IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

DAVID DAVIS,                          )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )      CIVIL ACTION NO. 3:06-cv-00544-~~VPM~~ W H A
                                      )
PHENIX CITY, ALABAMA, <u>et al</u>.  )
                                      )
                                      )
            Defendants.               )
_____ )


**DEPOSITIONS OF DEFENDANTS WALLACE HUNTER,
H.H. ROBERTS, AND JEFFREY HARDIN, AND
<u>DEPOSITIONS OF ROY WATERS AND BARBARA GOODWIN</u>**


Respectfully submitted,

Thomas A. Woodley
Molly A. Elkin
Bryan G. Polisuk
WOODLEY & McGILLIVARY
1125 15th Street, N.W.
Suite 400
Washington, D.C.  20005
Tel: (202) 833-8855
Fax:  (202) 452-109

J. Michael Cooper, Esq.
FITZPATRICK, COOPER & CLARK LLP
Farley Building, Suite 600
1929 Third Avenue North
Birmingham, Alabama 35203
Telephone (205) 320-2255
Fax:  (205) 320-7444

Counsel for Plaintiff

# EXHIBIT

# Deposition of Wallace Hunter

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

 COPY

DAVID DAVIS,

       Plaintiff,

vs.                CASE NO. 3:06-CV-0054-VPM

CITY of PHENIX CITY, ALABAMA,

et al.,

       Defendants.


\* \* \* \* \* \* \* \* \* \*


DEPOSITION OF WALLACE BURNS HUNTER, SR., taken pursuant to stipulation and agreement before Shannon M. Williams, Certified Court Reporter and Commissioner for the State of Alabama at Large, in the offices of City Hall, 601 12th Street, Phenix City, Alabama, on Wednesday, April 4, 2007, commencing at approximately 10:45 a.m. EST.


