# EXHIBIT

# Deposition of H.H. Roberts

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT OF ALABAMA

 3                       EASTERN DIVISION

 4

 5    DAVID DAVIS,                         COPY

 6           Plaintiff,

 7    vs.                       CASE NO. 3:06-CV-0054-VPM

 8    CITY OF PHENIX CITY, ALABAMA,

 9    et al.,

10           Defendants.

11

12

13              * * * * * * * * * *

14

15       DEPOSITION OF H.H. ROBERTS, taken pursuant to

16    stipulation and agreement before Shannon M.

17    Williams, Certified Court Reporter and Commissioner

18    for the State of Alabama at Large, in the offices of

19    City Hall, 601 12th Street, Phenix City, Alabama, on

20    Wednesday, April 4, 2007, commencing at

21    approximately 12:37 p.m. EST.

22

23              * * * * * * * * * *

24

25
```

2

```
 1                        APPEARANCES

 2    FOR THE PLAINTIFF:

 3    THOMAS A. WOODLEY
      Woodley & McGillivary
 4    1125 15th Street N.W.
      Suite 400
 5    Washington, D.C.  20005

 6    FOR THE DEFENDANTS:

 7    JAMES P. GRAHAM, JR.
      712 13th Street
 8    P.O. Box 3380
      Phenix City, Alabama   36868-3380

 9

10    JAMES R. MCKOON, JR.
      McKoon & Thomas
11    925 Broad Street
      P.O. Box 3220
12    Phenix City, Alabama   36868-3220

