1  apparatus themselves. I think we have moved
2  forward, and both -- Chief Hunter especially is down
3  here constantly looking for ways to buy equipment
4  and added resources for these firefighters not only
5  to, you know, fight a fire, but also in the training
6  process, which is a daily ongoing item. And I think
7  we have addressed those needs.
8      Q.  Okay. So I'm clear on this, in this
9  meeting that you had with Mr. Malone from the IAFF,
10 and Mr. Duty and Mr. Davis from the local labor
11 association of firefighters, you recall that one of
12 the items that they addressed with you at that
13 meeting involved fire equipment on the subject of
14 safety of the firefighters and, in particular, I
15 guess you recall their expressing concerns about the
16 self contained breathing apparatus; is that correct?
17     A.  That's correct.
18     Q.  Anything else that you can remember off the
19 top of your head of the issues they raised of
20 concern?
21     A.  A separate meeting came about that dealt
22 with their swap time. And Chief Prater came to me
23 shortly after I returned from active duty concerning
24 swap time. The swap time was removed. The problem
25 we were having with swap time was more of an

1  accounting/insurance issue than anything more so.
2      For instance, we had one firefighter -- and I
3  do not remember his name -- was injured or was sick
4  when he was actually pulling swap time for someone
5  else and workers' comp wouldn't pay the claim. So,
6  you know, we had to work some procedures out. And
7  Chief Hunter aggressively worked on that ever since
8  he was appointed chief. And when Assistant Chief
9  Waters came on board, they, along with the personnel
10 director and the insurance side of the house, felt
11 that they had it in line to where we could put the
12 swap time back in.
13     Q.  Okay. Any other issues or have I exhausted
14 your memory that were raised by Davis, Duty, and
15 Malone at your meeting?
16     A.  The staffing issue.
17     Q.  What was that about that they raised?
18     A.  You know, everybody would like to go by
19 NFPA standards of -- what is it -- 2010 or 2008?
20 Whichever it is.
21     Q.  1710.
22     A.  It's 1710, 1708.
23     Q.  Two in, two out policy?
24     A.  Sir?
25     Q.  Two in, two out policy?

1   A. Yes, sir. However, most cities -- city
2  governments and most managers in these United States
3  are against it. And if you talk about it in a city
4  managers' meeting, you see that they're not against
5  it, per se, for fire safety; it's the cost that it
6  costs the city to go into it. We cannot afford
7  staffing like that.
8      But we have increased staffing, and I think
9  that that's one of the main things. Not only the
10 fire department. We have increased staffing in the
11 police department as well. So, you know, I try to
12 keep a equal balance between those two. So I do
13 think we have tried to address those issues.
14     Q. That was an issue that was also raised by
15 Mr. Davis, Mr. Duty, and Mr. Malone with you at the
16 meeting?
17     A. That's right.
18     Q. Any other issues that you haven't already
19 mentioned that they raised at that meeting?
20     A. Morale. But I don't -- I think morale
21 right now is going real good. It appears to be.
22     Q. But they raised the concerns?
23     A. They talked about morale. You know, as a
24 manager, you know, you can talk to your department
25 heads. But, you know, your morale in a group of

1   men, whether it be, you know, with a infantry firing
2   squad or whether it be with a fire department, any
3   paramilitary organization, your front line
4   supervisors control. They control the morale of the
5   men.
6       And, usually, morale is high when you have good
7   intensive training and they're occupied. And it's
8   not necessarily that you give them everything they
9   want to keep good morale, but you give them the
10  necessary tools to do their job. And I think that
11  that portion has been addressed now. That's about
12  all that I know.
13      (Mr. McKoon entered the deposition room.)
14      Q.  But you do recall that Davis and Duty and
15  Mr. Malone raised the issue of employee morale in
16  the fire department at this meeting that you have
17  been describing?
18      A.  I do.
19      Q.  We've talked about five or six items that
20  they raised. Anything else you can remember they
21  addressed at the meeting?
22      A.  Not off the top of my head, I can't.
23      Q.  Fair enough. And was it your
24  understanding -- you may have testified to this
25  already -- that those three gentlemen -- Davis, Duty

1  and Mr. Malone -- were wanting to meet with you to
2  address these issues in their role as or in their
3  capacity as labor association representatives?
4      A.  Yes, sir.  But I also believe this.  It may
5  be in their role, but I also know they are Phenix
6  City Firefighters 24 hours a day, 7 days a week in
7  my opinion.
8      Q.  I'm sorry.  I didn't understand what you
9  mean.
10     A.  I know they were wanting to address me as a
11 labor organization, but I also know they are
12 employees and employees as firefighters, which I
13 think are 7-day-a-week, 24-hour-a-day jobs.
14     Q.  Yes.  Do you recall if Mr. Davis and
15 Mr. Duty were on their shift schedule or off duty
16 when they had the meeting with you?
17     A.  I don't know about Mr. Davis, Sergeant
18 Davis here.  But I do know that Mr. Duty was not
19 employed by the city at that time.
20     Q.  At that time he was gone?
21     A.  Yes, sir.
22     Q.  Okay.  Now either during or shortly after
23 that meeting, particularly involving Mr. Davis, did
24 you consider that he was violating the chain of
25 command or the Merit System rules and regulations

