1    ago, over a year ago. I have been retired for

2    approximately a year now.

3         Q.  And what was the issue of concern that he

4    had on his mind that he discussed with you?

5         A.  Carl spoke of some of the same issues, you

6    know, as it relates to morale and equipment. And I

7    think that those items have been addressed, just as

8    I instructed Carl to talk to Chief Hunter.

9         Q.  Do you know if he was a union member at the

10   time?

11        A.  Yes, he was.

12        Q.  And where was this conversation?

13        A.  National Guard Armory.

14        Q.  And how long did the conversation take

15   place, roughly?

16        A.  Not very long. I'm going to say five, ten

17   minutes at the most.

18        Q.  And did he address, on this occasion,

19   staffing?

20        A.  I don't know that he addressed all the

21   issues.

22        Q.  Did he address employee morale?

23        A.  He addressed the morale.

24        Q.  What about swap time?

25        A.  No. I think -- no. He may have now. We

1    got the swap time, I think, straight a year ago,

2    something like that.

3        Q.   In this conversation, did he address

4    staffing or equipment or firefighter safety?

5        A.   He talked some of the staffing and of the

6    equipment.

7        Q.   So how did that conversation end?  Did you

8    say you were going to look into it or did you

9    suggest that he follow up --

10        A.   I told him I think I understood some of his

11    concerns.

12        Q.   And did you do anything after that?

13        A.   No, sir.  We were already working on it.

14        Q.   So you didn't communicate with any chief

15    officer in the fire department about this

16    conversation?

17        A.   No, sir.  I don't go straight to the chief

18    officer.  I talk to the chiefs.  You know, when it

19    comes down to that, I'll listen to any employee that

20    wants to talk to me, but I'm going to go back to

21    that department head.

22        Q.   And this gentleman was named Taylor?

23        A.   Taylorson.  Carl Taylorson.

24        Q.   Carl Taylorson?

25        A.   He was a driver/engineer at the time, I

47

1    think.

2        Q.    And a union member at the time?

3        A.    Yes, sir.

4        Q.    Did you consider Carl Taylorson to have

5    violated the Merit System's rules and regulations

6    about chain of command when he addressed these

7    directly to you?

8        A.    Not really.  Not in the manner that he did

9    that, no, I did not.

10       Q.    When you say not in the manner, why?  What

11    do you mean by that?

12       A.    I instigated the conversation.  I asked him

13    how things were going at the fire department.  I

14    think when you do that, you open the door.

15       Q.    Okay.  So he was never charged or

16    disciplined for discussing it with you, was he?

17       A.    No, sir.

18       Q.    Were there any other individuals -- I think

19    you mentioned there were several firefighters.

20       A.    I've had a lot of firefighters -- I know a

21    lot of them out there, and a lot of them will talk

22    to me.  But as far as me giving them a yes or no

23    answer, I don't do that.

24       Q.    Do you know if firefighters have talked

25    directly to city council members about issues of

1    concern to them that are going on in the fire

2    department, whether it's firefighter health and

3    safety, staffing, equipment?

4        A.   That would be hearsay, and I would not know

5    of -- I don't like to testify like that.  I don't

6    know of any direct contact.  I know what I have

7    heard, and I cannot testify to that.

8        Q.   Well, there's no rules preventing you from

9    testifying.

10       A.   Well, I've heard that they have talked with

11   them.

12       Q.   I'm sorry?

13       A.   I've heard they've talked with them, yes,

14   sir.

15       Q.   Have talked with the city council members?

16       A.   Yes, sir.

17       Q.   Do you know if Mr. Davis has spoken to city

18   council members about issues?

