# EXHIBIT

# Deposition of Jeffrey Hardin

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    EASTERN DIVISION

4

5     DAVID DAVIS,

6          Plaintiff,

7     vs.                    CASE NO. 3:06-CV-0054-VPM

8     CITY OF PHENIX CITY, ALABAMA,

9     et al.,

10         Defendants.

11

12

13              * * * * * * * * * * *

14

15     DEPOSITION OF JEFFREY SCOTT HARDIN, taken

16  pursuant to stipulation and agreement before Shannon

17  M. Williams, Certified Court Reporter and

18  Commissioner for the State of Alabama at Large, in

19  the offices of City Hall, 601 12th Street, Phenix

20  City, Alabama, on Wednesday, April 4, 2007,

21  commencing at approximately 9:05 a.m. EST.

22

23              * * * * * * * * * * *

24

25

2

```
 1                        APPEARANCES

 2    FOR THE PLAINTIFF:

 3    THOMAS A. WOODLEY
      Woodley & McGillivary
 4    1125 15th Street N.W.
      Suite 400
 5    Washington, D.C.   20005

 6    FOR THE DEFENDANTS:

 7    JAMES P. GRAHAM, JR.
      712 13th Street
 8    P.O. Box 3380
      Phenix City, Alabama  36868-3380
 9

10    ALSO PRESENT:

11    David Davis
      H.H. Roberts
12    Wallace Hunter

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

STIPULATIONS

1     It is hereby stipulated and agreed by and

2  between counsel representing the parties that the

3  deposition of JEFFREY SCOTT HARDIN is taken pursuant

4  to the Federal Rules of Civil Procedure and that

5  said deposition may be taken before Shannon M.

6  Williams, Certified Court Reporter and Commissioner

7  for the State of Alabama at Large, without the

8  formality of a commission; that objections to

9  questions other than objections as to the form of

10  the questions need not be made at this time but may

11  be reserved for a ruling at such time as the

12  deposition may be offered in evidence or used for

13  any other purpose as provided for by the Federal

14  Rules of Civil Procedure.

15     It is further stipulated and agreed by and

16  between counsel representing the parties in this

17  case that said deposition may be introduced at the

18  trial of this case or used in any manner by either

19  party hereto provided for by the Federal Rules of

20  Civil Procedure.

21                 * * * * * * * * * *

22

23

24

25

4

JEFFREY SCOTT HARDIN

1

2     The witness, having first been duly sworn

3 or affirmed to speak the truth, the whole truth and

4 nothing but the truth, testified as follows:

5     THE REPORTER:  Usual stipulations?

6     MR. GRAHAM:  We do want to read and sign.

7     EXAMINATION

8 BY MR. WOODLEY:

9     Q.  Mr. Hardin, could you state your full name

10 for the Record, if you would, please?

11     A.  Jeffrey Scott Hardin.

12     Q.  Mayor Hardin, my name is Tom Woodley, and

13 I'm one of the attorneys representing the plaintiff,

14 David Davis, in this lawsuit.  And we are here this

15 morning pursuant to a Notice of Deposition that we

16 have served on you and the city and your attorneys.

17 And I'm going to ask you some preliminary questions

18 just to sort of set the stage for us this morning,

19 and then we'll get into the substance of my

20 questions and your answers.

21     Have you ever had your deposition taken before

22 in another case?

23     A.  Once before.

24     Q.  Once before?  What kind of a case was that?

25     A.  It was -- actually, it was a suit against

5

1    the city.  I think it had to do with a fireman.

2    Jimmy, was it -- do you remember, was it Dennis

3    Duty?

4        MR. GRAHAM:  Was it where he didn't get his

5        raise?

6        THE WITNESS:  I think so.  Whenever we had

7        to go to federal court in Opelika.

8        MR. GRAHAM:  That would have been in Dennis

9        Duty and Randy Doster's cases.

10       Q.   Thank you, sir.  And, Mayor, are you

11   generally familiar with the issues and the

12   allegations in this particular lawsuit?

13       A.   I've read the -- I guess the request for

14   deposition, yes, sir.

15       Q.   And have you had at least a brief

16   opportunity to spend some time with the attorneys

17   that are representing you and the city in this case?

18       A.   Yes, sir.

19       Q.   And do you have a general knowledge and

20   understanding about the procedures we will be

21   following this morning in your deposition?

22       A.   Yes, sir.

23       Q.   I just want to review those just to make

24   certain on the record that we're on the same page

25   about the procedures that we'll be following this

1    morning?

2         A.    Okay.

