1    position, that's really not where I'm supposed to be

2    as far as what the charter dictates my position to

3    be.  But I was invited to the meeting, and I just

4    wanted him to know that I had heard that there were

5    some issues.  And, like I say, typically, it's

6    through the paper and hearing rumblings and on

7    occasion, we get -- I'm on a local talk show, so we

8    get some phone calls from people that don't identify

9    themselves, but they let us know some things are

10   going on.  And some you find out once you start

11   asking the city manager and he does an

12   investigation, some you find that are valid and some

13   you find that are not.

14        Q.   Okay.  And who was the fire chief at that

15   point in time that you were just discussing?

16        A.   Prater.  Chief Prater.

17        Q.   Jerry Prater?

18        A.   Yes.

19        Q.   Who was the interim city manager?

20        A.   Max Wilkes.

21        Q.   Now, Mr. Mayor, I've heard it's been said

22   about you -- and this is not new for a lot of city

23   mayors -- that you have an open door policy and you

24   are receptive to communications from city employees,

25   whether they be firefighters or police or citizens

1  in general.  Is that a fair and accurate statement,

2  that you do have that sort of open door policy?

3     A.  It is.

4     Q.  And have you continued that open door

5  policy during the two years that you have been

6  mayor?

7     A.  I have.  You have to be very limited,

8  because some people want to -- it's real easy for

9  someone to say that the mayor said this, and that

10  may not be exactly what you said or it may not be

11  what you implied.  So in my position, you've got to

12  be very careful because you don't want to -- you

13  know, we are governed by a charter, and you want to

14  make sure that you don't encroach on any of the city

15  manager's duties, and you don't want something to be

16  said that you told somebody to do something when

17  that may not have been what you said.  So I guess

18  I'm very careful -- I do have an open door policy.

19  I do return all my phone calls.  But I'm very

20  careful what I say, especially to employees, because

21  you don't want them to think that you're directing

22  them in any way or trying to circumvent any of the

23  authority the charter gives to the city manager.

24     Q.  The police officers are employees of the

25  City of Phenix City.  Do you know if they have a

1    labor association that they're members of?

2        A.   I don't know if they do.  I know that --

3    I'm assuming it's still active -- the FOP.  But I'm

4    not real sure of an association.

5        Q.   And FOP, is that the fraternity order of

6    police?

7        A.   Fraternal Order, yes, sir.

8        Q.   Fraternal Order of Police.  Have you ever

9    spoken to the leaders of the FOP representing the

10   police officers of the city?

11       A.   Not as I know of.  If I did, I don't know

12   that I did.

13       Q.   Let's switch gears again.  At some point in

14   time, did you learn that the plaintiff, David Davis,

15   in this case had been terminated from his position

16   as a firefighter with the city?

17       A.   I did.  I heard that.

18       Q.   And who first told you that?  How did you

19   first discover that he was fired?

20       A.   If I'm not mistaken, it was one of the

21   council members that told me -- one of my fellow

22   council members.

23       Q.   Would that have been Mr. Bush?

24       A.   Yes.

25       Q.   Did he call you up or did he see you on the

1    street or what happened?

2        A.   I think we were talking on the phone one

3    day, and we were talking about different things, and

4    he happened to mention that Mr. Davis had been

5    terminated.

6        Q.   And what was your response when you had

7    this conversation with Mr. Bush?

8        A.   I didn't know that.  I was kind of shocked

9    and surprised because I didn't know that.  I hadn't

10   heard that.  Typically, in a small town, you know --

11   I think this had happened like a week before.  But

12   typically in a small town, you kind of know what --

13   you know, typically what goes on, whether it's

14   within the city or in the county or wherever it is,

15   you kind of hear stuff.  The rumor mill around here

16   is strong so you hear those things, you know,

17   typically an hour after they happen, not a week.

18       Q.   So when Council Member Bush informed you

19   that Mr. Davis had been discharged, as you put it,

20   you were surprised or shocked?

21       A.   Yes.

22       Q.   Was Council Member Bush also surprised at

23   the time?

24       A.   I think he was, because when he -- I guess

25   when we were talking about it, when he told me, he

1    expected me to know that for some reason.  And I

2    don't know -- I guess he thought I had already heard

3    that.

4        Q.    Anything else said in that conversation

5    with Council Member Bush that you can remember?

