1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION



**EXHIBIT**

**4**

**CONDENSED**

**COPY**

DAVID DAVIS,            )
                       )
      Plaintiff,    )
                       )
vs.                  )   CIVIL ACTION
                       )   FILE NO. 3:06-CV-00544-VPM
PHENIX CITY, ALABAMA, et al.,)
                       )
      Defendants.   )

Oral Deposition of **MR. DAVID DAVIS**, Plaintiff, called

by the Defendant, before Courtney Tillman Peters,

Certified Court Reporter and Notary Public for the State

of Alabama, taken at the City of Phenix City Hall, 601

12th Street, Phenix City, Alabama 36867, on the 5th day of

April, 2007, commencing at 11:25 a.m. EST.

**COURTNEY TILLMAN PETERS**
Certified in Alabama & Georgia
**CAUSEY & PETERSON CERTIFIED COURT REPORTERS**
Post Office Box 81
Columbus, Georgia  31902
(706) 317-3111

**2**

**APPEARANCES OF COUNSEL**

For the Plaintiff:    MR. THOMAS A. WOODLEY
Woodley & McGillivary
1125 Fifteenth Street, NW
Suite 400
Washington, D. C. 20005

For the Defendants:    MR. JAMES R. MCKOON, JR.
McKoon, Thomas & McKoon
925 Broad Street
Phenix City, Alabama 36867

MR. JAMES P. GRAHAM, JR.
Graham Law Offices
712 13th Street
Phenix City, Alabama 36867

Also Present:    ROY WATERS
WALLACE HUNTER
H. H. ROBERTS

**INDEX TO EXAMINATIONS**

| WITNESS/ATTY | DIR | CR | RD | RC |
|---|---|---|---|---|
| Davis (McKoon) | | 4 | | |

**INDEX OF EXHIBITS**

| INDEX NO. | PAGE |
|---|---|
| There were no exhibits marked for identification. | |

**3**

**S T I P U L A T I O N S**

IT IS STIPULATED AND AGREED by and between counsel appearing for the respective parties that:

1) The oral deposition of **MR. DAVID DAVIS**, Plaintiff, called by the Defendant, taken before Courtney Tillman Peters, Certified Court Reporter and Notary Public for the State of Alabama, at 601 12th Street, Phenix City, Alabama 36867, commencing at 11:25 a.m. EST, on the 5th of April, 2007;

2) ALL FORMALITIES with reference to notice of taking, notice of time and place of taking, qualifications of the Court Reporter, and all other matters precedent to the taking of depositions are WAIVED;

3) ALL OBJECTIONS, EXCEPT as to the form of the question and responsiveness of the answer, are RESERVED to the time of the hearing of the case;

4) ALL FORMALITIES with reference to the filing of depositions, including notice of filing, etc., are WAIVED;

5) With the consent of deponent, the reading and signing of the deposition by deponent is NOT WAIVED;

– – – – – – – – – – – – – – –

**4**

WHEREUPON, the deposition of Mr. David Davis, beginning at 11:25 a.m. EST, occurred as follows:

**MR. DAVID DAVIS**

Having been first duly sworn, testified upon examination, as follows:

MR. MCKOON:  State your name for the record, please, sir.

THE WITNESS:  My name is David Paul Davis.

MR. MCKOON:  Mr. Davis, my name is Jim McKoon. We have met a couple of times before, but we will be taking your deposition today and just asking you some questions under oath.  If at any time you don't understand my question, would you indicate that you don't understand it so that I can rephrase it?

THE WITNESS:  Yes, sir.

MR. MCKOON:  And if you answer my question, then I will assume that you understood it and that that is your answer to my question.  Is that fair enough?

THE WITNESS:  Fair enough.

**CROSS-EXAMINATION**

BY MR. MCKOON:

Q.    Give me your address.

A.    My address is 185 Lee Road 236, Phenix City, Alabama, 36870.

Q.    Where is that, a particular subdivision or --

**5**

A.    Not really.  It's just on Auburn Road, not in any particular subdivision.

Q.    Is it within the Phenix City limits?

A.    No, sir.  It's not within the Phenix City limits.

Q.    All right.  And is it in Lee County, Alabama?

A.    Yes, sir.

Q.    How long have you lived at that address?

A.    Probably I would say nine years --

Q.    All right.

A.    -- there take or give a year or two.  I'm not real -- I can't remember the exact date I moved at that address.

Q.    Who all lives there with you?

A.    Myself and my wife.

Q.    And what is her name?

A.    Brenda.

Q.    And is Brenda employed anywhere?

A.    Yes, sir.

Q.    Where is she employed?

A.    She's employed at Nova Med Surgery Center.

Q.    And what does she do?

A.    She's a nurse.

Q.    Is she an RN?

A.    Yes, sir.

Q.    How old are you?

**6**

1    A.    I am 32.
2    Q.    Briefly, if you would, I know it's contained in
3    your personnel file but for the record, tell me, start
4    with high school. I think you graduated from Smiths
5    Station High School; is that correct?
6    A.    Yes, sir.
7    Q.    All right. From there forward, would you just
8    give me your educational training and background?
9    A.    Yes, sir. I went to Smiths Station High School
10   and I graduated in 1993. I went to Chattahoochee Valley
11   Community College and graduated with my associate's
12   degree, I believe it was in 2000. Then I went to Columbus
13   Technical College and got my training, my paramedic
14   training and graduated in 2001. Then I went to Colorado
15   State University and graduated in 2004 with my bachelor's.
16   Then I went to Columbia Southern University and graduated
17   with my master's in 2006.
18   Q.    What is your master's in?
19   A.    Master of Science and Occupational Safety and
20   Health.
21   Q.    And the Colorado State University degree, what is
22   that in?
23   A.    Technology, Education and Training with an
24   emphasis in Fire Service Management.
25   Q.    Where are you currently employed?

**7**

1    A.    Right now, I have two jobs that I'm working. One
2    is with the City of Opelika.
3    Q.    What do you do with the City of Opelika?
4    A.    I'm a firefighter/paramedic.
5    Q.    When did you become employed with the City of
6    Opelika as a firefighter/paramedic?
7    A.    February 22, 2007.
8    Q.    Okay. And what's the other job?
9    A.    Care Ambulance Service.
10   Q.    Now, you have been here the last day and attended
11   all of the depositions taken in this case so far. The
12   only reason I say that is because sometimes it gives us a
13   frame of reference rather than me having to go back and
14   ask you a lot of things that I might otherwise -- I'm
15   going to try to shorten it as much as possible although we
16   will be here a little while. When we were going through
17   some of the other depositions, you had a date of
18   termination from the Phenix City Fire Department of when?
19   Do you remember when that was?
20   A.    Yes, sir. It was April 21.
21   Q.    What year?
22   A.    2006.
23   Q.    Okay. So from April 21, 2006 when you were
24   terminated with the Phenix City Fire Department, where
25   have you been employed between that time and your

**8**

1    employment with the City of Opelika?
2    A.    Care Ambulance Service.
3    Q.    Okay. Were you at the time you were working with
4    the City of Phenix City Fire Department also working for
5    Care Ambulance?
6    A.    No, sir.
7    Q.    Okay. When did your employment with Care
8    Ambulance begin?
9    A.    I'm not sure of the exact date, but it was some
10   time after my termination, possibly some time in probably
11   May.
12   Q.    Within an month or so?
13   A.    May or June, somewhere in there. It was pretty
14   quick from what I recollect.
15   Q.    Okay. And what was your job with Care Ambulance
16   when you started with them in May or June of 2006?
17   A.    Paramedic.
18   Q.    And what type of hours were you working for them?
19   A.    Working two 24-hour shifts a week.
20   Q.    Was that on the weekend or just whatever shifts
21   they gave you?
22   A.    Whatever was assigned.
23   Q.    Okay. And how do you work with them now?
24   A.    I work one day on, two days off.
25   Q.    That's seven days a week rotation?

**9**

1    A.    Well, yes, sir. I mean, seven -- yeah.
2    Q.    And do you -- I guess you tell them that your
3    employment with them, it is -- would you consider that
4    your secondary employment now and with the fire department
5    employment being your primary employment?
6    A.    Well, I'd have to be careful to say that because
7    both organizations would assume that they are both.
8    Q.    Let me put it this way: Which one pays you the
9    most?
10   A.    Probably Care Ambulance Service.
11   Q.    At this time. But you are able to schedule
12   yourself with both employers, both the City of Opelika and
13   with Care Ambulance, so that you can meet the requirements
14   of both of those employers?
15   A.    Somewhat.
16   Q.    Okay. Well, tell me how not.
17   A.    Well, I work for Opelika for 24 hours.
18   Q.    Uh-huh.
19   A.    Then I get off from there and I have to come to
20   Care Ambulance Service.
21   Q.    Okay.
22   A.    Unfortunately, Care Ambulance Service's shift
23   starts at a time that I would be late coming to work so
24   they have allowed for me to adjust my hours to make it in.
25   Q.    Okay.

10

1    A.    And not be punished.
2    Q.    Are you able to sleep on either one of these
3    jobs?
4    A.    In theory, yes.
5    Q.    I guess what I'm really trying to find out is do
6    they have provision for you to sleep?
7    A.    Yes, they do.
8    Q.    Do they have a cot for you to sleep on or
9    whatever?
10    A.    Yes.
11    Q.    Okay.  At both places?
12    A.    Yes.
13    Q.    When you worked with the City of Phenix City and
14    I'll go back to the year 2005/2006, did you have any other
15    employment other than with the City of Phenix City Fire
16    Department in those years?
17    A.    I don't believe that I did.  I believe I was
18    going to school primarily.
19    Q.    Okay.  And was the school that you were going to,
20    I know you have named them, but was it an on-line
21    situation or were you actually attending these schools,
22    going to a physical location?
23    A.    It was a mix.  The classes that I could attend
24    on-line, I did.  Some of the classes that I took at the
25    local colleges --

11

1    Q.    Okay.
2    A.    -- through that.
3    Q.    Okay.  Let me ask you this:  The Colorado State
4    one, was that all on-line stuff?
5    A.    Yes.
6    Q.    Okay.  And then on Columbia, is that Columbia
7    Southern?
8    A.    Columbia Southern.
9    Q.    Southern, I'm sorry.  Was it also on-line?
10    A.    Yes, sir.
11    Q.    When was the last time you physically attended a
12    place of higher learning?
13    A.    I believe I graduated in June 2006, so it would
14    be, you know, days or weeks in June.
15    Q.    All right.  What is your rank currently with the
16    City of Opelika Firefighter?
17    A.    Just fire medic.
18    Q.    Fire medic.  Okay.  And what do they pay you over
19    there?
20    A.    Hourly?
21    Q.    However you are paid.
22    A.    I'm paid hourly at $9.56 an hour.
23    Q.    Okay.  And how many hours do you work for them
24    each week?
25    A.    It varies.  I mean, you know, because I have got

12

1    different checks.  They do it different and I haven't went
2    through the whole process so I'd say at least 53 hours a
3    week.
4    Q.    With Care Ambulance, what are you making there?
5    A.    I make $14.00 an hour.
6    Q.    And that's times how many hours a week?
7    A.    53.
8    Q.    So you currently getting paid for 106 hours a
9    week?
10    A.    Yes.
11    Q.    All right.  When you were with the City of Phenix
12    City, what were you making as Sergeant prior to your
13    termination?
14    A.    $11.90 an hour.
15    Q.    So when you left Phenix City to go to Care
16    Ambulance, what did they start you out at?
17    A.    $12.50.
18    Q.    So were you making more money?  I'm not talking
19    about benefits and all that, but were you making more
20    money with Care Ambulance than you were as a Sergeant with
21    the City of Phenix City Fire Department?
22    A.    No, sir.
23    Q.    Okay.  And why not?
24    A.    Because I only worked 48 hours a week.
25    Q.    For Care Ambulance?

13

1    A.    Yes, sir.
2    Q.    And when you were working for the City of Phenix
3    City, how many hours were you working?
4    A.    Well, I was actually working a lot of overtime so
5    I was almost doubling my salary.
6    Q.    Okay.  So you were making the $11.90 plus time
7    and a half for overtime?
8    A.    Yes, sir.
9    Q.    I got you.  All right.  You are claiming in your
10    lawsuit lost wages, that's the reason I'm asking you these
11    questions.  Do you know how much money you reported on
12    your income tax returns in year 2005, as far as your
13    income?
14    A.    No, sir, I don't.  I don't recall.
15    Q.    Is that readily available to you?  Can you find
16    that out?
17    A.    I don't have anything with me.
18    Q.    I know that.  I'm talking about some time in the
19    near future like tomorrow or the next day, Could you find
20    that out?
21    A.    I'd have to check with my wife.  She kind of
22    handled all that stuff.
23    Q.    All right.  All right.  And for 2006, have you
24    filed tax returns for '05 and '06?
25    A.    Yes, sir.  I think we -- I think she has.

14

1    Q.    All right.
2    A.    I signed some paperwork so ...
3    Q.    And are you, as part of your lawsuit, claiming
4    lost wages?
5    A.    Yes, sir.
6    Q.    Okay. Do you know of any other way that would be
7    more efficient and less intrusive to find out what your
8    actual wages were for 2005 and 2006, other than you
9    providing the income tax returns?
10    A.    I don't know.
11    Q.    I mean, would that be the best way to find out
12    what you reported to the government as what you made?
13    A.    That's the only way I keep a record, I mean.
14    Q.    That's the only way you know to do?
15    A.    A pay stub or, you know, W-2s or would be the
16    only way I know.
17    Q.    All right. Now, are you still a member of the
18    International Firefighters Association?
19    A.    Yes, sir.
20    Q.    Okay. And how long have you been a member?
21    A.    I think I became a member in '99 when I got off
22    probation.
23    Q.    Okay. Did anyone recruit your membership or --
24    A.    Yes, sir.
25    Q.    Who was that?

15

1    A.    I believe it was Joseph Terrell.
2    Q.    Joseph Terrell?
3    A.    Yes, sir.
4    Q.    Okay. Was he another firefighter with the City
5    of Phenix City at the time?
6    A.    Yes, sir.
7    Q.    In 1999, do you remember who the president of the
8    local union was?
9    A.    I believe it was Dennis Duty.
10    Q.    Okay. And do you pay dues to the union?
11    A.    Yes, sir.
12    Q.    And are you still doing that with the City of
13    Opelika?
14    A.    No, sir.
15    Q.    Okay. Do they have a firefighters local over
16    there?
17    A.    I'm not -- nobody has said anything to me as of
18    yet so ...
19    Q.    You don't know?
20    A.    I don't know.
21    Q.    What requirements, if any, do you have to meet to
22    be a member of the International Firefighters Association?
23    A.    I believe that you have to be employed as a
24    firefighter.
25    Q.    Okay. When Mr. Terrell recruited you, tell me

16

1    how he went about that. In other words, what did he tell
2    you about the union or its benefits?
3    A.    I mean, they just asked me if I was a member of
4    the union, and I told them no and I didn't know anything
5    about it. And so they sat down and, you know, told me a
6    little bit about it and asked me if I was interested and
7    to come to a meeting.
8    Q.    Okay. And is that how you signed up or joined?
9    A.    Yes, sir.
10    Q.    Do you have some sort of a union member card or
11    anything like that?
12    A.    Yes, sir.
13    Q.    Do you keep that on you?
14    A.    I keep it in my wallet.
15    Q.    Do you have it with you today?
16    A.    No, sir.
17    Q.    You don't have your wallet today?
18    A.    I carry two wallets, one for work and then one
19    for when I'm away from work. I keep, you know, because if
20    you got to fight a fire or something and your credit cards
21    and everything get ruined.
22    Q.    Right. Do you have a member number?
23    A.    Yes, sir.
24    Q.    What is it?
25    A.    I don't know it by heart.

17

1    Q.    Okay. How long were you just a member as opposed
2    to an officer?
3    A.    I think I became an officer in 2002 so whatever
4    the math is from '99 to '02.
5    Q.    Okay. And what was the first office you held in
6    the local union?
7    A.    I was a secretary/treasurer.
8    Q.    And how did you achieve that office?
9    A.    I was nominated for the position and then
10    elected.
11    Q.    Okay. During that time frame of 2002, do you
12    know how many members you had there with the local union,
13    roughly?
14    A.    I believe when I took over secretary/treasurer,
15    there may -- it may have been 30, between 20 and 30. I
16    don't want -- I'm not real quite sure.
17    Q.    Okay.
18    A.    It's been some time ago.
19    Q.    All right. After serving as secretary/treasurer,
20    did you continue to be an officer up until I guess you
21    left the Phenix City Fire Department employment?
22    A.    Yes, sir.
23    Q.    Okay. Tell me the offices you held and the years
24    you held them if you can recall.
25    A.    I was -- I don't remember the year I was elected,

18

1  but I progressed to vice president.
2      Q.   Okay.
3      A.   And then I believe I was vice president up
4  until -- is it 2005, October of 2005 I believe I was
5  elected president.
6      Q.   Okay.  Who was president before that time in
7  2005?
8      A.   Dennis Duty.
9      Q.   Okay.  All right.  How many Chiefs have you
10  served under since you were employed by the City of Phenix
11  City or during the time you were employed by the City of
12  Phenix City?
13      A.   Let me see.  You want me to count them out or --
14      Q.   Yeah.  Just name them starting with the first.
15      A.   Chief Blankenship and then I believe -- I believe
16  Chief Hunter was -- I don't remember if he was interim or
17  the Chief, one or the other, and then Chief Prater and
18  then Chief Hunter definitely the next time.
19      Q.   Okay.  Do you know what happened to Chief
20  Blankenship, why he left the department?
21      A.   I believe he resigned as Chief.
22      Q.   Do you remember the circumstances of that?
23      A.   I believe there was some accusations that he was
24  guilty of kickbacks or some kind of something that was
25  going on.

19

1      Q.   Do you remember who made those allegations?
2      A.   I believe that -- I believe the union, some of
3  the union membership made those allegations.
4      Q.   Do you know whether or not those allegations were
5  ever proven to be true?
6      A.   No, sir, I do not.
7      Q.   Okay.  And Chief Prater, do you know what the
8  circumstances of him leaving as Fire Chief?
9      A.   No, sir.
10      Q.   Okay.  Did you get along with Chief Blankenship
11  when he was here?
12      A.   Yes, sir.
13      Q.   What about Chief Prater?
14      A.   I had a little contact with Chief Prater, other
15  than a meeting or two.
16      Q.   You didn't see him that much?
17      A.   That's correct.
18      Q.   Okay.  And how would you describe your
19  relationship with Chief Hunter since he became Chief?
20      A.   We didn't really have much of a relationship.
21      Q.   Was it good or bad or you just didn't have one?
22      A.   Didn't have one.
23      Q.   Back in 2005, there's been some reference to some
24  newspaper articles.  Let's see if I can find the exhibit.
25  One of them it's been referred to in the depositions as

20

1  Exhibit No. 14.  And what I'm going to do is since we been
2  using these exhibits, any exhibit I do after that, I am
3  going number consecutively and I think it will just be
4  easy to keep up with them for all the depositions that
5  way.
6      When this article came out, I think it was -- it was
7  Exhibit No. 14 it's been referred to in the other
8  depositions.  I'm not sure really what the date is.  Let
9  me show you that.  Well, you got it in front of you.  Do
10  you know what the date of this was?
11      A.   No, sir.  It's not on here.
12      Q.   All right.  I believe it was September the 21st
13  -- but I'm not sure -- of 2005.  At the time that these --
14  that this article ran, this newspaper article, were you
15  the president of the union at that time?
16      A.   Yes, sir.
17      Q.   Okay.  So earlier if you told me it was October
18  when you got elected, that was probably incorrect?
19      A.   I believe I was the acting president.
20      Q.   I got you.  So what happened was when Mr. Duty
21  was no longer president --
22      A.   Like an interim Chief.
23      Q.   Right.  You just kind of stepped into that role
24  until there was an election?
25      A.   I believe I was filling both positions.

21

1      Q.   Vice president and president?
2      A.   Right.  But it would be interim president.
3      Q.   Right.
4      A.   And then my official title would have been, you
5  know, president/vice president.
6      Q.   Now, as a member of the union or as a fireman
7  really, had you familiarized yourself with the standard
8  operating procedures within the department?
9      A.   I had.
10      Q.   And when did you do that?  When did you first do
11  that?
12      A.   I guess when you first get hired, you are handed
13  an SOP book.
14      Q.   Okay.  And so do you have to -- is that one of
15  the requirements of becoming a firefighter is to learn the
16  SOPs?
17      A.   I don't know if it's a requirement.  I mean, they
18  give you the book and, you know, expect you to follow the
19  rules and regulations.
20      Q.   Well, do you got a question about a procedure,
21  you need to go to the person above you or you can read the
22  book, find out what the procedure is, can't you?
23      A.   That would be correct.
24      Q.   All right.  Were you fairly familiar with those
25  procedures back in 2005, in specifically the summer and

22

1   fall of that year?
2       A.   I mean, there was -- some of them I knew, some of
3   them I didn't.
4       Q.   All right.
5       A.   It's pretty extensive.
6       Q.   As a member of the union, had you kept up with
7   Mr. Duty and Mr. Doster's lawsuit that was pending over in
8   Federal Court that year in 2005?
9       A.   I went, I attended one day.
10      Q.   Okay.  Did you find out the result of that
11  lawsuit?
12      A.   Yes, sir.
13      Q.   And what was the result?
14      A.   I believe the result was the City won.
15      Q.   Okay.  And their lawsuit was about wrongful
16  termination and people trying to stifle their freedom of
17  speech; is that correct?
18      A.   I don't know exactly what all it entailed.
19      Q.   Okay.  And that was in about, when that lawsuit
20  ended was about June of '05, wasn't it?
21      A.   Could possibly have been.  I'm not sure of the
22  exact date.
23      Q.   Okay.  And then in the fall of -- this was not
24  the only newspaper article that come out, was it, this
25  "Three-Alarm Turmoil" that's here in Exhibit No. 14; is

23

1   that correct?
2       A.   I believe it was the other papers had articles.
3       Q.   All right.  Do you know if -- let me ask you
4   this.  Does Chuck Williams, the author of this article,
5   did he contact you or did you contact him about alleged
6   problems within the fire department?
7       A.   He contacted me.
8       Q.   Okay.  Do you know how it was that he came to
9   contact you about alleged problems within the fire
10  department?
11      A.   No, sir, I do not.
12      Q.   He just called you up one day and said y'all got
13  problems?
14      A.   Well, he called me up and introduced who he was
15  and wanted me to go on the record, you know, and talk
16  about it.
17      Q.   Well, did he tell you how it is that any alleged
18  problems had even come to his attention?
19      A.   You know, I don't remember that.
20      Q.   Okay.  So you don't know why he called you, he
21  just happened to call you?
22      A.   That's correct.
23      Q.   Is that right?  And like I said, do you know if
24  he wrote a series of articles that appeared in the paper
25  over a course of a week or so regarding the Phenix City

24

1   Fire Department?
2       A.   The only one I know of right now is this one here
3   that he wrote --
4       Q.   All right.
5       A.   -- that week.
6       Q.   And did you agree to meet with him and talk to
7   him about whatever he wanted to talk about?
8       A.   I did.
9       Q.   All right.  And where did the meeting take place?
10      A.   It took place at a -- same place we have our
11  union meetings.
12      Q.   Which is where?
13      A.   Durango's Mexican.
14      Q.   Just a Mexican restaurant here in town?
15      A.   Yes, sir.
16      Q.   All right.  And I take it by the article that you
17  were not the only one that met with Mr. Williams out
18  there?
19      A.   Yes, sir.
20      Q.   All right.  And that there were other
21  firefighters there?
22      A.   Yes, sir.
23      Q.   Approximately how many?
24      A.   I believe it was approximately 10.
25      Q.   Okay.  And so how did the meeting start?

25

1       A.   I believe the meeting started with me briefing
2   the membership on what they could discuss --
3       Q.   Okay.
4       A.   -- and not discuss.
5       Q.   And what was that?
6       A.   Basically, I told them that we'd have to keep our
7   comments and to matters of public concern and not talk
8   about, you know, individuals or personal complaints or
9   grievances.
10      Q.   Okay.  Anything else?
11      A.   Not that I can recall at this time.
12      Q.   Well, what part does Mr. Williams play in the
13  meeting?
14      A.   I believe he just sat as a -- an observer.
15      Q.   Did he ask questions and y'all answer them?
16      A.   I believe it was more group discussed.
17      Q.   Okay.
18      A.   He sat in.
19      Q.   So he just sat in on a union meeting basically?
20      A.   Yes, sir.
21      Q.   Is that what it was about?
22      A.   Yes, sir.
23      Q.   All right.  And was he invited to the meeting?
24      A.   Yes.
25      Q.   All right.  So y'all invited him to come to the

26

1  union meeting so he could hear what y'all were discussing?
2    **A.   Well, he asked if he could come and sit, and I**
3  **told him that I'd have to ask the membership.**
4    Q.   All right.  When is the last time the union had
5  had a regular meeting prior to this meeting at Durango's
6  when Mr. William was present?
7    **A.   I'm unsure.**
8    Q.   One of the things that was requested in your
9  Deposition Notice was some documents from the union, and
10  the response was that you don't have those documents.  And
11  my question is:  Did the union, when you were with it,
12  keep any minutes?
13    **A.   All I can speak of, it's a secretary/treasurer's**
14  **job to do that.**
15    Q.   Okay.
16    **A.   I haven't personally kept minutes.**
17    Q.   When you were secretary/treasurer, did you do
18  it --
19    **A.   Yes, I believe I did.**
20    Q.   -- you keep the minutes?  Who was the secretary/
21  treasurer in 2005?
22    **A.   I don't remember if it was Robert Gaston -- I**
23  **believe it was Robert Gaston or it may be Pitts.  I'm**
24  **unsure exactly which one - --**
25    Q.   I guess the question is:  Where were the minutes

27

1  kept?
2    **A.   I'd have to talk to the secretary/treasurer.**
3    Q.   All right.  Who is that now?
4    **A.   Now it would be Bill Pitts.**
5    Q.   Okay.  So if any are kept, Bill Pitts would have
6  them?
7    **A.   Unless Robert Gaston has them.**
8    Q.   Well, he's in Iraq, isn't he?
9    **A.   Yes, sir.**
10    Q.   You don't think he would take them with him over
11  there, do you?
12    **A.   I don't believe he would have them.**
13    Q.   All I'm trying to find out is where do you -- if
14  I wanted to look at the minutes of that meeting, of any of
15  those meetings, where is the customary and ordinary place
16  to keep those minutes?
17    **A.   I'd have to talk to the secretary/treasurer.**
18    Q.   So you don't know the answer to the question?
19    **A.   That's correct.**
20    Q.   Okay.  Fair enough.  Well, when you have votes
21  and things, does somebody record those?
22    **A.   That is the secretary/treasurer's duties.**
23    Q.   Were there any regular meeting times of the
24  union?
25    **A.   Yes.**

28

1    Q.   And what were they?
2    **A.   We tried to meet at least once a month.**
3    Q.   Were you able to achieve that goal?
4    **A.   Not always.**
5    Q.   Did the local union have communication with the
6  international group, I guess, if it concerned something
7  particularly with the local organization?
8    **A.   I mean, there is some correspondence.**
9    Q.   All right.  Well, when you-all asked Mr. Williams
10  to come to this meeting in September of 2005 or whenever
11  it was prior to this article being written --
12    MR. WOODLEY:  I have an objection.  I don't think
13  his earlier testimony was that the union or Mr. Davis
14  asked Williams to come.  My recollection of his
15  testimony was that Williams asked him.
16    MR. MCKOON:  I apologize.  I didn't mean to
17  mischaracterize your testimony.  I blew that.  The
18  record will reflect what your testimony is.
19    Q.   (BY MR. MCKOON)  Let me go back and ask it this
20  way:  In regard to Exhibit No. 14, however Mr. Williams
21  asked to come or y'all invited him, whatever happened
22  about that, when he came to this meeting and listened to
23  your public concerns as you described them, was he taking
24  notes?
25    **A.   I don't personally know if he took notes or not.**

29

1    Q.   Do you know if he recorded anything with a tape
2  recorder while he was there?
3    **A.   I don't recall if he did or not.**
4    Q.   All right.  Let me go over some of the stuff in
5  the article.  It starts off in the first paragraph there.
6  I won't read it but go to the second column there.  The
7  first full paragraph I guess.  The first full paragraph is
8  one sentence.  The next one, it says, "Some firefighters
9  say they're mistreated by management in the City and work
10  in an atmosphere of intimidation, coercion, derogatory
11  comments, threats and harassment."  Did you tell anybody
12  that?
13    **A.   No, I don't believe that I did tell anybody that.**
14    Q.   Okay.
15    **A.   I'm quoted below that.**
16    Q.   I know that but I just wondered where he got
17  that.  There's not a quote connected to that statement,
18  and I just wondered did you contribute to his
19  understanding that that was what was going on by anything
20  that you said?
21    **A.   I don't know if he got that directly from me or**
22  **not.**
23    Q.   Okay.  Is that something that sounds like you
24  would have said it, that you were being mistreated by
25  management?

