EXHIBIT

ALL-STATE LEGAL

"115"

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  EASTERN DIVISION
4
5  DAVID DAVIS,
6        Plaintiff,
7  vs.                    CASE NO. 3:06-CV-0054-VPM
8  CITY OF PHENIX CITY, ALABAMA,
9  et al.,
10        Defendants.
11
12
13            * * * * * * * * * * *
14
15    DEPOSITION OF H.H. ROBERTS, taken pursuant to
16  stipulation and agreement before Shannon M.
17  Williams, Certified Court Reporter and Commissioner
18  for the State of Alabama at Large, in the offices of
19  City Hall, 601 12th Street, Phenix City, Alabama, on
20  Wednesday, April 4, 2007, commencing at
21  approximately 12:37 p.m. EST.
22
23            * * * * * * * * * * *
24
25

**Page 3**

1                STIPULATIONS
2        It is hereby stipulated and agreed by and
3  between counsel representing the parties that the
4  deposition of H.H. ROBERTS is taken pursuant to the
5  Federal Rules of Civil Procedure and that said
6  deposition may be taken before Shannon M. Williams,
7  Certified Court Reporter and Commissioner for the
8  State of Alabama at Large, without the formality of
9  a commission; that objections to questions other
10  than objections as to the form of the questions need
11  not be made at this time but may be reserved for a
12  ruling at such time as the deposition may be offered
13  in evidence or used for any other purpose as
14  provided for by the Federal Rules of Civil
15  Procedure.
16        It is further stipulated and agreed by and
17  between counsel representing the parties in this
18  case that said deposition may be introduced at the
19  trial of this case or used in any manner by either
20  party hereto provided for by the Federal Rules of
21  Civil Procedure.
22            * * * * * * * * * *
23
24
25

**Page 2**

1                APPEARANCES
2  FOR THE PLAINTIFF:
3  THOMAS A. WOODLEY
   Woodley & McGillivary
4  1125 15th Street N.W.
   Suite 400
5  Washington, D.C. 20005
6  FOR THE DEFENDANTS:
7  JAMES P. GRAHAM, JR.
   712 13th Street
8  P.O. Box 3380
   Phenix City, Alabama 36868-3380
9
10 JAMES R. MCKOON, JR.
   McKoon & Thomas
11 925 Broad Street
   P.O. Box 3220
12 Phenix City, Alabama 36868-3220
13
14 ALSO PRESENT:
15 David Davis
   Wallace Hunter
16
17


CONDENSED COPY
18
19
20
21
22
23
24
25

**Page 4**

1                H.H. ROBERTS
2        The witness, having first been duly sworn
3  or affirmed to speak the truth, the whole truth and
4  nothing but the truth, testified as follows:
5        THE REPORTER: Usual stipulations?
6        MR. GRAHAM: We do want to read and sign.
7                EXAMINATION
8  BY MR. WOODLEY:
9        Q. Could you state your full name for the
10 record, please?
11        A. Herbert Hayes Roberts.
12        Q. Mr. Roberts, I know you've been sitting in
13 on the two depositions that we had earlier this
14 morning, correct?
15        A. That's correct.
16        Q. But for the record of your deposition, I
17 want a couple things to be clear. First of all, my
18 name is Tom Woodley, and I'm one of the plaintiff's
19 attorneys representing David Davis in this lawsuit.
20 You understand that?
21        A. I do.
22        Q. Okay. Have you ever had your deposition
23 taken before in a previous case?
24        A. I have.
25        Q. Is that more than one previous case?

5

1    A.  Yes, sir.
2    Q.  How many?  Ten?
3    A.  I have been with the city 34 years.  I'm ex
4  law enforcement and I've had several depositions.
5    Q.  In light of that experience, I take it
6  you're familiar with the procedures we'll be
7  following in this deposition?
8    A.  Yes, sir.
9    Q.  And have you had an opportunity before
10  today to discuss with the city attorneys the nature
11  of this lawsuit and the issues that are involved?
12    A.  I have.
13    Q.  Well, again, I'll be asking you a number of
14  questions, and we expect you to give the best
15  answers that you're able to give.  You understand
16  that?
17    A.  Yes, sir.
18    Q.  And everything that you and I say will be
19  taken down by this court reporter.
20    A.  Yes, sir.
21    Q.  And she will put it in a transcript form,
22  and we should have that available perhaps as early
23  as next week.  Do you understand that?
24    A.  I understand that.
25    Q.  If at any time you don't hear or understand

6

1  one of my questions, stop me right away and I'll be
2  glad to repeat or rephrase that question.  Do you
3  understand that?
4    A.  Yes, sir.
5    Q.  And, of course, most importantly, you are
6  under oath, sworn to tell the truth under the
7  penalty of perjury.  Do you understand that,
8  Mr. Roberts?
9    A.  I understand that fully, sir.
10    Q.  All right.  Let's get into it.  What is
11  your current position that you hold with the city?
12    A.  City manager.
13    Q.  And how long have you held the position of
14  city manager?
15    A.  I was first appointed in 2002.  Latter part
16  of 2001, excuse me -- 2002 -- five years.
17    Q.  Were you appointed by the city council?
18    A.  Yes, sir, I was.
19    Q.  Okay.  And did you work for the city in
20  another capacity before that?
21    A.  I did.
22    Q.  What was that?
23    A.  I was assistant city manager as well as
24  director of code enforcement.
25    Q.  How long did you hold that job?

7

1    A.  Since 1973 as an enforcement guy, and as
2  assistant city manager since 1998 -- or '96, excuse
3  me.
4    Q.  In your job as a city manager, what are
5  your basic duties and responsibilities?
6    A.  The basic day-to-day operations of the
7  city.
8    Q.  Okay.  Let me invite your attention to a
9  binder of exhibits which you have in front of you,
10  Mr. Roberts, and Mr. Graham also has a full set of
11  these exhibits available to him.  And Exhibit
12  Number 8 is the charter of the City of Phenix City;
13  is that right?
14    A.  That's correct.
15    Q.  Okay.  I take it you're pretty familiar
16  with the provisions of this city charter?
17    A.  Fairly familiar, yes, sir.
18    Q.  And, as I understand it, the city council
19  consists of five members; is that true?
20    A.  That's correct.
21    Q.  And one of those members is the mayor of
22  the city?
23    A.  That's correct.
24    Q.  And those are elected positions?
25    A.  Yes, sir.

8

1    Q.  Okay.  If you could turn to Section 4 of
2  the city code which deals with the powers and duties
3  of the city manager.  And I take it it's true that
4  you're familiar with those provisions of the charter
5  as well?
6    A.  I am, sir.
7    Q.  And is it accurate to say that you, as the
8  city manager, are the head of the administrative
9  branch of the city government?
10    A.  Yes, sir.
11    Q.  And you're accountable and responsible to
12  the city council?
13    A.  Yes, sir.
14    Q.  Are you accountable or responsible in any
15  way to the city's mayor?
16    A.  Not as a whole, no, sir.
17    Q.  And when you say not as a whole, what do
18  you mean by that?
19    A.  I work for the entire city council.  I
20  answer to all of them equally.
21    Q.  And under the city code, particularly
22  Section 4, you are responsible as the city manager
23  to enforce the laws and ordinances?
24    A.  I am.
25    Q.  And do you have the authority to appoint

9

1  officers and employees of the city?
2      A.  I do.
3      Q.  And when it says appoint, does that mean
4  hire?
5      A.  The appointed -- you appoint your division
6  heads and, of course, your department heads, which
7  is different from your Merit System employees.  I
8  appoint those.
9      Q.  What about a person that wants to be hired
10  in the city fire department?  Who has that hiring
11  authority?
12      A.  I would ultimately okay it.  That's given
13  down to each of the chiefs or department heads.
14      Q.  Okay.  So if Fire Chief Hunter wants to
15  hire a person in the fire department, he sends that
16  up to you, you approve it, and then he's authorized
17  to hire?
18      A.  Let me explain that to a great degree.
19      Q.  Sure.
20      A.  Once they have went through that process of
21  testing, the chief or any department head will hire
22  their own employee.  I try not to get involved in
23  the hiring of the day-to-day everyday employees.
24  That's between the personnel director, the personnel
25  department, and the various departments.  I do

10

1  approve or hire all department heads or appointed
2  division chiefs.
3      Q.  All right.  What about with regard to a
4  possible termination or discharge of an employee in
5  the fire department?  What's your role in that?
6      A.  The Merit -- the charter, of course, says
7  that I'm responsible for all hires and terminations,
8  as you are well aware.  However, there is a section
9  where I can delegate that hiring and terminations to
10  the department heads, of which I have done.  I let
11  the department heads manage their own affairs within
12  the department.
13      The reasons for that is probably two-fold.
14  Number one, if there's an appeal process that's
15  going to take place, the ultimate decision is going
16  to come back to me, and then that's when I really
17  try to get more involved during the normal course of
18  any termination or any disciplinary action.
19      Q.  And specifically with regard to the
20  plaintiff, David Davis, in this case, were you the
21  ultimate decision maker on his termination of
22  employment?
23      A.  I was the ultimate decision maker.
24      Q.  Okay.  You want to add something?
25      A.  No, that's good.

11

1      Q.  I'm sure we'll cover that again, so if you
2  have another thought, you'll have a chance to
3  express it.
4      Then going on to Section 9 of the city charter
5  which, in part, addresses the removal of officers
6  and employees.  Does that Section 9.01 also give you
7  the authority, as the city manager, to remove
8  employees of the city?
9      A.  Yes, sir, it does.
10      Q.  Okay.
11      A.  It will also say subject to the approval of
12  such -- if you have a Civil Service board, which we
13  do not.  We have a Merit System.  We have a
14  Personnel Review Board that would review any of the
15  classified workers, which is anything other than the
16  department heads or the division chiefs.
17      Q.  What's your understanding as the difference
18  between a Civil Service commission or board and a
19  Personnel Board that sits here?
20      A.  Usually a Civil Service board is what we
21  had when we was under the old commission form of
22  government, three-man, and usually it dealt
23  specifically with usually police and fire in our
24  instances as a three-man commission form of
25  government.

12

1      When we changed forms of government and became
2  under a council/manager form of government, we had
3  no protection or anything as far as our other
4  employees were concerned, and we chose to go -- or
5  the council at the time chose to go to a Merit
6  System which covered everyone and we did away with
7  the Civil Service board.
8      Q.  Okay.  Under the current system and the
9  system that applied to Mr. Davis's termination, it
10  was a Personnel Board procedure; is that correct?
11      A.  It was an appeal to the Personnel Review
12  Board, and they made the decision, and I upheld the
13  decision.
14      Q.  Just so I understand the process,
15  Mr. Davis, for example, a firefighter employed in
16  the city's fire department, was terminated.  Then he
17  had the right to appeal that decision to the
18  Personnel Board, correct?
19      A.  That's correct.
20      Q.  And he, in fact, did that --
21      A.  He did.
22      Q.  -- correct?  And then after that decision
23  of the Personnel Board, it goes to your desk as a
24  city manager to make the final decision on the
25  termination such as in the case of Mr. Davis?

13

1    A. That's correct.
2    Q. And when that decision involving Mr. Davis
3 came from the Personnel Board to you, did you have
4 the authority to approve the decision of the board
5 or disapprove as well?
6    A. I could have overruled the board or I could
7 have approved the board. In this case, I listened
8 to the case. I went along with the board's reading
9 and followed their advice.
10    Q. The board's decision, does that come as a
11 recommendation to you?
12    A. Yes, sir, it does.
13    Q. So it's not a decision as such; it's a
14 recommendation to the city manager?
15    A. It's a recommendation to me that I can
16 either accept or deny. If I deny, then, of course,
17 it would go before the full council for a hearing.
18    Q. But if you approve the Personnel Board's
19 recommendation as you did in the Davis case, that's
20 the end of the matter?
21    A. Yes, sir, it is.
22    Q. So Mr. Davis did not have the opportunity
23 or the right to go to the city council to appeal his
24 termination?
25    A. That's correct, sir. When I say that's the

14

1 end of it, of course, you know, the civil process.
2    Q. What do you mean civil process?
3    A. Court procedures.
4    Q. Which is where we find ourselves.
5    A. Unfortunately.
6    Q. Does the mayor play any role in the
7 termination of city employees?
8    A. No, sir, he does not, unless it's a city
9 manager. I know of no one since '77 since we've
10 been under this form which has not followed a
11 recommendation of the Personnel Review Board. That
12 would be the only way -- and I'm not going to say
13 mayor, but that would be the only way a council
14 would be involved in a termination --
15    Q. Okay.
16    A. -- or suspension. It could be either/or.
17    MR. GRAHAM: Let's go off the record a
18 minute.
19    MR. WOODLEY: Sure.
20 (Discussion held off the record.)
21    MR. WOODLEY: Back on the record.
22    Q. In the particular case of Mr. Davis and his
23 termination -- and we've already covered the ground
24 of what the Personnel Board did, and you upheld that
25 recommendation -- what would have happened, if

15

1 anything, if a couple of the city council members
2 wanted to take up the termination of Mr. Davis?
3 Would they have the authority under the city charter
4 or any other law to take up that matter?
5    A. My understanding is that they do not.
6    Q. Okay. And the mayor himself, as mayor,
7 doesn't have the authority to overrule your decision
8 upholding the termination of Mr. Davis, does he?
9    A. No, sir, he does not.
10    Q. Okay. Now, let me ask you -- we have an
11 exhibit if you want to refer to it; it happens to be
12 Exhibit 4 -- there is an Alabama State Code
13 provision that gives firefighters in the State of
14 Alabama the right to belong to a labor organization
15 or to choose not to belong to a labor organization.
16 Are you aware of that?
17    A. I am aware of that.
18    Q. Are you aware that that same Alabama State
19 Code provision gives firefighters the right, through
20 their representatives such as a labor organization,
21 to make proposals to their employers concerning
22 salaries and other conditions of employment?
23    A. I'm very much aware of that.
24    Q. Okay. And are you aware that that same
25 Alabama State Code provision prohibits a person from

16

1 discharging or discriminating against any
2 firefighter when he or she may exercise the rights
3 to belong to or lead a local labor association or to
4 make proposals?
5    A. Yes, sir. I understand that.
6    Q. And how long have you understood that
7 roughly?
8    A. I have been a IBEW member since I was 19
9 years old.
10    Q. Are you still an IBEW member?
11    A. No, sir. I've had my 30 years.
12    Q. Thirty years? Did you work as an
13 electrician?
14    A. Yes, sir. I'm a master electrician.
15    Q. Are you still working as an electrician?
16    A. I have my state license, yes, sir, but I'm
17 not allowed to do any side work.
18    Q. Have you ever been a member of another
19 union before?
20    A. No, sir.
21    Q. Are you aware that the firefighters here
22 employed by the City of Phenix City have their own
23 labor organization?
24    A. I am.
25    Q. Do you know how long that has existed?

17

1    A.  They have had a local here for quite
2  awhile.  I don't know the exact number of years, but
3  they've had a local for quite awhile.
4    Q.  Are you aware that the police employed by
5  the City of Phenix City also have an association?
6    A.  I've been a member of the FOP, sir.
7    Q.  You've been a member of the FOP?
8    A.  Yes, sir.
9    Q.  Because you worked in the police
10  department?
11    A.  Yes, sir.
12    Q.  Are you still a member of the FOP?
13    A.  No, sir, not since I moved up here.  I
14  still hold my law enforcement certification due to
15  retirement purposes with the state, but I -- in a
16  management level, I felt that would be
17  inappropriate.
18    Q.  In your last three years, I think it was,
19  as city manager here in the city, have you had
20  occasions to meet with leaders or members of the
21  FOP --
22    A.  I have -- go ahead.  Excuse me.  I'm
23  sorry.
24    Q.  -- meet with leaders or members of the
25  FOP?

18

1    A.  I have daily contact with some of the FOP
2  members.  I have not met with them.  I have, since I
3  have been back, met with some of the International
4  Association of Firefighters.
5    Q.  Okay.  Has the FOP ever made any proposals
6  to you, as the city manager, concerning the salaries
7  or working conditions of police officers?
8    A.  No, sir.
9    Q.  Has the International Association of
10  Firefighters or the local affiliate here in Phenix
11  City ever made any proposals to you concerning
12  firefighter salaries or employment conditions?
13    A.  Yes, sir.
14    Q.  As I understand it, Mr. Roberts, the fire
15  chief here in the city reports and is accountable to
16  you as the city manager; is that correct?
17    A.  Yes, sir.
18    Q.  Does the fire chief have the right, if he
19  wanted to, to bypass you as the city manager and
20  address the city council on issues that he may
21  consider important in the fire department?
22    A.  I'm going to answer this in this way.  I
23  would hope that he wouldn't bypass me.  In a
24  paramilitary organization, you certainly don't want
25  someone subordinate going around you.  I have never

19

1  had that to happen under our tenure.  They're given
2  a chance -- the department heads are given a chance
3  to express their budget shortfalls -- or any
4  department head, not just the fire department -- at
5  proper times.
6    I would also like to add that if there's any
7  problem within any of the departments, I would hope
8  that I would go or either follow the proper
9  procedure to look into what their complaint is or
10  their shortcomings may be.
11    Q.  What would happen if Fire Chief Hunter next
12  month did not discuss an issue with you first but
13  went directly to a city council meeting about a fire
14  department operations issue and spoke to the city
15  council?  Would he be subject to discipline or
16  charged with violating the charter of the city or
17  the Merit System --
18    A.  Well --
19    Q.  -- let me finish -- or the Merit System
20  regulations?
21    A.  Number one, the fire chief and division
22  chiefs are not covered under the Merit System, by
23  Attorney General opinion and, also, you know,
24  they're an at will employee.  They work strictly for
25  me.

20

1    I would hope that I would not have a department
2  head to do that.  If he did, then I would probably
3  take the appropriate actions probably according to
4  what he discussed with them or something of that
5  magnitude.
6    Q.  When you say appropriate action, what would
7  be the range of actions that you could take?
8    A.  You know, it could come down to a
9  counseling or maybe a termination.  It's -- you
10  know, that's hypothetical.
11    Q.  And what is it that might be violated if
12  the chief went directly to the council on an issue
13  affecting the fire department?  Is it a charter code
14  provision or is there something else in writing?
15    A.  No, sir, it's not.  No, it's not.
16    Q.  Under the Merit System rules and
17  regulations, are disciplinary actions such as
18  dismissals from employment subject to review as
19  grievances?
20    A.  I would have to look at -- there are
21  certain ways that we have to do a grievance.  I
22  really need to read the exact procedures that goes
23  in.  Some may be a grievance that's going on within
24  the city that I would act on myself rather than a
25  Personnel Review Board hearing.  Usually anything

**21**

1  that does a disciplinary action should go before the
2  Personnel Review Board unless it's -- maybe they've
3  got a grievance that they had a oral reprimand or
4  something of that nature, then I might get a
5  grievance like that.
6      Q. Let me invite your attention to Exhibit 3,
7  which appears to be excerpts from the city's Merit
8  System's rules and regulations. Section 15.02 says
9  as follows: Quote, disciplinary actions,
10  dismissals, demotions, suspensions, fines,
11  reductions in pay, position classifications, and
12  allocations shall not be subject to review as
13  grievances, end quote. Do you see where it says
14  that?
15     A. I do.
16     Q. Is that an accurate statement?
17     A. It is. It is.
18     Q. So in the case of Mr. Davis and his
19  dismissal, he would not have been able to file any
20  kind of a grievance seeking review, would he?
21     A. To me, no.
22     Q. But to the Personnel Board yes?
23     A. That's correct.
24     Q. Is that considered a grievance or an
25  appeal? Maybe I'm being too technical.

**22**

1      A. I would think it would be an appeal rather
2  than a grievance. An appeal of decision of the
3  department head.
4      Q. Okay. All right. Mr. Roberts, with regard
5  to David Davis, are you aware that he worked for
6  about eight years in the Phenix City Fire
7  Department?
8      A. I am.
9      Q. And are you aware that he was first
10  employed in April of 1998 in the city fire
11  department?
12     A. I know the approximate hire date.
13     Q. And are you aware that Mr. Davis was
14  eventually promoted to the rank of sergeant in the
15  city fire department?
16     A. I am.
17     Q. As city manager, do you have the authority
18  or responsibility to review proposed promotions like
19  in the fire department?
20     A. I do. But as I stated earlier, that's
21  pretty much left up to the department heads or
22  chiefs. I don't get into the business of promotions
23  or anything like that within their areas of
24  responsibility.
25     Q. Do you get into employment evaluations of

**23**

1  their job performance like a firefighter in the city
2  fire department?
3      A. I will sign the total evaluation, the
4  yearly evaluations. But if you're asking me do I
5  read each and every one of them, no, sir, I do not.
6  I think that again is, of course, the first line
7  supervisor, the district chief -- or, in this case,
8  the chief. It's according to how they've got it set
9  up on who evaluates who and what -- in the rank
10  structure.
11     Q. I'm sorry. Did you say you would sign the
12  evaluations?
13     A. I think at the bottom of the evaluation
14  form, there's a signature block that I sign and I
15  think that's primarily for pay purposes anyway. But
16  I sign a lot of them every year, it appears.
17     Q. Let me show you -- I guess we can identify
18  this as Exhibit 34. And I don't have it in the
19  binder, sir, because I just got it this morning, at
20  least an additional copy. And this appears to be a
21  Performance Appraisal by the city fire department of
22  David Davis for the evaluation year 2003 to 2004.
23  And it does look like you have -- well, no, I don't
24  think you have. You weren't city manager then, were
25  you?

**24**

1      A. No, sir. I was -- unfortunately, I was
2  away.
3      Q. Well, there's -- somebody signed it there
4  as city manager. Can you make out the name or the
5  signature on that?
6      A. Max Wilkes.
7      Q. Was he the previous city manager?
8      A. He was my interim city manager. I
9  appointed him as an interim when I was gone half a
10  year.
11     Q. Let me invite your attention to
12  Exhibit 18. And as you're looking at that, I want
13  you to take as much time as you need, Mr. Roberts,
14  to review these documents before you feel
15  comfortable in answering my questions.
16     This is a memo from Roy Waters, Deputy Chief in
17  the city's fire department, to Wallace Hunter, the
18  fire chief, dated February 6, 2006, concerning the
19  subject of, quote, letter to Mr. H.H. Roberts, end
20  quote. You see where it says that?
21     A. I do, yes, sir.
22     Q. Have you seen this document before today?
23     A. Yes, sir. I read this memo.
24     Q. You do what?
25     A. I've read the memo.

