1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

DAVID DAVIS,

    Plaintiff,

vs.    CASE NO. 3:06-CV-0054-VPM

CITY of PHENIX CITY, ALABAMA,

et al.,

    Defendants.


* * * * * * * * * * *

DEPOSITION OF WALLACE BURNS HUNTER, SR., taken pursuant to stipulation and agreement before Shannon M. Williams, Certified Court Reporter and Commissioner for the State of Alabama at Large, in the offices of City Hall, 601 12th Street, Phenix City, Alabama, on Wednesday, April 4, 2007, commencing at approximately 10:45 a.m. EST.

* * * * * * * * * * *

---

2

APPEARANCES

FOR THE PLAINTIFF:
THOMAS A. WOODLEY
Woodley & McGillivary
1125 15th Street N.W.
Suite 400
Washington, D.C. 20005

FOR THE DEFENDANTS:
JAMES P. GRAHAM, JR.
712 13th Street
P.O. Box 3380
Phenix City, Alabama 36868-3380

ALSO PRESENT:
David Davis
H.H. Roberts

CONDENSED



COPY

---

4

STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of WALLACE BURNS HUNTER, SR., is taken pursuant to the Federal Rules of Civil Procedure and that said deposition may be taken before Shannon M. Williams, Certified Court Reporter and Commissioner for the State of Alabama at Large, without the formality of a commission; that objections to questions other than objections as to the form of the questions need not be made at this time but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose as provided for by the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between counsel representing the parties in this case that said deposition may be introduced in the trial of this case or used in any manner by either party hereto provided for by the Federal Rules of Civil Procedure.

* * * * * * * * *

---

WALLACE BURNS HUNTER, SR.

The witness, having first been duly sworn or affirmed to speak the truth, the whole truth and nothing but the truth, testified as follows:

THE REPORTER:  Usual stipulations?

MR. GRAHAM:  We do want to read and sign. He's our designated 30(b)(6).

MR. WOODLEY:  I'm going to go into that in just a couple minutes for the Record.

EXAMINATION

BY MR. WOODLEY:

Q.  Mr. Hunter, could you please state your full name for the Record, please, sir?

A.  Wallace Burns Hunter, Sr..

Q.  You're currently the fire chief of Phenix City Fire Department?

A.  Yes, sir.

Q.  Chief Hunter, my name is Tom Woodley, and I'm one of the attorneys representing the plaintiff, David Davis, in this pending federal court action. And I assume that you're aware that you are named as an individual defendant in your individual capacity as well as your official capacity in this lawsuit; is that correct?

A.  Yes, sir.

---

5

1    Q. Are you at least in general familiar with
2 the allegations and the issues that have been raised
3 in this lawsuit?
4    A. Yes, sir.
5    Q. Have you had an opportunity to spend some
6 time with the city attorneys about the issues in the
7 lawsuit and the procedures that we'll be following
8 today in your deposition?
9    A. Yes, sir.
10    Q. Have you ever had your deposition taken
11 before in another case?
12    A. Yes, sir.
13    Q. Is that more than one other case?
14    A. I guess it was basically -- yes, it was
15 one, I guess, or -- two cases were basically
16 combined, yes.
17    Q. So in light of that experience and the
18 chance that you have had to spend with the city
19 attorneys, is it fair to say that you are familiar
20 with the procedures that we're going to be following
21 today in your deposition?
22    A. Yes, sir.
23    Q. Again, you sat in on the earlier deposition
24 of the mayor and so you saw how that went. I'll be
25 asking questions. We expect you to give full,

6

1 complete, and honest answers. Do you understand
2 that?
3    A. Yes, sir.
4    Q. And then we have one of the most able
5 reporters here in the State of Alabama, and she'll
6 be taking down everything that's said today by me
7 and by you. Do you understand that?
8    A. Yes, sir.
9    Q. And then she will have a chance to put that
10 together in a written transcript form which you'll
11 have an opportunity to read and sign. Do you
12 understand that?
13    A. Yes, sir.
14    Q. And you must give verbal responses because
15 the reporter can't take down nods of the head.
16    A. Yes, sir.
17    Q. If at any time you don't hear or understand
18 one of my questions, please stop me immediately, and
19 I'll be more than happy to repeat or rephrase that
20 question. Do you understand that?
21    A. Yes, sir.
22    Q. Chief Hunter, are you under any medication
23 or do you have any kind of health condition that
24 might prevent you or impair you from understanding
25 any of my questions?

7

1    A. No, sir.
2    Q. And, of course, lastly, you're obviously
3 under oath and therefore sworn to tell the truth
4 under the potential penalty of perjury. Do you
5 understand that, Chief Hunter?
6    A. Yes, sir.
7    Q. Okay. Let's refer to the notice of
8 depositions because the city has designated you as
9 the Rule 30(b)(6) deponent. And you can turn to the
10 binder of exhibits that we have in front of you,
11 which the first exhibit is Exhibit Number 1. And on
12 page two of that Notice of the Deposition, it
13 indicates certain paragraphs that you have been once
14 again selected by the city and the other defendants
15 as the Rule 30(b)(6) representative to give
16 knowledgeable and authoritative testimony on the
17 issues that are involved in this case.
18    And I want to summarize those areas just so you
19 are again aware of the subjects that you have been
20 authorized to be the Rule 30(b)(6) witness. And
21 that would be the employment of plaintiff David
22 Davis and the circumstances surrounding his
23 termination by the Phenix City Fire Department. Do
24 you understand that, sir?
25    A. Yes, sir.

8

1    Q. And then in subparagraph (b) of the notice,
2 it also indicates that you're the representative
3 witness giving testimony on any communications that
4 Mr. Davis has had with the mayor, the city council,
5 persons in the city manager's office, persons in the
6 city's Human Resource Department and directors or
7 persons in the city Fire Department. Do you
8 understand that as well?
9    A. Yes, sir.
10    Q. And the third area would be communications
11 that Mr. Davis has had regarding staffing in the
12 fire department, health and safety of fire and
13 rescue service personnel, the adequacy and
14 efficiency of fire department operations to protect
15 the citizens in this city, and response times and
16 other personnel and employee morale in the fire
17 department. Do you understand that as well, Chief
18 Hunter?
19    A. Yes.
20    Q. The additional area that you have been
21 designated is communications about fire department
22 matters involving the employees and other issues.
23 You're aware of that as well?
24    A. Yes, sir.
25    Q. And then you've also been designated as the

**9**

1  witness concerning communications that relate in any
2  way to the phone conversation that Mr. Davis had
3  with one of the other defendants, Mayor Jeffrey
4  Hardin, on or about April 17, 2006, regarding the
5  proposed extension of the probationary period. Do
6  you understand that as well, Chief Hunter?
7      A. That's correct, yes, sir.
8      Q. And then lastly would be the subject of the
9  facts and documents which relate in any way to the
10  chain of command within the fire department. You're
11  aware of that as well, Chief Hunter?
12      A. Yes, sir.
13      Q. Let me invite your attention to another
14  exhibit within the binder in front of you. And I
15  should say again for the Record that the city
16  attorney also has a full set of these exhibits for
17  his review during the deposition.
18      Exhibit 6, Chief Hunter, appears to be a job
19  description of the job title of fire chief that has
20  been furnished to me by the city in this case. Are
21  you familiar with this job description?
22      A. Yes, sir.
23      Q. As far as you know, Chief Hunter, is this
24  an accurate job description of what you do as the
25  fire chief?

**10**

1      A. Yes.
2      MR. GRAHAM: Make sure you read it now.
3      Q. Again, Chief Hunter, when I ask you about
4  these papers and exhibits, make sure that you have
5  an adequate time to review them before you respond
6  to my questions.
7      Chief Hunter, have you had an adequate time to
8  review your job description?
9      A. Hold on one second.
10      Q. Okay. I'm sorry.
11      A. Yes, sir.
12      Q. Okay. So the general question I have, is
13  this a fairly accurate and complete description of
14  your job as the fire chief?
15      A. Somewhat. It's always if the city manager
16  give you any other details to do, any extra, it may
17  not be written in here but you have --
18      Q. And in line of authority, this job
19  description says you, as the fire chief, report to
20  the city manager; is that correct?
21      A. That is correct.
22      Q. And how long have you been the fire chief?
23      A. Since -- officially, since May of 2005.
24      Q. Okay. Why don't you just go back and trace
25  for us your career in the city's fire department,

**11**

1  how you moved up to the top position?
2      A. Okay. I started here in June of 1986. I
3  worked as a firefighter until April of -- I think it
4  was April of '89, I believe. And I worked as a
5  driver/engineer from April of '89 until 1995, I
6  became a captain through promotions. And I worked
7  as a captain until 1998. I became an assistant
8  chief. And then from '98 to 2001 -- in 2001, I
9  became interim fire chief, and for a brief time in
10  2001, I was the fire chief.
11      And I went from there, from being fire chief, I
12  stepped out of that position and I went to being a
13  deputy chief. And I stayed at the deputy chief
14  until my current appointment as fire chief.
15      Q. Okay. And you may have said this, but I
16  may have missed it. When were you first appointed
17  as the fire chief?
18      A. This time?
19      Q. Yes.
20      A. In May of 2005.
21      Q. Okay. And within your duties and
22  responsibilities as a fire chief here in the city,
23  are you responsible for the recruitment, selection,
24  and hiring and promotion of personnel within the
25  fire department?

**12**

1      A. That's correct.
2      Q. Do you have the final decisionmaking
3  authority as to hiring in the fire department?
4      A. That's correct.
5      Q. Do you have the final decisionmaking
6  authority as to terminations of employees in the
7  fire department?
8      A. As far as recommendations as far as
9  termination.
10      Q. So you make a recommendation if an
11  individual should be terminated from the fire
12  department?
13      A. Yes, sir.
14      Q. And who do you make that recommendation to?
15      A. I make that recommendation to the city
16  manager.
17      Q. And is it your understanding that the city
18  manager has the final decisionmaking authority to
19  terminate an employee from the fire department?
20      A. Basically the way I have done things since
21  I have been in as chief is make the recommendation
22  and always run things through the city attorney.
23      Q. I'm sorry?
24      A. We make a recommendation -- I make a
25  recommendation to the city manager, and we always

13

1  try to make sure we run things through the city
2  attorney.
3      Q.  Okay.  But in terms of the individual who
4  has the final decisionmaking authority within the
5  city's structure concerning a possible termination
6  of a City employee, is it your understanding that it
7  is the city manager who makes that final decision?
8      A.  Well, I just can't put that on the city
9  manager.  I make a recommendation.  It's my
10  department.  And when it's reached that point, if it
11  reach that point for terminate action, we go through
12  the city manager to make sure it's okay.
13      Q.  But who has the final sign off on somebody
14  being fired in the fire department?
15      A.  I guess it would be the city manager.
16      Q.  Okay.
17      A.  I guess.
18      Q.  Do you, as fire chief, have authority to
19  issue other forms of discipline without the input
20  and approval of the city manager such as suspensions
21  or written reprimands?
22      A.  Yes, sir.
23      Q.  And where does your authority stop?  Is it
24  at the level of someone being terminated where you
25  say the city manager has to make that choice?

14

1      A.  Well, that's a last resort that you want to
2  go to is termination.  So when you get to that
3  point, you must always make sure you go through the
4  city manager with that, let him know that.
5      Q.  But if you as fire chief wanted to suspend
6  someone, you don't have to go through the city
7  manager to suspend a firefighter, do you?
8      A.  No.  But I inform the city manager.
9      Q.  And as a long-time veteran employee of the
10  city's fire department, are you aware that the
11  plaintiff, David Davis, had worked for a number of
12  years for the city Fire Department?
13      A.  Yes, sir.
14      Q.  Do you know how many years he was employed
15  in the city Fire Department?
16      A.  I think it was about 8 years --
17      Q.  Okay.
18      A.  -- if I'm correct.
19      Q.  If I mention that Mr. Davis was hired in
20  the city Fire Department in April of 1998, would
21  that sound about right to you?
22      A.  Yes, sir, somewhere in there.
23      Q.  Are you aware that Mr. Davis was promoted
24  to the rank of sergeant in the city Fire Department?
25      A.  That's correct.

15

1      Q.  Did you have any input into that promotion
2  of Mr. Davis?
3      A.  That's correct.
4      Q.  Did you recommend that he be promoted to
5  sergeant?
6      A.  That's correct.
7      Q.  And why did you do that?
8      A.  Because he had met the requirements.
9      Q.  Did you think he was doing a good job and
10  deserved to be promoted to sergeant?
11      A.  That's correct.
12      Q.  Do you remember approximately when that
13  was, at least the year that he was promoted to
14  sergeant?
15      A.  I guess somewhere around -- if I'm correct,
16  2002 or 2003, somewhere in there.
17      Q.  Okay.  Let me invite your attention to
18  another exhibit, Chief Hunter, which would be
19  Exhibit 18, and this appears to be a memo from
20  Deputy Chief Roy Waters addressed to yourself as the
21  fire chief dated February 6, 2006.  And the re line
22  is, quote, letter to Mr. H.H. Roberts, end quote.
23      A.  Hold on.  Let me see.
24      Q.  Exhibit 18.
25      A.  Okay.  Yes.  I got it.

16

1      Q.  And it's addressed to you, so I assume you
2  received this on or about February 6, 2006; is that
3  correct?
4      A.  Yes.
5      Q.  Okay.  And you'll see at the very tail-end
6  at the bottom of this first page of this memo from
7  Deputy Chief Waters to yourself, he indicates,
8  quote, as I have communicated to you on several
9  occasions, David Davis is doing an outstanding job
10  for me and has a very positive and professional
11  attitude, end quote.  Do you see where it says that?
12      A.  Yes, sir.
13      Q.  As far as you know, was Deputy Chief Roy
14  Waters speaking honestly and truthfully when he made
15  that statement to you in the memo?
16      A.  I believe so.
17      Q.  Okay.  And did you, sir, agree with that
18  statement coming from your Deputy Chief, Mr. Waters,
19  about the job performance of Mr. Davis up to at
20  least February 6, 2006?
21      A.  I was happy about it.
22      Q.  You were happy about it?
23      A.  Yes, sir.
24      Q.  But did you agree with it as far as you
25  knew as the fire chief, that Mr. Davis was doing a

17

1 good job and had a very positive and professional
2 attitude?
3     A. I took Chief Waters' word for that, yes.
4     Q. Did you have any reason to disagree?
5     A. No, sir.
6     Q. Okay. Does the city and its fire
7 department have a policy of giving annual
8 evaluations of the firefighters employed in the
9 department?
10     A. That's correct.
11     MR. WOODLEY: Okay. Let's go off the
12 record for a second.
13     (Discussion held off the record.)
14     MR. WOODLEY: We can go back on the record.
15     Q. Chief Hunter, let me move to a different
16 subject matter. At some point in time, were you
17 aware that the Phenix City Fire Department employees
18 formed a labor organization in which they became
19 members of the labor association?
20     A. Yes, sir. I was a part of it.
21     Q. You were a part of it yourself?
22     A. Yes, sir.
23     Q. You were a member?
24     A. Yes, sir.
25     Q. Do you remember when you first became a

18

1 member of the firefighters' local union?
2     A. It was back when they began it, when it
3 began. I couldn't tell you the exact date.
4     Q. Is this years ago or --
5     A. Yes, sir. Current -- current association
6 that's in place.
7     Q. And would that be Local 3668 affiliated
8 with the International Association of Firefighters?
9     A. That is correct.
10     Q. Are you still a member of that union?
11     A. I'm in International now. International
12 Fire Chiefs Association.
13     Q. Okay. So at some point in time, you
14 dropped out of the local union that consisted of the
15 firefighters?
16     A. Yes, sir.
17     Q. Do you remember roughly when you left that
18 local firefighters' organization?
19     A. When I became an officer. It was somewhere
20 in -- I can't remember the exact date, but --
21     Q. Okay. Did it come to your attention at
22 some point in time that Mr. David Davis became a
23 vice-president of the firefighters' local labor
24 organization?
25     A. Yes, sir.

19

1     Q. Did it also come to your attention at some
2 point that Mr. Davis became the president of the
3 firefighters' local labor organization?
4     A. Yes, sir.
5     Q. And do you remember roughly when that was
6 that you were informed that he was the new president
7 of the local union?
8     A. I can't tell you an exact date, but I
9 remember, you know, knowing about it, you know, not
10 too much.
11     Q. Do you remember how it came to your
12 attention? Did someone tell you he was the new
13 president of the local union?
14     A. I believe so. I probably overheard some
15 talk in the stations.
16     Q. Does the city recognize the firefighters'
17 local union as a representative of the firefighters?
18     A. No, sir.
19     Q. And why not?
20     A. Mr. Roberts explained that in the letter.
21     Q. Have you ever had meetings or conversations
22 with David Davis, in his capacity as the president
23 of the local labor organization, about any issues or
24 concerns that the firefighters had?
25     A. Have I had a meeting with him?

20

1     Q. Yes.
2     A. No, sir.
3     Q. Have you had any conversations with
4 Mr. Davis in his role as the president of the local
5 union about issues that were of concern to the
6 members of the fire department?
7     A. No, sir. I never was given a chance to.
8     Q. Okay. Well, could you elaborate on that?
9     A. Just -- I just never was given a chance.
10 If it was some concerns from that direction, I never
11 was given -- was asked to have a meeting.
12     Q. Was what?
13     A. No one ever asked to have a meeting with
14 me.
15     Q. So Mr. Davis never asked to sit down with
16 you and talk about morale or staffing levels or any
17 issues like that?
18     A. No, sir.
19     Q. Have you ever had collective meetings with
20 the firefighters about issues of concern they might
21 have in the fire department?
22     A. The way the chain of command work, mostly
23 any issues or concerns that firefighters have, they
24 are to give those to the captains and they'll pass
25 it on to the assistant chiefs, and the assistant

21

1  chiefs come directly to myself. Or unless we was
2  having -- if they are having a shift meeting or
3  something that I would attend, I would attend and
4  hear people's views then. I'm very open.
5      Q. You have an open door policy?
6      A. I'm open to people's views, yes, sir, if
7  I'm given a chance.
8      Q. Did you ever invite Mr. Davis or any other
9  leaders of the local firefighters union to come in
10 and discuss issues with you?
11     A. I had no reason to. I wasn't -- like I
12 say, I wasn't given a chance of these concerns.
13     Q. But there were, in fact, a lot of newspaper
14 articles, right, that firefighters were expressing
15 their concerns about employee morale and shift
16 schedules and staffing levels? In fact, you were
17 interviewed for those articles. Did that give you
18 occasion to bring in the firefighters or local union
19 leaders and sit down and just chat about those
20 issues?
21     A. When that came about, sir, it just came out
22 of nowhere basically. And the article was there
23 before I was ever given a chance to address
24 anything.
25     Q. But you, in fact, had a chance, after the

22

1  newspaper articles came out, and you were aware of
2  these concerns --
3      A. That's correct.
4      Q. -- about a lot of firefighters?
5      A. That's correct. And we did have a
6  counseling session with some of the concerns that
7  was in the newspapers, and I opened the door at that
8  time to them. If that's what they wanted to talk
9  about, they just use the chain and come up through
10 the assistant chiefs, and we could talk about those
11 issues. Because you've got to understand, I've got
12 to address more than -- I got to address all
13 personnel.
14     Q. Right. Would you turn your attention to
15 Exhibit 11, which appears to be a memo from David
16 Davis in his position as vice-president of Local
17 3668, the Phenix City Firefighters' Association.
18 It's dated January 25, 2005, and it's addressed to
19 then Chief Jerry Prater.
20     A. Yes, sir.
21     Q. Have you ever seen this memo before today?
22     A. Yes. Chief Prater had this memo.
23     Q. Did Chief Prater give you a copy of it?
24     A. I've seen the one that he had.
25     Q. And did you discuss it with Chief Prater at

23

1  that time?
2      A. Yes, sir.
3      Q. Okay. And you'll see there that Mr. Davis,
4  on behalf of the firefighters' association, is
5  submitting a proposal which he describes is under
6  the Code of Alabama and asking for a meeting
7  concerning various safety issues, general employment
8  issues, discipline, communications, all of the items
9  that he lists on this document. You see where it
10 says that?
11     A. Yes, sir.
12     Q. And when you say you saw the copy that
13 Chief Prater had, did you have a conversation with
14 Chief Prater about the issues addressed in this
15 memo?
16     A. Yes, sir. Chief Prater had a conversation
17 with Sergeant Davis about this.
18     Q. Were you involved in that discussion?
19     A. No, sir.
20     Q. Did you have any communications with
21 Mr. Davis or the local union about these issues?
22     A. No, sir.
23     Q. So Chief Prater handled it as far as you're
24 concerned?
25     A. Yes, sir.

24

1      Q. Are you aware, sir -- I'm not asking you to
2  be a lawyer on this question. But are you aware
3  that, at least in a general sense, that under the
4  state Code of Alabama that public employees, such as
5  firefighters in particular, have the right to form a
6  labor organization and be members of a labor
7  association?
8      A. Yes, sir. Everybody that's under my
9  direction, as far as firefighter, is two-fold. They
10 have the right to be a part and they have the right
11 to not be a part, and I represent all.
12     Q. Right. And are you aware under that same
13 provision of the State of Alabama Code that the
14 firefighters not only have a right to be a part of a
15 labor association but also have the right to have a
16 representative to make proposals to a city or county
17 employer about issues of concern? Are you aware of
18 that?
19     A. Correct.
20     Q. And have you been aware of that for a
21 number of years?
22     A. Yes, sir, I have.
23     Q. Let me invite your attention, Chief Hunter,
24 to Exhibit 14, which appears to be at least the
25 first newspaper article, an article from the

25

1  Columbus Ledger-Enquirer.  And although I don't see
2  a date on the top of this, my understanding -- and
3  we'll get to this in a few more questions, is that
4  it came out in September of 2005.  And you'll see
5  that you apparently were interviewed as the chief of
6  the Phenix City Fire Department for the purpose of
7  putting this newspaper article together.  Do you
8  remember that?
9      A.  Yes, sir.
10      Q.  You'll see in the second column of this
11  article from the newspaper that the reporter at
12  least indicates the department is in turmoil; and
13  then further down in that second column, there's a
14  quote from Mr. Davis, quote, morale is at the lowest
15  point since I have been here, end quote.  And it
16  indicates he's a seven-year veteran and president of
17  the Phenix City Firefighters' Association.  Do you
18  see where it says that?
19      A.  Correct.  Yes, sir.
20      Q.  When you were interviewed and then when you
21  read this newspaper article, did you agree or
22  disagree that morale in the fire department was low?
23      A.  For some, it might have been.  Not for all.
24      Q.  Do you know if a majority of the
25  firefighters in the city Fire Department are members

26

1  of the labor organization that they formed?
2      A.  I think, if I'm going back, the number
3  was -- that we got at the review board was -- at the
4  time was probably about one-third.
5      Q.  At the review board?  The Personnel Board
6  hearing for Mr. Davis?
7      A.  That's correct.
8      Q.  Do you know at some point in time that
9  there was a majority support among the firefighters
10  in the fire department as being members of the labor
11  organization?
12      A.  At one time, it might have been.
13      Q.  It indicates further in this article that
14  you, Chief Hunter, were the fourth chief in the last
15  seven years.  Is that accurate?
16      A.  Yes, sir.
17      Q.  Why such a high turnover?
18      A.  Basically, we've had some -- well, we had
19  some -- I guess some problems and misunderstandings,
20  and we had -- at this time, I hadn't been in the job
21  but three months.
22      Q.  As the fire chief?
23      A.  Yes, sir.
24      Q.  And you succeeded Prater?
25      A.  Yes, sir.

27

1      Q.  Do you know what the circumstances were of
2  why Mr. Prater was no longer the fire chief?
3      A.  He signed on for three years.  And after
4  his time was up, he decided to go.
5      Q.  What is Mr. Prater doing now?  Is he in the
6  fire department?
7      A.  He's retired.
8      Q.  He's retired?
9      A.  Yes, sir.
10      Q.  It indicates further in the article, quote,
11  over the last five years, 29 firefighters have left
12  for a variety of reasons, including retirement and
13  medical disability, end quote.  Is that roughly an
14  accurate statement?
15      A.  It might be.  It might be different people
16  for different reasons.  Retirement, terminations,
17  other -- better jobs.  You know, the figures they
18  put in there wasn't -- they can be distorted.
19      Q.  It also indicates in this article the city
20  has spots for 51 firefighters.  Is that accurate?
21      A.  At that time, it probably was.
22      Q.  Is it larger now?
23      A.  Yes, sir.
24      Q.  What's the number?
25      A.  Total, when we're at full capacity, it

28

1  would be 65.
2      Q.  And then going back to the rough date of
3  this article -- again, it's, I believe, September
4  2005 -- it indicates in the right-hand column of the
5  article that 44 are currently on the force.  In
6  other words, 44 actively employed fire personnel out
7  of 51 spots in the city Fire Department.  Was that
8  roughly correct?
9      A.  That's correct, but what it didn't tell
10  there was the hiring process was in place.  We was
11  having people hired, and it takes several months to
12  have them trained and bring them in.  So that number
13  wasn't put in there.
14      Q.  But at that point in time, there was seven
15  positions not filled within the fire department?
16      A.  Not necessarily not filled, but -- because
17  we had -- I believe we had three people in training,
18  if I'm correct, at that point.
19      Q.  But was the fire department understaffed at
20  that point?  There was not a full complement of
21  actively employed firefighters?
22      A.  It was just like most of the fire
23  departments that are around; the majority you check
24  will be understaffed because of the hiring process.
25      Q.  As a fire chief, do you always like to have

29

1 a full complement of fire personnel to do the job?
2     A. It would be very nice, but it's not -- it's
3 been pretty tough throughout the country.
4     Q. Right now, is there a full complement in
5 the department?
6     A. No, sir. We have people in training now.
7 I have -- we have people in training right now.
8     Q. So right now, what is the number of
9 understaffed that are not full firefighters
10 training?
11     A. Three.
12     Q. Three. Later on in the article on page
13 two, it indicates that, quote, Davis puts it this
14 way -- it's about two inches down that first column
15 --
16     A. Okay, got it.
17     Q. -- quote, we are reluctant to talk because
18 the significant fear of retaliation, being
19 disciplined or fired, end quote. See where it says
20 that?
21     A. Yes, sir.
22     Q. Are you aware of any circumstances that
23 would have supported the statement of Mr. Davis and
24 some of these other firefighters that they were
25 fearful of retaliation or being disciplined or

30

1 fired?
2     A. No, sir. I don't see any reason for them
3 to be -- have that, because if anybody wanted to
4 talk, I was right over there in my office. So if
5 they followed the chain of command and used the
6 assistant chiefs that was in line, I would talk to
7 anyone.
8     Q. But are you telling me that the
9 firefighters like Sergeant Davis, they can't come
10 directly in to you, I guess, and go in your office
11 and say, Chief, we have an issue of concern about
12 public safety?
13     A. All they had to do is use --
14     Q. They've got to go through the chain of
15 command?
16     A. That's all they've got to do. It's
17 simple. It's easy.
18     Q. So you can't talk to a firefighter directly
19 because that would not be --
20     A. It's easy --
21     Q. -- through the chain of command?
22     A. Sir, if someone had genuine concerns and
23 they channeled that up to the captain and assistant
24 chiefs, I'll get in my vehicle and go to the
25 stations and talk to them.

