**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

DAVID DAVIS,
    Plaintiff,
vs.    CASE NO. 3:06-CV-0054-VPM
CITY OF PHENIX CITY, ALABAMA,
et al.,
    Defendants.

\* \* \* \* \* \* \* \* \* \*

DEPOSITION OF ROLAND LEROY WATERS, taken pursuant to stipulation and agreement before Shannon M. Williams, Certified Court Reporter and Commissioner for the State of Alabama at Large, in the offices of City Hall, 601 12th Street, Phenix City, Alabama, on Wednesday, April 4, 2007, commencing at approximately 1:47 p.m. EST.

\* \* \* \* \* \* \* \* \* \*

**Page 2**

APPEARANCES

FOR THE PLAINTIFF:
THOMAS A. WOODLEY
Woodley & McGillivary
1125 15th Street N.W.
Suite 400
Washington, D.C. 20005

FOR THE DEFENDANTS:
JAMES P. GRAHAM, JR.
712 13th Street
P.O. Box 3380
Phenix City, Alabama 36868-3380

JAMES R. MCKOON, JR.
McKoon & Thomas
925 Broad Street
P.O. Box 3220
Phenix City, Alabama 36868-3220

ALSO PRESENT:
David Davis
H.H. Roberts
Wallace Hunter



CONDENSED COPY

**Page 3**

STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of ROLAND LEROY WATERS is taken pursuant to the Federal Rules of Civil Procedure and that said deposition may be taken before Shannon M. Williams, Certified Court Reporter and Commissioner for the State of Alabama at Large, without the formality of a commission; that objections to questions other than objections as to the form of the questions need not be made at this time but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose as provided for by the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between counsel representing the parties in this case that said deposition may be introduced at the trial of this case or used in any manner by either party hereto provided for by the Federal Rules of Civil Procedure.

\* \* \* \* \* \* \* \* \* \*

**Page 4**

ROLAND LEROY WATERS

The witness, having first been duly sworn or affirmed to speak the truth, the whole truth and nothing but the truth, testified as follows:

    THE REPORTER: Usual stipulations?
    MR. GRAHAM: We do want to read and sign.

EXAMINATION
BY MR. WOODLEY:
    Q. Mr. Waters, could you state your full name for the Record?
    A. Roland Leroy Waters.
    Q. Mr. Waters, my name is Tom Woodley. I'm one of the attorneys representing the plaintiff, David Davis, in this federal court action brought against the city and yourself and others. If at any time you don't hear or understand one of my questions in your deposition, stop me right away. I'll be more than happy to repeat or rephrase the question. Do you understand that?
    A. Yes, sir.
    Q. Have you ever had your deposition taken before in another case?
    A. One time.
    Q. What was the nature of that suit, if you remember?

Page 5

1  A. A lawsuit involving the Columbus EMS
2 against the City of Columbus concerning an FLSA
3 issue.
4  Q. Okay. Have you had an opportunity to spend
5 at least some time with the city attorneys
6 concerning the nature of this lawsuit?
7  A. We met Monday for a few minutes, but that
8 was it.
9  Q. Okay. And did they explain to you the
10 nature of the procedures we'll be following in the
11 deposition so you're comfortable about what we're
12 going to do this afternoon?
13  A. Yes, sir.
14  Q. And like you were asked before we went on
15 the record, you'll have to give me verbal responses
16 so there can be an adequate record made of what we
17 discuss. Do you understand that?
18  A. Yes.
19  Q. And then, lastly, this reporter will have
20 an opportunity to put your testimony and what is
21 said today in a transcript form and you'll have a
22 chance to review and sign that. Do you understand
23 that?
24  A. Yes, sir.
25  Q. And, of course, most importantly, you've

Page 6

1 been sworn under oath now so you're obligated under
2 the potential penalty of perjury to tell the truth.
3 Do you understand that?
4  A. Yes, sir.
5  Q. Are you currently employed?
6  A. No, sir.
7  Q. Are you retired?
8  A. Yes, sir.
9  Q. And from what job did you retire?
10  A. Columbus Fire Emergency Medical Services.
11  Q. And how long did you work for the city's
12 fire department?
13  A. Thirty-two years and eight months, I
14 believe -- or ten months.
15  Q. Do you remember the year when you started
16 here?
17  A. I started in my other job -- here in Phenix
18 City or my other job?
19  Q. Yes, here.
20  A. December 2005. December 19, 2005, to be
21 exact.
22  Q. Okay. So -- I'm sorry -- maybe I didn't
23 understand your earlier response. You started
24 working here in the city fire department in 2005?
25  A. Yes, sir.

Page 7

1  Q. Okay. And you were a chief, in a chief
2 position?
3  A. Deputy Chief here.
4  Q. And what was the previous fire department?
5  A. Columbus, Georgia Fire and Emergency
6 Medical Services.
7  Q. Right across the river?
8  A. Yes, sir.
9  Q. And when you were in the Columbus Fire
10 Department, did you work yourself up the rank
11 structure?
12  A. Yes, sir.
13  Q. What was the highest position you held when
14 you left the Columbus Fire Department?
15  A. Chief of the department.
16  Q. And when did you retire from the Phenix
17 City Fire Department?
18  A. February 2nd of this year.
19  Q. Okay. And you're not doing anything now in
20 terms of employment?
21  A. No, sir.
22  Q. When you were Deputy Chief here in the
23 Phenix City Fire Department, what were your basic
24 duties and responsibilities?
25  A. Managing the Operations Division of the

Page 8

1 department.
2  Q. Mr. Waters, we have in front of you a
3 binder containing various papers and exhibits, and
4 we've got them tabbed with numbers on the right-hand
5 side to expedite the deposition. The attorneys
6 representing you and the city have a full set of
7 those exhibits as well. When I invite you to review
8 those documents, if you want to take as long as you
9 would like to review those to yourself before I ask
10 questions, feel free to do so.
11  Let me invite, first of all, your attention to
12 Exhibit 7, which appears to be a city job
13 description of the job that you held, which was
14 Deputy Fire Chief of Operations. Are you familiar
15 with this job description at all?
16  A. Yes, sir.
17  Q. And as far as you know, it is basically
18 correct as to what your duties and responsibilities
19 were?
20  A. Yes, sir.
21  Q. And, in part, your duties as Deputy Fire
22 Chief would be including supervising the fire
23 suppression personnel that were under your command?
24  A. Yes, sir.
25  Q. Did you periodically assess the job

```
                                                                 9
 1   performance and evaluate the job performance of the
 2   firefighters under your level?
 3       A. Officially, no. Unofficially, yes. The
 4   only people I evaluated would be my direct reports.
 5       Q. What do you mean by that, your direct
 6   reports?
 7       A. The assistant chiefs -- or the battalion
 8   chiefs as they're now called.
 9       Q. When David Davis was employed as a sergeant
10   in the Phenix City Fire Department, was he under
11   your supervision and management?
12       A. Indirect, yes, sir.
13       Q. And indirect meaning that there were some
14   positions between --
15       A. In the chain of command, yes, sir.
16       Q. What is the organizational structure and
17   chain of command within the city's fire department,
18   starting with Fire Chief?
19       A. Fire Chief, Deputy Chief, battalion chiefs,
20   now captain, sergeant, firefighter.
21       Q. Is there a position called Assistant Fire
22   Chief?
23       A. No longer, unless they changed it after I
24   left. It was changed to Battalion Chief.
25       Q. And when you were a Deputy Chief for the
```

```
                                                                10
 1   Phenix City Fire Department, were you obligated to
 2   become familiar with the general guidelines and
 3   standard operating procedures and rules and
 4   regulations of the fire department?
 5       A. Yes, sir.
 6       Q. Would that include also the city's Merit
 7   System rules and regulations?
 8       A. Yes, sir.
 9       Q. Based upon your extensive experience in the
10   fire service, including your capacity as Deputy
11   Chief here in the city fire department, would you
12   consider the recruitment and retention of
13   firefighters to be an important issue in any fire
14   department and also important to public safety?
15       A. Yes, sir.
16       Q. Would you consider adequate staffing to be
17   an important issue to the operation of a fire
18   department and to public safety?
19       A. Yes, sir.
20       Q. Would you consider employee morale within a
21   fire department to be an important issue concerning
22   effective operations of the fire department and also
23   public safety?
24       A. Yes, sir.
25       Q. Would you consider adequate protective gear
```

```
                                                                11
 1   and fire department equipment to be an important
 2   issue involving effective operations of the fire
 3   department and involving public safety?
 4       A. Yes, sir.
 5       Q. Would you consider adequate financial
 6   resources that might be available to a fire
 7   department to be an important issue concerning fire
 8   department operations and also public safety?
 9       A. Yes, sir.
10       Q. Would you consider adequate response times
11   and adequte dispatching procedures in a fire
12   department to be an important issue of effective
13   fire department operations and also public safety?
14       A. Yes, sir.
15       Q. Would you consider training, adequate
16   training of firefighters in the fire department, to
17   be an important issue that affects effective
18   operations of the fire department and also public
19   safety?
20       A. Yes, sir.
21       Q. Returning to your position as Deputy Fire
22   Chief, did you have the authority in that position
23   to hire and fire employees in the fire department?
24       A. No, sir.
25       Q. What's your understanding as to who had
```

```
                                                                12
 1   that authority?
 2       A. My understanding, as long as I have been in
 3   the fire service, only the department director has
 4   to authority to hire, fire, promote, or demote.
 5       Q. So that would be the fire chief here in the
 6   city of Phenix City?
 7       A. Yes, sir.
 8       Q. Did you have any authority over any
 9   disciplinary action when you were Deputy Chief?
10       A. Yes, sir.
11       Q. What was the nature or range of your
12   authority to discipline?
13       A. Well, of course, I could administer
14   discipline according to the Merit System. But if it
15   was something I did not myself implement or
16   initiate, then it would come up through the chain of
17   command to me, and from me to the chief for me to
18   review.
19       Q. Okay. Do you know what role, if any, the
20   city manager would play if a firefighter is going to
21   be discharged from his position?
22       A. My understanding, it has to have the city
23   manager's approval.
24       Q. Is it your understanding that the city
25   manager is the ultimate decisionmaking authority --
```

13

1  A. Yes, sir.
2  Q. -- with regard to firing a firefighter?
3  A. Yes, sir.
4  Q. At some point in time, sir, did you become
5  aware that the firefighters employed by the Phenix
6  City Fire Department had formed a labor
7  organization?
8  A. Yes, sir.
9  Q. And how did that come to your attention?
10 A. Shortly after I started work, David Davis
11 was assigned to Station One and said he wanted to
12 meet with me. He went through the chain of command
13 and wanted to let me know he was president of the
14 firefighters association, he hoped we could get
15 along and have a harmonious working relationship.
16 The meeting was short. And I assured him that I
17 would work with anybody I could; as long as
18 everybody understood their job, we would have no
19 problems.
20 Q. Do you remember approximately what period
21 of time this was when Mr. Davis informed you that he
22 was the president of the firefighters local labor
23 association?
24 A. It was shortly after I started to work. It
25 was probably around January, I would imagine.

