IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

DAVID DAVIS,                        )
                                    )
          Plaintiff,                )
                                    )
     vs.                            )     CIVIL ACTION NO. 3:06-cv-00544-VPM
                                    )
PHENIX CITY, ALABAMA, et al.        )
                                    )
                                    )
          Defendants.               )
_____)

### PLAINTIFF'S MEMORANDUM OF
### POINTS AND AUTHORITIES IN SUPPORT OF
### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff David Davis respectfully submits this memorandum of points and authorities in support of his motion for partial summary judgment as to defendants' liability. The plaintiff brought this action for violations of his constitutional rights to free speech (Count I) and free association (Count II) under the First and Fourteenth Amendments, and regarding defendants' liability for violations of his rights to freely associate and to present proposals protected under the Alabama State Code, §11-43-143(b), (Count III). In support of this motion, plaintiff has also filed his sworn Declaration (with attached exhibits), the Declaration of Thomas H. Malone, Jr., and the deposition testimony of defendants City Manager H.H. Roberts, Mayor Jeffrey Hardin, Fire Chief Wallace Hunter, as well as the depositions of City Personnel Director Barbara Goodwin and Deputy Chief Roy Waters.

## I. **INTRODUCTION**

This case concerns the defendants' unconstitutional prior restraints imposed on the free speech rights of David Davis and other Phenix City fire fighters, as well as the unlawful discharge of Davis for engaging in protected speech and associational activity in violation of the First and Fourteenth Amendments to the U.S. Constitution and Section 11-43-143(b) of the Alabama Code. Application of controlling legal authorities to the undisputed facts shows that the plaintiff's motion for partial summary judgment as to defendants' liability should be granted.

Specifically, the defendant City has adopted and applied policies and regulations that have imposed unconstitutional restrictions on Davis and other similarly situated City employees, prohibiting them from exercising their free speech rights with the media, as well as the elected Mayor and City Council members. In applying these unlawful regulations and policies, the defendants illegally terminated Davis, an 8-year veteran fire fighter, because, while off-duty and in his capacity as the President of the fire fighters' labor association, he spoke to Mayor Hardin about a matter of public concern involving the City's fire department.

In addition, the defendants discharged Davis in retaliation for his role as the President and leading spokesperson of the fire fighters' association, which also violated his right to engage in free association activities with his fellow fire fighters and with Mayor Hardin.

Lastly, Alabama State Code, §11-43-143, authorizes fire fighters to form and participate in a labor organization, and to present proposals regarding employment

2

conditions to the employer through their chosen representatives. That provision also makes it unlawful for any person to discipline or discharge a fire fighter for engaging in this protected conduct. In terminating Davis' employment, the defendants also contravened these statutory provisions.

Accordingly, applying the governing law to the record of facts set forth in the defendants' depositions and the submitted declarations (and accompanying exhibits), compels the conclusion that the instant motion for partial summary judgment should be granted.

## II. STATEMENT OF MATERIAL FACTS

The plaintiff submits the following statement of material facts as to which there is no genuine issue:

1.    Plaintiff David Davis was hired by the defendant Phenix City (hereafter "City"), and its fire department in April, 1998. In May, 2003, Davis was promoted to the rank of Driver-Engineer (Sergeant). (Complaint, ¶10, Answer, ¶10, Davis Decl., ¶1; Hunter Dep., p. 14 line 14 to p. 15 line 11). As a fire fighter for the City, Davis received very favorable evaluations for his job performance; as late as February, 2006, the fire department reported that Davis was doing an "outstanding job" and had "a very positive and professional attitude". (Waters Dep., p. 17 line 14 to p. 19 line 1; p. 21 lines 13 to 23; Hunter Dep., p. 15 line 17 to p. 17 line 5; Roberts Dep., p. 25 lines 1 to 17; Davis

Decl., ¶¶1, Exhs. 1, and 12)[1].

2.     In 2005, plaintiff Davis became the President of the Phenix City

Firefighters Association, Local 3668, International Association of Fire Fighters (hereafter

"Local 3668"), a local labor organization comprised of fire fighters and rescue service

employees employed in the City's fire department.  (Davis Decl, ¶2; Hunter Dep., p. 19

lines 1 to 15).

3.     Plaintiff Davis is also a resident of the Phenix City area.  At all time

material herein, Davis has been a "person" within the meaning of 42 U.S.C. §1983, and

a "fire fighter" within the meaning of the Alabama State Code, §11-43-143(b).

(Complaint, ¶3, Answer, ¶3).

4.     Defendant Phenix City is an incorporated municipality under the laws of

the State of Alabama.  The City is a "person" within the meaning of 42 U.S.C. §1983,

and a "person" within the meaning of the Alabama State Code, §11-43-143(b).

(Complaint, ¶4, Answer, ¶4).

5.     Defendant Jeffrey Hardin is the Mayor of Phenix City, and he is actively

engaged in the management, supervision and control of the operations, activities,

affairs, finances, property, personnel, compensation and employment conditions of the

City.  Defendant Hardin is a "person" within the meaning of 42 U.S.C. §1983 and a

---

[1]   The references to "Decl. ¶____" are to the paragraphs of the sworn
Declarations of plaintiff David Davis and Thomas Malone, Jr..  The "Exh. ____ "
references are to the numbered exhibits appended to those Declarations.  The "Dep.
p. ____ line ____" references are to the transcript pages and lines of the depositions of
defendants City Manager Roberts, Fire Chief Hunter, and Mayor Hardin, and
depositions of City Personnel Director Goodwin and Deputy Chief Waters.

"person" within the meaning of the Alabama State Code, §11-43-143(b).  (Complaint, ¶5, Answer, ¶5; Hardin Dep., p. 7 line 12 to p. 10 line 4).

6.      Defendant H.H. Roberts is the City Manager of Phenix, and he is actively engaged in the management, supervision and control of the operations, activities, affairs, finances, property, personnel, compensation and employment conditions of the City.  Defendant Roberts is a "person" within the meaning of 42 U.S.C. §1983 and a "person" within the meaning of the Alabama State Code, §11-43-143(b).  (Complaint, ¶6, Answer, ¶6; Roberts Dep., p. 8 line 1 to p. 11 line 9).

7.      Defendant Wallace Hunter is the Chief of the City's fire department, and he is actively engaged in the management, supervision and control of operations, activities, affairs, finances, property, personnel, compensation and employment conditions of the City's fire department.  Defendant chief Hunter is a "person" within the meaning of 42 U.S.C. §1983 and a "person" within the meaning of the Alabama State Code, §11-43-143(b).  (Complaint, ¶7, Answer, ¶7; Hunter Dep., p. 11 line 21 to p. 12 line 16).

8.      At times material herein, Roy Waters was the Deputy Chief of the City's fire department, and he was actively engaged in the management, supervision and control of operations, activities, affairs, property, personnel, compensation and employment conditions of the City's fire department.  (Complaint, ¶8, Answer, ¶8).

9.      Barbara Goodwin is the Personnel Director of the City, and she is actively engaged in the management, supervision and control of operations, activities, affairs,

finances, property, personnel, compensation and employment conditions of the City's
Fire Department. (Complaint, ¶9, Answer, ¶9).[2]

10.    The City Council of Phenix City consists of five members elected by the
citizens, including the Mayor. (Davis Decl., ¶3, Exh. 2, §§3.01, 3.02; Hardin Dep., p. 8
line 13 to p. 9 line 2; Roberts Dep., p. 7 lines 15 to 25). All matters of City policy are
vested in the Council. (Davis Decl., ¶3, Exh. 2, §3.07; Hardin Dep. p.11 lines 10 to 23;
Roberts Dep., p. 7 line 15 to p. 8, line 20).

11.    The City Manager is subject to appointment to, and removal from, that
position by a majority vote of the City Council. (Davis Decl., ¶4, Exh. 2, §§3.08, 3.09;
Hardin Dep., p. 11 lines 15 to 23; Roberts Dep., p. 8 lines 7 to 20). Pursuant to the
City's Charter, the City Manager is responsible for the supervision and administration of
the officers of the City, which includes enforcing laws and ordinances, supervision and
control over all officers and employees of the City, and the appointment and termination
of City employees. (Davis Decl., ¶4, Exh. 2, §§4.02, 9.01(a); Hardin Dep., p. 12 line 1
to p. 13 line 9; Roberts Dep., p. 8 line 1 to p. 11 line 9). The City Manager has the final
decision-making authority regarding the termination of an employee from the fire
department. (Hunter Dep., p. 12 line 5 to p. 13 line 15; Roberts Dep., p. 10 line 3 to p.
11 line 9).

12.    In his capacity as an officer and leader of Local 3668, Phenix City
Firefighters Association, plaintiff Davis has been the representative and spokesperson

---

[2]    Pursuant to the parties' stipulation filed with the Court, Roy Waters and
Barbara Goodwin have been voluntarily dismissed as defendants in this action.

for the members of that labor organization employed in the City's fire department, and he has tried to speak out on matters of public concern regarding public safety, fire fighters safety and health, fire and rescue services, adequate fire department staffing, employee morale, and other important subjects. (Davis Decl, ¶5).

13.     In Davis' former position as the Vice President of Local 3668, Davis presented a memorandum and proposal to the previous City Fire Chief Jerry Prater (on behalf of the members of Local 3668) requesting a meeting to discuss safety and health issues, employee morale, department "swap" or trading of time, communications, discipline, salaries, and other conditions of concern. (Davis Decl, ¶6, Exh. 3; Hunter Dep., p. 22 line 14 to p. 23 line 17; Roberts Dep., p. 36 lines 8 to 20).

