# DEPOSITION OF JEFFREY HARDIN

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE MIDDLE DISTRICT OF ALABAMA

 3                     EASTERN DIVISION

 4                                            📄 COPY

 5    DAVID DAVIS,

 6            Plaintiff,

 7    vs.                  CASE NO. 3:06-CV-0054-VPM

 8    CITY OF PHENIX CITY, ALABAMA,

 9    et al.,

10            Defendants.

11

12

13              * * * * * * * * * *

14

15        DEPOSITION OF JEFFREY SCOTT HARDIN, taken

16    pursuant to stipulation and agreement before Shannon

17    M. Williams, Certified Court Reporter and

18    Commissioner for the State of Alabama at Large, in

19    the offices of City Hall, 601 12th Street, Phenix

20    City, Alabama, on Wednesday, April 4, 2007,

21    commencing at approximately 9:05 a.m. EST.

22

23              * * * * * * * * * *

24

25
```

```
 1                          APPEARANCES

 2    FOR THE PLAINTIFF:

 3    THOMAS A. WOODLEY
      Woodley & McGillivary
 4    1125 15th Street N.W.
      Suite 400
 5    Washington, D.C.   20005

 6    FOR THE DEFENDANTS:

 7    JAMES P. GRAHAM, JR.
      712 13th Street
 8    P.O. Box 3380
      Phenix City, Alabama   36868-3380

 9

10    ALSO PRESENT:

11    David Davis
      H.H. Roberts
12    Wallace Hunter

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                    STIPULATIONS

2          It is hereby stipulated and agreed by and

3    between counsel representing the parties that the

4    deposition of JEFFREY SCOTT HARDIN is taken pursuant

5    to the Federal Rules of Civil Procedure and that

6    said deposition may be taken before Shannon M.

7    Williams, Certified Court Reporter and Commissioner

8    for the State of Alabama at Large, without the

9    formality of a commission; that objections to

10   questions other than objections as to the form of

11   the questions need not be made at this time but may

12   be reserved for a ruling at such time as the

13   deposition may be offered in evidence or used for

14   any other purpose as provided for by the Federal

15   Rules of Civil Procedure.

16          It is further stipulated and agreed by and

17   between counsel representing the parties in this

18   case that said deposition may be introduced at the

19   trial of this case or used in any manner by either

20   party hereto provided for by the Federal Rules of

21   Civil Procedure.

22                 * * * * * * * * * *

23

24

25

4

JEFFREY SCOTT HARDIN

1

2          The witness, having first been duly sworn

3   or affirmed to speak the truth, the whole truth and

4   nothing but the truth, testified as follows:

5          THE REPORTER:  Usual stipulations?

6          MR. GRAHAM:  We do want to read and sign.

7                       EXAMINATION

8   BY MR. WOODLEY:

9       Q.  Mr. Hardin, could you state your full name

10  for the Record, if you would, please?

11      A.  Jeffrey Scott Hardin.

12      Q.  Mayor Hardin, my name is Tom Woodley, and

13  I'm one of the attorneys representing the plaintiff,

14  David Davis, in this lawsuit.  And we are here this

15  morning pursuant to a Notice of Deposition that we

16  have served on you and the city and your attorneys.

17  And I'm going to ask you some preliminary questions

18  just to sort of set the stage for us this morning,

19  and then we'll get into the substance of my

20  questions and your answers.

21      Have you ever had your deposition taken before

22  in another case?

23      A.  Once before.

24      Q.  Once before?  What kind of a case was that?

25      A.  It was -- actually, it was a suit against

5

1    the city.  I think it had to do with a fireman.

2    Jimmy, was it -- do you remember, was it Dennis

3    Duty?

4            MR. GRAHAM:  Was it where he didn't get his

5        raise?

6            THE WITNESS:  I think so.  Whenever we had

7        to go to federal court in Opelika.

8            MR. GRAHAM:  That would have been in Dennis

9        Duty and Randy Doster's cases.

10        Q.   Thank you, sir.  And, Mayor, are you

11    generally familiar with the issues and the

12    allegations in this particular lawsuit?

13        A.   I've read the -- I guess the request for

14    deposition, yes, sir.

15        Q.   And have you had at least a brief

16    opportunity to spend some time with the attorneys

17    that are representing you and the city in this case?

18        A.   Yes, sir.

19        Q.   And do you have a general knowledge and

20    understanding about the procedures we will be

21    following this morning in your deposition?

22        A.   Yes, sir.

23        Q.   I just want to review those just to make

24    certain on the record that we're on the same page

25    about the procedures that we'll be following this

1   morning?

