1  anything?  Talk to anyone in response to this
2  letter?
3      A.   I don't think I did, no.
4      Q.   Now, in part, this letter addressed --
5  you'll see I'm going further down on the first page
6  of this letter, Exhibit 17, that it addresses the
7  concerns, apparently, of the firefighters about any
8  threat with retaliation about implementing an 8-hour
9  shift.  You see where it says that?
10     A.   Yes.
11     Q.   Were you familiar with that subject matter
12 at all?
13     A.   I had heard that.  I had heard that, I
14 guess, through the rumor mill, that there was a talk
15 of making changes in the shift work.
16     Q.   Did you have any conversations or meetings
17 about that possibility of reducing the hours to an
18 8-hour shift?
19     A.   No.
20     Q.   And that would not have been within your
21 scope of authority as mayor?
22     A.   No.
23     Q.   On the top of page two of
24 Mr. Schaitberger's letter, it refers to local union
25 president Davis, in September of 2005, being issued

```
 1   a counseling form or reprimand concerning his
 2   speaking to the local media.  Are you familiar with
 3   that subject matter at all?
 4       A.   No.
 5       Q.   And then further on in this letter,
 6   Mr. Schaitberger addresses the rights that public
 7   employees, including firefighters, have under the
 8   First Amendment about free speech and free
 9   association.  Are you familiar with those
10   principles, that public employees like firefighters
11   do have a constitutional right of free speech and
12   free association?
13       A.   Sure.
14       Q.   And how long have you been familiar with
15   those principles?  Has it been a matter of years?
16       A.   Probably early in civics, you know.
17       Q.   In high school?
18       A.   In high school, yes.
19       Q.   So when Mr. Schaitberger addressed these
20   principles about the First Amendment rights of
21   Mr. Davis or public employees, it didn't come as a
22   shock or a surprise to you, did it?
23       A.   No.  I think he's reiterating what we
24   already know, that all people have a right to free
25   speech.
```

1    Q.   All right.  Let's move on to a different
2 subject, which would have been, as I understand it,
3 a telephone call that was initiated by Mr. Davis to
4 you, as mayor of the city, in April of 2006.  And I
5 want to invite your attention, so we have accurate
6 testimony from you, to Exhibit 21.  And if you could
7 please identify what this document is?
8    A.   It's a message, just a memo that I received
9 from the secretary, Camara, like I receive several a
10 day.
11    Q.   Camara, how is that spelled?
12    A.   C-A-M-A-R-A.
13    Q.   Is that your secretary?
14    A.   Actually, she acts as secretary for both
15 the city manager and myself.
16    Q.   And is it your understanding that she
17 filled out and wrote this message?
18    A.   Yes.
19    Q.   And what is the date that it shows?
20    A.   4/17.
21    Q.   And that would have been the year 2006?
22    A.   Yes.
23    Q.   And it's partially blocked off there, but
24 it looks like 12:30 or something?
25    A.   Yes.

```
 1        Q.  Is that a fair statement?  Would it just
 2   have been after the noon hour on that date, after
 3   the noon hour?
 4        A.  Yes, sir.
 5        Q.  And it shows the phone number of Mr. Davis?
 6        A.  Uh-huh.
 7        Q.  And can you read for us what the brief
 8   message is there?
 9        A.  City proposals.  He would not speak with
10   anyone else.
11        Q.  And do you remember receiving that message
12   from Camara on that date?
13        A.  I -- not specifically this message, but I
14   receive messages every day.  But, yes, I do remember
15   receiving this message and returning the phone call.
16        Q.  Okay.  And when you say you returned the
17   phone call, did you, in fact, get Mr. Davis on the
18   phone when you tried to reach him back?
19        A.  I think I did.  I think I did the first
20   time, if I'm not mistaken.  I'm not real sure, but I
21   think I did.
22        Q.  Move on to Exhibit 22.  And this is a
23   statement apparently from a Mr. David Davis and
24   signed by him, and you see at the top there it bears
25   the date of April 19, 2006, which would have been
```

