1   the proposed extension of the probationary period,
2   that conversation, in and of itself, with you did
3   not interfere or disrupt the operations or
4   efficiency of the fire department, did it?
5        A.   Not as I know of, no.
6        Q.   And after that telephone conversation with
7   Mr. Davis, did you communicate with anyone the fact
8   that you had had this telephone conversation with
9   Mr. Davis?
10       A.   I did.
11       Q.   And who did you tell?
12       A.   I think we were leaving one evening and, if
13  I'm not mistaken, we were standing between my office
14  and the city manager's office.  And I think
15  Mr. Roberts was there and Ms. Goodwin, the personnel
16  director, was there, and I made a comment -- I don't
17  know if the fire chief was there or not, but I made
18  the comment that Mr. Davis had called me about the
19  extension of the probationary time.
20       Q.   Did you say anything beyond that?
21       A.   No.
22       Q.   Okay.  And what was the response of the
23  individuals when you communicated that Mr. Davis had
24  called you about the probationary period?
25       A.   No response to me.

1    Q.   They didn't say anything like, well, gee,
2  that's outrageous, that broke the chain of command,
3  they should be not talking to you, Mr. Mayor,
4  anything like that?
5    A.   I was kind of -- we were all on the way out
6  the door, so there was really no conversation with
7  me.  If they had conversation after that, I was not
8  privy to that.
9    Q.   In that conversation, or really at any
10 time, did you recommend that Mr. Davis be
11 investigated or charged or disciplined because he
12 had a telephone conversation with you?
13   A.   No.
14   Q.   Did you ever suggest or request that
15 Mr. Davis be terminated for that conversation with
16 you?
17   A.   No.
18   Q.   Did you ever authorize or approve
19 Mr. Davis's termination from his employment with the
20 city?
21   A.   No.
22   Q.   Based upon all the circumstances and
23 information that you have, Mr. Mayor, do you think
24 it was fair and appropriate that Mr. Davis be
25 terminated because he had a telephone conversation

63

1   with you on April 17, 2006?
2       A.  Well, that's not my decision.  Employees
3   don't work for me.
4       Q.  Oh, I understand that's not your decision.
5   But as an individual and as the mayor of the city,
6   do you think that was fair and reasonable, that he
7   be fired, as an 8-year veteran of the fire
8   department, because he had a telephone conversation
9   with you about the proposed change in the
10  probationary period?
11      A.  I'm not privy to the employees' records or
12  their performance on the job, so I don't -- I can't
13  really make that conclusion, because it's -- I
14  think -- I mean, I owned a business and, typically,
15  you have, you know, records of an employee's
16  performance, good or bad, that lead up to either
17  them being promoted or rewarded or terminated or
18  disciplined.  So I can't make that call, you know,
19  based on the information that I have, because I
20  don't have -- I have very little information.
21      Q.  Okay.  But again, based upon what you know,
22  focusing on the telephone conversation that you had
23  with Mr. Davis on April 17, 2006, if you as mayor
24  had the authority to terminate city employees, would
25  you have terminated Mr. Davis for that telephone

1  conversation?
2      A.   Again, I say that, you know, depending on
3  what --
4      Q.   I'm just talking about --
5      A.   -- what led up to that.
6      Q.   I'm just talking about --
7      A.   If you said --
8           THE REPORTER:  Hold on.  Hold on.  Y'all
9      are talking over each other and y'all need to
10     slow down.
11     Q.   Let me rephrase it.  Again, we just
12 reviewed that the reason for his termination was the
13 communication with you by the telephone.  So just
14 focusing on that reason or that single basis for his
15 discharge, if you had the authority as mayor to
16 terminate city employees, would you have fired
17 Mr. Davis because of his telephone conversation with
18 you?
19          MR. GRAHAM:  Can we go off the record for a
20     minute?
21          MR. WOODLEY:  Sure.
22     (Discussion held off the record.)
23          MR. WOODLEY:  Let's go back on the record.
24     Q.   Mr. Mayor, let's try this one more time.
25 If you, as the mayor, did have the authority to

