21

1  that does a disciplinary action should go before the

2  Personnel Review Board unless it's -- maybe they've

3  got a grievance that they had a oral reprimand or

4  something of that nature, then I might get a

5  grievance like that.

6       Q.   Let me invite your attention to Exhibit 3,

7  which appears to be excerpts from the city's Merit

8  System's rules and regulations.  Section 15.02 says

9  as follows:  Quote, disciplinary actions,

10  dismissals, demotions, suspensions, fines,

11  reductions in pay, position classifications, and

12  allocations shall not be subject to review as

13  grievances, end quote.  Do you see where it says

14  that?

15       A.   I do.

16       Q.   Is that an accurate statement?

17       A.   It is.  It is.

18       Q.   So in the case of Mr. Davis and his

19  dismissal, he would not have been able to file any

20  kind of a grievance seeking review, would he?

21       A.   To me, no.

22       Q.   But to the Personnel Board yes?

23       A.   That's correct.

24       Q.   Is that considered a grievance or an

25  appeal?  Maybe I'm being too technical.

1    A.   I would think it would be an appeal rather

2    than a grievance.  An appeal of decision of the

3    department head.

4    Q.   Okay.  All right.  Mr. Roberts, with regard

5    to David Davis, are you aware that he worked for

6    about eight years in the Phenix City Fire

7    Department?

8    A.   I am.

9    Q.   And are you aware that he was first

10   employed in April of 1998 in the city fire

11   department?

12   A.   I know the approximate hire date.

13   Q.   And are you aware that Mr. Davis was

14   eventually promoted to the rank of sergeant in the

15   city fire department?

16   A.   I am.

17   Q.   As city manager, do you have the authority

18   or responsibility to review proposed promotions like

19   in the fire department?

20   A.   I do.  But as I stated earlier, that's

21   pretty much left up to the department heads or

22   chiefs.  I don't get into the business of promotions

23   or anything like that within their areas of

24   responsibility.

25   Q.   Do you get into employment evaluations of

1    their job performance like a firefighter in the city

2    fire department?

3        A.   I will sign the total evaluation, the

4    yearly evaluations.  But if you're asking me do I

5    read each and every one of them, no, sir, I do not.

6    I think that again is, of course, the first line

7    supervisor, the district chief -- or, in this case,

8    the chief.  It's according to how they've got it set

9    up on who evaluates who and what -- in the rank

10   structure.

11       Q.   I'm sorry.  Did you say you would sign the

12   evaluations?

13       A.   I think at the bottom of the evaluation

14   form, there's a signature block that I sign and I

15   think that's primarily for pay purposes anyway.  But

16   I sign a lot of them every year, it appears.

17       Q.   Let me show you -- I guess we can identify

18   this as Exhibit 34.  And I don't have it in the

19   binder, sir, because I just got it this morning, at

20   least an additional copy.  And this appears to be a

21   Performance Appraisal by the city fire department of

22   David Davis for the evaluation year 2003 to 2004.

23   And it does look like you have -- well, no, I don't

24   think you have.  You weren't city manager then, were

25   you?

24

1    A.   No, sir.  I was -- unfortunately, I was

2    away.

3    Q.   Well, there's -- somebody signed it there

4    as city manager.  Can you make out the name or the

5    signature on that?

6    A.   Max Wilkes.

7    Q.   Was he the previous city manager?

8    A.   He was my interim city manager.   I

9    appointed him as an interim when I was gone half a

10   year.

11   Q.   Let me invite your attention to

12   Exhibit 18.  And as you're looking at that, I want

13   you to take as much time as you need, Mr. Roberts,

14   to review these documents before you feel

15   comfortable in answering my questions.

16   This is a memo from Roy Waters, Deputy Chief in

17   the city's fire department, to Wallace Hunter, the

18   fire chief, dated February 6, 2006, concerning the

19   subject of, quote, letter to Mr. H.H. Roberts, end

20   quote.  You see where it says that?

21   A.   I do, yes, sir.

22   Q.   Have you seen this document before today?

23   A.   Yes, sir.  I read this memo.

24   Q.   You do what?

25   A.   I've read the memo.

1     Q.   Okay.  I want to invite your attention to

2    the last sentence at the bottom of the memo where it

3    says, quote -- and this is Deputy Chief Waters

4    addressing Mr. Hunter -- quote, as I have

5    communicated to you on several occasions, David

6    Davis is doing an outstanding job for me and has a

7    very positive and professional attitude, end quote.

