41

```
 1        Q.   Do you know if any other follow-up meetings
 2   were scheduled?
 3        A.   Not to my knowledge that he did.
 4        Q.   That was pretty much the end of the matter?
 5        A.   As far as I know, that was as far as it
 6   went at that time.
 7        Q.   Okay.  Turn now to Exhibit 13, which
 8   appears to be a letter from yourself addressed back
 9   to Mr. Malone dated March 15, 2005.  I take it
10   that's your signature at the bottom of the letter?
11        A.   Yes, sir, it is.
12        Q.   And then you indicated that you were
13   responding to Mr. Malone, and you also state that
14   the city does not recognize your union and is not
15   required by law to do so.
16        A.   To bargain with.  To bargain, collectively
17   bargain with.
18        Q.   It does say recognize.  Is there a
19   difference between recognize and then you go on to
20   say will not enter into negotiations with the union?
21        A.   We're not going to enter into negotiations
22   as to salary or anything.  I think the Alabama law
23   is pretty explicit that we have to recognize the
24   union body as a local, and they can talk to us on
25   the issues as stated in state law, such as safety,
```

1  manning, and things of that nature.
2      Q.  Was it your understanding, again just so
3  it's clear in my mind, that when Mr. Davis was
4  sitting down with Mr. Malone and meeting with Chief
5  Jerry Prater, that Mr. Davis was meeting in his
6  capacity as a local firefighters' association
7  representative or officer?
8      A.  Let me back up.  I don't think Mr. Malone
9  was at this meeting with Mr. Davis and Chief Prater,
10 the way I understand it.  Now, did he get them on
11 duty and talk with them?  Yes, sir.  I think that
12 you can be an officer in the labor organization of
13 the International Association of Firefighters and
14 you can still talk about the same issues that we're
15 discussing the state law whether you're on or off
16 duty.
17     Q.  Okay.
18     A.  You know, with the chief, that's --
19     Q.  Fair enough. Now, at the end of your
20 letter to Mr. Malone, which again is Exhibit 13, you
21 indicate you would be glad to do a follow-up meeting
22 on these various issues.  Was such a meeting ever
23 held?
24     A.  I never heard from Mr. Malone for another
25 meeting.

1   Q.  All right.
2   A.  That I can recall. Let me add that.
3   Q.  Have you ever had occasion where a city
4 employee has come to you directly as a city manager
5 and expressed concerns about issues that involve the
6 individual's employment or department?
7   A.  Yes, sir, I have.
8   Q.  More than once?
9   A.  Yes, sir, I have.
10  Q.  Do you have an open door policy where city
11 employees can come in and talk to you?
12  A.  Not so much as that. I like for them to go
13 through their chain. I believe there's a chain of
14 command, and I am military, so -- but anytime
15 they'll stop me on the yard or something and ask me
16 a question, I do my best to answer it in a good
17 answer. But I'll also tell them they need to take
18 that up to their department head. The reason for
19 that is if it deals with the Merit System, as
20 happened in this case, I'm the one that has to sit
21 in on the review board. And rather than make a
22 call, I would rather hear everything at one time.
23  Q.  Can you recall occasions where a
24 firefighter working for the city's fire department
25 has talked to you about issues affecting the

```
 1  department?
 2      A.  I have.
 3      Q.  And who would that have been?
 4      A.  I've had several of them.
 5      Q.  Who were they?
 6      A.  I've talked as much as lately to -- not
 7  lately.  When I was in the guard.  Gosh.  I can't
 8  think of his name right now.  He's a captain today.
 9  But I've talked with several firefighters.
10      Q.  Were you a city manager at the time?
11      A.  Yes, sir.  Also was commanding officer in
12  the National Guard.
13      Q.  You can't remember the individual's name
14  though?
15      A.  Yes.  I'll think of it in just a second.
16  If you want to go off the record, I'll find out
17  right quick.
18      Q.  Sure.  We can go off the record.
19  (Discussion held off the record.)
20          MR. WOODLEY:  Let's go back on the record.
21      Q.  You remember the individual firefighter's
22  name that came to you about it?
23      A.  I do now.  Carl Taylorson.
24      Q.  How long ago was that roughly?
25      A.  It would have to have been around two years
```

