1  Please explain to me, Mr. Roberts, how the
2  communications and comments that Mr. Davis made in
3  that newspaper article we were just discussing would
4  violate the Merit System rules and regulations or
5  SOPs of the fire department?
6      A.  I would have to look at the rules and
7  regulations of the Merit System and not quote them
8  off the top of my head.  But I believe it will tell
9  you something about talking with the media.  If it
10 is not there, then I would have to to review the
11 SOP, and I do not know the fire or police SOP by
12 heart.
13     Q.  Well, then let's review it.  Exhibit 3,
14 which is an excerpt from the Merit System rules and
15 regulations.  And to shorten this, you may want to
16 look at page 3 of this document, Section 2.054,
17 where it addresses the subject matter of free
18 speech.  And tell me when you're finished reading
19 that section.
20     A.  I've read it, sir.
21     Q.  Is this the section of the Merit System
22 rules and regulations that you were just trying to
23 recall when I was asking you questions about the
24 counseling form that was issued to David Davis?
25     A.  That's correct.

1    Q.   Please tell me, if you can, which comments
2  that Mr. Davis made in the newspaper article and was
3  quoted would impair discipline and harmony in the
4  workplace under Section 2.054 of the Merit System
5  rules and regulations?
6    A.   I believe the headline itself as stated,
7  the alarm -- three alarm --
8    Q.   Turmoil?
9    A.   Yes, sir.  I think that's going to cause
10 turmoil in the fire department, because I do not
11 believe a hundred percent of my firefighters or the
12 city's firefighters -- let me correct myself --
13 believes this.  One hundred percent of our
14 firefighters are not disgruntled with their job.
15   And I also believe that it could impede job
16 performance on any negative quote by any city
17 employee in the paper that, you know, that could
18 cause someone to be intimidated against or feel peer
19 pressure from them, such as what's been the case in
20 the fire department.
21   Q.   Okay.  Anything else that would indicate
22 how Mr. Davis's comments in the newspaper article
23 would have impaired the discipline and harmony in
24 the fire department?
25   A.   Not right off the top of my head.

1    Q.  Okay.  Same question with regard to the
2  next provision in this free speech section of the
3  Merit System rules and regulations.  Can you give me
4  an example of how Mr. Davis's comments in that
5  newspaper article would impede job performance?
6    A.  Well, it's just like I said.  I think it
7  can -- by peer pressure.
8    Q.  I'm sorry.  What do you mean by that?
9    A.  You know, I -- in organized labor, you
10 know, you can exert some force on nonunion workers,
11 and I think that has been shown to work in all
12 realms, whether it be firefighters, electricians,
13 plumbers, steamfitters, whatever.  And I think some
14 of that, in my opinion, was evident.
15   Q.  Well, do you think Mr. Davis's comment in
16 the newspaper article about poor employee morale in
17 the department, do you think that impeded job
18 performance?
19   A.  I think it could have, yes, sir, I do.
20   Q.  I don't want to know if it could have.  Did
21 it actually?
22   A.  I do, yes.
23   Q.  Could you explain that happening?
24   A.  Well, there --
25   Q.  Or give me examples?

1     A.    -- again --
2           THE REPORTER:  I just can't get it down
3     when you're talking over each other.
4           MR. WOODLEY:  We can take a break.
5     (Brief recess.)
6     Q.    Mr. Roberts, I think we were addressing the
7     Section 2.054 of the Merit System rules and
8     regulations concerning the subject of free speech.
9     And I wanted to follow up on those questions by
10    asking you again, in light of the comments that you
11    are aware of that Mr. Davis made in that newspaper
12    article in September 2005, which of those comments,
13    if any, would have impeded job performance by him or
14    others in the fire department?
15    A.    Let me try to answer it this way, see if
16    I -- anything that's going to deal with safety,
17    equipment, morale, the general public don't --
18    they're not familiar with fire department
19    operations.  It gives a bad image in the total
20    concept of the operations, and it's really not a
21    true one, and it doesn't need to be in the paper
22    like that.
23    Q.    Do you think --
24    A.    It should be factual.
25    Q.    Do you think the citizens and members of

1  the public have a right to know and receive
2  information about the operations of their fire
3  department?
4      A.  If they get the proper perspective they do.
5      Q.  And when you say proper perspective, would
6  that be consistent with your personal opinion of the
7  fire department?  In other words, whatever the
8  firefighters happen to say should be?
9      A.  I think the majority of the operations with
10 the fire department have the true opinions and know
11 what's being done to correct any negatives.
12     Q.  Okay.  Were there any comments in that
13 newspaper article by Mr. Davis that were untruthful
14 as far as you know?
15     A.  I felt like they were.
16     Q.  Which ones?
17     A.  I think anytime you talk about the
18 staffing.  I think the staffing is fine.  I think we
19 man the vehicles.  I think we man all fire
20 apparatus.  I think we man the rescue trucks.  I'm
21 not totally convinced -- totally not convinced that
22 the equipment was all that bad.  We had some old
23 pieces of equipment; of course, due to budget
24 restraints you don't buy new engine apparatus every
25 day.  And, too, the training.  Some of the things

that he talks about in the article to me does impede job performance and, you know, it can touch back on the bottom -- personal loyalty to any of those. I think it could hurt the loyalty of some of your people as it relates to it.

