80

1    Mr. Davis had this telephone conversation with the

2    Mayor, did it occur to you that that would have been

3    a violation of the Merit System rules and

4    regulations?

5         A.   Yes, sir.

6         Q.   Did you tell Chief Hunter at the time that

7    it was -- in your opinion, that was a violation?

8         A.   I did not.

9         Q.   Let's go to Exhibit 23.  This is a memo

10   from Chief Wallace Hunter to yourself, sir, as city

11   manager dated April 20, 2006, a copy being sent also

12   to Barbara Goodwin, the Personnel Director.  I take

13   it you received this memo from the Chief on or about

14   that date?

15        A.   I did.

16        Q.   Now, did you do anything when you received

17   this memo?  Speak to anybody?  Give any

18   instructions?

19        A.   I don't remember whether I asked them or

20   told them that if, in the course of them conducting

21   the investigation was my understanding of what it

22   was about.  But I think, there again, they were told

23   to go through the the city attorney.

24        Q.   Did you voice the view to Chief Hunter or

25   Personnel Director Goodwin that in light of this

81

1    situation, you felt Mr. Davis should be fired?

2        A.   No.   I think my comment to the Personnel

3    Director was that I felt like we had a violation and

4    it needed to be checked.

5        Q.   So you did voice your opinion that you

6    thought the situation was a violation?

7        A.   Yes.   But to check it through the attorneys

8    and to go with it.

9        Q.   You'll notice Chief Hunter, in his memo to

10   you, is expressing concerns or actually criticizing

11   Mayor Hardin.   You'll see that at the bottom of the

12   first page of the memo where he says, quote, Mayor

13   Hardin should refer any employee violating the chain

14   of command, as indicated in our Merit System, back

15   to their department head, Personnel Department, or

16   city manager.   Failing to do so is a violation of

17   our City charter, end quote.   See where it says

18   that?

19       A.   I do.

20       Q.   Did you agree with that assessment by Chief

21   Hunter concerning the activities and position of the

22   Mayor?

23       A.   I felt like the Mayor should instruct the

24   firefighter or union president, if it concerned

25   something to do with any business, to contact me

1   since I was the designated representative for the

2   International Association of Firefighters to contact

3   on City business, which would have -- to me would

4   have violated the Merit System anyway if he was a

5   firefighter calling.  So yes, there was definitely a

6   Merit System violation.

7         Q.   Do you think the Mayor violated the Merit

8   System rules and regulations?

9         A.   No.  I'm saying Mr. Davis did.  The Mayor

10  is not covered by the Merit System.

11        Q.   No.  But I'm addressing these points that

12  Chief Hunter is talking about the Mayor.  You know,

13  I just quoted a couple sentences.  My question to

14  you is did you share and agree with the viewpoint of

15  Chief Hunter that Mayor Hardin failed in his efforts

16  to comply with the city charter?

17        A.   Yes.

18        Q.   And why do you say yes?

19        A.   I feel that that gets into the day-to-day

20  operations of the city and it should be left up to

21  the city manager.

22        Q.   Have you ever spoken to Mayor Hardin about

23  this situation in your --

24        A.   No, sir.

25        Q.   -- your position?

1      A.   No, sir.

2      Q.   Are there any circumstances under which a

3 firefighter working for the city can communicate

4 with the Mayor of the city about issues that involve

5 the city fire department?

6      A.   Not to my knowledge.

7      Q.   Would your answer be the same if I referred

8 to city council members?  Are there any

9 circumstances or situations under which a

10 firefighter can speak to a city council member about

11 issues involving the city's fire department?

12      A.   They can come to the council through proper

13 procedures.  And I think that that proper procedure

14 goes through their chain of command.  And if we

15 cannot correct it, then we feel -- ultimately, if I

16 feel that it needs to get to the council, then I

17 will get it to them.

18      Q.   You, as the city manager, will

19 raise concerns?

20      A.   Yes.  The bottom line, even on a work

21 session, of whatever comes before council for a work

22 session we control, whether it be the civilians

23 coming in or whomever.  It's a very structured form

24 of government.

