# SUPPLEMENTAL

# DEPOSITION OF H.H. ROBERTS

1

```
1                 IN THE UNITED STATES DISTRICT COURT

2                 FOR THE MIDDLE DISTRICT OF ALABAMA

3                           EASTERN DIVISION

4

5     DAVID DAVIS,                    ©COPY

6            Plaintiff,

7     vs.                      CASE NO. 3:06-CV-0054-VPM

8     CITY OF PHENIX CITY, ALABAMA,

9     et al.,

10            Defendants.

11

12

13                  * * * * * * * * * * *

14

15        DEPOSITION OF H.H. ROBERTS, taken pursuant to

16    stipulation and agreement before Shannon M.

17    Williams, Certified Court Reporter and Commissioner

18    for the State of Alabama at Large, in the offices of

19    City Hall, 601 12th Street, Phenix City, Alabama, on

20    Tuesday, November 6, 2007, commencing at

21    approximately 11:16 a.m. EST.

22

23                  * * * * * * * * * * *

24

25
```

```
 1                     APPEARANCES

 2   FOR THE PLAINTIFF:

 3   THOMAS A. WOODLEY
     Woodley & McGillivary
 4   1125 15th Street N.W.
     Suite 400
 5   Washington, D.C.  20005

 6   FOR THE DEFENDANTS:

 7   JAMES P. GRAHAM, JR.
     712 13th Street
 8   P.O. Box 3380
     Phenix City, Alabama  36868-3380
 9

10   JAMES R. MCKOON, JR.
     McKoon & Associates
11   925 Broad Street
     P.O. Box 3220
12   Phenix City, Alabama  36868-3220

13

14   ALSO PRESENT:

15   Cole Dugan
     David Davis
16   Wallace Hunter

17                 EXAMINATION INDEX

18      BY MR. WOODLEY                    4
        BY MR. MCKOON                    45
19

20

21

22

23

24

25
```

1          STIPULATIONS

2          It is hereby stipulated and agreed by and

3     between counsel representing the parties that the

4     deposition of H.H. ROBERTS is taken pursuant to the

5     Federal Rules of Civil Procedure and that said

6     deposition may be taken before Shannon M. Williams,

7     Certified Court Reporter and Commissioner for the

8     State of Alabama at Large, without the formality of

9     a commission; that objections to questions other

10    than objections as to the form of the questions need

11    not be made at this time but may be reserved for a

12    ruling at such time as the deposition may be offered

13    in evidence or used for any other purpose as

14    provided for by the Federal Rules of Civil

15    Procedure.

16         It is further stipulated and agreed by and

17    between counsel representing the parties in this

18    case that said deposition may be introduced at the

19    trial of this case or used in any manner by either

20    party hereto provided for by the Federal Rules of

21    Civil Procedure.

22              * * * * * * * * * *

23

24

25

4

```
 1                    H.H. ROBERTS
 2          The witness, having first been duly sworn
 3     or affirmed to speak the truth, the whole truth and
 4     nothing but the truth, testified as follows:
 5                    EXAMINATION
 6     BY MR. WOODLEY:
 7          Q.   Mr. Roberts, I think you know by now, my
 8     name is Tom Woodley.  I'm counsel for Mr. David
 9     Davis in this lawsuit against the city, Chief
10     Hunter, and yourself.  You're aware of that?
11          A.   I'm aware of that.
12          Q.   And you had your deposition taken earlier
13     in this case, correct?
14          A.   I have.
15          Q.   Let me go through a couple of preliminaries
16     just to make sure we're still on the same
17     wavelength.  You've now been placed under oath again
18     so you're obligated to tell the complete and full
19     truth.  Do you understand that?
20          A.   I understand.
21          Q.   If at any time you don't understand or hear
22     one of my questions, please stop me immediately and
23     I will be more than happy to rephrase or repeat that
24     question to ensure that you do, in fact, understand
25     my question.  Do you understand that?
```

1      A.   I understand.

2      Q.   You have to wait until I finish my question

3 before you begin your answer so that this

4 distinguished court reporter can take down all of

5 the words that we say today.  Do you understand

6 that?

7      A.   I understand.

8      Q.   Is there any reason today, medication or

9 otherwise, that you might be in any way impaired in

10 understanding my question and responding to my

11 questions?

12     A.   No.

13     Q.   Okay.  Let me invite your attention to the

14 binder of exhibits which you have in front of you.

