1    It says in Section 15.022, the definition of
2    grievance, that it includes a view or opinion
3    pertaining to employment conditions.  You see where
4    it says that on the first line there?  Let me quote
5    it completely:  "A grievance is a complaint, a view
6    or opinion pertaining to employment conditions, to
7    relationships between employees and supervisors, and
8    to relationships with other employees."
9        You see where it says that?  I think it's on
10   the first page.
11           MR. MCKOON:  Let me find it for you,
12       Bubba.  Looks like it's missing out of this
13       book.
14       A.   I don't have it.
15       Q.   Sorry.
16           MR. MCKOON:  Look at mine.  Definition of a
17       grievance.
18       A.   Okay.  Would you start again, please?
19       Q.   You have it in front of you now
20   apparently.  It says, in Section 15.022, "a
21   grievance is a complaint, a view, or opinion
22   pertaining to employment conditions, to
23   relationships between employees and supervisors, and
24   to relationships with other employees."
25       You see where it says that?

1  A. I do.

2  Q. Do you concur with that, that that's the

3 definition of grievance or complaint?

4  A. Yes, sir, as stated in the merit system.

5  Q. Okay.  Does this really apply to individual

6 employee grievances or complaints?  Like, for

7 example, a firefighter doesn't like his salary or

8 benefits or hours of work.  Does it focus on the

9 individual having a complaint?

10  A. I look at this as a two-way street.  It can

11 be either individual or group or any group can have

12 the same grievance with a spokesman coming or an

13 individual, either/or.

14  Q. Now, at the end of Exhibit 3 is the fire

15 department ASOP-12.  ASOP-12 is the fire

16 department's standard operating procedure concerning

17 addressing city council.  You are familiar with this

18 document, correct?

19  A. Yes, sir.

20  Q. Okay.  Says in paragraph three, "if a

21 problem cannot be solved by anyone in the chain of

22 command, then the city manager will arrange a

23 hearing with the city council."

24  Do you see where it says that?

25  A. I do.

1        Q.  Have you, in fact, ever arranged a hearing
2    with the city council concerning a city employee
3    wanting to address the council?
4        A.  Not -- no, sir, I have not.
5        Q.  Okay.  So in your six-plus years, you have
6    not done that?
7        A.  No.
8        Q.  What is your understanding of what is meant
9    by you, as city manager, will arrange a hearing with
10    the city council.  Would that be you, yourself,
11    doing the hearing or airing the concern?
12        A.  No, sir.  It would be with the individual
13    or the group.
14        Q.  But you say you've never done that?
15        A.  Not to my knowledge.  Not that I remember.
16        Q.  Mr. Roberts, as a city manager, do you
17    believe or feel that a city employee like a
18    firefighter, speaking as a citizen and while off
19    duty and out of uniform, has the right to address
20    the city council?
21        A.  On matters other than pertaining to the
22    fire department or to the police department or
23    issues within the work force, yes, sir, I do.
24        Q.  So a firefighter could go directly to the
25    city council while off duty and as a citizen and

1    speak to the city council in an open public meeting

2    about issues that affect the fire department?

3        A.   Not about issues that affect the fire

4    department, sir.

5        Q.   Okay.  Then I'm sorry.  I didn't understand

6    your earlier response.  So that's out of bounds?  A

7    firefighter cannot go to the city council, as a

8    citizen off duty, and speak about issues that affect

9    the fire department?

10       A.   That is my understanding, sir, of the merit

11   system and the SOPs.

12       Q.   And when you say the merit system, those

13   are the regulations and the ASOP-12 that would

14   preclude that from happening?

15       A.   Yes, sir.

16       Q.   Let me ask you, you're familiar with how

17   citizens, I guess, get on the agenda for the city

18   council to speak with the council, correct?

19       A.   I am.

20       Q.   And how does that process work?

21       A.   There's an application that's filled out in

22   the city clerk's office.  It has to be by a

23   deadline, which was Thursday prior to the meeting on

24   the following Monday.  And they're put on the agenda

25   with the content of what they're to talk to the

1  council about, sir.

2      Q.  Okay.  So if I understand what you just

3  said, an individual citizen would fill out a form

4  requesting permission to address the council and

5  submit it ahead of time?

6      A.  Yes, sir.

7      Q.  Let me invite your attention to

8  Exhibit 37.  This appears to be one of those request

9  forms.  This one, as an example, happens to be from

10  an individual named Martha Harris, and it's dated

11  November 9, 2006.  And apparently she has made a

12  request to address the council.  And this memo was

13  sent to Walter Grabon -- Grabon?

