1    firefighters may have had?

2        A.   Sure.  I've had some calls.  There was a

3    movement on swap time, and I got a call -- or I

4    don't know if it was a call or I ran into somebody

5    that said something about that; that said that that

6    was not a good thing.  And then, actually, someone

7    from Columbus called me, from the Columbus Fire

8    Department, and I guess he had heard some complaints

9    and called me and -- because he lives in Phenix

10   City -- and said that he didn't think it was a good

11   idea to do away with swap time.

12       Q.   Okay.  But I wanted to focus on the

13   firefighters that have been employed here in Phenix

14   City municipality.  Have you had any input or

15   discussions with any of those firefighters since the

16   time you've been mayor about swap time or any

17   policies or issues that involve a fire department?

18       A.   I had a conversation, and I don't -- I

19   don't remember who it was with, but I remember there

20   was a conversation to complain about the swap time.

21   They didn't like the fact of swap time.

22       Q.   And what about other issues?  Obviously,

23   there are many issues in the fire department about

24   public safety and the delivery of fire and rescue

25   services.  The last two years since you have been

1    mayor, have you had a chance to speak with some of
2    the firefighters about those issues?
3        A.   I have -- you know, as far as any
4    day-to-day things, the only thing that I was
5    involved -- we had a interim city manager here when
6    I first got elected, and there were some issues
7    going on within the fire department.  And he was
8    meeting one day with the fire chief -- the interim
9    city manager -- and asked me to sit down and talk
10   with the fire chief.  And my comments were to him
11   that, you know, this is not my position to sit down
12   and talk to the fire chief.  And, basically, I just
13   asked the fire chief, I said, you have had a lot
14   of -- by virtue of us hearing complaints, typically,
15   you pick up the paper and you read letters to the
16   editor or you read, you know, where someone is --
17   you know, the local paper is doing an
18   investigation.  You kind of hear rumblings that
19   things may not be going exactly right.
20       And my question to the fire chief was, you
21   know, all I want to know is do you understand that
22   there are some issues within your fire department
23   and do you have a plan to take care of those
24   things?  And that was the only thing I wanted to
25   know, because that -- you know, as far as my

1    position, that's really not where I'm supposed to be

2    as far as what the charter dictates my position to

3    be.  But I was invited to the meeting, and I just

4    wanted him to know that I had heard that there were

5    some issues.  And, like I say, typically, it's

6    through the paper and hearing rumblings and on

7    occasion, we get -- I'm on a local talk show, so we

8    get some phone calls from people that don't identify

9    themselves, but they let us know some things are

10   going on.  And some you find out once you start

11   asking the city manager and he does an

12   investigation, some you find that are valid and some

13   you find that are not.

14        Q.   Okay.  And who was the fire chief at that

15   point in time that you were just discussing?

16        A.   Prater.  Chief Prater.

17        Q.   Jerry Prater?

18        A.   Yes.

19        Q.   Who was the interim city manager?

20        A.   Max Wilkes.

21        Q.   Now, Mr. Mayor, I've heard it's been said

22   about you -- and this is not new for a lot of city

23   mayors -- that you have an open door policy and you

24   are receptive to communications from city employees,

25   whether they be firefighters or police or citizens

1    in general.  Is that a fair and accurate statement,

2    that you do have that sort of open door policy?

3        A.   It is.

4        Q.   And have you continued that open door

5    policy during the two years that you have been

6    mayor?

7        A.   I have.  You have to be very limited,

8    because some people want to -- it's real easy for

9    someone to say that the mayor said this, and that

10   may not be exactly what you said or it may not be

11   what you implied.  So in my position, you've got to

12   be very careful because you don't want to -- you

13   know, we are governed by a charter, and you want to

14   make sure that you don't encroach on any of the city

15   manager's duties, and you don't want something to be

16   said that you told somebody to do something when

17   that may not have been what you said.  So I guess

18   I'm very careful -- I do have an open door policy.

19   I do return all my phone calls.  But I'm very

20   careful what I say, especially to employees, because

21   you don't want them to think that you're directing

22   them in any way or trying to circumvent any of the

23   authority the charter gives to the city manager.

24       Q.   The police officers are employees of the

25   City of Phenix City.  Do you know if they have a

1    labor association that they're members of?

2        A.    I don't know if they do.  I know that --

3    I'm assuming it's still active -- the FOP.  But I'm

4    not real sure of an association.

