that does a disciplinary action should go before the Personnel Review Board unless it's -- maybe they've got a grievance that they had a oral reprimand or something of that nature, then I might get a grievance like that.

Q. Let me invite your attention to Exhibit 3, which appears to be excerpts from the city's Merit System's rules and regulations. Section 15.02 says as follows: Quote, disciplinary actions, dismissals, demotions, suspensions, fines, reductions in pay, position classifications, and allocations shall not be subject to review as grievances, end quote. Do you see where it says that?

A. I do.

Q. Is that an accurate statement?

A. It is. It is.

Q. So in the case of Mr. Davis and his dismissal, he would not have been able to file any kind of a grievance seeking review, would he?

A. To me, no.

Q. But to the Personnel Board yes?

A. That's correct.

Q. Is that considered a grievance or an appeal? Maybe I'm being too technical.

A. I would think it would be an appeal rather than a grievance. An appeal of decision of the department head.

Q. Okay. All right. Mr. Roberts, with regard to David Davis, are you aware that he worked for about eight years in the Phenix City Fire Department?

A. I am.

Q. And are you aware that he was first employed in April of 1998 in the city fire department?

A. I know the approximate hire date.

Q. And are you aware that Mr. Davis was eventually promoted to the rank of sergeant in the city fire department?

A. I am.

Q. As city manager, do you have the authority or responsibility to review proposed promotions like in the fire department?

A. I do. But as I stated earlier, that's pretty much left up to the department heads or chiefs. I don't get into the business of promotions or anything like that within their areas of responsibility.

Q. Do you get into employment evaluations of

their job performance like a firefighter in the city fire department?

A. I will sign the total evaluation, the yearly evaluations. But if you're asking me do I read each and every one of them, no, sir, I do not. I think that again is, of course, the first line supervisor, the district chief -- or, in this case, the chief. It's according to how they've got it set up on who evaluates who and what -- in the rank structure.

Q. I'm sorry. Did you say you would sign the evaluations?

A. I think at the bottom of the evaluation form, there's a signature block that I sign and I think that's primarily for pay purposes anyway. But I sign a lot of them every year, it appears.

Q. Let me show you -- I guess we can identify this as Exhibit 34. And I don't have it in the binder, sir, because I just got it this morning, at least an additional copy. And this appears to be a Performance Appraisal by the city fire department of David Davis for the evaluation year 2003 to 2004. And it does look like you have -- well, no, I don't think you have. You weren't city manager then, were you?

A. No, sir. I was -- unfortunately, I was away.

Q. Well, there's -- somebody signed it there as city manager. Can you make out the name or the signature on that?

A. Max Wilkes.

Q. Was he the previous city manager?

A. He was my interim city manager. I appointed him as an interim when I was gone half a year.

Q. Let me invite your attention to Exhibit 18. And as you're looking at that, I want you to take as much time as you need, Mr. Roberts, to review these documents before you feel comfortable in answering my questions.

This is a memo from Roy Waters, Deputy Chief in the city's fire department, to Wallace Hunter, the fire chief, dated February 6, 2006, concerning the subject of, quote, letter to Mr. H.H. Roberts, end quote. You see where it says that?

A. I do, yes, sir.

Q. Have you seen this document before today?

A. Yes, sir. I read this memo.

Q. You do what?

A. I've read the memo.

Q. Okay. I want to invite your attention to the last sentence at the bottom of the memo where it says, quote -- and this is Deputy Chief Waters addressing Mr. Hunter -- quote, as I have communicated to you on several occasions, David Davis is doing an outstanding job for me and has a very positive and professional attitude, end quote. Do you see where it says that?

A. I do.

Q. As far as you know, sir, as the city manager, is that a fair and accurate statement concerning Mr. Davis and his job performance as a sergeant?

A. As not being a first line supervisor knowing his day-to-day activities, I would accept the fact that the chief made an evaluation of him and I would not disagree with it.

Q. So you don't have any information or facts as the city manager to disagree with that statement within the fire department that Davis is doing an outstanding job and has a very positive and professional attitude?

A. I wouldn't have any day-to-day knowledge of that, no.

Q. When you were coming up for consideration

to be appointed as city manager, do you know if the firefighters' local labor organization took a position that you should be city manager or took a position that you should not be city manager?

