1  Please explain to me, Mr. Roberts, how the

2  communications and comments that Mr. Davis made in

3  that newspaper article we were just discussing would

4  violate the Merit System rules and regulations or

5  SOPs of the fire department?

6        A.   I would have to look at the rules and

7  regulations of the Merit System and not quote them

8  off the top of my head.  But I believe it will tell

9  you something about talking with the media.  If it

10 is not there, then I would have to to review the

11 SOP, and I do not know the fire or police SOP by

12 heart.

13       Q.   Well, then let's review it.  Exhibit 3,

14 which is an excerpt from the Merit System rules and

15 regulations.  And to shorten this, you may want to

16 look at page 3 of this document, Section 2.054,

17 where it addresses the subject matter of free

18 speech.  And tell me when you're finished reading

19 that section.

20       A.   I've read it, sir.

21       Q.   Is this the section of the Merit System

22 rules and regulations that you were just trying to

23 recall when I was asking you questions about the

24 counseling form that was issued to David Davis?

25       A.   That's correct.

1          Q.   Please tell me, if you can, which comments

2     that Mr. Davis made in the newspaper article and was

3     quoted would impair discipline and harmony in the

4     workplace under Section 2.054 of the Merit System

5     rules and regulations?

6          A.   I believe the headline itself as stated,

7     the alarm -- three alarm --

8          Q.   Turmoil?

9          A.   Yes, sir.   I think that's going to cause

10    turmoil in the fire department, because I do not

11    believe a hundred percent of my firefighters or the

12    city's firefighters -- let me correct myself --

13    believes this.   One hundred percent of our

14    firefighters are not disgruntled with their job.

15         And I also believe that it could impede job

16    performance on any negative quote by any city

17    employee in the paper that, you know, that could

18    cause someone to be intimidated against or feel peer

19    pressure from them, such as what's been the case in

20    the fire department.

21         Q.   Okay.   Anything else that would indicate

22    how Mr. Davis's comments in the newspaper article

23    would have impaired the discipline and harmony in

24    the fire department?

25         A.   Not right off the top of my head.

63

Q.   Okay.  Same question with regard to the
next provision in this free speech section of the
Merit System rules and regulations.  Can you give me
an example of how Mr. Davis's comments in that
newspaper article would impede job performance?

A.   Well, it's just like I said.  I think it
can -- by peer pressure.

Q.   I'm sorry.  What do you mean by that?

A.   You know, I -- in organized labor, you
know, you can exert some force on nonunion workers,
and I think that has been shown to work in all
realms, whether it be firefighters, electricians,
plumbers, steamfitters, whatever.  And I think some
of that, in my opinion, was evident.

Q.   Well, do you think Mr. Davis's comment in
the newspaper article about poor employee morale in
the department, do you think that impeded job
performance?

A.   I think it could have, yes, sir, I do.

Q.   I don't want to know if it could have.  Did
it actually?

A.   I do, yes.

Q.   Could you explain that happening?

A.   Well, there --

Q.   Or give me examples?

64

1      A.    -- again --

2           THE REPORTER:  I just can't get it down

3      when you're talking over each other.

4           MR. WOODLEY:  We can take a break.

5  (Brief recess.)

6      Q.    Mr. Roberts, I think we were addressing the

7  Section 2.054 of the Merit System rules and

8  regulations concerning the subject of free speech.

9  And I wanted to follow up on those questions by

10  asking you again, in light of the comments that you

11  are aware of that Mr. Davis made in that newspaper

12  article in September 2005, which of those comments,

13  if any, would have impeded job performance by him or

14  others in the fire department?

15      A.    Let me try to answer it this way, see if

16  I -- anything that's going to deal with safety,

17  equipment, morale, the general public don't --

18  they're not familiar with fire department

19  operations.  It gives a bad image in the total

20  concept of the operations, and it's really not a

21  true one, and it doesn't need to be in the paper

22  like that.

23      Q.    Do you think --

24      A.    It should be factual.

25      Q.    Do you think the citizens and members of

65

1    the public have a right to know and receive

2    information about the operations of their fire

3    department?

4         A.   If they get the proper perspective they do.

5         Q.   And when you say proper perspective, would

6    that be consistent with your personal opinion of the

7    fire department?  In other words, whatever the

8    firefighters happen to say should be?

9         A.   I think the majority of the operations with

10   the fire department have the true opinions and know

11   what's being done to correct any negatives.

12        Q.   Okay.  Were there any comments in that

13   newspaper article by Mr. Davis that were untruthful

14   as far as you know?

