23

```
1    It says in Section 15.022, the definition of

2    grievance, that it includes a view or opinion

3    pertaining to employment conditions.  You see where

4    it says that on the first line there?  Let me quote

5    it completely:  "A grievance is a complaint, a view

6    or opinion pertaining to employment conditions, to

7    relationships between employees and supervisors, and

8    to relationships with other employees."

9         You see where it says that?  I think it's on

10   the first page.

11            MR. MCKOON:  Let me find it for you,

12   Bubba.  Looks like it's missing out of this

13   book.

14   A.   I don't have it.

15   Q.   Sorry.

16            MR. MCKOON:  Look at mine.  Definition of a

17   grievance.

18   A.   Okay.  Would you start again, please?

19   Q.   You have it in front of you now

20   apparently.  It says, in Section 15.022, "a

21   grievance is a complaint, a view, or opinion

22   pertaining to employment conditions, to

23   relationships between employees and supervisors, and

24   to relationships with other employees."

25        You see where it says that?
```

1      A.   I do.

2      Q.   Do you concur with that, that that's the

3  definition of grievance or complaint?

4      A.   Yes, sir, as stated in the merit system.

5      Q.   Okay.  Does this really apply to individual

6  employee grievances or complaints?  Like, for

7  example, a firefighter doesn't like his salary or

8  benefits or hours of work.  Does it focus on the

9  individual having a complaint?

10     A.   I look at this as a two-way street.  It can

11  be either individual or group or any group can have

12  the same grievance with a spokesman coming or an

13  individual, either/or.

14     Q.   Now, at the end of Exhibit 3 is the fire

15  department ASOP-12.  ASOP-12 is the fire

16  department's standard operating procedure concerning

17  addressing city council.  You are familiar with this

18  document, correct?

19     A.   Yes, sir.

20     Q.   Okay.  Says in paragraph three, "if a

21  problem cannot be solved by anyone in the chain of

22  command, then the city manager will arrange a

23  hearing with the city council."

24     Do you see where it says that?

25     A.   I do.

1     Q.   Have you, in fact, ever arranged a hearing

2   with the city council concerning a city employee

3   wanting to address the council?

4     A.   Not -- no, sir, I have not.

5     Q.   Okay.  So in your six-plus years, you have

6   not done that?

7     A.   No.

8     Q.   What is your understanding of what is meant

9   by you, as city manager, will arrange a hearing with

10   the city council.  Would that be you, yourself,

11   doing the hearing or airing the concern?

12     A.   No, sir.  It would be with the individual

13   or the group.

14     Q.   But you say you've never done that?

15     A.   Not to my knowledge.  Not that I remember.

16     Q.   Mr. Roberts, as a city manager, do you

17   believe or feel that a city employee like a

18   firefighter, speaking as a citizen and while off

19   duty and out of uniform, has the right to address

20   the city council?

21     A.   On matters other than pertaining to the

22   fire department or to the police department or

23   issues within the work force, yes, sir, I do.

24     Q.   So a firefighter could go directly to the

25   city council while off duty and as a citizen and

1  speak to the city council in an open public meeting

2  about issues that affect the fire department?

3      A.  Not about issues that affect the fire

4  department, sir.

5      Q.  Okay.  Then I'm sorry.  I didn't understand

6  your earlier response.  So that's out of bounds?  A

7  firefighter cannot go to the city council, as a

8  citizen off duty, and speak about issues that affect

9  the fire department?

10      A.  That is my understanding, sir, of the merit

11  system and the SOPs.

12      Q.  And when you say the merit system, those

13  are the regulations and the ASOP-12 that would

14  preclude that from happening?

15      A.  Yes, sir.

16      Q.  Let me ask you, you're familiar with how

17  citizens, I guess, get on the agenda for the city

18  council to speak with the council, correct?

19      A.  I am.

20      Q.  And how does that process work?

21      A.  There's an application that's filled out in

22  the city clerk's office.  It has to be by a

23  deadline, which was Thursday prior to the meeting on

24  the following Monday.  And they're put on the agenda

25  with the content of what they're to talk to the

1   council about, sir.

2       Q.   Okay.  So if I understand what you just

3   said, an individual citizen would fill out a form

4   requesting permission to address the council and

5   submit it ahead of time?

6       A.   Yes, sir.

7       Q.   Let me invite your attention to

8   Exhibit 37.  This appears to be one of those request

9   forms.  This one, as an example, happens to be from

10  an individual named Martha Harris, and it's dated

11  November 9, 2006.  And apparently she has made a

12  request to address the council.  And this memo was

13  sent to Walter Grabon -- Grabon?

