41

about them.

Q. Okay. But, again, can you give me any specific examples of disruption or impairment --

A. I just gave you --

Q. You have to let me finish my question, please, Chief Hunter.

A. Sorry.

Q. Other than what you've just mentioned, can you give me any other specific or concrete examples of impairment of the fire department or disruption of fire department operations that were resulting from the comments of Mr. Davis and the other firefighters in this newspaper article that came out in September of 2005?

A. That's another one -- okay. Another one in here, I guess, would be Councilman Bush being in here to mediate something. He's mediating something that I didn't know anything about.

Q. Did you speak to Council Member Bush about --

A. No.

Q. -- his role as mediator?

A. No, sir.

Q. Were you upset about that?

A. Well, no, I wasn't upset about it.

```
 1        Q.   Did you think his involvement was
 2   disruptive to your authority as fire chief?
 3        A.   Councilman Bush don't know the charter like
 4   I do.
 5        Q.   Did you speak to Council Member Bush
 6   about --
 7        A.   No, sir.
 8        Q.   -- his role?
 9        A.   It's not my authority.  It's not in my
10   realm of authority to speak to him about it.
11        Q.   But at the time that he was trying to
12   apparently be helpful as a mediator between the
13   firefighters and fire department, do you think he
14   was intruding upon the chain of command?
15        A.   I don't know if he was being -- to me, I
16   don't know if he was being helpful or harmful.
17        Q.   Do you have any view on that right now?
18        A.   No, sir.
19        Q.   Okay.  Did you consider at the time, back
20   in September 2005, that Mr. Davis's comments and
21   communications in that newspaper article were a
22   violation of the city's Merit System rules and
23   regulations?
24        A.   Yes, sir.
25        Q.   And why do you say yes?
```

1  A. Because it was something that could have
2  been handled a different way. And, basically, like
3  I say, they didn't give me a opportunity to come in
4  there. And this right here is going to -- is going
5  to disrupt your normal operation.
6  Q. So in other words, if I understand your
7  testimony --
8  A. Because of other things that could have
9  been done to prevent this.
10 Q. Okay. So if I understand your testimony,
11 you think it's contrary to the city's Merit System
12 rules and regulations if a firefighter like
13 Mr. Davis would directly talk to the media about
14 issues of public concern, fire department safety,
15 health and welfare of the firefighters? You think
16 that would be a violation of the Merit rules and
17 regulations; is that correct?
18 A. If it's something that's going to impede or
19 harm the operation of the department, yes, sir.
20 Q. Would it be a violation of the Merit System
21 rules and regulations by a firefighter if he or she
22 spoke directly to the media about inadequate
23 staffing in the fire department?
24 A. Basically, that's something that they
25 could -- they have the opportunity to talk to me

about, or the assistant chiefs.

    Q.  I understand your position, but you have to listen to my question, if you would, Chief Hunter. I want to know specifically your position and view as to whether or not it would be a violation of the city's Merit System rules and regulations if a firefighter in your fire department spoke directly to a media representative about the subject of inadequate staffing in the city fire department.

    A.  As far as our rules and regulations, we have persons who can talk to the media about staffing that handles that.

    Q.  You have a public relations representative in the fire department that can talk to the media?

    A.  Yes, sir.

    Q.  Let me try this one more time. It's real specific. Would it be a violation of the city's Merit System rules and regulations if a firefighter spoke directly to the media --

