61

A.    No, sir.  Merit System dictates that they get -- basically, they've got to get permission to do so, but I haven't seen where anybody has been turned down.

Q.    What about during the period of probation?

A.    Probationary period that we focus on training.  During the probationary period, we have a restriction up until they finish their -- get certified.

Q.    Okay.  So just so I'm clear on that and the record is clear, during the 18-month probationary period in the city's fire department, that new hire during that 18-month period is not permitted to have a secondary job; is that correct?

A.    They changed that.  It was during the 12 months of getting your state certification.  The key to it is we didn't inflict that on them when we extended to the 18 months as far as having a secondary job.  We made sure -- because you were going to have to be state certified within one year or we couldn't keep you aboard anyway.

Q.    So what's the current restriction on the secondary --

A.    One year.

Q.    -- job?  Is it just twelve --

62

```
 1        A.    Twelve months --

 2        Q.    -- months?

 3        A.    -- that's correct.

 4              THE REPORTER:  Hold on.  Hold on.

 5              MR. WOODLEY:  Yes.  We just have to pause.

 6        Q.    In your judgment, based upon your
```

experience in the city's fire department, is it more

difficult fo recruit new hires into the fire

department because the probationary period happens

to be 18 months?

```
11        A.    I haven't never seen it affect anything.
```

People be so happy to get a job here, they wouldn't

care if it was 36 months.  We -- I haven't had

anybody sit at a table since I have been hiring

firefighters, or been on board hiring firefighters,

that say that your probationary period is too long.

They say, whatever -- they say, thank you, I just

want to get in the door.  If I can get in the door,

it's wonderful.

```
20        Q.    Did it come to your attention that
```

Mr. Davis and other firefighters in the city fire

department were opposed to the policy change

extending the probationary period to 18 months?

```
24        A.    Not basically until after the fact.  They
```

didn't have anything to do with it.

1    Q.   So you learned about the opposition after

2    the fact; is that correct?

3    A.   Basically, yes, through conversation.

4    Q.   Did anyone tell you the reasons why some of

5    the firefighters, including Mr. Davis, opposed the

6    extension of the probationary period?

7    A.   No, sir.  I learned later that they had, I

8    guess, taken it wrong or whatever.  But all they had

9    to do was come to my office and --

10   Q.   No, I understand.  You keep saying -- and I

11   appreciate that -- that you want them to come to

12   you.

13   A.   Well, they could have went to the assistant

14   chiefs, deputy chiefs.

15   Q.   But if I may, I just want to focus on this

16   very limited question.  Did you eventually become

17   aware of what the reasons were given by Mr. Davis or

18   other firefighters that they were not in favor of

19   extending the period to 18 months?

20   A.   I've heard bits and pieces, but I still

21   don't know.

22   Q.   So what are they?

23   A.   I still don't know the reason.

24   Q.   So you don't have any idea why --

25   A.   I still don't know the reason.

1    Q.   -- they --

2         THE REPORTER:  Hold on.

3    Q.   So even today, you still don't know?

4    A.   I don't know the exact reason of what was

5    behind that whatsoever.

6    Q.   Okay.  Fair enough.  That's my question.

7         THE REPORTER:  Please try not to talk over

8    each other.

9    Q.   All right.  Let's move on to another area,

10   Chief Hunter.  At some point in time in April of

11   2006, did it come to your attention that Mr. Davis,

12   as the then-president of the firefighters' labor

13   association, placed a telephone call to Mayor

14   Hardin?

15   A.   That's correct.

16   Q.   And did it come to your attention that, in

17   fact, Mr. Davis, in his role as the president of

18   firefighters' local union, had, in fact, a telephone

19   conversation in the middle of April of 2006 with the

20   mayor?

21   A.   That's correct.

22   Q.   And how did that come to your attention?

23   A.   I was talking to our Personnel --

24   conversation with our personnel director.

