81

1    moment.   And this appears to be the written warning

2    form dated April 20, 2006, involving David Davis; is

3    that correct?

4        A.   That's correct.

5        Q.   And you'll see there that it -- in the

6    first section when talking about the details of the

7    Merit System violation, it refers to a violation

8    concerning the April 17, 2006 conversation on the

9    telephone that Davis had with the mayor regarding

10   city proposals.   You see where it says that?

11       A.   That's correct.

12       Q.   And I know what it says elsewhere on the

13   form.   But that event, that telephone conversation

14   you viewed as violating the chain of command,

15   violating the Merit System rules and regulations for

16   which he was terminated; is that accurate?

17       A.   No.   He wasn't terminated for that.   He was

18   written up for that.   He was written up for that

19   action.   What got him terminated was the amount of

20   Group II offenses that he had in his file.   Which if

21   you go down to August -- if you'll go down to the

22   third paragraph right there on the same page, that

23   one thing got -- warranted a write-up.   That one

24   thing didn't get him terminated.

25       Q.   Well, let's look at the bottom of the form

82

1    where it says, quote, discharge as per Merit System

2    rules and regulations for second Group II offense.

3        A.    Yes, sir.

4        Q.    What was the second Group II offense?

5        A.    The one that he had just done.

6        Q.    I'm sorry?

7        A.    The first one -- you want to know what the

8    first one was?

9        Q.    No.  I don't want to know what the first

10    one was.

11        A.    Okay.  Well, the second one --

12        Q.    If you would just listen to my question.

13    Let me rephrase it.  It's real simple.  It says,

14    quote, discharge as per Merit System rules and

15    regulations for second Group II offense, end quote.

16    You see where it says that?

17        A.    Yes, sir.

18        Q.    Okay.  What, specifically, was the second

19    Group II offense?

20        A.    Contacting the mayor.

21        Q.    Okay.  Good enough.  And then it says

22    discharged -- and I quote it again -- discharged as

23    per Merit System rules and regulations for first

24    Group III offense, pages 53 and 54, end quote.  What

25    specifically was the first Group III offense for

1   which he was discharged?

2       A.   Okay.  Let me look at it.  It was Group

3   III, line 6, insubordination by refusal to perform

4   work assigned slash to comply with written or verbal

5   instructions of the supervisory force.

6       Q.   And that related to the telephone

7   conversation you had with the mayor; is that

8   correct?

9       A.   And the SOPs.  Merit System are written

10  instructions.  Basically, I said the Merit System is

11  written instructions and standard operating

12  procedures.

13      Q.   I'm afraid the record right now is not

14  clear, at least it's not clear in my mind.  So I

15  want to know what the specific first Group III

16  offense was for which he was discharged.  Was it the

17  communication over the telephone that he had with

18  Mayor Hardin?

19      A.   No.  It was his insubordination to follow

20  the rules that was written --

21      Q.   Follow what rules?

22      A.   -- which was not to --

23      Q.   Not to --

24      A.   -- the standard operating procedure or the

25  Merit System contact and direct contact with council

84

1    members.

2    Q.   Okay.  So it was, in fact, his

3    communication with the mayor that was considered by

4    you and others to be the Group III offense; is that

5    right?

6    A.   It was not following the rules.

7    Q.   Want me to try again?

8    A.   Yes.

9    Q.   I will.  I'm going to keep trying until I

10   get an adequate answer, which is:  The Group III

11   offense which was his first Group III offense for

12   which he was discharged, was that, in fact, his

13   telephone communication with Mayor Hardin?

14   A.   That is correct.  That was the violation.

15   Q.   Okay.  Thank you.

16   It goes on to say -- which is confusing to me

17   so you can, I think, explain it -- on the second

18   page of Exhibit 24, this written warning form goes

19   on to say, quote, this written warning is intended

20   to give you an opportunity to correct your work

21   performance and conduct in the future.  And then it

22   goes on to say, any further violations could result

23   in your dismissal from employment.  You see where it

24   says that?

