# SUPPLEMENTAL

# DEPOSITION OF WALLACE HUNTER

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE MIDDLE DISTRICT OF ALABAMA

 3                      EASTERN DIVISION

 4

 5    DAVID DAVIS,                    [c]COPY

 6           Plaintiff,

 7    vs.                      CASE NO. 3:06-CV-0054-VPM

 8    CITY OF PHENIX CITY, ALABAMA,

 9    et al.,

10           Defendants.

11

12

13              * * * * * * * * * *

14

15       DEPOSITION OF WALLACE HUNTER, taken pursuant to

16    stipulation and agreement before Shannon M.

17    Williams, Certified Court Reporter and Commissioner

18    for the State of Alabama at Large, in the offices of

19    City Hall, 601 12th Street, Phenix City, Alabama, on

20    Tuesday, November 6, 2007, commencing at

21    approximately 10:00 a.m. EST.

22

23              * * * * * * * * * *

24

25
```

2

```
 1                        APPEARANCES

 2     FOR THE PLAINTIFF:

 3     THOMAS A. WOODLEY
       Woodley & McGillivary
 4     1125 15th Street N.W.
       Suite 400
 5     Washington, D.C.  20005

 6     FOR THE DEFENDANTS:

 7     JAMES P. GRAHAM, JR.
       712 13th Street
 8     P.O. Box 3380
       Phenix City, Alabama  36868-3380
 9

10     JAMES R. MCKOON, JR.
       McKoon & Associates
11     925 Broad Street
       P.O. Box 3220
12     Phenix City, Alabama  36868-3220

13

14     ALSO PRESENT:

15     Cole Dugan
       David Davis
16     H.H. Roberts

17                     EXAMINATION INDEX

18        BY MR. WOODLEY                        4
          BY MR. MCKOON                        51
19

20

21

22

23

24

25
```

STIPULATIONS

1

2          It is hereby stipulated and agreed by and

3    between counsel representing the parties that the

4    deposition of WALLACE HUNTER is taken pursuant to

5    the Federal Rules of Civil Procedure and that said

6    deposition may be taken before Shannon M. Williams,

7    Certified Court Reporter and Commissioner for the

8    State of Alabama at Large, without the formality of

9    a commission; that objections to questions other

10   than objections as to the form of the questions need

11   not be made at this time but may be reserved for a

12   ruling at such time as the deposition may be offered

13   in evidence or used for any other purpose as

14   provided for by the Federal Rules of Civil

15   Procedure.

16          It is further stipulated and agreed by and

17   between counsel representing the parties in this

18   case that said deposition may be introduced at the

19   trial of this case or used in any manner by either

20   party hereto provided for by the Federal Rules of

21   Civil Procedure.

22                  * * * * * * * * * *

23

24

25

