1    A.    Well, according to the merit system, yes.

2    Q.    According to the merit system, yes?

3    A.    I guess as far as paperwork, it's something
4    that you refer to or talk to them if a person didn't
5    remember if you talked to them.

6    Q.    Because this counseling form goes into the
7    personnel file, do you consider that to be a written
8    reprimand of the firefighter?

9    A.    It's what it is.  It's a counseling form.

10   Q.    Let's move on to Exhibit 36, Chief Hunter.
11   This appears to be another counseling form involving
12   firefighter Robert Bowden, B-O-W-D-E-N, dated
13   September 23, 2005.  And it indicates that Assistant
14   Chief Johansen apparently spoke to Firefighter
15   Bowden about the interview and newspaper article
16   report in the middle of September 2005.  Are you
17   familiar with this document?

18   A.    Yes, sir.

19   Q.    Was this furnished to you by Assistant
20   Chief Johansen?

21   A.    Yes.

22   Q.    Did Assistant Chief Johansen interrogate or
23   interview Mr. Bowden pursuant to your directions?

24   A.    Yes, sir.

25   Q.    Was this also placed in Mr. Bowden's

```
 1   personnel file?
 2        A.   Yes, sir.  Should have been.
 3        Q.   So if I'm correct -- and if I'm not, you
 4   certainly correct me, Chief Hunter -- before a
 5   firefighter currently employed with the city's fire
 6   department is able to speak to the media about fire
 7   department issues, he's got to -- he's required to
 8   go through the chain of command within the fire
 9   department to get prior authorization to talk to the
10   media; is that true?
11        A.   If he had any reason, that would be the way
12   to go.
13        Q.   And the chain of command is what, if it's a
14   firefighter that wants to speak to the media?  He
15   goes to his captain and then the next officer is
16   battalion chief?
17        A.   Yes, sir.
18        Q.   And the next officer above the battalion
19   chief, is that an assistant chief?
20        A.   That would be -- no.  Batallion chief,
21   deputy chief, and chief.
22        Q.   Deputy chief and then assistant chief?
23        A.   No, sir.  We changed from assistant chief
24   to battalion chiefs.  We didn't have any assistant
25   chiefs.  Battalion chiefs.  And deputy chiefs is
```

1    over them and then myself.
2        Q.   So that would be the chain of command that
3    a firefighter would have to, in your judgment,
4    pursue before talking to the media about an issue
5    affecting the fire department; is that correct?
6        A.   Basically.
7        Q.   Now, on the chain of command, if a
8    firefighter wants to talk to the media and it goes
9    up to your level and you say, no, I do not permit
10   you or allow you to talk to the media about issues
11   affecting the fire department, does the firefighter
12   have any further recourse?  For example, can the
13   firefighter go to the city manager, Mr. Roberts,
14   above your head?
15       A.   If that's what that person requests, if
16   that person requests that of me.
17       Q.   And would that be the end of the road at
18   Mr. Roberts' level as the city manager, seeking
19   permission to talk to the media?
20       A.   That would be Mr. Roberts' decision.
21       Q.   But would that be the last level that a
22   firefighter could appeal that issue if he wanted to
23   talk to the media?
24       A.   That would be Mr. Roberts' decision.
25       Q.   I'm not --

1   A.  As far as my Standard Operating Procedures
2   run, once I've exhausted that person within the SOPs
3   that I govern over, then it would be up to
4   Mr. Roberts.
5   Q.  Okay.  But I'm trying to get your
6   understanding.  If the firefighter goes to
7   Mr. Roberts as the city manager and Mr. Roberts says
8   no, you're not permitted to talk to the media about
9   any issues affecting the fire department, is that
10  the end of the process for that firefighter?
11  A.  I can speak for the end of the road for
12  myself, and that would be once I turned it over to
13  Mr. Roberts.
14  Q.  So as far as you're concerned, Mr. Roberts
15  would be the end of the road for you?
16  A.  For myself.
17  Q.  Okay.
18  A.  As far as doing the job I'm required to do.
19  Q.  Okay.  But is that also true of the
20  firefighters below you?  Is Mr. Roberts the end of
21  the road for seeking permission?
22      MR. MCKOON:  I'm going to object.  You've
23      asked and answered that now three different
24      times.
25      MR. WOODLEY:  Well, I've asked it three

