1   yourself?
2       A.  Yes, sir.  I was a member of this union.
3       Q.  Did you drop out at a certain time?
4       A.  When I became a officer, I went into
5   International.  I'm still a union member.
6       Q.  The International Fire Chiefs?
7       A.  Yes, sir.
8       Q.  But you're not currently a member of the
9   International Association of Firefighters?
10      A.  No, sir. I'm a member of the fire chiefs.
11      Q.  But at some point, you were a member, a
12  union member, of the International Association of
13  Firefighters?
14      A.  That's correct.
15      Q.  Up until what time?  When you became the
16  fire chief or --
17      A.  No, sir.  I was out when I -- had the rank
18  of captain.
19      Q.  And what approximate year would that have
20  been?
21      A.  Somewhere in between '96 and '98.
22      Q.  Going back to this letter from
23  Mr. Schaitberger, Exhibit 17, the next sentence in
24  the middle of page two says as follows:  "The right
25  to discuss and inform people concerning the

```
 1   advantages and disadvantages of unions and joining
 2   them is protected not only as part of free speech
 3   but as part of free assembly."
 4        Do you see where it says that?
 5        A.   That's right.  Yes, sir.
 6        Q.   Now, prior to receiving this letter of
 7   January 31, 2005, had you been aware of those legal
 8   principles and rights?
 9        A.   Yes, sir.
10        Q.   And the next sentence in the next paragraph
11   says:  "Moreover, although there is no right or
12   entitlement to government employer, the denial or
13   deprivation of a job and related benefits may not be
14   based on one's exercise of First and Fourteenth
15   Amendment rights."
16        See where it says that?
17        A.   Yes, sir.
18        Q.   Were you aware of that principle of law
19   before you received a copy of Mr. Schaitberger's
20   letter?
21        A.   I've seen it before.
22        Q.   You've seen it before?
23        A.   Yes.
24        Q.   Would that include years before as well?
25        A.   I'm not -- I can't say exactly when, but
```

1  I've seen it.
2      Q.  Now, when you received your copy of this
3  letter, did you have occasion to sit down with the
4  city's attorney and discuss the contents of this
5  letter?
6          MR. MCKOON:  You know, I'm going to object
7      to that question.  I think it may invade the
8      attorney-client privilege as asked.  Could you
9      read it back?
10         MR. WOODLEY:  I just asked if he sat down.
11     I didn't ask what he said.  You want me to
12     repeat the question?
13         MR. MCKOON:  No, that's all right.  I
14     understand.  If he understands it.
15     Q.  Do you understand the question?  I just
16 want to know whether or not, after you received this
17 letter, you had occasion to sit down with the city
18 attorney?
19     A.  I believe I talked to the city manager
20 about it, but I don't recall exactly.
21     Q.  City manager Mr. Roberts?
22     A.  Yes.
23     Q.  The next sentence, middle of this second
24 page of this letter from Mr. Schaitberger, says as
25 follows:  "In this regard, individuals have the

```
 1   First Amendment right to speak out about matters of
 2   public concern without having government employers
 3   retaliate against them for the exercise of their
 4   right of free speech."
 5        You see where it says that?
 6        A.   That's correct, yes, sir.
 7        Q.   Were you aware of that legal principle and
 8   right prior to the time that you received
 9   Mr. Schaitberger's letter?
10        A.   I have seen that before, yes, sir.
11        Q.   And it says "retaliation by a government
12   employer against an individual who exercises his
13   First Amendment rights constitutes a First Amendment
14   violation."
15        Do you see where it says that?
16        A.   Yes, sir.
17        Q.   And, Chief Hunter, based upon your long
18   experience in this fire department, were you aware
19   of that legal principle prior to receiving
20   Mr. Schaitberger's letter of January 31, 2006?
21        A.   Somewhat, yes, sir.
22        Q.   You were aware of that legal principle
23   before receiving it?
24        A.   I've seen it before, but I -- yes, sir.
25        Q.   Okay.  Then it says in the next sentence
```

