# DEPOSITION OF LLOYD RAY BUSH

1

```
1            IN THE UNITED STATES DISTRICT COURT
2           FOR THE MIDDLE DISTRICT OF ALABAMA
3                      EASTERN DIVISION
4

5   DAVID DAVIS,
6          Plaintiff,
7   vs.                    CASE NO. 3:06-CV-0054-VPM
8   CITY OF PHENIX CITY, ALABAMA,
9   et al.,
10         Defendants.
11
12
13              * * * * * * * * * *
14
15      DEPOSITION OF LLOYD RAY BUSH, taken pursuant to
16   stipulation and agreement before Shannon M.
17   Williams, Certified Court Reporter and Commissioner
18   for the State of Alabama at Large, in the offices of
19   City Hall, 601 12th Street, Phenix City, Alabama, on
20   Tuesday, November 6, 2007, commencing at
21   approximately 12:14 p.m. EST.
22
23              * * * * * * * * * *
24
25
```

2

```
 1                      APPEARANCES

 2   FOR THE PLAINTIFF:

 3   THOMAS A. WOODLEY
     Woodley & McGillivary
 4   1125 15th Street N.W.
     Suite 400
 5   Washington, D.C.  20005

 6   FOR THE DEFENDANTS:

 7   JAMES P. GRAHAM, JR.
     712 13th Street
 8   P.O. Box 3380
     Phenix City, Alabama  36868-3380

 9

10   JAMES R. MCKOON, JR.
     McKoon & Associates
11   925 Broad Street
     P.O. Box 3220
12   Phenix City, Alabama  36868-3220

13


14   ALSO PRESENT:

15   Cole Dugan
     David Davis
16   Wallace Hunter
     H.H. Roberts
17

18

19

20

21

22

23

24

25
```

STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of LLOYD RAY BUSH is taken pursuant to the Federal Rules of Civil Procedure and that said deposition may be taken before Shannon M. Williams, Certified Court Reporter and Commissioner for the State of Alabama at Large, without the formality of a commission; that objections to questions other than objections as to the form of the questions need not be made at this time but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose as provided for by the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between counsel representing the parties in this case that said deposition may be introduced at the trial of this case or used in any manner by either party hereto provided for by the Federal Rules of Civil Procedure.

* * * * * * * * *

1      LLOYD RAY BUSH, JR.
2      The witness, having first been duly sworn
3 or affirmed to speak the truth, the whole truth and
4 nothing but the truth, testified as follows:
5                    EXAMINATION
6 BY MR. WOODLEY:
7      Q.   Mr. Bush, could you state your name for the
8 Record?
9      A.   Lloyd Ray Bush, Jr.
10     Q.   My name is Tom Woodley.  I am one of the
11 attorneys representing Mr. David Davis in this
12 lawsuit against the City and against Chief Hunter
13 and City Manager Roberts.  I want to make sure that
14 you're aware of that.  And we have noticed your
15 deposition and you were good enough to appear today
16 to be placed under oath to answer certain questions
17 that we have that are related to the case.
18     I want to mention some preliminary points to
19 you, just to be sure you and I are on the same
20 wavelength.  Have you ever had your deposition taken
21 before in another case?
22     A.   I'm sure I have.
23          MR. MCKOON:  Have you ever sat down like
24     with a court reporter right here and --
25     A.   Yes.

5

    Q.    Well, some of the points to keep in mind as we go through your deposition today is if at any time you don't hear or understand one of my questions, please let me know immediately and I'll be more than happy to repeat or rephrase that question. Do you understand that?

    A.    Yes.

    Q.    And you'll have to wait until I finish my question before you begin your answer so that this very able court reporter can take down everything that we say here today. Do you understand that?

    A.    I do.

    Q.    And then later on, if you choose, you'll have the opportunity to read the transcript of your deposition to make sure that you think it's correct and accurate. Do you understand that?

