# DEPOSITION OF ROLAND LEROY WATERS

1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                      EASTERN DIVISION

4

5    DAVID DAVIS,                        COPY

6           Plaintiff,

7    vs.                   CASE NO. 3:06-CV-0054-VPM

8    CITY OF PHENIX CITY, ALABAMA,

9    et al.,

10          Defendants.

11

12

13              * * * * * * * * * *

14

15      DEPOSITION OF ROLAND LEROY WATERS, taken

16   pursuant to stipulation and agreement before Shannon

17   M. Williams, Certified Court Reporter and

18   Commissioner for the State of Alabama at Large, in

19   the offices of City Hall, 601 12th Street, Phenix

20   City, Alabama, on Wednesday, April 4, 2007,

21   commencing at approximately 1:47 p.m. EST.

22

23              * * * * * * * * * *

24

25

2

```
 1                        APPEARANCES

 2    FOR THE PLAINTIFF:

 3    THOMAS A. WOODLEY
      Woodley & McGillivary
 4    1125 15th Street N.W.
      Suite 400
 5    Washington, D.C.  20005

 6    FOR THE DEFENDANTS:

 7    JAMES P. GRAHAM, JR.
      712 13th Street
 8    P.O. Box 3380
      Phenix City, Alabama  36868-3380
 9

10    JAMES R. MCKOON, JR.
      McKoon & Thomas
11    925 Broad Street
      P.O. Box 3220
12    Phenix City, Alabama  36868-3220

13

14    ALSO PRESENT:

15    David Davis
      H.H. Roberts
16    Wallace Hunter

17

18

19

20

21

22

23

24

25
```

3

## STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of ROLAND LEROY WATERS is taken pursuant to the Federal Rules of Civil Procedure and that said deposition may be taken before Shannon M. Williams, Certified Court Reporter and Commissioner for the State of Alabama at Large, without the formality of a commission; that objections to questions other than objections as to the form of the questions need not be made at this time but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose as provided for by the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between counsel representing the parties in this case that said deposition may be introduced at the trial of this case or used in any manner by either party hereto provided for by the Federal Rules of Civil Procedure.

* * * * * * * * * *

```
 1                    ROLAND LEROY WATERS
 2              The witness, having first been duly sworn
 3    or affirmed to speak the truth, the whole truth and
 4    nothing but the truth, testified as follows:
 5              THE REPORTER:  Usual stipulations?
 6              MR. GRAHAM:  We do want to read and sign.
 7                         EXAMINATION
 8    BY MR. WOODLEY:
 9         Q.   Mr. Waters, could you state your full name
10    for the Record?
11         A.   Roland Leroy Waters.
12         Q.   Mr. Waters, my name is Tom Woodley.  I'm
13    one of the attorneys representing the plaintiff,
14    David Davis, in this federal court action brought
15    against the city and yourself and others.  If at any
16    time you don't hear or understand one of my
17    questions in your deposition, stop me right away.
18    I'll be more than happy to repeat or rephrase the
19    question.  Do you understand that?
20         A.   Yes, sir.
21         Q.   Have you ever had your deposition taken
22    before in another case?
23         A.   One time.
24         Q.   What was the nature of that suit, if you
25    remember?
```

1    A.    A lawsuit involving the Columbus EMS

2    against the City of Columbus concerning an FLSA

3    issue.

4    Q.    Okay.  Have you had an opportunity to spend

5    at least some time with the city attorneys

6    concerning the nature of this lawsuit?

7    A.    We met Monday for a few minutes, but that

8    was it.

9    Q.    Okay.  And did they explain to you the

10   nature of the procedures we'll be following in the

11   deposition so you're comfortable about what we're

12   going to do this afternoon?

13   A.    Yes, sir.

14   Q.    And like you were asked before we went on

15   the record, you'll have to give me verbal responses

16   so there can be an adequate record made of what we

17   discuss.  Do you understand that?

18   A.    Yes.

19   Q.    And then, lastly, this reporter will have

20   an opportunity to put your testimony and what is

21   said today in a transcript form and you'll have a

22   chance to review and sign that.  Do you understand

23   that?

24   A.    Yes, sir.

25   Q.    And, of course, most importantly, you've

6

1    been sworn under oath now so you're obligated under

2    the potential penalty of perjury to tell the truth.

