1   firefighter. Because the amount of training that
2   they have to go through and the fact that, you know,
3   by the time they finish their training, get through
4   and get assigned to the station, because it's such a
5   different culture in the work environment, that if
6   they're not quite adapting, you know, and their
7   probationary period is 12 months, they could lose
8   their job. By extending it to 18 months, it's a
9   benefit for the city and for the employee. That was
10  clearly communicated, as was the fact that it only
11  applied to new hires.
12      Q.  That was your understanding, that the
13  proposed policy change only applied to new hires in
14  the fire department?
15      A.  Yes, sir.
16      Q.  It did not affect in any way veteran or
17  experienced firefighters in the department?
18      A.  No, sir.
19      Q.  And did not affect in any way David Davis,
20  who had worked for the fire department for a number
21  of years, correct?
22      A.  That is correct, yes, sir.
23      Q.  Did it come to your attention that some of
24  the firefighters or the firefighters labor
25  association opposed the proposed policy change

1  extending it to the 18-month period?
2     A.  No, sir.  In fact, there were only two
3  people in the -- which I don't mean that that shows
4  a hundred percent consensus.  But only two people
5  even questioned the Chief about the proposal going
6  from 12 to 18 months.  And when he explained that it
7  has nothing to do with you, it's only for new hires
8  after the ordinance takes effect, there was no more
9  discussion.  No one talked to me about it that I can
10 recall.
11    Q.  Who were the two individuals that raised
12 those concerns; do you remember?
13    A.  Sir, I honestly cannot recall.
14    Q.  Do you know whether or not in a
15 probationary period that a firefighter -- for
16 example, as a new hire -- can be subject to
17 termination for any reason or no reason at all while
18 he's a probationary period employee?
19    A.  Yes, sir.
20    Q.  That's a true statement?
21    A.  Yes, sir.  I believe that is.
22    Q.  Do you have a view on whether or not
23 changing the probationary period to 18 months had
24 any impact on trying to recruit qualified personnel
25 into the fire department?

    A.  No, sir, it did not, because there was applications coming in on a regular basis to the Department.

    Q.  All right. Moving into a different area. Did it come to your attention at one point in time that apparently David Davis placed a telephone call to Mayor Hardin in April of 2006?

    A.  Yes, sir.

    Q.  How did that come to your attention?

    A.  The chief had mentioned it to me, that he had overheard the conversation in this building.

    Q.  When you say the Chief, you mean Chief Hunter?

    A.  Chief Hunter.

    Q.  Chief Hunter?

    A.  Yes, sir.

    Q.  Did it come to your attention any information or facts as to what the nature of that telephone call was between Mr. Davis and the mayor?

    A.  If I recall, it had to do with the probationary -- the proposed probationary ordinance, if I recall correctly.

    Q.  Were you asked by anyone to investigate the matter of Mr. Davis having a telephone conversation with Mayor Hardin in April of 2006?

1    A.   Yes, sir.
2    Q.   And who asked you to do something?
3    A.   Chief Hunter.
4    Q.   And what did he ask you to do?
5    A.   He asked me to meet with David to ask him
6  what happened, or, in fact, if it did happen.
7    Q.   And did you comply with that directive?
8    A.   Yes, sir.
9    Q.   And did you, in fact, meet with David
10 Davis?
11   A.   Yes, sir, along with his immediate
12 supervisor, Captain Bennett, and the Assistant Chief
13 at that time, Bobby Brooks.
14   Q.   Okay.  Would this have been shortly after
15 the telephone conversation that was held between
16 Davis and the mayor?
17   A.   I would assume so, yes, sir.
18   Q.   Did you ask Mr. Davis at that time to give
19 a written statement?
20   A.   Yes, sir, I did.  I asked him what happened
21 and he told me.  I said, okay, David, what I want
22 you to do is to go next door to the office and get
23 on the computer and type a letter to Chief Hunter
24 explaining what happened.  And I want to hand carry
25 it to him.  And that was the extent of the

