# DEPOSITION OF BARBARA GOODWIN

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

DAVID DAVIS,                    )
                               )
          Plaintiff,           )
                               )
vs.                            )     CIVIL ACTION
                               )     FILE NO. 3:06-CV-00544-VPM
PHENIX CITY, ALABAMA, et al.,) 
                               )
          Defendants.          )

⊟ **COPY**

Oral Deposition of **MS. BARBARA GOODWIN**, Defendant, called by the Plaintiff, before Courtney Tillman Peters, Certified Court Reporter and Notary Public for the State of Alabama, taken at the City of Phenix City Hall, 601 12th Street, Phenix City, Alabama 36867, on the 5th day of April, 2007, commencing at 10:07 a.m. EST.

**COURTNEY TILLMAN PETERS**
Certified in Alabama & Georgia
**CAUSEY & PETERSON CERTIFIED COURT REPORTERS**
Post Office Box 81
Columbus, Georgia  31902
(706) 317-3111

1                            APPEARANCES OF COUNSEL
2
   For the Plaintiff:              MR. THOMAS A. WOODLEY
3                                  Woodley & McGillivary
                                   1125 Fifteenth Street, NW
4                                  Suite 400
                                   Washington, D. C. 20005
5
   Also Present:                   MR. DAVID DAVIS
6
   For the Defendants:             MR. JAMES R. MCKOON, JR.
7                                  McKoon, Thomas & McKoon
                                   925 Broad Street
8                                  Phenix City, Alabama 36867
9
                                   MR. JAMES P. GRAHAM, JR.
10                                 Graham Law Offices
                                   712 13th Street
11                                 Phenix City, Alabama 36867
12 Also Present:                   ROY WATERS
                                   WALLACE HUNTER
13                                 H. H. ROBERTS
14
15
16                          INDEX TO EXAMINATIONS

17 WITNESS/ATTY                  DIR        CR        RD        RC

18 Goodwin (Woodley)                        6

19
20
21                          INDEX OF EXHIBITS
22
   INDEX NO.                                          PAGE
23 Exhibit 35    (Retained by Attorney Woodley)        28
24
25

# STIPULATIONS

IT IS STIPULATED AND AGREED by and between counsel appearing for the respective parties that:

1)  The oral deposition of **MS. BARBARA GOODWIN**, Defendant, called by the Plaintiff, taken before Courtney Tillman Peters, Certified Court Reporter and Notary Public for the State of Alabama, at 601 12th Street, Phenix City, Alabama 36867, commencing at 10:07 a.m. EST, on the 5th of April, 2007;

2)  ALL FORMALITIES with reference to notice of taking, notice of time and place of taking, qualifications of the Court Reporter, and all other matters precedent to the taking of depositions are WAIVED;

3)  ALL OBJECTIONS, EXCEPT as to the form of the question and responsiveness of the answer, are RESERVED to the time of the hearing of the case;

4)  ALL FORMALITIES with reference to the filing of depositions, including notice of filing, etc., are WAIVED;

5)  With the consent of deponent, the reading and signing of the deposition by deponent is NOT WAIVED;

- - - - - - - - - - - - -

1          WHEREUPON, the deposition of Ms. Barbara Goodwin,

2          beginning at 10:07 a.m. EST, occurred as follows:

3                      MS. BARBARA GOODWIN

4    Having been first duly sworn, testified upon examination,

5    as follows:

6          MR. WOODLEY:  Ms. Goodwin, could you please state

7    your full name for the record.

8          THE WITNESS:  Barbara Tillery Goodwin.

9          MR. WOODLEY:  Ms. Goodwin, my name is Tom Woodley

10   and I'm one of the attorneys for the plaintiff, Mr.

11   David Davis in this lawsuit.

12         Have you, before now, had an opportunity to spend

13   some time with the City's attorneys concerning the

14   nature of this case and what the procedures are we'll

15   be following in your deposition this morning.

16         THE WITNESS:  Yes.

17         MR. WOODLEY:  So is it fair to say you have a

18   basic understanding what the issues are and the claims

19   are in this lawsuit.

