1   employees including perhaps firefighters in the City's

2   fire department, that they're required to get prior

3   approval before talking at a neighborhood or community

4   meeting about issues affected the fire department?

5      A.   That I do not know.

6      Q.   Now, we talked earlier about that newspaper

7   article that came out in September of 2005 in which Mr.

8   Davis and other firefighters were quoted making comments

9   about issues affecting the fire department.  Do you know

10   if there was ever a follow-up investigation of Mr. Davis

11   and others conducted by the fire department concerning

12   their comments that appeared in that newspaper article?

13      A.   I do not know.

14      Q.   You -- did you participate in any meetings or

15   discussions in which the comments of the firefighters in

16   the newspaper article were mentioned?

17      A.   No.

18      Q.   Okay.  Are you aware of, Ms. Goodwin, that Mr.

19   Davis actually received a counseling form concerning his

20   comments and his quotes in that newspaper article?

21      A.   I would have to see the counseling form.

22      Q.   Okay, that happens to be Exhibit No. 16.  And

23   this is a counseling form that was given to David Davis,

24   the plaintiff in this case, dated September 21, 2005 and

25   take a moment to read that to yourself.

1      A.    (Witness peruses document.)  I recognize this

2   counseling form as being a part of Mr. Davis' personnel

3   file.

4      Q.    Okay.  So a copy of this -- and roughly the time

5   again its September 2005 -- would have been given to you

6   as the Personnel Director and then you would have placed

7   it in his personnel file?

8      A.    That's correct.

9      Q.    Turn your attention if you would please, Ms.

10  Goodwin, to Exhibit No. 17 which appears to be a letter

11  from the general president of the International

12  Association of Firefighters, Harold Schaiteerger,

13  S-C-H-A-I-T-E-E-R-G-E-R, addressed to City Manager Roberts

14  dated January 31, 2006.  Have you seen this letter before

15  today?

16     A.    (Witness peruses documents.)  I recognize this as

17  also being part of David Davis' personnel file.

18     Q.    So you recall this copy of this letter being

19  placed in Mr. Davis' personnel file?

20     A.    Yes.

21     Q.    Do you recall if you read this letter shortly

22  after it's date in 2006 before you placed it in Mr. Davis'

23  personnel file?

24     A.    No.

25     Q.    Okay.  Are you familiar with some of the

```
 1    principles that are outlined in this letter concerning

 2    city employees having a first amendment right to free

 3    association and free speech?

 4        A.   Would you state that again?

 5        Q.   Yes.  Are you familiar with some of the

 6    principles that are outlined in this letter concerning

 7    city or public employees having a first amendment

 8    constitutional right of free speech and free association?

 9        A.   I'm not familiar with the actual cases mentioned

10    in this letter.

11        Q.   And I'm not asking you to state whether or not

12    you are familiar with the cases cited in this letter, I am

13    just asking you a more general, basic question as to

14    whether or not you are aware that city or public employees

15    who have a first amendment constitutional right of free

16    speech and free association?

17        A.   I am aware that our merit system addresses free

18    speech.

19        Q.   But the focus of my question is you, as the

20    Personnel Director of the City, are you at least generally

21    aware that city employees, like all other American

22    citizens, have the first amendment right of free speech

23    and free association?

24        A.   Yes.

25        Q.   Okay.  And are you aware that should a public
```

1   employer of municipality retaliate or punish a public

2   employee for speaking out or engaging in free association

3   under the first amendment would violate the law?

4       A.   I would have to read the first amendment.   I'm

5   not aware -- I'm not familiar with the verbiage in the

6   first amendment.

7       Q.   All right.   Ms. Goodwin, now let's move onto a

8   different area.   Did, at some point in time, you become

9   aware that the fire department was proposing a policy

10  change expanding the period of probation for new hires

11  into the fire department from one year to 18 months?

12      A.   Yes.

13      Q.   Okay.   Do you remember approximately when you

14  first became aware of that proposed policy change?

15      A.   I do not.

16      MR. WOODLEY:   Could we go off the record for a

17  second.

