**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

DAVID DAVIS,
    Plaintiff,
vs.    CASE NO. 3:06-CV-0054-VPM
CITY OF PHENIX CITY, ALABAMA,
et al.,
    Defendants.

\* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF KRISTIN H. KENNEDY, taken pursuant to stipulation and agreement before Shannon M. Williams, Certified Court Reporter and Commissioner for the State of Alabama at Large, in the offices of City Hall, 601 12th Street, Phenix City, Alabama, on Wednesday, November 7, 2007, commencing at approximately 11:12 a.m. EST.

\* \* \* \* \* \* \* \* \* \* \*

**Page 2**

APPEARANCES

FOR THE PLAINTIFF:
THOMAS A. WOODLEY
Woodley & McGillivary
1125 15th Street N.W.
Suite 400
Washington, D.C. 20005

FOR THE DEFENDANTS:
JAMES P. GRAHAM, JR.
712 13th Street
P.O. Box 3380
Phenix City, Alabama 36868-3380

JAMES R. MCKOON, JR.
McKoon & Associates
925 Broad Street
P.O. Box 3220
Phenix City, Alabama 36868-3220

ALSO PRESENT:
Cole Dugan
Wallace Hunter
H.H. Roberts

EXAMINATION INDEX
BY MR. WOODLEY    4

CONDENSED COPY



EXHIBIT C

**Page 3**

STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of KRISTIN H. KENNEDY is taken pursuant to the Federal Rules of Civil Procedure and that said deposition may be taken before Shannon M. Williams, Certified Court Reporter and Commissioner for the State of Alabama at Large, without the formality of a commission; that objections to questions other than objections as to the form of the questions need not be made at this time but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose as provided for by the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between counsel representing the parties in this case that said deposition may be introduced at the trial of this case or used in any manner by either party hereto provided for by the Federal Rules of Civil Procedure.

\* \* \* \* \* \* \* \* \* \*

**Page 4**

KRISTIN H. KENNEDY

The witness, having first been duly sworn or affirmed to speak the truth, the whole truth and nothing but the truth, testified as follows:

EXAMINATION

BY MR. WOODLEY:

    Q. Could you please state your full name for the Record?

    A. Kristin, K-R-I-S-T-I-N, Helen, H-E-L-E-N, Kennedy, K-E-N-N-E-D-Y.

    Q. Ms. Kennedy, my name is Tom Woodley. I'm one of the attorneys that represents David Davis in this court action that's been filed against the City of Phenix City and also against Chief Hunter and City Manager Roberts. Let me ask you some preliminary questions. Have you ever had your deposition taken before in another case?

    A. Yes, sir.

    Q. So are you generally familiar with the procedures we will be following here today?

    A. Somewhat.

    Q. Okay. Fair enough. Couple of points. If at any time you don't hear or understand one of my questions, stop me immediately and let me know that; I'll be happy to repeat or rephrase the question.

**Page 5**

1 Q. Do you understand that?
2 A. Yes, sir.
3 Q. And this reporter will be taking down
4 everything we say today and then she will have a
5 chance to put it in transcript form which, if you
6 want to, you can review that to make sure it's
7 accurate. Do you understand that?
8 A. Yes, sir.
9 Q. When I ask a question, you'll have to wait
10 until I finish my question to begin your answer so
11 we have an accurate transcript.
12 A. Okay.
13 Q. And, of course, you're under oath so you're
14 obligated to tell the truth. Do you understand
15 that?
16 A. Yes, sir.
17 Q. Why don't you, at least with the years,
18 trace your career when you first started here in the
19 fire department and how you moved up the chain of
20 command.
21 A. In 1989, I was hired as a firefighter and
22 remained a firefighter until, I think, the year 1998
23 or '99, was promoted to sergeant or driver engineer;
24 2002, I believe I was promoted to captain; and then
25 2005, promoted to assistant chief and reclassified

**Page 6**

1 as a battalion chief. Also, assistant chief and
2 battalion chief rank have the job title as fire
3 marshal.
4 Q. What's your current position?
5 A. Fire marshal/battalion chief. That's the
6 rank I have.
7 Q. Are you responsible for fire prevention?
8 A. Yes, sir.
9 Q. So that's -- that position is not a
10 frontline fire response, is it?
11 A. No, sir. I'm called if I'm needed.
12 Q. What kind of shifts do you work?
13 A. Eight hours.
14 Q. Eight-hour shifts?
15 A. Yes, sir. Monday through Friday.
16 Q. Have you ever had any supervisory
17 responsibility over David Davis when he was employed
18 in the fire department?
19 A. Can't say as I have.
20 Q. Have you ever been asked for your input or
21 recommendation concerning evaluating Mr. Davis's job
22 performance within the fire department?
23 A. No, sir.
24 Q. I take it you know David Davis, correct?
25 A. I know of Mr. Davis, yes, sir. I know that

**Page 7**

1 he was an employee with the City of Phenix City Fire
2 Department.
3 Q. Did you know he was an eight-year veteran
4 before he was terminated about a year and a half
5 ago?
6 A. I couldn't accurately tell you how long he
7 had been with the fire department, no, sir.
8 Q. Do you have an opinion as to what kind of
9 job performance Mr. Davis had when he was working
10 within the fire department?
11 A. No, sir. Seeing as how I didn't really
12 work on a continuous basis with Mr. Davis, I
13 couldn't tell you personally what type of job
14 performance he displayed, no, sir.
15 Q. Okay. And in light of that, I take it you
16 would not be able to tell me if you thought he was a
17 good firefighter or bad firefighter or disruptive
18 influence in the fire department? You just are not
19 in a position to comment on those issues, I take it?
20 A. The only issue that I can comment on is
21 concerning an issue where I took disciplinary action
22 against Mr. Davis. I can talk to you about that.
23 But other than giving you an accurate account of his
24 job performance, no, sir, I cannot do that.
25 Q. So you had occasion on one time to

