IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

DAVID DAVIS,                          )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )      CIVIL ACTION NO. 3:06-cv-00544-VPM
                                      )
PHENIX CITY, ALABAMA, et al.          )
                                      )
                                      )
            Defendants.               )
_____      )

**PLAINTIFF'S MEMORANDUM OF
POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**

        Plaintiff David Davis respectfully submits this memorandum in opposition to

defendants' renewed motion for summary judgment.[1]  In addition, in order to avoid

undue repetition, the plaintiff incorporates herein by reference the papers he previously

filed in support of his pending motion for partial summary judgment.

        The only new contention raised by defendants is the qualified immunity defense

asserted on behalf of the individual defendants, City Manager Roberts and Fire Chief

Hunter.  Defendants' motion also repeats earlier arguments, largely under the Pickering

balancing test, which were previously examined by the Court and found to be

_____

        [1] The defendant's "renewed" summary judgment motion is actually the third time the
defendants have come to this Court with a motion seeking to avoid a trial by having the case
dismissed.  In its Memorandum and Opinion and Order dated August 16, 2006, the Court
denied the defendants' motion to dismiss for failure to state a claim because, in part, a sufficient
factual record should be developed through discovery. (Doc. No. 14).  In its Memorandum
Opinion and Order entered June 27, 2007 (Doc. No. 49), this Court denied the defendants'
motion for summary judgment with respect to plaintiff's First Amendment free speech and free
association claims, finding that "[t]he case will proceed" on those claims (p. 22).

inappropriate for disposition on summary judgment.  That ruling remains the law of the case and, as the Court determined, the claims in Counts I and II of plaintiff's Complaint (unlawful retaliation for exercising free speech and free association rights) should be decided on a proper evidentiary record made at trial.

An extensive record of evidence and briefs have already been submitted by the plaintiff in this case.  Plaintiff relies on the following papers as part of his opposition to the defendants' renewed summary judgment motion:

1. Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Partial Summary Judgment (Doc. No. 30)

2. Plaintiffs Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 43);

3. Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Partial Summary Judgment (Doc No.46);

4. The initial and supplemental Declarations of Plaintiff David Davis (with exhibits) (Doc No. 30, Attachments 1 and 2 and Doc. No. 43, Attachment 1);

5. The Declaration of Thomas Malone (with Exhibits) (Doc. No. 30, Attachment 3); and

6. Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's (pending) Motion for Partial Summary Judgment (Doc. No. 91).

7. The initial and supplemental depositions of defendants City Manager H.H. Roberts and Fire Chief Wallace Hunter; the initial and supplemental depositions of Mayor Jeffrey Hardin; the depositions of City Council members Arthur L. Sumbry and Lloyd Ray Bush; and the depositions of City Personnel Director Barbara Goodwin and Deputy Chief Roy Waters (Doc. Nos. 93-99, with all attachments).

# I    MATERIAL FACTS

The material facts and evidence presented by plaintiff in opposition to the defendants' renewed summary judgment motion are contained in the papers previously included in this record and described above (page 2, items 1 through 7).

# II.    ARGUMENT

## A.  Defendants Roberts and Hunter Are Not Entitled to Qualified Immunity under Controlling Supreme Court Precedent

In assessing a qualified immunity claim, the Court must accept as true the allegations and facts presented by the plaintiff. Saucier v. Katz, 533 U.S. 194, 201 (2001); Cook v. Gwinnett County School Dist., 414 F.2d 1313, 1316 (11t Cir. 2005). Of course, the same rule applies in evaluating a summary judgment motion, where the Court accepts the nonmovant's evidence and draws all inferences in that party's favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000).

The individual defendants belatedly argue that they should be insulated from accountability by the defense of qualified immunity.[2]  Under the governing law declared in Supreme Court precedent, and considering the substantial record of facts submitted by the plaintiff, Mssrs. Roberts and Hunter can not evade responsibility for their actions.

---

[2]  This defense was advanced at the eleventh hour, after this case had been pending for 14 months.  The first time this issue was mentioned in this action was in the Court's June 27, 2007 Memorandum Opinion and Order (page 5, note 1), where the Court noted that the individual defendants had not asserted the qualified immunity defense.  Almost six weeks later, on August 6, 2007, and only two weeks before the trial was set to begin, the defendants filed a motion seeking leave to amend their Answer to the Complaint to raise this new defense.  (Doc. No. 72).  By Order filed August 7, 2007 (Doc. No. 75), this Court granted defendants' motion.  The defendants' track record does not suggest confidence in their claim of qualified immunity.

The claim of qualified immunity is analyzed in two steps:  1) taken in the light most favorable to the party asserting the injury, the plaintiff's facts show that the conduct of the local government official violated a constitutional right;[3] and 2) the conduct violates clearly established law if "in light of pre-existing law the unlawfulness [is] apparent."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  The test is one of objective reasonableness; the government official can assert qualified immunity only if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

The leading Supreme Court decision on qualified immunity is Hope v. Pelzer, 536 U.S. 730 (2002), where the Eleventh Circuit was "chastised . . . for taking an unwarrantedly narrow view of the circumstances in which public officials can be held responsible for their constitutional violations.  See, Vaughn v. Cox, 343 F.3d 1323, 1332 (11th Cir. 2003) ("The Supreme Court in Hope cautioned that we should not be unduly rigid in requiring factual similarity between prior cases and the case under consideration")."  Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004).  Citing several earlier opinions of this Circuit, the Supreme Court held that "[t]his rigid gloss in the qualified immunity standard. . . is not consistent with [the Supreme Court's] cases."  Hope, 536 U.S. at 739.

