1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    EASTERN DIVISION

4    ⒸⒸCOPY

5    DAVID DAVIS,

6        Plaintiff,

7    vs.        CASE NO. 3:06-CV-0054-VPM

8    CITY OF PHENIX CITY, ALABAMA,

9    et al.,

10        Defendants.

11

12

13    * * * * * * * * * *

14

15    DEPOSITION OF BRANDON SHEETS, taken pursuant to

16    stipulation and agreement before Shannon M.

17    Williams, Certified Court Reporter and Commissioner

18    for the State of Alabama at Large, in the offices of

19    City Hall, 601 12th Street, Phenix City, Alabama, on

20    Wednesday, November 7, 2007, commencing at

21    approximately 12:16 p.m. EST.

22

23    * * * * * * * * * *

24

25

EXHIBIT

2

2

```
 1                        APPEARANCES

 2     FOR THE PLAINTIFF:

 3     THOMAS A. WOODLEY
       Woodley & McGillivary
 4     1125 15th Street N.W.
       Suite 400
 5     Washington, D.C.   20005

 6     FOR THE DEFENDANTS:

 7     JAMES P. GRAHAM, JR.
       712 13th Street
 8     P.O. Box 3380
       Phenix City, Alabama   36868-3380
 9

10     JAMES R. MCKOON, JR.
       McKoon & Associates
11     925 Broad Street
       P.O. Box 3220
12     Phenix City, Alabama   36868-3220

13

14     ALSO PRESENT:

15     Cole Dugan
       Wallace Hunter
16     H.H. Roberts

17                     EXAMINATION INDEX

18         BY MR. WOODLEY                   4
           BY MR. MCKOON                   17
19         FURTHER BY MR. WOODLEY          37
           FURTHER BY MR. MCKOON           39
20

21

22

23

24

25
```

3

```
1                    STIPULATIONS
2           It is hereby stipulated and agreed by and
3    between counsel representing the parties that the
4    deposition of BRANDON SHEETS is taken pursuant to
5    the Federal Rules of Civil Procedure and that said
6    deposition may be taken before Shannon M. Williams,
7    Certified Court Reporter and Commissioner for the
8    State of Alabama at Large, without the formality of
9    a commission; that objections to questions other
10   than objections as to the form of the questions need
11   not be made at this time but may be reserved for a
12   ruling at such time as the deposition may be offered
13   in evidence or used for any other purpose as
14   provided for by the Federal Rules of Civil
15   Procedure.
16          It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that said deposition may be introduced at the
19   trial of this case or used in any manner by either
20   party hereto provided for by the Federal Rules of
21   Civil Procedure.
22              * * * * * * * * * *
23
24
25
```

```
1                    BRANDON SHEETS
2          The witness, having first been duly sworn
3   or affirmed to speak the truth, the whole truth and
4   nothing but the truth, testified as follows:
5                         EXAMINATION
6   BY MR. WOODLEY:
7        Q.   Mr. Sheets, could you state your full name
8   for the Record?
9        A.   Brandon Lynn Sheets.
10       Q.   My name is Tom Woodley.  I'm one of the
11  attorneys representing David Davis in this lawsuit
12  that he has filed against the City of Phenix City
13  and against Chief Hunter and City Manager Roberts.
14  Have you ever had your deposition taken before in
15  another case?
16       A.   No, sir.
17       Q.   Okay.  Have you had a chance to spend some
18  time with perhaps Mr. McKoon or Mr. Graham about the
19  nature of this lawsuit and the procedures we'll be
20  following today?
21       A.   Other than the deposition last time?  Is
22  that what you're talking about?
23       Q.   What deposition last time?
24       A.   Last week?
25            MR. MCKOON:  He's not had a deposition.
```

1    When you listed him, he came up here and we

2    asked him what he knew.  That was that.

3        MR. WOODLEY:  Okay.  Good enough.

4    Q.  Basically, the procedure is I'll be asking

5    you the questions.  We expect you to give answers to

6    the best of your ability.  And this court reporter

7    will take down everything we say today and she will

8    put it in a written transcript form.  Do you

9    understand that?

10    A.  Yes, sir.

11    Q.  And if at any time you don't understand or

12    hear one of my questions, stop me immediately and

13    I'll be glad to repeat or rephrase that question.

14    Do you understand that?

15    A.  Yes, sir.

16    Q.  You'll have to wait until I finish asking

17    my question before you begin your answer so we have

18    a clear record.  Do you understand that?

