```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE MIDDLE DISTRICT OF ALABAMA

 3                          EASTERN DIVISION

 4

 5   DAVID DAVIS,

 6           Plaintiff,

 7       vs.                     CASE NO.:  3:06cv544-WHA

 8   PHENIX CITY, ALABAMA, et al.,

 9           Defendants.

10

11                          VOLUME I

12                   *  *  *  *  *  *  *  *  *  *

13                   JURY TRIAL PROCEEDINGS

14                   *  *  *  *  *  *  *  *  *  *

15           BEFORE THE HONORABLE W. HAROLD ALBRITTON, UNITED

16   STATES DISTRICT JUDGE, and a jury, at Opelika, Alabama, on

17   Monday, March 3, 2008, commencing at 9:38 a.m.

18   APPEARANCES:

19   FOR THE PLAINTIFF:      Mr. Douglas L. Steele
                             Attorney at Law
20                           WOODLEY & McGILLIVARY
                             1125 15th Street NW, Suite 400
21                           Washington, D.C.  20005

22                           Mr. Gary Lamar Brown
                             Attorney at Law
23                           FITZPATRICK & BROWN
                             Farley Building, Suite 600
24                           1929 Third Avenue North
                             Birmingham, Alabama  35203
25
```

```
 1   APPEARANCES, Continued:

 2   FOR THE DEFENDANTS:        Mr. James Robert McKoon, Jr.
                                Mr. Joshua Robert McKoon
 3                              Attorneys at Law
                                McKOON, THOMAS & McKOON
 4                              925 Broad Street
                                Phenix City, Alabama  36868
 5
                                Mr. James Paul Graham, Jr.
 6                              Attorney at Law
                                THE GRAHAM LEGAL FIRM
 7                              P.O. Box 3380
                                Phenix City, Alabama  36868-3380
 8
                    Proceedings reported stenographically;
 9                     transcript produced by computer.

10                      * * * * * * * * * *

11                           VOLUME INDEX
```

```
12   JURY SWORN                                   68

13   PRELIMINARY INSTRUCTIONS BY THE COURT        68

14   OPENING STATEMENTS
          MR. STEELE                             77
15        MR. MCKOON                             86

16   DAVID PAUL DAVIS
          DIRECT BY MR. STEELE                   98
17        CROSS BY MR. MCKOON                    142
```

```
18                      * * * * * * * * * *

19      (The following proceedings were heard before the Honorable

20      W. Harold Albritton, United States District Judge, and a

21      jury, at Opelika, Alabama, on Monday, March 3, 2008,

22      commencing at 9:38 a.m.:)

23      (Chambers conference, as follows:)

24           THE COURT:  All right.

25           MR. STEELE:  Your Honor, we've got, well, two issues to
```

1   raise, but the first and the one that really should be addressed

2   first is of considerable concern to the plaintiff.

3            THE COURT:  Okay.

4            MR. STEELE:  It's come to our attention over the past

5   several days that the defendant has engaged in a course of

6   action that we believe was intended and we know had the effect

7   of intimidating the witnesses on our list, making them not just

8   reluctant to speak with us, but very reluctant to testify with

9   fear of retribution if they do testify.  They were ordered,

10  while on duty, to Mr. McKoon's office to be questioned about

11  their testimony in the case.  It wasn't a voluntary; they were

12  ordered.  And these were the individuals on our witness list.

13  With one of the individuals he was called back a second time to

14  sign some sort of statement or document.  We haven't seen it.

15  He felt compelled to sign it.  He wasn't given a copy of it.

16  Understandably nervous enough, he's not a hundred percent on

17  what exactly is in there after he did it because of the

18  environment in which he had to do it.

19            And perhaps most disturbingly -- and I think that this

20  really does need to be addressed -- two individuals were

21  instructed that if they were to speak with us, to seek our

22  counsel on how to respond to the subpoena that we issued, if

23  they were to speak to us -- and we view that as privileged

24  communication -- that they were to contact Mr. McKoon and inform

25  him what we had to say.  And one individual -- and we're more

1    than happy to bring her in and let you talk to her -- she

2    received that instruction.  She was uncomfortable with it, so

3    she did not immediately contact Mr. McKoon to convey what we had

4    told her.  And so while on duty at work, she was told she had to

5    speak to him on the telephone, at which time she was questioned

6    about that.

7         What -- the practical effect of that, among other

8    things, is they were effectively using their employees and the

9    power that they have over the employees to make them, in

10   essence, unwilling spies on our trial preparation.  I know a lot

11   of people in here have been doing this longer than I have, but

12   I've been doing it quite a while now, too.  We've never seen

13   anything that even approaches this.  We're talking -- one of the

14   individuals is a union officer.  We know that we are not

15   permitted to directly contact the chief, the city manager, the

16   mayor, or the other individuals that Mr. McKoon graciously has

17   offered to produce without the need of a subpoena.  We know that

18   those rules apply.  We certainly wouldn't even attempt to do

19   that without going through him.

20        And yet we've got the witnesses on our list being

21   intimidated to the point where we're being asked, you know, is

22   the chief going to be there in the courtroom?  Does he have to

23   be when I testify?  They're that worried about testifying and

24   they were that uncomfortable about being interviewed or

25   interrogated by the other side about their potential testimony

1  and about what we said to them.  But they all felt obligated

2  because they were on duty and they were told you need to go down

3  and talk to Mr. McKoon.  They were never told we would like you

4  to, you don't have to, it's completely up to you, you can go,

5  you can not go, you know, it's completely your choice, no

6  retribution whatever you decide.  It wasn't that type of

7  situation.  They were on duty and ordered to go to Mr. McKoon's

8  office to be questioned about this.

9          We think that it's incredibly inappropriate, that it

10  significantly interferes with Mr. Davis's ability to have a fair

11  trial when a good number of our witnesses, based upon these

12  actions, are now very reluctant to testify.  They were concerned

13  to begin with.  I mean this is a retaliation case, so they were

14  concerned to begin with.  And then when these activities

15  happened over the past several days, you know, they're

16  frightened, Judge.  And it shouldn't have happened, I think it's

17  inappropriate, and I think it needs to be dealt with in probably

18  a very severe manner.

19          And our request on that -- and we make this request

20  with great reluctance.  But the only thing that we believe would

21  come close to fully cleansing this problem would be the removal

22  of the city's current counsel in this case and a sanction,

23  assessment of the fees and costs associated with what would

24  undoubtedly be a necessary delay of trial.  We think that that's

25  really the only way to fully take care of this matter.

1          And we have some other issues related to that that we

2   can discuss, but I wanted to set this up, you know, first

3   thing.  Mr. McKoon will have a chance, I know, to talk.  And

4   you, Your Honor, may want to hear from one or two of these

5   people; and certainly if you so choose, that would be

6   appropriate as well.

7          THE COURT:  These two people that you are saying were

8   called in to talk about what you had said to them, did they

9   eventually do that?  I didn't exactly understand that.

10          MR. STEELE:  One of them did.  I don't know if the

11   second person did or did not.  One of them was on duty and was

12   put on the telephone with Mr. McKoon and questioned.  And she

13   told us that yes, she -- she did.  She didn't want to.  She felt

14   because she's at work and was told that you have to talk to him

15   that she better do it and not make waves.  So she did.  And I

16   don't know how much she told him.

17          You know, this is a case that's just amazing to me that

18   there's that overreaching going on.  But it's a bad situation

19   when we have, you know, four of the people, you know, we intend

20   to put on telling us that they're feeling intimidated and

21   reluctant to testify because of these actions.

22          Frankly, there's another person or two on our list,

23   one, in particular, a friend of David's, who certainly we had

24   every expectation would at least talk to us.  He refused not

25   only to speak with us -- which is certainly his option --

1  wouldn't answer calls from David as well.  And we believe -- not

2  that we can establish it independently, but given what we know

3  going on with the rest, we believe that person probably feels

4  the same way as the individuals that we've spoken to.

5        THE COURT:  Was he a firefighter?

6        MR. STEELE:  Yes.  All of the individuals that we're

7  talking about are employees of the fire department.

8        THE COURT:  Serious charges, Mr. McKoon.  What do say?

9        MR. JAMES MCKOON:  (Hereinafter referred to as

10  Mr. McKoon)  Judge, I've never been in a situation where I

11  couldn't talk to a witness, especially a witness --

12        THE COURT:  What he's saying is not that you couldn't

13  talk to them.  He's just saying they were compelled to talk to

14  you rather than having the freedom to talk or not talk.

15        MR. MCKOON:  Judge, nobody compelled anybody to talk to

16  me.  The first I heard that they had contacted -- I know who

17  he's talking -- I assume he's talking about Anne Land and Karl

18  Taylorson.

19        Is that the first two people you're talking about?

20        MR. STEELE:  Those are two of the people.

21        MR. MCKOON:  Anne Land and Karl -- Anne Land is a

22  captain that works under Wallace Hunter.  You know, and let me

23  say this, Judge.  You know, my demeanor may be a little

24  disappointed, I guess, right now.  You know, I've never in my

25  life had any kind of charge like this leveled against me.  This

1  is -- to me, this is just totally ridiculous.  So I have to --

2  I'm just sitting here kind of stifling my anger about it.

3       But the first I heard about any of this is I got a call

4  from the chief of the fire department, Wallace Hunter, who said

5  that lawyers for the plaintiff had contacted Ms. Land and

6  Mr. Taylorson and wanted to talk to them about this case.  And

7  they were asking whether or not they should talk to them.  And I

8  first -- my first reaction -- I was doing -- preparing for this

9  trial at the time -- is I said, well, Wallace, just tell them

10  they can talk to them if they want to.  And then I thought a

11  minute, and I said, no, don't do that.  Let me talk to them.  I

12  don't want them to say you told them anything.  So I got on the

13  phone with both of them and said --

14       THE COURT:  At the same time or separate?

15       MR. MCKOON:  No, sir.  They called -- you know, they're

16  at different places.  In fact, Mr. Taylorson, I think, was in

17  Opelika at the time.  I remember I returned a cell phone call to

18  him.  And I said, look, the proper way to have done this, had

19  the plaintiffs wanted to do it, would have been to take your

20  deposition, but they didn't have to take your deposition.  And

21  if you want to talk to them, I say go ahead and do it.  You're

22  welcome to do that if you want to.  Nobody can compel you to

23  talk to them just like nobody can compel you to talk to me.  I

24  would ask you this.  Once you talk to them, if you find out what

25  it is they want to talk to you about and you feel like sharing

1  it with me, let me know.  And that's all I said to them, period.

2        THE COURT:  Well, what were their positions -- are

3  there positions?  What are they?

4        MR. MCKOON:  One is a captain that works under --

5  Ms. Land is a captain that works I think directly for Wallace

6  Hunter.  Karl Taylorson is a driver engineer, a sergeant in the

7  fire department, who I've never met before.  I wouldn't know him

8  if I saw him.  I called him back and told him that.

9  Mr. Taylorson actually told me, he said, you know, I don't want

10  to get involved in this.  Everything is going good right now.  I

11  don't want to get drug back into this.  And I said, Karl, it's

12  up to you.  It's just up to you.

13        I didn't keep notes of this.  I don't remember if he

14  called me back or -- somebody called me back and said that they

15  had been contacted by the plaintiff.  I think it was Ms. Land.

16  I asked if she would come down to talk to me.  She rode down to

17  my office and talked to me.  The conversation didn't last five

18  minutes.  My -- the -- I tell her what I told everybody -- and

19  I'll also tell them something in just a minute -- which was,

20  look, I don't care what your testimony is.  Nothing's going to

21  happen to your career about this case.  I've been involved in

22  hundreds of cases in my lifetime; and cases come and go, but

23  careers are too important.  And you can tell me what you want to

24  tell me or you don't have to tell me anything.  And that's

25  exactly what I told them.

1      And I think Ms. Land told me they had asked her whether

2 or not the mayor had said there was an open-door policy.  I

3 believe that's what she said, and something else.  I don't even

4 remember what the other thing was.  It was not of any

5 significance, much, to me.  I was just curious as to why they

6 were contacting her.  And she's an employee and a potential

7 witness in this case.  I feel like I have an equal right to talk

8 to her just like they do.

9      Mr. Taylorson never came to my office.  My whole

10 conversation with him every time was on the telephone.

11      Now, there's a gentleman named Bill Pitts who is a

12 firefighter, and I asked to speak to Mr. Pitts.  And at that

13 time, I did not know that they had even contacted them.  Didn't

14 know anything about it.  The crucial testimony of Mr. Pitts

15 is -- it is Mr. Davis's testimony that Mr. Pitts is the only

16 person that he could recall polling or calling when he conducted

17 this telephone poll he says he conducted before going to the

18 mayor.  He says I called all the -- a bunch of union members.

19 And I said who did you call?  Well, I don't know.  I called --

20 well, can you name one of them?  Finally, he said Bill Pitts.

21      Mr. Pitts came in to see me, and he said -- he couldn't

22 remember anything about being called.  I asked him that

23 question.  And he said, but to tell you the truth, I wasn't

24 against it.  I wasn't against the change.  I think it was a good

25 thing.  And besides that, it didn't concern me.  I don't try to

1  get involved in things that didn't concern me.  That's what he

2  told me.  I'm sitting at my desk in my office; he's sitting

3  across from me.  I said, Mr. Pitts, let me tell you something.

4  Here's the way I feel about this.  I said, all I want is the

5  truth.  That's all I want from anybody.  I can live with the

6  truth.  If that's the truth and that's what you tell me you're

7  going to testify in court, that's fine, and I appreciate it.

8  And I hope you don't have to come; maybe you won't, but that's

9  the way it is.  He left.

10       I got to thinking about it after he left.  And I said,

11  you know, I've had people change stories on me 20 times.  So I

12  called him back and I said, would y'all ask Bill to come back

13  down here so I can get him to sign an affidavit about that.  I

14  typed up a quick affidavit, which I have out there.  He came

15  into my office.  He sat -- he sat there in front of my desk,

16  looked at the affidavit, read it.  And I said, is that -- is

17  everything in there accurate and true?  He said yes, and he

18  signed it.  My secretary was -- hadn't gotten in there before he

19  could sign it.  And as he was walking into the -- as she was

20  walking into the office, I said, wait a minute, wait a minute.

21  I said, would you tell her if that's your signature.  And he

22  said yes, and she notarized it.  And that's all that is.  And

23  I'll be glad to give them that affidavit.  There's no problem

24  with that, in my opinion.

25       Now, there's one other gentlemen, and I don't even know

1   if this is who you're talking about.  But are you talking about

2   Scotty Johnson, the fellow you're claiming wouldn't call him

3   back?

4           MR. STEELE:  Yes.

5           MR. MCKOON:  All right.  Scotty Johnson, I called

6   Scotty Johnson and he came to my office.  Because I was calling

7   everybody on their list after that.  Mr. Johnson came to my

8   office and he said, I don't want to be involved in this.  He

9   said, Mr. Davis called me the day my wife was having a baby; and

10  I told him I was at the hospital and my wife was having a baby,

11  and all he wanted to know was would I come and help him in this

12  case.  And he didn't even ask me how my baby was doing; and it

13  ticked me off, to be quite frank with you.  And he's called me

14  back several times since then, and I just felt like I don't want

15  to get involved in this.  And I said, okay, Mr. Johnson, thank

16  you.  And he left.  And that's all I know about any of this.

17          And I have never in my lifetime intimidated a witness.

18  And in fact, I also talked to a guy named Miles, Eddie Miles,

19  who came to my office.  And I said -- and kind of at the end of

20  talking to him, I said, have you been contacted by the

21  plaintiff's attorneys.  And he said yeah.  And he said, they

22  told me the same thing you told me, Mr. McKoon, which is they

23  just told me to tell the truth, whichever way it cut.  And I

24  said, well, that's what I'm telling you, too.  And that's all I

25  know about this.

```
 1            And I resent this.  I resent this terribly.  And if
 2    they want me out of this case that bad, that's fine.  But I'm
 3    going to tell you right now, I haven't done anything wrong.  And
 4    I would never intimidate anybody or any witness.  Anne Land is
 5    welcome to -- she's been promoted in the fire department since
 6    all this stuff happened.  She was one of the people that went
 7    down and talked to the newspaper and did all this stuff.  She's
 8    been promoted since then.  These people are treated fairly all
 9    the time, and I've never treated anybody unfairly.  And I
10    just -- I just resent it.  He doesn't know me and he doesn't
11    know me, but anybody that knows me knows I don't do that kind of
12    stuff.  I've never done it and I won't do it.  It's not worth
13    it.  I've got to look myself in the eye every day.  That's the
14    way I feel about it.  So that's not legal, but that's what I'm
15    telling you.
16            THE COURT:  Mr. Steele?
17            MR. STEELE:  Well, just two points that I'd like to add
18    on this.  And I understand why you take it personal.  It's not
19    meant that way, but I understand where you're --
20            MR. MCKOON:  It's personal to me.
21            MR. STEELE:  I understand that.  Two things on that.
22    The issue of two individuals asking the chief should I talk to
23    them or not, the reason that occurred is that last summer when
24    the case was originally going to be going to trial, one of the
25    management officials went around to the stations and told
```

1  everybody that they were not allowed to speak with us, as

2  David's attorneys, without first going through the chain of

3  command.  That's why they inquired as to whether they should

4  talk to us or not, because Anne Land, for example, believed that

5  without doing that, she could have been subject to discipline.

6        The second thing is each of the individuals we talked

7  to -- one of the things that I asked them specifically -- and

8  I'll tell you, the first person I asked this specifically, I

9  expected a different answer.  But I asked them each

10 specifically, when you were brought in, were you told, you know,

11 that you were free to talk or not to talk?  And were you told

12 that you didn't have to stay but they'd like to talk to you if

13 you're willing to?  Were you told anything like that?  And to a

14 person, each one said we were never told anything like that.

15 The only thing remotely like that is that we were told that we

16 don't have to talk to Mr. Davis's attorneys if we don't want to,

17 but we were ordered by our bosses to go talk to Mr. McKoon.  And

18 no one ever told us that we didn't have to go.

19        And that makes it an inherently coercive environment

20 when you're in -- you know, this is a case where -- where we're

21 going to hear the words "chain of command" come out of the

22 mouths of the defense witnesses time and time and time again.

23 And under this chain of command, when they're ordered to go talk

24 to Mr. McKoon, they're obligated to do it.

25        And, you know, I wouldn't be here raising this if any

1   of them had told me that Mr. McKoon, when I got there, said, you

2   know, listen, we'd like to talk to you about some things in this

3   case, but you don't have to talk to me if you don't want to.

4   Nothing's going to happen to you if you don't talk to me, but

5   I'd sure appreciate if you sat down and talked to me.  If any of

6   them told me that, I wouldn't be raising this at all.  I simply

7   wouldn't.  It wouldn't be an issue.  But to a person, to a

8   person, we were told that they were not told that.  And they

9   felt obligated and really coerced, because they didn't want to

10  do it, but obligated because of their employment to speak with

11  him about this case.  So on that point, we asked each and every

12  one of them.  And what we were told is different than -- than

13  Mr. McKoon's recollection.  Had their recollection been the

14  same, I wouldn't be raising this.  But I think it's different

15  under the facts as they've been told to us.

16          THE COURT:  All right.  This is the way I'm going to

17  handle this.  I'm not going to take the drastic step of removing

18  counsel and continuing the case at this time; however, I'll keep

19  open the possibility if at a later time it should prove that

20  such drastic action and a mistrial would be appropriate.

21          I'm going to -- with any of these witnesses, I'll be

22  happy to hear from them and let them come up and talk about what

23  you were just talking about before they testify if you want to.

24  I'll certainly let you question any of them in front of the jury

25  who may testify about these facts, and you can suggest to the

1  jury all you want to that if they believe that, they can take

2  that into consideration in the case.  I'll also talk to any of

3  these, if y'all think it appropriate, privately off the

4  record -- I mean on the record without asking them specifically

5  the facts but just to assure them that they are not subject to

6  any retribution or anything for what they say.  Or I'll tell

7  them that in -- without the jury there but in front of the

8  officials of the city and make it very clear that they're to

9  tell the truth and just let it roll on whatever the truth is

10  without any consequences affecting them.

11          So I'm not going to take action on it now.  But before

12  you get into those witnesses, I'll be happy for you to take it

13  up with me again.

14          MR. STEELE:  Okay.  And Your Honor, one additional

15  thing on that that we would ask you to at least consider.  Given

16  the reluctance of these individuals to testify, we believe it

17  would be appropriate to allow us to call them as adverse

18  witnesses with the ability to lead those witnesses.

19          THE COURT:  I'll let you do that if you establish

20  outside the presence of the jury that they're indeed adverse.

21          MR. MCKOON:  Judge, let me -- may I say something?

22          THE COURT:  Yes.

23          MR. MCKOON:  There's been no establishment that these

24  witnesses are reluctant to testify about anything.

25          THE COURT:  Well, that's what I said.  If you establish

 1  outside the presence of the jury that they are and that they

 2  would be adverse for any reason, then I'll do it.  But I'm not

 3  going to -- I'm not going to let you just start cross-examining

 4  them without that being done.

 5       MR. STEELE:  And certainly if it's your preference we'd

 6  be willing to bring -- we don't have all of them here, but we

 7  have at least two, maybe three, outside that could come in and

 8  on the record -- I would ask that it either be, you know -- I

 9  guess maybe Mr. McKoon and I here, not this big, you know, crowd

10  of everybody on our side and everybody on your side, which I

11  think --

12       MR. GRAHAM:  That's fine with me, Judge.

13       MR. MCKOON:  I'd be absolutely happy to voir dire these

14  witnesses in the presence of the Court.

15       MR. STEELE:  Well, I want to be careful about this,

16  though.  Talking about voir diring the witnesses in the presence

17  of the Court, I'm talking about bringing them in here because of

18  this issue so they can tell you, Your Honor, what they

19  experienced and how they feel.  I'm not talking about bringing

20  them in here to make them feel small and be cross-examined in an

21  adversarial manner, which will only amplify what we believe is

22  the harm and interference that already has been taking place.

23  And I see nothing wrong for them being able to tell you what

24  occurred.  And certainly I don't have to tell you, Your Honor,

25  that you can ask them any question that you'd wish to.

 1          THE COURT:  I'm inclined to do that with -- on the

 2   record with one counsel from each side present and then here in

 3   chambers, but not now.

 4          MR. STEELE:  Okay.

 5          THE COURT:  Let's select the jury and then see where we

 6   are after that, and then we'll take it --

 7          MR. JOSHUA MCKOON:  Your Honor, may I be heard on this

 8   for just a moment?

 9          THE COURT:  All right.

10          MR. JOSHUA MCKOON:  These interviews that have been

11   discussed were not taken just with Mr. McKoon and the witness.

12   I was present for the interviews of Mr. Pitts, Mr. Johnson, and

13   one of the -- one of the other individuals, and I believe

14   Mr. Graham and Mr. Dugan were present for the rest.  I can tell

15   you as to the ones that I was present for that it was made clear

16   to all of these witnesses that they were under no obligation

17   whatsoever to say anything to us about anything to do with this

18   proceeding, much less contact with the other side.  And I would

19   be more than willing to testify to that under oath, and I am

20   aware of the penalty for perjury.  And Mr. Steele is not aware

21   of this -- this law firm and my father's 30-year career in law

22   practice.  And so I know he makes this allegation without

23   understanding that no -- no such allegation has ever been made.

24   And I'm certain that if the Court is willing to inquire as to

25   the other -- other people that were present at these meetings,

 1  it will become manifest that there was no such witness

 2  intimidation that took place.  And I just wanted that on the

 3  record.

 4           MR. STEELE:  Well --

 5           THE COURT:  All right.  Thank you.  I'll take this up

 6  with just the two of you here with these.  And then if it

 7  becomes necessary to go further, we'll see.  But if we get into

 8  a situation where we've got all the lawyers on one side as

 9  witnesses, that creates another problem.  We'll just take it up

10  with two people so the purpose of it will be for me to see what

11  they have to say.

12           MR. MCKOON:  But just so the record will be clear, as I

13  understand it, there's no allegation being made that anybody was

14  ever told not to talk to you.

15           MR. STEELE:  Correct.

16           MR. MCKOON:  That's what I thought.

17           MR. STEELE:  But I'll repeat.  I asked each of them

18  whether they were told they had the option not to talk to you,

19  and each one said, no, they were never told that.

20           If they were, I wouldn't be raising this, Your Honor.

21  It was raised with reluctance.  I'm aware that Mr. McKoon has a

22  very long career.  I've never had to raise anything like this

23  before.  And it's with no joy, Your Honor, that I had to come in

24  this morning --

25           MR. MCKOON:  Yeah.

 1          MR. STEELE:  -- and raise that.  But when you talk to

 2   them, if they tell you what they told me, they were not given

 3   the option to either speak or choose not to speak with

 4   Mr. McKoon.

 5          THE COURT:  Well, my inclination would be just to

 6   ask -- tell them that it's been suggested that they have some

 7   hesitation about testifying and some reluctance to do this in

 8   the presence of city officials because of things that they were

 9   told before, and I just want them to tell me whatever they might

10   want to say about how they feel about testifying, see what they

11   have to say.  I don't -- I don't want to drill them either.  But

12   I want to just see what they have to say.

13          All right.  Is there anything else before we select a

14   jury?

15          MR. STEELE:  Yes.  The other issue that we have, Your

16   Honor, is in light of your evidentiary decisions at the end of

17   the week concerning the admission of testimony and exhibits

18   relating to certain past actions of Mr. Davis -- decisions that,

19   for the record, we disagree with but we respect and understand

20   that you've made those decisions -- we've discussed that matter

21   with our client.  And we've determined that the most appropriate

22   course of action for us in that regard is to voluntarily dismiss

23   the second claim for free association and to proceed forward on

24   the core First Amendment free speech claim as well as the prior

25   restraint that's before Your Honor.  And as we understand your

1    rulings, if we're proceeding simply on the free speech claim,

2    those exhibits and that testimony is not relevant to that claim

3    and should not come in.  So, you know, for that reason, we

4    believe that's what is the best course of action.  It's likely

5    to tighten up the time of the trial a bit, I would imagine; but

6    at this time, we would voluntarily dismiss and withdraw our

7    second cause of action on free association.

8        THE COURT:  All right.  We'll get that on the record

9    and take a look at the exhibits and see where that leaves us, as

10   far as witnesses are concerned, after we get the jury selected.

11       So let's go ahead and select a jury.  And I won't make

12   any mention of anything in the jury selection about that claim.

13   Anything else before we select a jury?

14       MR. STEELE:  No, sir.

15       THE COURT:  We'll select eight jurors, three strikes

16   each.  And I'll call the lawyers up to the bench in front of me

17   and the courtroom deputy will handle that with the plaintiff

18   first striking up to three, the defendant coming next, and no

19   back striking, up to three each.  Any question about the

20   mechanics?

21       MR. MCKOON:  No, sir.

22       MR. STEELE:  No, sir.

23       THE COURT:  Do you have -- did you have a question?

24       MR. BROWN:  Back striking meaning once we have approved

25   or passed on a witness, in the next round of strikes --

 1          THE COURT:  That's right.  That's right.  Okay.

 2          MR. MCKOON:  Judge, I want to say one other thing, if I

 3  could, and then I'll hush.  I promise.  You know, I'm not going

 4  to make an allegation I can't support.  But you know, I have no

 5  way of knowing if these union folks haven't talked to these

 6  people.  I have no way of knowing that.  I guess I could make

 7  that allegation if I wanted to, but I'm not going to, because I

 8  don't know anything like that.  So I just wanted to put that on

 9  the record.

10          MR. STEELE:  And respectfully, that is why we have

11  offered to bring them in and have them testify before the Judge

12  concerning what happened.  I'm not professing to have firsthand

13  knowledge of it.  But I did talk to these individuals, and

14  that's what they told me.

15          MR. MCKOON:  Okay.

16          THE COURT:  All right.

17      (Chambers conference concluded at 10:09 a.m.)

18      (Jury selection proceedings, which are filed as a separate

19       transcript, commenced at 10:11 a.m., after which, at

20       11:46 a.m., proceedings continued, as follows:)

21          THE COURT:  All right.  Be seated and we'll get a

22  couple of things on the record here, and then we'll see where we

23  stand.  Anybody who -- parties or witnesses, anybody who would

24  like to leave, it's fine.  I just want to take this up with

25  counsel.

1           I think this was on the record, but the plaintiff has

2    moved to dismiss count two in the case, and that's granted.

3    Count two will not be in the case.  The case will proceed on

4    count one before the jury and on count three as an equitable

5    claim before me.  Now, that's what I wanted to take up here.

6    But as to the timing of taking up some other matters that I've

7    discussed with counsel, let me -- let me see counsel.  We'll go

8    back in the robing room.  I'll ask the court reporter to stay

9    available, and we'll talk about whether to take this up before

10   or after lunch or what to do about it.  Anything else that

11   either side wants to bring up here before we adjourn?

12           MR. STEELE:  No, Your Honor.

13           MR. MCKOON:  Judge, the only thing I had is the

14   plaintiff's counsel had asked me to make available today five

15   people.  Of course, the parties are going to be here anyway,

16   Mr. Hunter and Mr. Roberts.  The other people here, Roy Waters,

17   for instance, no longer even works for the City of Phenix City.

18   He's here.  The mayor is here.  The personnel director is here.

19   I would like, if you would, just to give us some indication as

20   to when he might want to call these people.  Because if he's not

21   going to reach them today, I'd rather them not have to sit up

22   here all day.

23           THE COURT:  Mr. Steele?

24           MR. STEELE:  Your Honor, Mr. Waters and the personnel

25   director we do not anticipate reaching today.  So I would not

1    object to releasing them.

2         THE COURT:  Have them back tomorrow?  Do you want them

3    back tomorrow?

4         MR. STEELE:  I anticipate that, but we can bring that

5    up at the end of the day.

6         MR. MCKOON:  I'll give you the phone number, and you

7    can just call me.

8         MR. STEELE:  That's fine.

9         THE COURT:  All right.  I'm assuming that the parties

10   want the rule invoked and we will not have witnesses in the

11   courtroom.