\* \* \* \* \* \* \* \* \* \*

2

```
 1                        APPEARANCES

 2    FOR THE PLAINTIFF:

 3    THOMAS A. WOODLEY
      Woodley & McGillivary
 4    1125 15th Street N.W.
      Suite 400
 5    Washington, D.C.  20005

 6    FOR THE DEFENDANTS:

 7    JAMES P. GRAHAM, JR.
      712 13th Street
 8    P.O. Box 3380
      Phenix City, Alabama  36868-3380

 9

10    ALSO PRESENT:

11    David Davis
      H.H. Roberts
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of WALLACE BURNS HUNTER, SR., is taken pursuant to the Federal Rules of Civil Procedure and that said deposition may be taken before Shannon M. Williams, Certified Court Reporter and Commissioner for the State of Alabama at Large, without the formality of a commission; that objections to questions other than objections as to the form of the questions need not be made at this time but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose as provided for by the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between counsel representing the parties in this case that said deposition may be introduced at the trial of this case or used in any manner by either party hereto provided for by the Federal Rules of Civil Procedure.

*  *  *  *  *  *  *  *

4

1              WALLACE BURNS HUNTER, SR.

2          The witness, having first been duly sworn

3      or affirmed to speak the truth, the whole truth and

4      nothing but the truth, testified as follows:

5          THE REPORTER:  Usual stipulations?

6          MR. GRAHAM:  We do want to read and sign.

7      He's our designated 30(b)(6).

8          MR. WOODLEY:  I'm going to go into that in

9      just a couple minutes for the Record.

10                 EXAMINATION

11     BY MR. WOODLEY:

12         Q.   Mr. Hunter, could you please state your

13     full name for the Record, please, sir?

14         A.   Wallace Burns Hunter, Sr..

15         Q.   You're currently the fire chief of Phenix

16     City Fire Department?

17         A.   Yes, sir.

18         Q.   Chief Hunter, my name is Tom Woodley, and

19     I'm one of the attorneys representing the plaintiff,

20     David Davis, in this pending federal court action.

21     And I assume that you're aware that you are named as

22     an individual defendant in your individual capacity

23     as well as your official capacity in this lawsuit;

24     is that correct?

25         A.   Yes, sir.

*Causey Peterson Reporting, Inc.*
*Post Office Box 81*
*Columbus, Georgia 31902*
*(706) 317-3111*

1      Q.  Are you at least in general familiar with

2  the allegations and the issues that have been raised

3  in this lawsuit?

4      A.  Yes, sir.

5      Q.  Have you had an opportunity to spend some

6  time with the city attorneys about the issues in the

7  lawsuit and the procedures that we'll be following

8  today in your deposition?

9      A.  Yes, sir.

10     Q.  Have you ever had your deposition taken

11 before in another case?

12     A.  Yes, sir.

13     Q.  Is that more than one other case?

14     A.  I guess it was basically -- yes, it was

15 one, I guess, or -- two cases were basically

16 combined, yes.

17     Q.  So in light of that experience and the

18 chance that you have had to spend with the city

19 attorneys, is it fair to say that you are familiar

20 with the procedures that we're going to be following

21 today in your deposition?

22     A.  Yes, sir.

23     Q.  Again, you sat in on the earlier deposition

24 of the mayor and so you saw how that went.  I'll be

25 asking questions.  We expect you to give full,

1    A.   No, sir.

2    Q.   And, of course, lastly, you're obviously

3  under oath and therefore sworn to tell the truth

4  under the potential penalty of perjury.  Do you

5  understand that, Chief Hunter?

6    A.   Yes, sir.

7    Q.   Okay.  Let's refer to the notice of

8  depositions because the city has designated you as

9  the Rule 30(b)(6) deponent.  And you can turn to the

10  binder of exhibits that we have in front of you,

11  which the first exhibit is Exhibit Number 1.  And on

12  page two of that Notice of the Deposition, it

13  indicates certain paragraphs that you have been once

14  again selected by the city and the other defendants

15  as the Rule 30(b)(6) representative to give

16  knowledgeable and authoritative testimony on the

17  issues that are involved in this case.

18    And I want to summarize those areas just so you

19  are again aware of the subjects that you have been

20  authorized to be the Rule  30(b)(6) witness.  And

21  that would be the employment of plaintiff David

22  Davis and the circumstances surrounding his

23  termination by the Phenix City Fire Department.  Do

24  you understand that, sir?

25    A.   Yes, sir.

8

1      Q.   And then in subparagraph (b) of the notice,

2   it also indicates that you're the representative

3   witness giving testimony on any communications that

4   Mr. Davis has had with the mayor, the city council,

5   persons in the city manager's office, persons in the

6   city's Human Resource Department and directors or

7   persons in the city Fire Department.  Do you

8   understand that as well?

9      A.   Yes, sir.

10     Q.   And the third area would be communications

11  that Mr. Davis has had regarding staffing in the

12  fire department, health and safety of fire and

13  rescue service personnel, the adequacy and

14  efficiency of fire department operations to protect

15  the citizens in this city, and response times and

16  other personnel and employee morale in the fire

17  department.  Do you understand that as well, Chief

18  Hunter?

19     A.   Yes.

20     Q.   The additional area that you have been

21  designated is communications about fire department

22  matters involving the employees and other issues.

23  You're aware of that as well?

24     A.   Yes, sir.

25     Q.   And then you've also been designated as the

1    witness concerning communications that relate in any

2    way to the phone conversation that Mr. Davis had

3    with one of the other defendants, Mayor Jeffrey

4    Hardin, on or about April 17, 2006, regarding the

5    proposed extension of the probationary period.  Do

6    you understand that as well, Chief Hunter?

7        A.    That's correct, yes, sir.

8        Q.    And then lastly would be the subject of the

9    facts and documents which relate in any way to the

10   chain of command within the fire department.  You're

11   aware of that as well, Chief Hunter?

12       A.    Yes, sir.

13       Q.    Let me invite your attention to another

14   exhibit within the binder in front of you.  And I

15   should say again for the Record that the city

16   attorney also has a full set of these exhibits for

17   his review during the deposition.

18       Exhibit 6, Chief Hunter, appears to be a job

19   description of the job title of fire chief that has

20   been furnished to me by the city in this case.  Are

21   you familiar with this job description?

22       A.    Yes, sir.

23       Q.    As far as you know, Chief Hunter, is this

24   an accurate job description of what you do as the

25   fire chief?

1      A.   Yes.

2           MR. GRAHAM:  Make sure you read it now.

3      Q.   Again, Chief Hunter, when I ask you about

4 these papers and exhibits, make sure that you have

5 an adequate time to review them before you respond

6 to my questions.

7      Chief Hunter, have you had an adequate time to

8 review your job description?

9      A.   Hold on one second.

10     Q.   Okay.  I'm sorry.

11     A.   Yes, sir.

12     Q.   Okay.  So the general question I have, is

13 this a fairly accurate and complete description of

14 your job as the fire chief?

15     A.   Somewhat.  It's always if the city manager

16 give you any other details to do, any extra, it may

17 not be written in here but you have --

18     Q.   And in line of authority, this job

19 description says you, as the fire chief, report to

20 the city manager; is that correct?

21     A.   That is correct.

22     Q.   And how long have you been the fire chief?

23     A.   Since -- officially, since May of 2005.

24     Q.   Okay.  Why don't you just go back and trace

25 for us your career in the city's fire department,

1  how you moved up to the top position?

2      A.   Okay.  I started here in June of 1986.  I

3  worked as a firefighter until April of -- I think it

4  was April of '89, I believe.  And I worked as a

5  driver/engineer from April of '89 until 1995, I

6  became a captain through promotions.  And I worked

7  as a captain until 1998.  I became an assistant

8  chief.  And then from '98 to 2001 -- in 2001, I

9  became interim fire chief, and for a brief time in

10  2001, I was the fire chief.

11      And I went from there, from being fire chief, I

12  stepped out of that position and I went to being a

13  deputy chief.  And I stayed at the deputy chief