13

14    ALSO PRESENT:

15    David Davis
      Wallace Hunter

16

17

18

19

20

21

22

23

24

25
```

3

## STIPULATIONS

1

2      It is hereby stipulated and agreed by and

3  between counsel representing the parties that the

4  deposition of H.H. ROBERTS is taken pursuant to the

5  Federal Rules of Civil Procedure and that said

6  deposition may be taken before Shannon M. Williams,

7  Certified Court Reporter and Commissioner for the

8  State of Alabama at Large, without the formality of

9  a commission; that objections to questions other

10  than objections as to the form of the questions need

11  not be made at this time but may be reserved for a

12  ruling at such time as the deposition may be offered

13  in evidence or used for any other purpose as

14  provided for by the Federal Rules of Civil

15  Procedure.

16      It is further stipulated and agreed by and

17  between counsel representing the parties in this

18  case that said deposition may be introduced at the

19  trial of this case or used in any manner by either

20  party hereto provided for by the Federal Rules of

21  Civil Procedure.

22          * * * * * * * * * *

23

24

25

4

H.H. ROBERTS

1
2          The witness, having first been duly sworn
3     or affirmed to speak the truth, the whole truth and
4     nothing but the truth, testified as follows:
5               THE REPORTER:  Usual stipulations?
6               MR. GRAHAM:  We do want to read and sign.
7                        EXAMINATION
8     BY MR. WOODLEY:
9          Q.   Could you state your full name for the
10    record, please?
11         A.   Herbert Hayes Roberts.
12         Q.   Mr. Roberts, I know you've been sitting in
13    on the two depositions that we had earlier this
14    morning, correct?
15         A.   That's correct.
16         Q.   But for the record of your deposition, I
17    want a couple things to be clear.  First of all, my
18    name is Tom Woodley, and I'm one of the plaintiff's
19    attorneys representing David Davis in this lawsuit.
20    You understand that?
21         A.   I do.
22         Q.   Okay.  Have you ever had your deposition
23    taken before in a previous case?
24         A.   I have.
25         Q.   Is that more than one previous case?

5

1    A.   Yes, sir.

2    Q.   How many?  Ten?

3    A.   I have been with the city 34 years.  I'm ex

4 law enforcement and I've had several depositions.

5    Q.   In light of that experience, I take it

6 you're familiar with the procedures we'll be

7 following in this deposition?

8    A.   Yes, sir.

9    Q.   And have you had an opportunity before

10 today to discuss with the city attorneys the nature

11 of this lawsuit and the issues that are involved?

12    A.   I have.

13    Q.   Well, again, I'll be asking you a number of

14 questions, and we expect you to give the best

15 answers that you're able to give.  You understand

16 that?

17    A.   Yes, sir.

18    Q.   And everything that you and I say will be

19 taken down by this court reporter.

20    A.   Yes, sir.

21    Q.   And she will put it in a transcript form,

22 and we should have that available perhaps as early

23 as next week.  Do you understand that?

24    A.   I understand that.

25    Q.   If at any time you don't hear or understand

6

1   one of my questions, stop me right away and I'll be

2   glad to repeat or rephrase that question.  Do you

3   understand that?

4        A.   Yes, sir.

5        Q.   And, of course, most importantly, you are

6   under oath, sworn to tell the truth under the

7   penalty of perjury.  Do you understand that,

8   Mr. Roberts?

9        A.   I understand that fully, sir.

10       Q.   All right.  Let's get into it.  What is

11  your current position that you hold with the city?

12       A.   City manager.

13       Q.   And how long have you held the position of

14  city manager?

15       A.   I was first appointed in 2002.  Latter part

16  of 2001, excuse me -- 2002 -- five years.

17       Q.   Were you appointed by the city council?

18       A.   Yes, sir, I was.

19       Q.   Okay.  And did you work for the city in

20  another capacity before that?

21       A.   I did.

22       Q.   What was that?

23       A.   I was assistant city manager as well as

24  director of code enforcement.

25       Q.   How long did you hold that job?

7

1      A.   Since 1973 as an enforcement guy, and as

2  assistant city manager since 1998 -- or '96, excuse

3  me.

4      Q.   In your job as a city manager, what are

5  your basic duties and responsibilities?

6      A.   The basic day-to-day operations of the

7  city.

8      Q.   Okay.  Let me invite your attention to a

9  binder of exhibits which you have in front of you,

10  Mr. Roberts, and Mr. Graham also has a full set of

11  these exhibits available to him.  And Exhibit

12  Number 8 is the charter of the City of Phenix City;

13  is that right?

14      A.   That's correct.

15      Q.   Okay.  I take it you're pretty familiar

16  with the provisions of this city charter?

17      A.   Fairly familiar, yes, sir.

18      Q.   And, as I understand it, the city council