1  when he asked to meet with you for that almost an
2  hour meeting and address these issues?
3       A.  Well, it went through Chief Prater and I
4  agreed to it.
5       Q.  So earlier he got permission, Mr. Davis
6  did, to meet with you?
7       A.  And I believe Chief Prater talked with me
8  and then I believe Malone called me to get the
9  proper sequence.  I don't remember the exact
10 sequence.
11      Q.  Let me invite your attention --
12      A.  But I did not ask the chief to come over
13 here to the meeting.
14      Q.  You did not?
15      A.  No.  But I think I instructed him, once we
16 left here, to take their complaints to the chief.  I
17 felt like that was --
18      Q.  Was there a reason why you did not --
19          THE REPORTER:  Whoa, whoa, whoa.  I didn't
20      hear the end of your answer.
21      A.  I felt like it was the chief's job, Chief
22 Prater, to handle the complaint, see if he could
23 handle it prior to it coming back to me.
24      Q.  Did you give consideration to inviting
25 Chief Prater to come over and participate in this

1  meeting that we've been describing?
2     A.  I did, but I chose not to.
3     Q.  Why was that?
4     A.  I felt like I wanted to hear the complaint
5  myself and keep an open view, so to speak.
6     Q.  Keep a what?
7     A.  An open view.
8     Q.  Let me invite your attention, Mr. Roberts,
9  to Exhibit 11 in front of you. This is a memorandum
10 from David Davis in his capacity as vice-president
11 at the time of Local 3668, the Phenix City
12 Firefighters Association, dated January 25, 2005,
13 and addressed to Chief Jerry Prater. Have you seen
14 this document before today?
15    A.  I have.
16    Q.  Was this the so-called laundry list that
17 you described earlier that was given to you either
18 before or during the meeting you had with Davis,
19 Duty, and Malone?
20    A.  It is.
21    Q.  Some of these issues you've already
22 addressed. In your one-hour meeting, were they able
23 to go right down each and every item and cover all
24 of them?
25    A.  I don't think they did. I think they went

1   over a synopsis of the group.

2        Q.   And at the end of the meeting, did you
3   suggest to these three gentlemen -- Davis, Duty and
4   Malone -- that they follow up directly with Chief
5   Prater?

6        A.   I think I asked for Sergeant Davis to talk
7   with Chief Prater.

8        Q.   And were you contemplating at the time that
9   Davis would talk to Chief Prater again in his
10  capacity as a local union representative?

11       A.   Either/or.  It didn't matter to me which.
12  I think either one of them, whether he be a local
13  member or whether he be any other firefighter, if
14  he's got some concerns, then I think he needs to
15  bring it through the chain and let the chief handle
16  it.

17       Q.   Now, did you expect or instruct Mr. Davis
18  to go to his immediate officer, perhaps his captain,
19  and up the chain of command before he --

20       A.   Not to my knowledge.  I don't remember
21  doing that.

22       Q.   So you suggested Mr. Davis could go
23  directly to Chief Prater?

24       A.   I emphatically said that he needed to take
25  this up with Chief Prater.

1    Q.  Okay.  Fair enough.  Let me invite your
2 attention to Exhibit 12, which appears to be a
3 letter from Thomas Malone as a field service
4 representative of the IAFF dated March 7, 2005,
5 addressed to yourself.  Do you recall having
6 received this letter from Mr. Malone?
7    A.  I do.
8    Q.  And, again, like with all these documents,
9 if you want to take a moment to completely read it,
10 just let me know that you want to do that.
11    A.  I would like to do that and brief myself.
12    Q.  Sure.
13        MR. GRAHAM:  Let's go off the record.
14    (Discussion held off the record.)
15        MR. WOODLEY:  Back on the record.
16    Q.  Exhibit 12, you've had a chance now, Mr.
17 Roberts, to read to yourself this letter Mr. Malone
18 sent to you on March 7, 2005; is that correct?
19    A.  That's correct.
20    Q.  And he's describing a meeting that
21 apparently he and Davis had with Chief Prater; is
22 that correct?
23    A.  It's my understanding that it's a meeting
24 between Sergeant Davis and Chief Prater.
25    Q.  Who?

1   A.   Sergeant Davis and Chief Prater.  I don't
2   believe Mr. Malone was present.
3   Q.   Okay.  And would this have been the
4   follow-up meeting that you were suggesting to Davis
5   and Duty and Malone that they follow up and meet
6   with Prater?
7   A.   I would assume that it would be, due to the
8   date on the letter.
9   Q.   Now, obviously, Mr. Malone is expressing
10  his concerns that it was not a productive meeting
11  that was held involving Chief Prater and David Davis
12  and himself, Mr. Malone.  And he mentions to you in
13  his letter that they felt like there were threats
14  and intimidation and -- you see where it says all of
15  that?
16  A.   I do.
17  Q.   Did you take any follow-up action when you
18  received this letter and the concerns expressed
19  about it?
20  A.   I talked with Chief Prater about the
21  letter.
22  Q.   What did you discuss with him?
23  A.   He expressed that he had talked with
24  Mr. Davis about the request and basically that was
25  it, to a degree.  And by that, I mean we didn't go

indepth as to his answers.