19       A.   I know they have, yes, sir.

20       Q.   How do you know that?

21       A.   Well, I have had a conversation with both

22   Councilman Bush and, of course, Mayor Hardin.

23       Q.   And what's the substance of that?

24   Mr. Davis's communications about issues of concerns

25   that --

49

1      A.   Well, as far as the mayor goes, I
2   understand that he told me about going to a
3   retirement supper, or luncheon one, for Todd Boatner
4   with the firefighters.  And Councilman Bush has
5   mentioned the operation of the fire department a
6   couple times to me.
7      Q.   Okay.  But your understanding is that Davis
8   has raised those issues?
9      A.   Well, yes.  I understand that Sergeant
10  Davis and Councilman Bush's brother are real -- are
11  good friends or know one another or are
12  acquaintances.
13     Q.   Okay.  Do you recall any other discussions
14  Mayor Hardin may have had with firefighters about
15  issues of concern in the fire department?
16     A.   Not to my knowledge.
17     Q.   Okay.  Any other individual firefighters
18  other than Taylorson that you can recall discussed
19  issues of concern in the fire department with you?
20     A.   Not by name, I do not.
21     Q.   But there have been other firefighters?
22     A.   There have been other firefighters, yes,
23  sir.
24     Q.   Did you ever follow up in trying to get
25  them charged with discipline for deviating from the

1  chain of command or the Merit System's --

2      A.   I did not.

3      Q.   -- rules?  You're going to have to let me

4  finish my questions before you begin your answer.

5  Do you understand that?

6      A.   I understand.

7      Q.   Let me invite your attention to

8  Exhibit 14.  And this appears to be a newspaper

9  article.  My understanding, it's the Columbus

10  Ledger-Enquirer and I believe it's an article that

11  came out in September 2005.  Does this look familiar

12  to you?

13      A.   I've read the article, yes, sir.

14      Q.   Okay.  And when you read this newspaper

15  article at that time, what was your reaction to it

16  as a city manager?

17      A.   How do you mean reaction?

18      Q.   Were you upset?  Were you annoyed?  Were

19  you going to take some action in response to the

20  article?

21      A.   Not in response to the article, no.  Was I

22  annoyed or upset?

23      Q.   Yes.

24      A.   Anytime anything happens to the city,

25  whether it be with any department, you hate for it

1    to get in the paper.

2        Q.   I'm sorry.  What?

3        A.   Anytime anything happens to the city, you

4    hate for it to get in the paper.

5        Q.   Bad publicity?

6        A.   That's -- total concept, yes, sir.

7        Q.   So is it fair to say you were annoyed and

8    upset about the substance of this article?

9        A.   I think you could say that we were annoyed

10   by it.

11       Q.   Okay.  So after you read it and you were

12   annoyed, did you do anything with the fire

13   department or the chief over there?  Talk to them?

14       A.   Well, I think -- I don't know whether I

15   talked with Wallace the next -- this was on a

16   weekend, if I remember right.  I believe this was on

17   a weekend.  I don't know whether I talked with him

18   on Monday or Tuesday and, you know, verified some of

19   the things, and we talked about the article in just

20   general terms.  That was it.  I do not get into the

21   day-to-day operations unless they ask me to -- of

22   any department.

23       Q.   I understand.  When you discussed this with

24   Chief Hunter, this article and the substance and the

25   comments, did you give any instructions to Chief

52

1    Hunter to do anything specifically?

2         A.   I think Chief Hunter informed me that he

3    was planning on doing an investigation or something

4    to that effect.   And I think my instructions to

5    Chief Hunter is to be sure you check with the city

6    attorney to make sure that you're on solid legal

7    ground on whatever outcome.

8         Q.   And what kind of investigation was Chief

9    Hunter contemplating?

10        A.   I have no idea.

11        Q.   You didn't ask him?

12        A.   No, sir.  I did not.

13        Q.   Okay.  Some of the comments made in this

14   newspaper article were from, of course, David

15   Davis.  In part, you'll see there in the second

16   column he was quoted as saying, morale is at the

17   lowest point since I have been here in the fire

18   department.  And they list him as the president of

19   the Phenix City Firefighters' Association.  When you

20   read that, did that trouble you or cause you to

21   contact Chief Hunter and explore the morale

22   situation in the fire department?

23        A.   No, sir.  I've already heard that

24   complaint.