3         Q.    I'll be asking you a number of questions

4    and, of course, we expect you to give full and

5    truthful answers.  You understand that?

6         A.    Yes, sir.

7         Q.    And you have to verbalize your answer

8    because the reporter here can't take down nods of

9    the head so you'll have to verbalize your

10   responses.

11        A.    Okay.

12        Q.    You understand that?

13        A.    Yes.

14        Q.    If at any time you don't understand or hear

15   one of my questions, let me know immediately and

16   I'll be more than happy to repeat or rephrase that

17   question.

18        A.    Okay.

19        Q.    Do you understand that?

20        A.    Uh-huh.

21        Q.    You'll have to wait until I finish my

22   question before you begin your answer, again so the

23   reporter will have a clear record of what we're

24   talking about.  Do you understand that?

25        A.    Yes, sir.

7

1      Q.   And this reporter will have then a chance

2   to, after we finish your deposition, to put this in

3   writing in a transcript form.  And as your attorney,

4   Mr. Graham, just indicated, you'll have a chance to

5   review and read and sign that transcript.  Do you

6   understand that?

7      A.   Yes, sir.

8      Q.   And, of course, finally, you have been

9   sworn to tell the truth under the penalty of

10  perjury, so you understand that as well?

11     A.   Yes, sir.

12     Q.   Could you please tell us what your current

13  position is with the City of Phenix City?

14     A.   I serve as the mayor.

15     Q.   How long have you held that position?

16     A.   A little over two years.

17     Q.   Was that your first elected term as mayor?

18     A.   First as mayor, yes, sir.

19     Q.   Did you hold a previous position with the

20  city?

21     A.   I have served as a city council member.

22     Q.   How long were you a council member?

23     A.   Three years.

24     Q.   And before that, what was your occupation?

25     A.   I owned my own business.

8

1      Q.   And what's the nature of that business?

2      A.   It's a wholesale and retail meat company,

3  Phenix Food Service.

4      Q.   And do you still have that business?

5      A.   I do not.

6      Q.   Did you sell that?

7      A.   I am in the process of selling that.  I

8  have been inactive from the company for about two

9  years, and then I have a five-year buyout.

10      Q.   And how long is your current term as mayor?

11      A.   It's a four-year term.

12      Q.   And, basically, what are your duties and

13  responsibilities as the mayor of Phenix City?

14      A.   Basically, I act in ceremonial purposes,

15  and then I oversee the meetings.  I direct the

16  meetings, two council meetings a month, on the first

17  and third Tuesday of the month, and that's pretty

18  much the stated duties of the mayor in Phenix City.

19      Q.   Are you considered a member of the city

20  council?

21      A.   I am.

22      Q.   Are you a voting member of the city

23  council?

24      A.   I am, yes, sir.

25      Q.   And what is the total number of members on

1    the city council?

2        A.    Including myself, it's five.

3        Q.    Now, Mr. Mayor, we have prepared a binder

4    of papers and exhibits just to facilitate and

5    expedite the depositions over the next couple of

6    days.  So I want to give you a copy of these

7    deposition exhibits because I'll be asking you some

8    questions about these documents.  And I have another

9    full set of exhibits for your attorney, Mr. Graham.

10        And if you could open up that binder, Mayor

11    Hardin, to Exhibit 8, this particular paper or

12    document is at least portions of the city charter as

13    I understand it.  And if you could briefly just kind

14    of flip through those pages.  Is it your

15    understanding as well that these are at least

16    certain sections of the city charter or city code?

17        A.    It is, yes, sir.

18        Q.    If you would turn to section 2.02, which is

19    four or five pages into this document.

20        A.    Okay.

21        Q.    And I should say, when you review these

22    documents, take as much time that you feel

23    comfortable to look at this before you respond to my

24    question, because we're really in no hurry here.

25        A.    Okay.

1    Q.   So section 2.02 talks about the form of

2  government.  Is it accurate to say that this is a

3  council/manager form of government?

4    A.   It is, yes, sir.