6        A.    We talked about a lot -- it was not -- the

7    gist of the conversation was not to discuss a

8    terminated employee; it was just about some other

9    stuff, and that just came up.

10       Q.    When that conversation with Council Member

11   Bush was concluded and you had been informed that

12   Mr. Davis had been terminated, did you do anything

13   or talk to anyone further about the discharge of

14   Mr. Davis?

15       A.    If I'm not mistaken, when I heard that

16   conversation, I was on the way out of town with my

17   family for a long weekend at the beach or something,

18   and so I didn't do anything immediately.  But I

19   did -- when I came back to town, I asked about it.

20   I asked the city manager about it.

21       Q.    So did you initiate that conversation with

22   the city manager?

23       A.    Yes.

24       Q.    Did you call him up on the phone?

25       A.    No.  I think I waited until I got back in

1　town, because I was on the way out of town at that

2　time.

3　　　Q.　So did you meet with the city manager and

4　raise that issue of Mr. Davis's discharge?

5　　　A.　Yes.　Typically -- not just for that

6　purpose.　Typically when I come in on Monday morning

7　or something like that, I'll go over some things;

8　typically complaints that I have had from people in

9　the city about fixing potholes or -- so I have a

10　list of stuff and just kind of go over that.　And,

11　oh, by the way, I heard this, is this true kind of

12　thing.　So just bring up stuff or we'll talk about a

13　car wreck or a fire or whatever the case is or --

14　you know, trash on the riverwalk, so just kind of go

15　over a list of stuff.

16　　　Q.　And was it Mr. Roberts who was the city

17　manager that you discussed it with?

18　　　A.　Yes.

19　　　Q.　And do you regularly meet with the city

20　manager about various issues?

21　　　A.　We don't have a regular meeting time, but

22　it's kind of -- you know, his office is right next

23　to mine.　So when things come up, it's, hey, let me

24　ask you a question or, hey, I need to inform you of

25　this.　So it's not a -- we don't really have a --

1   barring our outside regular meetings or work session

2   and council meeting, we don't really have official

3   meeting times or times that we meet unless there's a

4   specific purpose.  But on these type conversations,

5   it will be, you know, I heard this or this is going

6   on, so -- but, typically, it's more in line with

7   minor complaints from citizens that I pass on to the

8   city manager, and he takes care of those things.

9       Q.  On the particular occasion where you met

10  with City Manager Roberts concerning, in part at

11  least, the termination of Mr. Davis, did you have a

12  list of items for that meeting that you did, in

13  fact, want to discuss with the city manager?

14      A.  I don't think I did, no.

15      Q.  Okay.  But one of the issues that you

16  raised with City Manager Roberts was the termination

17  of Mr. Davis?

18      A.  Correct.

19      Q.  And what do you recall the nature of that

20  conversation with Mr. Roberts concerning the

21  termination of Mr. Davis?

22      A.  Went something like, I heard that David

23  Davis was terminated, is that true?  And he

24  confirmed that it was.

25      Q.  So, undoubtedly, there was more discussed

1  about that.  Did you ask him why was he terminated?

2      A.   I don't -- I -- I don't know if I did, but

3  I had heard that it was for breaking the chain of

4  command.  And I don't know if I confirmed that or

5  not.  I'm just -- because, typically, it's -- you

6  know, I would ask, you know, if I didn't know.  But

7  in this case, I had heard that it was for breaching

8  the chain of command or breaking the chain of

9  command, so I don't know if I asked him or not.  I

10 don't remember the specifics of the conversation.

11 But I kind of had heard, you know, going into the

12 conversation, the reason why.

13     Q.   And who had told you the reason why

14 Mr. Davis was terminated?

15     A.   Councilman Bush.

16     Q.   And when you say breaking the chain of

17 command, please be more specific.  Could that have

18 been perhaps a conversation or telephone discussion

19 that Mr. Davis had with you?

20     A.   Yes.

21     Q.   And could you elaborate on that?

22     A.   Of the reason or the conversation that we

23 had?

24     Q.   Well, both.  Let's start with the reason

25 first, and then we'll go into the conversation that

30

1    Mr. Davis had with you.

2         A.   Okay.   The -- Well, let me make sure I

3    understand the question, okay?   You want me to

4    discuss the conversation?

5         Q.   That makes sense.   Why don't we do that

6    initially?   Why don't you discuss the nature of the

7    conversation that you had with Mr. Davis and who

8    initiated that first.