30

```
1        A.    I don't know if I personally would have said
2    that.
3        Q.    Okay.
4        A.    As an individual.
5        Q.    Well, what about work in an atmosphere of
6    intimidation, did you tell him that?
7        A.    I don't know if I did or not.
8        Q.    Anyway, you say:  Morale is at the lowest point
9    since I've been here."  Is that an accurate quote?
10       A.    Yes.
11       Q.    Sometimes you can't always believe everything you
12   read in the newspaper, can you?
13       A.    I believe that.
14       Q.    So I just want to make sure that's accurate,
15   though; is that correct?
16       A.    That is what I stated.
17       Q.    Is there any other statements in this article
18   that are made -- well, let me go on over to the next page.
19   If you go down, there's something that's underlined in
20   this particular one, it says, "Davis puts it this way, 'We
21   are reluctant to talk because of significant fear of
22   retaliation, being disciplined or fired'."  What is it
23   that you were reluctant to talk about?
24       A.    Any of the issues that we had as union members.
25       Q.    Okay.  Well, when you invited a -- well, whether
```

31

```
1    he invited himself or you invited him, you agreed for a
2    reporter with the local newspaper to come and listen to
3    all these complaints, one of which was your reluctance to
4    talk.  Did you not understand when you were doing this
5    that this was going to be reported in the local newspaper?
6        A.    That's correct.
7        Q.    Okay.  So you weren't reluctant to talk to Mr.
8    Williams, were you?
9        A.    Not as an individual but as a reporter that was
10   going to publish things in the paper, yes, I was.
11       Q.    Then why did you?  If you were reluctant to talk
12   to him, why did you talk to him?
13       A.    Because there were issues of public concern that
14   I did want to address.
15       Q.    And what were they?
16       A.    They were safety, health and labor issues.
17       Q.    All right.  And what were the safety issues that
18   you wanted to address?
19       A.    I don't recall all of them at this time.
20       Q.    Well, do you remember one of them sitting here
21   today?
22       A.    Staffing.
23       Q.    Okay.  And what was your issue about that?
24       A.    We had inadequate staffing.
25       Q.    And tell me what that was.  In other words,
```

32

```
1    what's your definition of "inadequate staffing"?
2        A.    Not being NFPA 1710 compliant.
3        Q.    PA 17 --
4        A.    NFPA 1710 compliant.
5        Q.    What does that mean?
6        A.    Basically, it's a staffing standard for the fire
7    service.
8        Q.    All right.  And how was the Phenix City Fire
9    Department out of compliance with NFPA 1710?
10       A.    Because we'd ride three to an engine.
11       Q.    Ride three to an engine?
12       A.    That's correct.
13       Q.    And how many did you think you needed?
14       A.    Four.
15       Q.    Four instead of three?
16       A.    Yes.
17       Q.    What is NPFA?  What does that stand for?
18       A.    National Fire Protection Association.
19       Q.    And who is that?
20       A.    It's the body that -- that develops standards
21   that the fire service goes by.
22       Q.    Okay.  So that's the staffing issue.  Anything
23   else in regard to safety that you were concerned about
24   that you wanted to let the public know about?
25       A.    Not that I can remember at this time.  I know
```

33

```
1    staffing issue was a major issue, with the high turnover
2    rate and retention and of employees.
3        Q.    Okay.  High turnover rate.  Okay.  Anything else?
4        A.    Not that I can remember.
5        Q.    Prior to going to the -- well, I don't know
6    whether you went to them or they came to you but where --
7    where is this National Fire Protection Association
8    located?  Do you know?
9        A.    I don't know where it's located.
10       Q.    Okay.  Do you know if this is a recommendation
11   you are talking about or if this is some mandatory
12   requirement?
13       A.    No, it's always, from my knowledge, been
14   recommendations.  It's only a requirement if the City
15   adopts it, from what I understand.
16       Q.    Do you know of any situation during the time you
17   were employed by the City of Phenix City Fire Department
18   where a fireman was hurt or injured because there were
19   only three people on the truck as opposed to four?
20       A.    I don't have any knowledge of that.
21       Q.    So you don't know of any situation like that?
22       A.    I'm not privy to any investigations of people
23   that are hurt.
24       Q.    I'm not asking you about investigations, I'm just
25   asking you about your personal knowledge.
```

34

1    A.    No.
2    Q.    Okay.
3    A.    I personally have not been injured, so I can't
4    speak for anything else.
5    Q.    Well, you have been around other people that were
6    with you on fire calls; am I right about that?
7    A.    Yes.
8    Q.    Well, did you observe any of them being injured
9    because there were three people on a truck instead of
10   four?
11   A.    I don't know if I have.
12   Q.    Okay.  Is that a no or a yes or I don't know?
13   A.    I don't know.
14   Q.    Okay.  Before this meeting with Mr. Williams
15   wherein y'all voiced your public concerns and he wrote
16   this article about this one that we have in front of us at
17   least, Exhibit No. 14, had you spoken with anyone within
18   the fire department about whatever concerns that you had?
19   A.    Yes.
20   Q.    Who did you talk to?
21   A.    Well, we have regular shift meetings.
22   Q.    Okay.
23   A.    And those things been brought up.
24   Q.    Who did you bring it up to?
25   A.    I don't know exactly.  I mean, it's a continuing

35

1    process my whole career.
2    Q.    Okay.  So, I mean, you surely can tell me one
3    person you brought it up to.
4    A.    I mean, it would always be more than likely
5    Assistant Chiefs.
6    Q.    Okay.
7    A.    The Captains.
8    Q.    Can you name one of those you talked to about
9    this?
10   A.    James Jackson.
11   Q.    Okay.  Who else?
12   A.    Mike Hanson.
13   Q.    Okay.
14   A.    Kenny Johansen.  Those were the three Assistant
15   Chiefs.
16   Q.    And what was it exactly that you remember telling
17   them?
18   A.    I mean, just general issues that we discussed.  I
19   don't know any specifics.
20   Q.    Okay.  Well, if one of your issues was this three
21   to persons on the engine as opposed to four, did you ever
22   complain to anyone about that?
23   A.    I'm sure I have.
24   Q.    All right.  And what was the response?
25   A.    That we don't have, you know -- I mean, we don't

36

1    have to go by NFPA 1710.
2    Q.    And who told you that?
3    A.    I don't remember.
4    Q.    Okay.  You just know somebody told you that?
5    A.    That's correct.
6    Q.    All right.  You said something about turnover
7    rate.  Do you know anything about the average turnover
8    rate in a department this size nationwide?
9    A.    No, I do not.
10   Q.    Okay.  So that was just a personal judgment as to
11   whether or not that was high was, in your mind, it was
12   high?
13   A.    It wasn't my personal judgment.
14   Q.    Well, whose judgment was that?
15   A.    It was the membership's collectively.
16   Q.    Okay.  Well, it said since January 2000, that
17   would be five -- excuse me -- during a five-year period,
18   21 employees had resigned, three retired and two went out
19   on disability retirement.  You see where I'm reading that?
20   A.    Yes.
21   Q.    Where did y'all get those statistics or did you
22   provide them or is that something Mr. Williams provided?
23   A.    I did not provide that information.
24   Q.    Okay.  Now, all of this -- was this the only
25   meeting you had with Mr. Williams?

37

1    A.    I believe so.
2    Q.    There's some photographs of firefighters in here,
3    including your photograph in here.  Do you know how those
4    got to be taken?
5    A.    I believe they were taken at that meeting.
6    Q.    Okay.  Mr. Williams take those photographs?
7    A.    No, sir, he did not.
8    Q.    He had a photographer with him?
9    A.    He had a guy with him that took the pictures.
10   Q.    Okay.  And these were all taken at the meeting --
11   A.    Yes, sir.
12   Q.    -- to your knowledge?  And what were you trying
13   to -- were you trying to accomplish anything in particular
14   by talking with Mr. Williams who was a reporter for the
15   Columbus Ledger-Enquirer at that time?
16   A.    Yes, sir.
17   Q.    And what were you trying to accomplish?
18   A.    I was trying to bring up some of our issues of
19   public concern to the public so maybe they would be
20   addressed.
21   Q.    Okay.  And the two that you can remember were
22   safety and staffing.  Any others that you can remember
23   sitting here today?
24   A.    Yes, labor issues.  We had a -- I had a whole
25   list of issues that I submitted.

38

1    Q.    Okay.  Was that the ones that's in another
2    exhibit here that you sent to Chief Prater?
3    A.    I believe they were quite similar.
4    Q.    Okay.  All right.  And none of this going to the
5    media at this time about all of this had anything to do
6    with Mr. Duty losing his lawsuit back in June?
7    A.    No, sir.
8    Q.    All right.  There's also some letters in here.  I
9    thought I saw some.
10    MR. WOODLEY:  Letters to the editor should be
11    behind that just --
12    MR. MCKOON:  I didn't mean -- I'm seeing the same
13    exhibit, yeah.
14    Q.    (BY MR. MCKOON)  Do you know Wayne Poole, the
15    gentleman that --
16    A.    No, I don't -- I don't know a Wayne Poole.
17    Q.    Okay.  What about Robin McDaniel?  Do you know
18    her?
19    A.    I do not know a Robin McDaniel.
20    Q.    Okay.  I guess I will just make it short.  Have
21    you looked at this exhibit prior to today?
22    A.    Well, yes, sir.  I looked through them yesterday.
23    Q.    All right.  And my question is:  Do you know the
24    names of any of these people that wrote letters in
25    response to Mr. Williams' articles?

39

1    A.    I know Mickey Hutchinson.
2    Q.    And who is that?
3    A.    He's a Captain of the fire department.  And I
4    know a Dennis Duty.
5    Q.    Okay.  Did Dennis write a letter?
6    A.    It looks like it.
7    A.    Yeah, it looks like he did.
8    A.    There's one in there.
9    Q.    Okay.  Any of the rest of them that you know?
10    A.    No, I don't see any of these other folks in here
11    that I --
12    Q.    Did you solicit any people to write letters to
13    the editor?
14    A.    I personally did not.
15    Q.    Do you know if any of your union members that did
16    that?
17    A.    Not that I know of.
18    Q.    Did you ask any of them to do that?
19    A.    I personally did not.
20    Q.    Were you trying to get Chief Hunter fired?
21    A.    No, sir.
22    Q.    That wasn't your goal?
23    A.    No, sir.
24    Q.    All right.
25    A.    Well, after these -- I don't know if it was after

40

1    that article or the day before, I don't know when that
2    article was but some point in time.
3    Q.    Turn to Exhibit No. 15.  Were you called in and
4    counseled about talking with the media about matters
5    involving the fire department?
6    A.    Yes, sir.
7    Q.    All right.  Tell me how that came about.
8    A.    I was called into the office by my Chief.
9    Q.    Okay.
10    A.    That would be Chief Johansen.
11    Q.    Okay.
12    A.    And he made me write a letter and told me that
13    this would probably be going to some lawyers and that I
14    was in trouble and so I had to write a letter and then he
15    left.
16    Q.    What letter was it that you wrote?
17    A.    I don't know.  I don't know if it's in here or
18    not, but I had to write a letter.
19    Q.    Have you seen it since that time?
20    A.    There it is right there.
21    Q.    What exhibit number you on there, Mr. Davis?
22    A.    Hold on a second, sir.  I think it's 16.
23    Q.    Okay.  Okay.  I see it.  It's the fourth page of
24    Exhibit No. 16.  And what is it he asked you to write?
25    Did he tell you to write this, or did he ask you to write

41

1    it?
2    A.    He told me to.
3    Q.    And what was it that he was telling you to write?
4    A.    He just told me I needed to write a letter
5    explaining what happened and why I did it and that this
6    would probably go into attorneys and he didn't know if I'd
7    have my job or not.
8    Q.    Okay.  When you were called in to talk to him?
9    Did you -- who all was present?
10    A.    Well, he, Chief Johansen came and made me write
11    this letter and then he took this letter and left.
12    Q.    What happened next?
13    A.    Then I think later on in the day, he came and
14    picked me up and took me to the Chief's office.
15    Q.    All right.  Now, earlier you said something about
16    Chief Johansen said he didn't know whether you would have
17    your job or not; is that right?
18    A.    Right.
19    Q.    You remember him telling you anything else about
20    this?
21    A.    He said that lawyers were involved.
22    Q.    Okay.  Anything else you remember Chief Johansen
23    telling you before he came and picked you up and took you
24    to Chief Hunter?
25    A.    No, that's it.

42

1    Q.    All right.  When he came to take you to Chief
2    Hunter, did he tell you what he was doing?
3    A.    No, sir.
4    Q.    Did he tell you where he was going?
5    A.    No, sir.
6    Q.    He just said, get Gn the car?
7    A.    Exactly.
8    Q.    So you got in the car and where did you go?
9    A.    To the Chief's office.
10   Q.    And how far did you ride?
11   A.    From my fire station to the Chief's office.
12   Q.    How far is that?
13   A.    Maybe --
14   Q.    I don't know where your fire station was.
15   A.    Well, Fire Station 3, it may be two miles.
16   Q.    Well, during the two-mile ride, did y'all have
17   any conversation about what was going on?
18   A.    No, sir.  I was scared.
19   Q.    Did you ask him what was going on?
20   A.    No, sir.  I was afraid to.
21   Q.    Where were you seated in the car?
22   A.    In the passenger seat.
23   Q.    So you were probably sitting right next to him?
24   A.    Right.
25   Q.    So you just didn't say anything to him, he didn't

43

1    say anything to you?
2    A.    No, sir.
3    Q.    Just a silent ride in the car?
4    A.    Yes, sir.
5    Q.    All right.  And y'all got to the Chief's office
6    and what happened?
7    A.    We went up and sat in the Chief's office and then
8    we all started talking.
9    Q.    Who is we all?
10   A.    It would be the Fire Chief, and then my Assistant
11   Chief and then me.
12   Q.    Tell me what you recall that you said.
13   A.    You know, I don't even remember.  I would have to
14   think back on that.  I told them that -- I believe I told
15   them that I believe I did nothing wrong; that what I spoke
16   on was matters of public concern; and that I had a first
17   amendment right; and that, you know, I was speaking out as
18   an acting president of the union and not as a Sergeant,
19   you know, in the fire department.
20   Q.    Uh-huh.
21   A.    And then I believe there was some conversation
22   about they told me that the union was going to be the end
23   of my career.
24   Q.    Who told you that?
25   A.    The Assistant Chief and the Fire Chief.

44

1    Q.    Chief Johansen and Chief Hunter told you that the
2    union was going to be the end of your career?
3    A.    Yes, sir.  And then Chief Johansen in a rage and
4    said I done told you that before and now you see, you
5    know.
6    Q.    Did you ever say or recall saying when you walked
7    in the room, "Well, I guess I'm going to be fired now"?
8    A.    No, I don't remember that.
9    Q.    Did you say anything like that?
10   A.    I don't remember.  I might have asked if I was
11   going to be fired, am I going to be fired.
12   Q.    Okay.  And what was the response?
13   A.    I don't remember if they said we don't know now
14   or somebody had to review it, I believe.  I don't think
15   they gave me a definite answer at the time --
16   Q.    Okay.
17   A.    -- that I asked.
18   Q.    All right.  So you've seen this, I guess it's a
19   counseling form.  It's the first page one of the Exhibit
20   No. 16?
21   A.    Yes, sir.
22   Q.    Let me read part of it, and I'm going to ask you
23   a question.  If I read anything incorrectly, stop me and
24   correct me.  I'm starting with the parties Sgt. David
25   Davis was counseled by Chief Hunter and Assistant Chief

45

1    Johannson.  Are we on the same spot?
2    A.    I'm sorry.
3    Q.    Go to Exhibit No. 16 --
4    A.    I'm sorry.
5    Q.    -- so we can be in the same place.  All right.
6    I'm starting right here.
7    A.    Okay.
8    Q.    "Sgt. David Davis was counseled by Chief Hunter
9    and Assistant Chief Johansen on the 20th of September 2005
10   concerning him making or publishing statements to the
11   local media concerning fire department issues which has
12   resulted in impaired discipline and harmony."  I want to
13   stop there just a minute.  Do you feel like what you said
14   in the paper resulted in impaired discipline and harmony?
15   A.    No, sir.
16   Q.    Do you think it helped discipline and harmony in
17   the fire department by going to the newspaper with your
18   complaints?
19   A.    I couldn't make a judgment on that or not.
20   Q.    Okay.  So you think it was just neutral?  In
21   other words, it didn't make any difference about
22   discipline and harmony in the fire place -- excuse me, in
23   the work place, with you and your group of folks?
24   A.    It didn't affect it negatively in any way that I
25   could see.

46

1    Q.    Okay.  Did it help it?
2    A.    I don't know if it did or not at that time.  I
3    can't say.
4    Q.    Okay.  It says also, "Speech which has
5    jeopardized close, personal loyalties in the work place."
6    Do you feel like the speech had jeopardized close,
7    personal loyalties in the work place?
8    A.    No, sir.
9    Q.    Okay.  "Sgt. Davis advised that his freedom of
10   speech and the merit system rules and regulations was
11   that, in fact, discussed in that meeting."
12   A.    I believe it wasn't so much discussed as they
13   handed me that sheet, this part of the exhibit that's got
14   a memo and then a bunch of paperwork in it.
15   Q.    Okay.
16   A.    Because, I mean, I believe that we did discuss
17   impairing discipline and harmony and I asked for examples
18   on how that was done.  They just said it just was.
19   Q.    Okay.  So they did bring that up and you said --
20   and you said, Well, does it affect that?
21   A.    Correct.
22   Q.    And their answer was, It just does?
23   A.    That's correct.
24   Q.    All right.  Show me -- look through the exhibits
25   if it's there and tell me which exhibit it is that you are

47

1    talking about that.
2    A.    It would be Exhibit -- I'm assuming -- 15.
3    Q.    Okay.  Is that your signature down there?
4    A.    Yes, sir.
5    Q.    All right.
6    A.    But that's not my printed name.
7    Q.    Where it says D. Davis, that's not your printed
8    name?
9    A.    No, sir.
10   Q.    But that is your signature?
11   A.    Yes, sir.
12   Q.    And you signed that -- I can't read the date.
13   A.    I think it says 9/20.
14   Q.    Okay.
15   A.    I'm not -- it looks like it's been photocopied
16   but I assume it says 9/20.
17   Q.    That's what it looks like to you?
18   A.    Yeah.
19   Q.    Were you given this document?
20   A.    I believe I was --
21   Q.    Given a copy of it?
22   A.    I believe I had to sign it and turn it in.  I
23   can't remember if I was given it or not.  I know I signed
24   this.
25   Q.    Were the grievance procedure things from the

48

1    merit system attached?
2    A.    I believe it was.
3    Q.    All right.  And what about the -- and what the
4    ASOP, was it attached?
5    A.    It is here, so I'm assuming it was.
6    Q.    Okay.  So you were counseled about this and given
7    all this on the 20th; right?
8    A.    I would have to say, yes, sir.  I signed that on
9    the 20th.
10   Q.    All right.  Well, let's go back to the counseling
11   form again, whis is Exhibit No. 16.  The next paragraph
12   starts with, "Sgt. Davis was also counseled for continuous
13   attempts to force unwanted attention through intimidation,
14   coercion or interfering with a co-worker, Firefighter B.
15   Wilkinson."  Do you remember any discussion about that?
16   A.    Yes.
17   Q.    All right.  Tell me what your recollection of
18   that discussion was.
19   A.    That discussion was the Assistant Chief and
20   Brandon Wilkinson and me went in the office at my station
21   and he told Brandon to tell him what you told us.  And
22   Brandon said, "I don't want to talk about the IFF no more
23   at work."  And I said, "Okay."
24   Q.    That was it?
25   A.    That was it.

49

1    Q.    And when did that occur?
2    A.    I'm assuming maybe the 20th.  I don't know.  I
3    don't remember.
4    Q.    Same day?
5    A.    Before that or not.
6    Q.    You think it was the same day?
7    A.    I'd have to guess.
8    Q.    All right.  And so the only thing that -- Brandon
9    Wilkinson's only complaint was he didn't want to hear
10   anything about the union while he was at work?
11   A.    That's what he said -- well, he just said, "I
12   don't want to hear anything else about the FIFF".  That's
13   what he said.
14   Q.    Okay.  Had you discussed the union with
15   Firefighter Wilkinson?
16   A.    I told him that day that to give me some examples
17   so, you know, I would be clear.  And he said he really
18   couldn't remember, but that we had talked about it.  And I
19   told him that I wish he would have told me and that would
20   have been the end of it.  And I told him that will be the
21   end of it.
22   Q.    What was his position in regard to you,
23   Firefighter Wilkinson?
24   A.    He worked at the station I did.
25   Q.    Okay.  Was he under you in any way?

50

1    A.    I mean, yes, I guess you could say that.
2    Q.    Were you -- were you a supervisor of his?
3    A.    I was a driver engineer.  I don't know I'm a
4    supervisor.  The Captain is the supervisor.
5    Q.    Okay.  But you were ahead of him in rank?
6    A.    Yes, sir.  But I'm in charge mainly of operating
7    the apparatus.
8    Q.    Okay.  Had you asked Mr. Wilkinson to do anything
9    in particular?
10   A.    No, sir.  I don't particularly remember that.
11   Q.    Had you asked him to get his wife to write some
12   letters downtown or do anything like that?
13   A.    I actually think I had invited him and his wife
14   to a meeting.
15   Q.    Okay.  And you think that his complaint was about
16   you talking about the union at work and inviting him and
17   his wife to a union meeting?
18   A.    I believe so.  I'm not quite sure what his
19   problem was.  He didn't express it.  He just said he
20   didn't want to talk about the IFF.
21   Q.    The next thing is, "Firefighter B. Wilkinson
22   informed Sgt. Davis that IAFF, derogatory statements, and
23   comments directed towards him would not be tolerated."
24   Had you made any derogatory statement or comments towards
25   Firefighter Wilkinson?

51

1    A.    Not that I recall.
2    Q.    Well, do you know what they're talking about
3    there in that paragraph?
4    A.    Actually, I do not.  All I know is he said he
5    didn't want to talk about the IFF anymore.
6    Q.    Okay.
7    A.    And it never was that, no words of "not be
8    tolerated" were ever mentioned.
9    Q.    Okay.  How about derogatory statements?  Was that
10   ever mentioned?
11   A.    Negative.
12   Q.    Unwanted attention, was that?
13   A.    Negative.
14   Q.    Coercing or interfering with a co-worker other
15   than being here, was that ever said by Firefighter
16   Wilkinson --
17   A.    Negative.
18   Q.    -- in your presence?
19   A.    No, sir.
20   Q.    Okay.  So, in your judgment, all of this, these
21   statements regarding Firefighter Wilkinson are inaccurate
22   except for the fact that you had talked with him about the
23   union on the job and you had invited him and his wife to a
24   union meeting?
25   A.    I believe the only part of it was that I invited

52

1    him and his wife to a meeting.
2    Q.    Okay.  All right.  Well, you were counseled about
3    this and given the form which is Exhibit No. 15, I
4    believe, to sign that we just went over.  Anything else
5    happen in regard to you going and talking with the media
6    and the union members talking with the media?
7    A.    I don't understand that question.
8    Q.    Okay.  Well, I mean, was any other action taken
9    against you other than going to a counseling session about
10   this and having to sign this form explaining what the
11   rules and regulations were about grievances and work place
12   issues?
13   A.    Not that I recall.
14   Q.    Did you understand from reading -- well, let me
15   ask you this:  Did you read Exhibit No. 15?
16   A.    I believe I read for sure this first part where I
17   signed it.
18   Q.    Okay.  Well, did you review these regulations and
19   the standard operating procedure that was referred to?
20   A.    Yes, I did, after I signed that paperwork.
21   Q.    And you became aware and you knew what -- you
22   knew what was expected in regard to grievances, didn't
23   you?
24   A.    Somewhat, yes.
25   Q.    Okay.  Well, there was nothing about it you

53

1    didn't understand, was it?
2    A.    That's correct.
3    Q.    All right.  And I believe the -- if I'm right
4    about this, and I'd have to look back and see but after
5    that -- after this all happened in September of '05, did
6    you ever have anymore conversations with any supervisor or
7    anyone -- and I'm talking about a conversation where you
8    were talking to them and they were talking back.  I'm not
9    talking about somebody just saying something and you
10   hearing it -- where anyone discussed with you the issue of
11   talking to the media about matters of public concern or
12   talking to the Mayor or talking to the City Council or
13   anything like that?
14   A.    I don't remember.
15   Q.    Okay.  All right.  Now, I'm going to expand the
16   question a little bit.  Do you remember whether or not any
17   supervisor or anybody in a supervisory capacity on any
18   regular basis met with you and groups of other
19   firefighters and talked about talking to the media,
20   keeping grievances within the fire department, trying to
21   work together and promote harmony?  Do you remember
22   anything like that?
23   A.    Yes, I do.
24   Q.    Who did that?
25   A.    I believe Deputy Chief Roy Waters --

54

1    Q.    Okay.
2    A.    -- addressed us.
3    Q.    All right.  When did -- do you remember when he
4  came on board with the fire department?
5    A.    I don't remember the exact date.  I believe it
6  was at the first of the year.
7    Q.    The first of '06?
8    A.    I would assume.
9    Q.    All right.  Did you meet with him when he came on
10  board?
11    A.    Yes.
12    Q.    Tell me about that meeting.
13    A.    I believe it might have been his first day where
14  I was actually on shift.
15    Q.    Uh-huh.
16    A.    He walked in the door and I was getting off work;
17  and he said, "Do you have time to talk?"  And I said, "For
18  you, yes."  He said, "Come on."  And we went in the office
19  and talked.
20    Q.    Tell me about that meeting.
21    A.    Just went in there and he told me that he knew
22  that I was, you know, president of the union and that's
23  why he wanted to meet with me first.  And told me that he
24  came here and that he had some plans to make things better
25  and that he wanted my cooperation and just asked for me to

55

1  give -- you know, talk to the guys and help convince them
2  that he was going to make things better.
3    Q.    Would you describe that as a good meeting?
4    A.    Yes, sir.
5    Q.    Did you like him?
6    A.    Yes, sir.
7    Q.    Tell me, did you have any subsequent meetings
8  with Chief Waters about any concerns you had with anything
9  within the fire department?
10    A.    Yes, sir.
11    Q.    All right.  When you would have those meetings
12  with him, would you normally start the meeting off with
13  something to the effect of I've been through the chain of
14  command?
15    A.    No, sir.
16    Q.    You never talked with him about chain of command?
17    A.    No, sir.
18    Q.    Well, tell me about your subsequent meetings with
19  him as best you can recall.
20    A.    I talked to him at the gym pretty regular.  And
21  then he came down and talked to me at my station before,
22  and then even in his office, you know, if I walked by or
23  whatever, I'd go in there and talk to him about something.
24    Q.    All right.  Did y'all have a good relationship?
25    A.    I felt we did.