25

1  Q. Okay. I want to invite your attention to
2  the last sentence at the bottom of the memo where it
3  says, quote -- and this is Deputy Chief Waters
4  addressing Mr. Hunter -- quote, as I have
5  communicated to you on several occasions, David
6  Davis is doing an outstanding job for me and has a
7  very positive and professional attitude, end quote.
8  Do you see where it says that?
9  A. I do.
10  Q. As far as you know, sir, as the city
11  manager, is that a fair and accurate statement
12  concerning Mr. Davis and his job performance as a
13  sergeant?
14  A. As not being a first line supervisor
15  knowing his day-to-day activities, I would accept
16  the fact that the chief made an evaluation of him
17  and I would not disagree with it.
18  Q. So you don't have any information or facts
19  as the city manager to disagree with that statement
20  within the fire department that Davis is doing an
21  outstanding job and has a very positive and
22  professional attitude?
23  A. I wouldn't have any day-to-day knowledge of
24  that, no.
25  Q. When you were coming up for consideration

26

1  to be appointed as city manager, do you know if the
2  firefighters' local labor organization took a
3  position that you should be city manager or took a
4  position that you should not be city manager?
5  A. Sir, when I was appointed city manager in
6  2002, it was on an interim basis for 2001 by a prior
7  administration. And I was not here when the
8  appointments were made at this time. I already held
9  the position. And I assumed that by federal laws I
10  would have had my job back anyway when I returned.
11  So I do not know anything about any of that.
12  Q. Okay. So you don't know whether or not the
13  firefighters' labor association --
14  A. No, sir, I do not.
15  Q. -- supported your appointment as city
16  manager?
17  A. I do not. And when I say that, I don't
18  know whether they did or whether they didn't.
19  Q. Right. Now, I think you started to
20  indicate earlier that there was at least one
21  occasion, perhaps more, where you met with the
22  firefighters' local union and perhaps a
23  representative of the International Association of
24  Firefighters?
25  A. We met in this office here. I never went

27

1  to a local meeting. And I -- I think his name is
2  Malone was the first gentleman that came down here.
3  Basically, he talked with me and Mr. Davis about
4  some complaints that Mr. Davis -- or let me not say
5  Mr. Davis per se -- let me say the local union had
6  concerning staffing, morale, equipment, and things
7  of that nature.
8  At that time, I pretty much was emphatic that
9  Sergeant Davis should go to his fire chief and
10  discuss those issues with him, which was at that
11  time Chief Prater. They had that meeting.
12  Basically, I don't think it was a good outcome.
13  Q. Okay. Before we get to the follow-up
14  meeting, let's go back to the earlier meeting that
15  you say you had in this building with Mr. Davis and
16  Mr. Malone from the IAFF.
17  A. And I may add, I believe Mr. Dennis Duty
18  was still the president of the local at that time
19  and was in attendance as well. And my memory may
20  not be that well, you know, but I do think there was
21  more than just Sergeant Davis, myself, and Malone.
22  Q. Do you know at that time if Mr. Davis was a
23  vice-president of the local firefighters' union?
24  A. I would have to say I did. I mean, that
25  would make sense.

28

1  Q. And, I guess, did they call you up ahead of
2  time and say, Mr. Roberts --
3  A. Yes, sir, they did.
4  Q. -- we would like to come over, have a
5  meeting?
6  A. Yes, sir.
7  Q. You agreed and scheduled the meeting, then
8  came and you sat here; is that correct?
9  A. That's right.
10  Q. Did they give you any documents at that
11  time, any proposals? Or was it just --
12  A. Yes, sir. I'm going to use the word
13  laundry list, because that's basically what it was,
14  some things that they felt needed to be addressed
15  within the fire department.
16  Q. And roughly how long was the meeting?
17  A. Probably less than an hour. Right around
18  an hour.
19  Q. Okay. And how did the meeting end up as
20  you recall?
21  A. I thought it was on a pretty positive note.
22  Q. Did they raise some issues that you thought
23  should be addressed and resolved?
24  A. And I believe that the issues they brought
25  up have been addressed and some are still pending.

29

1    Q. Can you remember, as an example, some of
2 the issues that they raised in this meeting that you
3 felt were legitimate and should be looked into and
4 addressed?
5    A. Well, there's been a couple of things
6 that's been brought up. The 8-hour shifts for one.
7 I have personally felt that a 8-hour shift or a
8 12-hour shift or Panama shift may have worked better
9 than a 24-hour shift. Some fire departments do
10 that. After research and finding out, we found that
11 we were wrong on an 8-hour shift. Had nothing to do
12 with anything else.
13    Then I looked at a 12-hour Panama shift like
14 they have some of these police officers work. That
15 probably would not work as well as what we've got
16 now, so we chose to keep the shift structure as it
17 is now. So I felt like that portion of their agenda
18 was addressed.
19    Q. Okay. Anything else that you can remember,
20 issues they raised that you --
21    A. Equipment. I think that -- the equipment
22 issue or the safety problems.
23    Q. Safety of the firefighters you mean?
24    A. Yes. I'm talking about the breathing
25 apparatuses and vehicles themselves, the fire

30

1 apparatus themselves. I think we have moved
2 forward, and both -- Chief Hunter especially is down
3 here constantly looking for ways to buy equipment
4 and added resources for these firefighters not only
5 to, you know, fight a fire, but also in the training
6 process, which is a daily ongoing item. And I think
7 we have addressed those needs.
8    Q. Okay. So I'm clear on this, in this
9 meeting that you had with Mr. Malone from the IAFF,
10 and Mr. Duty and Mr. Davis from the local labor
11 association of firefighters, you recall that one of
12 the items that they addressed with you at that
13 meeting involved fire equipment on the subject of
14 safety of the firefighters and, in particular, I
15 guess you recall their expressing concerns about the
16 self contained breathing apparatus; is that correct?
17    A. That's correct.
18    Q. Anything else that you can remember off the
19 top of your head of the issues they raised of
20 concern?
21    A. A separate meeting came about that dealt
22 with their swap time. And Chief Prater came to me
3 shortly after I returned from active duty concerning
24 swap time. The swap time was removed. The problem
25 we were having with swap time was more of an

31

1 accounting/insurance issue than anything more so.
2    For instance, we had one firefighter -- and I
3 do not remember his name -- was injured or was sick
4 when he was actually pulling swap time for someone
5 else and workers' comp wouldn't pay the claim. So,
6 you know, we had to work some procedures out. And
7 Chief Hunter aggressively worked on that ever since
8 he was appointed chief. And when Assistant Chief
9 Waters came on board, they, along with the personnel
10 director and the insurance side of the house, felt
11 that they had it in line to where we could put the
12 swap time back in.
13    Q. Okay. Any other issues or have I exhausted
14 your memory that were raised by Davis, Duty, and
15 Malone at your meeting?
16    A. The staffing issue.
17    Q. What was that about that they raised?
18    A. You know, everybody would like to go by
19 NFPA standards of -- what is it -- 2010 or 2008?
20 Whichever it is.
21    Q. 1710.
22    A. It's 1710, 1708.
23    Q. Two in, two out policy?
24    A. Sir?
25    Q. Two in, two out policy?

32

1    A. Yes, sir. However, most cities -- city
2 governments and most managers in these United States
3 are against it. And if you talk about it in a city
4 managers' meeting, you see that they're not against
5 it, per se, for fire safety; it's the cost that it
6 costs the city to go into it. We cannot afford
7 staffing like that.
8    But we have increased staffing, and I think
9 that that's one of the main things. Not only the
10 fire department. We have increased staffing in the
11 police department as well. So, you know, I try to
12 keep a equal balance between those two. So I do
13 think we have tried to address those issues.
14    Q. That was an issue that was also raised by
15 Mr. Davis, Mr. Duty, and Mr. Malone with you at the
16 meeting?
17    A. That's right.
18    Q. Any other issues that you haven't already
19 mentioned that they raised at that meeting?
20    A. Morale. But I don't -- I think morale
21 right now is going real good. It appears to be.
22    Q. But they raised the concerns?
23    A. They talked about morale. You know, as a
24 manager, you know, you can talk to your department
25 heads. But, you know, your morale in a group of

33

1  men, whether it be, you know, with a infantry firing
2  squad or whether it be with a fire department, any
3  paramilitary organization, your front line
4  supervisors control. They control the morale of the
5  men.
6      And, usually, morale is high when you have good
7  intensive training and they're occupied. And it's
8  not necessarily that you give them everything they
9  want to keep good morale, but you give them the
10 necessary tools to do their job. And I think that
11 that portion has been addressed now. That's about
12 all that I know.
13     (Mr. McKoon entered the deposition room.)
14     Q. But you do recall that Davis and Duty and
15 Mr. Malone raised the issue of employee morale in
16 the fire department at this meeting that you have
17 been describing?
18     A. I do.
19     Q. We've talked about five or six items that
20 they raised. Anything else you can remember they
21 addressed at the meeting?
22     A. Not off the top of my head, I can't.
23     Q. Fair enough. And was it your
24 understanding -- you may have testified to this
25 already -- that those three gentlemen -- Davis, Duty

34

1  and Mr. Malone -- were wanting to meet with you to
2  address these issues in their role as or in their
3  capacity as labor association representatives?
4      A. Yes, sir. But I also believe this. It may
5  be in their role, but I also know they are Phenix
6  City Firefighters 24 hours a day, 7 days a week in
7  my opinion.
8      Q. I'm sorry. I didn't understand what you
9  mean.
10     A. I know they were wanting to address me as a
11 labor organization, but I also know they are
12 employees and employees as firefighters, which I
13 think are 7-day-a-week, 24-hour-a-day jobs.
14     Q. Yes. Do you recall if Mr. Davis and
15 Mr. Duty were on their shift schedule or off duty
16 when they had the meeting with you?
17     A. I don't know about Mr. Davis, Sergeant
18 Davis here. But I do know that Mr. Duty was not
19 employed by the city at that time.
20     Q. At that time he was gone?
21     A. Yes, sir.
22     Q. Okay. Now either during or shortly after
23 that meeting, particularly involving Mr. Davis, did
24 you consider that he was violating the chain of
25 command or the Merit System rules and regulations

35

1  when he asked to meet with you for that almost an
2  hour meeting and address these issues?
3      A. Well, it went through Chief Prater and I
4  agreed to it.
5      Q. So earlier he got permission, Mr. Davis
6  did, to meet with you?
7      A. And I believe Chief Prater talked with me
8  and then I believe Malone called me to get the
9  proper sequence. I don't remember the exact
10 sequence.
11     Q. Let me invite your attention --
12     A. But I did not ask the chief to come over
13 here to the meeting.
14     Q. You did not?
15     A. No. But I think I instructed him, once we
16 left here, to take their complaints to the chief. I
17 felt like that was --
18     Q. Was there a reason why you did not --
19     THE REPORTER: Whoa, whoa, whoa. I didn't
20 hear the end of your answer.
21     A. I felt like it was the chief's job, Chief
22 Prater, to handle the complaint, see if he could
23 handle it prior to it coming back to me.
24     Q. Did you give consideration to inviting
25 Chief Prater to come over and participate in this

36

1  meeting that we've been describing?
2      A. I did, but I chose not to.
3      Q. Why was that?
4      A. I felt like I wanted to hear the complaint
5  myself and keep an open view, so to speak.
6      Q. Keep a what?
7      A. An open view.
8      Q. Let me invite your attention, Mr. Roberts,
9  to Exhibit 11 in front of you. This is a memorandum
10 from David Davis in his capacity as vice-president
11 at the time of Local 3668, the Phenix City
12 Firefighters Association, dated January 25, 2005,
13 and addressed to Chief Jerry Prater. Have you seen
14 this document before today?
15     A. I have.
16     Q. Was this the so-called laundry list that
17 you described earlier that was given to you either
18 before or during the meeting you had with Davis,
19 Duty, and Malone?
20     A. It is.
21     Q. Some of these issues you've already
22 addressed. In your one-hour meeting, were they able
23 to go right down each and every item and cover all
24 of them?
25     A. I don't think they did. I think they went

37

1  over a synopsis of the group.
2      Q.  And at the end of the meeting, did you
3  suggest to these three gentlemen -- Davis, Duty and
4  Malone -- that they follow up directly with Chief
5  Prater?
6      A.  I think I asked for Sergeant Davis to talk
7  with Chief Prater.
8      Q.  And were you contemplating at the time that
9  Davis would talk to Chief Prater again in his
10  capacity as a local union representative?
11      A.  Either/or.  It didn't matter to me which.
12  I think either one of them, whether he be a local
13  member or whether he be any other firefighter, if
14  he's got some concerns, then I think he needs to
15  bring it through the chain and let the chief handle
16  it.
17      Q.  Now, did you expect or instruct Mr. Davis
18  to go to his immediate officer, perhaps his captain,
19  and up the chain of command before he --
20      A.  Not to my knowledge.  I don't remember
21  doing that.
22      Q.  So you suggested Mr. Davis could go
23  directly to Chief Prater?
24      A.  I emphatically said that he needed to take
25  this up with Chief Prater.

38

1      Q.  Okay.  Fair enough.  Let me invite your
2  attention to Exhibit 12, which appears to be a
3  letter from Thomas Malone as a field service
4  representative of the IAFF dated March 7, 2005,
5  addressed to yourself.  Do you recall having
6  received this letter from Mr. Malone?
7      A.  I do.
8      Q.  And, again, like with all these documents,
9  if you want to take a moment to completely read it,
10  just let me know that you want to do that.
11      A.  I would like to do that and brief myself.
12      Q.  Sure.
13      MR. GRAHAM:  Let's go off the record.
14  (Discussion held off the record.)
15      MR. WOODLEY:  Back on the record.
16      Q.  Exhibit 12, you've had a chance now, Mr.
17  Roberts, to read to yourself this letter Mr. Malone
18  sent to you on March 7, 2005; is that correct?
19      A.  That's correct.
20      Q.  And he's describing a meeting that
21  apparently he and Davis had with Chief Prater; is
22  that correct?
23      A.  It's my understanding that it's a meeting
24  between Sergeant Davis and Chief Prater.
25      Q.  Who?

39

1      A.  Sergeant Davis and Chief Prater.  I don't
2  believe Mr. Malone was present.
3      Q.  Okay.  And would this have been the
4  follow-up meeting that you were suggesting to Davis
5  and Duty and Malone that they follow up and meet
6  with Prater?
7      A.  I would assume that it would be, due to the
8  date on the letter.
9      Q.  Now, obviously, Mr. Malone is expressing
10  his concerns that it was not a productive meeting
11  that was held involving Chief Prater and David Davis
12  and himself, Mr. Malone.  And he mentions to you in
13  his letter that they felt like there were threats
14  and intimidation and -- you see where it says all of
15  that?
16      A.  I do.
17      Q.  Did you take any follow-up action when you
18  received this letter and the concerns expressed
19  about it?
20      A.  I talked with Chief Prater about the
21  letter.
22      Q.  What did you discuss with him?
23      A.  He expressed that he had talked with
24  Mr. Davis about the request and basically that was
25  it, to a degree.  And by that, I mean we didn't go

40

1  indepth as to his answers.
2      Q.  Mr. Malone indicates that the meeting that
3  he had with the chief and, apparently, also
4  Personnel Director Goodwin lasted only about 10
5  minutes.  Was that your understanding?
6      A.  That's my understanding of his letter, yes.
7      Q.  That was a lot less than the length of time
8  that you met with him?
9      A.  If the timing is right, it is less.
10      Q.  Do you think that may be a bit brief to
11  have a constructive meeting addressing issues and
12  concerns?
13      A.  Not being in the tone of the meeting, I
14  wouldn't -- I wouldn't think it was enough time.
15  But according to Mr. Malone's letter, I don't know
16  that it may have been a good meeting.  Appears to
17  have been a bad meeting as I stated earlier.
18      Q.  And did Chief Prater report back to you
19  about the nature of the meeting he had on the
20  subject?
21      A.  As I stated earlier, it was my
22  understanding it was not a good meeting.
23      Q.  And that's what Prater reported back to
24  you?
25      A.  Basically, yes.

41

1    Q.  Do you know if any other follow-up meetings
2  were scheduled?
3    A.  Not to my knowledge that he did.
4    Q.  That was pretty much the end of the matter?
5    A.  As far as I know, that was as far as it
6  went at that time.
7    Q.  Okay.  Turn now to Exhibit 13, which
8  appears to be a letter from yourself addressed back
9  to Mr. Malone dated March 15, 2005.  I take it
10  that's your signature at the bottom of the letter?
11    A.  Yes, sir, it is.
12    Q.  And then you indicated that you were
13  responding to Mr. Malone, and you also state that
14  the city does not recognize your union and is not
15  required by law to do so.
16    A.  To bargain with.  To bargain, collectively
17  bargain with.
18    Q.  It does say recognize.  Is there a
19  difference between recognize and then you go on to
20  say will not enter into negotiations with the union?
21    A.  We're not going to enter into negotiations
22  as to salary or anything.  I think the Alabama law
23  is pretty explicit that we have to recognize the
24  union body as a local, and they can talk to us on
25  the issues as stated in state law, such as safety,

42

1  manning, and things of that nature.
2    Q.  Was it your understanding, again just so
3  it's clear in my mind, that when Mr. Davis was
4  sitting down with Mr. Malone and meeting with Chief
5  Jerry Prater, that Mr. Davis was meeting in his
6  capacity as a local firefighters' association
7  representative or officer?
8    A.  Let me back up.  I don't think Mr. Malone
9  was at this meeting with Mr. Davis and Chief Prater,
10  the way I understand it.  Now, did he get them on
11  duty and talk with them?  Yes, sir.  I think that
12  you can be an officer in the labor organization of
13  the International Association of Firefighters and
14  you can still talk about the same issues that we're
15  discussing the state law whether you're on or off
16  duty.
17    Q.  Okay.
18    A.  You know, with the chief, that's --
19    Q.  Fair enough.  Now, at the end of your
20  letter to Mr. Malone, which again is Exhibit 13, you
21  indicate you would be glad to do a follow-up meeting
22  on these various issues.  Was such a meeting ever
23  held?
24    A.  I never heard from Mr. Malone for another
25  meeting.

43

1    Q.  All right.
2    A.  That I can recall.  Let me add that.
3    Q.  Have you ever had occasion where a city
4  employee has come to you directly as a city manager
5  and expressed concerns about issues that involve the
6  individual's employment or department?
7    A.  Yes, sir, I have.
8    Q.  More than once?
9    A.  Yes, sir, I have.
10    Q.  Do you have an open door policy where city
11  employees can come in and talk to you?
12    A.  Not so much as that.  I like for them to go
13  through their chain.  I believe there's a chain of
14  command, and I am military, so -- but anytime
15  they'll stop me on the yard or something and ask me
16  a question, I do my best to answer it in a good
17  answer.  But I'll also tell them they need to take
18  that up to their department head.  The reason for
19  that is if it deals with the Merit System, as
20  happened in this case, I'm the one that has to sit
21  in on the review board.  And rather than make a
22  call, I would rather hear everything at one time.
23    Q.  Can you recall occasions where a
24  firefighter working for the city's fire department
25  has talked to you about issues affecting the

44

1  department?
2    A.  I have.
3    Q.  And who would that have been?
4    A.  I've had several of them.
5    Q.  Who were they?
6    A.  I've talked as much as lately to -- not
7  lately.  When I was in the guard.  Gosh.  I can't
8  think of his name right now.  He's a captain today.
9  But I've talked with several firefighters.
10    Q.  Were you a city manager at the time?
11    A.  Yes, sir.  Also was commanding officer in
12  the National Guard.
13    Q.  You can't remember the individual's name
14  though?
15    A.  Yes.  I'll think of it in just a second.
16  If you want to go off the record, I'll find out
17  right quick.
18    Q.  Sure.  We can go off the record.
19  (Discussion held off the record.)
20    MR. WOODLEY:  Let's go back on the record.
21    Q.  You remember the individual firefighter's
22  name that came to you about it?
23    A.  I do now.  Carl Taylorson.
24    Q.  How long ago was that roughly?
25    A.  It would have to have been around two years

45

1  ago, over a year ago. I have been retired for
2  approximately a year now.
3      Q. And what was the issue of concern that he
4  had on his mind that he discussed with you?
5      A. Carl spoke of some of the same issues, you
6  know, as it relates to morale and equipment. And I
7  think that those items have been addressed, just as
8  I instructed Carl to talk to Chief Hunter.
9      Q. Do you know if he was a union member at the
10  time?
11      A. Yes, he was.
12      Q. And where was this conversation?
13      A. National Guard Armory.
14      Q. And how long did the conversation take
15  place, roughly?
16      A. Not very long. I'm going to say five, ten
17  minutes at the most.
18      Q. And did he address, on this occasion,
19  staffing?
20      A. I don't know that he addressed all the
21  issues.
22      Q. Did he address employee morale?
23      A. He addressed the morale.
24      Q. What about swap time?
25      A. No. I think -- no. He may have now. We

46

1  got the swap time, I think, straight a year ago,
2  something like that.
3      Q. In this conversation, did he address
4  staffing or equipment or firefighter safety?
5      A. He talked some of the staffing and of the
6  equipment.
7      Q. So how did that conversation end? Did you
8  say you were going to look into it or did you
9  suggest that he follow up --
10      A. I told him I think I understood some of his
11  concerns.
12      Q. And did you do anything after that?
13      A. No, sir. We were already working on it.
14      Q. So you didn't communicate with any chief
15  officer in the fire department about this
16  conversation?
17      A. No, sir. I don't go straight to the chief
18  officer. I talk to the chiefs. You know, when it
19  comes down to that, I'll listen to any employee that
20  wants to talk to me, but I'm going to go back to
21  that department head.
22      Q. And this gentleman was named Taylor?
23      A. Taylorson. Carl Taylorson.
24      Q. Carl Taylorson?
25      A. He was a driver/engineer at the time, I

47

1  think.
2      Q. And a union member at the time?
3      A. Yes, sir.
4      Q. Did you consider Carl Taylorson to have
5  violated the Merit System's rules and regulations
6  about chain of command when he addressed these
7  directly to you?
8      A. Not really. Not in the manner that he did
9  that, no, I did not.
10      Q. When you say not in the manner, why? What
11  do you mean by that?
12      A. I instigated the conversation. I asked him
13  how things were going at the fire department. I
14  think when you do that, you open the door.
15      Q. Okay. So he was never charged or
16  disciplined for discussing it with you, was he?
17      A. No, sir.
18      Q. Were there any other individuals -- I think
19  you mentioned there were several firefighters.
20      A. I've had a lot of firefighters -- I know a
21  lot of them out there, and a lot of them will talk
22  to me. But as far as me giving them a yes or no
23  answer, I don't do that.
24      Q. Do you know if firefighters have talked
25  directly to city council members about issues of

48

1  concern to them that are going on in the fire
2  department, whether it's firefighter health and
3  safety, staffing, equipment?
4      A. That would be hearsay, and I would not know
5  of -- I don't like to testify like that. I don't
6  know of any direct contact. I know what I have
7  heard, and I cannot testify to that.
8      Q. Well, there's no rules preventing you from
9  testifying.
10      A. Well, I've heard that they have talked with
11  them.
12      Q. I'm sorry?
13      A. I've heard they've talked with them, yes,
14  sir.
15      Q. Have talked with the city council members?
16      A. Yes, sir.
17      Q. Do you know if Mr. Davis has spoken to city
18  council members about issues?
19      A. I know they have, yes, sir.
20      Q. How do you know that?
21      A. Well, I have had a conversation with both
22  Councilman Bush and, of course, Mayor Hardin.
23      Q. And what's the substance of that?
24  Mr. Davis's communications about issues of concerns
25  that --

49

1    A.  Well, as far as the mayor goes, I
2  understand that he told me about going to a
3  retirement supper, or luncheon one, for Todd Boatner
4  with the firefighters.  And Councilman Bush has
5  mentioned the operation of the fire department a
6  couple times to me.
7    Q.  Okay.  But your understanding is that Davis
8  has raised those issues?
9    A.  Well, yes.  I understand that Sergeant
10  Davis and Councilman Bush's brother are real -- are
11  good friends or know one another or are
12  acquaintances.
13    Q.  Okay.  Do you recall any other discussions
14  Mayor Hardin may have had with firefighters about
15  issues of concern in the fire department?
16    A.  Not to my knowledge.
17    Q.  Okay.  Any other individual firefighters
18  other than Taylorson that you can recall discussed
19  issues of concern in the fire department with you?
20    A.  Not by name, I do not.
21    Q.  But there have been other firefighters?
22    A.  There have been other firefighters, yes,
23  sir.
24    Q.  Did you ever follow up in trying to get
25  them charged with discipline for deviating from the