31

1     Q. Okay. On page two of this newspaper
2 article over in the right-hand column, it indicates
3 that since January 2000, 21 employees have
4 resigned. Do you know if that's roughly an accurate
5 statement?
6     A. Resigned? I think that mainly should be --
7 that's incorrect. That mainly should be referring
8 to that front page that would be -- part of that
9 would be people that's either terminated, people
10 that's gotten better jobs, people that's left for
11 medical reasons. But as far as resigned, no. It's
12 too good of a job. You won't see that many people
13 resign from it.
14     Q. Later on, it has a quote from a Sergeant
15 Ann Land, L-A-N-D. Is she still employed in the
16 fire department?
17     A. That's correct.
18     Q. At the bottom of the second page, she's
19 quoted in this newspaper article as saying, quote,
20 basically, if you are not happy, you -- and it's cut
21 off, I think, unfortunately on this copy -- to
22 leave; that is what we have been, I think, told
23 several times, end quote. See where it says that?
24     A. Basically if you was unhappy, you could
25 leave, I guess, what has been told to them. I

32

1 guess when -- currently, she's Firefighter of the
2 Year, so she made some adjustments as well as the
3 Department and --
4     Q. But she was obviously interviewed for this
5 newspaper article, correct?
6     A. That's correct.
7     Q. And, apparently, she was of the view, at
8 least at that time --
9     A. That's right.
10     Q. -- that the view in the department was if
11 you don't like it, you can leave?
12     A. It wasn't the view of the department. I
13 guess that's the way --
14     Q. But it was her view apparently?
15     A. -- some people took it -- well, and --
16     Q. Okay. And then further on in this article,
17 it talks about the firefighters expressing concern
18 about the elimination of swap time. You're familiar
19 with swap time, right?
20     A. That's correct.
21     Q. That's trading in time among firefighters?
22     A. That's correct.
23     Q. Was, in fact, the swap time privilege or
24 right eliminated by the department?
25     A. At one time it was.

33

1  Q. Is it in place now or is it still
2  eliminated?
3  A. It's in place. It's a better -- we have a
4  better setup for it this time.
5  Q. What's the current setup for swap time?
6  A. We have a set amount of hours that's set to
7  use.
8  Q. What?
9  A. We have a set amount of hours that you can
10 take. It's also better set up in payroll to make
11 sure everything works out right, so --
12 Q. But back in -- as of September of 2005 when
13 this newspaper article came out, swap time was
14 eliminated; is that accurate?
15 A. For a while, yes.
16 Q. Why was it eliminated, sir?
17 A. Chief Prater felt like there were some
18 things going on the swap time, that it was time
19 to --
20 Q. What were the things going on?
21 A. -- to move it for a while. Like if people
22 wasn't keeping, I guess, accurate paperwork. It
23 wasn't -- training didn't have it -- it wasn't --
24 you have to have a certain amount of training per
25 month, okay. It was -- they had to put a -- make

34

1  sure a cap was kept on top of it, which we always
2  tried to do. So it was some things just went on
3  with it that he felt like needed to be taken away
4  for a while.
5  Q. But in the newspaper article, it refers to
6  the fact that council member Ray Bush tried to
7  mediate the differences between the firefighters and
8  the city. Are you aware that that occurred?
9  A. I've heard that Ray Bush attended a
10 meeting, but as far as -- I never met with Ray Bush.
11 Q. Okay. But you heard information that
12 Council Member Bush attended a meeting with
13 firefighters to address the issues they were
14 raising?
15 A. That's correct.
16 Q. Do you know if anything came out of that
17 meeting that was useful or productive?
18 A. Not that I know of. I don't --
19 Q. Okay. Fair enough. You'll see also in
20 Exhibit 14 that there's a collection of letters
21 submitted by various individuals to newspapers about
22 issues of concern within the Phenix City Fire
23 Department. Were you generally aware of these
24 letters to the editor and did you have a chance at
25 the time to review those letters?

35

1  A. At times, I would look at some of them,
2  yes, sir. Read some of them because --
3  Q. Because of these newspaper articles that
4  were occurring back in 2005, did you participate in
5  any meetings with the fire chief at the time, or the
6  city manager, in which these newspaper articles and
7  media reports were addressed?
8  A. As far as these articles?
9  Q. Yes.
10 A. As far as just -- I didn't have to have any
11 special meetings on it. Just something mentioned
12 that things are in the paper. That's about it.
13 Q. Well, as a result of the article in
14 September 2005, Exhibit 14, which contains
15 quotations from David Davis and other firefighters,
16 were you asked to conduct any kind of an
17 investigation or review of these comments that the
18 firefighters made in the media reports?
19 A. I wasn't asked. I did one.
20 Q. You did it on your own?
21 A. Yes. I basically needed to -- I'm the
22 department head. I needed to ask why was this done
23 without me being given a chance first to meet with
24 someone over these issues. That was a concern of
25 mines. And then not only that, it was something I

36

1  needed to discuss with some of the people that was
2  in the paper. You got your freedom of speech, but
3  at the same time, you gotta watch impeding the
4  harmony within this department and the city. And it
5  was a concern. And that's why I had the meetings
6  and counseling sessions.
7  Q. Let me invite your attention to Exhibit 15,
8  which appears to be a memo from you as the fire
9  chief to -- it says member singular, but I believe
10 it was to members -- of the Phenix City Fire
11 Department; is that correct? Is this a memo that
12 you distributed to the --
13 A. That's correct.
14 Q. -- members of the fire department?
15 A. That's right.
16 Q. You have to wait until I finish answering
17 my questions before you start your answer;
18 otherwise, we'll get in trouble with Madam
19 Reporter.
20 A. Okay.
21 Q. This memo, Exhibit 15, is dated
22 September 20, 2005. Is this, in fact, a memo that
23 you drafted and distributed to the members of the
24 fire department?
25 A. Yes, sir.

37

1  Q. And it addresses the article that appeared
2  recently apparently in the Ledger-Enquirer newspaper
3  regarding the city's fire department. Is that
4  accurate?
5  A. That's correct.
6  Q. Then it goes on to say, quote, several
7  firefighters made comments in the paper that were
8  likely to impair discipline and harmony in the
9  workplace, impede job performance, and jeopardize
10  loyalty in this department, end quote. You see
11  where it says that?
12  A. That's correct.
13  Q. And, again, this would have been in
14  response to your review of this newspaper article
15  that we just covered in Exhibit 14 --
16  A. That is correct.
17  Q. -- is that accurate?
18  A. That's correct.
19  Q. What comments made by Mr. Davis and the
20  other firefighters that were quoted in this
21  newspaper article in your judgment impaired
22  discipline and harmony in the fire department?
23  A. Basically the comments about people being
24  afraid to talk. What was you afraid to talk when
25  you're not talking to anybody? Why would you --

38

1  that's misleading people. Why would you be afraid
2  to talk when you can use the chain of command and
3  come up and talk to me at any time, if you was
4  willing to give me a chance.
5  Q. But my question really is focused on -- and
6  as you just indicated, a number of the firefighters,
7  including Mr. Davis, expressed fears about potential
8  retaliation and discipline. So on that isolated
9  issue, how would that comment by Mr. Davis in the
10  newspaper article impair discipline and harmony in
11  the fire department?
12  A. It was misleading statements. Who had been
13  disciplined for anything during my tenure -- short
14  tenure so far? That's misleading.
15  Q. But he expressed fear about potential
16  discipline and, in fact, he was fired later on as we
17  know, but --
18  A. Well, no. That -- this right here was to
19  prevent anything. This was to prevent us from even
20  being here today.
21  Q. Okay. Give me a specific example of how
22  those comments in the newspaper article of Mr. Davis
23  actually, in fact, disrupted discipline or harmony
24  in the workplace. Give me a real concrete, specific
25  example of what you thought was an adverse

39

1  development from that newspaper article.
2  A. Okay. Let me go back to this article.
3  Now, what are you mainly talking about?
4  Q. I want you to give me a concrete, specific
5  example that occurred after this newspaper article
6  and the comments of Mr. Davis and the other
7  firefighters that you believe actually disrupted or
8  impaired the operation of this fire department --
9  A. They hadn't.
10  Q. -- as a result of the article and the
11  comments in the paper?
12  A. This is the perception of people that's
13  reading it.
14  Q. I'm sorry?
15  A. This is the perception of the readers.
16  Q. So what are you referring to there? A
17  three alarm turmoil?
18  A. Basically. And that the morale -- the
19  statements that are being made, what are you doing
20  as an employee of the city or the fire department to
21  help, you know, with that. So when you look at
22  that, that's a disruption itself when you haven't
23  given the people that you're working for any type of
24  opportunity or chance to discuss these things.
25  Q. Were there fires not put out, rescues not

40

1  conducted because of that newspaper article and the
2  quotations from Mr. Davis about employee morale and
3  staffing?
4  A. No. We answer the calls.
5  Q. You answer the calls?
6  A. Yes, sir.
7  Q. Any other specific disruption that you can
8  point to that you were really troubled by as the
9  fire chief as a result of these newspaper articles
10  and comments made by Davis and other firefighters?
11  A. As far as -- okay. Directly by Mr. Davis
12  during the counseling session after this, I had a
13  firefighter, Brandon Wilkerson, that said that he
14  was being bullied by David Davis to make phone calls
15  and complain. And I expressed this to David and we
16  talked to him about this --
17  Q. Okay.
18  A. -- when he came in and we did his
19  counseling session. So it was some things from this
20  that came out of it.
21  Q. Anything else?
22  A. Mainly just as far as not wanting to
23  communicate, but all of these different things in
24  the paper here. But as fire chief, I wasn't given a
25  chance to go over any of these issues or to talk

41

1 about them.
2 Q. Okay. But, again, can you give me any
3 specific examples of disruption or impairment --
4 A. I just gave you --
5 Q. You have to let me finish my question,
6 please, Chief Hunter.
7 A. Sorry.
8 Q. Other than what you've just mentioned, can
9 you give me any other specific or concrete examples
10 of impairment of the fire department or disruption
11 of fire department operations that were resulting
12 from the comments of Mr. Davis and the other
13 firefighters in this newspaper article that came out
14 in September of 2005?
15 A. That's another one -- okay. Another one in
16 here, I guess, would be Councilman Bush being in
17 here to mediate something. He's mediating something
18 that I didn't know anything about.
19 Q. Did you speak to Council Member Bush
20 about --
21 A. No.
22 Q. -- his role as mediator?
23 A. No, sir.
24 Q. Were you upset about that?
25 A. Well, no, I wasn't upset about it.

42

1 Q. Did you think his involvement was
2 disruptive to your authority as fire chief?
3 A. Councilman Bush don't know the charter like
4 I do.
5 Q. Did you speak to Council Member Bush
6 about --
7 A. No, sir.
8 Q. -- his role?
9 A. It's not my authority. It's not in my
10 realm of authority to speak to him about it.
11 Q. But at the time that he was trying to
12 apparently be helpful as a mediator between the
13 firefighters and fire department, do you think he
14 was intruding upon the chain of command?
15 A. I don't know if he was being -- to me, I
16 don't know if he was being helpful or harmful.
17 Q. Do you have any view on that right now?
18 A. No, sir.
19 Q. Okay. Did you consider at the time, back
20 in September 2005, that Mr. Davis's comments and
21 communications in that newspaper article were a
22 violation of the city's Merit System rules and
23 regulations?
24 A. Yes, sir.
25 Q. And why do you say yes?

43

1 A. Because it was something that could have
2 been handled a different way. And, basically, like
3 I say, they didn't give me a opportunity to come in
4 there. And this right here is going to -- is going
5 to disrupt your normal operation.
6 Q. So in other words, if I understand your
7 testimony --
8 A. Because of other things that could have
9 been done to prevent this.
10 Q. Okay. So if I understand your testimony,
11 you think it's contrary to the city's Merit System
12 rules and regulations if a firefighter like
13 Mr. Davis would directly talk to the media about
14 issues of public concern, fire department safety,
15 health and welfare of the firefighters? You think
16 that would be a violation of the Merit rules and
17 regulations; is that correct?
18 A. If it's something that's going to impede or
19 harm the operation of the department, yes, sir.
20 Q. Would it be a violation of the Merit System
21 rules and regulations by a firefighter if he or she
22 spoke directly to the media about inadequate
23 staffing in the fire department?
24 A. Basically, that's something that they
25 could -- they have the opportunity to talk to me

44

1 about, or the assistant chiefs.
2 Q. I understand your position, but you have to
3 listen to my question, if you would, Chief Hunter.
4 I want to know specifically your position and view
5 as to whether or not it would be a violation of the
6 city's Merit System rules and regulations if a
7 firefighter in your fire department spoke directly
8 to a media representative about the subject of
9 inadequate staffing in the city fire department.
10 A. As far as our rules and regulations, we
11 have persons who can talk to the media about
12 staffing that handles that.
13 Q. You have a public relations representative
14 in the fire department that can talk to the media?
15 A. Yes, sir.
16 Q. Let me try this one more time. It's real
17 specific. Would it be a violation of the city's
18 Merit System rules and regulations if a firefighter
19 spoke directly to the media --
20 A. Yes.
21 Q. -- about the subject of inadequate staffing
22 in the fire department?
23 A. Yes, sir.
24 Q. Would it be a violation of the city's Merit
25 System rules and regulations if a firefighter

45

1 employed by the city's fire department spoke
2 directly to a media representative about the health
3 and safety of firefighters on the job?
4    A. Yes, sir.
5    Q. Would it also be a violation of those rules
6 and regulations if a firefighter spoke directly to a
7 newspaper or media representative about inadequate
8 protective gear or inadequate fire department
9 equipment and vehicles in the city fire department?
10    A. Yes, sir.
11    Q. I'm sorry?
12    A. Yes, sir.
13    Q. Would it also be a violation of the Merit
14 System rules and regulations of the city if a
15 firefighter spoke directly to a media representative
16 about insufficient financial resources or inadequate
17 budget in the city's fire department?
18    A. Yes, sir.
19    Q. Would it also be a violation of the Merit
20 System rules and regulations of the city if a
21 firefighter spoke directly to a media representative
22 about poor response times or inadequate dispatching
23 procedures in the city's fire department?
24    A. Yes, sir.
25    Q. Would it be a violation in your view of the

46

1 Merit System rules and regulations of the city if a
2 firefighter spoke directly to a media representative
3 about poor employee morale among the fire personnel
4 in the fire department?
5    A. Yes, sir.
6    Q. Would it be a violation of the Merit System
7 rules and regulations of the city if a firefighter
8 spoke directly to a media representative about any
9 alleged corruption or misconduct by fire department
10 officers within the city fire department?
11    A. Yes, sir.
12    Q. And, finally, would it be a violation of
13 the city's Merit System rules and regulations if a
14 firefighter spoke directly to a media representative
15 about public safety in general within the city?
16    A. Yes, sir.
17    Q. Okay. And I take it with regard to that
18 series of questions that I just asked you about the
19 rules and regulations, that your position and the
20 position of the city is that a firefighter must
21 route any of those expressions of concerns through
22 the chain of command within the city Fire Department
23 before they speak to a media representative; is that
24 correct?
25    A. Yes, sir. We should be given a chance.

47

1    Q. Turn to Exhibit 16, Chief Hunter, if you
2 would, please. This appears to be a counseling form
3 or reprimand addressed to David Davis dated
4 September 21, 2005. Are you familiar with this
5 document?
6    A. Yes, sir.
7    Q. It says here -- you'll see at the beginning
8 here, it says Sergeant Davis was counseled by Chief
9 Hunter and Assistant Chief Johansen on the 20th of
10 September 2005 concerning him making or publishing
11 statements to the local media concerning fire
12 department issues. And then it goes on further.
13 You see where it says that?
14    A. Yes, sir.
15    Q. Is this counseling form considered a
16 written reprimand that's placed in the personnel
17 file of Mr. Davis?
18    A. It's not a written reprimand. It's just a
19 counseling form to prevent anything from going any
20 further. It's almost like a corrective thing if a
21 person -- basically gives them the chance, benefit
22 of the doubt that you didn't know. And that's what
23 this is for.
24    Q. Is there something else in the fire
25 department that is called a written reprimand?

48

1    A. Yes, sir.
2    Q. And have you issued those to firefighters?
3    A. Yes, sir. I've had to before.
4    Q. Now, at the end of this memo, it says that
5 this counseling form for Mr. Davis was placed in his
6 personnel file. You see where it says that?
7    A. Where you at? 16?
8       MR. GRAHAM: Right here.
9    A. Okay.
10    Q. Yes, right at the bottom.
11       MR. GRAHAM: Last sentence.
12    A. Okay. Yes.
13    Q. So your answer is yes?
14    A. Yes.
15    Q. It appears to be signed by Assistant Chief
16 Kenneth Johansen; is that correct?
17    A. That's correct.
18    Q. Again, it sounds like you, as the chief of
19 the department, and Mr. Johansen actually discussed
20 this situation and counseled Mr. Davis about it; is
21 that accurate?
22    A. That's correct.
23    Q. And if I understand your testimony
24 earlier -- and you correct me if I'm wrong -- you,
25 on your own initiative solely, as the fire chief,

49

1  began this investigation and these counseling
2  sessions as a result of the newspaper article that
3  appeared in the newspaper in September 2005?
4      A. That's correct. I talked to the city
5  attorney about it.
6      Q. Mr. Graham?
7      A. That's correct. Yes, sir.
8      Q. So you cleared it through him to do this?
9      A. Yes, sir.
10     Q. Did you talk to the city manager,
11 Mr. Roberts, about investigating this matter?
12     A. Well, that's correct. He knew that I had
13 to see about it.
14     Q. You had to get his okay to conduct the
15 investigation?
16     A. Basically not -- not his okay but, you
17 know, you want the city manager's blessing to make
18 sure you don't do anything wrong.
19     Q. And did you discuss this with City Manager
20 Roberts before you conducted the counseling sessions
21 of Mr. Davis and the other firefighters?
22     A. That's correct.
23     Q. Did he tell you not to do the investigation
24 and not to do the counseling as a result of the
25 newspaper article?

50

1      A. No, sir. Mr. Roberts pretty well let us
2  run our departments.
3      Q. And did you interview or discuss this
4  newspaper article with other firefighters as well as
5  Mr. Davis?
6      A. That's correct.
7      Q. And would that have included William Miles,
8  Lance Wagner, Sergeant Ann Land, Robert Gaskin,
9  Sergeant Bowden, and James Wells as well?
10     A. It was the entire department. And, not
11 only that, it was the entire city.
12     Q. Entire city?
13     A. Yes, sir. Make sure others in the city
14 didn't make this mistake.
15     Q. Are you telling me that every city employee
16 was interviewed and counseled about this newspaper?
17     A. Not by me, but they was made aware of this
18 situation.
19     Q. Do you know if that was put out in some
20 kind of memorandum form by the city, distributed to
21 other city employees about communications with the
22 media?
23     A. I know what was supposed to have been
24 done. I know what I done in my department.
25     MR. WOODLEY: Could we go off the record

51

1  for a second?
2      (Discussion held off the record.)
3      MR. WOODLEY: Let's take five.
4      (Brief recess.)
5      MR. WOODLEY: Okay. We're back on the
6  record.
7      Q. Okay, Chief Hunter. We can go back on the
8  record after a brief break. And we were talking
9  about the investigation or review that you and the
10 city conducted of the firefighters in response to
11 that newspaper article that came out in September
12 2005. So that's the context in which we left. Did
13 you sit in on these individual counseling or
14 interview sessions of the firefighters that I just
15 listed their names?
16     A. That's correct.
17     Q. And did the Assistant Chief Johansen sit in
18 on those interviews as well?
19     A. On the people that was his personnel. We
20 have three assistant chiefs at the time.
21     Q. Okay.
22     A. And they all have different groups of
23 firefighters.
24     Q. Now, in Exhibit 16, which is in front of
25 you, the first two pages are the counseling forms;

52

1  one which involves Mr. Davis concerning his
2  statements to the local media, and the one right
3  after that involves Captain Robert Gaskin,
4  G-A-S-K-I-N, who received also a counseling form for
5  his statements to the local media. You see where
6  both of those documents say that?
7      A. That's correct.
8      Q. And as I understand it -- you correct me if
9  I'm wrong -- those were the only two individual
10 firefighters who received these counseling forms as
11 a result of their comments to the newspaper; is that
12 correct?
13     A. That's correct.
14     Q. That is correct?
15     A. In this particular, they got -- well,
16 counseling forms, yes, sir.
17     Q. Did they get something else that you were
18 about to say?
19     A. No, sir. I said counseling forms, that's
20 correct.
21     Q. But none of the other firefighters who were
22 interviewed received counseling forms or any form of
23 discipline as a result of their comments in the
24 newspaper; is that correct?
25     A. All of them had to sign the forms, the

53

1  papers about the articles. Let me read Gaskins and
2  check this out, make sure.
3      Q. Sure.
4      A. That's correct.
5      Q. Okay. Again, just so the testimony record
6  is clear, the only two individuals that received
7  these written counseling forms from the fire
8  department as a result of statements to the local
9  media were Mr. Davis and Mr. Gaskin; is that
10 correct?
11     A. Yes. Counseling form on here with
12 Mr. Davis was concerning also with the derogatory
13 statements he made toward Firefighter Brandon
14 Wilkerson, which Wilkerson took as intimidation, and
15 it was because of that. And Gaskin being a captain
16 and a officer -- he was the only officer in there --
17 he made the comment that basically he would rather
18 be on the fire truck, I think, in Iraq. And --
19     Q. Okay.
20     A. -- that was the reason.
21     Q. Sergeant Ann Land did not receive a
22 counseling form as a result of her comments in the
23 newspaper article; is that correct?
24     A. The only reason these two -- that's
25 correct. And the only reason these two received it

54

1  is because, like I say, the harassment of Brandon
2  Wilkerson and with Gaskin being a officer. Land --
3  let me -- let me see what she said.
4      Q. She was the one that was quoted as
5  saying --
6      MR. GRAHAM: His question is, she didn't
7      get a counseling form.
8      A. Oh. No, she didn't get one.
9      MR. GRAHAM: Doesn't make any difference
10     what she was saying.
11     Q. To follow up on that, though, she was
12 quoted in that newspaper article that we looked at,
13 which was Exhibit 14, as saying that if you're not
14 happy in your job in the fire department, you leave.
15     A. Well, no. I think if you get that correct
16 statement, she said someone told her that.
17     Q. So you apparently felt like she didn't need
18 a counseling form as a result of --
19     A. Someone who had said that to her.
20     Q. Okay. Was there any particular statement
21 that Mr. Davis made in that newspaper article that
22 troubled you so much that you wanted to issue this
23 counseling form to him?
24     A. It was two-fold.
25     Q. I'm just talking about in the newspaper

55

1  article.
2      A. Newspaper article? Basically --
3      Q. Was his comment about employee morale being
4  poor, did that prompt you to give him the counseling
5  form? Or it was some other comment that he might
6  have made in the newspaper article that caused you
7  to issue the counseling form?
8      A. Not necessarily that, no. It was mainly
9  his counseling form, like I say on here, was we
10 talked about the issues of publications in the paper
11 and then his harassment of Brandon Wilkerson.
12     Q. And my question is just focusing on his
13 statements to the local media, just that part of the
14 equation. Okay? My question is, was there anything
15 in particular of his comments or quotes in the
16 newspaper article that caused you to be troubled and
17 to prompt the investigation and then ultimately
18 causing the counseling form to be issued to
19 Mr. Davis?
20     A. The whole thing was troubling.
21     Q. But you can't zero in on his comment about
22 employee morale or staffing concerns in the
23 department that caused you to do the investigation
24 and issue the counseling form to Mr. Davis?
25     A. The main thing was not giving me the

56

1  opportunity to address it.
2      Q. What is your position as the chief of the
3  fire department and the Rule 30(b)(6) witness in
4  this case on the following subject: If a
5  firefighter has concerns about public safety or
6  operations in the fire department, or poor morale,
7  or understaffing, and they exhaust the chain of
8  command -- they route those concerns up to their
9  first officer and ultimately to you -- do they then,
10 after you consider that matter, do they then have
11 the right to go to the local media and issue and
12 state those same exact concerns?
13     A. They still don't have the right. But if
14 they bring them to me, I could guarantee anyone that
15 I would try to do my best to resolve them.
16     Q. Okay. But in the situation, so I
17 understand it, Chief Hunter, if a firefighter raises
18 those issues of safety, staffing, poor morale that
19 involve the fire department, and he or she routes
20 those up to you at the highest level in the fire
21 department, and that firefighter is not satisfied
22 with what you're doing on it and your response, is
23 it your position the firefighter at that point would
24 violate Merit System rules and regulations if he or
25 she went to the media to express those exact same

57

1  concerns?
2      A.  That's correct.
3      Q.  So there's really no circumstances, as far
4  as you and the city are concerned, in which a
5  firefighter can go to the media expressing concerns
6  about safety or response times or staffing or morale
7  in the fire department, right?
8      A.  I guess if it was all-out corruption.  But
9  according to the Merit System, you have to follow
10  it.  But I have never seen that type of conditions
11  here.
12      Q.  Okay.  But on the issues of staffing, fire
13  department equipment and protective gear and
14  response times, the firefighter at no time can go to
15  the media and address those issues; is that correct?
16      A.  They shouldn't.  They should come to the
17  fire chief.  They should have used the chain of
18  command.  You know, use that, and we would explain
19  to people that we're doing our best and show them --
20      Q.  I want to be clear on this.  Even after it
21  goes to you and they're not happy with your response
22  as the fire chief, do they then have the right, or
23  would they violate the rules and regulations of the
24  city, if they then went to the media and expressed
25  those same concerns?