14

1  Q. What year?
2  A. 2006.
3  Q. Okay. Did you know that Mr. Davis was also
4  previously a vice-president of the firefighters
5  local union?
6  A. Yes, sir.
7  Q. Let me invite your attention to an exhibit
8  in our binder. It's Exhibit 18, and this appears to
9  be a memorandum from yourself, Mr. Waters, when you
10 were Deputy Chief of the city fire department,
11 addressed to Chief Wallace Hunter dated February 6,
12 2006, and regarding, quote, letter to Mr. H.H.
13 Roberts, end quote. You see where it says that?
14 A. Yes, sir.
15 Q. And did you prepare this memo and give it
16 to Chief Hunter?
17 A. Yes, I did.
18 Q. And is this your own language that you
19 typed up?
20 A. Yes, it was.
21 Q. Nobody prepared this for you?
22 A. Absolutely not.
23 Q. And prior to giving this memo to Chief
24 Hunter, were you instructed to meet with Mr. Davis
25 concerning a letter that apparently had been sent by

15

1  a Mr. Schaitberger to the city manager?
2  A. No, sir. I was not instructed. In fact, I
3  asked Chief Hunter if it would be all right if I did
4  meet with him, because the letter was not addressed
5  to me. But I asked the chief if I could have his
6  approval to meet with David to see if we could find
7  out what was going on. But I was not instructed to
8  meet with David.
9  Q. So this was your idea, to meet with David
10 about the letter?
11 A. Yes, sir, it was.
12 Q. And what caused you to reach that
13 conclusion and make that request to Chief Hunter?
14 A. Because I thought I had a relationship with
15 David, as I did with everybody else in the
16 department, where I could sit down and talk and find
17 out what was going on; if there was something I
18 needed to be aware of or if there's other
19 circumstances.
20 Q. When you had this conversation and made the
21 request to Chief Hunter, had you seen the letter
22 that was sent by Mr. Schaitberger of the IAFF to
23 City Manager Roberts?
24 A. I believe I had. What exhibit is that?
25 Q. That would be Exhibit 17. Why don't you go

16

1  ahead and take a look at that. And, for the record,
2  this is the letter from the general president of the
3  International Association of Firefighters.
4  A. Right. Yes, sir, I did.
5  Q. And it's dated January 31, 2006, addressed
6  to the city manager. So your testimony is that you,
7  in fact, saw a copy of this?
8  A. Yes, sir, I did.
9  Q. And when you read a copy of this letter, is
10 that what prompted you to go to Chief Hunter and
11 request a chance to discuss this subject with
12 Mr. Davis?
13 A. No, sir. It was a letter, I believe, that
14 Mr. Malone, if I'm not mistaken, had sent through
15 the city manager -- or Mr. Malone had called or
16 something. And I, at that time, told the chief, I
17 said, I don't believe that, you know, David is aware
18 of any of this going on, so I would like to have
19 your permission to talk to him. It was really about
20 a conversation, I believe, with a Mr. Malone that
21 prompted me to ask the Chief if I could talk to
22 David.
23 Q. We may be talking about two different
24 things here. Let me go back to Exhibit 18, again
25 your memo to Chief Hunter of February 6, 2006. And

**Page 17**

1  you see in the second sentence it says, quote, the
2  purpose of the meeting was to discuss the letter
3  Mr. Roberts received from Mr. Schaitberger.
4      A. Yes.
5      Q. So just focusing on that, and so your
6  testimony is clear, is this -- the meeting that you
7  had with Mr. Davis for the purpose of discussing the
8  Schaitberger letter?
9      A. Yes, sir.
10     Q. Okay. And was this your own idea, that you
11 had suggested this to Chief Hunter that you meet
12 with David?
13     A. Yes, sir.
14     Q. You'll see at the end of your memo to Chief
15 Hunter at the bottom it says, quote, as I have
16 communicated to you on several -- I believe that
17 should be occasions. It says obsessions, but did
18 you mean occasions?
19     A. Typographical error.
20     Q. Then it continues, David Davis is doing an
21 outstanding job for me and has a very positive and
22 professional attitude, end quote. Do you see where
23 it says that?
24     A. Yes, sir.
25     Q. Did you honestly and truthfully believe

**Page 18**

1  that when you communicated that to Chief Hunter?
2      A. Yes, sir.
3      Q. And when you say he was doing an
4  outstanding job, I assume that was in his role as
5  firefighter for the fire department?
6      A. Sergeant, yes, sir.
7      Q. Sergeant?
8      A. Yes, sir.
9      Q. And could you elaborate or detail that, as
10 to why you were indicating that David Davis was
11 doing an outstanding job as a sergeant?
12     A. Could you repeat the question again?
13     Q. Yes. Could you explain in detail that
14 which caused you to indicate here in this memo to
15 Chief Hunter that David Davis was doing an
16 outstanding job?
17     A. I was just reaffirming the fact that I had
18 had a conversation with Chief Hunter about numerous
19 people in the department that were doing an
20 outstanding job, and David -- I never had a problem
21 with his job performance, and I put that in the
22 memo.
23     Q. And, evidently, you had communicated that
24 assessment of his job performance on several
25 occasions to the Chief?

**Page 19**

1      A. Yes, sir. I did.
2      Q. Can you recall any specific examples where
3  he did an absolute outstanding job on a fire run or
4  rescue service call or --
5      A. No, sir, not on a fire. Primarily, the
6  things I was making mention to had to do with
7  assignments that I would give out to people in the
8  department. And it was probably new to a lot of the
9  people, the way I was doing things. And they were
10 required to take topics and research them and then
11 make Power Point presentations. And everything I
12 assigned was done, and it was done on time, and a
13 lot of work went into it. And, you know, as far as
14 job performance and whatever else, I mean, I -- I
15 was getting along with everybody, and I thought the
16 Chief needed to hear that because I was a newcomer,
17 so to speak, to the department.
18     Q. Did you have any specific concerns or
19 anything that troubled you concerning David Davis's
20 job performance?
21     A. Not until the end.
22     Q. And what was the end? What do you mean?
23     A. Well, when the swap time was -- when the
24 Chief had sat down and thought about implementing
25 the swap time again -- or trade time or whatever you

**Page 20**

1  want to call it -- I had had the opportunity to meet
2  with all the people in the department, because he
3  would come out and had met with everybody in the
4  shift meetings.
5      And I asked everybody, I said, look, this is a
6  major deal for the department. And I said, I'll
7  tell you as I have told you as soon as I walked in
8  the door; when the Chief of the Department, when the
9  city manager, mayor, council walks into the fire
10 station, you stand up, you greet them, you know, you
11 act interested, you stay focused, and be as
12 professional and polite as you possibly can. Of
13 course, this was a major deal for the Department to
14 get the time reinstated.
15     And at that particular meeting, David's
16 attitude was very negative. He wouldn't even look
17 at the chief. He stared off. And I met with his
18 supervisor after the meeting. They said they
19 noticed it, too. And said his comment was that
20 something along the lines that the Chief was doing
21 his job, so he didn't have to show anything other
22 than what he was.
23     Q. When, approximately, did this meeting
24 occur?
25     A. Sir, I'll be honest with you. I don't

21

1  know. Whenever the swap time was reinstated. I'm
2  sure the Chief would probably know. March, first
3  part of April, something around there.
4     Q. 2006?
5     A. Yes, sir.
6        CHIEF HUNTER: I think it was --
7        MR. MCKOON: Let him answer to his
8     recollection.
9     Q. So this concern about this meeting and swap
10 time would have been after your memo of February 6,
11 2006?
12    A. Yes, sir.
13    Q. Now, you indicate at the bottom of this
14 memo that David Davis had a very positive and
15 professional attitude. Can you think of any
16 specific examples that would support that assessment
17 of Davis?
18    A. Specific examples, no, sir, other than the
19 fact that the contact that I had with David was --
20 he was always professional. He was very
21 respectful. I never had any problems. Did what I
22 asked. And that's exactly what was communicated in
23 the memo.
24    Q. Take a look at Exhibit 14. This is a
25 newspaper article that came out, I believe, in

22

1  September 2005 from the Columbus Ledger-Enquirer.
2  And it deals with various issues and personnel that
3  were employed at the time in the Phenix City Fire
4  Department. Have you read this newspaper article
5  before today?
6     A. Yes, sir.
7     Q. And did you read it on or about the time
8  that it came out in this newspaper?
9     A. Yes, sir.
10    Q. After you read this article, were there any
11 meetings or discussions within the Fire Department
12 about the substance of the article?
13    A. I was not employed with the Fire Department
14 then.
15    Q. Okay. So you were still at the Columbus
16 Fire Department?
17    A. Yes, sir.
18    Q. Okay. Did you ever get a call from Chief
19 Hunter?
20    A. About this article right here, no, sir.
21    Q. Did you call him up and say, can I help you
22 out?
23    A. No.
24    Q. Okay. Have you ever had occasion to
25 address the city council about issues affecting the

23

1  Phenix City Fire Department?
2     A. No, sir.
3     Q. Have you ever had discussions with any
4  council members about issues affecting the Phenix
5  City Fire Department?
6     A. No, sir.
7     Q. Have you ever had any discussions or
8  conversations with the mayor of Phenix City
9  concerning its fire department?
10    A. No, sir.
11    Q. At some point in time, Mr. Waters, did it
12 come to your attention, in perhaps the first few
13 months of the year, 2006, when you were the Deputy
14 Chief, that there was consideration being given to
15 extending the probationary period for new hires in
16 the fire department from one year to 18 months?
17    A. Yes, sir.
18    Q. Did you play a role in those discussions or
19 the determination that that might be a good policy
20 change?
21    A. Did I play a role -- the Chief and I talked
22 about it. And we had meetings about it in the fire
23 department and talked about it, just letting
24 everybody know the purpose of it, which is a good
25 thing. In fact, it's like an insurance policy for a

24

1  firefighter. Because the amount of training that
2  they have to go through and the fact that, you know,
3  by the time they finish their training, get through
4  and get assigned to the station, because it's such a
5  different culture in the work environment, that if
6  they're not quite adapting, you know, and their
7  probationary period is 12 months, they could lose
8  their job. By extending it to 18 months, it's a
9  benefit for the city and for the employee. That was
10 clearly communicated, as was the fact that it only
11 applied to new hires.
12    Q. That was your understanding, that the
13 proposed policy change only applied to new hires in
14 the fire department?
15    A. Yes, sir.
16    Q. It did not affect in any way veteran or
17 experienced firefighters in the department?
18    A. No, sir.
19    Q. And did not affect in any way David Davis,
20 who had worked for the fire department for a number
21 of years, correct?
22    A. That is correct, yes, sir.
23    Q. Did it come to your attention that some of
24 the firefighters or the firefighters labor
25 association opposed the proposed policy change

**Page 25**

1  extending it to the 18-month period?
2     A.  No, sir.  In fact, there were only two
3  people in the -- which I don't mean that that shows
4  a hundred percent consensus.  But only two people
5  even questioned the Chief about the proposal going
6  from 12 to 18 months.  And when he explained that it
7  has nothing to do with you, it's only for new hires
8  after the ordinance takes effect, there was no more
9  discussion.  No one talked to me about it that I can
10 recall.
11    Q.  Who were the two individuals that raised
12 those concerns; do you remember?
13    A.  Sir, I honestly cannot recall.
14    Q.  Do you know whether or not in a
15 probationary period that a firefighter -- for
16 example, as a new hire -- can be subject to
17 termination for any reason or no reason at all while
18 he's a probationary period employee?
19    A.  Yes, sir.
20    Q.  That's a true statement?
21    A.  Yes, sir.  I believe that is.
22    Q.  Do you have a view on whether or not
23 changing the probationary period to 18 months had
24 any impact on trying to recruit qualified personnel
25 into the fire department?