14.     In response to Davis' memorandum and proposal, then-Chief Prater had Davis picked up at his fire station in a Chief's car (without Davis knowing why or what for). Davis was transported to Prater's office where City Personnel Director Goodwin was also waiting. The meeting lasted for only a short period. (Davis Decl, ¶7; Malone Decl, ¶2; Goodwin Dep., p. 12 line 7 to p. 13 line 25).

15.     In his letter to defendant City Manager Roberts, dated March 7, 2005, a Field Service Representative of the International Association of Fire Fighters ("IAFF"), Thomas Malone, pointed out the concerns with how the meeting was conducted by Prater, and noted that Davis and other Local 3668 members feared reprisals. (Malone Decl., ¶3, Exh. 1; Roberts Dep., p. 38 line 16 to p. 39 line 16).

16.     On September 13, 2005, Davis and other leaders and members of Local 3668 attended a union meeting to discuss understaffing in the Phenix Fire Department;

7

poor employee morale; the safety of fire fighters and the public; fire and rescue services; and their fears of retaliation and discipline for speaking out publicly or otherwise about their serious concerns. (Davis Decl, ¶8). Chuck Williams, a journalist employed by the newspaper Columbus Ledger-Enquirer, asked and was allowed to attend the Local 3668 meeting to interview Davis and the other members for the purpose of doing an article on the issues of concern in the Phenix Fire Department. (Id.).

As a result of that discussion, an extensive article appeared in that newspaper in mid-September, 2005 which addressed concerns expressed by Davis and others regarding fire fighter and public safety; understaffing in the fire department; high turnover and the lack of retention of experienced fire fighters; the elimination of "swap" or trading of time among the fire fighters; and threats to change shift schedules. Plaintiff David Davis, as President of Local 3668, was quoted in the article expressing his public concerns that "[m]orale is at the lowest point since I've been here." He also stressed: "We are reluctant to talk because of significant fear of retaliation, being disciplined or fired". (Davis Decl., ¶8, Exh. 4; Hardin Dep., p. 37 line 12 to p. 38 line 17; Roberts Dep., p. 50 line 7 to p. 55 line 22; Hunter Dep., p. 24 line 23 to p. 29 line 21). Fire Chief Hunter was also interviewed and quoted in the article about the issues impacting the Phenix fire department. (Id.).

During this time period, a number of letters to the editor were published in local newspapers in which citizens expressed their views on a number of fire department

issues.  (Davis Decl., ¶8, Exh. 5; Hunter Dep., p. 34 line 19 to p. 35 line 12; Hardin

Dep., p. 37 line 12 to p. 38 line 17; Roberts, p. 58 lines 4 to 12).

      17.     Immediately after the newspaper article appeared in the Columbus

Ledger-Enquirer in mid-September, 2005, and with the concurrence of City Manager

Roberts, defendant Fire Chief Hunter and Assistant Chief Johansen conducted an

"investigation", taking statements from Davis and eight other fire fighters who were

named in the article. (Davis Decl., ¶'s 9 and 10, Exhs. 6 and 7; Hunter Dep., p. 48 line

13 to p. 50 line 6; Roberts Dep., p. 58 lines 13 to line 20).  Davis' statement, dated

September 20, 2005, noted:  "On Tuesday, September 13, 2005, on my off duty day

and acting as President of the Phenix City Firefighters Association, Local 3668, I met

with and gave an interview with the local media on issues of the Phenix City Firefighters

Association."  (Davis Decl., ¶9, Exh. 6).  In his interrogation, Davis told Hunter that he

spoke to the newspaper reporter about matters of public concern and as the President

of Local 3668; Hunter told Davis that the "union" will be the end of his career.  (Davis

Decl., ¶9).

      18.     Fire fighter Robert Gaskin also participated in the discussion with the

media representative; he too was interrogated by Assistant Chief Johansen about the

newspaper article, and he gave the following statement to fire department officials:

> "On this date, September 20, 2005, at  or near 9:30 A.M., I was
> instructed by Assistant Chief Johansen to write this statement.
>
> The purpose of this statement, according to Assistant Chief Johansen,
> was to specify what authorization I obtained to speak about city
> policies and procedures.

> I was not aware that I needed to gain authorization to exercise my
> right to free speech. I firmly feel that everyone in the United States
> has this right or freedom. I feel pressured to write this statement, and
> feel that my rights are being questioned. Assistant Chief Johansen
> stated that lawyers (I assume for the City) are going to be looking at
> this statement, so I may seek legal counsel myself."

(Davis Decl., ¶10, Exh. 7; Hunter Dep., p. 51 line 24 to p. 52 line 20).

19.     Also on September 20, 2005, Chief Hunter issued a written directive to all
members of the Phenix fire department which stated, in part: "Recently there was an
article in the Ledger-Enquirer Newspaper regarding our department. Several fire
fighters made comments in the paper that were likely to impair discipline and harmony
in the workplace, impede job performance and jeopardize loyalty in this department."
Chief Hunter attached the portion of the City's merit systems rules and regulations titled
"Free Speech". He stressed in his directive that "[t]hese rules **must** be followed",
(emphasis in original), and that "[f]ailure to follow the rules in the future will be dealt with
in accordance with the merit system". Davis and each fire department employee had to
sign this Memorandum acknowledging receipt, and it was placed in the employee's
personnel file. (Davis Decl., ¶11, Exh. 8; Hunter Dep., p. 36 line 21 to p. 37 line 16;
Roberts Dep., p. 71 line 22 to p. 72 line 14; Goodwin Dep., p. 19 line 20 to p. 20 line 6).
If a fire fighter spoke to the media about issues of public concern involving the fire
department, he/she would violate this directive and be subjected to discipline, including
termination. (Hunter Dep., p. 42 line 19 to p. 46 line 25; Goodwin, Dep., p. 20 line 21 to
p. 21 line 7).

20.    The same directive (with the attached copy of the "Free Speech" section of the City's merit system rules and regulations) was distributed by City Manager Roberts to "All Employees" of the City, also on September 20, 2005. (Davis Decl., ¶12, Exh. 9; Roberts Dep., p. 72 lines 12 to 20; Goodwin Dep., p. 18 line 14 to p. 19 line 5, and p. 21 line 10 to p. 23 line 14).

21.    As a result of the investigation into the newspaper article, plaintiff Davis was issued a "Counseling Form" on September 20, 2005 by Chief Hunter and Assistant Chief Johansen which stated, in part:  "Sgt. David Davis was counseled by Chief Hunter and Assistant Chief Johansen on 20th of September, 2005, concerning him making or publishing statements to the local media."  Davis was instructed to sign and date this form, acknowledging that he understood this official notice will become a part of his personnel file. (Davis Decl., ¶13, Exh. 10; Hunter Dep., p. 51 line 24 to p. 52 line 13; Roberts Dep., p. 59 lines 2 to 20).  Fire fighter Robert Gaskin was given the same warning form and it was placed in his personnel file. (Davis Decl., ¶13, Exh. 10, p. 2, Hunter Dep., p. 51 line 24 to p. 52 line 13).  This investigation and the "corrective actions" for Davis and Gaskin were approved by City Manager Roberts.  (Hunter Dep., p. 49 lines 10 to 22).

About this same time, Assistant Chief Johansen told Davis that the "union" was ruining his career and that City Manager Roberts was tired of the union's "crap". (Davis Decl., ¶13).

22.    The City's Merit System Rules and Regulations (the so-called "Free Speech" section 2.054) prohibit Davis and other City fire fighters from speaking directly

11

to the media or publicly, at any time, about issues involving the provision of fire and rescue services by the Phenix City fire department, including the following matters:

- Inadequate staffing in the fire department;

- Safety and health of fire fighters;

- Inadequate fire department equipment and vehicles;

- Insufficient financial/budgetary resources for the fire department;

- Emergency response times and dispatching procedures;

- Employee morale in the fire department;

- Corruption by fire department officials; and

- The fire department's protection of public safety.

(Davis Decl., ¶14, Exh. 11; Roberts Dep., p. 67 line 10 to p. 71 line 5; Hunter Dep., p. 42 line 19 to p. 46 line 25; p. 56 line 2 to p. 58 line 3; Goodwin Dep., p. 17 line 11 to p. 21 line 7).

If a City fire fighter should speak to the media about these issues, he/she is subject to discipline, up to and including termination.  (Id.).

The City's position is that even if a fire fighter has raised issues of public concern through the chain of command, he/she still does not have the right to discuss those issues with the media at any time.  (Id.).

23.    On January 31, 2006, Harold Schaitberger, General President of the International Association of Fire Fighters, sent a letter to City Manager Roberts (with copies also sent to Chief Hunter and Mayor Hardin) underscoring concerns about the mistreatment and harassment of Local 3668 President David Davis, including the fact

that Davis was "issued a counseling form and threatened with loss of his job, for having spoken to the local media regarding [fire] Department operations and other matters of public concern." (Malone Decl., ¶4, Exh. 2; Roberts Dep., p. 73 line 8 to p. 75 line 16; Hardin Dep., p. 39 line 21 to p. 42 line 25). Mr. Schaitberger further articulated the First Amendment rights and protections afforded local government employees to freely associate and to speak out about matters of public concern without unlawful retaliation. He cited federal court rulings on these issues, emphasizing that "few subjects are of more public concern . . . than the provision of basic fire and rescue services". Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1564 (11th Cir. 1995)". (Id.). Schaitberger's letter asked the City and Manager Roberts to take actions that would ensure that the constitutional rights of Davis and other leaders and members of Local 3668 will be respected and safeguarded when they engage in lawful associational activities and speak out on matters of public concern. (Id.).