2        A.   Okay.

3        Q.   I'll be asking you a number of questions

4   and, of course, we expect you to give full and

5   truthful answers.  You understand that?

6        A.   Yes, sir.

7        Q.   And you have to verbalize your answer

8   because the reporter here can't take down nods of

9   the head so you'll have to verbalize your

10   responses.

11       A.   Okay.

12       Q.   You understand that?

13       A.   Yes.

14       Q.   If at any time you don't understand or hear

15   one of my questions, let me know immediately and

16   I'll be more than happy to repeat or rephrase that

17   question.

18       A.   Okay.

19       Q.   Do you understand that?

20       A.   Uh-huh.

21       Q.   You'll have to wait until I finish my

22   question before you begin your answer, again so the

23   reporter will have a clear record of what we're

24   talking about.  Do you understand that?

25       A.   Yes, sir.

1      Q.   And this reporter will have then a chance

2  to, after we finish your deposition, to put this in

3  writing in a transcript form.  And as your attorney,

4  Mr. Graham, just indicated, you'll have a chance to

5  review and read and sign that transcript.  Do you

6  understand that?

7      A.   Yes, sir.

8      Q.   And, of course, finally, you have been

9  sworn to tell the truth under the penalty of

10 perjury, so you understand that as well?

11     A.   Yes, sir.

12     Q.   Could you please tell us what your current

13 position is with the City of Phenix City?

14     A.   I serve as the mayor.

15     Q.   How long have you held that position?

16     A.   A little over two years.

17     Q.   Was that your first elected term as mayor?

18     A.   First as mayor, yes, sir.

19     Q.   Did you hold a previous position with the

20 city?

21     A.   I have served as a city council member.

22     Q.   How long were you a council member?

23     A.   Three years.

24     Q.   And before that, what was your occupation?

25     A.   I owned my own business.

8

1       Q.   And what's the nature of that business?

2       A.   It's a wholesale and retail meat company,

3   Phenix Food Service.

4       Q.   And do you still have that business?

5       A.   I do not.

6       Q.   Did you sell that?

7       A.   I am in the process of selling that.   I

8   have been inactive from the company for about two

9   years, and then I have a five-year buyout.

10      Q.   And how long is your current term as mayor?

11      A.   It's a four-year term.

12      Q.   And, basically, what are your duties and

13  responsibilities as the mayor of Phenix City?

14      A.   Basically, I act in ceremonial purposes,

15  and then I oversee the meetings.  I direct the

16  meetings, two council meetings a month, on the first

17  and third Tuesday of the month, and that's pretty

18  much the stated duties of the mayor in Phenix City.

19      Q.   Are you considered a member of the city

20  council?

21      A.   I am.

22      Q.   Are you a voting member of the city

23  council?

24      A.   I am, yes, sir.

25      Q.   And what is the total number of members on

1    the city council?

2        A.   Including myself, it's five.

3        Q.   Now, Mr. Mayor, we have prepared a binder

4    of papers and exhibits just to facilitate and

5    expedite the depositions over the next couple of

6    days.  So I want to give you a copy of these

7    deposition exhibits because I'll be asking you some

8    questions about these documents.  And I have another

9    full set of exhibits for your attorney, Mr. Graham.

10        And if you could open up that binder, Mayor

11    Hardin, to Exhibit 8, this particular paper or

12    document is at least portions of the city charter as

13    I understand it.  And if you could briefly just kind

14    of flip through those pages.  Is it your

15    understanding as well that these are at least

16    certain sections of the city charter or city code?

17        A.   It is, yes, sir.

18        Q.   If you would turn to section 2.02, which is

19    four or five pages into this document.

20        A.   Okay.

21        Q.   And I should say, when you review these

22    documents, take as much time that you feel

23    comfortable to look at this before you respond to my

24    question, because we're really in no hurry here.

25        A.   Okay.

1    Q.   So section 2.02 talks about the form of

2  government.  Is it accurate to say that this is a

3  council/manager form of government?

4    A.   It is, yes, sir.

5    Q.   And what, in layman's language, does that

6  mean to you as a council/manager form of government?

7    A.   It means that the mayor and the city

8  council act basically as a board of directors, and

9  we set basically the direction and vision for the

10  city.  And then the city manager handles the

11  day-to-day operations and basically acts on our

12  vision for the city, and moves the city in that

13  direction.

14    Q.   Okay.  Then if you would move on to section

15  3.06 of the city charter.

16    A.   Okay.

17    Q.   It indicates there in the beginning --

18    MR. WOODLEY:  Could we go off the record

19  just for one second?