1  just two days after the phone conversation that you
2  had with Mr. Davis.
3      A.  Uh-huh.
4      Q.  And it's fairly short, so let me quote it.
5  It's addressed to Wallace Hunter, Fire Chief of the
6  city. It says, quote, on Monday, April 17, 2006, I
7  placed a call to Mayor Jeff Hardin's office. As
8  president of the Phenix City Firefighters'
9  Association Local 3668, I made this call in regards
10 to some labor issues in which I had concerns with.
11 Mayor Hardin returned my call later that evening,
12 and we discussed the issues which I wanted to
13 address, end quote. You see where it says that?
14     A.  Yes.
15     Q.  As far as you know, is that an accurate
16 statement of Mr. Davis?
17     A.  It is. With regards to as president of the
18 Phenix City Firefighters' Association, that was --
19 that was something that's put in this letter. You
20 know, my message, you know, to him was to call David
21 Davis. We sent a letter to the association that all
22 the correspondence through the association should go
23 through the city manager. Actually, the city
24 council sent a letter to the association with all of
25 our agreeance -- unanimously agreed to all -- any

```
 1   association issues would be taken up with the city
 2   manager.  So, basically, he would be our
 3   spokesperson.
 4       Q.  When you returned the call to Mr. Davis on
 5   the evening, apparently, of April 17, 2006, what
 6   were the issue or issues that Mr. Davis discussed
 7   with you in that telephone conversation?
 8       A.  It was about the ordinance that we were
 9   going to pass to change the probationary time for
10   employees of public safety.
11       Q.  And did Mr. Davis, in that telephone
12   conversation with you, express concerns that he and
13   other firefighters had about that particular
14   proposed ordinance?
15       A.  I don't remember how he worded it, but he
16   did say he had concern.  I don't know if they were
17   his concerns or that he said there were other
18   concerns, but he said that there were some concerns
19   about the changing of the probationary time.
20       Q.  And what concerns did he express on behalf
21   of himself and the other members?
22       A.  He didn't like the fact that the
23   probationary time was going to be extended.
24       Q.  Did he say why?
25       A.  I -- I don't recall, but he didn't like the
```

1  fact that it was going to be extended.
2      Q.  Did he express concerns that that might
3  have an adverse impact on recruitment of new
4  firefighters into the department or perhaps an
5  adverse impact on employee morale in the fire
6  department?
7      A.  I don't know the specific reasons why he
8  had a problem with it, but he just said that -- my
9  conversation, what I understood, he just didn't like
10 the fact that it was going to be extended.
11     Q.  But you don't recall right now reasons that
12 he gave to you on behalf of himself and the members
13 about extending the probationary period?
14     A.  I don't remember exactly what he said
15 about -- I know that his issue was with,
16 specifically, the extension of the probationary
17 period.
18     Q.  And was there, in fact, a proposed
19 ordinance that was coming before the city council on
20 that matter?
21     A.  Yes.  Actually coming up for a final vote.
22 We had actually already placed it on the -- if I
23 remember correctly, we had already placed it on
24 first reading, and it was going to a final vote.
25     Q.  And who within the city had proposed that

```
 1  new policy or new ordinance?
 2       A.   The city manager brought it to the city
 3  council, but it was recommended to us -- it was
 4  recommended by the police chief, the fire chief, and
 5  the city manager.
 6       Q.   Was that going to be a new policy
 7  applicable to the police department as well?
 8       A.   Yes.
 9       Q.   And what was the underlying reasons or
10  rationale for the fire department and the police
11  department and the city manager to propose that
12  extension of the probationary period?
13       A.   And that was the question, of course, we
14  asked as a council.  And we were told that basically
15  what happens is the training period is so long for
16  both police and firemen, that there was not an ample
17  opportunity for the employee to come to work and be
18  evaluated within that probationary period that was
19  on the books at that time.  So they felt -- both the
20  police and the fire chief and city manager felt like
21  extending that would allow both the employee and the
22  leadership in both of those departments at the time
23  to get a true evaluation of what the job is
24  physically within the constraints of the job and not
25  just within training.  So we thought that was a
```