1  terminate city employees, would you have fired
2  Mr. Davis because solely of that telephone
3  conversation he had with you on April 17, 2006?
4      A.   No.
5      Q.   Okay.  Did you ever mention to anyone
6  within the city's management structure that it was
7  unfair or unreasonable to terminate Mr. Davis?
8      A.   My conversations with the city manager
9  were, you know, I heard that this employee had been
10 terminated and if, in fact, you know -- first, is it
11 true, you know, just kind of -- you know, this is
12 what I heard.  So trying to get the clarification on
13 it because, you know, you hear a lot of things and
14 some of them just don't turn out to be true, they're
15 just rumors.  I wanted to hear from the city manager
16 if it was true or not.
17     Q.   And you had that discussion with him?
18     A.   Yes.
19     Q.   Did you express concerns that that was
20 perhaps unreasonable or unfair or should not have
21 been done with regard to the discharge of Mr. Davis?
22     A.   I guess -- if I remember correctly, I guess
23 my interest was in finding -- in saying, you know,
24 was this -- was this, you know, based on this phone
25 call.  So was this -- you know, when I made the

1  comment to you that I had gotten a call from
2  Mr. David Davis, is that what this is all about?
3  And then was told that, you know, basically this is
4  just part of -- you know, part of an evaluation.
5  You know, it's just part of a record. So at that
6  point, it became very clear that it was a personnel
7  issue and that it didn't have anything to do with
8  me.
9      Q.  Do you recall if the city manager told you,
10 or anyone else told you, that in the past Mr. Davis
11 had spoken to the media and that there were
12 newspaper articles previously about issues involving
13 the operations of the Fire Department and Public
14 Safety, and that that was taken into account in
15 terms of the discharge of Mr. Davis?
16     A.  I was never told that, no. I mean, I knew
17 he made the comments to the media because I had read
18 them and seen them, but not that that was a part of
19 the termination.
20     Q.  Did anyone within the city, including the
21 City Manager or Chief Hunter, get back to you
22 concerning this criticism of your activities that we
23 discussed earlier in Exhibit 23 and tell you, as
24 mayor, you shouldn't be talking with city employees,
25 it's outside the chain of command, we think it's

```
 1  contrary to the merit system regulations and you,
 2  Mr. Mayor, shouldn't do that anymore.  Did anyone
 3  get back to you on that subject?
 4       A.   The only conversation I had concerning this
 5  about -- not specifically about this memo.  But
 6  after this conversation took place my conversation
 7  with Mr. Davis was that -- you know, was a reminder
 8  from the city manager that we had passed -- we had
 9  sent a letter, a unanimous letter, to him that he
10  was our -- he was our spokesperson for the city to
11  the association.
12       Q.   I'm sorry.  I'm not sure I followed you.
13  There was a subsequent document?
14       A.   No, no, no.  After our conversation, the
15  city manager -- and I'm assuming that it --
16       Q.   And when you say our -- just so the record
17  is clear -- I'm sorry.  I didn't mean to interrupt
18  you -- when you say "our conversation", which
19  conversation are you referring to?
20       A.   This was after the conversation that we had
21  concerning Mr. Davis and I's conversation.  And I'm
22  assuming --
23       Q.   And who is "we"?
24       A.   The city manager and I.  Mr. Roberts and
25  myself.
```

1  Q. All right. Go ahead. I'm sorry?
2  A. He and I had a conversation, and he
3  reminded me that the city council had appointed him
4  as a spokesperson for the city council to the
5  association. And my response at that point was I
6  was returning a phone call to David Davis, not the
7  association -- which is what my message was, and
8  that was what my conversation was.
9  Q. And since you again addressed the telephone
10 conversation with Mr. Davis, did he tell you in that
11 conversation that he was expressing the concerns
12 that were shared by other firefighters with regard
13 to extending the probationary period?
14 A. I don't recall that, no, sir.
15 Q. You don't remember?
16 A. No, sir.
17 Q. Has there ever been a discussion between
18 you and city council members individually or
19 collectively that you had exceeded your authority
20 when you have conversations with city employees
21 about policy matters or department issues?
22 A. There was -- there was a conversation that
23 I had with the District Attorney concerning one of
24 our council members talking to him unofficially
25 about my conversations with a department head or,

actually, two department heads -- or not really department heads; one chief and one assistant chief.

Q. And what was that about?

A. One was about the assistant police chief and one of his officers told somebody that -- as he was responding to a phone call, that we were about 30 officers short. And I questioned them on that.

And then the other was when Chief Hunter made the comment apparently -- I don't know to the city manager or one of our council members -- that I had told him to change his position on a subdivision fire code about the widths of the road.

And I had a conversation with the District Attorney, and I just told him that I did have the conversation with the assistant chief concerning his comments about us being 30 officers short or however many he said. I don't know if 30 was the right number. Seems like that comes to mind. And that my conversations with the fire chief, I was not directing him to change his mind but I was asking him about the fire codes.