8    Do you see where it says that?

9     A.   I do.

10     Q.   As far as you know, sir, as the city

11   manager, is that a fair and accurate statement

12   concerning Mr. Davis and his job performance as a

13   sergeant?

14     A.   As not being a first line supervisor

15   knowing his day-to-day activities, I would accept

16   the fact that the chief made an evaluation of him

17   and I would not disagree with it.

18     Q.   So you don't have any information or facts

19   as the city manager to disagree with that statement

20   within the fire department that Davis is doing an

21   outstanding job and has a very positive and

22   professional attitude?

23     A.   I wouldn't have any day-to-day knowledge of

24   that, no.

25     Q.   When you were coming up for consideration

26

1    to be appointed as city manager, do you know if the
2    firefighters' local labor organization took a
3    position that you should be city manager or took a
4    position that you should not be city manager?
5        A.   Sir, when I was appointed city manager in
6    2002, it was on a interim basis for 2001 by a prior
7    administration.  And I was not here when the
8    appointments were made at this time.  I already held
9    the position.  And I assumed that by federal laws I
10   would have had my job back anyway when I returned.
11   So I do not know anything about any of that.
12       Q.   Okay.  So you don't know whether or not the
13   firefighters' labor association --
14       A.   No, sir, I do not.
15       Q.   -- supported your appointment as city
16   manager?
17       A.   I do not.  And when I say that, I don't
18   know whether they did or whether they didn't.
19       Q.   Right.  Now, I think you started to
20   indicate earlier that there was at least one
21   occasion, perhaps more, where you met with the
22   firefighters' local union and perhaps a
23   representative of the International Association of
24   Firefighters?
25       A.   We met in this office here.  I never went

1    to a local meeting.  And I -- I think his name is

2    Malone was the first gentleman that came down here.

3    Basically, he talked with me and Mr. Davis about

4    some complaints that Mr. Davis -- or let me not say

5    Mr. Davis per se -- let me say the local union had

6    concerning staffing, morale, equipment, and things

7    of that nature.

8        At that time, I pretty much was emphatic that

9    Sergeant Davis should go to his fire chief and

10   discuss those issues with him, which was at that

11   time Chief Prater.  They had that meeting.

12   Basically, I don't think it was a good outcome.

13       Q.   Okay.  Before we get to the follow-up

14   meeting, let's go back to the earlier meeting that

15   you say you had in this building with Mr. Davis and

16   Mr. Malone from the IAFF.

17       A.   And I may add, I believe Mr. Dennis Duty

18   was still the president of the local at that time

19   and was in attendance as well.  And my memory may

20   not be that well, you know, but I do think there was

21   more than just Sergeant Davis, myself, and Malone.

22       Q.   Do you know at that time if Mr. Davis was a

23   vice-president of the local firefighters' union?

24       A.   I would have to say I did.  I mean, that

25   would make sense.

1    Q.   And, I guess, did they call you up ahead of

2    time and say, Mr. Roberts --

3    A.   Yes, sir, they did.

4    Q.   -- we would like to come over, have a

5    meeting?

6    A.   Yes, sir.

7    Q.   You agreed and scheduled the meeting, then

8    came and you sat here; is that correct?

9    A.   That's right.

10    Q.   Did they give you any documents at that

11    time, any proposals?  Or was it just --

12    A.   Yes, sir.  I'm going to use the word

13    laundry list, because that's basically what it was,

14    some things that they felt needed to be addressed

15    within the fire department.

16    Q.   And roughly how long was the meeting?

17    A.   Probably less than an hour.  Right around

18    an hour.

19    Q.   Okay.  And how did the meeting end up as

20    you recall?

21    A.   I thought it was on a pretty positive note.

22    Q.   Did they raise some issues that you thought

23    should be addressed and resolved?

24    A.   And I believe that the issues they brought

25    up have been addressed and some are still pending.

1       Q.   Can you remember, as an example, some of

2   the issues that they raised in this meeting that you

3   felt were legitimate and should be looked into and

4   addressed?