1  ago, over a year ago. I have been retired for
2  approximately a year now.
3     Q. And what was the issue of concern that he
4  had on his mind that he discussed with you?
5     A. Carl spoke of some of the same issues, you
6  know, as it relates to morale and equipment. And I
7  think that those items have been addressed, just as
8  I instructed Carl to talk to Chief Hunter.
9     Q. Do you know if he was a union member at the
10 time?
11    A. Yes, he was.
12    Q. And where was this conversation?
13    A. National Guard Armory.
14    Q. And how long did the conversation take
15 place, roughly?
16    A. Not very long. I'm going to say five, ten
17 minutes at the most.
18    Q. And did he address, on this occasion,
19 staffing?
20    A. I don't know that he addressed all the
21 issues.
22    Q. Did he address employee morale?
23    A. He addressed the morale.
24    Q. What about swap time?
25    A. No. I think -- no. He may have now. We

1  got the swap time, I think, straight a year ago,
2  something like that.
3      Q.  In this conversation, did he address
4  staffing or equipment or firefighter safety?
5      A.  He talked some of the staffing and of the
6  equipment.
7      Q.  So how did that conversation end?  Did you
8  say you were going to look into it or did you
9  suggest that he follow up --
10     A.  I told him I think I understood some of his
11 concerns.
12     Q.  And did you do anything after that?
13     A.  No, sir.  We were already working on it.
14     Q.  So you didn't communicate with any chief
15 officer in the fire department about this
16 conversation?
17     A.  No, sir.  I don't go straight to the chief
18 officer.  I talk to the chiefs.  You know, when it
19 comes down to that, I'll listen to any employee that
20 wants to talk to me, but I'm going to go back to
21 that department head.
22     Q.  And this gentleman was named Taylor?
23     A.  Taylorson.  Carl Taylorson.
24     Q.  Carl Taylorson?
25     A.  He was a driver/engineer at the time, I

think.

Q. And a union member at the time?

A. Yes, sir.

Q. Did you consider Carl Taylorson to have violated the Merit System's rules and regulations about chain of command when he addressed these directly to you?

A. Not really. Not in the manner that he did that, no, I did not.

Q. When you say not in the manner, why? What do you mean by that?

A. I instigated the conversation. I asked him how things were going at the fire department. I think when you do that, you open the door.

Q. Okay. So he was never charged or disciplined for discussing it with you, was he?

A. No, sir.

Q. Were there any other individuals -- I think you mentioned there were several firefighters.

A. I've had a lot of firefighters -- I know a lot of them out there, and a lot of them will talk to me. But as far as me giving them a yes or no answer, I don't do that.

Q. Do you know if firefighters have talked directly to city council members about issues of

1  concern to them that are going on in the fire
2  department, whether it's firefighter health and
3  safety, staffing, equipment?
4       A.   That would be hearsay, and I would not know
5  of -- I don't like to testify like that.  I don't
6  know of any direct contact.  I know what I have
7  heard, and I cannot testify to that.
8       Q.   Well, there's no rules preventing you from
9  testifying.
10      A.   Well, I've heard that they have talked with
11 them.
12      Q.   I'm sorry?
13      A.   I've heard they've talked with them, yes,
14 sir.
15      Q.   Have talked with the city council members?
16      A.   Yes, sir.
17      Q.   Do you know if Mr. Davis has spoken to city
18 council members about issues?
19      A.   I know they have, yes, sir.
20      Q.   How do you know that?
21      A.   Well, I have had a conversation with both
22 Councilman Bush and, of course, Mayor Hardin.
23      Q.   And what's the substance of that?
24 Mr. Davis's communications about issues of concerns
25 that --

    A. Well, as far as the mayor goes, I understand that he told me about going to a retirement supper, or luncheon one, for Todd Boatner with the firefighters. And Councilman Bush has mentioned the operation of the fire department a couple times to me.