Q. Well, sir, I'm not aware that Mr. Davis was quoted, as I read this newspaper article, on the subject of staffing or understaffing or the subject of training. He was quoted as morale being at the lowest that he's seen it in the fire department. And he was quoted again in the article about being concerned about potential fear and retaliation or being disciplined or fired. But I don't see anywhere in this article where Mr. Davis -- excuse me -- was quoted about training or staffing concern.

A. Well, I think, number one, he puts it this way; he relates to reluctant to talk of -- let's see how he put it. We're reluctant to talk about it because of fear of retaliation and being disciplined or fired. He's talking about the problems inside the fire department. To me, I'm taking that he's talking about everything we've been discussing, which doesn't, to me, impede job performance, bottom line.

1  Q.  So your reading into his quote that he's
2  got fear or concern about retaliation or being
3  disciplined or fired, you're reading that as
4  criticism of training and understaffing.  Is that
5  what you're telling me?
6  A.  I'm reading anything he's saying that's
7  detrimental to the fire department, going back to
8  the complaints throughout the entire course of media
9  publicity is detrimental to the fire department.
10 Q.  So bottom line is anytime a firefighter
11 criticizes the fire department and it gets in the
12 media, that's going to be bad for the fire
13 department?
14 A.  It could be, yes, sir.  It could be -- it
15 could be.
16 Q.  And you would consider that wrong on the
17 part of the firefighter and a violation of the Merit
18 System's rules and regulations; is that fair?
19 A.  Yes, sir, it is.
20 Q.  Let me ask you a series of questions, which
21 you were here when I addressed them with Chief
22 Hunter in his deposition earlier today.  Based upon
23 your experience with the city and particularly your
24 capacity as city manager, would it be a violation by
25 a firefighter here in the city -- a violation of the

```
 1   Merit System rules and regulations if that
 2   firefighter did not follow the so-called chain of
 3   command?
 4        A.   I do.  I believe that.
 5        Q.   Okay.  And, specifically, if the
 6   firefighter did not follow or pursue the chain of
 7   command and spoke directly with the media
 8   representative on the subject of inadequate staffing
 9   in the fire department, would you consider that to
10   be a violation of the Merit System rules and
11   regulations?
12        A.   Yes, sir.
13        Q.   Would you consider that firefighter then to
14   be subject to discipline, perhaps firing, as a
15   result?
16        A.   I would consider -- I would think that he
17   would fall in whatever category of Merit System
18   offense that was, whether it be termination,
19   suspension, written counseling statement.
20        Q.   And, sir, in your capacity as city manager,
21   would a firefighter violate Merit System rules and
22   regulations if he did not follow the chain of
23   command but spoke directly to the media about health
24   and safety of firefighters on the job?
25        A.   I do feel that would be a violation of the
```

1  Merit System.
2      Q.  And would that individual firefighter then
3  be subject to potential discipline or firing?
4      A.  I think so.
5      Q.  Same question.  Would the firefighter
6  violate the Merit System's rules and regulations and
7  be subject to discipline if he bypassed the chain of
8  command and spoke directly to the media about
9  inadequate protective gear or inadequate fire
10  department equipment and vehicles?
11      A.  I feel it's a violation of the Merit
12  System.
13      Q.  And that individual be subject to
14  discipline or firing, correct?
15      A.  Correct.
16      Q.  Would it be a violation of the Merit System
17  rules and regulations if a firefighter bypassed the
18  chain of command and spoke directly to a media
19  representative about concerns he had over response
20  times or inadequate dispatching procedures in the
21  fire department?
22      A.  I feel that would be a violation.
23      Q.  And would it also be a violation of the
24  Merit System rules and regulations, subjecting a
25  firefighter to discipline or firing, if he bypassed

1  the chain of command and spoke directly to a media
2  representative about employee morale in the fire
3  department?
4      A.  I feel it would be a violation.
5      Q.  Would it also be a violation of the Merit
6  System rules and regulations if a firefighter
7  bypassed the chain of command and spoke directly to
8  a media representative about public safety related
9  to fire department operations?
10     A.  I would think so.  There are certain
11 procedures on the ground where they've got ways of
12 doing it through the chain.
13     Q.  What do you mean specifically by that?
14     A.  They have got ways to talk with people and
15 get it to whomever they need to talk with.
16     Q.  On all of those subjects I just covered --
17 staffing, health and safety of firefighters,
18 protective gear, equipment in the fire department,
19 morale, safety -- would it be a violation of the
20 Merit System rules and regulations if a firefighter
21 addressed those issues directly with the city
22 council without pursuing it through the the chain of
23 command?
24     A.  I think it would be, yes.
25     Q.  And would that individual firefighter then