25      Q.   Is a firefighter permitted to -- after

1    exhausting the chain of command on an issue

2    affecting the fire department, is that firefighter

3    then allowed to address the city council or city

4    council members on that issue?

5         A.   Not by the Merit System, I don't think, no,

6    sir.

7         Q.   So if such a firefighter did that after

8    exhausting the chain of command, that firefighter

9    would be violating the Merit System rules and

10   regulations?

11        A.   I think he would be violating the intent of

12   the Merit System rules and regulations, I do.

13        Q.   Would he be violating the language of the

14   Merit System rules and regulations?

15        A.   I feel like they would be, yes.

16        Q.   And would that same firefighter, after

17   exhausting the chain of command, who addressed the

18   city council as a group on an issue affecting the

19   fire department, would that firefighter be subject

20   to discipline up to and including termination?

21        A.   He would be disciplined as to whatever the

22   Merit System says.  But I'm going to say this

23   again:  I don't feel like that it would ever get to

24   that point.  I've never seen it that way.  Let me

25   put it that way.

85

1       Q.   Well, just so the record is clear, the

2 firefighter pursues the chain of command on an issue

3 affecting the fire department and addresses the city

4 council on that same issue, then would he be subject

5 to discipline, including firing?

6       A.   He could be, yes.

7       Q.   Exhibit 25, Mr. Roberts, is a End of

8 Employment Form involving Mr. Davis and it indicates

9 that his employment was terminated April 21, 2006,

10 and he was dismissed.  It has a place for you to

11 sign, but on this copy there's no signature.  Do you

12 recall having signed that?

13       A.   I did not sign it.

14       Q.   Now, why would that have been?

15       A.   He was -- it was an appeal process, and

16 I've got to sign the ultimate letter that does the

17 discharge.

18       Q.   Had you, at this point in time, verbally

19 told Chief Hunter that you approved of the

20 termination?

21       A.   I knew of the termination, but I -- I knew

22 of the termination.  However, I did not go into

23 details with them.  I received those details -- full

24 details.  You get bits and pieces at any time to any

25 termination in the city.  But I will receive all the

86

1     details at one time from both sides at the Personnel

2     Review Board hearing.

3         Q.   Did Chief Hunter, at any time prior to the

4     termination of Mr. Davis, clear it through you or

5     get your concurrence to go ahead and discharge him?

6         A.   No, sir.  These department heads can make a

7     discharge on their own.  As I stated earlier, I

8     delegate that down to them.

9         Q.   Sir, do you have a view on whether or not

10     expanding the probationary period to 18 months for

11     new hires would have an adverse impact on recruiting

12     qualified individuals as firefighters?

13         A.   No, sir, I do not.

14         Q.   Do you know if firefighters, while they are

15     on probation, are prohibited from having secondary

16     jobs?

17         A.   It's the same as any of our others that's

18     on probation in the public sector.  Number one, we

19     want their total, one hundred percent divided

20     attention in the training process.  And you go

21     through the basic concept basic training for the

22     chosen Public Safety field they're in.

23         Q.   Now, coming to the end here, it's your

24     understanding that Mr. Davis did, in fact, appeal

25     his dismissal to the Personnel Board, correct?

87

A.    He did.

Q.    Did you attend that hearing?

A.    I attended the hearing.

Q.    Did you participate in that hearing?

A.    I was called to testify.

Q.    So you were a witness?

A.    At the very end of the hearing, yes, sir.

Q.    What was the substance of your testimony?

A.    Who the direct contact point for the International Association of Firefighters was with the city.

Q.    I'm sorry.  How did that relate to a telephone conver-- let me finish, please, if I may. How would that comment you just made relate to the telephone conversation that Mr. Davis had with the Mayor about the probationary period?

A.    Well, as union president or as he's indicated, then that comment should have been through me.

Q.    So, once again, your view is that he was calling the Mayor in his capacity as the local president and should have gone through you?

A.    From the indications that I have, yes. From everything that y'all have shown me today and in the Personnel Review Board hearing.