15 And Mr. McKoon has a full set of these exhibits as

16 well.  Exhibit Number 1 is the notice of depositions

17 that we served concerning this round of depositions

18 in the case.  And you have been designated as the

19 city's Rule 30(b)(6) witness to give knowledgeable

20 and informed testimony in certain subject matter

21 areas.  Are you aware of that?

22     A.   I'm aware of that.

23     Q.   Let me invite your attention to page 2 of

24 the Notice of Deposition.  Paragraph one is an area

25 where you have been designated as a Rule 30(b)(6)

1    witness for the city, and that states as follows:

2    "All actions, agendas, minutes, notes, notices,

3    memoranda, summaries, correspondence, media reports,

4    e-mails, and other documents which relate in any way

5    to city employees that have addressed or spoken to

6    city council members in any public meetings or

7    conferences of the city council for the period

8    January 1, 2001 to the present."

9         See where it says that?

10        A.   I do.

11        Q.   Are you prepared today to give testimony on

12   that subject?

13        A.   I am.

14        Q.   Paragraph two states as follows:  "All

15   actions, memoranda, correspondence, e-mails, notes,

16   notices, media reports, and other documents which

17   relate in any way to any communications in writing

18   or verbal that any city employees have had with city

19   council members outside of public meetings for the

20   period January 1, 2001 to the present."

21        See where it says that?

22        A.   I do.

23        Q.   Are you prepared to give testimony on that

24   subject as well?

25        A.   I am.

7

1      Q.  Going to paragraph four, it provides as

2   follows:  "All actions, memoranda, correspondence,

3   e-mails, notes, notices, grievances, warnings,

4   counseling forms, reprimands, disciplinary actions,

5   and other documents which relate in any way to the

6   adoption, implementation, application and

7   enforcement of Section 2.054 of the city's merit

8   system rules and regulations."

9      Do you see where it says that?

10      A.  I do.

11      Q.  And are you also prepared to give testimony

12   on that subject?

13      A.  I am.

14      Q.  Paragraph seven:  "All facts, memoranda,

15   correspondence, e-mails, notes, notices, and other

16   documents which relate in any way to information

17   obtained by defendant H.H. Roberts that the

18   plaintiff and other city employees have the

19   constitutional First Amendment right of free

20   expression."

21      Do you see where it says that?

22      A.  I do.

23      Q.  Are you prepared to give testimony on that

24   subject as well?

25      A.  I am.

1    Q.   And lastly, paragraph eight:  "All facts,

2  memoranda, correspondence, e-mails, notes, notices,

3  and other documents which relate in any way to

4  information obtained by defendant H.H. Roberts that

5  the plaintiff and other city employees have the

6  constitutional First Amendment right of free

7  association."

8    See where it says that?

9    A.   I do.

10    Q.   Are you prepared to give knowledgeable and

11  authoritative testimony --

12    A.   I am.

13    Q.   -- on behalf of the city on that subject as

14  well?

15    A.   I am.

16    Q.   Chief Roberts, I'm kind of curious, do you

17  use a computer?

18    A.   I do.

19    Q.   Do you use e-mails?

20    A.   I do.

21    Q.   Have you done that for years?

22    A.   Pretty good length of time.

23    Q.   Okay.  And refresh my recollection.  When

24  were you appointed or selected as city manager for

25  the Phenix City jurisdiction?

9

1     A.   2001.

2     Q.   So you've been city manager for the last

3 six-plus years?

4     A.   Six years and one month.

5     Q.   And do you, on occasion, send and receive

6 e-mails to other department heads concerning city

7 business?

8     A.   Occasionally.

9     Q.   Okay.  Do you recall, in connection with

10 the newspaper article that came out in September

11 2005, which is Exhibit 14 if you want to take a look

12 at that.  And again, just for the Record, this is

13 that newspaper article in which Mr. Davis and a

14 number of other firefighters were interviewed and

15 quoted concerning issues affecting the city's fire

16 department.

17    Do you recall, after you were aware of that

18 newspaper article, that you sent any e-mails or

19 memoranda to the chief of the fire department or

20 anyone else in the city about this newspaper

21 article?

22     A.   I don't recall right off the top of my

23 head.  I would be willing to look at any that you

24 might have.

25     Q.   So it's possible that e-mails could exist

1    on this subject?