14      MR. MCKOON:  I'm just trying to shorten --

15      I think you've got that wrong.  It's Mr. Grabon

16      that's making the request.  That's just a fax

17      cover sheet I think you're looking at there.

18      Martha Harris is the city clerk.

19      MR. WOODLEY:  Okay.

20      MR. MCKOON:  If you look at the second

21      page, I think it will clarify.  I'm not trying

22      to interrupt.

23      MR. WOODLEY:  I appreciate that

24      clarification.

25      Q.  So apparently the individual Walter Grabon

1    wanted to address the city council, and that is

2    clearer, I think, on the second page of this

3    exhibit.  Is that your understanding of how the

4    process works?

5         A.   Yes, sir.

6         Q.   And sometimes are these requests to address

7    the city council screened out and not allowed, if

8    you know?

9         A.   We screen.

10        Q.   Do you do it yourself?

11        A.   I do.

12        Q.   All requests to address --

13        A.   Not all requests, no.

14        Q.   Does the city clerk screen all of them?

15        A.   She does.

16        Q.   Okay.  And have you, on occasion, not

17   permitted a request to address the council?

18        A.   We have on occasion, when the request would

19   be made late, after the deadline.  Not on one that

20   has been made prior to the deadline.

21        Q.   Do you know of any situation where any city

22   employee has submitted a request in one of these

23   forms to address the city council?

24        A.   Not to my knowledge, no, sir.

25        Q.   Okay.  And what is the kind of session

1    conducted by the city council where they listen to

2    comments made by citizens?

3         A.   This is a work session.

4         Q.   And is that usually held the day before the

5    public meeting?

6         A.   It is.

7         Q.   Is it held at night?

8         A.   Yes, sir, it is.

9         Q.   Okay.  Let me invite your attention to

10   Exhibit 38.  This is a collection of examples, I

11   believe, of agendas for the work session of the city

12   council.  Would you agree with that?

13        A.   I would.

14        Q.   And this would be the occasion, the work

15   session where citizens would address the council; is

16   that correct?

17        A.   That is correct.

18        Q.   Do citizens ever address the council at

19   their formal meetings on Tuesday nights?

20        A.   Very seldom.

21        Q.   Why do you say that?

22        A.   It's handled in the work agenda.

23        Q.   In the work session?

24        A.   That's the wishes of the council.

25        Q.   So the formal meetings of the city council

1    are more business of the council as opposed to

2    entertaining comments?

3        A.   Yes, sir.

4        Q.   But what about the public hearing that's

5    conducted on the budget?  Is that more of an open

6    meeting where individuals can come forward and

7    comment on a proposed budget?

8        A.   Yes, sir, it is.

9            MR. MCKOON:  To be clear, the work session

10       is an open meeting.  Just want to let you know

11       that.

12           MR. WOODLEY:  Thank you.

13       Q.   Do the police officers here in the city

14   have any kind of labor organization or union?

15       A.   Fraternal Order of Police.

16       Q.   But as far as you know, none of the

17   representatives of the police labor organization

18   have addressed the city council about police issues?

19       A.   Not since I have been here, no, sir.

20       Q.   How about before you were here?  Are you

21   aware of that?

22       A.   No, sir.

23       Q.   Now, let's focus on the proposed city

24   ordinance which was eventually adopted by the city

25   council, which is -- I'm afraid I only have one

1    copy, but I'll be glad to share it with both you and

2    Mr. McKoon.

3         MR. MCKOON:  Hold on a minute.  I've got it

4         somewhere.  I'll give him one.  You talking

5         about that one?

6         Q.  Well, I can actually talk about that.

7    Let's talk about that, which I've got in here as

8    exhibit --

9         MR. MCKOON:  I'm sorry.  I thought that's

10        the one you were going to --

11        MR. WOODLEY:  That's all right.

12        Q.  Exhibit 34, Mr. Roberts, is a document

13   produced by the city in this case which appears to

14   be an ordinance number 78-24 adopted back in 1978.

15   And as I understand it, this is where the city

16   council adopted all of the merit system rules and

17   regulations.  Is that your understanding as well?

18        A.  This is the very first adoption of a merit

19   system for the City of Phenix City.

20        Q.  And then since then, periodically, the

21   council has adopted amendments or additions to the

22   merit system rules and regulations?

23        A.  A very few times.

24        Q.  But one of those very few times was the one

25   that is significant in this case, which is ordinance

1    number 2006-13 that apparently was adopted by the

2    city council on April 18, 2006.  Let me show you

3    that.  Take your time to read that.  You are

4    familiar with that, Mr. Roberts?