5        Q.    And FOP, is that the fraternity order of

6    police?

7        A.    Fraternal Order, yes, sir.

8        Q.    Fraternal Order of Police.  Have you ever

9    spoken to the leaders of the FOP representing the

10    police officers of the city?

11        A.    Not as I know of.  If I did, I don't know

12    that I did.

13        Q.    Let's switch gears again.  At some point in

14    time, did you learn that the plaintiff, David Davis,

15    in this case had been terminated from his position

16    as a firefighter with the city?

17        A.    I did.  I heard that.

18        Q.    And who first told you that?  How did you

19    first discover that he was fired?

20        A.    If I'm not mistaken, it was one of the

21    council members that told me -- one of my fellow

22    council members.

23        Q.    Would that have been Mr. Bush?

24        A.    Yes.

25        Q.    Did he call you up or did he see you on the

1   street or what happened?

2       A.   I think we were talking on the phone one

3   day, and we were talking about different things, and

4   he happened to mention that Mr. Davis had been

5   terminated.

6       Q.   And what was your response when you had

7   this conversation with Mr. Bush?

8       A.   I didn't know that.  I was kind of shocked

9   and surprised because I didn't know that.  I hadn't

10  heard that.  Typically, in a small town, you know --

11  I think this had happened like a week before.  But

12  typically in a small town, you kind of know what --

13  you know, typically what goes on, whether it's

14  within the city or in the county or wherever it is,

15  you kind of hear stuff.  The rumor mill around here

16  is strong so you hear those things, you know,

17  typically an hour after they happen, not a week.

18      Q.   So when Council Member Bush informed you

19  that Mr. Davis had been discharged, as you put it,

20  you were surprised or shocked?

21      A.   Yes.

22      Q.   Was Council Member Bush also surprised at

23  the time?

24      A.   I think he was, because when he -- I guess

25  when we were talking about it, when he told me, he

1  expected me to know that for some reason.  And I

2  don't know -- I guess he thought I had already heard

3  that.

4      Q.  Anything else said in that conversation

5  with Council Member Bush that you can remember?

6      A.  We talked about a lot -- it was not -- the

7  gist of the conversation was not to discuss a

8  terminated employee; it was just about some other

9  stuff, and that just came up.

10      Q.  When that conversation with Council Member

11  Bush was concluded and you had been informed that

12  Mr. Davis had been terminated, did you do anything

13  or talk to anyone further about the discharge of

14  Mr. Davis?

15      A.  If I'm not mistaken, when I heard that

16  conversation, I was on the way out of town with my

17  family for a long weekend at the beach or something,

18  and so I didn't do anything immediately.  But I

19  did -- when I came back to town, I asked about it.

20  I asked the city manager about it.

21      Q.  So did you initiate that conversation with

22  the city manager?

23      A.  Yes.

24      Q.  Did you call him up on the phone?

25      A.  No.  I think I waited until I got back in

1    town, because I was on the way out of town at that

2    time.

3        Q.    So did you meet with the city manager and

4    raise that issue of Mr. Davis's discharge?

5        A.    Yes.  Typically -- not just for that

6    purpose.  Typically when I come in on Monday morning

7    or something like that, I'll go over some things;

8    typically complaints that I have had from people in

9    the city about fixing potholes or -- so I have a

10   list of stuff and just kind of go over that.  And,

11   oh, by the way, I heard this, is this true kind of

12   thing.  So just bring up stuff or we'll talk about a

13   car wreck or a fire or whatever the case is or --

14   you know, trash on the riverwalk, so just kind of go

15   over a list of stuff.

16       Q.    And was it Mr. Roberts who was the city

17   manager that you discussed it with?

18       A.    Yes.

19       Q.    And do you regularly meet with the city

20   manager about various issues?

21       A.    We don't have a regular meeting time, but

22   it's kind of -- you know, his office is right next

23   to mine.  So when things come up, it's, hey, let me

24   ask you a question or, hey, I need to inform you of

25   this.  So it's not a -- we don't really have a --

1    barring our outside regular meetings or work session

2    and council meeting, we don't really have official

3    meeting times or times that we meet unless there's a

4    specific purpose.  But on these type conversations,

5    it will be, you know, I heard this or this is going

6    on, so -- but, typically, it's more in line with

7    minor complaints from citizens that I pass on to the

8    city manager, and he takes care of those things.