A. Sir, when I was appointed city manager in 2002, it was on a interim basis for 2001 by a prior administration. And I was not here when the appointments were made at this time. I already held the position. And I assumed that by federal laws I would have had my job back anyway when I returned. So I do not know anything about any of that.

Q. Okay. So you don't know whether or not the firefighters' labor association --

A. No, sir, I do not.

Q. -- supported your appointment as city manager?

A. I do not. And when I say that, I don't know whether they did or whether they didn't.

Q. Right. Now, I think you started to indicate earlier that there was at least one occasion, perhaps more, where you met with the firefighters' local union and perhaps a representative of the International Association of Firefighters?

A. We met in this office here. I never went

to a local meeting. And I -- I think his name is Malone was the first gentleman that came down here. Basically, he talked with me and Mr. Davis about some complaints that Mr. Davis -- or let me not say Mr. Davis per se -- let me say the local union had concerning staffing, morale, equipment, and things of that nature.

At that time, I pretty much was emphatic that Sergeant Davis should go to his fire chief and discuss those issues with him, which was at that time Chief Prater. They had that meeting. Basically, I don't think it was a good outcome.

Q. Okay. Before we get to the follow-up meeting, let's go back to the earlier meeting that you say you had in this building with Mr. Davis and Mr. Malone from the IAFF.

A. And I may add, I believe Mr. Dennis Duty was still the president of the local at that time and was in attendance as well. And my memory may not be that well, you know, but I do think there was more than just Sergeant Davis, myself, and Malone.

Q. Do you know at that time if Mr. Davis was a vice-president of the local firefighters' union?

A. I would have to say I did. I mean, that would make sense.

Q. And, I guess, did they call you up ahead of time and say, Mr. Roberts --

A. Yes, sir, they did.

Q. -- we would like to come over, have a meeting?

A. Yes, sir.

Q. You agreed and scheduled the meeting, then came and you sat here; is that correct?

A. That's right.

Q. Did they give you any documents at that time, any proposals? Or was it just --

A. Yes, sir. I'm going to use the word laundry list, because that's basically what it was, some things that they felt needed to be addressed within the fire department.

Q. And roughly how long was the meeting?

A. Probably less than an hour. Right around an hour.

Q. Okay. And how did the meeting end up as you recall?

A. I thought it was on a pretty positive note.

Q. Did they raise some issues that you thought should be addressed and resolved?

A. And I believe that the issues they brought up have been addressed and some are still pending.

Q. Can you remember, as an example, some of the issues that they raised in this meeting that you felt were legitimate and should be looked into and addressed?

A. Well, there's been a couple of things that's been brought up. The 8-hour shifts for one. I have personally felt that a 8-hour shift or a 12-hour shift or Panama shift may have worked better than a 24-hour shift. Some fire departments do that. After research and finding out, we found that we were wrong on an 8-hour shift. Had nothing to do with anything else.

Then I looked at a 12-hour Panama shift like they have some of these police officers work. That probably would not work as well as what we've got now, so we chose to keep the shift structure as it is now. So I felt like that portion of their agenda was addressed.

Q. Okay. Anything else that you can remember, issues they raised that you --

A. Equipment. I think that -- the equipment issue or the safety problems.

Q. Safety of the firefighters you mean?

A. Yes. I'm talking about the breathing apparatuses and vehicles themselves, the fire

apparatus themselves. I think we have moved forward, and both -- Chief Hunter especially is down here constantly looking for ways to buy equipment and added resources for these firefighters not only to, you know, fight a fire, but also in the training process, which is a daily ongoing item. And I think we have addressed those needs.

Q. Okay. So I'm clear on this, in this meeting that you had with Mr. Malone from the IAFF, and Mr. Duty and Mr. Davis from the local labor association of firefighters, you recall that one of the items that they addressed with you at that meeting involved fire equipment on the subject of safety of the firefighters and, in particular, I guess you recall their expressing concerns about the self contained breathing apparatus; is that correct?

A. That's correct.

Q. Anything else that you can remember off the top of your head of the issues they raised of concern?

A. A separate meeting came about that dealt with their swap time. And Chief Prater came to me shortly after I returned from active duty concerning swap time. The swap time was removed. The problem we were having with swap time was more of an

accounting/insurance issue than anything more so.