15        A.   I felt like they were.

16        Q.   Which ones?

17        A.   I think anytime you talk about the

18   staffing.  I think the staffing is fine.  I think we

19   man the vehicles.  I think we man all fire

20   apparatus.  I think we man the rescue trucks.  I'm

21   not totally convinced -- totally not convinced that

22   the equipment was all that bad.  We had some old

23   pieces of equipment; of course, due to budget

24   restraints you don't buy new engine apparatus every

25   day.  And, too, the training.  Some of the things

66

1    that he talks about in the article to me does impede

2    job performance and, you know, it can touch back on

3    the bottom -- personal loyalty to any of those.  I

4    think it could hurt the loyalty of some of your

5    people as it relates to it.

6        Q.   Well, sir, I'm not aware that Mr. Davis was

7    quoted, as I read this newspaper article, on the

8    subject of staffing or understaffing or the subject

9    of training.  He was quoted as morale being at the

10   lowest that he's seen it in the fire department.

11   And he was quoted again in the article about being

12   concerned about potential fear and retaliation or

13   being disciplined or fired.  But I don't see

14   anywhere in this article where Mr. Davis -- excuse

15   me -- was quoted about training or staffing

16   concern.

17       A.   Well, I think, number one, he puts it this

18   way; he relates to reluctant to talk of -- let's see

19   how he put it.  We're reluctant to talk about it

20   because of fear of retaliation and being disciplined

21   or fired.  He's talking about the problems inside

22   the fire department.  To me, I'm taking that he's

23   talking about everything we've been discussing,

24   which doesn't, to me, impede job performance, bottom

25   line.

1          Q.   So your reading into his quote that he's

2    got fear or concern about retaliation or being

3    disciplined or fired, you're reading that as

4    criticism of training and understaffing.  Is that

5    what you're telling me?

6          A.   I'm reading anything he's saying that's

7    detrimental to the fire department, going back to

8    the complaints throughout the entire course of media

9    publicity is detrimental to the fire department.

10         Q.   So bottom line is anytime a firefighter

11   criticizes the fire department and it gets in the

12   media, that's going to be bad for the fire

13   department?

14         A.   It could be, yes, sir.  It could be -- it

15   could be.

16         Q.   And you would consider that wrong on the

17   part of the firefighter and a violation of the Merit

18   System's rules and regulations; is that fair?

19         A.   Yes, sir, it is.

20         Q.   Let me ask you a series of questions, which

21   you were here when I addressed them with Chief

22   Hunter in his deposition earlier today.  Based upon

23   your experience with the city and particularly your

24   capacity as city manager, would it be a violation by

25   a firefighter here in the city -- a violation of the

1    Merit System rules and regulations if that

2    firefighter did not follow the so-called chain of

3    command?

4         A.   I do.  I believe that.

5         Q.   Okay.  And, specifically, if the

6    firefighter did not follow or pursue the chain of

7    command and spoke directly with the media

8    representative on the subject of inadequate staffing

9    in the fire department, would you consider that to

10   be a violation of the Merit System rules and

11   regulations?

12        A.   Yes, sir.

13        Q.   Would you consider that firefighter then to

14   be subject to discipline, perhaps firing, as a

15   result?

16        A.   I would consider -- I would think that he

17   would fall in whatever category of Merit System

18   offense that was, whether it be termination,

19   suspension, written counseling statement.

20        Q.   And, sir, in your capacity as city manager,

21   would a firefighter violate Merit System rules and

22   regulations if he did not follow the chain of

23   command but spoke directly to the media about health

24   and safety of firefighters on the job?

25        A.   I do feel that would be a violation of the

1    Merit System.

2         Q.   And would that individual firefighter then

3    be subject to potential discipline or firing?

4         A.   I think so.

5         Q.   Same question.  Would the firefighter

6    violate the Merit System's rules and regulations and

7    be subject to discipline if he bypassed the chain of

8    command and spoke directly to the media about

9    inadequate protective gear or inadequate fire

10   department equipment and vehicles?

11        A.   I feel it's a violation of the Merit

12   System.

13        Q.   And that individual be subject to

14   discipline or firing, correct?

15        A.   Correct.

16        Q.   Would it be a violation of the Merit System

17   rules and regulations if a firefighter bypassed the

18   chain of command and spoke directly to a media

19   representative about concerns he had over response

20   times or inadequate dispatching procedures in the

21   fire department?

22        A.   I feel that would be a violation.

23        Q.   And would it also be a violation of the

24   Merit System rules and regulations, subjecting a

25   firefighter to discipline or firing, if he bypassed

70

1    the chain of command and spoke directly to a media

2    representative about employee morale in the fire

3    department?

4        A.   I feel it would be a violation.

5        Q.   Would it also be a violation of the Merit

6    System rules and regulations if a firefighter

7    bypassed the chain of command and spoke directly to

8    a media representative about public safety related

9    to fire department operations?

10       A.   I would think so.  There are certain

11   procedures on the ground where they've got ways of

12   doing it through the chain.