14          MR. MCKOON:  I'm just trying to shorten --

15      I think you've got that wrong.  It's Mr. Grabon

16      that's making the request.  That's just a fax

17      cover sheet I think you're looking at there.

18      Martha Harris is the city clerk.

19          MR. WOODLEY:  Okay.

20          MR. MCKOON:  If you look at the second

21      page, I think it will clarify.  I'm not trying

22      to interrupt.

23          MR. WOODLEY:  I appreciate that

24      clarification.

25      Q.   So apparently the individual Walter Grabon

28

1    wanted to address the city council, and that is

2    clearer, I think, on the second page of this

3    exhibit.  Is that your understanding of how the

4    process works?

5        A.  Yes, sir.

6        Q.  And sometimes are these requests to address

7    the city council screened out and not allowed, if

8    you know?

9        A.  We screen.

10       Q.  Do you do it yourself?

11       A.  I do.

12       Q.  All requests to address --

13       A.  Not all requests, no.

14       Q.  Does the city clerk screen all of them?

15       A.  She does.

16       Q.  Okay.  And have you, on occasion, not

17   permitted a request to address the council?

18       A.  We have on occasion, when the request would

19   be made late, after the deadline.  Not on one that

20   has been made prior to the deadline.

21       Q.  Do you know of any situation where any city

22   employee has submitted a request in one of these

23   forms to address the city council?

24       A.  Not to my knowledge, no, sir.

25       Q.  Okay.  And what is the kind of session

1  conducted by the city council where they listen to

2  comments made by citizens?

3      A.   This is a work session.

4      Q.   And is that usually held the day before the

5  public meeting?

6      A.   It is.

7      Q.   Is it held at night?

8      A.   Yes, sir, it is.

9      Q.   Okay.  Let me invite your attention to

10 Exhibit 38.  This is a collection of examples, I

11 believe, of agendas for the work session of the city

12 council.  Would you agree with that?

13     A.   I would.

14     Q.   And this would be the occasion, the work

15 session where citizens would address the council; is

16 that correct?

17     A.   That is correct.

18     Q.   Do citizens ever address the council at

19 their formal meetings on Tuesday nights?

20     A.   Very seldom.

21     Q.   Why do you say that?

22     A.   It's handled in the work agenda.

23     Q.   In the work session?

24     A.   That's the wishes of the council.

25     Q.   So the formal meetings of the city council

1    are more business of the council as opposed to

2    entertaining comments?

3        A.    Yes, sir.

4        Q.    But what about the public hearing that's

5    conducted on the budget?  Is that more of an open

6    meeting where individuals can come forward and

7    comment on a proposed budget?

8        A.    Yes, sir, it is.

9            MR. MCKOON:  To be clear, the work session

10        is an open meeting.  Just want to let you know

11        that.

12            MR. WOODLEY:  Thank you.

13        Q.    Do the police officers here in the city

14    have any kind of labor organization or union?

15        A.    Fraternal Order of Police.

16        Q.    But as far as you know, none of the

17    representatives of the police labor organization

18    have addressed the city council about police issues?

19        A.    Not since I have been here, no, sir.

20        Q.    How about before you were here?  Are you

21    aware of that?

22        A.    No, sir.

23        Q.    Now, let's focus on the proposed city

24    ordinance which was eventually adopted by the city

25    council, which is -- I'm afraid I only have one

1   copy, but I'll be glad to share it with both you and
2   Mr. McKoon.
3         MR. MCKOON:  Hold on a minute.  I've got it
4      somewhere.  I'll give him one.  You talking
5      about that one?
6      Q.  Well, I can actually talk about that.
7   Let's talk about that, which I've got in here as
8   exhibit --
9         MR. MCKOON:  I'm sorry.  I thought that's
10      the one you were going to --
11         MR. WOODLEY:  That's all right.
12      Q.  Exhibit 34, Mr. Roberts, is a document
13   produced by the city in this case which appears to
14   be an ordinance number 78-24 adopted back in 1978.
15   And as I understand it, this is where the city
16   council adopted all of the merit system rules and
17   regulations.  Is that your understanding as well?
18      A.  This is the very first adoption of a merit
19   system for the City of Phenix City.
20      Q.  And then since then, periodically, the
21   council has adopted amendments or additions to the
22   merit system rules and regulations?
23      A.  A very few times.
24      Q.  But one of those very few times was the one
25   that is significant in this case, which is ordinance

1    number 2006-13 that apparently was adopted by the

2    city council on April 18, 2006.  Let me show you

3    that.  Take your time to read that.  You are

4    familiar with that, Mr. Roberts?