    A.  Yes.

    Q.  -- about the subject of inadequate staffing in the fire department?

    A.  Yes, sir.

    Q.  Would it be a violation of the city's Merit System rules and regulations if a firefighter

1    employed by the city's fire department spoke
2    directly to a media representative about the health
3    and safety of firefighters on the job?
4        A.   Yes, sir.
5        Q.   Would it also be a violation of those rules
6    and regulations if a firefighter spoke directly to a
7    newspaper or media representative about inadequate
8    protective gear or inadequate fire department
9    equipment and vehicles in the city fire department?
10       A.   Yes, sir.
11       Q.   I'm sorry?
12       A.   Yes, sir.
13       Q.   Would it also be a violation of the Merit
14   System rules and regulations of the city if a
15   firefighter spoke directly to a media representative
16   about insufficient financial resources or inadequate
17   budget in the city's fire department?
18       A.   Yes, sir.
19       Q.   Would it also be a violation of the Merit
20   System rules and regulations of the city if a
21   firefighter spoke directly to a media representative
22   about poor response times or inadequate dispatching
23   procedures in the city's fire department?
24       A.   Yes, sir.
25       Q.   Would it be a violation in your view of the

 1  Merit System rules and regulations of the city if a
 2  firefighter spoke directly to a media representative
 3  about poor employee morale among the fire personnel
 4  in the fire department?
 5       A.   Yes, sir.
 6       Q.   Would it be a violation of the Merit System
 7  rules and regulations of the city if a firefighter
 8  spoke directly to a media representative about any
 9  alleged corruption or misconduct by fire department
10  officers within the city fire department?
11       A.   Yes, sir.
12       Q.   And, finally, would it be a violation of
13  the city's Merit System rules and regulations if a
14  firefighter spoke directly to a media representative
15  about public safety in general within the city?
16       A.   Yes, sir.
17       Q.   Okay.  And I take it with regard to that
18  series of questions that I just asked you about the
19  rules and regulations, that your position and the
20  position of the city is that a firefighter must
21  route any of those expressions of concerns through
22  the chain of command within the city Fire Department
23  before they speak to a media representative; is that
24  correct?
25       A.   Yes, sir.  We should be given a chance.

1  Q.  Turn to Exhibit 16, Chief Hunter, if you
2  would, please.  This appears to be a counseling form
3  or reprimand addressed to David Davis dated
4  September 21, 2005.  Are you familiar with this
5  document?
6  A.  Yes, sir.
7  Q.  It says here -- you'll see at the beginning
8  here, it says Sergeant Davis was counseled by Chief
9  Hunter and Assistant Chief Johansen on the 20th of
10 September 2005 concerning him making or publishing
11 statements to the local media concerning fire
12 department issues.  And then it goes on further.
13 You see where it says that?
14 A.  Yes, sir.
15 Q.  Is this counseling form considered a
16 written reprimand that's placed in the personnel
17 file of Mr. Davis?
18 A.  It's not a written reprimand.  It's just a
19 counseling form to prevent anything from going any
20 further.  It's almost like a corrective thing if a
21 person -- basically gives them the chance, benefit
22 of the doubt that you didn't know.  And that's what
23 this is for.
24 Q.  Is there something else in the fire
25 department that is called a written reprimand?

```
 1      A.  Yes, sir.
 2      Q.  And have you issued those to firefighters?
 3      A.  Yes, sir.  I've had to before.
 4      Q.  Now, at the end of this memo, it says that
 5  this counseling form for Mr. Davis was placed in his
 6  personnel file.  You see where it says that?
 7      A.  Where you at?  16?
 8      MR. GRAHAM:  Right here.
 9      A.  Okay.
10      Q.  Yes, right at the bottom.
11      MR. GRAHAM:  Last sentence.
12      A.  Okay.  Yes.
13      Q.  So your answer is yes?
14      A.  Yes.
15      Q.  It appears to be signed by Assistant Chief
16  Kenneth Johansen; is that correct?
17      A.  That's correct.
18      Q.  Again, it sounds like you, as the chief of
19  the department, and Mr. Johansen actually discussed
20  this situation and counseled Mr. Davis about it; is
21  that accurate?
22      A.  That's correct.
23      Q.  And if I understand your testimony
24  earlier -- and you correct me if I'm wrong -- you,
25  on your own initiative solely, as the fire chief,
```