25   Q.   Barbara Goodwin?

1    A.   That's correct.

2    Q.   Let me invite your attention to Exhibit 23,

3  which is on this subject.  This is a memo from you,

4  Chief Hunter, to H.H. -- otherwise known as Bubba --

5  Roberts --

6    A.   That is correct.

7    Q.   -- city manager, dated April 20, 2006, with

8  a copy being sent by you to Barbara Goodwin,

9  personnel director.  And the re line is Sergeant

10  Davis, Merit System and SOP violations, end quote.

11  See where it says that?

12    A.   That's correct.

13    Q.   And at the beginning of this memo, you do

14  indicate what you just told me, that you were

15  informed in a conversation that you had with

16  Personnel Director Goodwin that the city's new

17  probation time for new hires for public safety was

18  evidently the subject of a telephone conversation

19  that Mr. Davis had with the mayor; is that true?

20    A.   That's correct.

21    Q.   When you learned of that conversation that

22  Mr. Davis had with the mayor from Ms. Goodwin, were

23  you instructed by anyone to look into the matter, to

24  investigate the subject?

25    A.   No, sir.  I instructed someone to look into

66

1    the subject.

2        Q.   So you did that on your own?

3        A.   That's correct.

4        Q.   Did Ms. Goodwin suggest or recommend or

5    request that you look into the conversation that

6    Mr. Davis had with the mayor?

7        A.   I solely done that on my own.

8        Q.   Did you inform City Manager Roberts that

9    you were going to be looking into the telephone

10   conversation that Davis had with Mayor Hardin?

11       A.   I informed him what I had heard.

12       Q.   From Ms. Goodwin?

13       A.   That's correct.

14       Q.   What did you tell Manager Roberts about

15   that?

16       A.   I told him that I have heard that I have an

17   employee that had directly contacted a council

18   member.  And then I had Deputy Chief Waters to talk

19   to him and ask him was this true and to find out

20   what was the reasons, because we had been having

21   open meetings on a lot of different things

22   discussing what we was in the process of doing.  And

23   Deputy Chief Waters told me that he had brought this

24   up in meetings that they had had so everybody was

25   informed of what we was in the process of trying to

1    do.  So --

2        Q.  This conversation --

3        A.  -- I was wondering why this came about.

4        Q.  The conversation that you just mentioned

5    you had with City Manager Roberts about this

6    subject, did this conversation occur before actually

7    investigating Mr. Davis and disciplining Mr. Davis?

8    I'm trying to get the timing of your conversation

9    with Roberts.

10       A.  Did it come before?

11       Q.  Yes.

12       A.  Yes, it came before, because I had to find

13   out the details first.

14       Q.  So you talked to City Manager Roberts

15   before conducting the investigation?

16       A.  This is what I done.  When I found out

17   about the conversation that particular evening, the

18   next morning I made a phone call to the deputy chief

19   to investigate this.  And then I made sure I

20   informed the city manager what I was doing.

21       Q.  At that time?

22       A.  At that time.

23       Q.  Was that by a telephone call to

24   Mr. Roberts?

25       A.  It probably was by coming upstairs.  My

1　office is right over there.  Probably told him face

2　to face.

3　　　Q.　And, at that time, what did Mr. Roberts

4　comment to you about looking into the conversation

5　that Davis had with the mayor?

6　　　A.　Basically is -- like I say, Mr. Roberts

7　give us the opportunity to manage our departments.

8　So it's a matter if that's something you need to

9　look into, then look into it.

10　　　Q.　Is that what he said to you, go ahead and

11　look into it?

12　　　A.　Basically -- I can't remember exact words,

13　but he knew that's what I was doing.

14　　　Q.　Did Mr. Roberts tell you at that time that

15　he felt like that might be a violation of the Merit

16　System rules and regulations?

17　　　A.　No.  Mr. Roberts didn't have to tell me

18　that.  I felt like that.

19　　　Q.　You felt like that on your own?

20　　　A.　Yes, sir.  Yes, sir.

21　　　Q.　So you commissioned Deputy Chief Roy Waters

22　to investigate the matter and to speak with Davis

23　about his telephone conversation with the mayor; is

24　that correct?