25   A.   That's a standard printout on the form.

85

```
 1   Doesn't have any bearing on that because it's also
 2   conditional --
 3        Q.   Because he's fired?
 4        A.   Well, it don't have any bearings on that.
 5   That would be in case it is a written warning and it
 6   wasn't at this point --
 7        Q.   Right.
 8        A.   -- you know.
 9        Q.   But obviously that warning form, if, in
10   fact, he's being discharged, doesn't have a lot of
11   bearing on Mr. Davis because he's gone.
12        A.   Well, I hate that, too.
13        Q.   You hate what?
14        A.   I hate that he's gone, but that's --
15        Q.   Would you be in favor --
16        A.   -- part of the rules.
17        Q.   -- of possibly reinstating him?
18        A.   Would I be in favor of it?
19        Q.   Yes.
20        A.   No, sir.
21        Q.   Why is that?
22        A.   It would -- I don't think that would be a
23   good idea.
24        Q.   Why?
25        A.   And I think he's gone on and done pretty
```

1    good.

2        Q.   We're going to talk about that later on.

3        A.   I don't --- I don't think he would want to

4    be here, to tell the truth.  And I'm going to be

5    honest with you.  I don't think he want to be here.

6    Because he could have communicated with the staff or

7    myself or anyone else while he was here.  He had

8    every opportunity.  I don't have anything against

9    David.

10       Q.   All right.  Good enough.

11       A.   It's the rules.

12       Q.   This warning and discharge form, Exhibit

13   24, was signed apparently by Ms. Goodwin and

14   yourself; is that correct?

15       A.   Which one now?  24?

16       Q.   Yes.

17       A.   Yes.

18       Q.   It bears the date April 21, right?

19       A.   And Roy Waters, who was the supervisor.

20   That's who carried this out.

21       Q.   Now, was this actually handed to Mr. Davis

22   in a meeting that you participated in?

23       A.   I wasn't in this one.  Chief Waters took

24   care of this, along with Barbara Goodwin.  I put

25   this in Chief Waters' hands, Deputy Chief Waters.

1    He signed this on the supervisor's signature.  So

2    I'm trying to remember was I there when the final

3    thing happened, but Chief Waters handled this

4    portion.

5         Q.   So you were not involved in the meeting

6    that evidently Mr. Davis was called in, Ms. Goodwin

7    was there, Deputy Chief Waters was there, and he was

8    handed this discharge form and actually entered his

9    comments?

10        A.   I think -- he handled this, but I might

11   have been there the day -- I'm trying to make sure

12   I'm correct.  I usually can remember everything

13   good, but I don't want to say anything that's

14   wrong.  I might have been there, but everything was

15   taken care of and the decision was made.

16        Q.   Okay.  I'm not going to try and read

17   because I can't read Mr. Davis's handwriting, but

18   apparently he entered these written comments at the

19   end of this written warning form, Exhibit 24.  Is

20   that your understanding?

21        A.   Yes, sir.  That's his writing.

22             MR. WOODLEY:  Mr. Graham, if you don't

23        mind, I'm going to ask Mr. Davis to read that,

24        because --

25             MR. GRAHAM:  That will be fine.

1        MR. WOODLEY:   -- it's right at the bottom

2    of Exhibit 24.

3        MR. GRAHAM:  No objection.

4        MR. DAVIS:  In regards -- what's that say?

5    In regards to contacting the mayor, I was

6    acting in my capacity as president of the

7    Phenix City Firefighters' Association Local

8    3668 and not as a driver/engineer with the City

9    of Phenix City.  I will seek a review board

10   hearing.

11       Q.  And, Chief Hunter, is that your

12   understanding that those were the written comments

13   that Mr. Davis entered in this warning and discharge

14   form?

15       A.  That's correct, and it was put before the

16   review board.