```
 1                    WALLACE HUNTER
 2          The witness, having first been duly sworn
 3     or affirmed to speak the truth, the whole truth and
 4     nothing but the truth, testified as follows:
 5                      EXAMINATION
 6     BY MR. WOODLEY:
 7          Q.   Good morning, Chief Hunter.  This is a
 8     continuation of your original deposition in this
 9     lawsuit.  And I think you recall that my name is Tom
10     Woodley, and I'm the lead counsel representing
11     Mr. David Davis in this lawsuit against the City,
12     against yourself, and also against Mr. Roberts.
13          Let me go through again some preliminaries, as
14     I did in your first deposition, just to make sure
15     that you and I are on the same wavelength.  I'm
16     going to be asking a number of questions of you this
17     morning, and we expect you to give full and complete
18     and truthful answers.  Do you understand that?
19          A.   Yes, sir.
20          Q.   And, of course, you have again been sworn
21     under oath, so you are obligated to give true
22     answers.  Do you understand that?
23          A.   Yes.
24          Q.   If at any time you don't hear or understand
25     one of my questions, please stop me immediately and
```

1    I will be more than happy to repeat or rephrase that

2    question.  Do you understand that?

3         A.   Yes, sir.

4         Q.   I'm going to invite your attention to some

5    of the exhibits that are in this binder in front of

6    you, as we did in the first session of your

7    deposition.  Mr. McKoon has a full set of these

8    exhibits as we go through them in the depositions

9    today and tomorrow.

10        And the first exhibit, if you would turn the

11   page on that, Chief Hunter, this is the Notice of

12   Deposition which we attorneys served on the other

13   side and on Mr. McKoon indicating the schedule and

14   areas that we wanted to cover in these depositions.

15   And you have been designated by the city defendant

16   in this case as what we lawyers call a Rule 30(b)(6)

17   witness to give knowledgeable and/or authoritative

18   testimony in certain subject matter areas.  Do you

19   understand that?

20        A.   Yes, sir.

21        Q.   In looking at this Exhibit 1, the notice of

22   deposition, I'm going to go through the several

23   areas in which the city has appointed you as its

24   witness and representative under Rule 30(b)(6).  And

25   the first subject matter area would be in paragraph

6

1    five of this Notice of Deposition, and you can turn

2    to that.  I'm going to read it into the record, and

3    I would like you to read it to yourself as well.

4        Paragraph five states as follows:  "All

5    actions, correspondence, emails, notes, notices,

6    grievances, appeals, warnings, counseling forms,

7    reprimands, disciplinary actions and other documents

8    which related in any way to the adoption,

9    implementation, application, and enforcement of

10   ASOP-12 of the city's fire department."

11       Do you see where it says that?

12       A.   Yes, sir.

13       Q.   So are you prepared today to give informed

14   testimony on behalf of the city on that subject

15   matter area?

16       A.   Yes, sir.

17       Q.   Okay.  The next area would be paragraph six

18   of the Notice of Deposition which states as

19   follows:  "All actions, memoranda, correspondence,

20   e-mails, notes, notices, grievances, appeals,

21   warnings, reprimands, disciplinary actions, and

22   other documents which relate in any way to employees

23   of the city's fire department following the "chain

24   of command" with regard to any communications in

25   writing or verbal with the media and with city

7

1    council members."

2        Do you see where it says that?

3        A.   Yes, sir.

4        Q.   And are you prepared today to give

5    authoritative and knowledgeable testimony on behalf

6    of the city on that subject matter area?

7        A.   Yes, sir.

8        Q.   Paragraph nine on the next page, Chief

9    Hunter, says as follows:  "All facts, memoranda,

10   correspondence, e-mails, notes, notices, and other

11   documents which relate in any way to information

12   obtained by defendant Wallace Hunter that the

13   plaintiff and other city employees have the

14   constitutional First Amendment right of free

15   expression."

16       Do you see where it says that?

17       A.   Yes, sir.

18       Q.   And you are also prepared to give

19   authoritative testimony on that subject today on