         different times, but he hasn't answered it.
              MR. MCKOON: Well, I think he has. He's
         given his answer. His answer is on the record.
              MR. WOODLEY: What is his answer,
         Mr. McKoon? Is it yes, Mr. Roberts is the end
         of the road?
              MR. MCKOON: She can read it back.
              MR. WOODLEY: It would probably be faster,
         if you're able to say if it's consistent with
         your understanding that Mr. Roberts, as the
         city manager, is the last person a firefighter
         can go to to seek permission to talk to the
         media about fire department issues.
              MR. MCKOON: I think that question needs to
         be asked of Mr. Roberts, but --
              MR. WOODLEY: I'll be glad to do that when
         I get to that, but right now I have Mr. Hunter.
         A.   You would have to ask Mr. Roberts that once
         I turned it over to him.
         Q.   All right. Let's go back and focus on that
         newspaper article in the middle of September 2005
         which -- and we have it as an exhibit if you want to
         look at it, Chief Hunter.
         A.   Which one?
         Q.   It's Exhibit 14. And this is the newspaper

1  article that appeared in the Ledger-Enquirer on
2  September 18, 2005, which a number of firefighters,
3  including Mr. Davis, were interviewed and quoted to
4  some extent about various issues within the fire
5  department.  I want to ask you this because I think
6  it's an interesting point.  If Mr. Davis and the
7  other firefighters who are identified in this
8  newspaper article had come to you, Chief Hunter, and
9  asked permission to address these issues and be
10 interviewed in this newspaper article, would you
11 have given that permission?
12     A.  First I would have wanted to know what the
13 issues were.
14     Q.  Well, you know the issues that they
15 addressed in the article, so that's apparent.  If
16 they had mentioned these issues and said we want to
17 talk to the newspaper about these issues, would you
18 have given your okay?
19     A.  I probably would have after I tried to
20 resolve it myself, if I was getting a chance to
21 resolve it.
22     Q.  Okay.  Let me invite your attention to
23 Exhibit 3, Chief Hunter, which is the grievance
24 procedure for the City of Phenix City and its merit
25 system rules and regulations, Section 15.02.  Are

1  you familiar with these grievance provisions?
2       A.   Somewhat, yes, sir.
3       Q.   Is it your position that firefighters are
4  required to pursue these grievance procedures and
5  exhaust these grievance procedures before they can
6  talk to the media about issues affecting the fire
7  department?
8       A.   Ask me that again.
9       Q.   I'm sorry?
10      A.   Ask me the question again.
11      Q.   Yes.  Is it your position that firefighters
12 are required to exhaust these grievance procedures
13 in the merit system rules and regulations before
14 they are permitted to talk to the media about issues
15 affecting the fire department?
16      A.   If they have a grievance, that's -- they
17 need to go through the grievance procedure if they
18 have a request of talking to the city manager or me
19 or something like that.  We have a operating
20 procedure for that.
21      Q.   Is it your understanding that a grievance
22 under these procedures involves an individual
23 employee's complaint about his or her employment
24 conditions or wages or benefits or hours of work?
25 In other words, is it focused on an individual

1  employee complaint or grievance?
2      A.  That's basically the way I see it.
3      Q.  Would these grievance procedures apply to
4  general concerns that firefighters may have such as,
5  perhaps, understaffing or inadequate training in the
6  fire department?
7      A.  That's correct.  You're hired as an
8  individual.  You have a individual feeling.  You can
9  go through this process as an individual.
10     Q.  But I guess what I'm trying to get at is if
11 there's a general concern in the fire department
12 amongst the firefighters concerning broader subjects
13 like staffing or recruitment or training, would
14 those subjects, general in their nature, be required
15 to be pursued under the grievance procedures?
16     A.  They could be.
17     Q.  They could?
18     A.  Yes, sir.
19     Q.  I don't think I asked this earlier, but I
20 think it's important to have on the record.  Has a
21 firefighter ever come to your level as chief of the
22 fire department and requested permission to speak to
23 the media about issues affecting the fire department
24 and been refused --
25     A.  No, sir.