1  "indeed, few subjects are of more public concern
2  than the provision of basic fire and rescue
3  services."
4  　　　　Do you see where it says that?
5  　　A.　Yes, sir.  I see that.
6  　　Q.　Based upon your experience and as the chief
7  of the department, would you agree with that
8  observation, that there are few subjects of more
9  public concern than the provision of basic fire and
10 rescue services?
11 　　A.　May be.  May be.
12 　　Q.　I'm not so sure I understand the response.
13 　　A.　Some things are.  Some things may be.
14 Yes.  I guess yes.
15 　　Q.　Well, simply asked -- let's make sure the
16 record is clear -- the provision of basic fire and
17 rescue services is, in your judgment, an important
18 matter of public concern, is it not?
19 　　A.　Say that again.
20 　　Q.　The provision of basic fire and rescue
21 services is an important matter of public concern;
22 is that true?
23 　　A.　The basic matters, yes.
24 　　Q.　Basic fire and rescue services.  Responding
25 to fires, running emergency medical services calls,

```
 1   saving people, putting out fires.  Those are basic
 2   important matters of public concern, are they not?
 3        A.   Yes, they are.
 4        Q.   Okay.  Now, as I understand it in this
 5   case -- and I think it's fairly clear -- at its
 6   bottom, Mr. Davis was fired because he had a
 7   conversation with Mayor Hardin; is that correct?
 8        A.   No, it's not.
 9        Q.   Was that part of the reason why he was
10   fired, because he had an off duty telephone
11   conversation with Mayor Hardin?
12        A.   I guess it would be part of the last
13   infraction to go on his record that caused the
14   termination.
15        Q.   Let me state it a little differently.  In
16   your judgment as the fire chief, if he had not
17   spoken to Mayor Hardin, would he have been
18   terminated for some other reason?
19        A.   Not that I know of.
20        Q.   Okay.  Fair enough.
21        A.   I guess.
22        Q.   Did you consult with any city attorney
23   prior to implementing the decision to discharge
24   David Davis?
25        A.   That's correct.  Yes, sir.
```

```
1    Q.   Which city attorney did you consult with?
2    A.   Our city attorney is Jimmy Graham.
3    Q.   James Graham --
4    A.   Yes.
5    Q.   -- who is here today?
6    A.   James Graham, that's correct.
7    Q.   Did you receive advice from Mr. Graham or
8  any other city attorney about First Amendment
9  issues, the right of free speech or free
10 association, involving Mr. Davis prior to his
11 termination?
12        MR. MCKOON:  Object to that.  What advice
13    he received is not --
14        MR. WOODLEY:  Okay.  Well, let's get
15    this -- Mr. McKoon, let's get this on the
16    record, because I want it to be clear as this
17    litigation proceeds.  You, of course, amended
18    the answer to the Complaint two weeks before
19    the trial to assert the additional defense of
20    qualified immunity on behalf of Chief Hunter
21    and Mr. Roberts as defendants in the case.  If
22    you're not going to permit me to get into the
23    legal issues and advice that may have been
24    given by the city attorneys to both Mr. Hunter
25    and Mr. Roberts upon the issues involved in
```

1  this case, then you're not going to be
2  permitted, later on in the litigation, to
3  submit any affidavits or any witness testimony
4  concerning legal advice in an effort to bolster
5  the new affirmative defense of qualified
6  immunity.
7      In other words, you're not going to be
8  permitted, in my judgment, by the court to have
9  it both ways, to come up with an affidavit to
10 sustain or reinforce the qualified immunity
11 defense concerning legal advice given to these
12 individual defendants, but then at the same
13 time object to me getting into those issues
14 about legal advice. You're not going to have
15 it both ways. So I would be interested in your
16 response to that.
17     MR. MCKOON: To tell you the truth, I
18 hadn't even considered that.
19     MR. WOODLEY: Well, I think you need to
20 consider it, because I want to ask questions of
21 this deponent and also Mr. Roberts about those
22 legal advice issues if, in fact, you have any
23 intention or plans later on to use legal advice
24 to sustain the qualified immunity defense.
25     MR. MCKOON: Well, let's take a break and

```
 1        I'll think about it.
 2             MR. WOODLEY:  Okay.
 3             MR. MCKOON:  I don't know that I even need
 4        to do that, but we will take a break and I'll
 5        think about it.
 6   (Brief recess.)
 7             MR. WOODLEY:  I think we are ready to go
 8        back on the record.
 9        Q.   Chief Hunter, we just took a break so that
10   Mr. McKoon and Mr. Graham could consult with
11   yourself and Mr. Roberts, and I think Mr. McKoon has
12   a statement in response to my earlier points.
13             MR. MCKOON:  Well, I guess the issue is
14        whether or not the concern of the plaintiff, as
15        I understood it, was whether or not there would
16        be some later affidavit or something that we
17        would file saying that the reason for the
18        termination was as a result of the reliance on
19        advice of counsel.  Am I correct?
20             MR. WOODLEY:  Well, it's broader than that
21        and it's in part correct.
22             MR. MCKOON:  Why don't you state it?
23             MR. WOODLEY:  We just want to ensure that
24        later on, that the defendants are not going to
25        put in any affidavit or declaration or
```