    A.    Yes.

    Q.    All right. I'm interested in your background. I understand you are currently a city council member?

    A.    That's true.

    Q.    How long have you been on the city council?

    A.    Since October of '04.

    Q.    Okay. And in a nutshell, what are the duties and responsibilities of a council member?

```
 1        A.   We primarily work with policy and making
 2   decisions as far as the city is concerned.
 3        Q.   And as I understand it, you are considered
 4   the city council, the legislative body of the city?
 5        A.   The legislative body, that's true.
 6        Q.   Is it accurate to say that the city manager
 7   is the ultimate chief executive officer of the local
 8   government?
 9        A.   Under our form of government, he is.
10        Q.   As I understand it, he has the final
11   decision making authority concerning any removal of
12   city employees.  Is that your understanding as well?
13        A.   That's true.
14        Q.   And do you have another job or source of
15   income other than being on the city council?
16        A.   Other than being retired and playing golf.
17        Q.   Not bad work if you can get it.  Okay.  Let
18   me get right to some of the issues that are involved
19   in this court action.  I take it you are familiar
20   with the plaintiff, David Davis, who is seated on my
21   right?
22        A.   Yes.
23        Q.   Have you known him for a number of years?
24        A.   I guess before I became on council, I met
25   David down at a fitness facility that we both worked
```

```
 1   out at.  He got to be very close with my brother,
 2   who is there a lot.  And then I met David through my
 3   brother Bill really.
 4       Q.  Okay.  Can you recall any past events you
 5   ever attended with Mr. Davis being there or talked
 6   to Mr. Davis?
 7       A.  I attended two or three meetings that he
 8   had.
 9       Q.  What kind of meetings were those?
10       A.  They were involving his -- I think before I
11   was elected -- the union with the fire department.
12       Q.  So it would be meetings of the union
13   members, and he was one of the local union officers?
14       A.  Yes.
15       Q.  And you recall having attended two or three
16   of those union meetings?
17       A.  Yes.
18       Q.  What were the reasons that you attended the
19   meeting?  Were you looking for political support
20   or --
21       A.  I was looking at the time also -- I was
22   looking for political support, but I was also
23   interested in what they had to say.  And I went down
24   and I didn't really get involved.  I just sat and
25   listened to their meetings.
```

1    Q.    Okay.
2    A.    And talked with them.
3    Q.    And when you say you were interested in
4  what the firefighter union members had to say, would
5  that be issues affecting the fire department?
6    A.    Well, at that particular time.  At that
7  particular time.
8    Q.    And what time period?
9    A.    This is before I was elected in 2004.
10   Q.    Okay.  Do you remember what issues, at
11 least in a general sense, were discussed with you at
12 those local union meetings that you attended?
13   A.    Not really, you know, because they talked
14 about a lot of different things.  And I don't really
15 recall what the major things they were complaining
16 about at that time.  And most of them were not of
17 any nature that I could do anything about anyway.
18   Q.    But do you recall, at least in a general
19 sense, that they --
20   A.    Yes.
21   Q.    You have to wait until I ask the question.
22 Do you recall, at least in a general sense, that the
23 issues discussed at the union meetings that you
24 attended were issues that related to the city's fire
25 department?

```
 1      A.   Yes.
 2      Q.   Okay.  Could they have been staffing or
 3 employee morale or --
 4      A.   Probably a little of all.  They
 5 carried on -- they talked about all different types
 6 of subjects.
 7      Q.   And you say this was before you were
 8 elected --
 9      A.   Yes.
10      Q.   -- to the city council?
11      A.   Yes.
12      Q.   How about after you were elected -- I think
13 you said in 2004 -- to the city council?  Did you
14 attend any local union meetings of the firefighters
15 with Mr. Davis?
16      A.   I -- the only one that I remember -- I may
17 have done maybe one more.  But the only one I
18 remember was -- the last one -- last time I was
19 there, I just remember it.  I couldn't tell you if I
20 had attended any before then, was when I was there
21 and I had to tell them that, you know, that the way
22 that it was, that I could not help them in any way
23 because of the fact that Mr. Roberts was the
24 spokesperson for the fire department and that there
25 was -- that I had no authority and that -- and I
```