3    Do you understand that?

4         A.    Yes, sir.

5         Q.    Are you currently employed?

6         A.    No, sir.

7         Q.    Are you retired?

8         A.    Yes, sir.

9         Q.    And from what job did you retire?

10        A.    Columbus Fire Emergency Medical Services.

11        Q.    And how long did you work for the city's

12   fire department?

13        A.    Thirty-two years and eight months, I

14   believe -- or ten months.

15        Q.    Do you remember the year when you started

16   here?

17        A.    I started in my other job -- here in Phenix

18   City or my other job?

19        Q.    Yes, here.

20        A.    December 2005.  December 19, 2005, to be

21   exact.

22        Q.    Okay.  So -- I'm sorry -- maybe I didn't

23   understand your earlier response.  You started

24   working here in the city fire department in 2005?

25        A.    Yes, sir.

*Causey Peterson Reporting, Inc.*
*Post Office Box 81*
*Columbus, Georgia  31902*
*(706) 317-3111*

7

```
 1          Q.   Okay.  And you were a chief, in a chief
 2     position?
 3          A.   Deputy Chief here.
 4          Q.   And what was the previous fire department?
 5          A.   Columbus, Georgia Fire and Emergency
 6     Medical Services.
 7          Q.   Right across the river?
 8          A.   Yes, sir.
 9          Q.   And when you were in the Columbus Fire
10     Department, did you work yourself up the rank
11     structure?
12          A.   Yes, sir.
13          Q.   What was the highest position you held when
14     you left the Columbus Fire Department?
15          A.   Chief of the department.
16          Q.   And when did you retire from the Phenix
17     City Fire Department?
18          A.   February 2nd of this year.
19          Q.   Okay.  And you're not doing anything now in
20     terms of employment?
21          A.   No, sir.
22          Q.   When you were Deputy Chief here in the
23     Phenix City Fire Department, what were your basic
24     duties and responsibilities?
25          A.   Managing the Operations Division of the
```

1   department.

2       Q.   Mr. Waters, we have in front of you a

3   binder containing various papers and exhibits, and

4   we've got them tabbed with numbers on the right-hand

5   side to expedite the deposition.  The attorneys

6   representing you and the city have a full set of

7   those exhibits as well.  When I invite you to review

8   those documents, if you want to take as long as you

9   would like to review those to yourself before I ask

10  questions, feel free to do so.

11      Let me invite, first of all, your attention to

12  Exhibit 7, which appears to be a city job

13  description of the job that you held, which was

14  Deputy Fire Chief of Operations.  Are you familiar

15  with this job description at all?

16      A.   Yes, sir.

17      Q.   And as far as you know, it is basically

18  correct as to what your duties and responsibilities

19  were?

20      A.   Yes, sir.

21      Q.   And, in part, your duties as Deputy Fire

22  Chief would be including supervising the fire

23  suppression personnel that were under your command?

24      A.   Yes, sir.

25      Q.   Did you periodically assess the job

9

1    performance and evaluate the job performance of the

2    firefighters under your level?

3        A.   Officially, no.  Unofficially, yes.  The

4    only people I evaluated would be my direct reports.

5        Q.   What do you mean by that, your direct

6    reports?

7        A.   The assistant chiefs -- or the battalion

8    chiefs as they're now called.

9        Q.   When David Davis was employed as a sergeant

10   in the Phenix City Fire Department, was he under

11   your supervision and management?

12       A.   Indirect, yes, sir.

13       Q.   And indirect meaning that there were some

14   positions between --

15       A.   In the chain of command, yes, sir.

16       Q.   What is the organizational structure and

17   chain of command within the city's fire department,

18   starting with Fire Chief?

19       A.   Fire Chief, Deputy Chief, battalion chiefs,

20   now captain, sergeant, firefighter.

21       Q.   Is there a position called Assistant Fire

22   Chief?

23       A.   No longer, unless they changed it after I

24   left.  It was changed to Battalion Chief.

25       Q.   And when you were a Deputy Chief for the

1   Phenix City Fire Department, were you obligated to

2   become familiar with the general guidelines and

3   standard operating procedures and rules and

4   regulations of the fire department?

5       A.   Yes, sir.

6       Q.   Would that include also the city's Merit

7   System rules and regulations?

8       A.   Yes, sir.

9       Q.   Based upon your extensive experience in the

10  fire service, including your capacity as Deputy

11  Chief here in the city fire department, would you

12  consider the recruitment and retention of

13  firefighters to be an important issue in any fire

14  department and also important to public safety?

15      A.   Yes, sir.

16      Q.   Would you consider adequate staffing to be

17  an important issue to the operation of a fire

18  department and to public safety?