1  conversation.
2      Q.  Take a look at Exhibit 22, which appears to
3  be that statement that you just mentioned.
4      A.  Yes, sir.
5      Q.  You can read it to yourself.  It's very
6  short.
7      A.  Yes, sir.
8      Q.  Is that, in fact, the statement that you
9  asked Mr. Davis to produce and give back to you?
10     A.  Yes, sir.
11     Q.  Now, as far as you know, based upon your
12 investigation and conversations on the subject
13 matter, is that a truthful and accurate statement
14 that Mr. Davis put together and handed to you?
15     A.  As far as I know, it is.  I mean, I have no
16 idea whether he talked to him that night or not.
17 All I know is that he said he did call him and he
18 was acting in his capacity as president of the
19 union.
20     Q.  And when you received this statement from
21 Mr. Davis, did you, in fact, hand carry it and give
22 it to Chief Hunter?
23     A.  Yes, sir.  I believe I was the one that
24 hand carried it, if I'm not mistaken.
25     Q.  At that time, did you have a conversation

```
 1   with Chief Hunter related to this subject?
 2        A.   No, sir.  I don't recall us having a
 3   conversation about it.  I may be incorrect, but I
 4   don't recall a conversation with him concerning this
 5   right here.
 6        Q.   So he didn't say anything to you even like
 7   thanks for the statement or do you have a view on
 8   this investigation or --
 9        A.   Well, I mean, first of all, there was no
10   investigation by me.  All I did was ask David a
11   question.  That's all I did.
12        Q.   And what was that question?
13        A.   Did he, in fact, call the mayor and did he
14   go through the chain of command?  That's it.
15        Q.   And did he give you an answer?
16        A.   He said he did call the mayor and he did
17   not go through the chain of command.
18        Q.   Okay.  Did he say he called the mayor when
19   he was off duty?
20        A.   Sir, I don't recall if that was part of the
21   conversation or not.
22        Q.   All right.  Were you asked by Chief Hunter
23   or Personnel Director Barbara Goodwin or even City
24   Manager Roberts for any recommendation or input as
25   to whether or not Mr. Davis should be disciplined
```

1   for placing a telephone call to the mayor?
2        A.  No, sir.
3        Q.  Did you, in fact, make any recommendations
4   or have any input concerning possible discipline of
5   Davis over this subject?
6        A.  Well, I had the disciplinary report
7   completed.  That's why my name is on there as being
8   the supervisor.  And the Merit System is clear that
9   on your second Group II offense you're terminated.
10  And so, I mean -- you know, there was, as I recall,
11  nothing in the disciplinary report form for that
12  other than the fact that it quoted the Merit System
13  what happens on your second Group II or your first
14  Group III offense.
15       Q.  What, specifically, was the second Group II
16  offense that David Davis engaged in?
17       A.  It involved the chain of command.
18       Q.  The telephone call to the mayor?
19       A.  Yes, sir.
20       Q.  Did you ever say to Chief Hunter that you
21  didn't think Mr. Davis should be terminated?
22       A.  No sir.  Not that I recall.
23       Q.  And are you familiar with the Group III
24  offenses?
25       A.  Yes, sir.

```
 1        Q.   Why don't we take a look at Exhibit 24,
 2   which is a document that I believe bears your
 3   signature on the second page.
 4        A.   Yes, sir.
 5        Q.   And this is described as a written warning
 6   form dated April 20, 2006.  And, again, at the
 7   second page, is that your signature?
 8        A.   Yes, it is.
 9        Q.   As the supervisor of Mr. Davis?
10        A.   Yes, sir.
11        Q.   And is that your handwriting on the date of
12   4/21/06?
13        A.   Yes, sir.
14        Q.   The bottom of the first page, it refers to
15   the second Group II offense that we just discussed.
16   And then it goes on to say, quote, discharged as per
17   Merit System's rules and regulations for first Group
18   III offense, end quote.  You see where it says that?
19        A.   Yes, sir.
20        Q.   So just so the record is clear, the
21   discharge concerning the first Group III offense
22   would have been focused on the telephone call and
23   conversation that Davis had with the mayor; is that
24   correct?
25        A.   My interpretation would be the
```

1   insubordination where the city manager had written a
2   letter stating that the city does not recognize the
3   union and that any business as such -- something
4   along those lines -- has to go through the city
5   manager. And that was the point of the conversation
6   that we had in the office with David and Captain
7   Bennett and Chief Brooks; to ask did you, in fact,
8   go through the chain of command with supervisors and
9   whatever. And it was not.
10          So my understanding is that the city manager,
11  when he wrote that memo stating that the city does
12  not recognize a union and that any dealings were to
13  go through him, something along those lines,
14  specifically. So that, in effect, was my
15  interpretation of insubordination, because you had a
16  directive stating you could not do it.
17       Q.   Okay. Let me state it the opposite way.
18  If Mr. Davis had not placed the telephone call to
19  the mayor in April of 2006, had not had that
20  telephone conversation, he would not have been
21  charged with a second Group II offense; is that
22  correct?
23       A.   That's correct. He would not have done
24  anything wrong.
25       Q.   Right. Same question: If he had not

1   placed the telephone call and had the telephone
2   conversation with the mayor in April of 2006, he
3   would not have been charged with a first Group III
4   offense; is that correct?
5        A.   That's my understanding, yes, sir.
6        Q.   And if he had not placed that telephone
7   call, he would not have been discharged; is that
8   correct?
9        A.   Well, yes, sir.
10       Q.   Did you participate in a meeting about this
11  same period of time on April 19 or April 20, 2006,
12  concerning this subject, which included Mr. Davis?
13       A.   A meeting?
14       Q.   A meeting, yes.
15       A.   With who?
16       Q.   With Mr. Davis perhaps?  Or perhaps with
17  Chief Hunter?  Perhaps with Personnel Director
18  Goodwin?
19       A.   Yes, sir.
20       Q.   You did?
21       A.   Yes, sir.
22       Q.   And you remember that meeting?
23       A.   Yes, sir.
24       Q.   Where did that meeting occur?
25       A.   In the Personal Director's office.