20         THE WITNESS:  Yes.

21         MR. WOODLEY:  Have you ever had your deposition

22   taken before in another case?

23         THE WITNESS:  Yes.

24         MR. WOODLEY:  Would that be more than once?

25         THE WITNESS:  No.

1     MR. WOODLEY:  What kind of case was the previous
2     case?
3         THE WITNESS:  To tell you the truth, I don't
4     remember.  It was very -- testified for about 10
5     minutes and they decided that my testimony was not
6     needed.
7         MR. WOODLEY:  Let me extend just to make sure
8     we're on the same page in your deposition, go through
9     a couple of the basic points and procedures.  I will
10    be asking a number of questions, and we expect you to
11    give the answers.  And everything that we say here in
12    your deposition will be taken down by this very able
13    court reporter, and she will put it in a transcript
14    form so that perhaps as early as next week, you will
15    have a chance to review and sign that transcript of
16    your deposition.  Do you understand that.
17        THE WITNESS:  Yes.
18        MR. WOODLEY:  If at any time you don't hear or
19    understand one of my questions, stop me immediately
20    and I will be more than happy to repeat or rephrase
21    that question.  Do you understand that.
22        THE WITNESS:  Yes.
23        MR. WOODLEY:  Are you under any medication or do
24    you have any medical condition that might impair your
25    ability to understand and respond to my questions.

1          THE WITNESS:  No.

2          MR. WOODLEY:  And most importantly, of course,

3     you have just been sworn under oath so you are

4     obligated under the potential penalty of perjury to

5     give truthful and honest answers.  Do you understand

6     that.

7          THE WITNESS:  Yes.

8                    CROSS-EXAMINATION

9     BY MR. WOODLEY:

10     Q.    What is your current occupation?

11     A.    Work for the City of Phenix City as Personnel

12     Director.

13     Q.    And how long have you held that position?

14     A.    Approximately four and a half years.

15     Q.    And what did you do before that?

16     A.    I was the Office Manager for the Building

17     Department with the City of Phenix City.

18     Q.    And how long approximately did you hold that

19     position?

20     A.    I was employed in January of 1990.

21     Q.    '90?

22     A.    Yes.

23     Q.    Is the position of Personnel Director also called

24     the Director of Human Resources?

25     A.    Yes.

1    Q.    That's one in the same?

2    A.    Yes.

3    Q.    Okay.  And what are the basic responsibilities

4    that you have as the City's Personnel Director?

5    A.    We take applications for employment.  We handle

6    all the benefits for our city employees.  We handle

7    workman's comp claims.  We just basically do the -- all

8    the, as far as when an applicant is hired by the City, we

9    handle their personnel file.  We administer the benefits,

10    handle the BlueCross BlueShield.  In general, the clerical

11    work that is provided in the personnel file.

12    Q.    In your position as Personnel Director for the

13    City of Phenix City, do you play a role concerning

14    possible discipline of city employees?

15    A.    We document the discipline of each employee as it

16    comes from the various departments.

17    Q.    Okay.  Is that essentially an administrative task

18    that you perform?

19    A.    Yes.

20    Q.    Do you have any authority to approve or impose

21    any sort of discipline on city employees?

22    A.    No.

23    Q.    Let me invite your attention to a binder of

24    exhibits that we have in front of you, and the City

25    attorneys at the table also have a binder of exhibits for

1    their review.  And I want you to open that blue binder.

2    If you would turn to Exhibit No. 5, please.  And this

3    appears to be a job description for a Director of Human

4    Resources.  Would that be the job description that you

5    have for your position as the Director of Personnel?

6        A.  Yes.

7        Q.  And it indicates here that you report to and are

8    accountable to the City Manager; is that accurate?

9        A.  Yes.

10       Q.  Have you seen this job description before today?

11       A.  Yes.

12       Q.  And in your view, is this essentially accurate

13   concerning the duties and responsibilities that you have

14   as a Personnel Director?

15       A.  Yes.

16       Q.  So just so I'm clear and the record's clear, you

17   do not have any authority to hire or fire city employees;

18   is that correct?