18      MR. MCKOON:   Sure.

19          (Off-the-record discussion.)

20      Q.   (BY MR. WOODLEY)   Did you have any role or

21  participate in that proposed policy change in the fire

22  department extending the probationary period to 18 months?

23      A.   I may have prepared the actual ordinance itself.

24      Q.   You may have or you did in fact?

25      A.   I may have.   I'd have to look at the ordinance.

1    Q.   Well, let me show you a copy of that ordinance.
2    And we can call this Exhibit No. 35.
3                        (Exhibit No. 35 was marked for
4                        identification.)
5    Q.   And this is Ordinance Number 2006-13.  Take a
6    look at that and tell me whether or not you prepared the
7    language in that ordinance.
8    A.   (Witness peruses document.)  Yes, I prepared the
9    ordinance, typed it.
10    Q.   Did someone ask you to prepare it?
11    A.   Yes.
12    Q.   Who was that?
13    A.   I recall a conversation with the City Manager and
14    the Fire Chief.
15    Q.   What is the underlying reason that prompted this
16    proposed change and expansion of the probationary period
17    to 18 months?
18    A.   The length of training for police officers,
19    firefighters and code enforcement officers.
20    Q.   Are you aware of any down side or disadvantages
21    that might come into play when the City enlarges the
22    period of probation from one year to 18 months?
23    A.   No, sir.
24    Q.   You don't think there's any adverse impact upon
25    potential recruitment or attracting individuals into the

1    City's fire department?

2        A.    No, sir.

3        Q.    Is this ordinance still in effect today?

4        A.    Yes, sir.

5        Q.    What is the probationary period for new hires in

6    other city departments?

7        A.    12 months.

8        Q.    So is the only exception to that the fire

9    department which now has 18 months for a probationary

10   period?

11       A.    I believe the ordinance says the fire department,

12   police department and code enforcement officers.

13       Q.    But all other city employees, it's one year?

14       A.    Correct.

15       Q.    And does the ordinance only apply to new hires?

16   In other words, it doesn't impose a probationary period on

17   veteran employees of the fire department?

18       A.    That's correct.

19       Q.    Now, let's move on to another area.  Are you

20   aware, Ms. Goodwin, that in the month of April, 2006

21   apparently that the plaintiff, David Davis, in this case,

22   placed a telephone call to Mayor Hardin?

23       A.    Yes.

24       Q.    Okay.  How did that first come to your attention?

25       A.    I don't recall how it first came to my attention.

1    Q.   Okay.  Maybe we can go through some documents to

2    refresh your recollection.  Let me invite your attention

3    to Exhibit No. 23, which is a memorandum from Fire Chief

4    Wallace Hunter to City Manager Roberts dated April 20,

5    2006 and it shows a copy being sent to you, Ms. Goodwin,

6    as the Personnel Director.  You see where it says that?

7    A.   Yes.

8    Q.   And the re: line on this memo is Sgt. David

9    Davis, merit system and SOP violations.  And in the first

10    sentence and I'll read it, it says, "This memo is to

11    inform you about a conversation between Personnel Director

12    Barbara Goodwin and myself about the City's new probation

13    time for new hires for public safety.  During this

14    conversation, I was informed that one of our firefighters,

15    Sgt. David Davis, called Mayor Hardin to discuss or

16    complain about the new policy."  And then it continues,

17    but I'll stop there.  You see where it says that?

18    A.   I do.

19    Q.   Does that refresh your recollection that you

20    apparently informed Chief Hunter that David Davis had

21    placed a telephone call to Mayor Hardin about the

22    probation period policy?

23    A.   I do not recall how -- how I heard about that

24    conversation, that call.  I'm sure that once I heard about

25    it, it was discussed with the Chief.  But as far as my

1    recollection of how I actually heard about the call, I do

2    not recall that.

3        Q.    But is this an accurate statement that you

4    informed Mr. Hunter about Davis calling up the Mayor?

5        A.    That's the statement that Chief Hunter has made.

6    And once again, I do not recall informing anyone of the --

7    of the call.  Like I said, if -- if I was made aware of

8    the call, I very well would have gone to the Chief about

9    it.