**Page 8**

1 discipline Mr. Davis?
2 A. Yes, sir, I did.
3 Q. Were you his supervisor at the time?
4 A. No, sir, I was not his direct supervisor.
5 But being an officer of the department, when he
6 became disruptive in the meeting that we were
7 holding with his shift, his actions were directed at
8 me. So at that point, based on his actions and his
9 gestures and his behavior in front of his peers as
10 well as my peers, I took disciplinary action against
11 him.
12 Q. And what discipline did you --
13 A. I performed a written warning and it was
14 taken up the chain of command through the personnel
15 office -- personnel director, Mrs. Goodwin. Then we
16 had a meeting with all of us and explained the
17 written warning to Mr. Davis.
18 Q. Was he suspended?
19 A. I'm going to be quite frank with you and
20 tell you at that point I don't know what his
21 punishment was. I don't enforce that. All I could
22 do was handle the situation that occurred, and
23 whatever disciplinary action was taken against him
24 was handled beyond me.
25 Q. Do you remember how long ago that was?

**Page 9**

1  A. Yes, sir. I believe it was August of '05.
2  Q. So a couple years ago?
3  A. Yes, sir.
4  Q. And do you remember who was at the meeting
5  when you became concerned?
6  A. The entire shift that Mr. Davis worked on.
7  And I cannot recall everyone there. I can tell you
8  that myself, Chiefs Johansen, Jackson, and Hanson
9  were present.
10  Q. But you couldn't identify the other
11  firefighters who were present?
12  A. No, sir. I really couldn't. I -- not
13  unless you told me who was there.
14  Q. Okay. Give me the details of the incident
15  or situation which troubled you.
16  A. Okay. We were conducting a meeting, all
17  three assistant chiefs and myself being a staff
18  person. We were there to talk to every shift
19  concerning a possible new work schedule when, during
20  the meeting --
21  Q. What was the new work schedule that was
22  being suggested or discussed?
23  A. Well, that we would possibly -- they would
24  possibly -- their hours may be different other than
25  24-hour shifts.

**Page 10**

1  Q. Eight-hour shifts?
2  A. Possibly. But nothing had been told to us
3  as far as an exact hour. No, sir, I don't know
4  that. So we --
5  Q. On that -- if I may interrupt you, please.
6  Were the firefighters in favor of having their
7  shifts changed or were they opposed to it generally?
8  A. Well, I can't really tell you that. I
9  don't know what was in their mind.
10  Q. What about Davis? Was he in favor of
11  changing the shift schedule or opposed to it?
12  A. Well, I can tell you based on the comment
13  that he made, it was obvious that he possibly didn't
14  like what he was hearing.
15  Q. What was his comment?
16  A. "Well, do it and stop punking me out."
17  Q. I'm not sure I understand that.
18  A. I didn't understand it either, sir.
19  Q. Was he directing that comment at you and/or
20  the others?
21  A. It was directed straight at me when he rose
22  up out of his chair, bowed his chest out, hit his
23  self in the chest and said, "well, do it and stop
24  punking me out."
25  Q. Now, why was he directing that comment and

**Page 11**

1  gestures at you? Were you running the meeting?
2  Were you suggesting a change in the shifts or what?
3  A. No, I wasn't running the meeting. The
4  meeting was held with all of us so that everybody
5  got the same message at the same time and no one
6  could say, well, that's not what we were told. But
7  no, sir. I think all of us had input into the
8  discussion. It was just at that moment his comments
9  were directed at me.
10  Q. Did you say something immediately before
11  that which caused him to direct his comments at you?
12  A. I may have.
13  Q. Do you remember what you said?
14  A. No, sir. But what I'm saying is, is that
15  at the time, whatever was said, his comment was
16  directed right at me. And the three assistant
17  chiefs -- as a matter of fact, I was very shocked
18  and surprised, and I asked the three assistant
19  chiefs did they see and hear the same thing that I
20  did, and they said, most definitely.
21  So at that point, I took action against
22  Mr. Davis. I don't feel, as an officer of this
23  department, that he nor anyone else should have the
24  ability to act that way. I've never acted that way
25  in a formal setting with my supervisors and I was

**Page 12**

1  not going to allow that to happen to myself.
2  Q. Did you interview any of the other
3  firefighters who attended the meeting in connection
4  with the Davis comments or gestures?
5  A. No, sir. No, sir.
6  Q. Do you know if Mr. Davis appealed the
7  discipline that was imposed on him as a result of
8  that situation?
9  A. Yes, sir. We went to the Personnel Review
10  Board.
11  Q. What was the end result of that?
12  A. The Personnel Review Board upheld the
13  decisions the city made.
14  Q. Do you know who appoints the members of the
15  Personnel Review Board?
16  A. No, sir. I know they are members made up
17  of the community.
18  Q. Do you know if the shift schedule was
19  actually changed after that meeting?
20  A. No, sir. I think they continued to work
21  24 hours as they do now.
22  Q. Have you ever been a member of the union?
23  A. I was briefly a member of the Phenix City
24  Firefighters' Association, and I'll explain
25  basically why. I was pretty much harassed on my