In Hope, the high Court stressed that the facts of previous cases need not be "materially similar" to the case at issue.  536 U.S. at 739.  On the contrary, the Court noted that "novel factual circumstances" can provide the type of "fair warning" and

---

[3]  Hope v. Pelzer, 536 U.S. 730, 736 (2002); Saucier, 533 U.S. at 201.

reasonable notice to government representatives that their conduct can violate constitutional rights. 536 U.S. at 740-41. The Court went on to emphasize that "general statements of the law" can give "fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful." Hope, 536 U.S. at 741. Accord: Calhoun v. Thomas, 360 F.Supp.2d 1264, 1277-78 (M.D. Ala. 2005).[4]

At the time of the defendants' actions in 2005-2006, there can be no doubt about the scope of First Amendment protections for local government employees. As this Circuit underscored in Cook v. Gwinnett County School District, 414 F.3d 1313, 1318 (11th Cir. 2005), "[t]he law is clearly established that a public employer may not retaliate against an employee for an employee's exercise of constitutionally protected speech. Rankin v. McPherson, 483 U.S. 378, 383 (1987); Connick v. Meyers, 461 U.S. 138, 140-42 (1983)." Also in Cook, the Court noted that "the law is clearly established that public employees have a First Amendment right to engage in associational activity without retaliation. Hatcher v. Board of Pub. Educ. & Orphanage for Bibb County, 809 F.2d 1546, 1558 (11th Cir. 1987); see also Smith v. Arkansas State Highway Employees Local 1315, 441 U.S. 463, 465 (1979). Furthermore, courts have long held that freedom of association protection extends to membership in organizations such as labor unions. See, Thomas v. Collins, 323 U.S. 516 (1945)." 414 F.2d at 1320.

---

[4]    Defendants have mistakenly relied on pre-Hope opinions of the Eleventh Circuit rendered prior to 2002, such as Hansen v. Solden Wagner, 19 F.3d 573 (1994) and Foy v. Holston, 94 F.3d 1528 (1996). In view of the Supreme Court's reversal in Hope and its plain criticism of the Eleventh Circuit's rulings in this area, those earlier decisions should not be viewed as valid precedent here. See, Hartwell v. City of Montgomery, 487 F.Supp.2d 1313, 1330 (M.D. Ala. 2007)("Hope 'abrogated many of the…standards articulated' in Eleventh Circuit case law. . . .").

Moreover, it has been settled law that local government officials may not impose 'prior restraints' on fire fighters and other public employees which prohibit or restrict those employees from speaking to the media and elected officials without prior clearance—especially as citizens about matters of public concern.[5] Clearly, the public also has a need to know, and fire fighters have the concomitant right to inform the public, about issues impacting operations and services in their fire departments.  Beckwith v. City of Daytona Beach Shores, 58 F.3d 1544, 1565 (11th Cir. 1995)("few subjects are of more public concern to the average citizen than the provision of basic fire and rescue services").

In addition, the constitutional right to associate in order to express one's views is "inseparable" from the right to speak freely.  Thomas, 323 U.S. at 530; Shelton v. Tucker, 364 U.S. 479, 486 (1960).  Similarly, the right of public workers, like fire fighters, to speak out for their fellow fire fighters and themselves about matters of public concern within the fire department is firmly ensconced in the law.  E.g., Beckwith, supra; Moore v. City of Kilgore, Texas, 877 F.2d 364 (5th Cir. 1989), cert denied, 493 U.S. 1003 (1990)(Local Union President Moore could not be disciplined for speaking to the press about alleged understaffing in the fire department).

Simply stated, the individual defendants here were obviously "not operating in a murky area of the law."  Doe v. Broderick, 225 F.3d 440, 453 (4th Cir. 2000).  In short, using the objective standard of reasonableness, the individual defendants can not seriously claim that the law was not established in 2005/2006 when they reprimanded,

---

[5]  See, cases cited in plaintiff's Memorandum of Points and Authorities, pp. 20-31 (Doc. No. 91).

threatened, restrained, and ultimately fired Davis for the exercise of his constitutional

rights of free speech and free association.[6]

In light of the substantial body of First Amendment decisional law in §1983

actions, there is simply no way that the individual defendants here could have

objectively and reasonably determined that their actions were consistent with

established law.  The salient facts and evidence already submitted in the record

by the plaintiff, are as follows:

- The individual defendants' reprimand, threats, and termination of Davis were based on the City's Merit System Rules and Regulations (Sec. 2.054) and Fire Department ASOP-12 (Doc. No. 30, Facts ¶'s 20, 33 to 36), which impose unconstitutional 'prior restraints' on the rights of free association and free speech, and to communicate as a citizen with the media and City Council members about matters of public concern;[7]

- City Manager Roberts has the final decision-making authority regarding termination of an employee from the fire department. (Doc. No. 30, Facts ¶11).

- Davis was known by the individual defendants to be the president and spokesperson of the Phenix City Firefighters Association (Local 3668).  (Doc. No. 30, Facts ¶'s 2, 12-15);

- A number of letters to the editor were published in local newspapers in which citizens expressed concerns over several fire department issues. (Doc. No. 30, Facts ¶16);

---

[6] Citing their depositions, defendants assert that neither Roberts nor Hunter "**believed** after Davis was terminated that such termination was in violation of Davis's First Amendment rights." (Defendants' Memorandum, pp. 3-4, emphasis supplied). Defendants apparently are unaware that the applicable standard is an objective one. Harlow, 457 U.S. at 818.  The correct analysis "does not include an inquiry into the officers' subjective intent or beliefs.  Anderson, 483 U.S. at 639."  Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir. 1990).  Accord:  Beardsley v. Webb, 30 F.3d 524, 530 (4th Cir. 1994).

[7] The references to "Facts ¶ _____" are to the factual paragraphs enumerated in the plaintiff's first summary judgment memorandum (Doc. No. 30), and in the plaintiff's recently filed summary judgment memorandum (Doc. No. 91).