19    A.  All right.  Yes, sir.

20    Q.  Are you currently a union member or member

21    of the Phenix Firefighters' Association?

22    A.  Yes, sir.

23        MR. MCKOON:  Tom, let me just interrupt a

24    second.  Jimmy reminded me of something.  In

25    the event that he's unavailable for trial, I

1          think we shouldn't use the usual stipulations.
2          You know, if there's an objection, it should be
3          like a court objection, for the purpose of this
4          deposition.
5                MR. WOODLEY:  I agree.  I think that's a
6          good statement on the record, Jim.
7          Q.   We do want to preserve his testimony
8    because I understand you're going to be going
9    overseas in the next few days; is that correct?
10         A.   Yes, sir.
11         Q.   Leaving tomorrow?
12         A.   Leaving Monday.
13         Q.   Going to Iraq?
14         A.   I'll be flying to Houston for a week and
15   then from Houston, we will fly to Dubai and have
16   about five days after --
17         Q.   Does that mean you're leaving your job here
18   in the department?
19         A.   Yes, sir.
20         Q.   Okay.  Do you expect you might come back
21   later on and work for the Phenix City Fire
22   Department?
23         A.   Yes, sir.  I'm going to try.
24         Q.   Well, good luck over there and be safe.
25         A.   Thank you.

1      Q.   So I think you indicated you're currently a
2  union member; is that right?
3      A.   Yes, sir.
4      Q.   And a number of firefighters employed with
5  the city are union members as well, correct?
6      A.   Yes, sir.
7      Q.   David Davis, as I understand it, was a
8  local union officer, correct?
9      A.   Yes, sir.
10     Q.   Have you worked with David Davis when he
11 was working his shifts in the department?
12     A.   Yes, sir.  I was on shift with him.
13     Q.   Were you in the same station?
14     A.   Yes, sir.
15     Q.   For a period of years or --
16     A.   Altogether, probably between six months and
17 a year, something like that.
18     Q.   And is it your understanding that David was
19 an eight-year veteran of the Phenix City Fire
20 Department?
21     A.   Yes, sir.
22     Q.   And that about a year and a half ago he got
23 fired.  Do you understand that?
24     A.   Yes, sir.
25     Q.   Do you know why he was fired?

1    A.   Chain of command.  Disobeying the chain of
2    command, I think, is what I understand.
3    Q.   Did you hear that he perhaps was fired
4    because he contacted Mayor Hardin about a proposed
5    ordinance and he was terminated?
6    A.   Yes, sir.
7    Q.   Let me invite your attention back to the
8    spring of 2006, specifically in April 2006, which
9    was the month that Mr. Davis was terminated.  As I
10   understand it, there was a proposed ordinance that
11   was coming before the city council at that time that
12   essentially expanded the probationary period from 12
13   months to 18 months for new hires in the fire and
14   police departments and code enforcement officers.
15   Does that ring a bell with you?
16   A.   Yes, sir.
17   Q.   How did that come to your attention back in
18   the spring of 2006?
19   A.   It was first -- it was brought about in a
20   class when they -- it was kind of mentioned but
21   didn't say that it was going to happen.  We were in
22   class.  And Chief Waters was teaching the class.
23   And I said something about probation.  He's like,
24   just be glad.  He said, most departments do 18
25   months probation.  And he's like, don't be surprised

1  if it didn't happen here.

2       And then we were all sitting at the table

3  eating lunch one day, and we read it in the paper

4  that it was going to happen.  And David said --

5       Q.  This is on duty at the station?

6       A.  Yes, sir.  Said, you know, we need to call

7  the mayor or call the city representatives or

8  whatever and tell them --

9       Q.  City council members?

10      A.  Say that we didn't like it 'cause, you

11  know, we thought that, you know, people that just

12  got hired couldn't get a job for 18 months, you

13  know, and we were trying -- thinking we can get

14  better people.  But we're sitting at the table and

15  read it in the newspaper.  We were all sitting there

16  saying we didn't like it and we wanted it changed.

17  And then he was like, we should call.  And he was

18  like, no, we can't -- Captain Bennett was like, no,

19  we can't just call.

20      Q.  I'm sorry.  You have to slow down.  Captain

21  who?