12        MR. MCKOON:  Yes, sir.  That's true, Your Honor.

13        MR. STEELE:  Your Honor, in connection to that, there

14   is -- and due in part to the recent rulings, we're removing

15   Thomas Malone from our witness list.  He will not be called in

16   our case in chief.  Of course, we reserve the right to bring

17   anyone who's necessary as rebuttal, but I do not anticipate his

18   participation.  And he will not be in our case in chief.

19        THE COURT:  All right.

20        MR. STEELE:  So I move that.

21        MR. MCKOON:  If he's not going to testify, he can stay

22   in.

23        THE COURT:  All right.  Then we will be in recess, and

24   I'll see counsel in chambers.

25      (Off-the-record in-chambers discussion)

```
 1        (Lunch recess at 11:49 a.m. until 1:16 p.m., at which time

 2         proceedings reconvened in chambers, as follows:)

 3      (Mr. Steele, Mr. McKoon, and Captain Land present)

 4            THE COURT:  Ms. Land?

 5            CAPTAIN LAND:  Yes, sir.

 6            THE COURT:  Just have a seat.  All right.  You are Anne

 7  Land?

 8            CAPTAIN LAND:  Yes, sir.

 9            THE COURT:  Okay.  I'm Judge Albritton.

10            CAPTAIN LAND:  Nice to meet you.

11            THE COURT:  You've been subpoenaed as a witness in this

12  case.  And I want to tell you first that when you're subpoenaed

13  as a witness in a case, you don't have any choice to come or not

14  to come.

15            CAPTAIN LAND:  Yes, sir.

16            THE COURT:  You're ordered to be here.  And your legal

17  obligation is to answer all questions that are asked you on the

18  stand truthfully.

19            CAPTAIN LAND:  (Nods head)

20            THE COURT:  You're not supposed to talk about things

21  that you're not asked about, but you are legally required to

22  answer all questions truthfully.  A lot of witnesses are

23  reluctant to -- a lot of people are reluctant to be witnesses in

24  court, would rather not get involved, and that's understandable.

25            CAPTAIN LAND:   (Nods head)
```

```
 1          THE COURT:  But I want you to understand that you -- in

 2    answering questions under subpoena and in telling the truth,

 3    that you need not be concerned about any repercussions from

 4    that, any actions being taken against you because of telling the

 5    truth in court by anybody.  You may feel under some -- some

 6    stress or feeling of testifying in court with having people from

 7    the city, by having the fire chief, or by having the plaintiff,

 8    Mr. Davis, or by having someone from the firefighters

 9    association there.  That's just unavoidable that you might have

10    those kinds of feelings yourself.

11          I want to ask you about -- because it's been suggested

12    to me that in addition to your having some feelings of not

13    wanting to get involved, that there may have been attempted

14    intimidation of some form in connection with this matter.  And

15    I'd like for you to just tell me the circumstances of your being

16    asked to testify and your being involved in the case.

17          CAPTAIN LAND:  I was -- I was left a voice mail by

18    David's attorneys to give them a call, that they wanted to ask

19    me a few questions.  So I contacted the fire chief to let them

20    know that David's attorneys had contacted me, and he said he

21    would call Mr. McKoon to let him know.  Chief Hunter then called

22    me back, told me that Mr. McKoon was waiting on me, that I

23    needed to go to his office.  And when I showed up, he said, you

24    know, I just want to ask you a few questions; it won't take

25    long.  He told me that I had the option to talk to David's
```

1   attorneys or not talk to them and that, you know, after I spoke

2   with them, that he would appreciate it if I would call him back

3   and let him know what we talked about.

4           THE COURT:  Did Mr. McKoon tell you that you had the

5   option to talk to him also or not talk to him?

6           CAPTAIN LAND:  No, sir.

7           THE COURT:  Did he tell you that you were under an

8   obligation to talk to him?

9           CAPTAIN LAND:  He didn't tell me that I was.  I was

10  just told to report to his office.

11          THE COURT:  Did the -- did the chief tell you that

12  after you reported there, that you had to talk to him?

13          CAPTAIN LAND:  He told me he had a few questions that

14  he wanted to ask me.  I didn't -- I didn't really feel like I

15  had a choice.  I mean I was on duty and, you know, they called

16  me down and told me they needed to talk to me, so.

17          THE COURT:  Did you relay back to Mr. McKoon anything

18  that the plaintiff's lawyers asked you about?

19          CAPTAIN LAND:  I was with Chief Hunter when Mr. McKoon

20  had called.  And Chief Hunter put me on the phone, said that he

21  wanted to ask me a few questions.  And he wanted to know what

22  David's attorneys had talked to me about.  Later that day, they

23  called me on the -- they called the battalion chief, and the

24  battalion chief told me that --

25          THE COURT:  The what kind of chief?

```
 1          CAPTAIN LAND:  The battalion chief, the shift

 2   commander, and told him that I needed to report to Mr. McKoon's

 3   office ASAP.  So Sergeant Pitts and me were together.  We were

 4   doing -- we were in the training division.  So we went to

 5   Mr. McKoon's office, and he told me it would be a minute, that

 6   he just had a few questions he wanted to ask me.

 7          THE COURT:  Now, was this the second time?

 8          CAPTAIN LAND:  This is the second time.  Yes, sir.  And

 9   he kind of asked me the same questions over again.

10          THE COURT:  The same questions he had asked you before.

11          CAPTAIN LAND:  Asked me the first time.  Yes, sir.

12          THE COURT:  Which was what, about what you were going

13   to testify to?

14          CAPTAIN LAND:  About an article that was in the paper

15   about a statement that I had written.

16          THE COURT:  An article in the paper about a statement

17   that you had written?

18          CAPTAIN LAND:  Yes, sir.

19          THE COURT:  Okay.  You say you went over there the

20   second time with someone else.  Who was that?

21          CAPTAIN LAND:  Sergeant Pitts.  William Pitts.

22          THE COURT:  And what's his position?

23          CAPTAIN LAND:  He's a sergeant.  He's one of the

24   witnesses also.

25          THE COURT:  Oh, okay.  He's one of the -- did he talk
```

1    to both of y'all together or separate?

2            CAPTAIN LAND:  Separate.

3            THE COURT:  Did you pass on any information that --

4    about questions you were asked by the other lawyers?

5            CAPTAIN LAND:  Yes, sir.

6            THE COURT:  Did that have to do with the same matter

7    that you were being questioned about otherwise, about the

8    article you -- or statement you made that was quoted in the

9    paper?

10           CAPTAIN LAND:  It was a little different.  The

11   question -- some of the questions that they had asked me about

12   the meeting with Mayor Hardin.

13           THE COURT:  About the meeting of the plaintiff with

14   Mayor Hardin?

15           CAPTAIN LAND:  Yes, sir.

16           THE COURT:  Did you know anything about that meeting

17   with Mayor Hardin?

18           CAPTAIN LAND:  I was at the meeting.

19           THE COURT:  Oh, you're not -- now, you were at a

20   meeting with Mayor Hardin?

21           CAPTAIN LAND:  We were at a union meeting when Mayor

22   Hardin was there.

23           THE COURT:  This is a different time from the telephone

24   conversation.

25           MR. STEELE:  Yes, Your Honor.

```
 1          THE COURT:  Did you feel intimidated in connection with
 2   any of this?
 3          CAPTAIN LAND:  I -- I felt that I didn't have an
 4   option.  I mean I -- I mean I -- I'm afraid that, you know,
 5   what's going to happen here is going to affect my career and my
 6   job, so I'm a little intimidated right now.
 7          THE COURT:  Well, as I've told you, nobody can take any
 8   adverse action against you for telling the truth.  And when
 9   you're subpoenaed to testify at trial, that's your obligation,
10   is to tell the truth.  And so I hope that will relieve some of
11   your -- of your feelings.  Is there anything else you'd like to
12   say about this?
13          CAPTAIN LAND:  No, sir.
14          THE COURT:  Let me ask you to just step outside, but
15   hang around just a minute.
16          CAPTAIN LAND:  Yes, sir.
17          THE COURT:  I may want to ask you to come back in.
18      (Captain Land not present)
19          THE COURT:  I'm inclined to let the lawyers ask
20   questions of this person.  Anybody -- do you have any problem
21   with that?
22          MR. STEELE:  No problem.
23          THE COURT:  Do you?
24          MR. MCKOON:  No, sir.
25          THE COURT:  Would you like to ask any questions,
```

1  Mr. Steele?

2         MR. STEELE:  I don't have any questions.  There might

3  be so-called redirect, depending upon what other questions get

4  asked, but I think that you asked her the core -- the core

5  issues.  It's probably better to --

6         THE COURT:  All right.  Mr. McKoon, I'll let you ask

7  questions.

8         Then if you want to ask some after that, I'll let you.

9         Ask her come back in.

10    (Captain Land present)

11         THE COURT:  Sit down again, please.  Ms. Land, I'm

12  going to let Mr. McKoon ask you some questions if he wants to,

13  and I'll ask -- I'll allow Mr. Steele, too.  I'm not addressing

14  you by your title.  What are you, captain?

15         CAPTAIN LAND:  Captain.

16         THE COURT:  Captain Land.  I'm sorry.  Go ahead.

17         MR. MCKOON:  Captain Land, when you came to my office,

18  do you recall me telling you that this would absolutely not

19  affect your job in any way?

20         CAPTAIN LAND:  Yes, sir.

21         MR. MCKOON:  All right.  And that I wouldn't do

22  anything to hurt your career, that lawsuits come and go, but

23  careers are something that are too important?  Do you remember

24  me saying that to you?

25         CAPTAIN LAND:  I remember you saying that you wouldn't

1    do anything to jeopardize my career.

2          MR. MCKOON:  All right.  Did I also tell you that if

3    there's anything that you told me that you wanted kept off the

4    record, so to speak, or that -- well, first of all, let me

5    rephrase the question -- that I would not repeat what you told

6    me to Captain Hunter or any of your superiors?

7          CAPTAIN LAND:  I don't remember that.

8          MR. MCKOON:  Okay.  Do you recall me telling you

9    that -- or do you recall this?  On the first meeting that you

10   came to my office, do you recall you telling me that there

11   was -- you knew who the problem was in the department?  And I

12   asked you who that was; and you said, I'd rather not say?

13         CAPTAIN LAND:  Yes.

14         MR. MCKOON:  Do you remember that?  And I said, well, I

15   don't want -- I won't ask anything you don't want to tell me

16   about.  Is that --

17         CAPTAIN LAND:  Yes, sir.

18         THE COURT:  Do you remember that?

19         CAPTAIN LAND:  Yes, sir.

20         MR. MCKOON:  Okay.  I'm sorry if you felt compelled to

21   come down there.  But at any time, did you tell me, I don't want

22   to talk to you, Mr. McKoon, or I'd just rather not talk?

23         CAPTAIN LAND:  I didn't feel that I had that option,

24   honestly.

25         MR. MCKOON:  Well, was there anything that you told me

 1    in this case that you felt like was some secret that the Court

 2    shouldn't find out about or that wouldn't come out in court

 3    anyway?

 4              CAPTAIN LAND:  Not that wouldn't come out in court.  I

 5    don't know what you already knew beforehand.

 6              MR. MCKOON:  Okay.  And basically, I can't remember

 7    what -- everything you told me; but the thing that stands out to

 8    me is that you said that there was some union meeting with the

 9    mayor, either when he was running for office or after he had

10    become mayor, where he said that people -- that he had an

11    open-door policy and that firefighters could come to him without

12    repercussions at any time.  Is that what you told me?

13              CAPTAIN LAND:  Yes, sir.

14              MR. MCKOON:  All right.  At any time, did I ever ask

15    you to say anything that was untrue?

16              CAPTAIN LAND:  No, sir.

17              MR. MCKOON:  And in fact, did I emphasize to you that

18    all I wanted you to do was tell the truth?

19              CAPTAIN LAND:  Yes, sir.

20              MR. MCKOON:  Like I said, I apologize if you felt

21    intimidated.  I didn't understand that at the time we were

22    talking.

23              THE COURT:  Mr. Steele?

24              MR. STEELE:  The only follow-up is to -- is to confirm

25    what I believe you told the Judge, is that at no time did either

 1  the chief or Mr. McKoon tell you that it was your option whether

 2  or not to speak with him; is that correct?

 3          CAPTAIN LAND:  That's correct.

 4          MR. STEELE:  That's it, Your Honor.

 5          THE COURT:  Thank you, ma'am.

 6          CAPTAIN LAND:  Yes, sir.

 7          THE COURT:  Would you ask Mr. Pitts -- what's his rank?

 8          CAPTAIN LAND:  Sergeant Pitts.

 9          THE COURT:  -- Sergeant Pitts to come in, please?

10          CAPTAIN LAND:  Yes, sir.

11     (Captain Land not present)

12          MR. MCKOON:  Judge, I've got his affidavit out there.

13  Let me bring it in here in case it comes up.

14     (Brief pause)

15     (Sergeant Pitts present)

16          THE COURT:  Sergeant Pitts, just have a seat there.

17          SERGEANT PITTS:  Yes, sir.

18          THE COURT:  Just a minute until Mr. McKoon gets back.

19     (Brief pause)

20     (Mr. McKoon present)

21          THE COURT:  You're Sergeant Bill Pitts?

22          SERGEANT PITTS:  Yes, sir.  William A.  I just go by

23  Bill, sir.

24          THE COURT:  Okay.  And you're with the fire department

25  of Phenix City?

 1          SERGEANT PITTS:  Yes, sir.

 2          THE COURT:  Okay.  I'm Judge Albritton.

 3          SERGEANT PITTS:  Nice to meet you, sir.

 4          THE COURT:  I understand that you've been subpoenaed as

 5  a witness in this case, and I wanted to ask you a few

 6  questions.  First, I want to explain to you your rights and

 7  obligations when you're under subpoena.  When you've been

 8  subpoenaed as a witness, you don't have any choice about whether

 9  to come or not.  So the law requires you to come and be sworn in

10  as a witness.  The law also requires you to tell the truth.

11          SERGEANT PITTS:  Yes, sir.

12          THE COURT:  And answer any question that you are

13  answering truthfully.  You cannot legally be hurt in any way or

14  have any action taken against you or any retaliation of any sort

15  with your job or otherwise because you've answered the subpoena

16  and testified truthfully in court.

17          SERGEANT PITTS:  (Nods head)

18          THE COURT:  So I know that some -- some people would

19  rather not get involved in a trial and would feel some -- some

20  hesitation and some intimidation, just by virtue of being there

21  in court.  I want you to -- I want to tell you that if you

22  testify, you should not feel intimidated by the presence of the

23  fire chief or the presence of the plaintiff there or a union

24  representative or the lawyers or anybody else.  Your obligation

25  is simply to answer questions truthfully.

```
 1          And -- but it's -- I've been advised that there may
 2  have been some intimidation, whether it was intentional or
 3  otherwise, but that there may have been, in connection with your
 4  being a witness in this case.  And I'd just like for you to tell
 5  me the circumstances of your being here as a witness.
 6          SERGEANT PITTS:  As far as --
 7          THE COURT:  How you were -- how you were called to be
 8  here, who you talked to, what you were told, and so forth.
 9          SERGEANT PITTS:  Well, the first subpoena I got I got
10  through the mail from -- from these guys right here (indicating
11  Mr. Steele).  And the second one was I went and talked to
12  Mr. McKoon and everything at his office.  We were on duty and
13  everything like that.  And we went down to his office that day
14  and talked with him and everything.
15          THE COURT:  You say we.  Who's that?
16          SERGEANT PITTS:  Captain Land and myself had went down
17  to Mr. McKoon at his office on that day.
18          THE COURT:  Had you talked to Mr. Steele or any other
19  lawyer for the plaintiff at that time?
20          SERGEANT PITTS:  Yes, sir.
21          THE COURT:  Before you went to see --
22          SERGEANT PITTS:  Yes, sir.
23          THE COURT:  Okay.  So you got a subpoena in the mail.
24          SERGEANT PITTS:  Yes, sir.
25          THE COURT:  And the first lawyer you talked to was who?
```

```
 1              SERGEANT PITTS:  I don't know if it was Doug or Bryan,
 2    I think it was.
 3              MR. STEELE:  I think it was Gary.  It was one of us.
 4              SERGEANT PITTS:  Gary.  Yes, sir.  I mean it's --
 5              THE COURT:  Some lawyer.
 6              SERGEANT PITTS:  Yes, sir.  Yes, sir.  I'm not real
 7    good with the names.
 8              THE COURT:  Some lawyer for the plaintiff.
 9              SERGEANT PITTS:  Yes, sir.
10              THE COURT:  All right.  Had anybody told you at that
11    time that you should not talk to them?
12              SERGEANT PITTS:  No, sir.
13              THE COURT:  Had anybody talked to you one way or the
14    other about whether -- about talking to anyone?
15              SERGEANT PITTS:  No, sir.  To these guys?
16              THE COURT:  Yes.
17              SERGEANT PITTS:  No, sir.  No, sir.
18              THE COURT:  Now, how did you happen, after talking to
19    them, to go to Mr. McKoon's office?
20              SERGEANT PITTS:  We were in an incident command class
21    that day down in our training center and everything, and we were
22    sitting in the class.  And I think Ms. -- Captain Land came in
23    there and said that we needed to report to Mr. McKoon's office
24    ASAP.
25              THE COURT:  Okay.  So you did?
```

 1          SERGEANT PITTS:  Yes, sir.

 2          THE COURT:  And Mr. McKoon asked you questions.

 3          SERGEANT PITTS:  Yes, sir.

 4          THE COURT:  All right.  Did he -- did he tell you you

 5    had to talk to him?

 6          SERGEANT PITTS:  No, sir.  I mean we -- basically, we

 7    went in there and everything.  He said I need to ask you a

 8    couple of questions.

 9          THE COURT:  Okay.  Did he say anything to you to the

10    effect that you did not have to talk to him if you didn't want

11    to?

12          SERGEANT PITTS:  No, sir.  It's just -- like I said,

13    basically, it was just, I just need to ask you a couple of

14    questions and everything, go over some things with you, and that

15    was all.

16          THE COURT:  Okay.  Did you feel anything was wrong with

17    that?  Did that bother you in any way?

18          SERGEANT PITTS:  I mean I was nervous enough, you know,

19    having to go down there not really knowing why I was going to

20    have to go down there.  And just being there, I mean it --

21    nervous like I am now.  You know what I mean?

22          THE COURT:  Yes.

23          SERGEANT PITTS:  And not knowing why.  Just being, you

24    know, kind of scared, because -- not knowing.  You know what I

25    mean?  So --

1          THE COURT:  Okay.  Well, you knew you had gotten a

2    subpoena to be here as a witness, right?

3          SERGEANT PITTS:  Yes, sir.

4          THE COURT:  Okay.  And you had talked to -- to the

5    plaintiff's lawyers.

6          SERGEANT PITTS:  Yes, sir.

7          THE COURT:  Were you asked anything about what the

8    plaintiff's lawyers said to you?

9          SERGEANT PITTS:  No, sir.

10         THE COURT:  Okay.  Do you feel under any kind of

11   intimidation about testifying today after what I've told you

12   about your legal rights?

13         SERGEANT PITTS:  I mean -- yes.  I mean -- I mean

14   honestly, I'm just -- I'm -- I probably -- the past couple of

15   days since all this has happened -- I mean you can't sleep.

16   Stomach just totally upset because I don't know what's going to

17   happen -- you know what I mean? -- one way or the other.

18   It's -- only thing I've told everybody, you know, these guys and

19   Mr. McKoon's guys, all I'm going to do is tell the truth, you

20   know, if it helps anybody or hurts anybody.  But as far as me

21   sitting in that -- in that chair in there, you know, if and when

22   I'm called on, scared to death.  I really am.  I mean I -- me

23   personally, I am.

24         THE COURT:  Okay.  Well, I can understand that.  And a

25   lot of people feel that way about -- have you ever testified in

1    court before?

2         SERGEANT PITTS:  No, sir.

3         THE COURT:  Okay.  Particularly with the first time,

4    some people feel that way.  I want to tell you again that if you

5    testify, legally, there can be no adverse consequences to your

6    job by getting on the stand and telling the truth.  There would

7    be -- it would be against the law if you just refused to get up

8    there on the stand.  You have to if you're under subpoena.

9         SERGEANT PITTS:  Yes, sir.

10        THE COURT:  It would also be -- it would be against the

11   law if you -- if you didn't tell the truth.

12        SERGEANT PITTS:  Yes, sir.

13        THE COURT:  So what the law requires you to do if

14   you're asked to take the stand is to answer the questions

15   truthfully.  And you cannot be penalized in your job or any

16   other way for doing that.

17        SERGEANT PITTS:  Yes, sir.

18        THE COURT:  I hope that would make you feel more

19   comfortable about it if you're actually called to testify.

20        Now, I'm going to ask -- let the lawyers ask you a

21   question or two, if they want to.  Mr. McKoon?

22        MR. MCKOON:  Can I call you Bill?

23        SERGEANT PITTS:  Yes, sir.

24        MR. MCKOON:  Bill, when you came down to my office, did

25   I tell you that if there was anything you didn't want to talk to

1    me about, you didn't have to talk to me about it?

2        SERGEANT PITTS:  I believe so.

3        MR. MCKOON:  In addition to that, when we were

4    talking -- and I'm not going to get into what it was, but there

5    was one particular question I asked you, and you said I'd rather

6    not tell you that.  And I said, well, I'm not going to bring it

7    up in court; we won't say anything about that.  Do you remember

8    what I was talking about?

9        SERGEANT PITTS:  No, sir, not right now.

10        MR. MCKOON:  All right.  Well, if I brought it up now,

11    then I'd be bringing it up in court, so I'm not going to do

12    that.

13        SERGEANT PITTS:  Yes, sir.

14        MR. MCKOON:  But I guess my question is did I ever ask

15    you to do anything except tell me the truth?

16        SERGEANT PITTS:  That's it.

17        MR. MCKOON:  And did you do that?

18        SERGEANT PITTS:  Yes, sir.  I've -- you know, the

19    things -- the questions he was asking and everything, I was just

20    basically -- what I could remember.  I probably said a hundred

21    times, you know, to the best I can recall and stuff, because

22    this happened so long ago and stuff.  And I was as honest as I

23    could be with them with what I remembered or, you know, thought

24    was right and everything and stuff like that.

25        MR. MCKOON:  All right.  And then after you left, did I

1   ask you to come back and sign an affidavit, just a real brief

2   affidavit to what you'd told me?

3           SERGEANT PITTS:  Yes, sir.

4           MR. MCKOON:  And did you do that?

5           SERGEANT PITTS:  Yes, sir.

6           MR. MCKOON:  Let me show it to you real quick.  Is that

7   what you signed?

8           SERGEANT PITTS:  Yes, sir.

9           MR. MCKOON:  Is it accurate?

10          SERGEANT PITTS:  What, my signature and all?

11          MR. MCKOON:  No.  What's on it.

12          SERGEANT PITTS:  Do you want me to read it?

13          MR. MCKOON:  Yes, sir.  Sure.  Take a minute and do it.

14      (Brief pause)

15          THE COURT:  Do you have a copy of that, Mr. Steele?

16          MR. STEELE:  No, sir.

17          THE COURT:  Excuse me a minute.  Let's get a copy of

18  this made.

19          MR. MCKOON:  Sure.  Sure.

20          THE COURT:  Ms. Behrman -- would you let her have that?

21          MR. MCKOON:  I guess we need at least two, one for the

22  Judge and one for Mr. Steele.  While he -- while he's doing

23  that, Judge, can I ask him just a couple more questions?

24          SERGEANT PITTS:  I can comment on that real quick.  I

25  mean at the present time, one of the things on there, I said

1  that the -- the ordinance that was trying to get passed and

2  everything was for new hirees and people, you know, being

3  promoted for probation, but I was off on it.  My wife, of all

4  people, has got a mind like a steel trap, and I was talking to

5  her about it.  And what it was was that it's, of course, for new

6  hirees.  And if it was -- if anybody had gotten in trouble, it

7  was to put them back on probation and everything for a

8  probationary period to watch over them and everything.  So

9  that -- so that right there is about the only difference, as far

10  as the other day when I thought that's what it was, but now I

11  basically know what it was.  And that's -- you know, my name

12  might be on it, but I mean -- what I thought it was, I signed;

13  but it's actually -- that's not what the ordinance was about,

14  so.

15          THE COURT:  So you were mistaken -- you say you were

16  mistaken in what you said about what the ordinance was.

17          SERGEANT PITTS:  Yes, sir.  Because like I said, it

18  was -- it was hard for me to remember and everything what it was

19  about.  Because I knew, of course, it was for the new hirees the

20  first time, but I couldn't recall what the second part of the

21  ordinance was about.  And like I said, I thought it was about,

22  you know, people being promoted, but it wasn't at the time.

23  Like I said, it was -- I believe it was for -- I don't know how

24  it was worded, but it was for -- in case like somebody had

25  gotten in trouble, they could be put on a six months' probation

 1   or something like that.  I haven't, you know, looked at it or

 2   whatever.  I don't think it got passed, though.  That's the only

 3   difference.

 4          MR. MCKOON:  I gotcha.  I know what you're talking

 5   about.  Let me go ahead and just ask you just a few more

 6   questions.  Bill, do you remember me telling you that I would

 7   promise you that I wouldn't do anything to hurt your career when

 8   you came in there, that careers lasted a lifetime and that

 9   lawsuits come and go?  Do you remember me saying something like

10   that to you?

11          SERGEANT PITTS:  I remember we talked about when I

12   asked you I didn't want to be made -- you know, look stupid on

13   the stand and everything.

14          MR. MCKOON:  Right.

15          SERGEANT PITTS:  You know, and the part -- what you

16   just said, Mr. McKoon, about not hurting or something like that,

17   I do.  The second part, I really don't.  But that first part, I

18   do.

19          MR. MCKOON:  Okay.  Well, let me tell you what I

20   remember.  Like I said, I think I told you, Bill, I'm not going

21   to do anything to hurt your career.  If there's anything you

22   don't want to tell me while we're in here today, don't worry

23   about it, but this is not going any further, just between me and

24   you.  All I want you to do is tell me the truth.  Does that

25   sound like what I told you?

 1          SERGEANT PITTS:  Yes, sir.

 2          MR. MCKOON:  All right.  Now, let's go back to the

 3   affidavit just a minute.  What I'm trying to figure out is what

 4   is it that you say is different on the affidavit?

 5          SERGEANT PITTS:  Right here in the second paragraph.

 6   It said --

 7          MR. MCKOON:  Yes, sir.

 8          SERGEANT PITTS:  The part where it says I was -- well,

 9   the part -- it says I was opposed to the change of the

10   probationary period from 12 months to 18 months because of

11   addition of new hires.  The part where it says it included a new

12   probationary period each time a firefighter was promoted within

13   the department, that's the part that I was mistaken on.

14          MR. MCKOON:  That was the first -- there were two times

15   you know it was proposed.

16          SERGEANT PITTS:  And I believe that either time it

17   wasn't -- I think the first time it was, I believe, for people

18   being -- that had got -- having disciplinary problems and

19   everything.

20          MR. MCKOON:  Right.

21          SERGEANT PITTS:  And they would be put back on

22   probation.  And the second time -- like I said, I'd have to

23   look -- I'd have to read the thing.

24          MR. MCKOON:  Well, let me ask you this.  Do you recall

25   telling me that at the time this came up, the thing that we're

1   here about today, about the probationary period being extended

2   from 12 months to 18 months that would only apply to new hires,

3   that you said to me, look, I'm going to tell you the truth; if

4   it didn't concern me, it didn't matter to me one way or the

5   other?  Do you remember saying something like that to me?

6          SERGEANT PITTS:  Yes, sir.  Because right now, it

7   benefits new hirees, because we've lost a lot of good people,

8   Your Honor, to being able to pass their EMT test.  And they

9   basically get six months.  And that's like as of today.  You

10  know what I mean?  And that's basically what -- the good thing

11  about it now, as far as the date.  That's basically what --

12  excuse me -- that's what it is.

13         THE COURT:  Anything else?

14         MR. MCKOON:  No, nothing else.

15         THE COURT:  Mr. Steele?

16         MR. MCKOON:  Thank you, Bill.

17         SERGEANT PITTS:  Sure.

18         MR. STEELE:  Mr. Pitts, did anyone tell you that you

19  were free not to visit Mr. McKoon's office and speak with him?

20         SERGEANT PITTS:  No, sir.  Just like I said, we were --

21  we were at a -- we were in class, and they -- Captain Land came

22  in and said that we needed to report to his office ASAP.

23         MR. STEELE:  So did you feel, because you were on duty,

24  compelled to answer his questions?

25         SERGEANT PITTS:  Yes, sir.

1      MR. STEELE:  To the best of your recollection, did

2  Mr. McKoon tell you that if you don't want to talk to me, you

3  don't have to talk to me?

4      SERGEANT PITTS:  No, sir.  Like I said, when we went

5  in, he just basically said, you know, I've just got a couple

6  questions for you.  And, you know, it was -- that was it.  You

7  know, we went in and talked for a few minutes, and that was it.

8      MR. STEELE:  Now, am I correct that he did tell you

9  that you don't have to talk to us, meaning David's attorneys, if

10  you don't want to?

11      SERGEANT PITTS:  I don't -- I don't really remember

12  that.

13      MR. STEELE:  Okay.  As you sit here today, are you

14  fearful that if you testified truthfully at this trial, that it

15  could negatively hurt your career with the department?

16      SERGEANT PITTS:  Yes, sir.  I mean -- yes, sir.  I mean

17  it's any -- kind of off of it, I mean a lot of people that found

18  out that, you know, I had to come here and everything, they're

19  basically -- are employed with us, you know, basically say, you

20  know, I'm glad I'm not you.  Because it's just -- things that's

21  happened in the past and everything, it's just kind of -- kind

22  of scared.

23      THE COURT:  Well, I want to assure you again that if

24  you're called as witness to testify, nobody -- the chief, the

25  city manager, nobody else -- can adversely affect your job

1  because you did that.