14  until my current appointment as fire chief.

15      Q.   Okay.  And you may have said this, but I

16  may have missed it.  When were you first appointed

17  as the fire chief?

18      A.   This time?

19      Q.   Yes.

20      A.   In May of 2005.

21      Q.   Okay.  And within your duties and

22  responsibilities as a fire chief here in the city,

23  are you responsible for the recruitment, selection,

24  and hiring and promotion of personnel within the

25  fire department?

12

1      A.   That's correct.

2      Q.   Do you have the final decisionmaking

3   authority as to hiring in the fire department?

4      A.   That's correct.

5      Q.   Do you have the final decisionmaking

6   authority as to terminations of employees in the

7   fire department?

8      A.   As far as recommendations as far as

9   termination.

10      Q.   So you make a recommendation if an

11   individual should be terminated from the fire

12   department?

13      A.   Yes, sir.

14      Q.   And who do you make that recommendation to?

15      A.   I make that recommendation to the city

16   manager.

17      Q.   And is it your understanding that the city

18   manager has the final decisionmaking authority to

19   terminate an employee from the fire department?

20      A.   Basically the way I have done things since

21   I have been in as chief is make the recommendation

22   and always run things through the city attorney.

23      Q.   I'm sorry?

24      A.   We make a recommendation -- I make a

25   recommendation to the city manager, and we always

13

1    try to make sure we run things through the city

2    attorney.

3        Q.   Okay.  But in terms of the individual who

4    has the final decisionmaking authority within the

5    city's structure concerning a possible termination

6    of a City employee, is it your understanding that it

7    is the city manager who makes that final decision?

8        A.   Well, I just can't put that on the city

9    manager.  I make a recommendation.  It's my

10   department.  And when it's reached that point, if it

11   reach that point for terminate action, we go through

12   the city manager to make sure it's okay.

13       Q.   But who has the final sign off on somebody

14   being fired in the fire department?

15       A.   I guess it would be the city manager.

16       Q.   Okay.

17       A.   I guess.

18       Q.   Do you, as fire chief, have authority to

19   issue other forms of discipline without the input

20   and approval of the city manager such as suspensions

21   or written reprimands?

22       A.   Yes, sir.

23       Q.   And where does your authority stop?  Is it

24   at the level of someone being terminated where you

25   say the city manager has to make that choice?

1   A.  Well, that's a last resort that you want to

2   go to is termination.  So when you get to that

3   point, you must always make sure you go through the

4   city manager with that, let him know that.

5   Q.  But if you as fire chief wanted to suspend

6   someone, you don't have to go through the city

7   manager to suspend a firefighter, do you?

8   A.  No.  But I inform the city manager.

9   Q.  And as a long-time veteran employee of the

10  city's fire department, are you aware that the

11  plaintiff, David Davis, had worked for a number of

12  years for the city Fire Department?

13  A.  Yes, sir.

14  Q.  Do you know how many years he was employed

15  in the city Fire Department?

16  A.  I think it was about 8 years --

17  Q.  Okay.

18  A.  -- if I'm correct.

19  Q.  If I mention that Mr. Davis was hired in

20  the city Fire Department in April of 1998, would

21  that sound about right to you?

22  A.  Yes, sir, somewhere in there.

23  Q.  Are you aware that Mr. Davis was promoted

24  to the rank of sergeant in the city Fire Department?

25  A.  That's correct.

1     Q.   Did you have any input into that promotion

2     of Mr. Davis?

3     A.   That's correct.

4     Q.   Did you recommend that he be promoted to

5     sergeant?

6     A.   That's correct.

7     Q.   And why did you do that?

8     A.   Because he had met the requirements.

9     Q.   Did you think he was doing a good job and

10    deserved to be promoted to sergeant?

11    A.   That's correct.

12    Q.   Do you remember approximately when that

13    was, at least the year that he was promoted to

14    sergeant?

15    A.   I guess somewhere around -- if I'm correct,

16    2002 or 2003, somewhere in there.

17    Q.   Okay.  Let me invite your attention to

18    another exhibit, Chief Hunter, which would be

19    Exhibit 18, and this appears to be a memo from

20    Deputy Chief Roy Waters addressed to yourself as the

21    fire chief dated February 6, 2006.  And the re line

22    is, quote, letter to Mr. H.H. Roberts, end quote.

23    A.   Hold on.  Let me see.

24    Q.   Exhibit 18.

25    A.   Okay.  Yes.  I got it.

16

1    Q.   And it's addressed to you, so I assume you

2    received this on or about February 6, 2006; is that

3    correct?

4    A.   Yes.

5    Q.   Okay.  And you'll see at the very tail-end

6    at the bottom of this first page of this memo from

7    Deputy Chief Waters to yourself, he indicates,

8    quote, as I have communicated to you on several

9    occasions, David Davis is doing an outstanding job

10   for me and has a very positive and professional

11   attitude, end quote.  Do you see where it says that?

12   A.   Yes, sir.

13   Q.   As far as you know, was Deputy Chief Roy

14   Waters speaking honestly and truthfully when he made

15   that statement to you in the memo?

16   A.   I believe so.

17   Q.   Okay.  And did you, sir, agree with that

18   statement coming from your Deputy Chief, Mr. Waters,

19   about the job performance of Mr. Davis up to at

20   least February 6, 2006?

21   A.   I was happy about it.

22   Q.   You were happy about it?

23   A.   Yes, sir.

24   Q.   But did you agree with it as far as you

25   knew as the fire chief, that Mr. Davis was doing a

17

1   good job and had a very positive and professional

2   attitude?

3       A.   I took Chief Waters' word for that, yes.

4       Q.   Did you have any reason to disagree?

5       A.   No, sir.

6       Q.   Okay.  Does the city and its fire

7   department have a policy of giving annual

8   evaluations of the firefighters employed in the

9   department?

10      A.   That's correct.

11           MR. WOODLEY:  Okay.  Let's go off the

12      record for a second.

13   (Discussion held off the record.)

14           MR. WOODLEY:  We can go back on the record.

15      Q.   Chief Hunter, let me move to a different

16   subject matter.  At some point in time, were you

17   aware that the Phenix City Fire Department employees

18   formed a labor organization in which they became

19   members of the labor association?

20      A.   Yes, sir.  I was a part of it.

21      Q.   You were a part of it yourself?

22      A.   Yes, sir.

23      Q.   You were a member?

24      A.   Yes, sir.

25      Q.   Do you remember when you first became a

18

1    member of the firefighters' local union?

2        A.   It was back when they began it, when it

3    began.   I couldn't tell you the exact date.

4        Q.   Is this years ago or --

5        A.   Yes, sir.  Current -- current association

6    that's in place.

7        Q.   And would that be Local 3668 affiliated

8    with the International Association of Firefighters?

9        A.   That is correct.

10        Q.   Are you still a member of that union?

11        A.   I'm in International now.   International

12    Fire Chiefs Association.

13        Q.   Okay.   So at some point in time, you

14    dropped out of the local union that consisted of the

15    firefighters?

16        A.   Yes, sir.

17        Q.   Do you remember roughly when you left that

18    local firefighters' organization?

19        A.   When I became an officer.   It was somewhere

20    in -- I can't remember the exact date, but --

21        Q.   Okay.   Did it come to your attention at

22    some point in time that Mr. David Davis became a

23    vice-president of the firefighters' local labor

24    organization?

25        A.   Yes, sir.

19

1    Q.   Did it also come to your attention at some

2  point that Mr. Davis became the president of the

3  firefighters' local labor organization?

4    A.   Yes, sir.

5    Q.   And do you remember roughly when that was

6  that you were informed that he was the new president

7  of the local union?

8    A.   I can't tell you an exact date, but I

9  remember, you know, knowing about it, you know, not

10  too much.

11    Q.   Do you remember how it came to your

12  attention?  Did someone tell you he was the new

13  president of the local union?

14    A.   I believe so.  I probably overheard some

15  talk in the stations.

16    Q.   Does the city recognize the firefighters'