19  consists of five members; is that true?

20      A.   That's correct.

21      Q.   And one of those members is the mayor of

22  the city?

23      A.   That's correct.

24      Q.   And those are elected positions?

25      A.   Yes, sir.

8

1      Q.   Okay.   If you could turn to Section 4 of

2 the city code which deals with the powers and duties

3 of the city manager. And I take it it's true that

4 you're familiar with those provisions of the charter

5 as well?

6      A.   I am, sir.

7      Q.   And is it accurate to say that you, as the

8 city manager, are the head of the administrative

9 branch of the city government?

10      A.   Yes, sir.

11      Q.   And you're accountable and responsible to

12 the city council?

13      A.   Yes, sir.

14      Q.   Are you accountable or responsible in any

15 way to the city's mayor?

16      A.   Not as a whole, no, sir.

17      Q.   And when you say not as a whole, what do

18 you mean by that?

19      A.   I work for the entire city council. I

20 answer to all of them equally.

21      Q.   And under the city code, particularly

22 Section 4, you are responsible as the city manager

23 to enforce the laws and ordinances?

24      A.   I am.

25      Q.   And do you have the authority to appoint

9

1    officers and employees of the city?

2        A.   I do.

3        Q.   And when it says appoint, does that mean

4    hire?

5        A.   The appointed -- you appoint your division

6    heads and, of course, your department heads, which

7    is different from your Merit System employees.  I

8    appoint those.

9        Q.   What about a person that wants to be hired

10   in the city fire department?  Who has that hiring

11   authority?

12       A.   I would ultimately okay it.  That's given

13   down to each of the chiefs or department heads.

14       Q.   Okay.  So if Fire Chief Hunter wants to

15   hire a person in the fire department, he sends that

16   up to you, you approve it, and then he's authorized

17   to hire?

18       A.   Let me explain that to a great degree.

19       Q.   Sure.

20       A.   Once they have went through that process of

21   testing, the chief or any department head will hire

22   their own employee.  I try not to get involved in

23   the hiring of the day-to-day everyday employees.

24   That's between the personnel director, the personnel

25   department, and the various departments.  I do

10

1    approve or hire all department heads or appointed

2    division chiefs.

3        Q.    All right.  What about with regard to a

4    possible termination or discharge of an employee in

5    the fire department?  What's your role in that?

6        A.    The Merit -- the charter, of course, says

7    that I'm responsible for all hires and terminations,

8    as you are well aware.  However, there is a section

9    where I can delegate that hiring and terminations to

10   the department heads, of which I have done.  I let

11   the department heads manage their own affairs within

12   the department.

13       The reasons for that is probably two-fold.

14   Number one, if there's an appeal process that's

15   going to take place, the ultimate decision is going

16   to come back to me, and then that's when I really

17   try to get more involved during the normal course of

18   any termination or any disciplinary action.

19       Q.    And specifically with regard to the

20   plaintiff, David Davis, in this case, were you the

21   ultimate decision maker on his termination of

22   employment?

23       A.    I was the ultimate decision maker.

24       Q.    Okay.  You want to add something?

25       A.    No, that's good.

1    Q.   I'm sure we'll cover that again, so if you

2  have another thought, you'll have a chance to

3  express it.

4    Then going on to Section 9 of the city charter

5  which, in part, addresses the removal of officers

6  and employees.  Does that Section 9.01 also give you

7  the authority, as the city manager, to remove

8  employees of the city?

9    A.   Yes, sir, it does.

10   Q.   Okay.

11   A.   It will also say subject to the approval of

12  such -- if you have a Civil Service board, which we

13  do not.  We have a Merit System.  We have a

14  Personnel Review Board that would review any of the

15  classified workers, which is anything other than the

16  department heads or the division chiefs.

17   Q.   What's your understanding as the difference

18  between a Civil Service commission or board and a

19  Personnel Board that sits here?

20   A.   Usually a Civil Service board is what we

21  had when we was under the old commission form of

22  government, three-man, and usually it dealt

23  specifically with usually police and fire in our

24  instances as a three-man commission form of

25  government.

12

1    When we changed forms of government and became

2    under a council/manager form of government, we had

3    no protection or anything as far as our other

4    employees were concerned, and we chose to go -- or

5    the council at the time chose to go to a Merit

6    System which covered everyone and we did away with