Q. Mr. Malone indicates that the meeting that he had with the chief and, apparently, also Personnel Director Goodwin lasted only about 10 minutes. Was that your understanding?

A. That's my understanding of his letter, yes.

Q. That was a lot less than the length of time that you met with him?

A. If the timing is right, it is less.

Q. Do you think that may be a bit brief to have a constructive meeting addressing issues and concerns?

A. Not being in the tone of the meeting, I wouldn't -- I wouldn't think it was enough time. But according to Mr. Malone's letter, I don't know that it may have been a good meeting. Appears to have been a bad meeting as I stated earlier.

Q. And did Chief Prater report back to you about the nature of the meeting he had on the subject?

A. As I stated earlier, it was my understanding it was not a good meeting.

Q. And that's what Prater reported back to you?

A. Basically, yes.

1  Q. Do you know if any other follow-up meetings
2  were scheduled?
3  A. Not to my knowledge that he did.
4  Q. That was pretty much the end of the matter?
5  A. As far as I know, that was as far as it
6  went at that time.
7  Q. Okay. Turn now to Exhibit 13, which
8  appears to be a letter from yourself addressed back
9  to Mr. Malone dated March 15, 2005. I take it
10 that's your signature at the bottom of the letter?
11 A. Yes, sir, it is.
12 Q. And then you indicated that you were
13 responding to Mr. Malone, and you also state that
14 the city does not recognize your union and is not
15 required by law to do so.
16 A. To bargain with. To bargain, collectively
17 bargain with.
18 Q. It does say recognize. Is there a
19 difference between recognize and then you go on to
20 say will not enter into negotiations with the union?
21 A. We're not going to enter into negotiations
22 as to salary or anything. I think the Alabama law
23 is pretty explicit that we have to recognize the
24 union body as a local, and they can talk to us on
25 the issues as stated in state law, such as safety,

1   manning, and things of that nature.
2      Q.  Was it your understanding, again just so
3   it's clear in my mind, that when Mr. Davis was
4   sitting down with Mr. Malone and meeting with Chief
5   Jerry Prater, that Mr. Davis was meeting in his
6   capacity as a local firefighters' association
7   representative or officer?
8      A.  Let me back up.  I don't think Mr. Malone
9   was at this meeting with Mr. Davis and Chief Prater,
10  the way I understand it.  Now, did he get them on
11  duty and talk with them?  Yes, sir.  I think that
12  you can be an officer in the labor organization of
13  the International Association of Firefighters and
14  you can still talk about the same issues that we're
15  discussing the state law whether you're on or off
16  duty.
17     Q.  Okay.
18     A.  You know, with the chief, that's --
19     Q.  Fair enough.  Now, at the end of your
20  letter to Mr. Malone, which again is Exhibit 13, you
21  indicate you would be glad to do a follow-up meeting
22  on these various issues.  Was such a meeting ever
23  held?
24     A.  I never heard from Mr. Malone for another
25  meeting.

1  Q. All right.
2  A. That I can recall. Let me add that.
3  Q. Have you ever had occasion where a city
4  employee has come to you directly as a city manager
5  and expressed concerns about issues that involve the
6  individual's employment or department?
7  A. Yes, sir, I have.
8  Q. More than once?
9  A. Yes, sir, I have.
10 Q. Do you have an open door policy where city
11 employees can come in and talk to you?
12 A. Not so much as that. I like for them to go
13 through their chain. I believe there's a chain of
14 command, and I am military, so -- but anytime
15 they'll stop me on the yard or something and ask me
16 a question, I do my best to answer it in a good
17 answer. But I'll also tell them they need to take
18 that up to their department head. The reason for
19 that is if it deals with the Merit System, as
20 happened in this case, I'm the one that has to sit
21 in on the review board. And rather than make a
22 call, I would rather hear everything at one time.
23 Q. Can you recall occasions where a
24 firefighter working for the city's fire department
25 has talked to you about issues affecting the

1   department?
2      A.   I have.
3      Q.   And who would that have been?
4      A.   I've had several of them.
5      Q.   Who were they?
6      A.   I've talked as much as lately to -- not
7   lately.  When I was in the guard.  Gosh.  I can't
8   think of his name right now.  He's a captain today.
9   But I've talked with several firefighters.
10     Q.   Were you a city manager at the time?
11     A.   Yes, sir.  Also was commanding officer in
12  the National Guard.
13     Q.   You can't remember the individual's name
14  though?
15     A.   Yes.  I'll think of it in just a second.
16  If you want to go off the record, I'll find out
17  right quick.
18     Q.   Sure.  We can go off the record.
19  (Discussion held off the record.)
20          MR. WOODLEY:  Let's go back on the record.
21     Q.   You remember the individual firefighter's
22  name that came to you about it?
23     A.   I do now.  Carl Taylorson.
24     Q.   How long ago was that roughly?
25     A.   It would have to have been around two years