25        Q.   Were you at all concerned that the chief,

53

1  Chief Hunter, was not doing anything about the

2  morale?  Because it seems like it's a continuing

3  concern.

4      A.  The morale issue is a rollover not just

5  from Chief Prater or Chief Hunter.  It was a

6  rollover from a prior chief as well.  This

7  department has been on a uphill struggle since the

8  '90s.  And I think we are on a positive path to

9  correct that now.  And that's what we've been

10  working on since I returned.

11      Q.  Why do you think the morale has been such a

12  problem for such a long period of time in the city

13  fire department?

14      A.  You know, not being a -- I don't know.  I

15  really don't know how to answer that.  I know it's

16  been a ongoing problem.  I think we are trying to

17  correct any problems as far as equipment.  But there

18  again, I go back down to the basic statement I made

19  while ago; that the first line supervisor and the

20  way he works his people and trains his people has a

21  great amount to do with the morale of any department

22  in communications through up to your chief.

23      Q.  You'll notice in this article that the

24  subject was also addressed about understaffing.  In

25  other words, apparently there were 51 slots or spots

54

1    in the fire department and only 44 were filled.

2    When you saw that, did that cause you to raise that

3    issue as a concern?

4        A.    No, it did not, because there again, as

5    I've talked with you before and as Sergeant Davis

6    and them knew, that we were looking at hiring

7    people.  You do have budget restraints and we were

8    able to combat any fire or any emergency that came

9    about.  However, you did have firefighters that had

10   to work over.

11       Q.    Later in the article, Mr. Davis indicates,

12   quote, we are reluctant to talk because of

13   significant fear of retaliation, being disciplined,

14   or fired, end quote.

15       A.    Sir, I've been working for this city for 34

16   years.  And whether it be a council or commission

17   form of government, there's never been any

18   intimidation or threat of firing or termination that

19   I know about.

20       Q.    So you don't -- I guess you would not have

21   an explanation as to why Mr. Davis and several of

22   the other firefighters expressed that concern about

23   retaliation?

24       A.    You know -- no, I don't.  I think it's

25   unjustified.

55

1      Q.   Do you know of a Sergeant Ann Land?

2      A.   I do know.

3      Q.   You do know her?

4      A.   Yes, sir, I do.

5      Q.   And I guess you're aware, because you read

6    this article, that she made a comment about the view

7    of the city's fire department is if you don't like

8    the job, you can leave it.

9      A.   I read that.

10     Q.   Did that trouble you or cause you to take

11   any remedial action?

12     A.   I did not.

13     Q.   Okay.  Then there's a quote in here on the

14   third page.  And there's some overlap in this

15   particular version of this newspaper article, but

16   there is a quote in here from Mr. McKoon:  Quote,

17   the last three fire chiefs have tried to reason and

18   have been out of a job, McKoon said; my advice is to

19   run this thing like you are a drill sergeant on

20   Parris Island, end quote.

21     Do you see where it says that?

22     A.   I do.

23     Q.   Did you ever receive that kind of advice or

24   input?

25          MR. MCKOON:  With all due respect, I don't

1        think that's the end of the quote, but --

2           MR. WOODLEY:  Well, it goes on to say,

3        everybody at the top can't be wrong.  Is that

4        what you mean?

5           MR. MCKOON:  Yes.

6           MR. WOODLEY:  That's the end of it.

7     Q.  Did you ever have a conversation with

8  Mr. McKoon about running the fire department like a

9  drill sergeant at Parris Island?

10    A.  No, sir, but I believe the fire department,

11  police department, and any law enforcement

12  organization has to be run in a military manner --

13  or a paramilitary manner, excuse me.  And that

14  includes the chain of command.

15    Q.  Do you think firefighters should be treated

16  the same as Marines?

17    A.  I think they should be disciplined.  A

18  Marine makes a good firefighter, sir.

19    Q.  Now, it also indicates that Council Member

20  Ray Bush -- and I take it you know who he is, right?

21    A.  Yes, sir.

22    Q.  And you're laughing now.  Is he a friend of

23  yours or an enemy?