5    Q.   And what, in layman's language, does that

6  mean to you as a council/manager form of government?

7    A.   It means that the mayor and the city

8  council act basically as a board of directors, and

9  we set basically the direction and vision for the

10  city.  And then the city manager handles the

11  day-to-day operations and basically acts on our

12  vision for the city, and moves the city in that

13  direction.

14    Q.   Okay.  Then if you would move on to section

15  3.06 of the city charter.

16    A.   Okay.

17    Q.   It indicates there in the beginning --

18        MR. WOODLEY:  Could we go off the record

19    just for one second?

20        MR. GRAHAM:  Sure.

21    (Discussion held off the record.)

22        MR. WOODLEY:  Okay.  We can go back on the

23    record.

24    Q.   Mayor Hardin, I think we were on section

25  3.06 of the city charter where it indicates that the

1   mayor shall preside over the meetings of the city

2   council.  Is that accurate?

3       A.   Yes, sir.

4       Q.   Then it indicates at the end of that first

5   sentence at section 3.06 that the mayor does not

6   have any regular administrative duties?

7       A.   Correct.

8       Q.   That is correct?

9       A.   Yes, sir.

10      Q.   Then in section 3.07 of the city charter

11  where it discusses powers, it indicates that all

12  matters of policy shall be vested in the city

13  council; is that correct?

14      A.   Yes, sir.

15      Q.   Then you'll see under subsection (a) of

16  3.07, it indicates that the city council shall have

17  the authority or power to appoint and remove the

18  city manager.  Is that accurate?

19      A.   Yes.

20      Q.   Are all votes of the city council, such as

21  the possible appointment or removal of a city

22  manager, done by a majority vote?

23      A.   Yes, sir.

24      Q.   And is that reflected in the city charter

25  or city code as well?

1     A.   It is.

2     Q.   Then if you would move on to section 4.01

3 of the city code where it talks about authority and

4 duties of the city manager.  In the next section,

5 4.02, it indicates that the city manager shall be

6 the head of the administrative branch of the city

7 government and shall have such responsibilities as

8 enforcing all laws and ordinances.  Do you see where

9 it says that?

10    A.   Yes, sir.

11    Q.   And is that correct as well?

12    A.   That is correct.

13    Q.   And it indicates in section 4.02,

14 subparagraph (3), that the city manager will

15 exercise supervision over the officers and employees

16 of the city.  Is that a correct statement?

17    A.   That's correct, yes, sir.

18    Q.   Then if you would move on to section 9.01

19 in the city code.

20    A.   Okay.

21    Q.   As I understand this section and the

22 following paragraphs, it indicates that the city

23 manager has the ultimate responsibility or authority

24 to remove any city officers or city employees.  Is

25 that a correct statement?

13

1        A.   That is correct.

2        Q.   As I understand it, then, basically the

3   city manager would have the final authority, the

4   final say, as to whether or not any city employee

5   would be discharged or removed from his or her

6   position; is that correct?

7        A.   That's the way I understand it, yes, sir.

8        Q.   So you're not the final decision maker as

9   far as removing employees of the city?

10       A.   No, sir.

11       Q.   All right.  Let's move on to another

12   subject matter area.  Mr. Mayor, were you aware that

13   the Phenix City firefighters, at least at some point

14   in time, had formed or organized a local labor

15   organization?

16       A.   Yes, sir.

17       Q.   And when were you generally first aware of

18   that?

19       A.   Probably when I ran for office the first

20   time.  That was back in probably '98, somewhere

21   around that time.  And I understood it to be an

22   association.  I don't know if I really understood it

23   to be a labor union, but I understood it to be an

24   association.

25       Q.   An association of the firefighters?

1    A.   Correct.

2    Q.   When you say you first ran for office, was

3    there a time where you ran for office as mayor and

4    you were unsuccessful?

5    A.   I'm sorry.  Before I ran for my first term

6    as city council member, that was during the time

7    that I heard about the association.

8    Q.   And were you aware at some point in time

9    that the plaintiff in this lawsuit, David Davis,

10    seated at my right, became the president of the