9         A.   I got a call which -- a message from David

10   Davis, which I returned his phone call, which is

11   what I do.   I try to return all my phone calls

12   unless it's just someone I absolutely can't

13   communicate with, and then I won't.   But 99 percent

14   of the time, I return phone calls.

15        And I returned Mr. Davis' phone call, called him

16   back.   And he wanted to discuss an item that was on

17   the agenda, an ordinance that was on the agenda to

18   change the probation period.   And that was -- he

19   wanted to ask a question, I think, as to when it was

20   going to come up for a vote, and then also elaborate

21   on some input that he wanted to have, I guess -- I'm

22   not sure, but I think that he asked why we were, as

23   a council, going to change or are interested in

24   changing this probation time.   So if I'm not

25   mistaken, that is all the conversation consisted of.

31

1      Q.   Let me return to that conversation just a

2   couple of minutes.   With regard to the discharge of

3   Mr. Davis, who, within the city, made that final

4   decision that he would be terminated?

5      A.   I would assume it would be the city

6   manager.

7      Q.   Well, I don't want you to assume.   Do you

8   know, in fact, who has the authority and who, in

9   fact, made the final decision to terminate

10  Mr. Davis?

11     A.   I don't get into the specifics of

12  personnel, but I'm just assuming the way it works --

13  I'm assuming that -- I can't tell you specifically.

14  You're asking for a specific answer.   I don't know.

15     I would think that it would work based on the

16  fire chief making a recommendation of termination to

17  the city manager.   If I'm not mistaken, I think the

18  fire chief has the authority to make those

19  decisions, but I think he runs those decisions by

20  the city manager prior to executing those things.

21     Q.   Okay.   But once again, just so the record

22  is clear, you were not involved in the

23  decisionmaking to terminate Mr. Davis; is that --

24     A.   No.

25     Q.   -- correct?   Have you, Mr. Mayor, ever

1   spoken to the media or a journalist, newspaper

2   reporter, about the termination of Mr. Davis from

3   his job in the fire department?

4       A.   I have been asked questions concerning

5   that.

6       Q.   Was that a newspaper?

7       A.   I'm sure both.  I mean, typically, we get

8   hit by all the media, so I know that a newspaper did

9   ask about it, and I'm sure there was some other

10  media coverage also.

11      Q.   And what newspaper are you referring to?

12      A.   Would have been both the Columbus Ledger

13  across the river, and I'm sure the local paper

14  covered it also.

15      Q.   And do you remember what you might have

16  said about the termination of Mr. Davis to those

17  newspapers?

18      A.   I typically don't comment on things like

19  that, so it would have been more or less no comment

20  or something to that effect.  Typically, personnel

21  issues, especially since they're not within my

22  realm, I try not to comment on them.  And if I keep

23  getting pressed, I try to say as little as I can,

24  because I don't know a lot about those things

25  because that's not within my authority to -- it's

1    out of my pay grade.

2        Q.    Sir, do you remember if you told a

3    journalist or a representative from a newspaper that

4    you were surprised to discover or learn that

5    Mr. Davis had been fired?

6        A.    I'm sure I did, if they would have asked.

7        Q.    And that would have been an accurate

8    comment, because I think you testified about that?

9        A.    Yes.

10        Q.    All right.  Let me invite your attention to

11    Exhibit Number 10, if you would turn to that.  And

12    this happens to be a pleading or a motion to dismiss

13    that was filed by the attorneys in this case earlier

14    on in the lawsuit.  And if you would go to page

15    number five of this pleading.

16        A.    Okay.

17        Q.    And you'll see about a third of the way

18    down here on page five of this Motion to Dismiss

19    where it says, quote, it is not disputed that the

20    reason for the termination of the plaintiff was his

21    contact to the mayor, which was a direct violation

22    of the city's merit system's rules and regulations,

23    end quote.  Do you see where it says that?

24        A.    Yes, I do.

25        Q.    As far as you know, sir, based upon the

1    information that you had about the circumstances

2    surrounding Mr. Davis's termination, is it fair and

3    accurate to say that that was the single reason or

4    single basis for the termination of Mr. Davis?

5         A.   I -- I don't -- I know that was one of the

6    reasons.   That's what I was told, that was one of

7    the reasons.