56

1    Q.    All right.  Do you think in your mind did things
2  improve after he got there?
3    A.    Yes, sir.
4    Q.    All right.  How so?
5    A.    Well, I mean we -- it wasn't just him, you know,
6  I believe all of the administration, you know, and I even
7  told them that, you know, that I felt like we were moving
8  forward.
9    Q.    Okay.
10    A.    And --
11    Q.    How so?  Tell me.
12    A.    I mean just -- we were implementing new policies
13  and procedures.  We were starting to do more training,
14  some of the old rules and regulations, you know, we were
15  allowing a little bit more flexibility in them and general
16  improvement in the department.
17    Q.    There was an issue at one time about swap time.
18  Did that come back?  Did you get your swap time back?
19    A.    I believe we did.
20    Q.    Okay.  And so in your mind, things were
21  progressing pretty well during the year 2006?
22    A.    After -- yes, sir.
23    Q.    Did you have any of these complaints that you had
24  made in the newspaper back in 2005?  Were they being
25  addressed?

57

1    A.    Some were.
2    Q.    All right.  Were you satisfied then with the
3  efforts that management was making to address those
4  concerns that had been raised back in the newspaper a year
5  previous?
6    A.    I don't know if I was completely satisfied, but I
7  could see progress.
8    Q.    Okay.  What kind of relationship did you feel
9  like you had with Chief Waters?
10    A.    I mean, it was a professional relationship.  I
11  mean, at work, I'd say we -- it was a professional
12  relationship.  And away from work, you know, I'd talk to
13  him pretty regular.
14    Q.    Just like he was anybody?
15    A.    Well, he was still a Chief, you know.
16    Q.    Right.
17    A.    But he makes himself pretty approachable.
18    Q.    Okay.  Well, as of 2006, you understood that
19  there was a procedure to go through if you had a grievance
20  or problem with any policy or procedure that was
21  implemented by the department.  Am I correct about that?
22    A.    No, sir.  I believe the grievances would be an
23  opinion or, you know, that I had.
24    Q.    Okay.
25    A.    I'd have to look and -- I mean, it's pretty

58

1   extensive.
2       Q.    Well, let's look back at Exhibit No. 15.  And
3   let's go to the third page of that exhibit.  And down at
4   the bottom, it says "definition of a grievance".  You see
5   that?
6       A.    Yes.
7       Q.    "A grievance is a complaint of you or opinion
8   pertaining to employment conditions, the relationships
9   between employees and supervisors or to relationships with
10  other employees."  You see that?
11      A.    That's correct.
12      Q.    Is that what you understood a grievance was?
13      A.    Yes.
14      Q.    All right.  So when this issue came up about
15  extending the probationary time of employees, when did you
16  first hear about that -- excuse me, of new employees to
17  the fire department?
18      A.    I heard about it by reading the newspaper.
19      Q.    All right.  Which newspaper was that?
20      A.    I'm assuming the Ledger-Enquirer.
21      Q.    Okay.  So first you ever heard of it was in the
22  newspaper?
23      A.    That's correct.
24      Q.    All right.  Nobody in the department ever brought
25  it to your attention?

59

1       A.    I believe maybe my secretary/treasurer did or
2   some of the other people noticed it too.
3       Q.    And who was that?
4       A.    I don't recall exactly who the members were.
5       Q.    You don't remember who the secretary/treasurer
6   was?
7       A.    Well, yeah, Firefighter Bill Pitts -- well, he's
8   a Sergeant now.
9       Q.    Bill Pitts brought it to your attention?
10      A.    He might have.  I'm not 100 percent accurate.
11      Q.    And what was it that he did to bring it to your
12  attention?
13      A.    I believe he asked me to, that he saw something
14  in the paper and wanted me to look at it.
15      Q.    So he had seen it in the paper and he referred
16  you to the newspaper article?
17      A.    Well, I had seen it too.
18      Q.    Okay.  And what was it that you had seen?
19      A.    It was just a proposal.
20      Q.    All right.  And do you remember about when that
21  was?
22      A.    I would assume it had to have been whenever they
23  put it in the paper before whatever the procedure is.
24      Q.    Well, you were terminated in April of 2006; is
25  that right?

60

1       A.    No -- yes, sir.  So it would have had to have
2   been in April 2006.
3       Q.    So you think there was a newspaper article in the
4   Ledger-Enquirer in April of 2006 about it or March, some
5   time in that time frame?
6       A.    Some time.
7       Q.    To be fair to you.
8       A.    Yes.
9       Q.    All right.  Well, what is it that you recall
10  about it?
11      A.    I remember seeing that there was a proposal.
12      Q.    All right.  So what did you do when you found out
13  what the proposal was?
14      A.    First thing I did was talked about it and then --
15      Q.    Who did you talk to about it?
16      A.    Well, I was on duty when I first saw it.
17      Q.    Uh-huh.
18      A.    So I was reading the paper, and I said, "Look,
19  they're making a change to the merit system."
20      Q.    Uh-huh.
21      A.    And then I said, "I have to look in the merit
22  book and see what the change was."
23      Q.    Uh-huh.
24      A.    And it looked like it was probation.
25      Q.    All right.

61

1       A.    Section whatever it was.
2       Q.    Okay.  So where did you get the merit book to
3   look at it?
4       A.    I believe it was at the station.
5       Q.    Keep a copy of the merit system rules at the
6   station?
7       A.    Yes.
8       Q.    And what station was that?
9       A.    I was at three at the time.
10      Q.    Okay.  So you went and got the copy of the merit
11  system rules, and what did you do next?
12      A.    Nothing.  Once I looked at it, I knew what it
13  was, the section.  I mean, I didn't know exactly what it
14  entailed, but I knew what the topic was and that it was
15  probation.
16      Q.    All right.  Well, what did you understand the
17  change was going to be, if any?
18      A.    I didn't know the changes at that time, exactly.
19      Q.    Okay.  Well --
20      A.    I mean, I knew there was going to be an
21  amendment, so I'd have to find out.
22      Q.    So all you heard was that there was going to be
23  an amendment?
24      A.    Right.
25      Q.    And it had something to do with probation that

---

62

1  you figured out?
2  A.  **That's correct.**
3  Q.  But you didn't know exactly what it was?
4  A.  **Right.**
5  Q.  So what did you do to learn more about this
6  situation?
7  A.  **Well, I -- you know, we talked about it at work.**
8  **And then when I got off Monday morning, I called the City**
9  **Clerk's office and asked what it was in reference to.**
10  Q.  Okay.
11  A.  **While I was off duty.**
12  Q.  All right.  What did you find out?
13  A.  **She explained to me what it was about.**
14  Q.  Okay.  And what was that?
15  A.  **That there was a proposal to change the probation**
16  **for new employees in the fire department and the police**
17  **department and the code enforcement.**
18  Q.  Okay.  And what did you do next?
19  A.  **Then I contacted the membership.**
20  Q.  Why did you do that?  Why did you contact the
21  membership?
22  A.  **To advise them.**
23  Q.  Just advise them that there was going to be a
24  change?
25  A.  **Change, yeah.**

---

63

1  Q.  Okay.  Did you have an opinion about it before
2  you contacted the membership?
3  A.  **Well, I had previously been involved in a**
4  **proposal to change probation before.**
5  Q.  Uh-huh.
6  A.  **And so I asked, you know -- of course I had my**
7  **own opinion which was I thought that it would probably**
8  **hurt our abilities to recruit.**
9  Q.  Okay.
10  A.  **And so I contacted other members.**
11  Q.  All right.  Tell me about the previous situation
12  where you been involved in a situation involving changing
13  probation.
14  A.  **The previous situation was that they were -- it**
15  **was an amendment to change probation that any time**
16  **somebody was disciplined that they could be put on**
17  **probation.**
18  Q.  And what happened to that?
19  A.  **It got voted down.**
20  Q.  All right.  What was your involvement in that?
21  A.  **I called and expressed my -- you know, expressed**
22  **the opinions of the membership to our elected officials.**
23  Q.  And who was that?
24  A.  **I believe the three that I called were the Mayor,**
25  **Mr. Bush and Mr. Sumbry -- Council Member Sumbry.**

---

64

1  Q.  Okay.  How long ago was that?
2  A.  **I don't remember when it was.**
3  Q.  Well, the last five years?
4  A.  **Oh, it was definitely within -- I mean, I was --**
5  **it wasn't that long before all this happened, I don't**
6  **think.**
7  Q.  Okay.  So you think it was some time in '05
8  maybe?
9  A.  **Maybe.**
10  Q.  So you called and talked to Councilman Sumbry and
11  who else?
12  A.  **Councilman Bush and Mayor Hardin, I believe.**
13  Q.  And was there ever anything in writing?  What I
14  mean by that, was there ever like a proposed ordinance
15  that was voted down or was it just something under
16  consideration that never got any further or what's your
17  recollection of that?
18  A.  **No, I believe it was a proposal.**
19  Q.  Okay.  You think an ordinance was actually
20  written up?
21  A.  **I believe so.**
22  Q.  And you think there was a vote on it and it was
23  voted down?
24  A.  **I believe so.**
25  Q.  And you think that some time in 2005?

---

65

1  A.  **Possibly.**
2  Q.  Could it have been 2004?  I mean, I'm just trying
3  to get a time frame.  Don't know --
4  A.  **Yes, sir.  I'm not real clear on --**
5  Q.  But some time within the last five years?
6  A.  **Yes.**
7  Q.  All right.  So your opinion was it was not a good
8  idea?
9  A.  **Which opinion?**
10  Q.  I'm sorry.  That's good question.  Your opinion
11  about the new proposal to change probationary time of new
12  employees at the fire department, police department and
13  building inspecting department from 12 months to 18
14  months.  Your opinion was that was not a good idea?
15  A.  **Now, my personal opinion was not that it was not**
16  **a good idea.**
17  Q.  Okay.  What was your personal opinion?
18  A.  **I mean my personal opinion was that I thought it**
19  **would negatively affect our ability to get some new**
20  **employees.**
21  Q.  Okay.  And I believe you said you took it to the
22  other members to talk to them about it?
23  A.  **That's correct.**
24  Q.  And did you have a meeting about it?
25  A.  **No, sir.**

---

66

1  Q.   All right.  How did you take it to the other
2  members?
3  A.   I phone called a number of members.
4  Q.   How many did you call?
5  A.   I don't remember an exact number.
6  Q.   A dozen?
7  A.   Probably.
8  Q.   Okay.  And what was the result of your phone
9  calling around?
10  A.   They were all against the changes.
11  Q.   All right.
12  A.   And then some of them offered, you know, I mean,
13  different ideas.
14  Q.   Okay.  Did you make any notes of any of your
15  phone calls?
16  A.   Not that I can remember.
17  Q.   Okay.  Can you name anybody specifically that you
18  remember calling and talking to about this?
19  A.   I mean, I know for sure that I called the
20  secretary/treasurer.
21  Q.   Bill Pitts again?
22  A.   Yes, sir.
23  Q.   Anybody else?
24  A.   I don't remember the other members, but I do know
25  that I did call him.

67

1  Q.   Okay.  So you called Bill Pitts but you can't
2  think of the name of any other member that you called?
3  A.   No, sir.
4  Q.   I mean, yes, you can't think of any other members
5  that you called?
6  A.   That is correct.
7  Q.   All right.  So what did you do next after you
8  talked to the membership?
9  A.   At that point, I called the elected officials.
10  Q.   Okay.  Called elected officials?
11  A.   That's correct.
12  Q.   At that point in time, who was your immediate
13  supervisor?
14  A.   I believe it was George Bennett.
15  Q.   George Bennett?
16  A.   Yes, sir.
17  Q.   And what was his rank?
18  A.   He was a Captain.
19  Q.   Did you ever talk to Mr. Bennett about the
20  situation before calling elected officials?
21  A.   Well, I was off duty Monday so, of course, I
22  didn't call him Monday but we did talk about it Sunday.
23  Q.   So you did talk to George Bennett about it?
24  A.   That's correct.
25  Q.   And was that before or after you called any

68

1  elected official?
2  A.   That was before.
3  Q.   And what did you and Mr. Bennett talk about?
4  A.   He just said that, "Man, it looks like you need
5  to call downtown and get this stopped."
6  Q.   Okay.  Is he a union member?
7  A.   No, sir.
8  Q.   All right.
9  A.   I don't want to say, you know, exactly those were
10  his words but ...
11  Q.   All right.  So you took this to your supervisor.
12  What did you say to him and what he say to you?
13  A.   I mean I just told him it looks like they're
14  messing -- you know, that they making an amendment to the
15  probation.  And then we discussed the fact that, you know,
16  that one of the Chiefs had brought up that, you know, they
17  were going to extend probation.  And he thought that that
18  was probably it and I agreed and then he said -- well, he
19  said, "Didn't you have to call downtown and do something
20  on that probation before?"  And I said, "Yeah."  And he
21  said, "Well, it looks like you need to do that again", or
22  something along that lines.
23  Q.   Okay.  Did you -- who would have been the next
24  person above George Bennett that you could have talked to
25  about this?

69

1  A.   On a Sunday or on a Monday.
2  Q.   Any time.
3  A.   Well, I mean, if I --
4  Q.   Let's assume normal business hours.  Let's do it
5  that way.
6  A.   Well, I don't know if I would have talked to
7  people because it didn't affect me.  You know, what I mean
8  is it does no good for me to talk.
9  Q.   Well, what I'm saying is if you were going to go
10  to someone above you because you were concerned about
11  this, the first person you would go to would be Mr.
12  Bennett; right?
13  A.   That's correct.
14  Q.   Who would be the next person above him?
15  A.   Are you talking about what was my chain of
16  command?
17  Q.   Correct.
18  A.   On duty?
19  Q.   Yes, sir.
20  A.   That would be George Bennett, my Captain.  I
21  mean, I had a number of Captains throughout my career so
22  it would be my Captain because I was a Sergeant.
23  Q.   Well, at this time, I want you to give me the
24  rank and the name, during this time frame.  You have told
25  me George Bennett was your Captain then and you talked to

70

1  him and his advice to you according to you was to go
2  downtown with it; is that right?
3      A.   Correct.
4      Q.   All right.  So if you wanted to go above him, who
5  would you go to next?
6      A.   **I don't remember who my Assistant Chief was but**
7  **that would be my next.**
8      Q.   Assistant Chief?
9      A.   **That's correct.**
10     Q.   Who would be the next one above that?
11     A.   **At that time, it would be a Deputy Chief.**
12     Q.   And who would that be?
13     A.   **That would have been Roy Waters.**
14     Q.   Okay.  Chief Waters pretty much had an open door
15  policy.  Anybody that wanted to talk to him about
16  anything?
17     A.   **I don't know if that was an official open door**
18  **policy, but I mean I went in there and talked to him**
19  **without repercussions.**
20     Q.   You didn't ever have any problems going to talk
21  to him if you had a concern about something, did you?
22     A.   **Well, that all depends on what it entailed.**
23     Q.   All right.  But you said a minute ago this didn't
24  affect you.  What do you mean by that?
25     A.   **That means that I personally would not be**

71

1  **affected by an extension of probation because I was**
2  **already a regular employee.**
3      Q.   Okay.  Well, if you felt like it was going to
4  hurt hiring, then that would hurt staffing, could it
5  ultimately affect you?
6      A.   **That would be correct.**
7      Q.   Was that part of your concern?
8      A.   **That was part of the concern of the membership.**
9      Q.   Was it part of your concern?
10     A.   **Yes, I did have concerns.**
11     Q.   So in a way it did affect you, didn't it?
12     A.   **Well, anything in the fire surface affects me if**
13  **I'm an employee.**
14     Q.   Okay.  Do you recall ever before making the phone
15  call that you made to Mayor Hardin, anyone in the fire
16  department discussing this issue openly with members of
17  the fire department including you?  When I say "this
18  issue," I mean the issue of this extending this
19  probationary time to 18 months, prior to -- let me start
20  over.  I have lost my question.  Let me just withdraw it
21  and start it over.  You've told me that you talked with
22  membership about it, the only one you can name is Bill
23  Pitts and then you talked to George Bennett about it.  And
24  then after that, what was your next step?  What did you
25  do?

72

1      A.   **My next step, we went over that.  I called the**
2  **City Clerk to get verification.**
3      Q.   Okay.  Was that after you talked to George
4  Bennett?
5      A.   **I was on duty Sunday.**
6      Q.   Right.
7      A.   **On Monday when I was off duty and in my capacity**
8  **as the president of the union.**
9      Q.   Right.
10     A.   **I called the City Clerk's office to get**
11  **verification on exactly what the amendment to the**
12  **probationary period entailed.**
13     Q.   Right.
14     A.   **Before I called members.**
15     Q.   Then what did you do next?
16     A.   **Then after I called the membership, then I called**
17  **our elected officials.**
18     Q.   Who did you call?
19     A.   **The Mayor, Jeff Hardin.**
20     Q.   Okay.  Anybody else?
21     A.   **Council Member Ray Bush.**
22     Q.   Okay.
23     A.   **And Council Member Arthur Sumbry.**
24     Q.   Okay.  Were you able to reach any of them?
25     A.   **Yes.**

73

1      Q.   Who did you talk to?
2      A.   **All three.**
3      Q.   You talked to all three of them?
4      A.   **Yes, sir.**
5      Q.   All right.  Now, at any time prior to calling
6  these three Council Members, had any person in authority
7  in the fire department be it a Chief, Assistant Chief or
8  Deputy Chief, communicated to you anything about this
9  proposed change in the system of probation for new
10  employees?
11     A.   **Yes.**
12     Q.   Who?
13     A.   **Chief Roy Waters.**
14     Q.   Okay.  Tell me about that.
15     A.   **We had regular training everyday at 1300 at the**
16  **fire department.**
17     Q.   Uh-huh.
18     A.   **He was over our training modules.**
19     Q.   Uh-huh.
20     A.   **And he brought it up that no time soon but, you**
21  **know, some time in the future that they were looking at**
22  **maybe extending probationary time for new employees.**
23     Q.   Was that before or after you learned about this
24  in the Ledger-Enquirer?
25     A.   **That was before.**

---

74

1    Q.    Okay. How long before?
2    A.    I don't have any idea.
3    Q.    Okay. Well, other than -- I mean was this a
4  personal conversation between you and him or were there
5  other people present?
6    A.    No, sir. It was a group discussion.
7    Q.    All right. How many folks do you think was there
8  in the group?
9    A.    The whole shift.
10   Q.    All right. So it was a shift meeting?
11   A.    Well, it was training. It's daily training.
12   Q.    Okay. But the whole shift was there?
13   A.    That would be correct.
14   Q.    And the person who brought it up was Deputy Chief
15 Waters?
16   A.    Yes, to the best of my knowledge.
17   Q.    All right. And so he told you what about the
18 proposed change?
19   A.    He didn't tell me directly.
20   Q.    Well, told the group what?
21   A.    Right. He just said that in Columbus that they
22 had 18 -- a year and a half probation and that no time
23 soon but some time in the future that they might -- that
24 they were thinking about maybe extending the probationary
25 time.

---

75

1    Q.    Okay. Anybody have any comments about it at the
2  time?
3    A.    Yes.
4    Q.    Who did?
5    A.    I don't remember who all it was.
6    Q.    Well, do you remember what was said?
7    A.    I said one.
8    Q.    What did you say?
9    A.    I asked him if the probationary time would be
10 just for the 18 months would be for new employees or if it
11 would be for, you know, everybody.
12   Q.    Okay. And what did he say?
13   A.    He said, "No, it would only be new employees."
14   Q.    All right.
15   A.    And I think he asked, you know, why I thought
16 that it would be like that because in our mind, we was
17 thinking if you was on a year and a half probation for
18 every time you got promoted, that you would be on
19 probation for --
20   Q.    I got you.
21   A.    -- ten years out of a 30-year career.
22   Q.    I see. Did he allay your concerns about --
23   A.    He said, "It ain't nothing we're doing today, you
24 know, and it doesn't have anything to do with y'all, it's
25 just new recruits. It's no big deal." He said -- I think

---

76

1  he added that he couldn't believe that -- you know, that
2  we went this long with not doing it.
3    Q.    Okay. He talk about any benefits to the new
4  recruits of having the system that way as opposed to the
5  old way?
6    A.    Not that I can remember.
7    Q.    Okay. Only one meeting where this was ever
8  discussed prior to you learning about it in the newspaper?
9    A.    That's correct.
10   Q.    Okay. How long do you think it was after this
11 one meeting that you learned about it in the newspaper?
12   A.    Probably a good two months, two or three months.
13 I don't know how accurate that would be but I'd guess.
14   Q.    All right. When you talked with any of these
15 people on the telephone, Jeff Hardin, Arthur Sumbry or Ray
16 Bush, did you record any of those conversations?
17   A.    No, sir.
18   Q.    One of the things that was asked for in your
19 Deposition Notice was any tape recordings or videotapes or
20 anything like that you might have in relation to this
21 case. Do you possess any audio recordings of any kind in
22 relation to this case?
23   A.    No, sir.
24   Q.    All right. Any videotapes?
25   A.    No, sir.

---

77

1    Q.    Nothing like that?
2    A.    No, sir.
3    Q.    Okay. Did you make any notes of your
4  conversations with Mr. Sumbry?
5    A.    No, sir.
6    Q.    How about Mr. Bush?
7    A.    No, sir.
8    Q.    How about Mayor Hardin?
9    A.    No, sir.
10   Q.    All right. There's an exhibit here No. 21 and on
11 the message part on it, on the re: line, it says "city
12 proposals, he would not speak with anyone else." Do you
13 recall telling whoever took this message that you didn't
14 want to talk to anybody else but the Mayor?
15   A.    No, I didn't say that.
16   Q.    Okay. Well, when you called to speak to the
17 Mayor, looks like this says 4/17 and around 12:30. Does
18 that sound right?
19   A.    Yes, sir.
20   Q.    Do you remember what day of the week that was?
21   A.    No, sir.
22   Q.    Did the Mayor call you back the same day?
23   A.    Yes, sir.
24   Q.    Tell me your recollection. Do you remember about
25 what time of day it was?

---

78

1    A.    I believe it was in the evening.
2    Q.    You say in the evening, you mean like after lunch
3   and before 5 o'clock or after 5 o'clock?
4    A.    Well, probably in between somewhere between 3:00
5   and 7:00.
6    Q.    Okay.  And tell me what you recall about the
7   conversation.
8    A.    I mean, he called and I discussed what the
9   Firefighters Association issue was and our stance on the
10   probation extension.
11    Q.    Okay.  What did you tell him?
12    A.    I told him that, you know, that the Firefighters
13   Association would be against any changes to extend the
14   probationary period for new employees.
15    Q.    And what did he tell you?
16    A.    He asked me why, why we felt that way.
17    Q.    Okay.  Take me through your conversation, the
18   best you can recall it.
19    A.    Well, I mean, the best I can recall it, he, you
20   know -- well, he called, he was -- you know, how you
21   doing, whatever.  We talked a little bit.  And then I told
22   him that, you know, "On behalf of the Firefighters
23   Association that we were against the -- you know, the
24   proposal."  And that I told him that before, you know,
25   that they had voted in our favor, what we asked them to

79

1   not mess with probation and that we were asking again and
2   then he asked why.  And so I went on to explain to him
3   about how that Firefighters Association felt that we had
4   high turnover rate and that we had a hard time recruiting,
5   maintaining people, and that it affected staffing and that
6   we felt that this would be negative on, you know, trying
7   to recruit employees because our health insurance costs
8   were so high and that people weren't allowed to work
9   part-time jobs when they were on probation, and that in
10   Columbus, they were allowed to.  And that so anybody that
11   we try to hire maybe go over there for a better deal and
12   that we were just against that and I think I even told him
13   that we're not so much against extending probationary
14   time, but we'd like for the people to be able to work
15   part-time jobs and still have rights under the merit
16   system.
17    Q.    And what did he say?
18    A.    He said -- well, I think he told me -- he said,
19   Well, you know, the Chief said -- I take that back.  He
20   didn't say the Chief.  He said, I don't remember who
21   proposed it, it was one of the Chiefs, the Police Chief or
22   the Fire Chief.  He said, But they said it had something
23   to do with training.  And then I told him that some of the
24   proposals from the membership was that if this was the
25   case that, you know, let the probation start when they

80

1   complete training or that extend the time for EMT -- he
2   said something about EMT.  And I told him that, you know,
3   instead of changing the probation, we'd be more happy, you
4   know, that we could successfully recruit people if we just
5   extend the time that people were allowed to do the EPMT.
6    Q.    Okay.  How did the conversation end?  He give you
7   a commitment he was going to do one thing or the other?
8    A.    No.  He said that he would bring that up; and
9   that he appreciated me bringing some of those issues to
10   his attention; and that, you know, if I ever needed
11   anything, feel free to let him know.
12    Q.    Okay.  All right.  Tell me about your
13   conversation with Council Member Bush.  Let me stop there.
14   Let me back up just a minute.  When you -- the number here
15   that -- it's got the call back number is 291-1927.  What
16   phone number is that?
17    A.    That's my phone number.
18    Q.    That's your home phone?
19    A.    That's correct.
20    Q.    All right.  Did you make any of these calls on
21   your cellular telephone?
22    A.    No, sir.  I don't -- I didn't even have one.
23    Q.    Okay.  So all the calls you made on your home
24   telephone?
25    A.    I am assuming they were.

81

1    Q.    Okay.  Did you talk with all of these people,
2   Councilman Bush, Councilman Sumbry and Mayor Hardin, all
3   on the same day?
4    A.    Yes.
5    Q.    All right.  So tell me had you already spoken
6   with either of the other two, Bush or Sumbry, prior to
7   talking to Mayor Hardin?
8    A.    Yes.
9    Q.    All right.  Tell me who was the first one you
10   spoke with that day.
11    A.    I can't remember in the order which one it was.
12    Q.    Okay.  Well, just give me your best recollection.
13    A.    Maybe Bush.
14    Q.    Okay.  Where did you reach him?
15    A.    Maybe at -- maybe his cell phone or his house.  I
16   can't remember which one.
17    Q.    Where did you -- where would you have gotten his
18   cell phone number?
19    A.    He had given it to us.
20    Q.    Who had given it to you?
21    A.    Council Member Bush.
22    Q.    When had he given it to you?
23    A.    I think at a union meeting that he had came to.
24    Q.    How long ago was that?
25    A.    I don't remember the exact date.

---

82

1    Q.    Was that when he was running for office or when
2    he was already in office?
3        A.    It might have been when he was already in or I
4    believe so.  He came to some before and after, so I'm not
5    real sure.
6    Q.    Was he a regular attendee at your meeting?
7        A.    He maybe -- he maybe attended a couple.
8    Q.    Okay.  Anyway you think you either called him at
9    his house or on his cell phone?
10       A.    That's correct.
11   Q.    One of the two.  Tell me about that conversation.
12       A.    Well, I called him and told him that the proposal
13   on the probation that on behalf of the Firefighters
14   Association that we'd be against it.
15   Q.    Uh-huh.
16       A.    And told him that, you know, in the past
17   that he's helped us out, you know, when we lobbying for
18   votes or whatnot.  And he said, no problem, that he'll
19   evaluate it.
20   Q.    That was the end of that?
21       A.    I mean, then we talked about some other stuff.
22   Q.    Well, I mean did he give you a commitment one way
23   or the other about what he was going to do?
24       A.    No, sir.  I didn't ask for one.
25   Q.    Do you remember what else you talked about?  You

---

83

1    said you talked about some other stuff.  What other stuff
2    did you talk about?
3        A.    I think we talked about his brother.
4    Q.    And who is that?
5        A.    Mr. Bush.
6    Q.    Bobby?
7        A.    I don't know if it's Bobby or Bill.
8    Q.    Okay.
9        A.    He's Mr. Bush to me.
10   Q.    All right.  What did y'all talk about his
11   brother?
12       A.    Oh, nothing.  Just how is he doing and all that.
13   Q.    You just happened to know him?
14       A.    Yes, sir.
15   Q.    How do you know him?
16       A.    From the gym.
17   Q.    Okay.  All right.  Mr. Sumbry.  Tell me about
18   that one.
19       A.    Called him and told him that this is David Davis
20   from the Phenix City Firefighters Association and had a
21   proposal to extend the probationary time.  I think I gave
22   him the merit system section, whatever it was, and that
23   the Firefighters Association would be against any changes
24   in the length of probation.
25   Q.    Basically the same thing you told the other two?