50

1  chain of command or the Merit System's --
2    A.  I did not.
3    Q.  -- rules?  You're going to have to let me
4  finish my questions before you begin your answer.
5  Do you understand that?
6    A.  I understand.
7    Q.  Let me invite your attention to
8  Exhibit 14.  And this appears to be a newspaper
9  article.  My understanding, it's the Columbus
10  Ledger-Enquirer and I believe it's an article that
11  came out in September 2005.  Does this look familiar
12  to you?
13    A.  I've read the article, yes, sir.
14    Q.  Okay.  And when you read this newspaper
15  article at that time, what was your reaction to it
16  as a city manager?
17    A.  How do you mean reaction?
18    Q.  Were you upset?  Were you annoyed?  Were
19  you going to take some action in response to the
20  article?
21    A.  Not in response to the article, no.  Was I
22  annoyed or upset?
23    Q.  Yes.
24    A.  Anytime anything happens to the city,
25  whether it be with any department, you hate for it

51

1  to get in the paper.
2    Q.  I'm sorry.  What?
3    A.  Anytime anything happens to the city, you
4  hate for it to get in the paper.
5    Q.  Bad publicity?
6    A.  That's -- total concept, yes, sir.
7    Q.  So is it fair to say you were annoyed and
8  upset about the substance of this article?
9    A.  I think you could say that we were annoyed
10  by it.
11    Q.  Okay.  So after you read it and you were
12  annoyed, did you do anything with the fire
13  department or the chief over there?  Talk to them?
14    A.  Well, I think -- I don't know whether I
15  talked with Wallace the next -- this was on a
16  weekend, if I remember right.  I believe this was on
17  a weekend.  I don't know whether I talked with him
18  on Monday or Tuesday and, you know, verified some of
19  the things, and we talked about the article in just
20  general terms.  That was it.  I do not get into the
21  day-to-day operations unless they ask me to -- of
22  any department.
23    Q.  I understand.  When you discussed this with
24  Chief Hunter, this article and the substance and the
25  comments, did you give any instructions to Chief

52

1  Hunter to do anything specifically?
2    A.  I think Chief Hunter informed me that he
3  was planning on doing an investigation or something
4  to that effect.  And I think my instructions to
5  Chief Hunter is to be sure you check with the city
6  attorney to make sure that you're on solid legal
7  ground on whatever outcome.
8    Q.  And what kind of investigation was Chief
9  Hunter contemplating?
10    A.  I have no idea.
11    Q.  You didn't ask him?
12    A.  No, sir.  I did not.
13    Q.  Okay.  Some of the comments made in this
14  newspaper article were from, of course, David
15  Davis.  In part, you'll see there in the second
16  column he was quoted as saying, morale is at the
17  lowest point since I have been here in the fire
18  department.  And they list him as the president of
19  the Phenix City Firefighters' Association.  When you
20  read that, did that trouble you or cause you to
21  contact Chief Hunter and explore the morale
22  situation in the fire department?
23    A.  No, sir.  I've already heard that
24  complaint.
25    Q.  Were you at all concerned that the chief,

53

1 Chief Hunter, was not doing anything about the
2 morale? Because it seems like it's a continuing
3 concern.
4    A. The morale issue is a rollover not just
5 from Chief Prater or Chief Hunter. It was a
6 rollover from a prior chief as well. This
7 department has been on a uphill struggle since the
8 '90s. And I think we are on a positive path to
9 correct that now. And that's what we've been
10 working on since I returned.
11    Q. Why do you think the morale has been such a
12 problem for such a long period of time in the city
13 fire department?
14    A. You know, not being a -- I don't know. I
15 really don't know how to answer that. I know it's
16 been a ongoing problem. I think we are trying to
17 correct any problems as far as equipment. But there
18 again, I go back down to the basic statement I made
19 while ago; that the first line supervisor and the
20 way he works his people and trains his people has a
21 great amount to do with the morale of any department
22 in communications through up to your chief.
23    Q. You'll notice in this article that the
24 subject was also addressed about understaffing. In
25 other words, apparently there were 51 slots or spots

54

1 in the fire department and only 44 were filled.
2 When you saw that, did that cause you to raise that
3 issue as a concern?
4    A. No, it did not, because there again, as
5 I've talked with you before and as Sergeant Davis
6 and them knew, that we were looking at hiring
7 people. You do have budget restraints and we were
8 able to combat any fire or any emergency that came
9 about. However, you did have firefighters that had
10 to work over.
11    Q. Later in the article, Mr. Davis indicates,
12 quote, we are reluctant to talk because of
13 significant fear of retaliation, being disciplined,
14 or fired, end quote.
15    A. Sir, I've been working for this city for 34
16 years. And whether it be a council or commission
17 form of government, there's never been any
18 intimidation or threat of firing or termination that
19 I know about.
20    Q. So you don't -- I guess you would not have
21 an explanation as to why Mr. Davis and several of
22 the other firefighters expressed that concern about
23 retaliation?
24    A. You know -- no, I don't. I think it's
25 unjustified.

55

1    Q. Do you know of a Sergeant Ann Land?
2    A. I do know.
3    Q. You do know her?
4    A. Yes, sir, I do.
5    Q. And I guess you're aware, because you read
6 this article, that she made a comment about the view
7 of the city's fire department is if you don't like
8 the job, you can leave it.
9    A. I read that.
10    Q. Did that trouble you or cause you to take
11 any remedial action?
12    A. I did not.
13    Q. Okay. Then there's a quote in here on the
14 third page. And there's some overlap in this
15 particular version of this newspaper article, but
16 there is a quote in here from Mr. McKoon: Quote,
17 the last three fire chiefs have tried to reason and
18 have been out of a job, McKoon said; my advice is to
19 run this thing like you are a drill sergeant on
20 Parris Island, end quote.
21    Do you see where it says that?
22    A. I do.
23    Q. Did you ever receive that kind of advice or
24 input?
25    MR. MCKOON: With all due respect, I don't

56

1 think that's the end of the quote, but --
2    MR. WOODLEY: Well, it goes on to say,
3 everybody at the top can't be wrong. Is that
4 what you mean?
5    MR. MCKOON: Yes.
6    MR. WOODLEY: That's the end of it.
7    Q. Did you ever have a conversation with
8 Mr. McKoon about running the fire department like a
9 drill sergeant at Parris Island?
10    A. No, sir, but I believe the fire department,
11 police department, and any law enforcement
12 organization has to be run in a military manner --
13 or a paramilitary manner, excuse me. And that
14 includes the chain of command.
15    Q. Do you think firefighters should be treated
16 the same as Marines?
17    A. I think they should be disciplined. A
18 Marine makes a good firefighter, sir.
19    Q. Now, it also indicates that Council Member
20 Ray Bush -- and I take it you know who he is, right?
21    A. Yes, sir.
22    Q. And you're laughing now. Is he a friend of
23 yours or an enemy?
24    A. He's a good -- he's a friend.
25    Q. Friend? Apparently, he tried to

57

1  participate in these disagreements among the
2  firefighters and their union and the city and tried
3  to mediate, as it says in the article, those
4  differences. Are you aware of that?
5      A. I read that in the article. I'm not aware
6  of that.
7      Q. Did you have any discussions with Mr. Bush
8  as a council member about these issues?
9      A. As a mediator, no.
10     Q. How about in general of these issues of
11  concerns at the fire department?
12     A. As I stated earlier, he's mentioned the
13  fire department a couple times and their issues.
14  And I've always told him that they were being worked
15  on.
16     Q. Did you think Council Member Bush was
17  acting out of line or outside his authority when
18  apparently he was trying to serve as a mediator on
19  these differences?
20     A. If he's trying to serve as a mediator, I
21  do, yes, sir, without council approval.
22     Q. Has Mr. Bush ever been told that he was
23  acting outside his authority?
24     A. I've never told him that.
25     Q. Do you know if he's ever been told that by

58

1  anybody else?
2      A. I have not. He was one of the authors of
3  this charter.
4      Q. And then you'll see a series of other
5  articles and letters to the editor about various
6  issues of concern within the fire department about
7  morale and swap time and other issues. I take it
8  you had the chance to read those letters to the
9  editor as well, correct?
10     A. I have not read every letter in the -- or
11  every article in the Ledger, but I've read the
12  majority of them, sir.
13     Q. So just to put this in context, after you
14  read that initial newspaper article in September
15  2005, you had a discussion with Chief Hunter, and
16  your understanding is that he was going to
17  investigate the matter; is that basically true?
18     A. That's basically what happened. I mean,
19  there was nothing new in the article that we did not
20  already know.
21     Q. Did you learn subsequently that after Chief
22  Hunter conducted his investigation on the issues and
23  individuals who were quoted in that newspaper
24  article, that he and the fire department issued a
25  counseling form to Mr. Davis?

59

1      A. I was.
2      Q. Why don't you look at Exhibit 16? This
3  appears to be that counseling form issued by the
4  fire department against David Davis, and it's dated
5  September 21, 2005. And I take it that would have
6  been shortly after that newspaper article; is that
7  about right?
8      A. I would have to look at the article, but I
9  assume it would be, too.
10     Q. You'll note in the first sentence this
11  counseling form says, quote, Sergeant David Davis
12  was counseled by Chief Hunter and Assistant Chief
13  Johanson on the 20th of September 2005 concerning
14  him making or publishing statements to the local
15  media, end quote. Do you understand that that was a
16  reference to that earlier newspaper article that we
17  spent a lot of time on?
18     A. It could have been to several media
19  statements. There's others put out other than
20  that. But that would be a fair statement to assume.
21     Q. Were you given a copy of this counseling
22  form?
23     A. I do not keep a copy of them, no, sir.
24     Q. But do you remember being given a copy of
25  this one?

60

1      A. No.
2      Q. You don't have to approve these, do you?
3      A. No.
4      Q. Did you ever discuss with Chief Hunter or
5  Assistant Chief Johanson why they issued this
6  counseling form to Davis?
7      A. No, sir, I didn't. I would assume it would
8  have been, though, by Merit System rules and
9  regulations or either their SOPs, whichever they
10  used at that particular time.
11     Q. And what are you referring to there?
12     A. SOPs?
13     Q. In the context of this communication with
14  local media.
15     A. Either it's going to be a Merit System
16  violation or one of their standard operating
17  procedure violations. Of course, the Merit System
18  will override any of their standard operating
19  procedures.
20     Q. You'll have to enlighten me. Explain how
21  Mr. Davis's communication with the local media and,
22  in particular, his comments in this newspaper
23  article --
24     A. I believe --
25     Q. You have to let me finish. I'm sorry.

61

1  Please explain to me, Mr. Roberts, how the
2  communications and comments that Mr. Davis made in
3  that newspaper article we were just discussing would
4  violate the Merit System rules and regulations or
5  SOPs of the fire department?
6      A.  I would have to look at the rules and
7  regulations of the Merit System and not quote them
8  off the top of my head.  But I believe it will tell
9  you something about talking with the media.  If it
10  is not there, then I would have to to review the
11  SOP, and I do not know the fire or police SOP by
12  heart.
13      Q.  Well, then let's review it.  Exhibit 3,
14  which is an excerpt from the Merit System rules and
15  regulations.  And to shorten this, you may want to
16  look at page 3 of this document, Section 2.054,
17  where it addresses the subject matter of free
18  speech.  And tell me when you're finished reading
19  that section.
20      A.  I've read it, sir.
21      Q.  Is this the section of the Merit System
22  rules and regulations that you were just trying to
23  recall when I was asking you questions about the
24  counseling form that was issued to David Davis?
25      A.  That's correct.

62

1      Q.  Please tell me, if you can, which comments
2  that Mr. Davis made in the newspaper article and was
3  quoted would impair discipline and harmony in the
4  workplace under Section 2.054 of the Merit System
5  rules and regulations?
6      A.  I believe the headline itself as stated,
7  the alarm -- three alarm --
8      Q.  Turmoil?
9      A.  Yes, sir.  I think that's going to cause
10  turmoil in the fire department, because I do not
11  believe a hundred percent of my firefighters or the
12  city's firefighters -- let me correct myself --
13  believes this.  One hundred percent of our
14  firefighters are not disgruntled with their job.
15      And I also believe that it could impede job
16  performance on any negative quote by any city
17  employee in the paper that, you know, that could
18  cause someone to be intimidated against or feel peer
19  pressure from them, such as what's been the case in
20  the fire department.
21      Q.  Okay.  Anything else that would indicate
22  how Mr. Davis's comments in the newspaper article
23  would have impaired the discipline and harmony in
24  the fire department?
25      A.  Not right off the top of my head.

63

1      Q.  Okay.  Same question with regard to the
2  next provision in this free speech section of the
3  Merit System rules and regulations.  Can you give me
4  an example of how Mr. Davis's comments in that
5  newspaper article would impede job performance?
6      A.  Well, it's just like I said.  I think it
7  can -- by peer pressure.
8      Q.  I'm sorry.  What do you mean by that?
9      A.  You know, I -- in organized labor, you
10  know, you can exert some force on nonunion workers,
11  and I think that has been shown to work in all
12  realms, whether it be firefighters, electricians,
13  plumbers, steamfitters, whatever.  And I think some
14  of that, in my opinion, was evident.
15      Q.  Well, do you think Mr. Davis's comment in
16  the newspaper article about poor employee morale in
17  the department, do you think that impeded job
18  performance?
19      A.  I think it could have, yes, sir, I do.
20      Q.  I don't want to know if it could have.  Did
21  it actually?
22      A.  I do, yes.
23      Q.  Could you explain that happening?
24      A.  Well, there --
25      Q.  Or give me examples?

64

1      A.  -- again --
2      THE REPORTER:  I just can't get it down
3  when you're talking over each other.
4      MR. WOODLEY:  We can take a break.
5  (Brief recess.)
6      Q.  Mr. Roberts, I think we were addressing the
7  Section 2.054 of the Merit System rules and
8  regulations concerning the subject of free speech.
9  And I wanted to follow up on those questions by
10  asking you again, in light of the comments that you
11  are aware of that Mr. Davis made in that newspaper
12  article in September 2005, which of those comments,
13  if any, would have impeded job performance by him or
14  others in the fire department?
15      A.  Let me try to answer it this way, see if
16  I -- anything that's going to deal with safety,
17  equipment, morale, the general public don't --
18  they're not familiar with fire department
19  operations.  It gives a bad image in the total
20  concept of the operations, and it's really not a
21  true one, and it doesn't need to be in the paper
22  like that.
23      Q.  Do you think --
24      A.  It should be factual.
25      Q.  Do you think the citizens and members of

65
1 the public have a right to know and receive
2 information about the operations of their fire
3 department?
4    A. If they get the proper perspective they do.
5    Q. And when you say proper perspective, would
6 that be consistent with your personal opinion of the
7 fire department? In other words, whatever the
8 firefighters happen to say should be?
9    A. I think the majority of the operations with
10 the fire department have the true opinions and know
11 what's being done to correct any negatives.
12    Q. Okay. Were there any comments in that
13 newspaper article by Mr. Davis that were untruthful
14 as far as you know?
15    A. I felt like they were.
16    Q. Which ones?
17    A. I think anytime you talk about the
18 staffing. I think the staffing is fine. I think we
19 man the vehicles. I think we man all fire
20 apparatus. I think we man the rescue trucks. I'm
21 not totally convinced -- totally not convinced that
22 the equipment was all that bad. We had some old
23 pieces of equipment; of course, due to budget
24 restraints you don't buy new engine apparatus every
25 day. And, too, the training. Some of the things

66
1 that he talks about in the article to me does impede
2 job performance and, you know, it can touch back on
3 the bottom -- personal loyalty to any of those. I
4 think it could hurt the loyalty of some of your
5 people as it relates to it.
6    Q. Well, sir, I'm not aware that Mr. Davis was
7 quoted, as I read this newspaper article, on the
8 subject of staffing or understaffing or the subject
9 of training. He was quoted as morale being at the
10 lowest that he's seen it in the fire department.
11 And he was quoted again in the article about being
12 concerned about potential fear and retaliation or
13 being disciplined or fired. But I don't see
14 anywhere in this article where Mr. Davis -- excuse
15 me -- was quoted about training or staffing
16 concern.
17    A. Well, I think, number one, he puts it this
18 way; he relates to reluctant to talk of -- let's see
19 how he put it. We're reluctant to talk about it
20 because of fear of retaliation and being disciplined
21 or fired. He's talking about the problems inside
22 the fire department. To me, I'm taking that he's
23 talking about everything we've been discussing,
24 which doesn't, to me, impede job performance, bottom
25 line.

67
1    Q. So your reading into his quote that he's
2 got fear or concern about retaliation or being
3 disciplined or fired, you're reading that as
4 criticism of training and understaffing. Is that
5 what you're telling me?
6    A. I'm reading anything he's saying that's
7 detrimental to the fire department, going back to
8 the complaints throughout the entire course of media
9 publicity is detrimental to the fire department.
10    Q. So bottom line is anytime a firefighter
11 criticizes the fire department and it gets in the
12 media, that's going to be bad for the fire
13 department?
14    A. It could be, yes, sir. It could be -- it
15 could be.
16    Q. And you would consider that wrong on the
17 part of the firefighter and a violation of the Merit
18 System's rules and regulations; is that fair?
19    A. Yes, sir, it is.
20    Q. Let me ask you a series of questions, which
21 you were here when I addressed them with Chief
22 Hunter in his deposition earlier today. Based upon
23 your experience with the city and particularly your
24 capacity as city manager, would it be a violation by
25 a firefighter here in the city -- a violation of the

68
1 Merit System rules and regulations if that
2 firefighter did not follow the so-called chain of
3 command?
4    A. I do. I believe that.
5    Q. Okay. And, specifically, if the
6 firefighter did not follow or pursue the chain of
7 command and spoke directly with the media
8 representative on the subject of inadequate staffing
9 in the fire department, would you consider that to
10 be a violation of the Merit System rules and
11 regulations?
12    A. Yes, sir.
13    Q. Would you consider that firefighter then to
14 be subject to discipline, perhaps firing, as a
15 result?
16    A. I would consider -- I would think that he
17 would fall in whatever category of Merit System
18 offense that was, whether it be termination,
19 suspension, written counseling statement.
20    Q. And, sir, in your capacity as city manager,
21 would a firefighter violate Merit System rules and
22 regulations if he did not follow the chain of
23 command but spoke directly to the media about health
24 and safety of firefighters on the job?
25    A. I do feel that would be a violation of the

69

1 Merit System.
2     Q. And would that individual firefighter then
3 be subject to potential discipline or firing?
4     A. I think so.
5     Q. Same question. Would the firefighter
6 violate the Merit System's rules and regulations and
7 be subject to discipline if he bypassed the chain of
8 command and spoke directly to the media about
9 inadequate protective gear or inadequate fire
10 department equipment and vehicles?
11     A. I feel it's a violation of the Merit
12 System.
13     Q. And that individual be subject to
14 discipline or firing, correct?
15     A. Correct.
16     Q. Would it be a violation of the Merit System
17 rules and regulations if a firefighter bypassed the
18 chain of command and spoke directly to a media
19 representative about concerns he had over response
20 times or inadequate dispatching procedures in the
21 fire department?
22     A. I feel that would be a violation.
23     Q. And would it also be a violation of the
24 Merit System rules and regulations, subjecting a
25 firefighter to discipline or firing, if he bypassed

70

1 the chain of command and spoke directly to a media
2 representative about employee morale in the fire
3 department?
4     A. I feel it would be a violation.
5     Q. Would it also be a violation of the Merit
6 System rules and regulations if a firefighter
7 bypassed the chain of command and spoke directly to
8 a media representative about public safety related
9 to fire department operations?
10     A. I would think so. There are certain
11 procedures on the ground where they've got ways of
12 doing it through the chain.
13     Q. What do you mean specifically by that?
14     A. They have got ways to talk with people and
15 get it to whomever they need to talk with.
16     Q. On all of those subjects I just covered --
17 staffing, health and safety of firefighters,
18 protective gear, equipment in the fire department,
19 morale, safety -- would it be a violation of the
20 Merit System rules and regulations if a firefighter
21 addressed those issues directly with the city
22 council without pursuing it through the the chain of
23 command?
24     A. I think it would be, yes.
25     Q. And would that individual firefighter then

71

1 be subject to discipline or potential firing if he
2 addressed those issues directly with the city
3 council without going through the so-called chain of
4 command?
5     A. I think it would be.
6     Q. Okay. Has that ever happened? Has a
7 firefighter ever gone to a council meeting and stood
8 up and addressed a fire department issue?
9     A. In my 34 years? No, sir. We -- not to my
10 knowledge now. That's -- that's not to say I have
11 been to every council meeting, but there have been
12 times when they would address budget hearings, when
13 the chief would ask some to talk years ago. Now we
14 have our budget hearings, you know, in this room
15 here, and the chiefs present their cases at that
16 time.
17     Q. Have any city police officers and/or
18 representatives of the FOP ever talked directly to
19 the news media about issues of concern in the Police
20 Department?
21     A. Not to my knowledge.
22     Q. Now, going back to Exhibit 15, which is the
23 memo again from Chief Hunter to members of the
24 Phenix City Fire Department dated September 20,
25 2005, is it your understanding that the Chief

72

1 distributed that to all the employees in the city's
2 fire department?
3     A. It was distributed to all the employees of
4 the city.
5     Q. Okay. But this, in particular, looks like
6 it was distributed by Hunter to members of the fire
7 department. Is that your understanding?
8     A. That's correct.
9     Q. Okay. And did he do this with your prior
10 knowledge and approval?
11     A. He did.
12     Q. Okay. And did you authorize a similar memo
13 to be distributed to all City employees?
14     A. Yes, I did.
15     Q. And it required apparently all of the
16 firefighters, as well as all City employees, to sign
17 off that they had received or read this?
18     A. We would like some type of record that they
19 received -- that each one received a copy of this
20 memo.
21     Q. Did you receive any objections from any
22 city employees or firefighters about the substance
23 of this memo?
24     A. I have not, no, sir.
25     Q. Have you heard that anyone objected to it?