58

1      A.  They would violate that, but we have never
2  had that -- I've never had the opportunity.
3      Q.  Fair enough.  Good enough.
4      Did there come a point in time where you and
5  the fire department had to propose extending the
6  probationary period for new hires into the fire
7  department from one year to 18 months?
8      A.  That's correct, for new hires.
9      Q.  For the new hires only?
10      A.  Yes, sir.
11      Q.  But that would not have applied and has not
12  applied to veteran firefighters already working in
13  the department, correct?
14      A.  Wouldn't have disturbed their careers at
15  all.
16      Q.  And so that would not have applied to
17  Mr. Davis, who had been an 8-year veteran of the
18  fire department, correct?
19      A.  None whatsoever.
20      Q.  What prompted that proposed extension of
21  the 18-month period in the fire department for
22  probation?
23      A.  Retentions and investment of firefighters.
24  We hire firefighters.  State law gives you one year
25  to train them.  We also require that they become

59

1  EMTs.  We have a high failure rate in the EMT
2  portion, emergency medical technician portion.  And
3  we have invested a lot of money in some of the
4  firefighters.  So it's a concern trying to retain
5  them instead of having to terminate them and bring
6  someone else in.  And doing that lets them know that
7  if we extend it and give them a chance to pass the
8  test, that would help a whole lot, help the
9  department and the city as far as their investment
10  in the firefighters.
11      And also in talking to the police chief, they
12  was extending their time as far as the schools was
13  more lengthy.  And then when the person get on, you
14  know, if they have been in training several months,
15  you didn't have a fair chance to give them the
16  evaluation.  So it was two or three different
17  things.  And, also, we talked to our building code
18  director, and he also was -- had to have people that
19  he hired and they go to the police academy, so he
20  was going to have the same problem.
21      So, in doing so, the three of us got together
22  and said we would propose and then, that way, we
23  would be able to keep personnel.  You know, you get
24  personnel down there.  They become accustomed --
25  they become part of the family.  And they're

60

1  firefighters, you know.  And you don't want to see
2  them, the ones that have trouble passing the test --
3  we've seen where a lot of them, if you can get them
4  help, they could pass the test.  So this was
5  something that we viewed as being real good,
6  something as being a good thing.
7      Q.  So you were part of proposing a change to
8  18 months, as well as the police chief?
9      A.  That's correct.
10      Q.  During that time when you were considering
11  proposing this extension of the probationary period,
12  did you investigate or look into the probation
13  periods of any other cities or counties nearby?  Did
14  you do any review like that?
15      A.  Well, we knew of other people that had
16  longer.  Columbus had 18 months, I believe.  And I
17  had a former chief that was working for me at the
18  time also.  And we had -- and when it came up with
19  the idea, we talked to other people, and he knew of
20  other people that had longer.  And this was
21  something that would give us a chance, like I say,
22  to keep these people on board.
23      Q.  Are there any restrictions at any time in
24  your fire department concerning firefighters working
25  secondary jobs or private jobs?

61

1    A. No, sir. Merit System dictates that they
2 get -- basically, they've got to get permission to
3 do so, but I haven't seen where anybody has been
4 turned down.
5    Q. What about during the period of probation?
6    A. Probationary period that we focus on
7 training. During the probationary period, we have a
8 restriction up until they finish their -- get
9 certified.
10    Q. Okay. So just so I'm clear on that and the
11 record is clear, during the 18-month probationary
12 period in the city's fire department, that new hire
13 during that 18-month period is not permitted to have
14 a secondary job; is that correct?
15    A. They changed that. It was during the 12
16 months of getting your state certification. The key
17 to it is we didn't inflict that on them when we
18 extended to the 18 months as far as having a
19 secondary job. We made sure -- because you were
20 going to have to be state certified within one year
21 or we couldn't keep you aboard anyway.
22    Q. So what's the current restriction on the
23 secondary --
24    A. One year.
25    Q. -- job? Is it just twelve --

62

1    A. Twelve months --
2    Q. -- months?
3    A. -- that's correct.
4       THE REPORTER: Hold on. Hold on.
5       MR. WOODLEY: Yes. We just have to pause.
6    Q. In your judgment, based upon your
7 experience in the city's fire department, is it more
8 difficult fo recruit new hires into the fire
9 department because the probationary period happens
10 to be 18 months?
11    A. I haven't never seen it affect anything.
12 People be so happy to get a job here, they wouldn't
13 care if it was 36 months. We -- I haven't had
14 anybody sit at a table since I have been hiring
15 firefighters, or been on board hiring firefighters,
16 that say that your probationary period is too long.
17 They say, whatever -- they say, thank you, I just
18 want to get in the door. If I can get in the door,
19 it's wonderful.
20    Q. Did it come to your attention that
21 Mr. Davis and other firefighters in the city fire
22 department were opposed to the policy change
23 extending the probationary period to 18 months?
24    A. Not basically until after the fact. They
25 didn't have anything to do with it.

63

1    Q. So you learned about the opposition after
2 the fact; is that correct?
3    A. Basically, yes, through conversation.
4    Q. Did anyone tell you the reasons why some of
5 the firefighters, including Mr. Davis, opposed the
6 extension of the probationary period?
7    A. No, sir. I learned later that they had, I
8 guess, taken it wrong or whatever. But all they had
9 to do was come to my office and --
10    Q. No, I understand. You keep saying -- and I
11 appreciate that -- that you want them to come to
12 you.
13    A. Well, they could have went to the assistant
14 chiefs, deputy chiefs.
15    Q. But if I may, I just want to focus on this
16 very limited question. Did you eventually become
17 aware of what the reasons were given by Mr. Davis or
18 other firefighters that they were not in favor of
19 extending the period to 18 months?
20    A. I've heard bits and pieces, but I still
21 don't know.
22    Q. So what are they?
23    A. I still don't know the reason.
24    Q. So you don't have any idea why --
25    A. I still don't know the reason.

64

1    Q. -- they --
2       THE REPORTER: Hold on.
3    Q. So even today, you still don't know?
4    A. I don't know the exact reason of what was
5 behind that whatsoever.
6    Q. Okay. Fair enough. That's my question.
7       THE REPORTER: Please try not to talk over
8 each other.
9    Q. All right. Let's move on to another area,
10 Chief Hunter. At some point in time in April of
11 2006, did it come to your attention that Mr. Davis,
12 as the then-president of the firefighters' labor
13 association, placed a telephone call to Mayor
14 Hardin?
15    A. That's correct.
16    Q. And did it come to your attention that, in
17 fact, Mr. Davis, in his role as the president of
18 firefighters' local union, had, in fact, a telephone
19 conversation in the middle of April of 2006 with the
20 mayor?
21    A. That's correct.
22    Q. And how did that come to your attention?
23    A. I was talking to our Personnel --
24 conversation with our personnel director.
25    Q. Barbara Goodwin?

65

1    A. That's correct.
2    Q. Let me invite your attention to Exhibit 23,
3 which is on this subject. This is a memo from you,
4 Chief Hunter, to H.H. -- otherwise known as Bubba --
5 Roberts --
6    A. That is correct.
7    Q. -- city manager, dated April 20, 2006, with
8 a copy being sent by you to Barbara Goodwin,
9 personnel director. And the re line is Sergeant
10 Davis, Merit System and SOP violations, end quote.
11 See where it says that?
12    A. That's correct.
13    Q. And at the beginning of this memo, you do
14 indicate what you just told me, that you were
15 informed in a conversation that you had with
16 Personnel Director Goodwin that the city's new
17 probation time for new hires for public safety was
18 evidently the subject of a telephone conversation
19 that Mr. Davis had with the mayor; is that true?
20    A. That's correct.
21    Q. When you learned of that conversation that
22 Mr. Davis had with the mayor from Ms. Goodwin, were
23 you instructed by anyone to look into the matter, to
24 investigate the subject?
25    A. No, sir. I instructed someone to look into

66

1 the subject.
2    Q. So you did that on your own?
3    A. That's correct.
4    Q. Did Ms. Goodwin suggest or recommend or
5 request that you look into the conversation that
6 Mr. Davis had with the mayor?
7    A. I solely done that on my own.
8    Q. Did you inform City Manager Roberts that
9 you were going to be looking into the telephone
10 conversation that Davis had with Mayor Hardin?
11    A. I informed him what I had heard.
12    Q. From Ms. Goodwin?
13    A. That's correct.
14    Q. What did you tell Manager Roberts about
15 that?
16    A. I told him that I have heard that I have an
17 employee that had directly contacted a council
18 member. And then I had Deputy Chief Waters to talk
19 to him and ask him was this true and to find out
20 what was the reasons, because we had been having
21 open meetings on a lot of different things
22 discussing what we was in the process of doing. And
23 Deputy Chief Waters told me that he had brought this
24 up in meetings that they had had so everybody was
25 informed of what we was in the process of trying to

67

1 do. So --
2    Q. This conversation --
3    A. -- I was wondering why this came about.
4    Q. The conversation that you just mentioned
5 you had with City Manager Roberts about this
6 subject, did this conversation occur before actually
7 investigating Mr. Davis and disciplining Mr. Davis?
8 I'm trying to get the timing of your conversation
9 with Roberts.
10    A. Did it come before?
11    Q. Yes.
12    A. Yes, it came before, because I had to find
13 out the details first.
14    Q. So you talked to City Manager Roberts
15 before conducting the investigation?
16    A. This is what I done. When I found out
17 about the conversation that particular evening, the
18 next morning I made a phone call to the deputy chief
19 to investigate this. And then I made sure I
20 informed the city manager what I was doing.
21    Q. At that time?
22    A. At that time.
23    Q. Was that by a telephone call to
24 Mr. Roberts?
25    A. It probably was by coming upstairs. My

68

1 office is right over there. Probably told him face
2 to face.
3    Q. And, at that time, what did Mr. Roberts
4 comment to you about looking into the conversation
5 that Davis had with the mayor?
6    A. Basically is -- like I say, Mr. Roberts
7 give us the opportunity to manage our departments.
8 So it's a matter if that's something you need to
9 look into, then look into it.
10    Q. Is that what he said to you, go ahead and
11 look into it?
12    A. Basically -- I can't remember exact words,
13 but he knew that's what I was doing.
14    Q. Did Mr. Roberts tell you at that time that
15 he felt like that might be a violation of the Merit
16 System rules and regulations?
17    A. No. Mr. Roberts didn't have to tell me
18 that. I felt like that.
19    Q. You felt like that on your own?
20    A. Yes, sir. Yes, sir.
21    Q. So you commissioned Deputy Chief Roy Waters
22 to investigate the matter and to speak with Davis
23 about his telephone conversation with the mayor; is
24 that correct?
25    A. That's correct.

69

1  Q. And did Deputy Chief Waters then report
2  back to you?
3  A. Yes, sir.
4  Q. Okay. And do you know if Mr. Davis gave a
5  written statement addressed to you concerning his
6  conversation with the mayor?
7  A. That's correct.
8  Q. And if you would look to Exhibit 22, which
9  appears to be a brief written statement from David
10  Davis dated April 19, 2006, addressed to you as the
11  fire chief. And so would that be the written
12  statement coming from Mr. Davis about his telephone
13  conversation with the mayor?
14  A. That's correct.
15  Q. As far as you know, is that statement true
16  and correct? Read it to yourself completely.
17  A. That is correct. That's -- this is the
18  form. This is what he gave me.
19  Q. But my question really is Exhibit 22 --
20  again, Davis's written statement dated April 19,
21  2006 addressed to you -- as far as you know, Chief,
22  is what Mr. Davis said in that written statement
23  true and correct?
24  A. Well, in his words, yes. The only choice I
25  have is --

70

1  Q. But you don't have any other basis --
2  A. -- take his word.
3  Q. I'm sorry.
4  A. I just have to -- I only can take his word.
5  Q. Do you have any other facts or basis to
6  suggest that what Mr. Davis said in his written
7  statement was untrue?
8  A. I guess what you're asking me as far as
9  reading this, I guess, as a -- what are you asking
10  me?
11  Q. Do you have any information or facts to
12  indicate that the statements contained in Mr. Davis'
13  written statement which we are reviewing now are
14  untrue or incorrect?
15  A. I don't have a reason to believe that they
16  are not true.
17  Q. Okay. Thank you. That's all I was
18  asking.
19  What was your understanding of the nature, if
20  you know, sir, of the telephone conversation between
21  Mr. Davis and the mayor? Do you know if it was on
22  the extension of the probation period? Do you know
23  if it was on other issues that Mr. Davis and Mayor
24  Hardin talked about?
25  A. That's basically what Ms. Goodwin had

71

1  expressed to me; that he called, I guess, to express
2  his feelings about the probationary period or
3  whatever.
4  Q. For new hires?
5  A. That he didn't agree with it, whatever. I
6  don't know if it was just for new hires or whether
7  he had taken it that it was going to affect him or
8  not.
9  Q. Well, in your memo to Mr. Roberts that we
10  looked at, Exhibit 23, you indicated that
11  Ms. Goodwin had told you there had been a telephone
12  conversation involving Davis and the mayor
13  concerning the new probation time for new hires.
14  You see where it says that?
15  A. Yes.
16  Q. So that was your information as well?
17  A. Yes.
18  Q. Now, later on in that same memo, Exhibit
19  23, from you to Roberts, you criticize Mayor Hardin
20  and you indicate -- you'll see at the bottom of the
21  memo, it says, quote, Mayor Hardin should refer any
22  employee violating the chain of command as indicated
23  in our Merit System back to their department head,
24  personnel department, or city manager. Failing to
25  do so is a violation of our city charter, end

72

1  quote. You see where you say that?
2  A. That's correct.
3  Q. You're basically accusing the mayor of
4  violating the city charter by talking to a city
5  employee; is that correct?
6  A. In the Merit System, employees are not to
7  have direct contact with -- and the mayor is a
8  council member. And not only that, it's a chain
9  that you go through to even -- to be told whether
10  you can do this or not do it. So the mayor -- yes.
11  That's -- I'm not accusing him of anything. The
12  mayor might have not known this, you know. I'm
13  saying the mayor might have not known this. But in
14  our city charter, it says inquiries about any
15  departments in our city are made solely through the
16  city manager.
17  Q. What, in your mind, was the failure of the
18  mayor when you mention this in the memorandum?
19  A. I guess in my mind, it was that once the
20  subject of the probationary period came up and he
21  recognized and knew it was David Davis, it should
22  have been the end of the conversation.
23  Q. And you understood that that was not the
24  end of the conversation, that the mayor continued
25  discussing it with Davis?

73

1    A.  Well, Davis say in his thing that they
2  discussed the issues, and then discussed it in its
3  entirety to what they wanted to discuss it to.
4    Q.  So the mayor's failing or violation of the
5  city charter was, in your judgment, the continuation
6  of the conversation with Davis, correct?
7    A.  In here I said feel strongly someone should
8  speak to the mayor about sensitive issue of
9  interfering.  The mayor might have not known
10 exactly.
11   Q.  Do you know if anyone spoke to Mayor Hardin
12 about the issue?
13   A.  That's not my job.  I put it in the letter
14 form, memo form.
15   Q.  Did you give a copy of this memo to the
16 mayor?
17   A.  I gave a copy of it to city manager and
18 personnel director.  That's not my job to go to the
19 mayor.  I'm not trying to be smart at you.  I'm just
20 staying within my parameters.  I don't go to the
21 mayor.  I stay within my parameters.
22   Q.  Do you know if, in the past, any city
23 firefighters have had conversations with the mayor
24 of the city about any issues affecting the fire
25 department?

74

1    A.  No, sir.  I don't know.
2    Q.  Sir, do you have any information that
3  Mr. Davis's telephone conversation with the mayor in
4  April of 2006 adversely impacted Davis's job
5  performance?
6    A.  Yes.  He's violated what we asked him to
7  follow as far as the standard operating procedure.
8    Q.  Maybe my question really wasn't clear.  His
9  actual performance on the job as a firefighter on
10 duty.  Did that telephone conversation affect
11 adversely his doing his job in the fire department?
12   A.  Yes, it did.  He was violating rules.
13   Q.  Other than the violation of the rules and
14 regulations, was he less of a firefighter in his
15 following shifts?
16   A.  To be a full-rounded firefighter, you need
17 to follow the rules.
18   Q.  Can you give me any concrete or specific
19 examples of how that telephone conversation between
20 Davis and the mayor actually disrupted the
21 operations of your fire department?
22   A.  Disrupted chain of command.  If we got one
23 person that's not following the chain of command, no
24 one else should have to follow it.
25   Q.  Other than that point -- and I understand

75

1  that point --
2    A.  That's it.  That's the point.
3    Q.  -- anything else?  Was there any other
4  impairment or disruption, adverse impact on the
5  operations of the fire department as --
6    A.  That was --
7    Q.  -- let me finish, please -- as a result of
8  the conversation that Mr. Davis had with Mayor
9  Hardin?
10   A.  That was the point.
11   Q.  Just that other one, the chain of command?
12   A.  Just that point.
13   Q.  Is there also an SOP that the fire
14 department has that you believe Mr. Davis violated
15 when he talked with the mayor about the probationary
16 period?
17   A.  ASOP 12, I believe it is.
18   Q.  Why don't you turn to Exhibit 3?  And go to
19 Exhibit 3, the fourth page, the last page of
20 Exhibit 3 which, as I understand it, is the ASOP 12
21 that you referred to; is that correct?
22   A.  That's correct.
23   Q.  And this talks about the subject of
24 addressing the city council; is that correct?
25   A.  That's correct.

76

1    Q.  Does that mean addressing the city council
2  as a body in a meeting, addressing the city council?
3    A.  Yes.  As a person -- this was written in
4  '98 -- I guess as trying to get there, the body,
5  which is a place you would never get to because it
6  stops at the city manager.
7    Q.  Okay.  So, in other words, under this
8  ASOP 12, firefighters are not permitted to go beyond
9  the city manager and are not permitted to address
10 the city council as a group in a meeting; is that
11 accurate?
12   A.  City Manager informs the council of
13 anything that's going on.  He would be the one
14 that -- if he had to express something that was bad,
15 he would be the one that would meet with the city
16 council.
17   Q.  If a firefighter had a concern about
18 staffing, morale, equipment, budget within the fire
19 department, those kinds of issues, Chief Hunter,
20 that firefighter is not permitted to go directly to
21 the city council in a public meeting and express
22 those concerns?
23   A.  That's correct.
24   Q.  And if he did so, that would violate the
25 chain of command and would violate this ASOP; is

77

1  that correct?
2      A.  That's right.  And it would -- yes, sir.
3      Q.  But I guess I'm confused and maybe you can
4  explain it for me.  Mr. Davis, of course, made a
5  telephone communication with the mayor while he was
6  off duty.  He was not addressing the city council in
7  a meeting or in any other way addressing the city
8  council.  So how would Mr. Davis's telephone
9  conversation with the mayor while he was off duty
10  have violated this ASOP which appears to only
11  address the city council?
12      A.  For one thing, he broke Merit System.  It's
13  a Merit System violation.  And for the next thing,
14  if he wanted to try to contact, to go directly --
15  which you'll see here, if any fire department member
16  appears before or try to directly contact -- it says
17  directly contact on number 4 -- a city council
18  member about work-related problems without following
19  these procedures.  And it addresses that.
20      Q.  And work-related business, you would
21  explain that to include virtually all issues that
22  affect the fire department; is that correct?
23      A.  That's correct.
24      Q.  Okay.  Are you aware that there's a State
25  of Alabama code provision that allows firefighters

78

1  to belong to an association?
2      A.  Yes, sir.
3      Q.  We covered that earlier?
4      A.  Yes, sir.
5      Q.  Okay.  And I'm not sure if I asked this,
6  Chief, but I want to make sure it's on the record.
7  You, as the fire chief, you report directly to the
8  city manager?
9      A.  That's correct.
10      Q.  In the city charter or the city code, are
11  there any provisions, to your knowledge, that
12  address your duties and responsibilities as the fire
13  chief?
14      A.  That is correct.  I work up under city
15  manager.
16      Q.  I know there are provisions that address
17  city manager, and the council and the mayor.  But as
18  far as I know, there's no city code provisions or
19  charter provisions that cover you as the fire
20  chief.  Is that your understanding?
21      A.  I'll have to make sure I look back at that,
22  because I know I -- I would have to look at that.
23      Q.  Fair enough.  Okay.  So let's return to the
24  investigation of Mr. Davis concerning the telephone
25  conversation he had with the mayor.  We already

79

1  covered the subject of Mr. Davis giving his written
2  statement as he was interviewed by Deputy Chief
3  Waters.  And we covered in large part the memorandum
4  that you issued to City Manager Roberts dated
5  April 20, 2006.  That was Exhibit 23.
6      What next occurred in that process of doing the
7  investigation of Mr. Davis which ultimately led to,
8  of course, his termination?
9      A.  What next occurred?  We determined that it
10  was a violation.  We had to do a write-up, a written
11  write-up.  So when that occurred, we took a look at
12  that.  That one infraction didn't get Sergeant Davis
13  terminated.  It was the multiple infractions and the
14  Group II offenses in Section 14 of the Merit System
15  that didn't allow for him to go over those two
16  different things that led to his termination.  It
17  wasn't the one thing; it was the second.
18      That's why I had the meeting with Sergeant
19  Davis in September, to prevent this.  He knew he
20  already had one Group II offense.  And knowing the
21  Merit System, that was what we was trying to do,
22  make sure that we prevented anybody from going over
23  their infractions that they're allowed.  In the
24  group, we have three offenses, three groups of
25  offenses in the Merit System.  Part of our job is

80

1  when we see a person, in trying to keep an employee
2  from getting to that point, we have counseling
3  sessions or whatever it takes to prevent that,
4  because you don't want to terminate anybody.  And
5  that's what happened when this particular infraction
6  happened.  It pushed it to the second Group II,
7  which is not allowed.  That led to his termination.
8      Q.  You mentioned that there was an earlier
9  Group II offense involving Mr. Davis.  Was that the
10  newspaper article?
11      A.  No, sir.
12      Q.  -- and the counseling form?
13      A.  No, sir.
14      Q.  What was the earlier Group II offense?
15      A.  It was one -- it should be on that -- it
16  should be listed on his termination form as far
17  as -- it should be on the written.  You have to put
18  a list of what a person has in the previous file.
19      MR. WOODLEY:  Could we go off the record
20  for a second?
21      MR. GRAHAM:  Sure.
22      (Brief recess.)
23      MR. WOODLEY:  Back on the record.
24      Q.  Again, Chief Hunter, we're talking about
25  Exhibit 24.  If you would, turn to that for a

81
1  moment. And this appears to be the written warning
2  form dated April 20, 2006, involving David Davis; is
3  that correct?
4      A. That's correct.
5      Q. And you'll see there that it -- in the
6  first section when talking about the details of the
7  Merit System violation, it refers to a violation
8  concerning the April 17, 2006 conversation on the
9  telephone that Davis had with the mayor regarding
10  city proposals. You see where it says that?
11      A. That's correct.
12      Q. And I know what it says elsewhere on the
13  form. But that event, that telephone conversation
14  you viewed as violating the chain of command,
15  violating the Merit System rules and regulations for
16  which he was terminated; is that accurate?
17      A. No. He wasn't terminated for that. He was
18  written up for that. He was written up for that
19  action. What got him terminated was the amount of
20  Group II offenses that he had in his file. Which if
21  you go down to August -- if you'll go down to the
22  third paragraph right there on the same page, that
23  one thing got -- warranted a write-up. That one
24  thing didn't get him terminated.
25      Q. Well, let's look at the bottom of the form

82
1  where it says, quote, discharge as per Merit System
2  rules and regulations for second Group II offense.
3      A. Yes, sir.
4      Q. What was the second Group II offense?
5      A. The one that he had just done.
6      Q. I'm sorry?
7      A. The first one -- you want to know what the
8  first one was?
9      Q. No. I don't want to know what the first
10  one was.
11      A. Okay. Well, the second one --
12      Q. If you would just listen to my question.
13  Let me rephrase it. It's real simple. It says,
14  quote, discharge as per Merit System rules and
15  regulations for second Group II offense, end quote.
16  You see where it says that?
17      A. Yes, sir.
18      Q. Okay. What, specifically, was the second
19  Group II offense?
20      A. Contacting the mayor.
21      Q. Okay. Good enough. And then it says
22  discharged -- and I quote it again -- discharged as
23  per Merit System rules and regulations for first
24  Group III offense, pages 53 and 54, end quote. What
25  specifically was the first Group III offense for

83
1  which he was discharged?
2      A. Okay. Let me look at it. It was Group
3  III, line 6, insubordination by refusal to perform
4  work assigned slash to comply with written or verbal
5  instructions of the supervisory force.
6      Q. And that related to the telephone
7  conversation you had with the mayor; is that
8  correct?
9      A. And the SOPs. Merit System are written
10  instructions. Basically, I said the Merit System is
11  written instructions and standard operating
12  procedures.
13      Q. I'm afraid the record right now is not
14  clear, at least it's not clear in my mind. So I
15  want to know what the specific first Group III
16  offense was for which he was discharged. Was it the
17  communication over the telephone that he had with
18  Mayor Hardin?
19      A. No. It was his insubordination to follow
20  the rules that was written --
21      Q. Follow what rules?
22      A. -- which was not to --
23      Q. Not to --
24      A. -- the standard operating procedure or the
25  Merit System contact and direct contact with council

84
1  members.
2      Q. Okay. So it was, in fact, his
3  communication with the mayor that was considered by
4  you and others to be the Group III offense; is that
5  right?
6      A. It was not following the rules.
7      Q. Want me to try again?
8      A. Yes.
9      Q. I will. I'm going to keep trying until I
10  get an adequate answer, which is: The Group III
11  offense which was his first Group III offense for
12  which he was discharged, was that, in fact, his
13  telephone communication with Mayor Hardin?
14      A. That is correct. That was the violation.
15      Q. Okay. Thank you.
16      It goes on to say -- which is confusing to me
17  so you can, I think, explain it -- on the second
18  page of Exhibit 24, this written warning form goes
19  on to say, quote, this written warning is intended
20  to give you an opportunity to correct your work
21  performance and conduct in the future. And then it
22  goes on to say, any further violations could result
23  in your dismissal from employment. You see where it
24  says that?
25      A. That's a standard printout on the form.