**Page 26**

1     A.  No, sir, it did not, because there was
2  applications coming in on a regular basis to the
3  Department.
4     Q.  All right.  Moving into a different area.
5  Did it come to your attention at one point in time
6  that apparently David Davis placed a telephone call
7  to Mayor Hardin in April of 2006?
8     A.  Yes, sir.
9     Q.  How did that come to your attention?
10    A.  The chief had mentioned it to me, that he
11 had overheard the conversation in this building.
12    Q.  When you say the Chief, you mean Chief
13 Hunter?
14    A.  Chief Hunter.
15    Q.  Chief Hunter?
16    A.  Yes, sir.
17    Q.  Did it come to your attention any
18 information or facts as to what the nature of that
19 telephone call was between Mr. Davis and the mayor?
20    A.  If I recall, it had to do with the
21 probationary -- the proposed probationary ordinance,
22 if I recall correctly.
23    Q.  Were you asked by anyone to investigate the
24 matter of Mr. Davis having a telephone conversation
25 with Mayor Hardin in April of 2006?

**Page 27**

1     A.  Yes, sir.
2     Q.  And who asked you to do something?
3     A.  Chief Hunter.
4     Q.  And what did he ask you to do?
5     A.  He asked me to meet with David to ask him
6  what happened, or, in fact, if it did happen.
7     Q.  And did you comply with that directive?
8     A.  Yes, sir.
9     Q.  And did you, in fact, meet with David
10 Davis?
11    A.  Yes, sir, along with his immediate
12 supervisor, Captain Bennett, and the Assistant Chief
13 at that time, Bobby Brooks.
14    Q.  Okay.  Would this have been shortly after
15 the telephone conversation that was held between
16 Davis and the mayor?
17    A.  I would assume so, yes, sir.
18    Q.  Did you ask Mr. Davis at that time to give
19 a written statement?
20    A.  Yes, sir, I did.  I asked him what happened
21 and he told me.  I said, okay, David, what I want
22 you to do is to go next door to the office and get
23 on the computer and type a letter to Chief Hunter
24 explaining what happened.  And I want to hand carry
25 it to him.  And that was the extent of the

**Page 28**

1  conversation.
2     Q.  Take a look at Exhibit 22, which appears to
3  be that statement that you just mentioned.
4     A.  Yes, sir.
5     Q.  You can read it to yourself.  It's very
6  short.
7     A.  Yes, sir.
8     Q.  Is that, in fact, the statement that you
9  asked Mr. Davis to produce and give back to you?
10    A.  Yes, sir.
11    Q.  Now, as far as you know, based upon your
12 investigation and conversations on the subject
13 matter, is that a truthful and accurate statement
14 that Mr. Davis put together and handed to you?
15    A.  As far as I know, it is.  I mean, I have no
16 idea whether he talked to him that night or not.
17 All I know is that he said he did call him and he
18 was acting in his capacity as president of the
19 union.
20    Q.  And when you received this statement from
21 Mr. Davis, did you, in fact, hand carry it and give
22 it to Chief Hunter?
23    A.  Yes, sir.  I believe I was the one that
24 hand carried it, if I'm not mistaken.
25    Q.  At that time, did you have a conversation

**Page 29**

1  with Chief Hunter related to this subject?
2      A. No, sir. I don't recall us having a
3  conversation about it. I may be incorrect, but I
4  don't recall a conversation with him concerning this
5  right here.
6      Q. So he didn't say anything to you even like
7  thanks for the statement or do you have a view on
8  this investigation or --
9      A. Well, I mean, first of all, there was no
10 investigation by me. All I did was ask David a
11 question. That's all I did.
12     Q. And what was that question?
13     A. Did he, in fact, call the mayor and did he
14 go through the chain of command? That's it.
15     Q. And did he give you an answer?
16     A. He said he did call the mayor and he did
17 not go through the chain of command.
18     Q. Okay. Did he say he called the mayor when
19 he was off duty?
20     A. Sir, I don't recall if that was part of the
21 conversation or not.
22     Q. All right. Were you asked by Chief Hunter
23 or Personnel Director Barbara Goodwin or even City
24 Manager Roberts for any recommendation or input as
25 to whether or not Mr. Davis should be disciplined

**Page 30**

1  for placing a telephone call to the mayor?
2      A. No, sir.
3      Q. Did you, in fact, make any recommendations
4  or have any input concerning possible discipline of
5  Davis over this subject?
6      A. Well, I had the disciplinary report
7  completed. That's why my name is on there as being
8  the supervisor. And the Merit System is clear that
9  on your second Group II offense you're terminated.
10 And so, I mean -- you know, there was, as I recall,
11 nothing in the disciplinary report form for that
12 other than the fact that it quoted the Merit System
13 what happens on your second Group II or your first
14 Group III offense.
15     Q. What, specifically, was the second Group II
16 offense that David Davis engaged in?
17     A. It involved the chain of command.
18     Q. The telephone call to the mayor?
19     A. Yes, sir.
20     Q. Did you ever say to Chief Hunter that you
21 didn't think Mr. Davis should be terminated?
22     A. No sir. Not that I recall.
23     Q. And are you familiar with the Group III
24 offenses?
25     A. Yes, sir.

**Page 31**

1      Q. Why don't we take a look at Exhibit 24,
2  which is a document that I believe bears your
3  signature on the second page.
4      A. Yes, sir.
5      Q. And this is described as a written warning
6  form dated April 20, 2006. And, again, at the
7  second page, is that your signature?
8      A. Yes, it is.
9      Q. As the supervisor of Mr. Davis?
10     A. Yes, sir.
11     Q. And is that your handwriting on the date of
12 4/21/06?
13     A. Yes, sir.
14     Q. The bottom of the first page, it refers to
15 the second Group II offense that we just discussed.
16 And then it goes on to say, quote, discharged as per
17 Merit System's rules and regulations for first Group
18 III offense, end quote. You see where it says that?
19     A. Yes, sir.
20     Q. So just so the record is clear, the
21 discharge concerning the first Group III offense
22 would have been focused on the telephone call and
23 conversation that Davis had with the mayor; is that
24 correct?
25     A. My interpretation would be the

**Page 32**

1  insubordination where the city manager had written a
2  letter stating that the city does not recognize the
3  union and that any business as such -- something
4  along those lines -- has to go through the city
5  manager. And that was the point of the conversation
6  that we had in the office with David and Captain
7  Bennett and Chief Brooks; to ask did you, in fact,
8  go through the chain of command with supervisors and
9  whatever. And it was not.
10     So my understanding is that the city manager,
11 when he wrote that memo stating that the city does
12 not recognize a union and that any dealings were to
13 go through him, something along those lines,
14 specifically. So that, in effect, was my
15 interpretation of insubordination, because you had a
16 directive stating you could not do it.
17     Q. Okay. Let me state it the opposite way.
18 If Mr. Davis had not placed the telephone call to
19 the mayor in April of 2006, had not had that
20 telephone conversation, he would not have been
21 charged with a second Group II offense; is that
22 correct?
23     A. That's correct. He would not have done
24 anything wrong.
25     Q. Right. Same question: If he had not

```
                                                    33
 1  placed the telephone call and had the telephone
 2  conversation with the mayor in April of 2006, he
 3  would not have been charged with a first Group III
 4  offense; is that correct?
 5      A.  That's my understanding, yes, sir.
 6      Q.  And if he had not placed that telephone
 7  call, he would not have been discharged; is that
 8  correct?
 9      A.  Well, yes, sir.
10      Q.  Did you participate in a meeting about this
11  same period of time on April 19 or April 20, 2006,
12  concerning this subject, which included Mr. Davis?
13      A.  A meeting?
14      Q.  A meeting, yes.
15      A.  With who?
16      Q.  With Mr. Davis perhaps?  Or perhaps with
17  Chief Hunter?  Perhaps with Personnel Director
18  Goodwin?
19      A.  Yes, sir.
20      Q.  You did?
21      A.  Yes, sir.
22      Q.  And you remember that meeting?
23      A.  Yes, sir.
24      Q.  Where did that meeting occur?
25      A.  In the Personal Director's office.
```

```
                                                    34
 1      Q.  And how did that meeting come about?  How
 2  did you learn that you were supposed to go to a
 3  meeting?
 4      A.  Because the Chief had called and told me to
 5  have David report to Personnel on a specific date
 6  and time.
 7      Q.  Okay.  And who do you recall was at the
 8  meeting?
 9      A.  It was just myself, Chief Hunter, the
10  Personnel Director, and David came in.
11      Q.  Do you know if there was a police officer
12  in the area as well?
13      A.  I believe there was, yes, sir.
14      Q.  And do you know the name of that police
15  officer?
16      A.  No, sir.
17      Q.  Was the police officer asked to be there
18  because of the meeting?
19      A.  Sir, I really don't know, to be a hundred
20  percent correct, if he or she was, because I
21  couldn't tell if you it was a male or female police
22  officer, to be honest with you.
23      Q.  Okay.  And what occurred at the meeting?
24      A.  David was brought in and read the charges
25  and asked if he had any questions.  And then the
```

```
                                                    35
 1  Personnel Director asked him if he wanted to resign.
 2      Q.  That was Ms. Goodwin asked him if he wanted
 3  to resign?
 4      A.  Yes, sir.
 5      Q.  And what was his response to that?
 6      A.  No.
 7      Q.  Did he say why he did not want to resign?
 8      A.  I don't recall if he did.
 9      Q.  Did he say he would like to think it over
10  or he would like to speak with a lawyer or he would
11  like to check out what his options are?  Say
12  anything like that?
13      A.  I don't recall hearing any of that, sir.
14  I'm not saying he didn't.  I just don't recall
15  hearing that.
16      Q.  So what happened next at the meeting then
17  when he indicated he did not prefer to resign?
18      A.  Then he was told that his employment would
19  be terminated.
20      Q.  And was he handed a copy of this
21  disciplinary written warning form at the time?
22      A.  I know that he had asked -- if I'm not
23  mistaken, he asked for copies of his personnel file.
24      Q.  But this Exhibit 24, the written warning
25  form which indicates he was being discharged, was he
```

```
                                                    36
 1  handed a copy of that at the meeting?
 2      A.  Sir, I don't know.
 3      Q.  What about Exhibit 25 which is entitled End
 4  of Employment form?
 5      A.  Yes, sir.
 6      Q.  Was that a document that was at the meeting
 7  that you're talking about?
 8      A.  If it was, I did not see it.
 9      Q.  So you don't know whether or not anyone
10  handed Mr. Davis this form during that meeting?
11      A.  No, sir.  I do not know that.
12      Q.  So at that meeting, then, did you consider
13  that, in fact, Mr. Davis's employment with the city
14  and the fire department was terminated?
15      A.  After the meeting?
16      Q.  At the meeting.  I mean, was that the
17  operative time and date that he was fired?
18      A.  I would have to say yes, sir.
19      Q.  Do you know if Mr. Davis was then given any
20  instructions as to what he should do after the
21  meeting?
22      A.  Well, I know what I did.  I don't know if
23  this has anything to do with your question or not,
24  but I actually had gotten up and called the station
25  he was assigned to and had them leave so he could go
```