24.    When Roberts and Chief Hunter received IAFF General President Schaitberger's letter, Deputy Chief Roy Waters was instructed to promptly meet with Davis and inquire about what generated the Schaitberger correspondence. Following that meeting, Waters gave Chief Hunter a Memorandum dated February 6, 2006, reporting on his investigation of Davis and the Schaitberger letter. Waters remarked that Davis did not have any individual complaints and that he did not generate the letter; Waters noted that he believed Davis on this point. Deputy Chief Waters emphasized at the end of his Memo to Chief Hunter: "As I have communicated to you on several occasions, David Davis is doing an outstanding job for me and has a very positive and

13

professional attitude". (Davis Decl., ¶15, Exh. 12; Hunter Dep., p. 15 line 17 to p. 17 line 5; Waters Dep., p. 17 line 14 to p. 19 line 1).

25.    In a reply letter from Roberts to Schaitberger dated February 14, 2006, Roberts observed that the Deputy Chief had spoken to Davis who said that he did not have any individual complaints. (Davis Decl., ¶16, Exh. 13; Roberts Dep., p. 77 lines 1 to 11).

26.    On or about April 16, 2006, plaintiff Davis learned that the City Council, in the next two days, would be giving final consideration to adopting an Ordinance (No. 2006-13) amending the City's Merit System Rules and Regulations extending the probation period for new hires in the fire department from one year to 18 months. Davis and others understood that the proposed change would not personally affect him because he had been employed in the fire department for eight (8) years. (Davis Decl., ¶17, Exh. 14; Hardin Dep., p. 50 line 9 to p. 51 line 13; Roberts Dep., p. 77 line 13 to p. 78 line 15; Hunter Dep., p. 58 lines 4 to 19; Goodwin Dep., p. 29 lines 8 to 18).

27.    On Monday, April 17, 2006, while off-duty, and in his capacity as President of Local 3668 and a citizen, Davis contacted a number of his fellow union members regarding the proposed City Ordinance. They were all opposed to the proposed change, expressing concerns that it would adversely affect recruitment of qualified persons into the City's fire department; harm the ability to retain qualified personnel; make it more difficult to maintain adequate staffing levels in the fire department; and potentially hurt the fire fighters' ability to work secondary jobs to bolster income for themselves and their families. (Davis Decl., ¶18).

28.     On the afternoon of April 17, 2006, while off-duty and in his capacity as President of Local 3668 and as a citizen, Davis telephoned Mayor Hardin's office to discuss the proposed Ordinance and related issues.  Mayor Hardin was not available and Davis left a message asking that the Mayor call him back.  (Davis Decl., ¶19, Exh. 15; Hardin Dep., p. 43 line 1 to p. 45 line 1).

29.     Later that evening, Mayor Hardin called Davis back.  In that telephone conversation, Davis stated that he called the Mayor as President of Local 3668 and on behalf of its members to express the concerns of the membership and the public about the proposed City Ordinance enlarging the probation period for new hires.  Davis spelled out those concerns, and offered proposals and other options for consideration by the Mayor and other City Council members (such as, making sure that fire department employees who are disciplined or promoted are not placed on probation because of the adverse impact it could have regarding the retention of experienced personnel, reductions in adequate staffing, prohibitions against holding secondary jobs to make a reasonable living, etc.). (Davis Decl., ¶20, Hardin Dep., p. 30 lines 5 to 30; p. 44 line 16 to p. 48 line 20; Waters Dep., p. 28 lines 2 to 24).  Mayor Hardin thanked Davis for the input and said that he and other Council members would consider these points.  (Davis Decl., ¶20).

30.     Davis had similar telephone conversations on April 17, 2006 with City Council members Ray Bush and Arthur Sumbry while off duty, and in his capacity as President of Local 3668 and as a citizen.  (Davis Decl., ¶21).

31.    During this period of time, Davis and City and fire department officials understood that the proposed Ordinance extending the probation period for future new hires from one year to 18 months would have no effect whatsoever on Davis as a City employee because he had already been employed in the fire department for eight (8) years. As a result, when he communicated with the Mayor and the two Council members, he was not pursuing his individual complaint or grievance as an employee of the City. (Davis Decl., ¶22; Hardin Dep., p. 50 line 9 to p. 51 line 13; Roberts Dep., p. 77 line 13 to p. 78 line 15; Hunter Dep., p. 58 lines 4 to 19; Waters Dep., p. 24 lines 12 to 22).

32.    Mayor Hardin informed City Manager Roberts that Davis had a conversation with him about the proposed City Ordinance enlarging the probation period (Hardin Dep., p. 61 lines 6 to 19; Roberts Dep., p. 79 lines 2 to 9). Personnel Director Goodwin also learned of the conversation between the Mayor and Davis, and she, in turn, informed Chief Hunter. (Id.; Hunter Dep., p. 64 line 9 to p. 65 line 20). With Roberts concurrence, an investigation was ordered, and Chief Hunter directed Deputy Chief Waters to meet with Davis on the subject. (Hunter Dep., p. 65 line 21 to p. 68 line 25; Waters Dep., p. 26 line 17 to p. 27 line 8). Deputy Waters immediately met with Davis on April 19, 2006 and asked him to prepare a written statement concerning his telephone conversation with the Mayor about the proposed Ordinance. (Davis Decl., ¶23; Waters Dep., p. 27 line 9 to p. 28 line 1). Davis typed-up and handed the following signed statement to Deputy Chief Waters:

4/19/06
Wallace Hunter, Fire Chief

On Monday, April 17, 2006, I placed a call to Mayor Hardin's office. As President of the Phenix City Firefighters Association/Local-3668, I made this call in regards to some labor issues in which I had concerns with. Mayor Hardin returned my call later that evening and we discussed the issues in which I wanted to address.

Respectively,

David P. Davis.

(Davis Decl., ¶23, Exh. 16; Waters Dep., p. 29 lines 2 to 24; Hunter Dep., p. 69 lines 1

to 18; Goodwin Dep., p. 32 line 25 to p. 33 line 9).

    33.    Chief Hunter then submitted a report to City Manager Roberts dated April

20, 2006 (with a copy to Goodwin).  Hunter stated, in pertinent part, as follows:

"This memo is to inform you about a conversation between Personnel Director Barbara Goodwin and myself about the city's new probation time for new hires for Public Safety.  During this conversation, I was informed that one of our firefighters, Sgt. David Davis, called Mayor Hardin to discuss or complain about the new policy.  This is a clear violation of our Merit System and S.O.P.'s.  Sgt. David Davis was counseled on this type of violation in September 2005 and he signed indicating his understanding of this violation.

On Wednesday, April 19, 2006, Deputy Chief Roy Waters met with Sgt Davis and asked him why he violated the chain of command and Merit System to call Mayor Hardin.  His response was that as president of the Phenix City Firefighters Association/Legal-3668; he made a call in regards to labor issues in which he had concerns with. Mayor Hardin returned his call later that evening and they discussed the issues in which he wanted to address."

(Davis Decl., ¶24, Exh. 17; Hunter Dep., p. 71 line 9 to p. 73 line 14; Roberts

Dep., p. 80 line 9 to p. 82 line 6).

At the end of this Memorandum to Manager Roberts, Chief Hunter was very critical of Mayor Hardin.  Specifically, he said that "Mayor Hardin should refer any employee violating the chain of command, as indicated in our merit system back to their department head, personnel department or city manager. Failing to do so is in violation of our city charter . . . ."  (Id.).

34.     The City's Merit System Rules and Regulations (the so called "Free Speech" section 2.054), as well as a fire department Standard Operating Procedure (ASOP 12), prohibit Davis and other City fire fighters, at any time, and in any public or non-public forum, from addressing or speaking with the City's elected Mayor and the other four elected members of the City Council about any issues involving the provision of fire and rescue services by the City's fire department — including the subjects listed above in para. 22.   These prohibitions remain applicable even if a fire fighter should first pursue and exhaust the chain-of-command in the fire department.  (Davis Decl., ¶25, Exh. 11; Roberts Dep., p. 83 line 2 to p. 85 line 6; Hunter Dep., p. 75 line 13 to p. 77 line 23).

If a fire fighter wants an issue related to fire and rescue services raised with the City Council, he/she must submit that request to the City Manager who is the only City representative that is permitted to discuss the issue with the members of the Council. (Id.).

35.     City Manager Roberts made the final decision that Davis be discharged from his job for contacting the Mayor regarding the proposed Ordinance extending the probation period for new hires employed in the fire department.  (Roberts Dep., p. 10

18

line 3 to p. 11 line 9; p. 12 line 8 to p. 14 line 1; Hunter Dep., p. 12 line 5 to p. 13 line 15;

Hardin Dep., p. 31 line 1 to line 24; Waters Dep., p. 12 line 19 to p. 13 line 3).