20    MR. GRAHAM:  Sure.

21    (Discussion held off the record.)

22    MR. WOODLEY:  Okay.  We can go back on the

23  record.

24    Q.   Mayor Hardin, I think we were on section

25  3.06 of the city charter where it indicates that the

11

1   mayor shall preside over the meetings of the city

2   council.  Is that accurate?

3        A.   Yes, sir.

4        Q.   Then it indicates at the end of that first

5   sentence at section 3.06 that the mayor does not

6   have any regular administrative duties?

7        A.   Correct.

8        Q.   That is correct?

9        A.   Yes, sir.

10        Q.   Then in section 3.07 of the city charter

11   where it discusses powers, it indicates that all

12   matters of policy shall be vested in the city

13   council; is that correct?

14        A.   Yes, sir.

15        Q.   Then you'll see under subsection (a) of

16   3.07, it indicates that the city council shall have

17   the authority or power to appoint and remove the

18   city manager.  Is that accurate?

19        A.   Yes.

20        Q.   Are all votes of the city council, such as

21   the possible appointment or removal of a city

22   manager, done by a majority vote?

23        A.   Yes, sir.

24        Q.   And is that reflected in the city charter

25   or city code as well?

1      A.   It is.

2      Q.   Then if you would move on to section 4.01

3  of the city code where it talks about authority and

4  duties of the city manager.  In the next section,

5  4.02, it indicates that the city manager shall be

6  the head of the administrative branch of the city

7  government and shall have such responsibilities as

8  enforcing all laws and ordinances.  Do you see where

9  it says that?

10     A.   Yes, sir.

11     Q.   And is that correct as well?

12     A.   That is correct.

13     Q.   And it indicates in section 4.02,

14  subparagraph (3), that the city manager will

15  exercise supervision over the officers and employees

16  of the city.  Is that a correct statement?

17     A.   That's correct, yes, sir.

18     Q.   Then if you would move on to section 9.01

19  in the city code.

20     A.   Okay.

21     Q.   As I understand this section and the

22  following paragraphs, it indicates that the city

23  manager has the ultimate responsibility or authority

24  to remove any city officers or city employees.  Is

25  that a correct statement?

1        A.   That is correct.

2        Q.   As I understand it, then, basically the

3   city manager would have the final authority, the

4   final say, as to whether or not any city employee

5   would be discharged or removed from his or her

6   position; is that correct?

7        A.   That's the way I understand it, yes, sir.

8        Q.   So you're not the final decision maker as

9   far as removing employees of the city?

10       A.   No, sir.

11       Q.   All right.  Let's move on to another

12   subject matter area.  Mr. Mayor, were you aware that

13   the Phenix City firefighters, at least at some point

14   in time, had formed or organized a local labor

15   organization?

16       A.   Yes, sir.

17       Q.   And when were you generally first aware of

18   that?

19       A.   Probably when I ran for office the first

20   time.  That was back in probably '98, somewhere

21   around that time.  And I understood it to be an

22   association.  I don't know if I really understood it

23   to be a labor union, but I understood it to be an

24   association.

25       Q.   An association of the firefighters?

1     A.   Correct.

2     Q.   When you say you first ran for office, was

3   there a time where you ran for office as mayor and

4   you were unsuccessful?

5     A.   I'm sorry.  Before I ran for my first term

6   as city council member, that was during the time

7   that I heard about the association.

8     Q.   And were you aware at some point in time

9   that the plaintiff in this lawsuit, David Davis,

10   seated at my right, became the president of the

11   firefighters local labor association?

12     A.   I had heard that, yes, sir.

13     Q.   Can you remember when you first heard that

14   approximately?

15     A.   I don't know.  That would have been during

16   my term as mayor that I heard that.

17     Q.   So within the last two years?

18     A.   Yes, sir.

19     Q.   And how long have you known David Davis?

20     A.   Probably about two -- I don't remember if I

21   met him during my first term.  I don't know if I met

22   him or not.  I guess I really knew who he was

23   probably during my -- starting my term or actually

24   when I was running for office for mayor.

25     Q.   And since you have known Mr. Davis, would

1    it be fair and accurate to say that you have had a

2    fairly good relationship or working relationship

3    with Mr. Davis?

4        A.    Well, my -- I don't have a working

5    relationship with people -- you know, my job here is

6    one that I am very removed from the people that work

7    for the city and -- you know, that's basically done

8    by the charter.  So my dealings with employees here

9    are seeing them and saying, hey, how you doing, you

10   know, everything going well kind of deal.  So it's

11   not -- we don't really have a relationship.  It's

12   more of a hey, how you doing kind of thing.  So

13   there's not a relationship between myself and the

14   employees.  And I don't see a lot of them very

15   often.