1  reasonable explanation of why they wanted that done
2  and that's why we passed it.
3       Q.  So it was passed and it was implemented?
4       A.  Yes.
5       Q.  Okay.  Then returning to the telephone
6  conversation you had with Mr. Davis on April 17, do
7  you recall anything else that was discussed by you
8  or by Mr. Davis in that telephone discussion?
9       A.  I don't recall anything.  I just remember
10 the -- kind of the reason for the call was to
11 express his concerns about extending the -- and I
12 actually think he made a recommendation.  I don't
13 remember what that was, but I think he recommended
14 something different than we had proposed.
15      Q.  Did he recommend or submit a proposal to
16 you in that telephone conversation to keep the
17 probationary period the same or to change it to some
18 other period of time?
19      A.  I think his proposal was to change it to
20 some other period of time.
21      Q.  Do you remember what period that was?
22      A.  I don't -- it had something to do with --
23 if I recall correctly, it had something to do with
24 the amount -- after the amount of training when that
25 person is put in place.  Instead of going to a set

50

1    amount of time, which I don't remember the
2    specifics, I think it -- but his was, you know, to
3    change -- if I'm not mistaken, it was to change
4    based on -- it was something different between what
5    we had on the books and what we were proposing.  It
6    was something different than that.
7        Q.  But you don't remember precisely?
8        A.  I don't remember precisely.
9        Q.  But this policy change that was implemented
10   extending the probationary period in the fire and
11   police departments from one year to 18 months, that
12   solely applied to new hires into those departments;
13   is that your understanding?
14       A.  That's what we understood, yes, sir.
15       Q.  So that change in the probationary period
16   would have had no application to veteran
17   firefighters who had been working for the fire
18   department for a period of years?
19       A.  No, sir.  And those questions were brought
20   up.
21       Q.  At the council meeting?
22       A.  Yes.
23       Q.  And could you elaborate on that, please?
24       A.  Just that that was asked; you know, who
25   does this apply to.  And, of course, the ordinance

1  spelled it out, but sometimes there's a lot of
2  legalese in there, so you want to make sure, in
3  layman's terms, you understand exactly what it
4  says.  So I know that that was brought up at the
5  meeting.  Someone asked that question.
6      Q.  So that new policy or ordinance of the city
7  extending the probationary period would not have had
8  any application to David Davis being a veteran
9  employee of the fire department, correct?
10     A.  No, sir, not as we understood it.
11     Q.  It would not have applied to him as an
12 employee?
13     A.  Correct.
14     Q.  So is it fair and accurate to say that in
15 your telephone conversation with Mr. Davis on
16 April 17, 2006, he was not raising this issue of
17 extending the probationary period because he had any
18 individual grievance or employee concern because it
19 didn't apply to him; is that a fair statement?
20     A.  I don't know if he -- because I remember
21 talking with him, and I don't know if he completely
22 understood what the ordinance said.  I think there
23 were some questions as to what the ordinance
24 actually applied to, and if it applied to -- because
25 I remember him asking some questions about the

1  ordinance and it was not -- if I remember correctly,
2  it was not a long conversation, but it was -- I
3  think there were some questions about it, you know.
4  I think when it was going to come up or, you know,
5  what it applied to.
6      Q.  But in terms of the scope or application of
7  extending the probationary period, just so the
8  record here is clear, it was your understanding and
9  the understanding of the city council that it would
10 have no application to veteran employees of the fire
11 department, correct?
12     A.  I think --
13     Q.  It applied only to new hires?
14     A.  If I'm not mistaken, it applied to new
15 employees, and I think if there was a new job title
16 or new job promotion, that it applied to those
17 employees also, if I remember correctly.  It's been
18 a long time since I read -- well, I didn't go over
19 that ordinance before our meeting, so I don't
20 exactly remember that it says.
21     Q.  In the past at city council meetings, have
22 employees of the city appeared before the city
23 council to express their position or concerns on
24 issues?
25     A.  No.