Q. With regard to the termination of David Davis, did you ever ask the city manager or Fire Chief Hunter to reconsider the matter of Mr. Davis's termination?

```
 1      A.   No.
 2      Q.   Do you have the authority as mayor to make
 3 such a request for reconsideration of the
 4 termination of the city employee?
 5      A.   No.
 6      Q.   Now, are you aware that Mr. Davis, after he
 7 was discharged, appealed that termination to the
 8 City Personnel Board?
 9      A.   Yes.
10      Q.   Did you attend that hearing before the
11 Personnel Board?
12      A.   No.
13      Q.   Did you have any input into the members of
14 the Personnel Board about their deliberations or
15 their decision concerning his termination?
16      A.   No.  The only interaction that we had --
17 which we have no interaction, but we appoint the
18 Personnel Review Board members and that's -- then
19 they work on their own at that point.
20      Q.   The members of the Personnel Board, is that
21 a compensated position?
22      A.   No.
23      Q.   Strictly volunteer?
24      A.   Yes.
25      Q.   Okay.  Let me invite your attention to
```

71

1  several exhibits at the end of the binder, which are
2  newspaper articles, and you can start with
3  Exhibit 31, please.  This appears to be a newspaper
4  report in the Columbus Ledger-Enquirer.  And you'll
5  see the title there is PC Firefighters'
6  Representative Terminated.  I assume PC stands for
7  Phenix City.  And this is concerning, of course, the
8  discharge of David Davis.  Do you remember seeing
9  this particular article in the newspaper?
10      A.   I think I did, yes.
11      Q.   On the right-hand column, there's a quote
12  from Mr. Davis, who was interviewed for this
13  article, in which he apparently said, quote, morale
14  is at the lowest point since I've been here, end
15  quote, that he mentioned in September of 2005.
16      Did it ever come to your attention as the mayor
17  that the morale in the fire department was low or
18  poor?
19      A.   I had heard that because of seeing stuff
20  like this in the paper.
21      Q.   Did that trouble you when you heard that,
22  when you saw that information in the paper or heard
23  that morale was bad in the fire department?
24      A.   Well, certainly.  It always -- and, of
25  course, it -- you know, what we try to do as the

1   city council is to make sure that if there are
2   issues like that, that the city manager is working
3   on those things.
4       Q.  And you indicated earlier, Mr. Mayor, that
5   you did have at least one meeting with the city
6   manager concerning issues in the fire department
7   such as morale.  Did you have any other meetings or
8   discussions with the city manager about how to work
9   on these concerns and improve them?
10      A.  No.
11      Q.  Just that one meeting?
12      A.  And like I said, that was not just a
13  meeting.  When I say -- we don't -- typically, we
14  don't meet to -- our meetings are more on the fly
15  than they are a plan.  And, usually, when we sit
16  down and talk -- I'm only here part-time.  So when I
17  come in, I have, typically, either a laundry list --
18  a physical laundry list or a list that I bring to
19  him, or e-mail and say, you know, this is what I've
20  heard or this is what I've seen or this is the kind
21  of things that -- and mine are more in line of
22  citizen complaints than they are employee
23  complaints.  Because I just don't -- I don't hear
24  those type of things because -- for obvious reasons.
25      Q.  Were you contacted by any newspaper or

```
 1   media representatives after the discharge of
 2   Mr. Davis concerning that very subject?
 3        A.   About his termination?
 4        Q.   Yes.
 5        A.   Yes.
 6        Q.   And did you respond to those inquiries by
 7   the media?
 8        A.   Like I say, I typically don't respond on
 9   personnel issues.
10        Q.   But on this one, did you?
11        A.   I don't think -- like I said, unless I'm
12   pushed, I just don't say anything.  My comment is
13   typically, I don't comment on personnel issues, or
14   those are items that you need to speak to the city
15   manager about, or the personnel director.  But,
16   typically, if it has to do with the city employee, I
17   refer them to the city manager.
18        Q.   But other than typically -- in this
19   particular matter concerning the termination of
20   Mr. Davis, did you give any information or
21   communications to the media about his discharge?
22        A.   No.
23        Q.   Has anyone ever contacted you about the
24   further employment of Mr. Davis after he was
25   fired -- any potential employers or potential fire
```