5       A.   Well, there's been a couple of things

6   that's been brought up.  The 8-hour shifts for one.

7   I have personally felt that a 8-hour shift or a

8   12-hour shift or Panama shift may have worked better

9   than a 24-hour shift.  Some fire departments do

10  that.  After research and finding out, we found that

11  we were wrong on an 8-hour shift.  Had nothing to do

12  with anything else.

13      Then I looked at a 12-hour Panama shift like

14  they have some of these police officers work.  That

15  probably would not work as well as what we've got

16  now, so we chose to keep the shift structure as it

17  is now.  So I felt like that portion of their agenda

18  was addressed.

19      Q.   Okay.  Anything else that you can remember,

20  issues they raised that you --

21      A.   Equipment.  I think that -- the equipment

22  issue or the safety problems.

23      Q.   Safety of the firefighters you mean?

24      A.   Yes.  I'm talking about the breathing

25  apparatuses and vehicles themselves, the fire

1    apparatus themselves.  I think we have moved

2    forward, and both -- Chief Hunter especially is down

3    here constantly looking for ways to buy equipment

4    and added resources for these firefighters not only

5    to, you know, fight a fire, but also in the training

6    process, which is a daily ongoing item.  And I think

7    we have addressed those needs.

8        Q.  Okay.  So I'm clear on this, in this

9    meeting that you had with Mr. Malone from the IAFF,

10    and Mr. Duty and Mr. Davis from the local labor

11    association of firefighters, you recall that one of

12    the items that they addressed with you at that

13    meeting involved fire equipment on the subject of

14    safety of the firefighters and, in particular, I

15    guess you recall their expressing concerns about the

16    self contained breathing apparatus; is that correct?

17        A.  That's correct.

18        Q.  Anything else that you can remember off the

19    top of your head of the issues they raised of

20    concern?

21        A.  A separate meeting came about that dealt

22    with their swap time.  And Chief Prater came to me

23    shortly after I returned from active duty concerning

24    swap time.  The swap time was removed.  The problem

25    we were having with swap time was more of an

1    accounting/insurance issue than anything more so.

2        For instance, we had one firefighter -- and I

3    do not remember his name -- was injured or was sick

4    when he was actually pulling swap time for someone

5    else and workers' comp wouldn't pay the claim.  So,

6    you know, we had to work some procedures out.  And

7    Chief Hunter aggressively worked on that ever since

8    he was appointed chief.  And when Assistant Chief

9    Waters came on board, they, along with the personnel

10   director and the insurance side of the house, felt

11   that they had it in line to where we could put the

12   swap time back in.

13       Q.   Okay.  Any other issues or have I exhausted

14   your memory that were raised by Davis, Duty, and

15   Malone at your meeting?

16       A.   The staffing issue.

17       Q.   What was that about that they raised?

18       A.   You know, everybody would like to go by

19   NFPA standards of -- what is it -- 2010 or 2008?

20   Whichever it is.

21       Q.   1710.

22       A.   It's 1710, 1708.

23       Q.   Two in, two out policy?

24       A.   Sir?

25       Q.   Two in, two out policy?

1    A.   Yes, sir.  However, most cities —— city

2   governments and most managers in these United States

3   are against it.  And if you talk about it in a city

4   managers' meeting, you see that they're not against

5   it, per se, for fire safety; it's the cost that it

6   costs the city to go into it.  We cannot afford

7   staffing like that.

8        But we have increased staffing, and I think

9   that that's one of the main things.  Not only the

10   fire department.  We have increased staffing in the

11   police department as well.  So, you know, I try to

12   keep a equal balance between those two.  So I do

13   think we have tried to address those issues.

14       Q.   That was an issue that was also raised by

15   Mr. Davis, Mr. Duty, and Mr. Malone with you at the

16   meeting?

17       A.   That's right.

18       Q.   Any other issues that you haven't already

19   mentioned that they raised at that meeting?

20       A.   Morale.  But I don't —— I think morale

21   right now is going real good.  It appears to be.