    Q. Okay. But your understanding is that Davis has raised those issues?

    A. Well, yes. I understand that Sergeant Davis and Councilman Bush's brother are real -- are good friends or know one another or are acquaintances.

    Q. Okay. Do you recall any other discussions Mayor Hardin may have had with firefighters about issues of concern in the fire department?

    A. Not to my knowledge.

    Q. Okay. Any other individual firefighters other than Taylorson that you can recall discussed issues of concern in the fire department with you?

    A. Not by name, I do not.

    Q. But there have been other firefighters?

    A. There have been other firefighters, yes, sir.

    Q. Did you ever follow up in trying to get them charged with discipline for deviating from the

50

```
 1   chain of command or the Merit System's --
 2        A.    I did not.
 3        Q.    -- rules?  You're going to have to let me
 4   finish my questions before you begin your answer.
 5   Do you understand that?
 6        A.    I understand.
 7        Q.    Let me invite your attention to
 8   Exhibit 14.  And this appears to be a newspaper
 9   article.  My understanding, it's the Columbus
10   Ledger-Enquirer and I believe it's an article that
11   came out in September 2005.  Does this look familiar
12   to you?
13        A.    I've read the article, yes, sir.
14        Q.    Okay.  And when you read this newspaper
15   article at that time, what was your reaction to it
16   as a city manager?
17        A.    How do you mean reaction?
18        Q.    Were you upset?  Were you annoyed?  Were
19   you going to take some action in response to the
20   article?
21        A.    Not in response to the article, no.  Was I
22   annoyed or upset?
23        Q.    Yes.
24        A.    Anytime anything happens to the city,
25   whether it be with any department, you hate for it
```

1  to get in the paper.
2      Q.  I'm sorry.  What?
3      A.  Anytime anything happens to the city, you
4  hate for it to get in the paper.
5      Q.  Bad publicity?
6      A.  That's -- total concept, yes, sir.
7      Q.  So is it fair to say you were annoyed and
8  upset about the substance of this article?
9      A.  I think you could say that we were annoyed
10 by it.
11     Q.  Okay.  So after you read it and you were
12 annoyed, did you do anything with the fire
13 department or the chief over there?  Talk to them?
14     A.  Well, I think -- I don't know whether I
15 talked with Wallace the next -- this was on a
16 weekend, if I remember right.  I believe this was on
17 a weekend.  I don't know whether I talked with him
18 on Monday or Tuesday and, you know, verified some of
19 the things, and we talked about the article in just
20 general terms.  That was it.  I do not get into the
21 day-to-day operations unless they ask me to -- of
22 any department.
23     Q.  I understand.  When you discussed this with
24 Chief Hunter, this article and the substance and the
25 comments, did you give any instructions to Chief

52

1  Hunter to do anything specifically?
2       A.  I think Chief Hunter informed me that he
3  was planning on doing an investigation or something
4  to that effect.  And I think my instructions to
5  Chief Hunter is to be sure you check with the city
6  attorney to make sure that you're on solid legal
7  ground on whatever outcome.
8       Q.  And what kind of investigation was Chief
9  Hunter contemplating?
10      A.  I have no idea.
11      Q.  You didn't ask him?
12      A.  No, sir.  I did not.
13      Q.  Okay.  Some of the comments made in this
14 newspaper article were from, of course, David
15 Davis.  In part, you'll see there in the second
16 column he was quoted as saying, morale is at the
17 lowest point since I have been here in the fire
18 department.  And they list him as the president of
19 the Phenix City Firefighters' Association.  When you
20 read that, did that trouble you or cause you to
21 contact Chief Hunter and explore the morale
22 situation in the fire department?
23      A.  No, sir.  I've already heard that
24 complaint.
25      Q.  Were you at all concerned that the chief,