71

1  be subject to discipline or potential firing if he
2  addressed those issues directly with the city
3  council without going through the so-called chain of
4  command?
5      A.  I think it would be.
6      Q.  Okay.  Has that ever happened?  Has a
7  firefighter ever gone to a council meeting and stood
8  up and addressed a fire department issue?
9      A.  In my 34 years?  No, sir.  We -- not to my
10 knowledge now.  That's -- that's not to say I have
11 been to every council meeting, but there have been
12 times when they would address budget hearings, when
13 the chief would ask some to talk years ago.  Now we
14 have our budget hearings, you know, in this room
15 here, and the chiefs present their cases at that
16 time.
17     Q.  Have any city police officers and/or
18 representatives of the FOP ever talked directly to
19 the news media about issues of concern in the Police
20 Department?
21     A.  Not to my knowledge.
22     Q.  Now, going back to Exhibit 15, which is the
23 memo again from Chief Hunter to members of the
24 Phenix City Fire Department dated September 20,
25 2005, is it your understanding that the Chief

Causey Peterson Reporting, Inc.
Post Office Box 81
Columbus, Georgia 31902
(706) 317-3111

1   distributed that to all the employees in the city's
2   fire department?
3       A.   It was distributed to all the employees of
4   the city.
5       Q.   Okay.  But this, in particular, looks like
6   it was distributed by Hunter to members of the fire
7   department.  Is that your understanding?
8       A.   That's correct.
9       Q.   Okay.  And did he do this with your prior
10  knowledge and approval?
11      A.   He did.
12      Q.   Okay.  And did you authorize a similar memo
13  to be distributed to all City employees?
14      A.   Yes, I did.
15      Q.   And it required apparently all of the
16  firefighters, as well as all City employees, to sign
17  off that they had received or read this?
18      A.   We would like some type of record that they
19  received -- that each one received a copy of this
20  memo.
21      Q.   Did you receive any objections from any
22  city employees or firefighters about the substance
23  of this memo?
24      A.   I have not, no, sir.
25      Q.   Have you heard that anyone objected to it?

1    A.   No, sir.

2    Q.   And we discussed earlier with Chief Hunter
3  Exhibit 34, which appears to be a memorandum from
4  you, sir, as the city manager dated September 20,
5  2005, to all employees.  And is this the kind of
6  memorandum that was distributed to the city workers?

7    A.   That's correct.

8    Q.   Okay.  Let's move on to Exhibit 17,
9  Mr. Roberts.  This appears to be a letter addressed
10 to you dated January 31, 2006, from a gentleman
11 named Harold A. Schaitberger, general president of
12 the International Association of Firefighters.  Do
13 you remember receiving this letter shortly after its
14 date?

15   A.   I do.

16   Q.   And copies were evidently also sent, you
17 can see at the end of the letter, to Mayor Hardin
18 and Fire Chief Hunter.  Do you see where it says
19 that?

20   A.   I do.

21   Q.   When you received this letter, what was
22 your reaction to it?  Were you annoyed?  Were you
23 upset?  Anything like that?

24   A.   Not annoyed or upset per se.  I called the
25 Chiefs in and wanted to know what the letter was

1   about.  I didn't know of anything going on at this
2   particular time.
3        Q.   Didn't know anything what?
4        A.   Any conflict that was going on at this
5   particular time.  And I believe it was Chief Waters
6   said he would talk with David Davis about the
7   letter.
8        Q.   Did you ask Chief Hunter to look into it
9   and get back to you?
10       A.   I think Chief Hunter was already looking
11  into it, yes.
12       Q.   But did you expect him to get back to you
13  at some time?
14       A.   Yes, sure.
15       Q.   And among other things in this letter,
16  Mr. Schaitberger is addressing concerns about the
17  shift schedule, the risks or possibility of
18  implementing an 8-hour shift as opposed to the
19  existing 24-hour schedule.  And, among other things,
20  also addressing a concern that Mr. Davis was issued
21  a counseling form on September 20, 2005, concerning
22  his interview and statements to the local media.  Do
23  you see where it says that?
24       A.   I do.
25       Q.   And then Mr. Schaitberger is outlining

```
 1   certainly legal principles under the First
 2   Amendment; for example, the right that public
 3   employees have to free association under the First
 4   Amendment.  Were you aware of those protections,
 5   those constitutional rights, before you got this
 6   letter from Mr. Schaitberger?
 7        A.   I'm aware of the First Amendment rights,
 8   yes, sir, and I do feel like that our First
 9   Amendment rights are -- we give them their due
10   diligence as well with them, and there's procedures
11   for that.
12        Q.   Have you been aware for a number of years
13   that the First Amendment also protects the right of
14   public employees to free speech?
15        A.   I do under the guidelines that's given,
16   yes, sir.
17        Q.   And have you been aware for a number of
18   years as city manager that it's a violation of the
19   First Amendment protections for public employees to
20   be disciplined or retaliated against if they are
21   exercising their First Amendment rights to free
22   speech and free association?
23        A.   As long as it's done in the proper
24   perspective.
25        Q.   What was the follow-up?  You get this
```