1        Q.   When you were called as witness at the

2   Personnel Review Board hearing, were you called by

3   the City's attorney or representative?

4        A.   I was called by the City's attorney.

5        Q.   Were you aware you were going to be called

6   as a witness?

7        A.   Not until right before he called me.

8        Q.   And that was Mr. Graham?

9        A.   That's correct.

10       Q.   And at that time when you were called as a

11   witness before the Personnel Board, were you

12   supportive of the discharge of Davis?

13       A.   From the testimony that I had heard, I felt

14   that he had a violation of the Merit System.

15       Q.   And then you're the ultimate decisionmaker

16   on behalf of the city, and I think you indicated

17   earlier that the Personnel Board made a

18   recommendation to you to uphold the discharge of

19   Davis?

20       A.   Yes, sir.  That's correct.

21       Q.   Did you at all, at any time, think you

22   might have a conflict of interest if you were called

23   as a witness by the city attorney at the Personnel

24   Board hearing and then you were going to make the

25   ultimate decision as to what might be recommended by

1    the Personnel Board?

2        A.    Not as it related to the ultimate question

3    of what the contact point was with the union.

4        Q.    So it's okay --

5        A.    So I do not.  I do not because I did not --

6    I don't think it was a conflict of interest, no.

7        Q.    Has anyone ever told you it might have been

8    a conflict of interest to be a witness, in effect,

9    against an employee that's been discharged and then

10   be the ultimate decisionmaker later on?

11       A.    No, sir.

12       Q.    Were you ever contacted by a member of the

13   press or the media to give a quote or comment after

14   Mr. Davis was discharged?

15       A.    I have.

16       Q.    And did you respond to that?

17       A.    I did not.

18       Q.    What did you say?  No comment or just --

19       A.    No comment.

20       Q.    And why did you say that?

21       A.    That's the normal response I have for

22   anything that deals with personnel issues.  That's

23   something that, to me, is private between the

24   individual and his employer, and it's up to them if

25   they want to put it out.

1     Q.   Were you aware that Mr. Davis explored

2   getting other employment after he was fired by the

3   city?

4     A.   I knew that he worked for the ambulance

5   service, yes, sir.

6     Q.   Do you know the name of the ambulance

7   service?

8     A.   Yes, I do.  He worked for us.  I mean, you

9   know -- Care?

10     Q.   Okay.  But were you ever contacted by any

11   possible or prospective employers inquiring about

12   Mr. Davis?

13     A.   No, sir, I have not been.

14     Q.   And that would would include verbally, by

15   telephone, e-mail, correspondence?  You were just

16   never contacted?

17     A.   I've never been contacted about employment

18   for Mr. Davis.

19     Q.   Does the city have a policy on that, about

20   making any comment about employees who have

21   previously worked for the city?

22     A.   We do.  Usually, it's a no comment, but

23   it's -- you would have to ask the Personnel Director

24   the exact quote.

25          MR. WOODLEY:  Okay.  I think that's all the

91

1    questions I have.  Thank you, Mr. Roberts, for

2    coming here.

3        (The deposition concluded at 1:35 p.m.)

4            *  *  *  *  *  *  *  *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Causey Peterson Reporting, Inc.
Post Office Box 81
Columbus, Georgia 31902
(706) 317-3111

92

REPORTER'S CERTIFICATE

STATE OF ALABAMA

MONTGOMERY COUNTY

I, Shannon Williams, Certified Shorthand

Reporter and Commissioner for the State of Alabama

at Large, hereby certify that on April 4, 2007, I

reported the deposition of H.H. ROBERTS, who was

first duly sworn or affirmed to speak the truth in

the matter of the foregoing cause, and that pages 1

through 92 contain a true and accurate transcription

of the examination of said witness by counsel for

the parties set out herein.

I further certify that I am neither of kin nor

of counsel to any of the parties to said cause, nor

in any manner interested in the results thereof.

This 10th day of April, 2007.


_Shannon M. Williams_
SHANNON M. WILLIAMS, CSR
Commissioner for the
State of Alabama at Large

MY COMMISSION EXPIRES: 1/14/2010