2         A.   Not to my knowledge.  I do not remember

3    sending one.

4         Q.   Have you been asked by anyone, including

5    the city attorneys in this case, to look back

6    through your e-mails to see whether or not there

7    were any e-mail communications either sent by you or

8    received by you concerning this newspaper article?

9         A.   Only through the city attorneys.

10        Q.   I don't understand your response.

11        A.   They are the only ones that asked me to

12   review and get the criteria that y'all had

13   requested.

14        Q.   Okay.  But were you specifically asked to

15   look at your e-mail?

16        A.   All e-mails, sir, is what I was asked to

17   look at.

18        Q.   And no e-mails, as far as I know, have been

19   produced in this case.  So does that mean that there

20   were no e-mails when you reviewed concerning the

21   subject of this newspaper article?

22        A.   I did not recover any.

23        Q.   Did you, in fact, look?

24        A.   The city clerk looked, sir.

25        Q.   Okay.  Same questions with regard to the

1    incident of the discharge of Mr. Davis which

2    occurred in April of 2006.  And I'm sure you'll

3    remember that he apparently spoke to the mayor,

4    Mayor Hardin; and as a result of that, at least in

5    part, he was a few days later terminated.  You're

6    aware of that, right?

7        A.   I'm aware he was terminated.

8        Q.   Okay.  Were there any e-mails that you sent

9    or received from anyone concerning his communication

10   with the mayor, the investigation of the situation,

11   and his eventual discharge?

12       A.   Not to my knowledge.

13       Q.   And have you looked to see if you had

14   received or sent any e-mails on that subject?

15       A.   I have not received any.  Neither have I

16   sent any.

17       Q.   But have you looked to see if there were,

18   in fact, any?

19       A.   As I stated earlier, the city clerk was

20   requested to gather this information, and that's the

21   point of contact that put the information together,

22   sir.

23       Q.   Who is city clerk?

24       A.   Martha Harris.

25       Q.   And how did she look whether or not there

12

1    were any e-mails on these subjects?

2         A.   Sir, that's a question that you would have

3    to ask her.

4         Q.   You're not aware of how she did it?

5         A.   No, sir, I am not.

6         Q.   Did she go into your computer or hard drive

7    or did somebody else do that?

8         A.   It's possible she could have had the IT

9    director to do that, sir.

10        Q.   But are you specifically knowledgeable and

11   aware that she made a good faith effort to see if

12   there were any e-mails and came up with zero?

13        A.   I'm confident Ms. Harris did her job.

14        Q.   Do you know whether or not you had any

15   interoffice memoranda or any written papers going to

16   Chief Hunter or the HR director, Mrs. Goodwin,

17   concerning the newspaper article in September 2005

18   and the discharge of Mr. Davis in April 2006?

19        A.   Not that I know of.

20        Q.   So as far as you know, all of the documents

21   that are relevant to these issues in this lawsuit

22   have been produced?

23        A.   All of the documents that I know of have

24   been produced to you.

25        Q.   Let me invite your attention, Mr. Roberts,

1  to Exhibit 35.  This is a memo from Assistant Chief

2  Hanson to Chief Hunter dated September 21, 2005, and

3  it's regarding the verbal counseling with D.E.

4  Karl –– with a K –– Taylorson.  And this concerns

5  that newspaper article in September 2005 which you

6  just looked at.  Have you seen this document, this

7  memo, before today?

8       A.   I read this memo, yes, sir.

9       Q.   Okay.  Concerning the substance of this

10  memo, do you agree with the substance, or is there

11  anything in here which you would disagree with or

12  take exception to?  And as I said with Chief Hunter,

13  when I ask you to look at a document, take all the

14  time you need, Mr. Roberts, before you respond to my

15  questions.

16       A.   Now restate your question.

17       Q.   Now that you have had a chance to read

18  through and review this memorandum, Exhibit 35, is

19  there anything contained in here that you disagree

20  with or take exception to?

21       A.   No, sir.

22       Q.   Okay.  You'll see in the second sentence of

23  this memo it says as follows:  "The statements

24  issued during this interview by personnel to the

25  news reporter were done in complete conflict of the

14

1  Phenix City employees merit system (Section 2.054 –

2  free speech)."

3      Do you see where it says that?

4      A.  I do.

5      Q.  And do you agree with that?  In other

6  words, that the comments made by Mr. Davis and the

7  firefighters in that newspaper article on September

8  2005 were in complete conflict with that section of

9  the merit system rules and regulations?