5        A.   Right, I am.

6        Q.   And, in essence, that was the ordinance

7    that extended the probationary period from a year to

8    18 months for the fire department, police

9    department, and code enforcement officers, correct?

10       A.   That is correct.

11       Q.   And this is the subject, among others, that

12   apparently Mr. Davis spoke to Mayor Hardin about on

13   the telephone, correct?  As far as you know?

14       A.   I don't know what he talked to the mayor

15   about, sir.

16       Q.   You don't know that Mr. Davis was talking

17   to the mayor about the opposition of his firefighter

18   union members to this proposed ordinance?

19       A.   I knew that.

20       Q.   Okay.  Now, is it your position as the

21   Rule 30(b)(6) witness and the city manager that

22   Mr. Davis should have exhausted the chain of command

23   or grievance procedures within the city before he

24   voiced his opposition to this proposed ordinance?

25       A.   Yes, sir.

33

1    Q.   Okay.  I want to walk through that, because
2  I want to be able to get my arms around this issue.
3  Are you saying in response to that earlier question
4  that Mr. Davis could have gone to his captain, first
5  line officer in the fire department, and voiced his
6  opposition to this proposed ordinance, and the
7  captain could have given him relief in some way?  He
8  could have stopped the adoption of this ordinance by
9  the council?
10    A.   I'm not going to say the captain could have
11  stopped the adoption of the ordinance.  The captain
12  could have given him permission to go up his chain
13  of command to where he could get to the proper
14  people to whom he could talk to in regard to the
15  possible adoption of any ordinance.
16    Q.   So then when the captain just moves it up
17  the chain of command, Mr. Davis's opposition to this
18  proposed ordinance, he would have gone to his
19  batallion chief, I take it?
20    A.   Yes.  Yes, sir.
21    Q.   Could the batallion chief have given him
22  any relief in preventing the council's adoption of
23  this ordinance?
24    A.   No, sir.  He would have to follow the chain
25  completely, like I said in the earlier question.

34

1      Q.  So it would go up to the assistant chief
2  and then up to Chief Hunter?
3      A.  Up to Chief Hunter.  And then by the merit
4  system, it would come to me, and then he could voice
5  his command to the legislative portion of this
6  government, which is city council.
7      Q.  And you're the chief executive officer?
8      A.  Yes, sir.
9      Q.  All right.  Then if Mr. Davis had gone to
10  Chief Hunter voicing, on behalf of his union
11  members, the opposition to this proposed ordinance,
12  are you aware of anything Chief Hunter, within his
13  authority, could have done?
14      A.  He could have directed them to us -- to me.
15      Q.  So, to you, that's all Chief Hunter could
16  have done --
17      A.  Yes, sir.
18      Q.  -- is just route it on to you?  And then if
19  he did that, and this concern about the adoption was
20  routed on to you, is there anything you could have
21  done, within your power as city manager, to have
22  prevented or stopped the city council from adopting
23  this ordinance?
24      A.  I could have got him a meeting with the
25  city council and let them -- let him express their

1   opinion as it related to the issues around that

2   particular ordinance.

3       Q.   Okay.  So through the chain of command and

4   through your position, it would just have to be

5   routed on to the council?

6       A.   That's correct.

7       Q.   Are you aware of any disruptive impact that

8   Mr. Davis's conversation with Mayor Hardin opposing

9   this proposed ordinance had, in fact, within the

10  city's fire department?

11      A.   Would you please explain that question?

12      Q.   Yes.  Are you aware of any adverse

13  consequences or serious disruptive impact that was

14  produced by Mr. Davis talking to Mayor Hardin about

15  the opposition to the ordinance?

16      A.   I am not privy to all fire department

17  operations on a day-to-day basis per se.  I do not

18  know the repercussions.

19      Q.   Okay.  Has Chief Hunter ever told you that

20  as a result of Mr. Davis contacting the mayor about

21  this proposed ordinance, it had a significant

22  disruptive impact on fire department operations or

23  efficiency?

24      A.   Chief Hunter advised that if the call

25  violated their SOP or merit system.

1       Q.   But other than violating the SOP or merit

2   system, did he ever discuss with you any actual

3   adverse impact that it had within the fire

4   department's operations or efficiency?

5       A.   I do not recall and neither do I remember

6   asking him were there any.

7       Q.   Okay.  Let me switch gears for a moment and

8   talk about the First Amendment right to free speech

9   and free association under our United States

10  Constitution.  I take it based upon your extensive

11  experience, particularly as the city manager for

12  over six years, that you're aware of the right that

13  all citizens, including public employees, have under

14  our First Amendment to free speech and free

15  association.  Is that a valid statement?