9        Q.  On the particular occasion where you met

10   with City Manager Roberts concerning, in part at

11   least, the termination of Mr. Davis, did you have a

12   list of items for that meeting that you did, in

13   fact, want to discuss with the city manager?

14       A.  I don't think I did, no.

15       Q.  Okay.  But one of the issues that you

16   raised with City Manager Roberts was the termination

17   of Mr. Davis?

18       A.  Correct.

19       Q.  And what do you recall the nature of that

20   conversation with Mr. Roberts concerning the

21   termination of Mr. Davis?

22       A.  Went something like, I heard that David

23   Davis was terminated, is that true?  And he

24   confirmed that it was.

25       Q.  So, undoubtedly, there was more discussed

1   about that.  Did you ask him why was he terminated?

2       A.   I don't -- I -- I don't know if I did, but

3   I had heard that it was for breaking the chain of

4   command.  And I don't know if I confirmed that or

5   not.  I'm just -- because, typically, it's -- you

6   know, I would ask, you know, if I didn't know.  But

7   in this case, I had heard that it was for breaching

8   the chain of command or breaking the chain of

9   command, so I don't know if I asked him or not.  I

10  don't remember the specifics of the conversation.

11  But I kind of had heard, you know, going into the

12  conversation, the reason why.

13      Q.   And who had told you the reason why

14  Mr. Davis was terminated?

15      A.   Councilman Bush.

16      Q.   And when you say breaking the chain of

17  command, please be more specific.  Could that have

18  been perhaps a conversation or telephone discussion

19  that Mr. Davis had with you?

20      A.   Yes.

21      Q.   And could you elaborate on that?

22      A.   Of the reason or the conversation that we

23  had?

24      Q.   Well, both.  Let's start with the reason

25  first, and then we'll go into the conversation that

1   Mr. Davis had with you.

2       A.   Okay.  The -- Well, let me make sure I

3   understand the question, okay?  You want me to

4   discuss the conversation?

5       Q.   That makes sense.  Why don't we do that

6   initially?  Why don't you discuss the nature of the

7   conversation that you had with Mr. Davis and who

8   initiated that first.

9       A.   I got a call which -- a message from David

10  Davis, which I returned his phone call, which is

11  what I do.  I try to return all my phone calls

12  unless it's just someone I absolutely can't

13  communicate with, and then I won't.  But 99 percent

14  of the time, I return phone calls.

15      And I returned Mr. Davis' phone call, called him

16  back.  And he wanted to discuss an item that was on

17  the agenda, an ordinance that was on the agenda to

18  change the probation period.  And that was -- he

19  wanted to ask a question, I think, as to when it was

20  going to come up for a vote, and then also elaborate

21  on some input that he wanted to have, I guess -- I'm

22  not sure, but I think that he asked why we were, as

23  a council, going to change or are interested in

24  changing this probation time.  So if I'm not

25  mistaken, that is all the conversation consisted of.

1    Q.   Let me return to that conversation just a

2    couple of minutes.  With regard to the discharge of

3    Mr. Davis, who, within the city, made that final

4    decision that he would be terminated?

5    A.   I would assume it would be the city

6    manager.

7    Q.   Well, I don't want you to assume.  Do you

8    know, in fact, who has the authority and who, in

9    fact, made the final decision to terminate

10   Mr. Davis?

11   A.   I don't get into the specifics of

12   personnel, but I'm just assuming the way it works --

13   I'm assuming that -- I can't tell you specifically.

14   You're asking for a specific answer.  I don't know.

15   I would think that it would work based on the

16   fire chief making a recommendation of termination to

17   the city manager.  If I'm not mistaken, I think the

18   fire chief has the authority to make those

19   decisions, but I think he runs those decisions by

20   the city manager prior to executing those things.

21   Q.   Okay.  But once again, just so the record

22   is clear, you were not involved in the

23   decisionmaking to terminate Mr. Davis; is that --

24   A.   No.

25   Q.   -- correct?  Have you, Mr. Mayor, ever

1  spoken to the media or a journalist, newspaper

2  reporter, about the termination of Mr. Davis from

3  his job in the fire department?

4      A.   I have been asked questions concerning

5  that.

6      Q.   Was that a newspaper?

7      A.   I'm sure both.  I mean, typically, we get

8  hit by all the media, so I know that a newspaper did

9  ask about it, and I'm sure there was some other

10  media coverage also.