For instance, we had one firefighter -- and I do not remember his name -- was injured or was sick when he was actually pulling swap time for someone else and workers' comp wouldn't pay the claim. So, you know, we had to work some procedures out. And Chief Hunter aggressively worked on that ever since he was appointed chief. And when Assistant Chief Waters came on board, they, along with the personnel director and the insurance side of the house, felt that they had it in line to where we could put the swap time back in.

Q. Okay. Any other issues or have I exhausted your memory that were raised by Davis, Duty, and Malone at your meeting?

A. The staffing issue.

Q. What was that about that they raised?

A. You know, everybody would like to go by NFPA standards of -- what is it -- 2010 or 2008? Whichever it is.

Q. 1710.

A. It's 1710, 1708.

Q. Two in, two out policy?

A. Sir?

Q. Two in, two out policy?

A. Yes, sir. However, most cities -- city governments and most managers in these United States are against it. And if you talk about it in a city managers' meeting, you see that they're not against it, per se, for fire safety; it's the cost that it costs the city to go into it. We cannot afford staffing like that.

But we have increased staffing, and I think that that's one of the main things. Not only the fire department. We have increased staffing in the police department as well. So, you know, I try to keep a equal balance between those two. So I do think we have tried to address those issues.

Q. That was an issue that was also raised by Mr. Davis, Mr. Duty, and Mr. Malone with you at the meeting?

A. That's right.

Q. Any other issues that you haven't already mentioned that they raised at that meeting?

A. Morale. But I don't -- I think morale right now is going real good. It appears to be.

Q. But they raised the concerns?

A. They talked about morale. You know, as a manager, you know, you can talk to your department heads. But, you know, your morale in a group of

men, whether it be, you know, with a infantry firing squad or whether it be with a fire department, any paramilitary organization, your front line supervisors control. They control the morale of the men.

And, usually, morale is high when you have good intensive training and they're occupied. And it's not necessarily that you give them everything they want to keep good morale, but you give them the necessary tools to do their job. And I think that that portion has been addressed now. That's about all that I know.

(Mr. McKoon entered the deposition room.)

Q. But you do recall that Davis and Duty and Mr. Malone raised the issue of employee morale in the fire department at this meeting that you have been describing?

A. I do.

Q. We've talked about five or six items that they raised. Anything else you can remember they addressed at the meeting?

A. Not off the top of my head, I can't.

Q. Fair enough. And was it your understanding -- you may have testified to this already -- that those three gentlemen -- Davis, Duty

and Mr. Malone -- were wanting to meet with you to address these issues in their role as or in their capacity as labor association representatives?

A. Yes, sir. But I also believe this. It may be in their role, but I also know they are Phenix City Firefighters 24 hours a day, 7 days a week in my opinion.

Q. I'm sorry. I didn't understand what you mean.

A. I know they were wanting to address me as a labor organization, but I also know they are employees and employees as firefighters, which I think are 7-day-a-week, 24-hour-a-day jobs.

Q. Yes. Do you recall if Mr. Davis and Mr. Duty were on their shift schedule or off duty when they had the meeting with you?

A. I don't know about Mr. Davis, Sergeant Davis here. But I do know that Mr. Duty was not employed by the city at that time.

Q. At that time he was gone?

A. Yes, sir.

Q. Okay. Now either during or shortly after that meeting, particularly involving Mr. Davis, did you consider that he was violating the chain of command or the Merit System rules and regulations

when he asked to meet with you for that almost an hour meeting and address these issues?

A. Well, it went through Chief Prater and I agreed to it.

Q. So earlier he got permission, Mr. Davis did, to meet with you?

A. And I believe Chief Prater talked with me and then I believe Malone called me to get the proper sequence. I don't remember the exact sequence.

Q. Let me invite your attention --

A. But I did not ask the chief to come over here to the meeting.

Q. You did not?

A. No. But I think I instructed him, once we left here, to take their complaints to the chief. I felt like that was --

Q. Was there a reason why you did not --

THE REPORTER: Whoa, whoa, whoa. I didn't hear the end of your answer.

A. I felt like it was the chief's job, Chief Prater, to handle the complaint, see if he could handle it prior to it coming back to me.