13       Q.   What do you mean specifically by that?

14       A.   They have got ways to talk with people and

15   get it to whomever they need to talk with.

16       Q.   On all of those subjects I just covered --

17   staffing, health and safety of firefighters,

18   protective gear, equipment in the fire department,

19   morale, safety -- would it be a violation of the

20   Merit System rules and regulations if a firefighter

21   addressed those issues directly with the city

22   council without pursuing it through the the chain of

23   command?

24       A.   I think it would be, yes.

25       Q.   And would that individual firefighter then

71

1    be subject to discipline or potential firing if he

2    addressed those issues directly with the city

3    council without going through the so-called chain of

4    command?

5        A.    I think it would be.

6        Q.    Okay.  Has that ever happened?  Has a

7    firefighter ever gone to a council meeting and stood

8    up and addressed a fire department issue?

9        A.    In my 34 years?  No, sir.  We -- not to my

10   knowledge now.  That's -- that's not to say I have

11   been to every council meeting, but there have been

12   times when they would address budget hearings, when

13   the chief would ask some to talk years ago.  Now we

14   have our budget hearings, you know, in this room

15   here, and the chiefs present their cases at that

16   time.

17       Q.    Have any city police officers and/or

18   representatives of the FOP ever talked directly to

19   the news media about issues of concern in the Police

20   Department?

21       A.    Not to my knowledge.

22       Q.    Now, going back to Exhibit 15, which is the

23   memo again from Chief Hunter to members of the

24   Phenix City Fire Department dated September 20,

25   2005, is it your understanding that the Chief

72

1    distributed that to all the employees in the city's

2    fire department?

3        A.    It was distributed to all the employees of

4    the city.

5        Q.    Okay.  But this, in particular, looks like

6    it was distributed by Hunter to members of the fire

7    department.  Is that your understanding?

8        A.    That's correct.

9        Q.    Okay.  And did he do this with your prior

10   knowledge and approval?

11       A.    He did.

12       Q.    Okay.  And did you authorize a similar memo

13   to be distributed to all City employees?

14       A.    Yes, I did.

15       Q.    And it required apparently all of the

16   firefighters, as well as all City employees, to sign

17   off that they had received or read this?

18       A.    We would like some type of record that they

19   received -- that each one received a copy of this

20   memo.

21       Q.    Did you receive any objections from any

22   city employees or firefighters about the substance

23   of this memo?

24       A.    I have not, no, sir.

25       Q.    Have you heard that anyone objected to it?

73

1     A.    No, sir.

2     Q.    And we discussed earlier with Chief Hunter

3   Exhibit 34, which appears to be a memorandum from

4   you, sir, as the city manager dated September 20,

5   2005, to all employees.  And is this the kind of

6   memorandum that was distributed to the city workers?

7     A.    That's correct.

8     Q.    Okay.  Let's move on to Exhibit 17,

9   Mr. Roberts.  This appears to be a letter addressed

10  to you dated January 31, 2006, from a gentleman

11  named Harold A. Schaitberger, general president of

12  the International Association of Firefighters.  Do

13  you remember receiving this letter shortly after its

14  date?

15    A.    I do.

16    Q.    And copies were evidently also sent, you

17  can see at the end of the letter, to Mayor Hardin

18  and Fire Chief Hunter.  Do you see where it says

19  that?

20    A.    I do.

21    Q.    When you received this letter, what was

22  your reaction to it?  Were you annoyed?  Were you

23  upset?  Anything like that?

24    A.    Not annoyed or upset per se.  I called the

25  Chiefs in and wanted to know what the letter was

74

1    about.  I didn't know of anything going on at this

2    particular time.

3        Q.   Didn't know anything what?

4        A.   Any conflict that was going on at this

5    particular time.  And I believe it was Chief Waters

6    said he would talk with David Davis about the

7    letter.

8        Q.   Did you ask Chief Hunter to look into it

9    and get back to you?

10       A.   I think Chief Hunter was already looking

11   into it, yes.

12       Q.   But did you expect him to get back to you

13   at some time?

14       A.   Yes, sure.

15       Q.   And among other things in this letter,

16   Mr. Schaitberger is addressing concerns about the

17   shift schedule, the risks or possibility of

18   implementing an 8-hour shift as opposed to the

19   existing 24-hour schedule.  And, among other things,

20   also addressing a concern that Mr. Davis was issued

21   a counseling form on September 20, 2005, concerning

22   his interview and statements to the local media.  Do

23   you see where it says that?

24       A.   I do.

25       Q.   And then Mr. Schaitberger is outlining

75

1  certainly legal principles under the First

2  Amendment; for example, the right that public

3  employees have to free association under the First

4  Amendment.  Were you aware of those protections,

5  those constitutional rights, before you got this

6  letter from Mr. Schaitberger?