5        A.   Right, I am.

6        Q.   And, in essence, that was the ordinance

7    that extended the probationary period from a year to

8    18 months for the fire department, police

9    department, and code enforcement officers, correct?

10       A.   That is correct.

11       Q.   And this is the subject, among others, that

12   apparently Mr. Davis spoke to Mayor Hardin about on

13   the telephone, correct?  As far as you know?

14       A.   I don't know what he talked to the mayor

15   about, sir.

16       Q.   You don't know that Mr. Davis was talking

17   to the mayor about the opposition of his firefighter

18   union members to this proposed ordinance?

19       A.   I knew that.

20       Q.   Okay.  Now, is it your position as the

21   Rule 30(b)(6) witness and the city manager that

22   Mr. Davis should have exhausted the chain of command

23   or grievance procedures within the city before he

24   voiced his opposition to this proposed ordinance?

25       A.   Yes, sir.

1      Q.   Okay.  I want to walk through that, because
2    I want to be able to get my arms around this issue.
3    Are you saying in response to that earlier question
4    that Mr. Davis could have gone to his captain, first
5    line officer in the fire department, and voiced his
6    opposition to this proposed ordinance, and the
7    captain could have given him relief in some way?  He
8    could have stopped the adoption of this ordinance by
9    the council?
10     A.   I'm not going to say the captain could have
11   stopped the adoption of the ordinance.  The captain
12   could have given him permission to go up his chain
13   of command to where he could get to the proper
14   people to whom he could talk to in regard to the
15   possible adoption of any ordinance.
16     Q.   So then when the captain just moves it up
17   the chain of command, Mr. Davis's opposition to this
18   proposed ordinance, he would have gone to his
19   batallion chief, I take it?
20     A.   Yes.  Yes, sir.
21     Q.   Could the batallion chief have given him
22   any relief in preventing the council's adoption of
23   this ordinance?
24     A.   No, sir.  He would have to follow the chain
25   completely, like I said in the earlier question.

34

1       Q.   So it would go up to the assistant chief
2    and then up to Chief Hunter?
3       A.   Up to Chief Hunter.  And then by the merit
4    system, it would come to me, and then he could voice
5    his command to the legislative portion of this
6    government, which is city council.
7       Q.   And you're the chief executive officer?
8       A.   Yes, sir.
9       Q.   All right.  Then if Mr. Davis had gone to
10   Chief Hunter voicing, on behalf of his union
11   members, the opposition to this proposed ordinance,
12   are you aware of anything Chief Hunter, within his
13   authority, could have done?
14      A.   He could have directed them to us -- to me.
15      Q.   So, to you, that's all Chief Hunter could
16   have done --
17      A.   Yes, sir.
18      Q.   -- is just route it on to you?  And then if
19   he did that, and this concern about the adoption was
20   routed on to you, is there anything you could have
21   done, within your power as city manager, to have
22   prevented or stopped the city council from adopting
23   this ordinance?
24      A.   I could have got him a meeting with the
25   city council and let them -- let him express their

1   opinion as it related to the issues around that

2   particular ordinance.

3        Q.   Okay.  So through the chain of command and

4   through your position, it would just have to be

5   routed on to the council?

6        A.   That's correct.

7        Q.   Are you aware of any disruptive impact that

8   Mr. Davis's conversation with Mayor Hardin opposing

9   this proposed ordinance had, in fact, within the

10  city's fire department?

11       A.   Would you please explain that question?

12       Q.   Yes.  Are you aware of any adverse

13  consequences or serious disruptive impact that was

14  produced by Mr. Davis talking to Mayor Hardin about

15  the opposition to the ordinance?

16       A.   I am not privy to all fire department

17  operations on a day-to-day basis per se.  I do not

18  know the repercussions.

19       Q.   Okay.  Has Chief Hunter ever told you that

20  as a result of Mr. Davis contacting the mayor about

21  this proposed ordinance, it had a significant

22  disruptive impact on fire department operations or

23  efficiency?

24       A.   Chief Hunter advised that if the call

25  violated their SOP or merit system.

1    Q.  But other than violating the SOP or merit

2    system, did he ever discuss with you any actual

3    adverse impact that it had within the fire

4    department's operations or efficiency?

5    A.  I do not recall and neither do I remember

6    asking him were there any.