1  began this investigation and these counseling
2  sessions as a result of the newspaper article that
3  appeared in the newspaper in September 2005?
4      A.  That's correct.  I talked to the city
5  attorney about it.
6      Q.  Mr. Graham?
7      A.  That's correct.  Yes, sir.
8      Q.  So you cleared it through him to do this?
9      A.  Yes, sir.
10     Q.  Did you talk to the city manager,
11 Mr. Roberts, about investigating this matter?
12     A.  Well, that's correct.  He knew that I had
13 to see about it.
14     Q.  You had to get his okay to conduct the
15 investigation?
16     A.  Basically not -- not his okay but, you
17 know, you want the city manager's blessing to make
18 sure you don't do anything wrong.
19     Q.  And did you discuss this with City Manager
20 Roberts before you conducted the counseling sessions
21 of Mr. Davis and the other firefighters?
22     A.  That's correct.
23     Q.  Did he tell you not to do the investigation
24 and not to do the counseling as a result of the
25 newspaper article?

```
 1    A.  No, sir.  Mr. Roberts pretty well let us
 2  run our departments.
 3    Q.  And did you interview or discuss this
 4  newspaper article with other firefighters as well as
 5  Mr. Davis?
 6    A.  That's correct.
 7    Q.  And would that have included William Miles,
 8  Lance Wagner, Sergeant Ann Land, Robert Gaskin,
 9  Sergeant Bowden, and James Wells as well?
10    A.  It was the entire department.  And, not
11  only that, it was the entire city.
12    Q.  Entire city?
13    A.  Yes, sir.  Make sure others in the city
14  didn't make this mistake.
15    Q.  Are you telling me that every city employee
16  was interviewed and counseled about this newspaper?
17    A.  Not by me, but they was made aware of this
18  situation.
19    Q.  Do you know if that was put out in some
20  kind of memorandum form by the city, distributed to
21  other city employees about communications with the
22  media?
23    A.  I know what was supposed to have been
24  done.  I know what I done in my department.
25    MR. WOODLEY:  Could we go off the record
```

```
1         for a second?
2         (Discussion held off the record.)
3              MR. WOODLEY:  Let's take five.
4         (Brief recess.)
5              MR. WOODLEY:  Okay.  We're back on the
6         record.
7         Q.   Okay, Chief Hunter.  We can go back on the
8    record after a brief break.  And we were talking
9    about the investigation or review that you and the
10   city conducted of the firefighters in response to
11   that newspaper article that came out in September
12   2005.  So that's the context in which we left.  Did
13   you sit in on these individual counseling or
14   interview sessions of the firefighters that I just
15   listed their names?
16        A.   That's correct.
17        Q.   And did the Assistant Chief Johansen sit in
18   on those interviews as well?
19        A.   On the people that was his personnel.  We
20   have three assistant chiefs at the time.
21        Q.   Okay.
22        A.   And they all have different groups of
23   firefighters.
24        Q.   Now, in Exhibit 16, which is in front of
25   you, the first two pages are the counseling forms;
```

1  one which involves Mr. Davis concerning his
2  statements to the local media, and the one right
3  after that involves Captain Robert Gaskin,
4  G-A-S-K-I-N, who received also a counseling form for
5  his statements to the local media. You see where
6  both of those documents say that?
7      A.  That's correct.
8      Q.  And as I understand it -- you correct me if
9  I'm wrong -- those were the only two individual
10 firefighters who received these counseling forms as
11 a result of their comments to the newspaper; is that
12 correct?
13     A.  That's correct.
14     Q.  That is correct?
15     A.  In this particular, they got -- well,
16 counseling forms, yes, sir.
17     Q.  Did they get something else that you were
18 about to say?
19     A.  No, sir. I said counseling forms, that's
20 correct.
21     Q.  But none of the other firefighters who were
22 interviewed received counseling forms or any form of
23 discipline as a result of their comments in the
24 newspaper; is that correct?
25     A.  All of them had to sign the forms, the