25　　　A.　That's correct.

1      Q.   And did Deputy Chief Waters then report
2    back to you?
3      A.   Yes, sir.
4      Q.   Okay.  And do you know if Mr. Davis gave a
5    written statement addressed to you concerning his
6    conversation with the mayor?
7      A.   That's correct.
8      Q.   And if you would look to Exhibit 22, which
9    appears to be a brief written statement from David
10   Davis dated April 19, 2006, addressed to you as the
11   fire chief.  And so would that be the written
12   statement coming from Mr. Davis about his telephone
13   conversation with the mayor?
14     A.   That's correct.
15     Q.   As far as you know, is that statement true
16   and correct?  Read it to yourself completely.
17     A.   That is correct.  That's -- this is the
18   form.  This is what he gave me.
19     Q.   But my question really is Exhibit 22 --
20   again, Davis's written statement dated April 19,
21   2006 addressed to you -- as far as you know, Chief,
22   is what Mr. Davis said in that written statement
23   true and correct?
24     A.   Well, in his words, yes.  The only choice I
25   have is --

1    Q.   But you don't have any other basis --

2    A.   -- take his word.

3    Q.   I'm sorry.

4    A.   I just have to -- I only can take his word.

5    Q.   Do you have any other facts or basis to

6  suggest that what Mr. Davis said in his written

7  statement was untrue?

8    A.   I guess what you're asking me as far as

9  reading this, I guess, as a -- what are you asking

10  me?

11    Q.   Do you have any information or facts to

12  indicate that the statements contained in Mr. Davis'

13  written statement which we are reviewing now are

14  untrue or incorrect?

15    A.   I don't have a reason to believe that they

16  are not true.

17    Q.   Okay.  Thank you.  That's all I was

18  asking.

19        What was your understanding of the nature, if

20  you know, sir, of the telephone conversation between

21  Mr. Davis and the mayor?  Do you know if it was on

22  the extension of the probation period?  Do you know

23  if it was on other issues that Mr. Davis and Mayor

24  Hardin talked about?

25    A.   That's basically what Ms. Goodwin had

71

1    expressed to me; that he called, I guess, to express

2    his feelings about the probationary period or

3    whatever.

4        Q.   For new hires?

5        A.   That he didn't agree with it, whatever.  I

6    don't know if it was just for new hires or whether

7    he had taken it that it was going to affect him or

8    not.

9        Q.   Well, in your memo to Mr. Roberts that we

10   looked at, Exhibit 23, you indicated that

11   Ms. Goodwin had told you there had been a telephone

12   conversation involving Davis and the mayor

13   concerning the new probation time for new hires.

14   You see where it says that?

15       A.   Yes.

16       Q.   So that was your information as well?

17       A.   Yes.

18       Q.   Now, later on in that same memo, Exhibit

19   23, from you to Roberts, you criticize Mayor Hardin

20   and you indicate -- you'll see at the bottom of the

21   memo, it says, quote, Mayor Hardin should refer any

22   employee violating the chain of command as indicated

23   in our Merit System back to their department head,

24   personnel department, or city manager.  Failing to

25   do so is a violation of our city charter, end

1    quote.  You see where you say that?

2        A.    That's correct.

3        Q.    You're basically accusing the mayor of

4    violating the city charter by talking to a city

5    employee; is that correct?

6        A.    In the Merit System, employees are not to

7    have direct contact with -- and the mayor is a

8    council member.  And not only that, it's a chain

9    that you go through to even -- to be told whether

10    you can do this or not do it.  So the mayor -- yes.

11    That's -- I'm not accusing him of anything.  The

12    mayor might have not known this, you know.  I'm

13    saying the mayor might have not known this.  But in

14    our city charter, it says inquiries about any

15    departments in our city are made solely through the

16    city manager.

17        Q.    What, in your mind, was the failure of the

18    mayor when you mention this in the memorandum?

19        A.    I guess in my mind, it was that once the

20    subject of the probationary period came up and he

21    recognized and knew it was David Davis, it should

22    have been the end of the conversation.

23        Q.    And you understood that that was not the

24    end of the conversation, that the mayor continued

25    discussing it with Davis?

1    A.   Well, Davis say in his thing that they

2  discussed the issues, and then discussed it in its

3  entirety to what they wanted to discuss it to.