17       Q.  And, again, you don't have any information

18   that would indicate that the written statement

19   Mr. Davis had at the bottom of this form was

20   untruthful or incorrect in any way, do you?

21       A.  Yes.  I feel like -- I don't have any

22   information, but --

23       Q.  I don't want your feelings.

24       A.  Okay.

25       Q.  I just want to know if you have facts --

1       A.   I don't have any facts on it.

2       Q.   -- that would indicate that statement by

3  him was untrue.  You don't have any facts, do you?

4       A.   I don't have any facts whether it's true or

5  untrue.

6       Q.   Okay.  If you could move on to Exhibit 25.

7  And this appears to be an End of Employment form of

8  the City of Phenix City concerning Mr. Davis

9  indicating that his employment ended on April 21,

10 2006.  And then you see where the box is checked or

11 the line is checked indicating he was dismissed.  Do

12 you see that?

13      A.   Yes, sir.

14      Q.   And then again -- and I don't want to

15 burden the record, but it refers to the Group II

16 offense and the Group III offense.  You see where it

17 indicates that?

18      A.   Correct.

19      Q.   And those two particular offenses, as you

20 indicated earlier in your testimony, related to his

21 telephone communication with Mayor Hardin; is that

22 correct?

23      A.   Phone call was violation of the Merit

24 System and the standard operating procedures.

25      Q.   So is the answer to my question yes, that

1   the particular Group II offense, the particular

2   Group III offense that caused his dismissal was that

3   telephone conversation with the mayor?

4        A.   That relates to the violation of the SOPs

5   and Merit System.

6        Q.   So the answer is yes, and then you added to

7   it?

8        A.   That's correct.

9        Q.   Okay.  I note that the city manager did not

10  sign this End of Employment form for Mr. Davis.  Do

11  you know why that was?

12       A.   I have -- I have no idea.

13       Q.   But you signed it as the department head,

14  correct?

15       A.   That's correct.

16       Q.   And Ms. Goodwin signed it as well; is that

17  correct?

18       A.   That's correct.  Yes, sir.

19       Q.   Do you know if this was handed to

20  Mr. Davis?

21       A.   I'm not for sure.

22       Q.   Because you can't remember if you were

23  involved in the meeting at the time, right?

24       A.   I'm quite sure I might have been there, but

25  I don't know what paperwork was -- when the

1    finalized paperwork was there.

2        Q.  If you move on to Exhibit 25, there's

3    another form.  This is called Notice of Termination

4    that apparently was being sent to the Alabama Fire

5    College and Personnel Standards Commission.

6        A.  You said 25?

7        Q.  It's actually -- I'm sorry.  It's 26.

8        A.  Okay.  26, yes.  Yes, sir.

9        Q.  Are you familiar with this form?

10       A.  Yes, sir.

11       Q.  Is this a normal form that's sent out to

12   the Alabama Fire College when someone leaves the

13   fire department?

14       A.  That's correct.  You have to notify the

15   Fire College.

16       Q.  Is that your signature at the bottom?

17       A.  That's correct.

18       Q.  And is that the date that you signed it?

19   April 28, 2006?

20       A.  That's correct.

21       Q.  Now, I'm a little bit confused because it

22   says the date of termination is April 19, 2006,

23   where the other documents say the date of

24   termination was April 21, 2006.  Do you know why

25   there's a discrepancy there?

1        A.   Training had to get the paperwork together

2    for this to be signed.  This come out of our

3    training department, is sent to the Fire College.

4    You have ten days, something like ten days or so.

5    And that's what happened with this.  There was the

6    delay in this as far as notification.

7        Q.   Well, I'm not talking about the delay.  I'm

8    asking you really why there were two different

9    dates.  This one says he was terminated on April 19,

10   2006 that you signed.  And the other documents

11   indicate that he was terminated and his employment

12   ended on April 21.  So there's a two-day difference

13   there, and I was asking you if you could explain why

14   there's a discrepancy on those two dates.