20   behalf the City?

21       A.   Yes, sir.

22       Q.   And, lastly, paragraph 10 which provides as

23   follows:  "All facts, memoranda, correspondence,

24   e-mails, notes, notices, and other documents which

25   relate in any way to information obtained by

1    defendant Wallace Hunter that the plaintiff and

2    other city employees have the constitutional First

3    Amendment right of free association."

4        Do you see where it says that?

5        A.   Yes, sir.

6        Q.   And are you also prepared to give

7    knowledgeable and authoritative testimony on behalf

8    of the city on that subject as well?

9        A.   Yes, sir.

10       Q.   Let me move on to Exhibit 35, which is a

11   more recently provided document that the defendants

12   gave to us in this case.  Exhibit 35 appears to be a

13   memorandum from Assistant Chief Hanson, H-A-N-S-O-N,

14   to yourself, Chief Hunter, dated September 21,

15   2005.  And the re line is verbal counseling with De,

16   D-E, Karl Taylorson.  I want to ask you several

17   questions about this document, but, initially, let

18   me state to you, anytime that I ask you to review a

19   document, take as much time as you need to read

20   through it before you respond to my questions.

21       Do you understand that, Chief Hunter?

22       A.   Yes, sir.

23       Q.   Are you familiar with this memorandum

24   addressed to yourself from Assistant Chief Hanson?

25       A.   Yes, sir.

9

1        Q.   Did he, in fact, give you this memorandum

2   on or about its date of September 21, 2005?

3        A.   Yes, sir.

4        Q.   And what's your best recollection as to

5   what Assistant Chief Hanson was doing on this

6   subject when he apparently interviewed or

7   interrogated Sergeant Karl Taylorson?

8        A.   Could I finish reading it?

9        Q.   Absolutely.  That's true with all the

10  documents.

11       Have you had a chance to read that completely?

12       A.   Yes.

13       Q.   I think my question was generally do you

14  recall the circumstances which prompted Assistant

15  Chief Hanson to apparently interview or interrogate

16  Sergeant Karl Taylorson concerning this subject?

17       A.   He was reminding Sergeant Taylorson of our

18  requirements through our merit system before talking

19  to the media.

20       Q.   Did this situation grow out of the

21  newspaper article that appeared in the Columbus

22  Ledger-Enquirer on or about September 18, 2005, in

23  which a number of firefighters were interviewed and

24  quoted in the newspaper?

25       A.   I believe so.

1      Q.   And did you instruct or direct Assistant

2   Chief Hanson to interview Karl Taylorson about that

3   subject?

4      A.   Yes, sir.

5      Q.   Do you recall if Mr. Taylorson was quoted

6   in that newspaper article about issues or policies

7   affecting the fire department?

8      A.   I believe so.

9      Q.   As far as you know, Chief Hunter, are the

10  statements contained in this memorandum from

11  Assistant Chief Hanson to yourself true and

12  accurate?

13     A.   I believe so.

14     Q.   You'll see in the second paragraph -- and

15  let me quote it -- "Sergeant Taylorson was reminded

16  of the "procedure for presentation of a grievance,"

17  Section 15.02), outlined in the merit system.  These

18  guidelines are to be followed by everyone employed

19  by the City of Phenix City."

20     Do you see where it says that?

21     A.   Yes, sir.

22     Q.   What is your understanding or recollection

23  of the provision of Section 15.02 of the merit

24  system rules and regulations?

25     A.   It's a section that contains the steps for

1    a grievance.

2        Q.   For a grievance?

3        A.   I believe so.

4        Q.   And is it your understanding that the

5    reference here to that section in the merit system

6    rules and regulations would require a city employee

7    to first exhaust those grievance procedures in the

8    merit system rules and regulations before the

9    employee is authorized or permitted to talk to the

10   media about an issue affecting the City?

11       A.   I believe what he was doing here is giving

12   him his avenue if he had a grievance.

13       Q.   Okay.  But is it your understanding of that

14   section of the merit system rules and regulations

15   that it is required by the city that before a city

16   employee speaks with the media about any issue

17   affecting the city or his department, that he first

18   has to exhaust the grievance procedures consistent