    Q. -- that permission?

    A. No, sir.

    Q. Before you speak to the media concerning issues affecting the fire department, do you have to get the prior okay from City Manager Roberts?

    A. I don't speak to anyone. It depends on what it's concerning. If we are out in the street and it's a fire that's going on, I will speak to them. If it's involving something that I shouldn't be speaking on, I'll go to the city manager.

    Q. Okay. Give me some examples of subjects which you should not be speaking on without first getting the okay from the City Manager Roberts.

    A. Subjects that I feel like I shouldn't be speaking on would be something that really don't involve me as a person as far as politics and -- I don't get involved in that, try not to get involved in that. So that's something if someone was to put a microphone in my face to speak or talk in, I wouldn't do it and I would inform the city manager. Or if someone called me on the phone and asked me would I speak on that, I would talk to the city manager about that.

    Q. Okay. Let's go through a few examples. What if the media approached you or contacted you by

1 telephone and wanted to interview you about general
2 subjects affecting the fire department like
3 staffing, recruitment, training, budget of the fire
4 department, adequate equipment in the fire
5 department? Do you feel you could immediately speak
6 to the media or would you have to first get
7 clearance from City Manager Roberts on those
8 subjects?
9     A.   As far as budgets, I wouldn't talk to the
10 media about that. As far as if they wanted to know
11 about new pieces of equipment, trucks that we
12 received and purchased, I could talk to them about
13 it.
14    Q.   Without getting a prior okay of Roberts?
15    A.   That's correct. Of course, I try to make
16 sure that he's told about it.
17    Q.   What about exercising your authority as a
18 fire chief and possibly terminating or firing a
19 firefighter? Is it your practice to run that by the
20 city manager first before you actually implement a
21 discharge of a firefighter?
22    A.   Yes, sir. I have to -- I make sure that
23 it's run through our personnel department what
24 situation we have with any personnel. And if it
25 leads -- if the record indicates it's going to lead

1  to that, then we have to talk to try to make sure we
2  talk to the city manager and our counsel.
3     Q.  And counsel meaning the lawyer for the
4  city?
5     A.  That's correct.
6     Q.  And did you follow that approach and
7  practice prior to implementing the discharge of
8  David Davis?
9     A.  That is correct.
10    Q.  So you did, in fact, speak with the
11 personnel director or HR director, Mrs. Goodwin,
12 before you implemented a decision to terminate
13 Mr. Davis?
14    A.  That is correct.
15    Q.  And is it also true that you spoke to City
16 Manager Roberts before implementing the decision to
17 discharge Mr. Davis?
18    A.  That is correct.
19    Q.  And when you spoke to Mrs. Goodwin, did she
20 give approval or the okay to discharge Mr. Davis?
21    A.  She does the paperwork.  And what she does
22 is she looks at the record and then we follow from
23 there as far as getting approval for the record;
24 whatever the record indicates, that's what we have
25 to follow.