1   testimony or any arguments in a brief to
2   sustain the qualified immunity defense that
3   either Mr. Hunter and/or Mr. Roberts were
4   relying upon legal advice or legal opinions
5   concerning the actions and decisions they
6   rendered in this matter.  So if you agree that
7   that will not be done, then, in return, I will
8   not go through those questions about legal
9   advice or opinions that may have been received
10  by Mr. Hunter and Mr. Roberts.
11       MR. MCKOON:  You know, that's a hard thing,
12  because I don't want to pretend about the truth
13  of the matter.  Okay.  We won't.  Is that clear
14  on the record?
15       MR. WOODLEY:  So you agree with the
16  statement I just made in return for me not
17  asking questions about it?
18       MR. MCKOON:  Right.
19       MR. WOODLEY:  So you won't have it both
20  ways?
21       MR. MCKOON:  Right.
22       MR. WOODLEY:  Okay.  Fair enough.
23       Q.  Chief Hunter, I want to ask you one or two
24  more questions about the First Amendment issues of
25  free speech and free association.  Have you ever

1  gone to a seminar or any meetings or educational
2  programs where you have received information and
3  knowledge about the right of firefighters concerning
4  their First Amendment right of free speech and free
5  association?
6      A.  Basically, we talk about some of the
7  subjects each year I go to the Tuscaloosa, Alabama
8  Fire Chief conference, and they touch on different
9  subject matters.
10     Q.  And do they also touch on the right of free
11 speech and free association under the First
12 Amendment to the U.S. Constitution that firefighters
13 have?
14     A.  Yes.  They touch on different matters.
15     Q.  Different matters.  Do they touch on that
16 matter?
17     A.  They touch on that matter also.
18     Q.  And you go there once a year?
19     A.  Yes, sir.  In February of each year.
20     Q.  And how many years have you gone to that
21 kind of seminar or program?
22     A.  I have been probably for -- ever since I
23 have been chief.  And before then, I was assistant
24 chief, I went.  So I have been several times.
25     Q.  Is that the last six or seven years?

1    A.   Basically, yes.
2    Q.   Okay. And then each one of those annual
3 programs, educational seminars, they do address the
4 right of firefighters under the First Amendment
5 concerning free speech and --
6    A.   Not each one.
7    Q.   -- and free association. Concerning free
8 speech and free association?
9    A.   Not in each one of our meetings, but they
10 have during those times.
11       MR. WOODLEY:  Fair enough. I don't have
12    any additional questions. Thank you, Chief
13    Hunter.
14       MR. MCKOON:  I just have two.
15                   EXAMINATION
16 BY MR. MCKOON:
17    Q.   Chief Hunter, at the time when you were
18 considering the termination of Firefighter Davis or
19 in terminating Firefighter Davis, did you feel you
20 were violating his First Amendment rights to free
21 speech or free association?
22    A.   No, sir.
23    Q.   At any time during the consideration of the
24 termination of Firefighter Davis's employment or at
25 the time of termination of his employment, did you

```
1   feel you were in violation of any of his
2   constitutional rights?
3       A.   No, sir.
4            MR. MCKOON:  That's all I have.
5            MR. WOODLEY:  I don't have any additional
6       questions.  Thank you, Chief.
7            THE WITNESS:  Thank you.
8   (The deposition concluded at 11:08 a.m.)
9                * * * * * * * * * *
```