10

1  laughed and said, well, sometimes the more I tried
2  to help you, the worse things got.  So I said, I
3  can't try to help y'all anymore.
4       Q.   When you say you-all, you mean the
5  firefighter union?
6       A.   Yes.  I mean the firefighter union.
7       Q.   Union members?
8       A.   Yes.
9       Q.   But I guess within your authority as a city
10 council member and the power of the city council
11 itself, you certainly can enact proposed ordinances
12 that effectuate changes or improvements in the fire
13 department, correct?
14      A.   Any ordinance that the chief and city
15 manager brings to us, you know, that we look at, we
16 do.  We vote -- we do have the last say as far as
17 those ordinances and things like that.
18      Q.   But as an individual council member, you
19 could certainly draft and propose an ordinance
20 yourself to be considered and voted on by the city
21 council --
22      A.   I could.
23      Q.   -- that would affect the fire department?
24      A.   I could.
25      Q.   And has that been done?

1    A.   No.  That I have not.
2    Q.   Do you recall a city ordinance that was
3  proposed and eventually adopted which expanded the
4  period of probation within the fire and police
5  department from one year to 18 months?
6    A.   Yes.
7    Q.   Let me invite your attention to that
8  ordinance.  I only have one copy, which we will have
9  to share.  It's Ordinance 2006-13, which was passed
10 and adopted by the city council on April 18, 2006,
11 and it does deal with the expansion of the
12 probationary period to 18 months for police
13 officers, firefighters, and code enforcement
14 officers.  Do you generally recall considering and
15 acting on that ordinance?
16   A.   Yes.
17   Q.   Prior to the adoption of that ordinance on
18 April 18, 2006, did you have occasion to speak with
19 Mr. Davis about the proposed ordinance?
20   A.   As I remember, I didn't contact Mr. Davis.
21 If I recall, he called me -- he called me at home.
22 I was at home.
23   Q.   Concerning the proposed ordinance?
24   A.   And asked me about the ordinance, yes.
25   Q.   And did he indicate he was calling in his

Case 3:06-cv-00544-WHA-WC     Document 99     Filed 12/10/2007     Page 13 of 17

12

```
 1   capacity as the local president of the firefighters'
 2   union expressing concerns about the proposed
 3   ordinance?
 4        A.   Well, he -- I can't -- I can't say that he
 5   said, you know, I'm calling.  He said, I'm just
 6   really interested in it, what it amounts to.  And he
 7   said, I was just wanting to know what you thought
 8   about it.  And so I explained to him exactly why I
 9   was for it, because the police chief and fire chief
10   and everybody had talked about how much time it took
11   in their training during the first year, that they
12   really didn't have time to really -- oh, what I'm
13   trying to say -- see how well they're doing, grade
14   them or whatever it is, before their probation
15   period is over.  So it sounded and felt like the
16   right thing.  And it only applied to new hires.  It
17   didn't affect anybody that was already with the
18   city.
19        Q.   So it would not have affected Mr. Davis --
20        A.   No.
21        Q.   -- who was an eight-year veteran of the
22   fire department?
23        A.   No.  Would not affect him at all.
24        Q.   And your understanding is that the police
25   and fire chief wanted to enlarge the probationary
```