19      A.   Yes, sir.

20      Q.   Would you consider employee morale within a

21  fire department to be an important issue concerning

22  effective operations of the fire department and also

23  public safety?

24      A.   Yes, sir.

25      Q.   Would you consider adequate protective gear

1   and fire department equipment to be an important

2   issue involving effective operations of the fire

3   department and involving public safety?

4        A.   Yes, sir.

5        Q.   Would you consider adequate financial

6   resources that might be available to a fire

7   department to be an important issue concerning fire

8   department operations and also public safety?

9        A.   Yes, sir.

10       Q.   Would you consider adequate response times

11   and adequte dispatching procedures in a fire

12   department to be an important issue of effective

13   fire department operations and also public safety?

14       A.   Yes, sir.

15       Q.   Would you consider training, adequate

16   training of firefighters in the fire department, to

17   be an important issue that affects effective

18   operations of the fire department and also public

19   safety?

20       A.   Yes, sir.

21       Q.   Returning to your position as Deputy Fire

22   Chief, did you have the authority in that position

23   to hire and fire employees in the fire department?

24       A.   No, sir.

25       Q.   What's your understanding as to who had

1    that authority?

2        A.   My understanding, as long as I have been in

3    the fire service, only the department director has

4    to authority to hire, fire, promote, or demote.

5        Q.   So that would be the fire chief here in the

6    city of Phenix City?

7        A.   Yes, sir.

8        Q.   Did you have any authority over any

9    disciplinary action when you were Deputy Chief?

10       A.   Yes, sir.

11       Q.   What was the nature or range of your

12   authority to discipline?

13       A.   Well, of course, I could administer

14   discipline according to the Merit System.  But if it

15   was something I did not myself implement or

16   initiate, then it would come up through the chain of

17   command to me, and from me to the chief for me to

18   review.

19       Q.   Okay.  Do you know what role, if any, the

20   city manager would play if a firefighter is going to

21   be discharged from his position?

22       A.   My understanding, it has to have the city

23   manager's approval.

24       Q.   Is it your understanding that the city

25   manager is the ultimate decisionmaking authority --

13

1    A.   Yes, sir.

2    Q.   -- with regard to firing a firefighter?

3    A.   Yes, sir.

4    Q.   At some point in time, sir, did you become

5    aware that the firefighters employed by the Phenix

6    City Fire Department had formed a labor

7    organization?

8    A.   Yes, sir.

9    Q.   And how did that come to your attention?

10   A.   Shortly after I started work, David Davis

11   was assigned to Station One and said he wanted to

12   meet with me.  He went through the chain of command

13   and wanted to let me know he was president of the

14   firefighters association, he hoped we could get

15   along and have a harmonious working relationship.

16   The meeting was short.  And I assured him that I

17   would work with anybody I could; as long as

18   everybody understood their job, we would have no

19   problems.

20   Q.   Do you remember approximately what period

21   of time this was when Mr. Davis informed you that he

22   was the president of the firefighters local labor

23   association?

24   A.   It was shortly after I started to work.  It

25   was probably around January, I would imagine.

14

1      Q.   What year?

2      A.   2006.

3      Q.   Okay.  Did you know that Mr. Davis was also

4    previously a vice-president of the firefighters

5    local union?

6      A.   Yes, sir.

7      Q.   Let me invite your attention to an exhibit

8    in our binder.  It's Exhibit 18, and this appears to

9    be a memorandum from yourself, Mr. Waters, when you

10   were Deputy Chief of the city fire department,

11   addressed to Chief Wallace Hunter dated February 6,

12   2006, and regarding, quote, letter to Mr. H.H.

13   Roberts, end quote.  You see where it says that?

14     A.   Yes, sir.

15     Q.   And did you prepare this memo and give it

16   to Chief Hunter?

17     A.   Yes, I did.

18     Q.   And is this your own language that you

19   typed up?

20     A.   Yes, it was.

21     Q.   Nobody prepared this for you?

22     A.   Absolutely not.

23     Q.   And prior to giving this memo to Chief

24   Hunter, were you instructed to meet with Mr. Davis

25   concerning a letter that apparently had been sent by

1    a Mr. Schaitberger to the city manager?

2        A.   No, sir.  I was not instructed.  In fact, I

3    asked Chief Hunter if it would be all right if I did

4    meet with him, because the letter was not addressed

5    to me.  But I asked the chief if I could have his

6    approval to meet with David to see if we could find

7    out what was going on.  But I was not instructed to

8    meet with David.