1  Q. And how did that meeting come about? How
2  did you learn that you were supposed to go to a
3  meeting?
4  A. Because the Chief had called and told me to
5  have David report to Personnel on a specific date
6  and time.
7  Q. Okay. And who do you recall was at the
8  meeting?
9  A. It was just myself, Chief Hunter, the
10 Personnel Director, and David came in.
11 Q. Do you know if there was a police officer
12 in the area as well?
13 A. I believe there was, yes, sir.
14 Q. And do you know the name of that police
15 officer?
16 A. No, sir.
17 Q. Was the police officer asked to be there
18 because of the meeting?
19 A. Sir, I really don't know, to be a hundred
20 percent correct, if he or she was, because I
21 couldn't tell if you it was a male or female police
22 officer, to be honest with you.
23 Q. Okay. And what occurred at the meeting?
24 A. David was brought in and read the charges
25 and asked if he had any questions. And then the

1   Personnel Director asked him if he wanted to resign.
2       Q.  That was Ms. Goodwin asked him if he wanted
3   to resign?
4       A.  Yes, sir.
5       Q.  And what was his response to that?
6       A.  No.
7       Q.  Did he say why he did not want to resign?
8       A.  I don't recall if he did.
9       Q.  Did he say he would like to think it over
10  or he would like to speak with a lawyer or he would
11  like to check out what his options are?  Say
12  anything like that?
13      A.  I don't recall hearing any of that, sir.
14  I'm not saying he didn't.  I just don't recall
15  hearing that.
16      Q.  So what happened next at the meeting then
17  when he indicated he did not prefer to resign?
18      A.  Then he was told that his employment would
19  be terminated.
20      Q.  And was he handed a copy of this
21  disciplinary written warning form at the time?
22      A.  I know that he had asked -- if I'm not
23  mistaken, he asked for copies of his personnel file.
24      Q.  But this Exhibit 24, the written warning
25  form which indicates he was being discharged, was he

```
 1   handed a copy of that at the meeting?
 2        A.   Sir, I don't know.
 3        Q.   What about Exhibit 25 which is entitled End
 4   of Employment form?
 5        A.   Yes, sir.
 6        Q.   Was that a document that was at the meeting
 7   that you're talking about?
 8        A.   If it was, I did not see it.
 9        Q.   So you don't know whether or not anyone
10   handed Mr. Davis this form during that meeting?
11        A.   No, sir.  I do not know that.
12        Q.   So at that meeting, then, did you consider
13   that, in fact, Mr. Davis's employment with the city
14   and the fire department was terminated?
15        A.   After the meeting?
16        Q.   At the meeting.  I mean, was that the
17   operative time and date that he was fired?
18        A.   I would have to say yes, sir.
19        Q.   Do you know if Mr. Davis was then given any
20   instructions as to what he should do after the
21   meeting?
22        A.   Well, I know what I did.  I don't know if
23   this has anything to do with your question or not,
24   but I actually had gotten up and called the station
25   he was assigned to and had them leave so he could go
```

1  by and clear out his locker, because I didn't want
2  to make it any more uncomfortable for him than it
3  was going to be. And when I was told that was done,
4  then I even brought David and told him that; I said,
5  go ahead and go by the station and get his stuff so
6  he could turn it in. That's the only conversation I
7  had with David.
8      Q.  Okay. So at the end of the meeting, David
9  was instructed to go to Fire Station 3 and clear out
10 his locker?
11     A.  Yes, sir, and turn his equipment in.
12     Q.  Who gave him that instruction? Was that
13 you or Chief Hunter?
14     A.  I did.
15     Q.  You did?
16     A.  Yes, sir.
17     Q.  And do you know, sir, that then Mr. Davis
18 exercised his right to appeal his termination to the
19 Personnel Review Board?
20     A.  Yes, sir.
21     Q.  Did you go to that hearing?
22     A.  Yes, sir.
23     Q.  Did you give testimony?
24     A.  Yes, sir.
25     Q.  And who were you called by to give

```
 1   testimony?  Was it the city attorney or someone
 2   else?
 3        A.  I guess it would have been the city
 4   attorney.
 5        Q.  And what was the substance of your
 6   testimony before the Personnel Board?
 7        A.  I guess basically what happened, how the
 8   situation came about, and the conversation I had
 9   with David in the office on that day that I asked
10   him about had he called the mayor and if he went
11   through the chain of the command.  My testimony in
12   that meeting was pretty short, if I'm not mistaken.
13        Q.  Did you favor or support the termination of
14   David Davis?
15        A.  Support it.
16        Q.  You did support it?
17        A.  Yes, sir.
18        Q.  Why is that, sir?
19        A.  Because there's no options.  The way the
20   personnel regulations are written, it wasn't just
21   one thing that any person is going to be fired for.
22   It's going to be his or her personnel file, any
23   discipline that's already in there.
24        Q.  Did it come to your attention that after
25   Mr. Davis was terminated by the city of Phenix City,
```