19       A.  No, that's correct.

20       Q.  Now, Ms. Goodwin, are you aware that the

21   plaintiff in this case, David Davis, who's seated at my

22   right, was employed by the City's fire department for

23   about eight years?

24       A.  Yes.

25       Q.  Okay.  And are you aware that during his

1    employment with the city, he was promoted to the rank of

2    sergeant in the fire department?

3        A.    Yes.

4        Q.    Bear with me for just one second here.  Okay.

5    Ms. Goodwin, let me invite your attention to Exhibit No.

6    18, also in the binder in front of you.  This appears to

7    be a memorandum from Deputy Chief Roy Waters to Fire Chief

8    Wallace Hunter dated February 6, 2006.  And the re: line

9    is Letter to Mr. H. H. Roberts.  Have you seen this memo

10   before today?

11       And, by the way, I should say when I ask you to review

12   these documents, take as much time as you need to look

13   through those documents before you feel comfortable in

14   responding to my questions?

15       A.    I believe this letter was submitted to my office

16   as a part of David's personnel file.

17       Q.    Okay.  So you have seen this before today?

18       A.    Yes.

19       Q.    You will note at the very bottom of this memo

20   from Deputy Chief Waters to Chief Hunter, it says as

21   follows, "As I have communicated to you on several

22   occasions, David Davis is doing an outstanding job for me

23   and has a very positive and professional attitude."  You

24   see where it says that?

25       A.    Yes.

1    Q.   Based upon the information that you have, would

2    you agree or disagree with that assessment of Mr. Davis'

3    performance as a firefighter on the job?

4    A.   I do not have direct communication with the

5    firefighter on the job.  I'm not capable of answering that

6    question.

7    Q.   Okay.  And so that would be true even given the

8    information that you have today, you're not in a position

9    to know whether or not that's an accurate or an inaccurate

10   statement or assessment of Mr. Davis' job performance?

11   A.   That's correct.

12   Q.   Okay.  And, Ms. Goodwin, at some point in time,

13   did you become aware that the firefighters employed by the

14   City of Phenix City formed a labor organization or a labor

15   association?

16   A.   I am aware that there are some firefighters that

17   are members of the Firefighters Union, yes.

18   Q.   Now, in terms of just a year, do you remember

19   what year you became first aware that they had a labor

20   association?

21   A.   The year I became Personnel Director.

22   Q.   And what year again was that?

23   A.   2002.

24   Q.   Okay.  Do you know who might have been the

25   president of that labor association of firefighters in the

1    year 2002?

2        A.    I do not.

3        Q.    Okay.  Did you also, at some point in time,

4    become aware that Mr. David Davis, the plaintiff in this

5    case, became an officer or leader of the Firefighters

6    Labor Association?

7        A.    Yes.

8        Q.    And when you became aware of that, do you recall

9    what position or office he held in the labor association?

10       A.    At some point in time, I believe Mr. Davis on an

11   occasion had mentioned that he was president of the local

12   union I believe was.

13       Q.    Does the City recognize the Firefighters Labor

14   Association as a union representative of its members?

15       A.    No.

16       Q.    Did you ever attend or participate in any

17   meetings where the Firefighters Labor Association was

18   proposing certain proposals or raising certain concerns?

19       A.    No.

20       Q.    You never did that at any time?

21       A.    No.

22       Q.    Okay.  Are you aware that the police officers

23   employed by the City of Phenix City also have an

24   association that they're members of?

25       A.    I believe they have a Fraternal Order of Police.

1    I don't -- I'm not familiar with it or have no knowledge
2    of their operations.
3        Q.   Have you ever had occasion to meet with the
4    leaders of the Fraternal Order of Police representing the
5    police officers here?
6        A.   No.
7        Q.   Okay.  Let me direct your attention, if I may, to
8    Exhibit No. 12.  I'm sorry, Exhibit No. 11.  And this
9    appears to be a letter or memo from David Davis, then the
10   vice president of Local 3668, the Phenix City Firefighters
11   Association dated January 25, 2005 and addressed to then
12   Fire Chief Jerry Prater.  Have you ever seen this memo or
13   letter before today?
14       A.   (Witness peruses document.)  Yes.
15       Q.   Okay.  Were you ever asked to do anything
16   concerning the issues that were addressed or raised by Mr.
17   Davis and the labor association?
18       A.   Chief Prater and I had a meeting with David Davis
19   to talk about issues that had nothing to do with the
20   union.  It would be any of these issues that were in
21   direct reference to the City and the merit system, not
22   with the union.
23       Q.   Do you recall if in that meeting if Mr. Davis was
24   there in his capacity as a representative of the other
25   firefighters or any association?