10        Q.    Okay.  Do you recall that you did meet on this

11    occasion that's mentioned in this memo with Chief Hunter?

12        A.    To discuss the new merit system policy, yes.

13        Q.    Okay.  Was anyone else in that meeting?

14        A.    I don't recall.

15        Q.    You don't recall anyone else being in the meeting

16    other than Chief Hunter?

17        A.    No.

18        Q.    Okay.  And you do remember at least in a general

19    sense that somebody told you that Davis had telephoned --

20        A.    Yes.

21        Q.    -- the Mayor?

22        A.    Yes.

23        Q.    Okay.  Could that have been City Manager Roberts?

24        A.    Could have been.

25        Q.    Could it have been someone else?

1    A.    Could have been.

2    Q.    Okay.  Let me direct your attention to Exhibit

3  No. 21, which appears to be a phone message note that

4  David Davis had evidently called the Mayor on April 17,

5  2006, after the time of noon and left a message on his

6  phone number for the Mayor to call him back.  Have you

7  seen that document before today?

8    A.    I have.

9    Q.    When did that first come to your attention?

10    A.    There again, I do not recall when this was

11  brought to my attention.  I know that it was presented to

12  my office along with other documents as far as discipline

13  against Mr. Davis to become a part of his personnel file.

14    Q.    Did you yourself as the Personnel Director

15  conduct any investigation concerning the placement of the

16  telephone call by Davis to the Mayor?

17    A.    No.

18    Q.    You didn't do any interviews?  You didn't even

19  discuss it with the Mayor himself?

20    A.    No.

21    Q.    Were you given any directions or instructions as

22  to look into the subject of the telephone conversation

23  between Davis and the Mayor?

24    A.    No.

25    Q.    Okay.  And let me invite your attention to

1    Exhibit No. 22.  This evidently is a statement prepared by

2    plaintiff David Davis and given to Fire Chief Wallace

3    Hunter dated April 19, 2006.  Can you read that to

4    yourself.

5        A.    (Witness peruses document.)

6        Q.    Okay.  Have you had a chance to read that?

7        A.    Yes.

8        Q.    Have you seen that before today?

9        A.    This is also a part of Mr. Davis' personnel file.

10       Q.    Based upon any information or facts that you may

11    have, Ms. Goodwin, as far as you know, is this statement

12    by Mr. Davis true and correct?

13       A.    Ask that question one more time, please.

14       Q.    Yeah.  Based upon the information and facts you

15    have up through today, as far as you know, is that

16    statement by Mr. Davis, which is Exhibit No. 22, true and

17    correct?

18       A.    As far as I know.  I have no information one way

19    or the other as to whether it's true and correct.

20       Q.    Okay.  And, Ms. Goodwin, are you aware that Chief

21    Hunter and Deputy Chief Waters conducted an investigation

22    into the subject of the telephone conversation between

23    Davis and Mayor Hardin in April of 2006?

24       A.    Yes.

25       Q.    Now, how did you become aware that that was being

1    looked into and investigated by the fire department?

2        A.    At some point, I would have more than likely had

3    conversations with the Chief that he was researching and

4    checking into the matter.

5        Q.    Did you give Chief Hunter any guidance or

6    direction concerning --

7        A.    I did not.

8        Q.    Again, you will have to wait until I finish my

9    question.  Did you give any guidance or directions about

10   how to conduct the investigation into that subject?

11       A.    I did not.

12       Q.    What do you recall the next step which included

13   your involvement or participation into the subject of Mr.

14   Davis and his telephone conversation with Mayor Hardin?

15       A.    At some point after the conclusion of the

16   investigation by the Chief, I would have gotten discipline

17   actions or whatever actions was taken against Davis --

18   David Davis would have been presented to my office as part

19   of his personnel file.

20       Q.    Okay.  Take a look at Exhibit No. 24.  This

21   appears to be a document entitled Written Warning Form

22   involving employee David Davis dated April 20, 2006.  Have

23   you have seen this document before today?

24       A.    (Witness peruses document.)  I have.

25       Q.    Did you participate in the preparation of any

1    part of this document?