- Davis met with other Association leaders and members on September 13, 2005 and discussed their public concerns about various fire department issues. (Doc. No. 30, Facts ¶16);

- A resulting newspaper article appeared in the <u>Columbus Ledger-Enquirer</u> on September 18, 2005 in which Davis and other Association members expressed concerns about public and fire fighter safety, high employee turnover and the lack of retention of experienced fire fighters, the elimination of "swap" time among fire fighters, and threats to change shift schedules; Davis was also quoted in the article about poor employee morale and about being "reluctant to talk because of significant fear of retaliation, being disciplined or fired".  (Doc No. 30, Facts ¶16);

- With Roberts' concurrence, Chief Hunter immediately conducted an "investigation" and Davis and other fire fighters identified in the article were interrogated (Doc. No. 30, Facts ¶17); Davis was ordered to give a written statement in which he confirmed that he met with the newspaper journalist while off-duty and in his capacity as the Association's President.  (<u>Id</u>.);

- At this time, Chief Hunter told Davis that the "union" would be the end of his career.  (<u>Id</u>.).

- Fire fighter Robert Gaskin was also interrogated about the newspaper article and instructed to give a statement on September 20, 2005 in which he explicitly noted: "I was not aware I needed to gain authorization to exercise my <u>right to free speech</u>" (emphasis added).  (Doc. No. 30, Facts ¶18);

- Fire fighter Karl Taylorson was also interrogated and issued a written form warning that the City "would not put up with another episode of speaking to the media without prior approval", and threatening discipline, up to termination.  (Doc. No. 91, Facts ¶15);

- Davis was given a written reprimand (placed in his personnel file) similarly warning him against further contacts with the media about any fire department issues.  (Doc. No. 30, Facts ¶21);

- Assistant Chief Johanson told Davis that the "union was ruining his career" and that City Manager Roberts was tired of the "union's crap."  (Doc. No. 30, Facts ¶21)

8

- Chief Hunter issued a written directive on September 20, 2005 to all fire department personnel (as did City Manager Roberts to all City employees), pointing out the article in the <u>Ledger-Enquirer</u> newspaper, and warning that the Merit System Rules and Regulations prohibited communications with the media; if Davis (or any other City employee) spoke to the media about issues of public concern, he/she would be subjected to discipline, up to discharge. (Doc. No. 30, Facts ¶'s 19 and 20);

- The investigation and "corrective actions" involving Davis and other fire fighters were approved by both Roberts and Hunter.  (Doc No. 30, Facts ¶21);

- Section 2.054 of the City's Merit System Rules and Regulations prohibit Davis and other fire fighters from speaking to the media about any issues involving the provision of fire and rescue services; deviation from this regulation, subjects the employee to discipline, including termination. (Doc. No. 30, Facts ¶22);

- The deposition testimony of Roberts and Hunter revealed that even if a fire fighter raised issues of public concern through the chain of command, he/she still could not discuss those issues with the media at any time. (Doc. No. 30, Facts ¶22);[8]

- There is no evidence that any fire fighter has communicated with the media about fire department matters since the "corrective actions" taken in September, 2005;

- On January 31, 2006, IAFF General President Harold Schaitberger sent a letter to City Manager Roberts, with copies to Chief Hunter and Mayor Hardin, informing them of the First Amendment free speech and free association protections of Davis—<u>with specific citations to pertinent court decisions</u>; the letter explicitly warned that Davis should not be retaliated against for exercising his constitutional rights. (Doc. No. 30, Facts ¶23; also appended hereto as Exhibit 1);

- In a memorandum from Deputy Chief Roy Waters to Chief Hunter, dated February 6, 2006, it was confirmed that Davis was "doing an outstanding job" and that he has "a very professional attitude". (Doc. No. 30, Facts ¶24);

---

[8] Subsequently, Roberts submitted an Affidavit which directly contradicted his deposition testimony on this point.  (Doc. Nos. 44 and 47).  Of course, serious credibility issues created by the defendants should not be resolved on summary judgment.

- On April 16, 2006, Davis learned that the City Council, in the next two days, would be giving final consideration to adopting an Ordinance (No. 2006-13) amending the City's Merit System Rules and Regulations extending the probation period for new hires in the fire department from one year to 18 months.  Davis and others understood that the proposed change would not personally affect him because he had been employed in the fire department for eight (8) years.  (Doc. No. 30, Facts ¶26);

- On April 17, 2006, while off-duty and in his capacity as President of Local 3668, Davis contacted a number of his fellow union members regarding the proposed City Ordinance.  They were all opposed to the proposed change because it would adversely affect recruitment of qualified persons into the City's fire department; harm the ability to retain qualified personnel; and make it more difficult to maintain adequate staffing levels in the fire department. (Doc. No. 30, Facts ¶27);

- Davis spoke to his fire department supervisor, Captain Bennett, about whether he should contact Council members about the proposed Ordnance and Captain Bennett agreed that Davis could do so in his capacity as the representative of Local 3668. (Depos. of Sheets, page 9, line 9 to page 11, line 23, appended hereto as Exhibit 2).