22      A.  Bennett.  And then he was like, well, I can

23  call on behalf of the union as a representative.

24      Q.  Who said this?

25      A.  David Davis.  And then it was -- he was

1     like -- Captain Bennett was like, I would call if I

2     was you, but -- but he wouldn't call.

3         Q.   Okay.  Let me see if I understand you.

4     This was on duty at the station?

5         A.   Yes, sir.

6         Q.   And you were there and Mr. Davis was there

7     and Captain Bennett was there?

8         A.   Yes, sir.

9         Q.   If I understood you correctly, Captain

10    Bennett said that someone should call the mayor and

11    city council members about the proposed ordinance

12    that enlarged the probationary period?

13             MR. MCKOON:   Object.  I'm not sure that's

14        what he said.

15        Q.   Well, put it in your own words.

16        A.   Well, David said that someone should call.

17        Q.   Call who?

18        A.   The city council members and say, you know,

19    that -- someone should call.  Then Captain Bennett

20    was like, we can't just call, you know; we can't do

21    that; it might, you know, make someone mad or

22    something like that.

23        And David was like, you know, I can call on

24    behalf of the union, you know.  It's the union.

25        And Captain Bennett was like, I would call if I

1    was you.

2       Q.   Captain Bennett said to Davis, I would call

3    if I were you?

4       A.   Something of that nature.  I mean, not

5    those exact words.

6       Q.   And did Captain Bennett mean at the time

7    when he talked to Davis that David should call as

8    the union representative and communicate with the

9    city council members about this proposed ordinance?

10          MR. MCKOON:   Object to the leading, and

11          calls for a mental operation on the part of

12          Captain Bennett.  He couldn't know what Captain

13          Bennett could have thought.

14       Q.   Okay.  I'm not asking what Captain Bennett

15    thought.  Just put it in your own words again.  What

16    did Captain Bennett say to Davis about possibly

17    contacting the city council?

18       A.   He was just like, you know, I would call if

19    I was you.

20       Q.   Okay.

21       A.   Something -- something about that.  He

22    wasn't going to call, but he would call if it was

23    him -- if he was in that situation, I presume.

24       Q.   Did you understand that comment from

25    Captain Bennett as giving permission or

1  authorization for Davis to call?

2      A.  Not really sure.  It was like we were all

3  sitting around talking about it.  It was just like a

4  random, I would call if I was you.  Like -- I don't

5  know if it was permission or just, you know, if I

6  was in that situation.

7      Q.  And do you know if Davis, in fact, followed

8  up and actually called the mayor and/or city council

9  members about the proposed ordinance?

10     A.  That's what I heard.  I mean, I wasn't with

11  him when he called, but --

12     Q.  That's what you heard later?

13     A.  That he called?

14     Q.  Yes.  Did you ever speak to any council

15  members about that proposed ordinance?

16     A.  No, sir.

17     Q.  Were you also against the proposed

18  ordinance that expanded the probationary period for

19  new hires?

20     A.  Yes, sir.

21     Q.  And why were you and the other firefighters

22  against that proposed ordinance?

23         MR. MCKOON:  Object.  Object to other

24     firefighters.  We don't -- I mean, how can he

25     know what other firefighters were for or

1      against?

2      Q.   Were other firefighters and union members

3  against the proposed ordinance?

4      A.   Yes, sir.

5      Q.   Do you know why?

6      A.   Because we were thinking, you know, it's

7  hard enough getting good people now.  You know, if

8  people can't get a second job, you know, because we

9  get paid, you know, a pretty good bit -- you know,

10  especially compared to other departments.  But a lot

11  of firefighters depend on a second source of income,

12  you know, to pay the bills.  And, you know, if you

13  can't get a second job for 18 months, we figured it

14  would be hard enough to get people up here because

15  of that, if you had to wait 18 months instead of

16  just 12.

17      Q.   So in your judgment, it would be more

18  difficult to get qualified people to hire on to the

19  department if the probationary period was longer?

20      A.   I wouldn't say qualified.  I mean, just --

21  I guess -- I mean regular people -- I mean good

22  people, I guess.  I don't know.