2        SERGEANT PITTS:  Yes, sir.

3        THE COURT:  We might all be back in court with you at

4  counsel table as the plaintiff instead of --

5        SERGEANT PITTS:  I put my hand on that Bible.  I

6  promise before God right now I'm going to say it for what it is.

7        THE COURT:  All right.  Thank you, Sergeant.  Would you

8  ask Karl Taylorson -- what's his -- is he

9        MR. MCKOON:  Karl Taylorson, I think, is his name.

10        SERGEANT PITTS:  Yes, sir.

11        MR. MCKOON:  I've never met him.

12        THE COURT:  Is he a fireman?

13        MR. MCKOON:  He is.  I think he's a driver engineer.

14  He's a sergeant like that gentleman there.

15        THE COURT:  Sergeant?

16     (Sergeant Pitts not present)

17     (Brief pause)

18     (Captain Taylorson present)

19        THE COURT:  Sergeant, have a seat.

20        CAPTAIN TAYLORSON:  Got a full house.  How are you

21  doing, sir?

22        THE COURT:  I'm well.

23        CAPTAIN TAYLORSON:  Good.

24        THE COURT:  Are you Sergeant Karl Taylorson?

25        CAPTAIN TAYLORSON:  Captain Taylorson.

```
 1              THE COURT:  Oh, I'm sorry.  I demoted you.
 2              CAPTAIN TAYLORSON:  That's all right.
 3              THE COURT:  I'm Judge Albritton.
 4              CAPTAIN TAYLORSON:  Good to meet you, sir.
 5              THE COURT:  I understand that you have received a
 6     subpoena to testify in this case, and I wanted to tell you about
 7     your rights there.  When a person -- a lot of people don't like
 8     to get involved in a lawsuit and would much rather not be called
 9     as a witness.
10              CAPTAIN TAYLORSON:  Absolutely.
11              THE COURT:  You're probably one of them.
12              CAPTAIN TAYLORSON:  Yes, sir.
13              THE COURT:  But when you're subpoenaed, when you
14     receive a subpoena, you don't have any choice.  You'd be
15     violating the law if you refused to come.  Once you get on the
16     witness stand or are sworn in, then you have a legal obligation
17     to tell the truth.
18              CAPTAIN TAYLORSON:  Yes, sir.
19              THE COURT:  And you'd be violating the law if you
20     didn't tell the truth once you got on the witness stand.
21     Another legal implication of it is that nobody can take any
22     adverse action against you for coming to court under a subpoena,
23     getting on the stand, and telling the absolute truth.
24              CAPTAIN TAYLORSON:  Yes, sir.
25              THE COURT:  It can't adversely affect your job and it
```

 1  can't adversely affect you in any other form or way.  When

 2  you're testifying, you may feel under some -- it may feel

 3  intimidating to you if you're testifying in the presence of the

 4  police chief or the city manager or the plaintiff himself or a

 5  representative from the firefighters association.  All of those

 6  things might -- might make you feel uncomfortable --

 7          CAPTAIN TAYLORSON:  Yes, sir.

 8          THE COURT:  -- or even intimidated.  But I want you to

 9  know that you cannot have adverse action taken against you for

10  telling the truth in court when you are required to be there.

11          Now, having said that, I've been told there might have

12  been some circumstances under which you either felt intimidated

13  or actually were directly intimidated in connection with your

14  being a witness.  And I just want to find out what the facts

15  were.

16          CAPTAIN TAYLORSON:  Yes, sir.

17          THE COURT:  So I'd like for you to tell me what the

18  circumstances were of your being -- first being contacted about

19  being a witness and how you happened to talk to people about it

20  and just everything that happened.

21          CAPTAIN TAYLORSON:  Okay.  Initially, I was contacted

22  by one of David's lawyers.  I'm not sure if it was --

23          MR. STEELE:  It was Mr. Brown initially.

24          CAPTAIN TAYLORSON:  Mr. Brown.  Okay.  Initially.

25  Initially I was contacted by them.  The next day -- I was on

1  military orders at the time -- I called Chief Hunter and advised

2  him that I had been contacted.  He told me that I needed to call

3  the city attorney, Mr. McKoon.  I did so; spoke to Mr. McKoon.

4          THE COURT:  Spoke to him on the phone or in person?

5          CAPTAIN TAYLORSON:  On the phone.  On the phone.  Yes,

6  sir.  Matter of fact, I had him to call me back at -- at drill

7  there where I was.  He did so.  I spoke with him.  He advised me

8  that I did not have to talk to them if I did not wish to at the

9  time.  They did get ahold of me.  I did speak with them.  And

10  then Mr. McKoon called me when I was back at work at the fire

11  station the -- I believe the day after I spoke with Mr. Brown.

12          THE COURT:  Uh-huh.  And what -- when he called you,

13  what did he do, ask you to come down and talk to him?

14          CAPTAIN TAYLORSON:  He did not ask me to come down and

15  talk to him.  He spoke to me while I was at work on the phone.

16          THE COURT:  Oh, he talked to you on the phone.

17          CAPTAIN TAYLORSON:  Yes, sir.

18          THE COURT:  How did you -- you say he called you and

19  somebody called you to the phone?

20          CAPTAIN TAYLORSON:  I believe I happened to answer the

21  phone.

22          THE COURT:  You answered the phone.

23          CAPTAIN TAYLORSON:  Yes, sir.

24          THE COURT:  Now, when he had talked to you the first

25  time, did he ask you questions about -- about what you were

 1    going to testify to or what you knew or that kind of thing?

 2              CAPTAIN TAYLORSON:  He did ask me a few questions.  I

 3    don't remember exactly what he asked me.

 4              THE COURT:  Did he --

 5              CAPTAIN TAYLORSON:  He asked me to call him after I

 6    got -- after they contacted me.  And then we spoke about our

 7    conversation when he called me at station four.

 8              THE COURT:  Okay.  The first time you talked to him,

 9    did he tell you that you didn't have to talk to him?

10              CAPTAIN TAYLORSON:  No, sir.

11              THE COURT:  Did he tell you you did have to talk to

12    him?

13              CAPTAIN TAYLORSON:  No, sir.  He didn't tell me I had

14    to talk to him.  He told me I did not have to talk to them

15    (indicating Mr. Steele).

16              THE COURT:  When he called you back later, were you

17    asked about what you talked to Mr. Davis's lawyers about?

18              CAPTAIN TAYLORSON:  Yes, I was.

19              THE COURT:  Did you -- did you tell him what you had

20    talked to him about?

21              CAPTAIN TAYLORSON:  Yes, sir, I did.

22              THE COURT:  All right.  Mr. McKoon -- I'm going to let

23    the lawyers ask you a few questions.

24              CAPTAIN TAYLORSON:  Yes, sir.

25              THE COURT:  Mr. McKoon.

```
 1              MR. MCKOON:  Mr. Taylorson, I guess I would start off
 2    by saying we talked twice on the phone?
 3              CAPTAIN TAYLORSON:  Yes, sir, we did.
 4              MR. MCKOON:  Both times, how long would you say it was,
 5    minute or two?
 6              CAPTAIN TAYLORSON:  No more than five.
 7              MR. MCKOON:  All right.  And the first time we talked,
 8    I believe you told me that Mr. Davis's lawyers had been trying
 9    to get in touch with you, but you wanted to try to stay out of
10    this.
11              CAPTAIN TAYLORSON:  Well, they had originally started
12    trying to get in touch with me.  Then the second time, I had
13    not -- they -- it took them -- it took them quite a while to get
14    in touch with me.  And, of course, I don't want anything to do
15    with this.
16              MR. MCKOON:  I don't blame you.
17              CAPTAIN TAYLORSON:  I'm scared to death.  I am.  I mean
18    this is not career productive.  Being down here, part of this,
19    no matter what side you're on, you know, going in here on the
20    stand, if you've got anything to say that's not productive for
21    the city and you're sitting there in front of your chief, the
22    city manager, the mayor, it's not good to my career to be down
23    here.  And it worries me to death.  I'm a single father with
24    three children that I have sole custody of, and it worries me to
25    death.  I hate -- this is just an ugly situation.
```

 1          MR. MCKOON:  I understand.  And when I talked -- when I

 2    talked to you, did I tell you that you could talk to these

 3    people if you wanted to, meaning the plaintiff's attorneys, but

 4    that you were under no obligation to do so?

 5          CAPTAIN TAYLORSON:  Yes.

 6          MR. MCKOON:  It was either way.  Am I right?

 7          CAPTAIN TAYLORSON:  Yes.  Yes.

 8          MR. MCKOON:  All right.

 9          CAPTAIN TAYLORSON:  You did not tell me not to talk to

10    them at all.

11          MR. MCKOON:  Okay.  In addition to that -- to be honest

12    with you, I don't remember the questions I asked you now, but I

13    did ask you -- I said, well, if they -- at that point in time, I

14    don't believe they had contacted you; is that right?

15          CAPTAIN TAYLORSON:  They did not.  When I first

16    contacted you, they had not got in touch with me.

17          MR. MCKOON:  All right.  And I believe you told me --

18    you said, you know, look, I'd just really like to stay out of

19    this.

20          CAPTAIN TAYLORSON:  Absolutely.

21          MR. MCKOON:  Is that right?

22          CAPTAIN TAYLORSON:  Uh-huh.

23          MR. MCKOON:  And that's when I told you, well, you

24    know, you can talk to them if you want to, or you don't have to

25    if you don't want to.  I'm certainly not going to tell you not

1  to talk to them.  Is that not what I said?

2          CAPTAIN TAYLORSON:  Yes, sir, you did.

3          MR. MCKOON:  In addition to that, when I talked to you,

4  I said, look, all I want is the truth.  Do you remember that?

5          CAPTAIN TAYLORSON:  Yes, sir.

6          MR. MCKOON:  And I guess on the second occasion, I

7  believe I had just called you back to find out if you had ever

8  been contacted.

9          CAPTAIN TAYLORSON:  I'm not sure what --

10          MR. MCKOON:  Okay.

11          CAPTAIN TAYLORSON:  You know, I know you did call me

12  while I was at station four.  We discussed what we discussed,

13  and that was it.

14          MR. MCKOON:  Right.  And then I asked you, I said,

15  well, what did they want with you?  I mean why were they calling

16  you?

17          CAPTAIN TAYLORSON:  Uh-huh.

18          MR. MCKOON:  And you told me; is that right?

19          CAPTAIN TAYLORSON:  Uh-huh.

20          MR. MCKOON:  And is there anything that you told me

21  that you haven't told the plaintiffs that wouldn't come out here

22  in court and be the truth of the matter?

23          CAPTAIN TAYLORSON:  No, not at all.  Nothing

24  whatsoever.

25          MR. MCKOON:  At any time, did you feel like I in any

1  way threatened you or tried to bully you into talking to me?

2          CAPTAIN TAYLORSON:  I didn't feel threatened by you.

3  I'm threatened by the --

4          MR. MCKOON:  By the situation.

5          CAPTAIN TAYLORSON:  -- the situation and what's

6  represented in this situation.

7          MR. MCKOON:  I understand.  Thank you, Mr. Taylorson.

8          THE COURT:  Mr. Steele?

9          MR. STEELE:  Mr. Taylorson, did you feel that you were

10  under orders from the department to speak with and cooperate

11  with Mr. McKoon?

12          CAPTAIN TAYLORSON:  I was told by Chief Hunter to call

13  Mr. McKoon.

14          MR. STEELE:  So did you feel compelled to answer his

15  questions, then?

16          CAPTAIN TAYLORSON:  I had to.  Oh, absolutely.

17  Absolutely.

18          MR. STEELE:  And that included questions about your

19  conversations with either Mr. Brown or myself?

20          CAPTAIN TAYLORSON:  Yes.

21          MR. STEELE:  I think that's all.

22          THE COURT:  All right, Captain.  Thank you.

23          CAPTAIN TAYLORSON:  Thank you.

24      (Captain Taylorson not present)

25          THE COURT:  All right.  From what's been said by the

1    witnesses, I do not find that this is a case where counsel

2    should be disqualified in this case.  It's a circumstance of

3    employees for the lawyer's client, the city.  Frankly, I very

4    much understand the feeling of these witnesses, that they were

5    under compulsion and felt intimidated by it, but they were

6    witnesses that were put on a witness list by plaintiff's

7    lawyers.  It's certainly common practice and should be to talk

8    to anybody who's going to be a witness.  I -- the fact that they

9    were not told that they didn't have to talk to the lawyer for

10   the city but were not told that they had to, were told to call

11   or to go down there, in my opinion and finding, is not

12   sufficient to disqualify counsel in this case.

13          The question, then, is what the results are as to their

14   feelings of intimidation.  I've advised them that they can't be

15   penalized for doing this.  It's going to be up to the plaintiffs

16   as to whether to call them, put them on the stand, and have them

17   testify.  If you do, I'll allow you to question them about the

18   circumstances of their having -- having talked to them, what --

19   everything I've been asking about as to whether they were told

20   not to talk to the plaintiff's lawyers, whether they were told

21   they had to talk to the defendants' lawyers, and whether

22   anything came out that would in any way prejudice the case of

23   the plaintiff.  The main reason I feel this way is I haven't

24   heard anything that seems to me prejudices the plaintiff's case

25   by their having talked to defense lawyers and having talked to

1  the defense lawyers in the way they've just told me about.

2  If -- Mr. Steele, if you want to articulate any way that I'm

3  unaware of that you think your case has been prejudiced, I'll be

4  glad to hear from you.

5      MR. STEELE:  Well, what I would say on that point is

6  that two of the three individuals that just came in here

7  directly testified that they were asked about their

8  communications with Mr. Brown and myself, who they voluntarily

9  contacted us for advice relative to their testimony.  So

10 intentionally, unintentionally, they were being asked to reveal

11 privileged communication; and they felt compelled to do so

12 because their chief is the one that instructed them to -- they

13 had to talk to Mr. McKoon.  In this environment in the fire

14 department, particularly in the nature of this case, it's not

15 only understandable, but I think that they were correct in their

16 belief that they were compelled to cooperate and answer the

17 questions when the chief tells them they have to go talk to

18 him.  And I don't know exactly what it is they told Mr. McKoon

19 about our trial preparation, but the fact that they were

20 compelled to reveal information about our trial preparation

21 troubles us greatly.

22     THE COURT:  Well, you've heard their testimony and

23 you've had an opportunity either here on the record or outside

24 the record to ask them anything you wanted to.

25     MR. STEELE:  Well --

1          THE COURT:  And I don't understand how disqualifying

2    counsel for the defendant and continuing the trial and requiring

3    the defendants to get other counsel and then coming in here and

4    trying the case again with you putting these people under

5    subpoena would solve anything.  I don't see where that cures

6    anything.

7          MR. STEELE:  Well, where it cures anything is that new

8    counsel, if you went that route, would not have whatever

9    information was conveyed by these individuals to Mr. McKoon

10   about the communications with us.  It cures that, certainly.

11   Assuming that new counsel does not -- or the chief does not

12   compel them to cooperate with new counsel -- maybe we should

13   word it that way, the chief does not compel them to cooperate

14   with new counsel but tells them they're free to or they're free

15   not to, this would certainly lower the level of anxiety,

16   trepidation, and fear that these individuals have.

17          Have I talked to them about what they conveyed to

18   Mr. McKoon?  Yes.  And I still don't know exactly what they

19   conveyed, because I have to tell you, Your Honor, these

20   people -- it took a lot of courage for them to talk to us after

21   talking to Mr. McKoon.  They didn't want to talk to us anymore,

22   and they ultimately decided to do it.  But, you know, they were

23   nervous; they were shaky.  And we think it's largely because --

24   I mean part of it, yes, they're subpoenaed to testify.  I

25   understand what you're saying.  But we believe that it's largely

1    because in a retaliation case, the chief of the department

2    ordered them to have this communication.

3              THE COURT:  Well --

4              MR. STEELE:  And that worries them.

5              THE COURT:  Well, I can understand you being worried;

6    but that, in and of itself, I don't find to be sufficient to

7    take the drastic step of disqualifying counsel, continuing the

8    case, and trying the case later because I have not seen where

9    the plaintiff's case is prejudiced by that.  And I understand

10   you to say you don't know either, but you're afraid that it has

11   been.  They've been in here, and you've had an opportunity to

12   find out what it was that they told Mr. McKoon.  I can't presume

13   that it was something that prejudices the plaintiff's case.

14   They've answered Mr. McKoon's questions.  They didn't generally

15   speak -- my understanding was that they didn't tell him anything

16   that they didn't expect to come out at the trial.  So --

17             MR. STEELE:  Well --

18             THE COURT:  Yes.

19             MR. STEELE:  I apologize.

20             THE COURT:  Go ahead.

21             MR. STEELE:  But on that issue, respectfully, I don't

22   think that that is the appropriate test.  If they communicated

23   under compulsion to the city's attorney about the questions we

24   asked them, what we were talking to them about, that disclosed

25   under compulsion where we were going in our trial preparation,

 1  how we were intending to present, and what areas we were

 2  focusing on.  And that is the difficulty.  And the fact that

 3  those areas would eventually come out at trial isn't -- doesn't

 4  change the fact that under compulsion they felt obligated to

 5  disclose to -- to the city's attorney that information.

 6          THE COURT:  Well, two things.  One, I'm not satisfied

 7  that there was actual compulsion, but a feeling of compulsion to

 8  some extent that may have been hard to avoid in any way in

 9  talking with them, but I understand your position on that.

10  Also, I can't assume that they were told all about how your

11  strategy was or what you planned to do and divulged your whole

12  case, because I don't have that evidence before me.

13          I'm going to deny your request to remove defendants'

14  counsel.  I'm going to proceed with the trial.  If you elect to

15  put these witnesses on the stand, I'll let you ask them about

16  the circumstances of talking to the lawyers on both sides; and

17  I'll let you, Mr. McKoon, cross-examine them on that.  And if it

18  should develop -- the other thing you asked me about this

19  morning was treating them as adverse witnesses.  I haven't heard

20  anything at this point that would make me think they are

21  adverse; but if it should develop during your examining of them

22  that -- you know, that they are or that you should be allowed to

23  ask leading questions for some other reason, I'll revisit it if

24  you ask me.

25          MR. STEELE:  Your Honor, I may have done a poor job

1   explaining myself when I said call them as if they were adverse

2   witness, but we were --

3           THE COURT:  You just want to ask them leading

4   questions.

5           MR. STEELE:  Right.  Because of their reluctance to

6   testify and fear that they've all stated.  Under the

7   circumstances, I felt it would be appropriate to be able to do

8   that.

9           THE COURT:  Well, what I want you to --

10          MR. STEELE:  Frankly, they've asked --

11          THE COURT:  Wait a minute.  What I want you to do is

12   not start out asking leading questions.  If it appears that

13   there is a problem with it and that there's a necessity for

14   prompting them with leading questions, you can do that.  If

15   there's an objection, I'll rule on it at that time.  But don't

16   just -- I'm not going to rule now that you can start off asking

17   leading questions.

18          MR. STEELE:  At least one of them, I think two of them,

19   but at least one of them specifically asked us to do that

20   because they felt it would be less harmful to them, but I

21   understand the Court's ruling.

22          THE COURT:  Well, one other thing I want to mention.

23   It's my practice to not allow counsel to address witnesses or

24   parties by first names.

25          MR. MCKOON:  Yes, sir.

```
 1          THE COURT:  I know that gets to be kind of habitual in
 2   a lot of courts, particularly in state courts here, and it may
 3   be in other places as well.  It was in my experience as a
 4   lawyer.  But I do not want you addressing witnesses or parties
 5   by first name.  Okay?
 6          Anything else before we start?
 7          MR. STEELE:  Before we broke -- before, we talked about
 8   this issue of how the union fits in, given that the second cause
 9   of action is no longer there.  And in thinking about it at
10   lunch, it seems to me that maybe that's not as difficult a
11   question as we were making it out to be.
12          THE COURT:  That's good.
13          MR. STEELE:  Certainly the fact that there were union
14   meetings that the mayor went to, that Mr. Davis was part of the
15   union, that's part of the background facts that will come out.
16   I think that what we're not allowed to do on our side is to
17   argue or suggest to the jury that the city was, for lack of a
18   better term, out to get Mr. Davis because of his union
19   affiliation.  Does Mr. Davis believe that that's one of the
20   reasons?  Sure, he does.  But under the First Amendment free
21   speech claim, that really doesn't matter if they had other
22   reasons, because the reason that they told him and they put in
23   writing is his call to the mayor.
24          And we were using a term "triggering event," but I
25   think your analogy is probably the more appropriate.  You
```

1   referred to it as the straw that breaks the camel's back.  And

2   because of that, it doesn't matter if Mr. Davis believes there

3   were other -- other considerations.  What matters is whether or

4   not his communication to the mayor was a substantial or

5   motivating factor.  And I think, Judge, you've pretty much said

6   that you believe it is and you're not sure that there's even a

7   question for the jury on that.

8              THE COURT:  Well, I think we'll cross that bridge when

9   we get down after all the evidence is in.  I've been judging

10  this thing on the basis of what's before me on summary judgment

11  motions, and I -- based on what I see, I don't see where there

12  would be anything.  But I -- we'll wait.  If there's nothing

13  different from what I see now, I feel like when we get into how

14  I'll instruct the jury, that will not be an issue.  But we'll

15  see what the evidence shows.

16             All right.  Anything we need to take up?  Yes.

17             MR. MCKOON:  The only thing, Judge, you had mentioned

18  at the pretrial that we need to show one another what we were

19  going to use in opening statement.  And I've got a few blow-ups

20  that I'd like to show them.  And I can tell you they're the --

21  it's the thing he signed after the newspaper article came out.

22             MR. STEELE:  His statement?

23             MR. MCKOON:  Yeah.  No, the form we asked him to sign

24  saying he was going to comply with the --

25             MR. STEELE:  Oh, the counseling form.

```
 1            MR. MCKOON:  Right.  No, not that.  There was a --

 2            THE COURT:  Why don't you just show it to him.

 3            MR. MCKOON:  I'll just show it to you.

 4            MR. STEELE:  Okay.

 5            MR. MCKOON:  Okay?  Anyway, if there's an objection to

 6   it, we'll come back to the Court.

 7            MR. STEELE:  Okay.

 8            THE COURT:  Do that as quickly as you can.  And then

 9   let Ms. Behrman know you're ready, and we'll get the jury ready.

10            MR. STEELE:  Thank you, sir.

11            THE COURT:  She's going to be putting pads out in their

12   seats while y'all are doing that.

13            MR. MCKOON:  And I understand we were not going to put

14   the exhibit books out until tomorrow.

15            THE COURT:  Correct.

16            THE CLERK:  Are y'all doing the openings?

17            MR. STEELE:  Yes.

18            THE CLERK:  Do you want warnings?

19            MR. STEELE:  Yes, please.

20            MR. MCKOON:  I do.

21            MR. STEELE:  A five-minute warning.

22            MR. MCKOON:  That's fine.

23            THE COURT:  Thirty minutes a side.  And also, I don't

24   know whether I told y'all this at the pretrial or whether you

25   knew it; but before I call on you for opening statements, I give
```

1  a brief opening to the jury.  And I'm going to tell them about

2  what the claim is and basically that the issue is going to be

3  the issue of how the policy works and whether they first have to

4  get permission to speak to the council or whether they can --

5  once they exhaust the chain of command, they can do so.

6          MR. STEELE:  The only thing, sir, that I would suggest

7  to you is that if you're introducing that to them initially, it

8  should be introduced as one of the considerations, not the only

9  consideration, which I believe is consistent with the case law

10 that we --

11         THE COURT:  Thinking about the disruption?  Yes.

12 That's true.  I won't say it's the only issue.  Because right

13 now, I don't feel like that's going to go to the jury, but I

14 want to leave that open.  So I won't say that's the only issue.

15         MR. STEELE:  I did have one scheduling question for

16 you, sir.  At what point in the process is it your practice to

17 address jury instructions?

18         THE COURT:  Toward the end.  And the way I do that is

19 I've gotten both of your requested jury instructions, and I go

20 through that and I prepare what I think is a reasonable set of

21 instructions to the jury, rather than given and refused and

22 everything.  I'll give you a copy of that with an opportunity to

23 go over it.  Then we'll have a jury charge conference that I

24 normally don't put on the record because it's just a chance for

25 everybody to talk about it, hopefully with the -- with it

1    resulting in everybody agreeing that this charge is all right.

2    If we don't get to that point, then before the jury goes out and

3    outside the presence of the jury, I'll give you an opportunity

4    to put objections on the record.  So it will be -- it will be on

5    down toward the end of the trial.

6            MR. STEELE:  Okay.

7            THE COURT:  Anything else?

8            MR. STEELE:  No, sir.

9            MR. MCKOON:  I can't think of anything.

10           THE COURT:  All right.  Let's T is up and get to work.

11           MR. MCKOON:  Thank you, Your Honor.

12      (Chambers conference concluded at 2:09 p.m., after which, at

13        2:14 p.m., proceedings reconvened in open court with the

14        jury present, as follows:)

15           THE CLERK:  Court is in session.  You may be seated.

16           THE COURT:  All right.  Members of the jury, we were a

17   little late getting started again.  I will tell you that it's

18   not been because we weren't here.  We've been working back

19   there.  And the things we had to talk about ahead of time will

20   result, I think you'll be pleased to know, in shortening the

21   trial.  So it's not extending the trial.  It will shorten it

22   more than the 15 minutes that we just took.

23           One thing I neglected to tell you before you went out

24   and that I'll mention to you now, as far as the mechanics of the

25   trial, is that you're not in any kind of assigned seats where

1  you are.  The witnesses are going to be testifying from over

2  here.  And after breaks, if you want to sit somewhere different

3  from where you're sitting now, it's perfectly all right.

4          Now, swear in the jury, please.

5          THE CLERK:  Would you stand and raise your right hand,

6  please.

7    (The jury is sworn)

8          THE CLERK:  Be seated.

9          THE COURT:  We're trying to get rid of that buzzing.  I

10 don't hear it now.  Okay.

11         All right.  Ladies and gentlemen, you have now been

12 sworn in as the jury to try this case.  And by your verdict, you

13 will decide the disputed issues in the case.  It's going to be

14 up to me to decide the questions of law.  And when we get

15 through with the trial, I'll instruct you on what that law is

16 and the law for you to follow and apply in reaching your

17 decision.  It will be up to you to decide the disputed facts,

18 and you'll be told more clearly before you retire to the jury

19 room just what law to apply and what -- you'll hear from the

20 lawyers about what goes into your deciding the facts and what

21 those facts are.

22         The evidence that will be presented to you in this

23 trial will consist of testimony of witnesses and tangible

24 items.  There will be a number of documents, papers, that will

25 be called exhibits.  You've been given pencils and pads in your

1    seats.  There's no requirement for you to take notes.  That's

2    just purely for your benefit if you want to take notes.  Some

3    people like to; some people don't.  I would caution you that if

4    you decide to take notes, don't get so carried away with writing

5    things down that you're not paying careful attention to the

6    witness as the witness is testifying.  Don't try to take

7    everything down in shorthand or anything like that, but it may

8    be very helpful for you to take some notes because this case

9    will last a while.

10          If you do take notes, I'll caution you that when you go

11   back to the jury room, you are to rely on your own memory rather

12   than your notes as to what happened.  In other words, if you

13   look at your notepad and you had written something down and you

14   think, well, that's not the way I remember it, go by your

15   memory, not by what you have written down.

16          Also, you are not to be guided by anybody else's

17   notes.  If some somebody says, well, wait a minute, I wrote this

18   down, and you say, that's not the way I remember it, you go by

19   your memory.  So the notepad is purely for your benefit and aid

20   if you want to use it.  If you do, I'll ask you to write your

21   name across the top and leave it in your chair, because we'll

22   not be taking them out of the jury box until the time you go

23   into the jury room.  Then you'll be able to take it with you.

24   But if you have your name on it, if you take different seats,

25   that will just make sure everybody gets their own pad back.

1          Now, I've told you about transcripts -- I mean about

2    documents and testimony.  And you see a court reporter down here

3    taking down everything that's being said.  We don't -- you won't

4    have the luxury of having a transcript of the testimony in the

5    jury room with you.  She's taking it down, but we don't have the

6    ability to send back a transcript of everything.  So you are

7    going to have to rely on your memory, and that's one of the

8    reasons that notepads are given to you.

9          On the other hand, as far as documents that are placed

10   in evidence, you will have the documents that are admitted back

11   in the jury room with you to see.  And most, if not all, of them

12   will be shown to you while you're here in court, and the lawyers

13   will be talking about them.  And if, during the course of the

14   trial, there's any document that's been admitted in evidence

15   that you feel like you need to see again that you haven't seen

16   enough, remember you'll have it in the jury room.  Or if you

17   feel that during the course of the trial you need to look at it,

18   you can ask for it.  And if it's in evidence, it will be

19   something for you to see.

20         You heard me this morning tell you in a nutshell what

21   this case was about, and I'll just refer to it briefly again.

22   You'll hear more about this when the lawyers will be given an

23   opportunity to get up and talk to you in a minute about what

24   they expect the evidence to show.  But this is a case in which

25   the plaintiff, Mr. David Davis, is suing the City of Phenix City

1   and suing in their official capacities as fire chief and city

2   manager the two people sitting over here in the courtroom with

3   you, Mr. Hunter and -- I'm sorry -- I've got my notes -- Fire

4   Chief Hunter and Mr. Roberts, the city manager.  They're sued in

5   their official capacity in those positions.  And the plaintiff

6   is asking money damages on a claim that the defendants violated

7   his constitutional rights under the First Amendment of the

8   Constitution, his right of freedom of speech.

9         The plaintiff -- and incidentally, I'll be referring to

10  Mr. Davis from time to time as the plaintiff.  That's the person

11  who files a lawsuit.  I'll be talking about the people who are

12  sued as the defendants, so those are the terms that we'll be

13  using.