17  local union as a representative of the firefighters?

18    A.   No, sir.

19    Q.   And why not?

20    A.   Mr. Roberts explained that in the letter.

21    Q.   Have you ever had meetings or conversations

22  with David Davis, in his capacity as the president

23  of the local labor organization, about any issues or

24  concerns that the firefighters had?

25    A.   Have I had a meeting with him?

20

1      Q.   Yes.

2      A.   No, sir.

3      Q.   Have you had any conversations with

4  Mr. Davis in his role as the president of the local

5  union about issues that were of concern to the

6  members of the fire department?

7      A.   No, sir.  I never was given a chance to.

8      Q.   Okay.  Well, could you elaborate on that?

9      A.   Just -- I just never was given a chance.

10  If it was some concerns from that direction, I never

11  was given -- was asked to have a meeting.

12      Q.   Was what?

13      A.   No one ever asked to have a meeting with

14  me.

15      Q.   So Mr. Davis never asked to sit down with

16  you and talk about morale or staffing levels or any

17  issues like that?

18      A.   No, sir.

19      Q.   Have you ever had collective meetings with

20  the firefighters about issues of concern they might

21  have in the fire department?

22      A.   The way the chain of command work, mostly

23  any issues or concerns that firefighters have, they

24  are to give those to the captains and they'll pass

25  it on to the assistant chiefs, and the assistant

21

1    chiefs come directly to myself.  Or unless we was

2    having -- if they are having a shift meeting or

3    something that I would attend, I would attend and

4    hear people's views then.  I'm very open.

5         Q.   You have an open door policy?

6         A.   I'm open to people's views, yes, sir, if

7    I'm given a chance.

8         Q.   Did you ever invite Mr. Davis or any other

9    leaders of the local firefighters union to come in

10   and discuss issues with you?

11        A.   I had no reason to.  I wasn't -- like I

12   say, I wasn't given a chance of these concerns.

13        Q.   But there were, in fact, a lot of newspaper

14   articles, right, that firefighters were expressing

15   their concerns about employee morale and shift

16   schedules and staffing levels?  In fact, you were

17   interviewed for those articles.  Did that give you

18   occasion to bring in the firefighters or local union

19   leaders and sit down and just chat about those

20   issues?

21        A.   When that came about, sir, it just came out

22   of nowhere basically.  And the article was there

23   before I was ever given a chance to address

24   anything.

25        Q.   But you, in fact, had a chance, after the

22

1    newspaper articles came out, and you were aware of

2    these concerns --

3        A.   That's correct.

4        Q.   -- about a lot of firefighters?

5        A.   That's correct.  And we did have a

6    counseling session with some of the concerns that

7    was in the newspapers, and I opened the door at that

8    time to them.  If that's what they wanted to talk

9    about, they just use the chain and come up through

10   the assistant chiefs, and we could talk about those

11   issues.  Because you've got to understand, I've got

12   to address more than -- I got to address all

13   personnel.

14       Q.   Right.  Would you turn your attention to

15   Exhibit 11, which appears to be a memo from David

16   Davis in his position as vice-president of Local

17   3668, the Phenix City Firefighters' Association.

18   It's dated January 25, 2005, and it's addressed to

19   then Chief Jerry Prater.

20       A.   Yes, sir.

21       Q.   Have you ever seen this memo before today?

22       A.   Yes.  Chief Prater had this memo.

23       Q.   Did Chief Prater give you a copy of it?

24       A.   I've seen the one that he had.

25       Q.   And did you discuss it with Chief Prater at

23

1    that time?

2         A.   Yes, sir.

3         Q.   Okay.  And you'll see there that Mr. Davis,

4    on behalf of the firefighters' association, is

5    submitting a proposal which he describes is under

6    the Code of Alabama and asking for a meeting

7    concerning various safety issues, general employment

8    issues, discipline, communications, all of the items

9    that he lists on this document.  You see where it

10   says that?

11        A.   Yes, sir.

12        Q.   And when you say you saw the copy that

13   Chief Prater had, did you have a conversation with

14   Chief Prater about the issues addressed in this

15   memo?

16        A.   Yes, sir.  Chief Prater had a conversation

17   with Sergeant Davis about this.

18        Q.   Were you involved in that discussion?

19        A.   No, sir.

20        Q.   Did you have any communications with

21   Mr. Davis or the local union about these issues?

22        A.   No, sir.

23        Q.   So Chief Prater handled it as far as you're

24   concerned?

25        A.   Yes, sir.

24

1      Q.   Are you aware, sir -- I'm not asking you to

2   be a lawyer on this question.   But are you aware

3   that, at least in a general sense, that under the

4   state Code of Alabama that public employees, such as

5   firefighters in particular, have the right to form a

6   labor organization and be members of a labor

7   association?

8      A.   Yes, sir.   Everybody that's under my

9   direction, as far as firefighter, is two-fold.   They

10  have the right to be a part and they have the right

11  to not be a part, and I represent all.

12     Q.   Right.   And are you aware under that same

13  provision of the State of Alabama Code that the

14  firefighters not only have a right to be a part of a

15  labor association but also have the right to have a

16  representative to make proposals to a city or county

17  employer about issues of concern?   Are you aware of

18  that?

19     A.   Correct.

20     Q.   And have you been aware of that for a

21  number of years?

22     A.   Yes, sir, I have.

23     Q.   Let me invite your attention, Chief Hunter,

24  to Exhibit 14, which appears to be at least the

25  first newspaper article, an article from the

1    Columbus Ledger-Enquirer.  And although I don't see

2    a date on the top of this, my understanding -- and

3    we'll get to this in a few more questions, is that

4    it came out in September of 2005.  And you'll see

5    that you apparently were interviewed as the chief of

6    the Phenix City Fire Department for the purpose of

7    putting this newspaper article together.  Do you

8    remember that?

9         A.   Yes, sir.

10        Q.   You'll see in the second column of this

11   article from the newspaper that the reporter at

12   least indicates the department is in turmoil; and

13   then further down in that second column, there's a

14   quote from Mr. Davis, quote, morale is at the lowest

15   point since I have been here, end quote.  And it

16   indicates he's a seven-year veteran and president of

17   the Phenix City Firefighters' Association.  Do you

18   see where it says that?

19        A.   Correct.  Yes, sir.

20        Q.   When you were interviewed and then when you

21   read this newspaper article, did you agree or

22   disagree that morale in the fire department was low?

23        A.   For some, it might have been.  Not for all.

24        Q.   Do you know if a majority of the

25   firefighters in the city Fire Department are members

26

1    of the labor organization that they formed?

2        A.    I think, if I'm going back, the number

3    was -- that we got at the review board was -- at the

4    time was probably about one-third.

5        Q.    At the review board?  The Personnel Board

6    hearing for Mr. Davis?

7        A.    That's correct.

8        Q.    Do you know at some point in time that

9    there was a majority support among the firefighters

10   in the fire department as being members of the labor

11   organization?

12       A.    At one time, it might have been.

13       Q.    It indicates further in this article that

14   you, Chief Hunter, were the fourth chief in the last

15   seven years.  Is that accurate?

16       A.    Yes, sir.

17       Q.    Why such a high turnover?

18       A.    Basically, we've had some -- well, we had

19   some -- I guess some problems and misunderstandings,

20   and we had -- at this time, I hadn't been in the job

21   but three months.

22       Q.    As the fire chief?

23       A.    Yes, sir.

24       Q.    And you succeeded Prater?

25       A.    Yes, sir.

1    Q.   Do you know what the circumstances were of

2  why Mr. Prater was no longer the fire chief?

3    A.   He signed on for three years.  And after

4  his time was up, he decided to go.

5    Q.   What is Mr. Prater doing now?  Is he in the

6  fire department?