7    the Civil Service board.

8    Q.    Okay.    Under the current system and the

9    system that applied to Mr. Davis's termination, it

10   was a Personnel Board procedure; is that correct?

11   A.    It was an appeal to the Personnel Review

12   Board, and they made the decision, and I upheld the

13   decision.

14   Q.    Just so I understand the process,

15   Mr. Davis, for example, a firefighter employed in

16   the city's fire department, was terminated.    Then he

17   had the right to appeal that decision to the

18   Personnel Board, correct?

19   A.    That's correct.

20   Q.    And he, in fact, did that --

21   A.    He did.

22   Q.    -- correct?    And then after that decision

23   of the Personnel Board, it goes to your desk as a

24   city manager to make the final decision on the

25   termination such as in the case of Mr. Davis?

13

1       A.   That's correct.

2       Q.   And when that decision involving Mr. Davis

3  came from the Personnel Board to you, did you have

4  the authority to approve the decision of the board

5  or disapprove as well?

6       A.   I could have overruled the board or I could

7  have approved the board.  In this case, I listened

8  to the case.  I went along with the board's reading

9  and followed their advice.

10      Q.   The board's decision, does that come as a

11 recommendation to you?

12      A.   Yes, sir, it does.

13      Q.   So it's not a decision as such; it's a

14 recommendation to the city manager?

15      A.   It's a recommendation to me that I can

16 either accept or deny.  If I deny, then, of course,

17 it would go before the full council for a hearing.

18      Q.   But if you approve the Personnel Board's

19 recommendation as you did in the Davis case, that's

20 the end of the matter?

21      A.   Yes, sir, it is.

22      Q.   So Mr. Davis did not have the opportunity

23 or the right to go to the city council to appeal his

24 termination?

25      A.   That's correct, sir.  When I say that's the

1  end of it, of course, you know, the civil process.

2      Q.   What do you mean civil process?

3      A.   Court procedures.

4      Q.   Which is where we find ourselves.

5      A.   Unfortunately.

6      Q.   Does the mayor play any role in the

7  termination of city employees?

8      A.   No, sir, he does not, unless it's a city

9  manager.   I know of no one since '77 since we've

10  been under this form which has not followed a

11  recommendation of the Personnel Review Board.   That

12  would be the only way -- and I'm not going to say

13  mayor, but that would be the only way a council

14  would be involved in a termination --

15      Q.   Okay.

16      A.   -- or suspension.   It could be either/or.

17          MR. GRAHAM:   Let's go off the record a

18      minute.

19          MR. WOODLEY:   Sure.

20      (Discussion held off the record.)

21          MR. WOODLEY:   Back on the record.

22      Q.   In the particular case of Mr. Davis and his

23  termination -- and we've already covered the ground

24  of what the Personnel Board did, and you upheld that

25  recommendation -- what would have happened, if

1  anything, if a couple of the city council members

2  wanted to take up the termination of Mr. Davis?

3  Would they have the authority under the city charter

4  or any other law to take up that matter?

5       A.  My understanding is that they do not.

6       Q.  Okay.  And the mayor himself, as mayor,

7  doesn't have the authority to overrule your decision

8  upholding the termination of Mr. Davis, does he?

9       A.  No, sir, he does not.

10      Q.  Okay.  Now, let me ask you -- we have an

11 exhibit if you want to refer to it; it happens to be

12 Exhibit 4 -- there is an Alabama State Code

13 provision that gives firefighters in the State of

14 Alabama the right to belong to a labor organization

15 or to choose not to belong to a labor organization.

16 Are you aware of that?

17      A.  I am aware of that.

18      Q.  Are you aware that that same Alabama State

19 Code provision gives firefighters the right, through

20 their representatives such as a labor organization,

21 to make proposals to their employers concerning

22 salaries and other conditions of employment?

23      A.  I'm very much aware of that.

24      Q.  Okay.  And are you aware that that same

25 Alabama State Code provision prohibits a person from

16

1    discharging or discriminating against any

2    firefighter when he or she may exercise the rights

3    to belong to or lead a local labor association or to

4    make proposals?

5        A.   Yes, sir.  I understand that.

6        Q.   And how long have you understood that

7    roughly?

8        A.   I have been a IBEW member since I was 19

9    years old.

10       Q.   Are you still an IBEW member?

11       A.   No, sir.  I've had my 30 years.

12       Q.   Thirty years?  Did you work as an

13   electrician?

14       A.   Yes, sir.  I'm a master electrician.

15       Q.   Are you still working as an electrician?

16       A.   I have my state license, yes, sir, but I'm

17   not allowed to do any side work.