24    A.  He's a good -- he's a friend.

25    Q.  Friend?  Apparently, he tried to

57

1    participate in these disagreements among the

2    firefighters and their union and the city and tried

3    to mediate, as it says in the article, those

4    differences. Are you aware of that?

5       A.  I read that in the article. I'm not aware

6    of that.

7       Q.  Did you have any discussions with Mr. Bush

8    as a council member about these issues?

9       A.  As a mediator, no.

10       Q.  How about in general of these issues of

11    concerns at the fire department?

12       A.  As I stated earlier, he's mentioned the

13    fire department a couple times and their issues.

14    And I've always told him that they were being worked

15    on.

16       Q.  Did you think Council Member Bush was

17    acting out of line or outside his authority when

18    apparently he was trying to serve as a mediator on

19    these differences?

20       A.  If he's trying to serve as a mediator, I

21    do, yes, sir, without council approval.

22       Q.  Has Mr. Bush ever been told that he was

23    acting outside his authority?

24       A.  I've never told him that.

25       Q.  Do you know if he's ever been told that by

58

1    anybody else?

2        A.    I have not.  He was one of the authors of

3    this charter.

4        Q.    And then you'll see a series of other

5    articles and letters to the editor about various

6    issues of concern within the fire department about

7    morale and swap time and other issues.  I take it

8    you had the chance to read those letters to the

9    editor as well, correct?

10        A.    I have not read every letter in the -- or

11    every article in the Ledger, but I've read the

12    majority of them, sir.

13        Q.    So just to put this in context, after you

14    read that initial newspaper article in September

15    2005, you had a discussion with Chief Hunter, and

16    your understanding is that he was going to

17    investigate the matter; is that basically true?

18        A.    That's basically what happened.  I mean,

19    there was nothing new in the article that we did not

20    already know.

21        Q.    Did you learn subsequently that after Chief

22    Hunter conducted his investigation on the issues and

23    individuals who were quoted in that newspaper

24    article, that he and the fire department issued a

25    counseling form to Mr. Davis?

A. I was.

Q. Why don't you look at Exhibit 16? This appears to be that counseling form issued by the fire department against David Davis, and it's dated September 21, 2005. And I take it that would have been shortly after that newspaper article; is that about right?

A. I would have to look at the article, but I assume it would be, too.

Q. You'll note in the first sentence this counseling form says, quote, Sergeant David Davis was counseled by Chief Hunter and Assistant Chief Johanson on the 20th of September 2005 concerning him making or publishing statements to the local media, end quote. Do you understand that that was a reference to that earlier newspaper article that we spent a lot of time on?

A. It could have been to several media statements. There's others put out other than that. But that would be a fair statement to assume.

Q. Were you given a copy of this counseling form?

A. I do not keep a copy of them, no, sir.

Q. But do you remember being given a copy of this one?

1       A.   No.

2       Q.   You don't have to approve these, do you?

3       A.   No.

4       Q.   Did you ever discuss with Chief Hunter or

5   Assistant Chief Johanson why they issued this

6   counseling form to Davis?

7       A.   No, sir, I didn't.  I would assume it would

8   have been, though, by Merit System rules and

9   regulations or either their SOPs, whichever they

10  used at that particular time.

11      Q.   And what are you referring to there?

12      A.   SOPs?

13      Q.   In the context of this communication with

14  local media.

15      A.   Either it's going to be a Merit System

16  violation or one of their standard operating

17  procedure violations.  Of course, the Merit System

18  will override any of their standard operating

19  procedures.

20      Q.   You'll have to enlighten me.  Explain how

21  Mr. Davis's communication with the local media and,

22  in particular, his comments in this newspaper

23  article --

24      A.   I believe --

25      Q.   You have to let me finish.  I'm sorry.

1   Please explain to me, Mr. Roberts, how the

2   communications and comments that Mr. Davis made in

3   that newspaper article we were just discussing would

4   violate the Merit System rules and regulations or

5   SOPs of the fire department?

6       A.  I would have to look at the rules and

7   regulations of the Merit System and not quote them

8   off the top of my head.  But I believe it will tell

9   you something about talking with the media.  If it

10  is not there, then I would have to to review the

11  SOP, and I do not know the fire or police SOP by

12  heart.