11    firefighters local labor association?

12    A.   I had heard that, yes, sir.

13    Q.   Can you remember when you first heard that

14    approximately?

15    A.   I don't know.  That would have been during

16    my term as mayor that I heard that.

17    Q.   So within the last two years?

18    A.   Yes, sir.

19    Q.   And how long have you known David Davis?

20    A.   Probably about two -- I don't remember if I

21    met him during my first term.  I don't know if I met

22    him or not.  I guess I really knew who he was

23    probably during my -- starting my term or actually

24    when I was running for office for mayor.

25    Q.   And since you have known Mr. Davis, would

1  it be fair and accurate to say that you have had a

2  fairly good relationship or working relationship

3  with Mr. Davis?

4      A.   Well, my -- I don't have a working

5  relationship with people -- you know, my job here is

6  one that I am very removed from the people that work

7  for the city and -- you know, that's basically done

8  by the charter.  So my dealings with employees here

9  are seeing them and saying, hey, how you doing, you

10  know, everything going well kind of deal.  So it's

11  not -- we don't really have a relationship.  It's

12  more of a hey, how you doing kind of thing.  So

13  there's not a relationship between myself and the

14  employees.  And I don't see a lot of them very

15  often.

16      Q.   Okay.  Mr. Mayor, when you ran for the

17  position that you currently hold of mayor, did you

18  ask for the support, the political support, of the

19  firefighters and their labor association?

20      A.   I did not.

21      Q.   You did not?  Do you know whether or not

22  they furnished political support to you when you ran

23  as mayor?

24      A.   They did.

25      Q.   And did you appreciate that?

1      A.    I sure did, yes, sir.

2      Q.    And were they helpful and constructive in

3  you being elected?

4      A.    All help is good when you're running for

5  office.

6      Q.    That makes sense.

7      A.    If you've got people out there working for

8  you, it's a benefit to you.

9      Q.    I understand.  And also when you were

10  campaigning to become the mayor of Phenix City, did

11  you have occasion to meet with the firefighters and

12  perhaps their leader of their labor association

13  during the campaign?

14      A.    I did.

15      Q.    And did you go out to a union hall or

16  restaurant and meet with them?

17      A.    I was invited to go to, if I'm not

18  mistaken, two gatherings at a restaurant, a local

19  restaurant.  I think during my campaign was two

20  different times that I attended.  I was trying to

21  remember that the other day when we were discussing

22  this.

23      Q.    What period of time would that have been

24  before the election when you were meeting with the

25  firefighters association?

17

1    A.    Probably within six months of the election,

2  some time like that.    Typically, elections around

3  here require about a year, ten to twelve months of

4  campaigning for mayor.

5    Q.    So what year are we talking about?

6    A.    We're talking about -- I think the election

7  was in 2004, if I'm not mistaken.    Does that sound

8  right, 2004?

9    Q.    Okay.

10    A.    So that would have been, you know,

11  approximately during that year --

12    Q.    Okay.

13    A.    -- because election was in September.

14    Q.    And on those two occasions when you were

15  campaigning for mayor and when you met with the

16  firefighters and their labor association, do you

17  remember basically what issues were discussed or

18  what concerns the firefighters might have had at the

19  time?

20    A.    I don't really remember specific concerns.

21  I know there was a lot of questions as to, you

22  know -- I think that there were -- if I'm not

23  mistaken, I think there was another person that was

24  running there, or maybe two more people that were

25  running for office, and there were questions to us

1  basically what our platform was, what our agenda

2  was, and basically what kind of people we were.  So

3  just trying to feel us out as candidates.

4      Q.  But did they mention to you issues related

5  to their employment, the fire department's

6  operations or policies?

7      A.  I know that -- I remember there being some

8  complaints.  I don't remember specifics, but I know

9  that there was some talk from the people running the

10  meeting that we don't want to get into all this; you