8         Q.   Were there additional reasons for his

9    termination that you were told?

10        A.   I'm assuming -- my answer is I assumed that

11   when I heard that, because I heard that was one of

12   the reasons but there were other pending factors

13   that weighed in on that.

14        Q.   When you say there were other pending

15   factors that weighed in, what were those pending

16   factors?

17        A.   I didn't get involved in that.

18        Q.   So you don't know if there were other

19   factors?

20        A.   No.

21        Q.   A couple questions on Exhibit Number 11,

22   Mr. Mayor.   This is a document that is over the name

23   of David Davis, then vice-president of the local

24   firefighters association dated January 25, 2005,

25   which was addressed to then fire chief Jerry Prater

1    in which Mr. Davis and the firefighters' labor

2    association have raised a number of issues that they

3    wanted to explore and discuss, including safety,

4    general employment issues, discipline, and

5    communications.  Have you ever seen this document

6    before today?

7        A.  I don't recall the document.  I have gotten

8    some mail from them, but I don't know if this was

9    part of the package that I received or not.

10       Q.  When you say you received mail from them,

11   you mean from the firefighters' labor association?

12       A.  Well, let me say I don't know.  I've gotten

13   mail -- I get anonymous mail from time to time that

14   talks about different things.  So I don't know if I

15   received this or not.  It does not look familiar to

16   me, but I have received some stuff and actually have

17   seen some stuff in the paper about different

18   things.  So I don't know -- I don't know if I

19   received this under this cover, or if something like

20   this came to me anonymously, I don't know.

21       Q.  But when you said just a moment ago that

22   you received some stuff or mailings, as I understood

23   your comment, and explained that you received

24   information or documents from the firefighters'

25   labor group or labor association.  Do you recall

1    that?

2        A.   I don't receive -- I don't believe I

3    received anything specifically from the firefighters

4    addressed to me, but have seen some stuff that has

5    circulated around about the firefighters' association

6    and some of the -- some of this stuff that is

7    outlined in here, I've heard of a couple of these

8    things.

9        Q.   When you say you've seen some stuff --

10       A.   Yes.

11       Q.   -- just so it's clear --

12       A.   Some paperwork.  Some letters.  Some basic

13   stuff that's been generated around, whether it's

14   come to me or other council members that may have

15   been circulated around.

16       Q.   Okay.  But this would have been letters or

17   memos from the firefighters' labor association; is

18   that correct?

19       A.   Or copies of those, yes, sir.

20       Q.   In the last two years since you've been

21   mayor?

22       A.   Yes.

23       Q.   And would those have been circulated or

24   given to the city council members as well?

25       A.   I don't know that.  Like I say, from time

37

1    to time, we share -- we share anonymous mail back

2    and forth, so from time to time, some people get

3    things and some others don't.  So we -- but

4    sometimes if we find something that is -- not that

5    this would be amusing, but sometimes we share things

6    that come in the mail that are amusing about each

7    other.

8         I'm not sure whether this particular piece came

9    to any of us, but some of these things, as I look

10   over it, looks like we have seen some of this

11   stuff -- or I've seen some of this stuff.

12        Q.   Okay.  If you would, turn briefly to

13   Exhibit Number 14, which are copies of various

14   newspaper articles and letters to the editor of

15   newspapers in which the fire department policies and

16   issues are being discussed by various firefighters

17   as well as Chief Hunter and others.  Do you recall,

18   at least in a general sense, Mr. Mayor, having seen

19   these newspaper articles in September of 2006 and

20   even earlier, September 2005, over the course of the

21   last couple of years?

22        A.   I have.  I'm looking over them now.

23        Q.   Yes.  Take your time, please.

24        A.   I know I've seen some of these.  I don't

25   know if I actually read all of these, but I have

38

1   seen some of these.

2       Q.   And at least in a general sense, in these

3   various newspaper articles, particularly the first

4   one that's in Exhibit 14, a number of the

5   firefighters, including David Davis, expressed their

6   concerns about a poor or low morale in the fire

7   department and expressed their concerns about

8   understaffing within the city's fire department.

9   Have these particular issues or concerns been

10  brought to your attention about --

11      A.   Through --

12      Q.   I'm sorry.  Go ahead.

13      A.   Certainly when you read stuff like this in

14  the paper, that brings it to your attention because

15  everybody is talking about it when they see it in

16  the paper like that.  So, yes, it was brought to our

17  attention.