---

84

1        A.    Yes, sir.
2    Q.    What did Councilman Sumbry tell you?
3        A.    No problem.
4    Q.    What did you take that to mean?
5        A.    I mean, I didn't take it as nothing.  I mean, no
6    problem.  I thought he copied what I said and he, you
7    know --
8    Q.    I mean, did you get the impression that he was
9    going to vote against any change?
10       A.    Well, I would assume no problem means that.
11   Q.    Is that what you left the conversation with?
12       A.    No.  I mean, when -- with his conversation, I
13   didn't know what to be left with.
14   Q.    Okay.  Where did you reach him?
15       A.    I don't know if it was his cell phone number or
16   home number or work number.  I'm not sure.
17   Q.    How would you have gotten his cell phone number?
18       A.    It's just part of our contact numbers.
19   Q.    Whose contact numbers?
20       A.    The union's contact numbers.
21   Q.    Okay.  All right.  At the time that you were
22   doing this phone calling, were you aware that there had
23   been some correspondence back and forth between the
24   international union and the City wherein the City Manager
25   had been designed to be contact for the union?

---

85

1        A.    No, sir.
2    Q.    Okay.  So they didn't share that, the
3    international union didn't share that with you?
4        A.    Not that I'm aware of.
5    Q.    Okay.  Well, you'd be aware of it if they told
6    you about it, wouldn't you?
7        A.    That's correct.
8    Q.    Okay.  So they hadn't told you about but it --
9        A.    No, sir.
10       MR. MCKOON:  All right.  Let's take a little
11   break.
12       (Recess was taken.)
13   Q.    (BY MR. MCKOON)  All right.  We stopped at the
14   point where you had called two Councilmen and the Mayor
15   about this situation concerning extending probationary
16   time for new employees of the fire, police and the
17   inspection departments.  After you made those phone calls
18   and had those discussions, did you tell me this was on an
19   off day of yours when this happened?
20       A.    Yes, sir.
21   Q.    Do you remember what day of the week it was?
22       A.    No, I don't remember -- I'm assuming Monday or --
23   Q.    If you don't remember, that's fine?
24       A.    Yeah, I don't.  I mean ...
25   Q.    Do you think it was a week day as opposed to a

---

86

1  weekend?
2      A.    Yeah, I know it was.  Let me look at the letter I
3  wrote and I think I put the day on there that I called.  I
4  don't know if it -- what the -- I think it was the 17th.
5      Q.    All right.  When was the first time you heard
6  anything in regard to your employment with the fire
7  department and you calling the Mayor?
8      A.    When I went -- when I went to work -- when I went
9  back to work, I was called in the office.
10     Q.    Okay.  Who called you in the office?
11     A.    Deputy Chief Waters.
12     Q.    Okay.  Was anybody else present?
13     A.    I believe it was my Captain and -- and Captain
14  Bobby Brooks.
15     Q.    Okay.  And who was your Captain?
16     A.    George Bennett.
17     Q.    So present was Roy Waters, George Bennett and
18  Bobby Brooks?
19     A.    Yes, sir.
20     Q.    Tell me what was said, if you recall.
21     A.    Chief Waters just asked me if I -- if I called
22  the Mayor; and I said, Yes.  And then he said, "Well, did
23  you use the chain of command?"  And I said, well -- I
24  said, "I called on my off duty day and as president of the
25  Firefighters Association."  I said, you know, "I assumed

87

1  that the chain of command was from my constituents to our
2  elected officials."  So -- and he was like, "All right.
3  Well, you need to type up a letter.  Go on next door and
4  type up a letter right now."  And he said, "Make sure you
5  don't put no junk on there."
6      Q.    Who said this?
7      A.    Chief Waters.
8      Q.    He said make sure you don't put no junk on --
9      A.    Or make sure you tell the truth or, you know, he
10  said something else like that.  So I went next door and
11  did what he said and typed up a letter.
12     Q.    Okay.  All right.  And I think we have seen that
13  letter previously.  It basically just states that you met
14  with the Mayor, right -- I mean, talked to the Mayor on
15  the phone?
16     A.    Yes, sir.
17     Q.    All right.  What happened next?
18     A.    He told -- when I typed it up, I gave it to him
19  and then he told me he was going to go give that to the
20  Chief and for that for me to sit there until they figured out
21  what they was going to do with it.
22     Q.    So where did you sit?
23     A.    I sat right down there where he told me to.
24     Q.    Where was that?
25     A.    Down at Station 1.

88

1      Q.    What happened next?
2      A.    I sat there for about three or four hours and
3  then they just told me to go back to my station.
4      Q.    The letter you wrote, I believe, was Plaintiff's
5  Exhibit No. 22; is that correct?
6      A.    Let me look.  Yes, sir.
7      Q.    And you refer to it as Monday, April 17th?
8      A.    Okay.  Yeah.
9      Q.    All right.  So anyway, I apologize.  You say you
10  sat there three or four hours.  What happened next?
11     A.    I was told to go on back down to Station 3.
12     Q.    All right.  Is that where you had come from?
13     A.    Yes, sir.
14     Q.    All right.  And what happened after that, in
15  regard to your employment with the Phenix City Fire
16  Department?
17     A.    I went ahead and finished on working.
18     Q.    Okay.  So that would have --
19     A.    Until --
20     Q.    Looks like this letter is actually dated the 19th
21  so all this happened on the 19th of April?
22     A.    Right, when I wrote the letter.
23     Q.    All right.  What happened next?
24     A.    When I was off duty, I was called and told that I
25  needed to report to the personnel office on the next day.

89

1      Q.    Did you do that?
2      A.    Yes, sir.  Well, I asked if I needed to wear my
3  uniform or what I needed do.  And they just told me just
4  to come on down there in plain clothes.
5      Q.    Who called you?
6      A.    I think it was Chief Jackson, James Jackson, was
7  the one I think that called me.
8      Q.    What time were you told to report down there?  Do
9  you recall?
10     A.    It was in the morning time, 9, 10 o'clock,
11  something like that.
12     Q.    So what -- did you have any thoughts in your mind
13  about why you would be asked to report to the personnel
14  office?
15     A.    I mean, usually the only time you go down there
16  is to be fired.
17     Q.    Is that what you thought was going to happen?
18     A.    Well, no, sir.  I thought, you know, I -- I
19  didn't know what to think at that time.  I had some
20  anxiety.
21     Q.    All right.  Well, tell me what happened when you
22  got there.
23     A.    Well --
24     Q.    Let me stop first.  Any other communication with
25  anybody at the fire department before -- after talking

90

1  with Chief Jackson being told to go to the personnel
2  department and going to the personnel department?
3      A.  I mean, the only conversations we had was before
4  that, you know, I mean, when I was still on duty.  When I
5  got off duty --
6      Q.  Okay.
7      A.  -- he called me.  Nobody else called me.
8      Q.  So tell me about what happened at the personnel
9  department.
10     A.  I showed up down there and the police met me at
11 the door and --
12     Q.  How many policemen?
13     A.  I think I only remember seeing was one that I
14 know of.  I don't know if there was more.
15     Q.  Do you know who it was?
16     A.  Some police officer.
17     Q.  I mean, did you know that officer?
18     A.  I had seen him before.  I don't --
19     Q.  Did you know his name?
20     A.  I don't know him personally.
21     Q.  Do you know his name sitting here today?
22     A.  I don't want to guess at something that I don't
23 know for sure.  He's a younger fellow.
24     Q.  So you don't know his name?
25     A.  No, sir.

91

1      Q.  Was he White or Black?
2      A.  He's a White guy.
3      Q.  Is he tall, short?
4      A.  He's regular, I mean.
5      Q.  Just medium-sized fellow?
6      A.  He probably wasn't no -- about my size, I guess.
7      Q.  Do you know if he's still with the police
8  department?
9      A.  I don't know.
10     Q.  Okay.  Anyway, so what did he say to you, if
11 anything?
12     A.  Nothing.  He just -- I think he asked me what am
13 I doing down here or something.  I don't know.  I can't
14 remember if I talked to him or not.
15     Q.  He asked you what you were doing there?
16     A.  Yeah.  What's going on or something.  I think I
17 told him I don't know.
18     Q.  All right.  So what happened next?
19     A.  I sat there in the waiting room until they called
20 me in the office.
21     Q.  And who was there?
22     A.  The Fire Chief and which was Chief Hunter and
23 then the Deputy Chief which was Roy Waters.
24     Q.  Uh-huh.
25     A.  And then the Human Resource Director which is Ms.

92

1  Barbara Goodwin.
2      Q.  Okay.  Anybody else present?
3      A.  No, sir.  Well, me.
4      Q.  Obviously you.  Was the policeman in the room
5  with y'all?
6      A.  No, sir.  I don't think he was in that room with
7  us.
8      Q.  Was the door open or shut?
9      A.  I believe it might have been shut.
10     Q.  Which room was it down at the personnel
11 department?
12     A.  I don't know.  I mean ...
13     A.  Was it a conference room similar to this room?
14     A.  Kind of, yes, sir.
15     Q.  Tell me what happened.
16     A.  They gave me this piece of paper that's one of
17 these exhibits.
18     Q.  All right.
19     Q.  Hold on.  I'll find it.
20     Q.  Is that 24?
21     A.  Yes, sir.
22     Q.  Exhibit No. 24.  They gave you that?
23     A.  Yep.  And --
24     Q.  Who handed it to you?
25     A.  I don't remember which one.

93

1      Q.  All right.  What happened next?
2      A.  They told me that I was going to be terminated,
3  but they was going to give me a chance to resign.
4      Q.  Who told you that?
5      A.  I think it was Ms. Goodwin.
6      Q.  Okay.  She said, "Mr. Davis, you are going to be
7  terminated but first we want to give you the opportunity
8  to resign"?
9      A.  Yes, sir.
10     Q.  All right.  And what did you say?
11     A.  I told -- I mean, not just specifically her but I
12 just said that at this point, I'd like to contact legal
13 representation to find out what would be my best option.
14     Q.  Okay.  And what was -- was there any reply to
15 that request?
16     A.  They said that I --
17     Q.  Who is they?
18     A.  They, I think Ms. Goodwin, told me that I could
19 either sign it now or I was just going to be fired
20 anyways --
21     Q.  Okay.
22     A.  -- so ...
23     Q.  That's what she told you?
24     A.  Yes, sir.
25     Q.  All right.  What happened next?

94

1    A.    I signed the bottom of this form.
2    Q.    If you would, Mr. Davis, because your handwriting
3  is so distinctive and small, would you read what you wrote
4  on the bottom so I can understand it?
5    A.    It's kind of distorted from the print. I think
6  it says in regards to the conversation -- wait. Oh, "In
7  regards to contacting the Mayor, I was acting in my
8  capacity as president of the Phenix City Firefighters
9  Association Local 3668 and not as a Driver Engineer with
10  the City of Phenix City. I will seek a review board
11  hearing."
12    Q.    Okay. And then did you sign it over here on the
13  back there where it's got employee signature?
14    A.    Yes, sir.
15    Q.    And dated it looks like 4/21/06?
16    A.    Yes.
17    Q.    Was anything else said by anybody that you
18  haven't told me about already while you were in there
19  being terminated?
20    A.    Not that I -- they just read it out loud.
21    Q.    They read this --
22    A.    To me.
23    Q.    -- details of merit system violation to you?
24    A.    They read this top part right here, you know
25  where it says --

95

1    Q.    Not the details but written warning form?
2    A.    Right.
3    Q.    Everything above the line that's above details of
4  merit system violation?
5    A.    Right.
6    Q.    All right. Did you understand the reason that
7  this action was being taken?
8    A.    Yes, sir.
9    Q.    Okay. And did you understand it to be because
10  you had talked with the Mayor?
11    A.    Yes, sir.
12    Q.    And had not gone through the chain of command?
13    A.    Well, noncompliance with requirements as set
14  forth in miscellaneous rules and insubordination by
15  refusing to perform work assigned to or comply with
16  written or verbal instructions and supervisory force.
17    Q.    Okay. Well, I understand that but like your
18  lawyer asked Ms. Goodwin, that's what the --
19    A.    The factual?
20    Q.    Yeah, what's the underlying factual reason?
21    A.    Because I called the Mayor.
22    Q.    Okay. All right. What did you do next?
23    A.    Sign the paperwork.
24    Q.    And left?
25    A.    No, sir.

96

1    Q.    All right. Tell me what happened.
2    A.    Well, then Ms. Goodwin gave me some more
3  paperwork about insurance COBRA.
4    Q.    She explained it to you?
5    A.    She said -- I think I told her that -- she told
6  me to contact her later, you know.
7    Q.    Okay.
8    A.    And then told me about my retirement and said
9  they, you know -- I could take it out and then I asked
10  her, you know, "Is it okay if I leave it in?" And she
11  said, "Well, if you plan to work some place in the state."
12  I said, "Well, yes, I do, and then I would like to leave
13  it in." And I asked her how long could I leave it in
14  there for, you know, before I had to find another job?
15  And she said she didn't know, that she would have to get
16  back with me. And then they told me that to sit there for
17  a minute. I believe the Chief told me to sit there, and
18  that they was going to try to find somebody to meet me at
19  my fire station so I could clean my locker out.
20    Q.    Uh-huh.
21    A.    And then, I think, the two Chiefs, I think, left
22  the room to go call somebody to meet me.
23    Q.    Okay.
24    A.    And I believe -- I mean -- and I'm not sure. But
25  from the Deputy Chief's testimony to get the people out of

97

1  the fire station.
2    Q.    So it wouldn't be unpleasant for you?
3    A.    Well, it was already unpleasant.
4    Q.    I understand. But I mean anymore unpleasant?
5    A.    Yes, I'm assuming.
6    Q.    Okay. Well, was -- I realize you were being
7  fired and any time you're being fired, that's an
8  unpleasant situation; but while all this was going on, was
9  anyone discourteous to you in any way?
10    A.    I don't believe anybody was discourteous.
11    Q.    They acted politely towards you?
12    A.    Yes.
13    Q.    Okay. So then did you leave after waiting? Did
14  you leave and go down to the fire station and clean your
15  locker out?
16    A.    Yes, sir.
17    Q.    All right. Did you have anymore contact with Ms.
18  Goodwin about either of the issues that you had asked her
19  about, either the COBRA or the leaving the retirement in?
20    A.    No, sir. I went and looked at the retirement
21  myself to see what the stipulations were, and then I think
22  the last time I talked to her was to give her a letter for
23  the Panel Review Board or whatever.
24    Q.    Okay. You see her anymore after that?
25    A.    I don't think I did.

98

1   Q.   You talked to Chief Hunter anymore after that?
2   A.   No, sir.
3   Q.   How about Chief Waters?
4   A.   No, sir.
5   Q.   Did you ever talk to the City Manager about any
6   of this?
7   A.   No, sir.
8   Q.   Okay.  Had you ever met with the City Manager
9   previously and a fellow named Malone from Montgomery
10  that's a representative in the state here of your union
11  about issues within the fire department?
12  A.   Yes, sir.
13  Q.   How long ago was that?  Do you remember?
14  A.   I don't remember the year.  Probably 2005 -- '4,
15  '5, '6, somewhere in there.
16  Q.   Well, from that meeting, did you understand that
17  the contact for the union was the City Manager?
18  A.   No, sir.
19  Q.   All right.  And I believe you previously stated
20  that you were never made aware of the letter between the
21  City Manager and the international union about whether the
22  City Manager was designated at the contact for the union?
23  A.   Yes, sir.
24  Q.   So just to kind of summarize, you knew about the
25  or hadn't you?  You either knew about or had access to the

99

1   merit system rules and regulations and the standard
2   operating procedure of the fire department in regard to
3   free speech prior to all this happening?
4   A.   Yes.
5   Q.   All right.  And, in fact, even after you had gone
6   to the media with all these public concerns you talked
7   about back in '05, no action was taken against you other
8   than to ask you to comply with those procedures; is that
9   correct?
10  A.   No disciplinary actions were taken against me.
11  Q.   Right.  But you were asked in the future to
12  comply with the merit system and with the SOP; is that
13  right?
14  A.   I signed that form saying I acknowledged
15  receiving that letter.
16  Q.   Right.  Well, I mean, were you asked at that time
17  to comply with those procedure in the future?
18  A.   I mean, they never verbally asked.  I was just
19  told to read that and sign.
20  Q.   What did you take it to mean?
21  A.   Mean that I better sign it and go by what it
22  says.
23  Q.   Okay.  And did you try to do that in the future
24  any time you had a problem?
25  A.   Yes, sir, I did.

100

1   Q.   Is the chain of command important in your mind in
2   a para-military organization like the fire department?
3   A.   Yes.
4   Q.   All right and why so?
5   A.   Specifically?
6   Q.   Uh-huh.
7   A.   On a fire ground, you know, when there's life and
8   death decisions being made, then there definitely needs to
9   be a chain of command.
10  Q.   And isn't it important when you are not on the
11  fire ground too?
12  A.   Yes.
13  Q.   So in this situation, why did you not follow the
14  chain of command?
15  A.   Because I was not at work and I was acting in my
16  capacity as a union president of the Phenix City
17  Firefighters Association and I was going before and
18  participating in the political process by going to the
19  Council Members who had a vote on the matter.
20  Q.   Okay.
21  A.   On behalf of my membership.
22  Q.   Well, you were expressing a view or opinion
23  pertaining to employment conditions, weren't you?
24  A.   I guess you could say that.
25  Q.   Okay.

101

1   A.   But it wasn't a complaint.
2   Q.   You weren't complaining about what was happening?
3   A.   No, I wasn't complaining.  It hadn't happened.
4   Q.   Okay.  Well, you weren't complaining in an
5   attempt to stop something from happening like you had
6   previously?
7   A.   I was just voicing the membership's stance on the
8   proposed change.
9   Q.   Okay.  So you didn't look at it as a grievance
10  then?
11  A.   No, sir.
12  Q.   Okay.  Let me look at your complaint and ask you
13  a few questions about that.  And before I do that, since
14  we talked earlier a little bit about your lost wage claim,
15  I believe you -- are you claiming that you had lost any
16  benefits as a result of being terminated from the Phenix
17  City Fire Department?  When I mean benefits, I mean like
18  leave time.
19  A.   Yes.
20  Q.   Okay.  You're making that claim.  Have you
21  calculated what that is?
22  A.   As in -- I don't understand your question.
23  Q.   Well, have you calculated what leave time you
24  have lost or vacation time you've lost?
25  A.   I lost all of what I had on record.

102

1  Q.  So whatever that was?
2  A.  And I had never taken a day off in my whole
3  career as far as sick time.
4  Q.  So whatever you were entitled to at that time,
5  you are claiming?
6  A.  Correct.
7  Q.  So what about your retirement?  Obviously you
8  weren't contributing to it after you were terminated; but
9  other than that claim, you're not claiming anything about
10  losing your retirement because you still have the amount
11  that was in there; am I correct?
12  A.  Well, no.
13  Q.  Okay.  Tell me -- explain that claim to me then.
14  A.  Well, not only was I not contributing but now
15  it's averaged on how much you are making and I'm not
16  making what I was making into the state retirement in my
17  new position.
18  Q.  Okay.
19  A.  And I have to start over, you know, verses having
20  to being pretty close to moving up the chain of command
21  within this City.  I'm starting over somewhere else.
22  Q.  Okay.
23  A.  And.
24  Q.  One of your allegations in your complaint, and
25  I'm referring to paragraph 12 of it, says, "In the period

103

1  of 2005 through the present, defendant City Manager
2  Roberts, Chief Hunter and Deputy Chief Waters had made
3  derogatory remarks about the firefighters local labor
4  organization."
5  Can you tell me any derogatory remarks that you ever
6  recall the City Manager, Chief Hunter or Deputy Chief
7  Waters making about the local firefighters labor
8  organization?
9  A.  I personally cannot.
10  Q.  Okay.  Well, what are you basing that allegation
11  on?
12  A.  I guess on statements made to me by others.
13  Q.  And who would those people be?
14  A.  During what time period?
15  Q.  It says in the period 2005 through the present.
16  A.  Okay.  Well, my Assistant Chief for one.
17  Q.  Who's that?
18  A.  Kenny Johansen.
19  Q.  And what has Kenny Johansen told you about --
20  let's go them one at a time, the City Manager makes some
21  derogatory remarks about the firefighters local labor
22  organization.
23  A.  That they're tired of us.
24  Q.  He told you that the City Manager said that?
25  A.  All the Chiefs actually brought us in a meeting

104

1  and told us that the City Manager's mad at us and tired of
2  our -- I think the actual word was crap.
3  Q.  Mad at us and tired of our crap.  Anything else
4  you remember that was reported to you that was said?
5  A.  From Chief Johansen?
6  Q.  Yes.
7  A.  Yeah that --
8  Q.  Or from anybody?
9  A.  -- yeah, that the union is ruining my career.
10  Q.  Chief Johannson told you that the union was
11  ruining your career?
12  A.  That's correct.
13  Q.  Okay.  Well, let me stop there for a minute.  I
14  am trying to confine it to derogatory remarks made about
15  the firefighters local labor organization by City Manager
16  Roberts.  Tell me who in the time period 2005 told you
17  that City Manager Roberts made any derogatory remarks
18  about the local firefighters union.
19  A.  I can't say that I know anything personally.  I
20  haven't had any conversations with him so ...
21  Q.  Okay.  Well, anybody other than other than Kenny
22  Johansen, if you understood your testimony just a minute
23  ago, has anyone else told you that the City Manager in the
24  time period 2005 through the present made any derogatory
25  remarks about the firefighters local labor organization?

105

1  A.  Not that I know of.
2  Q.  Okay.  Or about you in your capacity as the
3  organization's president?
4  A.  Not that I know of.
5  Q.  All right.  Or about Davis speaking out on
6  matters of public concern?
7  A.  Not that I know of.
8  Q.  All right.  Well, let's go to then -- let's take
9  that question to Chief Hunter.  In the period 2005 through
10  the present, do you know of anything where Chief -- any
11  time where Chief Hunter has made a derogatory comment
12  about the firefighters local labor organization?
13  A.  Yes.
14  Q.  All right.  Tell me about that.
15  A.  A number of people in the fire department.
16  Q.  Have told you what?
17  A.  You know that the Chief said that the union is
18  not going to help y'all.
19  Q.  Union won't help y'all?
20  A.  Right.
21  Q.  What else?
22  A.  That we getting rid of -- we done got rid of the
23  trouble makers.
24  Q.  Do you understand that to be union people?
25  A.  I'm assuming that's me since I was the one they

106

1   got rid of.
2       Q.   So this is a statement made some time after you
3   were discharged?
4       A.   I'm assuming so.
5       Q.   Well, who told you that?  Who told you that Chief
6   Hunter said that?
7       A.   Give me a second to think.
8       Q.   Sure.
9       A.   Actually, the guy's name is Stevens I think.  He
10  was applying for a job.
11      Q.   Do you know where he is today?
12      A.   No, I don't.
13      Q.   Anyone else tell you that Chief Hunter made
14  derogatory statements about the firefighters local labor
15  organization in the period of time from 2005 to the
16  present other than Mr. Stevens?
17      A.   No.
18      Q.   You had?
19      A.   No, sir.
20      Q.   Okay.  All right.  What about the allegation that
21  Chief Hunter has made statements about you in your
22  capacity as the organization's president during the period
23  of time 2005 to the present that were derogatory?
24      A.   I am not sure.
25      Q.   Don't know about that.  You don't know whether he

107

1   has or hadn't?
2       A.   I mean, it's mostly -- it would be hearsay, you
3   know, it's what people tell me.
4       Q.   Well, who have you heard that from?
5       A.   Everybody at the fire department.
6       Q.   Everybody at the fire department?
7       A.   All kinds of people tell me stuff.  I don't know
8   if it's -- you know what I mean?
9       Q.   Well, can you name one of them?
10      A.   I don't -- there's been so many of them, I really
11  can't.
12      Q.   So you can't name one of them; am I correct?
13      A.   That's correct.
14      Q.   All right.  Well, do you know of any occasions
15  where anybody has told you or you have heard that Chief
16  Hunter has made derogatory remarks about you speaking out
17  on matters of public concern in the period of 2005 through
18  the present?
19      A.   No, sir.  I don't -- I don't know.
20      Q.   Okay.  Same question as to Chief Waters.  You
21  know, have you ever heard Chief Waters make a derogatory
22  remark about the firefighters local labor organization?
23      A.   No, sir.
24      Q.   All right.  What about, you, in your capacity as
25  the president of that organization?

108

1       A.   No, sir.
2       Q.   Or about you speaking out on matters of public
3   concern?
4       A.   Not that I can remember.
5       Q.   Okay.  In the next allegation, paragraph 13, it
6   says, "In September of 2005, plaintiff Davis was issued a
7   counseling form and threatened with discharge for having
8   spoken out to the local media regarding fire department
9   operations and other matters of public concern."  Who, if
10  anyone, threatened you with discharge in September of
11  2005?
12      A.   The Chief and the Assistant Chief and the Fire
13  Chief.
14      Q.   Wallace Hunter?
15      A.   That's correct.
16      Q.   Who else?
17      A.   And Kenny Johansen.
18      Q.   Okay.  And who else?
19      A.   Those were the two that were in that meeting with
20  me that day.
21      Q.   And they told you that they were going to fire
22  you?
23      A.   They told me that it was going to lawyers and I
24  would probably be fired for what I did.
25      Q.   Okay.  Well, if they did tell you that, that

109

1   didn't happen, did it?
2       A.   That's correct.
3       Q.   Okay.  I'm going to paragraph 17 of your
4   complaint now.  It says, "On or about April 20, 2006,
5   while on duty, plaintiff Davis was summoned to defendant
6   Deputy Chief Waters' office where defendant Deputy Chief
7   Waters reprimanded the plaintiff Davis for contacting
8   defendant Mayor Hardin outside of the chain of command in
9   violation of the City's merit system rules and
10  regulations."  Tell me what you mean by he reprimanded
11  you.
12      A.   I don't know what exactly that means by reprimand
13  but he just asked me to write down what happened, if
14  that's the same date that I wrote this down.  Was it the
15  20th?
16      Q.   Yes, sir.  That's what it says here.  Let me show
17  you the paragraph.
18      A.   Yeah, I'm lost.
19      Q.   Look at 17 there.
20      A.   Right.  That's just where he asked me, you know,
21  if I went outside the chain of command and wanted me to
22  write it in a statement and make sure that it was accurate
23  and not be making no stuff up, that it was going to the
24  Chief.
25      Q.   We've already discussed that and that's all that

110

1  was said?
2     A.   Correct.
3     Q.   All right.  All right.  I'm going to go to
4  paragraph 22, and I am going to ask you some questions
5  about that.  It starts out that, "Upon learning plaintiff
6  Davis had spoken out on such matters of public concern,
7  defendants Phenix City, Mayor Hardin, City Manager
8  Roberts, Chief Hunter, Deputy Chief Waters and Personnel
9  Director Goodwin individually and separately and/or
10  jointly engaged in actions, omissions and decisions aimed
11  at denying the plaintiff's employment rights and
12  protections guaranteed to him under law but not limited to
13  threats of pressure, on-the-job counseling, threats of
14  terminations and efforts to silence the plaintiff as
15  alleged in this complaint."
16     I'm going to give you an opportunity to read what I
17  just read to yourself, paragraph number 22, just the first
18  sentence there.
19     A.   (Witness peruses document.)
20     Q.   Then I want to ask you a question about it.
21     A.   Okay.
22     Q.   Do you know the time period that that is
23  referring to?  In other words, when it says, "Upon
24  learning that you had spoken out on matter of public
25  concern."