73

1    A. No, sir.
2    Q. And we discussed earlier with Chief Hunter
3 Exhibit 34, which appears to be a memorandum from
4 you, sir, as the city manager dated September 20,
5 2005, to all employees. And is this the kind of
6 memorandum that was distributed to the city workers?
7    A. That's correct.
8    Q. Okay. Let's move on to Exhibit 17,
9 Mr. Roberts. This appears to be a letter addressed
10 to you dated January 31, 2006, from a gentleman
11 named Harold A. Schaitberger, general president of
12 the International Association of Firefighters. Do
13 you remember receiving this letter shortly after its
14 date?
15    A. I do.
16    Q. And copies were evidently also sent, you
17 can see at the end of the letter, to Mayor Hardin
18 and Fire Chief Hunter. Do you see where it says
19 that?
20    A. I do.
21    Q. When you received this letter, what was
22 your reaction to it? Were you annoyed? Were you
23 upset? Anything like that?
24    A. Not annoyed or upset per se. I called the
25 Chiefs in and wanted to know what the letter was

74

1 about. I didn't know of anything going on at this
2 particular time.
3    Q. Didn't know anything what?
4    A. Any conflict that was going on at this
5 particular time. And I believe it was Chief Waters
6 said he would talk with David Davis about the
7 letter.
8    Q. Did you ask Chief Hunter to look into it
9 and get back to you?
10    A. I think Chief Hunter was already looking
11 into it, yes.
12    Q. But did you expect him to get back to you
13 at some time?
14    A. Yes, sure.
15    Q. And among other things in this letter,
16 Mr. Schaitberger is addressing concerns about the
17 shift schedule, the risks or possibility of
18 implementing an 8-hour shift as opposed to the
19 existing 24-hour schedule. And, among other things,
20 also addressing a concern that Mr. Davis was issued
21 a counseling form on September 20, 2005, concerning
22 his interview and statements to the local media. Do
23 you see where it says that?
24    A. I do.
25    Q. And then Mr. Schaitberger is outlining

75

1 certainly legal principles under the First
2 Amendment; for example, the right that public
3 employees have to free association under the First
4 Amendment. Were you aware of those protections,
5 those constitutional rights, before you got this
6 letter from Mr. Schaitberger?
7    A. I'm aware of the First Amendment rights,
8 yes, sir, and I do feel like that our First
9 Amendment rights are -- we give them their due
10 diligence as well with them, and there's procedures
11 for that.
12    Q. Have you been aware for a number of years
13 that the First Amendment also protects the right of
14 public employees to free speech?
15    A. I do under the guidelines that's given,
16 yes, sir.
17    Q. And have you been aware for a number of
18 years as city manager that it's a violation of the
19 First Amendment protections for public employees to
20 be disciplined or retaliated against if they are
21 exercising their First Amendment rights to free
22 speech and free association?
23    A. As long as it's done in the proper
24 perspective.
25    Q. What was the follow-up? You get this

76

1 letter. You talk to Chief Hunter, what's going on.
2 You expect he's going to get back to you. Did he
3 get back to you?
4    A. Yes, sir. They had letter. I believe it
5 was some -- David said there wasn't any problems.
6    Q. Okay. Exhibit 18, this appears to be a
7 memo from Deputy Chief Roy Waters to Chief Hunter
8 dated February 6, 2006, and it's concerning the
9 letter Schaitberger had sent to you. Did you
10 receive a copy of this memo?
11    A. I did.
12    Q. On or about the date of it in February
13 2006?
14    A. Uh-huh.
15    Q. That's a yes?
16    A. Yes, sir. I'm sorry.
17    Q. So when you received a copy of this memo,
18 you understood, I take it, that there had been a
19 discussion between Deputy Chief Waters and
20 Mr. Davis, correct?
21    A. As indicated in the letter, yes, sir.
22    Q. All right. Did you take any further action
23 or think anything further was necessary on this
24 subject?
25    A. I did not.

77

1    Q.  And then you sent a reply letter back to
2  Mr. Schaitberger which appears as Exhibit 20 dated
3  February 14, 2006; is that correct?
4    A.  That's correct.
5    Q.  And you indicate in part in this letter
6  that the Deputy Chief spoke with Mr. Davis upon
7  receipt of your letter, and Mr. Davis expressed that
8  he thought everything in the department was going
9  good and that he did not have any complaints?
10    A.  I used Chief Waters' letter and put what
11  was reported to me.
12    Q.  Okay.
13    Q.  Then at some point did it come to your
14  attention, Mr. Roberts, that Mr. Davis had placed a
15  telephone call to Mayor Hardin sometime in April of
16  2006?
17    A.  Yes, sir.
18    Q.  How did that first come to your attention?
19    A.  To be honest with you, I don't really
20  remember.  I believe it was Chief Hunter that
21  explained it to me or told me about it.
22    Q.  In a conversation?
23    A.  Yes, sir.
24    Q.  And what did he tell you about it?
25    A.  In general terms, basically that the Mayor

78

1  had been contacted by Mr. Davis in relation to a
2  proposed change in probationary time.
3    Q.  Probationary time for new hires into the
4  fire department?
5    A.  For new hires within three departments, all
6  of our public safety, which is, of course, our
7  police, code enforcers, and, of course, the fire
8  department.
9    Q.  But is it fair and accurate to say that
10  since Mr. Davis was an 8-year employee of the fire
11  department, that this proposed extension of the
12  probationary period from one year to 18 months would
13  have not directly affected him?  Is that a fair and
14  accurate statement?
15    A.  It would not have affected him at all.
16    Q.  Was it your understanding, based upon the
17  information that you have been given, that Mr. Duty
18  placed the telephone call to Mayor Hardin in April
19  of 2006 when --
20    MR. GRAHAM:  You said Mr. Duty?
21    Q.  I'm sorry.  Is it your understanding, based
22  upon the information that you were given, that David
23  Davis, when he placed the call to Mayor Hardin in
24  April of 2006, was off duty at the time?
25    A.  I don't remember asking that.  I don't

79

1  know.
2    Q.  Okay.  Do you know if Mr. Davis -- or did
3  you receive any information that Mr. Davis had
4  placed that call to the Mayor in Mr. Davis' capacity
5  as president of the firefighters local labor
6  association?
7    A.  The only thing the Mayor told me was that
8  David had called concerning the proposed change in
9  probationary time.
10    Q.  Okay.
11    A.  Now, I would have assumed it would have
12  been as a officer of the local or as a firefighter,
13  either/or.
14    Q.  When you say assume, do you have any
15  personal knowledge that it might have been in his
16  capacity as president of the local union?
17    A.  Well, he's both, so I assumed it would be
18  that, yes.
19    Q.  Do you know or do you have any information
20  that Mr. Davis addressed any other issues when he
21  spoke to the Mayor by telephone other than extending
22  the probationary period?
23    A.  I do not know any other information on
24  their phone call.
25    Q.  When you were told by Chief Hunter that

80

1  Mr. Davis had this telephone conversation with the
2  Mayor, did it occur to you that that would have been
3  a violation of the Merit System rules and
4  regulations?
5    A.  Yes, sir.
6    Q.  Did you tell Chief Hunter at the time that
7  it was -- in your opinion, that was a violation?
8    A.  I did not.
9    Q.  Let's go to Exhibit 23.  This is a memo
10  from Chief Wallace Hunter to yourself, sir, as city
11  manager dated April 20, 2006, a copy being sent also
12  to Barbara Goodwin, the Personnel Director.  I take
13  it you received this memo from the Chief on or about
14  that date?
15    A.  I did.
16    Q.  Now, did you do anything when you received
17  this memo?  Speak to anybody?  Give any
18  instructions?
19    A.  I don't remember whether I asked them or
20  told them that if, in the course of them conducting
21  the investigation was my understanding of what it
22  was about.  But I think, there again, they were told
23  to go through the the city attorney.
24    Q.  Did you voice the view to Chief Hunter or
25  Personnel Director Goodwin that in light of this

81

1  situation, you felt Mr. Davis should be fired?
2      A. No. I think my comment to the Personnel
3  Director was that I felt like we had a violation and
4  it needed to be checked.
5      Q. So you did voice your opinion that you
6  thought the situation was a violation?
7      A. Yes. But to check it through the attorneys
8  and to go with it.
9      Q. You'll notice Chief Hunter, in his memo to
10 you, is expressing concerns or actually criticizing
11 Mayor Hardin. You'll see that at the bottom of the
12 first page of the memo where he says, quote, Mayor
13 Hardin should refer any employee violating the chain
14 of command, as indicated in our Merit System, back
15 to their department head, Personnel Department, or
16 city manager. Failing to do so is a violation of
17 our City charter, end quote. See where it says
18 that?
19     A. I do.
20     Q. Did you agree with that assessment by Chief
21 Hunter concerning the activities and position of the
22 Mayor?
23     A. I felt like the Mayor should instruct the
24 firefighter or union president, if it concerned
25 something to do with any business, to contact me

82

1  since I was the designated representative for the
2  International Association of Firefighters to contact
3  on City business, which would have -- to me would
4  have violated the Merit System anyway if he was a
5  firefighter calling. So yes, there was definitely a
6  Merit System violation.
7      Q. Do you think the Mayor violated the Merit
8  System rules and regulations?
9      A. No. I'm saying Mr. Davis did. The Mayor
10 is not covered by the Merit System.
11     Q. No. But I'm addressing these points that
12 Chief Hunter is talking about the Mayor. You know,
13 I just quoted a couple sentences. My question to
14 you is did you share and agree with the viewpoint of
15 Chief Hunter that Mayor Hardin failed in his efforts
16 to comply with the city charter?
17     A. Yes.
18     Q. And why do you say yes?
19     A. I feel that that gets into the day-to-day
20 operations of the city and it should be left up to
21 the city manager.
22     Q. Have you ever spoken to Mayor Hardin about
23 this situation in your --
24     A. No, sir.
25     Q. -- your position?

83

1      A. No, sir.
2      Q. Are there any circumstances under which a
3  firefighter working for the city can communicate
4  with the Mayor of the city about issues that involve
5  the city fire department?
6      A. Not to my knowledge.
7      Q. Would your answer be the same if I referred
8  to city council members? Are there any
9  circumstances or situations under which a
10 firefighter can speak to a city council member about
11 issues involving the city's fire department?
12     A. They can come to the council through proper
13 procedures. And I think that that proper procedure
14 goes through their chain of command. And if we
15 cannot correct it, then we feel -- ultimately, if I
16 feel that it needs to get to the council, then I
17 will get it to them.
18     Q. You, as the city manager, will
19 raise concerns?
20     A. Yes. The bottom line, even on a work
21 session, of whatever comes before council for a work
22 session we control, whether it be the civilians
23 coming in or whomever. It's a very structured form
24 of government.
25     Q. Is a firefighter permitted to -- after

84

1  exhausting the chain of command on an issue
2  affecting the fire department, is that firefighter
3  then allowed to address the city council or city
4  council members on that issue?
5      A. Not by the Merit System, I don't think, no,
6  sir.
7      Q. So if such a firefighter did that after
8  exhausting the chain of command, that firefighter
9  would be violating the Merit System rules and
10 regulations?
11     A. I think he would be violating the intent of
12 the Merit System rules and regulations, I do.
13     Q. Would he be violating the language of the
14 Merit System rules and regulations?
15     A. I feel like they would be, yes.
16     Q. And would that same firefighter, after
17 exhausting the chain of command, who addressed the
18 city council as a group on an issue affecting the
19 fire department, would that firefighter be subject
20 to discipline up to and including termination?
21     A. He would be disciplined as to whatever the
22 Merit System says. But I'm going to say this
23 again: I don't feel like that it would ever get to
24 that point. I've never seen it that way. Let me
25 put it that way.

85

1    Q. Well, just so the record is clear, the
2  firefighter pursues the chain of command on an issue
3  affecting the fire department and addresses the city
4  council on that same issue, then would he be subject
5  to discipline, including firing?
6    A. He could be, yes.
7    Q. Exhibit 25, Mr. Roberts, is a End of
8  Employment Form involving Mr. Davis and it indicates
9  that his employment was terminated April 21, 2006,
10 and he was dismissed. It has a place for you to
11 sign, but on this copy there's no signature. Do you
12 recall having signed that?
13   A. I did not sign it.
14   Q. Now, why would that have been?
15   A. He was -- it was an appeal process, and
16 I've got to sign the ultimate letter that does the
17 discharge.
18   Q. Had you, at this point in time, verbally
19 told Chief Hunter that you approved of the
20 termination?
21   A. I knew of the termination, but I -- I knew
22 of the termination. However, I did not go into
23 details with them. I received those details -- full
24 details. You get bits and pieces at any time to any
25 termination in the city. But I will receive all the

86

1  details at one time from both sides at the Personnel
2  Review Board hearing.
3    Q. Did Chief Hunter, at any time prior to the
4  termination of Mr. Davis, clear it through you or
5  get your concurrence to go ahead and discharge him?
6    A. No, sir. These department heads can make a
7  discharge on their own. As I stated earlier, I
8  delegate that down to them.
9    Q. Sir, do you have a view on whether or not
10 expanding the probationary period to 18 months for
11 new hires would have an adverse impact on recruiting
12 qualified individuals as firefighters?
13   A. No, sir, I do not.
14   Q. Do you know if firefighters, while they are
15 on probation, are prohibited from having secondary
16 jobs?
17   A. It's the same as any of our others that's
18 on probation in the public sector. Number one, we
19 want their total, one hundred percent divided
20 attention in the training process. And you go
21 through the basic concept basic training for the
22 chosen Public Safety field they're in.
23   Q. Now, coming to the end here, it's your
24 understanding that Mr. Davis did, in fact, appeal
25 his dismissal to the Personnel Board, correct?

87

1    A. He did.
2    Q. Did you attend that hearing?
3    A. I attended the hearing.
4    Q. Did you participate in that hearing?
5    A. I was called to testify.
6    Q. So you were a witness?
7    A. At the very end of the hearing, yes, sir.
8    Q. What was the substance of your testimony?
9    A. Who the direct contact point for the
10 International Association of Firefighters was with
11 the city.
12   Q. I'm sorry. How did that relate to a
13 telephone conver-- let me finish, please, if I may.
14 How would that comment you just made relate to the
15 telephone conversation that Mr. Davis had with the
16 Mayor about the probationary period?
17   A. Well, as union president or as he's
18 indicated, then that comment should have been
19 through me.
20   Q. So, once again, your view is that he was
21 calling the Mayor in his capacity as the local
22 president and should have gone through you?
23   A. From the indications that I have, yes.
24 From everything that y'all have shown me today and
25 in the Personnel Review Board hearing.

88

1    Q. When you were called as witness at the
2  Personnel Review Board hearing, were you called by
3  the City's attorney or representative?
4    A. I was called by the City's attorney.
5    Q. Were you aware you were going to be called
6  as a witness?
7    A. Not until right before he called me.
8    Q. And that was Mr. Graham?
9    A. That's correct.
10   Q. And at that time when you were called as a
11 witness before the Personnel Board, were you
12 supportive of the discharge of Davis?
13   A. From the testimony that I had heard, I felt
14 that he had a violation of the Merit System.
15   Q. And then you're the ultimate decisionmaker
16 on behalf of the city, and I think you indicated
17 earlier that the Personnel Board made a
18 recommendation to you to uphold the discharge of
19 Davis?
20   A. Yes, sir. That's correct.
21   Q. Did you at all, at any time, think you
22 might have a conflict of interest if you were called
23 as a witness by the city attorney at the Personnel
24 Board hearing and then you were going to make the
25 ultimate decision as to what might be recommended by

89

1  the Personnel Board?
2     A.  Not as it related to the ultimate question
3  of what the contact point was with the union.
4     Q.  So it's okay --
5     A.  So I do not.  I do not because I did not --
6  I don't think it was a conflict of interest, no.
7     Q.  Has anyone ever told you it might have been
8  a conflict of interest to be a witness, in effect,
9  against an employee that's been discharged and then
10  be the ultimate decisionmaker later on?
11     A.  No, sir.
12     Q.  Were you ever contacted by a member of the
13  press or the media to give a quote or comment after
14  Mr. Davis was discharged?
15     A.  I have.
16     Q.  And did you respond to that?
17     A.  I did not.
18     Q.  What did you say?  No comment or just --
19     A.  No comment.
20     Q.  And why did you say that?
21     A.  That's the normal response I have for
22  anything that deals with personnel issues.  That's
23  something that, to me, is private between the
24  individual and his employer, and it's up to them if
25  they want to put it out.

90

1     Q.  Were you aware that Mr. Davis explored
2  getting other employment after he was fired by the
3  city?
4     A.  I knew that he worked for the ambulance
5  service, yes, sir.
6     Q.  Do you know the name of the ambulance
7  service?
8     A.  Yes, I do.  He worked for us.  I mean, you
9  know -- Care?
10     Q.  Okay.  But were you ever contacted by any
11  possible or prospective employers inquiring about
12  Mr. Davis?
13     A.  No, sir, I have not been.
14     Q.  And that would would include verbally, by
15  telephone, e-mail, correspondence?  You were just
16  never contacted?
17     A.  I've never been contacted about employment
18  for Mr. Davis.
19     Q.  Does the city have a policy on that, about
20  making any comment about employees who have
21  previously worked for the city?
22     A.  We do.  Usually, it's a no comment, but
23  it's -- you would have to ask the Personnel Director
24  the exact quote.
25     MR. WOODLEY:  Okay.  I think that's all the

91

1  questions I have.  Thank you, Mr. Roberts, for
2  coming here.
3     (The deposition concluded at 1:35 p.m.)
4          \*\*\*\*\*\*\*\*\*\*\*

92

1        REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
3  MONTGOMERY COUNTY
4     I, Shannon Williams, Certified Shorthand
5  Reporter and Commissioner for the State of Alabama
6  at Large, hereby certify that on April 4, 2007, I
7  reported the deposition of H.H. ROBERTS, who was
8  first duly sworn or affirmed to speak the truth in
9  the matter of the foregoing cause, and that pages 1
10  through 92 contain a true and accurate transcription
11  of the examination of said witness by counsel for
12  the parties set out herein.
13     I further certify that I am neither of kin nor
14  of counsel to any of the parties to said cause, nor
15  in any manner interested in the results thereof.
16     This 10th day of April, 2007.
17
18
19     SHANNON M. WILLIAMS, CSR
20     Commissioner for the
       State of Alabama at Large
21     MY COMMISSION EXPIRES: 1/14/2010
22
23
24
25

**★**

★  (1:13) (1:23) (3:22) (91:4)

**A**

**able**  (5:15) (21:19) (36:22) (54:8)
**accept**  (13:16) (25:15)
**according**  (20:3) (23:8) (40:15)
**accountable**  (8:11) (8:14) (18:15)
**accounting/insurance**  (31:1)
**accurate**  (8:7) (21:16) (25:11)
(78:9) (78:14) (92:10)
**acquaintances**  (49:12)
**act**  (20:24)
**acting**  (57:17) (57:23)
**action**  (10:18) (20:6) (21:1) (39:17)
(50:19) (55:11) (76:22)
**actions**  (20:3) (20:7) (20:17) (21:9)
**active**  (30:23)
**activities**  (25:15) (81:21)
**actually**  (31:4) (63:21) (81:10)
**add**  (10:24) (19:6) (27:17) (43:2)
**added**  (30:4)
**additional**  (23:20)
**address**  (18:20) (32:13) (34:2)
(34:10) (35:2) (45:18) (45:22) (46:3)
(71:12) (84:3)
**addressed**  (28:14) (28:23) (28:25)
(29:4) (29:18) (30:7) (30:12) (33:11)
(33:21) (36:13) (36:22) (38:5) (41:8)
(45:7) (45:20) (45:23) (47:6) (53:24)
(67:21) (70:21) (71:2) (71:8) (73:9)
(79:20) (84:17)
**addresses**  (11:5) (61:17) (85:3)
**addressing**  (25:4) (40:11) (64:6)
(74:16) (74:20) (82:11)
**administration**  (24:16)
**administrative**  (8:8)
**adverse**  (86:11)
**advice**  (13:9) (55:18) (55:23)
**affairs**  (10:11)
**affected**  (78:13) (78:15)
**affecting**  (20:13) (43:25) (84:2)
(84:18) (85:3)
**affiliate**  (18:10)
**affirmed**  (4:3) (92:8)
**afford**  (32:6)
**after**  (12:22) (29:10) (30:23)
(34:22) (46:12) (51:11) (58:13)
(58:21) (59:6) (73:13) (83:25) (84:7)
(84:16) (89:13) (90:2)
**again**  (5:13) (11:1) (23:6) (37:9)
(38:8) (42:2) (42:20) (53:18) (54:4)
(64:1) (64:10) (66:11) (71:23) (80:22)
(84:23) (87:20)
**against**  (16:1) (32:3) (32:4) (59:4)
(62:18) (75:20) (89:9)
**agenda**  (29:17)
**aggressively**  (31:7)
**ago**  (44:24) (45:1) (46:1) (53:19)
(71:13)
**agree**  (81:20) (82:14)
**agreed**  (3:2) (3:16) (28:7) (35:4)
**agreement**  (1:16)
**ahead**  (17:22) (28:1) (86:5)
**alabama**  (1:2) (1:8) (1:18) (1:19)
(2:8) (2:12) (3:8) (15:12) (15:14)
(15:18) (15:25) (41:22) (92:2) (92:5)
(92:20)
**alarm**  (62:7)
**all**  (4:17) (6:10) (8:20) (10:1)
(10:3) (10:7) (22:4) (33:12) (36:23)
(38:8) (39:14) (43:1) (45:20) (52:25)
(55:25) (63:11) (65:19) (65:22)
(70:16) (72:1) (72:3) (72:13) (72:15)
(72:16) (73:5) (76:22) (78:5) (78:15)
(85:25) (88:21) (90:25)

**allocations**  (21:12)
**allowed**  (16:17) (84:3)
**almost**  (35:1)
**along**  (13:8) (31:9)
**already**  (14:23) (26:8) (32:18)
(33:25) (36:21) (46:13) (52:23)
(58:20) (74:10)
**also**  (2:14) (7:10) (11:6) (11:11)
(17:5) (19:6) (23:3) (30:5) (32:14)
(34:4) (34:5) (34:11) (40:3) (41:13)
(43:17) (44:11) (53:24) (56:19)
(62:15) (69:23) (70:5) (73:16) (74:20)
(75:13) (80:11)
**always**  (57:14)
**ambulance**  (90:4) (90:6)
**amendment**  (75:2) (75:4) (75:7)
(75:9) (75:13) (75:19) (75:21)
**among**  (57:1) (74:15) (74:19)
**amount**  (53:2)
**and/or**  (71:17)
**ann**  (55:1)
**annoyed**  (50:18) (50:22) (51:7)
(51:9) (51:12) (73:22) (73:24)
**another**  (6:20) (11:2) (16:18)
(42:24) (49:11)
**answer**  (8:20) (18:22) (35:20)
(43:16) (43:17) (47:23) (50:4) (53:15)
(64:15) (83:7)
**answering**  (24:15)
**answers**  (5:15) (40:1)
**anybody**  (58:1) (80:17)
**anyone**  (72:25) (89:7)
**anything**  (11:15) (12:3) (15:1)
(20:25) (22:23) (26:11) (29:12)
(29:19) (30:18) (31:1) (33:20) (41:22)
(46:12) (50:24) (51:3) (51:12) (52:1)
(53:1) (62:21) (64:16) (67:6) (73:23)
(74:1) (74:3) (76:23) (80:16) (89:22)
**anytime**  (43:14) (50:24) (51:3)
(65:17) (67:10)
**anyway**  (23:15) (26:10) (82:4)
**anywhere**  (66:14)
**apparatus**  (30:1) (30:16) (65:20)
(65:24)
**apparatuses**  (29:25)
**apparently**  (38:21) (40:3) (53:25)
(56:25) (57:18) (72:15)
**appeal**  (10:14) (12:11) (12:17)
(13:23) (21:25) (22:1) (22:2) (85:15)
(86:24)
**appearances**  (2:1)
**appears**  (21:7) (23:16) (23:20)
(32:21) (38:2) (40:16) (41:8) (50:8)
(59:3) (73:3) (73:9) (76:6) (77:2)
**applied**  (12:9)
**appoint**  (8:25) (9:3) (9:5) (9:8)
**appointed**  (6:15) (6:17) (9:5) (10:1)
(24:9) (26:1) (26:5) (31:8)
**appointment**  (26:15)
**appointments**  (26:8)
**appraisal**  (23:21)
**appropriate**  (20:3) (20:6)
**approval**  (11:11) (57:21) (72:10)
(60:2)
**approve**  (9:16) (10:1) (13:4) (13:18)
(60:2)
**approved**  (13:7) (85:19)
**approximate**  (22:12)
**approximately**  (1:21) (45:2)
**april**  (1:20) (22:10) (77:15) (78:18)
(78:24) (80:11) (85:9) (92:6) (92:16)
**areas**  (22:23)
**armory**  (45:13)
**around**  (18:25) (28:17) (44:25)
**article**  (50:9) (50:10) (50:13)
(50:15) (50:20) (50:21) (51:8) (51:19)
(51:24) (52:14) (53:23) (54:11) (55:6)
(55:15) (57:3) (57:5) (58:14) (58:14)