85

1 Doesn't have any bearing on that because it's also
2 conditional --
3      Q.  Because he's fired?
4      A.  Well, it don't have any bearings on that.
5 That would be in case it is a written warning and it
6 wasn't at this point --
7      Q.  Right.
8      A.  -- you know.
9      Q.  But obviously that warning form, if, in
10 fact, he's being discharged, doesn't have a lot of
11 bearing on Mr. Davis because he's gone.
12      A.  Well, I hate that, too.
13      Q.  You hate what?
14      A.  I hate that he's gone, but that's --
15      Q.  Would you be in favor --
16      A.  -- part of the rules.
17      Q.  -- of possibly reinstating him?
18      A.  Would I be in favor of it?
19      Q.  Yes.
20      A.  No, sir.
21      Q.  Why is that?
22      A.  It would -- I don't think that would be a
23 good idea.
24      Q.  Why?
25      A.  And I think he's gone on and done pretty

86

1 good.
2      Q.  We're going to talk about that later on.
3      A.  I don't -- I don't think he would want to
4 be here, to tell the truth.  And I'm going to be
5 honest with you.  I don't think he want to be here.
6 Because he could have communicated with the staff or
7 myself or anyone else while he was here.  He had
8 every opportunity.  I don't have anything against
9 David.
10      Q.  All right.  Good enough.
11      A.  It's the rules.
12      Q.  This warning and discharge form, Exhibit
13 24, was signed apparently by Ms. Goodwin and
14 yourself; is that correct?
15      A.  Which one now?  24?
16      Q.  Yes.
17      A.  Yes.
18      Q.  It bears the date April 21, right?
19      A.  And Roy Waters, who was the supervisor.
20 That's who carried this out.
21      Q.  Now, was this actually handed to Mr. Davis
22 in a meeting that you participated in?
23      A.  I wasn't in this one.  Chief Waters took
24 care of this, along with Barbara Goodwin.  I put
25 this in Chief Waters' hands, Deputy Chief Waters.

87

1 He signed this on the supervisor's signature.  So
2 I'm trying to remember was I there when the final
3 thing happened, but Chief Waters handled this
4 portion.
5      Q.  So you were not involved in the meeting
6 that evidently Mr. Davis was called in, Ms. Goodwin
7 was there, Deputy Chief Waters was there, and he was
8 handed this discharge form and actually entered his
9 comments?
10      A.  I think -- he handled this, but I might
11 have been there the day -- I'm trying to make sure
12 I'm correct.  I usually can remember everything
13 good, but I don't want to say anything that's
14 wrong.  I might have been there, but everything was
15 taken care of and the decision was made.
16      Q.  Okay.  I'm not going to try and read
17 because I can't read Mr. Davis's handwriting, but
18 apparently he entered these written comments at the
19 end of this written warning form, Exhibit 24.  Is
20 that your understanding?
21      A.  Yes, sir.  That's his writing.
22      MR. WOODLEY:  Mr. Graham, if you don't
23 mind, I'm going to ask Mr. Davis to read that,
24 because --
25      MR. GRAHAM:  That will be fine.

88

1      MR. WOODLEY:  -- it's right at the bottom
2 of Exhibit 24.
3      MR. GRAHAM:  No objection.
4      MR. DAVIS:  In regards -- what's that say?
5 In regards to contacting the mayor, I was
6 acting in my capacity as president of the
7 Phenix City Firefighters' Association Local
8 3668 and not as a driver/engineer with the City
9 of Phenix City.  I will seek a review board
10 hearing.
11      Q.  And, Chief Hunter, is that your
12 understanding that those were the written comments
13 that Mr. Davis entered in this warning and discharge
14 form?
15      A.  That's correct, and it was put before the
16 review board.
17      Q.  And, again, you don't have any information
18 that would indicate that the written statement
19 Mr. Davis had at the bottom of this form was
20 untruthful or incorrect in any way, do you?
21      A.  Yes.  I feel like -- I don't have any
22 information, but --
23      Q.  I don't want your feelings.
24      A.  Okay.
25      Q.  I just want to know if you have facts --

89

1      A. I don't have any facts on it.
2      Q. -- that would indicate that statement by
3  him was untrue. You don't have any facts, do you?
4      A. I don't have any facts whether it's true or
5  untrue.
6      Q. Okay. If you could move on to Exhibit 25.
7  And this appears to be an End of Employment form of
8  the City of Phenix City concerning Mr. Davis
9  indicating that his employment ended on April 21,
10  2006. And then you see where the box is checked or
11  the line is checked indicating he was dismissed. Do
12  you see that?
13      A. Yes, sir.
14      Q. And then again -- and I don't want to
15  burden the record, but it refers to the Group II
16  offense and the Group III offense. You see where it
17  indicates that?
18      A. Correct.
19      Q. And those two particular offenses, as you
20  indicated earlier in your testimony, related to his
21  telephone communication with Mayor Hardin; is that
22  correct?
23      A. Phone call was violation of the Merit
24  System and the standard operating procedures.
25      Q. So is the answer to my question yes, that

90

1  the particular Group II offense, the particular
2  Group III offense that caused his dismissal was that
3  telephone conversation with the mayor?
4      A. That relates to the violation of the SOPs
5  and Merit System.
6      Q. So the answer is yes, and then you added to
7  it?
8      A. That's correct.
9      Q. Okay. I note that the city manager did not
10  sign this End of Employment form for Mr. Davis. Do
11  you know why that was?
12      A. I have -- I have no idea.
13      Q. But you signed it as the department head,
14  correct?
15      A. That's correct.
16      Q. And Ms. Goodwin signed it as well; is that
17  correct?
18      A. That's correct. Yes, sir.
19      Q. Do you know if this was handed to
20  Mr. Davis?
21      A. I'm not for sure.
22      Q. Because you can't remember if you were
23  involved in the meeting at the time, right?
24      A. I'm quite sure I might have been there, but
25  I don't know what paperwork was -- when the

91

1  finalized paperwork was there.
2      Q. If you move on to Exhibit 25, there's
3  another form. This is called Notice of Termination
4  that apparently was being sent to the Alabama Fire
5  College and Personnel Standards Commission.
6      A. You said 25?
7      Q. It's actually -- I'm sorry. It's 26.
8      A. Okay. 26, yes. Yes, sir.
9      Q. Are you familiar with this form?
10      A. Yes, sir.
11      Q. Is this a normal form that's sent out to
12  the Alabama Fire College when someone leaves the
13  fire department?
14      A. That's correct. You have to notify the
15  Fire College.
16      Q. Is that your signature at the bottom?
17      A. That's correct.
18      Q. And is that the date that you signed it?
19  April 28, 2006?
20      A. That's correct.
21      Q. Now, I'm a little bit confused because it
22  says the date of termination is April 19, 2006,
23  where the other documents say the date of
24  termination was April 21, 2006. Do you know why
25  there's a discrepancy there?

92

1      A. Training had to get the paperwork together
2  for this to be signed. This come out of our
3  training department, is sent to the Fire College.
4  You have ten days, something like ten days or so.
5  And that's what happened with this. There was the
6  delay in this as far as notification.
7      Q. Well, I'm not talking about the delay. I'm
8  asking you really why there were two different
9  dates. This one says he was terminated on April 19,
10  2006 that you signed. And the other documents
11  indicate that he was terminated and his employment
12  ended on April 21. So there's a two-day difference
13  there, and I was asking you if you could explain why
14  there's a discrepancy on those two dates.
15      A. Okay. Basically, that would be a error.
16      Q. Which one is an error? Was he, in fact,
17  terminated on April 19 or was he terminated on
18  April 21?
19      A. Let me get the date here what he was
20  terminated on. The last -- terminated on the date
21  that Ms. Goodwin has here. The employment date was
22  on the 21st here.
23      MR. GRAHAM: Look at this one. This is --
24      A. Yes. That's the one I'm looking at. April
25  21st. That was a typo oversight.

93

1    Q.  What, in fact, was the termination date; do
2  you know?
3    A.  21st.
4    Q.  The 21st of April?
5    A.  Yes.  Personnel would know better than I
6  know, and Ms. Goodwin is on here, so that's what it
7  was --
8    Q.  Did Ms. Goodwin agree that Mr. Davis should
9  be terminated?
10    A.  You would have to ask her that, yes.  But
11  she wouldn't have signed it if she didn't.
12    Q.  Did City Manager Roberts agree that
13  Mr. Davis should be terminated?
14    A.  You're going to have to ask Mr. Roberts
15  that.
16    Q.  But what's your understanding?
17    A.  My understanding is he didn't tell me not
18  to terminate him, so --
19    Q.  And then you alluded earlier that Mr. Davis
20  requested a Personnel Review Board hearing
21  concerning his termination; is that correct?
22    A.  That's correct.
23    Q.  And did you attend that hearing?
24    A.  Yes, sir.
25    Q.  Did you give testimony at that hearing?

94

1    A.  I believe so.
2    Q.  Do you recall what the substance of your
3  testimony was at the Personnel Board hearing?
4    A.  No, sir. I can't remember that.  I would
5  have to see that.  I would have to take a look at
6  it. I don't want to say anything wrong.
7    Q.  Now, after the Personnel Board hearing was
8  over and had made its recommendation, did you have
9  any conversations with City Manager Roberts when the
10  matter was placed on his desk, about Mr. Davis?
11    A.  Did I have any conversations?
12    Q.  Yes.  After the hearing is over and before
13  Mr. Roberts makes his determination to uphold the
14  board's decision approving the termination, did you
15  have any conversations during that short period of
16  time with Mr. Roberts?
17    A.  No, not unless there was some kind of
18  apology or something.  You know, I'm a department
19  head.  Whenever something go wrong in the department
20  that leads to this, it's something that you're sorry
21  that you put -- that happens in your department.
22  That's mainly --
23    Q.  Look at Exhibit 31, which is another
24  newspaper article.  This one is out of the Columbus
25  Ledger-Enquirer which addresses the subject of

95

1  Mr. Davis's firing.  Did you have a chance to look
2  at that newspaper article when it came out?
3    A.  I might have.  Can I read it?
4    Q.  Oh, yes.  Sure.
5    A.  Yes.
6    Q.  Have you finished reading that newspaper
7  article?
8    A.  Yes.
9    Q.  And, again, this is the article in the
10  Ledger-Enquirer that came out after Mr. Davis's
11  termination.  Were you contacted by the newspaper to
12  make a comment on the subject?
13    A.  Yes, sir.
14    Q.  And did you?
15    A.  No, sir.
16    Q.  You declined comment?
17    A.  Yes, sir.
18    Q.  And why did you decline comment to the
19  newspaper?
20    A.  It wouldn't -- I feel like it wasn't any of
21  their business.  It was a personnel matter.
22    Q.  It wasn't any business of the newspaper?
23    A.  Not as far as a personnel matter.
24    Q.  Now, did it come to your attention after
25  Mr. Davis's firing that he sought employment

96

1  elsewhere?
2    A.  Did it come to my attention?
3    Q.  Yes, sir.
4    A.  You know, you hear things, but -- I knew he
5  was working for the ambulance service.  I seen him
6  working.
7    Q.  Were you ever contacted by a prospective
8  employer like the ambulance service concerning
9  Mr. Davis's employment here in the city?
10    A.  No. David already was working for them, I
11  think.
12    Q.  So you didn't receive any communications by
13  a prospective employer inquiring about what kind of
14  job he did or why he left the city fire department,
15  nothing like that at all?
16    A.  People have asked me, yes.  I had people
17  ask me about it, but --
18    Q.  What people?
19    A.  I had someone from Auburn ask me.  I had
20  someone from Opelika ask me.
21    Q.  What's the spelling on the last word?
22    A.  Opelika.
23    Q.  Let's talk about Auburn first.  Who called
24  you the Auburn Fire Department about Mr. Davis?
25    A.  Basically, they been -- I didn't get a

97

1  call. I was at a meeting and a couple guys asked
2  me, say -- well, told me, said one of your
3  firefighters put in for a job up here. And I knew
4  right then I couldn't discuss or talk about it,
5  so --
6      Q. Who were those two guys from the Auburn
7  Fire Department?
8      A. I don't know them.
9      Q. Were they chief officers?
10     A. No, sir. I talked to Chief Langley about
11  it. Chief Langley also told me David had put in,
12  but that was the end of it.
13     Q. Is Chief Langley chief of the Auburn Fire
14  Department?
15     A. That's correct.
16     Q. Where were you?
17     A. I was at a consortium meeting. We have a
18  meeting of the different departments in the
19  surrounding area. We all meet together for training
20  purposes, and we meet the first Wednesday of each
21  month and exchange ideas, and we train our personnel
22  together.
23     Q. So Chief Langley from the Auburn Fire
24  Department asked you about David, said he put in for
25  a job and used to work in your department?

98

1      A. Yes, sir.
2      Q. So what did you say in response to that to
3  Chief Langley?
4      A. I said, that's good.
5      Q. Did you comment on his job performance?
6      A. I know not to comment.
7      Q. Didn't, in fact, Chief Langley ask you
8  why -- what were the circumstances concerning
9  Mr. Davis's departure from your fire department?
10     A. Not that I know of.
11     Q. He didn't ask you anything about that?
12  Just seems to me that would be a curious question
13  that a chief of the department who's got a job
14  application, knowing that he left the Phenix City
15  Fire Department, would want to know why?
16     A. People didn't know me, Chief Langley and
17  certain people. And people who work for this
18  department will tell you it's certain things that
19  when they ask me, I give you a certain look and you
20  know not to ask me anything else.
21     Q. So you didn't say anything good or bad
22  about Davis's job here?
23     A. I know not to do that. I wouldn't do that.
24     Q. Okay. What about the second fire
25  department other than Auburn?

99

1      A. I was at the Fire Chiefs convention in
2  February. And Chief Morgan told me David had put
3  in. And I said, that's good.
4      Q. Did that chief ask you about his job here
5  in the Phenix City Fire Department?
6      A. He asked me, he said, what kind of
7  firefighter is he? I said, you have to determine
8  that for yourself. I don't -- I don't get into
9  that.
10     Q. So your testimony is you didn't comment one
11  way or the other on this?
12     A. No. I don't do that.
13     Q. Did you have any other communications with
14  any other fire department or ambulance service about
15  Davis?
16     A. No.
17     Q. Those are the only two?
18     A. Those are the only two until one of the
19  guys that worked for me, Rob Schwoebel, he told me
20  that David was working for Opelika. And I said,
21  that's good.
22     Q. Bear with me just for a moment here,
23  Chief.
24     (Brief recess)
25     Q. Okay. We can go back on the record.

100

1      Chief Hunter, have you ever had occasion to
2  address the city council on fire department issues?
3      A. During budget time each year.
4      Q. Is that the only time?
5      A. That's -- or unless they ask me something.
6  If they asked something in a work session. Or, like
7  recently, we received a Golden Axe from Muscular
8  Dystrophy for raising the highest amount of money in
9  the State of Alabama, you know, things like that.
10     Q. Well done.
11     A. Yes, sir. When we do things like that,
12  that's about it.
13     Q. If you wanted to directly address the city
14  council on an issue concerning your fire department,
15  would you first have to communicate that to the city
16  manager or could you go to the council meeting and
17  say I've got this concern as a chief.
18     A. I would never do that.
19     Q. You have to go through the manager?
20     A. Yes, sir. That's as far as I'm going.
21     Q. Do you know any of the citizens who sit on
22  the Personnel Review Board?
23     A. Do I know any of them?
24     Q. Yes.
25     A. I know them by going to Personnel Review

101

1  Board hearings, by knowing their faces, seeing them.
2      Q.  Outside of the scope of that hearing on
3  Mr. Davis before the board, did you have any
4  conversations with members of the Personnel Review
5  Board about Mr. Davis?
6      A.  No, sir.
7      Q.  And you are aware, I take it, Chief, that
8  there's a First Amendment to our U.S. Constitution
9  that gives all citizens the rights of free speech
10  and free association?
11      A.  That's correct.
12      Q.  Okay.  In your view, do those rights and
13  principles apply to firefighters in your fire
14  department?
15      A.  That's correct.  Our Merit System gives us
16  that, too, unless it impedes the performance of our
17  men.
18      Q.  Have you ever had a conversation with Mayor
19  Hardin about Davis after Davis was fired?
20      A.  Not that I know of.
21      Q.  Would that be outside the chain of command
22  if you talked to the mayor about a termination in
23  your department?
24      A.  I usually don't talk to him too much.
25      Q.  But would it be outside the chain of

102

1  command?
2      A.  Yes, sir.  I talk to the city manager.
3      Q.  And you can only speak to the city manager
4  about terminations?
5      A.  Well, if they are speaking about something
6  in a work session or talking, but I don't -- I don't
7  go to them.  I follow -- I stick as close to the
8  rules of etiquette as I can.  I couldn't get away
9  with it.  I wouldn't do it.
10      MR. WOODLEY:  All right.  I don't have any
11      further questions.  Thank you, Chief.
12          EXAMINATION
13  BY MR. GRAHAM:
14      Q.  Let me just ask you one question to clarify
15  something.  Now, you do recognize that a firefighter
16  has the right, under the U.S. Constitution, to free
17  speech?
18      A.  That's right.
19      Q.  And that free speech is allowed if you
20  follow the procedures that are set out in the ASOPs
21  and in the Merit System for the City of Phenix City?
22      A.  That's correct.
23      MR. GRAHAM:  That's all I have.
24      MR. WOODLEY:  I don't have anything
25  further.  Thanks, Chief.  Appreciate you

103

1      coming.
2  (The deposition concluded at 12:32 p.m.)
3          * * * * * * * * * * *
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

104

1          REPORTER'S CERTIFICATE
2  STATE OF ALABAMA
3  MONTGOMERY COUNTY
4      I, Shannon Williams, Certified Shorthand
5  Reporter and Commissioner for the State of Alabama
6  at Large, hereby certify that on April 4, 2007, I
7  reported the deposition of WALLACE BURNS HUNTER,
8  SR., who was first duly sworn or affirmed to speak
9  the truth in the matter of the foregoing cause, and
10  that pages 1 through 103 contain a true and accurate
11  transcription of the examination of said witness by
12  counsel for the parties set out herein.
13      I further certify that I am neither of kin nor
14  of counsel to any of the parties to said cause, nor
15  in any manner interested in the results thereof.
16      This 10th day of April, 2007.
17
18      SHANNON M. WILLIAMS, CSR
19      Commissioner for the
       State of Alabama at Large
20      MY COMMISSION EXPIRES: 1/14/2010
21
22
23
24
25

believe

| * |
| --- |
| * (1:13) (1:23) (3:22) (103:3) |

**A**

**able** (6:4) (59:23)
**aboard** (61:21)
**academy** (59:19)
**according** (57:9)
**accurate** (9:24) (10:13) (26:15) (27:14) (27:20) (31:4) (33:14) (33:22) (37:4) (37:17) (48:21) (76:11) (81:16) (104:10)
**accusing** (72:3) (72:11)
**accustomed** (59:24)
**acting** (88:6)
**action** (4:20) (13:11) (81:19)
**actively** (28:6) (28:21)
**actual** (74:9)
**actually** (38:23) (39:7) (48:19) (67:6) (74:20) (86:21) (87:8) (91:7)
**added** (90:6)
**additional** (8:20)
**address** (21:23) (22:12) (34:13) (56:1) (57:15) (76:9) (77:11) (78:12) (78:16) (100:2) (100:13)
**addressed** (15:20) (16:1) (22:18) (23:14) (35:7) (47:3) (69:5) (69:10) (69:21)
**addresses** (37:1) (77:19) (94:25)
**addressing** (75:24) (76:1) (76:2) (77:6) (77:7)
**adequacy** (8:13)
**adequate** (10:5) (10:7) (84:10)
**adjustments** (32:2)
**adverse** (38:25) (75:4)
**adversely** (74:4) (74:11)
**affect** (62:11) (71:7) (74:10) (77:22)
**affecting** (73:24)
**affiliated** (18:7)
**affirmed** (4:3) (104:8)
**afraid** (37:24) (38:1) (83:13)
**after** (21:25) (27:3) (39:5) (40:12) (51:8) (52:3) (56:10) (57:20) (62:24) (63:1) (94:7) (94:12) (95:10) (95:24) (101:19)
**again** (5:23) (7:14) (7:19) (9:15) (10:3) (28:3) (37:13) (41:2) (48:18) (53:5) (69:20) (80:24) (82:22) (84:7) (88:17) (89:14) (95:9)
**against** (86:8)
**ago** (18:4)
**agree** (16:17) (16:24) (25:21) (71:5) (93:8) (93:12)
**agreed** (3:2) (3:16)
**agreement** (1:16)
**ahead** (68:10)
**alabama** (1:2) (1:8) (1:18) (1:20) (2:8) (3:8) (6:5) (23:6) (24:4) (24:13) (77:25) (91:4) (91:12) (100:9) (104:2) (104:5) (104:19)
**alarm** (39:17)
**all** (22:12) (23:8) (24:11) (25:23) (30:13) (30:16) (40:23) (51:22) (52:25) (58:15) (63:8) (64:9) (70:17) (77:21) (86:10) (96:15) (97:19) (101:9) (102:10) (102:23)
**allegations** (5:2)
**alleged** (46:9)
**all-out** (57:8)
**allow** (79:15)
**allowed** (79:23) (80:7) (102:19)
**allows** (77:25)
**alluded** (93:19)
**almost** (47:20)
**along** (86:24)
**already** (58:12) (78:25) (79:20)

(96:10)
**also** (2:10) (8:2) (8:25) (9:16) (19:1) (24:15) (27:19) (33:10) (34:19) (45:5) (45:13) (45:19) (52:4) (53:12) (58:25) (59:11) (59:17) (59:18) (60:18) (75:13) (85:1) (97:11)
**although** (25:1)
**always** (10:15) (12:22) (12:25) (14:3) (28:25) (34:1)
**ambulance** (96:5) (96:8) (99:14)
**amendment** (101:8)
**among** (26:9) (32:21) (46:3)
**amount** (33:6) (33:9) (33:24) (81:19) (100:8)
**ann** (31:15) (50:8) (53:21)
**annual** (17:7)
**another** (5:11) (9:13) (15:18) (41:15) (64:9) (91:3) (94:23)
**answer** (36:17) (40:4) (40:5) (48:13) (84:10) (89:25) (90:6)
**answering** (36:16)
**answers** (6:1)
**anybody** (8:3) (37:25) (61:3) (62:14) (79:22) (80:4)
**anyone** (30:7) (56:14) (63:4) (65:23) (73:11) (86:7)
**anything** (21:24) (34:16) (38:13) (38:19) (40:21) (41:18) (47:19) (49:18) (55:14) (62:11) (62:25) (72:11) (75:3) (76:13) (86:8) (87:13) (94:6) (98:11) (98:20) (98:21) (102:24)
**anyway** (61:21)
**apology** (94:18)
**apparently** (25:5) (32:7) (32:14) (37:2) (42:12) (54:17) (86:13) (87:18) (91:4)
**appearances** (2:1)
**appeared** (37:1) (49:3)
**appears** (9:18) (15:19) (22:15) (24:24) (36:8) (47:2) (48:15) (69:9) (77:10) (77:16) (81:1) (89:7)
**application** (98:11)
**applied** (58:11) (58:12) (58:16)
**apply** (101:13)
**appointed** (11:16)
**appointment** (11:14)
**appreciate** (63:11) (102:25)
**approval** (13:20)
**approving** (94:14)
**approximately** (1:21) (15:12)
**april** (1:20) (9:4) (11:3) (11:4) (11:5) (14:20) (64:10) (64:19) (65:7) (69:10) (69:20) (74:4) (81:2) (81:8) (86:18) (89:9) (91:19) (91:22) (91:24) (92:9) (92:12) (92:17) (92:24) (93:4) (104:6) (104:16)
**area** (8:10) (8:20) (64:9) (97:19)
**areas** (7:18)
**around** (15:15) (28:23)
**article** (21:22) (24:25) (25:7) (25:11) (25:21) (26:13) (27:10) (27:19) (28:3) (28:5) (29:12) (31:2) (31:19) (32:5) (32:16) (33:13) (34:5) (35:13) (37:1) (37:14) (37:21) (38:10) (38:22) (39:1) (39:2) (39:5) (39:10) (40:1) (41:13) (42:1) (49:2) (49:25) (50:4) (51:11) (53:23) (54:12) (54:21) (55:1) (55:2) (55:6) (55:16) (80:10) (94:24) (95:2) (95:7) (95:9)
**articles** (21:14) (21:17) (22:1) (35:3) (35:6) (35:8) (40:9) (53:1)
**ask** (10:3) (35:22) (66:19) (87:23) (93:10) (93:14) (96:17) (96:19) (96:20) (98:7) (98:11) (98:19) (98:20) (99:4) (100:5) (102:14)
**asked** (20:11) (20:13) (20:15) (35:16) (35:19) (46:18) (74:6) (78:5)