**Page 37**

1  by and clear out his locker, because I didn't want
2  to make it any more uncomfortable for him than it
3  was going to be. And when I was told that was done,
4  then I even brought David and told him that; I said,
5  go ahead and go by the station and get his stuff so
6  he could turn it in. That's the only conversation I
7  had with David.
8      Q. Okay. So at the end of the meeting, David
9  was instructed to go to Fire Station 3 and clear out
10 his locker?
11     A. Yes, sir, and turn his equipment in.
12     Q. Who gave him that instruction? Was that
13 you or Chief Hunter?
14     A. I did.
15     Q. You did?
16     A. Yes, sir.
17     Q. And do you know, sir, that then Mr. Davis
18 exercised his right to appeal his termination to the
19 Personnel Review Board?
20     A. Yes, sir.
21     Q. Did you go to that hearing?
22     A. Yes, sir.
23     Q. Did you give testimony?
24     A. Yes, sir.
25     Q. And who were you called by to give

**Page 38**

1  testimony? Was it the city attorney or someone
2  else?
3      A. I guess it would have been the city
4  attorney.
5      Q. And what was the substance of your
6  testimony before the Personnel Board?
7      A. I guess basically what happened, how the
8  situation came about, and the conversation I had
9  with David in the office on that day that I asked
10 him about had he called the mayor and if he went
11 through the chain of the command. My testimony in
12 that meeting was pretty short, if I'm not mistaken.
13     Q. Did you favor or support the termination of
14 David Davis?
15     A. Support it.
16     Q. You did support it?
17     A. Yes, sir.
18     Q. Why is that, sir?
19     A. Because there's no options. The way the
20 personnel regulations are written, it wasn't just
21 one thing that any person is going to be fired for.
22 It's going to be his or her personnel file, any
23 discipline that's already in there.
24     Q. Did it come to your attention that after
25 Mr. Davis was terminated by the city of Phenix City,

**Page 39**

1  that he sought employment elsewhere?
2      A. I had heard that, yes, sir.
3      Q. Were you ever contacted by a prospective
4  employer or fire chief in any department --
5      A. No, sir.
6      Q. -- concerning Mr. Davis?
7      A. No, sir.
8      Q. Did you ever receive any contact from any
9  newspaper reporters about Mr. Davis or his
10 terminated employment?
11     A. Well, Chuck Williams had called over to the
12 department one day and had asked about the pending
13 lawsuit. And I told him I could not discuss it; he
14 would have to talk to Chief Hunter. And I mean, we
15 didn't discuss the case or anything else. I told
16 him he would have to talk to Chief Hunter about it.
17     Q. During the time that you were Deputy Chief
18 here in the Phenix City Fire Department, did you
19 ever communicate with any members of the media or
20 any newspaper reporters about issues affecting the
21 department?
22     A. Only interview I had was concerning a grant
23 that the city had gotten and the equipment that they
24 had purchased with the grant money, if I'm not
25 mistaken.

**Page 40**

1      Q. That was during your time as Deputy Chief
2  here?
3      A. Yes, sir. I may be wrong, but that's the
4  only one I can recall.
5      Q. And were you quoted in a newspaper about
6  that subject?
7      A. Well, it wasn't the newspaper, sir. It
8  was a television station.
9      Q. And were you on camera during that
10 interview?
11     A. Yes, sir.
12     Q. Do you know if they ran it on the TV
13 station?
14     A. Yes, sir. I believe they did.
15     Q. Your interview?
16     A. Yes, sir.
17     Q. And did you get prior approval from Chief
18 Hunter or anyone else to do that?
19     A. He's the one that told me to do it.
20     Q. He instructed you to do that?
21     A. Yes, he did.
22     Q. Now, when you were the fire chief across
23 the river here in Columbus, did you have occasion at
24 any time to speak to the newspaper media or the
25 television or radio media?

```
                                                           41
 1      A.  Yes, sir.
 2      Q.  Would that have been about issues affecting
 3  the fire department in Columbus?
 4      A.  Yes, sir, primarily.
 5      Q.  Did you feel like you had a First Amendment
 6  right of free speech to do that?
 7      A.  Yes, sir.
 8      Q.  Did you get anyone's approval over in
 9  Columbus to speak to the media?
10      A.  I didn't have to.
11      Q.  Why do you say you didn't have to?  There
12  was no rule or regulation on the subject?
13      A.  No, sir.  I was a department director.
14      Q.  Director?
15      A.  Yes, sir.  Department directors have the
16  authority to do that.  And unless it has something
17  to do with city business outside of the fire
18  department, then you couldn't speak to that.  You
19  would have to --
20          MR. WOODLEY:  Okay, Mr. Waters.  I don't
21      have any further questions.  Thanks for coming
22      today.
23      (The deposition concluded at 2:27 p.m.)
24                  * * * * * * * * * * *
25
```

```
                                                           42
 1              REPORTER'S CERTIFICATE
 2  STATE OF ALABAMA
 3  MONTGOMERY COUNTY
 4      I, Shannon Williams, Certified Shorthand
 5  Reporter and Commissioner for the State of Alabama
 6  at Large, hereby certify that on April 4, 2007, I
 7  reported the deposition of ROLAND LEROY WATERS, who
 8  was first duly sworn or affirmed to speak the truth
 9  in the matter of the foregoing cause, and that pages
10  1 through 42 contain a true and accurate
11  transcription of the examination of said witness by
12  counsel for the parties set out herein.
13      I further certify that I am neither of kin nor
14  of counsel to any of the parties to said cause, nor
15  in any manner interested in the results thereof.
16      This 8th day of April, 2007.
17
18
19
20      SHANNON M. WILLIAMS, CSR
        Commissioner for the
21      State of Alabama at Large
22      MY COMMISSION EXPIRES: 1/14/2010
23
24
25
```

*Causey Peterson Reporting, Inc.*  706-317-3111

continues

**\***
\*  (1:13)(1:23)(3:22)(41:24)

**A**
absolute  (19:3)
absolutely  (14:22)
according  (12:14)
accurate  (28:13)(42:10)
across  (7:7)(40:22)
act  (20:11)
acting  (28:18)
action  (4:14)(12:9)
actually  (36:24)
adapting  (24:6)
address  (22:25)
addressed  (14:11)(15:4)(16:5)
adequate  (5:16)(10:16)(10:25)
(11:5)(11:10)(11:15)
adequte  (11:11)
administer  (12:13)
affect  (24:16)(24:19)
affecting  (22:25)(23:4)(39:20)
(41:2)
affects  (11:17)
affirmed  (4:3)(42:8)
after  (9:23)(13:10)(13:24)(20:18)
(21:10)(22:10)(25:8)(27:14)(36:15)
(36:20)(38:24)
afternoon  (5:12)
again  (16:24)(18:12)(19:25)(31:6)
against  (4:15)(5:2)
agreed  (3:2)(3:16)
agreement  (1:16)
ahead  (16:1)(37:5)
alabama  (1:2)(1:8)(1:18)(1:20)
(2:8)(2:12)(3:8)(42:2)(42:5)(42:20)
all  (8:11)(8:15)(15:3)(20:2)
(25:17)(26:4)(28:17)(29:9)(29:10)
(29:11)(29:22)
along  (13:15)(19:15)(20:20)
(27:11)(32:4)(32:13)
already  (38:23)
also  (2:14)(10:6)(10:14)(10:22)
(11:8)(11:13)(11:18)(14:3)
always  (21:20)
amendment  (41:5)
amount  (24:1)
another  (4:22)
answer  (21:7)(29:15)
anybody  (13:17)
anyone  (26:23)(36:9)(40:18)
anyone's  (41:8)
anything  (7:19)(19:19)(20:21)
(29:6)(32:24)(35:12)(36:23)(39:15)
apparently  (14:25)(26:6)
appeal  (37:18)
appearances  (2:1)
appears  (8:12)(14:8)(28:2)
applications  (26:2)
applied  (24:11)(24:13)
approval  (12:23)(15:6)(40:17)
(41:8)
approximately  (1:21)(13:20)(20:23)
april  (1:20)(21:3)(26:7)(26:25)
(31:6)(32:19)(33:2)(33:11)(42:6)
(42:16)
area  (26:4)(34:12)
around  (13:25)(21:3)
article  (21:25)(22:4)(22:10)
(22:12)(22:20)
ask  (8:9)(16:21)(27:4)(27:5)
(27:18)(29:10)(32:7)
asked  (5:14)(15:3)(15:5)(20:5)
(21:22)(26:23)(27:2)(27:5)(27:20)
(28:9)(29:22)(34:17)(34:25)(35:1)
(35:2)(35:22)(35:23)(38:9)(39:12)

assess  (8:25)
assessment  (18:24)(21:16)
assigned  (13:11)(19:12)(24:4)
(36:25)
assignments  (19:7)
assistant  (9:7)(9:21)(27:12)
association  (13:14)(13:23)(16:3)
(24:25)
assume  (18:4)(27:17)
assured  (13:16)
attention  (8:11)(13:9)(14:7)
(23:12)(24:23)(26:5)(26:9)(26:17)
(38:24)
attitude  (17:22)(20:16)(21:15)
attorney  (38:1)(38:4)
attorneys  (4:13)(5:5)(8:5)
authority  (11:22)(12:1)(12:4)
(12:8)(12:12)(12:25)(41:16)
available  (11:6)
aware  (13:5)(15:18)(16:17)
away  (4:17)