36.    Chief Hunter prepared a Written Warning Form and notice of discharge

dated April 20, 2006. That document states that Davis violated the Merit System Rules

and Regulations when "[o]n April 17, 2006 at 12:30 p.m.. Driver Engineer David Davis

called Mayor Hardin regarding City proposals". (Davis Decl., ¶26, Exh. 18; Hunter Dep.,

p. 80 line 24 to p. 83 line 12; p. 84 lines 8 to 14; p. 86 lines 12 to 17; p. 89 line 6 to p. 90

line 8; Waters Dep., p. 30 line 3 to p. 33 line 9; Goodwin Dep., p. 38 line 3 to p. 40 line

6). This was considered a "Group II Offense ("negligence or omission in complying with

the requirements as set forth in miscellaneous rules"), and a "Group III Offense"

("Insubordination by the refusal to perform work assigned/to comply with written or

verbal instructions of the supervisory force"). (Id.). This discharge document also

referred to a prior "corrective action" involving the discussion Davis had in mid-

September 2005 with the newspaper journalist and the resulting article regarding

various issues of public concern.  (Id.).

37.    Deputy Chief Waters ordered Davis to come to the Personnel Director's

office on April 21, 2006, a day when Davis was off-duty. Davis went to that office where

Goodwin, Chief Hunter and Deputy Chief Waters were waiting for him. Davis was

handed the discharge form and told he was terminated. The form was already signed by

Goodwin, Hunter and Waters. On the lines available for the "Employee's comments",

Davis filled in the following statement:

> "In regards to contacting the Mayor, I was acting in my capacity as
> President of the Phenix City Firefighters Association, Local 3668 and

19

not as a Driver Engineer with the City of Phenix City. I will seek review board hearing".

Davis was also handed an "End of Employment Form" which confirmed that Davis was "dismissed" on April 21, 2006; that form was signed by Goodwin, Hunter, and Davis. (Davis Decl., ¶27, Exh. 19; Goodwin Dep., p. 35 line 12 to p. 41 line 3; Hunter Dep., p. 86 line 21 to p. 91 line 1; Waters Dep., p. 33 line 10 to p. 36 line 18).

Davis was told to go to his station, clear out his locker, turn in his gear, and leave the station. (Davis Decl., ¶27; Waters Dep., p. 36 line 19 to p. 37 line 16).

38.    Davis pursued an appeal of his dismissal before the City's Personnel Review Board, consisting of members appointed by the City. (Davis Decl., ¶28, Exh. 20). At the hearing before the Board, on May 16, 2006, Roberts was called as a witness by the City and gave testimony in support of Davis' discharge. (Roberts Dep., p. 87 line 2 to p. 89 line 11). After the hearing concluded, the Board recommended to City Manager Roberts that the earlier decision (made by Roberts himself) be upheld. (Davis Decl., ¶28, Exh. 21; Roberts Dep., p. 88 lines 15 to 20). Two days later, on May 18, 2006, City Manager Roberts sent Davis a letter indicating that he accepted the recommendation of the City's Personnel Review Board, and that Davis' termination "is upheld". (Davis Decl., ¶28, Exh. 22; Roberts Dep., p. 88 lines 15 to 20).

39.    Local newspapers and other media reported on the termination of Davis. (Davis Decl., ¶29, Exh. 23).

## III. __ARGUMENT__

### A. __Standards Governing Consideration of a Motion for Summary Judgment__

Summary judgment is appropriate when there is no genuine dispute of material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Twiss v. Kury, 25 F.3d 1551, 1554 (11th Cir. 1994). "Summary Judgment procedure is properly regarded as not a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action'". Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)(citation omitted).

### B. __The Defendants' Restrictive Regulations and Policies Impose an Unlawful Prior Restraint on the Exercise Free Speech Rights Safeguarded by the First Amendment__

#### 1. __The Appropriate Standards of Judicial Scrutiny__

It is well settled that "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values." Connick v. Meyers, 461 U.S. 138, 145 (1983). While a public employee does not have a constitutional right to his job, a public employer "cannot condition public employment on a basis that infringes the employee's constitutionality protected interest in freedom of expression'." Connick, 461 U.S. at 142. Government employees have the First Amendment right to speak out about matters of public concern without having their employers prohibit those communications or retaliate for the exercise of free speech. U.S. v. NTEU, 513 U.S. 454, 468 (1995); Rankin v. McPherson, 483 U.S. 378, 383 (1987).

There are two distinct contexts in which local government employers can violate the constitutional protections guaranteed to public employees regarding free speech. The first is where a municipal government imposes a policy and practice of **'prior restraint'** which prohibits or prevents employees from engaging in free speech. The second context is where a local government engages in *post hoc* discipline against an employee who has already spoken out about a matter of public concern. In the instant action, the defendants have violated constitutional safeguards in **both** situations.

### 2. The City's Regulations, Policies and Practices Impose an Unconstitutional 'Prior Restraint' on Free Speech

The federal courts have been diligent in striking down unlawful prior restraints on government employees' constitutional rights of free expression. See U.S. v. NTEU, 513 U.S. 454 (1995); Milwaukee Police Ass'n v. Jones, 192 F.3d 742, 749-50 (7th Cir. 1999); Harman v. City of New York, 140 F.3d 111 (2nd Cir. 1998); Providence Firefighters v. City of Providence, 26 F.Supp.2d 350 (D.R.I. 1998).

Where, as here, a local government employer imposes a *prior restraint* on free speech, it must carry a much heavier burden to justify its restrictions. Relying on the Supreme Court's decision in NTEU, the appellate court in Milwaukee Police Ass'n., 192 F.3d at 750, articulated the appropriate standard:

> With a prior restraint, the impact is more widespread than any single supervisor decision would be, and the action chills potential speech instead of merely punishing actual speech already communicated. *Id.* [NTEU] at 468, 115 S. Ct. 1003. Thus, the court held [in the NTEU case] that in the context of a prior restriction on expression, the government has a greater burden than it has where an isolated disciplinary action is involved. The government in such a case must demonstrate that "the interests of both potential audiences and a vast

22

> group of present and future employees in a broad range of present
> and future expression are outweighed by the expression's 'necessary
> impact on the actual operation' of the Government." [quoting, NTEU,
> 513 U.S. at 468].

See, Harmon, 140 F.3d at 118 (applying NTEU standard to strike down agency rule

forbidding employees from talking to media without prior clearance by agency official)[3].

### A. The City's Ban on Any Communications with the Media is Plainly Unconstitutional.

Here, the defendant City has adopted, and enforced, regulations and policies

which clearly impose unconstitutional prior restraints on free speech rights in several

respects. According to the deposition testimony of defendants City Manager Roberts

and Fire Chief Wallace Hunter[4], as well as that of Personnel Director Goodwin, the

City's Merit System Rules and Regulations (Section 2.054) prohibit the fire fighters from

communicating with the media or publicly, at any time, about any issues involving the

---

[3]    Accord:  Swartzwelder v. McNeilly, 297 F.3d 228, 231-32, 235-36 (3rd Cir.
2002)(applying NTEU standard to invalidate department policy that required a police
officer's communication to the public to be cleared by the Chief of Police); Weaver v.
U.S. Information Agency, 87 F.3d 1429, 1439 (D.C. Cir. 1996)(NTEU test applied where
restraint on speech achieve through a generally applicable regulation); Providence
Firefighters Local 799 v. City of Providence, 26 F.Supp.2d 350, 355-57 (D.R.I.
1988)(applying NTEU to invalidate a rule requiring fire fighters to get prior permission to
speak to public about fire department "matters").

[4] Chief Hunter was designated as the City's Rule 30(b)(6) witness to provide
authoritative and knowledgeable deposition testimony on behalf of the City on the
issues in this case.  (Hunter Dep., p. 7 line 7 to p. 9 line 12).

City's provision of fire and rescue services.  (Facts, ¶22).[5]  This ban covers a variety of

subjects of public concern including:  inadequate staffing in the City's fire department;

fire fighters safety and health; inadequate fire department equipment and vehicles;

insufficient financial/budgetary resources in the fire department; emergency response

times and dispatching procedures; employee morale in the fire department; corruption

by fire department officials; and the fire department's protection of public safety.  (Facts,

¶22).  This ban applied to the plaintiff David Davis, and it continues to apply to all City

fire fighters.  Indeed, the City's bold position is that even if a fire fighter has raised these

issues of citizen concern through the chain-of-command in the department, he/she is

still precluded from discussing these issues with the media.  (Id.).

   It is well settled that the public has a right to know about important issues

implicating the delivery of the vital fire and rescue services, and the news media and the

fire fighters are in the best positions to keep citizens informed.[6]  When confronted with

such an absolute ban **on its face**, the courts have uniformly struck down the local

_____

   [5]  The references to "Facts, ¶___" are to the paragraphs set forth above in the
Statement of Facts.
   [6]  It is well understood that there is widespread interest in the "ability of the
[public's] Fire Department to respond quickly and effectively to a fire."  Moore v. City of
Kilgore, 877 F.2d 364, 370 (5th Cir. 1989), cert. denied, 493 U.S. 1003 (1990)(fire fighter
had protected right to articulate concerns about understaffing to the press).  Accord:
Beckwith v. City of Daytona Beach Shores, 58 F.3d 1544, 1465 (11th Cir. 1995)("few
subjects are of more public concern to the average citizen than the provision of basic
fire and rescue services"); Casey v. City of Cabool, MO, 12 F.3d 799 (9th Cir.
1993)(employee's speech regarding disapproval of certain fire department policies is a
matter of public concern); Hickory Fire Fighters' Assn. v. City of Hickory, 656 F.2d 917,
920-21 (4th Cir. 1981)("working conditions of the fire fighters are a matter of public
concern which the Association's representatives are especially well qualified to
address").

government's regulation as an unconstitutional prior restraint on free speech.  See

cases cited supra, pp. 21-22.  The same result should be reached here regarding

Section 2.054 of the City's regulations.