16       Q.    Okay.  Mr. Mayor, when you ran for the

17   position that you currently hold of mayor, did you

18   ask for the support, the political support, of the

19   firefighters and their labor association?

20       A.    I did not.

21       Q.    You did not?  Do you know whether or not

22   they furnished political support to you when you ran

23   as mayor?

24       A.    They did.

25       Q.    And did you appreciate that?

16

1     A.   I sure did, yes, sir.

2     Q.   And were they helpful and constructive in

3  you being elected?

4     A.   All help is good when you're running for

5  office.

6     Q.   That makes sense.

7     A.   If you've got people out there working for

8  you, it's a benefit to you.

9     Q.   I understand.  And also when you were

10  campaigning to become the mayor of Phenix City, did

11  you have occasion to meet with the firefighters and

12  perhaps their leader of their labor association

13  during the campaign?

14     A.   I did.

15     Q.   And did you go out to a union hall or

16  restaurant and meet with them?

17     A.   I was invited to go to, if I'm not

18  mistaken, two gatherings at a restaurant, a local

19  restaurant.  I think during my campaign was two

20  different times that I attended.  I was trying to

21  remember that the other day when we were discussing

22  this.

23     Q.   What period of time would that have been

24  before the election when you were meeting with the

25  firefighters association?

1        A.    Probably within six months of the election,
2    some time like that.  Typically, elections around
3    here require about a year, ten to twelve months of
4    campaigning for mayor.
5        Q.    So what year are we talking about?
6        A.    We're talking about -- I think the election
7    was in 2004, if I'm not mistaken.  Does that sound
8    right, 2004?
9        Q.    Okay.
10       A.    So that would have been, you know,
11   approximately during that year --
12       Q.    Okay.
13       A.    -- because election was in September.
14       Q.    And on those two occasions when you were
15   campaigning for mayor and when you met with the
16   firefighters and their labor association, do you
17   remember basically what issues were discussed or
18   what concerns the firefighters might have had at the
19   time?
20       A.    I don't really remember specific concerns.
21   I know there was a lot of questions as to, you
22   know -- I think that there were -- if I'm not
23   mistaken, I think there was another person that was
24   running there, or maybe two more people that were
25   running for office, and there were questions to us

1  basically what our platform was, what our agenda

2  was, and basically what kind of people we were.  So

3  just trying to feel us out as candidates.

4      Q.  But did they mention to you issues related

5  to their employment, the fire department's

6  operations or policies?

7      A.  I know that -- I remember there being some

8  complaints.  I don't remember specifics, but I know

9  that there was some talk from the people running the

10  meeting that we don't want to get into all this; you

11  know, we want to talk to the candidates and let them

12  answer questions.  So there was -- I guess there was

13  a couple people that started complaining.  There

14  were people there that said, you know, this is not

15  what this meeting is for kind of deal, if I'm not

16  mistaken.  So I don't really remember any specifics,

17  but I know that there were some rumblings in the

18  room about some things that were not going

19  specifically the way they wanted them to go.

20      Q.  Do you remember any concerns being

21  expressed in those two meetings when you were

22  campaigning for mayor that the firefighters were

23  perhaps troubled by staffing issues or equipment in

24  the fire department or issues like that?  Do you

25  remember anything that comes to mind?

1    A.   I guess what I remember mostly is really

2    personalities being talked about, that there were --

3    this person didn't like this person more so than

4    anything about staffing and equipment.

5    Q.   Okay.  Do you remember if Mr. Davis, the

6    plaintiff in this case, attended those two meetings

7    when you were campaigning?

8    A.   I'm pretty sure -- I know he was at one.  I

9    don't remember the other one.  He could have been at

10   both of them, yes, sir.

11   Q.   Switching gears, after the time that you

12   were elected and became mayor, did you have occasion

13   to meet with the firefighters labor association and

14   their leaders and members?

15   A.   I went to -- I was invited to a retirement

16   party for one of the firemen and -- as a matter of

17   fact, it's a guy I went to high school with.  And I

18   went to that meeting.  That's the only meeting or

19   gathering that I can remember attending after

20   getting elected to office.

21   Q.   Okay.  And during your term as mayor of the

22   city, have you had any discussions with any

23   firefighters about issues concerning the fire

24   department, whether it might be staffing or swap

25   time or trading of time, any concerns that the