1  Q.  You don't remember any time that an
2  employee of the city has come before the city
3  council?
4  A.  Yes.  There's been times where employees
5  have -- during my previous council, we had an
6  employee that came in front of the city.  And then
7  we also had -- if I'm not mistaken, during my
8  previous council term, there was some kind of either
9  public hearing or something where we had a group of
10 firefighters at a meeting.  I don't know if it was a
11 work session or public hearing or council meeting,
12 but there was a group of firemen at the meeting.  I
13 don't really remember the whole conversation or why
14 they were there, but I remember --
15 Q.  And that was when you were a city council
16 member?
17 A.  Yes.
18 Q.  Do you remember what the subject matter was
19 that was raised by the firefighters?
20 A.  I do not.  I don't remember specifics, but
21 remember a group of firefighters being there.
22 Q.  And after that meeting with a group of
23 firefighters and the city council, do you know if
24 any other firefighters were disciplined in any way
25 for appearing before the city council?

1    A.   I don't know.  I mean, I wouldn't know
2  that.
3    Q.   Mr. Mayor, let me invite your attention to
4  Exhibit Number 23.  And this appears to be a
5  memorandum from Fire Chief Wallace Hunter addressed
6  to the City Manager, H.H. Roberts, dated April 20,
7  2006.  It shows a copy being sent to Barbara
8  Goodwin, the Personnel Director of the city, and the
9  re line indicates Sergeant David Davis, Merit System
10  and SOP violations.  Have you ever seen this memo
11  before today?
12    A.   No.
13    Q.   Okay.  Why don't you read that completely
14  to yourself?  It's fairly short.
15         MR. WOODLEY:  In the meantime, why don't we
16     take a five-minute break.  Does that sound
17     good?
18         MR. GRAHAM:  Yes.
19  (Brief recess.)
20         MR. WOODLEY:  Back on the record.
21    Q.   Mr. Mayor, I think just before we took this
22  brief break, I was inviting your attention to
23  Exhibit Number 23 in front of you and, once again,
24  this is a memo from Fire Chief Hunter to City
25  Manager Roberts dated April 20, 2006, a copy going

1  to the Personnel Director, Ms. Goodwin. And you've
2  had an opportunity to carefully and fully read this
3  document, correct?
4      A.  I have, yes, sir.
5      Q.  And have you seen this particular document
6  before today?
7      A.  No.
8      Q.  Let me invite your attention to a couple of
9  statements in this memorandum. In the very first
10 paragraph, first sentence, it says, quote, this memo
11 is to inform you about a conversation between
12 Personnel Director Barbara Goodwin and myself about
13 the city's new probation time for new hires for
14 Public Safety, end quote. You see where it says
15 that?
16     A.  Yes.
17     Q.  Once again, so it's at least clear in my
18 mind, that new policy applied to new hires for
19 Public Safety. Is that accurate?
20     A.  Yes.
21     Q.  Then further down in this document, the
22 third paragraph says, quote, David Davis has made it
23 clear that he will not adhere to our merit system
24 grievance process or the department and city
25 Standard Operating Procedures. Then it goes on to

1  say -- addressing you -- Mayor Hardin should refer
2  any employee violating the chain of command, as
3  indicated in our merit system, back to their
4  department head, personnel department, or city
5  manager. Failing to do so is a violation of our
6  city charter, end quote. See where it says that?
7     A.  I do.
8     Q.  It sounds to me like Chief Hunter is
9  telling City Manager Roberts and Ms. Goodwin that
10  you have violated the city charter. Do you have a
11  reaction to that?
12     A.  You know, first of all, I don't think that
13  Chief Hunter is an attorney, so his interpretation
14  of the charter is, you know, I guess like anybody
15  else, you can read it and get an interpretation that
16  you want. I don't -- you know, I don't really
17  have -- like I say, I'm just surprised to read this.
18     Q.  Would you agree with his statement that
19  your communication on the telephone with Mr. Davis
20  about the probationary period policy was a violation
21  of the city charter by you?
22     A.  No.
23     Q.  You don't agree with that?
24     A.  No.
25     Q.  When you say you don't agree with that,