1   departments -- about possibly employing Mr. Davis?
2       A.  No.
3       Q.  In the last two years since you have been
4   the mayor, have you considered possibly the removal
5   of Mr. Roberts as a city manager?
6       A.  Yes.
7       Q.  And could you tell us about that, please?
8       A.  I don't see how it refers to this case, I
9   guess is -- I mean, could you please explain that to
10  me, how the removal of the city manager in the last
11  couple of months refers to --
12      Q.  Sure.  The city manager, Mr. Roberts, is an
13  individual defendant in this case, so his role in
14  terms of the discharge and his functioning on the
15  job is very important to us as an issue in this
16  lawsuit.  So if, in fact, you have suggested, as I
17  understand, or recommended the removal of the city
18  manager perhaps for poor performance, we want to
19  know about that.  So that's the purpose of my
20  question.  So let me readdress the question one more
21  time.
22      A.  Okay.
23      Q.  Have you taken into account or considered
24  or recommended the possible removal of Mr. Roberts
25  as the city manager?

1    A.   Yes, I have.
2    Q.   And why did you do that and what were the
3  circumstances surrounding your position?
4    A.   The circumstances surrounding my position
5  were the communications that we've had over the last
6  couple of months and his, I guess, inability to
7  communicate effectively with me, or at least what I
8  think is effective with me.
9       It's very difficult for a city manager to do
10 his job if he can't communicate with the mayor or
11 the city council members.  And it's impossible for
12 the mayor and city council to do their job if they
13 can't communicate with the city manager.
14      But it had nothing to do with job performance.
15 It was more about communications and some reactions
16 that I've gotten from the city manager over some
17 issues that I've had.
18   Q.   Okay.  Well, you've been very general.  So
19 could you be more specific in terms of poor
20 communications?  What precisely do you mean that
21 raised your concerns about the city manager?
22   A.   Well, on one particular issue, I brought
23 something to him, and his reaction was very short
24 and abrupt; and when I started talking to him about
25 that, his reaction was -- instead of thinking about

1  the response that he made that could have not set
2  very well with me, you know, his reaction was to get
3  upset and start raising his voice and turning red in
4  the face and saying, you know, is that it or
5  something to that -- you know, is that all you
6  wanted to talk about or something like that.  So
7  that's --
8      Q.   What was the topic that was discussed?
9      A.   The topic that was discussed was about a
10 complaint that I had had from a lady in the city.
11 She had left me a voice mail.
12     Q.   About what subject?  What was the
13 complaint?
14     A.   About the police department.
15     Q.   Any other poor communications or concerns
16 that you had about the city manager which prompted
17 you to consider his removal?
18     A.   Well, for some reason, when -- at certain
19 points where I've been critical of the city manager
20 on issues or critical of specific departments, he
21 gets very defensive and won't speak to me for a week
22 or whatever until I have to go in and say, you know,
23 what's the problem, you know, what do we need to do
24 to solve this problem?  So -- and that, you know,
25 like I say, becomes an issue of communication, and

```
 1   it just got to a place where I no longer wanted to
 2   deal with that, and that's why I -- what prompted me
 3   to send a letter asking for his resignation.
 4        Q.   What was his response to your letter asking
 5   for his resignation?
 6        A.   He responded back that I needed two other
 7   votes, a majority of the council, to remove him from
 8   office.
 9        Q.   Did the issue of his possible removal come
10   up for a vote before the city council?
11        A.   No.
12        Q.   Didn't get that far?
13        A.   No.
14        Q.   Did you have a majority support if you had
15   proposed his removal?
16        A.   No.
17        Q.   And how long ago did this situation occur?
18   Just within recent months?
19        A.   Yes.  Very recently.
20             MR. WOODLEY:  All right, Mr. Mayor.  That's
21        all the questions that I have.  I want to thank
22        you for coming to your deposition today.
23        (The deposition concluded at 10:38 a.m.)
24                * * * * * * * * * *
25
```

78

REPORTER'S CERTIFICATE

STATE OF ALABAMA

MONTGOMERY COUNTY

    I, Shannon Williams, Certified Shorthand Reporter and Commissioner for the State of Alabama at Large, hereby certify that on April 4, 2007, I reported the deposition of JEFFREY SCOTT HARDIN, who was first duly sworn or affirmed to speak the truth in the matter of the foregoing cause, and that pages 1 through 78 contain a true and accurate transcription of the examination of said witness by counsel for the parties set out herein.

    I further certify that I am neither of kin nor of counsel to any of the parties to said cause, nor in any manner interested in the results thereof.

    This 8th day of April, 2007.

*Shannon M. Williams*
SHANNON M. WILLIAMS, CSR
Commissioner for the
State of Alabama at Large

MY COMMISSION EXPIRES: 1/14/2010