22       Q.   But they raised the concerns?

23       A.   They talked about morale.  You know, as a

24   manager, you know, you can talk to your department

25   heads.  But, you know, your morale in a group of

1    men, whether it be, you know, with a infantry firing

2    squad or whether it be with a fire department, any

3    paramilitary organization, your front line

4    supervisors control.  They control the morale of the

5    men.

6        And, usually, morale is high when you have good

7    intensive training and they're occupied.  And it's

8    not necessarily that you give them everything they

9    want to keep good morale, but you give them the

10   necessary tools to do their job.  And I think that

11   that portion has been addressed now.  That's about

12   all that I know.

13       (Mr. McKoon entered the deposition room.)

14       Q.   But you do recall that Davis and Duty and

15   Mr. Malone raised the issue of employee morale in

16   the fire department at this meeting that you have

17   been describing?

18       A.   I do.

19       Q.   We've talked about five or six items that

20   they raised.  Anything else you can remember they

21   addressed at the meeting?

22       A.   Not off the top of my head, I can't.

23       Q.   Fair enough.  And was it your

24   understanding -- you may have testified to this

25   already -- that those three gentlemen -- Davis, Duty

34

1    and Mr. Malone -- were wanting to meet with you to

2    address these issues in their role as or in their

3    capacity as labor association representatives?

4        A.   Yes, sir.  But I also believe this.  It may

5    be in their role, but I also know they are Phenix

6    City Firefighters 24 hours a day, 7 days a week in

7    my opinion.

8        Q.   I'm sorry.  I didn't understand what you

9    mean.

10       A.   I know they were wanting to address me as a

11   labor organization, but I also know they are

12   employees and employees as firefighters, which I

13   think are 7-day-a-week, 24-hour-a-day jobs.

14       Q.   Yes.  Do you recall if Mr. Davis and

15   Mr. Duty were on their shift schedule or off duty

16   when they had the meeting with you?

17       A.   I don't know about Mr. Davis, Sergeant

18   Davis here.  But I do know that Mr. Duty was not

19   employed by the city at that time.

20       Q.   At that time he was gone?

21       A.   Yes, sir.

22       Q.   Okay.  Now either during or shortly after

23   that meeting, particularly involving Mr. Davis, did

24   you consider that he was violating the chain of

25   command or the Merit System rules and regulations

1    when he asked to meet with you for that almost an

2    hour meeting and address these issues?

3        A.   Well, it went through Chief Prater and I

4    agreed to it.

5        Q.   So earlier he got permission, Mr. Davis

6    did, to meet with you?

7        A.   And I believe Chief Prater talked with me

8    and then I believe Malone called me to get the

9    proper sequence.  I don't remember the exact

10   sequence.

11       Q.   Let me invite your attention --

12       A.   But I did not ask the chief to come over

13   here to the meeting.

14       Q.   You did not?

15       A.   No.  But I think I instructed him, once we

16   left here, to take their complaints to the chief.  I

17   felt like that was --

18       Q.   Was there a reason why you did not --

19            THE REPORTER:   Whoa, whoa, whoa.  I didn't

20       hear the end of your answer.

21       A.   I felt like it was the chief's job, Chief

22   Prater, to handle the complaint, see if he could

23   handle it prior to it coming back to me.

24       Q.   Did you give consideration to inviting

25   Chief Prater to come over and participate in this

1   meeting that we've been describing?

2        A.   I did, but I chose not to.

3        Q.   Why was that?

4        A.   I felt like I wanted to hear the complaint

5   myself and keep an open view, so to speak.

6        Q.   Keep a what?

7        A.   An open view.

8        Q.   Let me invite your attention, Mr. Roberts,

9   to Exhibit 11 in front of you.  This is a memorandum

10  from David Davis in his capacity as vice-president

11  at the time of Local 3668, the Phenix City

12  Firefighters Association, dated January 25, 2005,

13  and addressed to Chief Jerry Prater.  Have you seen

14  this document before today?

15       A.   I have.

16       Q.   Was this the so-called laundry list that

17  you described earlier that was given to you either

18  before or during the meeting you had with Davis,

19  Duty, and Malone?

20       A.   It is.

21       Q.   Some of these issues you've already

22  addressed.  In your one-hour meeting, were they able

23  to go right down each and every item and cover all

24  of them?