1  Chief Hunter, was not doing anything about the
2  morale?  Because it seems like it's a continuing
3  concern.
4      A.  The morale issue is a rollover not just
5  from Chief Prater or Chief Hunter.  It was a
6  rollover from a prior chief as well.  This
7  department has been on a uphill struggle since the
8  '90s.  And I think we are on a positive path to
9  correct that now.  And that's what we've been
10  working on since I returned.
11      Q.  Why do you think the morale has been such a
12  problem for such a long period of time in the city
13  fire department?
14      A.  You know, not being a -- I don't know.  I
15  really don't know how to answer that.  I know it's
16  been a ongoing problem.  I think we are trying to
17  correct any problems as far as equipment.  But there
18  again, I go back down to the basic statement I made
19  while ago; that the first line supervisor and the
20  way he works his people and trains his people has a
21  great amount to do with the morale of any department
22  in communications through up to your chief.
23      Q.  You'll notice in this article that the
24  subject was also addressed about understaffing.  In
25  other words, apparently there were 51 slots or spots

1   in the fire department and only 44 were filled.
2   When you saw that, did that cause you to raise that
3   issue as a concern?
4       A.  No, it did not, because there again, as
5   I've talked with you before and as Sergeant Davis
6   and them knew, that we were looking at hiring
7   people.  You do have budget restraints and we were
8   able to combat any fire or any emergency that came
9   about.  However, you did have firefighters that had
10  to work over.
11      Q.  Later in the article, Mr. Davis indicates,
12  quote, we are reluctant to talk because of
13  significant fear of retaliation, being disciplined,
14  or fired, end quote.
15      A.  Sir, I've been working for this city for 34
16  years.  And whether it be a council or commission
17  form of government, there's never been any
18  intimidation or threat of firing or termination that
19  I know about.
20      Q.  So you don't -- I guess you would not have
21  an explanation as to why Mr. Davis and several of
22  the other firefighters expressed that concern about
23  retaliation?
24      A.  You know -- no, I don't.  I think it's
25  unjustified.

55

1    Q.   Do you know of a Sergeant Ann Land?
2    A.   I do know.
3    Q.   You do know her?
4    A.   Yes, sir, I do.
5    Q.   And I guess you're aware, because you read
6    this article, that she made a comment about the view
7    of the city's fire department is if you don't like
8    the job, you can leave it.
9    A.   I read that.
10   Q.   Did that trouble you or cause you to take
11   any remedial action?
12   A.   I did not.
13   Q.   Okay. Then there's a quote in here on the
14   third page. And there's some overlap in this
15   particular version of this newspaper article, but
16   there is a quote in here from Mr. McKoon:  Quote,
17   the last three fire chiefs have tried to reason and
18   have been out of a job, McKoon said; my advice is to
19   run this thing like you are a drill sergeant on
20   Parris Island, end quote.
21       Do you see where it says that?
22   A.   I do.
23   Q.   Did you ever receive that kind of advice or
24   input?
25       MR. MCKOON:  With all due respect, I don't

think that's the end of the quote, but --

MR. WOODLEY: Well, it goes on to say, everybody at the top can't be wrong. Is that what you mean?

MR. MCKOON: Yes.

MR. WOODLEY: That's the end of it.

Q. Did you ever have a conversation with Mr. McKoon about running the fire department like a drill sergeant at Parris Island?

A. No, sir, but I believe the fire department, police department, and any law enforcement organization has to be run in a military manner -- or a paramilitary manner, excuse me. And that includes the chain of command.