76

1   letter.  You talk to Chief Hunter, what's going on.
2   You expect he's going to get back to you.  Did he
3   get back to you?
4        A.   Yes, sir.  They had letter.  I believe it
5   was some -- David said there wasn't any problems.
6        Q.   Okay.  Exhibit 18, this appears to be a
7   memo from Deputy Chief Roy Waters to Chief Hunter
8   dated February 6, 2006, and it's concerning the
9   letter Schaitberger had sent to you.  Did you
10  receive a copy of this memo?
11       A.   I did.
12       Q.   On or about the date of it in February
13  2006?
14       A.   Uh-huh.
15       Q.   That's a yes?
16       A.   Yes, sir.  I'm sorry.
17       Q.   So when you received a copy of this memo,
18  you understood, I take it, that there had been a
19  discussion between Deputy Chief Waters and
20  Mr. Davis, correct?
21       A.   As indicated in the letter, yes, sir.
22       Q.   All right.  Did you take any further action
23  or think anything further was necessary on this
24  subject?
25       A.   I did not.

1  Q. And then you sent a reply letter back to
2  Mr. Schaitberger which appears as Exhibit 20 dated
3  February 14, 2006; is that correct?
4  A. That's correct.
5  Q. And you indicate in part in this letter
6  that the Deputy Chief spoke with Mr. Davis upon
7  receipt of your letter, and Mr. Davis expressed that
8  he thought everything in the department was going
9  good and that he did not have any complaints?
10 A. I used Chief Waters' letter and put what
11 was reported to me.
12 Q. Okay.
13 Q. Then at some point did it come to your
14 attention, Mr. Roberts, that Mr. Davis had placed a
15 telephone call to Mayor Hardin sometime in April of
16 2006?
17 A. Yes, sir.
18 Q. How did that first come to your attention?
19 A. To be honest with you, I don't really
20 remember. I believe it was Chief Hunter that
21 explained it to me or told me about it.
22 Q. In a conversation?
23 A. Yes, sir.
24 Q. And what did he tell you about it?
25 A. In general terms, basically that the Mayor

1  had been contacted by Mr. Davis in relation to a
2  proposed change in probationary time.
3     Q.  Probationary time for new hires into the
4  fire department?
5     A.  For new hires within three departments, all
6  of our public safety, which is, of course, our
7  police, code enforcers, and, of course, the fire
8  department.
9     Q.  But is it fair and accurate to say that
10 since Mr. Davis was an 8-year employee of the fire
11 department, that this proposed extension of the
12 probationary period from one year to 18 months would
13 have not directly affected him?  Is that a fair and
14 accurate statement?
15    A.  It would not have affected him at all.
16    Q.  Was it your understanding, based upon the
17 information that you have been given, that Mr. Duty
18 placed the telephone call to Mayor Hardin in April
19 of 2006 when --
20    MR. GRAHAM:  You said Mr. Duty?
21    Q.  I'm sorry.  Is it your understanding, based
22 upon the information that you were given, that David
23 Davis, when he placed the call to Mayor Hardin in
24 April of 2006, was off duty at the time?
25    A.  I don't remember asking that.  I don't

1  know.
2      Q.  Okay.  Do you know if Mr. Davis -- or did
3  you receive any information that Mr. Davis had
4  placed that call to the Mayor in Mr. Davis' capacity
5  as president of the firefighters local labor
6  association?
7      A.  The only thing the Mayor told me was that
8  David had called concerning the proposed change in
9  probationary time.
10     Q.  Okay.
11     A.  Now, I would have assumed it would have
12  been as a officer of the local or as a firefighter,
13  either/or.
14     Q.  When you say assume, do you have any
15  personal knowledge that it might have been in his
16  capacity as president of the local union?
17     A.  Well, he's both, so I assumed it would be
18  that, yes.
19     Q.  Do you know or do you have any information
20  that Mr. Davis addressed any other issues when he
21  spoke to the Mayor by telephone other than extending
22  the probationary period?
23     A.  I do not know any other information on
24  their phone call.
25     Q.  When you were told by Chief Hunter that