10      A.  I would have to agree with that.

11      Q.  Do you recall if any comments or quotes

12  they made in that newspaper article were not in

13  conflict with the merit system rules and

14  regulations, Section 2.054?

15      A.  I would have to reread it.  I do not know

16  that answer.

17      Q.  Okay.  Again, it's Exhibit 14 if you want

18  to reference it, Mr. Roberts, but maybe to shorten

19  up the questioning and answering, Mr. Davis and the

20  other firefighters talked about staffing concerns in

21  the fire department, so their discussion and

22  quotations, particularly of Mr. Davis on staffing,

23  would that have been in conflict with Section 2.054

24  of the merit system rules and regulations?

25      A.  Yes, sir.

1    Q.   And there was also a comment by Mr. Davis,

2  and I believe other firefighters, in that newspaper

3  article about poor employee morale in the fire

4  department.  Would that subject also be in conflict

5  with the merit system rules and regulations?

6    A.   I feel it would.

7    Q.   Now, is it your position that before a

8  firefighter can speak with the media about issues --

9  any issues affecting the fire department, that the

10  firefighter has to pursue the chain of command and

11  get prior permission before talking to the media?

12    A.   Yes.

13    Q.   And is that true with regard to issues of

14  staffing in the fire department, recruitment in the

15  fire department, training in the fire department,

16  adequate protective gear and apparatus in the fire

17  department, dispatching procedures, response times

18  in the fire department?  Are all of those subjects

19  that the firefighter would have to get prior

20  clearance through the chain of command in the city

21  before he or she could speak on those issues to a

22  media representative?

23    A.   Yes, sir.

24    Q.   Other than Mr. Davis, has anyone in the

25  fire department, to your knowledge, been disciplined

1   for speaking to the media about fire department

2   issues?

3         A.   I don't -- I do not know the answer.

4              MR. MCKOON:  Wait a minute.  I'm going to

5         object because I'm not sure he was, but just

6         for the Record.

7         Q.   Let me broaden the question.  Do you know

8   of any firefighters who have been disciplined for

9   speaking to the media?

10        A.   Not to my knowledge, I do not.

11        Q.   Later on in this Exhibit 35, the memo again

12   from Assistant Chief Hanson to Chief Hunter which

13   you have in front of you, it says in the second

14   paragraph, second sentence:  "These guidelines are

15   to be followed by everyone employed by the City of

16   Phenix City."

17        Is that an accurate statement?

18        A.   That is accurate.

19        Q.   And then the next sentence says "he",

20   referring to Mr. Taylorson, had -- and, again, the

21   word not has been inadvertently dropped.  I think we

22   had an understanding with Mr. McKoon --

23             MR. MCKOON:  That is correct.

24        Q.   -- that the word "not" should be inserted

25   there so it would say properly as follows:  "He had

17

1   not received nor requested permission from any fire

2   department supervisors to speak with a member of the

3   news media concerning issues within the fire

4   department."

5       Is that an accurate statement, Mr. Roberts?

6       A.   To the best of my knowledge, it is

7   accurate.

8       Q.   Now, as the city manager, these are called

9   counseling forms.  Do you consider this to be at

10  least a mild form of a reprimand or discipline?

11      A.   It's a form that the merit system allows to

12  be put under, I believe it's a Class I, where you

13  have a counseling form and it goes into the

14  personnel folder.

15      Q.   My question really is, is this sort of the

16  first stage or mild form of discipline or reprimand?

17      A.   It's a very mild form.

18      Q.   Would you consider it a reprimand?

19      A.   I would consider it a counseling statement.

20      Q.   But apparently they are inserted, as

21  Mr. Taylorson's was, in their personnel file,

22  correct?

23      A.   That is -- yes, sir.

24      Q.   And what is the purpose of putting it in

25  the personnel file?