16      A.   I'm aware of the First Amendment.

17      Q.   Are you aware that public employees also

18  have a First Amendment right of free speech and free

19  association?

20      A.   I understand they're covered by the First

21  Amendment.

22      Q.   What is your understanding of that?

23      A.   They have restrictions that they have to

24  follow.

25      Q.   What are those?

37

1    A.   The chain of command for one.  They are a
2  paramilitary organization.
3    Q.   Any other restrictions?
4    A.   Not to my knowledge.
5    Q.   I think you told me you were a former
6  marine, right?
7    A.   No, sir.  Army.
8    Q.   What an insult that was, huh?  I'm former
9  U.S. Army as well.  How long were you in the Army?
10    A.   Forty-one years.
11    Q.   Forty-one?  And what was your last rank
12  when you left?
13    A.   Chief Warrant Officer IV.
14    Q.   Let me invite your attention to Exhibit 17,
15  Mr. Roberts, which is the letter from the
16  International Association of Firefighters' General
17  President Harold Schaitberger dated January 31,
18  2006, addressed to yourself with copies going to
19  Mayor Hardin and Chief Wallace Hunter.  Do you
20  recall having received this letter from
21  Mr. Schaitberger a few days after its date?
22    A.   I do.
23    Q.   What did you do, if anything, when you
24  received this letter?  Did you take any action or
25  speak to anyone?

38

```
1        A.   I called both Chief Hunter and Chief Waters
2   and asked them the contents of what was going on.
3   Chief Waters advised that he would talk with
4   Mr. Davis.
5        Q.   Anything else?
6        A.   And then a letter was drafted and returned
7   back to the -- answering this letter.
8        Q.   And you'll note again that Mr. Schaitberger
9   refers to certain legal principles and rights under
10  the First Amendment and cites actual court
11  decisions.  You see where it says that generally?
12       A.   I do.
13       Q.   Did that prompt you to go to the city
14  attorney and discuss this letter and its contents
15  with the city attorney?
16       A.   I have discussed the contents with Attorney
17  Graham.
18       Q.   But did you do so shortly after receiving
19  the letter; do you remember?
20       A.   Within a short time frame, that's correct.
21       Q.   Within a week or two?
22       A.   Probably quicker than a week.
23       Q.   And why did you do that; do you remember?
24       A.   Anything that's of concern that deals with
25  law, then naturally I'm going to ask advice of my
```

```
1    city attorneys.
2         Q.   I want to go through as I did with Chief
3    Hunter when you were here in his deposition, some of
4    the statements in this letter to see if you are
5    aware of the principles.  And the first one I want
6    you to look at is on page 2 of Mr. Schaitberger's
7    letter in the middle starting paragraph where it
8    says, "it is well established that the First
9    Amendment right of free association includes the
10   right to belong to and to actively participate in
11   labor organizations."
12        Do you see where it says that?
13        A.   I do.
14        Q.   Were you aware of that statement of law or
15   principle even before you received
16   Mr. Schaitberger's letter?
17        A.   Yes, sir.
18        Q.   And were you aware of that principle for a
19   number of years like when you first became city
20   manager?
21        A.   A number of years prior to being city
22   manager.
23        Q.   Fair enough.  Next, it says, the very next
24   sentence, "the right to discuss and inform people
25   concerning the advantages and disadvantages of
```

1   unions and joining them is protected not only as
2   part of free speech but as part of free assembly."
3   Do you see where it says that?
4       A.   I do.
5       Q.   And were you aware of that principle of law
6   and protection even before you became city manager?
7       A.   I was.
8       Q.   And were you aware of it during the time
9   that you have been city manager?
10      A.   I am.
11      Q.   And are you aware that there's actually a
12  State of Alabama Code provision that gives the right
13  to firefighters to belong to a union and to make
14  proposals to their employers?
15      A.   I am.
16      Q.   And have you been aware of that during the
17  entire time that you were city manager?
18      A.   Yes, sir.
19      Q.   The next statement on page 2 of
20  Mr. Schaitberger's letter says in the beginning of
21  the last paragraph, "moreover, although there is no
22  right or entitlement to government employment, the
23  denial or deprivation of a job and related benefits
24  may not be based on one's exercise of First and
25  Fourteenth Amendment Rights."

41

1      Do you see where it says that?

2      A.   I do.

3      Q.   Were you aware of that legal protection and

4  right and principle of law during the time that you

5  have been city manager?