11      Q.   And what newspaper are you referring to?

12      A.   Would have been both the Columbus Ledger

13  across the river, and I'm sure the local paper

14  covered it also.

15      Q.   And do you remember what you might have

16  said about the termination of Mr. Davis to those

17  newspapers?

18      A.   I typically don't comment on things like

19  that, so it would have been more or less no comment

20  or something to that effect.  Typically, personnel

21  issues, especially since they're not within my

22  realm, I try not to comment on them.  And if I keep

23  getting pressed, I try to say as little as I can,

24  because I don't know a lot about those things

25  because that's not within my authority to -- it's

1    out of my pay grade.

2        Q.   Sir, do you remember if you told a

3    journalist or a representative from a newspaper that

4    you were surprised to discover or learn that

5    Mr. Davis had been fired?

6        A.   I'm sure I did, if they would have asked.

7        Q.   And that would have been an accurate

8    comment, because I think you testified about that?

9        A.   Yes.

10        Q.   All right.   Let me invite your attention to

11    Exhibit Number 10, if you would turn to that.   And

12    this happens to be a pleading or a motion to dismiss

13    that was filed by the attorneys in this case earlier

14    on in the lawsuit.   And if you would go to page

15    number five of this pleading.

16        A.   Okay.

17        Q.   And you'll see about a third of the way

18    down here on page five of this Motion to Dismiss

19    where it says, quote, it is not disputed that the

20    reason for the termination of the plaintiff was his

21    contact to the mayor, which was a direct violation

22    of the city's merit system's rules and regulations,

23    end quote.   Do you see where it says that?

24        A.   Yes, I do.

25        Q.   As far as you know, sir, based upon the

34

1    information that you had about the circumstances

2    surrounding Mr. Davis's termination, is it fair and

3    accurate to say that that was the single reason or

4    single basis for the termination of Mr. Davis?

5        A.   I -- I don't -- I know that was one of the

6    reasons.  That's what I was told, that was one of

7    the reasons.

8        Q.   Were there additional reasons for his

9    termination that you were told?

10       A.   I'm assuming -- my answer is I assumed that

11   when I heard that, because I heard that was one of

12   the reasons but there were other pending factors

13   that weighed in on that.

14       Q.   When you say there were other pending

15   factors that weighed in, what were those pending

16   factors?

17       A.   I didn't get involved in that.

18       Q.   So you don't know if there were other

19   factors?

20       A.   No.

21       Q.   A couple questions on Exhibit Number 11,

22   Mr. Mayor.  This is a document that is over the name

23   of David Davis, then vice-president of the local

24   firefighters association dated January 25, 2005,

25   which was addressed to then fire chief Jerry Prater

1    in which Mr. Davis and the firefighters' labor

2    association have raised a number of issues that they

3    wanted to explore and discuss, including safety,

4    general employment issues, discipline, and

5    communications.  Have you ever seen this document

6    before today?

7         A.   I don't recall the document.  I have gotten

8    some mail from them, but I don't know if this was

9    part of the package that I received or not.

10        Q.   When you say you received mail from them,

11   you mean from the firefighters' labor association?

12        A.   Well, let me say I don't know.  I've gotten

13   mail -- I get anonymous mail from time to time that

14   talks about different things.  So I don't know if I

15   received this or not.  It does not look familiar to

16   me, but I have received some stuff and actually have

17   seen some stuff in the paper about different

18   things.  So I don't know -- I don't know if I

19   received this under this cover, or if something like

20   this came to me anonymously, I don't know.

21        Q.   But when you said just a moment ago that

22   you received some stuff or mailings, as I understood

23   your comment, and explained that you received

24   information or documents from the firefighters'

25   labor group or labor association.  Do you recall

1    that?

2        A.    I don't receive -- I don't believe I

3    received anything specifically from the firefighters

4    addressed to me, but have seen some stuff that has

5    circulated around about the firefighters' association

6    and some of the -- some of this stuff that is

7    outlined in here, I've heard of a couple of these

8    things.

9        Q.    When you say you've seen some stuff --

10       A.    Yes.

11       Q.    -- just so it's clear --

12       A.    Some paperwork.  Some letters.  Some basic

13   stuff that's been generated around, whether it's

14   come to me or other council members that may have

15   been circulated around.

16       Q.    Okay.  But this would have been letters or

17   memos from the firefighters' labor association; is

18   that correct?