Q. Did you give consideration to inviting Chief Prater to come over and participate in this

meeting that we've been describing?

A. I did, but I chose not to.

Q. Why was that?

A. I felt like I wanted to hear the complaint myself and keep an open view, so to speak.

Q. Keep a what?

A. An open view.

Q. Let me invite your attention, Mr. Roberts, to Exhibit 11 in front of you. This is a memorandum from David Davis in his capacity as vice-president at the time of Local 3668, the Phenix City Firefighters Association, dated January 25, 2005, and addressed to Chief Jerry Prater. Have you seen this document before today?

A. I have.

Q. Was this the so-called laundry list that you described earlier that was given to you either before or during the meeting you had with Davis, Duty, and Malone?

A. It is.

Q. Some of these issues you've already addressed. In your one-hour meeting, were they able to go right down each and every item and cover all of them?

A. I don't think they did. I think they went

over a synopsis of the group.

Q. And at the end of the meeting, did you suggest to these three gentlemen -- Davis, Duty and Malone -- that they follow up directly with Chief Prater?

A. I think I asked for Sergeant Davis to talk with Chief Prater.

Q. And were you contemplating at the time that Davis would talk to Chief Prater again in his capacity as a local union representative?

A. Either/or. It didn't matter to me which. I think either one of them, whether he be a local member or whether he be any other firefighter, if he's got some concerns, then I think he needs to bring it through the chain and let the chief handle it.

Q. Now, did you expect or instruct Mr. Davis to go to his immediate officer, perhaps his captain, and up the chain of command before he --

A. Not to my knowledge. I don't remember doing that.

Q. So you suggested Mr. Davis could go directly to Chief Prater?

A. I emphatically said that he needed to take this up with Chief Prater.

Q. Okay. Fair enough. Let me invite your attention to Exhibit 12, which appears to be a letter from Thomas Malone as a field service representative of the IAFF dated March 7, 2005, addressed to yourself. Do you recall having received this letter from Mr. Malone?

A. I do.

Q. And, again, like with all these documents, if you want to take a moment to completely read it, just let me know that you want to do that.

A. I would like to do that and brief myself.

Q. Sure.

MR. GRAHAM: Let's go off the record.

(Discussion held off the record.)

MR. WOODLEY: Back on the record.

Q. Exhibit 12, you've had a chance now, Mr. Roberts, to read to yourself this letter Mr. Malone sent to you on March 7, 2005; is that correct?

A. That's correct.

Q. And he's describing a meeting that apparently he and Davis had with Chief Prater; is that correct?

A. It's my understanding that it's a meeting between Sergeant Davis and Chief Prater.

Q. Who?

A. Sergeant Davis and Chief Prater. I don't believe Mr. Malone was present.

Q. Okay. And would this have been the follow-up meeting that you were suggesting to Davis and Duty and Malone that they follow up and meet with Prater?

A. I would assume that it would be, due to the date on the letter.

Q. Now, obviously, Mr. Malone is expressing his concerns that it was not a productive meeting that was held involving Chief Prater and David Davis and himself, Mr. Malone. And he mentions to you in his letter that they felt like there were threats and intimidation and -- you see where it says all of that?

A. I do.

Q. Did you take any follow-up action when you received this letter and the concerns expressed about it?

A. I talked with Chief Prater about the letter.

Q. What did you discuss with him?

A. He expressed that he had talked with Mr. Davis about the request and basically that was it, to a degree. And by that, I mean we didn't go

indepth as to his answers.

Q. Mr. Malone indicates that the meeting that he had with the chief and, apparently, also Personnel Director Goodwin lasted only about 10 minutes. Was that your understanding?

A. That's my understanding of his letter, yes.

Q. That was a lot less than the length of time that you met with him?

A. If the timing is right, it is less.

Q. Do you think that may be a bit brief to have a constructive meeting addressing issues and concerns?

A. Not being in the tone of the meeting, I wouldn't -- I wouldn't think it was enough time. But according to Mr. Malone's letter, I don't know that it may have been a good meeting. Appears to have been a bad meeting as I stated earlier.

Q. And did Chief Prater report back to you about the nature of the meeting he had on the subject?

A. As I stated earlier, it was my understanding it was not a good meeting.

Q. And that's what Prater reported back to you?

A. Basically, yes.