7      A.  I'm aware of the First Amendment rights,

8  yes, sir, and I do feel like that our First

9  Amendment rights are -- we give them their due

10  diligence as well with them, and there's procedures

11  for that.

12      Q.  Have you been aware for a number of years

13  that the First Amendment also protects the right of

14  public employees to free speech?

15      A.  I do under the guidelines that's given,

16  yes, sir.

17      Q.  And have you been aware for a number of

18  years as city manager that it's a violation of the

19  First Amendment protections for public employees to

20  be disciplined or retaliated against if they are

21  exercising their First Amendment rights to free

22  speech and free association?

23      A.  As long as it's done in the proper

24  perspective.

25      Q.  What was the follow-up?  You get this

1    letter.  You talk to Chief Hunter, what's going on.

2    You expect he's going to get back to you.  Did he

3    get back to you?

4        A.  Yes, sir.  They had letter.  I believe it

5    was some -- David said there wasn't any problems.

6        Q.  Okay.  Exhibit 18, this appears to be a

7    memo from Deputy Chief Roy Waters to Chief Hunter

8    dated February 6, 2006, and it's concerning the

9    letter Schaitberger had sent to you.  Did you

10   receive a copy of this memo?

11       A.  I did.

12       Q.  On or about the date of it in February

13   2006?

14       A.  Uh-huh.

15       Q.  That's a yes?

16       A.  Yes, sir.  I'm sorry.

17       Q.  So when you received a copy of this memo,

18   you understood, I take it, that there had been a

19   discussion between Deputy Chief Waters and

20   Mr. Davis, correct?

21       A.  As indicated in the letter, yes, sir.

22       Q.  All right.  Did you take any further action

23   or think anything further was necessary on this

24   subject?

25       A.  I did not.

1    Q.    And then you sent a reply letter back to

2    Mr. Schaitberger which appears as Exhibit 20 dated

3    February 14, 2006; is that correct?

4    A.    That's correct.

5    Q.    And you indicate in part in this letter

6    that the Deputy Chief spoke with Mr. Davis upon

7    receipt of your letter, and Mr. Davis expressed that

8    he thought everything in the department was going

9    good and that he did not have any complaints?

10   A.    I used Chief Waters' letter and put what

11   was reported to me.

12   Q.    Okay.

13   Q.    Then at some point did it come to your

14   attention, Mr. Roberts, that Mr. Davis had placed a

15   telephone call to Mayor Hardin sometime in April of

16   2006?

17   A.    Yes, sir.

18   Q.    How did that first come to your attention?

19   A.    To be honest with you, I don't really

20   remember.  I believe it was Chief Hunter that

21   explained it to me or told me about it.

22   Q.    In a conversation?

23   A.    Yes, sir.

24   Q.    And what did he tell you about it?

25   A.    In general terms, basically that the Mayor

1   had been contacted by Mr. Davis in relation to a

2   proposed change in probationary time.

3       Q.   Probationary time for new hires into the

4   fire department?

5       A.   For new hires within three departments, all

6   of our public safety, which is, of course, our

7   police, code enforcers, and, of course, the fire

8   department.

9       Q.   But is it fair and accurate to say that

10   since Mr. Davis was an 8-year employee of the fire

11   department, that this proposed extension of the

12   probationary period from one year to 18 months would

13   have not directly affected him?  Is that a fair and

14   accurate statement?

15       A.   It would not have affected him at all.

16       Q.   Was it your understanding, based upon the

17   information that you have been given, that Mr. Duty

18   placed the telephone call to Mayor Hardin in April

19   of 2006 when --

20       MR. GRAHAM:  You said Mr. Duty?

21       Q.   I'm sorry.  Is it your understanding, based

22   upon the information that you were given, that David

23   Davis, when he placed the call to Mayor Hardin in

24   April of 2006, was off duty at the time?

25       A.   I don't remember asking that.  I don't

1    know.

2         Q.    Okay.    Do you know if Mr. Davis -- or did

3    you receive any information that Mr. Davis had

4    placed that call to the Mayor in Mr. Davis' capacity

5    as president of the firefighters local labor

6    association?

7         A.    The only thing the Mayor told me was that

8    David had called concerning the proposed change in

9    probationary time.

10        Q.    Okay.

11        A.    Now, I would have assumed it would have

12   been as a officer of the local or as a firefighter,

13   either/or.

14        Q.    When you say assume, do you have any

15   personal knowledge that it might have been in his

16   capacity as president of the local union?

17        A.    Well, he's both, so I assumed it would be

18   that, yes.

19        Q.    Do you know or do you have any information

20   that Mr. Davis addressed any other issues when he

21   spoke to the Mayor by telephone other than extending

22   the probationary period?

23        A.    I do not know any other information on

24   their phone call.

25        Q.    When you were told by Chief Hunter that