7    Q.  Okay.  Let me switch gears for a moment and

8    talk about the First Amendment right to free speech

9    and free association under our United States

10    Constitution.  I take it based upon your extensive

11    experience, particularly as the city manager for

12    over six years, that you're aware of the right that

13    all citizens, including public employees, have under

14    our First Amendment to free speech and free

15    association.  Is that a valid statement?

16    A.  I'm aware of the First Amendment.

17    Q.  Are you aware that public employees also

18    have a First Amendment right of free speech and free

19    association?

20    A.  I understand they're covered by the First

21    Amendment.

22    Q.  What is your understanding of that?

23    A.  They have restrictions that they have to

24    follow.

25    Q.  What are those?

1      A.   The chain of command for one.  They are a
2  paramilitary organization.
3      Q.   Any other restrictions?
4      A.   Not to my knowledge.
5      Q.   I think you told me you were a former
6  marine, right?
7      A.   No, sir.  Army.
8      Q.   What an insult that was, huh?  I'm former
9  U.S. Army as well.  How long were you in the Army?
10      A.   Forty-one years.
11      Q.   Forty-one?  And what was your last rank
12  when you left?
13      A.   Chief Warrant Officer IV.
14      Q.   Let me invite your attention to Exhibit 17,
15  Mr. Roberts, which is the letter from the
16  International Association of Firefighters' General
17  President Harold Schaitberger dated January 31,
18  2006, addressed to yourself with copies going to
19  Mayor Hardin and Chief Wallace Hunter.  Do you
20  recall having received this letter from
21  Mr. Schaitberger a few days after its date?
22      A.   I do.
23      Q.   What did you do, if anything, when you
24  received this letter?  Did you take any action or
25  speak to anyone?

38

1     A.    I called both Chief Hunter and Chief Waters

2     and asked them the contents of what was going on.

3     Chief Waters advised that he would talk with

4     Mr. Davis.

5     Q.    Anything else?

6     A.    And then a letter was drafted and returned

7     back to the -- answering this letter.

8     Q.    And you'll note again that Mr. Schaitberger

9     refers to certain legal principles and rights under

10    the First Amendment and cites actual court

11    decisions.  You see where it says that generally?

12    A.    I do.

13    Q.    Did that prompt you to go to the city

14    attorney and discuss this letter and its contents

15    with the city attorney?

16    A.    I have discussed the contents with Attorney

17    Graham.

18    Q.    But did you do so shortly after receiving

19    the letter; do you remember?

20    A.    Within a short time frame, that's correct.

21    Q.    Within a week or two?

22    A.    Probably quicker than a week.

23    Q.    And why did you do that; do you remember?

24    A.    Anything that's of concern that deals with

25    law, then naturally I'm going to ask advice of my

1   city attorneys.

2     Q.  I want to go through as I did with Chief

3   Hunter when you were here in his deposition, some of

4   the statements in this letter to see if you are

5   aware of the principles.  And the first one I want

6   you to look at is on page 2 of Mr. Schaitberger's

7   letter in the middle starting paragraph where it

8   says, "it is well established that the First

9   Amendment right of free association includes the

10   right to belong to and to actively participate in

11   labor organizations."

12     Do you see where it says that?

13     A.  I do.

14     Q.  Were you aware of that statement of law or

15   principle even before you received

16   Mr. Schaitberger's letter?

17     A.  Yes, sir.

18     Q.  And were you aware of that principle for a

19   number of years like when you first became city

20   manager?

21     A.  A number of years prior to being city

22   manager.

23     Q.  Fair enough.  Next, it says, the very next

24   sentence, "the right to discuss and inform people

25   concerning the advantages and disadvantages of

1  unions and joining them is protected not only as

2  part of free speech but as part of free assembly."

3  Do you see where it says that?

4      A.   I do.

5      Q.   And were you aware of that principle of law

6  and protection even before you became city manager?

7      A.   I was.

8      Q.   And were you aware of it during the time

9  that you have been city manager?

10     A.   I am.

11     Q.   And are you aware that there's actually a

12  State of Alabama Code provision that gives the right

13  to firefighters to belong to a union and to make

14  proposals to their employers?

15     A.   I am.

16     Q.   And have you been aware of that during the

17  entire time that you were city manager?

18     A.   Yes, sir.

19     Q.   The next statement on page 2 of

20  Mr. Schaitberger's letter says in the beginning of

21  the last paragraph, "moreover, although there is no

22  right or entitlement to government employment, the

23  denial or deprivation of a job and related benefits

24  may not be based on one's exercise of First and

25  Fourteenth Amendment Rights."

1        Do you see where it says that?

2        A.  I do.

3        Q.  Were you aware of that legal protection and

4   right and principle of law during the time that you

5   have been city manager?