1  papers about the articles.  Let me read Gaskins and
2  check this out, make sure.
3      Q.  Sure.
4      A.  That's correct.
5      Q.  Okay.  Again, just so the testimony record
6  is clear, the only two individuals that received
7  these written counseling forms from the fire
8  department as a result of statements to the local
9  media were Mr. Davis and Mr. Gaskin; is that
10 correct?
11     A.  Yes.  Counseling form on here with
12 Mr. Davis was concerning also with the derogatory
13 statements he made toward Firefighter Brandon
14 Wilkerson, which Wilkerson took as intimidation, and
15 it was because of that.  And Gaskin being a captain
16 and a officer -- he was the only officer in there --
17 he made the comment that basically he would rather
18 be on the fire truck, I think, in Iraq.  And --
19     Q.  Okay.
20     A.  -- that was the reason.
21     Q.  Sergeant Ann Land did not receive a
22 counseling form as a result of her comments in the
23 newspaper article; is that correct?
24     A.  The only reason these two -- that's
25 correct.  And the only reason these two received it

1  is because, like I say, the harassment of Brandon
2  Wilkerson and with Gaskin being a officer. Land --
3  let me -- let me see what she said.
4      Q. She was the one that was quoted as
5  saying --
6      MR. GRAHAM: His question is, she didn't
7      get a counseling form.
8      A. Oh. No, she didn't get one.
9      MR. GRAHAM: Doesn't make any difference
10     what she was saying.
11     Q. To follow up on that, though, she was
12  quoted in that newspaper article that we looked at,
13  which was Exhibit 14, as saying that if you're not
14  happy in your job in the fire department, you leave.
15     A. Well, no. I think if you get that correct
16  statement, she said someone told her that.
17     Q. So you apparently felt like she didn't need
18  a counseling form as a result of --
19     A. Someone who had said that to her.
20     Q. Okay. Was there any particular statement
21  that Mr. Davis made in that newspaper article that
22  troubled you so much that you wanted to issue this
23  counseling form to him?
24     A. It was two-fold.
25     Q. I'm just talking about in the newspaper

1  article.

2  A. Newspaper article? Basically --

3  Q. Was his comment about employee morale being
4  poor, did that prompt you to give him the counseling
5  form? Or it was some other comment that he might
6  have made in the newspaper article that caused you
7  to issue the counseling form?

8  A. Not necessarily that, no. It was mainly
9  his counseling form, like I say on here, was we
10 talked about the issues of publications in the paper
11 and then his harassment of Brandon Wilkerson.

12 Q. And my question is just focusing on his
13 statements to the local media, just that part of the
14 equation. Okay? My question is, was there anything
15 in particular of his comments or quotes in the
16 newspaper article that caused you to be troubled and
17 to prompt the investigation and then ultimately
18 causing the counseling form to be issued to
19 Mr. Davis?

20 A. The whole thing was troubling.

21 Q. But you can't zero in on his comment about
22 employee morale or staffing concerns in the
23 department that caused you to do the investigation
24 and issue the counseling form to Mr. Davis?

25 A. The main thing was not giving me the

```
 1   opportunity to address it.
 2        Q.  What is your position as the chief of the
 3   fire department and the Rule 30(b)(6) witness in
 4   this case on the following subject:  If a
 5   firefighter has concerns about public safety or
 6   operations in the fire department, or poor morale,
 7   or understaffing, and they exhaust the chain of
 8   command -- they route those concerns up to their
 9   first officer and ultimately to you -- do they then,
10   after you consider that matter, do they then have
11   the right to go to the local media and issue and
12   state those same exact concerns?
13        A.  They still don't have the right.  But if
14   they bring them to me, I could guarantee anyone that
15   I would try to do my best to resolve them.
16        Q.  Okay.  But in the situation, so I
17   understand it, Chief Hunter, if a firefighter raises
18   those issues of safety, staffing, poor morale that
19   involve the fire department, and he or she routes
20   those up to you at the highest level in the fire
21   department, and that firefighter is not satisfied
22   with what you're doing on it and your response, is
23   it your position the firefighter at that point would
24   violate Merit System rules and regulations if he or
25   she went to the media to express those exact same
```