4    Q.   So the mayor's failing or violation of the

5  city charter was, in your judgment, the continuation

6  of the conversation with Davis, correct?

7    A.   In here I said feel strongly someone should

8  speak to the mayor about sensitive issue of

9  interfering.  The mayor might have not known

10 exactly.

11   Q.   Do you know if anyone spoke to Mayor Hardin

12 about the issue?

13   A.   That's not my job.  I put it in the letter

14 form, memo form.

15   Q.   Did you give a copy of this memo to the

16 mayor?

17   A.   I gave a copy of it to city manager and

18 personnel director.  That's not my job to go to the

19 mayor.  I'm not trying to be smart at you.  I'm just

20 staying within my parameters.  I don't go to the

21 mayor.  I stay within my parameters.

22   Q.   Do you know if, in the past, any city

23 firefighters have had conversations with the mayor

24 of the city about any issues affecting the fire

25 department?

74

1       A.   No, sir.  I don't know.

2       Q.   Sir, do you have any information that

3   Mr. Davis's telephone conversation with the mayor in

4   April of 2006 adversely impacted Davis's job

5   performance?

6       A.   Yes.  He's violated what we asked him to

7   follow as far as the standard operating procedure.

8       Q.   Maybe my question really wasn't clear.  His

9   actual performance on the job as a firefighter on

10  duty.  Did that telephone conversation affect

11  adversely his doing his job in the fire department?

12      A.   Yes, it did.  He was violating rules.

13      Q.   Other than the violation of the rules and

14  regulations, was he less of a firefighter in his

15  following shifts?

16      A.   To be a full-rounded firefighter, you need

17  to follow the rules.

18      Q.   Can you give me any concrete or specific

19  examples of how that telephone conversation between

20  Davis and the mayor actually disrupted the

21  operations of your fire department?

22      A.   Disrupted chain of command.  If we got one

23  person that's not following the chain of command, no

24  one else should have to follow it.

25      Q.   Other than that point -- and I understand

1    that point --

2         A.   That's it.  That's the point.

3         Q.   -- anything else?  Was there any other

4    impairment or disruption, adverse impact on the

5    operations of the fire department as --

6         A.   That was --

7         Q.   -- let me finish, please -- as a result of

8    the conversation that Mr. Davis had with Mayor

9    Hardin?

10        A.   That was the point.

11        Q.   Just that other one, the chain of command?

12        A.   Just that point.

13        Q.   Is there also an SOP that the fire

14   department has that you believe Mr. Davis violated

15   when he talked with the mayor about the probationary

16   period?

17        A.   ASOP 12, I believe it is.

18        Q.   Why don't you turn to Exhibit 3?  And go to

19   Exhibit 3, the fourth page, the last page of

20   Exhibit 3 which, as I understand it, is the ASOP 12

21   that you referred to; is that correct?

22        A.   That's correct.

23        Q.   And this talks about the subject of

24   addressing the city council; is that correct?

25        A.   That's correct.

1      Q.   Does that mean addressing the city council

2    as a body in a meeting, addressing the city council?

3      A.   Yes.  As a person -- this was written in

4    '98 -- I guess as trying to get there, the body,

5    which is a place you would never get to because it

6    stops at the city manager.

7      Q.   Okay.  So, in other words, under this

8    ASOP 12, firefighters are not permitted to go beyond

9    the city manager and are not permitted to address

10   the city council as a group in a meeting; is that

11   accurate?

12     A.   City Manager informs the council of

13   anything that's going on.  He would be the one

14   that -- if he had to express something that was bad,

15   he would be the one that would meet with the city

16   council.

17     Q.   If a firefighter had a concern about

18   staffing, morale, equipment, budget within the fire

19   department, those kinds of issues, Chief Hunter,

20   that firefighter is not permitted to go directly to

21   the city council in a public meeting and express

22   those concerns?

23     A.   That's correct.

24     Q.   And if he did so, that would violate the

25   chain of command and would violate this ASOP; is

1    that correct?