15       A.   Okay.  Basically, that would be a error.

16       Q.   Which one is an error?  Was he, in fact,

17   terminated on April 19 or was he terminated on

18   April 21?

19       A.   Let me get the date here what he was

20   terminated on.  The last -- terminated on the date

21   that Ms. Goodwin has here.  The employment date was

22   on the 21st here.

23           MR. GRAHAM:  Look at this one.  This is --

24       A.   Yes.  That's the one I'm looking at.  April

25   21st.  That was a typo oversight.

93

1      Q.   What, in fact, was the termination date; do

2   you know?

3      A.   21st.

4      Q.   The 21st of April?

5      A.   Yes.   Personnel would know better than I

6   know, and Ms. Goodwin is on here, so that's what it

7   was --

8      Q.   Did Ms. Goodwin agree that Mr. Davis should

9   be terminated?

10      A.   You would have to ask her that, yes.   But

11   she wouldn't have signed it if she didn't.

12      Q.   Did City Manager Roberts agree that

13   Mr. Davis should be terminated?

14      A.   You're going to have to ask Mr. Roberts

15   that.

16      Q.   But what's your understanding?

17      A.   My understanding is he didn't tell me not

18   to terminate him, so --

19      Q.   And then you alluded earlier that Mr. Davis

20   requested a Personnel Review Board hearing

21   concerning his termination; is that correct?

22      A.   That's correct.

23      Q.   And did you attend that hearing?

24      A.   Yes, sir.

25      Q.   Did you give testimony at that hearing?

1   A.   I believe so.

2   Q.   Do you recall what the substance of your

3   testimony was at the Personnel Board hearing?

4   A.   No, sir. I can't remember that.  I would

5   have to see that.  I would have to take a look at

6   it.  I don't want to say anything wrong.

7   Q.   Now, after the Personnel Board hearing was

8   over and had made its recommendation, did you have

9   any conversations with City Manager Roberts when the

10  matter was placed on his desk, about Mr. Davis?

11  A.   Did I have any conversations?

12  Q.   Yes.  After the hearing is over and before

13  Mr. Roberts makes his determination to uphold the

14  board's decision approving the termination, did you

15  have any conversations during that short period of

16  time with Mr. Roberts?

17  A.   No, not unless there was some kind of

18  apology or something.  You know, I'm a department

19  head.  Whenever something go wrong in the department

20  that leads to this, it's something that you're sorry

21  that you put -- that happens in your department.

22  That's mainly --

23  Q.   Look at Exhibit 31, which is another

24  newspaper article.  This one is out of the Columbus

25  Ledger-Enquirer which addresses the subject of

95

1   Mr. Davis's firing.  Did you have a chance to look
2   at that newspaper article when it came out?
3       A.   I might have.  Can I read it?
4       Q.   Oh, yes.  Sure.
5       A.   Yes.
6       Q.   Have you finished reading that newspaper
7   article?
8       A.   Yes.
9       Q.   And, again, this is the article in the
10  Ledger-Enquirer that came out after Mr. Davis's
11  termination.  Were you contacted by the newspaper to
12  make a comment on the subject?
13      A.   Yes, sir.
14      Q.   And did you?
15      A.   No, sir.
16      Q.   You declined comment?
17      A.   Yes, sir.
18      Q.   And why did you decline comment to the
19  newspaper?
20      A.   It wouldn't -- I feel like it wasn't any of
21  their business.  It was a personnel matter.
22      Q.   It wasn't any business of the newspaper?
23      A.   Not as far as a personnel matter.
24      Q.   Now, did it come to your attention after
25  Mr. Davis's firing that he sought employment

1    elsewhere?

2         A.   Did it come to my attention?

3         Q.   Yes, sir.

4         A.   You know, you hear things, but -- I knew he

5    was working for the ambulance service.  I seen him

6    working.