19   with the merit system rules and regulations?

20       A.   I don't quite understand what you're

21   saying.  Say that again.

22       Q.   Okay.  Where I'm trying to go with this,

23   just so you understand, is that, is there a

24   preliminary requirement that before a city employee

25   can talk to the media about any city related issue,

12

1    that individual employee has to exhaust the
2    grievance procedures provided by the City?
3        A.   No.  We have designated people to talk to
4    the media.
5        Q.   And who would that be?
6        A.   Myself and whoever I elect, designate as
7    the person in fire prevention or whichever division
8    that they are requesting information from.
9        Q.   So do you consider yourself the
10   spokesperson for the fire department to the media?
11       A.   Yes, sir.
12       Q.   Okay.
13       A.   I'm one of them.
14       Q.   You are one of them.  And you have, as you
15   understand it, the authority to designate another
16   individual in the fire department to speak with the
17   media, correct?
18       A.   That is correct.
19       Q.   Does anyone else in the fire department
20   have the discretion or opportunity to speak to the
21   media without your prior approval on any issues
22   affecting the fire department?
23       A.   As far as the media?
24       Q.   Yes.
25       A.   No, sir.  We have designated personnel for

13

1  that.  As far as if I'm not here, in my absence,

2  someone would step in my place and that person would

3  have that authority.

4      Q.   Who would be the next person, if you are

5  absent, to speak to the media about fire?

6      A.   Presently, that would be Deputy Chief

7  Hanson.

8      Q.   Is there anyone else that -- as we're

9  sitting here today, that has that authority to speak

10 to the media?

11     A.   It basically follows the chain.  In his

12 absence, it would be the next person that he

13 designate, put in line to take care of those

14 matters.

15     Q.   But if tomorrow a rank and file firefighter

16 currently employed by the City of Phenix City

17 and its fire department spoke to the media on his

18 own about issues affecting the fire department

19 without your prior approval, would that be a

20 violation of the merit system rules and regulations

21 of the city?

22     A.   Yes, sir.

23     Q.   And you have been in the fire department

24 for over 20 years; is that correct, Chief Hunter?

25     A.   Yes, sir.

1    Q.  How long, again, have you been the chief of
2    the fire department?
3    A.  At this time, two years and -- two years
4    and six months, I believe.
5    Q.  And then there was an earlier period of
6    time where you were the acting chief, correct?
7    A.  Yes, sir.
8    Q.  In your experience in the city's fire
9    department, do you know of any other situations,
10   other than that newspaper article in September of
11   2005, where firefighters have spoken to the media
12   about any issues or matters affecting the fire
13   department?
14   A.  Are you asking under my tenure or someone
15   else's tenure?
16   Q.  In your 20 years plus within the fire
17   department, do you know of any other firefighters
18   who have spoken to the media other than the
19   situation involving the September 2005 newspaper
20   article?
21   A.  I believe so.
22   Q.  What's your recollection of that?
23   A.  I believe someone has under -- at a
24   different time.
25   Q.  Who?

1    A.   I remember some issues in 2001, but I can't
2    recall.  I wasn't the chief at that point in time.
3         Q.   Do you remember the -- generally the
4    issues?
5         A.   Well, we had conflict in 2001.
6         Q.   Conflict within the fire department?
7         A.   That is correct.
8         Q.   But over what subjects?  If there was
9    conflict, can you recall what the subjects were?
10        A.   Basically, it was a matter of -- I guess
11   under a different fire chief where we had, I guess,
12   a different opinion in deputy chief and chief and
13   some of the members of the fire department.
14        Q.   But what was the subject?  Was it
15   staffing?  Was it recruitment?  Was it training?
16   What was the subject?
17        A.   I believe the chief was accused of taking
18   products from a company.
19        Q.   What was his name?
20        A.   Rodney Blankenship.
21        Q.   And after that situation, did he step down
22   from his position?
23        A.   I believe so, yes, sir.
24        Q.   And you say that that subject appeared in
25   the newspaper?

16