1   Q.  Okay.  I'm not sure, with all due respect,
2 that was responsive to my question, so let me try it
3 one more time.  In the case of Mr. Davis and his
4 discharge, before that decision was effectuated or
5 implemented to discharge Mr. Davis, did Mrs. Goodwin
6 say okay or give her approval that the discharge was
7 appropriate?
8   A.  Yes.
9   Q.  Okay.  And same question with regard to
10 City Manager Roberts.  Before the ultimate or final
11 decision was made to implement the discharge of
12 Mr. Davis, did City Manager Roberts give you that
13 prior approval to implement the discharge of Davis?
14   A.  That's correct.
15   Q.  Let me invite your attention to Exhibit 3,
16 if you could turn to that, Chief Hunter, please.
17 It's the last page of Exhibit 3, which again is this
18 ASOP-12.  And I'm not going to spend a lot of time
19 on this because we covered it in your first
20 deposition, but this is the ASOP-12 apparently
21 adopted in January of 1998.  Do you see at the
22 bottom page there the date?
23   A.  That's correct.
24   Q.  And that's still in effect today, correct?
25   A.  Correct.

1  Q. The subject matter is "addressing city
2  council". See where it says that?
3  A. Yes, sir.
4  Q. Now, it says at the top there, the first
5  sentence under purpose, "to ensure the orderly
6  handling of work-related" -- that's underlined --
7  "work-related business of the fire department
8  personnel".
9  Do you see where it says that, Chief Hunter?
10 A. That's correct.
11 Q. I want to understand from you how broad or
12 narrow is the term "work-related business of the
13 fire department." Would that encompass general
14 subjects which I referred to earlier such as
15 recruitment, staffing of the fire department,
16 equipment in the fire department, schedule of shifts
17 of work in the fire department, protective gear,
18 response times in the fire department? Would all of
19 those, in your judgment, be considered work-related
20 business of the fire department covered by this
21 ASOP-12?
22 A. That's correct.
23 Q. Paragraph two, it refers to a position
24 called public safety director. Does that still
25 exist in the city?

1   A.   No, sir.
2   Q.   Who would be that individual now?
3   A.   City manager.
4   Q.   Mr. Roberts?
5   A.   Yes, sir.
6   Q.   So if an individual firefighter is
7   interested in addressing the city council on any
8   general subject of public concern affecting the fire
9   department, he or she would have to make an
10  appointment with City Manager Roberts to get that
11  authorization to address the city council; is that
12  true?
13  A.   As fire chief, I would make that
14  appointment.
15  Q.   You would make an appointment for the
16  firefighter?
17  A.   It says here --
18  Q.   Paragraph two.
19  A.   Two.  If you'll read in two, it will tell
20  you that, yes, sir.
21  Q.   Okay.  Let me see if I understand your
22  response.  If a firefighter does want to address the
23  city council about an issue of public concern
24  affecting the fire department, he would have -- he
25  or she would have to make an appointment with City

35

1  Manager Roberts to get that prior permission before
2  addressing the council; is that accurate?
3      A.  That's accurate.
4      Q.  Has that ever been done?  Has a firefighter
5  ever come to you and then gone to the city manager
6  for permission to address the city council?
7      A.  I haven't had that request, no, sir.
8      Q.  So as far as you know, that's never
9  happened?
10     A.  I haven't had those -- any requests, no,
11 sir.
12     Q.  And in your 20-plus years in the
13 department, do you know if any firefighter has gone
14 to the chief of the department or to the city
15 manager to seek authority before addressing the city
16 council on an issue affecting the fire department?
17     A.  I wouldn't know that, no, sir.  I haven't
18 always held rank to be privy to that information.
19     Q.  Then there's an interesting provision.
20 Paragraph three of this ASOP-12 says:  "If a problem
21 cannot be solved by anyone in the chain of command,
22 then the city manager will arrange a hearing with
23 the city council."
24     Do you see where it says that?
25     A.  Yes, sir.