*Causey Peterson Reporting, Inc.*
*Post Office Box 81*
*Columbus, Georgia 31902*
*(706) 317-3111*

```
 1   period for new hires to 18 months so they would have
 2   a longer period to evaluate --
 3        A.   To evaluate.  I was trying to get that
 4   word, but I couldn't.
 5        Q.   -- to evaluate probationary employees?
 6        A.   Yes.
 7        Q.   Did Mr. Davis mention to you in that
 8   conversation that expanding the probationary period
 9   could have an adverse impact upon effective
10   recruitment of new hires into the fire department?
11        A.   I think that's what he said his concerns
12   were.
13        Q.   So was the concern about staffing say in
14   the fire department?
15        A.   Yes.  I believe that's what he told me.
16   You know, I can't remember.  That's been --
17        Q.   Quite some time?
18        A.   -- quite some time.
19        Q.   And as I understand it, you don't recall if
20   he introduced himself in the telephone conversation
21   with you as representing the firefighter union
22   members on the subject?
23        A.   No.
24        Q.   Has Mr. Davis ever spoken to you about any
25   other subject since you became a council member in
```

```
1    2004, any proposed ordinance or other city issue
2    affecting the fire department?
3         A.   If he has, I don't recall.
4         Q.   Okay.  Now, when he contacted you, I think
5    you said he called you at home concerning --
6         A.   I believe that's correct.
7         Q.   Now, were you offended by his contacting
8    you?  Or did you welcome the information and input
9    from Mr. Davis and the union?
10        A.   Really, at the time, I never gave it a
11   thought.
12        Q.   You didn't think it was a big deal?
13        A.   That's -- at the time.
14        Q.   Did you think it was a big deal later?
15        A.   Well, I -- I wouldn't say, you know, that
16   because I didn't think his calling me was relevant.
17   You know, he called me at home and, like I say, I
18   don't think he -- I thought he had just called me
19   just as somebody that he knew and wanted to -- and
20   really and truly, the way I remember it, is he was
21   really wanting to make sure that it only -- that the
22   new ordinance only would be for new hires, to make
23   sure that it was only for new hires.
24        Q.   But I'm trying to get a sense of how you
25   reacted to his phone call with you in the
```

Case 3:06-cv-00544-WHA-WC    Document 99    Filed 12/10/2007    Page 16 of 17

15

```
 1   conversation you had with him about this proposed
 2   ordinance.  Were you upset in any way by the
 3   communication?  Did you think it was inappropriate
 4   or a problem of any kind?  Or was it pretty much
 5   business as usual and not a big deal?
 6       A.   Well, as far as I was concerned at the
 7   time, when he called, you know, he asked me and I
 8   explained to him what I -- as much as I could, about
 9   what I knew about the ordinance and the reason why I
10   supported it.  And that's pretty much, you know, all
11   I thought.  And I thought it was -- you know, as far
12   as I was concerned, it was over.  That was -- that I
13   answered his question and that was all that it was.
14       Q.   Okay.  I get a sense -- and you correct me
15   if I'm wrong -- that you didn't think his
16   communication with you at that time on the proposed
17   ordinance was a problem or some difficulty of any
18   kind, did you?
19       A.   Well, of course, one of the things, too, I
20   was still a fairly new council member and, of
21   course, I -- there was a lot of things then I did
22   not know.  And I, of course -- one of the things I
23   didn't know was the real structure of the fire
24   department and police department really as far as
25   them operating under the paramilitary, or whatever
```

Causey Peterson Reporting, Inc.
Post Office Box 81
Columbus, Georgia  31902
(706) 317-3111

```
 1    it is, rules that they do and that they go
 2    through -- have to go through their supervisors and
 3    go up the ladder.  And so -- so as far as at that
 4    particular time, you know, I thought nothing about
 5    it.
 6         Q.   You did not think it was inappropriate?
 7         A.   No, at the time.
 8         Q.   But later on, did you happen to reach a
 9    conclusion that you thought his communication with
10    you on the phone about this proposed ordinance was
11    improper?
12         A.   Well, you know, I'm not going to say that I
13    ever thought that it was that improper.  I just
14    found out that the -- that they did have steps that
15    they needed to go through, you know, under -- for --
16    from the fire chief on down to the assistant chiefs
17    and, you know, captains and all the way down.  And I
18    think that that's -- you know, and I shouldn't have
19    known that, but he should have known that.  You
20    know, I'm not -- because I've never been a fireman.
21    I didn't know anything, like I say, about the --
22    (interruption) --  I'm sorry.  I thought I had it
23    cut off.
24         Q.   Okay.  So by the time of April 2006, you
25    had been a city council member for two years?
```