9        Q.   So this was your idea, to meet with David

10   about the letter?

11       A.   Yes, sir, it was.

12       Q.   And what caused you to reach that

13   conclusion and make that request to Chief Hunter?

14       A.   Because I thought I had a relationship with

15   David, as I did with everybody else in the

16   department, where I could sit down and talk and find

17   out what was going on; if there was something I

18   needed to be aware of or if there's other

19   circumstances.

20       Q.   When you had this conversation and made the

21   request to Chief Hunter, had you seen the letter

22   that was sent by Mr. Schaitberger of the IAFF to

23   City Manager Roberts?

24       A.   I believe I had.  What exhibit is that?

25       Q.   That would be Exhibit 17.  Why don't you go

1  ahead and take a look at that.  And, for the record,

2  this is the letter from the general president of the

3  International Association of Firefighters.

4        A.  Right.  Yes, sir, I did.

5        Q.  And it's dated January 31, 2006, addressed

6  to the city manager.  So your testimony is that you,

7  in fact, saw a copy of this?

8        A.  Yes, sir, I did.

9        Q.  And when you read a copy of this letter, is

10  that what prompted you to go to Chief Hunter and

11  request a chance to discuss this subject with

12  Mr. Davis?

13        A.  No, sir.  It was a letter, I believe, that

14  Mr. Malone, if I'm not mistaken, had sent through

15  the city manager -- or Mr. Malone had called or

16  something.  And I, at that time, told the chief, I

17  said, I don't believe that, you know, David is aware

18  of any of this going on, so I would like to have

19  your permission to talk to him.  It was really about

20  a conversation, I believe, with a Mr. Malone that

21  prompted me to ask the Chief if I could talk to

22  David.

23        Q.  We may be talking about two different

24  things here.  Let me go back to Exhibit 18, again

25  your memo to Chief Hunter of February 6, 2006.  And

1  you see in the second sentence it says, quote, the

2  purpose of the meeting was to discuss the letter

3  Mr. Roberts received from Mr. Schaitberger.

4      A.  Yes.

5      Q.  So just focusing on that, and so your

6  testimony is clear, is this -- the meeting that you

7  had with Mr. Davis for the purpose of discussing the

8  Schaitberger letter?

9      A.  Yes, sir.

10     Q.  Okay.  And was this your own idea, that you

11  had suggested this to Chief Hunter that you meet

12  with David?

13     A.  Yes, sir.

14     Q.  You'll see at the end of your memo to Chief

15  Hunter at the bottom it says, quote, as I have

16  communicated to you on several -- I believe that

17  should be occasions.  It says obsessions, but did

18  you mean occasions?

19     A.  Typographical error.

20     Q.  Then it continues, David Davis is doing an

21  outstanding job for me and has a very positive and

22  professional attitude, end quote.  Do you see where

23  it says that?

24     A.  Yes, sir.

25     Q.  Did you honestly and truthfully believe

1    that when you communicated that to Chief Hunter?

2        A.   Yes, sir.

3        Q.   And when you say he was doing an

4    outstanding job, I assume that was in his role as

5    firefighter for the fire department?

6        A.   Sergeant, yes, sir.

7        Q.   Sergeant?

8        A.   Yes, sir.

9        Q.   And could you elaborate or detail that, as

10   to why you were indicating that David Davis was

11   doing an outstanding job as a sergeant?

12       A.   Could you repeat the question again?

13       Q.   Yes.  Could you explain in detail that

14   which caused you to indicate here in this memo to

15   Chief Hunter that David Davis was doing an

16   outstanding job?

17       A.   I was just reaffirming the fact that I had

18   had a conversation with Chief Hunter about numerous

19   people in the department that were doing an

20   outstanding job, and David -- I never had a problem

21   with his job performance, and I put that in the

22   memo.

23       Q.   And, evidently, you had communicated that

24   assessment of his job performance on several

25   occasions to the Chief?

19

1     A.   Yes, sir.  I did.

2     Q.   Can you recall any specific examples where

3  he did an absolute outstanding job on a fire run or

4  rescue service call or --

5     A.   No, sir, not on a fire.  Primarily, the

6  things I was making mention to had to do with

7  assignments that I would give out to people in the

8  department.  And it was probably new to a lot of the

9  people, the way I was doing things.  And they were

10  required to take topics and research them and then

11  make Power Point presentations.  And everything I

12  assigned was done, and it was done on time, and a

13  lot of work went into it.  And, you know, as far as

14  job performance and whatever else, I mean, I -- I

15  was getting along with everybody, and I thought the

16  Chief needed to hear that because I was a newcomer,

17  so to speak, to the department.