1  that he sought employment elsewhere?
2     A.  I had heard that, yes, sir.
3     Q.  Were you ever contacted by a prospective
4  employer or fire chief in any department --
5     A.  No, sir.
6     Q.  -- concerning Mr. Davis?
7     A.  No, sir.
8     Q.  Did you ever receive any contact from any
9  newspaper reporters about Mr. Davis or his
10 terminated employment?
11    A.  Well, Chuck Williams had called over to the
12 department one day and had asked about the pending
13 lawsuit.  And I told him I could not discuss it; he
14 would have to talk to Chief Hunter.  And I mean, we
15 didn't discuss the case or anything else.  I told
16 him he would have to talk to Chief Hunter about it.
17    Q.  During the time that you were Deputy Chief
18 here in the Phenix City Fire Department, did you
19 ever communicate with any members of the media or
20 any newspaper reporters about issues affecting the
21 department?
22    A.  Only interview I had was concerning a grant
23 that the city had gotten and the equipment that they
24 had purchased with the grant money, if I'm not
25 mistaken.

```
1       Q.  That was during your time as Deputy Chief
2   here?
3       A.  Yes, sir.  I may be wrong, but that's the
4   only one I can recall.
5       Q.  And were you quoted in a newspaper about
6   that subject?
7       A.  Well, it wasn't the newspaper, sir.  It
8   was a television station.
9       Q.  And were you on camera during that
10  interview?
11      A.  Yes, sir.
12      Q.  Do you know if they ran it on the TV
13  station?
14      A.  Yes, sir.  I believe they did.
15      Q.  Your interview?
16      A.  Yes, sir.
17      Q.  And did you get prior approval from Chief
18  Hunter or anyone else to do that?
19      A.  He's the one that told me to do it.
20      Q.  He instructed you to do that?
21      A.  Yes, he did.
22      Q.  Now, when you were the fire chief across
23  the river here in Columbus, did you have occasion at
24  any time to speak to the newspaper media or the
25  television or radio media?
```

1    A.    Yes, sir.
2    Q.    Would that have been about issues affecting
3 the fire department in Columbus?
4    A.    Yes, sir, primarily.
5    Q.    Did you feel like you had a First Amendment
6 right of free speech to do that?
7    A.    Yes, sir.
8    Q.    Did you get anyone's approval over in
9 Columbus to speak to the media?
10   A.    I didn't have to.
11   Q.    Why do you say you didn't have to?  There
12 was no rule or regulation on the subject?
13   A.    No, sir.  I was a department director.
14   Q.    Director?
15   A.    Yes, sir.  Department directors have the
16 authority to do that.  And unless it has something
17 to do with city business outside of the fire
18 department, then you couldn't speak to that.  You
19 would have to --
20       MR. WOODLEY:  Okay, Mr. Waters.  I don't
21    have any further questions.  Thanks for coming
22    today.
23    (The deposition concluded at 2:27 p.m.)
24            * * * * * * * * * *
25

REPORTER'S CERTIFICATE

STATE OF ALABAMA

MONTGOMERY COUNTY

I, Shannon Williams, Certified Shorthand Reporter and Commissioner for the State of Alabama at Large, hereby certify that on April 4, 2007, I reported the deposition of ROLAND LEROY WATERS, who was first duly sworn or affirmed to speak the truth in the matter of the foregoing cause, and that pages 1 through 42 contain a true and accurate transcription of the examination of said witness by counsel for the parties set out herein.

I further certify that I am neither of kin nor of counsel to any of the parties to said cause, nor in any manner interested in the results thereof.

This 8th day of April, 2007.

*Shannon M. Williams*

SHANNON M. WILLIAMS, CSR
Commissioner for the
State of Alabama at Large

MY COMMISSION EXPIRES: 1/14/2010