13

1   A.   Mr. Davis was on duty that day and he was there

2   as far as I knew as a City of Phenix City employee.

3   Q.   And did he raise issues that might have affected

4   other firefighters in the department beyond just himself?

5   A.   He -- some of the issues had to do with

6   management and merit system that would affect other

7   employees.

8   Q.   And in that meeting, did Mr. Davis raise some of

9   the points or issues that are outlined in this Exhibit No.

10  11?

11  A.   Mr. Davis raised issues that are addressed in

12  this letter.  Some were addressed by Chief Prater, some

13  were not.  The ones that had something to do with the

14  union was not addressed.

15  Q.   Which issues did Mr. Davis and Chief Prater

16  address in this meeting that are outlined in this Exhibit

17  No. 11?

18  A.   Safety issues were discussed to the extent that

19  they held safety meetings on a regular basis in the

20  department to deal with the safety issues.  Salaries and

21  benefits were discussed as far as that being management

22  decisions.  Trade time was discussed as being a management

23  decision.  Communication was discussed.  And I believe

24  that's as far as I can remember what was discussed in that

25  meeting.

1     Q.   And those issues raised by Mr. Davis and

2  discussed at the meeting with Chief Prater and yourself,

3  is it fair and accurate to say that those were issues that

4  would have affected other firefighters and perhaps members

5  of the labor association?

6     A.   They would have affected all employees of the

7  City, not just firefighters.

8     Q.   Okay.  But did Mr. Davis raise any points that

9  were directly related to other city employees besides the

10  fire department or was he just focused on the fire

11  department personnel?

12     A.   Well, as far as him directly mentioning other

13  employees, I don't recall that.  But all answers and

14  issues that were presented by Chief Prater were in

15  reference to merit system and management of the City.

16     Q.   And does that meeting occur after the date of

17  this memo from Mr. Davis, Exhibit No. 11, and that date

18  again is January 25, 2005?

19     A.   I don't remember the exact date, but I know that

20  we had this memo prior to that meeting.

21     Q.   Okay.  And after that meeting concluded, did you

22  have any other follow-up meetings that you may have

23  attended with Mr. Davis or any other members or leaders of

24  the Firefighters Labor Association?

25     A.   In reference to the association?

1     Q.    Well, not limited to the association.  I just

2     mean meetings in which common issues like those addressed

3     in the memo were discussed --

4     A.    I had no meetings -- no meeting with that, with

5     other members of the fire department in reference to these

6     issue.

7     Q.    And no further meeting with Mr. Davis in

8     reference to issues affecting firefighters that you

9     attended?

10    A.    Other than -- now, I did have another meeting

11    with Mr. Davis in reference to personnel issues.

12    Q.    His individual personnel issues?

13    A.    Correct.

14    Q.    But in general, did you have any follow-up

15    meetings that you attended where Mr. Davis was there and

16    issues affecting the firefighters in general were

17    discussed?

18    A.    Not that I can recall.

19    Q.    Okay.  Now, when this particular meeting that you

20    just testified about was concluded, did you take any

21    further action as the personnel director to follow up on

22    these questions that were discussed?

23    A.    No.

24    Q.    Do you know if Chief Jerry Prater took any

25    further actions to address these issues?

1       A.   I do not know.

2       Q.   Now, let me direct your attention, if I may, to

3   another Exhibit No. 14, which is a newspaper article that

4   appeared in the Columbus Ledger-Enquirer, and my

5   understanding is that this was printed in the newspaper in

6   the month of September 2005.  And you will see the title

7   is "Three-Alarm Turmoil".  And it discusses comments made

8   by Mr. Davis and other firefighters as well as Chief

9   Hunter about issues impacting the fire department.  Do you

10  recall having seen this newspaper article when it came

11  out?