2        A.    I did not.

3        Q.    Do you know who did prepare this document?

4        A.    Chief Waters and Chief Hunter.

5        Q.    Okay.  And how do you know that they prepared it?

6    Did they tell you that?

7        A.    Their signatures are on the document.

8        Q.    Okay.  And do you know if this document was

9    handed to Mr. Davis?

10       A.    That, I do not know.  His signature is on the

11   document.

12       Q.    Okay.  And did you participate in any meeting

13   involving Mr. Davis and perhaps Chief Hunter in which the

14   subject matter of this warning and the discharge notice

15   was discussed?

16       A.    I believe Mr. Davis was brought into the

17   personnel office to be advised of his discharge.

18       Q.    And when you say "into the personnel office,"

19   that would have been your office?

20       A.    Yes.

21       Q.    And how did that come about?  Who made that

22   decision to direct Mr. Davis to come to your office for

23   the purpose of being informed of his discharge?

24       A.    Chief Hunter.

25       Q.    Chief Hunter made that decision that there would

1   be a meeting at your office in which Davis would be fired?

2       A.   Yes.  All employees, once they are terminated,

3   have to come to the personnel office to do the end of

4   employment paperwork.

5       Q.   Was City Manager Roberts informed ahead of time

6   that there was going to be this meeting in your office

7   concerning the discharge of Davis?

8       A.   I do not know.

9       Q.   Did City Manager Roberts approve and authorize

10  the termination of Davis?

11      A.   I do not know.

12      Q.   Did you approve and authorize the termination of

13  Davis?

14      A.   No.

15      Q.   Is that within your authority to approve

16  discharges?

17      A.   No.

18      Q.   And who was in that meeting with Davis concerning

19  his discharge besides yourself and Davis?

20      A.   I believe I recall Chief Waters being there.

21      Q.   Okay.  And what was said in that meeting?

22      A.   David was informed of his -- the violations that

23  he had -- previous violations which lead up to his

24  discharge, and Chief Hunter advised him that per the merit

25  system and the progression of his disciplinary action,

1    that he was being discharged.

2        Q.   Did you say anything?

3        A.   I don't recall.

4        Q.   Did you tell Mr. Davis at that meeting that he

5    would have the option of resigning instead of being

6    discharged?

7        A.   Did I tell him that?

8        Q.   Yes.

9        A.   Not that I recall.

10       Q.   Do you recall Chief Hunter or perhaps Deputy

11   Chief Waters informing Mr. Davis that he had the option to

12   resign instead of being fired?

13       A.   Yes, they may have.

14       Q.   But you didn't say anything on the subject?

15       A.   Not that I recall.

16       Q.   Do you recall Mr. Davis saying, "Well, I would

17   like some time to think about whether or not I should

18   resign and perhaps even some time to consult an attorney

19   about the subject?"

20       A.   I don't recall.

21       Q.   You don't remember that at all?

22       A.   (Witness shakes head negatively.)

23       Q.   Do you remember you or Chief Waters or Chief

24   Hunter telling Davis he had to make a decision right then

25   and there as to whether or not he was going to resign,

1    otherwise he was going to be fired?

2        A.    No.

3        Q.    Look at the bottom of this Exhibit No. 24 again,

4    the Written Warning Form, the discharge notice.  Do you

5    remember this form first of all being given, handed to Mr.

6    Davis?

7        A.    I don't recall.

8        Q.    But it appears that Mr. Davis was asked to and

9    did, in fact, sign --

10       A.    Correct.

11       Q.    -- the form and it's dated April 21, 2006.  Does

12   that refresh your recollection that he was handed the form

13   and that he was asked to sign it?

14       A.    Well, yes.  At some point, he would have been

15   given the form and asked to sign it.

16       Q.    And during that meeting?

17       A.    I don't recall if he had signed it before he came

18   into the meeting or afterwards.

19       Q.    Okay.  At the bottom of this form, it says,

20   "Discharge as per merit system rules and regulations for

21   second group II offense."  You see where it says that?