- On the afternoon of April 17, 2006, while off-duty and in his capacity as President of Local 3668 and as a citizen, Davis telephoned Mayor Hardin and left a message.  (Doc. No. 30, Facts ¶28);

- Later that evening, Mayor Hardin called Davis back.  In that telephone conversation, Davis stated that he called the Mayor as President of Local 3668 and on behalf of its members to express the concerns of the membership and the public about the proposed City Ordinance enlarging the probation period for new hires.  Mayor Hardin thanked Davis for the input and said that he and other Council members would consider these points.  (Doc. No. 30, Facts ¶29);

- Davis and City and fire department officials understood that the proposed Ordinance extending the probation period for future new hires from one year to 18 months would have no effect whatsoever on Davis as a City employee because he had already been employed in the fire department for eight (8) years; thus, when he

spoke, with the Mayor, he was not pursuing an individual complaint or grievance as an employee of the City. (Doc. No. 30, Facts ¶31);

- When Roberts and Chief Hunter learned of the telephone conversation between Davis and Mayor Hardin, Hunter launched an "investigation". (Doc. No. 30, Facts ¶29);

- In a Memorandum to City Manager Roberts dated April 20, 2006, Chief Hunter stated that Davis' conversation with Mayor Hardin violated the City's Merit System and a fire department SOP; that memo also criticized Mayor Hardin for not reporting the conversation. (Doc. No. 30, Facts, ¶33);

- The City's Merit System Rules and Regulations (the so called "Free Speech" section 2.054), as well as fire department ASOP 12, prohibit Davis and other City fire fighters, at any time, and in any public or non-public forum, from addressing or speaking with the City's elected Mayor and the other four elected members of the City Council about any issues involving the provision of fire and rescue services by the City's fire department; these prohibitions remain applicable even if a fire fighter should first pursue and exhaust the chain-of-command in the fire department.  (Doc. No. 30, Facts ¶34; Doc No. 91, Facts ¶32);[9]

- If a fire fighter wants an issue related to fire and rescue services raised with the City Council, he/she must submit that request to the City Manager who is the only City representative that is permitted to discuss the issue with the members of the Council.  (Id.);

- With the prior approval of Roberts, Chief Hunter fired Davis because of his conversation with Mayor Hardin in violation of the City's Merit System Rules and Regulations.  (Doc. No. 30, Facts ¶'s 36 to 37);

- Davis pursued an appeal of his dismissal by Roberts and Hunter to the City's Personnel Review Board, consisting of members appointed by the City.  At the hearing before the Board on May 16, 2006, Roberts was called as a witness by the City and gave testimony in support of Davis' discharge. After the hearing

---

[9] Contrary to the initial deposition testimony of both Roberts (p. 83, line 2 to p. 85, line 6) and Hunter ( p. 75, Line 3 to p. 77 line 23), Doc. No. 30, Roberts later submitted an Affidavit stating that Davis could have obtained prior permission from Roberts and Hunter to address the Council members, or asked to be placed on a Council agenda.  No City employee has been given such permission, and no employee has ever addressed Council members about City-related issues.  (Doc. No. 91, Facts, ¶33).

concluded, the Board recommended to City Manager Roberts that the earlier decision (made by Roberts himself) be upheld.  Later, on May 18, 2006, City Manager Roberts sent Davis a letter indicating that he accepted the recommendation of the City's Personnel Review Board, and that Davis' termination "is upheld". (Doc. No. 30 Facts, ¶38);

Based on all of these facts—which must be accepted as true in assessing defendants' qualified immunity claim and their motion for summary judgment—no objectively reasonable public official could conclude that the defendants' prior restraints imposed on constitutional freedoms, as well as the retaliation taken against Davis for exercising those freedoms, were in accordance with well-known principles of law. Skrtich v. Thornton, 280 F.3d 1295, 1304, n. 9 (11th Cir. 2002)("[S]ome conduct is so obviously contrary to the constitutional norms that even in the absence of caselaw, the defense of qualified immunity does not apply").

The rejection of the qualified immunity defense is even more compelling on the record presented here.  It is uncontested that both Rogers and Hunter received a letter dated January 31, 2006, from Harold Schaitberger, General President of the International Association of Fire Fighters (with a copy to Mayor Hardin).  That correspondence underscored concerns about the mistreatment and harassment of Local 3668 President David Davis, including the fact that Davis was "issued a counseling form and threatened with loss of his job, for having spoken to the local media regarding [fire] Department operations and other matters of public concern." (Doc. No. 30, Facts, ¶23).  Mr. Schaitberger further articulated the First Amendment rights and protections afforded local government employees to freely associate and to speak out about matters of public concern without unlawful retaliation.  He cited several

federal court rulings on these issues, emphasizing that "few subjects are of more public

concern . . . than the provision of basic fire and rescue services". <u>Beckwith v. City of</u>

<u>Daytona Beach Shores</u>, 58 F.3d 1554, 1564 (11th Cir. 1995)". (<u>Id</u>.).  Schaitberger's letter

asked the City and Manager Roberts to take actions that would ensure that the

constitutional rights of Davis and other members of the local fire fighters Association be

respected and safeguarded when they engage in lawful associational activities and

speak out on matters of public concern.  (<u>Id</u>.).  In view of this plainly worded letter, there

is no way that Roberts and Hunter can reasonably claim they lacked knowledge about

established law.  Actually, as the record shows, they simply ignored the law and ten

weeks later discharged Davis for speaking as a citizen and representative of the fire

fighters Association about a proposed City-wide Ordinance that implicated public

concerns. It is difficult to imagine a more blatant violation of established First

Amendment law.

   Finally—and most importantly—the individual defendants both admitted in their

recent depositions that for years prior to January, 2006, they were well aware of the

legal principles protecting City employees when they engaged in free speech and free

association under the First Amendment.  City Manager Roberts testified as follows in his

supplemental deposition:

     Q.  I want to go through as I did with Chief Hunter when you
were here in his deposition, some of the statements in this letter to
see if you are aware of the principles.  And the first one I want you
to look at is on page 2 of Mr. Schaitberger's letter in the middle
starting paragraph where it says, "It is well established that the First
Amendment right of free association includes the right to belong to
and to actively participate in labor organizations."
     Do you see where it says that?
     A.  I do.

Q.  Were you aware of that statement of law or principle even before you received Mr. Schaitberger's letter?

A.  Yes, sir.

Q.  And were you aware of that principle for a number of years like when you first became city manager?

A.  A number of years prior to being city manager.

Q.  Fair enough.  Next, it says, the very next sentence, "the right to discuss and inform people concerning the advantages and disadvantages of unions and joining them is protected not only as part of free speech but as part of free assembly."