23      Q.   Before today, were you ever asked any

24  questions by city officials or city attorneys about

25  this conversation that you just described --

14

1    A.   Yes.

2    Q.   -- involving Captain Bennett and Mr. Davis?

3    A.   Yes.

4    Q.   Who asked you about that conversation?

5    A.   These two gentlemen here.

6    Q.   You're pointing at Mr. McKoon and

7  Mr. Graham?

8    A.   Yes, sir.

9    Q.   And when did you have that conversation

10  with the city attorneys?

11    A.   Thursday of last week.  Thursday?

12    Q.   Can you recall anything else that was said

13  in the conversation involving Captain Bennett,

14  Mr. Davis, and yourself?

15    A.   Not that I can think of.  Just about, you

16  know, if we didn't like it that, you know, it would

17  be hard enough to get people here and having 18

18  months -- other than that, no, sir.

19    Q.   Do you know if Captain Bennett was in favor

20  of the enlarged probationary period or whether he

21  was against it?

22    A.   I think he was against it, because we were

23  all talking about we didn't like it.

24    Q.   Is Captain Bennett a member of the union as

25  well?

1       A.   No, sir.

2       Q.   Has he ever been; do you know?

3       A.   I don't know -- I couldn't tell you.

4       Q.   There was a newspaper article that came

5    out.  In fact, you can take a look at it.  It's open

6    in the binder in front of you.  It's Exhibit 14.

7    This was a newspaper article from the

8    Ledger-Enquirer that was published on September 18,

9    2005, in which Mr. Davis and a number of other

10   firefighter and union members commented on various

11   issues affecting the fire department.  Were you

12   involved in that interview with the newspaper

13   reporter, if you recall?

14       A.   I don't believe I was.

15       Q.   You don't believe you were?

16       A.   I -- not that I can remember.

17       Q.   Okay.  Fair enough.  Do you know if, as a

18   result of this newspaper article, there was any

19   disruptions in the fire department performing the

20   duties and responsibilities of the fire department?

21       A.   And this is when?

22       Q.   September 2005.

23       A.   I couldn't tell you.

24       Q.   Did you notice any disruptions in

25   operations or efficiency in the fire department

1   because this article came out?

2       A.   I was just getting online.  I mean, well --

3   yes, I was just getting online then.  I couldn't

4   tell you.

5       Q.   Based upon your working relationship with

6   Mr. Davis, do you have a view as to whether or not

7   he was a good performer as a firefighter or a bad

8   performer?

9       A.   He did his job.  He was very intelligent,

10  knew his job well.

11      Q.   Do you know if he has expertise in

12  emergency medical services as well?

13      A.   He was one of our few paramedics that we

14  had.  Like we don't recognize paramedic in Phenix

15  City but, you know, he was one of our few

16  paramedics.

17          MR. WOODLEY:  I don't think I have any

18          further questions.  I thank you for coming

19          today.

20                    EXAMINATION

21  BY MR. MCKOON:

22      Q.   Mr. Sheets, since this is going to be our

23  only opportunity to ask you questions, I need to ask

24  you some under oath here today.

25      When you met with Mr. Graham and I, did anybody

1    ever ask you to say anything but the truth?

2        A.   No, sir.

3        Q.   All right.  In fact, we emphasized to you

4    that we wanted you to tell the truth as you knew it;

5    is that correct?

6        A.   Yes, sir.

7        Q.   All right.  And this is -- is today your

8    last official day of work?

9        A.   Yes, sir.

10        Q.   You're not here today under any subpoena?

11    Nobody gave you a subpoena to come here today, did

12    they?

13        A.   No, sir.

14        Q.   And the sole reason you are here today is

15    because Mr. Woodley asked you to come and we asked

16    you, from your fire department position, to come up

17    here and give your testimony; is that correct?

18        A.   Today, yes, sir.

19        Q.   All right.  Do you have or have you had, in

20    the last six months, a cell phone?

21        A.   Yes, sir.

22        Q.   What is your cell phone number?

23        A.   (706) 527-5093.

24        Q.   And who is your cell phone service with?

25        A.   Nextel.

1    Q.   Okay.  Is that out of Columbus?

2    A.   Yes, sir.

3    Q.   How do you know David Davis?

4    A.   Fire department previously.

5    Q.   Do you also see him at the gym?

6    A.   Yes, sir.

7    Q.   Y'all work out together sometimes?

8    A.   Well, I see him at the gym.  We don't have

9    a workout -- like if I need a spot, he might come

10   spot me, but we don't do the same workout program.