14        The plaintiff, Mr. Davis, says that the defendants

15  terminated his employment as a firefighter with the fire

16  department for talking on the telephone directly with Mayor

17  Hardin, the mayor of Phenix City, about his opposition to a

18  proposed city ordinance that would have extended the

19  probationary time for new firefighters from 12 months to 18

20  months and that -- he says that he was terminated for doing

21  that, talking directly with the mayor, without first going

22  through the internal chain of command within the department and

23  the city.  And you'll be hearing evidence about -- about the

24  chain of command and about the policies.

25        And the defendants say that the plaintiff should first

 1  have gone through the chain of command and then, if he was not

 2  satisfied after doing that, that he could have spoken to the

 3  city council about his opposition to this, but first had to go

 4  through that.  So there's an issue as to whether he had to get

 5  permission after going through all of the chain of command or

 6  whether he, once he did that, if he was not satisfied, whether

 7  he could do it without having to get permission.

 8         The lawyers will discuss with you more the theories

 9  there, but that's -- at the end of the trial, you're going to be

10  given certain questions.  They'll be called special

11  interrogatories.  And one of those is going to ask whether you

12  find by a preponderance of the evidence that the defendants have

13  proved that if the plaintiff had followed the rules and

14  procedures and practices with the city and the department, he

15  could have publicly addressed the issues once he had exhausted

16  the internal chain of command.  The defendant says yes; the

17  plaintiff says no.  You'll be asked to decide based on the

18  evidence that's presented to you.

19         During the trial -- that's one of the things you'll be

20  asked to decide.  During the trial, you should keep an open

21  mind, and you should avoid reaching any hasty impressions or

22  conclusions.  Reserve your judgment until all the evidence is

23  in, the lawyers have spoken to you in closing argument, and I

24  have charged you on what the law is.

25         Also, along those lines, because of the reason that you

1    have to make your decision based solely on the evidence in this

2    courtroom, I will tell you, and I'll tell you this more than

3    once, that you're not to try to find out any information about

4    anything outside of the courtroom, not just about the facts of

5    this case, but about anything that you may be curious about in

6    the case.  I used to tell people not to read the encyclopedia

7    about stuff.  Now I don't know whether they even have hardback

8    encyclopedias anymore.  If I looked at an encyclopedia, it would

9    be hardback, but I will tell you you're not to get on a computer

10   on the Internet and look up any things that you might be curious

11   about just because of the case.  The whole thing is that you're

12   going to have to, until this case is over, concentrate on what

13   happens in this courtroom.  Get it out of your mind when you

14   leave the courtroom.  Don't be influenced by anything.  Don't

15   try to find out anything about it.  Wait until you hear the

16   evidence presented in the courtroom.

17          Now, from time to time during the trial I'm sure I'll

18   be called on to make rulings on certain objections or motions.

19   The lawyers may object to a question asked of a witness or may

20   object to the offering of a document.  Don't hold that against

21   the lawyers or their clients if they make an objection.  That's

22   their responsibility and their duty to do that if they feel that

23   it's well taken.  If they object to a question or they object to

24   a document coming in, if I sustain the objection, that means

25   that it would not be proper for you to hear an answer to that or

1    to see the document.  If that happens, don't speculate on what

2    the answer would have been or what the document was.  It's

3    because it's something that would not be permissible to come

4    into the case.

5         But on the other hand, if I overrule an objection and

6    the answer comes in or the document comes in, don't give it any

7    less weight than you would have if no objection had been made.

8    The mere fact that an objection has been made, if it's

9    overruled, doesn't mean that you shouldn't consider it fully.

10        Now, also during the trial it might be necessary for me

11   to talk to the lawyers outside of your presence, such as we've

12   been doing up until this point, because there usually are times

13   when that's necessary.  It may be that it's something that can

14   be handled quickly by coming over for what's called a sidebar

15   conference, as you saw us do with two or three prospective

16   jurors over here at the end of the bench.  We may do that and

17   ask you to stay where you are.  I may ask you to step outside to

18   the jury room for a few minutes, or we may go outside of the

19   courtroom.  If that happens -- and it usually does -- I'll move

20   that along as fast as I can and not let that unduly delay the

21   trial.  We want to move this thing along as fast as we can, as

22   long as everybody has the opportunity to put in their evidence

23   fully.

24        But having said that, while you are either sitting

25   there waiting on us or outside or we're outside, don't speculate

1    on what we're talking about, because that's why you're not

2    hearing it.  It's something that needs to be taken up concerning

3    whether something would be appropriate to come before you.  So

4    you should not feel that you're being excluded from something

5    you need to know about, and just don't worry about what it is,

6    and I'll move it along as fast as I can.

7         Now, this is the way we will proceed in a minute when I

8    get through.  The lawyers will make to you what's called an

9    opening statement.  The plaintiff's lawyer will go first;

10   defendants' lawyer will go second.  And that's a time for them

11   to tell you what they expect the evidence to show and what their

12   case is about.  It's not a time for them to argue the case.

13   It's just a time for them to tell you what they expect the

14   evidence to show.  What they say is not evidence.  They don't

15   expect you to take it as evidence.  Anything the lawyers say is

16   not evidence.  Evidence must come under oath from the witness

17   stand or from a deposition or from documents that have been

18   admitted in court.  But it will be helpful for you to hear what

19   the lawyers have to say so you'll know where they're coming

20   from, what they expect the evidence to be that's presented to

21   you.

22         After they make those statements to you, then the

23   plaintiff goes first with calling witnesses.  He will call his

24   witnesses.  They'll be sworn in, take the witness stand over

25   here.  He'll ask questions.  When he gets through with the

1  questions, the lawyer for the defendants will have an

2  opportunity to ask questions, called cross-examination.  They'll

3  go back and forth until they're through with that witness, and

4  then the witness will come down.  When the plaintiff gets

5  through with all of his witnesses, he will say he rests.  That

6  means he's through with his case.  Then the defendant will put

7  on any evidence that they want to put on that's not already come

8  out during the first part of the trial; and then after the

9  defendants get through with their witnesses, the plaintiff will

10  be given an opportunity to call other witnesses in rebuttal.

11          When all of the evidence is in and both sides have

12  rested, then the lawyers will be allowed to speak to you in

13  closing argument.  And that's where they'll tell you what they

14  think the evidence showed, and they'll argue to you what they

15  think you ought to do about it.  When they get through with

16  that, I'll give you the Court's instructions on what the law

17  is.  They will be in writing, and I'll give you a copy of them

18  to take back into the jury room in case you want to refer to

19  them back there.

20          When you get to the jury room, you'll be -- the first

21  thing you'll do is elect one of your members to serve as your

22  foreperson, and that person will direct your deliberations while

23  you're there in the jury room and will speak for you here in

24  court.  Your verdict will have to be unanimous.  The questions

25  that you will be asked to answer and the answer will have to be

1   agreed to unanimously, by all eight of you.

2        When you have done that and have reached a conclusion,

3   you'll knock on the jury room door.  One of the marshals will

4   escort you back into the courtroom.  I'll ask the jury if you've

5   reached a verdict, and your foreperson will tell me you have.

6   I'll have you hand the written -- I'll send you verdict forms

7   that will all be explained to you.  I'll ask you to hand the

8   verdict form to the clerk and she'll hand it to me and I'll

9   announce the verdict.

10        Now, at this time, it's time for the lawyers to address

11   you in opening statement, and I ask you to give them your

12   careful attention.  The plaintiff will begin.

13        All right.  Mr. Steele.

14        MR. STEELE:  Thank you, Your Honor.

15        May it please the Court, Your Honor, counsel, and most

16   importantly, members of the jury.  As the Judge just told you,

17   this is the opening statement that gives us a chance to set

18   forth for you what we expect the evidence in the case will

19   show.  The other important factor to keep in mind that the Judge

20   just alluded to is the fact that what I say and what Mr. McKoon

21   says or the other attorneys in the case is not fact.  We believe

22   it's fact; it's not evidence.  And the evidence comes in through

23   the witness and through the witness stand.

24        And I guess maybe I shouldn't admit this, but I think

25   the lawyers are really the least important people in this room.

1  The most important people in the room are you, as jurors,

2  because you get to decide what the facts are.  The witnesses are

3  important, because they will be providing the testimony and the

4  documents that you'll use to decide those facts.  And, of

5  course, His Honor will be instructing you on the law.  So

6  everyone else is important but probably us, but you're the most

7  important.  And for that reason, we thank you for being here,

8  because your role is essential.  Without your role, we wouldn't

9  be able to do this process.

10        Now, as I said, this is our chance to explain to you

11  the course of events, what led up to our being here today.

12  Before I do that, I guess there's something that I want to say

13  first and to ask that you keep it in mind, that you keep it in

14  mind throughout the case and keep it in mind ultimately when

15  you're given the instructions and proceed to the jury room to

16  make your deliberations.  And that is this.  The evidence in

17  this case is going to show that on April 21st, 2006, David

18  Davis, this man sitting right here, lost his job.  He was

19  terminated.  And the stated reason for that termination was he

20  had the audacity to have a phone conversation with the mayor of

21  the city.

22        In 2006 in the United States of America, the evidence

23  will show that Mr. Davis made a phone call, a brief phone call

24  to the mayor of the city; and as a result, he lost his job.  How

25  did we get to that point?  Here's some background that we expect

1    the evidence and the documents are going to show over the course

2    of the next several days.

3           First of all, I want to reintroduce myself to you.  We

4    had a chance to have introductions earlier during jury

5    selection.  My name is Doug Steele.  I'm one of the attorneys

6    that represent Mr. Davis in this case.  Mr. Gary Brown is

7    sitting at counsel table.  And the two of us are very proud to

8    be here today to be representing Mr. Davis in this case.

9           Mr. Davis will be testifying shortly, and he'll be

10   telling you what occurred, a little bit about who he is, and

11   he'll be telling you about how these facts that will be

12   presented impact him.  But as an introduction to that, he's

13   going to explain that he's a member of this community, he's a

14   firefighter, he's a paramedic, and he's a husband.  And for

15   approximately eight years, he was employed by the City of Phenix

16   City in their fire department.  And Mr. Davis is going to tell

17   you that his job was of utmost importance to him.  Matter of

18   fact, he's going to explain to you that for him, this wasn't

19   just a job; it was his career.  And when that was taken away

20   from him, he felt that he lost everything.

21          Now, the events that we're going to be talking about

22   today largely occurred in the fall of 2005 through April of

23   2006.  In the fall of 2005, there was a newspaper reporter who

24   wanted to come to a meeting of an association that the

25   firefighters have to talk with them about some concerns they

1    had.  Mr. Davis was active in this association, was one of its

2    officers at the time.  And the evidence will be that the news

3    reporter came to the meeting and he met with approximately ten

4    firefighters, spoke with them, learned their concerns.  And the

5    reporter decided it was newsworthy, that it was something that

6    the public needed to hear, apparently, because he wrote an

7    article on it.  You'll be shown the article that is going to be

8    presented into evidence.

9        Now, the result here, however, is that after the

10    article was published and because the article was published,

11    Mr. Davis and the other firefighters who were quoted in the

12    article, they were investigated, they were interrogated, and

13    ultimately they received a counseling in the form of a reprimand

14    telling them that they violated, from the city's perspectives,

15    its rules and procedures by merely talking to the reporter off

16    duty on their own time about concerns they had in the

17    department.

18        There's an issue on whether the policies of the

19    department prohibited them from making that communication, and

20    that will be addressed as the case goes on.  But here's what you

21    need to keep in mind on that.  There's going to be an exhibit

22    and there's going to be some witnesses that will tell you as a

23    result of that newspaper article and that communication, that

24    Mr. Davis and others were informed that they were not permitted

25    to speak to the media unless they had approval first to do so.

1         Now, that was in the fall of 2005.  Moving forward to
2    2006 so I can tell you how we got to, really, where we are
3    today, in 2006, in April, April 16th, as a matter of fact,
4    Mr. Davis was at work with fellow firefighters at the station
5    and learned that there was an article in the newspaper
6    explaining that the city council was about to vote on a proposed
7    ordinance, an ordinance affecting the probationary period for
8    the fire department, the police department, and public safety
9    agencies of the city.  This concerned Mr. Davis, and he's going
10   to tell you why it concerned him.  He discussed that concern
11   with his supervisor that day, a Captain Bennett.  And as a
12   result and because of those concerns, Mr. Davis decided that on
13   the following day, on April 17th, which was a Monday, that he
14   would call the mayor and talk to the mayor and express to the
15   mayor the concerns that he felt the mayor should take into
16   consideration in deciding how to deal with this ordinance.
17        Now, here, I probably need to explain something for
18   you, particularly for any of you that do not live in Phenix City
19   or haven't lived in Phenix City.  There's different forms of
20   government.  And in Phenix City, the form of government is a
21   counsel slash city manager form of government.  And the mayor is
22   going to testify and explain that under that form of government,
23   as mayor, he chairs the council meetings and he has certain
24   ceremonial functions.  But by and large, he is a voting member
25   of the council; and he gets one vote, and it counts just like

1    everyone else's.

2        And before he joined the council -- this is an elected

3    position -- of course, he had to campaign for it.  As part of

4    that campaign, he spoke to various groups, one of the groups

5    being this association of firefighters.  And among the things

6    that he told that group while he was running for office -- and

7    we'll have multiple people that will testify to this -- is that

8    his policy, if elected, is that he would have an open door, and

9    that he encouraged them, if they had problems or concerns, his

10   door was open to them.  He didn't promise what he would do about

11   them.  He didn't make any promises of actions that he would

12   take, but he told them that he had an open door, that he would

13   listen to their concerns and problems that they had if he's

14   elected.  There was nothing extraordinary about that.  The

15   mayor -- you know, he was running and then became the mayor of

16   the city.  Frequently public officials, elected officials, have

17   open-door policies.  The mayor will explain that it's helpful to

18   him in fulfilling his duties and responsibilities to gather

19   information and -- but because of that, he in fact -- and he

20   acknowledges that at least once he did in fact tell Mr. Davis

21   and other firefighters that were gathered, I have an open-door

22   policy.

23       So on April the 17th, while off duty, out of uniform,

24   at his home, on his own time, Mr. Davis took up the mayor on his

25   offer of an open-door policy and telephoned him.  He wanted to

1    talk to the mayor about this ordinance.  And the mayor wasn't

2    in, so Mr. David Davis left a message, simply have the mayor

3    call me regarding the city ordinance.  And you'll see -- a phone

4    message will likely be one of the exhibits that's presented in

5    this case.

6            Later that afternoon, the mayor, doing what most of us

7    should do, not all of us are doing on a regular occasion, but he

8    returned his calls.  And he said it's his practice to return his

9    calls.  And he had a phone message from Mr. Davis, so he

10   returned the call and he spoke with Mr. Davis for about five

11   minutes.  They talked -- they exchanged some pleasantries.  They

12   talked about the proposed ordinance.  In fact, the mayor will

13   tell you that Mr. Davis offered some suggestions or ideas on how

14   he believed the ordinance might be improved.  And at the end of

15   the conversation, the mayor thanked Mr. Davis for his input, and

16   that was it.  It was cordial, it was polite, pleasant, nothing

17   out of the ordinary.

18           The problem is -- and the evidence is going to show

19   that the mayor mentioned -- and this, I don't fault him for,

20   obviously -- mentioned to the city manager that, gee, I got this

21   phone call and Mr. Davis has some concerns about the ordinance.

22   That set into motion a series of events that resulted in

23   Mr. Davis's termination.  It happened very swiftly.  It happened

24   very quickly.

25           As I said, April 17th, a Monday, Mr. Davis has this

1   brief, five-minute phone conversation with the mayor.  His next
2   day at work was Wednesday, the 19th.  Now, firefighters work
3   24-hour shifts, so they work 24 hours on and 48 hours off.  So
4   his next shift wasn't till Wednesday, the 19th.  He was called
5   out of his station, called down to headquarters, made to sit
6   there for hours and hours not exactly sure why, and then
7   interrogated and requested to give a statement about talking to
8   the mayor.  That was on Wednesday.  On Friday, the 21st,
9   Mr. Davis's day off, he was called at home, ordered in, and
10  terminated.  And he will tell you that what he was told in that
11  meeting when he was terminated is he was terminated because he
12  called the mayor.

13         Now, we expect that the city's going to speak a lot
14  about the chain of command, and the Judge indicated that.  And
15  they're likely to say chain of command -- he violated the chain
16  of command, he violated the chain of command, he violated the
17  chain of command.  What he did -- and this is what you need to
18  focus on.  The action that they contend violated the chain of
19  command was simply calling the mayor while off duty about an
20  issue that the council was about to vote on.

21         Now, Mr. Davis will have an opportunity to explain to
22  you exactly what occurred, why he did what he did, and his
23  conversations with various people concerning this.  He'll have
24  an opportunity to explain to you why he did not believe he was
25  violating the chain of command by calling the mayor, and he'll

1   also explain to you even if it applied, he actually did comply

2   with it, because he told his first-line supervisor about his

3   plan to do so.  But nevertheless, he made the call on a Monday,

4   spoke to the mayor Monday afternoon, and on Friday he was

5   terminated after eight years on the job, a job that he loved, a

6   job that, to him, was a career that he wanted to make his life's

7   career in this department.  And he lost his job because he spoke

8   to the mayor.

9          Now, finally, Mr. Davis is also going to be able to

10  explain how this has affected him.  And as you can imagine, but

11  you won't have to, because he's going to tell you, this affected

12  him greatly.  His sense of who he was in the world was centered

13  on his career.  His dreams for the future were centered on his

14  career.  He's going to tell you what it was like for him having

15  that taken away from him.  You will also hear testimony from two

16  people, two of the people who know him best and love him the

17  most.  His grandmother and his mother will both -- his

18  grandmother and his wife -- excuse me -- will both testify.  And

19  they will tell you what they've observed on how difficult this

20  has been for Mr. Davis.

21         It may be easy for officials to invoke and repeat the

22  phrase "chain of command" and end a man's career.  It's not easy

23  at all for the person whose career ended simply for doing

24  something that he thought he had a right to do, speaking freely,

25  protection under our Constitution, by calling the mayor.

1          That's what this case is about.  I appreciate that

2    you're here and the attention that you're going to give us.  And

3    thank you.

4          Thank you, Your Honor.

5          THE COURT:  Mr. McKoon?

6          MR. MCKOON:  May it please the Court, Mr. Brown.

7          I've been here all day waiting to talk to you about

8    this case.  You know, you get -- when you get started in

9    something like this, you get all wound up the night before.  And

10   I'm still a little bit wound up about it; but I want to start

11   off, I guess, by sticking to my plan.  And the plan was to

12   introduce the people that are here with me.  I'll just

13   reintroduce them real quick.

14         First of all, I guess I ought to reintroduce myself.

15   My name is Jim McKoon.  I practice law in Phenix City, Alabama.

16   I live in Smiths Station.  I've been doing that for 30 years

17   now.  Right here is Jimmy Graham.  He is the city attorney for

18   the City of Phenix City.  Jimmy served as a city councilor and

19   the city attorney.  He's been with the city for a long time.

20   This is Cole Dugan, who's a young associate of mine.  Like I

21   said, it's him and my son and Cole, and Cole and my son have

22   known each other since kindergarten.  And I'm proud to have them

23   with me.

24         Seated over here, what I expect the evidence to show in

25   this case, is Bubba Roberts, who has been sued in this case in

1  his official capacity.  I will call him Mr. Roberts from here on

2  out because the Judge has asked us to do that; but it's hard for

3  me not to refer to him as Bubba, because that's his name.  He's

4  been with the City of Phenix City, I expect the evidence to

5  show, for 35 years.  He started out as a building inspector

6  after he graduated from high school.  He went to Columbus Tech

7  and got a degree as an -- an electrical contracting degree and

8  then became an inspector.  He's been there 35 years and worked

9  his way all the way up to become the city manager.  Along the

10  way, he was in the National Guard for 41 years, and he served

11  his country in Central America and in the Gulf War and recently

12  in the War on Terror.  Seated next to him is -- oh, and by the

13  way, along the way he's done some high school refereeing, too,

14  and was a deputy sheriff at night for 13 years on a part-time

15  basis.

16        Seated next to him is Wallace Hunter, our fire chief.

17  Mr. Hunter has been the chief of the fire department since March

18  of 2005.  He was interim chief and then became the chief in May

19  of 2005.  Mr. Hunter has been with the fire department 22 years

20  and started out as a recruit and worked his way up.

21        I expect the evidence is going to show in this case

22  that -- and you're going to hear over and over again that the

23  reason -- see if I can figure out how to use one of these --

24  that Mr. Davis was fired was for making a five-minute phone call

25  to the mayor.  That's what they've told you.  What the evidence

1  is going to be in this case is he was not fired for what he

2  did.  He was fired for what he did not do, and that is this.

3        The evidence is going to be that in March of 2005 when

4  Wallace Hunter became the chief of the fire department, there

5  had been a lot of controversy in the fire department, a lot of

6  turmoil, a lot of problems.  Chief Hunter determined that he was

7  going to try to solve those problems.  And one of the ways he

8  wanted to solve them was to get everybody in that was

9  disgruntled and talk to them and try to say, look, guys, we need

10 to work together.

11        Because don't make a mistake.  Being a firefighter in

12 Phenix City is a pretty good job.  It's 24 hours on and 48 hours

13 off.  You work ten days a month.  In addition to that, we have a

14 policy called swap time, which means if you want to swap out

15 with somebody to work your shift, you can do that, too.  So you

16 can have a second job or you can also go to school if you want

17 to.  It's a good job to have.  You get state -- state benefits.

18 You get vacation.  You get retirement.  You get leave.  You get

19 lots of things in that job.  Mr. Davis knew all that.

20        All that Chief Hunter wanted was a chance, was just a

21 chance to try to straighten this department out.  And he's been

22 working on it.  And everybody that's going to testify in this

23 case is going to tell you it is 100 percent better than it was

24 when he took it over.  Mr. Davis never wanted to give him that

25 chance.  He wanted to keep turmoil up as much as possible.  He

1  was doing that because he was in this union.  And that place, it

2  cannot exist unless there's some kind of problem.

3       What he did was when he went to the newspaper that

4  Mr. Steele has referred to was he called a union meeting, a

5  reporter showed up, magically, and just sat there and had a

6  gripe session about first one thing and another.  It gets

7  published in the paper as "Three-Alarm Turmoil," some big

8  article.  After he went in the paper and talked about it, they

9  started calling Wallace.  They called me.  Called all sorts of

10 people up about this thing.

11      We have a policy in the fire department, and the reason

12 we have the policy is this.  A fire department is what's called

13 a paramilitary organization.  Everybody knows what a military

14 organization is.  You've got a -- if you're in the Marines,

15 you're in the Air Force, the Navy, the Army, you have a policy

16 where you have to go up the chain with any problem you have.

17 You go to your next supervisor.  The only thing the Phenix City

18 Fire Department has ever asked Mr. Davis to do is that.  If he

19 has a problem, if he has a gripe, if he has a complaint, all he

20 needs to do is take it to his supervisor.  And then if he

21 doesn't like the result, he can take it to the next place and

22 the next place.  And he can go take it to the chief; and he can

23 wind up, if he wants to, with the city manager.  And if it can't

24 be resolved there, he can hire a satellite truck and broadcast

25 his problem to the world.  All we ask is that we be given a

1    chance.   All Chief Hunter asks is that he be given a chance.

2         What happened after the newspaper article was real

3    simple.  Mr. Davis was called in, like a lot of other people

4    were, because there was already a policy in place about not

5    doing that kind of stuff unless you come up the chain of

6    command.  And he was called in and given a document, which will

7    be in evidence in this case.  And basically, it was just a

8    memo.  And it said, look, we have free speech policies.  We have

9    grievance policies in the city.  You're expected to follow

10   them.  Just follow the policy.

11        Mr. Davis -- you can hardly read that signature, but

12   he'll testify that's his signature right there.  And the

13   policies were given to him at that time.  This was is September

14   of 2005, now.  He signed off on it.  And if he doesn't change

15   his deposition testimony, he's going to say, and when I signed

16   off on it, I knew that I was supposed to follow it and that I --

17   I should do it.

18        He was given along with that a copy of what's called a

19   grievance procedure, if you have a grievance, and it defines

20   what it is.  A grievance is a complaint, a view, or an opinion

21   pertaining to employment conditions, to relationships between

22   employees and supervisors and relationships with other

23   employees.  It says what it's not.  He signed off on that.

24        He was also given at the same time a policy on free

25   speech.  It says the city won't discharge an employee for the

1    exercise of his or her right of free speech unless the city can

2    show a compelling interest in the abridgment of the rights and

3    the employee has been granted due process.  They will not be

4    abridged except in the following circumstances:  speech which

5    impairs harmony and discipline in the workplace or breaches

6    confidentiality or impedes job performance or which jeopardizes

7    close personal loyalty.  If you hold a news conference and say a

8    lot of things that may or may not be true, you're impeding job

9    performance and you're interfering with loyalty.  You're causing

10   disruption.  And that's what Mr. Davis wanted to do, and that's

11   what he continually did.

12          There's also another policy, and it's real clear.  It's

13   just as simple as it can be.  And the policy is addressing city

14   council.  It's ASOP 12.  And it clearly says if the fire

15   department -- a member of the fire department has a problem with

16   the department, a department, or city operations or procedures

17   which are work-related and finds it necessary to go above his or

18   her immediate supervisor, he must notify the supervisor of the

19   intention to do so.  And then he takes it up the chain of

20   command.  And then importantly, number three, if the problem

21   cannot be solved by anyone in the chain of command, then the

22   city manager will arrange a hearing with the city council.  It

23   doesn't say might do it, may do it, if he wants to, he'll do it.

24   It says he will arrange a hearing with city council.

25          Now, what happened here was that Mr. Davis wanted to

1  tweak the nose of the chief again.  He never talked about any of

2  these things he put in the newspaper, by the way, which we'll

3  get to during the course of this case, with Chief Hunter.  He

4  never brought them up the chain of command and talked to anybody

5  about them.  He just basically held a news conference and said,

6  you know, here's what I'm going to say.  Had his picture taken

7  to go in the paper with it.

8          What happened here is this policy came up about

9  extending the probationary period for people that would be

10  newly -- new recruits to the fire department.  And here is the

11  reason.  When people used to join the fire service, they were

12  trained only as firefighters.  Now they're trained as EMTs and

13  they've got to have haz mat training, too.  It takes longer for

14  these young men to get through their training, and it's

15  difficult.  And sometimes they get to the end, and they don't

16  pass their EMT test.  And they have to try to recertify to do

17  it.  And if they can't do it by the end of 12 months, we lose

18  them.

19          So the whole purpose for the new policy, the 18-month

20  probationary period, was to allow new recruits longer to get

21  into the fire department.  It was a good thing.  And I don't

22  expect you're going to hear anybody get on the witness stand and

23  say that it was not a good thing.  In fact, all of them are

24  going to say it was a good thing.  That's what Mr. Davis was

25  supposedly calling the mayor to complain about, was that policy.

 1          And he claims -- he's going to get on the witness stand
 2   and claim that, well, the first time I really knew anything
 3   about the policy was on the day before it was implemented.   I
 4   was sitting around the firehouse, and I -- and I read a
 5   newspaper.   And I saw in the newspaper where they were going to
 6   change something about that.   And so I -- I sprung into action,
 7   and I decided I was going to find out all about it.   And so I
 8   found out about it, and I decided I was against it.   And I was
 9   against it on behalf of my members in the union.   I polled all
10   of them and talked to them -- although when I took his
11   deposition, he couldn't remember but the name of one person he
12   polled -- and then I got on the phone and I called the mayor.
13   And what I called him to tell him was, was that we were against
14   that policy.
15          Well, this is the phone message.   It's hard to read,
16   but it says -- he doesn't say when he calls and leaves the
17   message that he's calling on behalf of the firefighters union or
18   anything.   Just leaves his name.   That's his home phone number.
19   And he says regarding city proposals.   He won't -- he would not
20   speak with anyone else.   He won't talk to the chief about it.
21   He won't talk to the city manager about it.   Only person he
22   wants to talk to now is the mayor.
23          Now, here's the position that that puts Chief Hunter
24   in.   We expect the evidence will be this, and Chief Hunter will
25   tell you this.   It's his proposal.   He's the chief of the

1   department.  It's been advertised once already.  It's coming up

2   for second reading to be voted on at the city council.  And what

3   position does that put him in when nobody even pays him the

4   courtesy to call him about it and yet somebody -- one of his

5   firefighters is going around him, around the city manager, and

6   up to the mayor?  What does that do to him?  It undermines his

7   authority.  That's why the chain of command is so important.

8   These people are working in a public safety position.  They're

9   working on a fire ground some of the time.  And when they get

10  out there, there can't be any question about who's in charge and

11  what you're going to do.

12          Now, one thing I haven't told you is this.  The truth

13  of the matter is he knew about this at least a month or two in

14  advance of it.  It's not like he said.  It's not like it was the

15  day before.  He knew it about two months before.  And the person

16  that's going to testify that -- about that is Roy Waters, who

17  was the chief of the Columbus Fire Department; after 32 years

18  with that department, had retired.

19          And remember I told you earlier that Mr. Hunter was

20  trying to straighten out the department when he took over in

21  March and all?  He said, you know, maybe I'm too close to

22  everything.  He saw Roy Waters was retiring.  So he went over

23  and he said, Chief, would you come over and help me with this?

24  Would you be my deputy chief for a while and see if you can see

25  what's going on here?  Maybe I'm too close to some of these

1  guys.  Maybe I need to take a step back.

2         And Chief Waters came in to do that, and Chief Waters

3  did a good job.  First of all, he put everybody to work.  They

4  all had to train every day at the same time.  He found people

5  that weren't working together well and put them together to make

6  them work.  And you know, things started getting better just

7  like that.  He even tried to bring Mr. Davis along.  And he will

8  testify that Mr. Davis came to see him two or three times and

9  said, Chief, I followed the chain of command, and I've got a

10  problem with so-and-so.  And he said, anytime you want to come

11  see me, come see me.  In fact, he opened every meeting with

12  anybody can come see me in my office anytime -- this is Deputy

13  Waters -- and if you don't want to come to my office, you can

14  come to my house.  Come to my house and see me.