7    A.   He's retired.

8    Q.   He's retired?

9    A.   Yes, sir.

10   Q.   It indicates further in the article, quote,

11  over the last five years, 29 firefighters have left

12  for a variety of reasons, including retirement and

13  medical disability, end quote.  Is that roughly an

14  accurate statement?

15   A.   It might be.  It might be different people

16  for different reasons.  Retirement, terminations,

17  other -- better jobs.  You know, the figures they

18  put in there wasn't -- they can be distorted.

19   Q.   It also indicates in this article the city

20  has spots for 51 firefighters.  Is that accurate?

21   A.   At that time, it probably was.

22   Q.   Is it larger now?

23   A.   Yes, sir.

24   Q.   What's the number?

25   A.   Total, when we're at full capacity, it

1    would be 65.

2        Q.   And then going back to the rough date of

3    this article -- again, it's, I believe, September

4    2005 -- it indicates in the right-hand column of the

5    article that 44 are currently on the force.   In

6    other words, 44 actively employed fire personnel out

7    of 51 spots in the city Fire Department.   Was that

8    roughly correct?

9        A.   That's correct, but what it didn't tell

10   there was the hiring process was in place.   We was

11   having people hired, and it takes several months to

12   have them trained and bring them in.   So that number

13   wasn't put in there.

14       Q.   But at that point in time, there was seven

15   positions not filled within the fire department?

16       A.   Not necessarily not filled, but -- because

17   we had -- I believe we had three people in training,

18   if I'm correct, at that point.

19       Q.   But was the fire department understaffed at

20   that point?   There was not a full complement of

21   actively employed firefighters?

22       A.   It was just like most of the fire

23   departments that are around; the majority you check

24   will be understaffed because of the hiring process.

25       Q.   As a fire chief, do you always like to have

29

1    a full complement of fire personnel to do the job?

2        A.    It would be very nice, but it's not -- it's

3    been pretty tough throughout the country.

4        Q.    Right now, is there a full complement in

5    the department?

6        A.    No, sir.  We have people in training now.

7    I have -- we have people in training right now.

8        Q.    So right now, what is the number of

9    understaffed that are not full firefighters

10   training?

11       A.    Three.

12       Q.    Three.  Later on in the article on page

13   two, it indicates that, quote, Davis puts it this

14   way -- it's about two inches down that first column

15   --

16       A.    Okay, got it.

17       Q.    -- quote, we are reluctant to talk because

18   the significant fear of retaliation, being

19   disciplined or fired, end quote.  See where it says

20   that?

21       A.    Yes, sir.

22       Q.    Are you aware of any circumstances that

23   would have supported the statement of Mr. Davis and

24   some of these other firefighters that they were

25   fearful of retaliation or being disciplined or

1    fired?

2        A.   No, sir.  I don't see any reason for them

3    to be -- have that, because if anybody wanted to

4    talk, I was right over there in my office.  So if

5    they followed the chain of command and used the

6    assistant chiefs that was in line, I would talk to

7    anyone.

8        Q.   But are you telling me that the

9    firefighters like Sergeant Davis, they can't come

10    directly in to you, I guess, and go in your office

11    and say, Chief, we have an issue of concern about

12    public safety?

13        A.   All they had to do is use --

14        Q.   They've got to go through the chain of

15    command?

16        A.   That's all they've got to do.  It's

17    simple.  It's easy.

18        Q.   So you can't talk to a firefighter directly

19    because that would not be --

20        A.   It's easy --

21        Q.   -- through the chain of command?

22        A.   Sir, if someone had genuine concerns and

23    they channeled that up to the captain and assistant

24    chiefs, I'll get in my vehicle and go to the

25    stations and talk to them.

31

1    Q.   Okay.  On page two of this newspaper

2  article over in the right-hand column, it indicates

3  that since January 2000, 21 employees have

4  resigned.  Do you know if that's roughly an accurate

5  statement?

6    A.   Resigned?  I think that mainly should be --

7  that's incorrect.  That mainly should be referring

8  to that front page that would be -- part of that

9  would be people that's either terminated, people

10  that's gotten better jobs, people that's left for

11  medical reasons.  But as far as resigned, no.  It's

12  too good of a job.  You won't see that many people

13  resign from it.

14    Q.   Later on, it has a quote from a Sergeant

15  Ann Land, L-A-N-D.  Is she still employed in the

16  fire department?

17    A.   That's correct.

18    Q.   At the bottom of the second page, she's

19  quoted in this newspaper article as saying, quote,

20  basically, if you are not happy, you -- and it's cut

21  off, I think, unfortunately on this copy -- to

22  leave; that is what we have been, I think, told

23  several times, end quote.  See where it says that?

24    A.   Basically if you was unhappy, you could

25  leave, I guess, what has been told to them.  I

32

1    guess when -- currently, she's Firefighter of the

2    Year, so she made some adjustments as well as the

3    Department and --

4        Q.    But she was obviously interviewed for this

5    newspaper article, correct?

6        A.    That's correct.

7        Q.    And, apparently, she was of the view, at

8    least at that time --

9        A.    That's right.

10       Q.    -- that the view in the department was if

11   you don't like it, you can leave?

12       A.    It wasn't the view of the department.  I

13   guess that's the way --

14       Q.    But it was her view apparently?

15       A.    -- some people took it -- well, and --

16       Q.    Okay.  And then further on in this article,

17   it talks about the firefighters expressing concern

18   about the elimination of swap time.  You're familiar

19   with swap time, right?

20       A.    That's correct.

21       Q.    That's trading in time among firefighters?

22       A.    That's correct.

23       Q.    Was, in fact, the swap time privilege or

24   right eliminated by the department?

25       A.    At one time it was.

1    Q.   Is it in place now or is it still

2  eliminated?

3    A.   It's in place.  It's a better -- we have a

4  better setup for it this time.

5    Q.   What's the current setup for swap time?

6    A.   We have a set amount of hours that's set to

7  use.

8    Q.   What?

9    A.   We have a set amount of hours that you can

10  take.  It's also better set up in payroll to make

11  sure everything works out right, so --

12    Q.   But back in -- as of September of 2005 when

13  this newspaper article came out, swap time was

14  eliminated; is that accurate?

15    A.   For a while, yes.

16    Q.   Why was it eliminated, sir?

17    A.   Chief Prater felt like there were some

18  things going on the swap time, that it was time

19  to --

20    Q.   What were the things going on?

21    A.   -- to move it for a while.  Like if people

22  wasn't keeping, I guess, accurate paperwork.  It

23  wasn't -- training didn't have it -- it wasn't --

24  you have to have a certain amount of training per

25  month, okay.  It was -- they had to put a -- make

34

1    sure a cap was kept on top of it, which we always

2    tried to do.  So it was some things just went on

3    with it that he felt like needed to be taken away

4    for a while.

5        Q.  But in the newspaper article, it refers to

6    the fact that council member Ray Bush tried to

7    mediate the differences between the firefighters and

8    the city.  Are you aware that that occurred?

9        A.  I've heard that Ray Bush attended a

10   meeting, but as far as -- I never met with Ray Bush.

11       Q.  Okay.  But you heard information that

12   Council Member Bush attended a meeting with

13   firefighters to address the issues they were

14   raising?

15       A.  That's correct.

16       Q.  Do you know if anything came out of that

17   meeting that was useful or productive?

18       A.  Not that I know of.  I don't --

19       Q.  Okay.  Fair enough.  You'll see also in

20   Exhibit 14 that there's a collection of letters

21   submitted by various individuals to newspapers about

22   issues of concern within the Phenix City Fire

23   Department.  Were you generally aware of these

24   letters to the editor and did you have a chance at

25   the time to review those letters?

35