18       Q.   Have you ever been a member of another

19   union before?

20       A.   No, sir.

21       Q.   Are you aware that the firefighters here

22   employed by the City of Phenix City have their own

23   labor organization?

24       A.   I am.

25       Q.   Do you know how long that has existed?

17

1     A.   They have had a local here for quite
2  awhile.  I don't know the exact number of years, but
3  they've had a local for quite awhile.
4     Q.   Are you aware that the police employed by
5  the City of Phenix City also have an association?
6     A.   I've been a member of the FOP, sir.
7     Q.   You've been a member of the FOP?
8     A.   Yes, sir.
9     Q.   Because you worked in the police
10  department?
11     A.   Yes, sir.
12     Q.   Are you still a member of the FOP?
13     A.   No, sir, not since I moved up here.  I
14  still hold my law enforcement certification due to
15  retirement purposes with the state, but I -- in a
16  management level, I felt that would be
17  inappropriate.
18     Q.   In your last three years, I think it was,
19  as city manager here in the city, have you had
20  occasions to meet with leaders or members of the
21  FOP --
22     A.   I have -- go ahead.  Excuse me.  I'm
23  sorry.
24     Q.   -- meet with leaders or members of the
25  FOP?

1    A.   I have daily contact with some of the FOP

2    members.  I have not met with them.  I have, since I

3    have been back, met with some of the International

4    Association of Firefighters.

5    Q.   Okay.  Has the FOP ever made any proposals

6    to you, as the city manager, concerning the salaries

7    or working conditions of police officers?

8    A.   No, sir.

9    Q.   Has the International Association of

10   Firefighters or the local affiliate here in Phenix

11   City ever made any proposals to you concerning

12   firefighter salaries or employment conditions?

13   A.   Yes, sir.

14   Q.   As I understand it, Mr. Roberts, the fire

15   chief here in the city reports and is accountable to

16   you as the city manager; is that correct?

17   A.   Yes, sir.

18   Q.   Does the fire chief have the right, if he

19   wanted to, to bypass you as the city manager and

20   address the city council on issues that he may

21   consider important in the fire department?

22   A.   I'm going to answer this in this way.  I

23   would hope that he wouldn't bypass me.  In a

24   paramilitary organization, you certainly don't want

25   someone subordinate going around you.  I have never

1   had that to happen under our tenure.  They're given
2   a chance -- the department heads are given a chance
3   to express their budget shortfalls -- or any
4   department head, not just the fire department -- at
5   proper times.
6        I would also like to add that if there's any
7   problem within any of the departments, I would hope
8   that I would go or either follow the proper
9   procedure to look into what their complaint is or
10  their shortcomings may be.
11       Q.  What would happen if Fire Chief Hunter next
12  month did not discuss an issue with you first but
13  went directly to a city council meeting about a fire
14  department operations issue and spoke to the city
15  council?  Would he be subject to discipline or
16  charged with violating the charter of the city or
17  the Merit System --
18       A.  Well --
19       Q.  -- let me finish -- or the Merit System
20  regulations?
21       A.  Number one, the fire chief and division
22  chiefs are not covered under the Merit System, by
23  Attorney General opinion and, also, you know,
24  they're an at will employee.  They work strictly for
25  me.

1      I would hope that I would not have a department

2   head to do that.  If he did, then I would probably

3   take the appropriate actions probably according to

4   what he discussed with them or something of that

5   magnitude.

6      Q.   When you say appropriate action, what would

7   be the range of actions that you could take?

8      A.   You know, it could come down to a

9   counseling or maybe a termination.  It's -- you

10  know, that's hypothetical.

11     Q.   And what is it that might be violated if

12  the chief went directly to the council on an issue

13  affecting the fire department?  Is it a charter code

14  provision or is there something else in writing?

15     A.   No, sir, it's not.  No, it's not.

16     Q.   Under the Merit System rules and

17  regulations, are disciplinary actions such as

18  dismissals from employment subject to review as

19  grievances?

20     A.   I would have to look at -- there are

21  certain ways that we have to do a grievance.  I

22  really need to read the exact procedures that goes

23  in.  Some may be a grievance that's going on within

24  the city that I would act on myself rather than a

25  Personnel Review Board hearing.  Usually anything

1    that does a disciplinary action should go before the

2    Personnel Review Board unless it's -- maybe they've

3    got a grievance that they had a oral reprimand or

4    something of that nature, then I might get a

5    grievance like that.