13      Q.  Well, then let's review it.  Exhibit 3,

14  which is an excerpt from the Merit System rules and

15  regulations.  And to shorten this, you may want to

16  look at page 3 of this document, Section 2.054,

17  where it addresses the subject matter of free

18  speech.  And tell me when you're finished reading

19  that section.

20      A.  I've read it, sir.

21      Q.  Is this the section of the Merit System

22  rules and regulations that you were just trying to

23  recall when I was asking you questions about the

24  counseling form that was issued to David Davis?

25      A.  That's correct.

62

1     Q.   Please tell me, if you can, which comments

2    that Mr. Davis made in the newspaper article and was

3    quoted would impair discipline and harmony in the

4    workplace under Section 2.054 of the Merit System

5    rules and regulations?

6     A.   I believe the headline itself as stated,

7    the alarm -- three alarm --

8     Q.   Turmoil?

9     A.   Yes, sir.  I think that's going to cause

10   turmoil in the fire department, because I do not

11   believe a hundred percent of my firefighters or the

12   city's firefighters -- let me correct myself --

13   believes this.  One hundred percent of our

14   firefighters are not disgruntled with their job.

15     And I also believe that it could impede job

16   performance on any negative quote by any city

17   employee in the paper that, you know, that could

18   cause someone to be intimidated against or feel peer

19   pressure from them, such as what's been the case in

20   the fire department.

21     Q.   Okay.  Anything else that would indicate

22   how Mr. Davis's comments in the newspaper article

23   would have impaired the discipline and harmony in

24   the fire department?

25     A.   Not right off the top of my head.

1  Q. Okay. Same question with regard to the

2 next provision in this free speech section of the

3 Merit System rules and regulations. Can you give me

4 an example of how Mr. Davis's comments in that

5 newspaper article would impede job performance?

6  A. Well, it's just like I said. I think it

7 can -- by peer pressure.

8  Q. I'm sorry. What do you mean by that?

9  A. You know, I -- in organized labor, you

10 know, you can exert some force on nonunion workers,

11 and I think that has been shown to work in all

12 realms, whether it be firefighters, electricians,

13 plumbers, steamfitters, whatever. And I think some

14 of that, in my opinion, was evident.

15  Q. Well, do you think Mr. Davis's comment in

16 the newspaper article about poor employee morale in

17 the department, do you think that impeded job

18 performance?

19  A. I think it could have, yes, sir, I do.

20  Q. I don't want to know if it could have. Did

21 it actually?

22  A. I do, yes.

23  Q. Could you explain that happening?

24  A. Well, there --

25  Q. Or give me examples?

64

1      A.   -- again --

2         THE REPORTER:  I just can't get it down

3   when you're talking over each other.

4        MR. WOODLEY:  We can take a break.

5   (Brief recess.)

6      Q.  Mr. Roberts, I think we were addressing the

7   Section 2.054 of the Merit System rules and

8   regulations concerning the subject of free speech.

9   And I wanted to follow up on those questions by

10   asking you again, in light of the comments that you

11   are aware of that Mr. Davis made in that newspaper

12   article in September 2005, which of those comments,

13   if any, would have impeded job performance by him or

14   others in the fire department?

15      A.  Let me try to answer it this way, see if

16   I -- anything that's going to deal with safety,

17   equipment, morale, the general public don't --

18   they're not familiar with fire department

19   operations.  It gives a bad image in the total

20   concept of the operations, and it's really not a

21   true one, and it doesn't need to be in the paper

22   like that.

23      Q.  Do you think --

24      A.  It should be factual.

25      Q.  Do you think the citizens and members of

1  the public have a right to know and receive

2  information about the operations of their fire

3  department?