11  know, we want to talk to the candidates and let them

12  answer questions.  So there was -- I guess there was

13  a couple people that started complaining.  There

14  were people there that said, you know, this is not

15  what this meeting is for kind of deal, if I'm not

16  mistaken.  So I don't really remember any specifics,

17  but I know that there were some rumblings in the

18  room about some things that were not going

19  specifically the way they wanted them to go.

20      Q.  Do you remember any concerns being

21  expressed in those two meetings when you were

22  campaigning for mayor that the firefighters were

23  perhaps troubled by staffing issues or equipment in

24  the fire department or issues like that?  Do you

25  remember anything that comes to mind?

19

A.   I guess what I remember mostly is really personalities being talked about, that there were -- this person didn't like this person more so than anything about staffing and equipment.

Q.   Okay.  Do you remember if Mr. Davis, the plaintiff in this case, attended those two meetings when you were campaigning?

A.   I'm pretty sure -- I know he was at one.  I don't remember the other one.  He could have been at both of them, yes, sir.

Q.   Switching gears, after the time that you were elected and became mayor, did you have occasion to meet with the firefighters labor association and their leaders and members?

A.   I went to -- I was invited to a retirement party for one of the firemen and -- as a matter of fact, it's a guy I went to high school with.  And I went to that meeting.  That's the only meeting or gathering that I can remember attending after getting elected to office.

Q.   Okay.  And during your term as mayor of the city, have you had any discussions with any firefighters about issues concerning the fire department, whether it might be staffing or swap time or trading of time, any concerns that the

20

1    firefighters may have had?

2       A.    Sure.  I've had some calls.  There was a

3    movement on swap time, and I got a call -- or I

4    don't know if it was a call or I ran into somebody

5    that said something about that; that said that that

6    was not a good thing.  And then, actually, someone

7    from Columbus called me, from the Columbus Fire

8    Department, and I guess he had heard some complaints

9    and called me and -- because he lives in Phenix

10   City -- and said that he didn't think it was a good

11   idea to do away with swap time.

12      Q.    Okay.  But I wanted to focus on the

13   firefighters that have been employed here in Phenix

14   City municipality.  Have you had any input or

15   discussions with any of those firefighters since the

16   time you've been mayor about swap time or any

17   policies or issues that involve a fire department?

18      A.    I had a conversation, and I don't -- I

19   don't remember who it was with, but I remember there

20   was a conversation to complain about the swap time.

21   They didn't like the fact of swap time.

22      Q.    And what about other issues?  Obviously,

23   there are many issues in the fire department about

24   public safety and the delivery of fire and rescue

25   services.  The last two years since you have been

1    mayor, have you had a chance to speak with some of

2    the firefighters about those issues?

3        A.    I have -- you know, as far as any

4    day-to-day things, the only thing that I was

5    involved -- we had a interim city manager here when

6    I first got elected, and there were some issues

7    going on within the fire department.  And he was

8    meeting one day with the fire chief -- the interim

9    city manager -- and asked me to sit down and talk

10   with the fire chief.  And my comments were to him

11   that, you know, this is not my position to sit down

12   and talk to the fire chief.  And, basically, I just

13   asked the fire chief, I said, you have had a lot

14   of -- by virtue of us hearing complaints, typically,

15   you pick up the paper and you read letters to the

16   editor or you read, you know, where someone is --

17   you know, the local paper is doing an

18   investigation.  You kind of hear rumblings that

19   things may not be going exactly right.

20       And my question to the fire chief was, you

21   know, all I want to know is do you understand that

22   there are some issues within your fire department

23   and do you have a plan to take care of those

24   things?  And that was the only thing I wanted to

25   know, because that -- you know, as far as my