18      Q.   And other than the one meeting that you

19  indicated earlier in your testimony that you had

20  with the city manager and the chief of the fire

21  department, have you had other meetings to address

22  these issues of concern raised by the firefighters

23  and Mr. Davis?

24      A.   None that I recall, no, sir.

25      Q.   Just that one meeting?

39

1     A.   Yes, sir.

2     Q.   Do you know if any action was taken in

3     response to that one meeting by the fire department

4     or Chief Hunter to address these issues?

5     A.   No.  Chief Prater is who I met with at the

6     time.  And, like I said, my only comments at the

7     time were -- you know, all I want to know is do you

8     know that there's some issues within the fire

9     department and do you have a plan to fix that.

10     Q.   Did you do a follow-up, though, to see if

11     then Chief Jerry Prater addressed those issues?

12     A.   No.  See, that's where it gets -- that's

13     where the line is very specific.

14     Q.   That's the disconnect?

15     A.   Right.  And then my correspondence after

16     that would be with the city manager, so --

17     Q.   Okay.  Let's move on to a letter that I

18     believe you received, but I certainly want to ask

19     you about it.

20     A.   Okay.

21     Q.   And this would be Exhibit Number 17,

22     Mayor.  And this appears to be a letter from the

23     general president of the International Association

24     of Firefighters, a gentleman named Harold

25     Schaitberger, and it's dated January 31, 2006, and

1  it's addressed to the then City Manager Roberts.

2  And if you look at the last page, the third page on

3  this letter, it indicates that you were sent a copy

4  of this letter from Mr. Schaitberger?

5      A.   Uh-huh.

6      Q.   Do you recall, in fact, receiving a copy of

7  this letter?

8      A.   I believe I did, yes, sir.

9      Q.   Have you had a chance to review this letter

10 within the last couple of weeks?

11     A.   I have not, no, sir.

12     Q.   Okay.  Well, take just a couple minutes now

13 to review it to yourself, because I want to ask you

14 several questions.

15     A.   Okay.

16     Q.   You've had a full opportunity to read

17 through that three-page letter from

18 Mr. Schaitberger?

19     A.   Yes.

20     Q.   Once again, you do recall having received

21 that letter at the time it was addressed?

22     A.   I believe I did.  I don't remember

23 specifically, but I believe I did.

24     Q.   Now, when you received this letter back in

25 probably early February of 2006, did you do

1    anything?  Talk to anyone in response to this

2    letter?

3        A.   I don't think I did, no.

4        Q.   Now, in part, this letter addressed --

5    you'll see I'm going further down on the first page

6    of this letter, Exhibit 17, that it addresses the

7    concerns, apparently, of the firefighters about any

8    threat with retaliation about implementing an 8-hour

9    shift.  You see where it says that?

10       A.   Yes.

11       Q.   Were you familiar with that subject matter

12   at all?

13       A.   I had heard that.  I had heard that, I

14   guess, through the rumor mill, that there was a talk

15   of making changes in the shift work.

16       Q.   Did you have any conversations or meetings

17   about that possibility of reducing the hours to an

18   8-hour shift?

19       A.   No.

20       Q.   And that would not have been within your

21   scope of authority as mayor?

22       A.   No.

23       Q.   On the top of page two of

24   Mr. Schaitberger's letter, it refers to local union

25   president Davis, in September of 2005, being issued

1   a counseling form or reprimand concerning his

2   speaking to the local media.  Are you familiar with

3   that subject matter at all?

4       A.   No.

5       Q.   And then further on in this letter,

6   Mr. Schaitberger addresses the rights that public

7   employees, including firefighters, have under the

8   First Amendment about free speech and free

9   association.  Are you familiar with those

10  principles, that public employees like firefighters

11  do have a constitutional right of free speech and

12  free association?

13      A.   Sure.

14      Q.   And how long have you been familiar with

15  those principles?  Has it been a matter of years?

16      A.   Probably early in civics, you know.

17      Q.   In high school?

18      A.   In high school, yes.

19      Q.   So when Mr. Schaitberger addressed these

20  principles about the First Amendment rights of

21  Mr. Davis or public employees, it didn't come as a

22  shock or a surprise to you, did it?

23      A.   No.  I think he's reiterating what we

24  already know, that all people have a right to free

25  speech.