111

1     A.   I'm assuming that that would have to be
2  contacting the Mayor.
3     Q.   Well, sir, I don't know.  It's your complaint.
4  I'm just asking you if you know.
5     A.   That's what I'm assuming, that and possibly --
6  yeah, I mean I'm assuming that's what I was terminated
7  for.  That must be what this is in reference to.
8     Q.   All right.  Well, let me go through them one by
9  one real quick.  Did Mayor Hardin ever threaten to
10  terminate you?
11     A.   Negative.
12     Q.   Did he ever give you -- it says here "threats of
13  pressure on the job".  Did Mayor Hardin ever do that?
14     A.   Negative.
15     Q.   Did he ever subject you to any counseling?
16     A.   Not that I'm aware of.
17     Q.   Do you know if he played any role in terminating
18  you?
19     A.   I'm unsure of that.
20     Q.   Okay.  Do you know if he made any effort to
21  silence you?
22     A.   I'm unaware.
23     Q.   If he did, you don't know anything about it, do
24  you?
25     A.   That would be correct.

112

1     Q.   What about Barbara Goodwin, the lady that was in
2  here earlier?  Did she ever subject you to any counseling?
3     A.   She sat in on my termination.
4     Q.   Right.
5     A.   So I would assume, yes.
6     Q.   Did she threaten to terminate you?
7     A.   No, she -- I was terminated.
8     Q.   All right.  She participated in the termination
9  as in her capacity as the Personnel Director; is that
10  correct?
11     A.   Yes.
12     Q.   All right.  What about City Manager Roberts?  To
13  your knowledge, did he ever subject you to any threats of
14  pressure on the job?
15     A.   Yes.
16     Q.   How did he do that?
17     A.   He signed this other termination form.
18     Q.   By signing the termination form?
19     A.   That's correct.
20     Q.   Okay.  You think that was a threatening or
21  pressuring you on the job?
22     A.   I believe it was.
23     Q.   All right.  Did he ever subject you to
24  counseling?
25     A.   I'm assuming that he did.

113

1     Q.   All right.  What about threats of termination?
2  Did he ever threaten to terminate you?
3     A.   Not personally.
4     Q.   Okay.  And you mentioned that he signed the --
5  which form was it, the termination form?
6     A.   Right.
7     Q.   Okay.  You know if the City Manager ever made any
8  effort to silence you?
9     A.   I'm assuming by issuing the free speech memo that
10  all city employees had, yes.
11     Q.   Okay.  What about Chief Waters when you had your
12  relationship with him?  Did he ever pressure you on the
13  job?
14     A.   Yes.
15     Q.   How so?
16     A.   He participated in my termination.
17     Q.   Okay.  Other than that during the time leading up
18  to your termination, did he ever put any pressure on you
19  on the job?
20     A.   Yes.
21     Q.   All right.  And how so?
22     A.   Well, he came down and talked to me one time and
23  then put in a memo that I had no complaints and I had went
24  to his office and talked to him about that and told him
25  that, you know, I did have complaints.

114

1    Q.    Oh, okay. We'll get to that in minute then.
2    What about -- did he ever subject you to counseling?
3    A.    **Yes, he terminated me.**
4    Q.    Okay. So you consider the day you were
5    terminated a counseling session?
6    A.    **I consider that adverse action, yes.**
7    Q.    Okay. Did he ever threaten to terminate you?
8    A.    **Him personally, no.**
9    Q.    Okay. Did he ever make an effort to silence you?
10   A.    **Not that I'm aware of.**
11   Q.    All right. Exhibit No. 25, your end of
12   employment form. Would you look at that just a minute?
13   A.    **Right.**
14   Q.    You see on there where the City Manager signed
15   that?
16   A.    **Right -- he didn't.**
17   Q.    He did not?
18   A.    **He did not.**
19   Q.    Okay.
20   A.    **But he did sign that he approved of the**
21   **recommendation to terminate me.**
22   Q.    So his part in the termination was you are saying
23   that he approved of it; is that correct?
24   A.    **I believe in his own testimony, he stated he**
25   **approved it.**

115

1    Q.    Okay. That's fine. Have you -- and the reason I
2    have to ask you these questions, am not being a smart
3    aleck about it -- but you have complained in your
4    complaint that you have suffered humiliation, harm to your
5    reputation, emotional and mental injuries, pain and
6    suffering, and financial and other adverse consequences
7    and I want to go over that just briefly by starting off
8    and asking you, have you had to seek any psychological
9    counseling as a result of your termination?
10   A.    **I probably should have but I have not.**
11   Q.    All right. So you do not have any bill for any
12   psychiatrist or psychologist?
13   A.    **No, sir, I do not.**
14   Q.    You have not consulted with one about this.
15   A.    **That's affirmative.**
16   Q.    Okay. Any other counselors that you consulted
17   with whether they be a psychologist or psychiatrist?
18   A.    **No, sir.**
19   Q.    Okay. That includes your priest or your pastor
20   or --
21   A.    **No. I mean, just my wife.**
22   Q.    All right. That's fine.
23   A.    **And my family.**
24   Q.    I understand. Other than money damages, what are
25   you seeking in your lawsuit?

116

1    A.    **I'm not sure I understand that question.**
2    Q.    Well, I mean you asking the City to pay you money
3    because of your alleged wrongful termination, and I'm just
4    saying is there anything else you are seeking?
5    A.    **Yeah. My job back.**
6    Q.    Okay. Anything else?
7    A.    **Whatever -- I mean, you know, whatever damages**
8    **and back pay and wages I lost and then my job back.**
9    Q.    Okay.
10   A.    **And my dream.**
11   Q.    And what was your dream?
12   A.    **To work for the City, my hometown.**
13   Q.    Okay. When Deputy Chief Waters started working
14   for the Phenix City Fire and Rescue Services, mandatory
15   meetings were conducted, is that correct, by Chief Hunter
16   and Chief Waters?
17   A.    **I mean, I don't understand mandatory.**
18   Q.    Well, required meetings?
19   A.    **I mean, we had training everyday at 1 o'clock,**
20   **1300.**
21   Q.    Well, was these meetings for all shift personnel?
22   A.    **Well, all stations came to headquarters, yes.**
23   Q.    Did you attend those meetings while you were on
24   duty?
25   A.    **Yes.**

117

1    Q.    When these meetings were started, did Deputy
2    Chief Waters clearly communicate what his expectations
3    would be?
4    A.    **I don't understand that question.**
5    Q.    Well, I mean, did you ever have a time when you
6    were uncertain about what was expected from you from Chief
7    Waters or was he pretty clear about laying down what was
8    expected?
9    A.    **He just said do your job.**
10   Q.    Okay. Did he ever talk to you about trying to
11   positively change the image and perception that the public
12   might have of the Phenix City Fire Department?
13   A.    **Yes.**
14   Q.    Tell me about that. Tell me what you recall
15   about it.
16   A.    **I don't remember everything he said, but he just**
17   **said that from the outside looking in or coming in or**
18   **whatever, I mean, he knew we had problems and that the**
19   **first thing we'd have to do is work together to improve**
20   **them.**
21   Q.    Did he set out kind of an agenda as to how he
22   thought that should be done?
23   A.    **I don't remember what he set out.**
24   Q.    Okay. Well, did he ever tell you that certain
25   rules ought to be followed in order to upgrade the image

118

1  and perception of the Phenix City Fire Department?
2      A.   I'm unclear on that.
3      Q.   All right.  Well, specifically, do you remember
4  any meetings where Chief Waters said that the department
5  needs to stay out of the media?
6      A.   Yes.
7      Q.   All right.  Do you remember him saying that the
8  people that were authorized in the department to
9  communicate with the media were Chief Chris Kennedy for
10  matters involving fire investigations and prevention and
11  Chief Hunter for all other matters?
12      A.   Yes.
13      Q.   Did he also tell you the only exception would be
14  if Chief Hunter authorized or delegated that authority to
15  someone else?
16      A.   In reference to contacting the media?
17      Q.   Correct.
18      A.   Yes.
19      Q.   Did he also say that no one was to talk to the
20  Mayor, City Manager or Councilors unless the chain of
21  command was followed first?
22      A.   I'm unsure about that.
23      Q.   Okay.  You don't remember him saying that?
24      A.   Not exactly.
25      Q.   Do you remember him talking about how important

119

1  the chain of command was and that it would complicate the
2  process and be counter-productive if it was not followed?
3      A.   I mean, he spoke of the chain of command.  I
4  don't know if those were his exact words.
5      Q.   Okay.  Did he say that everybody was, as far as
6  he was concerned, going to be treated with respect and
7  professional courtesy?
8      A.   I believe he talked about improving the
9  relationships.
10      Q.   Okay.  Did he treat you with respect and
11  professional courtesy?
12      A.   He's pretty fair with me, yes.
13      Q.   Okay.  Do you remember him having a little rule
14  about everybody would have to decide to make a decision to
15  sustain, succumb and succeed?
16      A.   I don't know.
17      Q.   Know anything about that.
18      A.   Never heard that before.
19      Q.   You never heard it before?  Was it your -- what
20  was your understanding of the responsibility of the Mayor
21  as it relates to the City Charter?  In other words, did
22  you understand what his responsibility as opposed to the
23  City Manager's?
24      A.   No, sir.
25      Q.   And I believe I have asked you earlier about the

120

1  chain of command, and I believe you told me you believe it
2  is important to follow it?
3      A.   In certain circumstances, yes.
4      Q.   Okay.  When you were working on overtime a lot of
5  the times that you were working, was that so that a fourth
6  person could be on a fire truck?
7      A.   I don't remember.
8      Q.   Don't remember that part; is that's right?
9      A.   That's correct.
10      Q.   Okay.  Did you ever request a meeting with Deputy
11  Chief Waters and where you advised him that you had
12  followed the chain of command first before talking to him?
13      A.   No, sir.
14      Q.   Okay.
15      A.   Matter of fact, we didn't -- I didn't use the
16  chain of command.  I just went in there and talked to him;
17  and as far as I know, he'd just come talk to me.  I mean,
18  it happens all the time in the fire services and in Phenix
19  City.
20      Q.   Say that again.
21      A.   I said the chain of command in the Phenix City
22  Fire Department is not always followed.  A Chief will come
23  and talk to a firefighter or vice versa.  It's not always,
24  you know, the firefighter talks to the Sergeant, the
25  Sergeant talks to the Captain.  I mean, it happens all the

121

1  time.
2      Q.   Go back to 15 for just a minute, Exhibit No. 15.
3  And I want to turn to the last page of that exhibit which
4  is the SOP on addressing City Council.  And it starts off
5  number one, "If a member of the fire department has a
6  problem with the department, a department or city
7  operations or procedures which are work related and finds
8  it necessary to go above his or her immediate supervisor,
9  he or she must notify the supervisor of intention to do
10  so."
11  You knew that was the rule, didn't you?
12      A.   Right.
13      Q.   "And if a member of the next is a member of the
14  fire department finds it necessary to go outside the
15  department, Fire Chief will be given a reasonable time to
16  make an appointment with the Public Safety Director."  We
17  don't have one of those anymore.  "If the problem cannot
18  be solved by anyone in the chain of command, then the City
19  Manager will arrange a hearing for the City Council."
20  You see that?
21      A.   Correct.
22      Q.   All right.  And then down at the bottom, it says,
23  "If a member of the fire department has a grievance, he
24  must follow the grievance procedures as outlined in
25  section 15 of the City of Phenix City personnel policies."

122

1  Is that correct?
2      A.    That's correct.
3      Q.    All right. Do you understand or do you have any
4  opinion about why it might be important if it's a work
5  related problem to follow the chain of command as opposed
6  to going directly to City Council with a concern?
7      A.    As in? I don't understand your question now? Is
8  that --
9      Q.    Well, if you got a problem at work -- at your
10  work for instance, the problem here was you disagreed with
11  or wanted to have input about the change in the
12  probationary period whichever it was for new employees,
13  did you not feel like that was something that you could
14  probably discuss within the department first before going
15  to City Council about it?
16      A.    It -- no, I didn't.
17      Q.    Why not?
18      A.    One, because it wasn't my personal complaint.
19      Q.    Okay.
20      A.    Two, I believe that the affects of that proposal
21  would affected public safety.
22      Q.    Okay.
23      A.    That's a matter of public concern. Two, what I
24  did was off duty and in my capacity as a union president,
25  not as an employee. This rule, from what I understand

123

1  would be, you know what I mean, in capacity as a member of
2  the fire department. And then, you know, as far as the
3  grievance system, it takes almost a month and a half to
4  use the grievance system, and this was like a Monday and
5  it was to be done on a Tuesday type deal.
6      Q.    Was it done on the Tuesday after that Monday?
7      A.    Yes, it was.
8      Q.    Okay. You know what the vote was on it?
9      A.    I don't know exactly what the vote.
10      Q.    Do you know if it was unanimous?
11      A.    I'm not sure.
12      Q.    In any of the shift meetings conducted by Chief
13  Waters or Chief Hunter, did either of them discuss the
14  proposed changes to the probationary period of
15  firefighters other than what we have already talked about?
16      A.    No, sir.
17      Q.    Okay. Did either of them clearly communicate
18  that if it was passed by the Council, that it would only
19  apply to personnel hired after the date the Council passed
20  the change?
21      A.    I'm unsure on that exact language.
22      Q.    Okay.
23      A.    I mean, they made it known that it would only
24  affect new employees.
25      Q.    At the beginning of each shift meeting or

124

1  training that was had, did Chief Waters always start the
2  meeting by saying how much he appreciated what everybody
3  was doing and if they had any complaints, suggestions or
4  recommendations or concerns to let him know?
5      A.    I'm unsure if he said that every time or not, but
6  he did give credit.
7      Q.    All right. Let me look at the complaint again.
8  We have been over previously I think which is it looks
9  like to me the same allegation again, roughly the same
10  language but have we talked about all of the incidents
11  that you can think of here today of threats of pressure on
12  the job, counseling, threats of termination, termination
13  or efforts to silence you that were engaged in by any of
14  the defendants in this case?
15      A.    I mean, I think we have already discussed.
16      Q.    I just want to know if there are anymore that we
17  haven't talked about?
18      A.    Not that I know of at this time.
19      Q.    Well, you would know about them today, wouldn't
20  you? I mean, you know about them today, you are not going
21  to learn anymore about it tomorrow?
22      A.    I don't know.
23      Q.    Okay. So your answer is you don't know?
24      A.    That would be correct.
25      Q.    All right. Did you know that Chief Hunter and

125

1  Chief Waters are both members of the union themselves?
2      A.    I did not.
3      Q.    All right. We have talked about loss of income,
4  we have talked about your loss of time and the retirement
5  system, your loss of vacation and leave time, the fact
6  that you want your job back, et cetera. Any other damage
7  issues that you are claiming that we have not talked about
8  today?
9      A.    I don't even remember what all we talked about
10  now.
11      Q.    Okay. Well, let me go down to the end. It says
12  -- one of the things you asked for is a "permanent
13  injunction against discriminating and retaliating against
14  you and an order of complete and accurate accounting of
15  all the compensation that you are entitled to, for
16  monetary damages in the form of back pay, unpaid
17  entitlements, interest", and then there's an amount here
18  for compensatory damages and an amount for punitive
19  damages and attorney's fees. Is that all you're claiming?
20      A.    And whatever else it says down there. I think
21  there's some more.
22      Q.    "Such other legal and equitable relief as may be
23  just and proper." Do you know what that is?
24      A.    No, I don't; but if it's on there, it must be
25  important.

126

1    Q.    Okay.  Did you review this complaint before it
2    was filed?
3       A.    I read over it what I could understand.
4    Q.    Okay.  Well, I mean, basically you understand
5    that you were terminated for going outside the chain of
6    command, not complying with the policies and procedures of
7    the merit system?  I mean, that was the reasons you were
8    given; right?
9       A.    Yes, that I made that phone call.
10   Q.    And you feel that was wrongful and that's the
11   reason you are suing the City?
12      A.    Yeah.  I feel it violates my rights.
13   Q.    Okay.  Do you feel like the first place -- where
14   do you feel like -- if you have a complaint that is a work
15   related complaint, where do you feel like the first place
16   you should go to try to resolve that complaint?
17      A.    If it's my individual complaint?
18   Q.    Yes, sir.
19      A.    And I'm on duty?
20   Q.    Yes, sir.
21      A.    Then I would go to my supervisor.
22   Q.    Okay.  Now, I believe you testified earlier that
23   if there were less people hired, then that would affect
24   the number of firefighters available and that would affect
25   your job; is that correct?

127

1       A.    That would actually affect the safety of every
2    person that resides in the fire protection district of the
3    City of Phenix City.
4    Q.    Well, it would affect your job, though, wouldn't
5    it?
6       A.    No, it wouldn't affect my job.  It would affect
7    my life.
8    Q.    Well, it would affect your job, your life
9    on-the-job, wouldn't it?
10      A.    Correct.
11   Q.    Okay.
12      A.    And when I'm living and traveling in this City on
13   or off duty.
14   Q.    So the way you see this is it's kind of like on
15   Andy Griffith, you got -- one hat is the firefighters
16   union president and the other hat is a firefighter?
17      A.    Yes, sir.
18   Q.    Is that right?
19      A.    Yes, sir.
20   Q.    And that when you are wearing the union hat and
21   complaining about something, that's different than if you
22   are wearing a firefighters' hat and complaining about
23   something?
24      A.    If it's matters of public concern.
25   Q.    Okay.  Do you know anybody else in the public

128

1    that was concerned about this other than you?
2       A.    Yes.
3    Q.    Who?
4       A.    Anybody that probably knew the staffing issues,
5    you know, would definitely be concerned.
6    Q.    Can you name one of those people sitting here
7    today?
8       A.    No.  I don't know if any of the people sitting
9    here today actually reside in the City except for the
10   Deputy Chief.
11   Q.    I'm sorry, I didn't mean sitting in this room
12   today.  I'm saying where you are sitting today, can you
13   name any of these people that had that public concern that
14   you are talking about?
15      A.    John Q. Public.
16   Q.    Okay.  I understand that, but can you name any
17   individual?
18      A.    Yeah.  I can name my grandmother lives in this
19   City.  She would have a problem with that.
20   Q.    Okay.  What is her name?
21      A.    Audrey Thomason.
22   Q.    Anybody else?
23      A.    Yeah.  There's 30,000 other people that live in
24   this City.  I don't know each and every one of them, so
25   I'm not going to get into trying to name people.

129

1    Q.    Okay.  All I was trying to ask you was there
2    anybody else that came to you other than Bill Pitts -- I
3    believe you said he mentioned something about all this.
4    Other than him, was there anybody else you can name
5    sitting here today that had this as a concern?
6       A.    I had the membership of the Phenix City
7    Firefighters Association.
8    Q.    Whoever they were?
9       A.    That's right.
10   Q.    That gets us back to one other question about
11   them for just a second.  Who today would have the minutes
12   of any meetings of that organization?
13      A.    I would have to reference that to the secretary/
14   treasurer who's is present, which would be Bill Pitts.
15   Q.    All right.  So he'd be the one who we'd have to
16   ask for that from if we wanted to get it?
17      A.    I'm assuming that will be correct.
18   Q.    All right.  Do you know if there's any regular
19   communication between the local firefighters union and the
20   international union?
21      A.    Yes, there is.
22   Q.    And how so?  Y'all get certified every year or is
23   there anything you --
24      A.    I mean, there's a number of union businesses that
25   occur.

130

1    Q.    Okay.  Who are the -- who is the correspondence
2    between the international union and the local union
3    addressed to?
4        A.    It depends on what their -- what the issues are.
5    It would be a number of union officers.
6        Q.    All right.  But there wouldn't be any minutes of
7    any meeting wherein the people in the union asked you to
8    bring this up as a concern because there was no meeting
9    about it; am I correct?
10       A.    There's been a number of meetings about issues.
11       Q.    No, sir.  I'm asking about this particular issue,
12   the issue of extending probationary period of new
13   employees from 12 months to 18 months.  If I've understood
14   your testimony earlier today, there was never an official
15   meeting about that, it was just a telephone poll
16   conducted; is that right?
17       A.    That's correct.
18       Q.    So there wouldn't be any minutes of any meeting
19   reflecting that?
20       A.    No, sir.
21           MR. MCKOON:  All right.  Give me about two more
22   minutes, and I think I may be through.  I might not
23   have anything else to ask you.
24           (Recess was taken.)
25           MR. WOODLEY:  I have no questions.  Thanks.

132

1                    C E R T I F I C A T E
2
3    STATE OF ALABAMA
4    COUNTY OF RUSSELL
5
6        I hereby certify that the foregoing deposition was
7    taken down, as stated in the caption, and the questions
8    and answers thereto were reduced to typewriting by me by
9    computer-aided transcription; that the foregoing pages
10   constitute a true, correct, and complete transcript, to
11   the best of my skills and ability, of the testimony given
12   April 5, 2007, by the witness, MR. DAVID DAVIS, who was
13   first duly sworn by me; that I am not a relative,
14   employee, attorney, or counsel of any of the parties; am
15   not a relative or employee of attorney or counsel for any
16   of said parties; nor am I financially interested in this
17   action.
18       This, the 12th day of April, 2007.
19
20
21   _____
22           Courtney Tillman Peters
            CSR #:  AL-CSR-544
23           CCR #:  B-2329
            Notary Public, State at Large
24
25

131

1        WHEREUPON, the deposition of Mr. David Davis concluded
2                   at 2:20 p.m. EST.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

COURTNEY TILLMAN PETERS, CCR, CSR        CERTIFIED COURT REPORTER        (706)317-3111

**$**

$11.90 - 12:14, 13:6
$12.50 - 12:17
$14.00 - 12:5
$9.56 - 11:22

**'**

'02 - 17:4
'05 - 13:24, 22:20, 53:5, 64:7, 99:7
'06 - 13:24, 54:7
'99 - 14:21, 17:4
'we - 30:20

**1**

1 - 3:6, 87:25, 116:19
10 - 24:24, 89:10
100 - 59:10
106 - 12:8
1125 - 2:3
11:25 - 1:19, 3:10, 4:2
12 - 65:13, 102:25, 130:13
12:30 - 77:17
12th - 1:18, 3:9, 132:18
13 - 108:5
1300 - 73:15, 116:20
13th - 2:10
14 - 20:1, 20:7, 22:25, 28:20, 34:17
15 - 40:3, 47:2, 52:3, 52:15, 58:2, 121:2, 121:25
16 - 40:22, 40:24, 44:20, 45:3, 48:11
17 - 32:3, 109:3, 109:19
1710 - 32:2, 32:4, 32:9, 36:1
17th - 86:4, 88:7
18 - 65:13, 71:19, 74:22, 75:10, 130:13
185 - 4:23
1993 - 6:10
1999 - 15:7
19th - 88:20, 88:21

**2**

2 - 3:12
20 - 17:15, 109:4
2000 - 6:12, 36:16
20005 - 2:4
2001 - 6:14
2002 - 17:3, 17:11
2004 - 6:15, 65:2
2005 - 13:12, 14:8, 18:4, 18:7, 19:23, 20:13, 21:25, 22:8, 26:21, 28:10, 45:9, 56:24, 64:25, 98:14, 103:1, 103:15, 104:16, 104:24, 105:9, 106:15, 106:23, 107:17, 108:6, 108:11
2005/2006 - 10:14
2006 - 6:17, 7:22, 7:23, 8:16, 11:13, 13:23, 14:8, 56:21, 57:18, 59:24, 60:2, 60:4, 109:4
2007 - 1:19, 3:11,

7:7, 132:12, 132:18
20th - 45:9, 48:7, 48:9, 49:2, 109:15
21 - 7:20, 7:23, 36:18, 77:10
21st - 20:12
22 - 7:7, 88:5, 110:4, 110:17
236 - 4:23
24 - 9:17, 92:20, 92:22
24-hour - 8:19
25 - 114:11
291-1927 - 80:15
2:20 - 131:2

**3**

3 - 3:16, 42:15, 88:11
30 - 17:15
30,000 - 128:23
30-year - 75:21
317-3111 - 1:24
31902 - 1:23
32 - 6:1
3668 - 94:9
36867 - 1:18, 2:7, 2:10, 3:10
36870 - 4:24
3:00 - 78:4
3:06-cv-00544-vpm - 1:8

**4**

4 - 2:17, 3:19, 98:14
4/17 - 77:17
4/21/06 - 94:15
400 - 2:4
48 - 12:24

**5**

5 - 3:21, 78:3, 98:15, 132:12
53 - 12:2, 12:7
5th - 1:18, 3:10

**6**

6 - 98:15
601 - 1:17, 3:9

**7**

706 - 1:24
712 - 2:10
7:00 - 78:5

**8**

81 - 1:23

**9**

9 - 89:10
9/20 - 47:13, 47:16
925 - 2:7

**A**

abilities - 63:8
ability - 65:19, 132:11
able - 9:11, 10:2, 28:3, 72:24, 79:14
access - 98:25
accomplish - 37:13, 37:17

according - 70:1
accounting - 125:14
accurate - 30:9, 30:14, 59:10, 76:13, 109:22, 125:14
accusations - 18:23
achieve - 17:8, 28:3
acknowledged - 99:14
acted - 97:11
acting - 20:19, 43:18, 94:7, 100:15
action - 52:8, 95:7, 99:7, 114:6, 132:17
Action - 1:8
actions - 99:10, 110:10
actual - 14:8, 104:2
added - 76:1
address - 4:22, 4:23, 5:7, 5:12, 31:14, 31:18, 57:3
addressed - 37:20, 54:2, 56:25, 130:3
addressing - 121:4
adjust - 9:24
administration - 56:6
adopts - 33:15
adverse - 114:6, 115:6
advice - 70:1
advise - 62:22, 62:23
advised - 46:9, 120:11
affect - 45:24, 46:20, 65:19, 69:7, 70:24, 71:5, 71:11, 123:24, 126:23, 126:24, 127:1, 127:4, 127:6, 127:8
affected - 71:1, 79:5, 122:21
affects - 71:12, 122:20
afraid - 42:20
agenda - 117:21
ago - 17:18, 64:1, 70:23, 81:24, 98:13, 104:23
agree - 24:6
agreed - 31:1, 68:18
Agreed - 3:3
ahead - 50:5, 88:17
aided - 132:9
aimed - 110:10
ain't - 75:23
al - 1:9
Al-csr-544 - 132:22
Alabama - 1:2, 1:9, 1:17, 1:18, 1:22, 2:7, 2:10, 3:9, 3:10, 4:24, 5:5, 132:3
alarm - 22:25
aleck - 115:3
allay - 75:22
allegation - 103:10, 106:20, 108:5, 124:9
allegations - 19:1, 19:3, 19:4, 102:24
alleged - 23:5, 23:9, 23:17, 110:15, 116:3
allowed - 9:24, 79:8, 79:10, 80:5
allowing - 56:15
almost - 13:5, 123:3
Ambulance - 7:9, 8:2, 8:5, 8:8, 8:15,