**believe**

(58:19) (58:24) (59:6) (59:8) (59:16)
(60:23) (61:3) (62:2) (62:22) (63:5)
(63:16) (64:12) (65:13) (66:1) (66:7)
(66:11) (66:14)
**articles**  (58:5)
**ask**  (15:10) (35:12) (43:15) (51:21)
(52:11) (67:20) (71:13) (74:8) (90:23)
**asked**  (35:1) (37:6) (47:12) (80:19)
**asking**  (5:13) (23:4) (61:23) (64:10)
(78:25)
**assessment**  (81:20)
**assistant**  (6:23) (7:2) (31:8)
(59:12) (60:5)
**association**  (16:3) (17:5) (18:4)
(18:9) (26:13) (26:23) (30:11) (34:3)
(36:12) (42:6) (42:13) (52:19) (73:12)
(75:3) (75:22) (79:6) (82:2) (87:10)
**assume**  (39:7) (59:9) (59:20) (60:7)
(79:14)
**assumed**  (26:9) (79:11) (79:17)
**attend**  (87:2)
**attendance**  (27:19)
**attended**  (87:3)
**attention**  (7:8) (21:6) (24:11)
(25:1) (35:11) (36:8) (38:2) (50:7)
(77:14) (77:18) (86:20)
**attitude**  (25:7) (25:22)
**attorney**  (19:23) (52:6) (80:23)
(88:3) (88:4) (88:23)
**attorneys**  (4:19) (5:10) (81:7)
**authority**  (8:25) (9:11) (11:7)
(13:4) (15:3) (15:7) (22:17) (57:17)
(57:23)
**authorize**  (72:12)
**authorized**  (9:16)
**authors**  (58:2)
**available**  (5:22) (71:7)
**aware**  (10:8) (15:16) (15:17) (15:18)
(15:23) (15:24) (16:21) (17:4) (22:5)
(22:9) (22:13) (55:5) (57:4) (57:5)
(64:11) (66:6) (75:4) (75:7) (75:12)
(75:17) (88:5) (90:1)
**away**  (6:1) (12:6) (24:2)
**awhile**  (17:2) (17:3)

**B**

**back**  (10:16) (14:21) (18:3) (26:10)
(27:14) (31:12) (35:23) (38:15)
(40:18) (40:23) (41:8) (42:8) (44:20)
(46:20) (53:18) (66:2) (67:7) (71:22)
(74:9) (74:12) (76:2) (76:3) (77:7)
(81:14)
**bad**  (40:17) (51:5) (64:19) (65:22)
(67:12)
**balance**  (32:12)
**barbara**  (80:12)
**bargain**  (41:16) (41:17)
**based**  (67:22) (78:16) (78:21)
**basic**  (7:5) (7:6) (53:18) (86:21)
**basically**  (27:3) (27:12) (28:13)
(39:24) (40:25) (58:17) (58:18) (77:25)
**basis**  (26:6)
**became**  (12:1)
**before**  (1:16) (3:6) (4:23) (5:9)
(6:20) (13:17) (16:19) (21:1) (24:14)
(24:22) (27:13) (36:14) (36:18)
(37:19) (50:4) (54:5) (75:5) (83:21)
(88:7) (88:11)
**begin**  (50:4)
**behalf**  (88:16)
**being**  (21:25) (25:14) (40:13)
(53:14) (54:13) (57:14) (59:24)
(65:11) (66:9) (66:11) (66:13) (66:20)
(67:2) (80:11)
**believe**  (27:17) (28:24) (34:4)
(35:7) (35:8) (39:2) (43:13) (50:10)
(51:16) (56:10) (60:24) (61:8) (62:6)

**believes**                                              **contacted**

(62:11) (62:15) (68:4) (74:5) (76:4)
(77:20)
**believes**  (62:13)
**belong**  (15:14) (15:15) (16:3)
**best**  (54:14) (43:16)
**better**  (29:8)
**between**  (3:3) (3:17) (9:24) (11:18)
(32:12) (38:24) (41:19) (76:19) (89:23)
**binder**  (7:9) (23:19)
**bit**  (40:10)
**bits**  (85:24)
**block**  (23:14)
**board**  (11:12) (11:14) (11:18)
(11:19) (11:20) (12:7) (12:10) (12:12)
(12:18) (12:23) (13:3) (13:4) (13:6)
(13:7) (14:11) (14:24) (20:25) (21:2)
(21:22) (31:9) (43:21) (86:2) (86:25)
(87:25) (88:2) (88:11) (88:17) (88:24)
(89:1)
**board's**  (13:8) (13:10) (13:18)
**boatner**  (49:3)
**body**  (41:24)
**both**  (30:2) (48:21) (79:17) (86:1)
**bottom**  (23:13) (25:2) (41:10) (66:3)
(66:24) (67:10) (81:11) (83:20)
**box**  (2:8) (2:11)
**branch**  (8:9)
**break**  (64:4)
**breathing**  (29:24) (30:16)
**brief**  (38:11) (40:10) (64:5)
**bring**  (37:15)
**broad**  (2:11)
**brother**  (49:10)
**brought**  (28:24) (29:6)
**budget**  (19:3) (54:7) (65:23) (71:12)
(71:14)
**building**  (27:15)
**bush**  (48:22) (49:4) (56:20) (57:7)
(57:16) (57:22)
**bush's**  (49:10)
**business**  (22:22) (81:25) (82:3)
**buy**  (30:3) (65:24)
**bypass**  (18:19) (18:23)
**bypassed**  (69:7) (69:17) (69:25)
(70:7)

## C

**call**  (28:1) (43:22) (77:15) (78:18)
(78:23) (79:4) (79:24)
**called**  (35:8) (73:24) (79:8) (87:5)
(88:1) (88:2) (88:4) (88:5) (88:7)
(88:10) (88:22)
**calling**  (82:5) (87:21)
**came**  (13:3) (27:2) (28:8) (30:21)
(30:22) (31:9) (44:22) (50:11) (54:8)
**cannot**  (32:6) (48:7) (83:15)
**can't**  (33:22) (44:7) (44:13) (56:3)
(64:2)
**capacity**  (6:20) (34:3) (36:10)
(37:10) (42:6) (67:24) (68:20) (79:4)
(79:16) (87:21)
**captain**  (37:18) (44:8)
**care**  (90:9)
**carl**  (44:23) (45:5) (45:8) (46:23)
(46:24) (47:4)
**case**  (1:7) (3:18) (3:19) (4:23)
(4:25) (10:20) (12:25) (13:7) (13:8)
(13:19) (14:22) (21:18) (23:7) (43:20)
(62:19)
**cases**  (71:15)
**category**  (68:17)
**cause**  (52:20) (54:2) (55:10) (62:9)
(62:18) (92:9) (92:14)
**certain**  (20:21) (70:10)
**certainly**  (18:24) (75:1)
**certificate**  (92:1)
**certification**  (17:14)

**certified**  (1:17) (3:7) (92:4)
**certify**  (92:6) (92:13)
**chain**  (34:24) (37:15) (37:19)
(43:13) (47:6) (50:1) (56:14) (68:2)
(68:6) (68:22) (69:7) (69:18) (70:1)
(70:7) (70:12) (70:22) (71:3) (81:13)
(83:14) (84:1) (84:8) (84:17) (85:2)
**chance**  (11:2) (19:2) (38:16) (58:8)
**change**  (78:2) (79:8)
**changed**  (12:1)
**charged**  (19:16) (47:15) (49:25)
**charter**  (7:12) (7:16) (8:4) (10:6)
(11:4) (15:3) (19:16) (20:13) (58:3)
(81:17) (82:16)
**check**  (52:5) (81:7)
**checked**  (81:4)
**chief**  (9:14) (9:21) (18:15) (18:18)
(19:11) (19:21) (20:12) (23:7) (23:8)
(24:16) (24:18) (25:3) (25:16) (27:9)
(27:11) (30:2) (30:22) (31:7) (31:8)
(35:3) (35:7) (35:12) (35:16) (35:21)
(35:25) (36:13) (37:4) (37:7) (37:9)
(37:15) (37:23) (37:25) (38:21)
(38:24) (39:1) (39:11) (39:20) (40:3)
(40:18) (42:4) (42:9) (42:18) (45:8)
(46:14) (46:17) (51:13) (51:24)
(51:25) (52:2) (52:5) (52:8) (52:21)
(52:25) (53:1) (53:5) (53:6) (53:22)
(58:15) (58:21) (59:12) (60:4) (60:5)
(67:21) (71:13) (71:23) (71:25) (73:2)
(73:18) (74:5) (74:8) (74:10) (76:1)
(76:7) (76:19) (77:6) (77:10) (77:20)
(79:25) (80:6) (80:10) (80:13) (80:24)
(81:9) (81:20) (82:12) (82:15) (85:19)
(86:3)
**chiefs**  (9:13) (10:2) (11:16) (19:22)
(22:22) (46:18) (55:17) (71:15) (73:25)
**chief's**  (35:21)
**choose**  (15:15)
**chose**  (12:4) (12:5) (29:16) (36:2)
**chosen**  (86:22)
**circumstances**  (83:2) (83:9)
**cities**  (32:1)
**citizens**  (64:25)
**city**  (1:8) (1:19) (2:8) (2:12) (5:3)
(5:10) (6:11) (6:12) (6:14) (6:17)
(6:19) (6:23) (7:2) (7:4) (7:7) (7:12)
(7:16) (7:18) (7:22) (8:2) (8:3) (8:8)
(8:9) (8:12) (8:19) (8:21) (8:22) (9:1)
(9:10) (11:4) (11:7) (11:8) (12:24)
(13:14) (13:23) (14:7) (14:8) (15:1)
(15:3) (16:22) (17:5) (17:19) (18:6)
(18:11) (18:15) (18:16) (18:19)
(18:20) (19:13) (19:14) (19:16)
(20:24) (22:6) (22:10) (22:15) (22:17)
(23:1) (23:21) (23:24) (24:4) (24:7)
(24:8) (25:10) (25:19) (26:1) (26:3)
(26:4) (26:5) (26:15) (32:1) (32:3)
(32:6) (34:6) (34:19) (36:11) (41:14)
(43:3) (43:4) (43:10) (44:10) (47:25)
(48:15) (48:17) (50:16) (50:24) (51:3)
(52:5) (52:19) (53:12) (54:15) (57:2)
(62:16) (67:23) (67:24) (67:25)
(68:20) (70:21) (71:2) (71:17) (71:24)
(72:4) (72:13) (72:16) (72:22) (73:4)
(73:6) (75:18) (80:10) (80:23) (81:16)
(81:17) (82:3) (82:16) (82:20) (82:21)
(83:3) (83:4) (83:5) (83:8) (83:10)
(83:18) (84:3) (84:18) (85:3) (85:25)
(87:11) (88:16) (88:23) (90:3) (90:19)
(90:21)
**city's**  (8:15) (12:16) (21:7) (24:17)
(43:24) (55:7) (62:12) (72:1) (83:11)
(88:3) (88:4)
**civil**  (3:5) (3:14) (3:21) (11:12)
(11:18) (11:20) (12:7) (14:1) (14:2)
**civilians**  (83:22)

**claim**  (31:5)
**classifications**  (21:11)
**classified**  (11:15)
**clear**  (4:17) (30:8) (42:3) (85:1)
(86:4)
**code**  (6:24) (8:2) (8:21) (15:12)
(15:19) (15:25) (20:13) (78:7)
**collectively**  (41:16)
**columbus**  (50:9)
**column**  (52:16)
**combat**  (54:8)
**come**  (10:16) (13:10) (20:8) (28:4)
(35:12) (35:25) (43:4) (43:11) (77:13)
(77:18) (83:12)
**comes**  (46:19) (83:21)
**comfortable**  (24:15)
**coming**  (25:25) (35:23) (83:23)
(86:23) (91:2)
**command**  (34:25) (37:19) (43:14)
(47:6) (50:1) (56:14) (68:3) (68:7)
(68:23) (69:8) (69:18) (70:1) (70:7)
(70:23) (71:4) (81:14) (83:14) (84:1)
(84:8) (84:17) (85:2)
**commanding**  (44:11)
**commencing**  (1:20)
**comment**  (55:6) (63:15) (81:2)
(87:14) (87:18) (89:13) (89:18)
(89:19) (90:20) (90:22)
**comments**  (51:25) (52:13) (60:22)
(61:2) (62:1) (62:22) (63:4) (64:10)
(64:12) (65:12)
**commission**  (3:9) (11:18) (11:21)
(11:24) (54:16) (92:21)
**commissioner**  (1:17) (3:7) (92:5)
(92:20)
**communicate**  (46:14) (83:3)
**communicated**  (25:5)
**communication**  (60:13) (60:21)
**communications**  (48:24) (53:22)
(61:2)
**comp**  (31:5)
**complaint**  (19:9) (35:22) (36:4)
(52:24)
**complaints**  (27:4) (35:16) (67:8)
(77:9)
**completely**  (38:9)
**comply**  (82:16)
**concept**  (51:6) (64:20) (86:21)
**concern**  (30:20) (45:3) (48:1)
(49:15) (49:19) (53:3) (54:3) (54:22)
(58:6) (66:16) (67:2) (71:19) (74:20)
**concerned**  (12:4) (52:25) (66:12)
(81:24)
**concerning**  (15:21) (18:6) (18:11)
(24:18) (25:12) (27:6) (30:23) (59:13)
(64:8) (74:21) (76:8) (79:8) (81:21)
**concerns**  (30:15) (32:22) (37:14)
(39:10) (39:18) (40:12) (43:5) (46:1)
(48:24) (57:11) (69:19) (74:16) (81:10)
**concluded**  (91:3)
**concurrence**  (86:5)
**conditions**  (15:22) (18:7) (18:12)
**conducted**  (58:22)
**conducting**  (80:20)
**conflict**  (74:4) (88:22) (89:6) (89:8)
**consider**  (18:21) (34:24) (47:4)
(67:16) (68:9) (68:13) (68:16)
**consideration**  (25:25) (35:24)
**considered**  (21:24)
**consistent**  (65:6)
**consists**  (7:19)
**constantly**  (30:3)
**constitutional**  (75:5)
**constructive**  (40:11)
**contact**  (18:1) (48:6) (52:21)
(81:25) (82:2) (87:9) (89:3)
**contacted**  (78:1) (89:12) (90:10)

| contain | | each |
|---|---|---|

**contain**

(90:16) (90:17)
**contain** (92:10)
**contained** (30:16)
**contemplating** (37:8) (52:9)
**context** (58:13) (60:13)
**continuing** (53:2)
**control** (33:4) (83:22)
**conversation** (45:12) (45:14) (46:3)
(46:7) (46:16) (47:12) (48:21) (56:7)
(77:22) (80:1) (87:15)
**convinced** (65:21)
**copies** (73:16)
**copy** (23:20) (59:21) (59:23) (59:24)
(72:19) (76:10) (76:17) (80:11) (85:11)
**correct** (4:14) (4:15) (7:14) (7:20)
(7:23) (12:10) (12:18) (12:19) (12:22)
(13:1) (13:25) (18:16) (21:23) (28:8)
(30:16) (30:17) (38:18) (38:19)
(38:22) (53:9) (53:17) (58:9) (61:25)
(62:12) (65:11) (69:14) (69:15) (72:8)
(73:7) (76:20) (77:3) (77:4) (83:15)
(86:25) (88:9) (88:20)
**correspondence** (90:15)
**cost** (32:5)
**costs** (32:6)
**could** (4:9) (8:1) (13:6) (14:16)
(20:7) (20:8) (31:11) (35:22) (37:22)
(51:9) (59:18) (62:15) (62:17) (63:19)
(63:20) (63:23) (66:4) (67:14) (67:15)
(85:6)
**council** (6:17) (7:18) (8:12) (8:19)
(12:5) (13:17) (13:23) (14:13) (15:1)
(18:20) (19:13) (19:15) (20:12)
(47:25) (48:15) (48:18) (54:16)
(56:19) (57:8) (57:16) (57:21) (70:22)
(71:3) (71:7) (71:11) (83:8) (83:10)
(83:12) (83:16) (83:21) (84:3) (84:4)
(84:18) (85:4)
**council/manager** (12:2)
**councilman** (48:22) (49:4) (49:10)
**counsel** (3:3) (3:17) (92:1) (92:14)
**counseled** (59:12)
**counseling** (20:9) (58:25) (59:3)
(59:11) (59:21) (60:6) (61:24) (68:19)
(74:21)
**county** (92:3)
**couple** (4:17) (15:1) (29:5) (49:6)
(57:13) (82:13)
**course** (6:5) (9:6) (10:6) (10:17)
(13:16) (14:1) (23:6) (48:22) (52:14)
(60:17) (65:23) (67:8) (78:6) (78:7)
(80:20)
**court** (1:1) (1:17) (3:7) (5:19) (14:3)
**cover** (1:11) (36:23)
**covered** (12:6) (14:23) (19:22)
(70:16) (82:10)
**criticism** (67:4)
**criticizes** (67:11)
**criticizing** (81:10)
**csr** (92:19)
**current** (6:11) (12:8)

**D**

**daily** (18:1) (30:6)
**date** (22:12) (39:8) (73:14) (76:12)
(80:14)
**dated** (24:18) (36:12) (38:4) (41:9)
(59:4) (71:24) (73:4) (73:10) (76:8)
(77:2) (80:11)
**david** (1:5) (2:15) (4:19) (10:20)
(22:5) (23:22) (25:5) (36:10) (39:11)
(52:14) (59:4) (59:11) (61:24) (74:6)
(76:5) (78:22) (79:8)
**davis** (1:5) (2:15) (4:19) (10:20)
(12:15) (12:25) (13:2) (13:19) (13:22)
(14:22) (15:2) (15:8) (21:18) (22:5)
(22:13) (23:22) (25:6) (25:12) (25:20)

(27:3) (27:4) (27:5) (27:9) (27:15)
(27:21) (27:22) (30:10) (31:14)
(32:15) (33:14) (33:25) (34:14)
(34:17) (34:18) (34:23) (35:5) (36:10)
(36:18) (37:3) (37:6) (37:9) (37:17)
(37:22) (38:21) (38:24) (39:1) (39:4)
(39:11) (39:24) (42:3) (42:5) (42:9)
(48:17) (49:7) (49:10) (52:15) (54:5)
(54:11) (54:21) (58:25) (59:4) (59:11)
(60:6) (61:2) (61:24) (62:2) (64:11)
(65:13) (66:6) (66:14) (74:6) (74:20)
(76:20) (77:6) (77:7) (77:14) (78:1)
(78:10) (78:23) (79:2) (79:3) (79:20)
(80:1) (81:1) (82:9) (85:8) (86:4)
(86:24) (87:15) (88:12) (88:19)
(89:14) (90:1) (90:12) (90:18)
**davis'** (79:4)
**davis's** (12:9) (48:24) (60:21)
(62:22) (63:4) (63:15)
**day** (34:6) (65:25) (92:16)
**days** (34:6)
**day-to-day** (7:6) (9:23) (25:15)
(25:23) (51:21) (82:19)
**deal** (64:16)
**deals** (8:2) (43:19) (89:22)
**dealt** (11:22) (30:21)
**decision** (10:15) (10:21) (10:23)
(12:12) (12:13) (12:17) (12:22)
(12:24) (13:2) (13:4) (13:10) (13:13)
(15:7) (22:2) (88:25)
**decisionmaker** (88:15) (89:10)
**defendants** (1:10) (2:6)
**definitely** (82:5)
**degree** (9:18) (39:25)
**delegate** (10:9) (86:8)
**demotions** (21:10)
**dennis** (2:17)
**deny** (13:16)
**department** (9:6) (9:10) (9:13)
(9:15) (9:21) (9:25) (10:1) (10:5)
(10:10) (10:11) (10:12) (11:16)
(12:16) (17:10) (18:21) (19:2) (19:4)
(19:14) (20:1) (20:13) (22:3) (22:7)
(22:11) (22:15) (22:19) (22:21) (23:2)
(23:21) (24:17) (25:20) (28:15)
(32:10) (32:11) (32:24) (33:2) (33:16)
(43:6) (43:18) (43:24) (44:1) (46:15)
(46:21) (47:13) (48:2) (49:5) (49:15)
(49:19) (50:25) (51:13) (51:22)
(52:18) (52:22) (53:7) (53:13) (53:21)
(54:1) (55:7) (56:8) (56:10) (56:11)
(57:11) (57:13) (58:6) (58:24) (59:4)
(61:5) (62:10) (62:20) (62:24) (63:17)
(64:14) (64:18) (65:3) (65:7) (65:10)
(66:10) (66:22) (67:7) (67:9) (67:11)
(67:13) (68:9) (69:10) (69:21) (70:3)
(70:9) (70:18) (71:8) (71:20) (71:24)
(72:2) (72:7) (77:8) (78:4) (78:8)
(78:11) (81:15) (83:5) (83:11) (84:2)
(84:19) (85:3) (86:6)
**departments** (9:25) (19:7) (29:9)
(78:5)
**deposition** (1:15) (3:4) (3:6) (3:12)
(3:18) (4:16) (4:22) (5:7) (33:13)
(67:22) (91:3) (92:7)
**depositions** (4:13) (5:4)
**deputy** (24:16) (25:3) (76:7) (76:19)
(77:6)
**described** (36:17)
**describing** (33:17) (36:1) (38:20)
**designated** (82:1)
**desk** (12:23)
**details** (85:23) (85:24) (86:1)
**detrimental** (67:7) (67:9)
**deviating** (49:25)
**didn't** (26:18) (34:8) (35:19)
(37:11) (39:25) (46:14) (52:11) (60:7)