(96:16) (97:1) (97:24) (99:6) (100:6)
**asking** (5:25) (23:6) (24:1) (70:8) (70:9) (70:18) (92:8) (92:13)
**asop** (75:17) (75:20) (76:25) (77:10)
**asops** (102:20)
**assigned** (83:4)
**assistant** (11:7) (20:25) (22:10) (30:6) (30:23) (44:1) (47:9) (48:15) (51:17) (51:20) (63:13)
**association** (17:19) (18:5) (18:8) (18:12) (22:17) (23:4) (24:7) (24:15) (25:17) (64:13) (78:1) (88:7) (101:10)
**assume** (4:21) (16:1)
**attend** (21:3) (93:23)
**attended** (34:9) (34:14)
**attention** (9:13) (15:17) (18:21) (19:1) (19:12) (22:14) (24:23) (36:7) (62:20) (64:11) (64:16) (64:22) (65:2) (95:24) (96:2)
**attitude** (16:11) (17:2)
**attorney** (9:16) (12:22) (13:2) (49:5)
**attorneys** (4:19) (5:6) (5:19)
**auburn** (96:19) (96:23) (96:24) (97:6) (97:13) (97:23) (98:25)
**august** (81:21)
**authoritative** (7:16)
**authority** (10:18) (12:3) (12:6) (12:18) (13:4) (13:18) (13:23) (42:2) (42:9) (42:10)
**authorized** (7:20)
**aware** (4:21) (7:19) (8:23) (9:11) (14:10) (14:23) (17:17) (22:1) (24:1) (24:2) (24:12) (24:17) (24:20) (29:22) (34:8) (34:23) (50:17) (63:17) (77:24) (101:7)
**away** (34:3) (102:8)
**axe** (100:7)

**B**

**back** (10:7) (17:14) (18:2) (26:2) (28:2) (33:12) (35:4) (39:2) (42:19) (51:5) (51:7) (69:2) (71:23) (78:21) (80:23) (99:25)
**bad** (76:14) (98:21)
**barbara** (64:25) (65:8) (86:24)
**based** (62:6)
**basically** (5:14) (5:15) (12:20) (21:22) (26:18) (31:20) (31:24) (35:21) (37:23) (39:18) (43:2) (43:24) (47:21) (49:16) (53:17) (55:2) (61:2) (62:24) (63:3) (68:6) (68:12) (70:25) (72:3) (83:10) (92:15) (96:25)
**basis** (70:5)
**bear** (99:22)
**bearing** (85:1) (85:11)
**bearings** (85:4)
**bears** (86:18)
**became** (11:6) (11:7) (11:9) (17:18) (17:25) (18:19) (18:22) (19:2)
**because it's** (85:1)
**become** (58:25) (59:24) (59:25) (63:16)
**before** (1:16) (3:6) (5:11) (10:5) (21:23) (22:21) (36:17) (46:23) (48:3) (49:20) (67:6) (67:10) (67:12) (67:15) (77:16) (88:15) (94:12) (101:3)
**began** (18:2) (18:3) (49:1)
**beginning** (47:7) (65:13)
**behalf** (23:4)
**behind** (64:5)
**being** (11:11) (11:12) (13:14) (13:24) (26:10) (29:18) (29:25) (35:23) (37:23) (38:20) (39:19) (40:14) (41:16) (42:15) (42:16) (53:15) (54:2) (55:3) (60:5) (60:6) (65:8) (85:10) (91:4)
**believe** (11:4) (16:16) (19:14)

**belong**

(28:3) (28:17) (36:9) (39:7) (60:16)
(70:15) (75:14) (75:17) (94:1)
**belong** (78:1)
**benefit** (47:21)
**best** (56:15) (57:19)
**better** (27:17) (31:10) (33:3) (33:4)
(33:10) (93:5)
**between** (3:3) (3:17) (34:7) (42:12)
(70:20) (74:19)
**beyond** (76:8)
**binder** (7:10) (9:14)
**bit** (91:21)
**bits** (63:20)
**blessing** (49:17)
**board** (26:3) (26:5) (60:22) (62:15)
(88:9) (88:16) (93:20) (94:3) (94:7)
(100:22) (101:1) (101:3) (101:5)
**board's** (94:14)
**body** (76:2) (76:4)
**both** (52:6)
**bottom** (16:6) (31:18) (48:10)
(71:20) (81:25) (88:1) (88:19) (91:16)
**bowden** (50:9)
**box** (2:8) (89:10)
**brandon** (40:13) (53:13) (54:1)
(55:11)
**break** (51:8)
**brief** (11:9) (51:4) (51:8) (69:9)
(80:22) (99:24)
**bring** (21:18) (28:12) (56:14) (59:5)
**broke** (77:12)
**brought** (66:23)
**bubba** (65:4)
**budget** (45:17) (76:18) (100:3)
**building** (59:17)
**bullied** (40:14)
**burden** (89:15)
**burns** (1:15) (3:4) (4:1) (4:14)
(104:7)
**bush** (34:6) (34:9) (34:10) (34:12)
(41:16) (41:19) (42:3) (42:5)
**business** (77:20) (95:21) (95:22)

**C**

**call** (64:13) (67:18) (67:23) (89:23)
(97:1)
**called** (47:25) (71:1) (87:6) (91:3)
(96:23)
**calls** (40:4) (40:5) (40:14)
**came** (19:11) (21:21) (22:1) (25:4)
(33:13) (34:16) (40:18) (40:20)
(41:13) (51:11) (60:18) (67:3) (67:12)
(72:20) (95:2) (95:10)
**can't** (6:15) (13:8) (18:20) (19:8)
(30:9) (30:18) (55:21) (68:12) (87:17)
(90:22) (94:4)
**cap** (34:1)
**capacity** (4:22) (4:23) (19:22)
(27:25) (88:6)
**captain** (11:6) (11:7) (30:23) (52:3)
(53:15)
**captains** (20:24)
**care** (62:13) (86:24) (87:15)
**career** (10:25)
**careers** (58:14)
**carried** (86:20)
**case** (1:7) (3:18) (3:19) (5:11)
(5:13) (7:17) (9:20) (56:4) (85:5)
**cases** (5:15)
**cause** (104:9) (104:14)
**caused** (55:6) (55:16) (55:23) (90:2)
**causing** (55:18)
**certain** (7:13) (33:24) (98:17)
(98:18) (98:19)
**certificate** (104:1)
**certification** (61:16)
**certified** (1:17) (3:7) (61:9)

**certify** (104:6) (104:13)
**chain** (9:10) (20:22) (22:9) (30:5)
(30:14) (30:21) (38:2) (42:14) (46:22)
(56:7) (57:17) (71:22) (72:8) (74:22)
(74:23) (75:11) (76:25) (81:14)
(101:21) (101:25)
**chance** (5:18) (6:9) (20:7) (20:9)
(21:7) (21:12) (21:23) (21:25) (34:24)
(35:23) (38:4) (39:24) (40:25) (46:25)
(47:21) (59:7) (59:15) (60:21) (95:1)
**change** (60:7) (62:22)
**changed** (61:15)
**channeled** (30:23)
**charter** (42:3) (71:25) (72:4)
(72:14) (73:5) (78:10) (78:19)
**chat** (21:19)
**check** (28:23) (53:2)
**checked** (90:10) (89:11)
**chief** (4:15) (4:18) (6:22) (7:5)
(8:17) (9:6) (9:11) (9:18) (9:19)
(9:23) (9:25) (10:3) (10:7) (10:14)
(10:19) (10:22) (11:8) (11:9) (11:10)
(11:11) (11:13) (11:14) (11:17)
(11:22) (12:21) (13:18) (14:5) (15:18)
(15:20) (15:21) (16:7) (16:13) (16:18)
(16:25) (17:3) (17:15) (22:19) (22:22)
(22:23) (22:25) (23:13) (23:14)
(23:16) (23:23) (24:23) (25:5) (26:14)
(26:22) (27:2) (28:25) (30:11) (33:17)
(35:5) (36:9) (40:9) (40:24) (41:6)
(42:2) (44:3) (47:11) (47:8) (47:9)
(48:15) (48:18) (48:25) (51:7) (51:17)
(56:2) (56:17) (57:17) (57:22) (59:11)
(60:8) (60:17) (64:10) (65:4) (66:18)
(66:23) (67:18) (68:21) (69:1) (69:11)
(69:21) (76:19) (78:6) (78:7) (78:13)
(78:20) (79:2) (80:24) (86:23) (86:25)
(87:3) (87:7) (88:11) (97:9) (97:10)
(97:11) (97:13) (97:23) (98:3) (98:7)
(98:13) (98:16) (99:2) (99:4) (99:23)
(100:1) (100:17) (101:7) (102:11)
(102:25)
**chiefs** (18:12) (20:25) (21:1)
(22:10) (30:6) (30:24) (44:1) (51:20)
(63:14) (99:1)
**choice** (13:25) (69:24)
**circumstances** (7:22) (27:1) (29:22)
(57:3) (98:8)
**cities** (60:13)
**citizens** (8:15) (100:21) (101:9)
**city** (1:8) (1:19) (1:20) (2:8) (4:16)
(5:6) (5:18) (7:8) (7:14) (7:23) (8:4)
(8:5) (8:7) (8:15) (9:15) (9:20)
(10:15) (10:20) (11:22) (12:15)
(12:17) (12:22) (12:25) (13:1) (13:6)
(13:7) (13:8) (13:12) (13:15) (13:20)
(13:25) (14:4) (14:6) (14:8) (14:12)
(14:15) (14:20) (14:24) (17:6) (17:17)
(19:16) (22:17) (24:16) (25:6) (25:17)
(25:25) (27:19) (28:7) (34:8) (34:22)
(35:6) (36:4) (36:10) (39:20) (44:9)
(45:9) (45:14) (45:20) (46:1) (46:7)
(46:10) (46:15) (46:20) (46:22) (49:4)
(49:10) (49:17) (49:19) (50:11)
(50:12) (50:13) (50:15) (50:20)
(50:21) (51:10) (57:4) (57:24) (59:9)
(62:21) (65:7) (66:8) (67:5) (67:14)
(67:20) (71:24) (71:25) (72:4) (72:14)
(72:15) (72:16) (73:6) (73:17) (73:22)
(73:24) (75:24) (76:1) (76:2) (76:6)
(76:9) (76:10) (76:12) (76:15) (76:21)
(77:6) (77:7) (77:11) (77:17) (78:8)
(78:10) (78:14) (78:17) (78:18) (79:4)
(81:10) (88:7) (88:8) (88:9) (89:8)
(90:9) (93:12) (94:9) (96:9) (96:14)
(98:14) (99:5) (100:2) (100:13)

**conducting**

(100:15) (102:2) (102:3) (102:21)
**city's** (8:6) (10:25) (13:5) (14:10)
(37:3) (42:22) (43:11) (44:6) (44:17)
(44:24) (45:1) (45:17) (45:23) (46:13)
(61:12) (62:7) (65:16)
**civil** (3:5) (3:15) (3:21)
**clarify** (102:14)
**clear** (53:6) (57:20) (61:10) (61:11)
(74:8) (83:14)
**cleared** (49:8)
**close** (102:7)
**code** (23:6) (24:4) (24:13) (59:17)
(77:25) (78:10) (78:18)
**collection** (34:20)
**collective** (20:19)
**college** (91:5) (91:12) (91:15) (92:3)
**columbus** (25:1) (60:16) (94:24)
**column** (25:10) (25:13) (28:4)
(29:14) (31:2)
**combined** (5:16)
**come** (18:21) (19:1) (21:1) (21:9)
(22:9) (30:9) (38:3) (43:3) (57:16)
(58:4) (62:20) (63:9) (63:11) (64:11)
(64:16) (64:22) (67:10) (92:2) (95:24)
(96:2)
**coming** (16:18) (67:25) (69:12)
(103:1)
**command** (9:10) (20:22) (30:5)
(30:15) (30:21) (38:2) (42:14) (46:22)
(56:8) (57:18) (71:22) (74:22) (74:23)
(75:11) (76:25) (81:14) (101:21)
(102:1)
**commencing** (1:21)
**comment** (38:9) (53:17) (55:3) (55:5)
(55:21) (68:4) (95:12) (95:16) (95:18)
(98:5) (98:6) (99:10)
**comments** (35:17) (37:7) (37:19)
(37:23) (38:22) (39:6) (39:11) (40:10)
(41:12) (42:20) (52:11) (52:23)
(53:22) (55:15) (87:9) (87:18) (88:12)
**commission** (3:9) (91:5) (104:20)
**commissioned** (68:21)
**commissioner** (1:18) (3:7) (104:5)
(104:18)
**communicate** (40:23) (100:15)
**communicated** (16:8) (86:6)
**communication** (77:5) (83:17) (84:3)
(84:13) (89:21)
**communications** (8:3) (8:10) (8:21)
(9:1) (23:8) (23:20) (42:21) (50:21)
(96:12) (99:13)
**complain** (40:15)
**complement** (28:20) (29:1) (29:4)
**complete** (6:1) (10:13)
**completely** (69:16)
**comply** (83:4)
**concern** (20:5) (20:20) (24:17)
(30:11) (32:17) (34:22) (35:24) (36:5)
(43:14) (59:4) (76:17) (100:17)
**concerned** (23:24) (57:4)
**concerning** (9:1) (13:5) (23:7)
(47:10) (47:11) (52:1) (53:12) (60:24)
(69:5) (71:13) (78:24) (81:8) (89:8)
(93:21) (96:8) (98:8) (100:14)
**concerns** (19:24) (20:10) (20:23)
(21:12) (21:15) (22:2) (22:6) (30:22)
(46:21) (55:22) (56:5) (56:8) (56:12)
(57:1) (57:5) (57:25) (76:22)
**concluded** (103:2)
**concrete** (38:24) (39:4) (41:9)
(74:18)
**condition** (6:23)
**conditional** (85:2)
**conditions** (57:10)
**conduct** (35:16) (49:14) (84:21)
**conducted** (40:1) (49:20) (51:10)
**conducting** (67:15)

**confused**

**discipline**

confused  (77:3) (91:21)
confusing  (84:16)
consider  (42:19) (56:10)
considered  (47:15) (84:3)
considering  (60:10)
consisted  (18:14)
consortium  (97:17)
constitution  (101:8) (102:16)
contact  (77:14) (77:16) (77:17)
(83:25)
contact with  (72:7)
contacted  (66:17) (95:11) (96:7)
contacting  (82:20) (88:5)
contain  (104:10)
contained  (70:12)
contains  (35:14)
context  (51:12)
continuation  (73:5)
continued  (72:24)
contrary  (43:11)
convention  (99:1)
conversation  (9:2) (23:13) (23:16)
(64:19) (64:24) (65:15) (65:18)
(65:21) (66:5) (66:10) (67:2) (67:4)
(67:6) (67:8) (67:17) (68:4) (68:23)
(69:6) (69:13) (70:20) (71:12) (72:22)
(72:24) (73:6) (74:3) (74:10) (74:19)
(75:8) (77:9) (78:25) (81:8) (81:13)
(83:7) (90:3) (101:18)
conversations  (19:21) (20:3)
(73:23) (94:9) (94:11) (94:15) (101:4)
copy  (22:23) (23:12) (31:21) (65:8)
(73:15) (73:17)
correct  (4:24) (9:7) (10:20) (10:21)
(12:1) (12:4) (14:18) (14:25) (15:3)
(15:6) (15:11) (15:15) (16:3) (17:10)
(18:9) (22:3) (22:5) (24:19) (25:19)
(26:7) (28:8) (28:9) (28:18) (31:17)
(32:5) (32:6) (32:20) (32:22) (34:15)
(36:11) (36:13) (37:5) (37:12) (37:16)
(37:18) (43:17) (46:24) (48:16)
(48:17) (48:22) (48:24) (49:4) (49:7)
(49:12) (49:22) (50:6) (51:16) (52:7)
(52:8) (52:12) (52:13) (52:14) (52:20)
(52:24) (53:4) (53:10) (53:23) (53:25)
(54:15) (57:2) (57:15) (58:8) (58:13)
(58:18) (60:9) (61:14) (62:3) (63:2)
(64:15) (64:21) (65:1) (65:6) (65:12)
(65:20) (66:3) (66:13) (68:24) (68:25)
(69:7) (69:14) (69:16) (69:17) (69:23)
(72:2) (72:5) (73:6) (75:21) (75:22)
(75:24) (75:25) (76:23) (77:1) (77:22)
(77:23) (78:9) (78:14) (81:3) (81:4)
(81:11) (83:8) (84:14) (84:20) (86:14)
(87:12) (88:15) (89:18) (89:22) (90:8)
(90:14) (90:15) (90:17) (90:18)
(91:14) (91:17) (91:20) (93:21)
(93:22) (97:15) (101:11) (101:15)
(102:22)
corrective  (47:20)
corruption  (46:9) (57:8)
could  (4:12) (20:8) (22:10) (31:24)
(43:1) (43:8) (43:25) (50:25) (56:14)
(60:4) (63:13) (80:19) (84:22) (86:6)
(89:6) (92:13) (100:16)
couldn't  (18:3) (61:21) (97:4)
(102:8)
council  (8:4) (34:6) (34:12) (41:19)
(42:5) (66:17) (72:8) (75:24) (76:1)
(76:2) (76:10) (76:12) (76:16) (76:21)
(77:6) (77:8) (77:11) (77:17) (78:17)
(83:25) (100:2) (100:14) (100:16)
councilman  (41:16) (42:3)
counsel  (3:3) (3:17) (104:12)
(104:14)
counseled  (47:8) (48:20) (50:16)
counseling  (22:6) (36:6) (40:12)

(40:19) (47:2) (47:15) (47:19) (48:5)
(49:1) (49:20) (49:24) (51:13) (51:25)
(52:4) (52:10) (52:16) (52:19) (52:22)
(53:7) (53:11) (53:22) (54:7) (54:18)
(54:23) (55:4) (55:7) (55:9) (55:18)
(55:24) (80:2) (80:12)
counties  (60:13)
country  (29:3)
county  (24:16) (104:3)
couple  (4:9) (97:1)
course  (7:2) (77:4) (79:8)
court  (1:1) (1:17) (3:7) (4:20)
cover  (78:19)
covered  (37:15) (78:3) (79:1) (79:3)
criticize  (71:19)
csr  (104:18)
curious  (98:12)
current  (11:14) (18:5) (33:5) (61:22)
currently  (4:15) (28:5) (32:1)
cut  (31:20)

**D**

date  (18:3) (18:20) (19:8) (25:2)
(28:2) (86:18) (91:18) (91:22) (91:23)
(92:19) (92:20) (92:21) (93:1)
dated  (15:21) (22:18) (36:21) (47:3)
(65:7) (69:10) (69:20) (79:4) (81:2)
dates  (92:9) (92:14)
david  (1:5) (2:11) (4:20) (7:21)
(14:11) (16:9) (18:22) (19:22) (22:15)
(35:15) (40:14) (40:15) (47:3) (69:9)
(72:21) (81:2) (86:9) (96:10) (97:11)
(97:24) (99:2) (99:20)
davis  (1:5) (2:11) (4:20) (7:22)
(8:4) (8:11) (9:2) (14:11) (14:19)
(14:23) (15:2) (16:9) (16:19) (16:25)
(18:22) (19:2) (19:22) (20:4) (20:15)
(21:8) (22:16) (23:3) (23:17) (23:21)
(25:14) (26:6) (29:13) (29:23) (30:9)
(35:15) (37:19) (38:7) (38:9) (38:22)
(39:6) (40:2) (40:10) (40:11) (40:14)
(41:12) (43:13) (47:3) (47:8) (47:17)
(48:5) (48:20) (49:21) (50:5) (52:1)
(53:9) (53:12) (54:21) (55:19) (55:24)
(58:17) (62:21) (63:5) (63:17) (64:11)
(64:17) (65:10) (65:19) (65:22) (66:6)
(66:10) (67:7) (68:5) (68:22) (69:4)
(69:10) (69:12) (69:22) (70:6) (70:21)
(70:23) (71:12) (72:21) (72:25) (73:1)
(73:6) (74:20) (75:8) (75:14) (77:4)
(78:24) (79:1) (79:7) (79:12) (79:19)
(80:9) (81:2) (81:9) (85:11) (86:21)
(87:6) (87:23) (88:4) (88:13) (88:19)
(89:8) (90:10) (90:20) (93:8) (93:13)
(93:19) (94:10) (96:24) (99:15)
(101:3) (101:5) (101:19)
davis'  (70:12)
davis's  (42:20) (69:20) (74:3)
(74:4) (77:8) (87:17) (95:1) (95:10)
(95:25) (96:9) (98:9) (98:22)
day  (87:11) (104:16)
days  (92:4)
decided  (27:4)
decision  (13:7) (87:15) (94:14)
decisionmaking  (12:2) (12:5)
(12:18) (13:4)
decline  (95:18)
declined  (95:16)
defendant  (4:22)
defendants  (1:10) (2:6) (7:14) (9:3)
delay  (92:6) (92:7)
department  (4:16) (7:23) (8:6) (8:7)
(8:12) (8:14) (8:17) (8:21) (9:10)
(10:25) (11:25) (12:3) (12:7) (12:12)
(12:19) (13:10) (13:14) (14:10)
(14:12) (14:15) (14:20) (14:24) (17:7)
(17:9) (17:17) (20:6) (20:21) (25:6)

(25:12) (25:22) (25:25) (26:10) (27:6)
(28:7) (28:15) (28:19) (29:5) (31:16)
(32:3) (32:10) (32:12) (32:24) (34:23)
(35:22) (36:4) (36:11) (36:14) (36:24)
(37:3) (37:10) (37:22) (38:11) (39:8)
(39:20) (41:10) (41:11) (42:13)
(43:14) (43:19) (43:23) (44:7) (44:9)
(44:14) (44:22) (45:1) (45:8) (45:9)
(45:17) (45:23) (46:4) (46:9) (46:10)
(46:22) (47:12) (47:25) (48:19)
(50:10) (50:24) (53:8) (54:14) (55:23)
(56:3) (56:6) (56:19) (56:21) (57:7)
(57:13) (58:5) (58:7) (58:13) (58:18)
(58:21) (59:9) (60:24) (61:12) (62:7)
(62:9) (62:22) (71:23) (71:24) (73:25)
(74:11) (74:21) (75:5) (75:14) (76:19)
(77:15) (77:22) (90:13) (91:13) (92:3)
(94:18) (94:19) (94:21) (96:14)
(96:24) (97:7) (97:14) (97:24) (97:25)
(98:9) (98:13) (98:15) (98:18) (98:25)
(99:5) (99:14) (100:2) (100:14)
(101:14) (101:23)
departments  (28:23) (50:2) (68:7)
(72:15) (97:18)
departure  (98:9)
deponent  (7:9)
deposition  (1:15) (3:4) (3:6) (3:13)
(3:18) (5:8) (5:10) (5:21) (5:23)
(7:12) (9:17) (103:2) (104:7)
depositions  (7:8)
deputy  (11:13) (15:20) (16:7)
(16:13) (16:18) (63:14) (66:18)
(66:23) (67:18) (68:21) (69:1) (79:2)
(86:25) (87:7)
derogatory  (53:12)
describes  (23:5)
description  (9:19) (9:21) (9:24)
(10:8) (10:13) (10:19)
deserved  (15:10)
designated  (4:7) (7:8) (8:21) (8:25)
desk  (94:10)
details  (10:16) (67:13) (81:6)
determination  (94:13)
determine  (99:7)
determined  (79:9)
development  (39:1)
dictates  (61:1)
didn't  (28:9) (35:10) (41:18) (43:3)
(47:22) (50:14) (54:6) (54:8) (54:17)
(59:15) (61:17) (62:25) (68:17) (71:5)
(79:12) (79:15) (81:24) (93:11)
(93:17) (96:12) (96:25) (98:7) (98:11)
(98:16) (98:21) (99:10)
didn't have  (33:23)
difference  (54:9) (92:12)
differences  (34:7)
different  (17:15) (27:15) (27:16)
(40:23) (43:2) (51:22) (59:16) (66:21)
(79:16) (92:8) (97:18)
difficult  (62:8)
direct  (72:7) (83:25)
direction  (20:10) (24:9)
directly  (21:1) (30:10) (30:18)
(40:11) (43:13) (43:22) (44:7) (44:19)
(45:2) (45:6) (45:15) (45:21) (46:2)
(46:8) (46:14) (66:17) (76:20) (77:14)
(77:16) (77:17) (78:7) (100:13)
director  (59:18) (64:24) (65:9)
(65:16) (73:18)
directors  (8:6)
disability  (27:13)
disagree  (17:4) (25:22)
discharge  (82:1) (82:14) (86:12)
(87:8) (88:13)
discharged  (82:22) (83:1) (83:16)
(84:12) (85:10)
discipline  (13:19) (23:8) (37:8)