**B**
back  (16:24)(28:9)
barbara  (29:23)
based  (10:9)(28:11)
basic  (7:23)
basically  (8:17)(38:7)
basis  (26:2)
battalion  (9:7)(9:19)(9:24)
bears  (31:2)
become  (10:2)(13:4)
before  (1:16)(3:6)(4:22)(5:14)
(8:9)(22:5)(38:6)
being  (23:14)(30:7)(35:25)
believe  (6:14)(15:24)(16:13)
(16:17)(16:20)(17:16)(17:25)
(21:25)(25:21)(28:23)(31:2)(34:13)
(40:14)
benefit  (24:9)
bennett  (27:12)(32:7)
between  (3:3)(3:17)(9:14)(26:19)
(27:15)
binder  (8:3)(14:8)
board  (37:19)(38:6)
bobby  (27:13)
bottom  (17:15)(21:13)(31:14)
box  (2:8)(2:11)
broad  (2:11)
brooks  (27:13)(32:7)
brought  (4:14)(34:24)(37:4)
building  (26:11)
business  (32:3)(41:17)

**C**
call  (19:4)(20:1)(22:18)(22:21)
(26:6)(26:19)(28:17)(29:13)(29:16)
(30:1)(30:18)(31:22)(32:18)(33:1)
(33:7)
called  (9:8)(9:21)(16:15)(29:18)
(34:4)(36:24)(37:25)(38:10)(39:11)
came  (21:25)(22:8)(34:10)(38:8)
camera  (40:9)
cannot  (25:13)
capacity  (10:10)(28:18)
captain  (9:20)(27:12)(32:6)
carried  (28:24)
carry  (27:24)(28:21)
case  (1:7)(3:18)(3:19)(4:22)
(39:15)
cause  (42:9)(42:14)
caused  (15:12)(18:14)
certificate  (42:1)
certified  (1:17)(3:7)(42:4)
certify  (42:6)(42:13)
chain  (9:15)(9:17)(12:16)(13:12)
(29:14)(29:17)(30:17)(32:8)(38:11)

chance  (5:22)(16:11)
change  (23:20)(24:13)(24:25)
changed  (9:23)(9:24)
changing  (25:23)
charged  (32:21)(33:3)
charges  (34:24)
check  (35:11)
chief  (7:1)(7:3)(7:15)(7:22)
(8:14)(8:22)(9:18)(9:19)(9:22)
(9:24)(9:25)(10:11)(11:22)(12:5)
(12:9)(12:17)(14:10)(14:11)(14:16)
(14:23)(15:3)(15:5)(15:13)(15:21)
(16:10)(16:16)(16:21)(16:25)
(17:11)(17:14)(18:1)(18:15)(18:18)
(18:25)(19:16)(19:24)(20:8)(20:17)
(20:20)(21:2)(21:6)(22:18)(23:14)
(23:21)(25:5)(26:10)(26:12)(26:14)
(26:15)(27:3)(27:12)(27:23)(28:22)
(29:1)(29:22)(30:20)(32:7)(33:17)
(34:4)(34:9)(37:13)(39:4)(39:14)
(39:16)(39:17)(40:1)(40:17)(40:22)
chiefs  (9:7)(9:8)(9:19)
chuck  (39:11)
circumstances  (15:19)
city  (1:8)(1:19)(1:20)(2:8)(2:12)
(4:15)(5:2)(5:5)(6:18)(6:24)(7:17)
(7:23)(8:6)(8:12)(9:10)(10:1)
(10:11)(12:6)(12:20)(12:22)(12:24)
(13:6)(14:10)(15:1)(15:23)(16:6)
(16:15)(20:9)(22:2)(22:25)(23:1)
(23:5)(23:8)(24:9)(29:23)(32:1)
(32:2)(32:4)(32:10)(32:11)(36:13)
(38:1)(38:3)(38:25)(39:18)(39:23)
(41:17)
city's  (6:11)(9:17)(10:6)
civil  (3:5)(3:15)(3:21)
clear  (17:6)(30:8)(31:20)(37:1)
(37:9)
clearly  (24:10)
columbus  (5:1)(5:2)(6:10)(7:5)
(7:9)(7:14)(22:1)(22:15)(40:23)
(41:3)(41:9)
come  (12:16)(13:9)(20:3)(23:12)
(24:23)(26:5)(26:9)(26:17)(34:1)
(38:24)
comfortable  (5:11)
coming  (26:2)(41:21)
command  (8:23)(9:15)(9:17)(12:17)
(13:12)(29:14)(29:17)(30:17)(32:8)
(38:11)
commencing  (1:21)
comment  (20:19)
commission  (3:9)(42:21)
commissioner  (1:18)(3:7)(42:5)
(42:20)
communicate  (39:19)
communicated  (17:16)(18:1)(18:23)
(21:22)(24:10)
completed  (30:7)
comply  (27:7)
computer  (27:23)
concern  (21:9)
concerning  (5:2)(5:6)(10:21)
(11:7)(14:25)(19:19)(23:9)(29:4)
(30:4)(31:21)(33:12)(39:6)(39:22)
concerns  (19:18)(25:12)
concluded  (41:23)
conclusion  (15:13)
consensus  (25:4)
consider  (10:12)(10:16)(10:20)
(10:25)(11:5)(11:10)(11:15)(36:12)
consideration  (23:14)
contact  (21:19)(39:8)
contacted  (39:3)
contain  (42:10)
containing  (8:3)
continues  (17:20)

...terson Reporting, Inc.
...t Office Box 81
...us, Georgia  31902

conversation / formality

conversation  (15:20)(16:20)
(18:18)(26:11)(26:24)(27:15)(28:1)
(28:25)(29:3)(29:4)(29:21)(31:23)
(32:5)(32:20)(33:2)(37:6)(38:8)
conversations  (23:8)(28:12)
copies  (35:23)
copy  (16:7)(16:9)(35:20)(36:1)
correct  (8:18)(24:21)(24:22)
(31:24)(32:22)(32:23)(33:4)(33:8)
(34:20)
correctly  (26:22)
could  (4:9)(12:13)(13:14)(13:17)
(15:5)(15:6)(15:16)(16:21)(18:9)
(18:12)(18:13)(24:7)(32:16)(36:25)
(37:6)(39:13)
couldn't  (34:21)(41:18)
council  (20:9)(22:25)(23:4)
counsel  (3:3)(3:17)(42:12)(42:14)
county  (42:3)
course  (5:25)(12:13)(20:13)
court  (1:1)(1:17)(3:7)(4:14)
csr  (42:19)
culture  (24:5)
currently  (6:5)

**D**

date  (31:11)(34:5)(36:17)
dated  (14:11)(16:5)(31:6)
david  (1:5)(2:15)(4:14)(9:9)
(13:10)(15:6)(15:8)(15:9)(15:15)
(16:17)(16:22)(17:12)(17:20)
(18:10)(18:15)(18:20)(19:19)
(21:14)(21:19)(24:19)(26:6)(27:5)
(27:9)(27:21)(29:10)(30:16)(32:6)
(34:5)(34:10)(34:24)(37:4)(37:7)
(37:8)(38:9)(38:14)
david's  (20:15)
davis  (1:5)(2:15)(4:14)(9:9)
(13:10)(13:21)(14:3)(14:24)(16:12)
(17:7)(17:20)(18:10)(18:15)(21:14)
(21:17)(24:19)(26:6)(26:19)(26:24)
(27:10)(27:16)(27:18)(28:9)(28:14)
(28:21)(29:25)(30:5)(30:16)(30:21)
(31:9)(31:23)(32:18)(33:12)(33:16)
(36:10)(36:19)(37:17)(38:14)
(38:25)(39:6)(39:9)
davis's  (19:19)(36:13)
day  (38:9)(39:12)(42:16)
deal  (20:6)(20:13)
dealings  (32:12)
deals  (22:2)
december  (6:20)
decisionmaking  (12:25)
defendants  (1:10)(2:6)
demote  (12:4)
department  (6:12)(6:24)(7:4)
(7:10)(7:14)(7:15)(7:17)(7:23)
(8:1)(9:10)(9:17)(10:1)(10:4)
(10:11)(10:14)(10:18)(10:21)
(10:22)(11:1)(11:3)(11:7)(11:8)
(11:12)(11:13)(11:16)(11:18)
(11:23)(12:3)(13:6)(14:10)(15:16)
(18:5)(18:19)(19:8)(19:17)(20:2)
(20:6)(20:8)(20:13)(22:4)(22:11)
(22:13)(22:16)(23:1)(23:5)(23:9)
(23:16)(23:23)(24:14)(24:17)
(24:20)(25:25)(26:3)(36:14)(39:4)
(39:12)(39:18)(39:21)(41:3)(41:13)
(41:15)(41:18)
deposition  (1:15)(3:4)(3:6)(3:13)
(3:18)(4:17)(4:21)(5:11)(8:5)
(41:23)(42:7)
deputy  (7:3)(7:22)(8:14)(8:21)
(9:19)(9:25)(10:10)(11:21)(12:9)
(14:10)(23:13)(39:17)(40:1)
described  (31:5)
description  (8:13)(8:15)

detail  (18:9)(18:13)
determination  (23:19)
didn't  (6:22)(20:21)(29:6)(30:21)
(35:14)(37:1)(39:15)(41:10)(41:11)
different  (16:23)(24:5)(26:4)
direct  (9:4)(9:5)
directive  (27:7)(32:16)
director  (12:3)(29:23)(33:17)
(34:10)(35:1)(41:13)(41:14)
directors  (41:15)
director's  (33:25)
discharge  (31:21)
discharged  (12:21)(31:16)(33:7)
(35:25)
disciplinary  (12:9)(30:6)(30:11)
(35:21)
discipline  (12:12)(12:14)(30:4)
(38:23)
disciplined  (29:25)
discuss  (5:17)(16:11)(17:2)
(39:13)(39:15)
discussed  (31:15)
discussing  (17:7)
discussion  (25:9)
discussions  (22:11)(23:3)(23:7)
(23:18)
dispatching  (11:11)
district  (1:1)(1:2)
division  (1:3)(7:25)
document  (31:2)(36:6)
documents  (8:8)
does  (32:2)(32:11)
doing  (7:19)(17:20)(18:3)(18:11)
(18:15)(18:19)(19:9)(20:20)
done  (19:12)(32:23)(37:3)
door  (20:8)(27:22)
down  (15:16)(19:24)
duly  (4:2)(42:8)
during  (36:10)(39:17)(40:1)(40:9)
duties  (7:24)(8:18)(8:21)
duty  (29:19)