## B. The City's Restrictive Regulation and Practices Are Unconstitutional as Actually Applied.

In addition, this same City regulation (ironically titled "Free Speech") has actually

been applied to punish and chill the free speech rights of Davis and other fire fighters to

communicate with the media.  As noted above, Local 3668 President Davis and other

members of their labor association met on September 13, 2005 to discuss a number of

issues implicating public and fire fighter safety in the Phenix fire department.  (Facts,

¶16).  At that time, they approved a request of Charles Williams, a reporter from the

Columbus Ledger-Enquirer, to speak with them about a host of troublesome issues

affecting the fire department for a long time.  Davis, fire fighter Robert Gaskin and seven

other fire fighters spoke to the journalist involving concerns of inadequate staffing and

high turnover in the fire department, and other public safety issues.  A detailed article

then appeared in that newspaper in mid-September 2005, in which Davis, as the Local

3668 President, was quoted about his concerns over poor morale in the fire department,

and fears of retaliation by the City because the fire fighters had spoken to the press.[7]

His fears proved to be well-founded.  Upon reading the newspaper article, City

Manager Roberts and Fire Chief Hunter initiated an "investigation".  (Facts, ¶17).  Davis

---

[7]  In his deposition, City Manager Roberts observed that poor fire department morale has been a continuous problem "since the 90's". (Roberts Dep., p. 53, line 25 to p. 53 line 10).  However, Roberts also said he was "annoyed" about the publicity in the newspaper article. (Id., p. 50 line 14 to p. 51 line 10).

and **each of the fire fighters named in the article** were interrogated about the union meeting and their comments to the newspaper reporter, and they were required to give written and signed statements.[8] In his statement, Davis noted that "[o]n Tuesday, September 13, 2005, on my off duty days and acting as President of the Phenix City Firefighters Association, Local 3668 I met and gave an interview with the local media on issues of the Phenix City Firefighters Association." (Facts, ¶17). Significantly, fire fighter Gaskin emphasized in his statement about the newspaper article that he was asked by Assistant Chief Johansen "what authorization" he obtained "to speak about city policies and procedures". (Facts, ¶18).[9]

Upon concluding these interrogations, Chief Hunter issued Davis and Gaskin warning notices (described as "Counseling Forms") on September 20, 2005 concerning "making or publishing statements to the local media concerning fire department issues." (Facts, ¶21). They were instructed to sign and date these notices acknowledging receipt, and they were placed in their personnel filed.

The City's actions to deter further contacts with the media did not stop there. Chief Hunter issued a written directive to "All members of the Phenix City Fire Department" dated September 20, 2005, essentially telling them that the Merit System Regulations precluded talking to the media. (Facts, ¶19). That directive noted that several fire fighters had made comments in the recent Ledger-Enquirer newspaper that,

---

[8] One intimidated employee, Lance Wagner, felt compelled to say in his statement that he has dropped out of the fire fighters' association. (Davis Decl, ¶9, Exh. 7).

[9] Notably, Gaskin also properly stated: "I was not aware that I needed to gain authorization to exercise my right to free speech." (Facts, ¶18).

in Chief Hunter's opinion, could "impair discipline and harmony in the workplace, impede job performance and jeopardize loyalty in this department". (Facts, ¶19). Pointedly, he attached the "Free Speech" section of the Merit System Regulations and fire department ASOP 12; he emphasized that "these rules **must** be followed" (emphasis in original) and that "[f]ailure to follow these rules in the future will be dealt with in accordance with the merit system." (Id.). Every fire department employee was obligated to sign this directive acknowledging receipt, and it was placed in their personnel files. (Id.). As Personnel Director Goodwin indicated in her deposition, the message conveyed to the fire fighters was unmistakable — if you speak to the media about topics involving the fire department, you will violate Chief Hunter's directive, and be disciplined or fired. (Goodwin Dep., p. 20 line 21 to p. 21 line 7).

City Manager Roberts decided to expand the prior restraint on media communications when he distributed essentially the same directive to "All Employees" of the City on September 20, 2005, with the attached "Free Speech" section of the City's Merit System Regulations. (Facts, ¶20).

The defendants' imposed restrictions have caused substantial harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976). Accord: Jackson v. City of Columbus, 194 F.3d 737, 747 (6th Cir. 1999); Providence Firefighters, 26 F.Supp.2d at 354.

In short, it is difficult to imagine broader prohibitions intended to completely silence fire fighters and other City employees from discussing any issues, at any time,

27

with media representatives.  No court has found that such an absolute ban on media

communications is consistent with the free speech safeguards of the First Amendment.

Accordingly, as written and as applied, these regulations, directives, and practices

should be declared unconstitutional and unenforceable.

### C. The City's Regulations and Practices Preventing Fire Fighters from Communicating with the Mayor and City Council Members Are Also Clearly Unconstitutional.

Equally unconstitutional are the City's regulations and practices which preclude

fire fighters (including plaintiff Davis) and other City employees from communicating

with the City's elected Mayor and Council members.  Once again, the deposition

testimony of City Manager Roberts and Chief Hunter confirm that both the Merit System

Regulations and the fire department's Standard Operating Procedures (ASOP 12) forbid

Davis and other fire fighters, at any time, and in any public or non-public forum, from

speaking with the Mayor and City Council members about any subject involving fire and

rescue services — including public and fire fighter safety, staffing, equipment,

emergency response times, employee morale, corruption by fire department officials,

etc.. (Facts, ¶'s 34 and 22).  These restrictions govern, even where a fire fighter first

exhausts the so-called 'chain-of-command' in the fire department.  (Id.).  The rigid view

of the City and City Manager Roberts is that the City Manager is the **only** individual who

is permitted to communicate with the Mayor and City Council members about any

question concerning fire department operations.  (Id.).  In other words, the City Manager

can screen-out or filter any fire fighter concerns that could implicate fire department

functions.  Indeed, a clear indication of how seriously the City enforces this ban is best

illustrated by the fact that Davis was abruptly fired because he spoke with the Mayor, while Davis was off-duty, about a matter of public concern (see, Facts, ¶'s 28-38 and discussion, infra, pp. 31-44).

No court has sustained such a far-reaching ban on municipal workers communicating with elected officials. In Local 2106 v. City of Rock Hill, 660 F.2d 97 (4th Cir. 1981), the appellate court held that the city violated the First Amendment when it sought to limit the fire fighters' rights to speak to City Council members. The Court reasoned that '[w]here state action seeks to limit the exercise of first amendment rights, the state must meet the exacting standard of strict judicial scrutiny, advancing a compelling justification for denying a particular person or entity the right to speak." 660 F.2d at 100-01. The Court rejected the notion that allowing fire fighters to speak to City Council members would "interfere with the operation of the fire department." 660 F.2d at 101. Accord: Hickory Fire Fighters Association v. City of Hickory, 656 F.2d 917, 921 (4th Cir. 1981)(City Manager's refusal to permit representatives of a fire fighters' association to address City Council members at a meeting violated First Amendment where City failed to show a 'compelling justification'); Henrico Prof. Fire Fighters v. Board of Supervisors, 649 F.2d 237, 243 (4th Cir. 1981)(prohibition against representatives of the fire fighters' association speaking to board of supervisors violates First Amendment rights of the association and its members of free speech, association and the right of petition); Pesek v. Brunswick, 794 F.Supp. 768 (N.D. Ohio 1992)(public

employee's First Amendment rights to free speech were violated when he was prohibited from speaking to city council members)[10]

Finally, there are fundamental principles involved which support the protection of free speech rights and the nullification of the defendants' restrictive regulations and practices. Local government employees "are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions." Cromer v. Brown, 88 F.3d 1315, 1327 (4th Cir. 1996). Moore v. City of Kilgore, 877 F.2d at 372 (the "informed speech" of fire fighters can provide "valuable information"). When elected municipal leaders are more fully informed about agency problems, they can do a better job, and the public is better served. Indeed, in Mayor Hardin's deposition in this case (p. 59 lines 9 to 17), he acknowledged that receiving information from City employees enables him to do a better job for the citizens in Phenix City. In stark contrast, imposing a 'gag order' on fire fighters only establishes a "device for the suppression of the communication of ideas and permits the official to act as a censor." Moore v. City of Kilgore, 877 F.2d at 387, quoting Cox v. Louisiana, 379 U.S. 536, 557 (1965). See, Harman, 140 F.3d at 120.

---

[10]    As noted above (Facts, ¶'s 2 and 12), Davis was the elected President and spokesperson of the Phenix Firefighters Association consisting of members who are employed by the City. The broad ban imposed on Davis also prevented him from speaking on behalf of the Association and its members. Speech is equally protected where the public employee is speaking on behalf of an association or its membership. See First National Bank of Boston v. Bellotti, 435 U.S. 765, 777 (1978)("[t]he inherent worth of speech in terms of its capacity for informing the public does not depend upon the identify of its sources, whether corporation, association, union or individual"); Allee v. Medrano, 416 U.S. 802, 819 n. 13 (1973).