1   could you please tell me why you don't agree with
2   it?
3       A.   Well, the conversation -- the charter is
4   very specific in what it states.  The charter is not
5   set up to where the mayor or council members can not
6   talk to city employees.  I mean, that's ridiculous.
7   The interpretation is ridiculous, to even think
8   that.
9       The charter is set up to where the mayor and
10  the city council does not order or direct employees
11  to any action.  There's a specific line between the
12  day-to-day operations of what the city manager and
13  the department head's duties are versus what the
14  city council's duties are.  So the charter -- the
15  intent of that portion of the charter that I'm
16  assuming that this is -- it doesn't have anything to
17  do -- you know, if that's the case, there would be
18  no communication whatsoever -- hello, how are you
19  doing, how was your birthday or your Christmas --
20  there would be no communication whatsoever, because
21  that could be perceived as communication between
22  employees and council.
23      Q.   As the mayor, do you believe that it's
24  consistent with your rights and responsibilities to
25  have conversations with city employees about issues

1  that affect the city or the operations of certain
2  departments?
3      A.  You said do you think it's my right?  Is
4  that what you said?
5      Q.  Yes.  Let me rephrase the question so it's
6  clear.  You indicated earlier that you have an open
7  door policy, and you appear to me to be an
8  individual that's willing to communicate with
9  people, and it's part of your job as mayor.
10     Do you feel like you're prohibited and barred
11 from discussing with city employees issues or
12 policies that affect the city or the department in
13 which the employee happens to work?
14     A.  I think, for the proper operation of the
15 city, that I don't need to get involved.  I think
16 there is a -- at some point, there may be a
17 misunderstanding of who you work for if you get
18 involved in the day-to-day operations.  So, you
19 know, the fact that you listen to what people have
20 to say is different than acting upon it or how you
21 carry that out.  You know, as a matter of fact, it
22 says in that letter here that things should be
23 reported to the department head or personnel
24 department or the city manager.  You know, my
25 conversations are not with department heads or the

```
 1   personnel director; they are with the city manager.
 2   So there's a misunderstanding there.  But I think
 3   that in my position, you have to listen to all
 4   people.  It's just a matter of what you do with that
 5   information.  And typically what I do is try to
 6   go -- to sort out and try to determine on my own
 7   what is relevant, and then carry the relevant
 8   information to the city manager.
 9        Q.   Is it fair and accurate to say in your job
10   and position as a city mayor, that you're looking to
11   collect information, whether it's from city
12   employees, about issues affecting a department or
13   other subjects so that you can better do a job as
14   mayor in collecting that information and doing your
15   duties?
16        A.   Well, that's what we have to do, to do an
17   effective job, yes.
18        Q.   Later on in this memo -- again, Exhibit 23,
19   the memo from Mr. Hunter to Mr. Roberts -- at the
20   end on page two it says, quote, I also feel very
21   strongly that someone should speak with Mayor Hardin
22   about this sensitive issue of interfering with the
23   jobs that department heads are trying to do to keep
24   their departments running smoothly and effectively,
25   end quote.  You see where it says that?
```

1   A.   Very clearly.
2   Q.   Did you feel like that your conversation on
3   the telephone with Mr. Davis on April 17, 2006, was
4   an interference with the fire department operations?
5   A.   I do not.
6   Q.   And why do you say you do not agree with
7   that?
8   A.   You know, I guess -- what do you do with
9   that information if you -- if I heard and listened
10  to what was said, you know, the interference would
11  go in if I went into the fire department and tried
12  to change the way they did business, or met with the
13  chief and tried to change their recommendation from
14  the probationary time.  That would be an
15  interference.
16       And I don't -- you know, I don't think, you
17  know, listening to what someone has to say that you
18  are interfering with the job that the department
19  heads are trying to do.  So, you know, from my
20  standpoint, I heard exactly what was said and -- but
21  I didn't interfere with the department head or what
22  the chief was trying to do in his department.
23  Q.   So in other words, the telephone
24  conversation you had with Mr. Davis on April 17,
25  2006, in which he evidently expressed concerns about