25       A.   I don't think they did.  I think they went

37

1    over a synopsis of the group.

2        Q.   And at the end of the meeting, did you

3    suggest to these three gentlemen -- Davis, Duty and

4    Malone -- that they follow up directly with Chief

5    Prater?

6        A.   I think I asked for Sergeant Davis to talk

7    with Chief Prater.

8        Q.   And were you contemplating at the time that

9    Davis would talk to Chief Prater again in his

10   capacity as a local union representative?

11       A.   Either/or.  It didn't matter to me which.

12   I think either one of them, whether he be a local

13   member or whether he be any other firefighter, if

14   he's got some concerns, then I think he needs to

15   bring it through the chain and let the chief handle

16   it.

17       Q.   Now, did you expect or instruct Mr. Davis

18   to go to his immediate officer, perhaps his captain,

19   and up the chain of command before he --

20       A.   Not to my knowledge.  I don't remember

21   doing that.

22       Q.   So you suggested Mr. Davis could go

23   directly to Chief Prater?

24       A.   I emphatically said that he needed to take

25   this up with Chief Prater.

1      Q.    Okay.  Fair enough.  Let me invite your

2    attention to Exhibit 12, which appears to be a

3    letter from Thomas Malone as a field service

4    representative of the IAFF dated March 7, 2005,

5    addressed to yourself.  Do you recall having

6    received this letter from Mr. Malone?

7      A.    I do.

8      Q.    And, again, like with all these documents,

9    if you want to take a moment to completely read it,

10    just let me know that you want to do that.

11      A.    I would like to do that and brief myself.

12      Q.    Sure.

13          MR. GRAHAM:  Let's go off the record.

14      (Discussion held off the record.)

15          MR. WOODLEY:  Back on the record.

16      Q.    Exhibit 12, you've had a chance now, Mr.

17    Roberts, to read to yourself this letter Mr. Malone

18    sent to you on March 7, 2005; is that correct?

19      A.    That's correct.

20      Q.    And he's describing a meeting that

21    apparently he and Davis had with Chief Prater; is

22    that correct?

23      A.    It's my understanding that it's a meeting

24    between Sergeant Davis and Chief Prater.

25      Q.    Who?

1      A.   Sergeant Davis and Chief Prater.  I don't

2  believe Mr. Malone was present.

3      Q.   Okay.  And would this have been the

4  follow-up meeting that you were suggesting to Davis

5  and Duty and Malone that they follow up and meet

6  with Prater?

7      A.   I would assume that it would be, due to the

8  date on the letter.

9      Q.   Now, obviously, Mr. Malone is expressing

10  his concerns that it was not a productive meeting

11  that was held involving Chief Prater and David Davis

12  and himself, Mr. Malone.  And he mentions to you in

13  his letter that they felt like there were threats

14  and intimidation and -- you see where it says all of

15  that?

16      A.   I do.

17      Q.   Did you take any follow-up action when you

18  received this letter and the concerns expressed

19  about it?

20      A.   I talked with Chief Prater about the

21  letter.

22      Q.   What did you discuss with him?

23      A.   He expressed that he had talked with

24  Mr. Davis about the request and basically that was

25  it, to a degree.  And by that, I mean we didn't go

40

1   indepth as to his answers.

2       Q.   Mr. Malone indicates that the meeting that

3   he had with the chief and, apparently, also

4   Personnel Director Goodwin lasted only about 10

5   minutes.  Was that your understanding?

6       A.   That's my understanding of his letter, yes.

7       Q.   That was a lot less than the length of time

8   that you met with him?

9       A.   If the timing is right, it is less.

10      Q.   Do you think that may be a bit brief to

11  have a constructive meeting addressing issues and

12  concerns?

13      A.   Not being in the tone of the meeting, I

14  wouldn't -- I wouldn't think it was enough time.

15  But according to Mr. Malone's letter, I don't know

16  that it may have been a good meeting.  Appears to

17  have been a bad meeting as I stated earlier.

18      Q.   And did Chief Prater report back to you

19  about the nature of the meeting he had on the

20  subject?

21      A.   As I stated earlier, it was my

22  understanding it was not a good meeting.

23      Q.   And that's what Prater reported back to

24  you?

25      A.   Basically, yes.