Q. Do you think firefighters should be treated the same as Marines?

A. I think they should be disciplined. A Marine makes a good firefighter, sir.

Q. Now, it also indicates that Council Member Ray Bush -- and I take it you know who he is, right?

A. Yes, sir.

Q. And you're laughing now. Is he a friend of yours or an enemy?

A. He's a good -- he's a friend.

Q. Friend? Apparently, he tried to

57

```
 1  participate in these disagreements among the
 2  firefighters and their union and the city and tried
 3  to mediate, as it says in the article, those
 4  differences.  Are you aware of that?
 5       A.  I read that in the article.  I'm not aware
 6  of that.
 7       Q.  Did you have any discussions with Mr. Bush
 8  as a council member about these issues?
 9       A.  As a mediator, no.
10       Q.  How about in general of these issues of
11  concerns at the fire department?
12       A.  As I stated earlier, he's mentioned the
13  fire department a couple times and their issues.
14  And I've always told him that they were being worked
15  on.
16       Q.  Did you think Council Member Bush was
17  acting out of line or outside his authority when
18  apparently he was trying to serve as a mediator on
19  these differences?
20       A.  If he's trying to serve as a mediator, I
21  do, yes, sir, without council approval.
22       Q.  Has Mr. Bush ever been told that he was
23  acting outside his authority?
24       A.  I've never told him that.
25       Q.  Do you know if he's ever been told that by
```

1  anybody else?
2      A.  I have not.  He was one of the authors of
3  this charter.
4      Q.  And then you'll see a series of other
5  articles and letters to the editor about various
6  issues of concern within the fire department about
7  morale and swap time and other issues.  I take it
8  you had the chance to read those letters to the
9  editor as well, correct?
10     A.  I have not read every letter in the -- or
11 every article in the Ledger, but I've read the
12 majority of them, sir.
13     Q.  So just to put this in context, after you
14 read that initial newspaper article in September
15 2005, you had a discussion with Chief Hunter, and
16 your understanding is that he was going to
17 investigate the matter; is that basically true?
18     A.  That's basically what happened.  I mean,
19 there was nothing new in the article that we did not
20 already know.
21     Q.  Did you learn subsequently that after Chief
22 Hunter conducted his investigation on the issues and
23 individuals who were quoted in that newspaper
24 article, that he and the fire department issued a
25 counseling form to Mr. Davis?

1  A. I was.

2  Q. Why don't you look at Exhibit 16? This
3  appears to be that counseling form issued by the
4  fire department against David Davis, and it's dated
5  September 21, 2005. And I take it that would have
6  been shortly after that newspaper article; is that
7  about right?

8  A. I would have to look at the article, but I
9  assume it would be, too.

10 Q. You'll note in the first sentence this
11 counseling form says, quote, Sergeant David Davis
12 was counseled by Chief Hunter and Assistant Chief
13 Johanson on the 20th of September 2005 concerning
14 him making or publishing statements to the local
15 media, end quote. Do you understand that that was a
16 reference to that earlier newspaper article that we
17 spent a lot of time on?

18 A. It could have been to several media
19 statements. There's others put out other than
20 that. But that would be a fair statement to assume.

21 Q. Were you given a copy of this counseling
22 form?

23 A. I do not keep a copy of them, no, sir.

24 Q. But do you remember being given a copy of
25 this one?

```
 1      A.   No.
 2      Q.   You don't have to approve these, do you?
 3      A.   No.
 4      Q.   Did you ever discuss with Chief Hunter or
 5   Assistant Chief Johanson why they issued this
 6   counseling form to Davis?
 7      A.   No, sir, I didn't.  I would assume it would
 8   have been, though, by Merit System rules and
 9   regulations or either their SOPs, whichever they
10   used at that particular time.
11      Q.   And what are you referring to there?
12      A.   SOPs?
13      Q.   In the context of this communication with
14   local media.
15      A.   Either it's going to be a Merit System
16   violation or one of their standard operating
17   procedure violations.  Of course, the Merit System
18   will override any of their standard operating
19   procedures.
20      Q.   You'll have to enlighten me.  Explain how
21   Mr. Davis's communication with the local media and,
22   in particular, his comments in this newspaper
23   article --
24      A.   I believe --
25      Q.   You have to let me finish.  I'm sorry.
```