18

1    A.   That's by merit system rules and
2    regulations.
3    Q.   Is it then to be used possibly for future
4    reference in the event that the same individual
5    might have some future discipline?
6    A.   It could be used.
7    Q.   And have these counseling forms been used
8    for further discipline down the road for the
9    individual?
10    A.   I'm sure they have.
11    Q.   In the last sentence here, Assistant Chief
12    Hanson is telling Chief Hunter that "I advised
13    him" -- again referring to Mr. Taylorson -- "I
14    advised him that the city would not put up with
15    another episode of speaking to the media without
16    prior approval."
17    As far as you know, is that a correct
18    statement?
19    A.   From reading it, I would say it's a correct
20    statement, but I do not know the intent of Assistant
21    Chief Hanson.
22    Q.   With regard to that newspaper article,
23    again in September of 2005, let me ask you this
24    question:  If Mr. Davis or the other eight or nine
25    firefighters who were interviewed by the newspaper

1   reporter in that article had, in fact, requested

2   prior permission through the chain of command up to

3   your level as the city manager, would you have given

4   your okay?

5       A.   I would feel -- and this is going to be an

6   explanation -- first, I would have to look at the

7   substance and if I felt like it was of concern and

8   of good intent, then I would forward it to the city

9   council.

10      Q.   You would what?

11      A.   Forward it to the city council.  And at

12  that time, they would have the opportunity to voice

13  their concern to the city council.  And then

14  probably from there, the city council would give the

15  okay or could give the okay.

16      Q.   To the firefighter as to whether he could

17  speak to the media?

18      A.   That is correct.

19      Q.   Has that procedure ever been followed?

20      A.   Not to my knowledge.

21      Q.   Well, going back to this newspaper article,

22  Exhibit 14, reading through the subjects that were

23  addressed by Mr. Davis and other firefighters, they

24  covered their concerns about what they felt was

25  understaffing in the fire department and low

20

1  employee morale in the fire department, among other

2  issues.

3     Would those have been subjects that you would

4  have felt it was okay for them to speak to the media

5  about?

6     A.   They would have been subjects that I would

7  have been happy to discuss with them and carry to

8  the council if they felt the need to go there first.

9     Q.   And then I take it you would let the

10  council make that decision whether or not they would

11  be permitted to talk to the media about those

12  issues?

13     A.   That is correct, yes, sir.

14     Q.   Now, some of these firefighters mentioned

15  in this newspaper article that they were fearful of

16  retaliation for speaking to the media about these

17  issues.  Are you aware of that?

18     A.   No, sir, I'm not.

19     Q.   You don't have any reason to know why

20  someone might have been fearful of retaliation?

21     A.   I do not.

22     Q.   In this article, Council Member Ray Bush

23  indicates that he apparently, in the past, attempted

24  to be a mediator with many of the firefighters in

25  the city about these issues of concern.  Are you

1   aware of that?

2        A.   I read that in the article, sir.

3        Q.   Did you participate in discussions with

4   Council Member Bush about that subject?

5        A.   Not to my knowledge, no, sir.

6        Q.   Now, let me invite your attention to

7   Exhibit 3, which is the city grievance procedure.

8   And I know from your earlier deposition testimony

9   that you are very familiar with this section of the

10  merit system rules and regulations, which is Section

11  15.02 concerning the subject of employee complaints

12  and grievances.  Is it your position that before

13  Mr. Davis and other firefighters spoke to the

14  newspaper reporter with the resulting article in

15  September 2005, that they should have first pursued

16  this grievance procedure concerning the issues that

17  they addressed?

18       A.   I do.

19       Q.   Did you want to add to that?

20       A.   There's two forms -- two roadways that they

21  can travel.

22       Q.   What are they?

23       A.   One is the grievance procedure.  And then,

24  of course, they have their own SOPs that they can

25  follow.

22

1      Q.   That would be before they address the media
2  on issues.   Is that what you mean?
3      A.   The media or council, yes, sir.
4      Q.   Or city council?
5      A.   Yes, sir.
6      Q.   But as I read the language in Section
7  15.023 of the merit system rules and regulations, it
8  says -- you may want to look at this subparagraph
9  D -- at the end of the grievance procedure, it says
10 "the decision of city manager shall be final and the
11 employee shall have no further rights of
12 administrative appeal."
13     Do you see where it says that?
14     A.   I do.
15     Q.   And is that an accurate statement that
16 you're the end of the road in terms of the grievance
17 procedure?
18     A.   It is as far as the grievance procedure
19 with the fire department and police department or
20 the code enforcement officers.  However, the SOPs --
21 they have the ultimate ability to get to the council
22 through SOPs, which will give them another route,
23 another step.
24     Q.   Now, I'm trying to understand the scope,
25 either broad or narrow, of the grievance process.