6      A.   Yes, sir.

7      Q.   The next sentence says, "in this regard,

8  individuals have the First Amendment right to speak

9  out about matters of public concern without having

10 government employers retaliate against them for the

11 exercise of their right to free speech."

12     Do you see where it says that, Mr. Roberts?

13     A.   I do.

14     Q.   Were you aware of that statement of law or

15 principle during the entire time you have been city

16 manager?

17     A.   I am.

18     Q.   Next sentence says, "retaliation by a

19 government employer against an individual who

20 exercises his First Amendment rights constitutes a

21 First Amendment violation."

22     Do you see where it says that?

23     A.   I do.

24     Q.   Were you aware of that principle or

25 protection under the law during the entire time

1    you've been city manager?

2        A.   I am.

3        Q.   The next sentence says, "indeed, few

4    subjects are of more public concern than the

5    provision of basic fire and rescue services."

6        You see where it says that?

7        A.   I do.

8        Q.   Would you agree with that statement?

9        A.   It's one of the top public concerns, if not

10   the top.  It ranks right up there.

11       Q.   So the citizens here in Phenix City would

12   have a legitimate interest and a public concern

13   about how they are furnished fire and rescue

14   services?

15       A.   Yes, sir.  That's correct.

16       Q.   Okay.  Thank you.  Have you ever received

17   any subscriptions or read any articles or reports

18   about First Amendment protections of free speech and

19   free association that are accorded public employees

20   like firefighters?

21       A.   I do not receive any articles on that, no.

22       Q.   Have you read articles or reports about

23   First Amendment protections for public employees?

24       A.   I have read articles as it relates to

25   public service employees and the relationship to the

1    First Amendment rights.

2        Q.   And is that during the time you have been

3    city manager?

4        A.   I couldn't answer that.  I don't remember.

5        Q.   Okay.  Have you ever gone to any

6    educational programs or seminars where the subject

7    of First Amendment rights of public employees has

8    been reviewed?

9        A.   I have not attended any as city manager,

10   no.

11       Q.   Now, a few weeks ago, Mr. McKoon forwarded

12   to me a box of documents in response to our request

13   for production of documents, and it was over 2000

14   pages.  Very expensive, by the way.  Did you have

15   occasion to look through all of those documents

16   before they were sent my way?

17       A.   No, sir.

18       Q.   Do you know if anyone within the city did

19   that?

20       A.   Every copy was made by either one of the

21   secretaries in the back or Mr. McKoon's secretary,

22   so someone saw every article.

23       Q.   Were those copies made here in City Hall?

24       A.   Yes, it was.

25       Q.   Let me ask you this.  With regard to the

1    decision and implementation of the decision to

2    discharge Mr. Davis in April 2006, did you give your

3    prior concurrence or approval to Chief Hunter to

4    implement that discharge decision?

5         A.   I was notified of the termination.  The

6    department heads are given that authority.  As the

7    city manager, there again, I sat with the Personnel

8    Review Board as stated in my prior deposition, I

9    think.  You know, I didn't sign the termination

10   notice due to the fact that I eventually have to

11   sign a letter if, in fact, the termination is

12   upheld.

13        Q.   Well, I'm not sure that was really

14   responsive to my question.  I'm really focusing on

15   whether or not you gave the OK, your approval as

16   city manager, to Chief Hunter before the decision to

17   discharge Mr. Davis was implemented?

18        A.   You could say that, yes.

19        Q.   Now, do you recall filing an affidavit

20   earlier in this lawsuit?

21        A.   I do.

22        Q.   Who typed that affidavit up?

23        A.   It was typed up at Mr. McKoon's office.

24        Q.   And who prepared the language in that

25   affidavit?

45

```
 1        A.   Mr. McKoon asked me a series of questions

 2   and then he put it together in the letter.

 3             MR. WOODLEY:  All right.  I don't have any

 4        further questions.  Thank you, Mr. Roberts.

 5                       EXAMINATION

 6   BY MR. MCKOON:

 7        Q.   All right.  I just have probably one

 8   question.  Mr. Roberts, at any time during your

 9   participation in the termination of Mr. Davis, did

10   you have any feeling or belief that you were

11   violating any of his First Amendment rights as you

12   have been -- as they were defined and asked about by

13   Mr. Woodley?

14        A.   No, sir, I didn't.

15             MR. MCKOON:  That's all.

16             MR. WOODLEY:  We're done.  Thank you.

17   (The deposition concluded at 12:06 p.m.)

18             *  *  *  *  *  *  *  *  *  *

19

20

21

22

23

24

25
```