19       A.    Or copies of those, yes, sir.

20       Q.    In the last two years since you've been

21   mayor?

22       A.    Yes.

23       Q.    And would those have been circulated or

24   given to the city council members as well?

25       A.    I don't know that.  Like I say, from time

1  to time, we share -- we share anonymous mail back

2  and forth, so from time to time, some people get

3  things and some others don't.  So we -- but

4  sometimes if we find something that is -- not that

5  this would be amusing, but sometimes we share things

6  that come in the mail that are amusing about each

7  other.

8      I'm not sure whether this particular piece came

9  to any of us, but some of these things, as I look

10  over it, looks like we have seen some of this

11  stuff -- or I've seen some of this stuff.

12      Q.   Okay.  If you would, turn briefly to

13  Exhibit Number 14, which are copies of various

14  newspaper articles and letters to the editor of

15  newspapers in which the fire department policies and

16  issues are being discussed by various firefighters

17  as well as Chief Hunter and others.  Do you recall,

18  at least in a general sense, Mr. Mayor, having seen

19  these newspaper articles in September of 2006 and

20  even earlier, September 2005, over the course of the

21  last couple of years?

22      A.   I have.  I'm looking over them now.

23      Q.   Yes.  Take your time, please.

24      A.   I know I've seen some of these.  I don't

25  know if I actually read all of these, but I have

1    seen some of these.

2        Q.   And at least in a general sense, in these

3    various newspaper articles, particularly the first

4    one that's in Exhibit 14, a number of the

5    firefighters, including David Davis, expressed their

6    concerns about a poor or low morale in the fire

7    department and expressed their concerns about

8    understaffing within the city's fire department.

9    Have these particular issues or concerns been

10   brought to your attention about --

11       A.   Through --

12       Q.   I'm sorry.  Go ahead.

13       A.   Certainly when you read stuff like this in

14   the paper, that brings it to your attention because

15   everybody is talking about it when they see it in

16   the paper like that.  So, yes, it was brought to our

17   attention.

18       Q.   And other than the one meeting that you

19   indicated earlier in your testimony that you had

20   with the city manager and the chief of the fire

21   department, have you had other meetings to address

22   these issues of concern raised by the firefighters

23   and Mr. Davis?

24       A.   None that I recall, no, sir.

25       Q.   Just that one meeting?

1     A.  Yes, sir.

2     Q.  Do you know if any action was taken in

3  response to that one meeting by the fire department

4  or Chief Hunter to address these issues?

5     A.  No.  Chief Prater is who I met with at the

6  time.  And, like I said, my only comments at the

7  time were -- you know, all I want to know is do you

8  know that there's some issues within the fire

9  department and do you have a plan to fix that.

10     Q.  Did you do a follow-up, though, to see if

11  then Chief Jerry Prater addressed those issues?

12     A.  No.  See, that's where it gets -- that's

13  where the line is very specific.

14     Q.  That's the disconnect?

15     A.  Right.  And then my correspondence after

16  that would be with the city manager, so --

17     Q.  Okay.  Let's move on to a letter that I

18  believe you received, but I certainly want to ask

19  you about it.

20     A.  Okay.

21     Q.  And this would be Exhibit Number 17,

22  Mayor.  And this appears to be a letter from the

23  general president of the International Association

24  of Firefighters, a gentleman named Harold

25  Schaitberger, and it's dated January 31, 2006, and

1    it's addressed to the then City Manager Roberts.

2    And if you look at the last page, the third page on

3    this letter, it indicates that you were sent a copy

4    of this letter from Mr. Schaitberger?

5         A.   Uh-huh.

6         Q.   Do you recall, in fact, receiving a copy of

7    this letter?

8         A.   I believe I did, yes, sir.

9         Q.   Have you had a chance to review this letter

10   within the last couple of weeks?

11        A.   I have not, no, sir.

12        Q.   Okay.  Well, take just a couple minutes now

13   to review it to yourself, because I want to ask you

14   several questions.

15        A.   Okay.

16        Q.   You've had a full opportunity to read

17   through that three-page letter from

18   Mr. Schaitberger?

19        A.   Yes.

20        Q.   Once again, you do recall having received

21   that letter at the time it was addressed?

22        A.   I believe I did.  I don't remember

23   specifically, but I believe I did.

24        Q.   Now, when you received this letter back in

25   probably early February of 2006, did you do