6        A.  Yes, sir.

7        Q.  The next sentence says, "in this regard,

8   individuals have the First Amendment right to speak

9   out about matters of public concern without having

10  government employers retaliate against them for the

11  exercise of their right to free speech."

12       Do you see where it says that, Mr. Roberts?

13       A.  I do.

14       Q.  Were you aware of that statement of law or

15  principle during the entire time you have been city

16  manager?

17       A.  I am.

18       Q.  Next sentence says, "retaliation by a

19  government employer against an individual who

20  exercises his First Amendment rights constitutes a

21  First Amendment violation."

22       Do you see where it says that?

23       A.  I do.

24       Q.  Were you aware of that principle or

25  protection under the law during the entire time

42

1    you've been city manager?

2        A.   I am.

3        Q.   The next sentence says, "indeed, few

4    subjects are of more public concern than the

5    provision of basic fire and rescue services."

6        You see where it says that?

7        A.   I do.

8        Q.   Would you agree with that statement?

9        A.   It's one of the top public concerns, if not

10   the top.  It ranks right up there.

11       Q.   So the citizens here in Phenix City would

12   have a legitimate interest and a public concern

13   about how they are furnished fire and rescue

14   services?

15       A.   Yes, sir.  That's correct.

16       Q.   Okay.  Thank you.  Have you ever received

17   any subscriptions or read any articles or reports

18   about First Amendment protections of free speech and

19   free association that are accorded public employees

20   like firefighters?

21       A.   I do not receive any articles on that, no.

22       Q.   Have you read articles or reports about

23   First Amendment protections for public employees?

24       A.   I have read articles as it relates to

25   public service employees and the relationship to the

1   First Amendment rights.

2       Q.   And is that during the time you have been

3   city manager?

4       A.   I couldn't answer that.  I don't remember.

5       Q.   Okay.  Have you ever gone to any

6   educational programs or seminars where the subject

7   of First Amendment rights of public employees has

8   been reviewed?

9       A.   I have not attended any as city manager,

10  no.

11      Q.   Now, a few weeks ago, Mr. McKoon forwarded

12  to me a box of documents in response to our request

13  for production of documents, and it was over 2000

14  pages.  Very expensive, by the way.  Did you have

15  occasion to look through all of those documents

16  before they were sent my way?

17      A.   No, sir.

18      Q.   Do you know if anyone within the city did

19  that?

20      A.   Every copy was made by either one of the

21  secretaries in the back or Mr. McKoon's secretary,

22  so someone saw every article.

23      Q.   Were those copies made here in City Hall?

24      A.   Yes, it was.

25      Q.   Let me ask you this.  With regard to the

44

1    decision and implementation of the decision to

2    discharge Mr. Davis in April 2006, did you give your

3    prior concurrence or approval to Chief Hunter to

4    implement that discharge decision?

5        A.   I was notified of the termination.  The

6    department heads are given that authority.  As the

7    city manager, there again, I sat with the Personnel

8    Review Board as stated in my prior deposition, I

9    think.  You know, I didn't sign the termination

10   notice due to the fact that I eventually have to

11   sign a letter if, in fact, the termination is

12   upheld.

13       Q.   Well, I'm not sure that was really

14   responsive to my question.  I'm really focusing on

15   whether or not you gave the OK, your approval as

16   city manager, to Chief Hunter before the decision to

17   discharge Mr. Davis was implemented?

18       A.   You could say that, yes.

19       Q.   Now, do you recall filing an affidavit

20   earlier in this lawsuit?

21       A.   I do.

22       Q.   Who typed that affidavit up?

23       A.   It was typed up at Mr. McKoon's office.

24       Q.   And who prepared the language in that

25   affidavit?

1        A.   Mr. McKoon asked me a series of questions

2   and then he put it together in the letter.

3        MR. WOODLEY:  All right.  I don't have any

4        further questions.  Thank you, Mr. Roberts.

5                        EXAMINATION

6   BY MR. MCKOON:

7        Q.   All right.  I just have probably one

8   question.  Mr. Roberts, at any time during your

9   participation in the termination of Mr. Davis, did

10  you have any feeling or belief that you were

11  violating any of his First Amendment rights as you

12  have been -- as they were defined and asked about by

13  Mr. Woodley?

14       A.   No, sir, I didn't.

15       MR. MCKOON:  That's all.

16       MR. WOODLEY:  We're done.  Thank you.

17  (The deposition concluded at 12:06 p.m.)

18                  *  *  *  *  *  *  *  *  *  *

19

20

21

22

23

24

25