1  concerns?
2     A.  That's correct.
3     Q.  So there's really no circumstances, as far
4  as you and the city are concerned, in which a
5  firefighter can go to the media expressing concerns
6  about safety or response times or staffing or morale
7  in the fire department, right?
8     A.  I guess if it was all-out corruption.  But
9  according to the Merit System, you have to follow
10 it.  But I have never seen that type of conditions
11 here.
12    Q.  Okay.  But on the issues of staffing, fire
13 department equipment and protective gear and
14 response times, the firefighter at no time can go to
15 the media and address those issues; is that correct?
16    A.  They shouldn't.  They should come to the
17 fire chief.  They should have used the chain of
18 command.  You know, use that, and we would explain
19 to people that we're doing our best and show them --
20    Q.  I want to be clear on this.  Even after it
21 goes to you and they're not happy with your response
22 as the fire chief, do they then have the right, or
23 would they violate the rules and regulations of the
24 city, if they then went to the media and expressed
25 those same concerns?

1   A.   They would violate that, but we have never
2   had that -- I've never had the opportunity.
3   Q.   Fair enough.  Good enough.
4        Did there come a point in time where you and
5   the fire department wanted to propose extending the
6   probationary period for new hires into the fire
7   department from one year to 18 months?
8   A.   That's correct, for new hires.
9   Q.   For the new hires only?
10  A.   Yes, sir.
11  Q.   But that would not have applied and has not
12  applied to veteran firefighters already working in
13  the department, correct?
14  A.   Wouldn't have disturbed their careers at
15  all.
16  Q.   And so that would not have applied to
17  Mr. Davis, who had been an 8-year veteran of the
18  fire department, correct?
19  A.   None whatsoever.
20  Q.   What prompted that proposed extension of
21  the 18-month period in the fire department for
22  probation?
23  A.   Retentions and investment of firefighters.
24  We hire firefighters.  State law gives you one year
25  to train them.  We also require that they become

```
 1   EMTs.  We have a high failure rate in the EMT
 2   portion, emergency medical technician portion.  And
 3   we have invested a lot of money in some of the
 4   firefighters.  So it's a concern trying to retain
 5   them instead of having to terminate them and bring
 6   someone else in.  And doing that lets them know that
 7   if we extend it and give them a chance to pass the
 8   test, that would help a whole lot, help the
 9   department and the city as far as their investment
10   in the firefighters.
11        And also in talking to the police chief, they
12   was extending their time as far as the schools was
13   more lengthy.  And then when the person get on, you
14   know, if they have been in training several months,
15   you didn't have a fair chance to give them the
16   evaluation.  So it was two or three different
17   things.  And, also, we talked to our building code
18   director, and he also was -- had to have people that
19   he hired and they go to the police academy, so he
20   was going to have the same problem.
21        So, in doing so, the three of us got together
22   and said we would propose and then, that way, we
23   would be able to keep personnel.  You know, you get
24   personnel down there.  They become accustomed --
25   they become part of the family.  And they're
```

```
1    firefighters, you know.  And you don't want to see
2    them, the ones that have trouble passing the test --
3    we've seen where a lot of them, if you can get them
4    help, they could pass the test.  So this was
5    something that we viewed as being real good,
6    something as being a good thing.
7         Q.  So you were part of proposing a change to
8    18 months, as well as the police chief?
9         A.  That's correct.
10        Q.  During that time when you were considering
11   proposing this extension of the probationary period,
12   did you investigate or look into the probation
13   periods of any other cities or counties nearby?  Did
14   you do any review like that?
15        A.  Well, we knew of other people that had
16   longer.  Columbus had 18 months, I believe.  And I
17   had a former chief that was working for me at the
18   time also.  And we had -- and when it came up with
19   the idea, we talked to other people, and he knew of
20   other people that had longer.  And this was
21   something that would give us a chance, like I say,
22   to keep these people on board.
23        Q.  Are there any restrictions at any time in
24   your fire department concerning firefighters working
25   secondary jobs or private jobs?
```