2        A.    That's right.  And it would -- yes, sir.

3        Q.    But I guess I'm confused and maybe you can

4    explain it for me.  Mr. Davis, of course, made a

5    telephone communication with the mayor while he was

6    off duty.  He was not addressing the city council in

7    a meeting or in any other way addressing the city

8    council.  So how would Mr. Davis's telephone

9    conversation with the mayor while he was off duty

10   have violated this ASOP which appears to only

11   address the city council?

12       A.    For one thing, he broke Merit System.  It's

13   a Merit System violation.  And for the next thing,

14   if he wanted to try to contact, to go directly --

15   which you'll see here, if any fire department member

16   appears before or try to directly contact -- it says

17   directly contact on number 4 -- a city council

18   member about work-related problems without following

19   these procedures.  And it addresses that.

20       Q.    And work-related business, you would

21   explain that to include virtually all issues that

22   affect the fire department; is that correct?

23       A.    That's correct.

24       Q.    Okay.  Are you aware that there's a State

25   of Alabama code provision that allows firefighters

1    to belong to an association?

2        A.   Yes, sir.

3        Q.   We covered that earlier?

4        A.   Yes, sir.

5        Q.   Okay.  And I'm not sure if I asked this,

6    Chief, but I want to make sure it's on the record.

7    You, as the fire chief, you report directly to the

8    city manager?

9        A.   That's correct.

10       Q.   In the city charter or the city code, are

11   there any provisions, to your knowledge, that

12   address your duties and responsibilities as the fire

13   chief?

14       A.   That is correct.  I work up under city

15   manager.

16       Q.   I know there are provisions that address

17   city manager, and the council and the mayor.  But as

18   far as I know, there's no city code provisions or

19   charter provisions that cover you as the fire

20   chief.  Is that your understanding?

21       A.   I'll have to make sure I look back at that,

22   because I know I -- I would have to look at that.

23       Q.   Fair enough.  Okay.  So let's return to the

24   investigation of Mr. Davis concerning the telephone

25   conversation he had with the mayor.  We already

1    covered the subject of Mr. Davis giving his written

2    statement as he was interviewed by Deputy Chief

3    Waters.  And we covered in large part the memorandum

4    that you issued to City Manager Roberts dated

5    April 20, 2006.  That was Exhibit 23.

6         What next occurred in that process of doing the

7    investigation of Mr. Davis which ultimately led to,

8    of course, his termination?

9         A.   What next occurred?  We determined that it

10   was a violation.  We had to do a write-up, a written

11   write-up.  So when that occurred, we took a look at

12   that.  That one infraction didn't get Sergeant Davis

13   terminated.  It was the multiple infractions and the

14   Group II offenses in Section 14 of the Merit System

15   that didn't allow for him to go over those two

16   different things that led to his termination.  It

17   wasn't the one thing; it was the second.

18        That's why I had the meeting with Sergeant

19   Davis in September, to prevent this.  He knew he

20   already had one Group II offense.  And knowing the

21   Merit System, that was what we was trying to do,

22   make sure that we prevented anybody from going over

23   their infractions that they're allowed.  In the

24   group, we have three offenses, three groups of

25   offenses in the Merit System.  Part of our job is

1    when we see a person, in trying to keep an employee

2    from getting to that point, we have counseling

3    sessions or whatever it takes to prevent that,

4    because you don't want to terminate anybody.  And

5    that's what happened when this particular infraction

6    happened.  It pushed it to the second Group II,

7    which is not allowed.  That led to his termination.

8         Q.   You mentioned that there was an earlier

9    Group II offense involving Mr. Davis.  Was that the

10   newspaper article --

11        A.   No, sir.

12        Q.   -- and the counseling form?

13        A.   No, sir.

14        Q.   What was the earlier Group II offense?

15        A.   It was one -- it should be on that -- it

16   should be listed on his termination form as far

17   as -- it should be on the written.  You have to put

18   a list of what a person has in the previous file.

19             MR. WOODLEY:  Could we go off the record

20        for a second?

21             MR. GRAHAM:  Sure.

22        (Brief recess.)

23             MR. WOODLEY:  Back on the record.

24        Q.   Again, Chief Hunter, we're talking about

25   Exhibit 24.  If you would, turn to that for a