7         Q.   Were you ever contacted by a prospective

8    employer like the ambulance service concerning

9    Mr. Davis's employment here in the city?

10        A.   No.  David already was working for them, I

11   think.

12        Q.   So you didn't receive any communications by

13   a prospective employer inquiring about what kind of

14   job he did or why he left the city fire department,

15   nothing like that at all?

16        A.   People have asked me, yes.  I had people

17   ask me about it, but --

18        Q.   What people?

19        A.   I had someone from Auburn ask me.  I had

20   someone from Opelika ask me.

21        Q.   What's the spelling on the last word?

22        A.   Opelika.

23        Q.   Let's talk about Auburn first.  Who called

24   you from the Auburn Fire Department about Mr. Davis?

25        A.   Basically, they been -- I didn't get a

97

1    call.  I was at a meeting and a couple guys asked

2    me, say -- well, told me, said one of your

3    firefighters put in for a job up here.  And I knew

4    right then I couldn't discuss or talk about it,

5    so --

6        Q.   Who were those two guys from the Auburn

7    Fire Department?

8        A.   I don't know them.

9        Q.   Were they chief officers?

10       A.   No, sir.  I talked to Chief Langley about

11   it.  Chief Langley also told me David had put in,

12   but that was the end of it.

13       Q.   Is Chief Langley chief of the Auburn Fire

14   Department?

15       A.   That's correct.

16       Q.   Where were you?

17       A.   I was at a consortium meeting.  We have a

18   meeting of the different departments in the

19   surrounding area.  We all meet together for training

20   purposes, and we meet the first Wednesday of each

21   month and exchange ideas, and we train our personnel

22   together.

23       Q.   So Chief Langley from the Auburn Fire

24   Department asked you about David, said he put in for

25   a job and used to work in your department?

1          A.   Yes, sir.

2          Q.   So what did you say in response to that to

3    Chief Langley?

4          A.   I said, that's good.

5          Q.   Did you comment on his job performance?

6          A.   I know not to comment.

7          Q.   Didn't, in fact, Chief Langley ask you

8    why -- what were the circumstances concerning

9    Mr. Davis's departure from your fire department?

10         A.   Not that I know of.

11         Q.   He didn't ask you anything about that?

12   Just seems to me that would be a curious question

13   that a chief of the department who's got a job

14   application, knowing that he left the Phenix City

15   Fire Department, would want to know why?

16         A.   People didn't know me, Chief Langley and

17   certain people.  And people who work for this

18   department will tell you it's certain things that

19   when they ask me, I give you a certain look and you

20   know not to ask me anything else.

21         Q.   So you didn't say anything good or bad

22   about Davis's job here?

23         A.   I know not to do that.  I wouldn't do that.

24         Q.   Okay.  What about the second fire

25   department other than Auburn?

99

1      A.   I was at the Fire Chiefs convention in
2  February.  And Chief Morgan told me David had put
3  in.  And I said, that's good.
4      Q.   Did that chief ask you about his job here
5  in the Phenix City Fire Department?
6      A.   He asked me, he said, what kind of
7  firefighter is he?  I said, you have to determine
8  that for yourself.  I don't -- I don't get into
9  that.
10      Q.   So your testimony is you didn't comment one
11  way or the other on this?
12      A.   No.  I don't do that.
13      Q.   Did you have any other communications with
14  any other fire department or ambulance service about
15  Davis?
16      A.   No.
17      Q.   Those are the only two?
18      A.   Those are the only two until one of the
19  guys that worked for me, Rob Schwoebel, he told me
20  that David was working for Opelika.  And I said,
21  that's good.
22      Q.   Bear with me just for a moment here,
23  Chief.
24      (Brief recess)
25      Q.   Okay.  We can go back on the record.