```
1        A.   Yes, sir.
2        Q.   And were firefighters interviewed and
3    quoted on that subject?
4        A.   I believe some were.
5        Q.   Do you remember who?
6        A.   I remember them talking to Chief Doster.
7    And I can't recall everybody they talked to, but
8    they talked to some people.
9        Q.   The firefighters who spoke to the media on
10   that occasion, were they subject to any discipline
11   or retaliation of any kind?
12       A.   During that time, sir, with -- I wasn't the
13   chief.  And it was so chaotic around here, I
14   don't -- I'm not privy to know what all went on at
15   that particular time.
16       Q.   So you don't have any information or
17   recollection as to whether or not there might have
18   been any disciplinary action on that subject?
19       A.   At that point in time, I wasn't chief.
20       Q.   Okay.  So the answer is no, you don't have
21   any information then; is that correct?
22            MR. MCKOON:  On what?  Doesn't have any
23       information on what?
24       Q.   On whether or not the individuals who spoke
25   to the media during that period of time were subject
```

17

1  to any discipline or retaliation by the city or the

2  department?

3      A.   I don't know exactly what went on then as

4  far as everything that went on, so I couldn't really

5  say was it or was it not.  I believe --

6      Q.   What --

7          MR. MCKOON:  I don't know if you want this

8      on the record or not, but they filed a lawsuit

9      claiming that the reason they were terminated

10     was because they were being retaliated -- was

11     for retaliation for speaking out.

12     Q.   And when you say "they," who is "they"; do

13  you recall?

14         MR. MCKOON: Dennis Duty and Randy Doster.

15     Q.   When you have been employed by the fire

16  department, other than your tenure as the chief,

17  have you ever spoken to the media about issues

18  affecting the fire department?

19     A.   No, sir.

20     Q.   Now, going back to Exhibit 35, which again

21  is this memorandum from Assistant Chief Hanson to

22  yourself dated September 21, 2005, it says in the

23  second paragraph, last sentence, he -- and this

24  refers to Sergeant Taylorson -- he had -- and I

25  believe this is a typo.  I think there should be the

1   word "not" in there.  Would you agree with that?

2   "He had not received nor requested permission."  Is

3   it -- do you think that's a typo in the word not?

4        A.   It could be.  And then it's the way he

5   speaks sometimes, I guess.

6        Q.   Is that the way Assistant Chief Hanson

7   speaks?

8        A.   Depends on how people -- sometimes people

9   speak.  It look like a typo to me.

10       Q.   I think in context it probably should have

11  the word not in there, so unless Mr. McKoon

12  objects --

13           MR. MCKOON:  I'll agree with that.

14       Q.   Let me quote it again.  "He" -- again

15  referring to Sergeant Taylorson -- "had not received

16  nor requested permission from any fire department

17  supervisors to speak with a member of the news media

18  concerning issues within the fire department."

19       As far as you know, Chief Hunter, is that an

20  accurate statement?

21       A.   He hadn't requested any permission from

22  myself, so I guess so.  No one else had informed me

23  that he requested permission.

24       Q.   And, again, just so the record is clear

25  here in the deposition, is it your understanding as

1    the chief of the fire department for the city, and

2    the Rule 30(b)(6) witness for the city, that it is

3    required by the merit system rules and regulations

4    of the city that a firefighter have prior permission

5    from the city or the fire department before he or

6    she speaks with the media concerning issues within

7    the fire department?

8         A.   I believe so.

9         Q.   Next, later on at the bottom of this

10   memorandum, it says that Assistant Chief Hanson has

11   advised Sergeant Taylorson that the city "would not

12   put up with another episode of speaking to the media

13   without prior approval."

14        Do you see where it says that?

15        A.   Yes, sir.

16        Q.   Do you have any idea what Assistant Chief

17   Hanson was referring to when he said the city was

18   just not going to put up with that again if

19   Taylorson talked to the media about the fire

20   department?

21        A.   Basically, he was telling him that he had

22   violated something without getting permission and

23   that he was -- he was basically counseling him this

24   time because he should have known what steps to take

25   and that, I guess, the next time he would be written

1    up.

2         Q.   Okay.  The next time, as you put it,

3    written up, he would be subject to discipline?

4         A.   Subject to discipline.

5         Q.   And possibly the next time Taylorson spoke

6    to the media, when you say "he" would be subject to

7    discipline, would that possibly include termination

8    of his employment as well?

9         A.   It depends on how his record stands.

10        Q.   Well, speaking of his record, I notice that

11   this -- apparently this counseling form, as it's

12   titled, was going to be put in Sergeant Taylorson's

13   personnel file.  Is that your understanding as well?

14        A.   That is correct.

15        Q.   What's the purpose of putting a counseling

16   form like this in a firefighter's personnel file?

17        A.   I guess so if something else ever occurred

18   that if you had to come back and you was to ask me a

19   question of had we given this person a chance or

20   talked to him before, that paperwork would show that

21   he had been talked to.

22        Q.   So, in other words, a counseling form like

23   this for a firefighter placed in his personnel file

24   could be referred to and used again for future

25   possible disciplinary action; is that correct?