1  Q.  Is it your understanding -- and I'm trying
2  to recall your testimony in your earlier deposition
3  on this.  Is it your understanding that this means
4  that the city manager himself would arrange a
5  hearing for himself with the city council?
6  A.  Would arrange -- say that again.
7  Q.  It says here the city manager will arrange
8  a hearing with the city council concerning the
9  possible issue of a firefighter addressing the city
10 council.  That's in paragraph three.  So what I'm
11 trying to understand is what this means.  Does this
12 mean that the city manager, Mr. Roberts, for
13 example, will arrange for himself to participate in
14 the hearing with the city council on such an issue?
15 A.  That would be Mr. Roberts' decision.  I
16 would follow our SOP.  That's what I would ask the
17 city manager to follow.  If that was gone through
18 and that's -- it is what it is.  It's a procedure to
19 follow.
20 Q.  Okay.  But I still want to get a clear
21 understanding on the record, at least in my own
22 mind.  Does this mean the city manager himself would
23 be at the hearing, just himself and the city
24 council, addressing any issue that the firefighter
25 wanted to raise?  Or would the firefighter be at the

```
 1  hearing himself addressing the city council?
 2       A.  I don't know.  Once I turned it over to the
 3  city manager --
 4       Q.  It's up to him?
 5       A.  It's the city manager's, yes, sir.
 6       Q.  Well, this is a fire department ASOP.
 7  That's why I'm asking you, Chief Hunter.
 8       A.  That's correct.  And once it exhausts me, I
 9  turn it over to a higher authority.
10       Q.  Then it's up to the city manager to do what
11  he thinks is appropriate; is that correct?
12       A.  I take it out of my hands.  It's out of my
13  hands at that point -- if this was requested.  I've
14  never had this request.
15       Q.  You've never had a firefighter request of
16  you, as the chief of the department, to address the
17  city council?
18       A.  Never.
19       Q.  Never.  Do you feel like a firefighter has
20  the right as a citizen, while he's off duty, to
21  speak to the city council?
22       A.  I'm a firefighter that was hired under
23  certain rules and guidelines, and I feel like a
24  firefighter should follow the rules and guidelines
25  that they was hired under.
```

1    Q.   Okay.  Let's move on to a different subject
2  matter area, Chief Hunter.  I take it as an
3  experienced firefighter working for the city for the
4  long years that you have, that you're aware of the
5  U.S. Constitution and that there's a First Amendment
6  right under the U.S. Constitution for citizens to
7  exercise the rights of free speech and free
8  association.  You've heard of that before, right?
9    A.   Yes, sir.
10   Q.   How long have you heard of that?  Since you
11 were a young man?
12   A.   Yes, sir.
13   Q.   Okay.  Is it your understanding that the
14 First Amendment right of free speech and free
15 association also applies to firefighters employed by
16 the City of Phenix City?
17   A.   Yes, sir.
18   Q.   Let me invite your attention to Exhibit 17,
19 which is a letter from General President Harold
20 Schaitberger, S-C-H-A-I-T-B-E-R-G-E-R, who is the
21 general president of the International Association
22 of Firefighters.  It's dated January 31, 2006, and
23 it's addressed to City Manager H.H. Roberts.
24   A.   Yes, sir.
25   Q.   And it shows that on the third page at the

```
 1   bottom -- if you could turn to that, Chief Hunter --
 2   that Mayor Hardin and yourself as the chief of the
 3   department and others were sent a copy of this
 4   letter.  Did you, in fact, receive a copy of this
 5   letter shortly after its date of January 31, 2006?
 6        A.   I've seen it, yes, sir.
 7        Q.   Did you receive it though?  Do you remember
 8   receiving it a few days after it was dated?
 9        A.   I don't remember exactly when I received
10   it, but I know I've seen it -- seen this letter.
11        Q.   You'll notice in the middle of the second
12   page Mr. Schaitberger mentions as follows:  "It is
13   well established that the First Amendment right of
14   free association includes the right to belong to and
15   to actively participate in labor organizations."
16   Then it cites a case or two.  Do you see where it
17   says that?
18        A.   That's correct.
19        Q.   Now, prior to receiving a copy of this
20   letter from Mr. Schaitberger, were you, in fact,
21   aware that the First Amendment gives the right of
22   free association, including the right of
23   firefighters to belong to a labor organization?
24        A.   That's correct.
25        Q.   Have you ever been a member of a union
```