18     Q.   Did you have any specific concerns or

19  anything that troubled you concerning David Davis's

20  job performance?

21     A.   Not until the end.

22     Q.   And what was the end?  What do you mean?

23     A.   Well, when the swap time was -- when the

24  Chief had sat down and thought about implementing

25  the swap time again -- or trade time or whatever you

1  want to call it -- I had had the opportunity to meet

2  with all the people in the department, because he

3  would come out and had met with everybody in the

4  shift meetings.

5      And I asked everybody, I said, look, this is a

6  major deal for the department.  And I said, I'll

7  tell you as I have told you as soon as I walked in

8  the door; when the Chief of the Department, when the

9  city manager, mayor, council walks into the fire

10  station, you stand up, you greet them, you know, you

11  act interested, you stay focused, and be as

12  professional and polite as you possibly can.  Of

13  course, this was a major deal for the Department to

14  get the time reinstated.

15      And at that particular meeting, David's

16  attitude was very negative.  He wouldn't even look

17  at the chief.  He stared off.  And I met with his

18  supervisor after the meeting.  They said they

19  noticed it, too.  And said his comment was that

20  something along the lines that the Chief was doing

21  his job, so he didn't have to show anything other

22  than what he was.

23      Q.  When, approximately, did this meeting

24  occur?

25      A.  Sir, I'll be honest with you.  I don't

1  know.  Whenever the swap time was reinstated.  I'm

2  sure the Chief would probably know.  March, first

3  part of April, something around there.

4       Q.  2006?

5       A.  Yes, sir.

6            CHIEF HUNTER:  I think it was --

7            MR. MCKOON:  Let him answer to his

8       recollection.

9       Q.  So this concern about this meeting and swap

10  time would have been after your memo of February 6,

11  2006?

12      A.  Yes, sir.

13      Q.  Now, you indicate at the bottom of this

14  memo that David Davis had a very positive and

15  professional attitude.  Can you think of any

16  specific examples that would support that assessment

17  of Davis?

18      A.  Specific examples, no, sir, other than the

19  fact that the contact that I had with David was --

20  he was always professional.  He was very

21  respectful.  I never had any problems.  Did what I

22  asked.  And that's exactly what was communicated in

23  the memo.

24      Q.  Take a look at Exhibit 14.  This is a

25  newspaper article that came out, I believe, in

1     September 2005 from the Columbus Ledger-Enquirer.

2     And it deals with various issues and personnel that

3     were employed at the time in the Phenix City Fire

4     Department.  Have you read this newspaper article

5     before today?

6          A.   Yes, sir.

7          Q.   And did you read it on or about the time

8     that it came out in this newspaper?

9          A.   Yes, sir.

10          Q.   After you read this article, were there any

11     meetings or discussions within the Fire Department

12     about the substance of the article?

13          A.   I was not employed with the Fire Department

14     then.

15          Q.   Okay.  So you were still at the Columbus

16     Fire Department?

17          A.   Yes, sir.

18          Q.   Okay.  Did you ever get a call from Chief

19     Hunter?

20          A.   About this article right here, no, sir.

21          Q.   Did you call him up and say, can I help you

22     out?

23          A.   No.

24          Q.   Okay.  Have you ever had occasion to

25     address the city council about issues affecting the

1    Phenix City Fire Department?

2         A.   No, sir.

3         Q.   Have you ever had discussions with any

4    council members about issues affecting the Phenix

5    City Fire Department?

6         A.   No, sir.

7         Q.   Have you ever had any discussions or

8    conversations with the mayor of Phenix City

9    concerning its fire department?

10        A.   No, sir.

11        Q.   At some point in time, Mr. Waters, did it

12   come to your attention, in perhaps the first few

13   months of the year, 2006, when you were the Deputy

14   Chief, that there was consideration being given to

15   extending the probationary period for new hires in

16   the fire department from one year to 18 months?

17        A.   Yes, sir.

18        Q.   Did you play a role in those discussions or

19   the determination that that might be a good policy

20   change?

21        A.   Did I play a role -- the Chief and I talked

22   about it.  And we had meetings about it in the fire

23   department and talked about it, just letting

24   everybody know the purpose of it, which is a good

25   thing.  In fact, it's like an insurance policy for a