12      A.   I do not recall.  I may I have, may not have.  I

13  do not recall the article.

14      Q.   Have you seen it before today?

15      A.   Like I said, I could have seen if in the

16  newspaper but it's -- I do not right offhand recall this

17  article.

18      Q.   Okay.  Have you seen this article in connection

19  with your preparation for this deposition?

20      A.   No.

21      Q.   Okay.  Have you ever been interviewed by the

22  media concerning issues that might affect the City or city

23  employees?

24      A.   No.  I have been -- have been approached but I

25  don't talk to the media.  I refer all comments to the City

1    Manager.

2        Q.    Okay.  Did you ever attend any meetings or

3    participate in any discussions in which the substance of

4    this newspaper article was addressed?

5        A.    No.

6        Q.    Okay.  So you never talked to, for example, City

7    Manager Roberts about some of the comments made by the

8    firefighters and Mr. Davis in this newspaper article?

9        A.    I do not recall that article.  I do not recall

10    talking to anyone about this article.

11        Q.    Okay.  Do you know if the City, as its Personnel

12    Director, has any policy or rules and regulations about

13    speaking or not speaking to the media about issues

14    affecting their employment or their department?

15        A.    It's the policy of the City for any

16    communications with the media to go through our City

17    Manager.

18        Q.    Could you elaborate on that.  I'm not sure what

19    you mean in terms of that limitation or restriction.

20        A.    If anyone from the media, news media, TV media,

21    anyone came to me to ask me any questions concerning the

22    City policies or City business, I would refer all comments

23    to our City Manager.

24        Q.    And does that restriction or limitation appear in

25    a written policy or regulation of the City?

1    A.    There is a directive that went out from the City

2    Manager concerning speaking with the media that all

3    employees have signed and it is in -- made a part of their

4    personnel file.

5    Q.    And that memo that you are referring to, is that

6    a prohibition or restriction that applies to all city

7    employees that they are not permitted to speak to the

8    media about any issues and that they are --

9    A.    There's not direct verbiage of that, you know.

10   Q.    Have to wait until I finish my questions and then

11   start your answers so the reporter can take the

12   information down.

13   A.    I'm sorry.

14   Q.    So, Ms. Goodwin, as I understand your testimony

15   just a moment ago, you recall a memorandum that was issued

16   by the City Manager, Mr. Roberts, to all city employees

17   giving them directions and instructions about not

18   communicating with the media; is that correct?

19   A.    That's correct.

20   Q.    Okay.  And that memo is applicable and that

21   restriction is applicable to all city employees, not just

22   fire department employees but all city employees; correct?

23   A.    Correct.

24   Q.    Now, what would happen if a city employee

25   departed from that memorandum and that policy and spoke

19

1    directly to a media representative about any issues

2    affecting that individual's department for the City?

3    Would there be a possible disciplinary action or

4    investigation?

5        A.    Possible.

6        Q.    Okay.  And what would the potentially the highest

7    form of discipline that might be visited upon at that

8    employee if he or she spoke to the media about issues

9    affecting the City or the City's department?

10       A.    I would have to -- do you have a copy?  I would

11   have to read that directive.

12       Q.    Let's go off the record for a minute.

13                       (Recess was taken.)

14       Q.    All right.  Mrs. Goodwin, we're back on the

15   record.  And we're going to come back in a few to the

16   memorandum that you were just testifying about that was

17   apparently distributed to city employees about the

18   prohibitions concerning communications with the media by

19   city employees.

20       Let me invite your attention to Exhibit No. 15, which

21   is a memorandum from Fire Chief Wallace Hunter addressed

22   to members of Phenix City Fire Department dated September

23   20, 2005.  Have you seen that document before today?

24       A.    I have.

25       Q.    And what's your basic understanding of the

1   purpose and intent of that memorandum?

2        A.    (Witness peruses document.)   The memorandum I

3   believe, in my opinion, was sent out to set some

4   guidelines and procedures as far as employees dealing or

5   having contact with the news media in regards to city

6   items and functions.