22       A.    Yes.

23       Q.    What is your understanding as to what precisely

24   was the second group II offense for which Mr. Davis was

25   being discharged?

1     A.    "The group II offense that is being referenced in

2   this written warning is negligence or admission in

3   complying with requirements as set forth in the

4   miscellaneous rules."

5     Q.    Okay.  Let me see if I can be more factually

6   specific.  Was the second group II offense for which Mr.

7   Davis was being discharged was the telephone conversation

8   he had on April 17, 2006 at 12:30 p.m. with Mayor Hardin

9   regarding the proposals concerning the probationary

10  period?

11    A.    Yes.

12    Q.    Okay.  And I'm going to ask the same question on

13  the next line at the bottom of this disciplinary form

14  where it says, "Discharge as per merit system rules and

15  regulations for first group III offense, pages 53 and 54."

16  Being factually specific, what was the specific incident

17  that constituted in the City's view the first group III

18  offense for which Mr. Davis was discharged?

19    A.    His refusal to comply with written, verbal

20  instructions of the supervisory force in that he did not

21  go through the chain of command.

22    Q.    Okay.  Let's again try to be more factually

23  specific.  Was the reason for the discharge constituting,

24  in the view of the City, the first group III offense the

25  April 17, 2006 telephone conversation that Davis had with

1    Mayor Hardin concerning the proposals involving the

2    probationary period?

3        A.   Yes, by refusing to comply with instructions.

4        Q.   But that was the factual incident that

5    constituted the first group III offense; is that correct?

6        A.   Yes.

7        Q.   Okay.  Moving along to Exhibit No. 25, Ms.

8    Goodwin, this appears to be an end of employment form

9    issued by the City to David Davis indicating that he was

10   dismissed and ended his employment on April 21, 2006.  And

11   it appears to have your signature as the Personnel

12   Director; is that correct?

13       A.   That's correct.

14       Q.   Do you know if this was handed to Mr. Davis at

15   this meeting that you previously testified about involving

16   Chief Hunter and Deputy Chief Waters?

17       A.   Yes.

18       Q.   And as far as you know, is that the signature of

19   Mr. Davis acknowledging receipt of this document?

20       A.   Yes.

21       Q.   And Chief Hunter signed it as well?

22       A.   Yes.

23       Q.   Do you know if this was handed to Mr. Davis at

24   that meeting?

25       A.   For his signature?

1    Q.    Well, was it handed to him and then he did sign

2    it?

3    A.    Yes.

4    Q.    And did you prepare and fill in this document?

5    A.    My assistant more than likely filled in this

6    document.  She prepares the end of employment forms.

7    Q.    In connection with Mr. Davis' discharge, was he

8    given any options concerning his pensions or continuation

9    of his health insurance benefits?

10    A.    Yes.

11    Q.    What would those have been?

12    A.    COBRA information.

13    Q.    COBRA on the health insurance benefits?

14    A.    Yes.

15    Q.    What about his pension?

16    A.    His retirement?

17    Q.    Right.

18    A.    For the State retirement, he was given the option

19    of sending in the paperwork to receive that retirement;

20    and he chose, at that time, to leave his money in the

21    retirement system.

22    Q.    Is that standard operating procedure when a city

23    employee is terminated?

24    A.    Yes.

25    Q.    Okay.  Exhibit No. 26 is a Notice of Termination

1    form that apparently was filled out and signed by Chief

2    Hunter.  Do you play any role or did you play any role in

3    filling out this particular document?

4        A.    No.

5        Q.    Okay.  Moving on to Exhibit No. 27.  This appears

6    to be a memo from David Davis addressed to yourself dated

7    April 28, 2006.  Have you seen this document before today?

8        A.    (Witness peruses document.)  Yes.

9        Q.    And it appears the purpose of this is that Mr.

10   Davis wants to pursue his right to appeal and have a

11   hearing before the Personnel Review Board; is that

12   correct?

13       A.    That's correct.

14       Q.    And did he, in fact, do that?

15       A.    Yes.

16       Q.    Did you attend that Personnel Board hearing?

17       A.    I did.

18       Q.    Did you participate as a witness in that hearing?

19       A.    I did.

20       Q.    And what was the substance of your testimony?

21       A.    I do not recall the specifics of my testimony at

22   this time.