Do you see where it says that?

A.  I do.

Q.  And were you aware of that principle of law and protection even before you became city manager?

A.  I was.

Q.  And were you aware that there's actually a State of Alabama Code provision that gives the right to firefighters to belong to a union and to make proposals to their employers?

A.  I am.

Q.  And have you been aware of that during the entire time that you were city manager?

A.  Yes, sir.

Q.  The next statement on page 2 of Mr. Schaitberger's letter says in the beginning of the last paragraph, "moreover, although there is no right or entitlement to government employment, the denial or deprivation of a job and related benefits may not be based on one's exercise of First and Fourteenth Amendment Rights."

Do you see where it says that?

A.  I do.

Q.  Were you aware of that legal protection and right and principle of law during the time that you have been city manager?

A.  Yes, sir.

Q.  The next sentence says, "in this regard, individuals have the First Amendment right to speak out about matters of public concern without having government employers retaliate against them for the exercise of their right to free speech."

Do you see where it says that, Mr. Roberts?

A.  I do.

Q.  Were you aware of that statement of law or principle during the entire time you have been city manager?

A.  I am.

Q.  Next sentence says, "retaliation by a government employer against an individual who exercises his First Amendment rights constitutes a First Amendment violation."

Do you see where it says that?

A.  I do.

14

Q.  Were you aware of that principle or protection under the law during the entire time you've been city manager?

A.  I am.

Q.  The next sentence says, "Indeed, few subjects are of more public concern than the provision of basic fire and rescue services."

You see where it says that?

A.  I do.

Q.  Would you agree with that statement?

A.  It's one of the top public concerns, if not the top.  It ranks right up there.

Q.  So the citizens here in Phenix City would have a legitimate interest and a public concern about how they are furnished fire and rescue services?

A.  Yes, sir.  That's correct.

(Roberts Supplemental Depos., Doc. No. 97, Attach. No. 4, page 39 line 2 to page 42, line 15).

Chief Hunter gave similar testimony in his supplemental deposition:

Q.  Okay.  Let's move on to a different subject matter area, Chief Hunter.  I take it as an experienced firefighter working for the city for the long years that you have, that you're aware of the U.S. Constitution and that there's a First Amendment right under the U.S. Constitution for citizens to exercise the rights of free speech and free association.  You've heard of that before, right?

A.  Yes, sir.

Q.  How long have you heard of that?  Since you were a young man?

A.  Yes, sir.

Q.  Okay.  Is it your understanding that the First Amendment right of free speech and free association also applies to firefighters employed by the City of Phenix City?

A.  Yes, sir.

Q.  Let me invite your attention to Exhibit 17 which is a letter from General President Harold Schaitberger, S-C-H-A-I-T-B-E-R-G-E-R, who is the general president of the International Association of Firefighters.  It's dated January 31, 2006, and it's addressed to City Manager H.H. Roberts.

A.  Yes, sir.

Q.  And it shows that on the third page at the bottom -- if you could turn to that, Chief Hunter -- that Mayor Hardin and yourself as the chief of the department and others were sent a copy of this letter.  Did you, in fact, receive a copy of this letter shortly after its date of January 31, 2006?

A.  I've seen it, yes, sir.

Q.  Did you receive it though?  Do you remember receiving it a few days after it was dated?

A.  I don't remember exactly when I received it, but I know I've seen it -- seen this letter.

Q.  You'll notice in the middle of the second page Mr. Schaitberger mentions as follows:  "It is well established that the First Amendment right of free association includes the right to belong to and to actively participate in labor organizations."  Then it cites a case or two.  Do you see where it says that?

A.  That's correct.

Q.  Now, prior to receiving a copy of this letter from Mr. Schaitberger, were you, in fact, aware that the First Amendment gives the right of the firefighters to belong to a labor organization?

A.  That's correct.

\* \* \* \* \*

Q.  Going back to this letter from Mr. Schaitberger, Exhibit 17, the next sentence in the middle of page two says as follows:  "The right to discuss and inform people concerning the advantages and disadvantages of unions and joining them is protected not only as part of free speech but as a part of free assembly."

Do you see where it says that?

A.  That's right.  Yes, sir.

Q.  Now, prior to receiving this letter of January 31, 2006, had you been aware of those legal principles and rights?

A.  Yes, sir.

Q.  And the next sentence in the next paragraph says:  "Moreover, although there is no right or entitlement to government employer, the denial or deprivation of a job and related benefits may not be based on one's exercise of First and Fourteenth Amendment rights."

See where it says that?

A.  Yes, sir.

Q.  Were you aware of that principle of law before you received a copy of Mr. Schaitberger's letter?

A.  I've seen it before.

\* \* \* \* \*

Q.  The next sentence, middle of this second page of this letter from Mr. Schaitberger, says as follows:  "In this regard, individuals have the First Amendment right to speak out about matters of public concern without having government employers retaliate against them for the exercise of their right of free speech."

You see where it says that?

A.  That's correct, yes, sir?

Q.  Were you aware of that legal principle and right prior to the time that you received Mr. Schaitberger's letter?

A.  I have seen that before, yes, sir.

Q.  And it says "retaliation by a government employer against an individual who exercises his First Amendment rights constitutes a First Amendment violation."

Do you see where it says that?

A.  Yes, sir.

Q.  And, Chief Hunter, based upon your long experience in this fire department, were you aware of that legal principle prior to receiving Mr. Schaitberger's letter of January 31, 2006?

A.  Somewhat, yes, sir.

Q.  You were aware of that legal principle before receiving it?

A.  I've seen it before, but I-- yes, sir.

Q.  Okay.  Then it says in the next sentence "indeed, few subjects are of more public concern than the provision of basic fire and rescue services."