11   Q.   How old are you?

12   A.   24.

13   Q.   And it's mentioned that you're leaving to

14   go to Iraq.  You're not in the military, are you?

15   A.   No, sir.

16   Q.   Who are you -- why is it that you're going

17   to Iraq?

18   A.   The money, help on the situation; you know,

19   pay bills, get ahead.

20   Q.   All right.  And who are you going to work

21   for in Iraq?

22   A.   Wackenhut.

23   Q.   And what is Wackenhut?

24   A.   It's a government contract, subcontract.

25   Q.   You said you were going over there for

1  money?

2      A.  Yes, sir.

3      Q.  What type of money are they going to pay

4  you in Iraq?

5      A.  Hundred grand.

6      Q.  A hundred grand?

7      A.  Yes, sir.

8      Q.  How long -- are you signing a contract to

9  be a contract firefighter over there?

10     A.  Yes, sir.

11     Q.  How long will you be over there?

12     A.  One year.

13     Q.  And as I understand it, what you told us

14  the other day, some of that money is tax-free money;

15  is that correct?

16     A.  Yes, sir.

17     Q.  How much of it is tax free?

18     A.  84.

19         MR. WOODLEY:  I'm going to object on

20     relevance grounds.  I'm not sure where we're

21     going.

22         MR. MCKOON:  That's fine.  You've got your

23     objection.  Go ahead.

24     A.  84,000.

25     Q.  Okay.

1      A.   84 -- 84 -- 85,000, something like that.

2      Q.   So the reason you're leaving the fire

3  service here is you're doing that voluntarily

4  because you want to go and make more money overseas;

5  is that right?

6      A.   Yes, sir.

7      Q.   All right.  Now, when did you become

8  employed with the Phenix City Fire Department?

9      A.   June of '05.

10      Q.   And at some point in time, did you join the

11  union?

12      A.   Yes, sir.

13      Q.   When did you join the union?

14      A.   Approximately a year after I got on.

15      Q.   Sometime in '06?

16      A.   Yes, sir.

17      Q.   All right.  Were you a union member when

18  this newspaper article that Mr. Woodley referred to

19  earlier and showed you, were you a union member at

20  the time that newspaper article came out in

21  September of '05?

22      A.   No, sir.

23      Q.   All right.  Were you a union member at the

24  time that you say you were sitting at a table and

25  read about this ordinance, about the changing from a

1   12-month probationary period to the 18-month

2   probationary period?

3       A.   Yes, sir.

4       Q.   Okay.  How many union meetings had you

5   attended during the course of your union membership

6   from the time you joined up until that day?

7       A.   Three to five, somewhere around there.

8       Q.   How many?

9       A.   Three to five.

10      Q.   Three to five?  Who would preside over the

11  meetings?

12      A.   Who all was there?

13      Q.   Who would be the person that was heading

14  the meetings, the person that was presiding, the

15  head person?

16      A.   David would usually do it.  Or if he

17  couldn't be there, it would be another union

18  representative.  Just no one in particular.

19      Q.   Did you ever have a meeting that David did

20  not attend?

21      A.   Yes, sir.

22      Q.   All right.  Do you know if anybody kept

23  minutes or notes at the meetings?

24      A.   Not sure.

25      Q.   You just -- you never saw that happen?

1    A.   I didn't -- no, sir.

2    Q.   Did you ever attend a meeting where

3    somebody stood up and said now we're going to read

4    the minutes from the last meeting and vote on the

5    approval of those minutes?

6    A.   No, sir.

7    Q.   Okay.  So you don't know whether anybody

8    took minutes or not?

9    A.   No, sir.

10   Q.   Now, going back to either the late part of

11   2005 or the early part of 2006 -- I would say

12   December of '05 or January of '06, sometime in that

13   time frame -- do you recall where there was a called

14   meeting of people on your shift where Chief Hunter

15   and Chief Waters came around and explained that

16   there may be a change in the probationary period

17   from 12 months to 18 months?

18   A.   I'm thinking maybe.

19   Q.   Do you recall that happening?

20   A.   I was trying to think.  I think it did

21   happen.

22   Q.   Okay.  Do you remember getting up and

23   asking a question at that meeting, since you would

24   have been one of the people that was kind of a new

25   hire and in your probationary period at the time?