15         Now, what happened was when the stuff about

16  probationary period came up, he announced it to every shift,

17  told them all about it.  Said this -- and there was only a

18  couple of questions.  And on his deposition, Mr. Davis said, and

19  one of them was me.  I was one.  I asked a question.  And I

20  said, well, Mr. Davis, what was your question?  And he's going

21  to testify, my question was, does this apply to the people that

22  are already on the job?  In other words, if somebody's promoted

23  from sergeant to captain -- that's the way it works in the fire

24  department -- does that mean they're going to be on probation

25  for 18 months?  And Chief Waters says, no, you don't have to

1   worry about that.  It only applies to new hires.  It only

2   applies to new hires.

3            So it's real simple.  It's real simple.  And I think

4   you're going to find that it's real simple at the end of this.

5   The only thing that was required of Mr. Davis was to follow this

6   policy, a policy he knew about, a policy he had signed off on.

7   He had been told about it before.  Instead of discipline him the

8   first time when he knew about it the first time, he was called

9   in and said, look, just in case you forgot, here's the rule;

10  sign off.  And he does it again.  He -- he left the chief no

11  choice.  He left him no choice.  How can you have somebody with

12  insubordination continue to be insubordinate and not do

13  something about it?

14           Now, these are the last documents I'm going to show

15  you.  This is a written warning form that was filled out on

16  April the 20th, 2006, in accordance with the merit system.  And

17  you can see here he called Mayor Hardin regarding city

18  proposals.  Mayor Hardin was not in.  David Davis asked to leave

19  a message.  Mayor Hardin returned his call.  Said he would not

20  speak with anyone else.  Prior verbal or written actions given.

21  And the next thing on here is September 20th, '05, violation of

22  the directive of Wallace Hunter regarding free speech and

23  grievances.  Violation of ASOP 12.  Same thing that happened

24  when he went to the newspaper.  There it is.  And then this is

25  the reason for the termination up here at the top.

1          Let's see if there's anything -- you'll see a lot of

2    this before we get through.  There's no sense in keeping it up

3    here for a long time.  But I'm fixing to finish now and sit down

4    and just tell you this, that we put a lot of training into

5    people in that fire department.  And you're going to hear

6    evidence that we have -- for the town our size, we've got one of

7    the best fire departments equipment-wise, training-wise -- other

8    people come from other places to train with us.

9          Since leaving the fire department -- Mr. Davis may want

10   to talk about his damages.  He left the fire department and went

11   to Care Ambulance and started making more money.  He makes more

12   money per hour there than he did with us.  He's also gotten a

13   second job with the Opelika Fire Department, so he's working two

14   jobs now.  Before, he was working one.  He was getting a lot of

15   overtime with the Phenix City Fire Department, so I don't blame

16   him for wanting his job back.  It's a good job to have.  It's

17   too bad he couldn't follow the rules, and that's what happens

18   when you don't.  And I -- and I'm sorry about it; but, you know,

19   I'm not sorry for anything that we did, because I don't think we

20   did anything wrong.

21         This courtroom, although it's got the leaks in it and

22   all, is a temple of justice.  And when you leave here, whatever

23   your verdict is, when this place empties out and there's less

24   and less people here today, hopefully you'll leave justice

25   here.  And justice in this case will be to let the city go and

 1  say you have a right to enforce rules.  You have a right to make

 2  people follow a chain of command and to do things that are

 3  reasonable with people.  And when they don't follow them, you

 4  have a right to let them go someplace else and work.  And that's

 5  all we did.  Thank you.

 6          THE COURT:  All right.  Mr. Steele, call your first

 7  witness.

 8          MR. STEELE:  Yes.  We call the plaintiff, David Davis,

 9  to the stand.

10          THE CLERK:  Would you raise your right hand, please.

11          THE WITNESS:  Yes, ma'am.

12     (The witness is sworn)

13          THE CLERK:  Be seated.

14          THE COURT:  Mr. Davis, pull that mike up in front of

15  you where everybody can hear you.  That's good.

16          **DAVID PAUL DAVIS**, the witness, having been duly sworn,

17  testified, as follows:

18                         DIRECT EXAMINATION

19  BY MR. STEELE:

20  Q.  Mr. Davis, I'd like for you to begin this afternoon by

21  telling the jury a little bit about yourself, your family, your

22  education, and just a little bit about who you are so that they

23  can see what happened here.

24  A.  Yes, sir.  My name is David Paul Davis.  I'm 33 years old.

25  I was raised in Phenix City, Alabama.  I went to school in East

1    Alabama.  I'm married to a local girl.  We don't have any

2    children, but we do got two Chihuahuas, and they're our

3    children.  And I was told this morning we're getting another

4    dog, so I guess we'll have three babies.

5        Most of my adult life I've worked for the fire department in

6    Phenix City.  I went there in my twenties.  My daddy lived down

7    the street from the fire station.  My stepdad was a fireman.

8    So, of course, that made me want to be a fireman.  I got on in

9    Phenix City in 1998 as a fire recruit, and I went to recruit

10   school, graduated top of my class.  Then I became a

11   firefighter.  I later was sent to EMT school.  After I completed

12   EMT school, I saw that I could serve my community better by

13   being a paramedic, which wasn't a requirement.  So out of my own

14   pocket and on my days off, I went to paramedic school.

15       In addition to that, I got my associate's degree at the

16   local community college in fire science.  And I saw that -- that

17   I really loved the fire department, and I wanted to end up

18   moving up.  And so I knew that I'd have to have an education to

19   do that, so I just started to go to school more and more on my

20   days off.  And I paid for it out of my own pocket and ended up

21   getting my bachelor's degree and then decided to go a little bit

22   farther and ended up getting my master's degree.  And I just

23   worked as a fireman there until April of 2006 when I was

24   terminated.

25   Q.  Mr. Davis, when were you first employed by the fire

1  department in Phenix City?

2  A.  I think my start date was April 27th, 1998.

3  Q.  And if you would, please tell the jury what positions and

4  ranks you held during your career with the Phenix City Fire

5  Department.

6  A.  Yes, sir.  I started off as a fire recruit and went through

7  my basic training and then was promoted -- you know, moved to

8  firefighter and then firefighter EMT.  And then I got my

9  paramedic, so I was a firefighter paramedic.  And in 2003, I was

10  promoted to a sergeant position, and I held that position until

11  I was terminated.

12  Q.  Now, in addition, Mr. Davis, was there an association of

13  local firefighters who worked in Phenix City?

14  A.  Yes, sir.

15  Q.  And did you have some involvement in that?

16  A.  Yes, sir.

17  Q.  And would you tell the jury what your involvement was during

18  the time period that we're talking about, the end of 2005

19  through the time of your termination in 2006?

20  A.  I believe in 2005 I was the acting president.  And at the

21  end of that year, I believe October, maybe, I was elected to the

22  president position of the association.

23  Q.  Is this association a union that's recognized by the city as

24  a bargaining representative or anything like that?

25  A.  No, sir.  They don't recognize us as a bargaining

1  organization.

2  Q.  Are they required to?

3  A.  Not that I know of.  By law, I don't think they are.

4  Q.  Now, I'm going to refer you to September of 2005.  And there

5  is a meeting of the association that a news reporter was at.  Do

6  you recall that meeting?

7  A.  Yes, sir.

8  Q.  Would you tell us how that meeting came about?

9  A.  Well, I was contacted by a member of the local media who

10  said that there was a number of issues in the fire department,

11  and he was wondering if he could come to a meeting and I guess

12  discover what some of those issues were and talk to some of the

13  members.

14  Q.  And were you one of the members that were at that -- was at

15  that meeting?

16  A.  Yes, sir.

17  Q.  What was your objective in allowing the reporter to come and

18  talk to y'all?

19  A.  We were just hoping to make things better in the fire

20  department.

21  Q.  Now, after that meeting, did the newspaper reporter write an

22  article relating to the fire department?

23  A.  Yes, sir, he did.

24        MR. STEELE:  Your Honor, if I may approach, I'd like to

25  show the witness Exhibit #7 in the exhibit notebook.

```
 1           THE COURT:  Yes, you may.  And I don't find my copies

 2   of those.

 3      (Brief pause)

 4           THE COURT:  All right.  Which number is this?

 5           MR. STEELE:  #7, Your Honor.

 6   Q.  Mr. Davis, will you take a look at what's been marked as

 7   Plaintiff's Exhibit #7?  It's in the notebook in front of you.

 8   And would you tell us what that is?

 9   A.  That's the newspaper article that the reporter wrote after

10   the meeting.

11   Q.  And does that appear to be an accurate copy of the newspaper

12   article you saw in the newspaper in September 2005?

13   A.  Yes, sir.

14           MR. STEELE:  And Your Honor, I'd move for the admission

15   of Plaintiff's Exhibit #7.

16           THE COURT:  Is this one that there's been no objection

17   to?  Is that correct?

18           MR. MCKOON:  I don't have any objection to it, Your

19   Honor.

20           THE COURT:  It's admitted.

21   Q.  Now, you were quoted in that newspaper article; is that

22   correct?

23   A.  Yes, sir, I was.

24   Q.  Would you take a look at the article and tell the jury what

25   statements of yours the reporter chose to put in the article?
```

1  A.  I think I'm quoted twice in this article.

2  Q.  Okay.  And would you please tell the jury what was -- what

3  those quotes are?

4  A.  "Morale is at the lowest point since I've been here," says

5  Sergeant Davis, a seven-year veteran and president of the Phenix

6  City Firefighters Association.  And then the next one is "Davis

7  puts it this way.  We are reluctant to talk because of

8  significant fear of retaliation, being disciplined, or fired."

9  Q.  Now, Mr. Davis, were those accurate quotes that the reporter

10  put in the article?

11  A.  Yes, sir.  I feel that they were.

12  Q.  Were those your honest opinions at that time?

13  A.  Yes, sir.

14  Q.  Now, why did you choose to meet with the reporter?

15  A.  Well, there were a number of issues that we were having in

16  the fire department, a bunch of issues that we felt like needed

17  to be made public so maybe we could get some help.

18  Q.  Were you on duty when you spoke to the reporter or off duty?

19  A.  No, sir.  I was off duty.

20  Q.  Do you believe you had a right to speak with that reporter?

21  A.  Yes, sir.  I believe any citizen would have a right to speak

22  to a reporter, I mean off duty and off work.

23  Q.  Now, after that article appeared in the paper, what occurred

24  to you relative to your employment?

25  A.  I was called down to the chief's office and told that

1  lawyers were involved and I could possibly be losing my job.

2  Q.  Now, who told you that?

3  A.  I believe it was the fire chief and my assistant chief.

4  Q.  And who was your assistant chief at the time?

5  A.  Kenny Johansen was my assistant chief.

6  Q.  Were you asked to write a statement about your participation

7  in that discussion with the reporter?

8  A.  Yes, sir, I believe I was.

9  Q.  If you would, please turn to what's marked as Plaintiff's

10  Exhibit #9 in the notebook in front of you.  And would you tell

11  the jury what Exhibit #9 is?

12  A.  Yes, sir.  It's the letter that I was told to write.

13  Q.  And does that appear to be an accurate copy of the statement

14  that you made on September 20th of 2005?

15  A.  Yes, sir.

16          MR. STEELE:  And Your Honor, I'd move for the admission

17  of Plaintiff's Exhibit #9.

18          MR. MCKOON:  We've seen it.  That's fine, Your Honor.

19          THE COURT:  Admitted.

20  Q.  Mr. Davis, now that it's admitted, would you read -- it's a

21  fairly short statement there.  Would you read that statement to

22  the jury, please?

23  A.  Yes, sir.  Do you want me to read the whole thing?

24  Q.  Yes.

25  A.  It's dated September 20th, 2005.  To whom it may concern:

1  On Tuesday, September 13th, 2005, on my off-duty day and acting

2  as president of the Phenix City Firefighters Association, Local

3  3668, I met and gave an interview with the local media on issues

4  in the Phenix City Firefighters Association.  Respectively

5  (sic), David P. Davis, Sergeant.

6  Q.  What, if anything, happened after you gave that statement?

7  A.  I was called down to the chief's office.

8  Q.  Okay.  And then what occurred?

9  A.  They gave me a packet, told me to sign for it, and then told

10  me, you know -- I asked if I was in any trouble.  They said they

11  didn't know, that lawyers were involved, and that I could lose

12  my job.

13  Q.  At some point, did you receive a counseling form in

14  connection with that newspaper article?

15  A.  Yes, sir.  I think the next morning when I was getting off,

16  my assistant chief rode down there and told me to sign a

17  counseling form right before I left from work.

18  Q.  Okay.  And if you would, please turn to Exhibit #13 in the

19  binder in front of you.  And would you tell us, is this the

20  counseling form you just referred to?

21  A.  Yes, sir.

22  Q.  And that appears to be an accurate copy of that form?

23  A.  Yes, sir.

24       MR. STEELE:  And Your Honor, I would move for admission

25  of Plaintiff's Exhibit #13.

1           MR. MCKOON:  No objection.

2           THE COURT:  It's admitted.

3  Q.  Did you sign this form at the meeting or was -- that you had

4  at the chief's office, or was this afterwards?

5  A.  I signed this afterwards.

6  Q.  Tell me the best that you can recall what you were told at

7  that meeting concerning your rights to speak to the media as an

8  employee, being an employee of this department.

9  A.  Well, I was told that I -- I couldn't speak to the media.

10  Q.  And who told you that?

11  A.  My fire chief.

12  Q.  Chief Hunter?

13  A.  Yes, sir.

14  Q.  Now, did Chief Hunter say you can't speak to the media

15  unless you talk to me first?

16  A.  I mean they gave me the policy and told me to read it, and

17  that's what the policy says.

18  Q.  And why didn't you follow that policy when you spoke to the

19  reporter?

20  A.  Well, first of all, I was on my day off, and I thought those

21  policies were applicable to when you're on duty.

22  Q.  And were there any other reasons?

23  A.  I mean we spoke about matters of public concern and, you

24  know, issues that -- that any public citizen would, you know, be

25  concerned about if they lived in the city of Phenix City.

1  Q.  Did you believe as a citizen you had a right to talk about

2  those issues?

3  A.  Yes, sir.

4  Q.  Now, as a result of receiving this counseling, did you do

5  anything different in response to it?  Did you change your

6  behavior or actions in any way?

7  A.  Yes, sir.  I didn't invite any more people from the media to

8  any of our meetings.

9  Q.  And is that true from the time you signed that form until

10 the time you were terminated?

11 A.  Yes, sir.

12 Q.  Now, that was in September of 2005, and then there became a

13 time that you learned of a proposed ordinance with respect to

14 the probationary policy; is that correct?

15 A.  Yes, sir.

16 Q.  Would you tell the jury when you first learned about that?

17 A.  When I first learned about --

18 Q.  About a proposed ordinance to change the city's probation

19 policy for firefighters.

20 A.  It was a Sunday.  I'm not sure of the exact date.  I was on

21 duty on a Sunday.

22 Q.  And how did -- how did that come to your attention?

23 A.  I saw it in the *Ledger-Enquirer*, which is a newspaper where

24 they make an announcement of the council's agenda.

25 Q.  Now, prior to that, had anyone shown you this proposed

1  ordinance?

2  A.  No, sir.  Nobody ever showed it to me.

3  Q.  When you read about it in the paper, did you know exactly

4  what the ordinance was?

5  A.  No, sir.

6  Q.  Chief Waters -- what, if anything, did Chief Waters say in

7  your presence about the probationary policy or the length of

8  probation?

9  A.  Probably two or three months prior to that being in the

10  newspaper, we had training every day at 1300, at one o'clock.

11  Chief Waters usually was over our training.  And sometime in the

12  course of the training, he told us that in the future, no time

13  soon, that they would probably extend the probationary time for

14  firefighters, that that was something that they did in Columbus

15  and he didn't know why we weren't doing it in Phenix City.

16  Q.  Did Chief Waters tell you that it was definitely going to

17  happen or that it might happen?

18  A.  No, sir.  I mean we had a little bit of discussion on it.

19  He said, hey, guys, that will be -- that's nothing that's going

20  to happen right now.

21  Q.  Between the time of that discussion and the time when you

22  read the article in the newspaper, did anyone within the

23  department or anyone at all tell you that there was a written

24  proposal to change the probationary policy that was presented

25  for consideration by the council?

1  A.  Let me see if this -- did you ask me before I saw it in the

2  paper, did I know about it?

3  Q.  Before you saw it in the paper.  Any time between when

4  Mr. Waters -- excuse me -- Chief Waters said that at some time

5  in the future we're probably going to be looking at this and

6  when you read the article in the paper in April of 2006, did

7  anyone ever tell you that there actually was a written proposal

8  being presented to the city council to amend the probationary

9  period and extend it by an additional six months?

10  A.  No, sir.

11  Q.  When did you first learn that a written proposal was before

12  the city council?

13  A.  On that Sunday that I saw it in the newspaper.

14  Q.  Now, when you saw it in the newspaper that Sunday, did you

15  have any discussions at the station about it?

16  A.  Yes, sir.

17  Q.  And who did you talk to at the station about that?

18  A.  My captain.

19  Q.  And who was your captain?

20  A.  George Bennett.

21  Q.  And is there anyone else that you talked to at the station

22  about it?

23  A.  Well, I talked on the telephone to Bill Pitts.

24  Q.  Okay.  Tell me about your conversation with -- with Captain

25  Bennett.  Where did that occur?

1  A.  I was sitting in the kitchen, and he was in the living room.

2  Q.  This is at the station?

3  A.  Yes, sir.  At the fire station number three.

4  Q.  Was anyone else there at that time participating in that

5  conversation?

6  A.  I think Brandon Sheets was in there as well.

7  Q.  Okay.  Now, tell me to the best you can recall -- and I

8  understand that that's now approaching almost two years ago, but

9  tell me the best that you can recall what you said during that

10  conversation to Captain Bennett and what, if anything, Captain

11  Bennett said to you in that conversation as it pertains to the

12  proposed ordinance at that point, the proposal before the city

13  council.

14  A.  I saw it in the paper.  And I went and looked in the merit

15  system book, and then I come back there in the kitchen.  And I

16  said, well, I said, it looks like they're changing the

17  probationary time again.  And I think Captain Bennett said it

18  must have been -- you know, it must be what the chief was

19  talking about the other day about the new employees.  And I said

20  yeah.  And then he said, that ain't going to work.  He said,

21  aren't you friends with the mayor?  And I said, well, we

22  supported him in his campaign.  And he said, well, you know,

23  you're going to have to call down there and get that stopped.

24  Q.  Is there anything else that you recall from that

25  conversation that day at the station?

```
1   A.   No, sir.
2   Q.   Did Captain Bennett tell you that you'd be violating the
3   chain of command if you made that call?
4   A.   No, sir.
5   Q.   Did he instruct you not to do so?
6   A.   No, sir.
7   Q.   Did he instruct you that you needed to go above him up the
8   chain of command before you made the call?
9   A.   No, sir.
10  Q.   So you have the discussion at the station with Mr. Sheets
11  and your captain.  Now, Captain Bennett, was he your first-line
12  supervisor that day?
13  A.   Yes, sir.  He's my boss.  He's my supervisor.
14  Q.   Okay.  So on that shift, as far as chain of command, it
15  starts with him, as far as your position as a sergeant that day?
16  A.   Yes, sir.  He's my boss.
17  Q.   And as you sit here today, your best recollection -- I want
18  to make sure we have this clear -- is that Captain Bennet told
19  you that you should make some calls?
20  A.   Yes, sir.  He said I need to make some calls.  He said, it
21  looks like that you need to make some calls.
22  Q.   And what did you say in response?
23  A.   Well, I said, yeah, I probably will tomorrow.
24  Q.   Now, after talking to Captain Bennett about it, why didn't
25  you take it higher up the chain of command?
```

1   A.   I didn't think I had to.

2   Q.   And why is that?

3   A.   Well, one, it was -- it didn't affect me.  Two, it was a

4   political issue and really wasn't work-related for me.  The

5   captain told me to do it.  And, you know, I was going to do it

6   on my day off.

7   Q.   Were you satisfied with the answer that -- or the statement

8   the captain gave you concerning your ability to make the call?

9   A.   Yes, sir.  I mean he said it was -- I mean he told me to do

10   it.

11   Q.   You weren't objecting to what Captain Bennett told you and

12   needing to raise that up the chain?

13   A.   No, sir.

14   Q.   So what did you do next in connection with this proposal?

15   A.   The next day when I was off, I called the city clerk's

16   office to get verification on exactly what it entailed because I

17   was unsure specifically what -- what it was.  She told me in

18   detail on what the proposal was.  So once I got verification on

19   exactly what it entailed, I called my fellow firefighters from

20   my house, you know, to get their opinions on what our stance

21   would be.  And then after I talked to my secretary-treasurer and

22   a number of other firefighters, I called the mayor.  He had told

23   me before on a number of occasions that if I ever needed

24   anything, I could call him.  So I called him and, you know,

25   voiced our concerns with the proposal over the telephone.  Well,

1    I called him and he wasn't in, and then he called me back later

2    and we discussed it.

3    Q.  Now, when you first called and the mayor wasn't in, did you

4    ask to leave a message so he could call you back?

5    A.  Yes, sir.

6    Q.  And I'd like to show you Exhibit -- I'd like you to take a

7    look at Exhibit #18 in the binder in front of you.  After you do

8    that, does that look like the same message form that Mr. McKoon

9    talked to the jury about during his opening?

10   A.  Yes, sir.

11   Q.  Are you able to read what's on that form?

12   A.  Yes, sir, I can.

13          MR. STEELE:  I'd like to, Your Honor, move for the

14   admission of this form.

15          MR. MCKOON:  No objection.

16          THE COURT:  Which number is that?

17          MR. STEELE:  Plaintiff's Exhibit #18.

18          THE COURT:  Yes.  It's admitted.

19   Q.  Would you read what it says under the message area of that

20   form, please.

21   A.  It says, message, city proposals, dash, he would not speak

22   with anyone else.

23   Q.  Now, this "he would not speak to anyone else," did the

24   person to take that message ask you if you wanted to talk to the

25   fire chief?

1  A.  No, sir.

2  Q.  Did the person say, well, the mayor's not in; is there

3  anyone else that can help you?

4  A.  Yes, sir.

5  Q.  And why didn't you talk to anybody else?

6  A.  I mean I just told her I called to talk -- to speak to the

7  mayor.

8  Q.  And she said she'd leave him the message.

9  A.  Yes, sir.

10  Q.  You didn't feel that you were snubbing the chief or city

11  manager by asking to speak to the mayor, did you?

12  A.  No, sir.

13  Q.  Now, you said that you called and you left a message because

14  the mayor wasn't in.  And then later that day, he called you

15  back; is that correct?

16  A.  Yes, sir.

17  Q.  And you had a conversation --

18  A.  Yes.

19  Q.  -- concerning the proposal.

20  A.  Yes, sir.

21  Q.  When you had that conversation, though, the mayor called

22  you, not you calling the mayor; is that correct?

23  A.  Yes, sir.

24  Q.  Now, tell us to the best you recall -- let me back up a

25  little bit.  Where were you when you received the mayor's call?

```
 1  A.   I was at home.

 2  Q.   And was that on your day off?

 3  A.   Yes, sir.  I was off work.

 4  Q.   Okay.  And how long did the call last?

 5  A.   Not even five minutes.

 6  Q.   Okay.  Would you tell us to the best of your recollection

 7  what you said during that call and what, if anything, the mayor

 8  said to you in response?

 9  A.   He called me back and said, hey, David; and I said, hey,

10  Mr. Mayor.  And we just chitchatted for a second or two,

11  exchange of pleasantries.  And I told him that, you know, we

12  were calling to voice our opposition to the changes to the

13  probation period for firefighters.  You know, we -- I gave him

14  some examples on why we were opposed to it, such as, you know,

15  we had been working short and we thought it would be hard to

16  recruit firefighters if probation was extended, that they

17  couldn't work part-time jobs when they're on probation, and they

18  didn't have any, you know, rights under the merit system when

19  they're on probation.  And other departments in the area

20  competing for the same recruits allowed their firefighters to

21  work.  And I think I even told him that, you know, our insurance

22  is pretty expensive and other places aren't, and the

23  firefighters kind of need their part-time jobs to make up the

24  difference and that we felt like it would hurt our -- you know,

25  our recruitment abilities and our staffing.
```

1    And I even proposed some changes, because he had brought up

2  the fact that he couldn't remember if it was the police chief or

3  the fire chief that brought this forward, but that one of the

4  chiefs said that it had to do something with EMTs, you know,

5  people not being able to pass EMTs.  And then I told him, I

6  said, well, why don't we just extend the period that people have

7  to allow to be able to pass EMTs.

8    And then he thanked me, you know, for bringing this to his

9  attention and said that he would keep that in his mind and he

10 would bring that up at the work session, and that he thanked me

11 for calling him and told me on the phone that, you know,

12 appreciate you calling.  And anytime you need anything, feel

13 free to call me.  And that was it.

14 Q.  Okay.  At any time during that conversation did the mayor

15 tell you that you needed to raise this with the chief or the

16 city manager instead of talking to him about it?

17 A.  No, sir.

18 Q.  At any time during the conversation did the mayor say, I

19 can't talk to you about this?  It's out of my area?

20 A.  No, sir.

21 Q.  So to the best of your knowledge, was the proposed ordinance

22 in fact something that was before the city council for

23 consideration?

24 A.  Yes, sir.  I assumed it was like any other ordinance.

25    (Brief pause)

```
 1              MR. STEELE:  I apologize, Your Honor.  I'll have this
 2   in just a moment.
 3              THE COURT:  If you're getting ready to go into another
 4   area, we'll take a break.  If you're still on what you're
 5   talking about now, we'll wait.
 6              MR. STEELE:  A couple more questions relating to this
 7   conversation and the ordinance --
 8              THE COURT:  All right.
 9              MR. STEELE:  -- if we could, sir.
10   Q.  Mr. Davis, please turn to Exhibit #17 in the notebook in
11   front of you and first take a look at that and read it for
12   yourself -- to yourself and let me know, does this appear to be
13   the ordinance that you discussed with the mayor in that phone
14   conversation?
15   A.  Yes, sir.  That looks correct.
16              MR. STEELE:  And I would move for the admission of
17   Plaintiff's Exhibit #17.
18              THE COURT:  Admitted.
19   Q.  And if you would, tell the jury what was the date that's
20   listed on Exhibit #17 as this ordinance having been passed and
21   approved.
22   A.  It says the 18th day of April, 2006.
23   Q.  So that was the day after you spoke to the mayor?
24   A.  Yes, sir.
25   Q.  And two days after you read about it in the paper?
```

1   A.  Yes, sir.

2        MR. STEELE:  Your Honor, this would be a fine stopping

3   point if you'd like to take a break.

4        THE COURT:  All right.  Members of the jury, we're

5   going to take a recess at this time.  And I understand there are

6   soft drinks and water and things down in the jury room.  If

7   anybody wants to step outside and catch a breath of fresh air,

8   feel free to do that and then come back up to the jury room

9   there.  I'll remind you not to discuss the case with anybody or

10  allow anybody to discuss it with you or in your presence.  Don't

11  begin talking among yourselves about the case.  We'll take 15

12  minutes and be back up here ready to start back at five minutes

13  till four.  We're in recess.

14     (Jury out at 3:41 p.m.)

15        THE COURT:  All right.  We're in recess for 15 minutes.

16     (Recess at 3:41 p.m. until 3:58 p.m., at which time

17      proceedings reconvened with the jury present, as follows:)

18        THE CLERK:  Court is in session.  You may be seated.

19        THE COURT:  All right.  Mr. Steele?

20        MR. STEELE:  Thank you, Your Honor.

21  Q.  Now, Mr. Davis, with respect to this probationary policy

22  ordinance, at the time that you talked to the mayor, were you a

23  new hiree?

24  A.  No, sir.

25  Q.  How long had you been in the department?

1  A.   Probably about a week shy of eight years.

2  Q.   Did you expect that the ordinance was a problem that was

3  going to affect you personally?

4  A.   No, sir.  It wouldn't affect me.

5  Q.   When you spoke to the mayor, did you tell him it was a

6  personal problem that you were having, or was it -- what did you

7  tell the mayor about it?

8  A.   I just told him we had some issues with it.

9  Q.   And the mayor said what?

10  A.   I mean he asked what kind of concerns do you have.

11  Q.   And then the rest proceeded as you've already testified?

12  A.   Yes, sir.

13  Q.   I want to change gears a little bit here and ask you about

14  the mayor and whether or not he had an open-door policy, to the

15  best of your knowledge.  What do you know about it?

16  A.   To the best of my knowledge, he had an open-door policy.

17  Q.   And what makes you say that?

18  A.   He told me.

19  Q.   And where did that occur?  How did that come about?

20  A.   One time we had a meeting.  He came in.  He was running for

21  election.  He asked for our support and told us his platform.

22  And part of his platform was that he would have an open-door

23  policy for firefighters.

24  Q.   How many people do you recall being at that meeting, if you

25  could estimate?

1  A.   Anywhere between 15 to 20 firefighters.

2  Q.   Was that the only occasion you heard the mayor reference

3  having an open-door policy?

4  A.   No, sir.

5  Q.   On how many occasions do you recall the mayor mentioning an

6  open-door policy?

7  A.   Including the -- I guess when he told me to call him anytime

8  when I called him that day?

9  Q.   Sure.   Including when you talked to him that day.

10  A.   Maybe four, total.

11  Q.   And you told us about what he said in the phone call and

12  about this meeting when he was running for office.   What do you

13  remember of the other occasions?

14  A.   Another time we had a captain who got injured on the job and

15  had to retire.   The mayor came to the retirement party and gave

16  a speech.   And part of that speech was he told us that his door

17  was open to us anytime.   Another time I was in his office for a

18  meeting and he told me anytime that, you know, I needed him, to

19  call him.   And then, of course, at the end of the conversation

20  when I called him that Monday morning, you know, he told me

21  thank you for bringing this to my attention and, you know, call

22  me if you need me.