```
 1        A.   At times, I would look at some of them,
 2   yes, sir.  Read some of them because --
 3        Q.   Because of these newspaper articles that
 4   were occurring back in 2005, did you participate in
 5   any meetings with the fire chief at the time, or the
 6   city manager, in which these newspaper articles and
 7   media reports were addressed?
 8        A.   As far as these articles?
 9        Q.   Yes.
10        A.   As far as just -- I didn't have to have any
11   special meetings on it.  Just something mentioned
12   that things are in the paper.  That's about it.
13        Q.   Well, as a result of the article in
14   September 2005, Exhibit 14, which contains
15   quotations from David Davis and other firefighters,
16   were you asked to conduct any kind of an
17   investigation or review of these comments that the
18   firefighters made in the media reports?
19        A.   I wasn't asked.  I did one.
20        Q.   You did it on your own?
21        A.   Yes.  I basically needed to -- I'm the
22   department head.  I needed to ask why was this done
23   without me being given a chance first to meet with
24   someone over these issues.  That was a concern of
25   mines.  And then not only that, it was something I
```

36

1    needed to discuss with some of the people that was

2    in the paper.  You got your freedom of speech, but

3    at the same time, you gotta watch impeding the

4    harmony within this department and the city.  And it

5    was a concern.  And that's why I had the meetings

6    and counseling sessions.

7         Q.   Let me invite your attention to Exhibit 15,

8    which appears to be a memo from you as the fire

9    chief to -- it says member singular, but I believe

10   it was to members -- of the Phenix City Fire

11   Department; is that correct?  Is this a memo that

12   you distributed to the --

13        A.   That's correct.

14        Q.   -- members of the fire department?

15        A.   That's right.

16        Q.   You have to wait until I finish answering

17   my questions before you start your answer;

18   otherwise, we'll get in trouble with Madam

19   Reporter.

20        A.   Okay.

21        Q.   This memo, Exhibit 15, is dated

22   September 20, 2005.  Is this, in fact, a memo that

23   you drafted and distributed to the members of the

24   fire department?

25        A.   Yes, sir.

37

1      Q.   And it addresses the article that appeared

2   recently apparently in the Ledger-Enquirer newspaper

3   regarding the city's fire department.  Is that

4   accurate?

5      A.   That's correct.

6      Q.   Then it goes on to say, quote, several

7   firefighters made comments in the paper that were

8   likely to impair discipline and harmony in the

9   workplace, impede job performance, and jeopardize

10   loyalty in this department, end quote.  You see

11   where it says that?

12      A.   That's correct.

13      Q.   And, again, this would have been in

14   response to your review of this newspaper article

15   that we just covered in Exhibit 14 --

16      A.   That is correct.

17      Q.   -- is that accurate?

18      A.   That's correct.

19      Q.   What comments made by Mr. Davis and the

20   other firefighters that were quoted in this

21   newspaper article in your judgment impaired

22   discipline and harmony in the fire department?

23      A.   Basically the comments about people being

24   afraid to talk.  What was you afraid to talk when

25   you're not talking to anybody?  Why would you --

38

1    that's misleading people.  Why would you be afraid

2    to talk when you can use the chain of command and

3    come up and talk to me at any time, if you was

4    willing to give me a chance.

5        Q.   But my question really is focused on -- and

6    as you just indicated, a number of the firefighters,

7    including Mr. Davis, expressed fears about potential

8    retaliation and discipline.  So on that isolated

9    issue, how would that comment by Mr. Davis in the

10   newspaper article impair discipline and harmony in

11   the fire department?

12       A.   It was misleading statements.  Who had been

13   disciplined for anything during my tenure -- short

14   tenure so far?  That's misleading.

15       Q.   But he expressed fear about potential

16   discipline and, in fact, he was fired later on as we

17   know, but --

18       A.   Well, no.  That -- this right here was to

19   prevent anything.  This was to prevent us from even

20   being here today.

21       Q.   Okay.  Give me a specific example of how

22   those comments in the newspaper article of Mr. Davis

23   actually, in fact, disrupted discipline or harmony

24   in the workplace.  Give me a real concrete, specific

25   example of what you thought was an adverse

1   development from that newspaper article.

2      A.   Okay.  Let me go back to this article.

3   Now, what are you mainly talking about?

4      Q.   I want you to give me a concrete, specific

5   example that occurred after this newspaper article

6   and the comments of Mr. Davis and the other

7   firefighters that you believe actually disrupted or

8   impaired the operation of this fire department --

9      A.   They hadn't.

10      Q.   -- as a result of the article and the

11   comments in the paper?

12      A.   This is the perception of people that's

13   reading it.

14      Q.   I'm sorry?

15      A.   This is the perception of the readers.

16      Q.   So what are you referring to there?  A

17   three alarm turmoil?

18      A.   Basically.  And that the morale -- the

19   statements that are being made, what are you doing

20   as an employee of the city or the fire department to

21   help, you know, with that.  So when you look at

22   that, that's a disruption itself when you haven't

23   given the people that you're working for any type of

24   opportunity or chance to discuss these things.

25      Q.   Were there fires not put out, rescues not

40

1    conducted because of that newspaper article and the

2    quotations from Mr. Davis about employee morale and

3    staffing?

4        A.   No.  We answer the calls.

5        Q.   You answer the calls?

6        A.   Yes, sir.

7        Q.   Any other specific disruption that you can

8    point to that you were really troubled by as the

9    fire chief as a result of these newspaper articles

10   and comments made by Davis and other firefighters?

11       A.   As far as -- okay.  Directly by Mr. Davis

12   during the counseling session after this, I had a

13   firefighter, Brandon Wilkerson, that said that he

14   was being bullied by David Davis to make phone calls

15   and complain.  And I expressed this to David and we

16   talked to him about this --

17       Q.   Okay.

18       A.   -- when he came in and we did his

19   counseling session.  So it was some things from this

20   that came out of it.

21       Q.   Anything else?

22       A.   Mainly just as far as not wanting to

23   communicate, but all of these different things in

24   the paper here.  But as fire chief, I wasn't given a

25   chance to go over any of these issues or to talk

41

1　about them.

2　　Q.　Okay.　But, again, can you give me any

3　specific examples of disruption or impairment --

4　　A.　I just gave you --

5　　Q.　You have to let me finish my question,

6　please, Chief Hunter.

7　　A.　Sorry.

8　　Q.　Other than what you've just mentioned, can

9　you give me any other specific or concrete examples

10　of impairment of the fire department or disruption