6        Q.   Let me invite your attention to Exhibit 3,

7    which appears to be excerpts from the city's Merit

8    System's rules and regulations.  Section 15.02 says

9    as follows:  Quote, disciplinary actions,

10   dismissals, demotions, suspensions, fines,

11   reductions in pay, position classifications, and

12   allocations shall not be subject to review as

13   grievances, end quote.  Do you see where it says

14   that?

15       A.   I do.

16       Q.   Is that an accurate statement?

17       A.   It is.  It is.

18       Q.   So in the case of Mr. Davis and his

19   dismissal, he would not have been able to file any

20   kind of a grievance seeking review, would he?

21       A.   To me, no.

22       Q.   But to the Personnel Board yes?

23       A.   That's correct.

24       Q.   Is that considered a grievance or an

25   appeal?  Maybe I'm being too technical.

22

1      A.   I would think it would be an appeal rather

2   than a grievance.  An appeal of decision of the

3   department head.

4      Q.   Okay.  All right.  Mr. Roberts, with regard

5   to David Davis, are you aware that he worked for

6   about eight years in the Phenix City Fire

7   Department?

8      A.   I am.

9      Q.   And are you aware that he was first

10   employed in April of 1998 in the city fire

11   department?

12      A.   I know the approximate hire date.

13      Q.   And are you aware that Mr. Davis was

14   eventually promoted to the rank of sergeant in the

15   city fire department?

16      A.   I am.

17      Q.   As city manager, do you have the authority

18   or responsibility to review proposed promotions like

19   in the fire department?

20      A.   I do.  But as I stated earlier, that's

21   pretty much left up to the department heads or

22   chiefs.  I don't get into the business of promotions

23   or anything like that within their areas of

24   responsibility.

25      Q.   Do you get into employment evaluations of

1    their job performance like a firefighter in the city

2    fire department?

3        A.   I will sign the total evaluation, the

4    yearly evaluations.  But if you're asking me do I

5    read each and every one of them, no, sir, I do not.

6    I think that again is, of course, the first line

7    supervisor, the district chief -- or, in this case,

8    the chief.  It's according to how they've got it set

9    up on who evaluates who and what -- in the rank

10   structure.

11       Q.   I'm sorry.  Did you say you would sign the

12   evaluations?

13       A.   I think at the bottom of the evaluation

14   form, there's a signature block that I sign and I

15   think that's primarily for pay purposes anyway.  But

16   I sign a lot of them every year, it appears.

17       Q.   Let me show you -- I guess we can identify

18   this as Exhibit 34.  And I don't have it in the

19   binder, sir, because I just got it this morning, at

20   least an additional copy.  And this appears to be a

21   Performance Appraisal by the city fire department of

22   David Davis for the evaluation year 2003 to 2004.

23   And it does look like you have -- well, no, I don't

24   think you have.  You weren't city manager then, were

25   you?

24

1      A.   No, sir.   I was -- unfortunately, I was

2   away.

3      Q.   Well, there's -- somebody signed it there

4   as city manager.   Can you make out the name or the

5   signature on that?

6      A.   Max Wilkes.

7      Q.   Was he the previous city manager?

8      A.   He was my interim city manager.   I

9   appointed him as an interim when I was gone half a

10  year.

11     Q.   Let me invite your attention to

12  Exhibit 18.   And as you're looking at that, I want

13  you to take as much time as you need, Mr. Roberts,

14  to review these documents before you feel

15  comfortable in answering my questions.

16     This is a memo from Roy Waters, Deputy Chief in

17  the city's fire department, to Wallace Hunter, the

18  fire chief, dated February 6, 2006, concerning the

19  subject of, quote, letter to Mr. H.H. Roberts, end

20  quote.   You see where it says that?

21     A.   I do, yes, sir.

22     Q.   Have you seen this document before today?

23     A.   Yes, sir.   I read this memo.

24     Q.   You do what?

25     A.   I've read the memo.

25

1    Q.   Okay.  I want to invite your attention to

2    the last sentence at the bottom of the memo where it

3    says, quote -- and this is Deputy Chief Waters

4    addressing Mr. Hunter -- quote, as I have

5    communicated to you on several occasions, David

6    Davis is doing an outstanding job for me and has a

7    very positive and professional attitude, end quote.

8    Do you see where it says that?

9        A.   I do.

10       Q.   As far as you know, sir, as the city

11   manager, is that a fair and accurate statement

12   concerning Mr. Davis and his job performance as a

13   sergeant?

14       A.   As not being a first line supervisor

15   knowing his day-to-day activities, I would accept

16   the fact that the chief made an evaluation of him

17   and I would not disagree with it.