4      A.   If they get the proper perspective they do.

5      Q.   And when you say proper perspective, would

6  that be consistent with your personal opinion of the

7  fire department?  In other words, whatever the

8  firefighters happen to say should be?

9      A.   I think the majority of the operations with

10  the fire department have the true opinions and know

11  what's being done to correct any negatives.

12      Q.   Okay.  Were there any comments in that

13  newspaper article by Mr. Davis that were untruthful

14  as far as you know?

15      A.   I felt like they were.

16      Q.   Which ones?

17      A.   I think anytime you talk about the

18  staffing.  I think the staffing is fine.  I think we

19  man the vehicles.  I think we man all fire

20  apparatus.  I think we man the rescue trucks.  I'm

21  not totally convinced -- totally not convinced that

22  the equipment was all that bad.  We had some old

23  pieces of equipment; of course, due to budget

24  restraints you don't buy new engine apparatus every

25  day.  And, too, the training.  Some of the things

66

1    that he talks about in the article to me does impede

2    job performance and, you know, it can touch back on

3    the bottom -- personal loyalty to any of those.  I

4    think it could hurt the loyalty of some of your

5    people as it relates to it.

6        Q.  Well, sir, I'm not aware that Mr. Davis was

7    quoted, as I read this newspaper article, on the

8    subject of staffing or understaffing or the subject

9    of training.  He was quoted as morale being at the

10   lowest that he's seen it in the fire department.

11   And he was quoted again in the article about being

12   concerned about potential fear and retaliation or

13   being disciplined or fired.  But I don't see

14   anywhere in this article where Mr. Davis -- excuse

15   me -- was quoted about training or staffing

16   concern.

17       A.  Well, I think, number one, he puts it this

18   way; he relates to reluctant to talk of -- let's see

19   how he put it.  We're reluctant to talk about it

20   because of fear of retaliation and being disciplined

21   or fired.  He's talking about the problems inside

22   the fire department.  To me, I'm taking that he's

23   talking about everything we've been discussing,

24   which doesn't, to me, impede job performance, bottom

25   line.

1     Q.  So your reading into his quote that he's

2  got fear or concern about retaliation or being

3  disciplined or fired, you're reading that as

4  criticism of training and understaffing.  Is that

5  what you're telling me?

6     A.  I'm reading anything he's saying that's

7  detrimental to the fire department, going back to

8  the complaints throughout the entire course of media

9  publicity is detrimental to the fire department.

10     Q.  So bottom line is anytime a firefighter

11  criticizes the fire department and it gets in the

12  media, that's going to be bad for the fire

13  department?

14     A.  It could be, yes, sir.  It could be -- it

15  could be.

16     Q.  And you would consider that wrong on the

17  part of the firefighter and a violation of the Merit

18  System's rules and regulations; is that fair?

19     A.  Yes, sir, it is.

20     Q.  Let me ask you a series of questions, which

21  you were here when I addressed them with Chief

22  Hunter in his deposition earlier today.  Based upon

23  your experience with the city and particularly your

24  capacity as city manager, would it be a violation by

25  a firefighter here in the city -- a violation of the

1  Merit System rules and regulations if that

2  firefighter did not follow the so-called chain of

3  command?

4      A.  I do.  I believe that.

5      Q.  Okay.  And, specifically, if the

6  firefighter did not follow or pursue the chain of

7  command and spoke directly with the media

8  representative on the subject of inadequate staffing

9  in the fire department, would you consider that to

10 be a violation of the Merit System rules and

11 regulations?

12     A.  Yes, sir.

13     Q.  Would you consider that firefighter then to

14 be subject to discipline, perhaps firing, as a

15 result?

16     A.  I would consider -- I would think that he

17 would fall in whatever category of Merit System

18 offense that was, whether it be termination,

19 suspension, written counseling statement.

20     Q.  And, sir, in your capacity as city manager,

21 would a firefighter violate Merit System rules and

22 regulations if he did not follow the chain of

23 command but spoke directly to the media about health

24 and safety of firefighters on the job?

25     A.  I do feel that would be a violation of the