9:10, 9:13, 9:20, 9:22, 12:4, 12:16, 12:20, 12:25
amendment - 43:17, 61:21, 61:23, 63:15, 68:14, 72:11
amount - 102:10, 125:17, 125:18
Andy - 127:15
answer - 3:17, 4:16, 4:18, 25:15, 27:18, 44:15, 46:22, 124:23
answers - 132:8
anxiety - 89:20
Anyway - 30:8, 82:8, 91:10
anyway - 88:9
anyways - 93:20
apologize - 28:16, 88:9
apparatus - 50:7
Appearances - 2:1
appeared - 23:24
appearing - 3:4
apply - 123:19
applying - 106:10
appointment - 121:16
appreciated - 80:9, 124:2
approachable - 57:17
approved - 114:20, 114:23, 114:25
April - 1:19, 3:11, 7:20, 7:23, 59:24, 60:2, 60:4, 88:7, 88:21, 109:4, 132:12, 132:18
arrange - 121:19
Arthur - 72:23, 76:15
article - 20:6, 20:14, 22:24, 23:4, 24:16, 28:11, 29:5, 30:17, 34:16, 40:1, 40:2, 59:16, 60:3
articles - 19:24, 23:2, 23:24, 38:25
Asop- - 48:4
assigned - 8:22, 95:15
Assistant - 35:5, 35:14, 43:10, 43:25, 44:25, 45:9, 48:19, 70:6, 70:8, 73:7, 103:16, 108:12
associate's - 6:11
Association - 14:18, 15:22, 32:18, 33:7, 78:9, 78:13, 78:23, 79:3, 82:14, 83:20, 83:23, 86:25, 94:9, 100:17, 129:7
assume - 4:17, 9:7, 47:16, 54:8, 59:22, 69:4, 84:10, 112:5
assumed - 86:25
assuming - 47:2, 48:5, 49:2, 58:20, 80:25, 85:22, 97:5, 105:25, 106:4, 111:1, 111:5, 111:16, 112:25, 113:9, 129:17
atmosphere - 29:10, 30:5
attached - 48:1, 48:4
attempt - 101:5
attempts - 48:13

attend - 10:23, 116:23
attended - 7:10, 11:11, 22:9, 82:7
attendee - 82:6
attending - 10:21
attention - 23:18, 48:13, 51:12, 58:25, 59:9, 59:12, 80:10
attorney - 132:14, 132:15
attorney's - 125:19
attorneys - 41:6
Auburn - 5:1
audio - 76:21
Audrey - 128:21
author - 23:4
author's - 73:6, 118:14
authorized - 118:8, 118:14
available - 13:15, 126:24
average - 36:7
averaged - 102:15
aware - 52:21, 84:22, 85:4, 85:5, 98:20, 111:16, 114:10

**B**

B-2329 - 132:23
bachelor's - 6:15
background - 6:8
bad - 19:21
Barbara - 92:1, 112:1
basing - 103:10
basis - 53:18
became - 14:21, 17:3, 19:19, 52:21
become - 7:5
becoming - 21:15
begin - 8:8
beginning - 4:2, 123:25
behalf - 78:22, 82:13, 100:21
behind - 18:11
below - 29:15
benefits - 12:19, 16:2, 76:3, 101:16, 101:17
Bennett - 67:14, 67:15, 67:19, 67:23, 68:3, 68:24, 69:12, 69:20, 69:25, 71:23, 72:4, 86:16, 86:17
best - 14:11, 55:19, 74:16, 78:18, 78:19, 81:12, 93:13, 132:11
better - 54:24, 55:2, 79:11, 99:21
between - 3:3, 7:25, 17:15, 58:9, 74:4, 78:4, 84:23, 98:20, 129:19, 130:2
big - 75:25
bill - 115:11
Bill - 27:4, 27:5, 59:7, 59:9, 66:21, 67:1, 71:22, 83:7, 129:2, 129:14
bit - 16:6, 53:16, 56:15, 78:21, 101:14
Black - 91:1
Blankenship - 18:15, 18:20, 19:10
blew - 28:17
Board - 97:23

board - 54:4, 54:10, 94:10
Bobby - 83:6, 83:7, 86:14, 86:18
body - 32:20
book - 21:13, 21:18, 21:22, 60:22, 61:2
bottom - 53:4, 94:1, 94:4, 121:22
Box - 1:23
Brandon - 48:20, 48:21, 48:22, 49:8
break - 85:11
Brenda - 5:16, 5:17
briefing - 25:1
briefly - 115:7
Briefly - 6:2
bring - 34:24, 37:18, 46:19, 59:11, 80:8, 130:8
bringing - 80:9
Broad - 2:7
Brooks - 86:14, 86:18
brother - 83:3, 83:11
brought - 34:23, 35:3, 58:24, 59:9, 68:16, 73:20, 74:14, 103:25
building - 65:13
bunch - 46:14
Bush - 63:25, 64:12, 72:21, 76:16, 77:6, 80:13, 81:2, 81:6, 81:13, 81:21, 83:5, 83:9
business - 69:4
businesses - 129:24

**C**

calculated - 101:21, 101:23
cannot - 103:9, 121:17
capacity - 53:17, 72:7, 94:8, 100:16, 105:2, 106:22, 107:24, 112:9, 122:24, 123:1
Captain - 39:3, 50:4, 67:18, 69:20, 69:22, 69:25, 86:13, 86:15, 120:25
Captains - 35:7, 69:21
caption - 132:7
car - 42:6, 42:8, 42:21, 43:3
card - 16:10
cards - 16:20
Care - 7:9, 8:2, 8:5, 8:7, 8:15, 9:10, 9:13, 9:20, 9:22, 12:4, 12:15, 12:20, 12:25
career - 35:1, 43:23, 44:2, 69:21, 75:21, 102:3, 104:9, 104:11
careful - 9:6
carry - 16:18
case - 3:18, 7:11, 76:21, 76:22, 79:25, 124:14
Causey - 1:22
Ccr - 132:23
cell - 81:15, 81:18, 82:9, 84:15, 84:17
cellular - 80:21

Center - 5:20
certain - 117:24, 120:3
Certified - 1:16, 1:22, 3:8
certified - 129:22
certify - 132:6
cetera - 125:6
chain - 55:13, 55:16, 69:15, 86:23, 87:1, 95:12, 100:1, 100:9, 100:14, 102:20, 109:8, 109:21, 118:20, 119:1, 119:3, 120:1, 120:12, 120:16, 120:21, 121:18, 122:5, 126:5
chance - 93:3
change - 60:19, 60:22, 61:17, 62:15, 62:24, 63:4, 63:15, 65:1, 73:9, 74:18, 84:9, 101:8, 117:11, 122:11, 123:20
Change - 62:25
changes - 61:18, 66:10, 78:13, 83:23, 123:14
changing - 63:12, 80:3
charge - 50:6
Charter - 119:21
Chattahoochee - 6:10
check - 13:21
checks - 12:1
Chief - 18:15, 18:16, 18:17, 18:18, 18:19, 18:21, 19:7, 19:8, 19:10, 19:13, 19:14, 19:19, 20:22, 38:2, 39:20, 40:8, 40:10, 41:10, 41:16, 41:22, 41:24, 42:1, 43:10, 43:11, 43:25, 44:1, 44:3, 44:25, 45:8, 45:9, 48:19, 53:25, 55:8, 57:9, 57:15, 70:6, 70:8, 70:11, 70:14, 73:7, 73:8, 73:13, 74:14, 79:19, 79:20, 79:21, 79:22, 86:11, 86:21, 87:7, 87:20, 89:6, 90:1, 91:22, 91:23, 96:17, 98:1, 98:3, 103:2, 103:6, 103:16, 104:5, 104:10, 105:9, 105:10, 105:11, 105:17, 106:5, 106:13, 106:21, 107:15, 107:20, 107:21, 108:12, 108:13, 109:6, 109:24, 110:8, 113:11, 116:13, 116:15, 116:16, 117:2, 117:6, 118:4, 118:9, 118:11, 118:14, 120:11, 120:22, 121:15, 123:12, 123:13, 124:1, 124:25, 125:1, 128:10
Chief's - 41:14, 42:9, 42:11, 43:5, 43:7, 96:25
Chiefs - 18:9, 35:5, 35:15, 68:16, 79:21,

96:21, 103:25
Chris - 118:9
Chuck - 23:4
circumstances - 18:22, 19:8, 120:3
City - 1:9, 1:17, 1:18, 2:7, 2:10, 3:9, 4:23, 5:3, 5:4, 7:2, 7:3, 7:5, 7:18, 7:24, 8:1, 8:4, 9:12, 10:13, 10:15, 11:16, 12:11, 12:12, 12:15, 12:21, 13:2, 13:3, 15:4, 15:5, 15:12, 17:21, 18:10, 18:11, 18:12, 22:14, 23:25, 29:9, 32:8, 33:14, 33:17, 53:12, 62:8, 72:2, 72:10, 83:20, 84:24, 88:15, 94:8, 94:10, 98:5, 98:8, 98:17, 98:21, 98:22, 100:16, 101:17, 102:21, 103:1, 103:6, 103:20, 103:24, 104:1, 104:15, 104:17, 104:23, 110:7, 112:12, 113:7, 114:14, 116:2, 116:12, 116:14, 117:12, 118:1, 118:20, 119:21, 119:23, 120:19, 120:21, 121:4, 121:18, 121:19, 121:25, 122:6, 122:15, 126:11, 127:3, 127:12, 128:9, 128:19, 128:24, 129:6
city - 77:11, 113:10, 121:6
City's - 109:9
Civil - 1:8
claim - 101:14, 101:20, 102:9, 102:13
claiming - 13:9, 14:3, 101:15, 102:5, 102:9, 125:7, 125:19
classes - 10:23, 10:24
clean - 96:19, 97:14
clear - 49:17, 65:4, 117:7
clearly - 117:2, 123:17
Clerk - 72:2
Clerk's - 62:9, 72:10
close - 46:5, 46:6, 102:20
clothes - 89:4
co - 48:14, 51:14
co-worker - 48:14, 51:14
Cobra - 96:3, 97:19
code - 62:17
Coercing - 51:14
coercion - 29:10, 48:14
collectively - 36:15
College - 6:11, 6:13
colleges - 10:25
Colorado - 6:14, 6:21, 11:3
Columbia - 6:16, 11:6, 11:8
Columbus - 1:23, 6:12, 37:11, 74:21, 79:10
column - 29:6
coming - 9:23,

117:17
command - 55:14, 55:16, 69:16, 86:23, 87:1, 95:12, 100:1, 100:9, 100:14, 102:20, 109:8, 109:21, 118:21, 119:1, 119:3, 120:1, 120:12, 120:16, 120:21, 121:18, 122:5, 126:6
commencing - 1:19, 3:10
comment - 105:11
comments - 25:7, 29:11, 50:23, 50:24, 75:1
commitment - 80:7, 82:22
communicate - 117:2, 118:9, 123:17
communicated - 73:8
communication - 28:5, 89:24, 129:19
Community - 6:11
compensation - 125:15
compensatory - 125:18
complain - 35:22
complained - 115:3
complaining - 101:2, 101:3, 101:4, 127:21, 127:22
complaint - 49:9, 50:15, 58:7, 101:1, 101:12, 102:24, 109:4, 110:15, 111:3, 115:4, 122:18, 124:7, 126:1, 126:14, 126:15, 126:16, 126:17
complaints - 25:8, 31:3, 45:18, 56:23, 113:23, 113:25, 124:3
complete - 80:1, 125:14, 132:10
completely - 57:6
compliance - 32:9
compliant - 32:2, 32:4
complicate - 119:1
comply - 95:15, 99:8, 99:12, 99:17
complying - 126:6
computer - 132:9
computer-aided - 132:9
concern - 25:7, 31:13, 37:19, 43:16, 53:11, 70:21, 71:7, 71:8, 71:9, 105:6, 107:17, 108:3, 108:9, 110:6, 110:25, 122:6, 122:23, 127:24, 128:13, 129:5, 130:8
concerned - 28:6, 32:23, 69:10, 119:6, 128:1, 128:5
concerning - 45:10, 45:11, 85:15
concerns - 28:23, 34:15, 34:18, 55:8, 57:4, 71:10, 75:22, 99:6, 124:4
concluded - 131:1
conditions - 58:8, 100:23
conducted -

116:15, 123:12, 130:16
conference - 92:13
confine - 104:14
connected - 29:17
consecutively - 20:3
consent - 3:21
consequences - 115:6
consider - 9:3, 114:4, 114:6
consideration - 64:16
constituents - 87:1
constitute - 132:10
consulted - 115:14, 115:16
contact - 19:14, 23:5, 23:9, 62:20, 84:18, 84:19, 84:20, 84:25, 93:12, 96:6, 97:17, 98:17, 98:22
contacted - 23:7, 62:19, 63:2, 63:10
contacting - 94:7, 109:7, 111:2, 118:16
contained - 6:2
continue - 17:20
continuing - 34:25
continuous - 48:12
contribute - 29:18
contributing - 102:8, 102:14
conversation - 42:17, 43:21, 53:7, 74:4, 78:7, 78:17, 80:6, 80:13, 82:11, 84:11, 84:12, 94:6, 90:3, 104:20
conversations - 53:6, 76:16, 77:4, 90:3, 104:20
convince - 55:1
cooperation - 54:25
copied - 84:6
copy - 47:21, 61:5, 61:10
correct - 6:5, 19:17, 21:23, 22:17, 23:1, 23:22, 27:19, 30:15, 31:6, 32:12, 36:5, 44:24, 46:23, 53:2, 57:21, 58:11, 58:23, 62:2, 65:23, 67:6, 67:11, 67:24, 69:13, 70:9, 71:6, 74:13, 76:9, 80:19, 82:10, 85:7, 88:5, 99:9, 102:11, 104:12, 107:12, 107:13, 108:15, 109:2, 111:25, 112:10, 112:19, 114:23, 116:15, 120:9, 122:1, 122:2, 124:24, 126:25, 129:17, 130:9, 130:17, 132:10
Correct - 46:21, 69:17, 70:3, 102:6, 110:2, 118:17, 121:21, 127:10
correspondence - 28:8, 84:23, 130:1
costs - 79:7
cot - 10:8
Council - 53:12, 63:25, 72:21, 72:23, 73:6, 80:13, 81:21, 100:19, 121:4, 121:19, 122:6,

122:15, 123:18,
123:19
**Councilman** -
64:10, 64:12, 81:2,
84:2
  **Councilmen** - 85:14
  **Councilors** - 118:20
  **Counsel** - 2:3
  **counsel** - 3:3,
132:14, 132:15
  **counseled** - 40:4,
44:25, 45:8, 48:6,
48:12, 52:2
  **counseling** - 44:19,
48:10, 52:9, 108:7,
110:13, 111:15,
112:2, 112:24, 114:2,
114:5, 115:9, 124:12
  **counselors** -
115:16
  **count** - 18:13
  **counter** - 119:2
  **counter-productive**
- 119:2
  **County** - 5:5, 132:4
  **couple** - 4:10, 82:7
  **course** - 23:25,
63:6, 67:21
  **Court** - 1:1, 1:16,
1:22, 3:8, 3:14, 22:8
  **courtesy** - 119:7,
119:11
  **Courtney** - 1:15,
1:21, 3:7, 132:22
  **Cr-** 2:16
  **crap** - 104:2, 104:3
  **credit** - 16:20, 124:6
  **Cross-** 4:20
  **Cross-examination**
- 4:20
  **Csr-** 132:22
  **customary** - 27:15

## D

  **daily** - 74:11
  **damage** - 125:6
  **damages** - 115:24,
116:7, 125:16,
125:18, 125:19
  **date** - 5:11, 7:17,
8:9, 20:8, 20:10,
22:22, 47:12, 54:5,
81:25, 109:14, 123:19
  **dated** - 88:20, 94:15
  **David** - 1:6, 1:14,
3:6, 4:1, 4:3, 4:8,
44:24, 45:8, 83:19,
131:1, 132:12
  **Davis** - 1:6, 1:14,
2:17, 3:6, 4:1, 4:3,
4:8, 4:9, 28:13, 30:20,
40:21, 44:25, 45:8,
46:9, 47:7, 48:12,
50:22, 83:19, 93:6,
94:2, 105:5, 108:6,
109:5, 109:7, 110:6,
131:1, 132:12
  **days** - 8:24, 8:25,
11:14
  **deal** - 75:25, 79:11,
123:5
  **death** - 100:8
  **decide** - 119:14
  **decision** - 119:14
  **decisions** - 100:8,
110:10
  **defendant** - 103:1,
109:5, 109:6, 109:8
  **Defendant** - 1:15,

3:7
  **defendants** - 110:7,
124:14
  **Defendants** - 1:10,
2:6
  **definite** - 44:15
  **definitely** - 18:18,
64:4, 100:8, 128:5
  **definition** - 32:1,
58:4
  **degree** - 6:12, 6:21
  **delegated** - 118:14
  **Dennis** - 15:9, 18:8,
39:4, 39:5
  **denying** - 110:11
  **Department** - 7:18,
7:24, 8:4, 10:16,
12:21, 17:21, 24:1,
32:9, 33:17, 88:16,
101:17, 117:12,
118:1, 120:22
  **department** - 9:4,
18:20, 21:8, 23:6,
23:10, 34:18, 36:8,
39:3, 40:5, 43:19,
45:11, 45:17, 53:20,
54:4, 55:9, 56:16,
57:21, 58:17, 58:24,
62:16, 62:17, 65:12,
65:13, 71:16, 71:17,
73:7, 73:16, 86:7,
89:25, 90:2, 90:9,
91:8, 92:11, 98:11,
99:2, 100:2, 105:15,
107:5, 107:6, 108:8,
118:4, 118:8, 121:5,
121:6, 121:14,
121:15, 121:23,
122:14, 123:2
  **departments** -
85:17
  **deponent** - 3:21,
3:22
  **Deposition** - 1:14,
26:9, 76:19
  **deposition** - 3:6,
3:22, 4:1, 4:11, 131:1,
132:6
  **depositions** - 3:15,
3:20, 7:11, 7:17,
19:25, 20:4, 20:8
  **Deputy** - 53:25,
70:11, 73:8, 74:14,
86:11, 91:23, 96:25,
103:2, 103:6, 109:6,
110:8, 116:13, 117:1,
120:10, 128:10
  **derogatory** - 29:10,
50:22, 50:24, 51:9,
103:3, 103:5, 103:21,
104:14, 104:17,
104:24, 105:11,
106:14, 106:23,
107:16, 107:21
  **describe** - 19:18,
55:3
  **described** - 28:23
  **designated** - 98:22
  **designed** - 84:25
  **details** - 94:23,
95:1, 95:3
  **develops** - 32:20
  **difference** - 45:21
  **different** - 12:1,
66:13, 127:21
  **Dir-** 2:16
  **directed** - 50:23
  **directly** - 29:21,
74:19, 122:6
  **Director** - 91:25,

110:9, 112:9, 121:16
  **disability** - 36:19
  **disagreed** - 122:10
  **discharge** - 108:7,
108:10
  **discharged** - 106:3
  **disciplinary** - 99:10
  **discipline** - 45:12,
45:14, 45:16, 45:22,
46:17
  **disciplined** - 30:22,
63:16
  **discourteous** -
97:9, 97:10
  **discriminating** -
125:13
  **discuss** - 25:2,
25:4, 46:16, 122:14,
123:13
  **discussed** - 25:16,
35:18, 46:11, 46:12,
49:14, 53:10, 68:15,
76:8, 78:8, 109:25,
124:15
  **discussing** - 26:1,
71:16
  **discussion** - 48:15,
48:18, 48:19, 74:6
  **discussions** - 85:18
  **distinctive** - 94:3
  **distorted** - 94:5
  **district** - 127:2
  **District** - 1:1, 1:2
  **Division** - 1:3
  **document** - 47:19,
110:19
  **documents** - 26:9,
26:10
  **done** - 44:4, 46:18,
105:22, 117:22,
123:5, 123:6
  **door** - 54:16, 70:14,
70:17, 87:3, 87:10,
90:11, 92:8
  **Doster's** - 22:7
  **doubling** - 13:5
  **Down** - 87:25
  **down** - 16:5, 30:19,
47:3, 55:21, 58:3,
63:19, 64:15, 64:23,
87:23, 88:11, 89:4,
89:8, 89:15, 90:10,
91:13, 92:10, 97:14,
109:13, 109:14,
113:22, 117:7,
121:22, 125:11,
125:20, 127:7
  **downtown** - 50:12,
68:5, 68:19, 70:2
  **dozen** - 66:6
  **dream** - 116:10,
116:11
  **Driver** - 94:9
  **driver** - 50:3
  **dues** - 15:10
  **duly** - 4:4, 132:13
  **Durango's** - 24:13,
26:5
  **During** - 17:11,
103:14
  **during** - 18:11,
33:16, 36:17, 42:16,
56:21, 69:24, 106:22,
113:17
  **duties** - 27:22
  **Duty** - 15:9, 18:8,
20:20, 22:7, 38:6,
39:4
  **duty** - 60:16, 62:11,
67:21, 69:18, 72:5,

72:7, 86:24, 88:24,
90:4, 90:5, 109:5,
116:24, 122:24,
126:19, 127:13

## E

  **Eastern** - 1:3
  **easy** - 20:4
  **editor** - 38:10, 39:13
  **Education** - 6:23
  **educational** - 6:8
  **effect** - 55:13
  **efficient** - 14:7
  **effort** - 111:20,
113:8, 114:9
  **efforts** - 57:3,
110:14, 124:13
  **either** - 10:2, 81:6,
82:8, 93:19, 97:18,
97:19, 98:25, 123:13,
123:17
  **elected** - 17:10,
17:25, 18:5, 20:18,
63:22, 67:9, 67:10,
67:20, 68:1, 72:17,
87:2
  **election** - 20:24
  **emotional** - 115:5
  **emphasis** - 6:24
  **employed** - 5:17,
5:19, 5:20, 6:25, 7:5,
7:25, 15:23, 18:10,
18:11, 33:17
  **employee** - 71:2,
71:13, 94:13, 122:25,
132:14, 132:15
  **employees** - 33:2,
36:18, 58:9, 58:10,
58:15, 58:16, 62:16,
65:12, 65:20, 73:10,
73:22, 75:10, 75:13,
78:14, 79:7, 85:16,
113:10, 122:12,
123:24, 130:13
  **employers** - 9:12,
9:14
  **employment** - 8:1,
8:7, 9:3, 9:4, 9:5,
10:15, 17:21, 58:8,
86:6, 88:15, 100:23,
110:11, 114:12
  **Emt-** 80:1, 80:2
  **end** - 43:22, 44:2,
49:20, 49:21, 80:6,
82:20, 114:11, 125:11
  **ended** - 22:20
  **enforcement** -
62:17
  **engaged** - 110:10,
124:13
  **engine** - 32:10,
32:11, 35:21
  **engineer** - 50:3
  **Engineer** - 94:9
  **enquirer** - 37:15,
58:20, 60:4, 73:24
  **entailed** - 22:18,
61:14, 70:22, 72:12
  **entitled** - 102:4,
125:15
  **entitlements** -
125:17
  **Epmt-** 80:5
  **equitable** - 125:22
  **Est-** 1:19, 3:10, 4:2,
131:2
  **et** - 1:9, 125:6
  **etc** - 3:20
  **evaluate** - 82:19

  **evening** - 78:1, 78:2
  **everyday** - 73:15,
116:19
  **exact** - 5:11, 8:9,
22:22, 54:5, 66:5,
81:25, 119:4, 123:21
  **exactly** - 22:18,
26:24, 34:25, 35:16,
59:4, 61:13, 61:18,
62:3, 68:9, 72:11,
109:12, 118:24, 123:9
  **Exactly-** 42:7
  **examination** - 4:4,
4:20
  **Examinations** - 2:15
  **examples** - 46:17,
49:16
  **except** - 51:22,
128:9
  **Except-** 3:16
  **exception** - 118:13
  **excuse** - 36:17,
45:22, 58:16
  **exhibit** - 19:24,
20:2, 38:2, 38:13,
38:21, 40:21, 46:13,
46:25, 58:3, 77:10,
121:3
  **Exhibit** - 20:1, 20:7,
22:25, 28:20, 34:17,
40:3, 40:24, 44:19,
45:3, 47:2, 48:11,
52:3, 52:15, 58:2,
88:5, 92:22, 114:11,
121:2
  **Exhibits** - 2:20
  **exhibits** - 2:22,
20:2, 46:24, 92:17
  **expand** - 53:15
  **expect** - 21:18
  **expectations** -
117:2
  **expected** - 52:22,
117:6, 117:8
  **explain** - 79:2,
102:13
  **explained** - 62:13,
96:4
  **explaining** - 41:5,
52:10
  **express** - 50:19
  **expressed** - 63:21
  **expressing** - 100:22
  **extend** - 68:17,
78:13, 80:1, 80:5,
83:21
  **extending** - 58:15,
71:18, 73:22, 74:24,
79:13, 85:15, 130:12
  **extension** - 71:1,
78:10
  **extensive** - 22:5,
58:1

## F

  **fact** - 46:11, 51:22,
68:15, 99:5, 120:15,
125:5
  **factual** - 95:19,
95:20
  **Fair-** 4:18, 60:7,
119:12
  **Fair-** 4:19, 27:20
  **fairly** - 21:24
  **fall** - 22:1, 22:23
  **familiar** - 21:24
  **familiarized** - 21:7
  **family** - 115:23
  **far** - 7:11, 13:12,

42:10, 42:12, 102:3,
119:5, 120:17, 123:2
  favor - 78:25
  fear - 30:21
  February- 7:7
  Federal- 22:8
  fees - 125:19
  fellow - 90:23, 91:5,
98:9
  felt - 55:25, 56:7,
71:3, 78:16, 79:3,
79:6
  few - 101:13
  Fiff- 49:12
  Fifteenth- 2:3
  fight - 16:20
  figured - 62:1,
87:20
  File- 1:8
  file - 6:3
  filed - 13:24, 126:2
  filing - 3:19, 3:20
  filling - 20:25
  financial - 115:6
  financially - 132:16
  fine - 85:23, 115:1,
115:22
  finished - 88:17
  fire - 9:4, 11:17,
16:20, 23:6, 23:9,
32:6, 32:21, 34:6,
34:18, 39:3, 40:5,
42:11, 42:14, 43:19,
45:11, 45:17, 45:22,
53:20, 54:4, 55:9,
58:17, 62:16, 65:12,
71:12, 71:15, 71:17,
73:7, 73:16, 85:16,
86:6, 89:25, 96:19,
97:1, 97:14, 98:11,
99:2, 100:2, 100:7,
100:11, 105:15,
107:5, 107:6, 108:8,
108:21, 118:10,
120:6, 120:18, 121:5,
121:14, 121:23,
123:2, 127:2
  Fire- 8:24, 7:18,
7:24, 8:4, 10:15,
11:18, 12:21, 17:21,
19:8, 24:1, 32:8,
32:18, 33:7, 33:17,
42:15, 43:10, 43:25,
79:22, 88:15, 91:22,
101:17, 108:12,
116:14, 117:12,
118:1, 120:22, 121:15
  fired - 39:20, 44:7,
44:11, 89:16, 93:19,
97:7, 108:24
  fired' - 30:22
  Firefighter- 11:16,
48:14, 49:15, 49:23,
50:21, 50:25, 51:15,
51:21, 59:7
  firefighter - 15:4,
15:24, 21:15, 120:23,
120:24, 127:16
  firefighter
paramedic - 7:4, 7:6
  Firefighters- 14:18,
15:22, 78:9, 78:12,
78:22, 79:3, 82:13,
83:20, 83:23, 86:25,
94:8, 100:17, 129:7
  firefighters - 15:15,
24:21, 29:8, 37:2,
53:19, 103:3, 103:7,
103:21, 104:15,
104:18, 104:25,

105:12, 106:14,
107:22, 123:15,
126:24, 127:15,
129:19
  firefighters' -
127:22
  fireman - 21:6,
33:18
  first - 4:4, 17:5,
18:14, 21:10, 21:12,
29:5, 29:7, 43:16,
44:19, 52:16, 54:6,
54:7, 54:13, 54:23,
58:16, 58:21, 60:16,
69:11, 81:9, 86:5,
89:24, 93:7, 110:17,
117:19, 118:21,
120:12, 122:14,
126:13, 126:15,
132:13
  First- 60:14
  five - 36:17, 64:3,
65:5
  five-year - 36:17
  flexibility - 56:15
  folks - 39:10, 45:23,
74:7
  follow - 21:18,
100:13, 120:2,
121:24, 122:5
  followed - 117:25,
118:21, 119:2,
120:12, 120:22
  follows - 4:2, 4:5
  force - 48:13, 95:16
  foregoing - 132:6,
132:9
  form - 3:16, 44:19,
48:11, 52:3, 52:10,
94:1, 95:1, 93:14,
108:7, 112:17,
112:18, 113:5,
114:12, 125:16
  Formalities- 3:12,
3:19
  forth - 84:23, 95:14
  forward - 6:7, 56:8
  Four- 32:14, 32:15
  four - 33:19, 34:10,
35:21, 88:2, 88:10
  fourth - 40:23,
120:5
  frame - 7:13, 17:11,
60:5, 65:3, 69:24
  free - 80:11, 99:3,
113:9
  freedom - 22:16,
46:9
  front - 20:9, 34:16
  full - 29:7
  future - 13:19,
73:21, 74:23, 99:11,
99:17, 99:23