**each**

(74:1) (74:3)
**difference** (11:17) (41:19)
**differences** (57:4) (57:19)
**different** (9:7)
**diligence** (75:10)
**direct** (48:6) (87:9)
**directly** (19:13) (20:12) (37:4)
(37:23) (43:4) (47:7) (47:25) (68:7)
(68:23) (69:8) (69:18) (70:1) (70:7)
(70:21) (71:2) (71:18) (78:13)
**director** (6:24) (9:24) (31:10)
(40:4) (80:12) (80:25) (81:3) (90:23)
**disagree** (25:17) (25:19)
**disagreements** (57:1)
**disapprove** (13:5)
**discharge** (10:4) (85:17) (86:5)
(86:7) (88:12) (88:18)
**discharged** (89:9) (89:14)
**discharging** (16:1)
**disciplinary** (10:18) (20:17) (21:1)
(21:9)
**discipline** (19:15) (49:25) (62:3)
(62:23) (68:14) (69:3) (69:7) (69:14)
(69:25) (71:1) (84:20) (85:5)
**disciplined** (47:16) (54:13) (56:17)
(66:13) (66:20) (67:3) (75:20) (84:21)
**discriminating** (16:1)
**discuss** (5:10) (19:12) (27:10)
(39:22) (60:4)
**discussed** (20:4) (45:4) (49:18)
(51:23) (73:2)
**discussing** (42:15) (47:16) (61:3)
(66:23)
**discussion** (14:20) (38:14) (44:19)
(58:15) (76:19)
**discussions** (49:13) (57:7)
**disgruntled** (64:4)
**dismissal** (21:19) (86:25)
**dismissals** (20:18) (21:10)
**dismissed** (85:10)
**dispatching** (69:20)
**distributed** (72:1) (72:3) (72:6)
(72:13) (73:6)
**district** (1:1) (1:2) (23:7)
**divided** (86:19)
**division** (1:3) (9:5) (10:2) (11:16)
(19:21)
**document** (24:22) (36:14) (61:16)
**documents** (24:14) (28:10) (38:8)
**does** (9:3) (11:6) (11:9) (13:10)
(13:12) (14:6) (14:8) (15:8) (15:9)
(18:18) (21:1) (23:23) (41:14) (41:18)
(50:11) (66:1) (85:16) (90:19)
**doesn't** (15:7) (64:21) (66:24)
**doing** (25:6) (25:20) (37:21) (52:3)
(53:1)
**doing it** (70:12)
**done** (10:10) (65:11) (75:23)
**door** (43:10) (47:14)
**down** (5:19) (9:13) (20:8) (27:2)
(30:2) (36:23) (42:4) (46:19) (53:18)
(64:2) (86:8)
**drill** (55:19) (56:9)
**driver/engineer** (46:25)
**due** (17:14) (39:7) (55:25) (65:23)
(75:9)
**duly** (4:2) (92:8)
**during** (10:17) (34:22) (36:18)
**duties** (7:5) (8:2)
**duty** (27:17) (30:10) (30:23) (31:14)
(32:15) (33:14) (33:25) (34:15)
(34:18) (36:19) (37:3) (39:5) (42:11)
(42:16) (78:17) (78:20) (78:24)

**E**

**each** (9:13) (23:5) (36:23) (64:3)
(72:19)

**earlier**

earlier (4:13) (22:20) (26:20) (27:14) (35:5) (36:17) (40:17) (40:21) (57:12) (59:16) (67:22) (73:2) (86:7) (88:17)
early (5:22)
eastern (1:3)
editor (58:5) (58:9)
effect (52:4) (89:8)
efforts (82:15)
eight (22:6)
either (3:19) (13:16) (19:8) (34:22) (36:17) (37:12) (60:9) (60:15)
either/or (14:16) (37:11) (79:13)
elected (7:24)
electrician (16:13) (16:14) (16:15)
electricians (63:12)
else (24:14) (29:12) (29:19) (30:18) (31:5) (33:20) (58:1) (62:21)
e-mail (90:15)
emergency (54:8)
emphatic (27:8)
emphatically (37:24)
employed (12:15) (16:22) (17:4) (22:10) (34:19)
employee (9:22) (10:4) (19:24) (33:15) (43:4) (45:22) (46:19) (62:17) (63:16) (70:2) (78:10) (81:13) (89:9)
employees (9:1) (9:7) (9:23) (11:6) (11:8) (12:4) (14:7) (34:12) (43:11) (72:1) (72:3) (72:13) (72:16) (72:22) (73:5) (75:3) (75:14) (75:19) (90:20)
employer (89:24)
employers (15:21) (90:11)
employment (10:22) (15:22) (18:12) (20:18) (22:25) (43:6) (85:8) (85:9) (90:2) (90:17)
end (13:20) (14:1) (21:13) (24:19) (25:7) (28:19) (35:20) (37:2) (41:4) (42:19) (46:7) (54:14) (55:20) (56:1) (56:6) (59:15) (73:17) (81:17) (85:7) (86:23) (87:7)
enemy (56:23)
enforce (8:23)
enforcement (5:4) (6:24) (7:1) (17:14) (56:11)
enforcers (78:7)
engine (65:24)
enlighten (60:20)
enough (33:23) (38:1) (40:14) (42:19)
enter (14:20) (41:21)
entered (33:13)
entire (8:19) (67:8)
equal (32:12)
equally (8:20)
equipment (27:6) (29:21) (30:3) (30:13) (45:6) (46:4) (46:6) (48:3) (53:17) (64:17) (65:22) (65:23) (69:10) (70:18)
especially (30:2)
est (1:21)
evaluates (23:9)
evaluation (23:3) (23:13) (23:22) (25:16)
evaluations (22:25) (23:4) (23:12)
even (83:20)
eventually (22:14)
ever (4:22) (16:18) (18:5) (18:11) (31:7) (42:22) (43:3) (49:24) (55:23) (56:7) (57:22) (57:25) (60:4) (71:6) (71:7) (71:18) (82:22) (84:23) (89:7) (89:12) (90:10)
every (23:5) (23:16) (36:23) (58:10) (58:11) (65:24) (71:11)
everybody (31:18) (56:3)
everyday (9:23)
everyone (12:6)
everything (5:18) (33:8) (43:22)

(66:23) (77:8) (87:24)
evidence (3:13)
evident (63:14)
evidently (73:16)
exact (17:2) (20:22) (35:9) (90:24)
examination (4:7) (92:11)
example (12:15) (29:1) (63:4) (75:2)
examples (63:25)
excerpt (61:14)
excerpts (21:7)
excuse (6:16) (7:2) (17:22) (56:13) (66:14)
exercise (16:2)
exercising (75:21)
exert (63:10)
exhausted (31:13)
exhausting (84:1) (84:8) (84:17)
exhibit (7:11) (15:11) (15:12) (21:6) (23:18) (36:9) (38:2) (38:16) (41:7) (42:20) (59:2) (61:13) (71:22) (73:3) (73:8) (76:6) (77:2) (80:9) (85:7)
exhibits (7:9) (7:11)
existed (16:25)
existing (74:19)
expanding (86:10)
expect (5:14) (37:17) (74:12) (76:2)
experience (5:5) (67:23)
expires (92:21)
explain (9:18) (60:20) (61:1) (63:23)
explained (77:21)
explanation (54:21)
explicit (41:23)
explore (52:21)
explored (90:1)
express (11:3) (19:3)
expressed (39:18) (39:23) (43:5) (54:22) (77:7)
expressing (30:15) (39:9) (81:10)
extending (79:21)
extension (78:11)

**F**

fact (12:20) (25:16) (86:24)
facts (25:18)
factual (64:24)
failed (82:15)
failing (81:16)
fair (25:11) (33:23) (38:1) (42:19) (51:7) (59:20) (67:18) (78:9) (78:13)
fairly (7:17)
fall (68:17)
familiar (5:6) (7:15) (7:17) (8:4) (50:11) (64:18)
far (12:3) (25:10) (41:5) (47:22) (49:1) (53:17) (65:14)
fear (54:13) (66:12) (66:20) (67:2)
february (24:18) (76:8) (76:12) (77:3)
federal (3:5) (3:14) (3:20) (26:9)
feel (24:14) (62:18) (68:25) (69:11) (69:22) (70:4) (75:8) (82:19) (83:15) (83:16) (84:15) (84:23)
felt (17:16) (28:14) (29:3) (29:7) (29:17) (31:10) (35:17) (35:21) (36:4) (39:13) (65:15) (81:1) (81:3) (81:23) (88:13)
field (38:3) (86:22)
fight (30:5)
file (21:19)
filled (54:1)
final (12:24)
find (14:4) (44:16)
finding (29:10)
fine (65:18)
fines (21:10)
finish (19:19) (50:4) (60:25) (87:13)

**fully**

finished (61:18)
fire (9:10) (9:14) (9:15) (10:5) (11:23) (12:16) (18:14) (18:18) (18:21) (19:4) (19:11) (19:13) (19:21) (20:13) (22:6) (22:10) (22:15) (22:19) (23:2) (23:21) (24:17) (24:18) (25:20) (27:9) (28:15) (29:9) (29:25) (30:5) (30:13) (32:5) (32:10) (33:2) (33:16) (43:24) (46:15) (47:13) (48:1) (49:5) (49:15) (49:19) (51:12) (52:17) (52:22) (53:13) (54:1) (54:8) (55:7) (55:17) (56:8) (56:10) (57:11) (57:13) (58:6) (58:24) (59:4) (61:5) (61:11) (62:10) (62:20) (62:24) (64:14) (64:18) (65:2) (65:7) (65:10) (65:19) (66:10) (66:22) (67:7) (67:9) (67:11) (67:12) (68:9) (69:9) (69:21) (70:2) (70:9) (70:18) (71:8) (71:24) (72:2) (72:6) (73:18) (78:4) (78:7) (78:10) (83:5) (83:11) (84:2) (84:19) (85:3)
fired (54:14) (66:13) (66:21) (67:3) (81:1) (90:2)
firefighter (12:15) (16:2) (18:12) (23:1) (31:2) (37:13) (43:24) (46:4) (48:2) (56:18) (67:10) (67:17) (67:25) (68:2) (68:6) (68:13) (68:21) (69:2) (69:5) (69:17) (69:25) (70:6) (70:20) (70:25) (71:7) (79:12) (81:24) (82:5) (83:3) (83:10) (83:25) (84:2) (84:7) (84:8) (84:16) (84:19) (85:2)
firefighters (15:13) (15:19) (16:21) (18:4) (18:10) (26:24) (29:23) (30:4) (30:11) (30:14) (34:6) (34:12) (36:12) (42:13) (44:9) (47:19) (47:20) (47:24) (49:4) (49:14) (49:17) (49:21) (49:22) (54:9) (54:22) (56:15) (57:2) (62:11) (62:12) (62:14) (63:12) (65:8) (68:24) (70:17) (72:16) (72:22) (73:12) (79:5) (82:2) (86:12) (86:14) (87:10)
firefighter's (44:21)
firefighters' (26:2) (26:13) (26:22) (27:23) (42:6) (52:19)
firing (33:1) (54:18) (68:14) (69:3) (69:14) (69:25) (71:1) (85:5)
first (4:2) (4:17) (6:15) (19:12) (22:9) (23:6) (25:14) (27:2) (53:19) (59:10) (75:1) (75:3) (75:7) (75:8) (75:13) (75:19) (75:21) (77:18) (81:12) (92:8)
five (6:16) (7:19) (33:19) (45:16) (46:9) (19:8) (37:4) (39:5) (46:9) (49:24) (64:9) (68:2) (68:6) (68:22)
followed (13:9) (14:10)
following (5:7)
follows (4:4) (21:9)
follow-up (27:13) (39:4) (39:17) (41:1) (42:21) (75:25)
fop (17:6) (17:7) (17:12) (17:21) (17:25) (18:1) (18:5) (71:18)
force (63:10)
foregoing (92:9)
form (3:10) (5:21) (11:21) (11:24) (12:2) (14:10) (23:14) (54:17) (58:25) (59:3) (59:11) (59:22) (60:6) (61:24) (74:21) (83:23) (85:8)
formality (3:8)
forms (12:1)
forward (30:2)
found (29:10)
free (61:17) (63:2) (64:8) (75:3) (75:14) (75:21) (75:22)
friend (56:22) (56:24) (56:25)
friends (49:11)
front (7:9) (33:3) (36:9)
full (4:9) (7:10) (13:17) (85:23)
fully (6:9)

further                                    issues

**further** (3:16) (76:22) (76:23) (92:13)

**G**

**gear** (69:9) (70:18)
**general** (19:23) (51:20) (57:10) (64:17) (73:11) (77:25)
**gentleman** (27:2) (46:22) (73:10)
**gentlemen** (33:25) (37:3)
**gets** (67:11) (82:19)
**getting** (90:2)
**give** (5:14) (5:15) (11:6) (28:10) (33:8) (33:9) (35:24) (51:25) (63:3) (63:25) (75:9) (80:17) (89:13)
**given** (9:12) (19:1) (19:2) (36:17) (59:21) (59:24) (75:15) (78:17) (78:22)
**gives** (15:13) (15:19) (64:19)
**giving** (47:22)
**glad** (6:2) (42:21)
**goes** (12:23) (20:22) (49:1) (56:2) (83:14)
**going** (10:15) (11:4) (14:12) (18:22) (18:25) (20:23) (28:12) (32:21) (41:21) (45:16) (46:8) (46:20) (47:13) (48:1) (49:2) (50:3) (50:19) (58:16) (60:15) (62:9) (64:16) (67:7) (67:12) (71:3) (71:22) (74:1) (74:4) (76:1) (76:2) (77:8) (84:22) (88:5) (88:24)
**gone** (24:9) (34:20) (71:7) (87:22)
**good** (10:25) (27:12) (32:21) (33:6) (33:9) (40:16) (40:22) (43:16) (49:11) (56:18) (56:24) (77:9)
**goodwin** (40:4) (80:12) (80:25)
**gosh** (44:7)
**got** (21:3) (23:8) (23:19) (29:15) (35:5) (37:14) (46:1) (67:2) (70:11) (70:14) (70:15) (75:5) (85:16)
**government** (8:9) (11:22) (11:25) (12:1) (12:2) (54:17) (83:24)
**governments** (32:2)
**graham** (2:7) (4:6) (7:10) (14:17) (38:13) (78:20) (88:8)
**great** (9:18) (53:21)
**grievance** (20:21) (20:23) (21:3) (21:5) (21:20) (21:24) (22:2)
**grievances** (20:19) (21:13)
**ground** (14:23) (52:7) (70:11)
**group** (32:25) (37:1) (84:18)
**guard** (44:7) (44:12) (45:13)
**guess** (23:17) (28:1) (30:15) (54:20) (55:5)
**guidelines** (75:15)
**guy** (7:1)

**H**

**half** (24:9)
**hall** (1:19)
**handle** (35:22) (35:23) (37:15)
**happen** (19:1) (19:11) (65:8)
**happened** (14:25) (43:20) (58:18) (71:6)
**happening** (63:23)
**happens** (15:11) (50:24) (51:3)
**hardin** (48:22) (49:14) (73:17) (77:15) (78:18) (78:23) (81:11) (81:13) (82:15) (82:22)
**harmony** (62:3) (62:23)
**harold** (73:11)
**has** (7:10) (9:10) (14:10) (16:25) (18:5) (18:9) (25:6) (25:21) (33:11) (43:4) (43:20) (43:25) (48:17) (49:4) (49:8) (53:7) (53:11) (53:20) (56:12) (57:22) (63:11) (71:6) (85:10) (89:7)
**hate** (50:25) (51:4)
**haven't** (32:18)
**having** (4:2) (30:25) (38:5) (85:12) (86:15)

**hayes** (4:11)
**head** (8:8) (9:21) (19:4) (20:2) (22:3) (30:19) (33:22) (43:18) (46:21) (61:8) (62:25) (81:15)
**headline** (62:6)
**heads** (9:6) (9:13) (10:1) (10:10) (10:11) (11:16) (19:2) (22:21) (32:25) (86:6)
**health** (48:2) (68:23) (70:17)
**hear** (5:25) (35:20) (36:4) (43:22)
**heard** (42:24) (48:7) (48:10) (48:13) (52:23) (72:25) (88:13)
**hearing** (13:17) (20:25) (86:2) (87:2) (87:3) (87:4) (87:7) (87:25) (88:2) (88:24)
**hearings** (71:12) (71:14)
**hearsay** (48:4)
**heart** (61:12)
**held** (6:13) (14:20) (26:8) (38:14) (39:11) (42:23) (44:19)
**her** (55:3)
**herbert** (4:11)
**hereby** (3:2) (92:6)
**herein** (92:12)
**hereto** (3:20)
**he's** (9:16) (37:14) (38:20) (44:8) (56:24) (57:12) (57:20) (57:25) (66:10) (66:21) (66:22) (67:1) (67:6) (76:2) (79:17) (87:17)
**high** (33:6)
**him** (7:11) (24:9) (25:16) (27:10) (35:15) (39:22) (40:8) (46:10) (47:12) (51:17) (52:11) (52:18) (57:14) (57:24) (59:14) (64:13) (74:12) (78:13) (78:15) (86:5)
**himself** (15:6) (39:12)
**hire** (9:4) (9:15) (9:17) (9:21) (10:1) (22:12)
**hired** (9:9)
**hires** (10:7) (78:3) (78:5) (86:11)
**hiring** (9:10) (9:23) (10:9) (54:6)
**his** (10:21) (13:23) (14:22) (21:18) (25:12) (25:15) (27:1) (27:9) (31:3) (36:10) (37:9) (37:18) (39:10) (39:13) (40:1) (40:6) (42:5) (44:8) (45:4) (46:10) (53:20) (57:17) (57:23) (58:22) (60:22) (67:1) (67:22) (74:22) (79:15) (81:9) (82:15) (85:9) (86:25) (87:21) (89:24)
**hold** (6:11) (6:25) (17:14)
**honest** (77:19)
**hope** (18:23) (19:7) (20:1)
**hour** (28:17) (28:18) (35:2)
**house** (31:10)
**however** (10:8) (32:1) (54:9) (85:22) (hundred (62:11) (62:13) (86:19)
**hunter** (2:15) (9:14) (19:11) (24:17) (25:4) (30:2) (31:7) (45:8) (51:24) (52:1) (52:2) (52:5) (52:9) (52:21) (53:1) (53:5) (58:15) (58:22) (59:12) (60:4) (67:22) (71:23) (72:6) (73:2) (73:18) (74:8) (74:10) (76:1) (76:7) (77:20) (79:25) (80:6) (80:10) (80:24) (81:9) (81:21) (82:12) (82:15) (85:19) (86:3)
**hurt** (66:4)
**hypothetical** (20:10)

**I**

**iaff** (27:16) (30:9) (38:4)
**ibew** (16:8) (16:10)
**idea** (52:10)
**identify** (23:17)
**i'll** (5:13) (6:1) (43:17) (44:15) (44:16) (46:19)
**image** (64:19)
**immediate** (37:18)

**impact** (86:11)
**impair** (62:3)
**impaired** (62:23)
**impede** (62:15) (63:5) (66:1) (66:24)
**impeded** (63:17) (64:13)
**implementing** (74:18)
**important** (18:21)
**importantly** (6:5)
**inadequate** (68:8) (69:9) (69:20)
**inappropriate** (17:17)
**include** (84:20)
**includes** (56:14)
**including** (84:20) (85:5)
**increased** (32:8) (32:10)
**indepth** (40:1)
**indicate** (26:20) (42:21) (62:21) (77:5)
**indicated** (41:12) (76:21) (81:14) (87:18) (88:16)
**indicates** (40:2) (54:11) (56:19) (85:8)
**indications** (87:23)
**individual** (44:21) (49:17) (69:2) (69:13) (70:25) (89:24)
**individuals** (47:18) (58:23) (86:12)
**individual's** (43:6) (44:13)
**infantry** (33:1)
**information** (25:18) (65:2) (78:17) (78:22) (79:3) (79:19) (79:23)
**informed** (52:2)
**initial** (58:14)
**injured** (31:3)
**input** (55:24)
**inquiring** (90:11)
**inside** (66:21)
**instance** (31:2)
**instances** (11:24)
**instigated** (47:12)
**instruct** (37:17) (81:23)
**instructed** (35:15) (45:8)
**instructions** (51:25) (52:4) (80:18)
**insurance** (31:10)
**intensive** (33:7)
**intent** (84:11)
**interest** (88:22) (89:6) (89:8)
**interested** (92:15)
**interim** (24:8) (24:9) (26:6)
**international** (18:3) (18:9) (26:23) (42:13) (73:12) (82:2) (87:10)
**interview** (74:22)
**intimidated** (62:18)
**intimidation** (39:14) (54:18)
**into** (6:10) (19:9) (22:22) (22:25) (29:3) (32:6) (41:20) (41:21) (46:8) (51:20) (67:1) (74:8) (74:11) (78:3) (82:19) (85:22)
**introduced** (3:18)
**investigate** (58:17)
**investigation** (52:3) (52:8) (58:22) (80:21)
**invite** (7:8) (21:6) (24:11) (25:1) (35:11) (36:8) (38:1) (50:7)
**inviting** (35:24)
**involve** (43:5) (83:4)
**involved** (5:11) (9:22) (10:17) (14:14) (30:13)
**involving** (13:2) (34:23) (39:11) (83:11) (85:8)
**island** (55:20) (56:9)
**issue** (19:12) (19:14) (20:12) (29:22) (31:1) (31:16) (32:14) (33:15) (45:3) (53:4) (54:3) (71:8) (84:1) (84:4) (84:18) (85:2) (85:4)
**issued** (58:24) (59:3) (60:5) (61:24) (74:20)
**issues** (5:11) (18:20) (27:10) (28:22) (28:24) (29:2) (29:20) (30:19)

| item | mind |
|---|---|

**item**

(31:13) (32:13) (32:18) (34:2) (35:2)
(36:21) (40:11) (41:25) (42:14)
(42:22) (43:5) (43:25) (45:5) (45:21)
(47:25) (48:18) (48:24) (49:8) (49:15)
(49:19) (57:8) (57:10) (57:13) (58:6)
(58:7) (58:22) (70:21) (71:2) (71:19)
(79:20) (83:4) (83:11) (89:22)
**item**  (30:6) (36:23)
**items**  (30:12) (33:19) (45:7)
**it's a**  (14:8)
**itself**  (62:6)
**i've**  (5:4) (16:11) (17:6) (24:25)
(44:4) (44:6) (44:9) (47:20) (48:10)
(48:13) (50:13) (52:23) (54:5) (54:15)
(57:14) (57:24) (58:11) (61:20)
(84:24) (85:16) (90:17)

**J**

**james**  (2:7) (2:10)
**january**  (36:12) (73:10)
**jerry**  (36:13) (42:5)
**job**  (6:25) (7:4) (23:1) (25:6)
(25:12) (25:21) (26:10) (33:10)
(35:21) (55:8) (55:18) (62:14) (62:15)
(63:5) (63:17) (64:13) (66:2) (66:24)
(68:24)
**jobs**  (34:13) (86:16)
**johanson**  (59:13) (60:5)

**K**

**keep**  (29:16) (32:12) (33:9) (36:5)
(36:6) (59:23)
**kin**  (92:13)
**kind**  (21:20) (52:8) (55:23) (73:5)
**knew**  (54:6) (85:21) (90:4)
**knowing**  (25:15)
**knowledge**  (25:23) (37:20) (41:3)
(49:16) (71:10) (71:21) (72:10)
(79:15) (83:6)

**L**

**labor**  (15:14) (15:15) (15:20) (16:3)
(16:23) (26:2) (26:13) (30:10) (34:3)
(34:11) (42:12) (63:9) (79:5)
**land**  (55:1)
**language**  (84:13)
**large**  (1:18) (3:8) (92:6) (92:20)
**last**  (17:18) (25:2) (55:17)
**lasted**  (40:4)
**lately**  (44:6) (44:7)
**later**  (54:11) (89:10)
**latter**  (6:15)
**laughing**  (56:22)
**laundry**  (28:13) (36:16)
**law**  (5:4) (15:4) (17:14) (41:15)
(41:22) (41:25) (42:15) (56:11)
**laws**  (8:23) (26:9)
**lawsuit**  (4:19) (5:11)
**lead**  (16:3)
**leaders**  (17:20) (17:24)
**learn**  (58:21)
**least**  (23:20) (26:20)
**leave**  (55:8)
**ledger**  (58:11)
**ledger-enquirer**  (50:10)
**left**  (22:21) (35:16) (82:20)
**legal**  (52:6) (75:1)
**legitimate**  (29:3)
**length**  (40:7)
**less**  (28:17) (40:7) (40:9)
**let**  (7:8) (9:18) (10:10) (15:10)
(19:19) (21:6) (23:17) (24:11) (27:4)
(27:5) (35:11) (36:8) (37:15) (38:1)
(38:10) (42:8) (43:2) (50:3) (50:7)
(60:25) (62:12) (64:15) (67:20)
(84:24) (87:13)
**let's**  (6:10) (14:17) (27:14) (38:13)