**disciplined**

(37:22) (38:8) (38:10) (38:16) (38:23) (52:23)
**disciplined** (29:19) (29:25) (38:13)
**disciplining** (67:7)
**discrepancy** (91:25) (92:14)
**discuss** (21:10) (22:25) (36:1) (39:24) (49:19) (50:3) (73:3) (97:4)
**discussed** (48:19) (73:2)
**discussing** (66:22) (72:25)
**discussion** (17:13) (23:18) (51:2)
**dismissal** (84:23) (90:2)
**dismissed** (89:11)
**dispatching** (45:22)
**disrupt** (43:5)
**disrupted** (38:23) (39:7) (74:20) (74:22)
**disruption** (39:22) (40:7) (41:3) (41:10) (75:4)
**disruptive** (42:2)
**distorted** (27:18)
**distributed** (36:12) (36:23) (50:20)
**district** (1:1) (1:2)
**disturbed their** (58:14)
**division** (1:3)
**do is** (30:13)
**document** (23:9) (47:5)
**documents** (9:9) (56:6) (91:23) (92:10)
**does** (13:23) (17:6) (19:16) (76:1)
**doesn't** (54:9) (85:1) (85:10)
**doing** (15:9) (16:9) (16:25) (27:5) (39:19) (56:22) (57:19) (59:6) (59:21) (66:22) (67:20) (68:13) (74:11) (79:6)
**done** (12:20) (35:22) (43:9) (50:24) (66:7) (67:16) (82:5) (85:25) (100:10)
**door** (21:5) (22:7) (62:18)
**doubt** (47:22)
**down** (6:6) (6:15) (20:15) (21:19) (25:13) (29:14) (59:24) (61:4) (81:21)
**drafted** (36:23)
**driver/engineer** (11:5) (88:8)
**dropped** (18:14)
**duly** (4:2) (104:8)
**during** (9:17) (38:13) (40:12) (60:10) (61:5) (61:7) (61:11) (61:13) (61:15) (94:15) (100:3)
**duties** (11:21) (78:12)
**duty** (74:10) (77:6) (77:9)
**dystrophy** (100:8)

**E**

**each** (64:8) (97:20) (100:3)
**earlier** (5:23) (48:24) (52:17) (78:3) (80:8) (80:14) (89:20) (93:19)
**eastern** (1:3)
**easy** (30:17) (30:20)
**editor** (34:24)
**efficiency** (8:14)
**either** (3:19) (31:9)
**elaborate** (20:8)
**eliminated** (32:24) (33:2) (33:14) (33:16)
**elimination** (32:18)
**else** (40:21) (47:24) (52:17) (59:6) (74:24) (75:3) (86:7) (98:20)
**elsewhere** (81:12) (96:1)
**emergency** (59:2)
**employed** (14:14) (17:8) (28:6) (28:21) (31:15) (45:1)
**employee** (8:16) (12:19) (13:6) (14:9) (21:15) (39:20) (40:2) (46:3) (50:15) (55:3) (55:22) (66:17) (71:22) (72:5) (80:1)
**employees** (8:22) (12:19) (13:6) (24:4) (31:3) (50:21) (72:6)
**employer** (24:17) (96:8) (96:13)
**employment** (7:21) (23:7) (84:23)

(89:7) (89:9) (90:10) (92:11) (92:21) (95:25) (96:9)
**emt** (59:1)
**emts** (59:1)
**end** (15:22) (16:11) (25:15) (27:13) (29:19) (31:23) (37:10) (48:4) (65:10) (71:25) (72:22) (72:24) (82:15) (82:24) (87:19) (89:7) (90:10) (97:12)
**ended** (89:9) (92:12)
**enough** (34:19) (58:3) (64:6) (78:23) (82:21) (86:10)
**entered** (87:8) (87:18) (88:13)
**entire** (50:10) (50:11) (50:12)
**entirety** (73:3)
**equation** (55:14)
**equipment** (45:9) (57:13) (76:18)
**error** (92:15) (92:16)
**est** (1:21)
**etiquette** (102:8)
**evaluation** (59:16)
**evaluations** (17:8)
**even** (38:19) (57:20) (64:3) (72:9)
**evening** (67:17)
**event** (81:13)
**eventually** (63:16)
**ever** (5:10) (19:21) (20:13) (20:19) (21:8) (21:23) (22:21) (96:7) (100:1) (101:18)
**every** (50:15) (86:8)
**everybody** (24:8) (66:24)
**everything** (6:6) (33:11) (87:12) (87:14)
**evidence** (3:13)
**evidently** (65:18) (87:6)
**exact** (16:3) (18:20) (19:8) (56:12) (56:25) (64:4) (68:12)
**exactly** (73:10)
**examination** (4:10) (102:12) (104:11)
**example** (38:21) (38:25) (39:5)
**examples** (41:3) (41:9) (74:19)
**exchange** (97:21)
**exhaust** (43:13)
**exhibit** (7:11) (9:14) (9:18) (15:18) (15:19) (15:24) (22:15) (24:24) (34:20) (35:14) (36:7) (36:21) (37:15) (47:1) (51:24) (54:13) (65:2) (69:8) (69:19) (71:10) (71:18) (75:18) (75:19) (79:5) (80:25) (84:18) (86:12) (87:19) (88:2) (89:6) (91:2) (94:23)
**exhibits** (7:10) (9:16) (10:4)
**expect** (5:25)
**experience** (5:17) (62:7)
**expires** (104:20)
**explain** (57:18) (77:4) (77:21) (84:17) (92:13)
**explained** (19:20)
**express** (56:25) (71:1) (76:14) (76:21)
**expressed** (38:7) (38:15) (40:15) (57:24) (71:1)
**expressing** (21:14) (32:17) (57:5)
**expressions** (46:21)
**extend** (59:7)
**extended** (61:18)
**extending** (58:5) (59:12) (62:23) (63:19)
**extension** (9:5) (58:20) (60:11) (63:6) (70:22)
**extra** (10:16)

**F**

**face** (68:1) (68:2)
**faces** (101:1)
**fact** (21:13) (21:16) (21:25) (32:23) (34:6) (36:22) (38:16) (38:23) (62:24) (63:2) (64:17) (64:18) (84:2) (84:12) (85:10) (92:16) (93:1) (98:7)

**firefighter**

**facts** (9:9) (70:5) (70:11) (88:25) (89:1) (89:3) (89:4)
**failing** (71:24) (73:4)
**failure** (59:1) (72:17)
**fair** (5:19) (34:19) (58:3) (59:15) (64:6) (78:23)
**fairly** (10:13)
**familiar** (5:1) (5:19) (9:21) (32:18) (47:4) (91:9)
**family** (59:25)
**far** (9:23) (12:8) (16:13) (16:24) (23:23) (24:9) (31:11) (34:10) (35:8) (35:10) (38:14) (40:11) (40:22) (44:10) (57:3) (59:9) (59:12) (61:18) (69:15) (69:21) (70:8) (74:7) (78:18) (80:16) (92:6) (95:23) (100:20)
**favor** (63:18) (85:15) (85:18)
**fear** (29:18) (38:15)
**fearful** (29:25)
**fears** (38:7)
**february** (15:21) (16:2) (16:20) (99:2)
**federal** (3:5) (3:14) (3:20) (4:20)
**feel** (73:7) (88:21) (95:20)
**feelings** (71:2) (88:23)
**felt** (33:17) (34:3) (54:17) (68:15) (68:18) (68:19)
**few** (25:3)
**figures** (27:17)
**file** (47:17) (48:6) (80:18) (81:20)
**filled** (28:15) (28:16)
**final** (12:2) (12:5) (12:18) (13:4) (13:7) (13:13) (87:2)
**finalized** (91:1)
**finally** (46:12)
**financial** (45:16)
**find** (66:19) (67:12)
**fine** (87:25)
**finish** (36:16) (41:5) (61:8) (75:7)
**finished** (95:6)
**fire** (4:15) (4:16) (7:23) (8:7) (8:12) (8:14) (8:16) (8:21) (9:10) (9:19) (9:25) (10:14) (10:19) (10:22) (10:25) (11:9) (11:10) (11:11) (11:14) (11:17) (11:22) (11:25) (12:3) (12:7) (12:11) (12:19) (13:14) (13:18) (14:5) (14:10) (14:12) (14:15) (14:20) (14:24) (15:21) (16:25) (17:6) (17:17) (18:12) (20:6) (20:21) (25:6) (25:22) (25:25) (26:10) (26:22) (27:2) (27:6) (28:6) (28:7) (28:15) (28:19) (28:22) (28:25) (29:1) (34:15) (34:22) (35:5) (36:8) (36:10) (36:14) (36:24) (37:3) (37:22) (38:11) (39:8) (39:20) (40:9) (40:24) (41:10) (41:11) (42:2) (42:13) (43:14) (43:23) (44:7) (44:9) (44:14) (44:22) (45:1) (45:8) (45:9) (45:17) (45:23) (46:3) (46:4) (46:9) (46:10) (46:22) (47:11) (47:24) (48:25) (53:7) (53:18) (54:14) (56:3) (56:6) (56:19) (56:20) (57:7) (57:12) (57:17) (57:22) (58:5) (58:6) (58:18) (58:21) (60:24) (61:12) (62:7) (62:8) (62:21) (69:11) (73:24) (74:11) (74:21) (75:5) (75:13) (76:18) (77:15) (77:22) (78:7) (78:12) (78:19) (91:4) (91:12) (91:13) (91:15) (92:3) (96:14) (96:24) (97:7) (97:13) (97:23) (98:9) (98:15) (98:24) (99:1) (99:5) (99:14) (100:2) (100:14) (101:13)
**fired** (13:14) (29:19) (30:1) (38:16) (85:3) (101:19)
**firefighter** (11:3) (14:7) (24:9) (30:18) (32:1) (40:13) (43:12) (43:21) (44:7) (44:18) (44:25) (45:6) (45:15) (45:21) (46:2) (46:7) (46:14) (46:20) (53:13) (56:5) (56:17) (56:21) (56:23)

**firefighters** (57:5) (57:14) (74:9) (74:14) (74:16) (76:17) (76:20) (99:7) (102:15)
**firefighters** (17:8) (18:8) (18:15) (19:17) (19:24) (20:20) (20:23) (21:9) (21:14) (21:18) (22:4) (24:5) (24:14) (25:25) (26:9) (27:11) (27:20) (28:21) (29:9) (29:24) (30:9) (32:17) (32:21) (34:7) (34:13) (35:15) (35:18) (37:7) (37:20) (38:6) (39:7) (40:10) (41:13) (42:13) (43:15) (45:3) (48:2) (49:21) (50:4) (51:10) (51:14) (51:23) (52:10) (52:21) (58:12) (58:23) (58:24) (59:4) (59:10) (60:1) (60:24) (62:15) (62:21) (63:5) (63:18) (73:23) (76:8) (77:25) (97:3) (101:13)
**firefighters'** (18:1) (18:18) (18:23) (19:3) (19:16) (22:17) (23:4) (25:17) (64:12) (64:18) (88:7)
**fires** (39:25)
**firing** (95:1) (95:25)
**first** (4:2) (7:11) (11:16) (16:6) (17:25) (24:25) (29:14) (35:23) (51:25) (56:9) (67:13) (81:6) (82:7) (82:8) (82:9) (82:23) (82:25) (83:15) (84:11) (96:23) (97:20) (100:15) (101:8) (104:8)
**five** (27:11) (51:3)
**focus** (61:6) (63:15)
**focused** (38:5)
**focusing** (55:12)
**follow** (54:11) (57:9) (74:7) (74:17) (74:24) (83:19) (83:21) (102:7) (102:20)
**followed** (30:5)
**following** (5:7) (5:20) (56:4) (74:15) (74:23) (77:18) (84:6)
**follows** (4:4)
**force** (28:5) (83:5)
**foregoing** (104:9)
**form** (3:10) (6:10) (24:5) (47:2) (47:15) (47:19) (48:5) (50:20) (52:4) (52:22) (53:11) (53:22) (54:7) (54:18) (54:23) (55:5) (55:7) (55:9) (55:18) (55:24) (69:18) (73:14) (80:12) (80:16) (81:2) (81:13) (81:25) (84:18) (84:25) (85:9) (86:12) (87:8) (87:19) (88:14) (88:19) (89:7) (90:10) (91:3) (91:9) (91:11)
**formality** (3:9)
**formed** (17:18) (26:1)
**former** (60:17)
**forms** (13:19) (51:25) (52:10) (52:16) (52:19) (52:22) (52:25) (53:7)
**found** (67:16)
**fourth** (26:14) (75:19)
**free** (101:9) (101:10) (102:16) (102:19)
**freedom** (36:2)
**front** (7:10) (9:14) (31:8) (51:24) (28:20) (29:1) (29:4) (29:9)
**full** (4:13) (5:25) (9:16) (27:25)
**full-rounded** (74:16)
**furnished** (9:20)
**further** (3:16) (25:13) (26:13) (27:10) (32:16) (47:12) (47:20) (84:22) (102:11) (102:25) (104:13)
**future** (84:21)

## G

**gaskin** (50:8) (52:3) (53:9) (53:15) (54:2)
**g-a-s-k-i-n** (52:4)
**gaskins** (53:1)
**gave** (41:4) (69:4) (69:18) (73:17)
**gear** (45:8) (57:13)
**general** (5:1) (10:12) (23:7) (24:3) (46:15)

**generally** (34:23)
**genuine** (30:22)
**getting** (61:16) (80:2)
**give** (5:25) (6:14) (7:15) (10:16) (20:24) (21:17) (22:23) (38:4) (38:21) (38:24) (39:4) (41:2) (41:9) (43:3) (55:4) (59:7) (59:15) (60:21) (68:7) (73:15) (74:18) (84:20) (93:25) (98:19)
**given** (20:7) (20:9) (20:11) (21:7) (21:12) (21:23) (35:23) (39:23) (40:24) (46:25) (63:17)
**gives** (47:21) (58:24) (101:9) (101:15)
**giving** (8:3) (17:7) (55:25) (79:1)
**goes** (37:6) (47:12) (57:21) (84:16) (84:18) (84:22)
**going** (4:8) (5:20) (26:2) (28:2) (33:18) (33:20) (43:4) (43:18) (47:19) (59:20) (61:20) (66:9) (71:7) (76:13) (79:22) (84:9) (86:2) (86:4) (87:16) (87:23) (93:14) (100:20) (100:25)
**golden** (100:7)
**gone** (85:11) (85:14) (85:25)
**good** (15:9) (17:1) (31:12) (58:3) (60:5) (60:6) (82:21) (85:23) (86:1) (86:10) (87:13) (98:4) (98:21) (99:3) (99:21)
**goodwin** (64:25) (65:8) (65:16) (65:22) (66:4) (66:12) (70:25) (71:11) (86:13) (86:24) (87:6) (90:16) (92:21) (93:6) (93:8)
**got** (15:25) (22:11) (22:12) (26:3) (29:16) (30:14) (30:16) (36:2) (52:15) (59:21) (61:2) (74:22) (81:19) (81:23) (98:13)
**gotta** (36:3)
**gotten** (31:10)
**graham** (2:7) (4:6) (10:2) (48:8) (48:11) (49:6) (54:6) (54:9) (80:21) (87:22) (87:25) (88:3) (92:23) (102:10) (103:23)
**group** (76:10) (79:14) (79:20) (79:24) (80:6) (80:9) (80:14) (81:20) (82:2) (82:4) (82:15) (82:19) (82:24) (82:25) (83:2) (83:15) (84:4) (84:10) (84:11) (89:15) (89:16) (90:1) (90:2)
**groups** (51:22) (79:24)
**guarantee** (56:14)
**guess** (5:14) (5:15) (13:15) (13:17) (15:15) (26:19) (30:10) (31:25) (32:13) (33:22) (41:16) (57:8) (63:8) (70:8) (70:9) (71:1) (72:19) (76:4) (77:3)
**guess when** (32:1)
**guys** (97:1) (97:6) (99:19)

## H

**hadn't** (26:20) (39:9)
**hall** (1:19)
**handed** (86:21) (87:8) (90:19)
**handled** (23:23) (43:2) (87:3) (87:10)
**handles** (44:12)
**hands** (86:25)
**handwriting** (87:17)
**happened** (80:5) (80:6) (87:3) (92:5)
**happens** (62:9) (94:21)
**happy** (6:19) (16:21) (16:22) (31:20) (54:14) (57:21) (62:12)
**harassment** (54:1) (55:11)
**hardin** (9:4) (64:14) (66:10) (70:24) (71:19) (71:21) (73:11) (75:9) (83:18) (84:13) (89:21) (101:19)
**harm** (43:19)
**harmful** (42:16)
**harmony** (36:4) (37:8) (37:22) (38:10) (38:23)
**has** (7:8) (8:4) (8:11) (9:16) (9:19)

**impair** (12:18) (13:4) (13:13) (13:25) (16:10) (27:20) (31:14) (56:5) (58:11) (61:3) (75:14) (80:18) (92:21) (102:16)
**hate** (85:12) (85:13) (85:14)
**haven't** (39:22) (61:3) (62:11) (62:13)
**having** (4:2) (21:2) (28:11) (59:5) (61:18) (66:20)
**head** (6:15) (35:22) (71:23) (90:13) (94:19)
**health** (6:23) (8:12) (43:15) (45:2)
**hear** (6:17) (21:4) (96:4)
**heard** (34:9) (34:11) (63:20) (66:11) (66:16)
**hearing** (26:6) (88:10) (93:20) (93:23) (93:25) (94:3) (94:7) (94:12) (101:2)
**hearings** (101:1)
**held** (17:13) (51:2)
**help** (39:21) (59:8) (60:4)
**helpful** (42:12) (42:16)
**her** (32:14) (53:22) (54:16) (54:19) (93:10)
**hereby** (3:2) (104:6)
**herein** (104:12)
**hereto** (3:20)
**he's** (4:7) (25:16) (27:7) (27:8) (41:17) (74:6) (85:3) (85:10) (85:11) (85:14) (85:25)
**high** (26:17) (59:1)
**highest** (56:20) (100:8)
**him** (14:4) (19:25) (40:16) (42:10) (47:10) (49:8) (54:23) (55:4) (66:11) (66:16) (66:19) (68:1) (71:7) (72:11) (74:6) (79:15) (81:19) (81:24) (85:17) (89:3) (93:18) (96:5) (101:24)
**hire** (58:24) (61:12)
**hired** (14:19) (28:11) (59:19)
**hires** (58:6) (58:8) (58:9) (62:8) (65:17) (71:4) (71:6) (71:13)
**hiring** (11:24) (12:3) (28:10) (28:24) (62:14) (62:15)
**his** (17:22) (9:17) (19:22) (20:4) (22:16) (27:4) (40:18) (41:22) (42:1) (42:8) (48:5) (49:14) (49:16) (51:19) (52:1) (52:5) (54:6) (55:3) (55:9) (55:11) (55:12) (55:15) (55:21) (64:17) (68:23) (69:5) (69:12) (69:24) (70:2) (70:4) (70:6) (71:2) (73:1) (74:8) (74:11) (74:14) (79:1) (79:8) (79:16) (80:7) (80:16) (81:20) (83:19) (84:2) (84:11) (84:12) (87:8) (87:21) (89:9) (89:20) (90:2) (92:11) (93:21) (94:10) (94:13) (98:5) (99:4)
**hold** (10:9) (15:23) (62:4) (64:2)
**honest** (6:1) (86:5)
**honestly** (16:14)
**hours** (33:6) (33:9)
**human** (8:6)
**hunter** (1:15) (3:4) (4:1) (4:12) (4:14) (4:18) (6:22) (7:5) (8:18) (9:6) (9:11) (9:18) (9:23) (10:3) (10:7) (15:18) (17:15) (24:23) (26:14) (41:6) (44:3) (47:1) (47:9) (51:7) (56:17) (64:10) (65:4) (76:19) (80:24) (88:11) (100:1) (104:7)

## I

**idea** (60:19) (63:24) (85:23) (90:12)
**ideas** (97:21)
**iii** (82:24) (82:25) (83:3) (83:15) (84:4) (84:10) (84:11) (89:16) (90:2)
**i'll** (5:24) (6:19) (30:24) (78:21)
**immediately** (6:18)
**impact** (75:4)
**impacted** (74:4)
**impair** (6:24) (37:8) (38:10)

**impaired**                                                                                          **make**

impaired  (37:21) (39:8)
impairment  (41:3) (41:10) (75:4)
impede  (37:9) (43:18)
impedes  (101:16)
impeding  (36:3)
inadequate  (43:22) (44:9) (44:21)
(45:7) (45:8) (45:16) (45:22)
inches  (29:14)
include  (77:21)
included  (50:7)
including  (27:12) (38:7) (63:5)
incorrect  (31:7) (70:14) (88:20)
indicate  (65:14) (70:12) (71:20)
(88:18) (89:2) (92:11)
indicated  (38:6) (71:10) (71:22)
(89:20)
indicates  (7:13) (8:2) (16:7)
(25:12) (25:16) (26:13) (27:10)
(27:19) (28:4) (29:13) (31:2) (89:17)
indicating  (89:9) (89:11)
individual  (4:22) (12:11) (13:3)
(51:13) (52:9)
individuals  (34:21) (53:6)
inflict  (61:17)
inform  (14:8) (66:8)
information  (34:11) (70:11) (71:16)
(74:2) (88:17) (88:22)
informed  (19:6) (65:15) (66:11)
(66:25) (67:20)
informs  (76:12)
infraction  (79:12) (80:5)
infractions  (79:13) (79:23)
initiative  (48:25)
input  (13:19) (15:1)
inquiries  (72:14)
inquiring  (96:13)
instead  (59:5)
instructed  (65:23) (65:25)
instructions  (83:5) (83:10) (83:11)
insubordination  (83:3) (83:19)
insufficient  (45:16)
intended  (84:19)
interested  (104:15)
interfering  (73:9)
interim  (11:9)
international  (18:8) (18:11)
interview  (50:3) (51:14)
interviewed  (21:17) (25:5) (25:20)
(32:4) (50:16) (52:22) (79:2)
interviews  (51:18)
intimidation  (53:14)
into  (4:8) (15:1) (58:6) (60:12)
(62:8) (65:23) (65:25) (66:5) (66:9)
(68:4) (68:9) (68:11) (99:8)
introduced  (3:18)
intruding  (42:14)
invested  (59:3)
investigate  (60:12) (65:24) (67:19)
(68:22)
investigating  (49:11) (67:7)
investigation  (35:17) (49:1)
(49:15) (49:23) (51:9) (55:17) (55:23)
(67:15) (78:24) (79:7)
investment  (58:23) (59:9)
invite  (9:13) (15:17) (21:8) (24:23)
(36:7) (65:2)
involve  (56:19)
involved  (7:17) (23:18) (87:5)
(90:23)
involvement  (42:1)
involves  (52:1) (52:3)
involving  (8:22) (71:12) (80:9)
(81:2)
iraq  (53:18)
isolated  (38:8)
issue  (13:19) (30:11) (38:9) (54:22)
(55:7) (55:24) (56:11) (73:8) (73:12)

(100:14)
issued  (48:2) (55:18) (79:4)
issues  (5:2) (5:6) (7:17) (8:22)
(19:23) (20:5) (20:17) (20:20) (20:23)
(21:10) (21:20) (22:11) (23:7) (23:8)
(23:14) (23:21) (24:17) (34:13)
(34:22) (35:24) (40:25) (43:14)
(47:12) (55:10) (56:18) (57:12)
(57:15) (70:23) (73:2) (73:24) (76:19)
(77:21) (100:2)
items  (23:8)
itself  (39:22)
i've  (22:11) (22:24) (34:9) (48:3)
(58:2) (63:20)
i've got  (100:17)

**J**

james  (2:7) (50:9)
january  (22:18) (31:3)
jeffrey  (9:3)
jeopardize  (37:9)
jerry  (22:19)
job  (9:18) (9:19) (9:21) (9:24)
(10:8) (10:14) (10:18) (15:9) (16:9)
(16:19) (17:1) (26:20) (29:1) (31:12)
(37:9) (45:3) (54:14) (61:14) (61:19)
(61:25) (62:12) (73:13) (73:18) (74:4)
(74:9) (74:11) (79:25) (96:14) (97:3)
(97:25) (98:5) (98:13) (98:22) (99:4)
jobs  (27:17) (31:10) (60:25)
johansen  (47:9) (48:16) (48:19)
(51:17)
judgment  (37:21) (62:6) (73:5)
june  (11:2)
just have  (70:4)

**K**

keep  (59:23) (60:22) (61:21) (63:10)
(80:1) (84:9)
keeping  (33:22)
kenneth  (48:16)
kept  (34:1)
key  (61:16)
kin  (104:13)
kind  (6:23) (35:16) (50:20) (94:17)
(96:13) (99:6)
kinds  (76:19)
knew  (16:25) (49:12) (60:15) (60:19)
(68:13) (72:21) (79:19) (96:4) (97:3)
knowing  (19:9) (79:20) (98:14)
(101:1)
knowledge  (78:11)
knowledgeable  (7:16)
known  (72:12) (72:13) (73:9)