**E**

earlier  (6:23)
eastern  (1:3)
effect  (25:8)(32:14)
effective  (10:22)(11:2)(11:12)
(11:17)
eight  (6:13)
either  (3:19)
elaborate  (18:9)
else  (15:15)(19:14)(38:2)(39:15)
(40:18)
elsewhere  (39:1)
emergency  (6:10)(7:5)
employed  (6:5)(9:9)(13:5)(22:3)
(22:13)
employee  (10:20)(24:9)(25:18)
employees  (11:23)
employer  (39:4)
employment  (7:20)(35:18)(36:4)
(36:13)(39:1)(39:10)
ems  (5:1)
end  (14:13)(17:14)(17:22)(19:21)
(19:22)(31:18)(36:3)(37:8)
engaged  (30:16)
entitled  (36:3)
environment  (24:5)
equipment  (11:1)(37:11)(39:23)
error  (17:19)
est  (1:21)
evaluate  (9:1)
evaluated  (9:4)
even  (20:16)(25:5)(29:6)(29:23)
(37:4)
ever  (4:21)(22:18)(22:24)(23:3)
(23:7)(30:20)(39:3)(39:8)(39:19)

everybody  (13:18)(15:15)(19:15)
(20:3)(20:5)(23:24)
everything  (19:11)
evidence  (3:13)
evidently  (18:23)
exact  (6:21)
exactly  (21:22)
examination  (4:7)(42:11)
example  (25:16)
examples  (19:2)(21:16)(21:18)
exercised  (37:18)
exhibit  (8:12)(14:7)(14:8)(15:24)
(15:25)(16:24)(21:24)(28:2)(31:1)
(35:24)(36:3)
exhibits  (8:3)(8:7)
expedite  (8:5)
experience  (10:9)
experienced  (24:17)
expires  (42:21)
explain  (5:9)(18:13)
explained  (25:6)
explaining  (27:24)
extending  (23:15)(24:8)(25:1)
extensive  (10:9)
extent  (27:25)

**F**

fact  (15:2)(16:7)(18:17)(21:19)
(23:25)(24:2)(24:10)(25:2)(27:6)
(27:9)(28:8)(28:21)(29:13)(30:3)
(30:12)(32:7)(36:13)
facts  (26:18)
familiar  (8:14)(10:2)(30:23)
far  (8:17)(19:13)(28:11)(28:15)
favor  (38:13)
february  (7:18)(14:11)(16:25)
(21:10)
federal  (3:5)(3:14)(3:20)(4:14)
feel  (8:10)(41:5)
female  (34:21)
few  (5:7)(23:12)
file  (35:23)(38:22)
financial  (11:5)
find  (15:6)(15:16)
finish  (24:3)
fire  (6:10)(6:12)(6:24)(7:4)(7:5)
(7:9)(7:14)(7:17)(7:23)(8:14)
(8:21)(8:22)(9:10)(9:17)(9:18)
(9:19)(9:21)(10:1)(10:4)(10:10)
(10:11)(10:13)(10:17)(10:21)
(10:22)(11:1)(11:2)(11:6)(11:7)
(11:11)(11:13)(11:16)(11:18)
(11:21)(11:23)(12:3)(12:4)(12:5)
(13:6)(14:10)(18:5)(19:3)(19:5)
(20:9)(22:3)(22:11)(22:13)(22:16)
(23:1)(23:5)(23:9)(23:16)(23:22)
(24:14)(24:20)(25:25)(36:14)(37:9)
(39:4)(39:18)(40:22)(41:3)(41:17)
fired  (36:17)(38:21)
firefighter  (9:20)(12:20)(13:2)
(18:5)(24:1)(25:15)
firefighters  (9:2)(10:13)(11:16)
(13:5)(13:14)(13:22)(14:4)(16:3)
(24:17)(24:24)
firing  (13:2)
first  (4:2)(8:11)(21:2)(23:12)
(29:9)(30:13)(31:14)(31:17)(31:21)
(33:3)(41:5)(42:8)
flsa  (5:2)
focused  (20:11)(31:22)
focusing  (17:5)
following  (5:10)
follows  (4:4)
foregoing  (42:9)
form  (3:10)(5:21)(30:11)(31:6)
(35:21)(35:25)(36:4)(36:10)
formality  (3:9)

formed                                                                                                   45                                      mistaken

| | | |
|---|---|---|
| formed (13:6)<br>free (8:10)(41:6)<br>front (8:2)<br>full (4:9)(8:6)<br>further (3:16)(41:21)(42:13) | (18:18)(21:6)(22:19)(26:13)(26:14)<br>(26:15)(27:3)(27:23)(28:22)(29:1)<br>(29:22)(30:20)(33:17)(34:9)(37:13)<br>(39:14)(39:16)(40:18) | ledger-enquirer (22:1)<br>left (9:24)<br>leroy (1:15)(3:4)(4:1)(4:11)(42:7)<br>let (8:11)(13:13)(14:7)(16:24)<br>(21:7)(32:17) |
| **G** | **I** | letter (14:12)(14:25)(15:4)<br>(15:10)(15:21)(16:2)(16:9)(16:13)<br>(17:2)(17:8)(27:23)(32:2) |
| gave (37:12)<br>gear (10:25)<br>general (10:2)(16:2)<br>georgia (7:5)<br>getting (19:15)<br>give (5:15)(14:15)(19:7)(27:18)<br>(28:9)(28:21)(29:15)(37:23)(37:25)<br>given (23:14)(36:19)<br>giving (14:23)<br>goes (31:16)<br>going (5:12)(12:20)(15:7)(15:17)<br>(16:18)(25:5)(37:3)(38:21)(38:22)<br>good (23:19)(23:24)<br>goodwin (29:23)(33:18)(35:2)<br>got (8:4)<br>gotten (36:24)(39:23)<br>graham (2:7)(4:6)<br>grant (39:22)(39:24)<br>greet (20:10)<br>group (30:9)(30:13)(30:14)(30:15)<br>(30:23)(31:15)(31:17)(31:21)<br>(32:21)(33:3)<br>guess (38:3)(38:7)<br>guidelines (10:2) | iaff (15:22)<br>idea (15:9)(17:10)(28:16)<br>iii (30:14)(30:23)(31:18)(31:21)<br>(33:3)<br>i'll (4:18)(20:6)(20:25)<br>imagine (13:25)<br>immediate (27:11)<br>impact (25:24)<br>implement (12:15)<br>implementing (19:24)<br>important (10:13)(10:14)(10:17)<br>(10:21)(11:1)(11:7)(11:12)(11:17)<br>importantly (5:25)<br>include (10:6)<br>included (33:12)<br>including (8:22)(10:10)<br>incorrect (29:3)<br>indicate (18:14)(21:13)<br>indicated (35:17)<br>indicates (35:25)<br>indicating (18:10)<br>indirect (9:12)(9:13)<br>individuals (25:11)<br>information (26:18)<br>informed (13:21)<br>initiate (12:16)<br>input (29:24)(30:4)<br>instructed (14:24)(15:2)(15:7)<br>(37:9)(40:20)<br>instruction (37:12)<br>instructions (36:20)<br>insubordination (32:1)(32:15)<br>insurance (23:25)<br>interested (20:11)(42:15)<br>international (16:3)<br>interpretation (31:25)(32:15)<br>interview (39:22)(40:10)(40:15)<br>into (19:13)(20:9)(25:25)(26:4)<br>introduced (3:18)<br>investigate (26:23)<br>investigation (28:12)(29:8)(29:10)<br>invite (8:7)(8:11)(14:7)<br>involved (30:17)<br>involving (5:1)(11:2)(11:3)<br>issue (5:3)(10:13)(10:17)(10:21)<br>(11:2)(11:7)(11:12)(11:17)<br>issues (22:2)(22:25)(23:4)(39:20)<br>(41:2) | letting (23:23)<br>level (9:2)<br>like (5:14)(8:9)(16:18)(23:25)<br>(29:6)(35:9)(35:10)(35:11)(35:12)<br>(41:5)<br>lines (20:20)(32:4)(32:13)<br>local (13:22)(14:5)<br>locker (37:1)(37:10)<br>long (6:11)(8:8)(12:2)(13:17)<br>longer (9:23)<br>look (16:1)(20:5)(20:16)(21:24)<br>(28:2)(31:1)<br>lose (24:7)<br>lot (19:8)(19:13) |
| | | **M** |
| | | made (3:11)(5:16)(15:20)<br>major (20:6)(20:13)<br>make (15:13)(19:11)(30:3)(37:2)<br>making (19:6)<br>male (34:21)<br>malone (16:14)(16:15)(16:20)<br>management (9:11)<br>manager (12:20)(12:25)(15:1)<br>(15:23)(16:6)(16:15)(20:9)(29:24)<br>(32:1)(32:5)(32:10)<br>manager's (12:23)<br>managing (7:25)<br>manner (3:19)(42:15)<br>march (21:2)<br>matter (26:24)(28:13)(42:9)<br>maybe (6:22)<br>mayor (20:9)(23:8)(26:7)(26:19)<br>(26:25)(27:16)(29:13)(29:16)<br>(29:18)(30:1)(30:18)(31:23)(32:19)<br>(33:2)(38:10)<br>mcgillivary (2:3)<br>mckoon (2:10)(21:7)<br>mean (9:5)(17:18)(19:14)(19:22)<br>(25:3)(26:12)(28:15)(29:9)(30:10)<br>(36:16)(39:14)<br>meaning (9:13)<br>media (39:19)(40:24)(40:25)(41:9)<br>medical (6:10)(7:6)<br>meet (13:12)(14:24)(15:4)(15:6)<br>(15:8)(15:9)(17:11)(20:1)(27:5)<br>(27:9) |
| **H** | | |
| hall (1:19)<br>hand (27:24)(28:21)(28:24)<br>handed (28:14)(35:20)(36:1)(36:10)<br>handwriting (31:11)<br>happen (27:6)<br>happened (27:6)(27:20)(27:24)<br>(35:16)(38:7)<br>happens (30:13)<br>happy (4:18)<br>hardin (26:7)(26:25)<br>harmonious (13:15)<br>has (12:3)(12:22)(17:21)(25:7)<br>(32:4)(36:23)(41:16)<br>having (4:2)(26:24)(29:2)<br>hear (4:16)(19:16)<br>heard (39:2)<br>hearing (35:13)(35:15)(37:21)<br>held (7:13)(8:13)(27:15)<br>help (22:21)<br>her (38:22)<br>hereby (3:2)(42:6)<br>herein (42:12)<br>hereto (3:20)<br>he's (25:18)(40:19)<br>highest (7:13)<br>him (13:16)(15:4)(16:19)(21:7)<br>(22:21)(27:5)(27:20)(27:25)(28:16)<br>(28:17)(29:4)(32:13)(35:1)(35:2)<br>(37:2)(37:4)(37:12)(38:10)(39:13)<br>(39:16)<br>hire (11:23)(12:4)(25:16)<br>hires (23:15)(24:11)(24:13)(25:7)<br>his (12:21)(15:5)(18:4)(18:21)<br>(18:24)(20:17)(20:19)(20:21)(21:7)<br>(27:11)(28:18)(35:15)(35:11)(35:18)<br>(35:23)(37:1)(37:5)(37:10)(37:11)<br>(37:18)(38:22)(39:9)<br>honest (20:25)(34:22)<br>honestly (17:25)(25:13)<br>hoped (13:14)<br>hundred (25:4)(34:19)<br>hunter (2:16)(14:11)(14:16)<br>(14:24)(15:3)(15:13)(15:21)(16:10)<br>(16:25)(17:11)(17:15)(18:1)(18:15) | **J** | meeting (13:16)(17:2)(17:6)<br>(20:15)(20:18)(20:23)(21:9)(33:10)<br>(33:13)(33:14)(33:22)(33:24)(34:1)<br>(34:3)(34:8)(34:18)(34:23)(35:16)<br>(36:1)(36:6)(36:10)(36:12)(36:15)<br>(36:16)(36:21)(37:8)(38:12)<br>meetings (20:4)(22:11)(23:22)<br>members (23:4)(39:19)<br>memo (14:15)(14:23)(16:25)(17:14)<br>(18:14)(18:22)(21:10)(21:14)<br>(21:23)(32:11)<br>memorandum (14:9)<br>mention (19:6)<br>mentioned (26:10)(28:3)<br>merit (10:6)(12:14)(30:8)(30:12)<br>(31:17)<br>met (5:7)(20:3)(20:17)<br>middle (1:2)<br>might (11:6)(23:19)<br>minutes (5:7)<br>mistaken (16:14)(28:24)(35:23)<br>(38:12)(39:25) |
| | james (2:7)(2:10)<br>january (13:25)(16:5)<br>job (6:9)(6:17)(6:18)(8:12)(8:13)<br>(8:15)(8:25)(9:1)(13:18)(17:21)<br>(18:4)(18:11)(18:16)(18:20)(18:21)<br>(18:24)(19:3)(19:14)(19:20)(20:21)<br>(24:8) | |
| | **K** | |
| | kin (42:13) | |
| | **L** | |
| | labor (13:6)(13:22)(24:24)<br>language (14:18)<br>large (1:18)(3:8)(42:6)(42:20)<br>lastly (5:19)<br>lawsuit (5:1)(5:6)(39:13)<br>lawyer (35:10)<br>learn (34:2)<br>least (5:5)<br>leave (36:25) | |