In sum, Section 2.054 of the City's Merit System Regulations, ASOP 12 of the fire department, and related policies and practices impose an unconstitutional ban on Davis and other fire fighters communicating with the Mayor and City Council members about any issues affecting the City's fire department.  Under <u>NTEU</u>, the City can not carry its heavy burden of demonstrating that the interests of both potential audiences and a vast group of present and future employees in present and future expression are outweighed by the "expression's necessary impact on the actual operation of the Government."  513 U.S. at 468.  Applying controlling authorities, these regulations, policies and actions should be found unconstitutional and invalid.

### D. The City's Restrictive Regulations and Policies Also Violate the First Amendment Right of Free Association

The plaintiff's freedom of association claim parallels his free speech claim. Indeed,  "the right to association in order to express one's views is 'inseparable' from the right to speak freely."  <u>Thomas v. Collins</u>, 323 U.S. 516, 530,  As the Supreme Court explained in <u>Roberts v. United States Jaycees</u>:

> An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed . . . . Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends. <u>Id</u>., at 622, 468 U.S. 609; <u>see also</u> <u>NAACP v. Alabama, et rel. Patterson</u>, 357 U.S. 449, 460-61, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

31

Following the same analytical approach used in the prior restraint/free speech decisions cited above, the defendants must carry a heavy burden for justifying the ban against Davis and other City employees exercising their associational rights in the future. The defendants are simply wrong in their belief that public employees may be lawfully barred from meeting with — associating with — elected municipal government leaders in a formal and informal setting. In these circumstances, the plaintiff is entitled to partial summary judgment with regard to the prior restraint imposed on his First Amendment right of free association.

## E. The Discharge of David Davis Violated His Constitutional Right of Free Speech

A public employer may not retaliate against an employee for exercising his or her right to constitutionally protected speech. Connick v. Myers, 461 U.S. 138, 142 (1983). The Courts will apply a four-part analysis in addressing the claims of a local government worker who asserts that he/she has been retaliated against for exercising the right to free speech: Whether (1) the speech related to a matter of "public concern"; (2) the plaintiffs' interest in speaking, as well as the public interest, outweighed the local government's interest in efficient operations of services; and (3) the speech was a substantial or motivating factor in the adverse employment actions. Rankin v. McPherson, 483 U.S. 378, 383-85 (1987). If these three parts are satisfied, the fourth step permits an employer to prove, by a preponderance of the evidence, that it would have made the same disciplinary decision in the absence of the employee's protected speech. Cook v. Gwinnett County School Dist., 414 F.3d 1313, 1318 (11th Cir. 2005).

The first two elements are questions of law; the latter two steps are questions of fact. Cook, 414 F.3d at 1319.

### (i) Davis' Communication with City Mayor Hardin Addressed a Matter of Public Concern

The Supreme Court has held that if speech can "be fairly considered as relating to any matter of political, social, or other concern to the community", it qualifies as a matter of public concern. Connick, 461 at 146. In making this decision, the Court must consider the "content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48. Accord: Fikes v. City of Daphne, 79 F.3d 1079, 1084 (11th Cir. 1996)(consideration of "time, place and manner" of speech).

The content of plaintiff's speech here clearly demonstrates that it related to matters of public concern. After Davis learned on April 16, 2007 that the City Council would soon be giving final consideration to the adoption of a City Ordinance enlarging the probation period for new hires in the fire department from the existing one year to 18 months, he contacted a number of his fellow members of the Phenix Firefighters Association the next day while he was off-duty. (Facts, ¶27). These members emphasized that such a change would adversely affect the department and the public in various ways: 1) it would make it difficult to recruit qualified personnel into the fire department if they know they could be subject to termination for as long as 18 months for any reason (or no reason); 2) the change would exacerbate the longstanding problems of retaining personnel, high turnover, and understaffing that had plagued the City's fire department; 3) it could result in further restrictions on fire fighters working secondary jobs on their off-duty days, and cause personnel to leave; and 4) it would

further undermine employee morale which was already low in the department. (Id.). There is no question that the public has a substantial interest in all of these issues.

Based on the uniform views of the members of Local 3668, and in his capacity as President of that association and while off-duty (and not in uniform), Davis placed a telephone call to Mayor Hardin's office shortly after noon on Monday, April 17, 2006. (Facts, ¶28). Since the Mayor was not available, Davis left a message. (Id.). Later that evening, Mayor Hardin called back Davis. (Facts, ¶29). Davis explained at the outset that he was calling the Mayor in his capacity as the President of the Phenix Firefighters association and wanted to address an issue that impacted the fire fighters and the public — namely, the proposed Ordinance before the Council expanding the probation period to 18 months for new hires in the fire department. (Facts, ¶29). Davis, the Mayor (and everyone else) understood that Davis himself would not be affected by the proposed change in the probation period because it covered solely new hires and Davis was an 8-year veteran of the fire department. (Facts ¶'s 26 and 31). Davis asked that the Mayor and the Council consider each of the safety and related concerns listed by the members, as well as other alternatives that he mentioned. (Facts, ¶29). Mayor Hardin thanked Davis and assured him that the concerns expressed would be taken into account when the Council considered the proposed Ordinance. (Id.).

There can be little doubt that "speech relating to the safety of the public involves a matter of public concern." Cook v. Gwinnett, 414 F.3d 1313, 1319 (11th Cir. 2005). "*Few subjects are of more public concern to the average citizen that the provision of basic fire and rescue services*." Beckwith, 58 F.3d at 1564 (emphasis supplied).

34

"Issues regarding the operation of government, including issues of union organization, are often considered matters of public concern." Cook, 414 F.3d at 1319.

Indeed, the Eleventh Circuit has already held that speech similar in content to Davis' speech in this case addressed matters of public concern. For example, in Beckwith, the plaintiff was a fire chief who publicly spoke out in opposition to Council members changes in the fire department's medical services. Beckwith considered the paramedic proposals to be ill-advised and "urged the people with whom he spoke to attend the next city council meeting in order to oppose the proposed cuts." Beckwith, 58 F.3d at 1556-57. Similarly, in Williams v. Roberts, 904 F.2d 634, 638 (11th Cir. 1990), this Circuit held that a senior tax clerk's columns in a union newsletter criticizing the County's budget for failing to include a pay raise for County employees addressed matters of public concern.

The Eleventh Circuit's view is consistent with the decisions of courts in other jurisdictions, which have concluded that speech substantially similar to the plaintiff's touched on matters of public concern. See e.g., Local 2106 v. City of Rock Hill, SC, 660 F.2d 97, 100 (4th Cir. 1981) ("government employees have a protected right to discuss conditions of their employment" with City Council members); Moore v. City of Kilgore, 877 F.2d 364, 370 (5th Cir. 1989), cert. denied, 493 U.S. 1003 (1990)(fire fighters concerns expressed to media about understaffing and fire fighter safety were subjects of public concern); McKinley v. City of Eloy, 705 F.2d 1110 (9th Cir. 1983) (the ability of the city to attract and retain qualified police personnel is a matter of great public concern."); Casey v. City of Cabool, 12 F.3d 799 (8th Cir. 1993) (fire department

employee's speech disapproving of certain fire department policies is a matter of public concern); Brasslet v. Cota, 761 F.2d 827, 844 n.14 (1st Cir. 1985) (matter involving fire department rules, regulations and safety procedures are "prototypical matter[s] of public concern.").[11]

As with the content, the form of Davis' speech also demonstrates that it was on matters of public concern.  He was off-duty, out of uniform, when he contacted the Mayor seeking support against the proposed Ordinance because the issues were important to the safety and well-being of the public, as well as the fire fighters Davis represented.  (Facts ¶'s 27 and 29).

Finally, the context of Davis' speech also shows that it involved matters of public concern.  In Davis' phone conversation with the Mayor, he asked him to support the fire fighters' position. (Facts ¶29).  The plaintiff's speech, communicated as a citizen and representative of the firefighters association, specifically addressed ongoing issues that could undermine the delivery of fire and rescue services to the citizens of Phenix, as

---

[11]  See also, Gilbrook v. City of Westminster, 177 F.3d 839, 866 (9th Cir. 1999)(preparedness of the fire department "goes to the core of what constitutes speech on matters of public concern."); Hickory, 656 F.2d at 920-21 (firefighters' working conditions are a matter of public concern which the union's representatives are well qualified to address); Providence Firefighters, 26 F.Supp. at 356 (fire department policies and their effect on safety and tax money are subjects of public concern). Donohue v. New York City Dept. of Prob., 1989 U.S. Dist. LEXIS 12154, *12 and *16 (S.D.N.Y. 1989) (a probation officer's petition criticizing the Department's salary structure was protected speech because "[i]nadequate hiring and inadequate salaries for public servants performing a critical task is a matter of public concern"); Beach v. City of Olathe, 185 F. Supp. 2d 1229, 1237 (D. Kan. 2002) (police officer's speech on various issues, including "staffing" addressed matters of public concern).

well as the health and well-being of the firefighters serving the public.[12]  Moreover, the Ordinance and related issued arose during a time when the media was covering the fire department's many problems and citizens were submitting numerous letters to the editor about their concerns.  (Facts, ¶16).  Thus, the environment or context of Davis' speech implicated the public's interest.

Finally, providing information to elected City leaders about the adverse impact a proposed City Ordinance could have on fire department personnel and operations is critical to effective representative government and the City's citizens.  That is exactly why Mayor Hardin said in his deposition that he has an "open door policy" and he welcomed Davis' input on the Ordinance that he and the Council were about to vote on. (Hardin Dep., p. 22 line 21 to p. 23 line 3; p. 59 lines 9 to 17; p. 60 line 2 to p. 61 line 5). Thus, Davis' conversation with the Mayor falls squarely within the zone of constitutionally protected speech.