100

1          Chief Hunter, have you ever had occasion to
2    address the city council on fire department issues?
3          A.    During budget time each year.
4          Q.    Is that the only time?
5          A.    That's -- or unless they ask me something.
6    If they asked something in a work session.  Or, like
7    recently, we received a Golden Axe from Muscular
8    Dystrophy for raising the highest amount of money in
9    the State of Alabama, you know, things like that.
10         Q.    Well done.
11         A.    Yes, sir.  When we do things like that,
12   that's about it.
13         Q.    If you wanted to directly address the city
14   council on an issue concerning your fire department,
15   would you first have to communicate that to the city
16   manager or could you go to the council meeting and
17   say I've got this concern as a chief.
18         A.    I would never do that.
19         Q.    You have to go through the manager?
20         A.    Yes, sir.  That's as far as I'm going.
21         Q.    Do you know any of the citizens who sit on
22   the Personnel Review Board?
23         A.    Do I know any of them?
24         Q.    Yes.
25         A.    I know them by going to Personnel Review

1   Board hearings, by knowing their faces, seeing them.

2       Q.   Outside of the scope of that hearing on

3   Mr. Davis before the board, did you have any

4   conversations with members of the Personnel Review

5   Board about Mr. Davis?

6       A.   No, sir.

7       Q.   And you are aware, I take it, Chief, that

8   there's a First Amendment to our U.S. Constitution

9   that gives all citizens the rights of free speech

10  and free association?

11      A.   That's correct.

12      Q.   Okay.  In your view, do those rights and

13  principles apply to firefighters in your fire

14  department?

15      A.   That's correct.  Our Merit System gives us

16  that, too, unless it impedes the performance of our

17  men.

18      Q.   Have you ever had a conversation with Mayor

19  Hardin about Davis after Davis was fired?

20      A.   Not that I know of.

21      Q.   Would that be outside the chain of command

22  if you talked to the mayor about a termination in

23  your department?

24      A.   I usually don't talk to him too much.

25      Q.   But would it be outside the chain of

1    command?

2        A.    Yes, sir.  I talk to the city manager.

3        Q.    And you can only speak to the city manager

4    about terminations?

5        A.    Well, if they are speaking about something

6    in a work session or talking, but I don't -- I don't

7    go to them.  I follow -- I stick as close to the

8    rules of etiquette as I can.  I couldn't get away

9    with it.  I wouldn't do it.

10        MR. WOODLEY:  All right.  I don't have any

11        further questions.  Thank you, Chief.

12                        EXAMINATION

13    BY MR. GRAHAM:

14        Q.    Let me just ask you one question to clarify

15    something.  Now, you do recognize that a firefighter

16    has the right, under the U.S. Constitution, to free

17    speech?

18        A.    That's right.

19        Q.    And that free speech is allowed if you

20    follow the procedures that are set out in the ASOPs

21    and in the Merit System for the City of Phenix City?

22        A.    That's correct.

23        MR. GRAHAM:  That's all I have.

24        MR. WOODLEY:  I don't have anything

25        further.  Thanks, Chief.  Appreciate you

103

1        coming.

2    (The deposition concluded at 12:32 p.m.)

3                 * * * * * * * * * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    REPORTER'S CERTIFICATE

2    STATE OF ALABAMA

3    MONTGOMERY COUNTY

4         I, Shannon Williams, Certified Shorthand

5    Reporter and Commissioner for the State of Alabama

6    at Large, hereby certify that on April 4, 2007, I

7    reported the deposition of WALLACE BURNS HUNTER,

8    SR., who was first duly sworn or affirmed to speak

9    the truth in the matter of the foregoing cause, and

10   that pages 1 through 103 contain a true and accurate

11   transcription of the examination of said witness by

12   counsel for the parties set out herein.

13        I further certify that I am neither of kin nor

14   of counsel to any of the parties to said cause, nor

15   in any manner interested in the results thereof.

16        This 10th day of April, 2007.

17                    Shannon M. Williams

18             SHANNON M. WILLIAMS, CSR
               Commissioner for the
19             State of Alabama at Large

20             MY COMMISSION EXPIRES: 1/14/2010

21

22

23

24

25
```