7        Q.    City's what?

8        A.    Items, anything dealing with the City as far as

9   communications between employees and the news media.

10       Q.    Okay.  Did you play any role or participate in

11  the preparation of this memorandum?

12       A.    I did not.

13       Q.    Did you play any role or participate in the

14  preparation of the memorandum that was distributed to all

15  other city employees by the City of Phenix City?

16       A.    I did not.

17       Q.    Did you participate in any meetings when this

18  subject matter of restrictions on employees talking to the

19  news media was discussed?

20       A.    No.

21       Q.    Now, based upon your experience here as the

22  Personnel Director for the City, if a firefighter employed

23  by the City's fire department departed from the

24  limitations in this memorandum and spoke directly to the

25  news media about an issue that impacted the fire

1    department, perhaps an issue of public concern regarding

2    the fire department, would that firefighter have violated

3    this restriction and be potentially subject to discipline?

4        A.    Yes.

5        Q.    And would that discipline potentially include up

6    to firing or termination?

7        A.    Yes.

8        Q.    Okay.

9                    (Off-the-record discussion.)

10       Q.    All right.  Ms. Goodwin, we're back on the record

11   and the City's attorneys have been kind enough to furnish

12   me an additional copy of the memorandum that yesterday we

13   marked as Exhibit No. 34, and I want to show it to you.

14   It appears to be a memorandum issued by City Manager

15   Roberts to all city employees dated September 20, 2005.

16   And this particular one has been signed by a city employee

17   named Ruth Freidman with a date that she signed it

18   apparently on September 22, 2005.  Is that the memorandum

19   that you were referring to earlier in your testimony that

20   was distributed to all city employees?

21       A.    (Witness peruses document.)  Yes.

22       Q.    And the intent or purpose of that memorandum is

23   to prohibit, if you will, city employees from talking

24   directly to the news media about any issues affecting the

25   City or their department of employment; is that correct?

1       A.    In my opinion, it is the purpose to set out and

2   give employees guidance as to the procedures of speaking

3   with the news media.

4       Q.    Okay.  When you say guidance, isn't it a

5   prohibition that they're not permitted to speak to the

6   media and they are expected and required to refer all City

7   contacts to the City Manager?

8       A.    I believe the merit system outlines procedures as

9   far as filing grievances and there is a chain of command

10  that has to be followed.

11      Q.    Okay.  I'm not sure I follow your testimony right

12  now.  I thought you indicated earlier, and you correct me

13  if I'm wrong, that the purpose of this memorandum issued

14  by Mr. Roberts to all city employees is to prevent them

15  from talking to the news media about issues affecting the

16  City or their department of employment and that they are

17  required to refer those inquiries from the news media to

18  the City Manager's office.  Is that an accurate --

19      A.    I said earlier that any -- any requests that came

20  to me through the media, I directed mine directly to the

21  City Manager.  The City Manager is my immediate

22  supervisor.

23      Q.    Okay.  Well, with regard to other city employees,

24  all other city employees, what are they expected to do if

25  they are contacted by the news media concerning issues

1    related to their employment or related to their

2    department?

3        A.    They are expected to follow the chain of command.

4        Q.    Refer it up to their supervisor?

5        A.    From their supervisor to their department head,

6    from their department head to the City Manager.

7        Q.    Okay.  Are department heads permitted to talk to

8    the news media or are they required too, as you apparently

9    are, required to refer those inquires to the City Manager?

10       A.    It's my opinion that the department head would be

11   required to speak with the City Manager before speaking

12   out on City issues.

13       Q.    Before speaking out to the media?

14       A.    Correct.

15       Q.    What about in the area of speaking to the public

16   such as community or neighborhood meetings?  Are you

17   permitted, on your own, at your own discretion, to go to a

18   community or neighborhood meeting and talk about City

19   issues or are you required to clear that first through the

20   City Manager?

21       A.    Any time I would speak out on any issues

22   involving the City, I would go to mister -- to my

23   immediate supervisor, being the City Manager in my case,

24   and get approval from him before speaking on City issues.

25       Q.    Okay.  Is that also applicable to other city