23       Q.    Well, not so much as the specifics but what was

24   the general substance?  Did you talk about Mr. Davis

25   improperly contacting the mayor in that telephone

1    conversation?  Does that refresh --

2    A.    I believe my testimony would have been more to

3    the disciplinary action against him and his prior

4    disciplinary actions that lead up to his termination.

5    Q.    You don't recall testifying about the triggering

6    incident such as the telephone conversation with the

7    Mayor?

8    A.    No.

9    Q.    Do you recall any other witness testifying about

10   that at the hearing?

11   A.    I recall Chief Hunter testifying.

12   Q.    About that subject?

13   A.    Yes.

14   Q.    Other than your attendance at the hearing itself

15   before the Personnel Review Board, did you have any

16   communications or conversations with members of the

17   Personnel Board concerning the Davis matter?

18   A.    No.

19   Q.    Okay.  Were you ever asked for input or

20   recommendation as to whether or not Davis should be fired

21   because of his telephone conversation with Mayor Hardin?

22   A.    No.

23   Q.    Are you aware, Ms. Goodwin, that after Mr. Davis

24   was discharged by the City that he sought employment

25   elsewhere?

1      A.    Yes.

2      Q.    How did that come to your attention?

3      A.    My office had a call from -- and I don't remember

4    right offhand if it was the City of Auburn or some other

5    city calling for employment verification on David Davis.

6      Q.    Did you speak with that person that was inquiring

7    about Davis?

8      A.    Yes.

9      Q.    Do you remember the name of the person?

10      A.    I recall the last name maybe Langley, Langley.

11      Q.    Fire Chief Langley of the Auburn Fire Department?

12      A.    Possibly.

13      Q.    So you spoke to him when he placed the call?

14      A.    My assistant spoke with him and she referred him

15    to me.

16      Q.    Okay.  And what did Chief Langley ask you about

17    Mr. Davis?

18      A.    He wanted employment verification, wanted to know

19    his reason for termination, the date of his employment,

20    and his position with our fire department.

21      Q.    Did Chief Langley ask for any paperwork on Mr.

22    Davis?

23      A.    No.

24      Q.    And when he raised these questions on the phone

25    with you, what were your responses to the Auburn Fire

1   Department Chief Langley?

2       A.   I told him that we would verify David's

3   employment dates, his position within the department and

4   that we would provide no other information.

5       Q.   Did you indicate to Chief Langley that he had

6   been dismissed in any way?

7       A.   No.

8       Q.   So as far as you know, in that conversation Chief

9   Langley didn't know if he voluntarily resigned, was fired

10  or anything else?

11      A.   That's correct.

12      Q.   Any other communications with any other potential

13  employers that came to your attention inquiring about Mr.

14  Davis?

15      A.   No.

16          MR. WOODLEY:  All right.  Thank you, Ms. Goodwin.

17      I don't think I have any further questions.

18          **WHEREUPON, the deposition of Ms. Barbara Goodwin**

19                  **concluded at 11:20 a.m. EST.**

20

21

22

23

24

25

C E R T I F I C A T E

STATE OF ALABAMA

COUNTY OF RUSSELL


    I hereby certify that the foregoing deposition was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting by me by computer-aided transcription; that the foregoing pages constitute a true, correct, and complete transcript, to the best of my skills and ability, of the testimony given April 5, 2007, by the witness, MS. BARBARA GOODWIN, who was first duly sworn by me; that I am not a relative, employee, attorney, or counsel of any of the parties; am not a relative or employee of attorney or counsel for any of said parties; nor am I financially interested in this action.

    This, the 10th day of April, 2007.



_Courtney Tillman Peters_

Courtney Tillman Peters
CSR #:  AL-CSR-544
CCR #:  B-2329
Notary Public, State at Large

RY PUBLIC
ALABAMA AT LARGE
TILLMAN PETERS
MISSION EXPIRES
JUARY 1, 2009