Do you see where it says that?

A.  Yes sir, I see that.

Q.  Based upon your experience and as the chief of the department, would you agree with that observation, that there are few subjects of more public concern than the provision of basic fire and rescue services?

A.  May be.  May be.

Q.  I'm not so sure I understand the response.

A.  Some things are.  Some things may be.  Yes.  I guess yes.

> (Hunter's Supplemental Depos., Doc. No. 98, Attach. Nos. 6 and 7, page 38 line 1 to page 44, line 14).

These candid admissions, under oath, confirm that both Roberts and Hunter, in fact, had a clear understanding of established law for some time.  The Eleventh Circuit has held that "after Hope v. Pelzer, 536 U.S. 730 (2002), we have emphasized that 'general statements of the law are perfectly capable of giving clear and fair warning to officials even where the very action in question has [not] previously been held unlawful'.

Harris v. Coweta County, GA, 406 F.3d 1307, 1318 (11th Cir. 2005)." Cook, 414 F.3d at
1320.

In sum, based on long-established law and the facts and allegations submitted
into the record by the plaintiffs, there is no reasonable basis for defendants Roberts and
Hunter to claim that they are insulated from accountability under qualified immunity.

**B.    The Pickering Balancing Test Does Not**
**Favor the Defendants on This Record**

In their renewed motion for summary judgment, the defendants have taken yet
another "bite at the apple" by repeating their earlier summary judgment argument that
this action should be dismissed under the Pickering balancing test.  In the plaintiff's
previous summary judgment submissions (Doc. Nos. 30 (pp. 39 to 45), 43, (pp. 4-21),
and 46 (pp. 6 to 10)), the application of the Pickering test was extensively briefed.
Those factual and legal points need not be reiterated here.  This Court carefully
examined the parties' submissions on that issue and found that there was a material
issue of fact "which precludes summary judgment in favor of any party on the issue of
Pickering balancing".  (Memorandum Opinion and Order, entered June 27, 2007, p. 17,
Doc. No. 49).  Nothing has changed in favor of the defendants since that ruling, and the
'law of the case' doctrine alone should defeat the defendants' resurrected argument.

In rejecting the defendants' earlier summary judgment motion, the Court
expressly pointed to the conflicts created by Roberts' and Hunter's deposition testimony
and the later filed Roberts' Affidavit.  In light of the supplemental depositions of Roberts
and Hunter taken on November 6 and 7, 2007, the defendants have even greater
credibility problems now. (Doc. Nos. 97 and 98).  For example, while Roberts' conflicting

Affidavit stated that Davis could have obtained prior permission to speak to City Council members, in his supplemental deposition he again stated that the City's Merit System Regulations and fire department ASOP 12 barred a fire fighter from speaking to Council members about any fire department issues.  (Doc. No. 91, Facts ¶32).  Moreover, although Roberts' conflicting Affidavit made it appear that Davis could have obtained prior approval through the chain-of-command, the grievance procedure, or been placed on a City Council agenda, neither Roberts nor Hunter has **ever** authorized or allowed a fire fighter to do that.  (Id., Facts ¶33).[10]  Most significantly—no fire fighter or other City employee has ever addressed the City Council at a public meeting about any fire department or City-related issues.  (Id.).  Considering the City's stringent policies and practices, and knowing what happened to Davis when he spoke to the media and Mayor Hardin, it is not surprising that the chilling effect imposed by the defendants has effectively deterred City employees from exercising their First Amendment rights.

Furthermore, in his first deposition, Roberts denied giving his prior approval to Chief Hunter that Davis be fired.  (Doc. No. 30, Attachments 9 and 10, page 80, line 24 to page 81, line 4; page 85, line 7, to page 86, line 8).  In his supplemental deposition, Roberts initially said he was merely "notified of the termination", but then he finally admitted he had given his prior approval to Chief Hunter to discharge Davis.  (Doc. 97,

---

[10] Yet another conflict in defendants' testimony exists with respect to who might eventually be allowed to speak to the City Council.  Chief Hunter swears that only City Manager Roberts can talk to Council members, and nobody else.  (Doc. No. 98, Attach. No. 3, Hunter Dep., page 75, line 13 to page 77, line 2).

In his third version of testimony (after his first deposition and his Affidavit), Roberts stated in his supplemental deposition that after exhausting the chain-of-command or the grievance procedure, the individual employee or group can address Council members.  (Doc. No. 97, Attach. No. 5, page 23, line 19 to page 24, line 13).

Attach. No. 5, page 43, line 25, to page 44 line 18).[11]  Clearly, these serious credibility

questions, as this Court has already determined, can not be decided on summary

judgment.

        Another telling inconsistency in the defendants' divergent positions

involves the fundamental question of the reason prompting Davis' termination.  For the

first 17 months of this litigation, the defendants, in their briefs filed with the Court and

their deposition testimony, have represented that Davis was fired because of his

conversation with Mayor Hardin about the Ordinance.[12]  Now, in an obvious attempt to

---

[11]  Roberts' serious credibility problems are compounded by his refusal to recognize his obvious conflicts of interest in the many roles he played to ensure Davis' discharge.  The City appoints the members of the City's Personnel Board; City Manager Roberts made the decision that Davis would be terminated; Roberts then testified against Davis at the Board's hearing; the Board then recommended to Roberts that he uphold Davis' termination; and Roberts accepted the Board's recommendation and, in essence, upheld his original decision to discharge Davis. (Doc. No. 30, Facts ¶'s 35 and 38).  In his deposition, Roberts did not see any difficulties with the Personnel Board proceedings, any conflicts of interest or any unfairness. (Doc. No. 30, Roberts' Dep., p. 88 line 1 to p.89 line 6).  This is not a record on which defendants deserve summary judgment.