23  Q.   Now, Mr. Davis, setting aside what the mayor told you in

24  that conversation on April 17th, 2006, were the other three

25  occasions you just told the jury about before or after that

1  conversation?

2  A.  Could you ask that question again, please?

3  Q.  Sure.  You've told us about four times when the mayor

4  mentioned an open-door policy in your presence --

5  A.  Yes, sir.

6  Q.  -- is that correct?  One time you mentioned is in the phone

7  conversation on April 17th that we discussed earlier, correct?

8  A.  Yes, sir.

9  Q.  The other three occasions, were they before April 17th,

10  2006?

11  A.  Oh, yes, sir.  Yes, sir.

12  Q.  Now, you mentioned that there was a meeting relating to an

13  individual that was -- was retiring; is that correct?

14  A.  Yes, sir.

15  Q.  And the mayor came and spoke at that meeting?

16  A.  Yes, sir.

17  Q.  Do you recall when that meeting occurred?

18  A.  I don't remember the exact date.  It might have been January

19  '06.

20  Q.  Do you recall whether it was before or after the mayor was

21  elected mayor?

22  A.  It was after.  He was already the mayor.  I gave him the

23  invitation at a council meeting.

24  Q.  And the other time you told us about was when you talked to

25  him in his office.  Was that his office at city hall?

1    A.   Yes, sir.

2    Q.   So that was after he was elected as well.

3    A.   Yes, sir.  Yes, sir.

4    Q.   When the mayor told you or told the people assembled at

5    these meetings that he had an open-door policy, did you believe

6    him?

7    A.   Yes, sir.

8    Q.   Did the mayor give you any reason not to believe him?

9    A.   No, sir.

10   Q.   Did you take him at his word?

11   A.   Yes, sir.

12   Q.   And at any time between the time the mayor ran for election

13   and the time that you were terminated, did the mayor ever

14   communicate to you that my door is now closed, the open-door

15   policy, that's no longer in effect?

16   A.   No, sir.

17   Q.   He never communicated that to you?

18   A.   No, sir.

19   Q.   Now, you spoke with the mayor, you said, on the 17th, and

20   you identified the ordinance having been enacted on the 18th of

21   April.  Do you know customarily what time of day the city

22   council meets?  Do they meet in the evening?  Do they meet in

23   the morning?  If you're aware.

24   A.   They have council meetings on Tuesdays in the mornings, I

25   think nine o'clock, 9:30.

1  Q.  And so you spoke to the mayor about five p.m. the night

2  before?

3  A.  Yes, sir.  On Monday night.

4  Q.  Now, talk about the 17th and the 18th.  Would you tell us

5  what occurred when you returned to work on April 19th relative

6  to your communication with the mayor?

7  A.  Okay.  I think I returned to work -- the 19th was a

8  Wednesday.  It might be easier for me to remember the day of the

9  week, but it was a Wednesday, and I came back to work.  I worked

10 at fire station three and was told to report to fire -- to

11 headquarters.  And I reported to headquarters and was questioned

12 on if I called the mayor.

13 Q.  How long were you at headquarters?

14 A.  Probably five or six hours.

15 Q.  Were you in discussions for all that time?

16 A.  No, sir.  They asked me if I called the mayor, and I told

17 them yes.  They asked me why, and I told them.  And then they

18 told me to go in the next room and write a statement.  I wrote

19 the statement.  They told me to sit there until they figured out

20 what they were going to do with me.

21 Q.  And who was it that told you to sit there?

22 A.  Chief Waters.

23 Q.  And how long did you sit there?

24 A.  Two or three hours.

25 Q.  Now, if you would, please, Mr. Davis, turn to what's marked

1  for identification as Plaintiff's Exhibit #19 in the book in

2  front of you.  And would you identify that for the jury, please?

3  A.  That's the statement that I was told to write.

4  Q.  And does this appear to be an accurate copy of the statement

5  you provided on April 19th, 2006?

6  A.  Yes, sir.

7         MR. STEELE:  And Your Honor, we would move for

8  admission of Plaintiff's Exhibit #19.

9         THE COURT:  It's admitted.

10  Q.  And if you would, Mr. Davis, please -- it's a brief

11  statement.  Please read this statement into the record and for

12  the jury.

13  A.  4/19/2006.  Wallace Hunter, Fire Chief.  On Monday, April

14  17th, 2006, I placed a call to Mayor Jeff Hardin's office.  As

15  president of the Phenix City Firefighters Association, Local

16  3668, I made this call in regards to some labor issues in which

17  I had concerns with.  Mayor Hardin returned my call later that

18  evening, and we discussed the issues in which I wanted to

19  address.  Respectively, David P. Davis.

20  Q.  And what are the issues that you were referring to?

21  A.  Lengthening the probationary time.

22  Q.  The ordinance that you've already testified to?

23  A.  Yes, sir.  The city ordinance proposal.

24  Q.  So on the 19th, you gave them a statement, and then they sat

25  you in a room for a few hours?

1   A.   Yes, sir.

2   Q.   And then what happened?

3   A.   I was ordered to go back to my station.

4   Q.   And did you complete your shift?

5   A.   Yes, sir.

6   Q.   Tell me what next happened to you in relation to your

7   communication with the mayor.

8   A.   I think Thursday night I was called by one of the assistant

9   chiefs.  And he told me to come to work -- come to the personnel

10  office on Friday in the morning.

11  Q.   And who was that that called you?

12  A.   I think it was -- James Jackson was the assistant chief that

13  called me at home.

14  Q.   And did you go to the personnel department on Friday

15  morning?

16  A.   Yes, sir.

17  Q.   Who did you meet with there?

18  A.   I believe it was Barbara Goodwin, the personnel director,

19  the fire chief, and the deputy chief.

20  Q.   Chief Hunter?

21  A.   Yes, sir.

22  Q.   And the deputy chief at the time?

23  A.   Yes, sir.

24  Q.   Please identify for the jury the deputy chief.

25  A.   Oh.  The deputy chief was Roy Waters.

1  Q.  Was it just the four of you at that meeting?

2  A.  In the room.  There was a police officer that met me at the

3  door.

4  Q.  Okay.  But he was not in the room when you had the

5  discussion, however?

6  A.  No, sir.  He stood outside the door.

7  Q.  Okay.  Tell me what you recall occurring in that meeting,

8  what you recall those individuals having said to you, what you

9  recall having said to them.

10  A.  They gave me a piece of paper and told me to read it, and I

11  read it.  And then they told me I was going to be terminated,

12  but they would give me the opportunity to resign.  I asked if I

13  could call legal counsel to see what my best options would be.

14  The personnel director, Ms. Goodwin, told me that I couldn't do

15  that; that if I didn't resign, then I'd be terminated effective

16  immediately -- effective immediately.  And so I asked them why,

17  and they told me that it's right there on that piece of paper

18  why.  And I had to sign that paperwork.  Then I sat there until

19  they called -- I think they made everybody leave the fire

20  station, and then they called the captain to meet me down there

21  and made me clean out my locker.  I mean I was fired.

22  Q.  Now, Mr. Davis, if you would turn, please, to Exhibit #21 in

23  the binder in front of you.  Is that the statement that you were

24  provided and told to read?

25  A.  Yes, sir.

1          MR. STEELE:  Your Honor and Mr. McKoon, if I could, I'd

2    let the jury know that it's the same as the blow-up that you

3    showed them.

4          MR. MCKOON:  Yes, sir.

5          MR. STEELE:  You'll be receiving a copy of the exhibits

6    later; but just so you'll know what we're talking about, it's

7    this exhibit that Mr. McKoon referenced earlier.

8    Q.  And does that appear to be an accurate copy of the statement

9    you received on the 20th of April when you were called in to the

10   personnel office?

11   A.  Yes, sir.

12         MR. STEELE:  And Your Honor, we would move for

13   admission of Plaintiff's Exhibit #21.

14         THE COURT:  It's admitted.

15   Q.  Mr. Davis, at the bottom of that exhibit in fairly small

16   print there is some handwriting.  Do you see where that is?

17   A.  Yes, sir.

18   Q.  Do you know whose handwriting that is?

19   A.  Yes, sir.  That's my handwriting.

20   Q.  Okay.  Would you help us out and tell the jury what you have

21   written there at the bottom of the first page of the exhibit?

22   A.  All right.  It says, in regards to contacting the mayor, I

23   was acting in my capacity as president of the Phenix City

24   Firefighters Association, Local 3668, and not as a driver

25   engineer with the City of Phenix City.  I will seek a review

1  board hearing.

2  Q.  And then you signed this document?

3  A.  Yes, sir.

4  Q.  What did you do immediately after the conclusion of the

5  meeting?

6  A.  I had to go down to the fire station and clean out my

7  locker.

8  Q.  Were you accompanied by anybody when you did that?

9  A.  Yes, sir.  They had a captain to meet me down there.

10  Q.  And he followed you and watched what you did?

11  A.  Well, yes, sir.

12  Q.  If you would, please turn to Exhibit #22 in the binder in

13  front of you.  And would you tell us what this exhibit is,

14  please?

15  A.  It says End of Employment Form, City of Phenix City.

16  Q.  Okay.  And have you seen that document before?

17  A.  Yes, sir.  I think I signed it that day.

18  Q.  Does this appear to be an accurate copy of the document, the

19  end of employment form you signed on that date?

20  A.  Yes, sir.

21        MR. STEELE:  Your Honor, the plaintiffs would move for

22  admission of Plaintiff's Exhibits #22.

23        THE COURT:  Admitted.

24        MR. STEELE:  Thank you.

25  Q.  When did you receive Plaintiff's Exhibit #22, what's

1  represented as Plaintiff's Exhibit #22?

2  A.  That morning in the personnel office on the 21st.

3  Q.  And what, if anything, were you told about this document?

4  A.  I mean they just handed me a bunch of documents and told me

5  to read it and sign.

6  Q.  Okay.  Was there any discussion of this document, or did you

7  just do as they said, read it and sign?

8  A.  No.  I asked them why I was being fired.

9  Q.  Who did you ask?

10 A.  All three of them.

11 Q.  Okay.  Did any of them answer you?

12 A.  Yes, sir.

13 Q.  Who was that?

14 A.  I believe it was Deputy Chief Waters.

15 Q.  What did he say?

16 A.  He said that you can look on that paperwork right there in

17 the detailed account, and so I read it.

18 Q.  Now, when he said that, was he referring to what's been

19 admitted as Exhibit #22, or was he referring to what has been

20 admitted as Exhibit #21?

21 A.  No, sir.  It was Exhibit #21.  He pointed to it.

22 Q.  Okay.  And he told you to -- pointed it and told you what?

23 A.  That it's right there.

24 Q.  And there's a section on this document that says detailed

25 description of violation including date, time, and nature of

1    occurrence.  Do you see that?

2    A.  Yes, sir.

3    Q.  Is that the section that Chief Waters pointed you to?

4    A.  Yes, sir.

5    Q.  Would you read that for us, please.

6    A.  On April 17th, 2006, at 12:30 p.m., Driver Engineer David

7    Davis called Mayor Hardin regarding city proposals.  Mayor

8    Hardin was not in, and David Davis asked to leave a message for

9    Mayor Hardin to return his call.  David Davis stated he would

10   not speak with anyone else.

11   Q.  And that's what you were told during that meeting was the

12   reason for the termination.

13   A.  Well, I asked.  I said, so I'm being fired for calling the

14   mayor.

15   Q.  Was there a response to that?

16   A.  I was told yes.

17   Q.  And who told you yes?

18   A.  The deputy chief, Waters.

19   Q.  Now, if you would, I'd like you to turn to Exhibit #5 in the

20   notebook in front of you.  And please tell the jury what Exhibit

21   #5 is.

22   A.  It says City of Phenix City Fire Department, ASOP 12,

23   Addressing City Council.

24        MR. STEELE:  And for the record, the jury was shown a

25   blow-up copy of it during Mr. McKoon's opening, so they'll know

1    we're referring to the same document.

2    Q.  Did you receive a copy of ASOP 12?

3    A.  Yes, sir.

4    Q.  Do you know when?

5    A.  I believe it was in September of '05, sometime after that --

6    the newspaper article was published, I got a packet.

7    Q.  Do you also have copies of the ASOPs prior to that?

8    A.  Oh, yes, sir.  Yes, sir.

9    Q.  When you called the mayor on April 17th, 2006, did you

10   believe that you were violating ASOP 12?

11   A.  No, sir.

12   Q.  Why not?

13   A.  Well, number one, the mayor told me to call him, that he had

14   an open-door policy.  Two, I thought that addressing the city

15   council with work-related business -- to me, it was a political

16   issue.  It hadn't even been enacted, so it wasn't work-related

17   for me.  And I was on my day off acting as a, you know, citizen

18   of the United States.  I thought you had a right to contact your

19   political leaders that you had helped get elected.

20   Q.  So at the time that you called the mayor, if I understand

21   what you said correctly, the new policy wasn't in effect yet?

22   A.  The new --

23   Q.  The new probationary policy?

24   A.  Oh, no, sir.  No, sir.  It was proposed.

25   Q.  Hadn't been voted on yet?

1  A.  Right.

2  Q.  As of that date, it wasn't anything governing the

3  firefighters?

4  A.  No, sir.

5  Q.  Now, in addition to ASOP 12, there was reference earlier

6  this morning to a grievance.  Why didn't you file a grievance

7  over your concerns on the probationary policy?

8  A.  I didn't see it as a grievance.  It didn't affect me.

9  Q.  And explain to us why you didn't see it as a grievance.

10  A.  Because a grievance is an individual's view or opinion.  It

11  didn't affect me individually.  I had already been a seasoned

12  veteran, so my probationary time was going to be the same.

13  Q.  Had anyone ever told you that it's appropriate to file a

14  grievance over proposed ordinances before the counsel?

15  A.  No, sir.  I never thought you'd have to file a grievance on

16  something that's proposed.  It's -- I mean it hadn't happened

17  yet.

18  Q.  So when you called the mayor, did you think that you were

19  violating any -- any grievance policy or any other policy that

20  you were aware of?

21  A.  No, sir, I did not.

22  Q.  Was it your intent to violate any policy that you're aware

23  of?

24  A.  No, sir.

25  Q.  Did you feel you were thumbing your nose at Chief Hunter, as

1  was suggested earlier?

2  A.  Absolutely not.

3  Q.  Explain to the jury why it was the mayor that you called on

4  that date instead of someone within the department.

5  A.  Because the mayor told me to call him if I ever needed him.

6  Q.  Any other reasons that you recall?

7  A.  No, sir.  I mean other than the fact that as a citizen, you

8  know, on your day off and you feel like you ought to be able to

9  contact any of your elected officials, whether it be the

10  president or the mayor of your hometown.

11  Q.  Was it your understanding that Fire Chief Hunter or City

12  Manager Roberts would be voting on the proposed ordinance,

13  whether it became part of the city code or not?

14  A.  No, sir.  They don't have a vote on those proposals.  Only

15  the city council does.

16  Q.  And in Phenix City, the mayor is a member of the city

17  council; is that correct?

18  A.  He leads the city council.

19  Q.  Does he vote?

20  A.  Yes, sir.

21  Q.  Now, after you received notice of your termination for

22  calling the mayor, what did you do next in connection with your

23  employment or loss of employment at the fire department?

24  A.  Did you ask me what I did after I got fired?

25  Q.  Yes.

1  A.  Well, I --

2  Q.  Was there an appeal or anything like that?

3  A.  Yes, sir.  I applied for an appeal process.

4  Q.  Would you please turn to Exhibit #23 in the notebook in

5  front of you?  And would you identify that exhibit for us,

6  please?

7  A.  This is the letter I sent the personnel director asking if I

8  could have an appeal.

9  Q.  And does this appear to be an accurate copy of your letter

10  to the personnel director?

11  A.  Yes, sir.

12       MR. STEELE:  Your Honor, we move for the admission of

13  Plaintiff's Exhibit #23.

14       THE COURT:  Admitted.

15       MR. STEELE:  Thank you.

16  Q.  Mr. Davis, would you read to the jury what you wrote in your

17  letter to the personnel director, Exhibit #23?

18  A.  It says, 4/28/2006, Barbara Goodwin, the personnel

19  director.  I am humbly requesting an appeal hearing to the

20  personnel review board for the disciplinary actions and

21  termination that was taken against me April 21st, 2006.  I

22  respectfully ask that this hearing not occur until after May

23  12th, 2006, for I will be out of town.  In addition, I will be

24  using legal counsel and ask that you inform me in writing that I

25  will be allowed to use legal representation during this appeal

1  hearing.  Respectfully, David P. Davis, 185 Lee Road 236, Phenix

2  City, Alabama, 36870, 334-291-1927.

3  Q.  Mr. Davis, was there in fact an appeal hearing?

4  A.  Yes, sir.

5  Q.  And you participated in the hearing?

6  A.  Yes, sir.

7  Q.  And eventually you got the results, the outcome from the

8  hearing?

9  A.  Yes, sir.

10  Q.  How did you receive those results?

11  A.  I got a letter in the mail.

12  Q.  And who was that letter from?

13  A.  I think it was from the city manager.

14  Q.  If you would, please, turn to Exhibit #25 in the notebook in

15  front of you.  And would you tell us, please, is this the letter

16  that you're referring to from City Manager Roberts?

17  A.  Yes, sir.

18  Q.  I'm not going to make you read this one, but if you'd tell

19  us what you learned from Exhibit #25.

20  A.  That I was still fired.

21  Q.  The city manager upheld the termination?

22  A.  Yes, sir.

23  Q.  Now, you told us you'd been with the department for I guess

24  a bit longer than eight years?

25  A.  A little short of eight years.

1  Q.  A little short of eight years.  I'm sorry.

2  A.  I was one -- about one week exactly short of being there

3  eight years.

4  Q.  Okay.  Tell the jury, if you would, what did your job mean

5  to you?

6  A.  Well, I can tell you that I don't like to call it a job

7  because -- I mean most people got a job that they do for a

8  living; but to me, being a firefighter at Phenix City was more

9  than a job.  It was my life.  And I mean that's -- the only

10 reason why I went to school and kept in shape was to work there

11 and move up and serve the people that I grew up around and was

12 with.  The firefighters that I worked with was, you know, like

13 my family.  That job meant everything to me.

14     And ever since I've been fired, I feel like I'm less of a

15 man.  I mean even my -- it's affected my home life.  I mean my

16 wife, you know, she's not married to the same man that she was

17 married to.  I just don't take the same pride in everything that

18 I used to.  I've had to go to the doctor and, you know, get

19 medicine for depression because I've been sad.  I just don't

20 feel like the same -- I mean I got a job with another fire

21 department and I work on the ambulance.  I work 106 hours a week

22 to compensate for the fact that I just don't have what I used to

23 have.  I just want my job back.  That's all I want.

24     Being a firefighter somewhere else, I mean I'm still a

25 firefighter, but it ain't the same.  And when I work on the

1  ambulance, I have to work in the same town I grew up with.  And

2  I see the firefighters that I grew up with in the fire

3  department, and I just want to be back on the fire truck with

4  them.  I mean I made a phone call, you know, and lost it all.

5  And I just want it back so I can feel whole again.

6  Q.  Thank you, Mr. Davis.

7       Your Honor, would this be an appropriate time to inform

8  the jury of the stipulation regarding out-of-pocket lost wages?

9       THE COURT:  Do you have a document you want to put in,

10  or do you want to read something or how do you want to do it?

11       MR. STEELE:  The document that has the total number on

12  it is Exhibit #28 in the binder in front of you.

13       THE COURT:  Okay.

14       MR. STEELE:  And the number stipulated to is on the

15  last page of that exhibit.

16       THE COURT:  All right.  Ladies and gentlemen, the

17  parties to this lawsuit have not agreed that the plaintiff is

18  entitled to anything in this case, but they have agreed as to

19  what, if he were entitled to anything, would be his net loss of

20  wages resulting from this.  Is that correct?

21       MR. MCKOON:  Yes, sir, Your Honor.

22       MR. STEELE:  Yes, Your Honor.

23       THE COURT:  All right.  And that's in Exhibit #28.  And

24  I understand that's being admitted by agreement and

25  stipulation.  Both -- this is not just from one side or the

```
 1    other.  Both parties have agreed to this, that if -- not that

 2    he's entitled to it, but this would be the net wages that he

 3    lost.  And that's admitted in evidence.

 4            And you can read out the figures if you'd like.

 5            MR. STEELE:  Your Honor, would it be possible to take a

 6    short break and let the witness get a drink of water?

 7            THE COURT:  Do we have some available here?  We'll pass

 8    some over.

 9            MR. STEELE:  May I approach, Your Honor?

10            THE COURT:  Yes, you may.

11            All right.  Why don't you just read the bottom line

12    that you -- both sides have agreed to on this.

13            MR. STEELE:  Certainly, Your Honor.  The stipulation of

14    the parties as to the amount of -- net amount of lost wages and

15    out-of-pocket expenses in this case is $3,756.88 and appears as

16    the last line in Exhibit #28.

17            THE COURT:  All right.

18    Q.  (Mr. Steele, continuing:)  Now, Mr. Davis, I'm going to

19    change the subject for a minute here and want to talk about the

20    financial impact that the loss of employment had on you.  And

21    the Judge has just informed you that the parties have

22    stipulated, as you were aware, that your net lost wages was

23    $3,756.56.  You understand that, correct?

24    A.  Sir?

25    Q.  Your lost wages -- your net lost wages as a result of losing
```

1  your job with the fire department in Phenix City is represented

2  in Exhibit #28 and has been stipulated to by the parties as

3  $3,756.56.  And you're aware of that, Mr. Davis?

4  A.  Yes, sir.

5  Q.  Now, you were fired nearly two years ago.  Would you please

6  explain to the jury why it is that your damages for lost wages

7  and benefits are just 3756 and 56 cents?

8  A.  Because I work all the time.

9  Q.  And what do you mean by that?  Explain to the jury where

10  you've worked since you were terminated, when, how long.  Just

11  explain to them what you've been doing to earn money since you

12  were terminated.

13  A.  Well, after I got fired -- you know, I'm like anybody else.

14  I've got a family and a mortgage, so I had -- I mean I had to do

15  something.  I went to work for an ambulance service.  Being a

16  paramedic, I got me a job.  It paid more an hour, but the hours

17  were less, but it's all I could get.  So I worked there as much

18  as they would allow me to work until I got me a job back in the

19  fire department here in the city of Opelika.  And, you know, of

20  course, I don't make as much on the city of Opelika fire

21  department as I did at Phenix City.  And I just work there and

22  then I get off and then I work on an ambulance.  So I do 24

23  hours, you know, in Opelika, then I do 24 hours on the

24  ambulance, and then a day's break in between.  And I just --

25  it's 106 hours a week I work that way, and I've just been doing

1    it ever since.  I mean it just helps me.  I don't want to not be

2    doing something, you know, because it weighs on my mind about

3    what happened.

4    Q.  Mr. Davis, when did you begin your employment with Opelika?

5    A.  I think I started the 1st of March of '07 with Opelika.

6    Q.  And now with those two jobs, did any one of those separately

7    pay you as much as you were earning when you worked at the fire

8    department in Phenix City?

9    A.  No, sir, not at the time.

10   Q.  Is that why you've got both jobs?

11   A.  Well, that, and I just feel like I have to compensate, you

12   know, for my loss.  I mean it just makes me feel, you know,

13   better because I feel less of a man, you know, than I did at the

14   one job I had at the fire department.

15   Q.  How has working -- you said an average of 106 hours a week.

16   How has that affected you?

17   A.  It's put a strain on my marriage.  I mean anybody that works

18   that many hours, you know, and sees some of the things that we

19   see, I mean it's going to have an impact.  I mean that's why the

20   fire department lets you work one day on and give you two off,

21   so, you know, you can let it all go.  But I just go from one to

22   the other.

23   Q.  Do you think it's having an effect on you physically?

24   A.  Oh, I'm sure it has.  I've lost -- I mean I've lost weight.

25   I had to go to the doctor.  I got an ulcer.  I was treated for

1  an ulcer and depression.

2  Q.  Mr. Davis, I just have one last question for you at this

3  time.  Would you please tell the jury why you brought this suit?

4  A.  Well, because I felt like I didn't do anything wrong, not to

5  lose my eight-year career.  I mean the mayor told me to call

6  him; I did.  Obviously, it ain't about the money, because I

7  didn't lose that much because I've been working.  Plus, I mean

8  anybody in this country ought to be able to call an elected

9  representative on their day off.  I can understand, you know, if

10  I was on duty; but I was off, you know, on my time, out of

11  uniform and in my house.

12  Q.  What do you hope to achieve by bringing this suit?

13  A.  Number one, I just want my life back, to go back to work in

14  the fire department where I want to finish my career.  I just

15  want to feel whole again.  And that's just the only way it's

16  going to be.

17         MR. STEELE:  No further questions at this time, Your

18  Honor.

19         THE COURT:  All right.  Mr. McKoon?

20         MR. MCKOON:  Your Honor, if I would, may I approach the

21  witness and give him a copy of his deposition?

22         THE COURT:  Yes, you may.

23         MR. MCKOON:  Here you go, Mr. Davis.  You might need to

24  refer to that.

25

1                         CROSS-EXAMINATION

2    BY MR. MCKOON:

3    Q.   Mr. Davis, is it true that you have a master's degree?

4    A.   Yes, sir.

5    Q.   And when did you achieve your master's degree?

6    A.   I graduated in I think May of 2006.

7    Q.   And what -- what do you have a master's degree in?  What

8    subject or topic?

9    A.   It's a master of science.

10   Q.   In what?  Is it in anything else?

11   A.   Occupational safety and health.

12   Q.   And so as far as educational level, you've gone as far as a

13   master's degree; is that correct?

14   A.   Yes, sir, so far.

15   Q.   Now, when you left the Phenix City Fire Department, you were

16   testifying a minute ago you were making less money.  Actually,

17   on an hourly rate, you took a job making more money, didn't you?

18   A.   Hourly, I did make more, yes.

19   Q.   And what was the rate you were making with the Phenix City

20   Fire Department?

21   A.   I think it was 11.90 an hour when I got fired.

22   Q.   And what were you making when you signed on with Care

23   Ambulance?

24   A.   12.50 an hour.

25   Q.   And you said something about working 106 hours a week.  Tell

1  the jury how you work currently.

2  A.  I work one day at the fire department in Opelika.

3  Q.  Now, wait a minute.  Is that a 24-hour shift?

4  A.  Yes, sir.

5  Q.  Do you sleep any on that shift?

6  A.  Sometimes in between calls.

7  Q.  Well, I mean don't they give you time to sleep on a 24-hour

8  shift?

9  A.  They provide sleeping arrangements.  And if you don't have a

10  call, then you can sleep at nighttime.

11  Q.  And so included in that shift is an eight-hour rest period,

12  is it not?

13  A.  No, sir.

14  Q.  Not -- it's not.

15  A.  No, sir.

16  Q.  Okay.  What about the Care Ambulance?  Are you provided any

17  sleeping quarters there?

18  A.  Yes, sir.

19  Q.  Do you sleep some on that shift also?

20  A.  Yes, sir.

21  Q.  And what is your position currently with Care Ambulance?

22  A.  Shift supervisor.

23  Q.  Shift supervisor?  So do you go out on ambulances currently?

24  A.  No, sir.  I have a quick response unit.

25  Q.  How is that different from what an ambulance would do?

1  A.  An ambulance has got two people on it and they transport

2  patients.  And then I have the same equipment they have, but

3  it's just a pickup truck with just me.

4  Q.  And what do you do in that truck?

5  A.  I go to calls and treat patients.

6  Q.  As a supervisor for Care Ambulance, have you had the

7  experience of having to write people up when they don't perform

8  their job like they're supposed to?

9  A.  Yes, sir.

10 Q.  And have you done that?

11 A.  Yes, sir.

12 Q.  Getting back to the Phenix City Fire Department for a

13 minute, or, for that matter, the fire department that you work

14 for now, the Opelika Fire Department, is there a -- first of

15 all, is that a paramilitary organization?

16 A.  Which one?

17 Q.  The Phenix City Fire Department.

18 A.  Yes, sir.

19 Q.  What about the Opelika Fire Department?

20 A.  Yes, sir.

21 Q.  In fact, every fire department is a paramilitary

22 organization, isn't it?

23 A.  I can only speak for the two that I've worked for.

24 Q.  Okay.  And what does that mean, a paramilitary organization?

25 A.  That means they have a rank structure.

1  Q.   And what's the significance of that?

2  A.   To establish a chain of command.

3  Q.   And why is that?

4  A.   Because in emergencies, you have to have somebody in charge

5  giving the orders.

6  Q.   And is a chain of command important in a paramilitary

7  organization?

8  A.   Yes, sir.

9  Q.   And is that true whether you're on the fire ground or off

10 the fire ground?

11 A.   Yes, sir.

12 Q.   I mean have you ever heard the phrase if you won't follow

13 the chain of command off the fire ground, you might not follow

14 it when you're on the fire ground, and that's why it's so

15 important?

16 A.   No, sir.

17 Q.   You've never heard that before?

18 A.   No, sir.

19 Q.   You do agree, though, that you knew about this ASOP -- I'll

20 put it back up again -- at any time you need a break, Mr. Davis,

21 just let me know, okay?

22 A.   I'll make it.

23 Q.   This ASOP that is -- I believe it's Plaintiff's Exhibit #5.

24 Let me make sure I'm correct.  That is correct.  When you -- let

25 me stop just a minute and say -- do you need some water or

1  something?

2  A.   I'm okay.

3  Q.   Okay.  Do you remember giving your deposition in this case?

4  A.   Yes, sir.

5  Q.   And that's when you appeared at the city hall or the city

6  council up there where we have the work sessions and you had

7  your lawyer with you; is that right?

8  A.   Yes, sir.

9  Q.   All right.  And there was a court reporter sitting there

10 just like this lady was --

11 A.   Yes, sir.

12 Q.   -- taking down what you say?

13 A.   Uh-huh.

14 Q.   And you swore to tell the truth; is that right?

15 A.   Yes, sir.

16 Q.   And I asked you questions at that time.  Do you remember

17 that?