11　of fire department operations that were resulting

12　from the comments of Mr. Davis and the other

13　firefighters in this newspaper article that came out

14　in September of 2005?

15　　A.　That's another one -- okay.　Another one in

16　here, I guess, would be Councilman Bush being in

17　here to mediate something.　He's mediating something

18　that I didn't know anything about.

19　　Q.　Did you speak to Council Member Bush

20　about --

21　　A.　No.

22　　Q.　-- his role as mediator?

23　　A.　No, sir.

24　　Q.　Were you upset about that?

25　　A.　Well, no, I wasn't upset about it.

42

1    Q.   Did you think his involvement was

2    disruptive to your authority as fire chief?

3    A.   Councilman Bush don't know the charter like

4    I do.

5    Q.   Did you speak to Council Member Bush

6    about --

7    A.   No, sir.

8    Q.   -- his role?

9    A.   It's not my authority.  It's not in my

10   realm of authority to speak to him about it.

11   Q.   But at the time that he was trying to

12   apparently be helpful as a mediator between the

13   firefighters and fire department, do you think he

14   was intruding upon the chain of command?

15   A.   I don't know if he was being -- to me, I

16   don't know if he was being helpful or harmful.

17   Q.   Do you have any view on that right now?

18   A.   No, sir.

19   Q.   Okay.  Did you consider at the time, back

20   in September 2005, that Mr. Davis's comments and

21   communications in that newspaper article were a

22   violation of the city's Merit System rules and

23   regulations?

24   A.   Yes, sir.

25   Q.   And why do you say yes?

1    A.  Because it was something that could have
2   been handled a different way.  And, basically, like
3   I say, they didn't give me a opportunity to come in
4   there.  And this right here is going to -- is going
5   to disrupt your normal operation.
6    Q.  So in other words, if I understand your
7   testimony --
8    A.  Because of other things that could have
9   been done to prevent this.
10   Q.  Okay.  So if I understand your testimony,
11  you think it's contrary to the city's Merit System
12  rules and regulations if a firefighter like
13  Mr. Davis would directly talk to the media about
14  issues of public concern, fire department safety,
15  health and welfare of the firefighters?  You think
16  that would be a violation of the Merit rules and
17  regulations; is that correct?
18   A.  If it's something that's going to impede or
19  harm the operation of the department, yes, sir.
20   Q.  Would it be a violation of the Merit System
21  rules and regulations by a firefighter if he or she
22  spoke directly to the media about inadequate
23  staffing in the fire department?
24   A.  Basically, that's something that they
25  could -- they have the opportunity to talk to me

1   about, or the assistant chiefs.

2        Q.   I understand your position, but you have to

3   listen to my question, if you would, Chief Hunter.

4   I want to know specifically your position and view

5   as to whether or not it would be a violation of the

6   city's Merit System rules and regulations if a

7   firefighter in your fire department spoke directly

8   to a media representative about the subject of

9   inadequate staffing in the city fire department.

10       A.   As far as our rules and regulations, we

11  have persons who can talk to the media about

12  staffing that handles that.

13       Q.   You have a public relations representative

14  in the fire department that can talk to the media?

15       A.   Yes, sir.

16       Q.   Let me try this one more time.  It's real

17  specific.  Would it be a violation of the city's

18  Merit System rules and regulations if a firefighter

19  spoke directly to the media --

20       A.   Yes.

21       Q.   -- about the subject of inadequate staffing

22  in the fire department?

23       A.   Yes, sir.

24       Q.   Would it be a violation of the city's Merit

25  System rules and regulations if a firefighter

45

1    employed by the city's fire department spoke

2    directly to a media representative about the health

3    and safety of firefighters on the job?

4         A.   Yes, sir.

5         Q.   Would it also be a violation of those rules

6    and regulations if a firefighter spoke directly to a

7    newspaper or media representative about inadequate

8    protective gear or inadequate fire department

9    equipment and vehicles in the city fire department?

10        A.   Yes, sir.

11        Q.   I'm sorry?

12        A.   Yes, sir.

13        Q.   Would it also be a violation of the Merit

14   System rules and regulations of the city if a

15   firefighter spoke directly to a media representative

16   about insufficient financial resources or inadequate

17   budget in the city's fire department?

18        A.   Yes, sir.

19        Q.   Would it also be a violation of the Merit

20   System rules and regulations of the city if a

21   firefighter spoke directly to a media representative

22   about poor response times or inadequate dispatching

23   procedures in the city's fire department?

24        A.   Yes, sir.

25        Q.   Would it be a violation in your view of the

46

1  Merit System rules and regulations of the city if a
2  firefighter spoke directly to a media representative
3  about poor employee morale among the fire personnel
4  in the fire department?
5      A.   Yes, sir.
6      Q.   Would it be a violation of the Merit System
7  rules and regulations of the city if a firefighter
8  spoke directly to a media representative about any
9  alleged corruption or misconduct by fire department
10 officers within the city fire department?
11     A.   Yes, sir.
12     Q.   And, finally, would it be a violation of
13 the city's Merit System rules and regulations if a
14 firefighter spoke directly to a media representative
15 about public safety in general within the city?
16     A.   Yes, sir.
17     Q.   Okay.  And I take it with regard to that
18 series of questions that I just asked you about the
19 rules and regulations, that your position and the
20 position of the city is that a firefighter must
21 route any of those expressions of concerns through
22 the chain of command within the city Fire Department
23 before they speak to a media representative; is that
24 correct?
25     A.   Yes, sir.  We should be given a chance.

*Causey Peterson Reporting, Inc.*
*Post Office Box 81*
*Columbus, Georgia 31902*
*(706) 317-3111*

47

1      Q.   Turn to Exhibit 16, Chief Hunter, if you

2 would, please.  This appears to be a counseling form

3 or reprimand addressed to David Davis dated

4 September 21, 2005.  Are you familiar with this

5 document?

6      A.   Yes, sir.

7      Q.   It says here -- you'll see at the beginning

8 here, it says Sergeant Davis was counseled by Chief

9 Hunter and Assistant Chief Johansen on the 20th of

10 September 2005 concerning him making or publishing

11 statements to the local media concerning fire

12 department issues.  And then it goes on further.

13 You see where it says that?

14      A.   Yes, sir.

15      Q.   Is this counseling form considered a

16 written reprimand that's placed in the personnel

17 file of Mr. Davis?

18      A.   It's not a written reprimand.  It's just a

19 counseling form to prevent anything from going any

20 further.  It's almost like a corrective thing if a

21 person -- basically gives them the chance, benefit

22 of the doubt that you didn't know.  And that's what

23 this is for.

24      Q.   Is there something else in the fire

25 department that is called a written reprimand?

48