18       Q.   So you don't have any information or facts

19   as the city manager to disagree with that statement

20   within the fire department that Davis is doing an

21   outstanding job and has a very positive and

22   professional attitude?

23       A.   I wouldn't have any day-to-day knowledge of

24   that, no.

25       Q.   When you were coming up for consideration

1   to be appointed as city manager, do you know if the

2   firefighters' local labor organization took a

3   position that you should be city manager or took a

4   position that you should not be city manager?

5        A.   Sir, when I was appointed city manager in

6   2002, it was on a interim basis for 2001 by a prior

7   administration.  And I was not here when the

8   appointments were made at this time.  I already held

9   the position.  And I assumed that by federal laws I

10  would have had my job back anyway when I returned.

11  So I do not know anything about any of that.

12       Q.   Okay.  So you don't know whether or not the

13  firefighters' labor association --

14       A.   No, sir, I do not.

15       Q.   -- supported your appointment as city

16  manager?

17       A.   I do not.  And when I say that, I don't

18  know whether they did or whether they didn't.

19       Q.   Right.  Now, I think you started to

20  indicate earlier that there was at least one

21  occasion, perhaps more, where you met with the

22  firefighters' local union and perhaps a

23  representative of the International Association of

24  Firefighters?

25       A.   We met in this office here.  I never went

1    to a local meeting.  And I -- I think his name is

2    Malone was the first gentleman that came down here.

3    Basically, he talked with me and Mr. Davis about

4    some complaints that Mr. Davis -- or let me not say

5    Mr. Davis per se -- let me say the local union had

6    concerning staffing, morale, equipment, and things

7    of that nature.

8        At that time, I pretty much was emphatic that

9    Sergeant Davis should go to his fire chief and

10   discuss those issues with him, which was at that

11   time Chief Prater.  They had that meeting.

12   Basically, I don't think it was a good outcome.

13       Q.  Okay.  Before we get to the follow-up

14   meeting, let's go back to the earlier meeting that

15   you say you had in this building with Mr. Davis and

16   Mr. Malone from the IAFF.

17       A.  And I may add, I believe Mr. Dennis Duty

18   was still the president of the local at that time

19   and was in attendance as well.  And my memory may

20   not be that well, you know, but I do think there was

21   more than just Sergeant Davis, myself, and Malone.

22       Q.  Do you know at that time if Mr. Davis was a

23   vice-president of the local firefighters' union?

24       A.  I would have to say I did.  I mean, that

25   would make sense.

28

1    Q.   And, I guess, did they call you up ahead of

2    time and say, Mr. Roberts --

3    A.   Yes, sir, they did.

4    Q.   -- we would like to come over, have a

5    meeting?

6    A.   Yes, sir.

7    Q.   You agreed and scheduled the meeting, then

8    came and you sat here; is that correct?

9    A.   That's right.

10   Q.   Did they give you any documents at that

11   time, any proposals?  Or was it just --

12   A.   Yes, sir.  I'm going to use the word

13   laundry list, because that's basically what it was,

14   some things that they felt needed to be addressed

15   within the fire department.

16   Q.   And roughly how long was the meeting?

17   A.   Probably less than an hour.  Right around

18   an hour.

19   Q.   Okay.  And how did the meeting end up as

20   you recall?

21   A.   I thought it was on a pretty positive note.

22   Q.   Did they raise some issues that you thought

23   should be addressed and resolved?

24   A.   And I believe that the issues they brought

25   up have been addressed and some are still pending.

1    Q.  Can you remember, as an example, some of

2  the issues that they raised in this meeting that you

3  felt were legitimate and should be looked into and

4  addressed?

5    A.  Well, there's been a couple of things

6  that's been brought up.  The 8-hour shifts for one.

7  I have personally felt that a 8-hour shift or a

8  12-hour shift or Panama shift may have worked better

9  than a 24-hour shift.  Some fire departments do

10  that.  After research and finding out, we found that

11  we were wrong on an 8-hour shift.  Had nothing to do

12  with anything else.

13    Then I looked at a 12-hour Panama shift like

14  they have some of these police officers work.  That

15  probably would not work as well as what we've got

16  now, so we chose to keep the shift structure as it

17  is now.  So I felt like that portion of their agenda

18  was addressed.

19    Q.  Okay.  Anything else that you can remember,

20  issues they raised that you --

21    A.  Equipment.  I think that -- the equipment

22  issue or the safety problems.

23    Q.  Safety of the firefighters you mean?

24    A.  Yes.  I'm talking about the breathing

25  apparatuses and vehicles themselves, the fire