G

  Gaston - 26:22,
26:23, 27:7
  general - 35:18,
56:15
  gentleman - 38:15
  George - 67:14,
67:15, 67:23, 68:24,
69:20, 69:25, 71:23,
72:3, 86:16, 86:17
  Georgia - 1:22, 1:23
  given - 47:19,
47:23, 48:6, 62:3,
81:19, 81:20, 81:22,
121:15, 126:8, 132:11

  Given - 47:21
  Gn - 42:6
  goal - 28:3, 39:22
  Goodwin - 92:1,
93:5, 93:18, 95:18,
96:2, 97:18, 110:9,
112:1
  government - 14:12
  graduated - 6:4,
6:10, 6:11, 6:14, 6:15,
6:16, 11:13
  Graham- 2:9
  grandmother -
128:18
  grievance - 47:25,
57:19, 58:4, 58:7,
58:12, 101:9, 121:23,
121:24, 123:3, 123:4
  grievances - 25:9,
52:11, 52:22, 53:20,
57:22
  Griffith- 127:15
  ground - 100:7,
100:11
  group - 25:16, 28:6,
45:23, 74:6, 74:8,
74:20
  groups - 53:18
  guaranteed -
110:12
  guess - 9:2, 10:5,
17:20, 21:12, 26:25,
28:6, 29:7, 38:20,
44:7, 44:18, 49:7,
50:1, 76:13, 90:22,
91:6, 100:24, 103:12
  guilty - 18:24
  guy - 37:9, 91:2
  guys - 55:1
  gym - 55:20, 83:16

H

  half - 13:7, 74:22,
75:17, 123:3
  Hall - 1:17
  handed - 21:12,
46:13, 92:24
  handled - 13:22
  handwriting - 94:2
  Hanson - 35:12
  happy - 80:3
  harassment - 29:11
  hard - 79:4
  Hardin - 64:12,
71:15, 72:19, 76:15,
77:8, 81:2, 81:7,
109:8, 110:7, 111:9,
111:13
  harm - 115:4
  harmony - 45:12,
45:14, 45:16, 45:22,
46:17, 53:21
  hat - 127:15,
127:16, 127:20,
127:22
  headquarters -
116:22
  Health - 6:20
  health - 31:16, 79:7
  hear - 26:1, 49:9,
49:12, 58:16
  heard - 58:18,
58:21, 61:22, 86:5,
107:4, 107:15,
107:21, 119:18,
119:19
  hearing - 3:18,
53:10, 94:11, 121:19
  hearsay - 107:2

  heart - 16:25
  held - 17:5, 17:23,
17:24
  help - 46:1, 55:1,
105:18, 105:19
  helped - 45:16,
82:17
  hereby - 132:6
  high - 6:4, 33:1,
36:11, 36:12, 79:4,
79:8
  High - 6:5, 6:9, 33:3
  higher - 11:12
  himself - 31:1,
57:17
  hire - 79:11
  hired - 21:12,
123:19, 126:23
  hiring - 71:4
  Hold - 40:22, 92:19
  home - 80:18,
80:23, 84:16
  hometown - 116:12
  hour - 11:22, 12:5,
12:14
  Hourly- 11:20
  hourly - 11:22
  hours - 8:18, 9:17,
9:24, 11:23, 12:2,
12:6, 12:8, 12:24,
13:3, 69:4, 88:2,
88:10
  house - 81:15, 82:9
  Human - 91:25
  humiliation - 115:4
  Hunter - 2:12,
18:16, 18:18, 19:19,
39:20, 41:24, 42:2,
44:1, 44:25, 45:8,
91:22, 98:1, 103:2,
103:6, 105:9, 105:11,
106:6, 106:13,
106:21, 107:16,
108:14, 110:8,
116:15, 118:11,
118:14, 123:13,
124:25
  hurt - 33:18, 33:23,
63:8, 71:4
  Hutchinson - 39:1

I

  Iaff - 50:22
  idea - 65:8, 65:14,
65:16, 74:2
  ideas - 66:13
  identification - 2:22
  Iff - 48:22, 50:20,
51:5
  image - 117:11,
117:25
  immediate - 67:12,
121:8
  impaired - 45:12,
45:14
  impairing - 46:17
  implemented -
57:21
  implementing -
56:12
  important - 100:1,
100:10, 118:25,
120:2, 122:4, 125:25
  impression - 84:8
  improve - 56:2,
117:19
  improvement -
56:16
  improving - 119:8

  inaccurate - 51:21
  inadequate - 31:24,
32:1
  incidents - 124:10
  includes - 115:19
  including - 3:20,
37:3, 71:17
  income - 13:12,
13:13, 14:9, 125:3
  incorrect - 20:18
  incorrectly - 44:23
  Index - 2:15, 2:20,
2:21
  indicate - 4:13
  individual - 30:4,
31:9, 126:17, 128:17
  individually - 110:9
  individuals - 25:8
  information - 36:23
  informed - 50:22
  injunction - 125:13
  injured - 33:18,
34:3, 34:8
  injuries - 115:5
  input - 122:11
  inspecting - 65:13
  inspection - 85:17
  instance - 122:10
  instead - 32:15,
34:9, 80:3
  instructions - 95:16
  insubordination -
95:14
  insurance - 79:7,
96:3
  intention - 121:9
  interest - 125:17
  interested - 16:6,
132:16
  interfering - 48:14,
51:14
  interim - 18:16,
20:22, 21:2
  International -
14:18, 15:22
  international - 28:6,
84:24, 85:3, 98:21,
129:20, 130:2
  intimidation -
29:10, 30:6, 48:13
  introduced - 23:14
  intrusive - 14:7
  investigations -
33:22, 33:24, 118:10
  invited - 25:23,
25:25, 28:21, 30:25,
31:1, 50:13, 51:23,
51:25
  inviting - 50:16
  involved - 41:21,
63:3, 63:12
  involvement - 63:20
  involving - 40:5,
63:12, 116:10
  Iraq - 27:8
  issue - 31:23,
32:22, 33:1, 53:10,
56:17, 58:14, 71:16,
71:18, 78:9, 130:11,
130:12
  issued - 108:6
  issues - 30:24,
31:13, 31:16, 31:17,
35:18, 35:20, 37:18,
37:24, 37:25, 45:11,
52:12, 80:9, 97:18,
98:11, 125:7, 128:4,
130:4, 130:10
  issuing - 113:9

## J

Jackson- 35:10, 89:6, 90:1
James- 2:6, 2:9, 35:10, 89:6
January- 36:16
Jeff- 72:19, 76:15
jeopardized - 46:5, 46:6
Jim- 4:9
job - 7:8, 8:15, 26:14, 41:7, 41:17, 51:23, 96:14, 106:10, 110:13, 111:13, 112:14, 112:21, 113:13, 113:19, 116:5, 116:8, 117:9, 124:12, 125:6, 126:25, 127:4, 127:6, 127:8, 127:9
jobs - 7:1, 10:3, 79:9, 79:15
Johannson- 45:1, 104:10
Johansen- 35:14, 40:10, 41:10, 41:16, 41:22, 44:1, 44:3, 45:9, 103:18, 103:19, 104:5, 104:22, 108:17
John- 128:15
joined - 16:8
jointly - 110:10
Joseph- 15:1, 15:2
Jr- 2:6, 2:9
judgment- 36:10, 36:13, 36:14, 45:19, 51:20
June- 8:13, 8:16, 11:13, 11:14, 22:20, 38:6
junk - 87:5, 87:8

## K

keep - 14:13, 16:13, 16:14, 16:19, 20:4, 25:6, 26:12, 26:20, 27:16
Keep- 61:5
keeping - 53:20
Kennedy- 118:9
Kenny- 35:14, 103:18, 103:19, 104:21, 108:17
kept - 22:6, 26:16, 27:1, 27:5
kickbacks - 18:24
Kind- 92:14
kind - 13:21, 57:8, 76:21, 94:5, 98:24, 117:21, 127:14
kinds - 107:7
knowledge - 33:13, 33:20, 33:25, 37:12, 74:16, 112:13
known - 123:23

## L

labor - 31:16, 37:24, 103:3, 103:7, 103:21, 104:15, 104:25, 105:12, 106:14, 107:22
lady - 112:1
language - 123:21, 124:10
Large- 132:23

last - 7:10, 11:11, 26:4, 64:3, 65:5, 97:22, 121:3
late - 9:23
law - 110:12
Law- 2:9
lawsuit - 13:10, 14:3, 22:7, 22:11, 22:15, 22:19, 38:6, 115:25
lawyer - 95:18
lawyers - 40:13, 41:21, 108:23
laying - 117:7
leading - 113:17
learn - 21:15, 62:5, 124:21
learned - 73:23, 76:11
learning - 11:12, 76:8, 110:5, 110:24
least - 12:2, 28:2, 34:17
leave - 96:10, 96:12, 96:13, 97:13, 97:14, 101:18, 101:23, 125:5
leaving - 19:8, 97:19
Ledger- 37:15, 58:20, 60:4, 73:24
Ledger-enquirer- 37:15, 58:20, 60:4, 73:24
Lee- 4:23, 5:5
left - 12:15, 17:21, 18:20, 40:15, 41:11, 84:11, 84:13, 95:24, 73:24
legal - 93:12, 125:22
length - 83:24
less - 14:7, 126:23
letter - 39:5, 40:12, 40:14, 40:16, 40:18, 41:4, 41:11, 86:2, 87:3, 87:4, 87:11, 87:13, 88:4, 88:20, 88:22, 97:22, 98:20, 99:15
letters - 38:8, 38:24, 39:12, 50:12
Letters- 38:10
life - 100:7, 127:7, 127:8
likely - 35:4
limited - 110:12
limits - 5:3, 5:4
line - 10:20, 10:24, 11:4, 11:9, 77:11, 95:3
lines - 68:22
list - 37:25
listen - 31:2
listened - 28:22
live - 128:23
lived - 5:7
lives - 5:13, 128:18
living - 127:12
lobbying - 82:17
Local- 94:9
local - 10:25, 15:8, 15:15, 17:6, 17:12, 28:5, 28:7, 31:2, 31:5, 45:11, 103:3, 103:7, 103:12, 104:15, 104:18, 104:25, 105:12, 106:14, 107:22, 108:8, 129:19, 130:2
located - 33:8, 33:9

location - 10:22
locker - 96:19, 97:15
Look- 60:18, 109:19
look - 27:14, 46:24, 53:4, 57:25, 58:2, 59:14, 60:21, 61:3, 86:2, 88:6, 101:9, 101:12, 114:12, 124:7
looked - 38:21, 38:22, 60:24, 61:12, 97:20
looking - 73:21, 117:17
looks - 39:6, 39:7, 47:15, 47:17, 68:4, 68:13, 68:21, 77:17, 94:15, 124:8
Looks- 88:20
losing - 38:6, 102:10
loss - 125:3, 125:4, 125:5
lost - 13:10, 14:4, 71:20, 101:14, 101:15, 101:24, 101:25, 109:18, 116:8
loud - 84:20
lowest - 30:8
loyalties - 46:5, 46:7
lunch - 78:2

## M

mad - 104:1
Mad - 104:3
maintaining - 79:5
major - 33:1
makers - 105:23
Malone - 98:9
Man - 68:4
management - 29:9, 29:25, 57:3
Management - 6:24
Manager - 84:24, 98:5, 98:8, 98:17, 98:21, 98:22, 103:1, 103:6, 103:20, 103:24, 104:15, 104:17, 104:23, 107:12, 112:12, 113:7, 114:14, 118:20, 121:19
Manager's - 104:1, 119:23
mandatory - 33:11, 116:14, 116:17
March - 60:4
marked - 22:2
Master - 6:19
master's - 6:17, 6:18
math - 17:4
matter - 100:19
matter - 100:19, 100:24, 122:23
matters - 3:14, 25:7, 40:4, 43:16, 53:11, 105:6, 107:17, 108:2, 108:9, 110:6, 118:10, 118:11, 127:24
Mayor - 53:12, 63:24, 64:12, 71:15, 72:19, 77:8, 77:14, 77:17, 77:22, 81:2, 81:7, 85:14, 86:7, 86:22, 87:14, 94:7, 95:10, 95:21, 109:8, 110:7, 111:2, 111:9,

111:13, 118:20, 119:20
Mcdaniel - 38:17, 38:19
Mcgillivary - 2:3
Mckoon - 2:6, 2:17, 4:6, 4:9, 4:16, 4:21, 28:16, 28:19, 38:12, 38:14, 85:10, 85:13, 130:21
mean - 9:1, 11:25, 14:11, 14:13, 16:3, 21:17, 22:2, 28:8, 28:16, 32:5, 34:25, 35:2, 35:4, 35:18, 35:25, 38:12, 46:16, 50:1, 52:8, 56:5, 56:12, 57:10, 57:11, 57:25, 61:13, 61:20, 64:4, 64:14, 65:2, 65:18, 66:12, 66:19, 67:4, 68:13, 69:3, 69:7, 69:21, 70:18, 70:24, 71:18, 74:3, 78:2, 78:8, 78:19, 82:21, 82:22, 84:4, 84:5, 84:8, 84:12, 85:4, 85:24, 87:14, 89:15, 90:3, 90:4, 90:17, 91:4, 92:12, 93:11, 96:24, 97:4, 99:16, 99:18, 99:20, 101:17, 107:2, 107:8, 109:10, 111:6, 115:21, 116:2, 116:7, 116:17, 116:19, 117:5, 117:18, 119:3, 120:17, 120:25, 123:1, 123:23, 124:15, 124:20, 126:4, 126:7, 128:11, 129:24
Mean - 99:21
means - 70:25, 84:10, 109:12
Med - 5:20
media - 38:5, 40:4, 45:11, 52:5, 52:6, 53:11, 53:19, 99:6, 108:8, 118:5, 118:9, 118:16
medic - 11:17, 11:18
medium - 91:5
medium-sized - 91:5
meet - 9:13, 15:21, 24:6, 28:2, 54:9, 54:23, 96:18, 96:22
meeting - 16:7, 19:15, 24:9, 24:25, 25:1, 25:13, 25:19, 25:23, 26:1, 26:5, 27:14, 27:23, 28:10, 28:22, 34:14, 36:25, 37:5, 37:10, 46:11, 50:14, 50:17, 51:24, 52:1, 54:12, 54:20, 55:3, 55:12, 65:24, 74:10, 76:7, 76:11, 81:23, 82:6, 98:16, 103:25, 108:19, 120:10, 123:25, 124:2, 130:7, 130:8, 130:15, 130:18
meetings - 24:11, 27:15, 34:21, 55:7, 55:11, 55:18, 116:15, 116:18, 116:21, 116:23, 117:1, 118:4,

123:12, 129:12, 130:10
Member - 63:25, 72:21, 72:23, 80:13, 81:21
member - 14:17, 14:20, 14:21, 15:22, 16:3, 16:10, 16:22, 17:1, 21:6, 22:6, 67:2, 68:6, 121:5, 121:13, 121:23, 123:1
members - 17:12, 30:24, 39:15, 52:6, 59:4, 63:10, 65:22, 66:2, 66:3, 66:24, 67:4, 71:16, 72:14, 125:1
Members - 73:6, 100:19
membership - 14:23, 19:3, 25:2, 26:3, 62:19, 62:21, 63:2, 63:22, 67:8, 71:8, 71:22, 72:16, 79:24, 100:21, 129:6
membership's - 36:15, 101:7
memo - 46:14, 113:9, 113:23
mental - 115:5
mentioned - 51:8, 51:10, 113:4, 129:3
merit - 46:10, 48:1, 60:19, 60:21, 61:2, 61:5, 61:10, 79:15, 83:22, 94:23, 95:4, 99:1, 99:12, 109:9, 126:7
mess - 79:1
message - 77:11, 77:13
messing - 68:14
met - 4:10, 24:17, 53:18, 87:13, 90:10, 98:8
Mexican - 24:13, 24:14
Mickey - 39:1
Middle - 1:2
might - 7:14, 44:10, 54:13, 59:10, 74:23, 76:20, 82:3, 92:9, 117:12, 122:4, 130:22
Mike - 35:12
mile - 42:16
miles - 42:15
military - 100:2
mind - 36:11, 56:1, 56:20, 75:16, 89:12, 100:1
minute - 45:13, 70:23, 80:14, 96:17, 104:13, 104:22, 114:1, 114:12, 121:2
minutes - 26:12, 26:16, 26:20, 26:25, 27:14, 27:16, 129:11, 130:6, 130:18, 130:22
miscellaneous - 95:14
mischaracterize - 28:17
mistreated - 29:9, 29:24
mix - 10:23
modules - 73:18
Monday - 62:8, 67:21, 67:22, 69:1, 72:7, 85:22, 88:7, 123:4, 123:6

monetary - 125:16
money - 12:18, 12:20, 13:11, 115:24, 116:2
Montgomery - 98:9
month - 8:12, 28:2, 123:3
months - 65:13, 65:14, 71:19, 75:10, 76:12, 130:13
Morale - 30:8
morning - 62:8, 89:10
most - 9:9
mostly - 107:2
moved - 5:11
moving - 56:7, 102:20
must - 111:7, 121:9, 121:24, 125:24

**N**

name - 4:6, 4:8, 4:9, 5:15, 18:14, 35:8, 47:6, 47:8, 66:17, 67:2, 69:24, 71:22, 90:19, 90:21, 90:24, 106:9, 107:9, 107:12, 128:6, 128:13, 128:16, 128:18, 128:20, 128:25, 129:4
named - 10:20, 98:9
names - 38:24
National - 32:18, 33:7
nationwide - 36:8
near - 13:19
necessary - 121:8, 121:14
need - 21:21, 68:4, 68:21, 87:3
needed - 32:13, 41:4, 80:10, 88:25, 89:2, 89:3
needs - 100:8, 118:5
Negative - 51:11, 51:13, 51:17, 111:11, 111:14
negative - 79:6
negatively - 45:24, 65:19
neutral - 45:20
never - 51:7, 55:16, 64:16, 98:20, 99:18, 102:2, 119:19, 130:14
Never- 119:18
new - 56:12, 58:16, 62:16, 65:11, 65:19, 73:9, 73:22, 75:10, 75:13, 75:25, 76:3, 78:14, 85:16, 102:17, 122:12, 123:24, 130:12
newspaper - 19:24, 20:14, 22:24, 30:12, 31:2, 31:5, 45:17, 56:24, 57:4, 58:18, 58:19, 58:22, 59:16, 60:3, 76:8, 76:11
next - 13:19, 18:18, 29:8, 30:18, 41:12, 42:23, 48:11, 50:21, 61:11, 62:18, 67:7, 68:23, 69:14, 70:5, 70:7, 70:10, 71:24, 72:1, 72:15, 87:3, 87:10, 87:17, 88:1, 88:10, 88:23, 88:25,

91:18, 93:1, 93:25, 95:22, 108:5, 121:13
Nfpa - 32:2, 32:4, 32:9, 36:1
nine - 5:8
nobody - 15:17
Nobody - 58:24, 90:7
nominated - 17:9
noncompliance - 96:13
none - 38:4
normal - 69:4
normally - 55:12
Notary - 1:16, 3:8, 132:23
notes - 28:24, 28:25, 66:14, 77:3
nothing - 43:15, 52:25, 75:23, 83:12, 84:5
Nothing - 61:12, 77:1, 91:12
notice - 3:12, 3:13, 3:20
Notice - 26:9, 76:19
noticed - 59:2
notify - 121:9
Nova- 5:20
Npfa - 32:17
number - 16:22, 20:3, 40:21, 66:3, 66:5, 69:21, 80:14, 80:15, 80:16, 80:17, 81:18, 84:15, 84:16, 84:17, 105:15, 110:17, 121:5, 126:24, 129:24, 130:5, 130:10
numbers - 84:18, 84:19, 84:20
nurse - 5:22
Nw- 2:3

**O**

o'clock - 78:3, 89:10, 116:19
oath - 4:12
objection - 28:12
Objections - 3:16
observe - 34:8
observer - 25:14
Obviously - 92:4, 102:7
occasions - 107:14
Occupational - 6:19
occur - 49:1, 129:25
occurred - 4:2
October- 18:4, 20:17
offered - 66:12
office - 17:5, 17:8, 40:8, 41:14, 42:9, 42:11, 43:5, 43:7, 48:20, 54:18, 55:22, 62:9, 72:10, 82:1, 82:2, 86:9, 86:10, 88:25, 89:14, 91:20, 109:6, 113:24
Office - 1:23
officer - 17:2, 17:3, 17:20, 90:16, 90:17
officers - 130:5
Offices - 2:9
offices - 17:23
official - 21:4, 68:1, 70:17, 130:14
officials - 63:22, 67:9, 67:10, 67:20,

72:17, 87:2
old - 5:25, 56:14, 76:5
omissions - 110:10
on-line - 10:20, 10:24, 11:4, 11:9
on-the-job - 110:13, 127:9
once - 28:2
Once- 61:12
One - 7:1, 19:25, 26:8, 76:18, 82:11, 102:24, 122:18
one - 8:24, 9:8, 10:2, 11:4, 16:18, 18:17, 19:21, 19:22, 21:14, 22:9, 23:12, 24:2, 24:17, 26:24, 29:8, 30:20, 31:3, 31:20, 34:16, 35:2, 35:8, 35:20, 39:8, 44:19, 56:17, 68:16, 70:10, 71:22, 75:7, 76:7, 76:11, 79:21, 80:7, 80:22, 81:9, 81:11, 81:16, 82:22, 82:24, 83:18, 89:7, 90:13, 92:16, 92:25, 100:5, 105:7, 107:9, 107:12, 111:8, 111:9, 113:22, 115:14, 118:19, 121:5, 121:17, 125:12, 127:15, 128:6, 128:24, 129:10, 129:15
ones - 38:1
Opelika- 7:2, 7:3, 7:6, 8:1, 9:12, 9:17, 11:16, 15:13
open - 70:14, 70:17, 92:8
openly - 71:16
operating - 21:8, 50:6, 52:19, 99:2
operations - 108:9, 121:7
opinion - 57:23, 58:7, 63:1, 63:7, 65:7, 65:9, 65:10, 65:14, 65:15, 65:17, 65:18, 100:22, 122:4
opinions - 63:22
opportunity - 93:7, 110:16
opposed - 17:1, 33:19, 35:21, 76:4, 85:25, 119:22, 122:5
option - 93:13
oral - 3:6
Oral- 1:14
order - 81:11, 117:25, 125:14
ordinance - 64:14, 64:19
ordinary - 27:15
organization - 28:7, 100:2, 103:4, 103:8, 103:22, 104:15, 104:25, 105:12, 106:15, 107:22, 107:25, 129:12
organization's - 105:3, 106:22
organizations - 9:7
otherwise - 71:14
ought - 117:25
outlined - 121:24
outside - 109:8,

109:21, 117:17, 121:14, 126:15
overtime - 13:4, 13:7, 120:4
own - 63:7, 114:24

**P**

page - 30:18, 40:23, 44:19, 58:3, 121:3
Page - 2:21
pages - 132:9
paid - 11:21, 11:22, 12:8
pain - 115:5
Panel - 97:23
paper - 23:24, 31:10, 45:14, 59:14, 59:15, 59:23, 60:18, 92:16
papers - 23:2
paperwork - 14:2, 46:14, 52:20, 95:23, 96:3
para - 100:2
para-military - 100:2
paragraph - 29:5, 29:7, 48:11, 51:3, 102:25, 108:5, 109:3, 109:17, 110:4, 110:17
Paramedic - 8:17
paramedic - 6:13
part - 14:3, 25:12, 44:22, 46:13, 51:25, 52:16, 71:7, 71:8, 71:9, 77:11, 79:9, 79:15, 84:18, 94:24, 114:22, 120:8
part-time - 79:9, 79:15
participated - 112:8, 113:16
participating - 100:18
particular - 4:25, 5:2, 30:20, 37:13, 50:9, 130:11
particularly - 28:7, 50:10
parties - 3:4, 44:24, 132:14, 132:16
passed - 123:18, 123:19
passenger - 42:22
past - 82:16
pastor - 115:19
Paul - 4:8
pay - 11:18, 14:15, 15:10, 116:2, 116:8, 125:16
pays - 9:8
pending - 22:7
people - 22:16, 33:19, 33:22, 34:5, 34:9, 38:24, 39:12, 59:2, 69:7, 74:5, 76:15, 79:5, 79:8, 79:14, 80:4, 80:5, 81:1, 96:25, 103:13, 105:15, 105:24, 107:3, 107:7, 118:8, 126:23, 128:6, 128:8, 128:13, 128:23, 128:25, 130:7
percent - 59:10
perception - 117:11, 118:1
perform - 95:15
period - 36:17,

72:12, 78:14, 102:25, 103:14, 103:15, 104:16, 104:24, 105:9, 106:15, 106:22, 107:17, 110:22, 122:12, 123:14, 130:12
permanent - 125:12
person - 21:21, 35:3, 68:24, 69:11, 69:14, 73:6, 74:14, 120:6, 127:2
personal - 25:8, 33:25, 36:10, 36:13, 46:5, 46:7, 65:15, 65:17, 65:18, 74:4, 122:18
personally - 26:16, 28:25, 30:1, 34:3, 39:14, 39:19, 70:25, 90:20, 103:9, 104:19, 113:3, 114:8
Personnel - 110:8, 112:9
personnel - 6:3, 88:25, 89:13, 90:1, 90:2, 90:8, 92:10, 116:21, 121:25, 123:19
persons - 35:21
pertaining - 58:8, 100:23
peruses - 110:19
Peters - 1:15, 1:21, 3:8, 132:22
Peterson - 1:22
Phenix - 1:9, 1:17, 1:18, 2:7, 2:10, 3:9, 4:23, 5:3, 5:4, 7:18, 7:24, 8:4, 10:15, 10:15, 12:11, 12:15, 12:21, 13:2, 15:5, 17:21, 18:10, 18:12, 23:25, 32:8, 33:17, 83:20, 88:15, 94:8, 94:10, 100:16, 101:16, 110:7, 116:14, 117:12, 118:1, 120:18, 120:21, 121:25, 127:3, 129:6
phone - 66:3, 66:8, 66:15, 71:14, 80:16, 80:17, 80:18, 81:15, 81:18, 82:9, 84:15, 84:17, 84:22, 85:17, 87:15, 126:9
photocopied - 47:15
photograph - 37:3
photographer - 37:8
photographs - 37:2, 37:6
physical - 10:22
physically - 11:11
picked - 41:14, 41:23
pictures - 37:9
piece - 92:16
Pitts - 26:23, 27:4, 27:5, 59:7, 59:9, 66:21, 67:1, 71:23, 129:2, 129:14
place - 3:13, 11:12, 24:9, 24:10, 27:15, 45:5, 45:22, 45:23, 46:5, 46:7, 52:11, 96:11, 126:13, 126:15
places - 10:11