**made**  (3:11) (12:12) (18:5) (18:11)
(25:16) (26:8) (52:13) (53:18) (55:6)
(61:2) (62:2) (64:11) (87:14) (88:17)
**magnitude**  (20:5)
**main**  (32:9)
**majority**  (58:12) (65:9)
**make**  (12:24) (15:21) (16:4) (24:4)
(27:25) (43:21) (52:6) (86:6) (88:24)
**maker**  (10:21) (10:23)
**makes**  (56:18)
**making**  (59:14) (90:20)
**malone**  (27:2) (27:16) (27:21) (30:9)
(31:15) (32:15) (33:15) (34:1) (35:8)
(36:19) (37:4) (38:3) (38:6) (38:17)
(39:2) (39:5) (39:9) (39:12) (40:2)
(41:9) (41:13) (42:4) (42:8) (42:20)
(42:24)
**malone's**  (40:15)
**man**  (65:19) (65:20)
**manage**  (10:11)
**management**  (17:16)
**manager**  (6:12) (6:14) (6:23) (7:2)
(7:4) (8:3) (8:8) (8:22) (11:7) (12:24)
(13:14) (14:9) (17:19) (18:6) (18:16)
(18:19) (22:17) (23:24) (24:7)
(24:8) (25:11) (25:19) (26:1) (26:3)
(26:4) (26:5) (26:16) (32:24) (44:4)
(44:10) (50:16) (67:24) (68:20) (73:4)
(75:18) (80:11) (81:16) (82:21) (83:18)
**managers**  (32:2)

**managers'**  (32:4)
**manner**  (3:19) (47:8) (47:10) (56:12)
(56:13) (92:15)
**manning**  (42:1)
**many**  (5:2)
**march**  (38:4) (38:18) (41:9)
**marine**  (56:18)
**marines**  (56:16)
**master**  (16:14)
**matter**  (13:20) (15:4) (37:11) (41:4)
(58:17) (61:17) (92:9)
**max**  (24:6)
**maybe**  (20:9) (21:2) (21:25)
**mayor**  (7:21) (8:15) (14:6) (14:13)
(15:6) (48:22) (49:1) (49:14) (73:17)
(77:15) (77:25) (78:18) (78:23) (79:4)
(79:7) (79:21) (80:2) (81:11) (81:12)
(81:22) (81:23) (82:7) (82:9) (82:12)
(82:15) (82:22) (83:4) (87:16) (87:21)
**mcgillivray**  (2:3)
**mckoon**  (2:10) (33:13) (55:16)
(55:18) (55:25) (56:5) (56:8)
**mean**  (8:18) (9:3) (14:2) (27:24)
(29:23) (34:9) (39:25) (47:11) (50:17)
(56:4) (58:18) (63:8) (70:13) (90:8)
**media**  (59:15) (59:18) (60:14)
(60:21) (61:9) (67:8) (67:12) (68:7)
(68:23) (69:8) (69:18) (70:1) (70:8)
(71:19) (74:22) (89:13)
**mediate**  (57:3)
**mediator**  (57:9) (57:18) (57:20)
**meet**  (17:20) (17:24) (34:1) (35:1)
(35:6) (39:5)
**meeting**  (19:13) (27:1) (27:11)
(27:14) (28:5) (28:7) (28:16) (28:19)
(29:2) (30:9) (30:13) (30:21) (31:15)
(32:4) (32:16) (32:19) (33:16) (33:21)
(34:16) (34:23) (35:2) (35:13) (36:1)
(36:18) (36:22) (37:2) (38:20) (38:23)
(39:4) (39:10) (40:2) (40:11) (40:13)
(40:16) (40:17) (40:19) (40:22) (42:4)
(42:5) (42:9) (42:21) (42:22) (42:25)
(71:7) (71:11)
**meetings**  (41:1)
**member**  (16:8) (16:10) (16:18) (17:6)
(17:7) (17:12) (37:13) (45:9) (47:2)
(56:19) (57:8) (57:16) (83:10) (89:12)
**members**  (7:19) (7:21) (15:1) (17:20)
(17:24) (18:2) (47:25) (48:15) (48:18)
(64:25) (71:23) (72:6) (83:8) (84:4)
**memo**  (24:16) (24:23) (24:25) (25:2)
(71:23) (72:12) (72:20) (72:23) (76:7)
(76:10) (76:17) (80:9) (80:13) (80:17)
(81:9) (81:12)
**memorandum**  (36:9) (73:3) (73:6)
**memory**  (27:19) (31:14)
**men**  (33:1) (33:5)
**mentioned**  (32:19) (47:19) (49:5)
(57:12)
**mentions**  (39:12)
**merit**  (9:7) (10:6) (11:13) (12:5)
(19:17) (19:19) (19:22) (20:16) (21:7)
(34:25) (43:19) (47:5) (50:1) (60:8)
(60:15) (60:17) (61:4) (61:7) (61:14)
(61:21) (62:4) (63:3) (64:7) (67:17)
(68:1) (68:10) (68:17) (68:21) (69:1)
(69:6) (69:11) (69:16) (69:24) (70:5)
(70:20) (80:3) (81:14) (82:4) (82:6)
(82:7) (82:10) (84:5) (84:9) (84:12)
(84:14) (84:22) (88:14)
**met**  (18:2) (18:3) (26:21) (26:25)
(40:8)
**middle**  (1:2)
**might**  (20:11) (21:4) (79:15) (88:22)
(88:25) (89:7)
**military**  (43:14) (56:12)
**mind**  (42:3) (45:4)

**letter**  (24:19) (38:3) (38:6) (38:17)
(39:8) (39:13) (39:18) (39:21) (40:6)
(40:15) (41:8) (41:10) (42:20) (58:10)
(73:9) (73:13) (73:17) (73:21) (73:25)
(74:7) (74:15) (75:6) (76:1) (76:4)
(76:9) (76:21) (77:1) (77:5) (77:7)
(77:10) (85:16)
**letters**  (58:5) (58:8)
**level**  (17:16)
**license**  (16:16)
**light**  (5:5) (64:10) (80:25)
**like**  (19:6) (21:5) (22:18) (22:23)
(23:1) (23:23) (28:4) (29:13) (29:17)
(31:18) (32:7) (35:17) (35:21) (36:4)
(38:8) (38:11) (39:13) (43:12) (46:2)
(48:5) (53:2) (55:7) (55:19) (56:8)
(63:6) (64:22) (65:15) (72:5) (72:18)
(73:23) (75:8) (81:3) (81:23) (84:15)
(84:23)
**line**  (23:6) (25:14) (31:11) (33:3)
(53:19) (57:17) (66:25) (67:10) (83:20)
**list**  (28:13) (36:16) (52:18)
**listen**  (46:19)
**listened**  (13:7)
**local**  (16:3) (17:1) (17:3) (18:10)
(26:2) (26:22) (27:1) (27:5) (27:18)
(27:23) (30:10) (36:11) (37:10)
(37:12) (41:24) (42:6) (59:14) (60:14)
(60:21) (74:22) (79:5) (79:12) (79:16)
(87:21)
**long**  (6:13) (6:25) (16:6) (16:25)
(28:16) (44:24) (45:14) (45:16)
(53:12) (75:23)
**look**  (19:9) (20:20) (23:23) (46:8)
(50:11) (59:2) (59:8) (61:6) (61:16)
(74:8)
**looked**  (29:3) (29:13)
**looking**  (24:12) (30:3) (54:6) (74:10)
**looks**  (72:5)
**lot**  (23:16) (40:7) (47:20) (47:21)
(59:17)
**lowest**  (52:17) (66:10)
**loyalty**  (66:3) (66:4)
**luncheon**  (49:3)

**M**

minute    (14:18)
minutes    (40:5) (45:17)
moment    (38:9)
monday    (51:18)
montgomery    (92:3)
month    (19:12)
months    (78:12) (86:10)
morale    (27:6) (32:20) (32:23)
(32:25) (33:4) (33:6) (33:9) (33:15)
(45:6) (45:22) (45:23) (52:16) (52:21)
(53:2) (53:4) (53:11) (53:21) (58:7)
(63:16) (64:17) (66:9) (70:2) (70:19)
morning    (44:14) (23:19)
most    (6:5) (32:1) (32:2) (45:17)
move    (73:8)
moved    (17:13) (30:1)
much    (15:23) (22:21) (24:13) (27:8)
(41:4) (43:12) (44:6)
myself    (20:24) (27:21) (36:5)
(38:11) (62:12)

**N**

name    (4:9) (4:18) (24:4) (27:1)
(31:3) (44:8) (44:13) (44:22) (49:20)
(90:6)
named    (46:22) (73:11)
national    (44:12) (45:13)
nature    (5:10) (21:4) (27:7) (40:19)
(42:1)
necessarily    (33:8)
necessary    (33:10) (76:23)
need    (3:10) (20:22) (24:13) (43:17)
(64:21) (70:15)
needed    (28:14) (37:24) (81:4)
needs    (30:7) (37:14) (83:16)
negative    (62:16)
negatives    (65:11)
negotiations    (41:20) (41:21)
neither    (92:13)
never    (18:25) (26:25) (42:24)
(47:15) (54:17) (57:24) (84:24)
(90:16) (90:17)
new    (58:19) (65:24) (78:3) (78:5)
(86:11)
news    (71:19)
newspaper    (50:8) (50:14) (52:14)
(55:15) (58:14) (58:23) (59:6) (59:16)
(60:22) (61:3) (62:2) (62:22) (63:5)
(63:16) (64:11) (65:13) (66:7)
next    (5:23) (19:11) (51:15) (63:2)
nfpa    (31:19)
nonunion    (63:10)
nor    (92:13) (92:14)
normal    (10:17) (89:21)
note    (28:21) (59:10)
nothing    (4:4) (29:11) (58:19)
notice    (53:23) (81:9)
now    (15:10) (26:19) (29:16) (29:17)
(32:21) (33:11) (34:22) (37:17)
(38:16) (39:9) (41:7) (42:10) (42:19)
(44:8) (44:23) (45:2) (45:25) (53:9)
(56:19) (56:22) (71:10) (71:13)
(71:22) (79:11) (80:16) (85:14) (86:23)
number    (5:13) (10:14) (17:2) (19:21)
(66:17) (75:12) (75:17) (86:18)

**O**

oath    (6:6)
objected    (72:25)
objections    (3:9) (3:10) (72:21)
obviously    (39:9)
occasion    (26:21) (43:3) (45:18)
occasions    (17:20) (25:5) (43:23)
occupied    (33:7)
occur    (80:2)
off    (14:17) (14:20) (30:18) (33:22)
(34:15) (38:13) (38:14) (42:15)

offense    (68:18)
offered    (3:12)
office    (26:25)
officer    (37:18) (42:7) (42:12)
(44:11) (46:15) (46:18) (79:12)
officers    (9:1) (11:5) (18:7) (29:14)
(71:17)
offices    (1:18)
old    (11:21) (16:9) (65:22)
once    (9:20) (35:15) (43:8) (87:20)
one    (4:18) (4:25) (6:1) (7:21)
(10:14) (14:9) (19:21) (23:5) (26:20)
(29:6) (30:11) (31:2) (32:9) (37:12)
(43:20) (43:22) (49:3) (49:11) (58:2)
(59:25) (60:16) (62:13) (64:21)
(66:17) (72:19) (78:12) (86:1) (86:18)
(86:19)
one-hour    (36:22)
ones    (65:16)
ongoing    (30:6) (53:16)
only    (14:12) (14:13) (30:4) (32:9)
(40:4) (54:1) (79:7)
open    (36:5) (36:7) (43:10) (47:14)
operating    (60:16) (60:18)
operation    (49:5)
operations    (7:6) (19:14) (51:21)
(64:19) (64:20) (65:2) (65:9) (70:9)
(82:20)
opinion    (19:23) (34:7) (63:14)
(65:6) (80:7) (81:5)
opinions    (65:10)
opportunity    (5:9) (13:22)
opposed    (74:18)
oral    (21:3)
ordinances    (8:23)
organization    (15:14) (15:15)
(15:20) (16:23) (18:24) (26:2) (33:3)
(34:11) (42:12) (56:12)
organized    (63:9)
others    (59:19) (64:14) (86:17)
our    (11:23) (12:3) (19:1) (62:13)
(71:14) (75:8) (78:6) (81:14) (81:17)
(86:17)
ourselves    (14:4)
out    (24:4) (29:10) (31:6) (31:23)
(31:25) (44:16) (47:21) (50:11)
(55:18) (57:17) (59:19) (89:25) (92:12)
outcome    (27:12) (52:7)
outlining    (74:25)
outside    (57:17) (57:23)
outstanding    (25:6) (25:21)
over    (28:4) (35:12) (35:25) (37:1)
(45:1) (51:13) (54:10) (64:3) (69:19)
overlap    (55:14)
override    (60:18)
overrule    (15:7)
overruled    (13:6)
own    (9:22) (10:11) (16:22) (86:7)

**P**

page    (55:14) (61:16) (81:12)
pages    (92:9)
panama    (29:8) (29:13)
paper    (51:1) (51:4) (62:17) (64:21)
paramilitary    (18:24) (33:3) (56:13)
parris    (56:20) (56:9)
part    (6:15) (11:5) (52:15) (67:17)
(77:5)
participate    (35:25) (57:1) (87:4)
particular    (14:22) (30:14) (55:15)
(60:10) (60:22) (72:5) (74:2) (74:5)
particularly    (8:21) (34:23) (67:23)
parties    (3:3) (3:17) (92:12) (92:14)
party    (3:20)
path    (53:8)

pay    (21:11) (23:15) (31:5)
peer    (62:18) (63:7)
penalty    (6:7)
pending    (28:25)
people    (53:20) (54:7) (66:5) (70:14)
per    (27:5) (32:5) (73:24)
percent    (62:11) (62:13) (86:19)
performance    (23:1) (23:21) (25:12)
(62:16) (63:5) (63:18) (64:13) (66:2)
(66:24)
perhaps    (5:22) (26:21) (26:22)
(37:18) (68:14)
period    (53:12) (78:12) (79:22)
(86:10) (87:16)
perjury    (6:7)
permission    (35:5)
permitted    (83:25)
person    (65:6) (66:3) (79:15)
personal    (65:6) (66:3) (79:15)
personally    (29:7)
personnel    (9:24) (11:14) (11:19)
(12:10) (12:11) (12:18) (12:23) (13:3)
(13:18) (14:11) (14:24) (20:25) (21:2)
(21:22) (31:9) (40:4) (80:12) (80:25)
(81:2) (81:15) (86:1) (86:25) (87:25)
(88:2) (88:11) (88:17) (88:23) (89:1)
(89:22) (90:23)
perspective    (65:4) (65:5) (75:24)
phenix    (1:8) (1:19) (2:8) (2:12)
(7:12) (16:22) (17:5) (18:10) (22:6)
(34:5) (36:11) (52:19) (71:24)
phone    (79:24)
pieces    (65:23) (85:24)
place    (10:15) (45:15) (85:10)
placed    (77:14) (78:18) (78:23) (79:4)
plaintiff    (1:6) (2:2) (10:20)
plaintiff's    (4:18)
planning    (52:3)
play    (14:6)
please    (4:10) (61:1) (62:1) (87:13)
plumbers    (63:13)
point    (52:17) (77:13) (84:24)
(85:18) (87:9) (89:3)
points    (82:11)
police    (11:23) (17:4) (17:9) (18:7)
(29:14) (32:11) (56:11) (61:11)
(71:17) (71:19) (78:7)
policy    (31:23) (31:25) (43:10)
(90:19)
poor    (63:16)
portion    (29:17) (33:11)
position    (6:11) (6:13) (21:11)
(26:3) (26:4) (26:9) (81:21) (82:25)
positions    (7:24)
positive    (25:7) (25:21) (28:21)
(53:8)
possibility    (74:17)
possible    (10:4) (90:11)
potential    (66:12) (69:3) (71:1)
powers    (8:2)
prater    (27:11) (30:22) (35:3) (35:7)
(35:22) (35:25) (36:13) (37:5) (37:7)
(37:9) (37:23) (37:25) (38:21) (38:24)
(39:1) (39:6) (39:25) (39:20) (40:18)
(40:23) (42:5) (42:9) (53:5)
present    (2:14) (39:2) (71:15)
president    (27:18) (52:18) (73:11)
(79:5) (79:16) (81:24) (87:17) (87:22)
press    (89:13)
pressure    (62:19) (63:7)
pretty    (7:15) (22:21) (27:8) (28:21)
(41:4) (41:23)
preventing    (48:8)
previous    (4:23) (4:25) (24:7)
previously    (90:21)
primarily    (23:15)
principles    (75:1)

**prior**

prior (26:6) (35:23) (53:6) (72:9) (86:3)
private (89:23)
probably (10:13) (20:2) (20:3) (28:17) (29:15)
probation (86:15) (86:18)
probationary (78:2) (78:3) (78:12) (79:9) (79:22) (86:10) (87:16)
problem (19:7) (30:24) (53:12) (53:16)
problems (29:22) (53:17) (66:21) (76:5)
procedure (3:5) (3:15) (3:21) (12:10) (19:9) (60:17) (83:13)
procedures (5:6) (14:3) (20:22) (31:6) (60:19) (69:20) (70:11) (75:10) (83:13)
process (9:20) (10:14) (12:14) (14:1) (14:2) (30:6) (85:15) (86:20)
productive (39:10)
professional (25:7) (25:22)
prohibited (86:15)
prohibits (15:25)
promoted (22:14)
promotions (22:18) (22:22)
proper (19:5) (19:8) (35:9) (65:4) (65:5) (75:23) (83:12) (83:13)
proposals (15:21) (16:4) (18:5) (18:11) (28:11)
proposed (22:18) (78:2) (78:11) (79:8)
prospective (90:11)
protection (12:3)
protections (75:4) (75:19)
protective (69:9) (70:18)
protects (75:13)
provided (3:14) (3:20)
provision (15:13) (15:19) (15:25) (20:14) (63:2)
provisions (7:16) (8:14)
public (64:17) (65:1) (70:8) (75:2) (75:14) (75:19) (78:6) (86:18) (86:22)
publicity (51:5) (67:9)
publishing (59:14)
pulling (31:4)
purpose (3:13)
purposes (17:15) (23:15)
pursuant (1:15) (3:4)
pursue (68:6)
pursues (85:2)
pursuing (70:22)
puts (66:17)

---

**Q**

qualified (86:12)
question (6:2) (43:16) (63:1) (69:5) (82:13) (89:2)
questions (3:9) (3:10) (5:14) (6:1) (24:15) (50:4) (61:23) (64:9) (67:20) (91:1)
quick (44:17)
quite (17:1) (17:3)
quote (21:9) (21:13) (24:19) (24:20) (25:3) (25:4) (25:7) (54:12) (54:14) (55:13) (55:16) (55:20) (56:1) (59:11) (59:15) (61:7) (62:16) (67:1) (81:12) (81:17) (89:13) (90:24)
quoted (52:16) (58:23) (62:3) (66:7) (66:9) (66:11) (66:15) (82:13)

---

**R**

raise (28:22) (54:2)
raise concerns (83:19)
raised (29:2) (29:20) (30:19) (31:14) (31:17) (32:14) (32:19) (32:22) (33:15) (33:20) (49:8)
range (20:7)

**rank** (22:14) (23:9)
rather (20:24) (22:1) (43:21) (43:22)
ray (56:20)
reaction (50:15) (50:17) (73:22)
read (4:6) (20:22) (23:5) (24:23) (24:25) (38:9) (38:17) (50:13) (50:14) (51:11) (52:20) (55:5) (55:9) (57:5) (58:8) (58:10) (58:11) (58:14) (61:20) (66:7) (72:17)
reading (13:8) (61:18) (67:1) (67:3) (67:6)
real (32:21) (49:10)
really (10:16) (20:22) (47:8) (53:15) (64:20) (77:19)
realms (63:12)
reason (35:18) (43:18) (55:17)
reasons (10:13)
recall (28:20) (30:11) (30:15) (33:14) (34:14) (38:5) (43:2) (43:23) (49:13) (49:18) (61:23) (85:12)
receipt (77:5)
receive (55:23) (65:1) (72:21) (76:10) (79:3) (85:25)
received (38:6) (39:18) (72:17) (72:19) (73:21) (76:17) (80:13) (80:16) (85:23)
receiving (73:13)
recess (64:5)
recognize (41:14) (41:18) (41:19) (41:23)
recommendation (13:11) (13:14) (13:15) (13:19) (14:11) (14:25) (88:18)
recommended (88:25)
record (4:10) (4:16) (14:17) (14:20) (14:21) (38:13) (38:14) (38:15) (44:16) (44:18) (44:19) (44:20) (72:18) (85:1)
recruiting (86:11)
reductions (21:11)
refer (15:11) (81:13)
reference (59:16)
referred (83:7)
referring (60:11)
regard (10:3) (10:19) (22:4) (63:1)
regulations (19:20) (20:17) (21:8) (34:25) (47:5) (60:9) (61:4) (61:7) (61:15) (61:22) (62:5) (63:3) (64:8) (67:18) (68:11) (68:22) (69:6) (69:17) (69:24) (70:6) (70:20) (80:4) (82:8) (84:10) (84:12) (84:14)
relate (87:12) (87:14)
related (70:8) (89:2)
relates (45:6) (66:5) (66:18)
relation (78:1)
reluctant (54:12) (66:18) (66:19)
remedial (55:11)
remember (29:1) (29:19) (30:18) (31:3) (33:20) (35:9) (37:20) (44:13) (44:21) (51:16) (59:24) (73:13) (77:20) (78:25) (80:19)
removal (11:5)
remove (11:7)
removed (30:24)
repeat (6:2)
rephrase (6:2)
reply (77:1)
report (40:18)
reported (40:23) (77:11) (92:7)
reporter (1:17) (3:7) (4:5) (5:19) (35:19) (64:2) (92:5)
reporter's (92:1)
reports (18:15)
representative (26:23) (37:10) (38:4) (42:7) (68:8) (69:19) (70:2) (70:8) (82:1) (88:3)
representatives (15:20) (34:3) (71:18)