**L**

labor  (17:18) (17:19) (18:23) (19:3)
(19:23) (24:6) (24:15) (26:1) (26:10)
(64:12)
lance  (50:8)
land  (31:15) (50:8) (53:21) (54:2)
l-a-n-d  (31:15)
langley  (97:10) (97:11) (97:13)
(97:23) (98:3) (98:7) (98:16)
large  (1:18) (3:8) (79:3) (104:6)
(104:19)
larger  (27:22)
last  (14:1) (26:14) (27:11) (48:11)
(75:19) (92:20) (96:21)
lastly  (7:2) (9:8)
later  (29:12) (31:14) (38:16) (63:7)
(71:18) (86:2)
law  (58:24)
lawsuit  (4:23) (5:3) (5:7)
lawyer  (24:2)
leaders  (21:9) (21:19)
leads  (94:20)

learned  (63:1) (63:7) (65:21)
least  (5:1) (15:13) (16:20) (24:3)
(24:24) (25:12) (32:8) (83:14)
leave  (31:22) (31:25) (32:11) (54:14)
leaves  (91:12)
led  (79:7) (79:16) (80:7)
ledger-enquirer  (25:1) (37:2)
(94:25) (95:10)
left  (18:17) (27:11) (31:10) (51:12)
(96:14) (98:14)
lengthy  (59:13)
less  (74:14)
let  (9:13) (14:4) (15:17) (15:23)
(17:15) (24:23) (36:7) (39:2) (41:5)
(44:16) (50:1) (53:1) (54:3) (65:2)
(75:7) (82:13) (83:2) (92:19) (102:14)
lets  (59:6)
let's  (7:7) (17:11) (51:3) (64:9)
(78:23) (81:25) (96:23)
letter  (15:22) (19:20) (73:13)
letters  (34:20) (34:24) (34:25)
level  (13:24) (56:20)
levels  (20:16) (21:16)
light  (5:17)
like  (20:17) (21:11) (28:22) (28:25)
(30:9) (32:11) (33:17) (33:21) (34:3)
(42:3) (43:2) (43:12) (47:20) (48:18)
(54:1) (54:17) (55:9) (60:14) (60:21)
(68:6) (68:15) (68:18) (68:19) (88:21)
(92:4) (95:20) (96:8) (96:15) (100:6)
(100:9) (100:11)
likely  (37:8)
limited  (63:16)
line  (10:18) (15:21) (30:6) (65:9)
(83:3) (89:11)
list  (80:18)
listed  (51:15) (80:16)
listen  (44:3) (82:12)
lists  (23:9)
little  (91:21)
local  (18:1) (18:7) (18:14) (18:18)
(18:23) (19:3) (19:7) (19:13) (19:17)
(19:23) (20:4) (21:9) (21:18) (22:16)
(23:21) (47:11) (52:2) (52:5) (53:8)
(55:13) (56:11) (64:18) (88:7)
long  (10:22) (62:16)
longer  (27:2) (60:16) (60:20)
long-time  (14:9)
look  (35:1) (39:21) (60:12) (65:23)
(65:25) (66:5) (68:9) (68:11) (69:8)
(78:21) (78:22) (79:11) (81:25) (83:2)
(92:23) (94:5) (94:23) (95:1) (98:19)
looked  (54:12) (71:10)
looking  (66:9) (68:4) (92:24)
lot  (21:13) (22:4) (59:3) (59:8)
(60:3) (66:21) (85:10)
low  (25:22)
lowest  (25:14)
loyalty  (37:10)

**M**

madam  (36:18)
made  (3:11) (16:14) (32:2) (35:18)
(37:7) (37:19) (39:19) (40:10) (50:17)
(53:13) (53:17) (54:21) (55:6) (61:19)
(67:18) (67:19) (72:15) (77:4) (87:15)
(94:8)
main  (55:25)
mainly  (31:6) (31:7) (39:3) (40:22)
(55:8) (94:22)
majority  (25:24) (26:9) (28:23)
make  (10:2) (10:4) (12:10) (12:14)
(12:15) (12:21) (12:24) (13:1) (13:9)
(13:12) (13:25) (14:3) (24:16) (33:10)
(33:25) (40:14) (49:17) (50:13)
(50:14) (53:2) (54:9) (78:6) (78:21)
(79:22) (87:11) (95:12)

| makes | middle | our |
|---|---|---|

**makes** (13:7)(94:13)
**making** (47:10)
**manage** (68:7)
**manager** (10:15)(10:20)(12:16)
(12:18)(12:25)(13:7)(13:9)(13:12)
(13:15)(13:20)(13:25)(14:4)(14:7)
(14:8)(35:6)(49:10)(49:19)(65:7)
(66:8)(66:14)(67:5)(67:14)(67:20)
(71:24)(72:16)(73:17)(76:6)(76:9)
(76:12)(78:8)(78:15)(78:17)(79:4)
(90:9)(93:12)(94:9)(100:16)
(100:19)(102:2)(102:3)
**manager's** (8:5)(49:17)
**manner** (3:19)(104:15)
**many** (14:14)(31:12)
**matter** (17:16)(49:11)(56:10)
(65:23)(68:8)(68:22)(94:10)(95:21)
(95:23)(104:9)
**matters** (8:22)
**maybe** (74:8)(77:3)
**mayor** (5:24)(8:4)(9:3)(64:13)
(64:20)(65:19)(65:22)(66:6)(66:10)
(68:5)(68:23)(69:6)(69:13)(70:21)
(70:23)(71:12)(71:19)(71:21)(72:3)
(72:7)(72:10)(72:12)(72:13)(72:18)
(72:24)(73:8)(73:9)(73:11)(73:16)
(73:19)(73:21)(73:23)(74:3)(74:20)
(75:8)(75:15)(77:5)(77:9)(78:17)
(78:25)(81:9)(82:20)(83:7)(83:18)
(84:3)(84:13)(88:5)(89:21)(90:3)
(101:18)(101:22)
**mayor's** (73:4)
**mcgillivary** (2:3)
**mean** (76:1)
**media** (35:7)(35:18)(43:13)(43:22)
(44:8)(44:11)(44:14)(44:19)(45:2)
(45:7)(45:15)(45:21)(46:2)(46:8)
(46:14)(46:23)(47:11)(50:22)(52:2)
(52:5)(53:9)(55:13)(56:11)(56:25)
(57:5)(57:15)(57:24)
**mediate** (34:7)(41:17)
**mediating** (41:17)
**mediator** (41:22)(42:12)
**medical** (27:13)(31:11)(59:2)
**medication** (6:22)
**meet** (35:23)(76:15)(97:19)(97:20)
**meeting** (19:25)(20:11)(20:13)
(21:2)(23:6)(34:10)(34:12)(34:17)
(76:2)(76:10)(76:21)(77:7)(79:18)
(86:22)(87:5)(90:23)(97:1)(97:17)
(97:18)(100:16)
**meetings** (19:21)(20:19)(35:5)
(35:11)(36:5)(66:21)(66:24)
**member** (17:23)(18:1)(18:10)(34:6)
(34:12)(36:9)(41:19)(42:5)(66:18)
(72:8)(77:15)(77:18)
**members** (17:19)(20:6)(24:6)
(25:25)(26:10)(36:10)(36:14)
(36:23)(84:1)(101:4)
**memo** (15:19)(16:6)(16:15)(22:15)
(22:21)(22:22)(23:15)(36:8)(36:11)
(36:21)(36:22)(48:4)(65:3)(65:13)
(71:9)(71:18)(71:21)(73:14)(73:15)
**memorandum** (50:20)(72:18)(79:3)
**men** (101:17)
**mention** (14:19)(72:18)
**mentioned** (35:11)(41:8)(67:4)
(80:8)
**merit** (42:22)(43:11)(43:16)
(43:20)(44:6)(44:18)(44:24)(45:13)
(45:19)(46:1)(46:6)(46:13)(56:24)
(57:9)(61:1)(65:10)(68:15)(71:23)
(72:6)(77:12)(77:13)(79:14)(79:21)
(79:25)(81:7)(81:15)(82:1)(82:14)
(82:23)(83:9)(83:10)(83:25)(89:23)
(90:5)(101:15)(102:21)
**met** (15:8)(34:10)

**middle** (1:2)(64:19)
**might** (6:24)(20:20)(25:23)(26:12)
(27:15)(55:5)(68:15)(72:12)(72:13)
(73:9)(87:10)(87:14)(90:24)(95:3)
**miles** (50:7)
**mind** (72:17)(72:19)(83:14)(87:23)
**mines** (35:25)
**minutes** (4:9)
**misconduct** (46:9)
**misleading** (38:1)(38:12)(38:14)
**missed** (11:16)
**mistake** (50:14)
**misunderstandings** (26:19)
**moment** (81:1)(99:22)
**money** (59:3)(100:8)
**montgomery** (104:3)
**month** (33:25)(97:21)
**months** (26:21)(28:11)(58:7)
(59:14)(60:8)(60:16)(61:16)(61:18)
(62:1)(62:2)(62:10)(62:13)(62:23)
(63:19)
**morale** (8:16)(20:16)(21:15)
(25:14)(25:22)(39:18)(40:2)(46:3)
(55:3)(55:22)(56:6)(56:18)(57:6)
(76:18)
**morgan** (99:2)
**morning** (26:4)
**most** (6:4)(28:22)
**mostly** (20:22)
**move** (17:15)(33:21)(64:9)(89:6)
(91:2)
**moved** (11:1)
**much** (19:10)(54:22)(101:24)
**multiple** (79:13)
**muscular** (100:7)
**must** (6:14)(14:3)(46:20)
**myself** (21:1)(86:7)

| N |
|---|

**name** (4:13)(4:18)
**named** (4:21)
**names** (51:15)
**nature** (70:19)
**nearby** (60:13)
**necessarily** (28:16)(55:8)
**need** (3:11)(54:17)(68:8)(74:16)
**needed** (34:3)(35:21)(35:22)(36:1)
**neither** (104:13)
**never** (20:7)(20:9)(20:10)(20:15)
(34:10)(57:10)(58:1)(58:2)(62:11)
(76:5)(100:18)
**new** (19:6)(19:12)(58:6)(58:8)
(58:9)(61:12)(62:8)(65:16)(65:17)
(71:4)(71:6)(71:13)
**newspaper** (21:13)(22:1)(24:25)
(25:7)(25:11)(25:21)(31:1)(31:19)
(32:5)(33:13)(34:5)(35:3)(35:6)
(37:2)(37:14)(37:21)(38:10)(38:22)
(39:1)(39:5)(40:1)(40:9)(41:13)
(42:21)(45:7)(49:2)(49:3)(49:25)
(50:4)(50:16)(51:11)(52:11)(52:24)
(53:23)(54:12)(54:21)(54:25)(55:2)
(55:6)(55:16)(80:10)(94:24)(95:2)
(95:6)(95:11)(95:19)(95:22)
**newspapers** (22:7)(34:21)
**next** (67:18)(77:13)(79:6)(79:9)
**nice** (29:2)
**nods** (6:15)
**none** (52:21)(58:19)
**nor** (104:13)(104:14)
**normal** (43:5)(91:11)
**note** (90:9)
**nothing** (4:4)(96:15)
**notice** (7:7)(7:12)(8:1)(91:3)
**notification** (92:6)
**notify** (91:14)
**now** (10:2)(18:11)(27:5)(27:22)

(29:4)(29:6)(29:7)(29:8)(33:1)
(39:3)(42:17)(48:4)(51:24)(70:13)
(71:18)(83:13)(86:15)(86:21)
(91:21)(94:7)(95:24)(102:15)
**nowhere** (21:22)
**number** (7:11)(14:11)(24:21)(26:2)
(27:24)(28:12)(29:8)(38:6)(77:17)

| O |
|---|

**oath** (7:3)
**objection** (88:3)
**objections** (3:9)(3:10)
**obviously** (7:2)(32:4)(85:9)
**occasion** (21:18)(100:1)
**occasions** (16:9)
**occur** (67:6)
**occurred** (34:8)(39:5)(79:6)(79:9)
(79:11)
**occurring** (35:4)
**off** (13:13)(17:11)(17:13)(31:21)
(50:25)(51:2)(77:6)(77:9)(80:19)
**offense** (79:20)(80:9)(80:14)
(82:2)(82:4)(82:15)(82:19)(82:24)
(82:25)(83:16)(84:4)(84:11)(89:16)
(90:1)(90:2)
**offenses** (79:14)(79:24)(79:25)
(81:20)(89:19)
**offered** (3:13)
**office** (8:5)(30:4)(30:10)(63:9)
(68:1)
**officer** (18:19)(53:16)(54:2)(56:9)
**officers** (46:10)(97:9)
**offices** (1:19)
**official** (4:23)
**officially** (10:23)
**on them** (61:17)
**once** (7:13)(72:19)
**one** (4:19)(5:13)(5:15)(6:4)(6:18)
(9:3)(10:9)(20:13)(22:24)(26:12)
(32:25)(35:19)(41:15)(44:16)(52:1)
(52:2)(54:4)(54:8)(58:7)(58:24)
(61:20)(61:24)(74:22)(74:24)
(75:11)(76:13)(76:15)(77:12)
(79:12)(79:17)(79:20)(80:15)
(81:23)(82:5)(82:7)(82:8)(82:10)
(82:11)(86:15)(86:23)(92:9)(92:16)
(92:23)(92:24)(94:24)(97:2)(99:10)
(99:18)(102:14)
**ones** (60:2)
**one-third** (26:4)
**only** (24:14)(35:25)(50:11)(52:9)
(53:6)(53:16)(53:24)(53:25)(58:9)
(69:24)(70:4)(72:8)(77:10)(99:17)
(99:18)(100:4)(102:3)
**opelika** (96:20)(96:22)(99:20)
**open** (21:4)(21:5)(21:6)(66:21)
**opened** (22:7)
**operating** (74:7)(83:11)(83:24)
(89:24)
**operation** (39:8)(43:5)(43:19)
**operations** (8:14)(41:11)(56:6)
(74:21)(75:5)
**opportunity** (5:5)(6:11)(39:24)
(43:3)(43:25)(56:1)(58:2)(68:7)
(84:20)(86:8)
**opposed** (62:22)(63:5)
**opposition** (63:1)
**organization** (17:18)(18:18)
(18:24)(19:3)(19:23)(24:6)(26:1)
(26:11)
**other basis** (70:1)
**others** (50:13)(84:4)
**otherwise** (36:18)
**otherwise known** (65:4)
**our** (4:7)(44:10)(50:2)(57:19)
(59:17)(64:23)(64:24)(68:7)(71:23)
(71:25)(72:14)(72:15)(79:25)(92:2)

out                                    recruit

(97:21) (101:8) (101:15) (101:16)
out   (11:12) (18:14) (21:21) (22:1)
(25:4) (28:6) (33:11) (33:13) (34:16)
(39:25) (40:20) (41:13) (50:19)
(51:11) (53:2) (66:19) (67:13) (67:16)
(86:20) (91:11) (92:2) (94:24) (95:2)
(95:10) (102:20) (104:12)
outside   (101:2) (101:21) (101:25)
outstanding   (16:9)
over   (27:11) (30:4) (31:2) (35:24)
(40:25) (64:7) (68:1) (79:15) (79:22)
(83:17) (94:8) (94:12)
overheard   (19:14)
oversight   (92:25)
own   (35:20) (48:25) (66:2) (66:7)
(68:19)

**P**

page   (7:12) (16:6) (29:12) (31:1)
(31:8) (31:18) (75:19) (81:22) (84:18)
pages   (51:25) (82:24) (104:10)
paper   (35:12) (36:2) (37:7) (39:11)
(40:24) (55:10)
papers   (10:4) (53:1)
paperwork   (33:22) (90:25) (91:1)
(92:1)
paragraph   (81:22)
paragraphs   (7:13)
parameters   (73:20) (73:21)
part   (17:20) (17:21) (24:10) (24:11)
(24:14) (31:8) (55:13) (59:25) (60:7)
(79:3) (79:25) (85:16)
participate   (35:4)
participated   (86:22)
particular   (24:5) (52:15) (54:20)
(55:15) (67:17) (80:5) (89:19) (90:1)
parties   (3:3) (3:17) (104:12)
(104:14)
party   (3:20)
pass   (20:24) (59:7) (60:4)
passing   (60:2)
past   (73:22)
pause   (62:5)
payroll   (33:10)
penalty   (7:4)
pending   (4:20)
people   (27:15) (28:11) (28:17)
(29:6) (29:7) (31:9) (31:10) (31:12)
(32:15) (33:21) (36:1) (37:23) (38:1)
(39:12) (39:23) (51:19) (57:19)
(59:18) (60:15) (60:19) (60:20)
(60:22) (62:12) (96:16) (96:18)
(98:16) (98:17)
people's   (21:4) (21:6)
per   (33:24) (82:1) (82:14) (82:23)
perception   (39:12) (39:15)
perform   (83:3)
performance   (16:19) (37:9) (74:5)
(74:9) (84:21) (98:5) (101:16)
period   (9:5) (58:6) (58:21) (60:11)
(61:5) (61:6) (61:7) (61:12) (61:13)
(62:9) (62:16) (62:23) (63:6) (63:19)
(70:22) (71:2) (72:20) (75:16) (94:15)
periods   (60:13)
perjury   (7:4)
permission   (61:2)
permitted   (61:13) (76:8) (76:9)
(76:20)
person   (47:21) (59:13) (74:23)
(76:3) (80:1) (80:18)
personnel   (8:13) (8:16) (11:24)
(22:13) (26:5) (28:6) (29:1) (46:3)
(47:16) (48:6) (51:19) (59:23) (59:24)
(64:23) (64:24) (65:9) (65:16) (71:24)
(73:18) (91:5) (93:5) (93:20) (94:3)
(94:7) (95:21) (95:23) (97:21)
(100:22) (100:25) (101:4)

persons   (8:5) (8:7) (44:11)
phenix   (1:8) (1:19) (2:8) (4:15)
(7:23) (17:17) (22:17) (25:6) (25:17)
(34:22) (36:10) (88:7) (88:9) (89:8)
(98:14) (99:5) (102:21)
phone   (9:2) (40:14) (67:18) (89:23)
pieces   (63:20)
place   (18:6) (28:10) (33:1) (33:3)
(76:5)
placed   (47:16) (48:5) (64:13) (94:10)
plaintiff   (1:6) (2:2) (4:19) (7:21)
(14:11)
please   (4:12) (4:13) (6:18) (41:6)
(47:2) (64:7) (75:7)
point   (13:10) (13:11) (14:3) (17:16)
(18:13) (18:22) (19:2) (25:15) (26:8)
(28:14) (28:18) (28:20) (40:8) (56:23)
(58:4) (64:10) (74:25) (75:1) (75:2)
(75:10) (75:12) (80:2) (85:6)
police   (59:11) (59:19) (60:8)
policy   (17:7) (21:5) (62:22)
poor   (45:22) (46:3) (55:4) (56:6)
(56:18)
portion   (59:2) (87:4)
position   (11:1) (11:12) (22:16)
(44:2) (44:4) (46:19) (46:20) (56:2)
(56:23)
positions   (28:15)
positive   (16:10) (17:1)
possible   (13:5)
possibly   (85:17)
potential   (7:4) (38:7) (38:15)
prater   (22:19) (22:22) (22:23)
(22:25) (23:13) (23:14) (23:16)
(23:23) (26:24) (27:2) (27:5) (33:17)
present   (2:10)
president   (19:2) (19:6) (19:13)
(19:22) (20:4) (25:16) (64:17) (88:6)
pretty   (29:3) (50:1) (85:25)
prevent   (6:24) (38:19) (43:9)
(47:19) (79:19) (80:3)
prevented   (79:22)
previous   (80:18)
principles   (101:13)
printout   (84:25)
private   (60:25)
privilege   (32:23)
probably   (19:14) (26:4) (27:21)
(67:25) (68:1)
probation   (58:22) (60:12) (61:5)
(65:17) (70:22) (71:13)
probationary   (9:5) (58:6) (60:11)
(61:6) (61:7) (61:11) (62:9) (62:16)
(62:23) (63:6) (71:2) (72:20) (75:15)
problem   (59:20)
problems   (26:19) (77:18)
procedure   (3:5) (3:15) (3:21) (74:7)
(83:24)
procedures   (5:7) (5:20) (45:23)
(77:19) (83:13) (89:24) (102:20)
process   (28:10) (28:24) (66:22)
(66:25) (79:6)
productive   (34:17)
professional   (16:10) (17:1)
promoted   (14:23) (15:4) (15:10)
(15:13)
promotion   (11:24) (15:1)
promotions   (11:6)
prompt   (55:4) (55:17)
prompted   (58:20)
proposal   (23:5)
proposals   (24:16) (81:10)
propose   (58:5) (59:22)
proposed   (9:5) (58:20)
proposing   (60:7) (60:11)
prospective   (96:7) (96:13)
protect   (8:14)

protective   (45:8) (57:13)
provided   (3:14) (3:20)
provision   (24:13) (77:25)
provisions   (78:11) (78:16) (78:18)
(78:19)
public   (24:4) (30:12) (43:14)
(44:13) (46:15) (56:5) (65:17) (76:21)
publications   (55:10)
publishing   (47:10)
purpose   (3:14) (25:6)
purposes   (97:20)
pursuant   (1:16) (3:5)
pushed   (80:6)
puts   (29:13)
putting   (25:7)

**Q**

question   (6:20) (10:12) (24:2)
(38:5) (41:5) (44:3) (54:6) (55:12)
(55:14) (63:16) (64:6) (69:19) (74:8)
(82:12) (89:25) (98:12) (102:14)
questions   (3:10) (3:11) (5:25)
(6:18) (6:25) (10:6) (25:3) (36:17)
(46:18) (102:11)
quite   (90:24)
quotations   (35:15) (40:2)
quote   (15:22) (16:8) (16:11) (25:14)
(25:15) (27:10) (27:13) (29:13)
(29:17) (29:19) (31:14) (31:19)
(31:23) (37:6) (37:10) (65:10) (71:21)
(72:1) (82:1) (82:14) (82:15) (82:22)
(82:24) (84:19)
quoted   (31:19) (37:20) (54:4) (54:12)
quotes   (55:15)

**R**

raised   (5:2)
raises   (56:17)
raising   (34:14) (100:8)
rank   (14:24)
rate   (59:1)
rather   (53:17)
ray   (34:6) (34:9) (34:10)
reach   (13:11)
reached   (13:10)
read   (4:6) (6:11) (10:2) (25:21)
(35:2) (53:1) (69:16) (87:16) (87:17)
(87:23) (95:3)
readers   (39:15)
reading   (39:13) (70:9) (95:6)
real   (38:24) (44:16) (60:5) (82:13)
really   (38:5) (40:8) (57:3) (69:19)
(74:8) (92:8)
realm   (42:10)
reason   (17:4) (21:11) (30:2) (53:20)
(53:24) (53:25) (63:23) (63:25) (64:4)
(70:15)
reasons   (27:12) (27:16) (31:11)
(63:4) (63:17) (66:20)
recall   (94:2)
receive   (53:21) (96:12)
received   (16:2) (52:4) (52:10)
(52:22) (53:6) (53:25) (100:7)
recently   (37:2) (100:7)
recess   (51:4) (80:22) (99:24)
recognize   (19:16) (102:15)
recognized   (72:21)
recommend   (15:4) (66:4)
recommendation   (12:10) (12:14)
(12:15) (12:21) (12:24) (12:25) (13:9)
(94:8)
recommendations   (12:8)
record   (4:9) (4:13) (9:15) (17:12)
(17:13) (17:14) (50:25) (51:2) (51:6)
(51:8) (53:5) (61:11) (78:6) (80:19)
(80:23) (83:13) (89:15) (99:25)
recruit   (62:8)

**recruitment**

recruitment (11:23)
refer (7:7) (71:21)
referred (75:21)
referring (31:7) (39:16)
refers (34:5) (81:7) (89:15)
refusal (83:3)
regard (46:17)
regarding (8:11) (9:4) (37:3) (81:9)
regards (88:4) (88:5)
regulations (42:23) (43:12) (43:17)
(43:21) (44:6) (44:10) (44:18) (44:25)
(45:6) (45:14) (45:20) (46:1) (46:7)
(46:13) (46:19) (56:24) (57:23)
(68:16) (74:14) (81:15) (82:2) (82:15)
(82:23)
reinstating (85:17)
relate (9:1) (9:9)
related (83:6) (89:20)
relates (90:4)
relations (44:13)
reluctant (29:17)
remember (15:12) (17:25) (18:17)
(18:20) (19:5) (19:9) (19:11) (25:8)
(68:12) (87:2) (87:12) (90:22) (94:4)
repeat (6:19)
rephrase (6:19) (82:13)
report (10:19) (69:1) (78:7)
reported (104:7)
reporter (1:17) (3:7) (4:5) (6:15)
(25:11) (36:19) (62:4) (64:2) (64:7)
(104:5)
reporters (6:5)
reporter's (104:1)
reports (35:7) (35:18)
represent (24:11)
representative (7:15) (8:2) (19:17)
(24:16) (44:8) (44:13) (45:2) (45:7)
(45:15) (45:21) (46:2) (46:8) (46:14)
(46:23)
representing (3:3) (3:17) (4:19)
reprimand (47:3) (47:16) (47:18)
(47:25)
reprimands (13:21)
request (66:5)
requested (93:20)
require (58:25)
requirements (15:8)
rescue (8:13)
rescues (39:25)
reserved (59:14)
resign (31:13)
resigned (31:4) (31:6) (31:11)
resolve (56:15)
resort (14:1)
resource (8:6)
resources (45:16)
respond (10:5)
response (8:15) (37:14) (45:22)
(51:10) (56:22) (57:6) (57:14) (57:21)
(98:2)
responses (6:14)
responsibilities (11:22) (78:12)
responsible (11:23)
restriction (61:8) (61:22)
restrictions (60:23)
result (35:13) (39:10) (40:9) (49:2)
(49:24) (52:11) (52:23) (53:8) (53:22)
(54:18) (75:7) (84:22)
resulting (41:11)
results (104:15)
retain (59:4)
retaliation (29:18) (29:25) (38:8)
retentions (58:23)
retired (27:7) (27:8)
retirement (27:12) (27:16)
return (78:23)
review (9:17) (10:5) (10:8) (26:3)

(26:5) (34:25) (35:17) (37:14) (51:9)
(60:14) (88:9) (88:16) (93:20)
(100:22) (100:25) (101:4)
reviewing (70:13)
right (14:21) (21:14) (22:14) (24:5)
(24:10) (24:12) (24:14) (24:15) (29:4)
(29:7) (29:8) (30:4) (32:9) (32:19)
(32:24) (33:11) (36:15) (38:18)
(42:17) (43:4) (48:8) (48:10) (52:2)
(56:11) (56:13) (57:7) (57:22) (64:9)
(68:1) (77:2) (81:22) (83:13) (84:5)
(85:7) (86:10) (86:18) (88:1) (90:23)
(97:4) (102:10) (102:16) (102:18)
right-hand (28:4) (31:2)
rights (101:9) (101:12)
rob (99:19)
robert (50:8) (52:3)
roberts (2:11) (15:22) (19:20)
(49:11) (49:20) (50:1) (65:5) (66:8)
(66:14) (67:5) (67:9) (67:14) (67:24)
(68:3) (68:6) (68:14) (68:17) (71:9)
(71:19) (79:4) (93:12) (93:14) (94:9)
(94:13) (94:16)
role (20:4) (41:22) (42:8) (64:17)
rough (28:2)
roughly (18:17) (19:5) (27:13)
(28:8) (31:4)
route (46:21) (56:8)
routes (56:19)
roy (15:20) (16:13) (68:21) (86:19)
rule (7:9) (7:15) (7:20) (56:3)
rules (3:5) (3:15) (3:20) (42:22)
(43:12) (43:16) (43:21) (44:6) (44:10)
(44:18) (44:25) (45:5) (45:14) (45:20)
(46:1) (46:7) (46:13) (46:19) (56:24)
(57:23) (68:16) (74:12) (74:13)
(74:17) (81:15) (82:2) (82:14) (82:23)
(83:20) (83:21) (84:6) (85:16) (86:11)
(102:8)
ruling (3:12)
run (12:22) (13:1) (50:2)