**monday** (5:7)
**money** (39:24)
**montgomery** (42:3)
**months** (6:13)(6:14)(23:13)(23:16)(24:7)(24:8)(25:6)(25:23)
**morale** (10:20)
**most** (5:25)
**moving** (26:4)
**myself** (12:15)(34:9)

### N

**name** (4:9)(4:12)(30:7)(34:14)
**nature** (4:24)(5:6)(5:10)(12:11)(26:18)
**need** (3:11)
**needed** (15:18)(19:16)
**negative** (20:16)
**neither** (42:13)
**never** (18:20)(21:21)
**new** (19:8)(23:15)(24:11)(24:13)(25:7)(25:16)
**newcomer** (19:16)
**newspaper** (21:25)(22:4)(22:8)(39:9)(39:20)(40:5)(40:7)(40:24)
**next** (27:22)(35:16)
**night** (28:16)
**nobody** (14:21)
**nor** (42:13)(42:14)
**nothing** (4:4)(25:7)(30:11)
**noticed** (20:19)
**now** (6:1)(7:19)(9:8)(9:20)(21:13)(28:11)(40:22)
**number** (24:20)
**numbers** (8:4)
**numerous** (18:18)

### O

**oath** (6:1)
**objections** (3:9)(3:10)
**obligated** (6:1)(10:1)
**occasion** (22:24)(40:23)
**occasions** (17:17)(17:18)(18:25)
**occur** (20:24)(33:24)
**occurred** (34:23)
**off** (20:17)(29:19)
**offense** (30:9)(30:14)(30:16)(31:15)(31:18)(31:21)(32:21)(33:4)
**offenses** (30:24)
**offered** (3:13)
**office** (27:22)(32:6)(33:25)(38:9)
**officer** (34:11)(34:15)(34:17)(34:22)
**offices** (1:19)
**officially** (9:3)
**one** (4:13)(4:16)(4:23)(13:11)(23:16)(25:9)(26:5)(28:23)(38:21)(39:12)(40:4)(40:19)
**only** (9:4)(12:3)(24:10)(24:13)(25:2)(25:4)(25:7)(37:6)(39:22)(40:4)
**operating** (10:3)
**operation** (10:17)
**operations** (7:25)(8:14)(10:22)(11:2)(11:8)(11:13)(11:18)
**operative** (36:17)
**opportunity** (5:4)(5:20)(20:1)
**opposed** (24:25)
**opposite** (32:17)
**options** (35:11)(38:19)
**ordinance** (25:8)(26:21)
**organization** (13:7)
**organizational** (9:16)
**others** (4:15)
**our** (14:8)
**out** (15:7)(15:17)(19:7)(20:3)(21:25)(22:8)(22:22)(35:11)(37:1)(37:9)(42:12)

**outside** (41:17)
**outstanding** (17:21)(18:4)(18:11)(18:16)(18:20)(19:3)
**over** (12:8)(30:5)(35:9)(39:11)(41:8)
**overheard** (26:11)
**own** (14:18)(17:10)

### P

**page** (31:3)(31:7)(31:14)
**pages** (42:9)
**papers** (8:3)
**part** (8:21)(21:3)(29:20)
**participate** (33:10)
**particular** (20:15)
**parties** (3:3)(3:17)(42:12)(42:14)
**party** (3:20)
**penalty** (6:2)
**pending** (39:12)
**people** (9:4)(18:19)(19:7)(19:9)(20:2)(25:3)(25:4)
**per** (31:16)
**percent** (25:4)(34:20)
**performance** (9:1)(18:21)(18:24)(19:14)(19:20)
**perhaps** (23:12)(33:16)(33:17)
**period** (13:20)(23:15)(24:7)(25:1)(25:15)(25:18)(25:23)(33:11)
**periodically** (8:25)
**perjury** (6:2)
**permission** (16:19)
**person** (38:21)
**personal** (33:25)
**personnel** (8:23)(22:2)(25:24)(29:23)(33:17)(34:5)(34:10)(35:1)(35:3)(37:19)(38:6)(38:20)(38:22)
**phenix** (1:8)(1:19)(2:8)(2:12)(6:17)(7:16)(7:23)(9:10)(10:1)(12:6)(13:5)(22:3)(23:1)(23:4)(23:8)(38:25)(39:18)
**placed** (26:6)(32:18)(33:1)(33:6)
**placing** (30:1)
**plaintiff** (1:6)(2:2)(4:13)
**play** (12:2)(23:18)(23:21)
**point** (13:4)(19:11)(23:11)(26:5)(32:5)
**police** (34:11)(34:14)(34:17)(34:21)
**policy** (23:19)(23:25)(24:13)(24:25)
**polite** (20:12)
**position** (7:2)(7:13)(9:21)(11:21)(11:22)(12:21)
**positions** (9:14)
**positive** (17:21)(21:14)
**possible** (30:4)
**possibly** (20:12)
**potential** (6:2)
**power** (19:11)
**prefer** (35:17)
**prepare** (14:15)
**prepared** (14:21)
**present** (2:14)
**presentations** (19:11)
**president** (13:13)(13:22)(16:2)(28:18)
**pretty** (38:12)
**previous** (7:4)
**previously** (14:4)
**primarily** (19:5)(41:4)
**prior** (14:23)(40:17)
**probably** (13:25)(19:8)(21:2)
**probationary** (23:15)(24:7)(25:15)(25:18)(25:23)(26:21)
**problem** (18:20)
**problems** (13:19)(21:21)
**procedure** (3:5)(3:15)(3:21)

**procedures** (5:10)(10:3)(11:11)
**produce** (28:9)
**professional** (17:22)(20:12)(21:15)(21:20)
**promote** (12:4)
**prompted** (16:10)(16:21)
**proposal** (25:5)
**proposed** (24:13)(24:25)(26:21)
**prospective** (39:3)
**protective** (10:25)
**provided** (3:14)(3:20)
**public** (10:14)(10:18)(10:23)(11:3)(11:8)(11:13)(11:18)
**purchased** (39:24)
**purpose** (3:14)(17:2)(17:7)(23:24)
**pursuant** (1:16)(3:4)

### Q

**qualified** (25:24)
**question** (4:19)(18:12)(29:11)(29:12)(32:25)(36:23)
**questioned** (25:5)
**questions** (3:10)(3:11)(4:17)(8:10)(34:25)(41:21)
**quite** (24:6)
**quote** (14:12)(14:13)(17:1)(17:15)(17:22)(31:16)(31:18)
**quoted** (30:12)(40:5)

### R

**radio** (40:25)
**raised** (25:11)
**ran** (40:12)
**range** (12:11)
**rank** (7:10)
**reach** (15:12)
**read** (4:6)(16:9)(22:4)(22:7)(22:10)(28:5)(34:24)
**reaffirming** (18:17)
**really** (16:19)(34:19)
**reason** (25:17)
**recall** (19:2)(25:10)(25:13)(26:20)(26:22)(29:2)(29:4)(29:20)(30:10)(30:22)(34:7)(35:8)(35:13)(35:14)(40:4)
**receive** (39:8)
**received** (17:3)(28:20)
**recognize** (32:2)(32:12)
**recollection** (21:8)
**recommendation** (29:24)
**recommendations** (30:3)
**record** (4:10)(5:15)(5:16)(16:1)(31:20)
**recruit** (25:24)
**recruitment** (10:12)
**refers** (31:14)
**regard** (13:2)
**regarding** (14:12)
**regular** (26:2)
**regulation** (41:12)
**regulations** (10:4)(10:7)(31:17)(38:20)
**reinstated** (20:14)(21:1)
**related** (29:1)
**relationship** (13:15)(15:14)
**remember** (4:25)(6:15)(13:20)(25:12)(33:22)
**repeat** (4:18)(18:12)
**rephrase** (4:18)
**report** (30:6)(30:11)(34:5)
**reported** (42:7)
**reporter** (1:17)(3:7)(4:5)(5:19)(42:5)
**reporters** (39:9)(39:20)
**reporter's** (42:1)
**reports** (9:4)(9:6)
**representing** (3:3)(3:17)(4:13)