In short, the content, form and context of Davis' speech demonstrate that his speech here involved recognized matters of public concern.  As in <u>Beckwith</u> and the other cases cited above, the issues addressed by Davis were "at the core of activity protected by the First Amendment." <u>Beckwith</u>, 58 F.3d at 1564.

---

[12]    Speech is equally protected whether the public employee is speaking on behalf of a labor organization or its members.  <u>First National Bank of Boston v. Bellotti</u>, 435 U.S. 765, 777 (1978)("[t]he inherent worth of speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual"); <u>Allee v. Medrano</u>, 416 U.S. 802, 819 n. 13 (1973)("It has been implicitly recognized that protected First Amendment rights flow to unions as well as to their members and organizers.").

### (ii) Plaintiff's Speech Was Not an Internal Employee Grievance

Defendants have contended earlier in this case, without supporting evidence, that plaintiff's speech was solely "motivated by his personal interest" and was "nothing more than an employee grievance" concerning internal Department polices.  The record belies that contention.  In Connick v. Meyers, the Supreme Court considered a questionnaire circulated by Meyers to her co-workers that was motivated by her intent to turn her "dissatisfaction with a transfer . . . into a cause celebre." 461 U.S. at 148. Nonetheless, the Court found her speech to be protected because one of the questions in Meyers' questionnaire addressed "a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." Id.  Accord: Cook, 414 F.3d at 1319 (finding speech pertaining to employment issues facing bus drivers touched on matters of public concern); Williams, 904 F.2d at 638 (holding editorial columns advocating for pay raises and complaining of a transfer were, as a matter of law, matters of public concern).

As noted above, Davis' intention was to educate the Mayor and the Council about the broader ramifications of the proposed Ordinance.  He spoke about difficulties in recruiting qualified personnel, high employee turnover, understaffing, low morale, and how enlarging the probation period would exacerbate these problems and public safety. Most importantly, there is no evidence whatsoever in the record suggesting that Davis engaged in the speech for his own private reasons.  On the contrary, in their depositions the City and fire department officials all agreed that the proposed Ordinance **only** applied to new hires — Davis was an 8-year veteran of the fire department. (Facts ¶'s

38

26 and 31). As City Manager Roberts stated: "It [the Ordinance] would not have affected him [Davis] at all". (Roberts Dep., p. 78 lines 9 to 15). In addition, it is uncontested that Davis was off-duty, and speaking to the Mayor on behalf of the members of the fire fighters' association who wanted their collective concerns known by the City Council before it acted on the Ordinance. Accordingly, Davis was obviously not addressing the question as an individual employee with a personal grievance or complaint.[13] Succinctly stated, on this record, it is abundantly clear that Davis' telephone conversation with Mayor Hardin was protected free speech because it addressed a matter of public concern.

### (iii) The Plaintiff's Interests in Free Speech Outweigh the City's Interest

In Pickering v. Board of Education, the Supreme Court established a test for determining whether a public employee's speech on matters of public concern is protected by the First Amendment. See 391 U.S. at 568. Once it is determined that "the speech addresses a matter of public concern, the court then applies the second prong of Pickering, the balancing test, weighing the employee's First Amendment interests against 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs. . . . '" Pickering, 391 U.S. at 568.

---

[13] Defendants have mistakenly relied upon Anderson v. Burke County, GA, 339 F.3d 1216, 1221 (11th Cir. 2001). There, the plaintiff had submitted his questionnaire to political candidates which raised longevity pay and other topics the Court found to be "grievances as an employee" rather than issues of public concern. Here, as noted, enlarging the probation period for new hires to 18 months would not have affected Davis who had been employed for 8 years, and he was plainly raising his union member's collective concerns about recruiting and keeping qualified fire fighters, understaffing, and other issues which would certainly impact the public.

The Eleventh Circuit has long held that "*[i]t is hard to imagine any
combination of government interests sufficient to outweigh [an employee's]
strong interests in informing the public about policies he believed were
dangerous to the City's citizens.*" Beckwith, 58 F.3d at 1564 (emphasis added).  The
Eleventh Circuit has also indicated that an employer's speculative or "purely subjective
fear of disruption is insufficient to outweigh an employee's exercise of her rights." Ross
v. Clayton County, 173 F.3d 1305, 1311 (11th Cir. 1999). See also Belyeu v. Coosa
County Bd. of Educ., 998 F.2d 925, 929 n.5 (11th Cir. 1993) (citing approvingly Tenth,
Eleventh, and Fourth Circuit cases holding *Pickering* balance favors employee's
freedom of speech where employers' claims of disruption are unsupported); Fikes, 79
F.3d at 1084 (overturning the district court's dismissal of plaintiff's First Amendment
claim because there was "no indication that [plaintiff's] actions disrupted the functioning
of the Daphne police department"); Eiland v. City of Montgomery, 797 F.2d 953, 959
(11th Cir.1986) (unsupported speculation that derogatory poem posted by police officer
may have led to disruption does not outweigh employee's right to speech), cert. denied,
483 U.S. 1020 (1987); Edwards v. City of Goldsboro, 178 F.3d 231, 249 (4th Cir. 1999)
(stating that a "police department's perceived threat of disruption to its external
operations and relationships . . . could not serve as justification for disciplinary action").

In essence, the defendants here believe that they can simply say — without more
—that Davis' telephone conversation with the Mayor **might** have an adverse affect on
harmony and efficiency in the fire department, and therefore, his firing was justified.
The courts have not accepted that notion.  According to defendants, the City and City

Manager Roberts have a legitimate governmental interest in limiting employees of the Department from actively participating in the democratic process. The spurious interest articulated by defendants is wholly unrelated to their legitimate interest in promoting the efficiency of the public services the City performs as identified in <u>Pickering</u>.  In <u>Pickering</u>, the Court considered a teacher's letter to the local newspaper addressing, among other things, the funding policies of the school board. 391 U.S. at 566. The Court determined that "the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public." <u>Id</u>. at 573. In other words, the City's interest is given little weight. When considering the speech of teachers on matters affecting the school administration, the Court explained that teachers are "the members of a community most likely to have informed and definite opinions" regarding school expenditures. *Id.* at 572.

     In the present case, Davis' shared information with the Mayor (and two Council members) on vital issues of public concern – issues of safety even more important than the matters approved of in <u>Pickering</u>. Defendants' interest in limiting emergency service employees' participation in the public dialogue on these matters – if legitimate at all – is minor. Compared to the interests of the Phenix Fire Department employees and the public's interest in having its elected leaders make fully informed decisions on vital safety concerns, the City's alleged interest is unquestionably outweighed.  See <u>Cook</u>, 414 F.3d at 1320 (finding the plaintiff's "interests in promoting safety and improving the competency, management, and organization of the district bus drivers far outweighed"

41

the workplace efficiency argument); Beckwith, 58 F.3d at 1564 (concluding it was

difficult to find "any combination of government interests" that would outweigh the

interest in speaking out on significant policies). See also Fikes, 79 F.3d at 1084

(concluding that an officer's attempts to "expose police department deficiencies helped

further the municipality's responsibility to provide effective law enforcement services");

Akins v. Fulton County, 420 F.3d 1293, 1304 (11th Cir. 2005) (concluding that bringing

to light harmful government practices leads to more efficient provision of public services,

satisfying the Pickering balancing test).

     Undoubtedly, the most telling deposition testimony that Davis' conversation with

Mayor Hardin did not interfere with or disrupt fire department operations or the efficiency

of services came from Mayor Hardin himself:

> Q. Did you feel like that your conversation on the
> telephone with Mr. Davis on April 17, 2006, was an
> interference with the fire department operations?
>
> A. I do not.
>
>     \*   \*   \*   \*   \*
>
> Q. So in other words, the telephone conversation you
> had with Mr. Davis on April 17, 2006, in which he evidently
> expressed concerns about the proposed extension of the
> probationary period, that conversation, in and of itself, with
> you did not interfere or disrupt the operations or efficiency of
> the fire department, did it?
>
> A. Not as I know of, no.
>
>           (Hardin Dep., p. 60 line 2 to p. 61 line 5)

In addition, Davis' speech did not arise within the workplace. Rather, it occurred off-duty, away from City-owned property. In this context, the brief telephone conversation with Mayor Hardin could not be considered disruptive of working relationships inside the fire department. See Watters v. City of Philadelphia, 55 F.3d 886, 898 (3rd Cir. 1995)(employee's statement in newspaper article outside of workplace context).

Moreover, it is significant to note that Davis had not caused any disruptions regarding his work as a fire fighter; on the contrary, he received very favorable performance evaluations, and as late as February, 2006 (two months before he was fired for talking to Mayor Hardin) the fire department recognized him as doing an "outstanding job" and having "a very positive and professional attitude." (Facts, ¶1).