[12] In their earlier-filed motion to dismiss in this action (Doc. No. 7, p. 5), the defendants conceded:  "It is not disputed that the reason for the termination of the plaintiff was his contact with the Mayor, which was a direct violation of the City's Merit System Rules and Regulations". Furthermore, the defendants' investigation of Davis, the relevant documents surrounding his termination, the explanations given to him, and the defendants' (and others) deposition testimony, all confirm that Davis was fired because of his off-duty telephone conversation with Mayor Hardin.  (Doc. No. 30, Facts, ¶'s 32-39).  Thus, it is evident that the City fired Davis from his job of eight (8) years because of his telephone conversation with Mayor Hardin.
    The depositions of City officials confirm that if Davis had not contacted the Mayor, he would not have been fired.  (Doc No. 30, Facts, ¶36; Goodwin Dep., p. 38 line 19 to p. 40 line 6; Hunter Dep., p. 82 line 12 to p. 83 line 12; p. 84 lines 9 to 14; Waters Dep., p. 30 lines 15 to 19). Indeed, Mayor Hardin testified in his deposition, that if it was up to him, Davis would not have been discharged due to that telephone conversation.  (Doc. No. 30, Hardin Dep., p. 64 line 11 to p. 65 line 4).
    Hunter recently reiterated in his supplemental deposition that if Davis had not talked with Mayor Hardin, he would not have been terminated (Doc. No. 98, Attach. No. 7, p.45 lines 15 to 19).  Yet the defendants, including Hunter, **now** argue that there were additional reasons for firing Davis (Defendants' Memorandum, pp. 19-24).  Vacillating testimony and contentions should not be resolved on summary judgment.

backfill and bolster their weak position, defendants argue in their recently filed summary

judgment memorandum (pp. 19 to 23) that Davis was a "complainer" and that a

previous incident with Assistant Chief Kennedy are additional reasons for his firing .[13]

Switching gears at this late date, to try to come up with more reasons to buttress their

retaliatory discharge of Davis, clearly undermines the credibility of the defendants.

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000) (fact-finder at trial

can base liability on pretextual reasons advanced by employer for terminating a

worker.).

　　　　In addition, Roberts' conflicting testimony that Davis had a 'less disruptive' way of

communicating with the Mayor makes no sense and has no support in case

precedent.[14]  It is uncontested that Davis' telephone conversation with Mayor Hardin

occurred while he was off-duty, in his capacity as a citizen and representative of the fire

fighters' Association.  He was not speaking as an employee about an individual

grievance concerning his employment.  Indeed, this Court has already found that Davis

was speaking as a citizen (Doc. No. 49, pages 9-10); his speech "was on a city-wide

proposed Ordinance" (Id., p. 9); and his "speech was on a matter of public concern".

(Id., p. 10).  In light of these findings and undisputed facts, it is evident that the City's

grievance procedure is not involved here because it applies solely to employees and

their own employment grievances—not to Davis in his capacity as a citizen speaking

---

[13]　In stark contrast, as late as February, 2006, Deputy Chief Waters emphasized that Davis was doing an "outstanding job" and that he had a "very professional attitude".  (Doc. No. 30, Facts, ¶24).

[14]　The courts have consistently rejected the notion that local government employees, including fire fighters, can be constitutionally required to get prior approval or clearance before they can speak to elected City officials or the media about matters of public concern.  See cases cited in plaintiff's pending summary judgment memorandum.  (Doc. No. 91, pp. 20-32).

about issues of public concern.

With regard to the City's almost exclusive reliance on the 'chain-of-command', defendants have never explained how Davis could have prevented or dissuaded the City Council from considering and acting on the proposed City-wide Ordinance by going to his station Captain or an Assistant Chief.[15]  They have no authority or control over the Council which serves as the City's legislative body.  Chief Hunter also lacks that authority and he was one of the department heads who actually sponsored the proposed Ordinance; going to him would certainly have been an exercise in futility.  In addition, when Davis learned of the proposed Ordinance, the Council planned to act on the matter in only two days.  Pursuit of time-consuming grievance procedures or the chain-of-command would have been futile because the adoption of the Ordinance would have become final.

It is important to also note that Davis actually did **communicate** with his supervisor, Captain Bennett, who agreed that Davis could contact the Mayor about the Ordinance if he did so in his capacity as the representative of the fire fighters' Association (and not in his employee capacity).  (Depos. of Brandon Sheets, Exhibit 2 appended hereto, page 9, line 9 to page 11, line 23).[16]  That is exactly what Davis did.

_____

[15]  As with other points, plaintiff has previously rebutted the defendants' dependence on the 'chain-of-command'. (Doc. No. 43, pp. 10 to 19).  While the chain of command is one factor among many to be considered under the Pickering balancing test, it is not "outcome determinative".  Perry v. Kinlock, 680 F.Supp. 1339, 1342 (E.D. Mo. 1988), cited in this Court's Memorandum Opinion and Order (p. 5) entered August 16, 2006.  (Doc. No. 14).

[16]  Sheets' testimony about what was said to Davis by Captain Bennett is an exception to the hearsay rule because Captain Bennett is an officer and agent of the defendant City; therefore, it is admissible as an adverse statement of a party-in-interest.  FRE 801 (d)(2)(A) and (D).  See, Camp Creek Hospitality v. Sheraton Franchise, 139 F.3d 1396, 1406, n.14 (11th Cir. 1998); U.S. v. Portsmouth Paving Corp., 694 F.2d 312, 320-21 (4th Cir. 1982); Cline v. Roadway Express, 689 F.2d 481, 488 (4th Cir. 1982).

Thus, even though it was not required under First Amendment judicial holdings, Davis actually did receive his supervisor's permission to do what he did. In these circumstances, the defendants' extensive reliance on the chain-of-command argument is unavailing.