18 A.   Yes, sir.

19 Q.   And I'm sure you've looked at your deposition before today.

20 A.   Yes, sir.

21 Q.   All I want to ask you is, is it true that you said on your

22 deposition that you knew this -- that you knew about this rule

23 before you ever went to city council or went to the mayor about

24 your problem or about this probationary problem you talked

25 about?

1  A.  Yes, sir.

2  Q.  So I mean you knew what the rule was --

3  A.  Yes, sir.

4  Q.  -- is that right?  And you knew what it said.

5  A.  Yes, sir.

6  Q.  For instance, down here on number three, it says, if a

7  problem cannot be solved by anyone in the chain of command, then

8  the city manager will arrange a hearing with city council.  You

9  knew about that, too, didn't you?

10 A.  Yes, sir.

11 Q.  Now, I'm trying to understand your claim in this case.  And

12 I think it is that what you're saying -- and correct me if I'm

13 wrong -- that because you were on your off time and acting as

14 the union president and because this proposal had no application

15 to you, that you didn't have to follow this policy.  Am I

16 stating your position correctly?

17 A.  Yes, sir.

18 Q.  All right.  And in addition to that, you said -- and besides

19 that, my captain told me it was okay.  Is that right?

20 A.  Yes, sir.

21 Q.  Did George Bennett tell you that?

22 A.  Yes, sir.

23 Q.  Okay.  And he told you that on -- on Sunday before you made

24 the call on Monday.

25 A.  Yes, sir.

1    Q.   Is that right?  Now, let's get that straight.  April the

2    16th was a Sunday.  Am I correct?

3    A.   Yes, sir.

4    Q.   And you were working 7:30 in the morning till 7:30 Monday

5    morning, is that right?

6    A.   Yes, sir.

7    Q.   So sometime during the shift, you picked up the Columbus

8    newspaper and learned about this proposal.  Is that your

9    testimony?

10   A.   Yes, sir.

11   Q.   All right.  And you read about it in the paper yourself; is

12   that right?

13   A.   Yes, sir.

14   Q.   And then after you read about it in the paper yourself, you

15   waited till the next day, and then you started calling union

16   members.  Am I right about that?

17   A.   Well, I called the city clerk's office first.

18   Q.   Yeah, that's right.  You called the city clerk's office, and

19   the city clerk explained to you in detail what the proposal was.

20   A.   Yes, sir.

21   Q.   And is that when you learned that the proposal did not apply

22   to you?

23   A.   Yes, sir.

24   Q.   And so you knew that the proposal did not apply to you

25   before you ever called the mayor.

```
 1   A.   That's correct.

 2   Q.   And there was no confusion about that --

 3   A.   Yes, sir.

 4   Q.   -- in your mind; is that correct?

 5   A.   Yes, sir.

 6   Q.   All right.  Now, in that regard, once you were terminated,

 7   there was in fact a personnel review board hearing, was there

 8   not?

 9   A.   Yes, sir.

10   Q.   And you asked for the city, if they would -- in fact, the

11   way those hearings are done, they have to be done within a

12   certain period of days once an employee makes a request; is that

13   right?

14   A.   Yes, sir.

15   Q.   And you wanted to make sure that they didn't set it up too

16   soon for you, so you said I want it after March the 12th,

17   because I'm going to be out of town.

18   A.   Yes, sir.

19   Q.   Do you remember why you were out of town?

20   A.   Yes, sir.

21   Q.   Why was that?

22   A.   I had to go to some training.

23   Q.   And what was the training for?

24   A.   My paramedic certification.

25   Q.   So it was something unrelated to the fire department.
```

1  A.  No, sir.

2  Q.  Well, was it something you were doing on your own?

3  A.  I mean yeah, out of my pocket.

4  Q.  That would be on your own, wouldn't it?  Am I right?

5  A.  Yes, sir.

6  Q.  Now, after you called the city clerk, she made it clear to

7  you what was going on.  Then the next thing you did was what?

8  A.  I called some other firefighters.

9  Q.  And when I took your deposition, is it right that you told

10  me you couldn't remember the names of any of the ones you called

11  except Bill Pitts?

12  A.  That's correct.

13  Q.  Has your memory gotten any better since your deposition?

14  A.  No, sir.  I don't remember who all I called.

15  Q.  So you still can't, to this day, tell this jury the name of

16  one single person you called before you called the mayor --

17  A.  No, sir.

18  Q.  -- other than Bill Pitts?

19  A.  No, sir.  I don't remember who all I called.

20  Q.  Do you remember what any of them said to you?

21  A.  Yes, sir.

22  Q.  And what was that?

23  A.  That they were opposed to lengthening the probation.

24  Q.  Do you know who said that?

25  A.  No, sir.

```
 1  Q.   Okay.  Do you know if Bill Pitts said that?

 2  A.   Yes, sir.

 3  Q.   So Bill Pitts told you he was opposed to it --

 4  A.   That's correct.

 5  Q.   -- the lengthening of the probationary period; is that

 6  correct?

 7  A.   Yes, sir.

 8  Q.   You're sure about that?

 9  A.   Yes, sir.  Quite sure.

10  Q.   Now, when you had the discussion with the -- with the mayor,

11  then, all your confusion about who this applied to and what was

12  going on had been cleared up by the city clerk.  So you were

13  about to talk to the mayor about all this, and you called and

14  left word for him to call you back; is that right?

15  A.   Yes, sir.

16  Q.   Now, when the mayor told you, whenever he told you, that he

17  had some sort of open-door policy, did he ever tell you that you

18  could violate your chain of command?

19  A.   No, sir.

20  Q.   Did he ever tell you that you could disregard your standard

21  operating procedures in the fire department?

22  A.   No, sir.

23  Q.   And don't you, especially as union president, pride yourself

24  on knowing all the merit system rules and regulations and all

25  the SOPs of the department?
```

```
 1  A.  No, sir.

 2  Q.  You don't?

 3  A.  No, sir.

 4  Q.  Did you know them?

 5  A.  There's no way I could know all of them.

 6  Q.  Okay.  Well, you knew about this one, didn't you, this ASOP

 7  12?

 8  A.  Yes, sir.  I had seen it before.

 9  Q.  All right.  I want to back up just a minute before we get

10  back to the mayor, and I want to talk about this conversation or

11  this meeting with the newspaper.  I thought I heard you to say a

12  moment ago when Mr. Steele was asking you some questions that

13  after this incident with the newspaper, you said -- I thought I

14  heard you say, we didn't invite any more reporters to the

15  meeting.  Do you remember saying that?

16  A.  Yes, sir.

17  Q.  All right.  Well, did you invite this reporter to the

18  meeting in the first place?

19  A.  Not really.

20  Q.  Well, how was it -- I mean was he just walking along the

21  street while y'all were having a union meeting and decide to pop

22  in?  I mean how was it that he got to your union meeting?

23  A.  We allowed him to come.

24  Q.  Well, but I mean how did he know that y'all were having a

25  union meeting or that y'all were disgruntled?  Did he ever tell
```

1  you that?

2  A.  He called me.

3  Q.  He called you.

4  A.  Yes, sir.

5  Q.  And then you invited him?

6  A.  Yes, sir.

7  Q.  Is that right?

8  A.  Well, I allowed him and the other members allowed him to sit

9  in.

10  Q.  So you wanted him to come to the meeting, didn't you?

11  A.  I wouldn't say I wanted him to.

12  Q.  Well, when he got there, you gave statements to him, didn't

13  you?

14  A.  Yes, sir.

15  Q.  And you had your picture taken; is that right?

16  A.  Correct.

17  Q.  So that it could be in the newspaper; is that right?

18  A.  Not necessarily.  I didn't know if it was going to be in the

19  paper or not.

20  Q.  Mr. Davis, do you expect people to believe that you invited

21  a newspaper to a Mexican restaurant where you were having a

22  union meeting and that a photographer from the paper took your

23  picture and you didn't expect it to be in the paper?  Is that

24  what you're telling this jury?

25  A.  That's affirmative.

1    Q.   So you are telling them that?

2    A.   Yes, sir.

3    Q.   Okay.  And then once the -- once the -- you began to give

4    all these statements -- have you read this article, this -- let

5    me see where it is in the plaintiff's book.  Okay.  I believe

6    it's Plaintiff's Exhibit #7.  Have you still got the book up

7    there?

8    A.   Yes, sir.

9    Q.   I want you to turn over to the -- what would be the second

10   page there of Plaintiff's Exhibit #7.  Down about halfway on the

11   first thing, it says, during the interview, firefighters laid

12   out a litany of complaints including disparity in treatment of

13   union and nonunion personnel, intimidation, coercion, derogatory

14   comments, threats and harassment of union members, and

15   micromanagement.  Then the next sentence is, they were vague

16   about specific incidents but focused on the general nature of

17   their complaints.  What was your complaint?

18   A.   I had a list.  There was a list of issues.

19   Q.   Do you know what happened to the list?

20   A.   No, sir.

21   Q.   Do you remember the list, what was on it?

22   A.   No, sir.

23   Q.   Well, did you ever take your list of complaints to anybody

24   in your chain of command before holding a meeting at a Mexican

25   restaurant, inviting the press, and having your picture taken to

1   go in the paper?

2   A.   Yes, sir.

3   Q.   And who was that?

4   A.   I had a meeting with the mayor at one time and the city

5   manager.

6   Q.   Okay.  Did you ever have any -- they're not in your chain --

7   city manager is in your chain of command, isn't he?

8   A.   Yes, sir.  He's the city manager.

9   Q.   Right.  He's at the top of the chain of command, isn't he?

10  A.   Well, him and the mayor.

11  Q.   Well, the mayor is not in your chain of command, is he?

12  A.   I mean he's the mayor of the town.

13  Q.   All right.  Do you not understanding how the government

14  works in Phenix City?

15  A.   Well, I mean the mayor is over the city council and he's

16  over the city manager, and then the city manager is over the

17  day-to-day operations of the city.

18  Q.   Where do you live?

19  A.   I live in Phenix City.

20  Q.   What part of Phenix City?

21  A.   Lee County, Phenix City.

22  Q.   So you live in Phenix City, Alabama?

23  A.   Yes, sir.

24  Q.   Within the corporate limits of the city?

25  A.   No, sir.

```
 1  Q.  So you don't live in Phenix City.  You live at a Phenix City
 2  address that's in Lee County.
 3  A.  Yes, sir.
 4  Q.  Is that right?  All right.  Moving along here about this --
 5  and I believe you testified earlier that you felt like that by
 6  airing these problems in the newspaper, that it would help
 7  things in the department.  Is that what you said?
 8  A.  Yes, sir.
 9  Q.  Is that what you believed?
10  A.  Yes, sir.
11  Q.  All right.  So you believed that by going -- with problems
12  within your department, within your fire department, not talking
13  to the chief about them or your assistant chief about them or
14  anybody there that might could solve the problem, that it is a
15  better thing to do to go to the newspaper with them and then
16  maybe the problem will get solved; is that correct?
17  A.  What was your question?
18  Q.  I'll tell you what.  I won't repeat the question.  Let me
19  ask you something.  Do you think by going to the newspaper you
20  were creating a less disruptive environment in the fire
21  department?
22          MR. STEELE:  Objection.  Relevancy to the disruptive
23  environment allegedly caused by the newspaper article.
24          THE COURT:  I'll sustain the objection as to the form
25  of the question, also as to whether he believed he was creating
```

1    a less of a disruptive environment.

2              MR. MCKOON:  All right.  Let me reask it.

3    Q.  As I understand it, the reason you went to the newspaper is

4    because you felt like you had a whole bunch of problems; is that

5    right?

6    A.  Yes, sir.

7    Q.  And you wanted to solve the problems.

8    A.  Yes, sir.  I wanted to bring some issues to the public.

9    Q.  All right.  And did you feel like the best way to solve the

10   problems would be to go to the newspaper as opposed to go

11   through your chain of command and see if they could be solved?

12   A.  Those issues were already brought before the city manager.

13   Q.  Okay.  And that's your answer?

14   A.  Yes, sir.

15   Q.  All right.  Now, you said something in the paper about you

16   were reluctant to talk.  Do you remember saying that?

17   A.  Yes, sir.

18   Q.  Well, you weren't reluctant to talk to the newspaper, were

19   you?

20   A.  Yes, sir.

21   Q.  You invited them to your meeting.  That doesn't sound like

22   you being reluctant to talk about it, does it?

23   A.  No, sir.  I didn't invite him to the meeting.

24   Q.  You didn't say that just a minute ago?

25   A.  No, I didn't say that.  I said I allowed him.

1    Q.   What you said was he called you; and I said, so did you

2    invite him to come?  And you didn't say yes, I did?

3    A.   No.  We allowed him to come.

4    Q.   You allowed him to come.  All right.  Well, let me just do

5    it this way, then.  This whole meeting with the newspaper

6    business, wasn't it done for the sole purpose of causing

7    problems within the department?

8    A.   Absolutely not.

9    Q.   Do you like Chief Hunter?

10   A.   Yes, sir.  I supported him.

11   Q.   You did?  You supported him?

12   A.   Yes, sir.

13   Q.   Did you feel like by going to the newspaper with problems

14   rather than talking to him about them that you were being

15   supportive?

16   A.   I didn't feel like I was unsupportive.

17   Q.   All right.  So you don't think that -- you thought you were

18   helping Chief Hunter, then.

19   A.   I don't think it had anything to do with Chief Hunter.

20   Q.   It had nothing to do with Chief Hunter?

21   A.   I didn't speak about Chief Hunter to the newspaper.

22   Q.   Well, who was the chief of the fire department at this time?

23   A.   It might have been Chief Hunter.  I don't know if he was the

24   fire chief or interim chief.

25   Q.   Isn't he the person who's supposed to be running the

1  department?

2  A.  Yes, sir.  He's the department head.

3  Q.  Well, so you're telling this jury, then, that you don't go

4  to a department head first.  You go to the newspaper first or

5  you go to the city manager first or you go to the mayor first;

6  is that right?

7  A.  No.

8       MR. STEELE:  Objection to the form of the question.

9       MR. MCKOON:  I believe it's --

10      MR. STEELE:  It unfairly characterized the testimony.

11      THE COURT:  Rephrase your question.

12  Q.  Well, let me -- is it a fact that instead of going to the

13  chief of your department, you went to the city manager, you

14  said; is that correct?

15  A.  Yes, sir.

16  Q.  And you went to the newspaper; is that correct?

17  A.  Yes, sir.

18  Q.  And then later you went to the mayor; is that correct?

19  A.  Not about these issues.

20  Q.  Okay.  Well, about another issue.

21  A.  Yes.

22  Q.  Is that correct?  So does Mr. Hunter over here, the chief of

23  the fire department, does he have to open up a newspaper to get

24  you to talk to him?

25  A.  No, sir.

```
 1   Q.  Well, then why can't you just go to him?
 2   A.  I had went to him.
 3   Q.  When?
 4   A.  When I've had issues.
 5   Q.  When -- what issue, Mr. Davis?
 6   A.  Department issues.
 7   Q.  Name it.  What is it?
 8   A.  I don't remember.
 9   Q.  You don't remember.  Okay.  Well, do you remember how he
10   resolved it?
11   A.  Sir?
12   Q.  Do you remember how he resolved it?
13   A.  Apparently it must have been successful.  I didn't have to
14   go any further.
15   Q.  All right.  Well, do you go to him sometimes and just ignore
16   him on other occasions?
17   A.  No, sir.
18   Q.  Do you see where that would create chaos within a department
19   when you have people just going to the newspaper on one thing
20   and going to the city manager on another and going to the mayor
21   on another and never going to their department head?
22           MR. STEELE:  Objection on two grounds, Your Honor.
23   One, there's no evidence of chaos in the fire department.
24   Second, that's not an issue that's before the Court or the jury
25   in this case.
```

 1      THE COURT:  Let me make sure I understand your last

 2  basis of objection.  It's your contention that there is no issue

 3  in this case as to whether the actions were disruptive or had

 4  the possibility of disruption?

 5      MR. STEELE:  No, Your Honor.  I'm saying there's no

 6  issue in this case of whether the newspaper article created

 7  disruption or possible disruption.  Mr. Davis was terminated for

 8  calling the mayor.

 9      THE COURT:  I understand.  But you've brought this

10  meeting -- this newspaper meeting into it as leading up to

11  that.  That's part of the whole picture.  Is it your contention

12  that the disruption or possibility of disruption of the total

13  picture is not an issue?

14      MR. STEELE:  It is my contention that any alleged

15  disruption caused by the newspaper article is not a relevant

16  issue to any issue before the jury or the Court.

17      THE COURT:  Okay.  Well, I'm going to tell you that if

18  you contend that it's an issue as to whether the final act was

19  disruptive or had the possibility of disruption, I'm going to

20  rule that that same thing applies to anything leading up to it,

21  so --

22      MR. STEELE:  Well, Your Honor, we have not argued and

23  are not arguing that he was terminated for the newspaper

24  article.

25      THE COURT:  I understand.

1          MR. STEELE:  It's our contention that he was terminated

2     for speaking to the mayor.

3          MR. MCKOON:  Your Honor, may we approach?

4          THE COURT:  All right.  Be at ease just a minute,

5     ladies and gentlemen.  We're going to be over here at sidebar.

6        (Bench conference, as follows:)

7          THE COURT:  Let me say this before we get into any of

8     this.  I have a serious doubt as to whether there's any issue

9     before this jury that has to do with disruption or the

10    possibility of disruption.  But I'm not going to pick and choose

11    as to whether you have that issue over the final act or whether

12    we can say things that are leading up to it.  If it's an issue

13    in some way, we'll hear the evidence on all of it.

14         Now, what do you say, Mr. McKoon?

15         MR. MCKOON:  What I was going to say is when we were

16    back in conference, you know, the plaintiffs are the ones that

17    wanted to bring in this issue of the newspaper article.  They

18    said specifically we don't want you talking about anything on

19    that written warning form but -- except just that he got fired

20    by the mayor and this article.  And I've stuck to that, although

21    he keeps contending over and over again that the only reason he

22    was fired was for this phone call.  And he says that's what they

23    told him.  And I've got a document there that he signed that

24    doesn't say that.

25         MR. STEELE:  Well --

1          MR. MCKOON:  And I'm not going to get into it because

2    that's the Court's order.  But I'm just saying, you know, if

3    we're going to have some parameters to go by, we need to stay in

4    those parameters.

5          MR. STEELE:  Well, I can --

6          THE COURT:  Let me -- let's let the jury --

7       (Bench conference concluded)

8          THE COURT:  There's no point in y'all sitting there

9    while we're talking.  This may take just a few minutes.  I'll

10   let you go out into the jury room, and we'll be back with you in

11   just a moment.  You're excused until we call you back.

12      (Jury out at 5:02 p.m.)

13         THE COURT:  All right.  Mr. Steele, you were getting

14   ready to speak when we let the jury go out.  Go ahead.

15         MR. MCKOON:  Go ahead.  It's not nothing you haven't

16   seen before.

17         MR. STEELE:  Yes, Your Honor.  It is our contention,

18   and as it was mentioned in the earlier conference in chambers,

19   that the newspaper article and the city's reaction to the

20   newspaper article and the punishment that they called counseling

21   that they gave to the newspaper article is relevant to the prior

22   restraint argument that's before the Court.  And that's exactly

23   what I said when we were in your chambers earlier.  I have never

24   contended that the newspaper article is the reason that he was

25   fired or that we're presenting it to the jury to justify or to

1   explain why he was fired.  He was fired because he called the

2   mayor; but without bringing out the information on the newspaper

3   article, we can't make the argument to you that the policy

4   forbidding -- as we believe it is, forbidding firefighters from

5   going to the media without approval constitutes an unlawful

6   prior restraint.

7           And if the Court believes -- and we would respectfully

8   disagree with this -- but if the Court believes that the issue

9   of whether there was disruption relating to the newspaper

10  article is relevant to the Court's determination on our prior

11  restraint claim, then that would be testimony that should only

12  be presented outside the presence of the jury and to Your

13  Honor.  We don't believe that that evidence is relevant to prior

14  restraint; but if the Court disagrees with us on that, that

15  evidence can be presented outside of the jury.  It's not

16  relevant to the evidence and issues before the jury and before

17  the Court.

18          And the issues before the Court include, quite

19  specifically, under *Pickering* and under the cases that we've

20  cited in our trial brief and in our earlier briefs, the issue of

21  whether that -- the speech that you found, Your Honor, was made

22  as a citizen on a matter of public concern -- whether that

23  speech caused disruption or was likely to cause disruption to

24  such an extent that it outweighs Mr. Davis's right to free

25  speech.  That is where disruption is an issue.  It's an issue

1    under *Pickering* with respect to his speech; but *Pickering*, if

2    you read the cases -- and I know you have -- is very specific in

3    that you look at whether the disruption was caused by the

4    protected activity.  And the protected activity that we're suing

5    on except for -- except for the prior restraint is contacting

6    the mayor.

7        And that is why all this talk of disruption is not

8    relevant to any of the issues before the jury.  I think it's

9    potentially prejudicial to the issues before the jury and

10   certainly will lengthen this case into areas that we had hoped

11   we wouldn't be going after dismissing the second cause of

12   action.  But Mr. McKoon seems to want to go there anyway.  But

13   we don't believe it's part of the case, certainly not part of

14   the case that's before the jury.

15       THE COURT:  All right.  I'm going to say two things.

16   As far as disruption is concerned, I think that that is a part

17   of *Pickering* balancing.  It will go to me.  I don't think it's a

18   factual issue that's going to be going to the jury on anything,

19   on whether the phone call was disruptive or had the potential of

20   disruption or whether meeting with the newspaper person was

21   disruptive or had the potential for disruption either way.  So

22   I'm going to sustain an objection to getting into disruption,

23   but I'm going to also do it as far as the telephone call is

24   concerned.

25       Now, I want to -- I think there may be a

1   misunderstanding as to what I've ruled as far as how restricted

2   the defendants' attorney is going to be allowed to go on the

3   other things besides just the call.  This case has been

4   presented to the jury in opening statement by you, Mr. Steele,

5   that he was fired just because he made one little phone call to

6   the mayor.  Merely talking to reporters on their own time was

7   referred to.

8            MR. STEELE:  Respect --

9            THE COURT:  Terminated after eight years because he

10  spoke to the mayor.  Ended simply because of the call, what he

11  had a right to do.  The plaintiff, in talking about emotional

12  damages, has emotionally said that he made just a five-minute

13  phone call and lost it all and that he's upset because of that.

14           I'm not going to restrict the plaintiff -- the

15  defendant, rather, from going into those items that are listed

16  on that sheet.  He's been told -- the plaintiff has been told

17  that they said this is why you were fired.  Now, the position of

18  the defendant is that, yes, certainly nothing would have

19  happened if the phone call hadn't been made.  But I'm not going

20  to allow this case to go -- to go to the jury with them thinking

21  that that's absolutely all that happened, that he had a clean

22  record, and that it was one little five-minute phone call that

23  resulted in the discipline.

24           I'm going to allow the decision makers to testify what

25  was on that sheet that they told him was the reason; and that

1    included these other items in his history, not that they can go

2    into the details of it, not that they can call independent

3    witnesses to testify as to the facts of that, but that that was

4    within the knowledge of the decision makers.  And, yes, as long

5    as they don't dodge the fact that he was terminated because of

6    the telephone call, I'm going to allow them to say that that

7    wouldn't have been the discipline if it hadn't have been for his

8    prior history, that he would have been disciplined in another

9    manner than terminating him.  In light of his testimony and the

10   way this case is being presented, I think that's only fair, and

11   I'm going to let them do that.  I'm not going to let them go

12   into what the details were of these things or call independent

13   witnesses on them unless the door is further opened.

14          And that's my ruling.  Does everybody understand it?

15          MR. MCKOON:  Yes, sir.

16          MR. STEELE:  Your Honor, I should -- on the disruption

17   issue, I'm not sure that I do understand the scope of your

18   ruling.  I understand the scope of your ruling with respect to

19   the reasons for termination.  If you could, the scope of the

20   ruling with respect to the newspaper article, which, as I've

21   discussed, relates to the prior restraint claim, I still did

22   not, respectfully, understand how that is relevant.  Even if

23   there was disruption -- we don't agree that there was -- but if

24   there was disruption from a newspaper article, that that has any

25   relevancy to whether he was terminated for calling the mayor,

1  whether his call to the mayor was disruptive or potentially

2  disruptive, or whether he would have received some lesser

3  penalty had -- if they didn't have the other things listed on

4  the sheet.  There's just no issue before the Court on that,

5  respectfully, sir.  That issue isn't before the Court.  And in

6  your recitation --

7         THE COURT:  Wait a minute.  Wait a minute.  The issue

8  that you say is not before the Court is disruption by the

9  meeting with the newspaper man; is that right?

10         MR. STEELE:  Correct.

11         THE COURT:  I agree.  And I sustained the objection to

12  testimony concerning disruption of that.  I'm telling you that I

13  will also sustain an objection if one is made to testimony

14  concerning disruption or lack of disruption of the telephone

15  call.

16         MR. STEELE:  Well, with respect to that ruling, I guess

17  we would make sure that our objection is stated on the record.

18  We'd like to revisit that at the time.  And we would ask, in

19  addition, Your Honor, that we be allowed -- if we're not allowed

20  to present that information in front of the jury, that we be

21  allowed to present that information in front of Your Honor, who

22  will be making the determination on that balancing.  At a

23  minimum, we request the right to put on witnesses and ask them

24  questions to create a record outside of the jury, because the

25  witnesses will tell you, Your Honor, that between the 16th --

1  excuse me -- the 17th of April when he made the call and the

2  21st when they fired him, there wasn't any disruption at the

3  station.  And I believe we have a right to present that --

4          THE COURT:  I understand --

5          MR. STEELE:  -- because that's the claim that we're

6  suing on.

7          THE COURT:  I understand your position.  And at an

8  appropriate time when it won't hold the jury up, when the jury's

9  not here, I'll let you make a tender.  And you don't have to

10  call any witnesses for it unless the defendant doesn't accept

11  the tender, but I'll let you put in the record what you say you

12  would have proved.

13          MR. STEELE:  Thank you, Your Honor.

14          THE COURT:  All right.  Anything further?  Yes.

15          MR. MCKOON:  Judge, I have two things.  One, I think --

16  I don't know what the Court wants to do about time; but I'm

17  going to be a while, is one thing I wanted to tell the Court.

18  And the second thing is I intend to use in my cross-examination

19  some excerpts from his -- some tape-recorded excerpts from his

20  personnel review board hearing where his people were there and

21  all.  And I have that stuff here, and it's going to take a

22  minute to set that up.  So I just wanted to let the Court be

23  aware.

24          THE COURT:  All right.  As far as time is concerned, we

25  checked the weather report when we had the break.  And the

1  latest report that we've gotten from the weather station is

2  there are still reports of dangerous -- possibly dangerous

3  storms tomorrow morning through around eleven o'clock or twelve

4  o'clock -- twelve o'clock, I think -- here and then rain after

5  that, but nothing that appears to be dangerous.  So it's my

6  feeling that we go on a while longer, probably till around six,

7  no later than six, but stop at a convenient stopping point

8  before six and then start back tomorrow afternoon at two

9  o'clock.

10        MR. STEELE:  Your Honor, apologizing again if I'm wrong

11  about this.  I'm not aware of receiving as part of the discovery

12  these tape recordings.  It may have happened, and I'd like to

13  have an opportunity to confirm that it happened.  I'm not aware

14  of that being presented.  And if I'm wrong, I apologize on

15  that.  But I'd like an opportunity to find out the answer to

16  that before tape recordings are played.  And if it's going to be

17  a while and he's continuing with Mr. Davis in the morning, I

18  would request if we could please reserve that portion of the

19  examination until morning.

20        THE COURT:  Mr. McKoon?

21        MR. MCKOON:  They were produced.  There's a response to

22  a request for production of documents.  It actually was produced

23  in CD form.  Also, they're -- Mr. Polisuk from their office was

24  at the personnel review board hearing.  At the end of the

25  hearing, he requested them.  So they were produced twice,

1   actually.  The personnel review people sent them to them; and

2   then when they were asked for in this lawsuit, they were

3   produced again there.

4          THE COURT:  Do you have anything that you could pull

5   quickly to show Mr. Steele --

6          MR. MCKOON:  Yes, sir.

7          THE COURT:  -- that they were produced?  I understand,

8   Mr. Steele, you just say you don't remember.

9          MR. STEELE:  Right.  I haven't seen them personally.

10  I'm not the only one that's been working on the case.  I'm not

11  asserting that position.

12         THE COURT:  I understand.

13         MR. STEELE:  Your Honor, if we have a few minutes,

14  maybe the easiest way to resolve this is for me to make a

15  telephone call that may very well confirm what Mr. McKoon just

16  said that he said to Mr. Polisuk, and we won't have an issue.

17         THE COURT:  All right.  Let me ask first.  Mr. McKoon?

18         MR. MCKOON:  Yes, sir.

19         THE COURT:  Do you expect to need to get into this

20  before six o'clock?

21         MR. MCKOON:  I would think that I would.  I mean I

22  can -- I can ask a few more questions.

23         THE COURT:  Well, why don't -- have you got your cell

24  phone up here?

25         MR. STEELE:  No.  Mr. Brown has a cell phone that I'm

1  sure I can borrow.

2          THE COURT:  Go ahead and step over somewhere and make

3  the call.

4          MR. STEELE:  Thank you.

5          THE COURT:  All right.  Court will be in recess for a

6  few minutes.

7      (Recess at 5:16 p.m. until 5:25 p.m., at which time

8        proceedings reconvened without the jury present, as

9        follows:)

10         THE CLERK:  Court is in session.  You may be seated.

11         THE COURT:  All right.  Before we call the jury in,

12  where are we on that?

13         MR. STEELE:  Your Honor, I was unable to reach

14  Mr. Polisuk, but I'm going to accept Mr. McKoon's

15  representations and not hold things up.

16         THE COURT:  All right.  Let's bring the jury in.

17         MR. MCKOON:  We can go ahead, then.

18      (Jury in at 5:26 p.m.)