```
 1        A.   Yes, sir.

 2        Q.   And have you issued those to firefighters?

 3        A.   Yes, sir.  I've had to before.

 4        Q.   Now, at the end of this memo, it says that

 5   this counseling form for Mr. Davis was placed in his

 6   personnel file.  You see where it says that?

 7        A.   Where you at?  16?

 8             MR. GRAHAM:  Right here.

 9        A.   Okay.

10        Q.   Yes, right at the bottom.

11             MR. GRAHAM:  Last sentence.

12        A.   Okay.  Yes.

13        Q.   So your answer is yes?

14        A.   Yes.

15        Q.   It appears to be signed by Assistant Chief

16   Kenneth Johansen; is that correct?

17        A.   That's correct.

18        Q.   Again, it sounds like you, as the chief of

19   the department, and Mr. Johansen actually discussed

20   this situation and counseled Mr. Davis about it; is

21   that accurate?

22        A.   That's correct.

23        Q.   And if I understand your testimony

24   earlier -- and you correct me if I'm wrong -- you,

25   on your own initiative solely, as the fire chief,
```

49

1    began this investigation and these counseling

2    sessions as a result of the newspaper article that

3    appeared in the newspaper in September 2005?

4        A.   That's correct.  I talked to the city

5    attorney about it.

6        Q.   Mr. Graham?

7        A.   That's correct.  Yes, sir.

8        Q.   So you cleared it through him to do this?

9        A.   Yes, sir.

10       Q.   Did you talk to the city manager,

11   Mr. Roberts, about investigating this matter?

12       A.   Well, that's correct.  He knew that I had

13   to see about it.

14       Q.   You had to get his okay to conduct the

15   investigation?

16       A.   Basically not -- not his okay but, you

17   know, you want the city manager's blessing to make

18   sure you don't do anything wrong.

19       Q.   And did you discuss this with City Manager

20   Roberts before you conducted the counseling sessions

21   of Mr. Davis and the other firefighters?

22       A.   That's correct.

23       Q.   Did he tell you not to do the investigation

24   and not to do the counseling as a result of the

25   newspaper article?

50

1     A.  No, sir.  Mr. Roberts pretty well let us

2  run our departments.

3     Q.  And did you interview or discuss this

4  newspaper article with other firefighters as well as

5  Mr. Davis?

6     A.  That's correct.

7     Q.  And would that have included William Miles,

8  Lance Wagner, Sergeant Ann Land, Robert Gaskin,

9  Sergeant Bowden, and James Wells as well?

10     A.  It was the entire department.  And, not

11  only that, it was the entire city.

12     Q.  Entire city?

13     A.  Yes, sir.  Make sure others in the city

14  didn't make this mistake.

15     Q.  Are you telling me that every city employee

16  was interviewed and counseled about this newspaper?

17     A.  Not by me, but they was made aware of this

18  situation.

19     Q.  Do you know if that was put out in some

20  kind of memorandum form by the city, distributed to

21  other city employees about communications with the

22  media?

23     A.  I know what was supposed to have been

24  done.  I know what I done in my department.

25         MR. WOODLEY:  Could we go off the record

51

1      for a second?

2      (Discussion held off the record.)

3          MR. WOODLEY:   Let's take five.

4      (Brief recess.)

5          MR. WOODLEY:   Okay.   We're back on the

6      record.

7      Q.   Okay, Chief Hunter.   We can go back on the

8   record after a brief break.   And we were talking

9   about the investigation or review that you and the

10  city conducted of the firefighters in response to

11  that newspaper article that came out in September

12  2005.   So that's the context in which we left.   Did

13  you sit in on these individual counseling or

14  interview sessions of the firefighters that I just

15  listed their names?

16     A.   That's correct.

17     Q.   And did the Assistant Chief Johansen sit in

18  on those interviews as well?

19     A.   On the people that was his personnel.   We

20  have three assistant chiefs at the time.

21     Q.   Okay.

22     A.   And they all have different groups of

23  firefighters.

24     Q.   Now, in Exhibit 16, which is in front of

25  you, the first two pages are the counseling forms;

1    one which involves Mr. Davis concerning his

2    statements to the local media, and the one right

3    after that involves Captain Robert Gaskin,

4    G-A-S-K-I-N, who received also a counseling form for

5    his statements to the local media.  You see where

6    both of those documents say that?

7        A.   That's correct.

8        Q.   And as I understand it -- you correct me if

9    I'm wrong -- those were the only two individual

10    firefighters who received these counseling forms as

11    a result of their comments to the newspaper; is that

12    correct?

13        A.   That's correct.

14        Q.   That is correct?

15        A.   In this particular, they got -- well,

16    counseling forms, yes, sir.

17        Q.   Did they get something else that you were

18    about to say?

19        A.   No, sir.  I said counseling forms, that's

20    correct.

21        Q.   But none of the other firefighters who were

22    interviewed received counseling forms or any form of

23    discipline as a result of their comments in the

24    newspaper; is that correct?

25        A.   All of them had to sign the forms, the

53

1   papers about the articles.  Let me read Gaskins and

2   check this out, make sure.

3        Q.   Sure.

4        A.   That's correct.

5        Q.   Okay.  Again, just so the testimony record

6   is clear, the only two individuals that received

7   these written counseling forms from the fire

8   department as a result of statements to the local

9   media were Mr. Davis and Mr. Gaskin; is that

10  correct?

11       A.   Yes.  Counseling form on here with

12  Mr. Davis was concerning also with the derogatory

13  statements he made toward Firefighter Brandon

14  Wilkerson, which Wilkerson took as intimidation, and

15  it was because of that.  And Gaskin being a captain

16  and a officer -- he was the only officer in there --

17  he made the comment that basically he would rather

18  be on the fire truck, I think, in Iraq.  And --

19       Q.   Okay.

20       A.   -- that was the reason.

21       Q.   Sergeant Ann Land did not receive a

22  counseling form as a result of her comments in the

23  newspaper article; is that correct?

24       A.   The only reason these two -- that's

25  correct.  And the only reason these two received it

1   is because, like I say, the harassment of Brandon

2   Wilkerson and with Gaskin being a officer.  Land --

3   let me -- let me see what she said.

4       Q.  She was the one that was quoted as

5   saying --

6           MR. GRAHAM:  His question is, she didn't

7       get a counseling form.

8       A.  Oh.  No, she didn't get one.

9           MR. GRAHAM:  Doesn't make any difference

10      what she was saying.

11      Q.  To follow up on that, though, she was

12  quoted in that newspaper article that we looked at,

13  which was Exhibit 14, as saying that if you're not

14  happy in your job in the fire department, you leave.

15      A.  Well, no.  I think if you get that correct

16  statement, she said someone told her that.

17      Q.  So you apparently felt like she didn't need

18  a counseling form as a result of --

19      A.  Someone who had said that to her.

20      Q.  Okay.  Was there any particular statement

21  that Mr. Davis made in that newspaper article that

22  troubled you so much that you wanted to issue this

23  counseling form to him?

24      A.  It was two-fold.

25      Q.  I'm just talking about in the newspaper

1    article.

2        A.   Newspaper article?   Basically --

3        Q.   Was his comment about employee morale being

4    poor, did that prompt you to give him the counseling

5    form?   Or it was some other comment that he might

6    have made in the newspaper article that caused you

7    to issue the counseling form?

8        A.   Not necessarily that, no.   It was mainly

9    his counseling form, like I say on here, was we

10   talked about the issues of publications in the paper

11   and then his harassment of Brandon Wilkerson.

12       Q.   And my question is just focusing on his

13   statements to the local media, just that part of the

14   equation.   Okay?   My question is, was there anything

15   in particular of his comments or quotes in the

16   newspaper article that caused you to be troubled and

17   to prompt the investigation and then ultimately

18   causing the counseling form to be issued to

19   Mr. Davis?

20       A.   The whole thing was troubling.

21       Q.   But you can't zero in on his comment about

22   employee morale or staffing concerns in the

23   department that caused you to do the investigation

24   and issue the counseling form to Mr. Davis?

25       A.   The main thing was not giving me the

56

1    opportunity to address it.

2        Q.   What is your position as the chief of the

3    fire department and the Rule 30(b)(6) witness in

4    this case on the following subject:  If a

5    firefighter has concerns about public safety or

6    operations in the fire department, or poor morale,

7    or understaffing, and they exhaust the chain of

8    command -- they route those concerns up to their

9    first officer and ultimately to you -- do they then,

10   after you consider that matter, do they then have

11   the right to go to the local media and issue and

12   state those same exact concerns?

13       A.   They still don't have the right.  But if

14   they bring them to me, I could guarantee anyone that

15   I would try to do my best to resolve them.

16       Q.   Okay.  But in the situation, so I

17   understand it, Chief Hunter, if a firefighter raises

18   those issues of safety, staffing, poor morale that

19   involve the fire department, and he or she routes

20   those up to you at the highest level in the fire

21   department, and that firefighter is not satisfied

22   with what you're doing on it and your response, is

23   it your position the firefighter at that point would

24   violate Merit System rules and regulations if he or

25   she went to the media to express those exact same

1    concerns?

2        A.    That's correct.

3        Q.    So there's really no circumstances, as far

4    as you and the city are concerned, in which a

5    firefighter can go to the media expressing concerns

6    about safety or response times or staffing or morale

7    in the fire department, right?

8        A.    I guess if it was all-out corruption.  But

9    according to the Merit System, you have to follow

10   it.  But I have never seen that type of conditions

11   here.

12       Q.    Okay.  But on the issues of staffing, fire

13   department equipment and protective gear and

14   response times, the firefighter at no time can go to

15   the media and address those issues; is that correct?

16       A.    They shouldn't.  They should come to the

17   fire chief.  They should have used the chain of

18   command.  You know, use that, and we would explain

19   to people that we're doing our best and show them --

20       Q.    I want to be clear on this.  Even after it

21   goes to you and they're not happy with your response

22   as the fire chief, do they then have the right, or

23   would they violate the rules and regulations of the

24   city, if they then went to the media and expressed

25   those same concerns?

58

1     A.   They would violate that, but we have never

2  had that -- I've never had the opportunity.

3     Q.   Fair enough.  Good enough.

4     Did there come a point in time where you and

5  the fire department wanted to propose extending the

6  probationary period for new hires into the fire

7  department from one year to 18 months?

8     A.   That's correct, for new hires.

9     Q.   For the new hires only?

10     A.   Yes, sir.

11     Q.   But that would not have applied and has not

12  applied to veteran firefighters already working in

13  the department, correct?

14     A.   Wouldn't have disturbed their careers at

15  all.

16     Q.   And so that would not have applied to

17  Mr. Davis, who had been an 8-year veteran of the

18  fire department, correct?

19     A.   None whatsoever.

20     Q.   What prompted that proposed extension of

21  the 18-month period in the fire department for

22  probation?

23     A.   Retentions and investment of firefighters.

24  We hire firefighters.  State law gives you one year

25  to train them.  We also require that they become