7

plain - 89:4
plaintiff - 108:6, 109:5, 109:7, 110:5, 110:14
Plaintiff - 1:7, 1:14, 2:2, 3:7
Plaintiff's - 88:4
plaintiff's - 110:11
plan - 96:11
plans - 24:4
play - 25:12
played - 111:17
plus - 13:6
Pm - 131:2
point - 30:8, 40:2, 67:9, 67:12, 85:14, 93:12
police - 62:16, 65:12, 85:16, 90:10, 90:16, 91:7
Police - 79:21
policeman - 92:4
policemen - 90:12
policies - 56:12, 121:25, 126:6
policy - 57:20, 70:15, 70:18
politely - 97:11
political - 100:18
poll - 130:15
Poole - 38:14, 38:16
position - 17:9, 49:22, 102:17
positions - 20:25
positively - 117:11
possess - 76:21
possible - 7:15
Possibly - 65:1
possibly - 8:10, 22:21, 111:5
Post - 1:23
Prater - 18:17, 19:7, 19:13, 19:14, 38:2
precedent - 3:14
presence - 51:18
present - 26:6, 41:9, 74:5, 86:12, 86:17, 92:2, 103:1, 103:15, 104:24, 105:10, 106:16, 106:23, 107:18, 129:14
Present - 2:11
president - 15:7, 18:1, 18:3, 18:5, 18:6, 20:15, 20:19, 20:21, 21:1, 21:2, 21:5, 43:18, 54:22, 72:8, 86:24, 94:8, 100:16, 105:3, 106:22, 107:25, 122:24, 127:16
president/vice - 21:5
pressure - 110:13, 111:13, 112:14, 113:12, 113:18, 124:11
pressuring - 112:21
pretty - 8:13, 22:5, 55:20, 56:21, 57:13, 57:17, 57:25, 70:14, 102:20, 117:7, 119:12
prevention - 118:10
previous - 57:5, 63:11, 63:14
previously - 63:3, 87:13, 98:9, 98:19, 101:6, 124:8
priest - 115:19
primarily - 10:18

primary - 9:5
print - 94:5
printed - 47:6, 47:7
privy - 33:22
probation - 14:22, 60:24, 61:15, 61:25, 62:15, 63:4, 63:13, 63:15, 63:17, 68:15, 68:17, 68:20, 71:1, 73:9, 74:22, 75:17, 75:19, 78:10, 79:1, 79:9, 79:25, 80:3, 82:13, 83:24
probationary - 58:15, 65:11, 71:19, 72:12, 73:22, 74:24, 75:9, 78:14, 79:13, 83:21, 85:15, 122:12, 123:14, 130:12
problem - 50:19, 57:20, 82:18, 84:3, 84:6, 84:10, 99:24, 121:6, 121:17, 122:5, 121:12, 122:10, 128:19
problems - 23:6, 23:9, 23:13, 23:18, 70:20, 117:18
procedure - 21:20, 21:22, 47:25, 52:19, 57:19, 57:20, 59:23, 99:2, 99:17
procedures - 21:8, 21:25, 56:13, 99:8, 121:7, 121:24, 126:6
process - 12:2, 35:1, 100:18, 119:2
productive - 119:2
professional - 57:10, 57:11, 119:7, 119:11
progress - 57:7
progressed - 18:1
progressing - 56:21
promote - 53:21
promoted - 75:18
proper - 125:23
proposal - 59:19, 60:11, 60:13, 62:15, 63:4, 64:18, 65:11, 78:24, 82:12, 83:21, 122:20
proposals - 77:12, 79:24
proposed - 64:14, 73:9, 74:18, 79:21, 101:8, 123:14
Protection - 32:18, 33:7
protection - 127:2
protections - 110:12
proven - 19:5
provide - 36:22, 36:23
provided - 36:22
providing - 14:9
provision - 10:6
psychiatrist - 115:12, 115:17
psychological - 115:8
psychologist - 115:12, 115:17
Public - 1:16, 3:8, 121:16, 128:15, 132:23
public - 25:7, 28:23, 31:13, 32:24, 34:15, 37:19, 43:16, 53:11, 99:6, 105:6, 107:17,

108:2, 108:9, 110:6, 110:24, 117:11, 122:21, 122:23, 127:24, 127:25, 128:13
publish - 31:10
publishing - 45:10
punished - 10:1
put - 9:8, 59:23, 63:16, 86:3, 87:5, 87:8, 113:18, 113:23
puts - 30:20

### Q

qualifications - 3:13
questions - 4:12, 13:11, 25:15, 101:13, 110:4, 115:2, 130:25, 132:7
quick - 8:14, 111:9
quite - 17:16, 38:3, 50:18
quote - 29:17, 30:9
quoted - 29:15

### R

rage - 44:3
raised - 57:4
ran - 20:14
rank - 11:15, 50:5, 67:17, 69:24
rate - 33:2, 33:3, 36:7, 36:8, 79:4
rather - 7:13
Ray- 72:21, 76:15
Rc- 2:16
Rd- 2:16
re - 77:11
reach - 72:24, 81:14, 84:14
read - 21:21, 29:6, 30:12, 44:22, 44:23, 47:12, 52:15, 52:16, 94:3, 94:20, 94:21, 94:24, 99:19, 110:16, 110:17, 126:3
readily - 13:15
reading - 3:21, 36:19, 52:14, 58:18, 60:18
real - 5:11, 17:16, 65:4, 82:5, 111:9
realize - 97:6
really - 5:1, 10:5, 19:20, 20:8, 21:7, 49:17, 107:10
reason - 7:12, 13:10, 95:6, 95:20, 115:1, 126:11
reasonable - 121:15
reasons - 126:7
receiving - 99:15
Recess- 85:12, 130:24
recollect - 8:14
recollection - 28:14, 48:17, 64:17, 77:24, 81:12
recommendation - 33:10, 114:21
recommendations - 33:14, 124:4
record - 4:6, 6:3, 14:13, 23:15, 27:21, 28:18, 76:16, 101:25
recorded - 29:1

recorder - 29:2
recordings - 76:19, 76:21
record - 14:23, 63:8, 79:7, 80:4
recruited - 15:25
recruiting - 79:4
recruits - 75:25, 76:4
reduced - 132:8
refer - 88:7
reference - 3:12, 3:19, 7:13, 19:23, 62:9, 111:7, 118:16, 129:13
referred - 19:25, 20:7, 52:19, 59:15
referring - 102:25, 103:4
reflect - 28:18
reflecting - 130:19
refusing - 95:15
regard - 28:20, 32:23, 49:22, 52:5, 52:22, 86:6, 88:15, 99:2
regarding - 23:25, 51:21, 108:8
regards - 94:6, 94:7
regular - 26:5, 27:23, 34:21, 53:18, 55:20, 57:13, 71:2, 73:15, 82:6, 91:4, 129:18
regulations - 21:19, 46:10, 52:11, 52:18, 56:14, 99:1, 109:10
related - 121:7, 122:5, 126:15
relates - 119:21
relation - 76:20, 76:22
relationship - 19:19, 19:20, 55:24, 57:8, 57:10, 57:12, 113:12
relationships - 58:8, 58:9, 119:9
relative - 132:13, 132:15
relief - 125:22
reluctance - 31:3
reluctant - 30:21, 30:23, 31:7, 31:11
remark - 107:22
remarks - 103:3, 103:5, 103:21, 104:14, 104:17, 104:25, 107:16
remember - 5:11, 7:19, 15:7, 17:25, 18:16, 18:22, 19:1, 23:19, 26:22, 31:20, 32:25, 33:4, 35:16, 36:3, 37:21, 37:22, 41:19, 41:22, 43:13, 44:8, 44:10, 44:13, 47:23, 48:15, 49:3, 49:18, 50:10, 53:14, 53:16, 53:21, 54:3, 54:5, 59:5, 59:20, 60:11, 64:2, 66:5, 66:16, 66:18, 66:24, 70:6, 75:5, 75:6, 76:6, 77:20, 77:24, 79:20, 81:11, 81:16, 81:25, 82:25, 85:21, 85:22, 85:23, 90:13, 91:14, 92:25, 98:13, 98:14, 104:4, 108:4, 117:16,

117:23, 118:3, 118:7, 118:23, 118:25, 119:13, 120:7, 120:8, 125:9
repercussions - 70:19
rephrase - 4:14
reply - 93:14
report - 88:25, 89:8, 89:13
reported - 13:11, 14:12, 31:5, 104:4
Reporter- 1:16, 3:8, 132:9
reporter - 31:2, 31:9, 37:14
Reporters- 5:19
Reporters- 1:22
representation - 93:13
representative - 98:10
reprimand - 109:12
reprimanded - 109:7, 109:10
reputation - 115:5
request - 93:15, 120:10
requested - 26:8
required - 116:18
requirement - 21:17, 33:12, 33:14
requirements - 9:13, 15:21, 21:15, 95:13
Rescue- 116:14
Reserved- 3:17
reside - 128:9
resides - 127:2
resign - 93:3, 93:8
resigned - 18:21, 36:18
resolve - 116:16
Resource- 91:25
respect - 119:6, 119:10
respective - 3:4
response - 26:10, 35:24, 38:20, 44:12
responsibility - 119:20, 119:22
responsiveness - 3:17
rest - 39:9
restaurant - 24:14
result - 22:10, 22:13, 22:14, 66:8, 101:16, 115:9
resulted - 45:12, 45:14
retaliating - 125:13
retaliation - 30:22
retention - 33:2
retired - 36:18
retirement - 36:19, 96:8, 97:19, 97:20, 102:7, 102:10, 102:16, 125:4
returns - 13:12, 13:24, 14:9
review - 44:14, 52:18, 94:10, 126:1
Review- 97:23
rid - 105:22, 106:1
ride - 32:10, 42:10, 42:16, 43:3
Ride- 32:11
rights - 79:15, 110:11, 126:12
Rn- 5:23
Road- 4:23, 5:1

**Robert**- 26:22, 26:23, 27:7
**Roberts**- 2:12, 103:2, 104:16, 104:17, 110:8, 112:12
**Robin**- 38:17, 38:19
**role** - 20:23, 111:17
**room** - 44:7, 91:19, 92:4, 92:6, 92:10, 92:13, 96:22, 128:11
**rotation** - 8:25
**roughly** - 17:13, 124:9
**Roy**- 2:11, 53:25, 70:13, 73:13, 86:17, 91:23
**ruined** - 16:21
**ruining** - 104:9, 104:11
**rule** - 119:13, 121:11, 122:25
**rules** - 21:19, 46:10, 52:11, 56:14, 61:5, 61:11, 95:14, 99:1, 109:9, 117:25
**running** - 82:1
**Russell**- 132:4

**S**

**safety** - 31:16, 31:17, 32:23, 37:22, 122:21, 127:1
**Safety** - 6:19, 121:16
**salary** - 13:5
**sat** - 16:5, 25:14, 25:18, 25:19, 43:7, 87:23, 88:2, 88:10, 91:19, 112:3
**satisfied** - 57:2, 57:6
**saw** - 38:9, 59:13, 60:16
**scared** - 42:18
**schedule** - 9:11
**school** - 6:4, 10:18, 10:19
**School** - 6:5, 6:9
**schools** - 10:21
**Science** - 6:19
**seat** - 42:22
**seated** - 42:21
**second** - 29:6, 40:22, 106:7, 129:11
**secondary** - 9:4
**secretary** - 26:20, 129:13
**secretary/treasurer** - 17:7, 17:14, 17:19, 26:17, 27:2, 27:17, 59:1, 59:5, 66:20
**secretary/treasurer's** - 26:13, 27:22
**Section** - 61:1
**section** - 61:13, 83:22, 121:25
**see** - 18:13, 19:16, 19:24, 36:19, 39:10, 40:23, 44:4, 45:25, 53:4, 57:7, 58:4, 58:10, 60:22, 75:22, 97:21, 97:24, 114:14, 121:20, 127:14
**seeing** - 38:12, 60:11, 90:13
**seek** - 94:10, 115:8
**seeking** - 115:25, 116:4
**sent** - 38:2

**sentence** - 29:8, 110:18
**separately** - 110:9
**September** - 20:12, 28:10, 45:9, 53:5, 108:6, 108:10
**Sergeant** - 12:12, 12:20, 43:18, 59:8, 69:22, 120:24, 120:25
**series** - 23:24
**served** - 18:10
**Service** - 6:24, 7:9, 8:2, 9:10, 9:20
**service** - 32:7, 32:21
**Service's** - 9:22
**Services** - 116:14
**services** - 120:18
**serving** - 17:19
**session** - 52:9, 114:5
**set** - 95:13, 117:21, 117:23
**seven** - 8:25, 9:1
**Sgt** - 44:24, 45:8, 46:9, 48:12, 50:22
**share** - 85:2, 85:3
**sheet** - 46:13
**shift** - 9:22, 34:21, 54:14, 74:9, 74:10, 74:12, 116:21, 123:12, 123:25
**shifts** - 8:19, 8:20
**short** - 38:20, 91:3
**shorten** - 7:15
**Show** - 46:24
**show** - 20:9, 109:16
**showed** - 90:10
**shut** - 92:8, 92:9
**sick** - 10:23
**Sign** - 95:23
**sign** - 47:22, 52:4, 52:10, 93:19, 94:12, 99:19, 99:21, 114:20
**signature** - 47:3, 47:10, 94:13
**signed** - 14:2, 16:8, 47:12, 47:23, 48:8, 52:17, 52:20, 94:1, 99:14, 112:17, 113:4, 114:14
**significant** - 30:21
**signing** - 3:22, 112:18
**silence** - 110:14, 111:21, 113:8, 114:9, 124:13
**silent** - 43:3
**similar** - 38:3, 92:13
**sit** - 26:2, 87:20, 87:22, 96:16, 96:17
**sitting** - 31:20, 37:23, 42:23, 90:21, 128:6, 128:8, 128:11, 128:12, 129:5
**situation** - 10:21, 112:18
**six** - 33:16, 33:21, 62:6, 63:11, 63:12, 63:14, 67:20, 85:15, 97:8, 100:13
**size** - 36:8, 91:6
**sized** - 91:5
**skills** - 132:11
**sleep** - 10:2, 10:6, 10:8
**small** - 94:3
**smart** - 115:2
**Smiths** - 6:4, 6:9
**solicit** - 38:12
**solved** - 121:18

**someone** - 69:10, 118:15
**Sometimes** - 30:11
**sometimes** - 7:12
**Somewhat** - 9:15, 52:24
**somewhere** - 8:13, 78:4, 98:15, 102:21
**soon** - 73:20, 74:23
**Sop** - 21:13, 99:12, 121:4
**Sops** - 21:16
**sorry** - 11:9, 45:2, 45:4, 65:10, 128:11
**sort** - 16:10
**sound** - 77:18
**sounds** - 29:23
**Southern** - 6:16, 11:7, 11:8, 11:9
**speaking** - 43:17, 105:5, 107:16, 108:2
**Specifically** - 100:5
**specifically** - 21:25, 66:17, 93:11, 118:3
**specifics** - 35:19
**Speech** - 46:4
**speech** - 22:17, 46:6, 46:10, 99:3, 113:9
**spoken** - 34:17, 81:5, 108:8, 110:6, 110:24
**spot** - 45:1
**Staffing** - 31:22
**staffing** - 31:24, 32:1, 32:6, 32:22, 33:1, 37:22, 71:4, 79:5, 128:4
**stance** - 78:9, 101:7
**stand** - 32:17
**standard** - 21:7, 32:6, 52:19, 99:1
**standards** - 32:20
**start** - 6:3, 12:16, 24:25, 55:12, 71:19, 71:21, 79:25, 102:19, 124:1
**started** - 8:16, 25:1, 43:8, 116:13, 117:1
**starting** - 18:14, 44:24, 45:6, 56:13, 102:21, 115:7
**starts** - 9:23, 29:5, 48:12, 110:5, 121:4
**State** - 1:16, 3:9, 4:6, 6:15, 6:21, 11:3, 132:3, 132:23
**state** - 96:11, 98:10, 102:16
**statement** - 29:17, 50:24, 106:2, 109:22
**statements** - 30:17, 45:10, 50:22, 51:9, 51:21, 103:12, 106:14, 106:21
**states** - 87:13
**States** - 1:1
**station** - 42:11, 42:14, 48:20, 49:24, 55:21, 61:4, 61:6, 61:8, 88:3, 96:19, 97:1, 97:14
**Station** - 6:5, 6:9, 42:15, 87:25, 88:11
**stations** - 116:22
**statistics** - 36:21
**stay** - 118:5
**step** - 71:24, 72:1
**stepped** - 20:23
**Stevens** - 106:9,

106:16
**stifle** - 22:16
**still** - 14:17, 15:12, 57:15, 79:15, 90:4, 91:7, 102:10
**Stipulated** - 3:3
**stipulations** - 97:21
**stop** - 44:23, 45:13, 80:13, 89:24, 101:5, 104:13
**stopped** - 68:5, 85:13
**Street** - 1:18, 2:3, 2:7, 2:10, 3:9
**stub** - 14:15
**stuff** - 11:4, 13:22, 29:4, 82:21, 83:1, 107:7, 109:23
**subdivision** - 4:25, 5:2
**subject** - 111:15, 112:2, 112:13, 112:23, 114:2
**submitted** - 37:25, 55:18
**subsequent** - 55:7, 55:18
**succeed** - 119:15
**successfully** - 80:4
**succumb** - 119:15
**suffered** - 115:4
**suffering** - 115:6
**suggestions** - 124:3
**suing** - 126:11
**Suite** - 2:4
**Sumbry** - 63:25, 64:10, 72:23, 76:15, 77:4, 81:2, 81:6, 83:17, 84:2
**summarize** - 98:24
**summer** - 21:25
**summoned** - 109:5
**Sunday** - 67:22, 69:1, 72:5
**supervisor** - 50:2, 50:4, 53:6, 53:17, 67:13, 68:11, 121:8, 121:9, 126:21
**supervisors** - 58:9
**supervisory** - 53:17, 95:16
**surely** - 35:2
**surface** - 71:12
**Surgery** - 5:20
**sustain** - 119:15
**swap** - 56:17, 56:18
**sworn** - 4:4, 132:13
**system** - 46:10, 48:1, 60:19, 61:5, 61:11, 73:9, 76:4, 79:16, 83:22, 94:23, 95:4, 99:1, 99:12, 109:9, 123:3, 123:4, 125:5, 126:7

**T**

**talks** - 120:24, 120:25
**tall** - 91:3
**tape** - 29:1, 76:19
**tax** - 13:12, 13:24, 14:9
**Technical** - 6:13
**Technology** - 6:23
**telephone** - 76:15, 80:21, 80:24, 130:15
**ten** - 75:21
**terminate** - 111:10, 112:6, 113:2, 114:7,

114:21
**terminated** - 7:24, 59:24, 93:2, 93:7, 94:19, 101:16, 102:8, 111:6, 112:7, 114:3, 114:5, 126:5
**terminating** - 111:17
**termination** - 7:18, 8:10, 12:13, 22:16, 112:3, 112:8, 112:17, 112:18, 113:1, 113:5, 113:16, 113:18, 114:22, 115:9, 116:3, 124:12
**terminations** - 110:14
**Terrell**- 15:1, 15:2, 15:25
**testified** - 4:4, 126:22
**testimony** - 28:13, 28:15, 28:17, 28:18, 96:25, 104:22, 114:24, 130:14, 132:11
**themselves** - 125:1
**theory** - 10:4
**thereto** - 132:8
**thinking** - 74:24, 75:17
**third** - 58:3
**Thomas**- 2:2, 2:6
**Thomason** - 128:21
**thoughts** - 89:12
**threaten** - 111:9, 112:6, 113:2, 114:7
**threatened** - 108:7, 108:10
**threatening** - 112:20
**threats** - 29:11, 110:13, 111:12, 112:13, 113:1, 124:11, 124:12
**three** - 32:10, 32:11, 32:15, 33:19, 34:9, 35:14, 35:20, 36:18, 61:9, 63:24, 73:2, 73:3, 73:6, 76:12, 88:2, 88:10
**Three**- 22:25
**Three-alarm** - 22:25
**throughout** - 69:21
**Tillman**- 1:15, 1:21, 3:8, 132:22
**tired** - 103:23, 104:1, 104:3
**title** - 21:4
**today** - 4:11, 16:15, 16:17, 31:21, 37:23, 38:21, 75:23, 90:21, 106:11, 124:11, 124:19, 124:20, 125:8, 128:7, 128:9, 128:12, 129:5, 129:11, 130:14
**together** - 53:21, 117:19
**tolerated** - 50:23, 51:8
**tomorrow** - 13:19, 124:21
**took** - 10:24, 17:14, 24:10, 28:25, 37:9, 41:11, 41:14, 41:23, 65:21, 68:11, 77:13
**top** - 94:24
**topic** - 61:14
**towards** - 50:23,

50:24, 97:11
**town** - 24:14
**training** - 6:8, 6:13, 6:14, 56:13, 73:15, 73:18, 74:11, 79:23, 80:1, 116:19, 124:1
**Training** - 6:23
**transcript** - 132:10
**transcription** - 132:9
**traveling** - 127:12
**treasurer** - 26:21, 129:14
**treat** - 119:10
**treated** - 119:6
**tried** - 28:2
**trouble** - 40:14, 105:23
**truck** - 33:19, 34:9, 120:6
**true** - 19:5, 132:10
**truth** - 87:9
**try** - 7:15, 79:11, 96:18, 99:23, 126:16
**trying** - 10:5, 22:16, 27:13, 37:12, 37:13, 37:17, 37:18, 39:20, 53:20, 65:2, 79:6, 104:14, 117:10, 128:25, 129:1
**Tuesday** - 123:5, 123:6
**Turmoil** - 22:25
**Turn** - 40:3
**turn** - 47:22, 121:3
**turnover** - 33:1, 33:3, 36:6, 36:7, 79:4
**Two** - 122:20, 122:23
**two** - 5:10, 7:1, 8:19, 8:24, 16:18, 19:15, 36:18, 37:21, 42:15, 42:16, 76:12, 81:6, 82:11, 83:25, 85:14, 96:21, 108:19, 130:21
**two-mile** - 42:16
**type** - 8:18, 87:3, 87:4, 123:5
**typed** - 87:11, 87:18
**typewriting** - 132:8

**U**

**ultimately** - 71:5
**unanimous** - 123:10
**unaware** - 111:22
**uncertain** - 117:6
**unclear** - 118:2
**under** - 4:12, 18:10, 49:25, 64:15, 79:15, 110:12
**underlined** - 30:19
**underlying** - 95:20
**understood** - 4:17, 57:18, 58:12, 104:22, 130:13
**Unfortunately** - 9:22
**uniform** - 89:3
**Union** - 105:19
**union** - 15:8, 15:10, 16:2, 16:4, 16:10, 17:6, 17:12, 19:2, 19:3, 20:15, 21:6, 22:6, 24:11, 25:19, 26:1, 26:4, 26:9, 26:11, 27:24, 28:5, 28:13, 30:24, 39:15, 43:18, 43:22, 44:2,

49:10, 49:14, 50:16, 50:17, 51:23, 51:24, 52:6, 54:22, 68:6, 72:8, 81:23, 84:24, 84:25, 85:3, 98:10, 98:17, 98:21, 98:22, 100:16, 104:9, 104:10, 104:18, 105:17, 105:24, 122:24, 125:1, 127:16, 127:20, 129:19, 129:20, 129:24, 130:2, 130:5, 130:7
**union's** - 84:20
**United** - 1:1
**University** - 6:15, 6:16, 6:21
**unless** - 118:20
**Unless** - 27:7
**unpaid** - 125:16
**unpleasant** - 97:2, 97:3, 97:4, 97:8
**unsure** - 26:7, 26:24, 111:19, 118:22, 123:21, 124:5
**unwanted** - 48:13
**Unwanted** - 51:12
**up** - 16:8, 17:20, 18:3, 20:4, 22:6, 23:12, 23:14, 34:23, 34:24, 35:3, 37:18, 41:14, 41:23, 43:7, 46:19, 58:14, 64:20, 68:16, 73:20, 74:14, 80:8, 80:14, 87:3, 87:4, 87:11, 87:18, 90:10, 102:20, 109:23, 113:17, 130:8
**upgrade** - 117:25

**V**

**vacation** - 101:24, 125:5
**Valley** - 6:10
**varies** - 11:25
**verbal** - 95:16
**verbally** - 99:18
**verification** - 72:2, 72:11
**versa** - 120:23
**verses** - 102:19
**Vice** - 21:1
**vice** - 18:1, 18:3, 120:23
**videotapes** - 76:19, 76:24
**view** - 100:22
**violates** - 126:12
**violation** - 94:23, 95:4, 109:9
**voiced** - 34:15
**voicing** - 101:7
**vote** - 64:22, 84:9, 100:19, 123:8, 123:9
**voted** - 63:19, 64:15, 64:23, 78:25
**votes** - 27:20, 82:18
**vs** - 1:8

**W**

**W-2s** - 14:15
**wage** - 101:14
**wages** - 13:10, 14:4, 14:8, 116:8
**wait** - 94:6
**waiting** - 91:19, 97:13

**Waived** - 3:15, 3:20, 3:22
**walked** - 44:6
**Wallace** - 2:12, 108:14
**wallet** - 16:14, 16:17
**wallets** - 16:18
**warning** - 95:1
**Washington** - 2:4
**Waters** - 2:11, 53:25, 55:8, 57:9, 70:13, 70:14, 73:13, 74:15, 86:11, 86:17, 86:21, 87:7, 91:23, 98:3, 103:2, 103:7, 107:20, 107:21, 109:7, 110:8, 113:11, 116:13, 116:16, 117:2, 117:7, 118:4, 120:11, 123:13, 124:1, 125:1
**Waters'** - 109:6
**Wayne** - 38:14, 38:16
**wear** - 89:2
**wearing** - 127:20, 127:22
**week** - 8:19, 8:25, 11:24, 12:3, 12:6, 12:9, 12:24, 23:25, 24:5, 77:20, 85:21, 85:25
**weekend** - 8:20, 86:1
**weeks** - 11:14
**whatnot** - 82:18
**wherein** - 34:15, 84:24, 130:7
**whichever** - 122:12
**White** - 91:1, 91:2
**whole** - 12:2, 35:1, 37:24, 74:9, 74:12, 102:2
**wife** - 5:14, 13:21, 50:11, 50:13, 50:17, 51:23, 52:1, 115:21
**Wilkinson** - 48:15, 48:20, 49:15, 49:23, 50:8, 50:21, 50:25, 51:16, 51:21
**Wilkinson's** - 49:9
**William** - 26:6
**Williams** - 23:4, 24:17, 25:12, 28:9, 28:14, 28:15, 28:20, 31:8, 34:14, 36:22, 36:25, 37:6, 37:14
**Williams'** - 38:25
**wish** - 49:19
**withdraw** - 71:20
**Witness** - 4:8, 4:15, 4:19, 110:19
**witness** - 132:12
**Witness/atty** - 2:16
**won** - 22:14
**wondered** - 29:16, 29:18
**Woodley** - 2:2, 2:3, 28:12, 38:10, 130:25
**word** - 104:2
**words** - 16:1, 31:25, 45:21, 51:17, 68:10, 110:23, 119:4, 119:21
**worker** - 48:14, 51:14
**write** - 39:5, 39:12, 40:12, 40:14, 40:18, 40:24, 40:25, 41:3,

41:4, 41:10, 50:11, 109:13, 109:22
**writing** - 64:13
**written** - 28:11, 64:20, 95:1, 95:16
**wrongful** - 22:15, 116:3, 126:10
**wrote** - 23:24, 24:3, 34:15, 38:24, 40:16, 86:3, 88:4, 88:22, 94:3, 109:14

**Y**

**Y'all** - 129:22
**y'all** - 23:12, 25:15, 25:25, 26:1, 28:21, 34:15, 36:21, 42:16, 43:5, 55:24, 75:24, 83:10, 92:5, 105:18, 105:19
**year** - 5:10, 7:21, 10:14, 13:12, 17:25, 22:1, 22:8, 36:17, 54:6, 56:21, 57:4, 74:22, 75:17, 98:14, 129:22
**years** - 5:8, 10:16, 17:23, 64:3, 65:5, 75:21
**yesterday** - 38:22
**you-all** - 28:9
**younger** - 90:23
**yourself** - 9:12, 21:7, 110:17