**representing** (3:3) (3:17) (4:19)
reprimand (21:3)
request (39:24)
required (41:15) (72:15)
rescue (65:20)
research (29:10)
reserved (3:11)
resolved (28:23)
resources (30:4)
respect (55:25)
respond (89:16)
responding (41:13)
response (50:19) (50:21) (69:19) (89:21)
responsibilities (7:5)
responsibility (22:18) (22:24)
responsible (8:11) (8:14) (8:22) (10:7)
restraints (54:7) (65:24)
result (68:15)
results (92:15)
retaliated (75:20)
retaliation (54:13) (54:23) (66:12) (66:20) (67:2)
retired (45:1)
retirement (17:15) (49:3)
returned (26:10) (30:23) (53:10)
review (11:14) (12:11) (14:11) (20:18) (20:25) (21:2) (21:12) (21:20) (22:18) (24:14) (43:21) (61:10) (61:13) (86:2) (87:25) (88:2)
right (6:1) (6:10) (7:13) (10:3) (12:17) (13:23) (15:14) (15:19) (18:18) (22:4) (26:19) (28:9) (28:17) (32:17) (32:21) (36:23) (40:9) (43:1) (44:8) (44:17) (51:16) (56:20) (59:7) (62:25) (65:1) (75:2) (75:13) (76:22) (88:7)
rights (16:2) (75:5) (75:7) (75:9) (75:21)
risks (74:17)
roberts (1:15) (3:4) (4:1) (4:11) (4:12) (6:8) (7:10) (18:14) (22:4) (24:13) (24:19) (28:2) (36:8) (38:17) (61:1) (64:6) (73:9) (77:14) (85:7) (91:1) (92:7)
role (10:5) (14:6) (34:2) (34:5)
rollover (53:4) (53:6)
room (33:13) (71:14)
roughly (16:7) (28:16) (44:24) (45:15)
roy (24:16) (76:7)
rules (3:5) (3:14) (3:20) (20:16) (21:8) (34:25) (47:5) (48:8) (50:3) (60:8) (61:4) (61:6) (61:14) (61:22) (62:5) (63:3) (64:7) (67:18) (68:1) (68:10) (68:21) (69:6) (69:17) (69:24) (70:6) (70:20) (80:3) (82:8) (84:9) (84:12) (84:14)
ruling (3:12)
run (55:19) (56:12)
running (56:8)

---

**S**

safety (29:22) (29:23) (30:14) (32:5) (41:25) (46:4) (48:3) (64:16) (68:24) (70:8) (70:17) (70:19) (78:6) (86:22)
said (3:5) (3:18) (37:24) (55:18) (63:6) (74:6) (76:5) (78:20) (92:11) (92:14)
salaries (15:22) (18:6) (18:12)
salary (41:22)
same (15:18) (15:24) (42:14) (45:5) (56:16) (63:1) (69:5) (83:7) (84:16) (85:4) (86:17)
sat (28:8)

**saw**

| | | |
|---|---|---|

saw (54:2)
saying (52:16) (67:6) (82:9)
says (9:3) (10:6) (21:8) (21:13)
(24:20) (25:3) (25:8) (39:14) (55:21)
(57:3) (59:11) (73:18) (74:23) (81:12)
(81:17) (84:22)
schaitberger (73:11) (74:16)
(74:25) (75:6) (76:9) (77:2)
schedule (34:15) (74:17) (74:19)
scheduled (28:7) (41:2)
second (44:15) (52:15)
secondary (86:15)
section (8:1) (8:22) (10:8) (11:4)
(11:6) (21:8) (61:16) (61:19) (61:21)
(62:4) (63:2) (64:7)
sector (86:18)
seeking (21:20)
seems (53:2)
self (30:16)
sends (9:15)
sense (27:25)
sent (38:18) (73:16) (76:9) (77:1)
(80:11)
sentence (25:2) (59:10)
sentences (82:13)
separate (30:21)
september (50:11) (58:14) (59:5)
(59:13) (64:12) (71:24) (73:4) (74:21)
sequence (35:9) (35:10)
sergeant (22:14) (25:13) (27:9)
(27:21) (34:17) (37:6) (38:24) (39:1)
(49:9) (54:5) (55:1) (55:19) (56:9)
(59:11)
series (58:4) (67:20)
serve (57:18) (57:20)
service (11:12) (11:18) (11:20)
(12:7) (38:3) (90:5) (90:7)
session (83:21) (83:22)
set (7:10) (23:8) (92:12)
several (5:4) (25:5) (44:4) (44:9)
(47:19) (54:21) (59:18)
shall (21:12)
shannon (1:16) (3:6) (92:4) (92:19)
share (82:14)
shift (29:7) (29:8) (29:9) (29:11)
(29:13) (29:16) (34:15) (74:17) (74:18)
shifts (29:6)
shortcomings (19:10)
shorten (61:15)
shortfalls (19:3)
shorthand (92:4)
shortly (30:23) (34:22) (59:6)
(73:13)
should (5:22) (21:1) (26:3) (26:4)
(27:9) (28:23) (29:3) (56:15) (56:17)
(64:24) (65:8) (81:1) (81:13) (81:23)
(82:20) (87:18) (87:22)
show (23:17)
shown (63:11) (87:24)
sick (31:3)
side (16:17) (31:10)
sides (86:1)
sign (4:6) (23:3) (23:11) (23:14)
(23:16) (72:16) (85:11) (85:13) (85:16)
signature (23:14) (24:5) (41:10)
(85:11)
signed (24:3) (85:12)
significant (54:13)
similar (72:12)
since (7:1) (7:2) (14:9) (16:8)
(17:13) (18:2) (31:7) (52:17) (53:7)
(53:10) (78:10) (82:1)
sir (5:1) (5:8) (5:17) (5:20) (6:4)
(6:9) (6:18) (7:17) (7:25) (8:6) (8:10)
(8:13) (8:16) (11:9) (13:12) (13:21)
(13:25) (14:8) (15:9) (16:5) (16:11)
(16:14) (16:16) (16:20) (17:6) (17:8)

(17:11) (17:13) (18:8) (18:13) (18:17)
(20:15) (23:5) (23:19) (24:1) (24:21)
(24:23) (25:10) (26:5) (26:14) (28:3)
(28:6) (28:12) (31:24) (32:1) (34:4)
(34:21) (41:11) (42:11) (43:7) (43:9)
(44:11) (46:13) (46:17) (47:3) (47:17)
(48:14) (48:16) (48:19) (49:23)
(50:13) (51:6) (52:12) (52:23) (54:15)
(55:4) (56:10) (56:18) (56:21) (57:21)
(58:12) (59:23) (60:7) (61:20) (62:9)
(63:19) (66:6) (67:14) (67:19) (68:12)
(68:20) (71:9) (72:24) (73:1) (73:4)
(75:8) (75:16) (76:4) (76:16) (76:21)
(77:17) (77:23) (80:5) (80:10) (82:24)
(83:1) (84:6) (86:6) (86:9) (86:13)
(87:7) (88:20) (89:11) (90:5) (90:13)
sit (43:20)
sits (11:19)
sitting (4:12) (42:4)
situation (52:22) (81:1) (81:6)
(82:23)
situations (83:9)
six (33:19)
slots (53:25)
so-called (36:16) (68:2) (71:3)
solid (52:6)
some (18:1) (18:3) (20:23) (27:4)
(28:14) (28:22) (28:25) (29:1) (29:9)
(29:14) (31:6) (36:21) (37:14) (45:5)
(46:5) (46:10) (50:19) (51:18) (52:13)
(55:14) (63:10) (63:13) (65:22)
(65:25) (66:4) (71:13) (72:18) (74:13)
(76:5) (77:13)
somebody (24:3)
someone (18:25) (31:4) (62:18)
sometime (77:15)
sop (61:11)
sops (60:9) (60:12) (61:5)
sorry (17:23) (23:11) (34:8) (48:12)
(51:2) (60:25) (63:8) (76:16) (78:21)
(87:12)
speak (4:3) (36:5) (80:17) (83:10)
(92:8)
specifically (10:19) (11:23) (52:1)
(68:5) (70:13)
speech (61:18) (63:2) (64:8) (75:14)
(75:22)
spent (59:17)
spoke (19:14) (45:5) (68:7) (68:23)
(69:8) (69:18) (70:1) (70:7) (77:6)
(79:21)
spoken (48:17) (82:22)
spots (53:25)
squad (33:2)
staffing (27:6) (31:16) (32:7)
(32:8) (32:10) (45:19) (46:4) (46:5)
(48:3) (65:18) (66:8) (66:15) (68:8)
(70:17)
standard (60:16) (60:18)
standards (31:19)
started (26:19)
state (1:18) (3:8) (4:9) (15:12)
(15:13) (15:18) (15:25) (16:16)
(17:15) (41:13) (41:25) (42:15) (92:2)
(92:5) (92:20)
stated (22:20) (40:17) (40:21)
(41:25) (57:12) (62:6) (86:7)
statement (21:16) (25:11) (25:19)
(53:18) (59:20) (68:19) (78:14)
statements (59:14) (59:19) (74:22)
states (1:1) (32:2)
steamfitters (63:13)
still (16:10) (16:15) (17:12)
(17:14) (27:18) (28:25) (42:14)
stipulated (3:2) (3:16)
stipulation and (1:16)
stipulations (3:1) (4:5)

**tell**

stood (71:7)
stop (6:1) (43:15)
straight (46:1) (46:17)
street (1:19) (2:4) (2:7) (2:11)
strictly (19:24)
structure (23:10) (29:16)
structured (83:23)
struggle (53:7)
subject (11:11) (19:15) (20:18)
(21:12) (24:19) (30:13) (40:20)
(53:24) (61:17) (64:8) (66:8) (68:8)
(68:14) (69:3) (69:7) (69:13) (71:1)
(76:24) (84:19) (85:4)
subjecting (69:24)
subjects (70:16)
subordinate (18:25)
subsequently (58:21)
substance (48:23) (51:8) (51:24)
(72:22) (87:8)
suggest (37:3) (46:9)
suggested (37:22)
suggesting (39:4)
suite (2:4)
supervisor (23:7) (25:14) (53:19)
supervisors (33:4)
supper (49:3)
supported (26:15)
supportive (88:12)
sure (9:19) (11:1) (14:19) (38:12)
(44:18) (52:5) (52:6) (74:14)
suspension (14:16) (68:19)
suspensions (21:10)
swap (30:22) (30:24) (30:25) (31:4)
(31:12) (45:24) (46:1) (58:7)
sworn (4:2) (6:6) (92:8)
synopsis (37:1)
system (9:7) (11:13) (12:6) (12:8)
(12:9) (19:17) (19:19) (19:22) (20:16)
(34:25) (43:19) (60:8) (60:15) (60:17)
(61:4) (61:7) (61:14) (61:21) (62:4)
(63:3) (64:7) (68:1) (68:10) (68:17)
(68:21) (69:1) (69:12) (69:16) (69:24)
(70:6) (70:20) (80:3) (81:14) (82:4)
(82:6) (82:8) (82:10) (84:5) (84:9)
(84:12) (84:14) (84:22) (88:14)
system's (21:8) (47:5) (50:1)
(67:18) (69:6)

| T |
|---|

take (5:5) (7:15) (8:3) (10:15)
(15:2) (15:4) (20:3) (20:7) (24:13)
(35:16) (37:24) (38:9) (39:17) (41:9)
(43:17) (45:14) (50:19) (55:10)
(56:20) (58:7) (59:5) (64:4) (76:18)
(76:22) (80:12)
taken (1:15) (3:4) (3:6) (4:23) (5:19)
taking (66:22)
talk (32:3) (32:24) (37:6) (37:9)
(41:24) (42:11) (42:14) (43:11) (45:8)
(46:18) (46:20) (47:21) (51:13)
(54:12) (65:17) (66:18) (66:19)
(70:14) (70:15) (71:13) (74:6) (76:1)
talked (27:3) (32:23) (33:19) (35:7)
(39:20) (39:23) (43:25) (44:6) (44:9)
(46:5) (47:24) (48:10) (48:13) (48:15)
(51:15) (51:17) (51:19) (54:5) (71:18)
talking (29:24) (61:9) (64:3)
(66:21) (66:23) (82:12)
talks (66:1)
taylor (46:22)
taylorson (44:23) (46:23) (46:24)
(47:4) (49:18)
technical (21:25)
telephone (77:15) (78:18) (79:21)
(80:1) (87:15) (90:15)
telephone conver-- (87:13)
tell (6:6) (43:17) (61:8) (61:18)

**telling**

(62:1) (77:24) (80:6)
**telling** (67:5)
**ten** (5:2) (45:16)
**tenure** (19:1)
**terminated** (12:16) (85:9)
**termination** (10:4) (10:18) (10:21)
(12:9) (12:25) (13:24) (14:7) (14:14)
(14:23) (15:2) (15:8) (20:9) (54:18)
(68:18) (84:20) (85:20) (85:21)
(85:22) (85:25) (86:4)
**terminations** (10:7) (10:9)
**terms** (51:20) (77:25)
**testified** (4:4) (33:24)
**testify** (48:5) (48:7) (87:5)
**testifying** (48:9)
**testimony** (87:8) (88:13)
**testing** (9:21)
**thank** (91:1)
**them** (8:20) (18:2) (20:4) (23:5)
(23:16) (33:8) (33:9) (36:24) (37:12)
(42:10) (42:11) (43:12) (43:17) (44:4)
(47:21) (47:22) (48:1) (48:11) (48:13)
(49:25) (51:13) (54:6) (58:12) (59:23)
(61:7) (62:19) (67:21) (75:9) (75:10)
(80:19) (80:20) (83:17) (85:23) (86:8)
(89:24)
**themselves** (29:25) (30:1)
**thereof** (92:15)
**there's** (10:14) (19:6) (23:14)
(24:3) (29:5) (43:13) (48:8) (54:17)
(55:13) (55:14) (59:19) (75:10) (85:11)
**these** (7:11) (24:14) (29:14) (30:4)
(32:2) (34:2) (35:2) (36:21) (37:3)
(38:8) (42:22) (47:6) (57:1) (57:8)
(57:10) (57:19) (60:2) (82:11) (86:6)
**they'll** (43:15)
**they're** (19:1) (19:24) (32:4) (33:7)
(64:18) (86:22)
**they've** (17:3) (21:2) (23:8) (48:13)
(70:11)
**thing** (55:19) (79:7)
**things** (4:17) (27:6) (28:14) (29:5)
(32:9) (42:1) (47:13) (51:19) (65:25)
(74:15) (74:19)
**think** (17:18) (22:1) (23:6) (23:13)
(23:15) (23:24) (26:19) (27:1) (27:12)
(27:20) (29:21) (30:1) (30:6) (32:8)
(32:13) (32:20) (33:10) (34:13)
(35:15) (36:25) (37:6) (37:12) (37:14)
(40:10) (40:14) (41:22) (42:8) (42:11)
(44:8) (44:15) (45:7) (45:25) (46:1)
(46:10) (47:1) (47:14) (47:18) (51:9)
(51:14) (52:2) (52:4) (53:8) (53:11)
(53:16) (54:24) (56:1) (56:15) (56:17)
(57:16) (62:9) (63:6) (63:11) (63:13)
(63:15) (63:17) (63:19) (64:6) (64:23)
(64:25) (65:9) (65:17) (65:18) (65:19)
(65:20) (66:4) (66:17) (68:16) (69:4)
(70:10) (70:24) (71:5) (74:10) (76:23)
(80:22) (81:2) (82:7) (83:13) (84:5)
(84:11) (88:16) (88:21) (89:6) (90:25)
**third** (55:14)
**thirty** (16:12)
**thomas** (2:3) (2:10) (38:3)
**though** (44:14) (60:8)
**thought** (11:2) (28:21) (28:22)
(77:8) (81:6)
**threat** (54:18)
**threats** (39:13)
**three** (17:18) (33:25) (37:3) (55:17)
(62:7) (78:5)
**three-man** (11:22) (11:24)
**through** (9:20) (15:19) (35:3)
(37:15) (43:13) (53:22) (70:12)
(70:22) (71:3) (80:23) (81:7) (83:12)
(83:14) (86:4) (86:21) (87:19) (87:22)
(92:10)

**throughout** (67:8)
**times** (19:5) (49:6) (57:13) (69:20)
(71:12)
**timing** (40:9)
**today** (5:10) (24:22) (36:14) (44:8)
(67:22) (87:24)
**todd** (49:3)
**told** (46:10) (49:2) (57:14) (57:22)
(57:24) (57:25) (77:21) (79:7) (79:25)
(80:20) (80:22) (85:19) (89:7)
**tom** (4:18)
**tone** (40:13)
**took** (26:2) (26:3)
**tools** (33:10)
**top** (30:19) (33:22) (56:3) (61:8)
(62:25)
**total** (23:3) (51:6) (64:19) (86:19)
**totally** (65:21)
**touch** (66:2)
**training** (30:5) (33:7) (65:25)
(66:9) (66:15) (67:4) (86:20) (86:21)
**trains** (53:20)
**transcript** (5:21)
**transcription** (92:10)
**treated** (56:15)
**trial** (3:19)
**tried** (32:13) (55:17) (56:25) (57:2)
**trouble** (52:20) (55:10)
**trucks** (65:20)
**true** (7:19) (8:3) (58:17) (64:21)
(65:10) (92:10)
**truth** (3:14) (4:4) (6:6) (92:8)
**try** (9:22) (10:17) (32:11) (64:15)
**trying** (34:24) (53:16) (57:18)
(57:20) (61:22)
**tuesday** (51:18)
**turmoil** (62:8) (62:10)
**turn** (41:1) (41:7)
**two** (4:13) (31:23) (31:25) (32:12)
(44:25)
**two-fold** (10:13)
**type** (72:18)

**U**

**uh-huh** (76:14)
**ultimate** (10:15) (10:21) (10:23)
(85:16) (88:15) (88:25) (89:2) (89:10)
**ultimately** (9:12) (83:15)
**under** (6:6) (8:21) (11:21) (12:2)
(12:8) (14:10) (15:3) (19:1) (19:22)
(20:16) (62:4) (75:1) (75:3) (75:15)
(83:2) (83:9)
**understaffing** (53:24) (66:8) (67:4)
**understand** (4:20) (5:15) (5:23)
(5:24) (5:25) (6:3) (6:7) (6:9) (7:18)
(12:14) (16:5) (18:14) (34:8) (42:10)
(49:2) (49:9) (50:5) (50:6) (51:23)
(59:15)
**understanding** (11:17) (15:5)
(33:24) (38:23) (40:5) (40:6) (40:22)
(42:2) (49:7) (50:9) (58:16) (71:25)
(72:7) (78:16) (78:21) (80:21) (86:24)
**understood** (16:6) (46:10) (76:18)
**unfortunately** (14:5) (24:1)
**union** (16:19) (26:22) (27:5) (27:23)
(37:10) (41:14) (41:20) (41:24) (45:9)
(47:2) (57:2) (79:16) (81:24) (87:17)
(89:3)
**united** (1:1) (32:2)
**unjustified** (54:25)
**unless** (14:8) (21:2) (51:21)
**until** (88:7)
**untruthful** (65:13)
**upheld** (12:12) (14:24)
**uphill** (53:7)
**uphold** (88:18)
**upholding** (15:8)

**worked**

**upon** (67:22) (77:6) (78:16) (78:22)
(73:24)
**upset** (50:18) (50:22) (51:8) (73:23)
(73:24)
**use** (28:12)
**used** (3:13) (3:19) (60:10) (77:10)
**usual** (4:5)
**usually** (11:20) (11:22) (11:23)
(20:25) (33:6) (90:22)

**V**

**various** (9:25) (42:22) (58:5)
**vehicles** (29:25) (65:19) (69:10)
**verbally** (85:18) (90:14)
**verified** (51:18)
**version** (55:15)
**vice-president** (27:23) (36:10)
**view** (36:5) (36:7) (55:6) (80:24)
(86:9) (87:20)
**viewpoint** (82:14)
**violate** (61:4) (68:21) (69:6)
**violated** (20:11) (47:5) (82:4) (82:7)
(84:9) (84:11) (84:13)
**violating** (19:16) (34:24) (81:13)
(84:9) (84:11) (84:13)
**violation** (60:16) (67:17) (67:24)
(67:25) (68:10) (68:25) (69:11)
(69:16) (69:22) (69:23) (70:4) (70:5)
(70:19) (75:18) (80:3) (80:7) (81:3)
(81:6) (81:16) (82:6) (88:14)
**violations** (60:17)
**voice** (80:24) (81:5)

**W**

**wallace** (2:15) (24:17) (51:15)
(80:10)
**wanted** (15:2) (18:19) (36:4) (64:9)
(73:25)
**wanting** (34:1) (34:10)
**wants** (9:9) (9:14) (46:20)
**washington** (2:5)
**wasn't** (76:5)
**waters** (24:16) (25:3) (31:9) (74:5)
(76:7) (76:19)
**waters'** (77:10)
**way** (8:15) (14:12) (14:13) (18:22)
(42:10) (53:20) (64:15) (66:18)
(84:24) (84:25)
**ways** (20:21) (30:3) (70:11) (70:14)
**wednesday** (1:20)
**week** (5:23) (34:6)
**weekend** (51:16) (51:17)
**we'll** (5:6) (11:1)
**we're** (41:21) (42:14) (66:19)
**weren't** (23:24)
**whatever** (52:7) (63:13) (65:7)
(68:17) (83:21) (84:21)
**who** (9:10) (23:9) (38:25) (44:3)
(44:5) (56:20) (58:23) (84:17) (87:9)
(90:20) (92:7)
**whoa** (35:19)
**whole** (4:3) (8:16) (8:17)
**whomever** (70:15) (83:23)
**wilkes** (24:6)
**will** (5:18) (5:21) (9:21) (11:11)
(19:24) (23:3) (41:20) (47:21) (60:18)
(61:8) (83:17) (83:18) (85:25)
**williams** (1:17) (3:6) (92:4) (92:19)
**witness** (4:2) (87:6) (88:1) (88:6)
(88:11) (88:23) (89:8) (92:11)
**woodley** (2:3) (4:8) (4:18) (14:19)
(14:21) (38:15) (44:20) (56:2) (56:6)
(64:4) (90:25)
**word** (28:12)
**words** (53:25) (65:7)
**work** (6:19) (8:19) (16:12) (16:17)
(19:24) (29:14) (29:15) (31:6) (54:10)
(63:11) (83:20) (83:21)
**worked** (17:9) (22:5) (29:8) (31:7)

**workers**                                                      **you'll**

(57:14) (90:4) (90:8) (90:21)
**workers**   (11:15) (63:10) (73:6)
**workers'**   (31:5)
**working**   (16:15) (18:7) (43:24)
(46:13) (53:10) (54:15) (83:3)
**workplace**   (62:4)
**works**   (53:20)
**writing**   (20:14)
**written**   (68:19)
**wrong**   (29:11) (56:3) (67:16)

## Y

**yard**   (43:15)
**year**   (23:16) (23:22) (24:10) (45:1)
(45:2) (46:1) (78:12)
**yearly**   (23:4)
**years**   (5:3) (6:16) (16:9) (16:11)
(16:12) (17:2) (17:18) (22:6) (44:25)
(54:16) (71:9) (71:13) (75:12) (75:18)
**yes**   (5:1) (5:8) (5:17) (5:20) (6:4)
(6:18) (7:17) (7:25) (8:10) (8:13)
(11:9) (13:12) (13:21) (16:5) (16:14)
(16:16) (17:8) (17:11) (18:13) (18:17)
(21:22) (24:21) (24:23) (28:3) (28:6)
(28:12) (29:24) (32:1) (34:4) (34:14)
(34:21) (40:6) (40:25) (41:11) (42:11)
(43:7) (43:9) (44:11) (44:15) (45:11)
(47:3) (47:22) (48:13) (48:16) (48:19)
(49:9) (49:22) (50:13) (50:23) (51:6)
(55:4) (56:5) (56:21) (57:21) (62:9)
(63:19) (63:22) (67:14) (67:19)
(68:12) (70:24) (72:14) (74:11)
(74:14) (75:8) (75:16) (76:4) (76:15)
(76:16) (76:21) (77:17) (77:23)
(79:18) (80:5) (81:7) (82:5) (82:17)
(82:18) (83:20) (84:15) (85:6) (87:7)
(87:23) (88:20) (90:5) (90:8)
**you'll**   (11:2) (52:15) (53:23) (58:4)
(59:10) (60:20) (81:9) (81:11)