**S**

safety (8:12) (23:7) (30:12) (43:14)
(45:3) (46:15) (56:5) (56:18) (57:6)
(65:17)
said (3:6) (3:18) (6:6) (11:15)
(40:13) (52:19) (54:3) (54:16) (54:19)
(59:22) (68:10) (69:22) (70:6) (73:7)
(83:10) (91:6) (97:2) (97:24) (98:4)
(99:3) (99:6) (99:7) (99:20) (104:11)
(104:14)
same (24:12) (36:3) (56:12) (56:25)
(57:25) (59:20) (71:18) (81:22)
sat (5:23)
satisfied (56:21)
saw (5:24) (23:12)
saying (31:19) (54:5) (54:10)
(54:13) (63:10) (72:13)
says (10:19) (16:11) (23:10) (25:18)
(29:19) (31:23) (36:9) (37:11) (47:7)
(47:8) (47:13) (48:4) (48:6) (65:11)
(71:14) (71:21) (72:14) (77:16)
(81:10) (81:12) (82:1) (82:13) (82:16)
(82:21) (84:24) (91:22) (92:9)
schedules (21:16)
schools (59:12)
schwoebel (99:19)
scope (101:2)
second (10:9) (17:12) (25:10)
(25:13) (31:18) (51:1) (79:17) (80:6)
(80:20) (82:2) (82:4) (82:11) (82:15)
(82:18) (84:17) (98:24)
secondary (60:25) (61:14) (61:19)
(61:23)
section (79:14) (81:6)
seeing (101:1)

**sir**

seek (88:9)
seems (98:12)
selected (7:14)
selection (11:23)
sense (24:3)
sensitive (73:8)
sent (65:8) (91:4) (91:11) (92:3)
sentence (48:11)
september (25:4) (28:3) (33:12)
(35:14) (41:14) (42:20) (47:4) (47:10)
(49:3) (51:11) (79:19)
sergeant (14:24) (15:5) (15:10)
(15:14) (23:17) (30:9) (31:14) (47:8)
(50:8) (50:9) (53:21) (65:9) (79:12)
(79:18)
series (46:18)
service (8:13) (96:5) (96:8) (99:14)
session (22:6) (40:12) (40:19)
(100:6) (102:6)
sessions (36:6) (49:2) (49:20)
(51:14) (80:3)
set (9:16) (33:6) (33:9) (33:10)
(102:20) (104:12)
setup (33:4) (33:5)
seven (26:15) (28:14)
seven-year (25:16)
several (16:8) (28:11) (31:23)
(37:6) (59:14)
shannon (1:16) (3:6) (104:4) (104:18)
she'll (6:5)
she's (31:18) (32:1)
shift (21:2) (21:15)
shifts (74:15)
short (38:13) (94:15)
shorthand (104:4)
should (9:15) (12:11) (31:6) (31:7)
(46:25) (57:16) (57:17) (71:21)
(72:21) (73:7) (74:24) (80:15) (80:16)
(80:17) (93:8) (93:13)
shouldn't (57:16)
show (57:19)
sign (4:6) (6:11) (13:13) (52:25)
(90:10)
signature (87:1) (91:6)
signed (27:3) (48:15) (86:13) (87:1)
(90:13) (90:16) (91:18) (92:2) (92:10)
(93:11)
significant (29:18)
simple (30:17) (82:13)
since (10:23) (12:20) (25:15) (31:3)
(62:14)
singular (36:9)
sir (4:13) (4:17) (4:25) (5:4) (5:9)
(5:12) (5:22) (6:3) (6:8) (6:13) (6:16)
(6:21) (7:1) (7:6) (7:24) (7:25) (8:9)
(8:24) (9:7) (9:12) (9:22) (10:11)
(12:13) (13:22) (14:13) (14:22)
(16:12) (16:17) (16:23) (17:5) (17:20)
(17:22) (17:24) (18:5) (18:16) (18:25)
(19:4) (19:18) (20:2) (20:7) (20:18)
(21:6) (21:21) (22:20) (23:2) (23:11)
(23:16) (23:19) (23:22) (23:25) (24:1)
(24:8) (24:22) (25:9) (25:19) (26:16)
(26:23) (26:25) (27:9) (27:23) (29:6)
(29:21) (30:2) (30:22) (33:16) (35:2)
(36:25) (40:6) (41:23) (42:7) (42:18)
(42:24) (43:19) (44:15) (44:23) (45:4)
(45:10) (45:12) (45:18) (45:24) (46:5)
(46:11) (46:16) (46:25) (47:6) (47:14)
(48:1) (48:3) (49:7) (49:9) (50:1)
(50:13) (52:16) (52:19) (58:10) (61:1)
(63:7) (65:25) (68:20) (69:3) (70:20)
(74:1) (74:2) (77:2) (78:2) (78:4)
(80:1) (80:13) (82:3) (82:17) (85:20)
(87:21) (89:13) (90:18) (91:8) (91:10)
(93:24) (94:4) (95:13) (95:15) (95:17)
(96:3) (97:10) (98:1) (100:11)

**sit**

(100:20) (101:6) (102:2)
**sit** (20:15) (21:19) (51:13) (51:17)
(62:14) (100:21)
**situation** (48:20) (50:18) (56:16)
**slash** (83:4)
**smart** (73:19)
**solely** (48:25) (66:7) (72:15)
**some** (5:5) (17:16) (18:13) (18:22)
(19:1) (19:14) (20:10) (22:6) (25:23)
(26:8) (26:18) (26:19) (29:24) (32:2)
(32:15) (33:17) (34:2) (35:1) (35:2)
(36:1) (40:19) (50:19) (55:5) (59:3)
(63:4) (64:10) (94:17)
**somebody** (13:13)
**someone** (13:24) (14:6) (19:12)
(30:22) (35:24) (54:16) (54:19) (59:6)
(65:25) (73:7) (91:12) (96:19) (96:20)
**somewhat** (10:15)
**somewhere** (14:22) (15:15) (15:16)
(18:19)
**sop** (65:10) (75:13)
**sops** (83:9) (90:4)
**sorry** (10:10) (12:23) (39:14) (41:7)
(45:11) (70:3) (82:6) (91:7) (94:20)
**sought** (95:25)
**sound** (14:21)
**sounds** (48:18)
**speak** (4:3) (41:19) (42:5) (42:10)
(46:23) (68:22) (73:8) (102:3) (104:8)
**speaking** (16:14) (102:5)
**special** (35:11)
**specific** (38:21) (38:24) (39:4)
(40:7) (41:3) (41:9) (44:17) (74:18)
(83:15)
**specifically** (44:4) (82:18) (82:25)
**speech** (36:2) (101:9) (102:17)
(102:19)
**spelling** (96:21)
**spend** (5:5) (5:18)
**spoke** (43:22) (44:7) (44:19) (45:1)
(45:6) (45:15) (45:21) (46:2) (46:8)
(46:14) (73:11)
**spots** (27:20) (28:7)
**staff** (86:6)
**staffing** (8:11) (20:16) (21:16)
(40:3) (43:23) (44:9) (44:12) (44:21)
(55:22) (56:18) (57:6) (57:12) (76:18)
**standard** (74:7) (83:11) (83:24)
(84:25) (89:24)
**standards** (91:5)
**start** (36:17)
**started** (11:24)
**state** (1:18) (3:8) (4:12) (6:5)
(24:4) (24:13) (56:12) (58:24) (61:16)
(61:20) (77:24) (100:9) (104:2)
(104:5) (104:19)
**statement** (16:15) (16:18) (27:14)
(29:23) (31:5) (54:16) (54:20) (69:5)
(69:9) (69:12) (69:15) (69:20) (69:22)
(70:7) (70:13) (79:2) (88:18) (89:2)
**statements** (38:12) (39:19) (47:11)
(52:2) (52:5) (53:8) (53:13) (55:13)
(70:12)
**states** (1:1)
**stations** (19:15) (30:25)
**stay** (73:21)
**stayed** (11:13)
**staying** (73:20)
**stepped** (11:12)
**stick** (102:7)
**still** (18:10) (31:15) (33:1) (56:13)
(63:20) (63:23) (63:25) (64:3)
**stipulated** (3:2) (3:16)
**stipulation and** (1:16)
**stipulations** (3:1) (4:5)
**stop** (6:18) (13:23)
**stops** (76:6)

**street** (1:19) (2:4) (2:7)
**strongly** (73:7)
**structure** (13:5)
**subject** (9:8) (17:16) (44:8) (44:21)
(56:4) (65:3) (65:18) (65:24) (66:1)
(67:6) (72:20) (75:23) (79:1) (94:25)
(95:12)
**subjects** (7:19)
**submitted** (34:21)
**submitting** (23:5)
**subparagraph** (8:1)
**substance** (94:2)
**succeeded** (26:24)
**suggest** (66:4) (70:6)
**suite** (2:4)
**summarize** (7:18)
**supervisor** (86:19)
**supervisor's** (87:1)
**supervisory** (83:5)
**support** (26:9)
**supported** (29:23)
**supposed** (50:23)
**sure** (10:2) (10:4) (13:1) (13:12)
(14:3) (33:11) (34:1) (49:18) (50:13)
(53:2) (53:3) (61:19) (67:19) (78:5)
(78:6) (78:21) (79:22) (80:21) (87:11)
(90:21) (90:24) (95:4)
**surrounding** (7:22) (97:19)
**suspend** (14:5) (14:7)
**suspensions** (13:20)
**swap** (32:18) (32:19) (32:23) (33:5)
(33:13) (33:18)
**sworn** (4:2) (7:3) (104:8)
**system** (42:22) (43:11) (43:20)
(44:6) (44:18) (44:25) (45:14) (45:20)
(46:1) (46:6) (46:13) (56:24) (57:9)
(61:1) (65:10) (68:16) (71:23) (72:6)
(77:12) (77:13) (79:14) (79:21)
(79:25) (81:7) (81:15) (82:1) (82:14)
(82:23) (83:9) (83:10) (83:25) (89:24)
(90:5) (101:15) (102:21)

# T

**table** (62:14)
**tail-end** (16:5)
**take** (6:15) (33:10) (46:17) (51:3)
(70:2) (70:4) (94:5) (101:7)
**taken** (1:15) (3:4) (3:6) (5:10)
(34:3) (63:8) (71:7) (87:15)
**takes** (28:11) (80:3)
**taking** (6:6)
**talk** (19:15) (20:16) (22:8) (22:10)
(29:17) (30:4) (30:6) (30:18) (30:25)
(37:24) (38:2) (38:3) (40:25) (43:13)
(43:25) (44:11) (44:14) (49:10) (64:7)
(66:18) (86:2) (96:23) (97:4) (101:24)
(102:2)
**talked** (40:16) (49:4) (55:10)
(59:17) (60:19) (67:14) (70:24)
(75:15) (97:10) (101:22)
**talking** (37:25) (39:3) (51:8)
(54:25) (59:11) (64:23) (72:4) (80:24)
(81:6) (92:7) (102:6)
**talks** (32:17) (75:23)
**technician** (59:2)
**telephone** (64:13) (64:18) (65:18)
(66:9) (67:23) (68:23) (69:12) (70:20)
(71:11) (74:3) (74:10) (74:19) (77:5)
(77:8) (78:24) (81:9) (81:13) (83:6)
(83:17) (84:13) (89:21) (90:3)
**tell** (7:3) (18:3) (19:8) (19:12)
(28:9) (49:23) (63:4) (66:14) (68:14)
(68:17) (86:4) (93:17) (98:18)
**telling** (30:8) (50:15)
**ten** (92:4)
**tenure** (38:13) (38:14)
**terminate** (12:19) (13:11) (59:5)

**told** (80:4) (93:18)
**terminated** (12:11) (13:24) (31:9)
(79:13) (81:16) (81:17) (81:19)
(81:24) (92:9) (92:11) (92:17) (92:20)
(93:9) (93:13)
**termination** (7:23) (12:9) (13:5)
(14:2) (79:8) (79:16) (80:7) (80:16)
(91:3) (91:22) (91:24) (93:1) (93:21)
(94:14) (95:11) (101:22)
**terminations** (12:6) (27:16) (102:4)
**terms** (13:3)
**test** (59:8) (60:2) (60:4)
**testified** (4:4)
**testimony** (7:16) (8:3) (43:7)
(43:10) (48:23) (53:5) (89:20) (93:25)
(94:3) (99:10)
**thank** (62:17) (70:17) (84:15)
(102:11)
**thanks** (102:25)
**them** (10:5) (22:8) (28:12) (30:2)
(30:25) (31:25) (35:1) (35:2) (41:1)
(47:21) (52:25) (56:14) (56:15)
(57:19) (58:25) (59:5) (59:6) (59:7)
(59:15) (60:2) (60:3) (63:11) (96:10)
(97:8) (100:23) (100:25) (101:1)
(102:7)
**then-president** (64:12)
**therefore** (7:3)
**thereof** (104:15)
**there's** (25:13) (34:20) (57:3)
(77:24) (78:18) (91:2) (91:25) (92:12)
(92:14) (101:8)
**these** (9:16) (10:4) (21:12) (22:2)
(23:21) (29:24) (34:23) (35:3) (35:6)
(35:8) (35:17) (35:24) (39:24) (40:9)
(40:23) (40:25) (49:1) (51:13) (52:10)
(53:7) (53:24) (53:25) (60:22) (77:19)
(87:18)
**they'll** (20:24)
**they're** (57:21) (59:25) (79:23)
**they've** (30:14) (30:16) (61:2)
**thing** (47:20) (55:20) (55:25) (60:6)
(73:1) (77:12) (77:13) (79:17) (81:23)
(81:24) (87:3)
**things** (12:20) (12:22) (13:1)
(33:18) (33:20) (34:2) (35:12) (39:24)
(40:19) (40:23) (43:8) (59:17) (66:21)
(79:16) (96:4) (98:18) (100:9) (100:11)
**think** (11:3) (14:16) (15:9) (26:2)
(31:6) (31:21) (31:22) (42:1) (42:13)
(43:11) (43:15) (53:18) (54:15)
(84:17) (85:22) (85:25) (86:3) (86:5)
(87:10) (96:11)
**third** (8:10) (81:22)
**thomas** (2:3)
**though** (54:11)
**thought** (38:25)
**three** (26:21) (27:3) (28:17) (29:11)
(29:12) (39:17) (51:20) (59:16)
(59:21) (79:24)
**through** (11:6) (12:22) (13:1)
(13:11) (14:3) (14:6) (22:9) (30:14)
(30:21) (46:21) (49:8) (72:9) (72:15)
(100:19) (104:10)
**through conversation** (63:3)
**throughout** (29:3)
**times** (8:15) (31:23) (35:1) (45:22)
(57:6) (57:14)
**timing** (67:8)
**title** (9:19)
**today** (5:8) (5:21) (6:6) (22:21)
(38:20) (64:3)
**together** (6:10) (25:7) (59:21)
(92:1) (97:19) (97:22)
**told** (31:22) (31:25) (54:16) (65:14)
(66:16) (66:23) (68:1) (71:11) (72:9)
(97:2) (97:11) (99:2) (99:19)

**tom**

**tom** (4:18)
**took** (17:3) (32:15) (53:14) (79:11)
(86:23)
**top** (11:1) (25:2) (34:1)
**total** (27:25)
**tough** (29:3)
**toward** (53:13)
**trace** (10:24)
**trading** (32:21)
**train** (58:25) (97:21)
**trained** (28:12)
**training** (28:17) (29:6) (29:7)
(29:10) (33:23) (33:24) (59:14) (61:7)
(92:1) (92:3) (97:19)
**transcript** (6:10)
**transcription** (104:11)
**trial** (3:19)
**tried** (34:2) (34:6)
**trouble** (36:18) (60:2)
**troubled** (40:8) (54:22) (55:16)
**troubling** (55:20)
**truck** (53:18)
**true** (65:19) (66:19) (69:15) (69:23)
(70:16) (89:4) (104:10)
**truth** (4:3) (4:4) (7:3) (86:4) (104:9)
**truthfully** (16:14)
**try** (13:1) (44:16) (56:15) (64:7)
(77:14) (77:16) (84:7) (87:16)
**trying** (42:11) (59:4) (66:25) (67:8)
(73:19) (76:4) (79:21) (80:1) (84:9)
(87:2) (87:11)
**turmoil** (25:12) (39:17)
**turn** (7:9) (22:14) (47:1) (75:18)
(80:25)
**turned** (61:4)
**turnover** (26:17)
**twelve** (61:25) (62:1)
**two** (5:15) (7:12) (29:13) (29:14)
(31:1) (51:25) (52:9) (53:6) (53:24)
(53:25) (59:16) (79:15) (89:19) (92:8)
(92:14) (97:6) (99:17) (99:18)
**two-day** (92:12)
**two-fold** (24:9) (54:24)
**type** (39:23) (57:10)
**typo** (92:25)

**U**

**ultimately** (55:17) (56:9) (79:7)
**under** (6:22) (7:3) (7:4) (23:5)
(24:3) (24:8) (24:12) (76:7) (78:14)
(102:16)
**understaffed** (28:19) (28:24) (29:9)
**understaffing** (56:7)
**understand** (6:1) (6:7) (6:12) (6:17)
(6:20) (7:5) (7:24) (8:8) (8:17) (9:6)
(22:11) (43:10) (44:2) (48:23) (52:8)
(56:17) (63:10) (74:25) (75:20)
**understand your** (75:7)
**understanding** (6:24) (12:17) (13:6)
(25:2) (70:19) (78:20) (87:20) (88:12)
(93:16) (93:17)
**understood** (72:23)
**unfortunately** (31:21)
**unhappy** (31:24)
**union** (18:1) (18:10) (18:14) (19:7)
(19:13) (19:17) (20:5) (21:9) (21:18)
(23:21) (64:18)
**united** (1:1)
**unless** (94:17) (100:5) (101:16)
**unless we** (21:1)
**until** (11:3) (11:5) (11:7) (11:14)
(36:16) (61:8) (62:24) (84:9) (99:18)
**untrue** (70:7) (70:14) (89:3) (89:5)
**untruthful** (88:20)
**uphold** (94:13)
**upon** (42:14) (62:6)
**upset** (41:24) (41:25)

**upstairs** (67:25)
**use** (22:9) (30:13) (33:7) (38:2)
(57:18)
**used** (3:13) (3:19) (30:5) (57:17)
(97:25)
**useful** (34:17)
**usual** (4:5)
**usually** (87:12) (101:24)

**V**

**variety** (27:12)
**various** (23:7) (34:21)
**vehicle** (30:24)
**vehicles** (45:9)
**verbal** (6:14) (83:4)
**veteran** (14:9) (25:16) (58:12)
(58:17)
**vice-president** (18:23) (22:16)
**view** (32:7) (32:10) (32:12) (32:14)
(42:17) (44:4) (45:25) (101:12)
**viewed** (60:5) (81:14)
**views** (21:4) (21:6)
**violate** (56:24) (57:23) (58:1)
(76:24) (76:25)
**violated** (74:6) (75:14) (77:10)
**violating** (71:22) (72:4) (74:12)
(81:14) (81:15)
**violation** (42:22) (43:16) (43:20)
(44:5) (44:17) (44:24) (45:5) (45:13)
(45:19) (45:25) (46:6) (46:12) (68:15)
(71:25) (73:4) (74:13) (77:13) (79:10)
(81:7) (84:14) (89:23) (90:4)
**violations** (65:10) (84:22)
**virtually** (77:21)

**W**

**wagner** (50:8)
**wait** (36:16)
**wallace** (1:15) (3:4) (4:1) (4:14)
(104:7)
**wanted** (14:5) (22:8) (30:3) (54:22)
(58:5) (73:3) (77:14) (100:13)
**wanting** (40:22)
**warning** (81:1) (84:18) (84:19)
(85:5) (85:9) (86:12) (87:19) (88:13)
**warranted** (81:23)
**washington** (2:5)
**wasn't** (21:11) (21:12) (27:18)
(28:13) (32:12) (33:22) (33:23)
(35:19) (40:24) (41:25) (74:8) (79:17)
(81:17) (85:6) (86:23) (95:20) (95:22)
**watch** (36:3)
**waters** (15:20) (16:7) (16:14)
(16:18) (66:18) (66:23) (68:21) (69:1)
(79:3) (86:19) (86:23) (86:25) (87:3)
(87:7)
**waters'** (17:3) (86:25)
**way** (9:2) (9:9) (12:20) (20:22)
(29:14) (32:13) (43:2) (59:22) (77:7)
(88:20) (99:11)
**wednesday** (1:20) (97:20)
**welfare** (43:15)
**we'll** (5:7) (25:3) (36:18)
**wells** (50:9)
**we're** (5:20) (27:25) (51:5) (57:19)
(80:24) (86:2)
**what has** (31:25)
**whatever** (62:17) (63:8) (71:3)
(71:5) (80:3)
**whenever** (94:19)
**who** (12:14) (13:3) (13:7) (13:13)
(38:12) (44:11) (52:4) (52:10) (52:21)
(54:19) (58:17) (86:19) (86:20)
(96:23) (97:6) (98:17) (100:21) (104:8)
**whole** (4:3) (55:20) (59:8)
**who's** (98:13)
**wilkerson** (40:13) (53:14) (54:2)

**you'll**

(55:11)
**will** (6:9) (28:24) (84:9) (87:25)
(88:9) (98:18)
**william** (50:7)
**williams** (1:17) (3:7) (104:4)
(104:18)
**willing** (38:4)
**witness** (4:2) (7:20) (8:3) (9:1)
(56:3) (104:11)
**wonderful** (62:19)
**wondering** (67:3)
**won't** (31:12)
**woodley** (2:3) (4:8) (4:11) (4:18)
(17:11) (17:14) (50:25) (51:3) (51:5)
(62:5) (80:19) (80:23) (87:22) (88:1)
(102:10) (102:24)
**word** (17:3) (70:2) (70:4) (96:21)
**words** (28:6) (43:6) (68:12) (69:24)
(76:7)
**work** (20:22) (78:14) (83:4) (84:20)
(97:25) (98:17) (100:6) (102:6)
**worked** (11:3) (11:4) (11:6) (14:11)
(99:19)
**working** (39:23) (58:12) (60:17)
(60:24) (96:5) (96:6) (96:10) (99:20)
**workplace** (37:9) (38:24)
**work-related** (77:18) (77:20)
**works** (33:11)
**write-up** (79:10) (79:11) (81:23)
**writing** (87:21)
**written** (6:10) (10:17) (13:21)
(47:16) (47:18) (47:25) (53:7) (69:5)
(69:9) (69:11) (69:20) (69:22) (70:6)
(70:13) (76:3) (79:1) (79:10) (80:17)
(81:1) (81:18) (83:4) (83:9) (83:11)
(83:20) (84:18) (84:19) (85:5) (87:18)
(87:19) (88:12) (88:18)
**wrong** (48:24) (49:18) (52:9) (63:8)
(87:14) (94:6) (94:19)

**Y**

**year** (15:13) (32:2) (58:7) (58:24)
(61:20) (61:24) (100:13)
**years** (14:12) (14:14) (14:16) (18:4)
(24:21) (26:15) (27:3) (27:11)
**yes** (4:17) (4:25) (5:4) (5:9) (5:12)
(5:14) (5:16) (5:22) (6:3) (6:8) (6:13)
(6:16) (6:21) (7:6) (7:25) (8:9) (8:19)
(9:24) (9:7) (9:12) (9:22) (10:1)
(10:11) (11:19) (12:13) (13:22)
(14:13) (14:22) (15:25) (16:4) (16:12)
(16:23) (17:3) (17:20) (17:22) (17:24)
(18:5) (18:16) (18:25) (19:4) (20:1)
(21:6) (22:20) (22:22) (23:2) (23:11)
(23:16) (23:25) (24:8) (24:22) (25:9)
(25:19) (26:16) (26:23) (26:25) (27:9)
(27:23) (29:21) (33:15) (35:2) (35:9)
(35:21) (36:25) (40:6) (42:24) (42:25)
(43:19) (44:15) (44:20) (44:23) (45:4)
(45:10) (45:12) (45:18) (45:24) (46:5)
(46:11) (46:16) (46:25) (47:6) (47:14)
(48:1) (48:3) (48:10) (48:12) (48:13)
(48:14) (49:7) (49:9) (50:13) (52:16)
(53:11) (58:10) (62:5) (63:3) (67:11)
(67:12) (68:20) (69:3) (69:24) (71:15)
(71:17) (72:10) (74:6) (74:12) (76:3)
(77:2) (78:2) (78:4) (82:3) (82:17)
(84:8) (85:19) (86:16) (86:17) (87:21)
(88:21) (89:13) (89:25) (90:6) (90:18)
(91:8) (91:10) (92:24) (93:5) (93:10)
(93:24) (94:12) (95:4) (95:5) (95:8)
(95:13) (95:17) (96:3) (96:16) (98:1)
(100:11) (100:20) (100:24) (102:2)
**you'll** (6:10) (16:5) (23:3) (25:4)
(25:10) (34:19) (47:7) (71:20) (77:15)
(81:5) (81:21)

…terson Reporting, Inc.
…t Office Box 81
…us, Georgia 31902

zero                                                zero

| **Z** |
| --- |
| **zero** (55:21) |

...terson Reporting, Inc.
...t Office Box 81
...us, Georgia  31902