| | | |
|---|---|---|
| request (8:6) | (10:8)(10:15)(10:19)(10:24)(11:4) | understood |
| request (15:13)(15:21)(16:11) | (11:9)(11:14)(11:20)(11:24)(12:7) | swap (19:23)(19:25)(21:1)(21:9) |
| required (19:10) | (12:10)(13:1)(13:3)(13:4)(13:8) | sworn (4:2)(6:1)(42:8) |
| rescue (19:4) | (14:6)(14:14)(15:2)(15:11)(16:4) | system (10:7)(12:14)(30:8)(30:12) |
| research (19:10) | (16:8)(16:13)(17:9)(17:13)(17:24) | system's (31:17) |
| reserved (3:12) | (18:2)(18:6)(18:8)(19:1)(19:5) | **T** |
| resign (35:1)(35:3)(35:7)(35:17) | (20:25)(21:5)(21:12)(21:18)(22:6) | tabbed (8:4) |
| resources (11:6) | (22:9)(22:17)(22:20)(23:2)(23:6) | take (8:8)(16:1)(19:10)(21:24) |
| respectful (21:21) | (23:10)(23:17)(24:15)(24:18) | (28:2)(31:1) |
| response (6:23)(11:10)(35:5) | (24:22)(25:2)(25:13)(25:19)(25:21) | taken (1:15)(3:4)(3:6)(4:21) |
| responses (5:15) | (26:1)(26:8)(26:16)(27:1)(27:8) | takes (25:8) |
| responsibilities (7:24)(8:18) | (27:11)(27:17)(27:20)(28:4)(28:7) | talk (15:16)(16:19)(16:21)(39:14) |
| results (42:15) | (28:10)(28:23)(29:2)(29:20)(30:2) | (39:16) |
| retention (10:12) | (30:19)(30:22)(30:25)(31:4)(31:10) | talked (23:21)(23:23)(25:9)(28:16) |
| retire (6:9)(7:16) | (31:13)(31:19)(33:5)(33:9)(33:19) | talking (16:23)(36:7) |
| retired (6:7) | (33:21)(33:23)(34:13)(34:16) | telephone (26:6)(26:19)(26:24) |
| returning (11:21) | (34:19)(35:4)(35:13)(36:2)(36:5) | (27:15)(30:1)(30:18)(31:22)(32:18) |
| review (5:22)(8:7)(8:9)(12:18) | (36:11)(36:18)(37:11)(37:16) | (32:20)(33:1)(33:6) |
| (37:19) | (37:17)(37:20)(37:22)(37:24) | television (40:8)(40:25) |
| right (4:17)(7:7)(15:3)(16:4) | (38:17)(38:18)(39:2)(39:5)(39:7) | tell (6:2)(20:7)(34:21) |
| (22:20)(26:4)(29:5)(29:22)(32:25) | (40:3)(40:7)(40:11)(40:14)(40:16) | ten (6:14) |
| (37:18)(41:6) | (41:1)(41:4)(41:7)(41:13)(41:15) | terminated (30:9)(30:21)(35:19) |
| right-hand (8:4) | sit (15:16) | (36:14)(38:25)(39:10) |
| river (7:7)(40:23) | situation (38:8) | termination (25:17)(37:18)(38:13) |
| roberts (2:15)(14:13)(15:23) | some (5:5)(9:13)(13:4)(23:11) | terms (7:20) |
| (17:3)(29:24) | (24:23) | testified (4:4) |
| roland (1:15)(3:4)(4:1)(4:11) | someone (38:1) | testimony (5:20)(16:6)(17:6) |
| (42:7) | soon (20:7) | (37:23)(38:1)(38:6)(38:11) |
| role (12:19)(18:4)(23:18)(23:21) | sorry (6:22) | thanks (29:7)(41:21) |
| rule (41:12) | sought (39:1) | them (8:4)(19:10)(20:10)(36:25) |
| rules (3:5)(3:15)(3:20)(10:3) | speak (4:3)(19:17)(35:10)(40:24) | thereof (42:15) |
| (10:7)(31:17) | (41:9)(41:18)(42:8) | there's (15:18)(38:19) |
| ruling (3:12) | specific (19:2)(19:18)(21:16) | they're (9:8)(24:6) |
| run (19:3) | (21:18)(34:5) | thing (23:25)(38:21) |
| **S** | specifically (30:15)(32:14) | things (16:24)(19:6)(19:9) |
| safety (10:14)(10:18)(10:23) | speech (41:6) | think (21:6)(21:15)(30:21)(35:9) |
| (11:3)(11:8)(11:13)(11:19) | spend (5:4) | thirty-two (6:13) |
| said (3:6)(3:18)(5:21)(13:11) | staffing (10:16) | thomas (2:3)(2:10) |
| (16:17)(20:5)(20:6)(20:18)(20:19) | stand (20:10) | thought (15:14)(19:15)(19:24) |
| (27:21)(28:17)(29:16)(37:4)(42:11) | standard (10:3) | through (12:16)(13:12)(16:14) |
| (42:14) | stared (20:17) | (24:2)(24:3)(29:14)(29:17)(32:4) |
| same (32:25)(33:11) | started (6:15)(6:17)(6:23)(13:10) | (32:8)(32:13)(38:11)(42:10) |
| sat (19:24) | (13:24) | times (11:10) |
| saw (16:7) | starting (9:18) | today (5:21)(22:5)(41:22) |
| saying (35:14) | state (1:18)(3:8)(4:9)(32:17) | together (28:14) |
| says (14:13)(17:1)(17:15)(17:23) | (42:2)(42:5)(42:20) | told (16:16)(20:7)(27:21)(34:4) |
| (31:18) | statement (25:20)(27:19)(28:3) | (35:18)(37:3)(37:4)(39:13)(39:15) |
| says obsessions (17:17) | (28:8)(28:13)(28:20)(29:7) | (40:19) |
| schaitberger (15:1)(15:22)(17:3) | states (1:1) | tom (4:12) |
| (17:8) | stating (32:2)(32:11)(32:16) | topics (19:10) |
| second (17:1)(30:9)(30:13)(30:15) | station (13:11)(20:10)(24:4) | trade (19:25) |
| (31:3)(31:7)(31:15)(32:21) | (36:24)(37:5)(37:9)(40:8)(40:13) | training (11:15)(11:16)(24:1) |
| sent (14:25)(15:22)(16:14) | stay (20:11) | (24:3) |
| sentence (17:1) | still (22:15) | transcript (5:21) |
| september (22:1) | stipulated (3:2)(3:16) | transcription (42:11) |
| sergeant (9:9)(9:20)(18:6)(18:7) | stipulation and (1:16) | trial (3:19) |
| (18:11) | stipulations (3:1)(4:5) | troubled (19:19) |
| service (10:10)(12:3)(19:4) | stop (4:17) | true (25:20)(42:10) |
| services (6:10)(7:6) | street (1:19)(2:4)(2:7)(2:11) | truth (4:3)(4:4)(6:2)(42:8) |
| set (8:6)(42:12) | structure (7:11)(9:16) | truthful (28:13) |
| several (17:16)(18:24) | stuff (37:5) | truthfully (17:25) |
| shannon (1:16)(3:6)(42:4)(42:19) | subject (16:11)(25:16)(28:12) | trying (25:24) |
| shift (20:4) | (29:1)(30:5)(33:12)(40:6)(41:12) | turn (37:6)(37:11) |
| short (13:16)(28:6)(38:12) | substance (22:12)(38:5) | two (16:23)(25:2)(25:4)(25:11) |
| shorthand (42:4) | suggested (17:11) | type (27:23) |
| shortly (13:10)(13:24)(27:14) | suit (4:24) | typed (14:19) |
| should (17:17)(29:25)(30:21) | suite (2:4) | typographical (17:19) |
| (36:20) | supervising (8:22) | **U** |
| show (20:21) | supervision (9:11) | ultimate (12:25) |
| shows (25:3) | supervisor (20:18)(27:12)(30:8) | uncomfortable (37:2) |
| side (8:5) | (31:9) | under (6:1)(8:23)(9:2)(9:10) |
| sign (4:6)(5:22) | supervisors (32:8) | understand (4:16)(4:19)(5:17) |
| signature (31:3)(31:7) | support (21:16)(38:13)(38:15) | (5:22)(6:3)(6:23) |
| sir (4:20)(5:13)(5:24)(6:4)(6:6) | (38:16) | understanding (11:25)(12:2) |
| (6:8)(6:25)(7:8)(7:12)(7:21)(8:16) | supposed (34:2) | (12:22)(12:24)(24:12)(32:10)(33:5) |
| (8:20)(8:24)(9:12)(9:15)(10:5) | suppression (8:23) | understood (13:18) |
| | sure (21:2) | |

:terson Reporting, Inc.
t Office Box 81
ous, Georgia 31902

| | | |
|---|---|---|
| union  (14:5)(28:19)(32:3)(32:12)<br>united  (1:1)<br>unless  (9:23)(41:16)<br>unofficially  (9:3)<br>until  (19:21)<br>upon  (10:9)(28:11)<br>used  (3:13)(3:19)<br>usual  (4:5) | you'll  (5:15)(5:21)(17:14) | |
| **V** | | |
| various  (8:3)(22:2)<br>verbal  (5:15)<br>veteran  (24:16)<br>vice-president  (14:4)<br>view  (25:22)(29:7) | | |
| **W** | | |
| walked  (20:7)<br>walks  (20:9)<br>wallace  (2:16)(14:11)<br>wanted  (13:11)(13:13)(35:1)(35:2)<br>warning  (31:5)(35:21)(35:24)<br>washington  (2:5)<br>wasn't  (38:20)(40:7)<br>waters  (1:15)(3:4)(4:1)(4:9)(4:11)(4:12)(8:2)(14:9)(23:11)(41:20)(42:7)<br>way  (19:9)(24:16)(24:19)(32:17)(38:19)<br>wednesday  (1:20)<br>we'll  (5:10)<br>we're  (5:11)<br>whatever  (19:14)(19:25)(32:9)<br>whenever  (21:1)<br>who  (11:25)(24:20)(25:11)(27:2)(33:15)(34:7)(37:12)(37:25)(42:7)<br>whole  (4:3)<br>will  (5:19)<br>williams  (1:17)(3:7)(39:11)(42:4)(42:19)<br>witness  (4:2)(42:11)<br>woodley  (2:3)(4:8)(4:12)(41:20)<br>work  (6:11)(7:10)(13:10)(13:17)(13:24)(19:13)(24:5)<br>worked  (24:20)<br>working  (6:24)(13:15)<br>written  (27:19)(31:5)(32:1)(35:21)(35:24)(38:20)<br>wrong  (32:24)(40:3)<br>wrote  (32:11) | | |
| **Y** | | |
| year  (6:15)(7:18)(14:1)(23:13)(23:16)<br>years  (6:13)(24:21)<br>yes  (4:20)(5:13)(5:18)(5:24)(6:4)(6:8)(6:19)(6:25)(7:8)(7:12)(8:16)(8:20)(8:24)(9:3)(9:12)(9:15)(10:5)(10:8)(10:15)(10:19)(10:24)(11:4)(11:9)(11:14)(11:20)(12:7)(12:10)(13:1)(13:3)(13:8)(14:6)(14:14)(14:17)(14:20)(15:11)(16:4)(16:8)(17:4)(17:9)(17:13)(17:24)(18:2)(18:6)(18:8)(18:13)(19:1)(21:5)(21:12)(22:6)(22:9)(22:17)(23:17)(24:15)(24:22)(25:19)(25:21)(26:8)(26:16)(27:1)(27:8)(27:11)(27:17)(27:20)(28:4)(28:7)(28:10)(28:23)(30:19)(30:25)(31:4)(31:8)(31:10)(31:13)(31:19)(33:5)(33:9)(33:14)(33:19)(33:21)(33:23)(34:13)(35:4)(36:5)(36:18)(37:11)(37:16)(37:20)(37:22)(37:24)(38:17)(39:2)(40:3)(40:11)(40:14)(40:16)(40:21)(41:1)(41:4)(41:7)(41:15)<br>you left  (7:14) | | |

:terson Reporting, Inc.
:t Office Box 81
:us, Georgia  31902