The City is expected to argue that under the Pickering balancing test, its fire department is a "paramilitary organization', and its interests in the 'chain-of-command' are enough to outweigh Davis rights and interests in free speech. In other words, the City believes that all fire department employees should express their concerns solely in-house to their immediate supervisor, and they are never permitted to discuss any fire department issues with the elected Mayor and City Council members or the media. This sweeping contention falls from its own weight. As the City knows, if a local government could silence its fire service employees by simply referring to its 'chain-of-command' and the desire for loyalty and 'efficient operations', fire fighters would **never** be able to speak outside the fire department to elected officials, the public, the media, or anybody else. The Courts have rejected this contention as eviscerating First

43

Amendment protections.  In another fire fighter case, an appellate court ruled that a City's "desire to control the flow of information" should carry "no weight".  <u>Moore v. Harmon v. City of New York</u>, 140 F.2d at 120 ("Employees who are critical of the agency will naturally hesitate to voice their concerns if they must first ask permission from the very people whose judgment they call into question").  Accord: <u>Mansoor v. Trank</u>, 189 F.Supp.2d, 426, 436-37 (W.D. Va. 2002), <u>aff'd</u>, 319 F.3d 133, 138-39 (4th Cir. 2003); <u>Hickory Fire Fighters Ass'n v. City of Hickory</u> 656 F.2d 917-921 (4th Cir.)(city could not use the contention that fire fighters should air their complaints 'in-house' through grievance procedures as a justification to bar them from speaking to City Council members).

In sum, terminating Davis for his off-duty telephone conversation with Mayor Hardin about issues of public concern was not necessary to maintain "effective functioning of the public employer's enterprise."  <u>Rankin</u>, 483 U.S. at 388.  Accordingly, for the reasons stated above, the balancing of interests tips decidedly in favor of Davis and the exercise of his free speech rights.

## F. It is Uncontested that Davis' Conversation with the Mayor Caused His Termination and He Would Not Have Been Fired Absent that Communication

The third element in a free speech/retaliation claim is whether the plaintiff's speech was a substantial or motivating factor in the employer's adverse action.  There is no dispute on this point.  In their earlier-filed motion to dismiss in this action (at p. 5), the defendants admitted: "It is not disputed that the reason for the termination of the plaintiff was his contact with the Mayor, which was a direct violation of the City's Merit

44

System Rules and Regulations". Furthermore, the defendants' investigation of Davis, the relevant documents surrounding his termination, the explanations given to him, and the defendants' (and others) deposition testimony, all confirm that Davis was fired because of his off-duty telephone conversation with Mayor Hardin. (Facts, ¶'s 32-39).[14] Thus, it is uncontroverted that the City fired Davis from his job of eight (8) years because of his telephone conversation with Mayor Hardin.

With respect to the fourth element, based on the deposition testimony of City officials, it is also uncontested that if Davis had not contacted the Mayor, he would not have been fired. (Facts, ¶36; Goodwin Dep., p. 38 line 19 to p. 40 line 6; Hunter Dep., p. 82 line 12 to p. 83 line 12; p. 84 lines 9 to 14; Waters Dep., p. 30 lines 15 to 19). Indeed, Mayor Hardin testified in his deposition, that if it was up to him, Davis would not have been discharged due to that telephone conversation. (Hardin Dep., p. 64 line 11 to p. 65 line 4). Thus, the City concedes that Davis would have retained his job in the fire department but for his conversation with Mayor Hardin.

In sum, Davis engaged in protected free speech and his interests and right to do so plainly outweigh any claimed interests of the City. Accordingly, as a matter of law, the defendants violated the First Amendment when they fired Davis for the exercise of his right to free expression.

---

[14] The termination document given to Davis (Facts, ¶36) also made reference to prior "corrective action" involving the discussion Davis had in September 2005 with the newspaper reporter. Of course, as shown above, that warning notice was also a violation of Davis' right of free expression.

## G. The Defendants' Termination of Davis Also Violated
## His First Amendment Right of Free Association

The First Amendment guarantee of the right of assembly protects more than "the right to attend a meeting; it includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it or by other lawful means." Griswold v. Connecticut, 381 U.S. 479, 483 (1965); NAACP v. Alabama, ex re. Patterson, 357 U.S. 449, 460-461 (1958). Similarly, the First Amendment protects the right of one citizen to associate with other citizens for any lawful purpose free from government interference. Of course, it is well established that the First Amendment right of free association includes the right to belong to, and actively participate in, labor organizations. Shelton v. Tucker, 364 U.S. 479 (1960); Thomas v. Collins, 323 U.S. 516 (1945); Cook 414 F.3d at 1319-20. As one Court of Appeals aptly held, the First Amendment safeguards the right of public employees, like fire fighters, to play an active part in their labor association:

> The first amendment protects the right of all persons to associate together in groups to further their lawful interests. [fn omitted]. This right of association encompasses the right of public employees to join unions and the right of their unions to engage in advocacy and to petition government in their behalf. Thus, the first amendment is violated by state action whose purpose is either to intimidate public employees from joining a union or from taking an active part in its affairs or to retaliate against those who do. [fn omitted]. Such "protected First Amendment rights flow to unions as well as to their members and organizers." Allee v. Medrano, 416 U.S. 802, 819 n. 13.

Professional Ass'n. of College Educators v. El Paso County, 730 F.2d 258, 262 (5th Cir. 1984), cert. denied, 469 U.S. 881 (1984).

As the record demonstrates, the defendants committed multiple violations of Davis' right of free association when they terminated him. First, Davis was associating with Mayor Hardin when he contacted him on April 17, 2006, and he was fired for doing so. Second, he was unquestionably contacting the Mayor in his capacity as President and representative of his fellow members of Local 3668, advocating their collective concerns about the proposed Ordinance being considered by the Council. (Facts, ¶'s 27-29). This infringed on his right to freely associate with and represent the members of the fire fighters' association.

In addition, the record reveals that Davis had submitted proposals to the City on behalf of Local 3668 members with regard to various important issues affecting the members. (Facts ¶ 13). Unfortunately, he was subject to discriminatory treatment when the defendants responded to these proposals. (Facts, ¶'s 14-15).

Moreover, the anti-association animus of the defendant is further evidenced by their reaction to Davis meeting with his fellow union members in September 13, 2005 and the resulting newspaper interview given by Davis and other Local 3668 members. For their associational activities, Davis was investigated, required to give a statement, and issued a warning notice. And, of course, there are the pointed threats by Chief Hunter and Assistant Chief Johansen to the effect that the union would "end" and "ruin" Davis' career (Facts, ¶'s 17 and 21), and the remark that City Manager Roberts was tired of the union's "crap". (Facts, ¶21).

Taken together, all of these facts show that Davis constitutional right to associate with Mayor Hardin and his union members was violated by the defendants.

47

Accordingly, the plaintiff's motion for partial summary judgment should be granted on this issue as well.

## H. Defendants Have Violated The Protective Provisions Of Section 11-43-143(B) Of The Alabama Code

This Court has supplemental jurisdiction to consider and rule on the plaintiff's claim (Count III) that the defendants' conduct violated Davis rights and protections under Alabama state law. Specifically, the Alabama State Code provides that

> All fire fighters serving the state or any municipality in the state either as paid firemen or as volunteer fire fighters who comply with the provisions of this section are assured the right and freedom of association, self-organization and the right to join or continue as members of any employee or labor organization which complies with this section, and shall have the right to present proposals relative to salaries and other conditions of employment by representatives of their own choosing.

> Alabama State Code §11-43-143(b).

That same provision of the Alabama State Code also provides:

> No such person shall be discharged or discriminated against because of his exercise of such right, nor shall any person or group of persons, directly or indirectly, by intimidation or coercion compel or attempt to compel any fire fighter or fireman to join or refrain from joining a labor organization.

It is evident from the record that the defendants violated this statutory section in three ways: 1) they infringed on Davis right to be a member of an employee or labor organization; 2) they interfered with Davis' right to present proposals regarding employment conditions to the employer through a chosen representative; and 3) they coerced and discharged him with regard to his participation and leadership in Local 3668.

Without repeating the points mentioned above, when Davis passed along the proposals of Local 3668 members to Mayor Hardin relative to the probation period for new hires, he was exercising his rights under Section 11-43-143(b) to freely associate, make proposals, and most importantly, to be free of discharge or discrimination for having done so. Regrettably, the defendants responded with intimidation and coercion — and then they fired him.

Furthermore, as noted in Section G above, the defendants had previously engaged in a patter of misconduct in response to Davis serving as an officer of Local 3668: by the way they reacted to earlier proposals on behalf of the fire fighters' labor organization; coercing him with anti-union threats; interrogating him about a letter received from IAFF General President Schaitberger (Facts, ¶24); and issuing him a warning notice when he joined with other union members in comments in a local newspaper report. On such a strong record, it is abundantly clear that the defendants violated the rights and protections granted to fire fighter Davis under Section 11-43-143(b).

## IV. CONCLUSION

Based on the material facts and the applicable legal principles set forth above, plaintiff David Davis respectfully submits that this motion for partial summary judgment as to defendants' liability should be granted.

Respectfully submitted,

Thomas A. Woodley
Molly A. Elkin
Bryan G. Polisuk
WOODLEY & McGILLIVARY
1125 15th Street, N.W.
Suite 400
Washington, D.C.  20005
Tel: (202) 833-8855
Fax:  (202) 452-1090

Gary Brown, Esq.
FITZPATRICK, COOPER & CLARK LLP
Farley Building, Suite 600
1929 Third Avenue North
Birmingham, Alabama 35203
Telephone (205) 320-2255
Fax:  (205) 320-7444

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th of May 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

Joshua Robert McKoon
McKoon, Thomas & McKoon
925 Broad Street
P.O. Box 3220
Phenix City, AL 36868


Of Counsel

2