In essence, the defendants believe under <u>Pickering</u> that they can simply say—without more—that Davis' telephone conversation with the Mayor might have an adverse affect on harmony and efficiency in the fire department, and therefore, his firing was justified. The courts have not accepted that notion. The Eleventh Circuit has indicated that an employer's speculative or "purely subjective fear of disruption is insufficient to outweigh an employee's exercise of her rights." <u>Ross v. Clayton County</u>, 173 F. 3d 1305, 1311 (11th Cir. 1999). <u>See also</u> <u>Belyeu v. Coosa County Bd. Of Educ.</u>, 998 F.2d 925, 929 n.5 (11th Cir. 1993) (holding <u>Pickering</u> balance favors employee's freedom of speech where employer claims of disruption are unsupported); <u>Fikes v. City of Daphne</u> 79 F.3d 1079 1084 (11th Cir. 1996) (overturning the district court's dismissal of plaintiff's First Amendment claim because there was "no indication that [plaintiff's] actions disrupted the functioning of the Daphne police department"); <u>Eiland v. City of Montgomery</u>, 797 F.2d 953, 959 (11th Cir. 1986) (unsupported speculation that derogatory poem posted by police officer may have led to disruption does not outweigh employee's right to speech), <u>cert.</u> <u>denied,</u> 483 U.S. 1020 (1987); <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 249 (4th Cir. 1999) (stating that a "police department's perceived threat of disruption to its external operations and relationships…could not serve as justification for disciplinary action").

Lastly, with respect to the <u>Pickering</u> balancing test, the Eleventh Circuit's holding in <u>Cook v. Gwinnett County Dist.</u>, 414 F.3d 1313 (2005) is instructive.[17]  In <u>Cook</u>, like here, the local government did not point to any "specific job duties" that were neglected as a result of the exercise of protected free speech.  414 F.3d at 1320.  In <u>Cook</u>, the speech actually occurred on duty, unlike the present situation.  Also, the county in <u>Cook</u>, as the City here, could only produce "scant evidence" in support of its workplace efficiency argument.  414 F.3d 1320.[18]  The sound reasoning in <u>Cook</u> should be applied to the instant case, and the factual record favoring Davis' exercising his free speech on important pubic safety issues pushes the scale decidedly in his favor.

## III.  CONCLUSION

Summary judgment for defendants should be "used sparingly in . . . First Amendment cases . . . involving delicate constitutional rights, . . . . disputed testimony, and questionable credibilities."  <u>Benningfield v. City of Houston</u>, 157 F.3d 369, 377 (5th Cir. 1988).  The plaintiff has compiled and submitted to this Court a detailed record of facts and evidence supporting his First Amendment claims involving free speech and

---

[17] The ruling of the Tenth Circuit in <u>Belcher v. City of McAlester, Oklahoma</u>, 324 F.3d 1203 (2003), as the defendants acknowledge (Doc No. 90, Brief, p. 16), is not a binding precedent; that ruling is also distinguishable from the instant case.  (<u>See</u>, discussion in Doc. No. 43, pages 13-14).

[18]  As previously noted, defendants have not come forward with any specific or reliable evidence to support their contention that Davis' brief telephone call with Mayor Hardin about the Ordinance had a disruptive impact on fire department operations.  (Doc. No. 43, pp. 7-21).  In his supplemental deposition on November 6, 2007, City Manager Roberts still could not offer any information as to how Davis' speech might have disrupted the fire department.  (Doc. No. 95, Attach. No. 11, page 35, line 7 to page 36, line 6).  Mayor Hardin, who maintains that he has an open door policy for employees, has testified that his conversation with Davis did not interfere with or disrupt the operations or efficiency of the fire department. (Doc. No. 30, Dep., p.60 line 2, to p.61, line 5).  If the two top officials of the City don't believe Davis' exercise of free speech was disruptive, the Court should not reach that conclusion.

free association.  As indicated above, these presented facts and related inferences must be accepted as true in assessing the defendants' qualified immunity contention and their "renewed' motion for summary judgment.

Applying Supreme Court and Eleventh Circuit precedent to plaintiff's facts, fully supports the conclusion that defendants' motion for summary judgment should be denied.

Respectfully submitted,


/s/ Thomas A. Woodley
Thomas A. Woodley
Molly A. Elkin
Bryan G. Polisuk
WOODLEY & McGILLIVARY
1125 15th Street, NW, Ste. 400
Washington, DC 20005
Tel:  (202) 833-8855
Fax: (202) 452-1090


/s/ Gary Brown
Gary Brown, Esq.
FITZPATRICK & BROWN
Farley Building, Suite 600
1929 Third Avenue North
Birmingham, Alabama 35203
Tel: (205) 320-2255
Fax: (205) 320-7444

Counsel for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

DAVID DAVIS,                          )
                                      )
            Plaintiff,                )
                                      )
        vs.                           )        CIVIL ACTION NO. 3:06-cv-00544-VPM
                                      )
PHENIX CITY, ALABAMA, et al.          )        Judge W. Harold Albritton
                                      )
            Defendants.               )
_____)

## CERTIFICATE OF SERVICE

This is to certify that on December 31, 2007, I electronically filed Plaintiff's

Memorandum of Points and Authorities in Opposition to Defendant's Renewed Motion

for Summary Judgment with the Clerk of the Court using the CM/ECF system which will

send notification of such filing.  Service has also been made by regular U.S. mail to

counsel for defendant:

Joshua Robert McKoon
McKoon, Thomas, & McKoon
925 Broad Street
P.O. Box 3220
Phenix City, AL 36868


                              _____/s/ Thomas A. Woodley_____
                              Thomas A. Woodley
                              Attorney for Plaintiff