19         THE COURT:  Be seated.  We had to get an answer on

20  something from somebody that was not readily available.  It took

21  a little while.  So I think you've been advised that we're going

22  to go until not past six.  But the weather report -- the latest

23  weather reports still do show the possibility of dangerous

24  weather over here in this part of the state up until around

25  noon, blowing through by then, still some rain, but nothing

1  dangerous is the latest we're getting.  So when we break in just

2  a little while, we're going to break until two o'clock tomorrow

3  afternoon.  From all reports, it may still be raining some then,

4  but there shouldn't be any kind of dangerous situation.

5        All right.  Mr. McKoon, go ahead.

6  Q.  All right.  Let's move on to something else, Mr. Davis.  And

7  this is the last time I'll ask you about this, but I just want

8  to be clear.  When you first get into the department, they give

9  you the standard operating procedures, don't they?

10  A.  Yes.

11  Q.  And just as a new firefighter, you're expected to review

12  them and know them?

13  A.  Yes, sir.

14  Q.  Is that right?  And if at any time you have a question about

15  standard operating procedures, do you have them there at the

16  station to refer to?

17  A.  Yes.

18  Q.  Same thing with the merit system rules and procedures?

19  A.  It depends on what station you're at.

20  Q.  What stations do they have them at?

21  A.  When I was at station three, I had one readily available;

22  but at station one, it was in the assistant chief's office.

23  Q.  Okay.  The bottom line is if you're not sure about

24  something, you can either ask somebody above you or you can go

25  look it up yourself --

1    A.   Yes.

2    Q.   -- is that correct?  Now, in this -- when this came up about

3    the probationary period, is it not true that the new hires,

4    people that would be hired newly, now have two more

5    certifications to get than when you were first hired?

6    A.   I'm unaware of if they have to or not.

7    Q.   You don't know about that?

8    A.   No, sir.  I haven't been through training in eight years.

9    Q.   Well, and your opposition to it was what?

10   A.   Our opposition to it was that we didn't want probationary

11   time to be extended to 18 months.

12   Q.   Okay.  And why was that?

13   A.   Because we didn't want it to affect our recruiting or

14   staffing issues.

15   Q.   Now, does that affect you in any way?

16   A.   Not personally.

17   Q.   I believe you said in your deposition that if you couldn't

18   recruit people, you'd be shorthanded, and that might affect you,

19   something to that effect.  Do you remember that?

20   A.   Well, staffing eventually would have an effect on me and

21   every citizen in the city.

22   Q.   But the reason you were calling the mayor wasn't because it

23   personally affected you.

24   A.   That's correct.  That condition of employment wouldn't

25   personally affect me.

1  Q.  And when you talked to the mayor -- and I'd like for you to

2  go over to -- let's see where it is -- page 78 of your

3  deposition.

4  A.  That's the book you gave me?

5  Q.  Yes, sir.  If you would, just go to page 78.  And I had a

6  question there.  And I want to get -- I want to ask you the

7  question.  I'd like for you to read your answer.  Because after

8  you finish your answer, I have a question about it.  On line 17,

9  I said:  Okay.  Take me through your conversation the best you

10 can recall.

11     I'm talking about your conversation with the mayor.  And

12 what was your answer?

13 A.  Do you want me to read starting on 19?

14 Q.  Yes, sir.

15 A.  Answer:  Well, I mean the best I can recall, he, you know,

16 called -- well, he called.  He was, you know, how are you doing

17 or whatever.  We talked a little bit.  And I told him, you know,

18 on behalf of the firefighters association that we were against,

19 you know, the proposal and that I told him before, you know,

20 that they had voted in our favor, but we asked them not to mess

21 with probation and that we were asking again.

22     And then he asked why.  And so I went on to explain to him

23 about how the firefighters association felt we had a high

24 turnover rate and had a hard time recruiting, maintaining

25 people, and that it affected staffing; and that we felt this

1  would be negative on, you know, trying to recruit employees

2  because our health insurance costs were so high; and that people

3  weren't allowed to work part-time jobs when they were on

4  probation and that in Columbus they were allowed to; and that so

5  anybody that we try to hire maybe go over there for a better

6  deal, and that we were just against that.  And I think I even

7  told him that we were not so much against extending probationary

8  time, but we'd like for people to be able to work part-time jobs

9  and still have their rights under the merit system.

10  Q.  All right.  Let me stop you there a minute.  What you were

11  saying there, as I understand, is you wanted people to be able

12  to be training as a firefighter and still have the right to work

13  a part-time job.

14  A.  No, sir, not in training.

15  Q.  Okay.  But when -- let me back up to line 12 there where it

16  starts with I think I even told him that we're not so much

17  against extending probationary time, but we'd like for people to

18  be able to work part-time jobs and still have rights under the

19  merit system.  What were you referring to?

20  A.  I was referring to the -- when we were discussing maybe

21  lengthening the time that they could get their EMT.  And then

22  also, that once they finish their training, you know, if they

23  finish their training in four months, then all that other time

24  they would just be on probation.  And we wanted them to be able

25  to work a part-time job and have protection under the merit

1    system.

2    Q.    The question on line 17 was:  And what did he say?

3          And just read that for them.

4    A.    Number 17.  Question:  And what did he say?

5    Q.    Correct.  Just read your answer.

6    A.    Do you want me to read line 18?

7    Q.    Yes, sir.  Your answer.

8    A.    Answer:  He said -- well, I think he told me, he said, well,

9    you know, the chief said -- I take that back.  He didn't say the

10   chief.  He said, I don't remember who proposed it.  It was one

11   of the chiefs, the police chief or the fire chief.  He said, but

12   they said it had something to do with training.  And then I told

13   him that some of the proposals from the membership was that if

14   this was the case, you know, let the probation start when they

15   complete training or that extending the time for EMT.  He said

16   something about EMT; and I told him that, you know, instead of

17   changing the probation, we'd be more happy -- you know, that we

18   could successfully recruit people if we'd just extend the time

19   people are allowed to do the EMT.  Well, it says EPMT.

20   Q.    I'm going to finish this up real quick.  I'm going to ask

21   you one other question and get you to read that answer, and then

22   I have some questions about this exchange.

23         Okay.  How did the conversation end?  Did he give you a

24   commitment he was going to do one thing or the other?

25         And what was your answer on line 8?

1    A.    Line 8, A, answer:   No.   He said that he would bring that up

2    and that he appreciated me bringing some of the issues to his

3    attention and that, you know, if we ever need anything, feel

4    free to let him know.

5    Q.    All right.   Does that pretty much summarize your

6    conversation with the mayor?

7    A.    To the best of my knowledge, it does.

8    Q.    And at the time you were talking to him, you clearly

9    understood what the proposal was; is that correct?

10    A.    Yes.

11    Q.    You knew it was only for new hires?

12    A.    Yes.

13    Q.    And you weren't confused about it.

14    A.    I wasn't personally, no.

15    Q.    Now, do you remember having a -- when we had the personnel

16    review board hearing, I was not present, but Mr. Graham was.   Do

17    you remember that hearing?

18    A.    Somewhat, yes.

19    Q.    And I believe it took place on May the 16th, 2006, which

20    would have been within one month of you being terminated; is

21    that right?

22    A.    Yes.

23    Q.    And at that time, you came before the personnel review

24    board, and you gave testimony under oath.   You were sworn in

25    just like you were here today; is that right?

```
 1   A.   Yes, sir.

 2   Q.   And you had a lawyer there with you; is that correct?

 3   A.   Yes, sir.

 4   Q.   And did you know that it was being tape-recorded?

 5   A.   I don't remember if I knew or not.

 6   Q.   That meeting.

 7   A.   I think I might -- yeah, I think I did, because I think they

 8   had to change tapes out, so we had to stop.

 9          MR. MCKOON:  All right.  At this time, Your Honor, I'd

10   like to play this excerpt from the personnel review board

11   hearing concerning his conversation with the mayor.  It's very

12   short.  It will only take just a moment if the Court will give

13   me just a minute to set it up.  I'll try to be as portable as I

14   can.  I'm going to set these speakers up here.  Hopefully,

15   they'll work.  May I set these up here, Your Honor?

16          THE COURT:  All right.

17          MR. MCKOON:  Let me put this in.  I want to see if this

18   might refresh your recollection on what you told the personnel

19   review board.

20          THE COURT:  Now, I understand there's no -- no dispute

21   as to whether this is actually the tape of the meeting that was

22   there; is that correct?

23          MR. STEELE:  Actually, we have not stipulated to that,

24   but the witness may be able to identify it.

25          THE COURT:  All right.
```

 1     (The hearing excerpt is played, as follows:)

 2          QUESTION (By Mr. Polisuk):  Did the mayor return your

 3   phone call?

 4          ANSWER (By Mr. Davis):  Yes, sir.

 5          QUESTION:  How long, first of all, after you called did

 6   the mayor return your phone call, if you remember?

 7          ANSWER:  It might have been three or four hours later.

 8          QUESTION:  Okay.  It was the same day?

 9          ANSWER:  Oh, it was the same day.  Yes, sir.

10          QUESTION:  Was it -- do you remember if it was still

11   during normal business hours?

12          ANSWER:  I believe so.

13          QUESTION:  Okay.  And I hate to be really picky here,

14   but what did the mayor say on the phone?

15          ANSWER:  He -- he called, you know, and I said hello.

16   He said, David?  I said, yes, sir.  He said, can I help you, you

17   know, or he said they told me you called.  And I said, yes,

18   sir.  And I told him that, you know, that on behalf of the

19   firefighters association, that we had noticed that there was a

20   new proposal to change the merit system, the length of

21   probation.  And then I went on and had a conversation with him

22   and expressed, you know, why we would be opposed to that.

23          QUESTION:  Okay.  Well, let me -- let me cut you off.

24   You said that you addressed him.  I believe you said that you

25   addressed the mayor and said that you're calling on behalf of

 1  the firefighters.  Do you remember specifically what you said or

 2  roughly specifically, if that phrase makes sense?

 3          ANSWER:  Yeah.  I mean he called.  You know, he was,

 4  like, hey, how are you doing?  I said all right.  I said, look,

 5  I just want to call, you know, on behalf of the firefighters

 6  association and, you know, give you our viewpoint on this

 7  proposed change.  And, you know, I told him that what we believe

 8  the merit system Section 9 or whatever, with probation.  And

 9  then I, you know, expressed to him our concerns.

10          QUESTION:  And what did you tell him your concerns were

11  or the concerns of the membership, I guess?

12          ANSWER:  Well, I told him our concerns were, number

13  one, that, you know, to extend probation for new hirees I felt

14  like would hurt recruitment with respect to staffing and safety

15  and morale -- or actually, with recruitment, staffing, and

16  safety.  And I also told him that -- that, you know, that we

17  were against being put on probation after you were promoted,

18  that, you know -- I mean an 18-month probation -- I mean

19  probation after you were promoted was a little long.  Twelve

20  months was adequate.  And that's when he told me that the

21  probation didn't affect people that were already employed.  It

22  would only be new hirees.  And I said, well, I wasn't aware of

23  that.  But, you know, no matter what, I just want to let you

24  know what our viewpoint is.  We would be opposed to probation

25  for, you know, employees who were promoted as well as extending

1    probation for new employees.

2          QUESTION:  Okay.  So the mayor cleared up your

3    confusion as to whether or not this proposal applied to new

4    employees or all employees in general.

5          ANSWER:  Yes.

6          QUESTION:  Was there --

7      (The hearing excerpt is concluded)

8    Q.  (Mr. McKoon, continuing:)  Were you able to hear that,

9    Mr. Davis?

10   A.  Yes, sir, I was.

11   Q.  So were you in fact -- when you called the mayor, were you

12   still confused about what the probation applied to?

13   A.  No, sir.  I was not personally.

14   Q.  Well, you heard your lawyer ask that question just now where

15   he said, so the mayor cleared up the confusion.  That was

16   Mr. Polisuk, wasn't it, that asked the question?

17   A.  Yes.  Yes, sir.

18   Q.  The guy that was present with you?  And I mean that wasn't

19   Mr. Graham asking the question, was it?

20   A.  No, sir.

21   Q.  And the question he asked was, so the mayor cleared up your

22   confusion as to whether or not this proposal applied to new

23   employees or all employees in general.  And your answer was yes.

24   A.  Yes.

25   Q.  In fact, when you called the mayor, according to your

1    personnel review board testimony, you were telling him that you

2    didn't want to be put on probation, that you thought people that

3    were already working there didn't need to be put on probation;

4    is that right?

5    A.   Repeat the question.

6    Q.   Okay.  When you called the mayor, you were telling him that

7    you didn't think -- that one of your objections was you didn't

8    want people like you, who were already employed there, to be put

9    on probation.

10   A.   Well, I think part of the conversation was I was making sure

11   by his discussion that he was aware that this wasn't affecting

12   full-time employees but was part-time employees.

13   Q.   All right.  Well, you just heard what was on that tape,

14   didn't you?

15   A.   That's correct.

16   Q.   That's not what that tape said, is it?

17   A.   That's -- it didn't say that.

18   Q.   Okay.  I mean you said what you said, didn't you?

19   A.   When I talked to the mayor and I was bringing up the fact

20   about the probation, I wanted to make sure that he ensured me

21   that he understood that it didn't have to do with full-time

22   employees as well, that we would be against that and extending

23   the probationary time for new employees.

24   Q.   Well, again, this is a transcript of what we just -- we just

25   listened to.  And it said here, and that's when he told me --

1  the mayor told you -- that the probation didn't affect people

2  that were already employed, that it would only be new hirees.

3  And I said, well, I wasn't aware of that.

4       Were you aware of that or were the not aware of it?

5  A.  I was aware of it.

6  Q.  Okay.  So why did you say in your sworn testimony in front

7  of the personnel review board that you weren't aware of it?

8  A.  I think that's what I discussed -- that's what I said to him

9  on the phone.  I was aware prior to calling him, because I

10 called the city clerk.

11 Q.  Okay.  I understand that.  My question is why would you tell

12 him you weren't aware of that if you were in fact aware of it?

13 A.  I don't know why I said that.

14 Q.  All right.

15 A.  I was just trying to find out if he knew exactly what he was

16 voting on.

17 Q.  Well, he wasn't even at this personnel review board hearing,

18 was he?

19 A.  I don't know if he was or not.

20 Q.  And your lawyer was asking you these questions; is that

21 right?

22 A.  That's correct.

23 Q.  And your lawyer asked you, he said, so the mayor cleared up

24 your confusion as to whether or not this proposal applied to new

25 employees or all employees, in general, and your answer was yes;

1   is that correct?

2   A.  He did clear up my position that he knew exactly what he was

3   talking about.

4   Q.  Mr. Davis, not your position, your confusion.  That's

5   what -- that's what you said on the --

6   A.  I wasn't confused.

7   Q.  You weren't confused.  Okay.  So you just misunderstood your

8   own lawyer's question at the personnel review board hearing.

9   A.  Yes, sir.

10  Q.  All right.  You said you called the membership -- after

11  talking to the clerk and she cleared up your confusion, you said

12  that you called the membership and that they were all opposed to

13  it, these people that you can't remember their names except for

14  Bill Pitts, whose name you could remember.  Did any of those

15  people ever call you before you called them?

16  A.  No, sir.

17  Q.  So none of them were calling you at home saying that they

18  had seen it in the paper?

19  A.  No, sir.

20  Q.  You're sure about that?

21  A.  To the best of my knowledge, yes.

22  Q.  Well, let's go back to the -- I don't know what I did with

23  the tape.  Here it is.

24          MR. MCKOON:  Give us just a second.

25      (Brief pause)

```
 1        (The hearing excerpt is played, as follows:)
 2            QUESTION:  How long had y'all known that they were
 3   going to change this from -- it was just something that came to
 4   light in between two meetings, or had y'all known about it in
 5   the past and it hadn't come up in any meetings prior?
 6            ANSWER (By Mr. Davis):  Yeah.  I knew about it Monday,
 7   and the vote was Tuesday, the next day.  During the day, you
 8   know, they called the house, hey, have you seen the paper.  I
 9   was, like, no, but I'm looking into it.  And then I called and
10   got confirmation from the city about what it was because I
11   didn't know what it was by looking at it.
12            QUESTION:  Okay.
13        (The hearing excerpt is concluded)
14   Q.  (Mr. McKoon, continuing:)  Okay.  Did you hear that?
15   A.  Somewhat.
16   Q.  Okay.  Well, I'll represent to you this is a transcript
17   where one of the board members asked you how long you had known
18   about the change, meaning the change in the probationary period.
19            MR. STEELE:  Excuse me, Your Honor.
20            THE COURT:  Yes.
21            MR. STEELE:  Do you have a copy of the representation?
22            MR. MCKOON:  I'll be glad to.  One moment.  Page 33.
23            MR. STEELE:  Thank you.
24   Q.  The board member asked you how long y'all had known they
25   were going to change this from -- it was something that just
```

1    came to light in between two meetings.  In other words, as I

2    understood it, you were telling the board at the time that this

3    is something that you just found out about on the 16th, and so

4    you had to get on to the mayor.  You didn't have time to follow

5    the chain of command.  Is that correct?

6    A.   What day was the 16th?

7    Q.   The day before --

8    A.   The Monday?

9    Q.   -- you made the phone call to the mayor.

10   A.   Yes.  That's when I found out exactly what it entailed.

11   Q.   And it's got on here, David Davis:  Yeah, I knew about it

12   Monday, and the vote was the Tuesday.

13        Do you remember that?

14   A.   Yes, sir.

15   Q.   And board member said, oh, okay.  And then you said, and

16   during the day, you know, calling the house, like, hey, have you

17   seen the paper?  So I was, like, no, but I'm looking into it.

18   And then I called and got confirmation from the city.  I wanted

19   to know what it was because I didn't know what it was by looking

20   at it.

21        So were people calling you at your house asking you to look

22   at it in the paper?

23   A.   Not Monday.

24   Q.   Okay.  Well, when were they doing that?

25   A.   The only person that I had a conversation with about it

1  being in the paper was Bill Pitts.

2  Q.   Okay.  Well, again, I don't -- I'm not trying to beat a dead

3  horse; but according to this, it says, you know, calling the

4  house, like, hey, have you seen the paper?

5      Was that Bill Pitts calling your house?

6  A.   No.  He called me at the station I believe Sunday.

7  Q.   Okay.  So I was, like, no, but I'm looking into it.

8      So you hadn't seen the paper when whoever it was called you

9  at your house; is that right?

10  A.   I don't know exactly what to say.  That was three years ago,

11  two years ago.  I answered that the best I could at the time.

12  Q.   Well, in fact, your memory of this whole incident would have

13  been much better on March the 16th, 2006, than it would be

14  today.  Is that a fair statement?

15  A.   No, sir.  That would probably be an unfair statement.

16  Q.   Okay.  So has your memory gotten better over time?

17  A.   Well, I can tell you when all these events occurred, I

18  didn't know they would be so significant that I'd have to pay

19  attention to every one of them.  I was an emotional wreck

20  shortly thereafter being fired.

21  Q.   Okay.  Let me get this out of the way.  The truth of the

22  matter is, is George Bennett never told you that you should go

23  to the mayor with this, did he?

24  A.   No.  The truth is George Bennett told me to make the phone

25  calls.

1  Q.  And he did that at the station house, but then you just

2  learned about it when you were at your house.  Is that what

3  you're saying?

4  A.  No, sir.  That's not what I'm saying.

5  Q.  Okay.

6  A.  I'm saying George Bennett told me Sunday that I needed to

7  make some phone calls.

8  Q.  All this stuff that you just read that you told the mayor,

9  all the details about how you might want this changed or how

10 this -- this probationary period could be made different and all

11 of that, that was -- the proposal to change it actually came

12 from this man seated over here, didn't it, Mr. Wallace Hunter?

13 A.  I'm not sure if it did or not.

14 Q.  Well, how does a proposal for the fire department usually

15 get made to the city council?

16 A.  It didn't affect just the fire department.

17 Q.  Well, how did the -- how does a proposal for public safety

18 usually get made?

19 A.  I don't know.

20 Q.  Okay.  So you didn't know about that either.

21 A.  Know about what?

22 Q.  About how these proposals get made and sent to council.

23 A.  No, sir.  I don't have knowledge of that.  I've never been a

24 part of that process.

25 Q.  Okay.  Yet you've been a lobbyist before, haven't you?

1  A.  Yes.

2  Q.  You've testified before that you've lobbied the State

3  Legislature for different things.

4  A.  Yes, sir.

5  Q.  Is that right?  So you know how laws are made.

6  A.  Well, as a lobbyist, all I know is I call and voice what me

7  or the people I represent's, you know, opinions would be on that

8  legislation.

9  Q.  All of these things that you told the mayor that you just

10  read just a moment ago, was there any reason in the world you

11  couldn't have taken those same things up with Chief Hunter?

12  A.  Chief Hunter didn't have a vote on it.

13  Q.  Well, but it was his proposal.

14  A.  I don't know that it was his proposal.

15  Q.  Well, did you bother to find out, Mr. Davis?

16  A.  I was on my day off.  I called the people that were voting

17  on it.

18  Q.  I see.

19  A.  After they told me it was okay to call.

20  Q.  So is the answer no, you didn't bother to find out?

21  A.  Didn't bother to find out --

22  Q.  Whose proposal it was.

23  A.  It didn't matter whose proposal it was.

24  Q.  Okay.

25  A.  That wasn't the issue.

1  Q.  So if the fire chief makes a proposal to the city council

2  and you don't like it, your idea is in spite of the policy that

3  you know about and in spite of this job that you love and

4  treasure and have sat up there and talked about a few moments

5  ago and put at risk to do this, in spite of all that, you'd

6  rather go around the policy than simply make a phone call to the

7  chief.

8  A.  I didn't say that.

9  Q.  Well, did you make a phone call to the chief?

10 A.  No, sir, I didn't.  I called the legislative body.

11 Q.  When Roy Waters came on as the deputy chief of the

12 department, did he come in and tell everybody at every shift

13 that he had an open-door policy?

14 A.  Yes, sir.

15 Q.  And did he -- did he actually make overtures to you to talk

16 to you about the situation at the fire department?

17 A.  Yes, sir.

18 Q.  And did y'all have shift meetings every day?

19 A.  No, sir.

20 Q.  You didn't?

21 A.  No, sir.

22 Q.  Well, did you go to meetings where Mr. Roy Waters was there

23 on the -- let's just say during the course of a week, that would

24 happen two or three times a week?

25 A.  We had training sessions every day.

1  Q.  You had training sessions every day.  And was Chief Waters

2  at them?

3  A.  Some of them, yes.

4  Q.  All right.  At every meeting would he start it off by saying

5  if anybody has any concerns, any suggestions, any problems,

6  you're welcome to come to me?

7  A.  I don't know if he said that every time.

8  Q.  Did you know his door was open to you if you wanted to come

9  to him about something?

10  A.  He personally told me the door was open.

11  Q.  Did you take advantage of that?

12  A.  Yes.

13  Q.  Why didn't you do it on this occasion?

14  A.  I was off work.

15  Q.  So is it your position that when you're off work, that as a

16  firefighter, that the rules don't apply to you?

17  A.  I follow the rules at work that are for work.

18  Q.  Okay.  Well, what good would this rule do, ASOP 12, in your

19  mind -- what good would this rule do if people only had to

20  follow it while they were at work?

21  A.  Well, you would follow it at work because you had a

22  work-related issue and you were going to council as an employee.

23  Q.  Wasn't the change in the probationary period of new hires a

24  work-related issue?

25  A.  No, sir, it wasn't a work-related issue.  It was a

1  proposal.  It wasn't an issue yet.

2  Q.  Oh, I see.  So you were calling to stop something that was

3  not going to be work-related.

4  A.  No.  I was calling to voice our opinions in opposition to

5  proposed legislation.

6  Q.  When you came in and signed this form on April the 20th or

7  the 21st, whenever it was signed, did you know the reason you

8  were being terminated?

9  A.  Yes, sir.  They -- I was told.

10 Q.  Okay.  And does it say on here why you're being terminated?

11 A.  Yes, sir.

12 Q.  What is that?

13 A.  The document detailed a description of events.  That's what

14 I was directed to.

15 Q.  Down here at the bottom, does it say discharge as per merit

16 system rules and regulations for second group II offense?

17 A.  I can't see.

18 Q.  Do you see that right there?

19 A.  Okay.  Yes, sir.

20 Q.  So this wasn't your first offense, was it?

21 A.  My first offense of what?

22 Q.  Group II offense.

23 A.  Well, there's like a hundred group IIs.

24 Q.  Okay.  You didn't feel like you'd been insubordinate?

25 A.  No, sir.

1  Q.  Okay.  Is this just all a mistake?  Is that what it is, just

2  an innocent mistake?  You just didn't understand the rule, or

3  does the rule not apply to you?  Which is it?

4  A.  No.  I understood the rule as if I was on duty and in my

5  capacity as a firefighter.

6  Q.  So you're not a firefighter -- by the way, what do you

7  consider your first job?  Is it an ambulance person or a

8  firefighter?

9        MR. STEELE:  Objection.  Relevancy.

10        THE COURT:  I'm sorry?

11        MR. STEELE:  Objection, Your Honor.  Relevancy.

12        THE COURT:  What is the relevance?

13        MR. STEELE:  He's asking --

14        THE COURT:  Mr. McKoon, what is the relevance?

15        MR. MCKOON:  He's saying he doesn't have to do it when

16  he's off duty.  I just wonder which comes first.

17        MR. STEELE:  At the time in question, he had one job.

18  He wasn't working for the ambulance --

19        MR. MCKOON:  I'll withdraw it.

20        THE COURT:  I'll sustain it.

21        MR. MCKOON:  I'll withdraw it.

22  Q.  When you were working for the Phenix City Fire Department,

23  what was your -- what was your first job?

24  A.  As a Phenix City firefighter.

25  Q.  And were you subject to recall?

1  A.  I could be.

2  Q.  And you were a public safety employee?

3  A.  Yes.

4  Q.  Means you ensure the public -- the safety of the public.

5  A.  Yes.

6  Q.  And you've heard of off-duty police officers.  Have you ever

7  heard a police officer is a police officer 24 hours a day?

8  A.  No, sir.

9  Q.  Never heard that before?

10  A.  No, sir.

11          MR. MCKOON:  Okay.  Thank you, Mr. Davis.

12          THE COURT:  All right.  We'll recess for the day at

13  this time.  Members of the jury, if the weather changes -- and

14  that can happen, but this is the same report we've been getting

15  all day, the timetable.  If it should change that it's delayed

16  and that there's a dangerous condition over here that we're told

17  about, we'll call you.  I believe you've already given your

18  numbers, haven't you, to the deputy?  And if anything happens,

19  then we will; but if you don't get a call, then I'll ask you to

20  be back tomorrow afternoon before two o'clock so that we can

21  start at two o'clock.  Don't come back in the courtroom.  Come

22  back to the jury room where you've been, and we'll try to start

23  promptly at two o'clock.

24          Now, when you go home, there may be, in a case like

25  this involving the city -- and you've heard about newspaper

 1    articles.  There may be something in a newspaper about this; I

 2    don't know.  There may be something on television or radio about

 3    it.  I'm instructing you that you're not to read it, listen to

 4    it, or watch it.  And if you see anything about it, just put it

 5    away.  If somebody wants to put it aside and let you see what it

 6    said afterwards, after this is all over, that's fine.  But

 7    you've got to make your decision based on what happens in the

 8    courtroom.  And things they talk about on television or that's

 9    written about in a newspaper or talked about on the radio,

10    people haven't heard everything you've heard.  They may say

11    something that they thought important that you didn't think

12    important at all.  They may leave out something that was

13    important or they may get it wrong and say something different

14    from what you've heard.  So you just can't be influenced by any

15    of that.  So just don't listen to it.  Don't read it.

16          It would be unusual if somebody out of the eight of you

17    doesn't get home and have a spouse or somebody ask you what this

18    case is all about that you're going to be up here most of the

19    week on.  For the same reason that it's not their duty --

20    they're not the ones that are going to have to answer these

21    questions -- you can't be influenced by somebody else.  So just

22    tell them that you've been told that you can't discuss the case

23    until it's over.  When it's over, you can talk to them or

24    anybody else about it all you want to.  You don't have to talk

25    to anybody about it then, but you'll be free to.  But until

 1  then, with anybody, just don't talk about or discuss what's

 2  happening in the courtroom.

 3          So having said all that, I think you'll have a safe

 4  drive home.  It's not supposed to be bad weather yet.  I haven't

 5  looked outside, but it's not supposed to be.  And we'll be in

 6  recess until tomorrow at two o'clock.

 7      (Jury out at 5:59 p.m.)

 8          THE COURT:  All right.  Is there anything counsel need

 9  to take up on the record before we recess for the day?

10  Plaintiff?  Mr. Steele?

11          MR. STEELE:  No, sir, Your Honor.

12          THE COURT:  Mr. McKoon?

13          MR. MCKOON:  Judge, the only thing I would say is

14  this.  Given the Court's rulings on these other matters, I

15  didn't cross-examine him about any of those until -- until and

16  unless they come in otherwise.  And so I would like him subject

17  to recall, should I decide to do that.  That's my only --

18          THE COURT:  All right.  Well, I'll let you recall him

19  if --

20          MR. MCKOON:  If necessary.  I don't know that it's

21  going to be necessary.

22          THE COURT:  All right.  I want to get started promptly

23  at two.  I will be here at 1:30.  And if there's anything that

24  we need to take up before we get started, it will have to be

25  done in less than 30 minutes.  But I'll be happy to get with

1   counsel at 1:30.  If you have anything ahead of time, be here at

2   1:30 and we'll take it up.  We're in recess until 1:30.

3       (Evening recess at 6:01 p.m.)

4                       * * * * * * * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              COURT REPORTER'S CERTIFICATE

2          I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4          This 16th day of May, 2008.

5

6                                    /s/ Risa L. Entrekin
                                     Registered Diplomate Reporter
7                                    Certified Realtime Reporter
                                     Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25