1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE MIDDLE DISTRICT OF ALABAMA

3                        EASTERN DIVISION

4

5    DAVID DAVIS,

6            Plaintiff,

7       vs.                    CASE NO.:  3:06cv544-WHA

8    PHENIX CITY, ALABAMA, et al.,

9            Defendants.

10

11                          VOLUME II

12                  * * * * * * * * * *

13                   JURY TRIAL PROCEEDINGS

14                  * * * * * * * * * *

15          BEFORE THE HONORABLE W. HAROLD ALBRITTON, UNITED

16   STATES DISTRICT JUDGE, and a jury, at Opelika, Alabama, on

17   Tuesday, March 4, 2008, commencing at 1:23 p.m.

18   APPEARANCES:

19   FOR THE PLAINTIFF:       Mr. Douglas L. Steele
                              Attorney at Law
20                            WOODLEY & McGILLIVARY
                              1125 15th Street NW, Suite 400
21                            Washington, D.C.  20005

22                            Mr. Gary Lamar Brown
                              Attorney at Law
23                            FITZPATRICK & BROWN
                              Farley Building, Suite 600
24                            1929 Third Avenue North
                              Birmingham, Alabama  35203

25

1   APPEARANCES, Continued:

2   FOR THE DEFENDANTS:        Mr. James Robert McKoon, Jr.
                               Mr. Joshua Robert McKoon
3                              Attorneys at Law
                               McKOON, THOMAS & McKOON
4                              925 Broad Street
                               Phenix City, Alabama  36868
5
                               Mr. James Paul Graham, Jr.
6                              Attorney at Law
                               THE GRAHAM LEGAL FIRM
7                              P.O. Box 3380
                               Phenix City, Alabama  36868-3380
8
                  Proceedings reported stenographically;
9                    transcript produced by computer.

10                     * * * * * * * * * *

11                          VOLUME INDEX

12   DAVID PAUL DAVIS
          FURTHER CROSS BY MR. MCKOON              225
13        REDIRECT BY MR. STEELE                   241

14   JEFFREY SCOTT HARDIN
          DIRECT BY MR. STEELE                     244
15        CROSS BY MR. MCKOON                      273
          REDIRECT BY MR. STEELE                   281
16        RECROSS BY MR. MCKOON                    288

17   ANNE LAND
          DIRECT BY MR. BROWN                      290
18        CROSS BY MR. MCKOON                      310
          REDIRECT BY MR. BROWN                    321
19
     WILLIAM MYRON PITTS, JR.
20        DIRECT BY MR. BROWN                      324
          CROSS BY MR. MCKOON                      341
21        REDIRECT BY MR. BROWN                    349

22   KARL TAYLORSON
          DIRECT BY MR. BROWN                      352
23        CROSS BY MR. MCKOON                      367

24

25

```
 1                    VOLUME INDEX, Continued
```

```
 2  BRANDON LYNN SHEETS (via deposition)
          DIRECT BY MR. WOODLEY                 377
 3        CROSS BY MR. MCKOON                   388
          REDIRECT BY MR. WOODLEY              405
 4        RECROSS BY MR. MCKOON                407
```

```
 5                    * * * * * * * * * *

 6      (The following proceedings were heard before the Honorable

 7      W. Harold Albritton, United States District Judge, and a

 8       jury, at Opelika, Alabama, on Tuesday, March 4, 2008,

 9       commencing at 1:23 p.m.:)

10      (Chambers conference, as follows:)

11          THE COURT:  I've got a thing I wanted to take up with

12  y'all.  I don't know whether either side had something you

13  wanted to take up with me.  Do you?

14          MR. STEELE:  We do have a few items.

15          THE COURT:  All right.  Why don't I hear from you.

16          MR. STEELE:  Okay.  We have some questions for

17  clarification or at least, at a minimum, to make sure that we

18  have our objection on the record pertaining to some evidentiary

19  rulings yesterday afternoon, if we understood them properly.

20  The first is, as I understand it, the Court's concluded that

21  there will be -- there's no issue that should be presented to

22  the jury with respect to the question of whether the telephone

23  call to the mayor created disruption.

24          THE COURT:  Let me interrupt you, because that's

25  exactly what I wanted to take up with y'all myself on the
```

 1   record.  Is there something else unrelated to that that we can

 2   handle before we get into that?

 3          MR. STEELE:  There is one that's unrelated to that.  My

 4   second one was also related to that, so I'll skip that.  But on

 5   the last one, as I understand it, you indicated yesterday that

 6   you would allow the decision maker or makers to testify in

 7   regard to the -- we'll call it the prior offenses as listed in

 8   that exhibit to the extent that they relied on that information

 9   in making their decision.  And we wanted to make sure our

10   objection to that is plain on the record.

11          In ruling for -- ruling on the motion in limine as well

12   as the motion for summary judgment, the Court concluded with

13   respect to the Kristin Kennedy incident, which is one of those

14   incidents -- the Court concluded that it was both irrelevant to

15   the first cause of action for freedom of speech and also that it

16   was prejudicial -- so even if there was some relevancy, it's

17   outweighed by the prejudicial value -- and that it would be

18   admitted, if at all, under the second claim for free

19   association.  And the Court even invited us, if we wished, to

20   seek a limiting instruction.

21          So I'm very concerned to hear you say that you're

22   allowing it in.  And I don't mean any disrespect, Your Honor --

23          THE COURT:  Don't worry about that.

24          MR. STEELE:  -- when I say that between the date of

25   your decision on those motions, which I believe was Thursday,

1    perhaps Wednesday, and today, that type of information did not

2    become any more relevant than it was when you made the

3    decision.  It didn't become any less prejudicial than it was

4    when you made the decision.  And, you know, the mere dismissal

5    of the second cause of action does not convert irrelevant,

6    prejudicial evidence suddenly into relevant, admissible

7    evidence.  So we object to that conclusion.  I respect that you

8    get to make the call.  But we wanted a chance to express that to

9    you, because we were quite concerned about that.

10         THE COURT:  All right.  Let me make clear what I was

11    saying, which I think is consistent with what I have ruled

12    before, or at least not inconsistent with -- is that this

13    phone?  I think it is.  I don't know.

14         The document has been introduced in evidence.  The

15    plaintiff has talked about it and has said that was handed to

16    him, and he was told that was the reason that he was

17    terminated.  The document is in.  It's not my intention -- and

18    also, he has -- he has testified and you, Mr. Steele, in

19    opening, have emphasized the idea that he was fired for one

20    little five-minute telephone call and that was it.  Well, that's

21    not the whole story.

22         I'm not going to admit independent evidence or

23    testimony about the facts of the Kennedy incident or anything

24    else.  We'd be trying the Kennedy incident if we did that.

25    However, the defendants' position has consistently been that he

1    would not have been fired just for the telephone call if it had

2    not been for all of this past history.  In fact, if it hadn't

3    been for the past history, I -- they've argued at one time that

4    he might or probably would have been disciplined in some way,

5    but that it would have been short of termination.

6            With the plaintiff having made -- having made a

7    contention that could be taken by the jury and by me, based on

8    what was said, that all that he did after eight years on the

9    force was talk to the mayor in a little five-minute innocuous

10   telephone conversation and for that his whole career was ruined

11   and his life was ruined and he was terminated for that one

12   little telephone call, that's not the whole story.  And I'm

13   going to let the decision makers not talk about what the Kennedy

14   incident was, not talk about all of these various things and not

15   bring in Kennedy or anybody else to talk about this, but say

16   what's on that form that they gave him when they told him that's

17   your reason.

18           They may say they told him other reasons.  I don't know

19   what they're going to say about what they told him.  He says

20   that's all they told him.  They may disagree with that, say they

21   told him different things; I don't know.  But I think it's fair

22   game and appropriate for them to say that if it had not been for

23   his past history of these various things that are listed on

24   there, he'd still have his job.

25           Now, whether they believe that or not or I believe it

1  or not, I don't know; but I think that that's been made an issue

2  in the case.  And I don't view that -- as long as it's limited

3  to not trying the truth or not truth of those incidents, I think

4  the plaintiff can testify if he wants to that some of these were

5  just little minor things that he was being picked on for or

6  whatever.  But I'm not going to have this telephone conversation

7  just be one thing in a complete vacuum.

8          MR. STEELE:  So I understand properly -- I want to make

9  sure that everybody has an understanding of the scope.

10          THE COURT:  So do I.

11          MR. STEELE:  The decision maker on the stand could

12  testify that in addition to the phone call, I took into

13  consideration items listed on the remainder of that document.

14  But the decision maker wouldn't, for example, be able to go down

15  that list and explain to the jury what those different items

16  are; that this item involved, you know, an accusation with

17  respect to Kristin Kennedy that plaintiff did such-and-such;

18  this item involved, you know, reports that plaintiff did this or

19  that.

20          THE COURT:  Well, it's between those two things.  I

21  won't restrict them from saying we considered the items on this

22  paper and that's it.  I would allow them to say what the items

23  on the paper are and that we considered these, but not go into

24  Kristin Kennedy was so-and-so and what the facts were, that

25  there was an incident that is referred to in here as -- I've

1  forgotten how it's referred to on the form, but that that was

2  taken into consideration, not facts beyond that unless they say

3  they talked to -- to him at the time about the details.  He said

4  they didn't.  I don't know whether they -- I just don't know

5  whether they claim they did talk to him more about it.  If they

6  do, I think that would be a proper response to his testimony.

7       MR. STEELE:  Well, if the witness is limited to reading

8  those items and the description is limited to the description

9  that's on that document, then it's unlikely that we have -- have

10 a problem with that.  If it goes beyond that to describing the

11 incidents, we would strongly object to that because it would be

12 both irrelevant and highly prejudicial to the First Amendment

13 free speech claim and would effectively be expanding this case

14 into however many minitrials on these things.  It would really

15 force us to put the plaintiff on, probably, to explain some of

16 these.  And the jury is going to be left figuring out, is it all

17 that bad that he told somebody you owe me 25, meaning push-ups,

18 and have to go through each and every one of those that the

19 Court has already ruled is not relevant to the First Amendment

20 free speech claim.  Secondly --

21      THE COURT:  I think I've agreed with what you're

22 saying, but --

23      MR. STEELE:  Well, I just want to make sure.

24      THE COURT:  Let me see what Mr. McKoon says.

25      MR. MCKOON:  Judge, I mean I understand -- I think I

 1  understand your ruling.  And the reason I didn't go any further

 2  with the plaintiff yesterday than I did was for that reason.

 3  What I thought your ruling was, was that the decision makers,

 4  who in this case are going to be Mr. Hunter, Mr. Waters, and

 5  Bubba Roberts, that at the time they made their final decision

 6  in this case on termination, that they reviewed the things that

 7  are summarized on this piece of paper.  Now, I can tell you for

 8  a fact that what I would expect them to say is, you know, we

 9  did, and we went through his personnel file and that's how all

10  that stuff got on here.  I don't even -- if the Court tells me

11  to -- I mean I'll tell them not to get into any detail about any

12  incident.

13        You know, if -- if -- you know, if all we're limited --

14  if we're just limited to saying, okay, this was insubordination

15  on group II, that's fine.  We'll do that.  You know what I

16  mean?  I'm not trying to -- I don't want blow this trial out

17  into a bunch of minitrials.  I'm not trying to do that.  I

18  understand the Court wants these questions answered, and I

19  appreciate you wanting to be fair about it in at least allowing

20  us to not leave the impression in the mind of the jurors that,

21  like you said, he was eight years and all the sudden he made a

22  phone call, and that was the only reason he's gone.

23        THE COURT:  Well, the insubordination that you're

24  talking about, that was the meeting with the press, wasn't it?

25        MR. MCKOON:  No, sir.

 1          THE COURT:  Oh, okay.

 2          MR. MCKOON:  It was not.  He was counseled for that.

 3   And I'm not sure it's under insubordination.  It's under --

 4   threatening or intimidating a fellow employee was the Kristin

 5   Kennedy incident, and I believe that's what it says on that

 6   line.

 7          THE COURT:  Okay.  What I'm --

 8          MR. MCKOON:  But that was the other group II offense,

 9   the Kristin Kennedy incident.  The meeting with the press --

10          THE COURT:  Let me interrupt you just a minute.

11          MR. MCKOON:  Sure.

12          THE COURT:  What I was saying and intended to say was

13   that they could say they went through the personnel file, they

14   put the things on this form that entered into the decision.

15          MR. MCKOON:  That is correct.

16          THE COURT:  Just going down, one of them was a past

17   whatever it was violation, based on whatever the language is in

18   that, and then move on.

19          MR. MCKOON:  That's fine.  I have no problem with that.

20          THE COURT:  That's what you are saying, isn't it?

21          MR. STEELE:  That's what we're saying.

22          THE COURT:  Okay.

23          MR. STEELE:  On that.  However, here's the "however"

24   that I started a moment ago.  Here's the other concern with

25   that, is that Your Honor said several times that it's relevant

 1   to let the jury know about these other events.  And my concern

 2   with that is, as Your Honor said yesterday -- and there's really

 3   no question as a matter of law -- it's not relevant that the

 4   employer may have had a dozen reasons for taking an answer -- or

 5   taking an action as long as the protected speech was a

 6   substantial or motivating reason.  And in this case, you've

 7   indicated that you're waiting to hear all of the evidence.  But

 8   based upon what you saw in relationship to summary judgment, it

 9   doesn't appear that there's even a question as to that.  So I

10   guess I'm a bit confused on why that's relevant at all and --

11          THE COURT:  All right.  Let me tell you.  I -- in my

12   opinion, it comes in because of the way the plaintiff's case has

13   been presented, which suggests that the telephone call was the

14   only thing that this person had done that resulted in that, and

15   that's not so.  It was a substantial and motivating factor.  I

16   think when all the evidence is in, that it will be.  They said

17   that -- I mean that's why they fired him, but not only because

18   of that.  So the law is that it doesn't have to be the only

19   reason.  All it has to be is a substantial or motivating.  Your

20   case at this point suggests that it was the only reason, and

21   that's not so.

22          MR. STEELE:  Well --

23          THE COURT:  Now, what you've put on itself may not have

24   been relevant in this case, but it has come into the -- into the

25   case.

 1          MR. STEELE:  Well, Your Honor, I won't disagree with

 2   you on the only reason, although I don't recall using that

 3   phrase, only reason.

 4          THE COURT:  I don't think you did.  But you suggested

 5   that.

 6          MR. STEELE:  What we suggested, because there has been

 7   no stipulation on the fact, that the phone call and the

 8   conversation was a substantial motivating reason.  And we have

 9   to present that and argue that because we do not have a

10   stipulation on that.  We shouldn't be penalized because there's

11   no stipulation on that and say that that opens the door widely.

12   If the door is open just a small amount in the way that you've

13   described it, you know, I guess we probably wouldn't object to

14   that.  We would reserve, I guess, our right to it when we see

15   how it actually comes out in the courtroom.

16          THE COURT:  Okay.  Then let's move on to the next

17   thing.

18          MR. STEELE:  Well, the other issues related to the

19   question about evidence or issues to the jury concerning

20   evidence of disruption.  And you said you wanted to raise that

21   yourself.

22          THE COURT:  Yes, I did.  I've been concerned about that

23   since this came up yesterday, and I want to give you-all my take

24   on this right now and let you comment on it and also as to

25   whether you think I'm off base in thinking this way and what you

 1  think that the effect of all this is on the evidence.

 2        The question of whether the speech at issue is --

 3  generally speaking, at issue -- the question of whether the

 4  speech at issue impairs -- let me see the language -- impairs

 5  discipline by superiors or among coworkers -- that's one of the

 6  things -- is relevant.  And that's in the case of *Jackson versus*

 7  *State of Alabama State Tenure Commission*, 405 F.3d 1276 at 1285,

 8  Eleventh Circuit, 2005.  Well, the *Jackson* case involved a

 9  school board.  The *Anderson* case that we've talked about at

10  times in the past -- and that's Eleventh Circuit, 2001, *Anderson*

11  *versus Burke County, Georgia*, 239 F.3d 1216 over at 1221 -- puts

12  that in the context -- puts this issue in the context of a

13  paramilitary organization because that involved the Emergency

14  Management Agency employees.  And in that case, the Eleventh

15  Circuit clearly held that the -- that a defendant -- that

16  defendant -- that was a paramilitary organization -- did not

17  have to wait for disruption or disturbance to occur before

18  acting.

19        So it seems to me that it's probably not correct to bar

20  all evidence about disruption or the possibility of disruption.

21  So it seems to me that since it's a paramilitary organization,

22  since that's an issue, since an issue in balancing is whether

23  the telephone call impairs the -- impairs discipline by

24  superiors or among coworkers, and since it being a paramilitary

25  organization, just the potential for doing that is sufficient,

 1   that evidence as to whether it actually -- the telephone

 2   actually impaired that might be relevant to whether there was a

 3   potential for it.  But in addition to that, the evidence can

 4   come in not just in a vacuum of that one telephone call but in

 5   the context that it was -- that it was made after the incident

 6   involving the press and the discussion with this plaintiff and

 7   others about what they could and could not do so that -- that

 8   when they terminated him for going to the -- talking to the

 9   mayor, it was -- it would be relevant to determine whether that

10   telephone call had a potential for impairing discipline or work

11   among coworkers in the context of it having come on the heels of

12   this -- of this other incident.  So that's the way I'm looking

13   at it right now, and I'd like to hear from both sides any

14   comments.

15          MR. STEELE:  Your Honor, I have several comments on

16   that and perhaps later a question.  But where I disagree with

17   what you said -- like it's in two parts.  I think you and I read

18   the *Anderson* case a bit differently.  I happen to have argued

19   the losing side of that case --

20          THE COURT:  Oh, really?

21          MR. STEELE:  -- at the Eleventh Circuit before Judge

22   Edmondson.  And my reading of the case is that the Court didn't

23   explain what it did, what its analysis was in respect to

24   disruption or potential for disruption.  It said very little and

25   really didn't provide guidance on that.  So -- but when you

1    bring it back to this case, we would strongly object to evidence

2    of any alleged disruption caused by the newspaper article coming

3    in on the issue of whether the phone call caused disruption.

4    And I mention at least two reasons for that.  One is although

5    you've mentioned it coming on the heels of, the phone call to

6    the mayor was actually six months after.  It wasn't the next day

7    or the next week.

8            THE COURT:  I understand.

9            MR. STEELE:  But the more important reason is this.

10   The newspaper article was public.  It was on the newspaper,

11   photos of everybody on it.  And because of that, it puts it

12   qualitatively, in the analysis of whether there's disruption, in

13   a very different factual framework than what Mr. Davis did in

14   this case.

15           In this case, rather than telephone the mayor about

16   this incident, if Mr. Davis had in fact called up that newspaper

17   reporter and, you know, gave him an earful about it and an

18   article was printed, that -- I could understand what you're

19   saying in terms of, well, what happened before might be

20   informative as to what happened now.  But Mr. Davis actually

21   chose a course of action that was unlikely to cause any

22   difficulty -- and we're not admitting that there was difficulty

23   before, but he chose a course of action that was really designed

24   not to cause that difficulty.  It was, you know, two people on a

25   conversation, he and the mayor; and if the mayor hadn't told

1  anybody about it, nobody would have known about it.  And during

2  the short time period between the conversation and the

3  termination, the information that we have is that it wasn't a

4  topic of discussion.  People generally didn't know about it.

5  There's nothing at all at the station, and it didn't become a

6  topic of discussion at the station until he was terminated.

7  Then everyone was talking about it.

8          It even is different than and I think more respectful

9  to the chief in terms of some of the arguments they've made that

10 he did not try to in the first instance go to a public meeting

11 of the city council and raise this issue before everybody where,

12 you know, I'm assuming that there's members of the press there

13 and it would be reported and perhaps even blown out of -- out of

14 proportion.

15         But to say that evidence which would clearly be

16 prejudicial relating whether, you know, a big newspaper story

17 plastered all over the paper caused disruption is informative as

18 to whether a private telephone conversation caused disruptive --

19 disruption is something that we disagree with.  And any possible

20 relevancy to that is substantially outweighed by the potential

21 for prejudice caused by that.

22         THE COURT:  Well, that's certainly a good argument.  It

23 could also be argued, however, that going to -- under the --

24 under the circumstances and the past history, that it had more

25 potential for disruption to go privately to the mayor of the

 1   city and I'll say somewhat in secret than it would have been to

 2   go through the chain of command and speak publicly at a city

 3   council meeting.  I don't know which would have been the most

 4   disruptive.  And under the *Anderson* case, it seems to me that

 5   they're saying that the decision makers in a paramilitary

 6   organization don't have to wait until something becomes public

 7   and let it fester and cause disruption before taking action but

 8   can take action to head that off.  That's the way I view it.

 9        But I -- let me hear from --

10        MR. MCKOON:  That's -- that's what I believe we argued

11   the distinction was previously, that you had a paramilitary

12   organization.  It made it different.  Because you're not talking

13   about -- you don't have to show actual disruption; you have to

14   show potential for disruption.  And it's a violation of the same

15   policy on both occasions, a policy that he clearly knew about.

16   And so I think we're entitled to show that.

17        MR. STEELE:  And we would contend, of course, that

18   they're not because they're two completely different and

19   qualitatively different events.  And if the Court disagrees with

20   that -- and our objection is on the record for that -- I would

21   request that that information, if it's to be presented at all,

22   is to be presented outside the presence of the jury because you,

23   Your Honor, as you said yesterday, will be the one deciding this

24   issue of potential disruption and that that's an issue that

25   you're going to be deciding.  If that's the case, we shouldn't

1  have this -- this prejudicial information presented in front of

2  the jury.

3         THE COURT:  Well, now, in your requested special

4  interrogatories you've asked for the jury to answer a question

5  as to whether this was disruptive.  And it may be that by the

6  time all the evidence is in, it is something to submit to the

7  jury.  I haven't crossed that bridge yet.  Until all the

8  evidence is in, I don't know.  It may be a fact issue that we'd

9  want the jury -- that the jury would need to determine or that

10 the jury might be asked to make an advisory decision on.  I just

11 don't know.  So I'm not going to take some evidence and hear it

12 outside the presence of the jury and other evidence and hear it

13 in the presence of the jury unless I'm satisfied that there's no

14 question about whether it will be relevant to the question that

15 would be asked.

16        MR. STEELE:  Well, Your Honor, what I was suggesting on

17 this issue of disruption is that you hear all of the evidence,

18 evidence that there was disruption, evidence that there wasn't

19 disruption, that you hear all of that outside the presence of

20 the jury.  I wasn't asking to pick and choose.

21        THE COURT:  Well, I understand, but you've requested an

22 interrogatory to the jury on the issue.

23        MR. STEELE:  We submitted interrogatories on -- on

24 everything we thought could potentially --

25        THE COURT:  You've changed your mind.

 1          MR. STEELE:  No, no.  We submitted them on everything

 2  we thought could potentially come before the Court.  To the

 3  extent there's an adjustment here -- I'll be perfectly frank --

 4  the adjustment is because from our perspective, this stuff

 5  shouldn't have come in anyway.  And now -- now we're in a

 6  different situation where information is coming in that we think

 7  shouldn't come in and should have been excluded but apparently

 8  is not going to be excluded.  And the Court's, you know,

 9  indicated quite clearly that the Court will be making the

10  judgment on that.  And those two factors together justify

11  presenting that information, if at all, outside the presence of

12  the jury.  I would suggest that maybe there needs to be a

13  showing of what disruption, if any, the city contends resulted

14  from that telephone call in those -- those five days.

15          THE COURT:  What do you say, Mr. McKoon?

16          MR. MCKOON:  Well, I can tell you that one thing that

17  happened was that the first thing the fire chief did was he

18  wrote a memorandum to the city manager saying the mayor should

19  not be interfering in the department or city government because

20  he said, you know, the charter of our city calls for all these

21  matters to be handled in the department and then on up from

22  there.  And I can tell you right now the mayor is going to

23  testify that he didn't like hearing that.  But, you know, there

24  was some friction caused by it just from that standpoint.

25          The other thing that I expect the chief is going to

1    testify to is that this was the very kind of thing he was trying

2    to -- this man had only been the permanent chief of the

3    department since May of 2005.  We're now in April of 2006.  He's

4    sitting there trying to get this department in order by -- by

5    trying to come by and do a systematic enforcement of the rules.

6    And when somebody goes around those rules, it puts him in a

7    situation like how is this going to make me look if I let

8    somebody go around these rules.  And that's what he's going to

9    testify to, I expect.  And so that's the -- there was not

10   only -- I think there's going to be a showing of actual

11   disruption, but there's going to be a showing of the potential

12   for more.  And that's what we intend to put on.

13          MR. STEELE:  If the chief's letter -- inaccurately,

14   from the mayor's point of view -- expressing his opinion that

15   the mayor was overstepping his bounds is disruption, then that

16   is not the fault of David Davis.  It's the fault of the chief

17   putting himself in the position of trying to tell the mayor what

18   the city charter and rules provide and doesn't provide,

19   something that the mayor took umbrage at.  But that wasn't

20   anything that David Davis did or that he can be held responsible

21   for.

22          Secondly, to look at this appropriately, you have to

23   look at the time period that we're looking at here.  And there's

24   no evidence that anyone other than the chief and the top

25   management people knew or had any issue with there being this

1  short, brief, cordial phone call to the mayor.  There's simply

2  no evidence of that.

3         This gets back to the qualitative difference.

4  Mr. McKoon's description makes it sound more like this was done

5  in public and broadcast around instead of being something that

6  you've got a mayor who said I have an open-door policy and

7  you've got an employee who calls the mayor.  And the mayor

8  didn't have to talk to him, but the mayor had no problem talking

9  to him, and that was it.  Had the mayor not mentioned it to

10  Mr. Roberts, nobody would have known about it.  But the

11  potential disruption can't be the disruption because management

12  people didn't like that David Davis disagrees with them on an

13  issue that's before the city council.  Disagreement with the

14  chief over a city council matter can't be the test, because if

15  it is, then freedom of speech is only freedom to speak in a

16  matter that your boss approves and in favor of your boss's

17  viewpoint, which, of course, is not freedom of speech at all.

18         THE COURT:  Well --

19         MR. MCKOON:  May I respond to that briefly?

20         THE COURT:  Yes.

21         MR. MCKOON:  You know, of course, it is our contention

22  that the rule, the ASOP, is a reasonable rule.  To say that

23  David Davis did not cause this disruption, to me, is -- is

24  ludicrous.  Had he followed the rule, we wouldn't have been in

25  this situation, you know.  And to say that, well, if you break

1   the rule and nobody knows about it, then it's okay, again, to

2   me, that's kind of silly.

3            MR. STEELE:  Well --

4            MR. MCKOON:  To sit here and say that -- and this is

5   the last thing I'll say about it.  To say that it is not as

6   disruptive because the public didn't know about it, to me, is

7   not the test.  There's a lot of disruption that goes on behind

8   the scenes in departments that causes problems if people are not

9   following the rules.  And that's our point.

10           THE COURT:  All right.  Well, I'm going to start this

11  trial in four minutes.  I'm going to allow testimony concerning

12  actual disruption, potential for disruption from the telephone

13  conversation.  And the potential for disruption and actual

14  disruption can be put in context of why it was considered to be

15  potentially disruptive or actually disruptive and not restricted

16  to just what happened in those few days between the telephone

17  conversation and the termination.

18           Now, if at an appropriate time, Mr. Steele, you want to

19  get anything further on the record about that --

20           MR. STEELE:  And we will.

21           THE COURT:  -- I'll be happy for you to.  But that's

22  the way I'm going to rule.  Is there anything else we need to

23  take up?

24           MR. MCKOON:  Judge, I haven't -- have you got anything

25  else?

1          MR. STEELE:  No.

2          MR. MCKOON:  Judge, I haven't brought up anything, and

3    I know you've got a time limitation.  But, you know, I got the

4    transcript of these interviews that we had with Captain Land and

5    Captain Taylorson and I think it's Sergeant Bill --

6          MR. DUGAN:  Pitts.

7          MR. MCKOON:  -- Pitts -- I'm sorry -- that was in here

8    the other day.  And, you know, I don't know what they intend to

9    ask them about -- about me involving all of this.  I've gone

10   back over these transcripts.  And it looks like to me the only

11   thing I could see that they could possibly complain about is

12   that they claim that I did not tell these people that they did

13   not have to talk to me.

14         If they want to ask that, I have no problem with that.

15   But to go any further into that I think is prejudicial and it

16   has no probative value whatsoever, because everyone that

17   testified said that they were going to tell the truth.  They got

18   an instruction from the Court that absolutely nothing was going

19   to happen to them as a result of telling the truth.  And in

20   fact, each one of them acknowledges in here that I told them

21   that nothing like that was going to happen.

22         THE COURT:  I don't know what they plan to ask about

23   that.  Do you want to respond to that?

24         MR. STEELE:  My response to that is twofold.  First of

25   all, as we contended yesterday and continue to contend, the fact

1   that people were instructed to report back on our trial

2   preparation and what we asked them, we think, you know, is a

3   violation and it's disruptive and inherently reduces Mr. Davis's

4   ability to have a fair trial.  And the Court in its ruling

5   yesterday decided, as I understood it, that, well, I don't think

6   it's so severe that I'm going to exclude it, but you're entitled

7   to bring all of this out so that the jury --

8              THE COURT:  That's right.

9              MR. STEELE:  -- can just have all the information.  The

10  jury can give it whatever weight it chooses or not to give when

11  it's considering the testimony of those individuals.  And I

12  think that if it's going to be allowed, I think that --

13             THE COURT:  I'll allow that --

14             MR. STEELE:  -- we should be able to do that.

15             THE COURT:  -- and you can object to any specific

16  question.

17             MR. MCKOON:  Can I just get one other thing on the

18  record?

19             THE COURT:  Okay.

20             MR. MCKOON:  When we were in here yesterday, it is my

21  recollection that Mr. Steele acknowledged that he had asked

22  these witnesses the same questions in regard to what I had asked

23  the witnesses.

24             Is that correct?

25             MR. STEELE:  Some of them.

 1          MR. MCKOON:  Okay.  Well, which ones did you not?

 2          THE COURT:  You can ask them about it.

 3          MR. MCKOON:  Well, I understand that.  But I'm just

 4  saying to say that that interfered with his trial preparation --

 5          THE COURT:  Well, we're not --

 6          MR. MCKOON:  -- I mean he did the same thing I did.

 7          THE COURT:  We're not going by --

 8          MR. STEELE:  The distinction --

 9          THE COURT:  Excuse me.

10          MR. STEELE:  Sorry.

11          THE COURT:  We're not talking about that.  We're just

12  talking about whether he can ask those witness those questions,

13  and I'll allow it.  Let's go.

14          MR. MCKOON:  All right.

15     (Chambers conference concluded at 2:00 p.m., at which time

16      proceedings reconvened in open court with the jury present,

17      as follows:)

18     (Call to Order of the Court)

19          THE COURT:  Well, welcome back.  It turned out we

20  didn't have dangerous weather over here after all, but I guess

21  it's better to be safe than sorry.  The weather reports were

22  still calling for the potential up until the end of the

23  morning.

24          I do want to make up for a little bit of that time by

25  going this afternoon until around -- not later than six o'clock,

 1    but going a little later so that we can move the trial along.

 2            Mr. McKoon, were you through with your

 3    cross-examination of Mr. Davis?

 4            MR. MCKOON:  Judge, I would like to ask another

 5    question, if it's all right.

 6            THE COURT:  Take the stand.  Sir?

 7            MR. STEELE:  Your Honor, Mr. McKoon rested yesterday at

 8    the end of the examination.  It was plain on the record that he

 9    rested, and we indicated that we would be starting with

10    redirect.

11            THE COURT:  I didn't understand that.  I'll let him --

12            MR. MCKOON:  I thought I asked for permission to recall

13    him.

14            THE COURT:  Yes.  I'll let him continue with

15    cross-examination.

16            Take the stand, please, Mr. Davis.  You're still under

17    oath.

18            THE WITNESS:  Okay.

19            **DAVID PAUL DAVIS**, the witness, having been previously

20    duly sworn, resumed the stand and testified further as follows:

21                      FURTHER CROSS-EXAMINATION

22    BY MR. MCKOON:

23    Q.  Mr. Davis, I just have a few more questions for you, and I

24    won't be very long, I hope.  This incident involving Mr. Bennett

25    where you say that he told you that it was okay that you go to

```
 1  the mayor with your concerns -- do you remember testifying about
 2  that yesterday?
 3  A.   Yes, sir.
 4  Q.   And he was your captain; is that correct?
 5  A.   Yes, sir.
 6  Q.   When you filed a complaint in this case and an amended
 7  complaint, do you know whether or not there's anything in those
 8  documents about this conversation with Mr. Bennett?
 9          MR. STEELE:  Objection.  Relevancy.
10          THE COURT:  Yes.  I sustain.
11  Q.   Well, let me ask you this.  At the time that you were called
12  in to be discharged -- I guess that's when it happened -- was
13  Captain Bennett there?
14  A.   No, sir.
15  Q.   Okay.  He was not there?
16  A.   No, sir.
17  Q.   All right.  You're sure about that?
18  A.   Yes, sir.
19  Q.   Okay.  Well, who was there?
20  A.   The day I was terminated?
21  Q.   Yes, sir.
22  A.   It was the personnel director, which is Ms. Barbara Goodwin,
23  the fire chief, which is Wallace Hunter, and the deputy chief,
24  which was Roy Waters.
25  Q.   Okay.  Is that the first time you'd been called in and asked
```

1    about this?

2    A.  I was asked I think on Wednesday to write a statement.

3    Q.  Okay.  And who was present on that day?

4    A.  I'm not real sure.  I'd have to check the record.

5    Q.  Do you know if Roy Waters was the person who asked you to

6    write the statement?

7    A.  Yes, sir.

8    Q.  And he was the deputy chief?

9    A.  Yes, sir.

10   Q.  And do you know if he called you in to an office and asked

11   you if in fact you had followed the chain of command?

12   A.  I think he asked me first if I called the mayor.

13   Q.  Okay.  And then the second -- and you said yes?

14   A.  Yes, sir.

15   Q.  And then the second question was did you follow the chain of

16   command?

17   A.  Yes, sir.

18   Q.  And what did you tell him?

19   A.  Whatever's on the statement that I wrote.

20   Q.  All right.  And was Captain Bennett present on that

21   occasion?

22   A.  I don't remember if he was or not.

23   Q.  Okay.  Well, did you say to Chief Waters, well, you know, I

24   got permission from Captain Bennett?

25   A.  No, sir.

1  Q.  Why didn't you?

2  A.  I mean I didn't know I was going to be fired.  I just was

3  told to write a statement.

4  Q.  Well, did you understand that you were being written up or

5  that there was some problem with what you had done?

6  A.  No, sir.

7  Q.  So you were just called in and asked the questions we just

8  went over and asked to write a statement about it, and then what

9  happened after that?

10 A.  I was told to sit there at station -- firehouse one.

11 Q.  What was the next thing that happened in regard to this

12 incident?

13 A.  I was told to go back to my station, and I finished my

14 shift.

15 Q.  And then when were you next contacted about it?

16 A.  When I was at home.

17 Q.  And is that when you were called back down to the personnel

18 office?

19 A.  I was called at home and told to report to the personnel

20 office.  Yes, sir.

21 Q.  And at that time, were you given a reason as to why you were

22 being called down there?

23 A.  Well, they gave me a sheet of paper that listed why I was

24 being terminated.

25 Q.  Okay.  And that's this written warning form we've talked

1   about?

2   A.   Yes, sir.

3   Q.   The one that you signed; is that correct?

4   A.   Yes, sir.

5   Q.   This one right here.  And when you went in there, did they

6   let you know that when you called the mayor, that you were being

7   terminated for not following the chain of command?

8   A.   I don't remember those words.

9   Q.   Okay.  You don't remember anything about chain of command.

10  A.   Right.  I was told to read that document detailed account.

11  Q.   Well, you were at the end of your eight-year career, and you

12  were about to be fired.  I guess you were surprised.

13  A.   Yes, sir.

14  Q.   And if -- did you not know it was because you had failed to

15  follow the chain of command?

16  A.   I thought I was fired for calling the mayor.

17  Q.   Okay.  So you didn't know it was because you hadn't followed

18  the chain of command?

19  A.   I was told it was because I called the mayor.

20  Q.   I understand what you were told.  My question was, you did

21  not know it was because you failed to follow the chain of

22  command?

23  A.   All I did know was it was because I called the mayor.

24  Q.   So that's -- that's your best answer to that question?

25  A.   Yes, sir.

1  Q.  All right.  Did you at that time say, well, you know, I got

2  permission from Captain Bennett to call the mayor?

3  A.  No, sir.

4  Q.  Well, you had a personnel review board hearing, didn't you?

5  A.  Yes, sir.

6  Q.  And at the personnel review board hearing, did you at any

7  time while you were testifying before the personnel review board

8  say, you know, and by the way, I had permission to call the

9  mayor from my captain, Captain Bennett?

10  A.  No, sir.  I did not tell them that.

11  Q.  Well, did you think that would be important, since that's

12  part of your allegation in this case?

13  A.  Yes.

14  Q.  Why did you leave that out when you talked to the personnel

15  review board?

16  A.  Because he asked me not to.

17  Q.  Who asked you not to?

18  A.  Captain Bennett.

19  Q.  Oh.  When did he do that?

20  A.  From the time I was terminated till I was waiting for my

21  panel review board, in between that time period.

22  Q.  Okay.  So you had conversations with Captain Bennett about

23  that during that period of time?

24  A.  Yes, sir.

25  Q.  And where did those conversations take place?

```
 1   A.   At his motorcycle shop.

 2   Q.   And where is that?

 3   A.   It's in Columbus.

 4   Q.   Where in Columbus?

 5   A.   Down the road from the bank that I use.

 6   Q.   Do you know what street it's on?

 7   A.   I think it was on 13th Street.

 8   Q.   13th Street in Columbus.

 9   A.   Yes.

10   Q.   What's the name of his motorcycle shop?

11   A.   C&B Customs.

12   Q.   Did you go over there?

13   A.   Yes, sir.

14   Q.   And what was your purpose in going over there?

15   A.   I was driving by from the bank and I saw him.  And he waved,

16   and I pulled in the parking lot.

17   Q.   Well, tell -- who all was present for this conversation you

18   just told us about?

19   A.   Just me and George, Captain Bennett.

20   Q.   And what was said?

21   A.   He asked me when my panel review board hearing was, and I

22   told him that I'm waiting for them to give me a date.

23   Q.   Okay.  What else was said?

24   A.   And he told me -- asked me if, you know, I was having a

25   legal representative, and I said yes.  And he said don't worry
```

1   about it; you're going to be okay.

2   Q.   Okay.  Anything else said?

3   A.   And then he told me that -- not to say anything about our

4   conversation on that Sunday, that Wallace would kill him.

5   Q.   Is that right?

6   A.   Yes, sir.

7   Q.   Okay.  And, of course, only you and Mr. Bennett were present

8   when that happened.

9   A.   Yes, sir.

10  Q.   Did the -- did your captain have the authority to refer you,

11  let's say, to the fire chief?

12  A.   My captain has the authority to do whatever he wants to.

13  He's my captain.

14  Q.   What I'm trying to ask -- maybe I'm not doing a good job,

15  Mr. Davis -- is when you're coming up the chain of command, he's

16  your -- your captain is your immediate supervisor; is that

17  correct?

18  A.   Yes, sir.  He's my boss.

19  Q.   And if you take a problem to him and he can't resolve it,

20  then what's the next course for him?

21  A.   For my captain?

22  Q.   Yes, sir.  Where can he send you?

23  A.   To his boss.

24  Q.   And who is that?

25  A.   His boss would be an assistant chief.

1  Q.  Okay.  And now it's called a battalion chief, but then an

2  assistant chief, right?

3  A.  I don't know.  They were assistant chiefs when I was there.

4  Q.  Okay.  And so if it went to the assistant chief and you went

5  up to the assistant chief, what would the assistant chief have

6  the authority to do?

7  A.  Are you talking about a grievance policy or --

8  Q.  Any -- any complaint, grievance, whatever you want to call

9  it.  If you wanted to go up the chain of command with a problem,

10  what would be the next person up the chain of command from the

11  assistant chief?

12  A.  After the assistant chief would be a deputy chief.

13  Q.  And who after that?

14  A.  That would be the fire chief.

15  Q.  And who after that?

16  A.  The city manager.

17  Q.  Okay.  And that's the chain of command, isn't it?

18  A.  As far as, what, if I have a problem?

19  Q.  As far as the chain of command if you have a problem, yes.

20  A.  In the fire department, yes.

21  Q.  Okay.  Well, that's the department you were in; is that

22  right?

23  A.  When I'm on duty, yes.

24  Q.  Okay.  So if Captain Bennett told you you could go to the

25  mayor, he wouldn't have the authority to do that, would he?

1    A.   Yes, he could.

2    Q.   Oh, he could?

3    A.   Yes, sir.

4    Q.   That's your understanding of the chain of command?

5    A.   No.  But that's what the captain told me.  And the

6    captain -- if he says that, he's my immediate supervisor.  And

7    if I'm satisfied with his answer, then I don't have to go any

8    further.

9    Q.   All right.  So it's your testimony here under oath today

10   that Captain Bennett sent you directly to the mayor.

11   A.   The captain told me to call the mayor.

12   Q.   Okay.  Now, in addition to that, is it also your testimony

13   here today that you were fired because you were a union

14   president?

15          MR. STEELE:  Objection, Your Honor.

16          THE COURT:  Yes.

17          MR. STEELE:  Relevance.

18          THE COURT:  That's not an issue in the case.  I

19   sustain.

20          MR. MCKOON:  Okay.

21   Q.   Well, it is your -- well, let me ask you this, because

22   there's some confusion about this, I guess.  When you were going

23   to the mayor with this probationary policy, if it didn't affect

24   you and you were just going as a -- like you said, as a private

25   citizen, is that -- is that what you're saying happened in this

1  case, that the policy did not affect you?

2  A.  That's correct.

3  Q.  All right.  If the policy had affected you, then would you

4  have followed the chain of command?

5  A.  If I'm on duty and I felt like I had to file a grievance, I

6  would use the chain of command.

7  Q.  So the bottom line on the answer to every question is, in

8  your mind, you don't have to follow any standard operating

9  procedure or any rule of your fire department if you are off

10  duty.

11        MR. STEELE:  Objection, Your Honor.  Not only is that

12  an inaccurate recitation of the witness's testimony, it's also

13  posing a hypothetical that the witness should not have to

14  respond to.

15        THE COURT:  Well, I sustain as to the breadth of the

16  question.  I'll let him go into this as to what he's contending.

17        MR. MCKOON:  I'm going to ask it differently, then.

18  Q.  Is it your position that anytime you're not on duty as a

19  fireman, that you do not have to follow the standard operating

20  procedures of the fire department?

21        MR. STEELE:  Objection.  Hypothetical.

22        THE COURT:  Overruled.

23  A.  Could you repeat the question?

24  Q.  Yes, sir.  Is it your position that when you're not on duty

25  as a fireman, that you do not have to follow the standard

1    operating procedures of the Phenix City Fire Department back

2    when you worked for them?

3              MR. STEELE:  Objection.  Relevancy.

4              THE COURT:  Overruled.

5    A.   When I worked for the fire department, I would follow the

6    rules and regulations that I'm required to while I'm on duty.

7    Q.   So is it your position that you don't have to do that when

8    you're off duty?

9    A.   If it infringes on my rights as a citizen, then I would

10   think that the Constitution would be predominantly more

11   important than an SOP for the fire department when I'm off

12   duty.  I'm a citizen, not a firefighter.

13   Q.   And yesterday I believe you said you were just going to the

14   mayor like you would about any other ordinance with the city; is

15   that correct?

16       I'm sorry.  I lost my train of thought.  Yesterday you

17   testified that you were just going to the mayor like you would

18   for any kind of ordinance that came before the city council.

19   But this wasn't just any kind of ordinance, was it?  I mean it

20   wasn't the same as a zoning ordinance, for instance, that

21   affected all the citizens of Phenix City.

22   A.   Oh, it absolutely --

23             MR. STEELE:  Objection.  Relevancy.

24             THE COURT:  Overruled.

25   A.   It did affect all the citizens of Phenix City.

1   Q.  Okay.  Well, wasn't it -- wasn't it concerning the fire

2   department and the police department and the building inspection

3   department?

4   A.  No, sir.  It was a matter of public concern.

5   Q.  The ordinance itself, though, had to do with the

6   probationary period for people that would be newly hired in the

7   fire department, the police department, and the building

8   inspection department; isn't that correct?

9   A.  Yes.  That's what -- the agencies, the public safety

10  agencies, is what it --

11  Q.  So it pertained to your organization that you were a part

12  of; is that right?

13  A.  Yes.  I was a part of the public safety.

14  Q.  So like I said, in that -- in that sense, it's not just an

15  ordinance that affects parks and recreation, for instance, or

16  zoning or something like that.  It affected your department; is

17  that right?

18  A.  It affected public safety.

19  Q.  All right.  Which was your department.

20  A.  I was in the fire department, which is under public safety.

21  Q.  And under the rule, just to be clear, if it has to do with

22  the fire department, the work-related business of the fire

23  department -- was this work-related business of the fire

24  department?

25  A.  No, sir.

1  Q.  It was not?

2  A.  No, sir.

3  Q.  Wasn't related in any way to the work of the fire

4  department?

5  A.  No, sir.  It was proposed legislation.  It wasn't even

6  enacted.

7  Q.  All right.  Well, then I guess we just won't agree on that.

8  Let's go back to one other thing about that.  You understand

9  that as a citizen, even though you don't live in the city of

10  Phenix City, but if you did live in the city of Phenix City,

11  then if you had a problem with your garbage pickup or you had a

12  problem with a pothole in front of your house or with the way

13  traffic was being directed in front of your office or if -- like

14  the way the street is tore up in front of my office right now,

15  any --

16         MR. STEELE:  Objection, Your Honor.  Relevancy.

17         MR. MCKOON:  Can I --

18         THE COURT:  I haven't heard the question yet.

19  Overruled.

20         MR. MCKOON:  Thank you, Your Honor.  I'd like to finish

21  it.

22  Q.  -- that you could call up any elected representative you

23  wanted to about any of that sort of business?

24         MR. STEELE:  Objection, Your Honor.  Relevancy.

25         THE COURT:  Well, I'll overrule to the extent that the

```
 1   question is asking about a policy of the city and whether it
 2   would restrict him from doing things that didn't have anything
 3   to do with work.  You can answer it.
 4   Q.  I guess that's my question.  My question is --
 5   A.  Okay.
 6   Q.  -- if it didn't have anything to do with the fire
 7   department, you understood you could call anybody you wanted to
 8   about it.  Is that not correct?
 9   A.  Are you asking me as a citizen, do I have the right to
10   contact elected officials?
11   Q.  About anything other than fire department business.  I'm
12   going -- let's take the fire department business out of it right
13   now.
14   A.  Yes.  I have that right as a citizen.
15   Q.  Okay.  And you understood you could do that anytime you
16   wanted to.
17   A.  Correct.
18   Q.  All right.  And you could call the mayor or the city
19   councilman, the city manager, any department head, anybody about
20   something that's not fire-department-related without any
21   consequence whatsoever or without having to go through any sort
22   of procedure to do it; is that correct?
23   A.  No, sir.  I don't think that would be correct.
24   Q.  Okay.  Well, correct me.
25   A.  Well, if I was on duty, you know, I don't think I would be
```

1  making phone calls to anybody I wanted to.

2  Q.  I'm just talking about as a private citizen, sir.

3  A.  Oh, yes.  As a private citizen, I feel like I have rights.

4  Q.  And the only thing this policy requires is that if you're

5  handling work-related business of the fire department or a

6  proposal of the fire department, is that you'd have to go

7  through these steps.  Do you agree with that?

8        MR. STEELE:  Objection, Your Honor.  There's not a word

9  in that document about a proposal of the fire department.  It's

10 misrepresentation of the document.

11       THE COURT:  Overruled.

12 Q.  Do you understand what I'm saying, Mr. Davis?

13 A.  If there was something that was work-related and in place as

14 part of the rules and regulations, then yes, I would follow that

15 SOP.

16 Q.  Okay.  If it had to do with the fire department.

17 A.  Already had to do with the fire department.

18 Q.  Exactly.  And that by following this SOP, if you couldn't

19 get satisfaction in the chain of command, that eventually you

20 could get to the city -- the city manager would arrange a

21 hearing with the city council; is that correct?

22 A.  In theory.

23 Q.  In theory.  Okay.

24 A.  Yes.

25 Q.  So all this policy requires you to do, basically, is to take

```
 1  a problem that you have up the chain of command before taking it
 2  to city council; isn't that right?
 3  A.  Not necessarily.
 4         MR. MCKOON:  Okay.  I don't have anything further.
 5         THE COURT:  Mr. Steele, cross-examine?
 6         MR. STEELE:  Just briefly, Your Honor.
 7                        REDIRECT EXAMINATION
 8  BY MR. STEELE:
 9  Q.  Mr. Davis, yesterday on cross-examination you were
10  questioned regarding when you received phone calls notifying you
11  about a newspaper article concerning the proposed ordinance.
12  Would you please tell the jury when you learned of the proposed
13  ordinance, where you were, and how you learned.
14  A.  When I first learned of the proposal to lengthen the
15  probationary time, I was on duty.  I don't know the date, but it
16  was a Sunday.  I received a phone call from Bill Pitts, who told
17  me to look in the paper.  I looked in the paper and saw that
18  there was a proposal to change a part of the merit system.
19  Q.  Now, Mr. Davis, could you explain to the jury, if you
20  recall, what you meant during your review board hearing when you
21  mentioned calls coming into the house?
22  A.  The "house" phrase could mean firehouse or house, home.  I
23  don't remember exactly.  That was two years ago.  But I am
24  absolutely positive that when I found out about the probation
25  time, I was on duty at the firehouse and received a call from
```

1  Bill Pitts to look into the paper, the Sunday paper.

2  Q.  And Mr. Davis, you were also questioned on cross-examination

3  on this idea that your -- because you work 24-hour shifts, that

4  you're sleeping on the job during part of that period.  Would

5  you explain to the jury how frequently you were able to obtain

6  even six hours of uninterrupted sleep or four hours of

7  uninterrupted sleep while you were employed by the Phenix City

8  Fire Department?

9  A.  All I can say is more times than not, your sleep is

10  interrupted.  I don't recall many, many nights that you go to

11  bed and sleep all night.  That doesn't happen.  That's why they

12  give you time off, because you're wore out after you work.  I

13  mean maybe a long time ago you used to be able to sleep through

14  the night; but since I've been in the fire service, that's not a

15  reality because we run emergency medical calls.  Fires don't

16  come as often as they used to, but EMS calls are like 80

17  percent.  And people call 911 because they're sick a lot during

18  the nighttime.

19  Q.  And Mr. Davis, during your 24-hour shift, are you -- is it

20  permissible for you to go home to sleep?

21  A.  No, sir.

22  Q.  You're required to remain at the station?

23  A.  Yes, sir.  You can't leave.

24  Q.  Mr. Davis, would you explain to the jury a couple of

25  examples of the type of calls that you received in the middle of

1  the night that prevented you from sleeping?

2  A.  Well, I've been on calls to where people's houses were on

3  fire.  You pull up in the yard and, you know, they're screaming

4  save my house, save my house.  You go in; it's hot.  You risk

5  your life because people are counting on you.  Your ears -- you

6  get so hot in there that your ears melt into your protective

7  gear; when you pull it off, pieces of your ear come off.  You

8  can't sleep the rest of the night because your ears are

9  blistered and swole up like cantaloupes.

10      You go on calls and people have been driving, and they roll

11  their cars over and the whole family's, you know, out on the

12  ground.  And one person that may be still conscious with broke

13  legs is saying, you know, save my babies, save my babies.  That

14  kind of stuff happens any shift you can go to work.  You never

15  know.  And then, you know, you're expected to just be able to go

16  back to sleep after that.  It doesn't matter how long you're in

17  the business.  I mean you're a human being; you can't just see

18  that stuff and go back and turn it off.

19  Q.  Mr. Davis, when you're on duty, are you required to respond

20  to calls like that even if they come during the middle of the

21  night?

22  A.  Even if you're using the bathroom, you have to stop what

23  you're doing and go on a call.

24          MR. STEELE:  Thank you.  Nothing further.

25          THE COURT:  Any recross on matters raised in redirect?

 1          MR. MCKOON:  No, sir, Your Honor.

 2          THE COURT:  All right.  You can come down.

 3          THE WITNESS:  Thank you, sir.

 4          THE COURT:  Call your next witness.

 5          MR. STEELE:  The plaintiff calls Mayor Hardin as an

 6     adverse witness, sir.

 7          THE CLERK:  Would you raise your right hand, please.

 8       (The witness is sworn)

 9          THE CLERK:  Be seated.

10          MR. STEELE:  If I may.

11          THE COURT:  Sure.

12          **JEFFREY SCOTT HARDIN**, the witness, having been duly

13     sworn, testified, as follows:

14                          DIRECT EXAMINATION

15     BY MR. STEELE:

16     Q.  Sir, will you please state your name for the record.

17     A.  Jeffrey Scott Hardin is full name.

18     Q.  And Mr. Hardin, are you presently the mayor of the City of

19     Phenix City?

20     A.  Yes.

21     Q.  And how long have you been the mayor of Phenix City?

22     A.  Approximately three and a half years.

23     Q.  And what is your profession other than mayor, or is that

24     your full-time?

25     A.  No, sir.  That's a part-time position.  I also have some

1   real estate investments and own a business here in Opelika.

2   Q.  Okay.  Now, in Phenix City, am I correct that the form of

3   government is known as a city council slash city manager form of

4   government?

5   A.  Correct.  Council/manager form.  Correct.

6   Q.  Okay.  And under that form of government, as I understand

7   it -- and correct me if I'm wrong -- the mayor of the city

8   chairs the city council meetings, correct?

9   A.  Correct.

10  Q.  Has certain ceremonial obligations or functions to perform;

11  is that correct?

12  A.  Correct.

13  Q.  Other than that, in every other respect, the mayor of the

14  city functions as a fully functioning member of the city

15  council; is that correct?

16  A.  Yes, sir.

17  Q.  In fact, there are, what, five members on the city council?

18  A.  Including myself, five.

19  Q.  Including yourself?

20  A.  Yes, sir.

21  Q.  Three of which cover specific districts, and then two kind

22  of at-large members that are elected from the city as a whole?

23  A.  Correct.

24  Q.  And the mayor is elected from the city as a whole?

25  A.  Yes, sir.

1   Q.   Your vote on the council, you get one vote just like any

2   other council member?

3   A.   Correct.

4   Q.   And your vote counts the same as any other council member?

5   A.   Yes, sir.

6   Q.   What year was it, again, that you ran for mayor?

7   A.   It would be 2004.

8   Q.   And is that the first time you ran for mayor?

9   A.   Yes, sir.

10  Q.   If you would, briefly tell us your prior experience on the

11  city council.

12  A.   I had --

13  Q.   Is this your first time on the council?

14  A.   No, sir.  I had served -- I ran in 1998 and served a term,

15  which at that time, the terms were three years.  I served until

16  2001 as the council member at large and also was the mayor pro

17  tem at that time.

18  Q.   Okay.

19  A.   And that was my prior experience.  And the next term I did

20  not run and then ran for mayor.

21  Q.   Okay.  Now, when you ran for mayor of Phenix City, you

22  welcomed the support of various groups or organizations within

23  the city who sought to assist you in your efforts of being

24  elected, correct?

25  A.   Yes, sir.

1   Q.   And it's also correct that one of the groups or

2   organizations that offered support to your candidacy was the

3   local firefighters association?

4   A.   Yes, sir.

5   Q.   In fact, sir, it's true that that association made a

6   donation to your campaign?

7   A.   Yes, sir.

8   Q.   And also took other steps to support the campaign, such as

9   putting up yard signs and the like?

10  A.   Yes, sir.

11  Q.   Now, through that effort or through any other effort, at

12  some point in time you became aware of who Mr. Davis is,

13  correct?

14  A.   Yes, sir.

15  Q.   And you knew he was a firefighter or a sergeant employed by

16  the fire department?

17  A.   I didn't know him specifically, but I knew that he was

18  employed as a fireman, correct.

19  Q.   Okay.

20  A.   Excuse me.

21  Q.   You didn't know his rank, but you knew he was a firefighter

22  for the city; is that correct?

23  A.   Yes, sir.

24  Q.   And at some point in time, you became aware that he had a

25  leadership role in the firefighters organization?

1  A.  I don't know if I ever did before I was elected, because I

2  think there were some changing of positions about that time.  So

3  it was around the election or right after that I knew he was --

4  had a leadership role.  Yes, sir.

5  Q.  Okay.  So at some point, you learned; you're just not sure

6  exactly when?

7  A.  Correct.

8  Q.  Now, did you attend any meetings or functions that the

9  firefighters association held?

10 A.  I did.  I was invited -- if I'm correct on the attendance, I

11 was invited once as a candidate along with other candidates.

12 And then once after I was elected, I was invited to a function

13 that was more of a celebration to celebrate a retirement of a

14 firefighter, which I think -- assume was a member of the

15 association.  But he and I had also went to high school

16 together.  So I think total, I went to two different functions

17 that were put on by the association, one as a candidate and then

18 one as -- as an elected person.

19 Q.  Okay.  So you went to one before you were elected and one

20 after you were elected.

21 A.  To the best of my memory, that is correct.

22 Q.  Do you know whether or not Mr. Davis was present at those

23 occasions when you appeared at the firefighters function?

24 A.  I think he was.  Yes, sir.

25 Q.  Now, sir, I believe that you testified previously in your

1   deposition that at some point in time there was an issue in the

2   department concerning the subject of swap time.  Are you

3   familiar with that?

4   A.  Yes, sir.

5   Q.  And that certain firefighters spoke to you concerning that

6   issue?

7   A.  I had run into -- if I'm not mistaken, I had run into a

8   firefighter at McDonald's about that, and something was

9   mentioned about swap time.  Yes, sir.

10  Q.  And that was after you were already mayor?

11  A.  Yes, sir.  I think so.  Yes, sir.

12  Q.  Did you tell anyone within the fire department or the city

13  manager's office that you had that conversation?

14  A.  I did not.

15  Q.  What, if anything, did you do with the information that you

16  received from -- from that firefighter?

17  A.  I didn't do anything with it.  Those decisions are typically

18  internal decisions that are made by the city manager.

19  Q.  So you listened to the firefighter, but it didn't go further

20  than that?

21  A.  Correct.

22  Q.  Now, has anyone told you that you did anything wrong by

23  listening to that firefighter?

24  A.  Through this process, I have -- my assumption has always

25  been that, you know, when someone comes to you, that they have

1  typically followed what is being known as a chain of command.

2  So as -- through this process, you know, typically, I've learned

3  not to assume that, that you ask the question when someone

4  approaches you about their job, have you followed the chain of

5  command prior to coming to the city council or -- members or the

6  mayor.

7  Q.  Well, isn't it true, Mr. Mayor, that you told the

8  firefighters on at least one, maybe more occasions, that you, as

9  mayor, would have an open-door policy?  Isn't that correct?

10  A.  I tell pretty much everyone that I come in contact with that

11  I have an open-door policy, yes.

12  Q.  When you told the firefighters that you had an open-door

13  policy, you did not say one word about the chain of command, did

14  you?

15  A.  No.

16  Q.  In fact, when you were deposed in this case and were asked

17  about your open-door policy, you talked about how important it

18  was for you in the functioning of your role as mayor to hear the

19  views of members of the citizenry so that you could take those

20  into consideration; is that correct?

21  A.  It's very important.  Yes, sir.

22  Q.  And as I understood your testimony, you did not believe that

23  there was anything wrong with you listening to that information,

24  that the issue became what, if anything, you do with the

25  information afterwards.  Is that fair?

1   A.   Correct.

2   Q.   Do you know, was there any investigation of the firefighter

3   that spoke with you about swap time?

4   A.   I wouldn't think so.   I wouldn't know that, but I wouldn't

5   think so.

6   Q.   Not to your knowledge?

7   A.   Not to my knowledge at this point.

8   Q.   To your knowledge, there was no discipline of that

9   firefighter because he spoke to you?

10  A.   No, sir.   I wouldn't know that.

11  Q.   When you spoke to that firefighter about swap time, did you

12  indicate to him or her in any way that, listen, I can't talk to

13  you about that?

14  A.   I did not.

15  Q.   You simply listened to the concern because you're the mayor

16  of the city.

17  A.   Right.

18  Q.   Now, as mayor and a member of the council, it's the role of

19  the council, if I understand properly, to act as the legislative

20  body for the city.   Is that fair?

21  A.   Basically, a board of directors would be a good description

22  or a legislative body, I would -- depending on, you know, how

23  your thinking on each one of those would be.

24  Q.   Well, Mr. Mayor, the City of Phenix City has certain

25  ordinances, correct?

1  A.  Yes, sir.

2  Q.  Essentially laws that govern the city and how it operates,

3  correct?

4  A.  Correct.

5  Q.  And am I also correct that it's the role of the city council

6  to consider and approve or disapprove ordinances or proposed

7  legislation?

8  A.  Correct.  Yes, sir.

9  Q.  That responsibility rests with the council.

10  A.  Yes, sir.

11  Q.  Now, if you have a proposed ordinance before you at the

12  council, you'd agree with me, wouldn't you, that it's important

13  before you vote on it to gather information and learn the pros

14  and cons and the details of the ordinance?

15  A.  We try to do our due diligence on every ordinance.  Yes,

16  sir.

17  Q.  Because otherwise, you may not know what you're voting on,

18  correct?

19  A.  Well, I would hope that everyone sitting around the table

20  knows what they're voting on prior to casting their vote.

21  Q.  And that's important that they know what they're voting on.

22  A.  Yes, sir.

23  Q.  And one of the ways you learn what you're voting on is you

24  talk to people, correct?

25  A.  One of the things -- I mean, obviously, when an ordinance is

 1  presented, you typically want to know, one, if a council member

 2  has recommended this ordinance or who recommended this

 3  ordinance.  So -- and then at that point, you question that

 4  person as to why do you think this is important.  And --

 5  Q.  Now, Mr. Mayor, it's not your testimony, is it, that when

 6  voting on a proposed ordinance, it's your policy only to speak

 7  to the individual that proposed the ordinance?

 8  A.  No.

 9  Q.  You're willing to -- to listen to people who may oppose the

10  ordinance.

11  A.  Sure.

12  Q.  You might not act on that.  You might not agree with them,

13  but you're willing to listen to that information, correct?

14  A.  You listen to all views.  Yes, sir.

15  Q.  And you take that into consideration in making your

16  determination as a member of the council whether to vote yes or

17  no on an ordinance.

18  A.  Yes, sir.

19  Q.  Now, there's been a lot of testimony in this case.  And I

20  know, sir, that you're aware of an issue in this case that there

21  was an ordinance that came before the city council with respect

22  to probationary -- the length of the probationary period for

23  public safety employees, correct?

24  A.  Correct.

25  Q.  And I'm going to give you a binder of exhibits to have in

1  front of you just so you can confirm we're talking about the

2  same ordinance.

3  A.   Okay.

4     (Brief pause)

5        MR. STEELE:  Permission to approach, Your Honor?

6        THE COURT:  Yes, you may.

7  Q.   Here, Mr. Mayor.  And if you would, sir, please turn for me

8  to Exhibit #17 in that binder.  Now, sir, is that the proposed

9  ordinance with respect to extension of the probationary period

10 for public safety employees that came before the city council in

11 April of 2006?

12 A.   It is.

13 Q.   And if I'm reading this correctly, Mr. Mayor, you were one

14 of the individuals that voted in favor of the ordinance?

15 A.   Yes, sir.

16 Q.   And that was done on the 18th day of April, 2006?

17 A.   Correct.

18 Q.   Now, is your normal meeting day Tuesdays?

19 A.   The first and third Tuesdays of the month.

20 Q.   First and third Tuesdays?  To the best of your recollection,

21 in fact, this proposed ordinance was voted on in the normal

22 course of business during a Tuesday meeting, correct?

23 A.   Yes, sir.

24 Q.   What time do your Tuesday meetings -- what time of day do

25 you hold them?

1    A.   Nine o'clock Eastern.

2    Q.   Nine o'clock Eastern.  And is there a typical length that

3    they last, or does it all depend on what's before you?

4    A.   It just depends.

5    Q.   Do you recall on the 18th of April, 2006, how long your

6    meeting was that day?

7    A.   No, sir.

8    Q.   But to the best of your recollection, it was a regularly

9    scheduled council meeting that would have begun at nine o'clock

10   in the morning on that date?

11   A.   Correct.  Yes, sir.

12   Q.   Now, the ordinance that's before you and was a proposed

13   ordinance until you-all voted on it --

14   A.   Yes, sir.

15   Q.   -- that was an issue that you believed was within the scope

16   and authority of the city council to determine; is that correct?

17   A.   Correct.

18   Q.   It was within the power and authority of the city council

19   either to approve the ordinance if the council thought they

20   should do that or to disapprove the ordinance if the council or

21   a majority of the council felt that was the right thing,

22   correct?

23   A.   Correct.  Yes, sir.

24   Q.   That was a policy decision that -- in the form of government

25   that Phenix City has, it's the type of policy decision, the type

1   of legislative decision, that rests on your shoulders and the

2   shoulders of the other members of the council.

3   A.   Yes, sir.

4   Q.   The city manager doesn't vote on proposed ordinances before

5   the council, correct?

6   A.   No, sir.

7   Q.   Nor does the fire chief or the police chief?

8   A.   No, sir.

9   Q.   It's only the five members of the council?

10  A.   Yes, sir.

11  Q.   Now, you already testified that it's important for you to

12  gather information to have information concerning the issues and

13  ordinances that come before the council, correct?

14  A.   Yes, sir.

15  Q.   And does that include the proposed ordinance that actually

16  became the law of the city when passed by the council on April

17  18th of 2006?

18  A.   Yes, sir.

19  Q.   Do you think it helps you make a better decision if you hear

20  what people think and have to say about a proposed ordinance

21  that's before you?

22  A.   To a certain extent, yes, sir.

23  Q.   Now, I'm not suggesting you agree with everything somebody

24  tells you, but to gather information and hear differing

25  viewpoints so that you can make your own determination on

1   whether to vote for or against a proposal?

2   A.  Yes, sir.

3   Q.  And that would include or be true for this proposal here

4   that became law when the city council passed it.

5   A.  Yes, sir.

6   Q.  And I'd like to turn your attention to a much-discussed

7   telephone call or conversation you had with Mr. Davis concerning

8   the proposed ordinance.  Do you recall that conversation?

9   A.  Yes, sir.

10  Q.  And in fact, you had that conversation with Mr. Davis on

11  April the 17th of 2006; is that correct?

12  A.  I don't know the exact date, but somewhere around that

13  time.  Yes, sir.

14  Q.  If I told you that the correct date is April 17th, 2006, do

15  you have any reason to believe it's not?

16  A.  I have no -- and I know there's a copy of the message that

17  was taken, so the date would be on there.  So that would be the

18  date of the conversation.  But I know it was approximately

19  around this time period.  Yes, sir.

20  Q.  Okay.  If you would, then, please turn to Exhibit #18 in the

21  binder in front of you.  Mr. Mayor, is what appears in Exhibit

22  #18 a copy of the phone message that you just referred to?

23  A.  It is.  Yes, sir.

24       MR. STEELE:  Your Honor, I'd move for admission of

25  Plaintiff's Exhibit #18.

1          THE COURT:  It's admitted.

2    Q.  Now, have you had a moment to take a look at it since you

3    opened up your binder to that page?

4    A.  Yes, sir.

5    Q.  Probably didn't take you very long.

6    A.  No, sir.

7    Q.  Does that refresh your recollection as to the date that

8    Mr. Davis contacted you regarding the ordinance?

9    A.  Yes, it does.  Yes, sir.

10   Q.  And what was that date?

11   A.  April the 17th.

12   Q.  Okay.  When Mr. Davis called, you weren't in; is that

13   correct?

14   A.  I was not available to take the phone call.  I don't know if

15   I was in a meeting, but --

16   Q.  You weren't available --

17   A.  Right.

18   Q.  -- at any rate.  Okay.

19   A.  Correct.

20   Q.  Can you tell by the signature on here who it was that took

21   the message?

22   A.  It's my administrative assistant.  Camara is her name.

23   Q.  Okay.  Part of your administrative assistant's

24   responsibilities when people call for you and you're not

25   available is to take a message and let you know?

1  A.  Yes, sir.

2  Q.  Now, there's reference in here where your administrative

3  assistant wrote down words that -- it looks like it reads "would

4  not speak to anyone else" or words to that effect.  You may --

5  A.  Yes.

6  Q.  -- have better luck reading her handwriting than I do.

7  A.  Looks like it.

8  Q.  But that's essentially what's there, correct?

9  A.  Yes, sir.

10  Q.  Did you ever talk to her about that language she put down on

11  the message?

12  A.  I don't recall if I did.  I sometimes get messages that say

13  this on there, that they don't want to speak to anyone else.

14  Q.  Do you think it's at all odd that someone calls your office

15  because they want to discuss something with you and your

16  assistant says, well, the mayor's not available right now, would

17  you like to speak with someone else, and the person says, no,

18  I'm calling for the mayor, and so a message is taken and given

19  to you?  Is that an odd occurrence?

20  A.  Regular occurrence.

21  Q.  Regular occurrence.  And so when you received the message of

22  Exhibit #18, it didn't seem peculiar to you that that language

23  was written on it.

24  A.  No, sir.

25  Q.  Now, what did you do with the message after you received

1  it?  Did you respond to the call?  Did you not respond to the

2  call?

3  A.  I returned the phone call.

4  Q.  Okay.  And when did you do that?

5  A.  I'm not real sure.  It was that day, but I'm not real sure

6  about the time.  I typically try to return all my phone calls.

7  Q.  Okay.  But you do recall that it would have been April

8  17th.  Sometime that day, you returned the call.

9  A.  Yes, sir.  Based on the time that I got the message -- it

10  looks like it's twelve-something -- I would have returned that

11  phone call that day.

12  Q.  Okay.  And based upon the time that's on that message, I

13  guess we can safely say that you returned the call sometime in

14  the afternoon or evening of April 17th?

15  A.  Yes, sir.

16  Q.  Where were you when you returned that phone call?

17  A.  I was in my office.

18  Q.  And where is that?

19  A.  It's on -- it's at city hall, which is --

20  Q.  At city hall?

21  A.  -- the utility building on the third floor.

22  Q.  Okay.  Was anyone else present when you returned that phone

23  call?

24  A.  No, sir.

25  Q.  Did anyone force you to return that phone call?

1   A.   No, sir.  It's a policy that I have.

2   Q.   It's your personal policy?

3   A.   Yes, sir.

4   Q.   Do you think that's a good policy?

5   A.   It helps to get elected.  Yes, sir.  Yes, sir.

6   Q.   I imagine that it would.

7   A.   And I don't mean to joke, I mean; but no, that's my personal

8   policy, even outside of politics.

9   Q.   I won't disagree with you on that.  So you freely and

10  voluntarily returned the call because that's your personal

11  policy.

12  A.   Yes, sir.

13  Q.   You weren't obligated to return it except that you feel it's

14  the right thing to do.

15  A.   Correct.

16  Q.   And was anyone else present when you returned that call?

17  A.   No, sir.

18  Q.   Do you recall how long your conversation -- well, let me --

19  let me back up a little bit.  You placed the call, and you were

20  able to reach Mr. Davis, correct?

21  A.   Correct.

22  Q.   And you had a conversation with him on that occasion.

23  A.   I did.  Yes, sir.

24  Q.   Do you recall approximately how long that telephone

25  conversation was?

1    A.   I don't remember the exact time, but I don't think it was a

2    very long conversation.

3    Q.   Could it have been five minutes or less?

4    A.   Probably.  Yes, sir.

5    Q.   Somewhere in that range?

6    A.   Yes, sir.

7    Q.   Now, when you returned Mr. Davis's call, prior to talking

8    about the ordinance, did the two of you exchange pleasantries,

9    greetings?

10   A.   I'm sure.  Yeah, I would think.

11   Q.   And did you also, in exchanging pleasantries, say to

12   Mr. Davis, you know, hey, Mr. Davis, or perhaps you call him by

13   his first name, but how are things going?

14   A.   I don't really know exactly what I said, but I'm sure it

15   would be, you know, I'm returning your previous phone call or

16   something to that extent.

17   Q.   Okay.  You're not sure if you asked him how things are going

18   or not?

19   A.   I'm not sure.

20   Q.   Is that something that you might ask?

21   A.   Or I may have said how are you doing.

22   Q.   How are you doing?

23   A.   Yeah.  Sure.

24   Q.   How are things going?  Something like that.

25   A.   Yeah.  Or what's the good news is kind of a statement I ask

1  a lot.

2  Q.  Okay.  That's an interesting one.  I'll keep that one in

3  mind.

4  A.  I get to hear a lot of bad, so I always ask for the good

5  first.

6  Q.  Okay.  Now, this conversation with Mr. Davis, it was a

7  cordial conversation?

8  A.  Yes.

9  Q.  Mr. Davis was not rude or disrespectful to you?

10 A.  I don't remember him being rude at all.  No, sir.

11 Q.  So your recollection is that it was a perfectly normal,

12 polite exchange between and you Mr. Davis?

13 A.  Yes, sir.

14 Q.  And as part of that conversation Mr. Davis discussed with

15 you some concerns about the proposed ordinance; is that correct?

16 A.  He -- from what I remember, he didn't understand the

17 ordinance and what -- what the meaning -- what the ordinance

18 said and how it applied to the new hires and the existing

19 employees.

20 Q.  Okay.  So you had a discussion about what you viewed the

21 ordinance as applying to or not applying to?

22 A.  Correct.  There was a question as to the -- the time frame

23 and how it applied to new employees and how it applied to

24 promotions and so forth.

25 Q.  Now, in fact, as part of this conversation Mr. Davis offered

1    some suggestions or proposed changes to the proposed ordinance;

2    is that correct?

3    A.   He did.

4    Q.   And you listened to him, correct?

5    A.   I did.

6    Q.   At the end of the conversation with Mr. Davis, the

7    conclusion, did you thank him for calling?

8    A.   I don't remember.  I may have.

9    Q.   That wouldn't be unusual for you to thank somebody for

10   calling who calls you up to discuss something.

11   A.   No.

12   Q.   And you also actually told Mr. Davis that you'd take what he

13   said under consideration, correct?

14   A.   You know, what I remember of the conversation, it was more

15   he asked about it and then, you know, what it meant, as far

16   as --

17   Q.   Right.

18   A.   -- and then made the recommendation.

19   Q.   I understand that.  And you've explained that.  The

20   question, though, before you --

21            MR. MCKOON:  Excuse me.  May I just object for this

22   witness?

23            Will you just let him finish his answer?

24            THE COURT:  Do you have anything else to say on that?

25   A.   Basically, the conversation that I remember was questions on

1    the length of the contract, who it applied to, and then a

2    recommendation or wouldn't it be better to do it this way.  And

3    that was what I remember of the conversation.

4    Q.  Okay.  And my question to you was actually quite different.

5    I didn't ask you to explain the conversation.

6    A.  Okay.

7    Q.  My question to you was at the end of the conversation, did

8    you tell Mr. Davis that you would take what he had to say under

9    consideration?

10   A.  I -- I don't remember that.  No, sir.

11   Q.  You don't remember one way or the other.

12   A.  Don't remember either.

13   Q.  It was some time ago.  You -- did you keep any notes or

14   records or recordings of this conversation?

15   A.  No, sir.

16   Q.  So you don't have anything to go on but your memory --

17   A.  Correct.

18   Q.  -- with respect to that call?  Now, at any time during this

19   conversation, did you say words to the effect of, hey, wait a

20   minute, Mr. Davis, you're talking to the wrong person?  You

21   shouldn't be talking to me about that?

22   A.  I did not.

23   Q.  And in fact, the issue Mr. Davis was talking to you about

24   was an issue that was before the city council, correct?

25   A.  It was.  Yes, sir.

1   Q.  So you're one of the -- one of the right people to talk to

2   about it.  Is that fair?

3   A.  You know, I guess it depends on what the standards have been

4   that you followed before then if I was the right person to talk

5   to or not.

6   Q.  So you don't believe that it's -- members of the city

7   council are appropriate people to talk to about ordinances that

8   are before the council?

9   A.  I do.

10  Q.  You do.  Okay.

11  A.  I do, but --

12  Q.  I apologize if I misunderstood your answer.

13  A.  But if there is an internal way to reach the council, then

14  those steps should be followed prior to a contact with myself or

15  other council members.

16  Q.  Now, we already talked about your reference to an open-door

17  policy, okay?

18  A.  Yes, sir.

19  Q.  And that you didn't put any limitations on your open-door

20  policy when you told the firefighters.  You didn't say, I have

21  an open-door policy except that you need to jump through this

22  hoop and this hoop and this hoop and this hoop, and then maybe

23  at the end you might be able to talk to me.  That isn't what you

24  told the firefighters.

25  A.  I did not, because those are internal parameters that are

1    put on employees.

2    Q.   Regardless of your reason for not telling them that --

3    A.   Yes, sir.

4    Q.   -- you didn't tell them that, correct?

5    A.   No, sir.

6    Q.   And at the time that you had this conversation with

7    Mr. Davis, you didn't believe you were doing anything wrong by

8    talking to him, did you?

9    A.   No, sir.

10   Q.   And you didn't tell Mr. Davis that, I'm sorry, you need to

11   bring this up with someone else.  You didn't question him about

12   that.

13   A.   No, sir.

14   Q.   There was no question even of whether he had spoken to

15   anybody about that.

16   A.   No, sir.

17   Q.   As a member of the city council, your concern was to hear

18   what the individual had to say and give it what worth you think

19   it's worth in determining what you're going to do with it.  Is

20   that fair?

21   A.   Correct.  Yes.

22   Q.   And at the time of the phone conversations, to the best of

23   your knowledge and belief at that time, you didn't believe that

24   Mr. Davis had done anything wrong by calling you up, did you?

25   A.   No.

1   Q.   And you certainly didn't tell him he had done anything wrong
2   by calling you up.
3   A.   No.
4   Q.   And with respect to this call, I guess we've been able to
5   pinpoint it to the afternoon or perhaps early evening of April
6   17th of 2006, correct?
7   A.   Correct.
8   Q.   Do you have a typical time that you leave the office in the
9   evening?
10  A.   I do not.  It just depends on what meetings are going on
11  that day in the morning or in the afternoon.  Or sometimes I
12  come by and retrieve messages or stop by and sign paperwork.  So
13  I don't really have a -- outside of the set meetings, I don't
14  really have -- or set appointments, I don't have a set schedule
15  to be in the office.
16  Q.   Okay.  So you've told us the best you can in terms of
17  narrowing down what time of day that phone call occurred,
18  correct?
19  A.   I would -- obviously, it was after twelve whatever, 50, and
20  before, I would think, five o'clock.
21  Q.   Okay.  And what makes you believe it was probably before
22  five o'clock?  Are you typically out of the office by five
23  o'clock?
24  A.   Everyone starts locking up and going home.
25  Q.   Okay.  They don't lock you in, sometimes?

1   A.   Sometimes they do.  Yes, sir.  But I have a key.

2   Q.   Oh, there you go.  You're the mayor; you should have a key.

3        Now, at the time of that phone conversation, you, sir, did

4   not believe that your conversation with Mr. Davis was likely to

5   cause disruption or problems in the department?

6   A.   No.

7   Q.   To the best of your knowledge, the phone call didn't disrupt

8   the ability of the department to respond to calls or any of the

9   business that they undertook in the next several days?

10  A.   I'm very separated from that, so I wouldn't know that.

11  Q.   To the best of your knowledge, then, no.

12  A.   No.

13  Q.   Now, subsequent to that phone call, at a certain point in

14  time, you learned from one of your fellow council members that

15  Mr. Davis had been fired; is that correct?

16  A.   Correct.

17  Q.   And was that Council Member Bush?

18  A.   Councilman Bush.  Yes, sir.

19  Q.   Okay.  Do you know when you heard that from Councilman Bush?

20  A.   I was going out of town.  And I remember, because I hadn't

21  read the paper.  I think I had left early and I was on the road

22  when I got a phone call from Councilman Bush that informed me

23  that he had been fired.

24  Q.   Okay.  Do you know whether it was in -- well, what's your

25  best recollection as to when that call occurred?

1  A.  I don't -- I don't remember.  It was -- I think it was a few

2  days afterward, because I was surprised, because I hadn't heard

3  it before.

4  Q.  Okay.  So --

5  A.  So I think some time had lapsed between the actual

6  termination and me hearing about it.

7  Q.  Okay.  Do you believe that it was more than a few days had

8  lapsed before you heard about it?

9  A.  I would -- I would think three, four or five, six days,

10  something like that, if I had to guess.

11  Q.  Okay.  So I guess it's fair to say that you heard about it

12  within a week of it happening?

13  A.  Yes, sir.  I would think that would be fair.

14  Q.  That would fit your recollection?

15  A.  (Nods head)

16  Q.  Now, sir, you yourself never recommended that Mr. Davis be

17  disciplined in any manner because he called you on the phone,

18  did you?

19  A.  No.

20  Q.  You yourself didn't urge or suggest or encourage an

21  investigation into that phone call.

22  A.  No.  And I think you -- just to add to that, I think you've

23  got to understand what the position of the mayor and council is

24  defined as versus the day-to-day operations of the city.  So if

25  I would have recommended anything, it would have been a

1  violation of the charter.

2  Q.  Okay.  Well, let me ask the question differently, then.

3  A.  Yes, sir.

4  Q.  Following your phone call with Mr. Davis -- let's say

5  between the phone call and when you learned of the termination

6  from Mr. -- Councilman Bush, regardless of whether you had the

7  authority or didn't have the authority, you were never of the

8  opinion during that time period that Mr. Davis should be

9  investigated or disciplined.

10  A.  Based on the knowledge that I had at that time, no.

11  Q.  In fact, as you already told us, at the time of the

12  conversation, you didn't think that there was anything wrong

13  with it.

14  A.  No.

15  Q.  Now, when you learned that Mr. Davis had been terminated, at

16  some point in time am I correct that your understanding was that

17  the triggering event that resulted in the termination was that

18  phone call, correct?

19  A.  That was a report in the paper.  Yes, sir.

20  Q.  And is that where you received your information as to the

21  circumstances surrounding Mr. Davis's termination?

22  A.  That was the secondhand information that I had received from

23  Mr. Bush.  And that's where he had gotten it from.

24  Q.  Okay.

25  A.  I think that's where he had gotten it from.

272

1  Q.  What did you do with that information when you got it?  Did

2  you ask anybody about it?

3  A.  I called the city manager at that -- I don't know if I

4  called him right after that or I ran into him.  I had a

5  conversation with the city manager after that and just asked

6  him, just is it true that Mr. Davis was terminated, just --

7  because I was curious about it.

8  Q.  Okay.  And I understand that the city manager confirmed that

9  for you, correct?

10  A.  He did.

11  Q.  Now, is it your testimony that in that conversation you did

12  not inquire and the city manager did not offer an explanation

13  for the termination?

14  A.  Not at that time, because at that time, it was all

15  internal.  And those records are not shared with the city

16  council, as far as personnel records or anything like that.

17  Q.  So the answer is no?

18  A.  No.

19  Q.  But still, up to that point you didn't think you had done

20  anything wrong, correct?

21  A.  No.

22  Q.  And other than the fact Mr. Davis had been terminated, you

23  didn't have any knowledge that he had done anything wrong in

24  calling you at that point in time.

25  A.  No.

```
 1            MR. STEELE:  Thank you.

 2            THE COURT:  Mr. McKoon.

 3                      CROSS-EXAMINATION

 4  BY MR. MCKOON:

 5  Q.  Mayor Hardin, let me just ask you a few questions about this

 6  situation.  You've never been a firefighter, have you?

 7  A.  No, sir.

 8  Q.  Or a police officer?

 9  A.  No, sir.

10  Q.  Or any kind of public safety person.

11  A.  No, sir.

12  Q.  And the way the Phenix City government functions, as I

13  understand it, the mayor and the council, if we had an

14  organizational chart, would be over here to the side; and then

15  there's a line down to city manager.  Is that correct?

16  A.  Yes, sir.

17  Q.  And is it fair to say that the city council and the mayor

18  basically serve as a policy making body and a -- kind of a board

19  of directors and that the city manager runs the day-to-day

20  functions of the city?

21  A.  That is correct.

22  Q.  I mean whether that's a good thing or a bad thing, that's

23  the way our government's set up; is that right?

24  A.  That is correct.  Yes, sir.

25  Q.  And then under the chain of command of the city manager
```

1  would be the department heads?

2  A.  Yes, sir.

3  Q.  Some of which would be like the police chief and the fire

4  chief and the head of building inspection, parks and rec, stuff

5  like that; is that right?

6  A.  Yes, sir.

7  Q.  Who hires and fires those people, the department heads?

8  A.  The city -- the city manager.

9  Q.  And that's his -- that's in his sole discretion to do that.

10  A.  Yes, sir.

11  Q.  And basically, does everybody under that chain -- does it

12  all filter up to the city manager?

13  A.  It does.  Yes, sir.

14  Q.  Are you in any way in the chain of command?

15  A.  No, sir.

16  Q.  Is it your responsibility to know the standard operating

17  procedures of the Phenix City Fire Department?

18  A.  No, sir.

19  Q.  Or the Phenix City Police Department?

20  A.  No, sir.

21  Q.  That would be the responsibility of the people that work in

22  those departments, wouldn't it?

23  A.  That's the way our government is set up.  Yes, sir.

24  Q.  So if Mr. Davis called you, you wouldn't have any way of

25  knowing what his policy was in regard to whether he should be

1  calling you or not; is that correct?

2  A.  No, sir.

3  Q.  But he ought to know that.

4  A.  I was --

5         MR. STEELE:  Objection.  Speculative.

6         THE COURT:  Yes.  I sustain.

7         MR. MCKOON:  Okay.

8  Q.  When he did call you, do you recall whether or not he

9  identified himself as calling on behalf of the firefighters

10  union?

11  A.  He did not.

12         MR. STEELE:  Objection.  Relevancy.

13         MR. MCKOON:  He -- that's what he testified to.

14         THE COURT:  I think he's already testified.  Overruled.

15         MR. MCKOON:  I'm sorry.

16         THE COURT:  Let me make clear.  The plaintiff in this

17  case is not contending that he was terminated because he was

18  acting on behalf of the firefighters union, but it's a fact.

19  It's in evidence.  But he's not -- that's not an issue in the

20  case.  He's not claiming they terminated him because of his

21  actions on behalf of the firefighters association.

22         Go ahead.

23  Q.  My point is when Mr. Davis called you, did he identify

24  himself as calling on behalf of the union or said he was the

25  union president calling on their behalf?

1    A.   He did not.

2    Q.   All right.  And the message that you looked at a minute ago,

3    did it say anything about David Davis, union president, on it?

4    A.   No, sir.

5    Q.   When you got the message, did you recognize the name David

6    Davis, I mean as far as any person that you knew other than just

7    somebody from the public calling?

8    A.   I -- I knew of David Davis, but I didn't know if it was him

9    that was calling.  Obviously, there's people that share names.

10   Q.   Okay.  So when you got the message and you saw it was David

11   Davis, you just returned the call.

12   A.   Sure.

13   Q.   Is that correct?

14   A.   Yes, sir.

15   Q.   And I believe you just previously testified he didn't

16   identify himself as calling on behalf of anybody.  He just said

17   I'm calling to talk to you about this particular matter; is that

18   right?

19   A.   Questions about the particular ordinance.  Correct.

20   Q.   Do you remember what his question was about it?

21   A.   It was about the -- the length of the probationary period

22   and why it was being changed and then who it applied to, whether

23   it be new hires or existing employees.

24   Q.   Did he seem to have some confusion about whether it applied

25   to veteran employees as well as new hires?

1   A.   He did.

2   Q.   And what did you tell him about that, if you recall?

3   A.   Basically, the ordinance applied to new hires only.

4   Q.   A little bit about the way the council works.  When an

5   ordinance comes before council, does it just come up one time?

6   A.   No, sir.

7   Q.   Tell the ladies and gentlemen of the jury what is done in

8   regard to notifying the public of an ordinance and the

9   availability for people to get the ordinance if they want to

10  look at it in advance.

11  A.   Well, first we put it -- first it's advertised in the paper

12  before -- typically on the Sunday in the local newspaper before

13  it's introduced on the Tuesday.  And then we'll put an ordinance

14  on a first reading.  So it will be placed on first reading, and

15  it allows two weeks of comments.  So it's advertised again for

16  the two weeks before it's put on the second and final reading.

17  So there's several -- at least two and a half weeks before --

18  when it's first advertised before it's voted on for the final

19  time, the second and final time.

20  Q.   Now, the -- when Mr. Davis called you, do you recall whether

21  it was not -- he called you before the first reading or before

22  the second reading?

23  A.   It was the -- according to the dates, it was the day before

24  the second reading.

25  Q.   All right.  The ordinance itself, is it available to people

1    in the city clerk's office if they want to come get a copy of

2    it?

3    A.   Yes, sir.

4    Q.   Along with the agenda for the council meeting?

5    A.   Yes, sir.  And again, those -- the agendas are advertised

6    before, a couple of days before the meeting, in the local paper.

7    Q.   These -- a proposal of this kind that affected the building

8    inspection department, police department, and the fire

9    department, was that something that was drafted by the council?

10   A.   No, sir.

11   Q.   Do you know where that proposal came from; in other words,

12   who the authors of it were?

13   A.   Sure.  And we -- as I spoke of before, typically in these

14   type of situations when you see an ordinance like this, you want

15   to know, you know, what's the reasoning, who's the author, or

16   why was it written up.  And in this particular case, the

17   questions that were brought up were answered -- the city manager

18   proposed the ordinance after speaking with the building

19   official -- the chief building official and the police chief and

20   the fire chief.

21   Q.   So you understood that the proposal actually came up through

22   the public safety departments to the city manager.

23   A.   Well, I'd say public safety and code and enforcements on the

24   building side.

25   Q.   Okay.

1   A.   I don't know if they're considered -- I don't know if

2   they're classified as public safety, per se, but --

3   Q.   But those three departments.

4   A.   Correct.

5   Q.   They got together, put the ordinance together, took it to

6   the city manager, and the city manager then brings it to

7   council.  Is that the way that normally works?

8   A.   Yes, sir.

9   Q.   Are there ever occasions when ordinances like that come

10  before council maybe for the first time or in a work session and

11  they're discussed and the department heads are there and make

12  changes to what they're going to do?

13          MR. STEELE:  Objection.  Relevancy.

14          THE COURT:  Overruled.

15  Q.   You may go ahead.

16  A.   Yes, sir.  Typically, there will be a discussion period; and

17  if -- if there is a change, we'll table the ordinance until some

18  further research is done and maybe a change to the ordinance.

19  And then we'll go back -- either amend it or go back through the

20  process of reintroducing it.

21  Q.   And does the council in matters of this kind, matters

22  affecting these departments and an ordinance like this, do they

23  usually rely upon the judgment of those department heads?

24  A.   We do.

25  Q.   And do you usually take their advice most of the time if

 1  they make a proposal such as this?

 2  A.  Yes.  Yes, sir, we do.

 3  Q.  And is it pretty much up to them to -- as to what ordinance

 4  they want to bring you?

 5  A.  Yes, sir.

 6  Q.  And even though you're the final decision makers -- you-all

 7  have to either pass it or not pass it -- they are the ones that

 8  work on the proposal, put it together, take it to their city

 9  manager, and then have it brought to you.

10  A.  Yes, sir.

11  Q.  Is that correct?

12  A.  Yes, sir.

13  Q.  You were asked a moment ago a question about whether or

14  not -- or what you knew about this situation at the time

15  Mr. Davis was terminated and whether or not you -- based on

16  that, you would have terminated him or were surprised about it,

17  some kind of question like that.  And I believe your answer was

18  no; is that right?

19  A.  Correct.  Yes, sir.

20  Q.  My question is since that time, have you learned additional

21  information about this situation?

22  A.  Yes, sir.

23  Q.  And do you also understand now that in addition to the --

24  this so-called five-minute phone call, that there were other

25  reasons for Mr. Davis's termination?

1          MR. STEELE:  Objection.  Relevancy.  This witness's

2    knowledge or lack of knowledge of events subsequent to the

3    termination is not relevant.

4          MR. MCKOON:  It is my --

5          THE COURT:  Ordinarily, I might agree.  But he was

6    asked about his opinion based on what he knew at the time, and I

7    think this is in response to that.  Overruled.

8    Q.  (Mr. McKoon, continuing:) Go ahead.

9    A.  Repeat --

10   Q.  Do you remember the question?

11   A.  No, sir.  Would you please repeat it?

12   Q.  Let me repeat it.  I guess it's this sort of question.  If

13   you knew then everything you knew now, would you have agreed

14   with the termination of Mr. Davis?

15   A.  Yes, sir.

16         MR. MCKOON:  That's all I have.

17         THE COURT:  Redirect?

18         MR. STEELE:  Yes, Your Honor.

19                      REDIRECT EXAMINATION

20   BY MR. STEELE:

21   Q.  Now, Mr. Mayor, you were just asked questions about the

22   structure of the government and department heads and city

23   manager.  And you were asked, and you said, well, you're not

24   part of the chain of command.  But isn't it true, Mr. Mayor,

25   that the city manager is hired by the city council?

1    A.   Yes, sir.

2    Q.   The city council has the authority to fire the city manager?

3    A.   Yes, sir.

4    Q.   The city manager reports to the city council?

5    A.   When you say reports, not in the day-to-day activities of

6    the city.

7    Q.   If the city council calls the city manager to a meeting to

8    address a topic, is it expected that he'll come?

9    A.   Yes, sir.

10   Q.   And if you request information from the city manager, is it

11   expected that the city manager, having that request from you as

12   a council member, should provide that information?

13   A.   It depends on what that information is.

14   Q.   Okay.  So sometimes you ask him for information that you

15   don't expect him to provide?

16   A.   Well, if I ask him, I'd always expect him.  But there is the

17   rule of law that says certain things we cannot discuss.  And a

18   lot of them have to do with the day-to-day operation of the

19   city, especially where employees are concerned, because we're

20   governed by a charter.

21   Q.   Well, Mr. Mayor, there's no evidence in this case that you

22   asked the city manager for any information relating to David

23   Davis and had that request denied, correct?

24   A.   No, sir.

25   Q.   That didn't occur.  Now, you indicated that -- and as a

1    member of the council, that you're not required to be

2    knowledgeable about all of the SOPs within the fire department;

3    is that correct?

4    A.  Correct.

5    Q.  You also have merit system rules and regulations within the

6    city, don't you?

7    A.  We do.  Yes, sir.

8    Q.  And the merit system rules and regulations, they're

9    effectively the laws that govern the operation of the employees

10   of the city?

11   A.  Yes, sir.

12   Q.  And the merit system rules and regulations are adopted by

13   and, on occasion, amended by the city council?

14   A.  They are.  Yes, sir.

15   Q.  They're not adopted and approved and -- by the city

16   manager.  That's the authority of the council to do that,

17   correct?

18   A.  It is.  Yes, sir.

19   Q.  And as I understand your testimony, that when Mr. Davis

20   called you, to the best of your knowledge or to the best of your

21   recollection, he was just calling you as a citizen to ask you

22   some questions about an ordinance.  He -- from your

23   recollection, he didn't say he was calling on behalf of an

24   organization.

25   A.  Correct.

1   Q.   Now, you've already testified that you were aware prior to

2   this time, right, that Mr. Davis was in fact an officer of the

3   firefighters association?

4   A.   Yes, sir.

5   Q.   So you knew that before he called.

6   A.   Yes, sir.

7   Q.   Now, when -- you said, gee, you know, it said David Davis; I

8   didn't know what David Davis -- which David Davis it was on the

9   message.   And I appreciate where you're coming from on that,

10  Mr. Mayor.   But when you saw the message and it said David Davis

11  and you know that there's a firefighter by that name, you know

12  he's the head of the firefighters association that gave you a

13  lot of support when you ran for election, did it cross your mind

14  that it might be this David Davis who had left you the message?

15  A.   Well, certainly it crossed the mind, but that doesn't mean I

16  knew who it was.

17  Q.   I'm not asking if you knew with certainty.

18  A.   Yes.

19  Q.   But you didn't look at this and say I have no idea who this

20  might be, correct?

21  A.   Correct.

22  Q.   And when this David Davis answered the phone, you weren't

23  shocked or surprised that it was that David Davis that had left

24  you the message, right?

25  A.   No.

1   Q.   Now, you testified at some length about how the city council

2   goes about advertising what -- meeting agendas or printing

3   proposed ordinances in the newspaper.  My question to you, sir,

4   is do you have any personal knowledge as to whether David Davis

5   had seen or was aware of this particular proposed ordinance at

6   any time prior to April 16th, 2006?

7   A.   At the time of the call?  Is that what -- the question?

8   Q.   Do you have any personal knowledge as to when David Davis

9   saw in the newspaper or learned about this particular proposed

10  ordinance?

11  A.   Well, a lot of information that I was privy to after I was

12  sued -- I was exposed to a lot of information.  So after that, I

13  did find out that he was privy to the information prior to the

14  phone call.  But --

15  Q.   And that's based on your personal knowledge?

16  A.   That's based on information that I had read.

17  Q.   So it's not based on your personal knowledge.  You can't

18  testify as you sit here today that you know for a fact that

19  David Davis had ever seen the ordinance that you voted on at any

20  time prior to April 16th.  Based on your own personal knowledge,

21  you can't tell the jury that, can you?

22  A.   Not with certainty.  No, sir.

23  Q.   In fact, you're just basing it on things somebody else told

24  you, correct?

25  A.   As -- as I am basing that he didn't know about it by what he

1  told me or what you're telling me, yes.

2  Q.  That's not my question.

3  A.  Well, repeat the question again.

4  Q.  Yeah.  My question is that when you said, oh, he knew about

5  it earlier, you're basing that on just some information somebody

6  else told you.

7  A.  Yes.

8  Q.  Not on any personal knowledge that you have.

9  A.  No.

10  Q.  You weren't present when anybody told Mr. Davis about it?

11  A.  Nor was I present when he read it.  No.

12  Q.  Correct.  Now, among all of these other ways that

13  information is distributed with respect to proposed ordinances,

14  on an ordinance like this that involved the fire department and

15  the police department and the building inspectors, it's not the

16  policy of the city, is it, to distribute that ordinance to the

17  police stations and fire stations and to post it and to take any

18  efforts to notify those individuals above and beyond the efforts

19  you've already described in the newspaper to let the public know

20  about it, correct?

21  A.  We -- our meetings are televised, and we do post all the

22  pending ordinances on a bulletin board in city hall.

23  Q.  Okay.  What about at the fire stations?

24  A.  I wouldn't know that.

25  Q.  You wouldn't know that.  Now, Mr. Mayor, on

1    cross-examination, you talked about how much you rely on the

2    input of the city manager or department heads when an ordinance

3    comes before you relating to a particular department, correct?

4    A.  Yes, sir.

5    Q.  And Mr. McKoon got you to agree how -- how important that

6    information is to you and all the work that the department heads

7    or the city manager may put into a proposed ordinance, correct?

8    A.  Yes, sir.  Correct.

9    Q.  Now, make no mistake about it, Mr. Mayor.  The city council

10   isn't a rubber stamp for the police chief, the fire chief, or

11   the city manager, is it?

12   A.  No, sir.

13   Q.  You make your own determination on whether to support or

14   oppose an ordinance that's before you.

15   A.  Yes, sir.

16   Q.  You don't vote yes simply because it was proposed by the

17   fire chief or the police chief.  You vote yes based upon the

18   totality of the information that you've collected and whether

19   you believe it's a good idea, correct?

20   A.  If it's in the best interests of the city.  Yes, sir.

21   Q.  Right.  In your opinion, based on all the information you

22   have.

23            MR. STEELE:  Nothing further.

24            THE COURT:  Any redirect?

25            MR. MCKOON:  Just a couple things.

 1          THE COURT:  Recross.

 2                    RECROSS-EXAMINATION

 3  BY MR. MCKOON:

 4  Q.  Just to be clear, you're not in the firefighters' chain of

 5  command in any way, are you?

 6  A.  No, sir.

 7  Q.  And you were asked some questions earlier about this

 8  open-door policy.  As part of your open-door policy, I mean you

 9  were campaigning for office; is that right?

10          MR. STEELE:  Objection, Your Honor.  That's beyond the

11  scope of redirect.

12          THE COURT:  That's beyond the scope of redirect.  I

13  sustain that.

14          MR. MCKOON:  All right.  I don't have anything further,

15  then.

16          THE COURT:  You may come down.

17          MR. MCKOON:  Your Honor, may he be excused?

18          THE COURT:  Any objection from the plaintiff?

19          MR. STEELE:  No objection.

20          THE COURT:  All right.  You're free to go.

21          Call your next witness.

22          MR. BROWN:  Plaintiffs call Ms. Anne Land.

23          THE COURT:  Okay.

24          MR. BROWN:  Your Honor, point of clarification.  In

25  accord with your pretrial conference, I prefer to stand here,

 1   with your permission, please.

 2          THE COURT:  That's fine.

 3          MR. MCKOON:  While the witness is coming, may we

 4   approach?

 5          THE COURT:  All right.  Just be at ease, ladies and

 6   gentlemen, just a minute.

 7          Go ahead and swear in the witness.

 8          THE CLERK:  Would you raise your right hand.

 9      (The witness is sworn )

10          THE CLERK:  Be seated.

11      (Bench conference, as follows:)

12          MR. MCKOON:  Judge, just very briefly.  And I apologize

13   for the interruption.

14          THE COURT:  Just a minute.  Okay.  Make it snappy.

15          MR. MCKOON:  I notice there's been some passing of

16   notes to Mr. Malone back here and Mr. Brown has been leaving the

17   room and coming back, and I don't know what's that all about.  I

18   know the Court instructed everybody about the rule being

19   invoked.  And I don't know what it's about; but I think if he's

20   going to be in here, he shouldn't be getting up and leaving the

21   room with notes in his hand.

22          THE COURT:  Well, I don't know what it's about either,

23   but it wouldn't be appropriate for somebody to sit in the room

24   and then go out and discuss testimony with any of the

25   witnesses.  So I'll ask counsel to make sure that's not

1  happening.

2          MR. BROWN:  You can be assured that's not happening.

3          MR. STEELE:  I'll be happy to speak with him.

4          MR. MCKOON:  Thank you.

5      (Bench conference concluded)

6          THE COURT:  All right.  Mr. Brown.

7          **ANNE LAND**, the witness, having been duly sworn,

8  testified, as follows:

9                        DIRECT EXAMINATION

10  BY MR. BROWN:

11  Q.  Ms. Land, would you please state for the record where you

12  live.

13  A.  Columbus, Georgia.

14  Q.  And what is your address, for the record?

15  A.  1506 Luckie Drive.

16  Q.  And what is your occupation?

17  A.  Firefighter, Phenix City Fire Department.

18  Q.  And how long have you been an employee of the Phenix City

19  Fire Department?

20  A.  Almost ten years.

21  Q.  And what is your job classification with the fire

22  department?

23  A.  I'm the administrative captain.

24  Q.  Who is your direct supervisor?

25  A.  My direct supervisor is Fire Chief Wallace Hunter.

1    Q.    Captain Land, did you receive a subpoena to appear in court

2    and give testimony today?

3    A.    Yes, sir.

4    Q.    And are you at all reluctant to give your testimony today in

5    open court?

6    A.    Yes, sir.

7    Q.    Which party in this proceeding subpoenaed your appearance?

8    A.    David's attorneys.

9    Q.    And just to clarify the record, I will attempt to refer and

10   make sure you understand Mr. Davis is the plaintiff in the case

11   and the city is the defendant.

12   A.    Yes, sir.

13   Q.    Prior to your receiving your subpoena to appear, were you

14   made -- were you made aware that the plaintiff desired your

15   testimony in this case?

16   A.    Yes, sir.

17   Q.    And after learning that the plaintiff desired your testimony

18   in the case, did you contact the plaintiff's attorneys seeking

19   advice and input about your testimony?

20   A.    Yes, sir.

21   Q.    Did you seek permission from your superior officer prior to

22   speaking with the plaintiff's attorneys?

23   A.    Yes, sir, I did.

24   Q.    And why did you do that?

25   A.    In the merit system, it states that we have to contact the

1   city attorney before speaking to any other law firm or attorney.

2         THE COURT:  Captain Land, will you pull that microphone

3   over a little closer to you so we can all hear you?  Just bend

4   it over a little.  There you go.  Thank you.  Go ahead.

5   Q.  Were you specifically informed at any time that concerning

6   this lawsuit, that you needed to contact your superiors prior to

7   speaking with any attorney?

8   A.  Not that I recall.

9   Q.  At some time after speaking with plaintiff's attorneys, were

10  you asked to speak with the city's attorneys in this case, the

11  defendant?

12  A.  Yes, sir.

13  Q.  And how did that occur, Captain Land?

14  A.  I was with the fire chief, and Mr. McKoon had called the

15  fire chief on his cell phone.  And he -- Chief Hunter said that

16  I was with him, so he handed me the phone and said that

17  Mr. McKoon wanted to speak with me.

18  Q.  And what happened next?

19  A.  He just asked me what we had -- what we had talked about.

20  And then after that, they called the battalion chief that was on

21  duty and asked me to come down to Mr. McKoon's office to speak

22  with him.

23  Q.  He asked you -- you said who -- we -- what we had talked

24  about.  We, meaning who?

25  A.  David -- the -- David Davis's attorneys.  What we had talked

 1  about.

 2  Q.  And did you have any choice in the matter as to whether or

 3  not you would be taken to visit with the defendants' attorneys?

 4  A.  No, sir.

 5  Q.  Did you consider that directive an order?

 6  A.  Yes, sir.

 7  Q.  Why?

 8  A.  I wasn't asked.  I was just told to go on down there.

 9  Q.  After being made aware that the plaintiff's attorneys wanted

10  to speak with you, did we in fact discuss your (sic) case?

11  A.  Yes, sir.

12  Q.  And during the course of that conversation, were we

13  exploring the factual matter that you understood about --

14  relating to this case?

15  A.  Yes, sir.

16  Q.  And did you seek the input and advice of plaintiff's

17  attorneys concerning the testimony you would give today?

18  A.  Yes, sir.

19  Q.  After we discussed what possible testimony you may be giving

20  in court as you're sitting in the witness stand today, were you

21  told at some point in time to report again to the defendants'

22  attorneys?

23  A.  Yes, sir.  Mr. McKoon asked that if I would let him know

24  after we had spoken.  He wanted to know what we talked about.

25  Q.  And did you subsequently speak with them?

1  A.  Yes, sir.

2  Q.  Were you on duty?

3  A.  Yes, sir.

4  Q.  And were you on duty the first instance that that occurred?

5  A.  Yes, sir.

6  Q.  Were you given a choice from anyone in the fire department

7  on the second event of this that you could decline to speak with

8  the defendants' attorneys?

9  A.  No, sir.

10  Q.  Did you consider the instruction that you received on the

11  second event of being asked to speak with the defendants'

12  attorneys, that that was an order?

13  A.  Yes, sir.

14  Q.  Did you feel that if you had declined to follow that order,

15  you would be subject to discipline?

16  A.  Yes, sir.

17  Q.  What did the defendants' attorneys ask you on that occasion?

18  A.  What we had spoken about.

19  Q.  They attempted to discern the facts of the plaintiff's case,

20  as you knew them?

21  A.  They were asking me about a statement that I had written and

22  like, again, just going over what we had talked about again, for

23  the second time.

24  Q.  Were you at that event given an instruction by the

25  defendants' attorneys that you could decline speaking to them?

```
 1  A.  No, sir.
 2  Q.  Were you told that you could decline to speak to me?
 3  A.  Yes, sir.
 4  Q.  Who told you that?
 5  A.  Mr. McKoon.
 6  Q.  Did that event cause you more reluctance to give testimony
 7  in this proceeding?
 8  A.  Yes, sir.
 9  Q.  And were you ever contacted subsequent to the second event
10  to speak with the defendants' attorneys?
11  A.  I was contacted three times, twice in person and once on the
12  phone.
13  Q.  And was the phone conversation the third event of being
14  contacted by defense attorneys?
15  A.  The second.
16  Q.  That was the second.
17  A.  Yes, sir.
18  Q.  What was asked to you on that telephone conversation,
19  Captain Land?
20  A.  That was after I had spoken with David's attorneys, and they
21  wanted to know what we spoke about.
22  Q.  And did you believe on that occasion that you had a choice
23  of whether or not you wished to speak to defendants' attorneys?
24  A.  No, sir.
25  Q.  And were you on duty --
```

1  A.   Yes, sir.

2  Q.   -- at that time?  Did you feel that if you had wanted to

3  decline to speak to defendants' attorneys, that you could be

4  subject to discipline?

5  A.   If I declined to talk to them, yes.

6  Q.   Would you like to have had a choice?

7  A.   Yes, sir.

8  Q.   And what were you asked by defense counsel on the third

9  event of having been contacted by them?

10 A.   Just what we had talked about.

11 Q.   And what did you tell them?

12 A.   I told them that y'all wanted to know what my rank in the

13 department was, how things were going at this time in the

14 department, and about the meeting that we had with the mayor.

15 Q.   And is that what we had discussed as well?

16 A.   Yes, sir.

17 Q.   And did they want to know details about our conversation?

18 A.   No, sir.  He just, you know, asked me what we spoke about,

19 and I told him.

20 Q.   Did you feel you could be held insubordinate if you declined

21 to cooperate with defense counsel?

22 A.   Yes, sir.

23 Q.   And you didn't want to take a chance.

24 A.   Right.

25 Q.   Has this sequence of events that we have been discussing

1  made you even more reluctant to be on the stand today and give

2  testimony?

3  A.  Yes, sir.

4  Q.  Does it make you afraid?

5  A.  Yes, sir.

6  Q.  Why?

7  A.  I don't want to be fired.

8          MR. BROWN:  Your Honor, we'd like to have permission to

9  approach the bench, please.

10          THE COURT:  All right.  Let's make it fast.

11      (Bench conference, as follows:)

12          THE COURT:  All right.

13          MR. BROWN:  Your Honor, in view of your in-camera

14  examinations of yesterday, this line of questioning that we have

15  engaged in has been intended to establish that there is the

16  sufficient identification of this witness with the adverse party

17  in this case.  And we view this as falling under Federal Rule of

18  Civil Procedure -- excuse me -- the Federal Rules of Evidence

19  611 subparagraph (c) and as well under the authority of the

20  Eleventh Circuit's holding in *Haney versus Mizell Memorial*

21  *Hospital*, 744 F.2d 1467 -- is that the correct interpretation as

22  held by the circuit of the federal rule of evidence is that the

23  plaintiff is not required to make a threshold showing of actual

24  hostility by this witness and, therefore, we should be allowed

25  to examine this witness as an adverse party.

1       At this point, Your Honor, we frankly do not know whose

2   witness she is.  We have established that she has had multiple

3   contacts with the defendant.  She is a captain in the

4   department.  And we respectfully ask for you to reconsider

5   yesterday's ruling in that she has stated for the record now

6   under oath that she was frightened and afraid to give

7   testimony.  We request to treat her as an adverse witness and

8   lead her.

9       THE COURT:  Well, I've heard what you said, but I

10  haven't heard anything that would make me feel that she's

11  adverse to you.  If she answers questions in a way that you feel

12  like you need to -- that you need to ask her leading questions

13  after that, you know, try; if there's no objection, go forward.

14  I'm not going to give you a blanket leave to lead her based on

15  what I've heard.  So I -- she can't be treated as an adverse

16  witness, but I'll certainly be lenient as to leading questions

17  if it appears that that's necessary.

18      MR. BROWN:  We respectfully object to your ruling, but

19  we will proceed as you direct.

20      THE COURT:  All right.  Let's move on.

21      MR. BROWN:  Thank you, sir.

22  (Bench conference concluded)

23  Q.  (Mr. Brown, continuing:)  Captain Land?

24  A.  Yes, sir.

25  Q.  Do the firefighters of Phenix City have a firefighters

1   association of some sort?

2   A.  Yes, sir.

3   Q.  And are you a member of that organization?

4   A.  Yes, sir, I am.

5   Q.  Do you hold an office in that association?

6   A.  No, sir.

7   Q.  Do you attend meetings of that association?

8   A.  Yes, sir.

9   Q.  How frequently?

10        MR. MCKOON:  Judge, I'm going to object.  I'm not clear

11  about the relevance of this.  I thought we were out of that.

12        THE COURT:  What is the relevance?

13        MR. BROWN:  Background.

14        THE COURT:  What kind of background would be relevant

15  to the issue?

16        MR. BROWN:  Background along the line of -- regarding

17  her association that has been mentioned -- or her affiliation

18  with the same association as the plaintiff was a member.

19        THE COURT:  You can ask her about that.  Let's move on

20  to what you want to get into.

21        MR. BROWN:  Okay.

22  Q.  Captain Land, did you recall attending a meeting of the

23  firefighters association in the fall of 2005 wherein a

24  journalist may have attended?

25  A.  Yes, sir.

1  Q.  And do you know who that reporter was?

2  A.  I believe it was Chuck Williams.

3  Q.  And what newspaper did he write for?

4  A.  *Ledger-Enquirer*.

5  Q.  And do you know why he attended?

6  A.  What I understood him to say is he wanted to hear our side

7  of the story.

8  Q.  And did he tell you anything else about why he had appeared

9  at the meeting?

10  A.  He said that he had already talked to the fire chief and the

11  personnel and the city manager and gotten their side and that he

12  had permission to speak to us, and that he wanted to hear our

13  side of the story.

14  Q.  And did you infer from his comments that you had permission

15  to speak with him?

16  A.  Yes, sir.

17  Q.  And did you make the same inference from every other member

18  of that organization that was at that meeting?

19  A.  Yes, sir.

20  Q.  Did anyone from the department or the city ever dispute that

21  fact to you?

22  A.  No, sir.

23  Q.  If you would, please, would you open the binder in front of

24  you?  And I would like to ask you to look at Exhibit #10-E.  Can

25  you identify that document, Captain Land?

1   A.   Yes, sir.

2   Q.   What is it?

3   A.   It's a statement that I had written.

4   Q.   And would you mind reading that statement, please?   Excuse

5   me.

6          MR. BROWN:   Plaintiffs move into admission Exhibit

7   #10-E, please, Your Honor.

8          THE COURT:   It's admitted.

9   Q.   Would you please read for the record the statement contained

10  on that sheet.

11  A.   To whom it may concern.   I was contacted by the journalist

12  of the *Ledger-Enquirer* for my personal views.   The journalist

13  advised me that he had spoken with the fire chief, city

14  attorney, personnel for the fire department, and personnel for

15  the city.   I was not on duty during this time that I spoke with

16  the journalist, and I was told that the fire chief knew that the

17  journalist was talking to other people on the department.

18  Q.   And to the best of your knowledge, is that a true and

19  accurate copy of the statement that you had given at that time?

20  A.   Yes, sir.

21  Q.   It is not dated, is it?

22  A.   No, sir, it's not.

23  Q.   Can you tell the jury approximately when you gave that?

24  A.   It was approximately a couple of days after we had spoken

25  with the journalist.

1  Q.  Did anyone from the management of the city or the department

2  speak with you after the meeting concerning your attendance at

3  that meeting?

4  A.  The -- our assistant chief talked to us.

5  Q.  And what did he tell you?

6  A.  That we were not allowed to speak to any media without

7  getting permission.

8  Q.  And did you voluntarily provide the statement that you've

9  just read into evidence?

10  A.  We were told to write statements.

11  Q.  And who told you to write that statement?

12  A.  My assistant chief.

13  Q.  And who was that?

14  A.  I can't recall at this time who my assistant chief was at

15  the time.

16  Q.  Were you told to do anything else concerning your attendance

17  at the meeting of the firefighters association that resulted in

18  the article?

19  A.  Not that I recall.

20  Q.  Were you disciplined in any way for speaking to that

21  reporter?

22  A.  We were given counseling forms for speaking to the media.

23  Q.  What is a counseling form?

24  A.  It's a written document that goes into your file that states

25  that you have been counseled about talking to the media.  It

1    stays in your record.

2    Q.  And what is the significance of that counseling form?

3    A.  Basically, I mean if it happens again, I can be written up

4    for it.

5    Q.  And at that time, what was your understanding -- or at the

6    time of the meeting -- of your right to speak to a member of the

7    media off duty?

8    A.  At that time, we didn't know that we could not speak to the

9    media.

10   Q.  Did you feel you were within your legal rights to do so?

11   A.  Yes, sir.

12   Q.  Was the union meeting with that reporter the only

13   association meeting you ever attended?

14   A.  No, sir.

15   Q.  You attended other meetings?

16   A.  Yes, sir.

17   Q.  Did you ever attend any meetings of the firefighters -- of

18   the firefighters association where the mayor was in attendance?

19   A.  Yes, sir.

20   Q.  Would you please describe or explain to the jury that event?

21   A.  We had a meeting with the mayor before he was elected just

22   talking to him about some of the problems that we had at that

23   time, some of our concerns and issues.  And he said that he had

24   an open-door policy, that we could come talk to him, that he

25   would look out for us and take care of us.

1      After he was elected, we had a retirement party for one of

2  the guys, Todd Boatner, and he, you know, stated that -- you

3  know, that we could come talk to him, that he would take care of

4  us, he had an open-door policy, that we could come talk to him

5  anytime and we would not suffer any repercussions for talking to

6  him.

7  Q.  Other than the testimony that you've just stated, what did

8  an open-door policy mean to you?

9  A.  I felt that we could go to his office anytime and talk to

10  him and, you know, if we had any issues, talk to him and seek

11  his advice and let him know what was going on.

12  Q.  Did you ever personally take the mayor up on his invitation

13  to walk through his open door?

14  A.  No, sir.

15  Q.  Did you believe you, though, had that right based on what he

16  had told you?

17  A.  Yes, sir.

18  Q.  Do you believe that same right applied to every other

19  firefighter?

20  A.  Yes, sir.

21  Q.  Do you -- or did you feel it was limited only to those

22  firefighters who were in attendance at those meetings?

23  A.  No, sir.

24  Q.  Did -- other than the mayor, were there any other elected

25  officials that appeared at association meetings?

305

1  A.  Yes, sir.  Ray Bush, the council member at large.

2  Q.  Did Mr. Bush make any particular comments to the

3  firefighters association?

4  A.  He said that he had an open-door policy as well.

5  Q.  So another council person.

6  A.  Yes, sir.

7  Q.  Do you recall -- and let me make sure I understand.  Do

8  you -- did you say -- do you recall meetings where the mayor

9  attended both before he was elected and after he was elected?

10  A.  Yes, sir.

11  Q.  And he extended his open door at both of those events.

12  A.  Yes, sir.

13  Q.  Did you believe at that time that you had to seek permission

14  from anyone else prior to taking the mayor up on his open-door

15  policy?

16  A.  No, sir, I didn't.

17  Q.  Did he mention to the firefighters that they had to take any

18  other steps before walking through his open door?

19  A.  No, sir.

20  Q.  Digressing back to the event where the reporter spoke at

21  the -- or attended the association meeting, did you ever, after

22  that time, speak to another member of the media?

23  A.  No, sir, I did not.

24  Q.  Did you do your best to comply with the rules and the

25  regulations and guidelines of the department?

```
 1  A.  Yes, sir.

 2  Q.  And they were explained to you, correct?

 3  A.  Yes, sir.

 4  Q.  Do you know of any other fire department employee who spoke

 5  to the media after the -- the article was published?

 6  A.  Not to my knowledge.

 7  Q.  Do you know if the plaintiff ever spoke to the media again

 8  after that one event?

 9  A.  No, sir.

10  Q.  Moving to a different matter, did you have occasion at some

11  time after the newspaper article was published that the city was

12  considering expanding the probation period for merit system

13  employees?

14  A.  Yes, sir.

15  Q.  And when did that occur?

16  A.  I'm not sure how long after that.

17  Q.  Do you -- would you -- do you agree that it would be in the

18  spring of 2006, about six months or so after the newspaper event?

19  A.  That sounds about right.

20  Q.  Okay.  And at that time -- or excuse me.  When did you first

21  learn of it?

22  A.  When David Davis called me and told me about it.

23  Q.  So the plaintiff made a phone call to you and told you about

24  the ordinance.

25  A.  He left a voice mail on my cell phone.
```

1  Q.  Did you return it?

2  A.  No, sir, I didn't.

3  Q.  Did you attempt to ascertain what the proposed ordinance was

4  about?

5  A.  We did ask on duty what the ordinance was about.  And it was

6  lack of communication, really, because we were unclear exactly

7  what the ordinance was about at the time.

8  Q.  Based on the knowledge that you had when you learned from

9  the plaintiff that there was a proposed ordinance before city

10  council, were you opposed to it?

11  A.  At that time, I was.  Yes, sir.

12  Q.  And was it your understanding that the plaintiff shared that

13  concern with you?

14  A.  Yes, sir.

15  Q.  Or that you shared it with him?

16  A.  Yes, sir.

17  Q.  Okay.  So if I understand correctly, you never had a

18  conversation with Mr. Davis prior to the voting of the ordinance?

19  A.  No, sir, I didn't.

20  Q.  But you shared his opinion.

21  A.  Yes, sir.

22  Q.  Did you believe based on what you knew at that time that the

23  plaintiff, Mr. Davis, had a right to speak with the mayor about

24  the proposed ordinance?

25  A.  Yes, sir, I did.

```
 1  Q.   As a private citizen?
 2  A.   Yes, sir.
 3  Q.   As an off-duty employee?
 4  A.   Yes, sir.
 5  Q.   Now, do you know anything of the content of the conversation
 6  that the plaintiff had over the telephone with the mayor?
 7  A.   No, sir, I don't.
 8  Q.   Did he call you after having the conversation and report to
 9  you what was spoken about?
10  A.   No, sir.
11  Q.   Do you know of anyone else that the plaintiff may have
12  spoken with after his conversation with the mayor?
13  A.   No, sir.
14  Q.   Did anyone come to you during the time period after he had
15  spoken with the mayor but prior to his termination and tell you
16  he had had a conversation?
17  A.   I did hear through the department that he had had a
18  conversation with the mayor.
19  Q.   When did you hear that?
20  A.   I believe it was the next shift that I worked.
21  Q.   Do you recall when that shift occurred?
22  A.   It was I want to say on a Wednesday.  I'm not really sure.
23  It was during the week.
24  Q.   Do you recall whether that was before or after the city
25  council had passed the ordinance?
```

1  A.   It was after.

2  Q.   And to your knowledge, did -- can you -- can you describe

3  more specifically the conversation that you heard that the

4  plaintiff had made a phone call?

5  A.   All I heard was that he had made a phone call to the mayor

6  and that he was called in to give a statement on it.

7  Q.   During that time period and the time period of when you had

8  received that voice mail from the plaintiff about the proposed

9  ordinance and the time that he was eventually terminated, was

10 that phone call a topic of -- a particular topic of conversation

11 in the fire station?

12 A.   No, sir.

13 Q.   Do you know of any disharmony that it caused?

14 A.   No, sir.

15 Q.   Do you know of any interruption of fire department services

16 that the plaintiff's phone call caused in the department?

17 A.   No, sir.

18 Q.   Do you know of any relationships that the plaintiff's phone

19 call with the mayor jeopardized?

20 A.   No, sir.

21 Q.   At that time, did you believe that the plaintiff, Mr. Davis,

22 had violated any rules by speaking to the mayor?

23 A.   No, sir, I didn't.

24        MR. BROWN:  That's all I have at this time, Your Honor.

25        THE COURT:  All right.  Let's take a break before

 1   cross-examination.

 2        Members of the jury, I'll remind you not to let anybody

 3   talk to you about the case or in your presence.  Don't talk to

 4   anybody else, including yourselves.  And be back in the -- be in

 5   the jury room in time to start back at ten minutes after four.

 6      (Jury out at 3:56 p.m.)

 7        THE COURT:  Court is in recess until 4:10.

 8      (Recess at 3:56 p.m. until 4:13 p.m., at which time

 9       proceedings reconvened with the jury present, as follows:)

10        THE CLERK:  Court is in session.  You may be seated.

11        THE COURT:  All right.  Mr. McKoon, cross-examine.

12                     CROSS-EXAMINATION

13   BY MR. MCKOON:

14   Q.  Captain Land, I'm going to start off with this series of

15   questions about you coming to my office and so on.  Do you

16   recall how that first came about; in other words, how it was

17   that I was first notified that you might be called as a witness

18   for the plaintiff in this case or as a witness in this case,

19   period?

20   A.  Yes, sir.  I called Fire Chief Wallace Hunter to let him

21   know that I was contacted by David's attorneys, that they wanted

22   to speak to me.  And he said that he would call you to let you

23   know and that he would call me back.

24   Q.  Okay.  And do you recall whether Chief Hunter called you

25   back or I called you back?

1   A.   Chief Hunter called me back.

2   Q.   All right.  And then what happened next?

3   A.   He told me that I needed to go to your office, that you were

4   waiting on me.

5   Q.   All right.  And did Chief Hunter ever talk to you about your

6   testimony in any way in this case?

7   A.   No, sir.

8   Q.   All right.  And has he -- has he ever done that at any time?

9   A.   No, sir.

10  Q.   Has he ever tried to influence your testimony in this case?

11  A.   No, sir.

12  Q.   Have I ever tried to influence your testimony in this case?

13  A.   No, sir.

14  Q.   When you came down to my office, at that time you had not

15  actually talked to the plaintiff's attorneys; is that correct?

16  A.   That's correct.

17  Q.   All right.  And I don't know on which occasion, but when I

18  first talked to you, do you recall me telling you that if you

19  were called as a witness in this case by either side, that there

20  would be absolutely no effect on your job whatsoever?

21  A.   Yes, sir.

22  Q.   And do you also recall me telling you that I would -- that

23  I, Jim McKoon, would never do anything to jeopardize your career?

24  A.   Yes, sir.

25  Q.   In fact, I -- did I say something like lawsuits come and go,

1  but somebody's career is too important to get messed up over a

2  lawsuit?

3  A.   Yes, sir.

4  Q.   Okay.  Did I also tell you that I wouldn't ask you anything

5  you didn't want to tell me about?

6  A.   Yes, sir.

7  Q.   At any time when you were talking to me, did -- and I

8  understand how you say you felt now.  But at any time while you

9  were talking to me, did you ever say, Mr. McKoon, I'd just

10 rather not talk to you about this?

11 A.   No, sir, I didn't.

12 Q.   Did the plaintiff's attorneys in this case ever ask you what

13 questions I had asked you?

14 A.   I advised them that you wanted to know if I had spoke with

15 them.

16 Q.   Okay.  But did they ever ask you any of the questions that I

17 had asked you?

18 A.   They just asked me what I told them.  I said what we had

19 talked about.  No, sir.

20 Q.   That's what I'm saying.  You told them what you and I talked

21 about --

22 A.   Yes, sir.

23 Q.   -- is that correct?

24 A.   Yes, sir.

25 Q.   Just like you told me what you and they talked about --

```
 1  A.  Yes, sir.
 2  Q.  -- is that right?  You were kind of caught in the middle
 3  here, weren't you?
 4  A.  Yes, sir.
 5  Q.  All right.  Now, did I tell you that -- oh.  Did I also say
 6  at any time -- did I ever ask you to say anything up here that
 7  would be untrue?
 8  A.  No, sir.
 9  Q.  In fact, did I emphasize to you that all I ever wanted you
10  to do is tell the truth in this case?
11  A.  Yes, sir.
12  Q.  Is that right?  With that all being said, let's now move on
13  to your -- the case, okay?
14  A.  Yes, sir.
15  Q.  The -- back in 2005 when this incident took place about
16  addressing the newspaper and all, did you -- at that time, what
17  was your position in the department?
18  A.  I was a sergeant.
19  Q.  All right.  And what did you -- what were your duties?  What
20  did you do?
21  A.  Maintenance of the truck and driving the apparatus.
22  Q.  Were you called a driver engineer --
23  A.  Yes, sir.
24  Q.  -- basically at that time?  And you were one of the people
25  in this group that was at a union meeting when there was a
```

 1  reporter there; is that right?

 2  A.  Yes, sir.

 3  Q.  And one of the things I asked you about when you were at my

 4  office was this statement you had made, the one that Mr. Brown

 5  referred to a minute ago, this #10-E?

 6  A.  Yes, sir.

 7  Q.  Okay.  And, you know, I didn't notice until today, but you

 8  said I was told that the chief knew the journalist was talking

 9  to other people in the department.  Who told you that?

10  A.  He did.  The journalist.

11  Q.  Chuck Williams?

12  A.  Yes, sir.

13  Q.  Okay.  Did you ever confirm whether or not that was true?

14  A.  No, sir, we didn't.

15  Q.  Have you ever known a journalist to tell somebody something

16  that was not true in order to get them to talk to them?

17  A.  I've never been in that situation before.

18  Q.  Okay.  Was -- in 2005 when y'all had this meeting, was there

19  a lot of, I guess, disgruntlement in the department?

20  A.  Yes, sir.

21  Q.  And how long had Chief Hunter been the chief at this time?

22  A.  I'm not sure at this time.

23  Q.  Well, if he had come in in, let's say, May of 2005, that

24  would have made him the chief approximately six months by

25  September; is that right?

1  A.  Yes, sir.

2  Q.  After he got there, did he start trying to make changes in

3  the department?

4          MR. BROWN:  Objection.  Not within the scope of direct.

5          THE COURT:  I think it's closely enough related to the

6  direct.  I overrule it.

7  Q.  All I'm saying is did he make changes, start to make changes

8  in the department?

9  A.  It -- it's hard -- I mean --

10          MR. BROWN:  Objection, Your Honor.  Same objection.

11          MR. MCKOON:  Okay.  I'll tell you what, Judge.  I'll go

12  to another question.

13          THE COURT:  All right.  Go ahead.

14  Q.  Let me just do this.  When -- once the -- this meeting with

15  the journalist took place and there was this article in the

16  newspaper, were you called in and asked to sign a document

17  something like this where it explained to you that you were in a

18  paramilitary organization; if a firefighter has a grievance, it

19  shall be presented in accordance with the routine grievance

20  procedure?  And then it goes on to say, it occurred to me some

21  department members might not be as familiar as they should with

22  the merit system rules.  And then they said, these rules must be

23  followed, and they were attached.  Do you recall signing

24  something like that?

25  A.  Yes, sir.

1  Q.  All right.  And so no one received any discipline of any

2  kind except signing a counseling form and signing one of these;

3  is that right?

4  A.  That's correct.

5  Q.  And did you understand that the purpose of this was to

6  inform people in the department, just in case they didn't know,

7  what the rules exactly were?

8  A.  Yes, sir.

9  Q.  All right.  And did you agree to do that and abide by the

10  rules after that point?

11  A.  Yes, sir.

12  Q.  In your judgment, was the fact that you participated in this

13  news thing, was it ever held against you in any way?

14  A.  Not directly, no, sir.

15  Q.  Okay.  Well, in fact, you were promoted to captain at some

16  point in time, weren't you?

17  A.  Two years later.  Yes, sir.

18  Q.  All right.  I mean did it stop you from getting promoted to

19  captain, in your judgment?

20  A.  No, sir.

21  Q.  And what is your position currently in the department?

22  A.  Administrative captain.

23  Q.  And what do you do there as administrative captain?

24  A.  I work directly for the fire chief and in fire prevention

25  and training.

1  Q.   What hours do you work?

2  A.   Eight to five, Monday through Friday.

3  Q.   Has Chief Hunter been fair with you?

4  A.   Yes, sir.

5  Q.   On another note, I believe that there was some testimony

6  earlier about plaintiff's attorneys asking you about how things

7  are going in the department now.  Do you remember that?

8  A.   Yes, sir.

9       MR. BROWN:  Objection.  I do not believe that

10 information came in on direct examination.  Not within the scope

11 of direct examination.

12      THE COURT:  I don't recall that either.  Unless you can

13 show me how that's relevant, I don't recall that being testified

14 to.

15      MR. MCKOON:  Well, all right.  Let me --

16      THE COURT:  I think she was asked about how -- how it

17 was at the time then, but I'm not sure what she remembers.  You

18 can ask her.

19 Q.   Let me ask it this way, I guess.  Were you asked by the

20 plaintiff's attorneys how things were going now?

21 A.   I believe I was.  Yes, sir.

22 Q.   Okay.  And what did you tell them?

23 A.   Things are going well right now.

24 Q.   All right.  Are they much improved over what was happening

25 in September of 2005?

1  A.  Things are much better now.  Yes, sir.

2  Q.  Was there a lot of disruption and problems in the department

3  at that time?

4  A.  In 2005, yes, sir.

5  Q.  Yes.  And what about in early 2006?  Had that changed any?

6  A.  It was getting better.

7  Q.  Okay.  To what do you attribute that?

8  A.  I believe a lot of it was the time that Chief Hunter had as

9  the fire chief and with Chief Waters coming in.

10  Q.  And when Chief Waters came in, did he institute some changes

11  that helped the department, in your judgment?

12  A.  Yes, sir.

13  Q.  And did things begin to kind of straighten out at that point?

14  A.  Yes, sir.

15  Q.  And have they been pretty good since then?

16  A.  Yes, sir.

17  Q.  Much improved over what they were before?

18  A.  Yes, sir.

19  Q.  I believe you were asked on direct examination about whether

20  or not you were for or against this probationary change.  And I

21  believe your answer was at that time, I was against it.

22  A.  At that time, yes, sir.

23  Q.  How do you feel about it now?

24        MR. BROWN:  Objection.  Relevance, Your Honor.

25        THE COURT:  Well, she testified that based on the

1  information she had then, she was opposed to it.  What would be

2  the relevance of any change?

3       MR. MCKOON:  Well, my feeling, Judge, is it just goes

4  to the fact that it was a good idea.

5       THE COURT:  I'll allow you to ask her if she has

6  additional information to what she had then.  She's testified as

7  to what her opinion was then.

8  Q.  Did you -- do you have additional information before you now

9  about that probationary change that you didn't have at the time?

10  A.  It was clarified of what the change was for.

11  Q.  Okay.  When did you get the clarification?

12  A.  It was probably a couple months after, maybe a couple weeks

13  to a month after it was passed.

14  Q.  Prior to the change taking place, do you recall Chief Waters

15  ever discussing it at any training meetings that this

16  probation -- a change in the probationary period was going to be

17  proposed or come about?

18  A.  I heard talk about it.  I didn't really think about it

19  much.  I mean it was -- it was -- I vaguely remember the

20  conversations that were taking place at that time.

21  Q.  Just a couple of other questions.  As a firefighter, is it

22  your duties -- one of your duties to be familiar with your

23  standard operating procedures?

24  A.  Yes, sir.

25  Q.  And also with the merit system, if something comes up about

1  the merit system?

2  A.  Yes, sir.

3  Q.  And are those documents readily available to you?  In other

4  words, can you get hold of a standard operating procedure book

5  pretty easily if you need to get hold of one?

6  A.  We're issued one when we're hired.

7  Q.  Okay.  So you have one -- a personal book that you were

8  given --

9  A.  Yes, sir.

10 Q.  -- with the procedures in it.  And as far as the merit

11 system, is one of those kept pretty much at each station?

12 A.  It's in the battalion chief's office.

13 Q.  So if you have a question about that, you can go to anybody

14 above you and ask about it.  Is that also correct?

15 A.  Yes, sir.

16 Q.  When you're in a firefighter position, are you a firefighter

17 only when you're on duty?

18      MR. BROWN:  Objection.  Not within the scope of direct

19 examination.

20      THE COURT:  Sustained.

21      MR. MCKOON:  That's all I have.

22      THE COURT:  All right.  Any redirect?

23      MR. BROWN:  Yes, sir.

24

25

```
 1                    REDIRECT EXAMINATION
 2  BY MR. BROWN:
 3  Q.   Captain Land, defense counsel asked you who directed you to
 4  speak with him.  And who gave you that directive?
 5  A.   Chief Hunter asked me to go to his office to speak to him.
 6  Q.   Is Chief Hunter in your chain of command?
 7  A.   Yes, sir.  He's my immediate supervisor.
 8  Q.   Is Mr. McKoon in your chain of command?
 9  A.   Not that I'm aware of.
10  Q.   So any assertions made by Mr. McKoon are not relevant to
11  your particular job functions within the chain of command.
12  A.   That's correct.
13  Q.   Mr. McKoon mentioned a paramilitary organization.  Do you
14  recall that?
15  A.   Yes, sir.
16  Q.   What does that mean to you?
17  A.   We operate like the military, but not as strict.  We have
18  guidelines.
19  Q.   Can you elaborate any further on what being in a
20  paramilitary organization means to you?
21  A.   No, sir.
22  Q.   Okay.  Do you believe by virtue of the fact that you are a
23  member of a paramilitary organization that you have surrendered
24  your off-duty speech by being a member of that organization?
25  A.   No, sir.
```

1          MR. MCKOON:  Object.

2          THE COURT:  I'm sorry?

3          MR. MCKOON:  I'm sorry.  I object to the form of that

4    question.

5          THE COURT:  Yes.  I sustain.

6    Q.  Do you believe members of paramilitary organizations have

7    First Amendment freedom of speech?

8    A.  Yes, sir.

9    Q.  And in your view, is that particularly important to off-duty

10   speech?

11   A.  Yes, sir.

12   Q.  On matters of private concern?

13   A.  Yes, sir.

14   Q.  Mr. McKoon mentioned the present state of affairs or whether

15   or not matters had improved in the department.  Do you recall

16   that line of questioning?

17   A.  Yes, sir.

18   Q.  Do you believe it's a plausible explanation that your

19   participation in letting the public know about your concerns

20   through that newspaper article could have, in fact, improved

21   some things?

22   A.  It's a possibility.

23   Q.  And you had mentioned that -- or he asked you about the

24   information that you had -- and I did as well -- at the time

25   that you had to make this decision about the proposed ordinance

 1  on probation.  Do you recall that?

 2  A.  Yes, sir.

 3  Q.  And do you believe, miscommunication notwithstanding, that

 4  you have a First Amendment right to speak on matters even if you

 5  don't have good information?

 6  A.  Yes, sir.

 7          MR. BROWN:  Thank you.

 8          THE COURT:  Any recross?

 9          MR. MCKOON:  I don't think so, Your Honor.

10          THE COURT:  All right.  You may come down, Captain

11  Land.

12          May Captain Land be excused?  May Captain Land be

13  excused?

14          MR. BROWN:  The plaintiffs excuse her, Your Honor.

15          MR. MCKOON:  Yes.  She's not under my subpoena.

16          You're the one that got her here.

17          THE COURT:  All right.  You're free to go, Captain

18  Land.

19          Call your next witness.

20          MR. BROWN:  Plaintiffs call William Pitts.

21      (Brief pause)

22          THE CLERK:  Would you raise your right hand.

23      (The witness is sworn)

24          THE CLERK:  Be seated.

25          THE COURT:  All right.  Mr. Brown.

1          **WILLIAM MYRON PITTS, JR.**, the witness, having been

2     duly sworn, testified, as follows:

3                        DIRECT EXAMINATION

4     BY MR. BROWN:

5     Q.   Good afternoon.

6     A.   Good afternoon.

7     Q.   Please state your full name for the record.

8     A.   William Myron Pitts, Jr.

9     Q.   Mr. Pitts, where do you reside?

10    A.   Salem, Alabama.

11    Q.   What is your address there?

12    A.   686 Lee Road 439.

13    Q.   And how long have you resided at that location?

14    A.   About 13 years.

15    Q.   Where did you attend high school?

16    A.   Smiths Station High School.

17    Q.   And what's your occupation, sir?

18    A.   I'm a sergeant with the Phenix City Fire Department.

19    Q.   And how long have you been employed at the fire department?

20    A.   Eleven and a half -- ten and a half years.

21    Q.   Mr. Pitts, are you here today by virtue of a subpoena that

22    has compelled you to be here?

23    A.   Yes, sir.

24    Q.   Where did that subpoena issue from?

25    A.   I actually got two subpoenas.

1    Q.   From both parties in the lawsuit?

2    A.   Yes, sir.

3    Q.   Which subpoena did you receive first?

4    A.   I guess y'all's.  It got FedExed to me and everything.

5    Q.   And I may refer somewhat in this line of questioning as the

6    plaintiff.  And just so you understand, the plaintiff is sitting

7    to my right, Mr. Davis, and the defendants are the city.

8    A.   Yes, sir.

9    Q.   And did you at some point in time prior to receiving the

10   subpoena from my office have an understanding that the plaintiff

11   wanted you to provide testimony in this proceeding?

12   A.   Yes, sir.

13   Q.   And did you, subsequent to that, contact his counsel to seek

14   advice about that matter?

15   A.   About the -- talk to them?

16   Q.   Yes.

17   A.   When he -- when he -- Mr. Davis had told me about it and

18   everything, I -- I contacted them, yes.

19   Q.   And did we, after that point in time, begin to ascertain the

20   facts that you knew about this case?

21   A.   What about the facts, sir?

22   Q.   The facts that you knew about Mr. Davis's lawsuit.

23   A.   Yes, sir.

24   Q.   And after that time, were you contacted by counsel for the

25   defense?

1   A.   Yes, sir.

2   Q.   And what -- how did that occur?

3   A.   We were in a class, in an incident command class at our

4   training center.  And Captain Land and myself were sitting in

5   there, and they came to us and said that we needed to report to

6   Mr. McKoon's office ASAP.

7   Q.   What did you think at that time?

8   A.   That we better get down there pretty quick.

9   Q.   Did you consider that an order?

10  A.   Yes, sir.

11  Q.   And just to clarify the record, were you on duty?

12  A.   Yes, sir.

13  Q.   Did that upset or make you reluctant about matters?

14  A.   Made me -- I was pretty nervous about it.

15  Q.   Are you reluctant to be here today?

16  A.   Yes, sir.

17  Q.   Why?

18  A.   I mean -- I mean it's -- I'm basically giving testimony

19  against my employer, you know, and pretty nervous about it.  I

20  just -- I just am.

21  Q.   When you were called down to the defense counsel's offices,

22  what were you told?

23  A.   He had seen Captain Land at first, and he just told me to

24  kind of hang on for a second.  And when I went in, he just told

25  me that he had a few questions he wanted to ask me.

1  Q.   What were those questions?

2  A.   He was basically asking about a -- the ordinance that we

3  were going through and everything at the time and, you know,

4  what I could, you know, remember about it and stuff.

5  Q.   Did you feel you had a choice as to whether or not you

6  could -- could speak to the city's attorneys?

7  A.   I mean, like I said, when we were asked down there and

8  everything, when they -- to me, it's just the way it all went

9  down, how we were supposed to go, that we were told that we

10  needed to be there ASAP.  And I basically thought if anything --

11  if he asked questions, I was going to answer them to the best of

12  my ability.

13  Q.   Did you feel that you could have declined that invitation to

14  go to the defense counsel's office?

15  A.   No, sir.  I mean just like I said, we weren't really asked.

16  It was just -- we were told just to go down there and stuff.

17  Q.   Were you ever told you didn't have to if you didn't want to?

18  A.   No, sir.  No, sir.

19  Q.   Were you ever informed that you didn't have to speak to me

20  if you didn't want to?

21  A.   No, sir.

22  Q.   Did you feel comfortable carrying out that order?

23  A.   No, sir.  I'm not really comfortable about anything.

24  Q.   Was that the only occasion that you had an opportunity to

25  visit with defense counsel on this case?

1  A.  No, sir.  I had to go back down there about an hour or so
2  later -- well, give or take, you know, a few minutes.  I had to
3  go back down there.
4  Q.  And what was the purpose of that?
5  A.  Some of the things that Mr. McKoon and myself had talked
6  about and everything, he -- it was a draft of a letter and
7  everything.  And he told me to read over it to make sure if this
8  is basically what I was saying at the time.  And that's what it
9  was.  It was to sign a document.
10  Q.  Did you feel comfortable signing that document?
11  A.  No, sir.
12  Q.  Did you truly wish to sign that document?
13  A.  No, sir.
14  Q.  Why not?
15  A.  I just -- I was kind of nervous at the time.  You know what
16  I mean?  It's just -- I didn't really feel I had a choice to.  I
17  mean, like I said, I was nervous the first time I went down
18  there.  And the second time I had to go, I was even -- I didn't
19  know -- really know what was going on.  I was even, you know,
20  more nervous the second time, the second time than the first
21  time, because I didn't know if I had done something wrong the
22  first time that I had to go back the second time.
23  Q.  Did that make you even more reluctant to be a part of
24  providing evidence in this lawsuit?
25  A.  Yes, sir.

1  Q.  Are you concerned about negative repercussions for

2  participating in this lawsuit?

3  A.  Yes, sir.  Just like I said, it's just -- it's my employer.

4  That's it.

5  Q.  Well, let me switch gears a little bit with you and ask you

6  about one particular event in this lawsuit.  Do you recall in

7  the spring of 2006 a proposed ordinance that was before city

8  council relating to the probation period for merit system

9  employees?

10  A.  Yes, sir.

11  Q.  And can you describe for me how you found out about that

12  ordinance?

13  A.  The -- the first time or the second time?

14  Q.  The second.

15  A.  The second time, I was at home.  My wife was telling me

16  about it.  She knew about the first time we had it, and we were

17  opposed to it.  And she was reading in the newspaper that it was

18  going to try to be passed again and everything, and so she

19  called me and told me about it.  So I read the article and

20  everything, and that's how I found out about it.

21  Q.  And did you do anything in particular after you found out

22  about it?

23  A.  Yes, sir.  I called Mr. Davis.

24  Q.  You called the plaintiff?

25  A.  The plaintiff.  Yes, sir.  I'm sorry.

1  Q.  Do you recall what day of the week that was on?

2  A.  It was -- I believe it was a Sunday.  Almost a hundred

3  percent sure.  Because my wife works basically, you know, five

4  days a week -- or did at the time -- and she was off that

5  Sunday.  And that's how I knew.

6  Q.  Do you recall whether or not -- or where the plaintiff was

7  when you called him?

8  A.  Yes, sir.  He was at work.

9  Q.  So he was at work at the firehouse.

10  A.  Yes, sir.

11  Q.  What did you tell him?

12  A.  I just told him that there was -- the new ordinance coming

13  up was in the paper again, that they were going to try to pass

14  it.  Basically, I just told him to look at the newspaper and

15  that it was in there again and they were -- it was going to try

16  to go through.

17  Q.  Did y'all discuss it any further?

18  A.  I talked to him the next day.  I mean it was basically

19  pretty short the first time I talked to him.  And the next day,

20  I talked to him again.

21  Q.  And that was the -- on that Sunday, that was the very first

22  time you had learned of this proposed ordinance.

23  A.  Yes, sir.

24  Q.  Were you aware that that ordinance had received a prior

25  reading at city council?

1  A.  The first time, it did receive one and it didn't get passed

2  the first time.  And that's why there was the second time.

3  They -- it was going for -- I guess to be passed or whatever

4  again.

5  Q.  But on this second event, were you aware on that Sunday that

6  that proposed ordinance had already received a first reading?

7  A.  No, sir.

8  Q.  Do you recall anything else about the conversation you had

9  with the plaintiff on that Sunday?

10  A.  No, sir.  It was pretty -- pretty much just that it was back

11  in the newspaper again.

12  Q.  Now, if I heard you correctly, you said you also spoke with

13  the plaintiff, Mr. Davis, the following day, on Monday.

14  A.  Yes, sir.

15  Q.  Can you tell me about that conversation?

16  A.  It was basically -- we sat there, and he had found out what

17  the ordinance was going to be about and everything.  And for --

18  we basically was just going to call members of our association

19  to just let them know that the ordinance that had got -- that

20  didn't pass the first time was back up again.  And we just

21  wanted to basically get their opinion on it and see if they were

22  either for it or against it.

23  Q.  Did you have any knowledge at that time that the plaintiff

24  would contact any of your elected officials at Phenix City?

25  A.  No, sir.

```
 1  Q.  Did you ask him to?

 2  A.  Did I ask him if he did or ask him to do it?

 3  Q.  Did you ask him to contact any of your elected officials?

 4  A.  No, sir.  We were basically -- at that time, we were

 5  basically just contacting the members of our association.

 6  Q.  Did the plaintiff tell you he was going to call?

 7  A.  Call the --

 8  Q.  Any of your elected officials.

 9  A.  No, sir.

10  Q.  On that Monday, did you voice any opinion about that

11  proposed ordinance to the plaintiff, Mr. Davis?

12  A.  No, sir.  We -- like I said, we basically were sitting there

13  talking about just calling our members and everything.

14  Q.  What was -- what did you recommend to the plaintiff what he

15  should tell the members?

16  A.  That that -- that the same ordinance that we -- that we

17  opposed the first time was back up again and that we needed to,

18  I guess, you know, regroup and try to get it taken care of

19  again.

20  Q.  What do you mean by get it taken care of?

21  A.  I mean try to -- try to not -- try not to get it passed, I

22  guess.  Just try to not let it go through.

23  Q.  Were you in opposition, then, to that ordinance based on

24  what you knew at that time?

25  A.  Yes, sir.
```

1  Q.  Do you recall being at any members -- or any meetings of the

2  firefighters association where any of the city officials

3  attended?

4  A.  Yes, sir.

5  Q.  Who were those city officials?

6  A.  It was Mayor Hardin and Ray Bush.

7  Q.  Did Mayor Hardin make any particular comments to the members

8  of the association?

9  A.  Yes, sir.  He told us that he was basically there to take

10  care of us.  He knew of problems we had in the past with

11  other, I guess, councils and stuff like that.  He said he was

12  there to take care of us and that if we ever needed anything

13  from him, that we could contact him.

14  Q.  Do you recall if he used the term that he had an open-door

15  policy?

16  A.  Yes, sir.

17  Q.  Did he in fact use that term?

18  A.  Yes, sir.

19  Q.  What did that mean to you?

20  A.  I mean that's pretty much self-explanatory.  I mean open

21  door is open door.  You know, I mean that means you can go to

22  him anytime you have a problem.  You know what I mean?

23  Q.  Did he indicate to anyone at that meeting that there was any

24  procedural steps they needed to take prior to coming and walking

25  through his open door?

1   A.   No, sir.

2   Q.   Did you feel that you had permission from him to utilize

3   that open door?

4   A.   Yes, sir.

5   Q.   Did you feel that every other firefighter had that same

6   right and permission?

7   A.   Yes, sir.

8   Q.   It was interpreted by you, his comments, as a blanket

9   invitation?

10  A.   Yes, sir.

11  Q.   How many meetings do you recall that subject coming up by

12  the mayor?

13  A.   Two.

14  Q.   Do you recall whether they were prior to his election or

15  after his election?

16  A.   I believe one was before the election and one was afterwards.

17  Q.   Did you take him at his word?

18  A.   Yes, sir.

19  Q.   Either way.

20  A.   Yes, sir.

21  Q.   Let me go back to your testimony on the Monday that you

22  called David Davis after learning about the proposed probation

23  period.  Based on your information that you had at that time,

24  did you believe David Davis had permission to speak to the mayor

25  about a proposed ordinance?

1  A.  Yes, sir.  I mean like we just said, I mean he told us we

2  could -- you know, open-door policy, I mean, he said, if we ever

3  had anything.  Because basically, the things of the past, he

4  told us yes.

5  Q.  Did Mr. Davis --

6        MR. BROWN:  Strike that or I'll withdraw that.

7  Q.  Did you eventually learn that Mr. Davis had been terminated

8  from the fire department?

9  A.  Sir?

10  Q.  I said did you eventually learn that Mr. Davis, the

11  plaintiff, had been terminated from the fire department?

12  A.  Yes, sir.

13  Q.  Okay.  I want to focus you on that period of time between

14  your Monday conversation with Mr. Davis about the probation

15  period and the time you learned of his termination.  And do you

16  know about when it was you learned of his termination?

17  A.  In adjacent to the time of the phone call that Monday?

18  Q.  Yes.

19  A.  No, sir, I don't recall.  I don't -- I mean it -- I don't

20  think it was long after, but I really don't remember.  You know,

21  week or whatever.  I just know pretty close.

22  Q.  Did you -- excuse me.  I'm sorry.

23  A.  That's all right.

24  Q.  I want you to finish.  I'm sorry.  Did you and Mr. Davis

25  have any discussions after that Monday prior to his termination?

1    A.   After his termination?

2    Q.   No.   After your Monday discussion with him and prior to his

3    termination.

4    A.   No, sir.

5    Q.   So that matter didn't come up, then.

6    A.   No, sir.

7    Q.   Was it discussed with anyone else in the fire station, that

8    probation ordinance?

9    A.   No, sir.   Like I said, what I personally did myself is I

10   contacted our members on the telephone.

11   Q.   But do you know of any disharmony that -- the telephone

12   conversation the plaintiff made to the mayor, that it caused in

13   the firehouse?

14   A.   No, sir.

15   Q.   Was it discussed?

16   A.   No, sir.

17   Q.   Did -- to your knowledge, did it impede any other department

18   operations during that time frame?

19   A.   No, sir.

20   Q.   Did it -- in your view, do you know of any relationships it

21   jeopardized as a result of that conversation?

22   A.   No, sir.

23   Q.   Was it an issue?

24   A.   No, sir.

25   Q.   And just to clarify the record, did -- at that time, during

 1  that time period, did you believe -- or did you oppose that

 2  probation period?

 3  A.  At that time, yes, sir, I did.

 4       MR. BROWN:  Okay.  Your Honor, I'd like permission to

 5  approach the witness and show him an exhibit.

 6       THE COURT:  Oh, yes.  All right.  Go ahead.

 7       MR. MCKOON:  I know what it is.

 8       MR. BROWN:  And Your Honor, these are not in the

 9  exhibit books because we just received this yesterday.

10  Q.  Mr. Pitts, I would like to show you what we have marked as

11  Plaintiff's Exhibit #30.  Can you identify that document?

12  A.  Yes, sir.

13  Q.  What is it?

14  A.  It's the letter that Mr. McKoon's office had drafted up when

15  I went back to -- after the first meeting we had, the document

16  that I needed to sign was this one right here.

17  Q.  And was this the document you referred to -- I'm sorry.

18       MR. BROWN:  Your Honor, permission to give the clerk

19  the original.

20       THE COURT:  Go ahead.

21  Q.  Was this the document that you referred to earlier in your

22  testimony as signing with some anxiety?

23  A.  Yes, sir.

24  Q.  And now, you have testified in court today that you were

25  opposed to the probation period at that time based on what you

1  knew; is that correct?

2  A.  Yes, sir.

3  Q.  Okay.  I would like to -- for you to direct your attention

4  to the second paragraph in this Plaintiff's Exhibit #30.  And

5  let me -- let me read it, if you don't mind, okay?

6      Mr. McKoon asked me about a change in the probation period

7  for firefighters.  I told him that the issue had come up on two

8  separate occasions.  I told him that on the first occasion, I

9  was opposed to the change of the probationary period from 12 to

10 18 months because in addition to new hires, it included a new

11 probationary period each time a firefighter was promoted within

12 the department.  That proposal was never implemented.  I told

13 him that the matter came up again.  And on the second occasion,

14 it was my understanding that the extension of the probationary

15 period from 12 to 18 months only applied to new hires.  Since

16 this did not concern me, I had no opposition to this change.

17 Also, I felt it might help some new hires to complete their

18 necessary certifications.  I do not remember any union meeting

19 or anyone calling me about the second occasion involving the

20 change in the probation period from 12 to 18 months as it

21 applied to new hires.

22      Is that a true and accurate reflection of what that document

23 states, sir?

24 A.  No, sir.

25 Q.  Well, is this the document or is it an accurate copy of the

1  document that you signed in Mr. McKoon's office?

2  A.  Yes, sir.

3          MR. BROWN:  Your Honor, we'd move exhibit --

4  Plaintiff's Exhibit #30 into the record.

5          THE COURT:  It's admitted.

6  Q.  Okay.  Now, Mr. Pitts, I want to give you a chance to

7  clarify some things.  You've stated in open court that you were

8  opposed to the probation period.

9  A.  Yes, sir.

10  Q.  And can you tell me on what day you signed this document?

11  A.  The 27th of February.

12  Q.  Last week.

13  A.  Yes, sir.

14  Q.  And this was at defense counsel's office.

15  A.  Yes, sir.

16  Q.  Does this reflect your true beliefs about the events of the

17  probation period in the spring of 2006?

18  A.  No, sir.

19  Q.  Why does it not?

20  A.  Why does it not -- when -- at that time?

21  Q.  Uh-huh.

22  A.  I mean because at the time -- the probationary period at the

23  time, we were feeling that it might have something to do with

24  people being hired.  It doesn't allow some people to, you know,

25  have part-time jobs.  I mean it's just -- we had the reasons for

1  it, but we were -- we were just against it at the time because

2  we didn't know what it was going to be about.  I mean, like I

3  said, I don't know if it was a year or six months or how much

4  prior it was to the first one, but we opposed the first one.

5  And it was the same thing with this one right here.  I don't

6  know if it was this one they were trying to -- it was also

7  including people who were having disciplinary problems and

8  stuff, and they wanted to put them back on probation again.  I

9  believe that's what it was.  But I really -- like I said, I

10 didn't remember at the time of it.

11 Q.  Can you explain to me especially the sentence that says

12 since it did not concern me -- speaking of this probation

13 period -- I had no opposition to this change?  Would you agree

14 that contradicts your testimony of today?

15 A.  Yes, sir.

16 Q.  Why?  Did you read this document before you signed it?

17 A.  Yes, sir.

18 Q.  Did you feel pressured to sign this document?

19 A.  I basically wanted to get in and out.  You know what I mean?

20 Q.  Let me ask you this.  Do you understand the significance of

21 an affidavit?

22 A.  No, sir.

23 Q.  Do you know that an affidavit is a sworn statement?

24 A.  No, sir, I didn't.

25 Q.  Do you know what it means to be a sworn statement?

1  A.  I mean basically, it's like when I swore to get up here.  I

2  just -- I just didn't raise my hand or anything.  I just was

3  asked if this was accurate, and that was it.

4  Q.  Have you --

5  A.  If it was accurate to what we had talked about earlier.

6  Q.  I'm sorry.  I -- I want you to explain this document.  Your

7  last statement confuses me.  I want to know, is the testimony

8  that you have given here in open court today your true and

9  accurate testimony?

10  A.  Yes, sir.

11  Q.  Do you understand that you have given an oath today to tell

12  the truth, the whole truth --

13  A.  Yes, sir.

14  Q.  -- and all the truth?

15  A.  Yes, sir.

16  Q.  And that is the truth, as you've known it today?

17  A.  Yes, sir.

18  Q.  And not reflected in this document.

19  A.  Yes, sir.

20          MR. BROWN:  Thank you, sir.

21          THE COURT:  All right.  Mr. McKoon, cross-examine.

22                    CROSS-EXAMINATION

23  BY MR. MCKOON:

24  Q.  Mr. Pitts, when you were in my office, did you feel like I

25  was fair with you?

```
 1   A.  Yes, sir.

 2   Q.  Do you feel like I'm a crook?

 3   A.  No, sir.

 4        MR. BROWN:  Objection, Your Honor.  Not within the

 5   scope of direct.

 6        THE COURT:  It's already answered.  Go ahead.

 7   Q.  When you came down to my office, Mr. Pitts, did I tell you

 8   that if there was anything you didn't want to talk to me about,

 9   you didn't have to talk to me about it?

10   A.  Yes, sir.

11   Q.  And did I ever ask to you do anything except tell the truth?

12   A.  No, sir.

13   Q.  And when you sat in my office and I asked you about this

14   probationary period when you were first there, do you recall

15   telling me that, Mr. McKoon, I'll tell you the truth.  I'm the

16   kind of guy that if something doesn't concern me, I'm not

17   concerned with it.  And when I found out it applied to new

18   hires, it didn't make any difference to me.  Do you remember

19   saying that?

20   A.  Yes, sir.

21   Q.  And is that what you told me?

22   A.  At that time, it was.  Yes, sir.

23   Q.  Okay.  And did you also tell me that, actually, you thought

24   it was a good thing because it allowed people extra time to

25   complete their certifications?
```

1  A.  I told you -- yes, I told you it was a good thing.  But I

2  was speaking of the present time, right now it was a good thing.

3  Q.  Well, did you -- well, let me talk about that just a little

4  bit.  And I'm not going to mince words with you about that, but

5  I will ask you this.  Did you say that you thought it was kind

6  of silly about this -- you having to have this EMT license

7  anyway; that actually, when you're a first responder, you were

8  kind of trained like that; but since they were requiring it,

9  sometimes people needed to take it once or twice before they

10  could complete it?  Do you remember something like that being

11  said?

12          MR. BROWN:  Objection.  Not within the scope of direct

13  examination, Your Honor.

14          MR. MCKOON:  It's about this affidavit, Your Honor.

15          THE COURT:  Overruled.  Go ahead.

16  Q.  And then after you told me what you did, at first I told

17  you, I said, now, Mr. Pitts, I'm just going to let you look me

18  in the eye and tell me, if you come to court, are you going to

19  tell me the same thing in court that you're telling me today?

20  Do you remember me saying that to you?

21  A.  I remember you asking -- I remember you asking me if I'm

22  going to tell the truth.  And I told you I'm going to tell the

23  truth, help or hurt anybody.  I'm going to tell the truth.

24  Q.  All right.  And that's all I ever asked you to do, wasn't

25  it?

```
 1  A.  Yes, sir.

 2  Q.  All right.  Do you remember me also saying that whatever you

 3  said in court wasn't going to affect your career one way or the

 4  other, that careers were too important and that court cases come

 5  and go, and that I had had lots of court cases --

 6  A.  Yes, sir.

 7  Q.  -- and I didn't want to hurt anybody's career?  Do you

 8  remember me telling you that?

 9  A.  Yes, sir.

10  Q.  Did you believe me, Mr. Pitts, when I told you that?

11  A.  Yes, sir.

12  Q.  Well, you can believe it.  Let me tell you -- or ask you

13  another thing.  Are you the secretary-treasurer of the union?

14  A.  Yes, sir.

15          MR. BROWN:  Objection.

16          MR. MCKOON:  He asked him all about his union

17  membership.

18          THE COURT:  Overruled.  Go ahead.

19  Q.  And do you still hold that position today?

20  A.  Yes, sir.

21  Q.  And when you -- what was your position in regard to

22  Mr. Davis sitting right here?  Was there a vice president

23  between you and him, or were you pretty much -- y'all were

24  pretty close in the union?

25  A.  Yes, sir.
```

```
 1  Q.  You were pretty close in the union?
 2  A.  I mean we were -- what do you mean by pretty close?
 3  Q.  Well, I mean he was the president and you were the
 4  secretary-treasurer, right?
 5  A.  Oh, yes, sir.  Yes, sir.  Yes, sir.
 6  Q.  Your responsibility was I guess to keep up with the money if
 7  there was any money to come in and keep up with the bylaws and
 8  things, right?
 9  A.  Yes, sir.
10  Q.  Did you also keep up with the minutes?
11  A.  When we had meetings, yes.
12  Q.  Who has those, the minutes and the bylaws?
13  A.  The --
14  Q.  Of the local union.  Who has those documents?
15  A.  They will be -- I have them in a folder in my attic at the
16  house.
17  Q.  I'm sorry?
18  A.  I have them in a folder in the attic of my house.
19  Q.  Do you know Mr. Malone seated out here?
20  A.  Do I know him?
21  Q.  Yes, sir.
22  A.  Yes, sir, I've met him before.
23  Q.  And what is his position?
24  A.  I think he's -- I know he represents the association in the
25  Southeast, but don't know the area or anything that he
```

 1  represents them at.  I just know a couple states or something.

 2  Q.  All right.  Now, getting back to this affidavit, would it be

 3  fair to say that when I typed this affidavit up, I typed it up

 4  based on the information you gave me at that time?

 5  A.  Yes, sir.

 6  Q.  And when you came back down to the office, to my office, you

 7  actually came into my office, my little office, not the little

 8  conference room I've got back there in the back; is that right?

 9  A.  Yes, sir.

10  Q.  And I gave it to you.  And I said, now, Bill, I want you to

11  take your time and read this --

12          MR. MCKOON:  I'm sorry, Judge.  I mean that's what I

13  said.

14  Q.  -- and if there's any changes you want to make, change it.

15  Do you remember that?

16  A.  Yes, sir.

17  Q.  And did I ever say anything in voice or in manner that --

18  that would make you think you were under some sort of threat to

19  sign this?

20  A.  No, sir.

21  Q.  And did you take it and read it just like you wanted -- take

22  all the time you wanted to?

23  A.  Yes, sir.

24  Q.  And did you sign it?

25  A.  Yes, sir.

1    Q.   And my secretary was coming in about the time you were

2    signing it, and I -- do you remember me saying hold up just a

3    minute, because I wanted her to see you sign it?  Do you

4    remember that?

5    A.   Yes, sir.

6    Q.   Because she was going to be the notary.

7    A.   Yes, sir.

8    Q.   And then when she came in, you were just about through.  And

9    I said, would you tell her that's your signature?  Do you

10   remember that, all that happening?

11   A.   Yes, sir.

12   Q.   All right.  And then as you were about to leave, you said,

13   man, I hope this is the end of this.  I hope I don't have to go

14   to court.

15   A.   Yeah.

16   Q.   Do you remember that?

17   A.   Yes, sir.

18   Q.   All right.  And I said, well, maybe you won't have to.  Do

19   you remember me saying that?

20   A.   Yes, sir.

21   Q.   So you're kind of stuck in the middle here, aren't you?

22   A.   Just here to tell the truth.

23   Q.   I understand.  Well, the problem that we have now is we have

24   an affidavit, of course, that says one thing; and then we now

25   have some testimony in the court here that says another thing.

1  A.  Yes, sir.

2  Q.  And I'm not trying to get on to you about it.  All I'm

3  trying to find out is why would you have signed this affidavit

4  and told me what you told me if it turned out -- if it turns out

5  it's not the truth?

6  A.  A lot of times, Mr. McKoon, when we were in that meeting and

7  everything, you know, some of the times when we were in

8  discussion and stuff, I -- you know, a lot of times I told you I

9  really don't recall or I don't remember.  And it was hard for me

10  to.  But after -- after our meeting, I sat there and thought

11  about it hot and heavy for -- for the rest of the time at work.

12  I went home the next morning and even, you know, talked to my

13  wife and finally realized what the second one was actually

14  about.  At the time, you know, when I was in your office and

15  everything --

16  Q.  Right.

17  A.  -- and I signed this, at the time, that's what I thought

18  was -- the second ordinance was about, but it wasn't.  It was

19  like I told you.  It was such a long time ago, I couldn't

20  remember.

21  Q.  So what you're saying is you just made a mistake when you

22  signed this.

23  A.  Basically.

24  Q.  Is that right?

25  A.  Yes, sir.  I apologize.

1  Q.  The fact that Mr. Davis was the union president and

2  Mr. Malone is sitting here today, does that make you feel any

3  pressure?

4  A.  No, sir.

5  Q.  The fact that Chief Hunter is sitting here today, does that

6  make you feel any pressure?

7  A.  Just like I stated earlier, I'm just nervous because it's my

8  employers.  You know what I mean?  It's just -- and that should

9  be understandable.

10 Q.  But the fact that the union is involved doesn't have

11 anything do with it?

12 A.  No, sir.

13 Q.  And that doesn't have anything to do with your changing your

14 affidavit -- your testimony today?

15 A.  Not a bit.

16         MR. MCKOON:  I appreciate you coming.  Thank you.

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Any redirect, Mr. Brown?

19         MR. BROWN:  Just a couple of questions.

20                    REDIRECT EXAMINATION

21 BY MR. BROWN:

22 Q.  Who was it that directed you to go to defense counsel's

23 office and speak with them?

24 A.  When we were in the class that day?

25 Q.  Yes, sir.

1  A.  I don't know if it was Captain Land, but I remember somebody

2  saying that you and Anne need to go to the defense attorney's

3  office.

4  Q.  Was it someone in your chain of command?

5  A.  I really don't remember.  It might have been Chief Hanson.

6  He was in the class that day, but I really don't remember.

7  Q.  I believe you used the term they told you to report ASAP?

8  A.  Yes, sir.

9  Q.  What's that mean?

10  A.  As soon as possible.

11  Q.  And did you comply with that?

12  A.  Yes, sir.

13  Q.  Did you feel you had a choice about complying?

14  A.  No, sir.  They asked us to go down there right then, and

15  that's what we did.

16  Q.  Is Mr. McKoon in your chain of command at the fire

17  department?

18         MR. MCKOON:  Judge, that's all been asked and answered

19  one time before.

20         THE COURT:  Yes, it has been asked and answered.  I'll

21  sustain.  Limit yourself to subjects that came up on cross and

22  that haven't already been testified to.

23         MR. BROWN:  I have no further questions, Your Honor.

24         THE COURT:  May he be excused?

25         MR. BROWN:  Yes, sir, Your Honor.

```
 1              MR. MCKOON:  I may recall him later.  He's under a
 2    subpoena by both sides.
 3              THE COURT:  But you don't need him to stay in the
 4    courthouse.
 5              MR. MCKOON:  No, sir, not today.
 6              THE COURT:  All right.  Sergeant Pitts, you're excused
 7    subject to being recalled.  You don't have to stay down here.
 8    They'll call you if they need you again.
 9              THE WITNESS:  So I can go today?
10              THE COURT:  You can go today.  Just stay available in
11    case somebody needs to get up with you.
12              THE WITNESS:  Okay.  I mean so do I need to show up
13    here tomorrow or anything?
14              THE COURT:  No.
15              THE WITNESS:  Okay.  I'll be by phone or anything.
16              THE COURT:  That's right.
17              THE WITNESS:  Okay.  Thank you, sir.
18              THE COURT:  Call your next witness.
19              MR. BROWN:  Plaintiffs call Mr. Karl Taylorson.
20         (Brief pause)
21              THE CLERK:  Would you raise your right hand.
22         (The witness is sworn)
23              THE CLERK:  You may be seated.
24              KARL TAYLORSON, the witness, having been duly sworn,
25    testified, as follows:
```

```
 1                    DIRECT EXAMINATION

 2   BY MR. BROWN:

 3   Q.  Mr. Taylorson, would you state your full name for the

 4   record, please.

 5   A.  Karl Taylorson.

 6   Q.  And where do you reside, Mr. Taylorson?

 7   A.  625 Oswichee Road in Seale.

 8   Q.  And how long have you lived at your present address?

 9   A.  It's been my home of record since I was 14.  I built a home

10   next to my parents about six years ago.

11   Q.  And who is your employer, sir?

12   A.  Phenix City Fire Rescue, Fire Department, City of Phenix

13   City.

14   Q.  And what job classification do you hold in the fire

15   department?

16   A.  I'm a captain in the fire department.

17   Q.  And who is your direct supervisor in the fire department?

18   A.  Battalion Chief Bill Zuker.

19   Q.  Excuse me?

20   A.  Bill Zuker.

21   Q.  Captain Taylorson, did you receive a subpoena compelling

22   your appearance for testimony today?

23   A.  Yes, sir, I did.

24   Q.  And who issued that subpoena to you, sir?

25   A.  You-all (indicating).
```

1   Q.   Okay.  I may ask you a line of questions that I will use the

2   term the plaintiff, and I want you to understand who is to my

3   right, Mr. Davis, and the defendants are the city.  Were you

4   made aware at some point in time that the plaintiff desired your

5   testimony in this proceeding?

6   A.   Yes, sir.

7   Q.   And after that time, did you seek or communicate with me

8   concerning your testimony?  Did you make --

9   A.   Yes, sir, I did.

10  Q.   Okay.  And what did we discuss?

11  A.   We discussed the meeting with the mayor, which was Captain

12  Boatner's retirement party.  We discussed the newspaper article

13  meeting.  And I'm sure there were several other things that

14  you -- that you'll bring up here.

15  Q.   And did you express to me a reluctance to give testimony in

16  this --

17  A.   Absolutely.  I don't think anyone wants to be here.

18  Q.   What's the basis of that?

19  A.   No matter -- no matter what you say in here -- everyone's

20  sworn to tell you the truth, but you -- you worry because of --

21  we -- I work for the City of Phenix City.  No matter what I say

22  in here, it's not going to -- it can't bode well for me.  I mean

23  you just -- you worry.  You worry.  I'm a single father with

24  three children, and I've got bills to pay.  And, you know, you

25  just can't help but worry about those kind of things.

1  Q.  Notwithstanding those concerns, you've taken an oath,

2  though --

3  A.  Absolutely.

4  Q.  -- to be as honest as you can.

5  A.  Yes, sir.  Yes, sir.

6  Q.  After you and I discussed the factual material you knew

7  about the case, were you contacted by the defendants' attorney?

8  A.  Yes, sir.  I called him myself.

9  Q.  Okay.  Why?

10  A.  The -- I tried to follow proper procedures.  I contacted my

11  chief, as I was supposed to, and he advised me to contact the

12  city attorney.

13  Q.  And what happened next?

14  A.  He asked me various questions prior to my talking with you

15  to see if I had any -- any other knowledge.  And basically, it's

16  exactly what -- it is absolutely exactly what I had talked to

17  you about.  And after that conversation, I spoke with you about

18  two or three nights later.

19  Q.  Were you told that you didn't have to speak to me?

20  A.  Yes, sir, I was.

21  Q.  Were you instructed at that time that you didn't have to

22  speak to the city?

23  A.  No, sir.

24  Q.  Did you subsequently have communication with defense counsel

25  concerning this case?

1  A.  After I spoke with you, I spoke to him on one -- one other

2  occasion.  Yes, sir.

3  Q.  How did that communication occur?

4  A.  I was at station four, and Mr. McKoon called for me.

5  Q.  Were you on duty?

6  A.  Yes, sir, I was.

7  Q.  Did you have any choice as to whether or not you could speak

8  with him?

9  A.  No, I wouldn't think so.

10  Q.  Did you consider it an obligation on your job to speak with

11  him?

12  A.  Yes, sir.

13  Q.  Did you believe at that time that if you didn't want to

14  speak to him, you could be subject to discipline?

15  A.  I felt like it was in my best interests to speak with him.

16  Q.  Did it make you further reluctant to provide testimony in

17  this case?

18  A.  Yes, sir.  Absolutely.

19  Q.  What was discussed in that communication with counsel for

20  the city?

21  A.  What we discussed.  Basically, that the mayor stated that he

22  has an open-door policy at the retirement party for Captain

23  Boatner.  He asked me a question about Chief Kennedy that I was

24  not aware of.  I -- I was -- didn't have any knowledge on or did

25  not know.  We basically covered what we had discussed.

```
 1   Q.   Did he -- were you asked what we had discussed?
 2   A.   Yes, sir.
 3   Q.   You just made reference to an open-door policy.
 4   A.   Yes, sir.
 5   Q.   Did you ever attend meetings of the firefighters
 6   association?
 7   A.   Yes, sir, I did.
 8   Q.   Are you a member of the firefighters association?
 9   A.   Yes, sir, I am.
10   Q.   And at any of those meetings, did elected officials
11   appear --
12   A.   Yes, sir.
13   Q.   -- before you?  Did they address the meeting of the
14   firefighters?
15   A.   Yes, sir, they did.
16   Q.   And who were those elected officials?
17   A.   Our current mayor and Council Member Bush, Ray Bush.
18   Q.   And how many meetings do you recall that, first of all, the
19   mayor attended?
20   A.   I remember them being at at least two separate meetings.
21   Q.   Do you recall when those meetings might have been?
22   A.   No, sir, not specifically.  I do not.
23   Q.   Let me try to ask you to place it in the frame of reference
24   of the mayor's election.  Do you recall if he appeared at the
25   firefighters association prior to his election?
```

1  A.  I can tell you he was at Captain Boatner's retirement

2  party.  If Captain Boatner's retirement party was prior to his

3  election, then it was prior.  If it was after, then it was

4  after.  I don't know specifically, to be honest with you.

5  Q.  What was the comment that he made at -- you just said you

6  remembered seeing him at Captain Boatner's retirement party.  Do

7  you remember any comments in particular the mayor made?

8  A.  He said he had an open-door policy and that he would -- he

9  would look out for us, because Captain Boatner told him to be

10  sure and look out for us.

11  Q.  What did that mean to you?

12  A.  With Captain Boatner leaving, he was -- Captain Boatner was

13  a fine, fine captain at the fire department.  With him leaving,

14  I'm sure, as if -- if I were to leave, I would -- I would want

15  someone to look out for the men while I'm gone.  And he

16  basically left us in the mayor's hands, feeling that he was

17  capable, someone who could get things done and look out for us.

18  Q.  What did the mayor's comment about an open-door policy mean

19  to you?

20  A.  It meant that we could go to him with -- with problems.

21  Q.  Did you ever take him up on that offer?

22  A.  No, sir.  If I saw him out and about -- I've seen him in

23  public -- I'd speak with him.  But, you know, only in passing

24  and in common things.

25  Q.  Did the mayor at that time provide any further instruction

1  that any firefighter needed to follow to use his open door?

2  A.  No, sir.

3  Q.  Did he instruct that you were to get approval from anyone?

4  A.  No, sir.

5  Q.  Did you believe you needed to, to use his open door?

6  A.  Now or -- now or then?

7  Q.  When he made this statement.

8  A.  He told us that we could come to him with any problems that

9  we had.

10  Q.  You referenced another elected official as having

11  attended --

12  A.  Yes, sir.

13  Q.  -- at least one meeting?

14  A.  He was at at least two that I know of.

15  Q.  Okay.  And who was that, again?

16  A.  Ray Bush.

17  Q.  And what position does Mr. Bush hold?

18  A.  He's council member.

19  Q.  Did Mr. Bush make any particular comments to the members of

20  the association?

21  A.  I -- I don't recall specifically.  No, I do not.  He did

22  speak with us; but very positively, I don't recall.

23  Q.  Were you -- were you made aware sometime during the spring

24  of 2006 that the city was considering -- or the -- pardon me --

25  the council was considering an ordinance to change the probation

1   period for certain city employees?

2   A.  Yes, sir.

3   Q.  What did you understand about that at that time?

4   A.  At that time, we were under the understanding that the

5   probation would go from one year's time, which was what it was

6   at the time -- it would be extended to a year and a half, which

7   is 18 months.

8   Q.  What was the significance of that to you?

9   A.  To me, it -- at the time, it did not -- we -- we felt

10  threatened by it.  It seemed -- it did not seem positive at the

11  time.

12  Q.  Why?

13  A.  It's hard to say.  It -- I don't know.  I don't know how to

14  put it.

15  Q.  What particular reason, if you can name one, did you believe

16  it wasn't good at the time?

17  A.  You're looking at extending the probation period for your

18  personnel to where you can be let go within that time, which

19  is -- which is -- can be a very absolute, positive, good thing

20  if you need to get rid of people.  But at the time, we -- we

21  felt -- I felt -- we felt threatened by it, threatened by it.

22  Q.  Do you recall when you first became aware that the city

23  council was considering that ordinance?

24  A.  Sergeant Davis approached me with it and discussed it with

25  me.

```
 1  Q.  Do you -- how did he communicate with you?
 2  A.  He explained what he knew of the ordinance and wanted my
 3  input on it.
 4  Q.  Can you tell me whether or not that was a telephone call or
 5  a personal visit?
 6  A.  I believe -- I believe it was a phone call.  I believe it
 7  was a phone call.
 8  Q.  Do you recall whether or not that was prior to the city
 9  council acting on that ordinance?
10  A.  Yes, sir.  It was prior.
11  Q.  And did you express an opinion to him during that
12  conversation about what you understood or what you thought about
13  that policy?
14  A.  At the time, I did not think it was a good thing.
15  Q.  And did he express an opinion to you about the policy?
16  A.  At the time, he was not for it.
17  Q.  So you agreed --
18  A.  Yes, sir.  I agreed.
19  Q.  -- with the plaintiff, Mr. Davis --
20  A.  Yes, sir.
21  Q.  -- at that time --
22  A.  Yes, sir.
23  Q.  -- that you didn't want it to be there.
24  A.  Yes, sir.
25  Q.  Did you believe that based on those statements made by the
```

1   mayor of Phenix City in your association meeting that Mr. Davis

2   had a right to speak to the mayor and express his views on that

3   ordinance?

4   A.   Yes, sir.

5   Q.   Why?

6        MR. MCKOON:   Judge, I'm going to object --

7   A.   He told us --

8        MR. MCKOON:   -- to what he believes about it.   It

9   doesn't have any relevance to this matter.

10       THE COURT:   Yes.   I sustain as to why he believes

11  somebody else had a right to do something.   Sustained.

12  Q.   Do you recall if Mr. Davis contacted you in the time period

13  after the ordinance was passed?

14  A.   I don't recall.

15  Q.   You don't know whether he called you or not?

16  A.   No.   No, sir.

17  Q.   Did anyone else speak with you or call you about the

18  ordinance at that time?

19  A.   No, sir.

20  Q.   And at some time after your discussion with Mr. Davis about

21  the ordinance, did you learn he had been terminated from the

22  fire department?

23  A.   Yes, sir.

24  Q.   Do you know about when you found that out?

25  A.   It was sometime after his termination.

1   Q.   Was it within a few days?

2   A.   It was within a few days.  Yes, sir.

3   Q.   If I could focus your attention to that time period between

4   the conversation you had with Mr. Davis, the last one before his

5   termination, and the time you learned of his termination, did

6   you view the issue of this proposed ordinance as disruptive to

7   the department?

8   A.   No, sir.

9   Q.   Was it being discussed in your presence?

10  A.   No, sir.

11  Q.   While you were on duty?

12  A.   No, sir.

13  Q.   Did anyone call you at home and explain to you or say to you

14  they didn't -- they had an opinion about it?

15  A.   No, sir.

16  Q.   It just wasn't discussed.

17  A.   No.

18  Q.   Do you know of any operation of the fire department that was

19  impeded or obstructed in any way because of his phone call to

20  the mayor?

21  A.   Not at all.

22  Q.   Do you know of any relationships that it put in jeopardy

23  because he made a phone call to the mayor?

24  A.   None whatsoever.

25  Q.   Mr. Taylorson, do you recall a meeting of the association in

1  the fall of 2005 wherein a journalist attended?

2  A.  Yes, sir.

3  Q.  And do you recall who that journalist was?

4  A.  I -- the only way I could tell you is if I was to read the

5  article.

6  Q.  Did you attend that meeting where --

7  A.  Yes, sir.

8  Q.  -- the journalist was there?

9  A.  Yes, sir, I did.

10 Q.  And did that meeting -- did the journalist subsequently

11 write an article that appeared in the newspaper?

12 A.  Yes, sir, he did.

13 Q.  Okay.  At that time, did you believe you had a right to

14 speak to a member of the media off duty?

15 A.  It was kind of gray at the time.  I -- we did not -- we were

16 not told that we could not.

17 Q.  Were you off duty at the time you attended that meeting of

18 the association?

19 A.  Yes, sir.

20 Q.  After that meeting, did you receive any communications from

21 the department about attending the meeting?

22 A.  Yes, sir.

23 Q.  What kind of communications did you receive?

24 A.  It was basically explaining to us that we were not to talk

25 to the paper like that.  And it was -- I believe there's an SOP

1   on it that was brought to our attention.

2   Q.  Did you receive any disciplinary action for having contacted

3   the media?

4   A.  No, sir.

5   Q.  I'd like for you to open the binder in front of you, if you

6   don't mind, Captain Taylorson, and turn it to tab -- I believe

7   it's #29.

8   A.  Yes, sir.

9   Q.  I ask, can you identify that document?

10  A.  I do not -- I don't recall seeing this.

11  Q.  Do you recall if you've ever seen that document?

12  A.  I don't recall seeing this.  No.

13  Q.  Okay.  Well, let me ask you this.  Do you recall a

14  counseling session that one of the assistant chiefs had with you

15  concerning the -- concerning that article that appeared --

16  A.  A personal counseling session?  No.  And I may have.  It's

17  been quite some time.

18  Q.  Do you recall having a meeting with one of the assistant

19  chiefs concerning the recent newspaper article in the *Columbus*

20  *Ledger-Enquirer*?  I want to make sure --

21  A.  No, sir.

22  Q.  Does your tab have Exhibit #29 at the bottom of it?  I want

23  to make sure we're reading on the same --

24  A.  Yes, sir.

25  Q.  Would you read the top of that page, please, sir?

1    A.  The very top, "to," or would you like me to start with "I

2    met?"

3    Q.  Starting with "to."

4    A.  To Chief Hunter from Assistant Chief Hanson, dated September

5    21st, 2005.  Verbal counseling with Driver Engineer Karl

6    Taylorson.

7    Q.  Does that refresh your recollection about a verbal

8    counseling that was --

9    A.  It does not specifically.  No.

10   Q.  You don't recall having a verbal counseling with --

11   A.  I do not.  I do not recall.

12   Q.  Do you recall Chief Hanson reminding you of anything in a

13   meeting concerning obtaining permission to speak to the media?

14   A.  I remember being scolded, basically, about talking to the

15   media.

16   Q.  Do you recall being advised, as the exhibit states on the

17   last line of the memorandum?

18   A.  It does seem like something that I would say, so this may --

19   it may -- it's been quite some time.  I honestly don't

20   remember.  It -- you know, saying Chief Hanson -- it may have

21   been Chief Hanson that -- and I may have been a part of this.

22   That last statement seems like how I would word something where

23   it states, and he assured me it would not happen again.  That

24   just sounds like something I would say.

25   Q.  Well, what -- what does the last line say?  Or just read

1  that final --

2  A.  Sergeant Karl Taylorson stated that he understood the

3  purpose of this counseling session, concerns merited by the

4  city, and assured me that this would not happen again.  I

5  advised him that the city would not put up with another episode

6  of speaking to the media without prior approval.

7  Q.  So do you believe that -- do you recall Chief Hanson making

8  that statement to you?

9  A.  Do I recall it?  No, I do not.  Does it sound like something

10  I would say after he possibly got on to me about being a part of

11  that?  Yes, it does.

12  Q.  Well, let me ask you this.  As of September 21, 2005, was

13  that your understanding of the policy of the fire department

14  concerning speaking to the media?  Does that last paragraph

15  accurately describe your understanding?

16  A.  Would I talk to the media today?  Absolutely not.

17  Q.  Without prior approval.

18  A.  Absolutely not.

19  Q.  Can you think of any reason you would ever speak to the

20  media without obtaining prior approval?

21  A.  Today?

22  Q.  Yes.

23  A.  No.

24  Q.  So you don't believe you have that right.

25  A.  No.

```
 1   Q.  Do you believe you should have that right?
 2            MR. MCKOON:  Judge, I object.
 3   A.  I believe every American should have that right, yes.
 4            THE COURT:  I sustain.
 5            MR. BROWN:  Thank you, sir.  No further questions.
 6            THE COURT:  All right.  Mr. McKoon?
 7                        CROSS-EXAMINATION
 8   BY MR. MCKOON:
 9   Q.  Mr. Taylorson, I won't be too long.
10   A.  Thank you.
11   Q.  You doing all right?
12   A.  Thank you.  I'm doing as well as anyone could over here.
13   Q.  Are you a weight lifter?
14   A.  I do what I can to hold myself together.
15   Q.  All right.  I just wondered.  If I recall this right, the
16   way you and I got in touch was the plaintiff's lawyers were
17   trying to get in touch with you --
18   A.  Yes, sir.
19   Q.  -- and you called Chief Hunter --
20   A.  Yes, sir.
21   Q.  -- and told him about that.
22   A.  Uh-huh.
23   Q.  And you were asking about it, I guess about whether you
24   should talk to them or not or something.
25   A.  I was trying to follow proper procedures.
```

1  Q.  Right.

2  A.  Yes, sir.

3  Q.  And then what happened was, I think, then I called you.

4  A.  I called you, and then I had you call me.

5  Q.  Yeah.  That's right.  You wanted me to call you back on your

6  cell phone.

7  A.  That's right.  Yes, sir.

8  Q.  Because you were in training or something somewhere?

9  A.  Yes, sir.  I was on my two-week camp with the military, Army

10  National Guard.

11  Q.  All right.  So that's how all that came about in the

12  beginning.

13  A.  Yes, sir.

14  Q.  And I believe when I called you, you told me Mr. Davis's

15  lawyers had been trying to get in touch with you, but that you

16  wanted to stay out of this.

17  A.  I was very reluctant to speak.  Yes, sir.

18  Q.  And in fact, you said, I really don't want anything to do

19  with this.  Do you remember that?

20  A.  Yes, sir.  I don't think anyone wants anything to do with

21  something like this.

22  Q.  And I believe my -- I believe my retort was, and I don't

23  blame you, or something like that.

24  A.  Uh-huh.  Sounds familiar.

25  Q.  And when you talked to me, you were asking about whether or

 1  not you should talk to the plaintiff's lawyers; is that right?
 2  A.  I don't recall if I was asking whether I should.  I know
 3  that I was explaining to you that I was reluctant to talk.  Yes,
 4  sir.
 5  Q.  All right.  And I think my -- and you help me, now, because
 6  I don't want to say anything incorrect.  But it's my
 7  recollection that I said, well, you don't have to talk to them
 8  if you don't want to.
 9  A.  Yes, sir.
10  Q.  But I'm not going to tell you not to talk to them.  Is that
11  right?
12  A.  That sounds -- that's probably about exactly how you said
13  it.  Yes, sir.
14  Q.  I said, you're free to talk to them if you want to and you
15  don't have to if you don't want to.
16  A.  Yes, sir.
17  Q.  Is that right?  I did say, you know, if you do talk to them,
18  I'd appreciate if you called me back and tell me what they want
19  to know.
20  A.  Yes, sir.
21  Q.  And did you agree to do that?
22  A.  Yes, sir.
23  Q.  In addition, when I talked to you, when I finally did talk
24  to you about any substantive matter about what they had called
25  and asked you about --

370

1  A.  Yes, sir.

2  Q.  -- did I at any time tell you all I -- I mean did I always

3  say all I want is the truth, Mr. Taylorson?

4  A.  Yes, sir.

5  Q.  And all I want you to do is tell the truth in court.

6  A.  Yes, sir.

7  Q.  Do you remember if I told you that this would not hurt your

8  career in any way?

9  A.  Yes, sir, you did.

10 Q.  And that I wouldn't ever let something like that happen?  Do

11 you remember that?

12 A.  I remember you saying the first part without a doubt.  I

13 don't know about the second.

14 Q.  Okay.  Is there anything that you told me that you haven't

15 told these people?

16 A.  Not that I recall.

17 Q.  Okay.  So whatever you got to say, everybody knew about it

18 before you got in here today, didn't they?

19 A.  As far as I know, yes, sir.

20 Q.  And this is going to sound like a real silly question, but

21 I'm going to have to ask it --

22 A.  Okay.

23 Q.  -- because I promise you, I don't think you'll have any

24 trouble answering it.  But you didn't feel threatened by me, did

25 you?

1  A.   Personally, no.

2  Q.   Okay.  You did feel uncomfortable with the situation,

3  though.

4  A.   Extremely.

5  Q.   Is that fair enough?

6  A.   Yes, sir.

7  Q.   All right.  At any time, did you ever tell me, Mr. McKoon, I

8  just really don't want to talk to you?

9  A.   No, sir.

10  Q.   Did I ever tell you, Mr. Taylorson, you've got to talk to

11  me?

12  A.   No, sir.

13  Q.   And I want to go back over some things that came up in your

14  testimony a few minutes ago.  You were in the group of -- you

15  were in the union.  Am I right?

16  A.   Yes, sir.  I still am.

17  Q.   You're still in the union now?

18  A.   Yes, sir.

19  Q.   And you participated in that meeting on September the 20th

20  or around that time -- I don't know if it was September the

21  20th, but --

22  A.   Dates don't help.  I can tell you my children's birth

23  dates --

24  Q.   Right.

25  A.   -- and this, that, and the other, but that's about it.

1    Q.  Well, whenever it was that the meeting was held where y'all

2    had the meeting at the Mexican restaurant and the reporter came

3    and all that, do you remember that?

4    A.  Yes, sir.

5    Q.  You were there.

6    A.  Yes, sir.

7    Q.  And you were actually quoted in the paper.

8    A.  Yes, sir, I believe I was.

9    Q.  Is that correct?  And I believe one of the quotes was

10   something to the effect of you were just -- we were just looking

11   for somebody to help us, be it the mayor or the city manager

12   or --

13   A.  Yes, sir.  That's sounds familiar.

14   Q.  Let me get the article and make sure I'm quoting it right.

15   Now, that doesn't mean they quoted you right.  But I'm just

16   saying -- let me get it and see what it says you said.  I'm

17   reading from one of your quotes from the article.  I hope the

18   right person hears it and comes in to help, it be a citizen, the

19   city manager -- I think it says the council.  We're just looking

20   for a savior.

21       Is that right?

22   A.  Yes, sir.  I believe so.

23   Q.  Do you know if there had been any effort at this point in

24   time, whenever this happened, for anybody to go up the chain to

25   the fire chief and then to the city manager with any of the

1  concerns that you-all had?

2  A.  Yes, sir, I believe there was.

3  Q.  All right.  Do you know if anybody had done that?

4  A.  I -- I believe I know of -- I know for sure of at least one

5  definite meeting.  I'm sure there were more.

6  Q.  Who was president of the union at that time?

7  A.  At that time?

8  Q.  Yes, sir.  In September of 2005.

9  A.  Sergeant Davis.

10  Q.  Mr. Davis?

11  A.  Yes, sir.

12  Q.  What was your rank at that time?

13  A.  I was sergeant at the time.

14  Q.  And what were your duties?

15  A.  My duties?

16  Q.  Yes, sir.

17  A.  I was the driver engineer of the fire apparatus.  I was to

18  get the personnel and crew there as safely as possible, to and

19  from the scene.

20  Q.  And after this incident occurred where all this stuff

21  appeared in the press and there was this article that said

22  "Three-Alarm Turmoil" and all that sort of business, do you

23  recall -- and I believe you said this a few minutes ago, but you

24  do recall being called in and told what the policies were and

25  asked to sign off on that?

1   A.  I don't -- I don't recall whether it was an actual sit-down

2   or an open scolding.  I actually -- I honestly don't recall.

3   Q.  Okay.  That's fine.  That's fair enough.  But did that

4   incident result in any -- and when I say discipline, I mean like

5   a written reprimand, a suspension of any kind, any kind of job

6   action against you other than what you referred to as a verbal

7   scolding?

8   A.  No, sir.

9   Q.  And since that time, since 2005, have you been promoted in

10  the department?

11  A.  Yes, sir.

12  Q.  Who promoted you?

13  A.  Chief Hunter.

14  Q.  And I'm going to put you on the spot just for a minute.  Has

15  Chief Hunter been fair with you?

16  A.  Yes, sir.

17  Q.  Thus far, since he's become chief this last time, has he

18  been a good chief?

19  A.  Yes, sir.

20  Q.  When the mayor had the two meetings -- and again, I believe

21  you said you're not good on dates, but you're sure it's -- he

22  had one meeting either when he was running or right after he

23  became mayor and another one when Todd Boatner retired.

24  A.  Yes, sir.

25  Q.  Is that fair enough?

1   A.  Yes, sir, it is.

2   Q.  Do you remember going to any other meeting other than those

3   meetings with the mayor?

4   A.  I used to -- I believe I went pretty regularly back then.

5   Yes, sir.

6   Q.  I'm sorry.  I didn't finish my question.

7   A.  Okay.

8   Q.  Do you remember going to any other union meetings where the

9   mayor was present other than those two?

10  A.  Not specifically.  No, sir.

11  Q.  And is it the duty of a firefighter to know the standard

12  operating procedures?

13  A.  Yes, sir, it is.

14  Q.  And to know the grievance procedures?

15  A.  Yes, sir, it is.

16  Q.  And do you understand sitting here today that if you want to

17  take a matter to city council, you have to take it up the chain

18  of command first?

19  A.  Yes, sir.

20          MR. MCKOON:  That's all I have.

21          THE WITNESS:  Thank you.

22          MR. MCKOON:  Thank you.

23          THE COURT:  Any redirect?

24          MR. BROWN:  Nothing further, Your Honor.

25          THE COURT:  All right.  May Captain Taylorson be

1  excused?

2        MR. BROWN:  Yes, Your Honor.

3        MR. MCKOON:  Yes.  Like I said, he's under their

4  subpoena.

5        THE COURT:  All right.  You're free to go, and you

6  don't need to come back.

7        THE WITNESS:  Thank you, Your Honor.  Thank you.

8        THE COURT:  Mr. Steele, do you have -- or Mr. Brown,

9  either of you, do you have a witness that can -- we can have

10 some brief testimony from this afternoon without throwing things

11 out of organization?

12       MR. STEELE:  Could we approach, Your Honor?

13       THE COURT:  All right.

14    (Bench conference held off the record)

15       THE COURT:  This is going to be something that will be

16 brief that we should get through before six o'clock.  I didn't

17 phrase the question the way one of our other judges did one

18 time.  He asked -- he said he never has after that either.  He

19 asked the lawyers, getting close to the end of the day, if they

20 had a short witness they could put on.  And they called one, and

21 out walks this little guy about four feet six inches tall.  So

22 he's phrased it a different way, and so did I.

23       All right.  Go ahead.

24       Let me explain to you what they're getting ready to do,

25 members of the jury.  This is a deposition that's going to be

1  read to you.  In circumstances where somebody can't be present

2  and the rules are followed, a deposition can be introduced into

3  evidence when it's taken with the formalities.  A person is

4  sworn in, lawyers on both sides ask questions.  It's

5  transcribed.  Everybody is given an opportunity to look it over

6  and all, and then it's offered.  There's been no objection to

7  this coming in that way.  So it should be taken by you to be the

8  same as if the witness were sitting on the witness stand.

9         Now, Mr. Brown is going to play the role of the

10 witness, so he's going to be the person they're questioning, not

11 Mr. Brown, but he's going to play the role of the person

12 questioned.  The lawyers will -- Mr. Steele will ask questions

13 that the plaintiff's lawyer asked, and Mr. McKoon will ask

14 questions that the defendants' lawyer asked.

15        All right.  Go ahead.

16        MR. STEELE:  Thank you, Your Honor.

17        **BRANDON LYNN SHEETS**, the witness, having been duly

18 sworn, testified via deposition as follows:

19                     DIRECT EXAMINATION

20 BY MR. WOODLEY:

21 Q.  Mr. Sheets, would you state your full name for the record.

22 A.  Brandon Lynn Sheets.

23 Q.  My name is Tom Woodley.  I'm one of the attorneys

24 representing David Davis in this lawsuit that he has filed

25 against the City of Phenix City and against Chief Hunter and

1  City Manager Roberts.  Have you ever had your deposition taken

2  before in another case?

3  A.  No, sir.

4  Q.  Okay.  Have you had a chance to spend some time with perhaps

5  Mr. McKoon or Mr. Graham about the nature of the lawsuit and the

6  procedures we'll be following today?

7  A.  Other than the deposition last time.  Is that what you're

8  talking about?

9  Q.  What deposition last time?

10  A.  Last week.

11      MR. MCKOON:  He's not had a deposition.  When you

12  listed him, he came up here and we asked him what he knew.  And

13  that was that.

14      MR. WOODLEY:  Okay.  Good enough.

15  Q.  Basically, the procedure is I'll be asking you questions.

16  We expect you to give answers to the best of your ability.  And

17  this court reporter will take down everything we say today, and

18  she'll put it in a written transcript form.  Do you understand

19  that?

20  A.  Yes, sir.

21  Q.  And if at any time you don't understand or hear one of my

22  questions, stop me immediately and I'll be glad to repeat or

23  rephrase that question.  Do you understand that?

24  A.  Yes, sir.

25  Q.  You'll have to wait until I finish asking my question before

1  you begin your answer so that we have a clear record.  Do you

2  understand that?

3  A.  All right.  Yes, sir.

4  Q.  Are you currently a union member or member of the Phenix

5  Firefighters Association?

6  A.  Yes, sir.

7        MR. MCKOON:  Tom, let me interrupt just a second.

8  Jimmy reminded me of something.  In the event he's unavailable

9  for trial, I think we should use the usual stipulations.  You

10  know, if there's an objection, it should be like a court

11  objection for the purpose of this deposition.

12        MR. WOODLEY:  I agree.  I think that's a good statement

13  on the record, Jim.  We do want to preserve his testimony.

14  Q.  Because I understand you're going to be overseas in the next

15  few days; is that correct?

16  A.  Yes, sir.

17  Q.  Leaving tomorrow?

18  A.  Leaving Monday.

19  Q.  Going to Iraq?

20  A.  I'll be flying to Houston for a week and then from Houston,

21  we will fly to Dubai and have about five days after --

22  Q.  Does that mean you're leaving your job here in the

23  department?

24  A.  Yes, sir.

25  Q.  Okay.  Do you expect you might come back later on and work

 1  for the Phenix City Fire Department?

 2  A.  Yes, sir.  I'm going to try to.

 3  Q.  Well, good luck over there, and be safe.

 4  A.  Thank you.

 5  Q.  So I think you indicated you're currently a union member; is

 6  that right?

 7  A.  Yes, sir.

 8  Q.  And a number of firefighters employed with the city are

 9  union members as well, correct?

10  A.  Yes, sir.

11  Q.  David Davis, as I understand it, was a local union officer,

12  correct?

13  A.  Yes, sir.

14  Q.  Have you worked with David Davis when he was working his

15  shifts in the department?

16  A.  Yes, sir.  I was on shift with him.

17  Q.  Were you in the same station?

18  A.  Yes, sir.

19  Q.  For a period of years or --

20  A.  Altogether, probably between six months and a year,

21  something like that.

22  Q.  And is it your understanding that David was an eight-year

23  veteran of the Phenix City Fire Department?

24  A.  Yes, sir.

25  Q.  And that about a year and a half ago, he got fired?  Do you

1  understand that?

2  A.  Yes, sir.

3  Q.  Do you know why he was fired?

4  A.  Chain of command.  Disobeying the chain of command, I -- I

5  think is what I understand.

6  Q.  Did you hear that he perhaps was fired because he contacted

7  Mayor Hardin about a proposed ordinance and he was terminated?

8  A.  Yes, sir.

9  Q.  Let me invite your attention back to the spring of 2006 --

10  specifically, in April 2006 -- which was the month that

11  Mr. Davis was terminated.  As I understand it, there was a

12  proposed ordinance that was coming before the city council at

13  that time that essentially expanded the probationary period from

14  12 months to 18 months for new hires in the fire and police

15  departments and code enforcement officers.  Does that ring a

16  bell with you?

17  A.  Yes, sir.

18  Q.  How did that come to your attention back in the spring of

19  2006?

20  A.  It was first -- it was brought about in a class when they --

21  it was kind of mentioned but didn't say that it was going to

22  happen.  We were in class, and Chief Waters was teaching the

23  class.  And I said something about probation.  He's, like, just

24  be glad; he said, most departments do 18 months' probation.  And

25  he's, like, don't be surprised if it didn't happen here.

1    And then we were all sitting at the table eating lunch one
2  day, and we read it in the paper that it was going to happen.
3  And David said --
4  Q.  This is on duty at the station?
5  A.  Yes, sir.  -- said, you know, we need to call the mayor or
6  call the city representatives or whatever and tell them --
7  Q.  City council members?
8  A.  -- say that we -- say that we didn't like it because, you
9  know, we thought that, you know, people that just got hired
10 couldn't get a job for 18 months, you know.  And we were trying,
11 thinking we could get better people.  But we're sitting at the
12 table and read it in the newspaper.  We were all sitting there
13 saying we didn't like it and we wanted it changed.  And then he
14 was, like, we should call.  And he was, like, no, we can't.
15 Captain Bennett was, like, no, we can't just call.
16 Q.  I'm sorry.  You have to slow down.  Captain who?
17 A.  Bennett.  And then he was, like, well, I can call on behalf
18 of the union as a representative.
19 Q.  Who said this?
20 A.  David Davis.  And then it was -- he was, like -- Captain
21 Bennett was, like, I would call if I was you, but -- but he
22 wouldn't call.
23 Q.  Okay.  Let me see if I understand you.  This was on duty at
24 the station?
25 A.  Yes, sir.

1  Q.  And you were there with -- Mr. Davis was there and Captain

2  Bennett was there?

3  A.  Yes, sir.

4  Q.  If I understood you correctly, Captain Bennett said that

5  someone should call the mayor and city council members about the

6  proposed ordinance that enlarged the probationary period?

7          MR. MCKOON:  Object.  I'm not sure that's what he said.

8  Q.  Well, put it in your own words.

9  A.  Well, Davis said that someone should call.

10 Q.  Call who?

11 A.  The city council members and say, you know, that someone

12 should call.  Then Captain Bennett was, like, we can't just

13 call, you know.  We can't do that.  It might, you know, make

14 someone mad or something like that.  And David was, like, you

15 know, I can call on behalf of the union, you know.  It's the

16 union.  And Captain Bennett was, like, I would call if I was

17 you.

18 Q.  Captain Bennett said to Davis, I would call if I were you?

19 A.  Something of that nature.  I mean not those exact words.

20 Q.  Did Captain Bennett mean at the time when he talked to Davis

21 that David should call as union representative and communicate

22 with the city council members about this proposed ordinance?

23         MR. MCKOON:  Object to the leading.  And it calls for a

24 mental operation on the part of Captain Bennett.  He didn't

25 know -- he couldn't know what Captain Bennett could have

1  thought.

2  Q.  Okay.  Well, I'm not asking what Captain Bennett thought.

3  Just put it in your own words again.  What did Captain Bennett

4  say to Davis about the possibility of contacting the city

5  council?

6  A.  He was just, like, you know, I would call if I was you.

7  Q.  Okay.

8  A.  Something -- something about that.  He wasn't going to call,

9  but he would call if it was him, if he was in that situation, I

10  presume.

11  Q.  Did you understand that comment from Captain Bennett as

12  giving permission or authorization for Davis to call?

13  A.  Not really sure.  It was like we were all sitting around

14  talking about it.  It was just like a random, I would call if I

15  was you.  Like I don't know if it was permission or just, you

16  know, if I was in that situation.

17  Q.  And do you know if Davis in fact followed up and actually

18  called the mayor or city council members about the proposed

19  ordinance?

20  A.  That's what I heard.  I mean I wasn't with him when he

21  called, but --

22  Q.  That's what you heard later?

23  A.  That he called?

24  Q.  Yes.  Did you ever speak to any council members about that

25  proposed ordinance?

1  A.  No, sir.

2  Q.  Were you also against a proposed ordinance that expanded the

3  probationary period for new hires?

4  A.  Yes, sir.

5  Q.  And why were you and the other firefighters against the

6  proposed ordinance?

7           MR. MCKOON:  Object to other firefighters.  I mean how

8  can he know what other firefighters were for or against?

9  Q.  Were other firefighters and union members against the

10  proposed ordinance?

11  A.  Yes, sir.

12  Q.  Do you know why?

13  A.  Because we were thinking, you know, it's hard enough getting

14  good people now.  You know, if people can't get a second job,

15  you know -- because we get paid, you know, a pretty good bit,

16  you know, especially compared to other departments.  But a lot

17  of firefighters depend on a second source of income, you know,

18  to pay the bills.  And, you know, if you can't get a second job

19  for 18 months, we figured it would be hard enough to get people

20  up here because of that, if you had to wait 18 months instead of

21  just 12.

22  Q.  So in your judgment, it would be more difficult to get

23  qualified people to hire on to the department if the

24  probationary period was longer?

25  A.  I wouldn't say qualified.  I mean just -- I guess -- I mean

1  regular people.  I mean good people, I guess.  I don't know.

2  Q.  Before today, were you ever asked any questions by city

3  officials or city attorneys about this conversation that you

4  just described?

5  A.  Yes.

6  Q.  Involving Captain Bennett and Mr. Davis?

7  A.  Yes.

8  Q.  Who asked you about that conversation?

9  A.  These two gentlemen here.

10  Q.  And you're pointing at Mr. McKoon and Mr. Graham?

11  A.  Yes, sir.

12  Q.  And when did you have that conversation with the city

13  attorneys?

14  A.  Thursday of last week.  Thursday.

15  Q.  Can you recall anything else that was said in the

16  conversation involving Captain Bennett, Mr. Davis, and yourself?

17  A.  Not that I can think of.  Just about, you know, if we didn't

18  like it, that -- you know, it would be hard enough to get good

19  people here, and having 18 months -- other than that, no, sir.

20  Q.  Do you know if Captain Bennett was in favor of the enlarged

21  probationary period or whether he was against it?

22  A.  I think he was against it, because we were all talking about

23  we didn't like it.

24  Q.  Is Captain Bennett a member of the union as well?

25  A.  No, sir.

1    Q.   Has he ever been?  Do you know?

2    A.   I don't know.  I couldn't tell you.

3    Q.   There was a newspaper article that came out.  In fact, you

4    can take a look at it.  It's open in the binder in front of

5    you.  It's Exhibit 14.  This was a newspaper article from the

6    *Ledger-Enquirer* and was published on September 18, 2005, in

7    which Mr. Davis and a number of other firefighters and union

8    members commented on various issues affecting the fire

9    department.  Were you involved in that interview with the

10   newspaper reporter, if you recall?

11   A.   I don't believe I was.

12   Q.   You don't believe that you were?

13   A.   I -- not that I can remember.

14   Q.   Okay.  Fair enough.  Do you know if as a result of this

15   newspaper article there was any disruptions in the fire

16   department performing the duties and responsibilities of the

17   fire department?

18   A.   And this is when?

19   Q.   September 2005.

20   A.   I couldn't tell you.

21   Q.   Did you notice any disruptions in operations or efficiency

22   in the fire department because this article came out?

23   A.   I was just getting on line.  I mean -- well, yes, I was just

24   getting on line then.  I -- I couldn't tell you.

25   Q.   Based upon your working relationship with Mr. Davis, do you

1    have a view as to whether or not he was a good performer as a

2    firefighter or a bad performer?

3    A.  He did his job well.  He was very intelligent.  Knew his job

4    well.

5    Q.  Do you know if he has expertise in emergency medical

6    services as well?

7    A.  He was one of our few paramedics that we had.  Like we don't

8    recognize paramedic in Phenix City, but, you know, he was one of

9    our few paramedics.

10          MR. WOODLEY:  I don't think I have any further

11   questions.  I thank you for coming down.

12                    CROSS-EXAMINATION

13   BY MR. MCKOON:

14   Q.  Mr. Sheets, since this is going to be our only opportunity

15   to ask you questions, I need to ask you some under oath here

16   today.  When you met Mr. Graham and I, did anybody ever ask you

17   to say anything but the truth?

18   A.  No, sir.

19   Q.  All right.  In fact, we emphasized to you that we wanted you

20   to tell the truth as you knew it; is that correct?

21   A.  Yes, sir.

22   Q.  All right.  And this -- this is -- today is your last

23   official day of work.

24   A.  Yes, sir.

25   Q.  You're not here today under any subpoena.  Nobody gave you a

```
 1   subpoena to come here today, did they?
 2   A.   No, sir.
 3   Q.   And the sole reason you're here today is because Mr. Woodley
 4   asked you to come and we asked you from your fire department
 5   position to come up here and give your testimony; is that
 6   correct?
 7   A.   Today.  Yes, sir.
 8   Q.   All right.  Do you or have you had in the last six months a
 9   cell phone?
10   A.   Yes, sir.
11   Q.   What is your cell phone number?
12   A.   706-527-5093.
13   Q.   And who is your service with?
14   A.   Nextel.
15   Q.   Okay.  Is that out of Columbus?
16   A.   Yes, sir.
17   Q.   How do you know David Davis?
18   A.   Fire department previously.
19   Q.   Do you also see him at the gym?
20   A.   Yes, sir.
21   Q.   Do y'all work out together sometimes?
22   A.   Well, I see him at the gym.  We don't have a workout.  Like
23   if I need a spot, he might come spot me, but we don't do the
24   same workout program.
25   Q.   How old are y'all -- are you?
```

```
 1   A.   24.
 2   Q.   And it's mentioned that you're leaving to go to Iraq.
 3   You're not in the military, are you?
 4   A.   No, sir.
 5   Q.   Why are you -- why is it that you're going to Iraq?
 6   A.   The money.  Help on the situation, you know.  Pay bills.
 7   Get ahead.
 8   Q.   And who are you going to work for in Iraq?
 9   A.   Wackenhut.
10   Q.   And what is Wackenhut?
11   A.   It's a government contract, subcontract.
12   Q.   You said you were going over there for money?
13   A.   Yes, sir.
14   Q.   What type of money are they going to pay you in Iraq?
15   A.   A hundred grand.
16   Q.   A hundred grand?
17   A.   Yes, sir.
18   Q.   How long -- are you signing a contract to be a contract
19   firefighter over there?
20   A.   Yes, sir.
21   Q.   How long will you be over there?
22   A.   One year.
23   Q.   And as I understand it, what you told us the other day, some
24   of that money is tax-free money; is that correct?
25   A.   Yes, sir.
```

```
 1   Q.   How much of it is tax-free?

 2   A.   84.

 3            MR. WOODLEY:  I'm going to object on relevance

 4   grounds.  I'm not sure where this is going.

 5            MR. MCKOON:  That's fine.  You got your objection.  Go

 6   ahead.

 7   Q.  84,000?

 8   A.  84,000.

 9   Q.  Okay.  84, 85,000.

10            MR. MCKOON:  I'm sorry.  That's your words.  Go ahead.

11   You read it.

12   A.  84.  84, 85,000, something like that.

13   Q.  So the reason you're leaving the fire service here is you're

14   doing that voluntarily because you want to go make more money

15   overseas; is that right?

16   A.   Yes, sir.

17   Q.  All right.  Now, when did you become employed in the Phenix

18   City Fire Department?

19   A.   June of '05.

20   Q.  And at some point in time did you join the union?

21   A.   Yes, sir.

22   Q.  When did you join the union?

23   A.  Approximately a year after I got on.

24   Q.  Sometime in '06?

25   A.   Yes, sir.
```

1    Q.  Were you a union member when this newspaper article appeared

2    that Mr. -- excuse me -- when this newspaper article that

3    Mr. Woodley referred to earlier, showed you -- were you a union

4    member at the time that newspaper article came out in September

5    of '05?

6    A.  No, sir.

7    Q.  All right.  Were you a union member at the time you said you

8    were sitting at a table and reading about this ordinance about

9    changing from a 12-month probationary period to an 18-month

10   probationary period?

11   A.  Yes, sir.

12   Q.  Okay.  How many union meetings have you attended during the

13   course of your union membership from the time you joined up

14   until that day?

15   A.  Three to five, somewhere around there.

16   Q.  How many?

17   A.  Three to five.

18   Q.  Three to five.  Who would preside over the meetings?

19   A.  Who all was there?

20   Q.  Who would be the person that was heading the meetings, the

21   person that was presiding, the head person?

22   A.  David would usually do it.  Or if he couldn't be there, it

23   would be another union representative.  Just no one in

24   particular.

25   Q.  Did you ever have a meeting that David did not attend?

1  A.  Yes, sir.

2  Q.  All right.  Do you know if anybody kept minutes or notes at

3  the meetings?

4  A.  Not sure.

5  Q.  You just never saw that happen?

6  A.  I didn't.  No, sir.

7  Q.  Did you ever attend a meeting where somebody stood up and

8  said, now we're going to read the minutes from the last meeting

9  and then vote on the approval of those minutes?

10  A.  No, sir.

11  Q.  So you don't know whether anybody took minutes or not.

12  A.  No, sir.

13  Q.  Now, going back to either the late part of 2005 or the early

14  part of 2006, I would say December of '05 or January of '06,

15  sometime in that time frame, do you recall where there was a

16  called meeting of the people on your shift where Chief Hunter

17  and Chief Waters came around and explained there may be a change

18  in the probationary period from 12 to 18 months?

19  A.  I'm thinking maybe.

20  Q.  Do you recall that happening?

21  A.  I was trying to think.  I think it did happen.

22  Q.  Do you remember getting up and asking a question at that

23  meeting since you would have been one of the people that was

24  kind of a new hire and in your probationary period at that time?

25  A.  That it would affect me?

```
 1  Q.  Yes, sir.
 2  A.  I know I said something to Chief Waters outside of any
 3  meetings.  It was just me and him, one on one.  I talked to him
 4  about it, and he said it wouldn't affect me.  Then I asked him
 5  if it would affect the guys that are in school at the time, and
 6  he said -- I think he said it wouldn't affect them either.
 7  Q.  Okay.  All right.  Do you remember when that conversation
 8  took place?
 9  A.  I think it was after David got fired, actually.
10  Q.  You think it was after David got fired?
11  A.  Yes, sir.
12  Q.  So you didn't ask about the probationary period being
13  extended before it actually happened?
14  A.  What's that, now?
15  Q.  Are you -- all right.  Are you telling me that at the time
16  you had the conversation with Chief Waters about your
17  questioning about the probationary period affecting you that it
18  was after it had already been implemented?  Is that what you're
19  saying?
20  A.  Yes.  Yes, sir.  Well, I -- I couldn't really tell you when
21  it got implemented.  I know they were talking about -- when we
22  had a conversation, they were talking about bringing it about
23  and that we need to call and say, you know, we didn't like it.
24  But I don't know if it was in effect then or when it become --
25  when it wasn't in effect.  So --
```

1  Q.  Well, there wouldn't be any need to call the city council

2  about something you didn't like if it had already happened,

3  would it?

4  A.  No, sir.

5  Q.  Okay.

6  A.  Well, I guess not, no.

7  Q.  All right.  So all I'm trying to do is kind of get a time

8  frame on this.  And my question, basically, is do you recall

9  whether or not there was a discussion -- and when I say a

10 discussion, a presentation by Chief Hunter and Chief Waters to

11 your shift where you were there and heard them say way in

12 advance of this ordinance being passed that there was talk about

13 going from 12 to 18 months as a probationary period for new

14 hires?

15 A.  I can't remember.  What I remember was we were in class.

16 Chief Waters brought it up in class about, you know, don't be

17 surprised if it did happen.

18 Q.  Well, did you at that time in class -- did you ask a

19 question about that?

20 A.  Not sure.  I probably would have, though.

21 Q.  And that's because you got hired in June of '05?

22 A.  Yes, sir.

23 Q.  And so if something were happening towards the end of '05 or

24 '06, you were still in your probationary period, weren't you?

25 A.  Yes, sir.

1  Q.  So you were one of the people that would have been most

2  concerned, I take it, about whether or not it affected you.

3  A.  Yes, sir.

4  Q.  Is that right?  Now, let's go to the incident that you

5  talked about where you say you were sitting at the table with

6  David Davis and Captain George Bennett.  And it's my

7  understanding from your earlier testimony that you said that

8  you -- that y'all were sitting there, and somebody read

9  something in the paper about the probationary period being

10  changed from 12 -- being changed from 12 to 18 months.

11  A.  Yes, sir.

12  Q.  Who read it?

13  A.  I couldn't tell you.

14  Q.  You don't remember reading it?

15  A.  I mean the paper was passed around.  I -- I don't remember

16  right off hand.

17  Q.  Well, who brought it up?

18  A.  David Davis.

19  Q.  David brought it up?  And so you were -- you were there and

20  David was there and Captain Bennett was there.

21  A.  Yes, sir.

22  Q.  And it's my understanding of your previous testimony a few

23  minutes ago that David said something about calling somebody.

24  A.  Yes, sir.

25  Q.  And Captain Bennett told him what, again, not to do that?

1          MR. WOODLEY:  That's not his testimony.  It's just the

2    reverse.  I would object to that.

3    Q.  Okay.  Well, tell me, what was the first thing that George

4    Bennett told David Davis about whether or not any call should be

5    made to the city council.

6    A.  He was, like, you know, I probably wouldn't do that because,

7    you know, might be pretty much stepping on toes.  I mean I

8    couldn't really tell you.  It might make somebody mad.  And

9    David returned with, you know, I can call them on behalf of the

10   union.

11   Q.  So let me stop you a minute.  So the first thing George

12   Bennett told him was not to call somebody.

13   A.  Right.

14   Q.  Is that right?

15   A.  Yes, sir.

16   Q.  Because it might step on somebody's toes?  Is that what

17   you're telling me?

18   A.  Well, pretty much something like that.  Those aren't the

19   exact words, but something like that.

20   Q.  Well, in fact --

21          MR. WOODLEY:  You're going to have to let him finish

22   his answer without interrupting him.

23          Were you finished with your answer?

24          THE WITNESS:  I think.

25   Q.  You got anything else you want to add to that answer?

1   A.   I forget what the question was.  Okay.  What's the question

2   again?  I'm sorry.

3   Q.   Okay.

4   A.   What was said?

5   Q.   Here's where he were, as I understand it.  Mr. Davis had

6   just remarked that he thought that he should call somebody,

7   right?

8           MR. MCKOON:  I'm sorry.  Go ahead.

9   A.   Right.

10  Q.   Meaning a city council member?

11  A.   Right.

12  Q.   And Captain Bennett told him he wouldn't do that if he were

13  him because it might step on somebody's toes.  Is that where we

14  were?

15  A.   Right.  It might mess --

16  Q.   Well, I don't have any more questions.  I just want to know,

17  is that where we were?  Yes or no.

18  A.   Yes.

19          MR. WOODLEY:  Object to the leading nature of the

20  questions.

21          MR. MCKOON:  Well, it's cross-examination.  I can lead

22  him all I want to.

23          MR. WOODLEY:  You can give your own answers in your own

24  words.

25          MR. MCKOON:  It's cross-examination.  I can lead him

1    all I want to.

2    Q.  So the next thing that happened, as I understand it, was

3    David made some further remark about, well, he could call as a

4    union representative.

5    A.  Yes, sir.

6    Q.  Now, before we get into that part of it, did you understand

7    in your training as a fireman, as a new fireman, that there was

8    such a thing as a chain of command?

9    A.  Yes, sir.

10   Q.  And did you understand that if you had a problem related to

11   your work, that you should take it to your supervisor?

12   A.  Yes, sir.

13   Q.  All right.  And as far as you knew at that time, this didn't

14   concern Mr. Davis, did it, from the standpoint of his

15   employment?

16   A.  The 18 months?

17   Q.  Right.

18   A.  It wouldn't have affected him.

19   Q.  It wouldn't have affected him at all, would it?

20   A.  No, sir.

21   Q.  Okay.  And so the only person in the room at that time or at

22   the table at the time that it might have had an effect on would

23   have been you; is that correct?

24   A.  Yes, sir.

25   Q.  All right.  So when you're having this discussion -- we're

1  now at the point where Mr. Davis says, well, he will call as

2  union president -- are you telling me that Mr. Bennett reversed

3  field and said -- when he had previously said don't call

4  somebody, he now told or encouraged him to call somebody?

5  A.  He was saying I would call if I was you.

6  Q.  Okay.  So he went from saying -- almost within a space of a

7  minute or two saying don't call to saying call somebody --

8  A.  Yes, sir.

9  Q.  -- is that right?  And who all overheard that?

10 A.  Me.  Us three.

11 Q.  Just the three of y'all.

12 A.  There was somebody -- I mean somebody else was at the

13 station, too.  I'm not sure if they were sitting at the table.

14 I want to say it was Daniel Dixon was down there with us.

15        DEPOSITION COURT REPORTER:  What was that last name

16 again?

17        THE WITNESS:  Dixon.

18 Q.  Was he sitting at the table?

19 A.  I'm not sure.

20 Q.  All right.  So after that happened, you later learned that

21 Mr. Davis actually called the mayor or some members of the

22 council -- city council.

23 A.  Yes, sir.

24 Q.  All right.  And then he was terminated; is that correct?

25 A.  Yes, sir.

1  Q.  All right.  When is the -- have you talked to Mr. Davis

2  about this within the last week or so?

3  A.  No, sir.

4  Q.  You have not talked to him at all?

5  A.  I've talked to him at the gym, but it's pretty much about me

6  leaving.

7  Q.  You haven't spoken with him about this issue at all?

8  A.  About the depositions?  I mean he -- he told me they would

9  probably be coming up.

10  Q.  Okay.  But when did you talk with him about that?

11  A.  Not sure.

12  Q.  Okay.  You don't know?

13  A.  No, sir.

14  Q.  Has it been in the last month?

15  A.  I think so.

16  Q.  Did you talk to him yesterday?

17  A.  I don't think so.

18  Q.  You don't think you talked to him yesterday.  Well, you

19  would remember that, wouldn't you?

20  A.  Yes.  I mean I've -- I've been busy, but I -- I don't think

21  I've talked -- I don't think -- I didn't talk to him yesterday.

22  Q.  Okay.  Well --

23  A.  Hold on.  No, I didn't talk to him yesterday.

24  Q.  You did talk to him?

25  A.  No, I didn't.

1    Q.   You did not?

2    A.   No, sir.

3    Q.   You did not.

4    A.   No, sir.  I talked to him what day?  Two days ago.  A couple

5    of days ago.

6    Q.   Two days ago?

7    A.   At the gym.

8    Q.   At the gym.  And what was that discussion about?

9    A.   I take it back.  It wasn't two days ago.  I'm trying to

10   think.  It was a couple of days ago.  I wouldn't say two days

11   ago.  I saw him at the gym here recently within the past five or

12   six days.

13   Q.   And what was the topic of your conversation?

14   A.   Me leaving.

15   Q.   Okay.  You didn't say anything about your deposition?

16   A.   No, sir.

17   Q.   Or what you would testify to in your deposition?

18   A.   I -- I did talk to him about that, yes, sir.

19   Q.   Tell me about that discussion.

20   A.   It was just -- I was like, they asked me some questions, you

21   know, about what happened, told him what happened, what I said.

22   Same things we're talking about here.

23   Q.   Okay.  Did you ever get any phone calls from Mr. Davis after

24   the day you sat there at the table with him and these events

25   transpired that you have testified about regarding polling you

1  as to your opinion as to what should happen about this?

2  A.  No, sir.

3  Q.  Do you know of any -- okay.  Do you know of anybody else

4  that got a phone call like that?

5  A.  No, sir.

6  Q.  All right.  Mr. Woodley asked you if other firefighters were

7  concerned about this.  As I understand it, how long was it

8  between the time that you know that you-all had this discussion

9  at the table and Mr. Davis called the mayor?

10  A.  I'm not sure.

11  Q.  Well, did you ever go to a union meeting where this was

12  discussed?

13  A.  No, sir.

14  Q.  Did you ever talk to any other firefighters about this other

15  than Mr. Davis and George Bennett about this issue?

16  A.  Yes, sir.

17  Q.  Okay.  Who did you talk to about it?

18  A.  I'm not sure.  Probably Lund.  I mean it was -- it was a big

19  topic when it first come about.  I mean a lot of people talked

20  about it.  I'm not sure.

21  Q.  Who else -- you said Eric Lund.  Who else?

22  A.  I'm not sure.

23  Q.  You can't think of another person sitting here today?

24  A.  I mean I talked to Chief Waters about it.

25  Q.  Have you told me everything you and Chief Waters talked

1  about?

2  A.  I guess.

3  Q.  I mean about this subject.

4  A.  Yes, sir.

5  Q.  All right.  Was Chief Waters truthful with you when he

6  answered your questions?

7  A.  He told me it wouldn't affect the guys in the school.  I

8  think it did.  I mean he might not have known.  I mean he

9  wouldn't -- he wouldn't lie about it.  I mean --

10  Q.  Did he more or less have an open-door policy?  If you had a

11  problem, you could go in and talk with him about it?

12  A.  Yes, sir.

13  Q.  Do you know any other firefighters that had a problem with

14  this particular policy other than Eric Lund, if he did -- I mean

15  you told me you talked to him about it; I don't know what --

16  that you told me he had a problem with it -- other than you and

17  Mr. Davis?

18  A.  There were other people that didn't like it, but I mean I

19  couldn't tell you.

20  Q.  You don't know the name of any of them; is that right?

21  A.  That's right.

22  Q.  And all of those people at the time that you would have

23  talked to them about it were people that were already hired,

24  already firefighters --

25  A.  Yes, sir.

1  Q.  -- is that right?  And this policy didn't have any effect on

2  them.

3  A.  No, sir.  I think the only one it might have had an effect

4  on --

5  Q.  Just one other thing.  Do you know whether or not the change

6  in the policy had any effect on recruitment of new firefighters?

7  A.  Like it would affect anyone that started applying for it?

8  Q.  No, sir.  I'm saying in your position as a firefighter with

9  the City of Phenix City, up until today, do you know if this

10  policy of changing from a 12-month probationary period to an

11  18-month probationary period for new hires had any effect on the

12  recruitment of new firefighters for the City of Phenix City?

13  A.  No, sir.  I wouldn't be able to tell that.

14        MR. MCKOON:  That's all.

15                    REDIRECT EXAMINATION

16  BY MR. WOODLEY:

17  Q.  Just a couple of follow-up questions, Mr. Sheets, if I may.

18  Again, going back to this conversation you testified about at

19  the station around the table involving Captain Bennett and

20  Mr. Davis on that subject, have you had any recent conversations

21  with Captain Bennett, say in the last six months, in which you

22  may have discussed that earlier conversation about the proposed

23  ordinance enlarging the probationary period?

24  A.  Before the last time we sat down when I went up there to

25  pick up Dixon, he thought he didn't say it.  He said he don't

1  remember saying that.  And I described the whole situation to

2  him then, too.

3  Q.  You just said Captain Bennett could not recall having said

4  what you have testified about today?

5        MR. MCKOON:  I'm going to object to what Captain

6  Bennett told him outside of here.  It's hearsay.

7        MR. WOODLEY:  Go ahead.

8  A.  All right.  I went up there to pick up Dixon.  That

9  conversation was up, and he said don't -- he don't remember

10  saying that.  And then I told him the whole -- everything I've

11  told y'all about the whole situation, about the whole talk at

12  the table.  And I told him about that, and he said he still

13  didn't remember that conversation.

14  Q.  And when was this more recent conversation you're talking

15  about now with Captain Bennett?

16  A.  Thursday.

17  Q.  Of last week?

18  A.  When I picked up Dixon to come down here for the -- when we

19  talked last time.

20  Q.  And you said that Mr. Dixon was involved in that

21  conversation around the table concerning the proposed ordinance

22  and the enlargement of the probationary period?

23  A.  He -- he might have been.

24        MR. MCKOON:  I object.  That's not what he said.  But

25  anyway, he can say whatever he wants to.

1  Q.  Was Dixon involved in that conversation?

2  A.  He wasn't.

3  Q.  He was not?

4  A.  Not -- not that I can remember.  I mean he --

5  Q.  So the only three individuals involved in that earlier

6  conversation about the probationary period was yourself, Davis,

7  and Captain Bennett.  Is that accurate?

8  A.  Right.  Dixon might have.  I mean he was -- he -- I think he

9  was down there at the station with us, because when I went up

10 there to pick him up and told him that situation, Dixon said he

11 can't remember, you know, what -- you know, what was said at the

12 table then.  I didn't know if he was at the table.  He might

13 have been sitting on the couch.  He might have been in another

14 room.

15        MR. WOODLEY:  Fair enough.  I don't have any further

16 questions.  Thanks for coming.

17        MR. MCKOON:  Just a couple more things.

18                    RECROSS-EXAMINATION

19 BY MR. MCKOON:

20 Q.  Have you ever heard Mr. Davis use the term the blue shirts

21 versus the white shirts?

22 A.  No, sir.

23 Q.  Never heard him say that.  Did Mr. Davis ever tell you he

24 felt like the white shirts were against him?

25 A.  Not that I can remember.

```
 1   Q.  Never heard anything like that.

 2   A.  No.

 3           MR. MCKOON:  All right.  That's all.

 4           MR. WOODLEY:  Thanks for coming.

 5           THE COURT:  Okay.  You can come down.

 6           Well, obviously that took a little longer than the

 7   lawyers thought it was going to take, but let's wrap it up for

 8   today.  We're going to start tomorrow morning at nine o'clock.

 9   I think you'll be happy to hear me tell you that because of a

10   matter that I can't change, we're going to quit by 4:30 tomorrow

11   afternoon.  So we won't be going this late in the day.

12           While you're away, remember not to discuss it with

13   anybody.  Don't watch anything on television or read the

14   newspaper if there's anything in it, or radio.  Don't talk among

15   yourselves or with anyone else about it.  Just forget about it

16   and go on to something else tonight.  And I'll ask you to be

17   back here tomorrow morning in time to start back at nine

18   o'clock.  We'll be in recess until that time.

19       (Jury out at 6:13 p.m.)

20           THE COURT:  All right.  Have a seat.  There are a

21   couple of things I want to mention before we break, and then

22   I'll see if any of the lawyers have anything to bring up.  We

23   are going to have to stop at 4:30 tomorrow afternoon.  I've got

24   a matter that can't be changed that I have to be involved in.

25           As we go along, the question of just what
```

1  interrogatories are going to be submitted to the jury are more

2  and more concerning me and I'm sure concerning the lawyers as

3  well.  When you submitted the requested form earlier, the case

4  was in a different situation than it is now with the claims.  So

5  I want to ask the lawyers to start seriously thinking about and

6  considering what you were going to request as special

7  interrogatories to be submitted to the jury, what you think the

8  fact issues are that the jury should answer.  And go ahead and

9  be giving that some thought so we won't have to wait till later

10  in the week or toward the end of the trial to take that up.  I'd

11  like for you at any time -- as soon as either side can get

12  together your thinking on it at this point, exchange it with

13  each other and pass it on to me.  And the situation may change

14  after that, but let's keep in touch with where we are on the

15  interrogatories that might be asked.

16          The other thing is -- and I'm not going to cut anybody

17  short on the witnesses you present, and I don't like to -- I

18  don't like to interrupt lawyers during their questioning to tell

19  them to move on.  But I'm going to ask all the lawyers to move

20  this thing along.  I don't want you to be repetitious about

21  things that have been asked just for the sake of emphasizing

22  it.  And let's pick it up.  Pick up the pace and move this thing

23  along so we're not going to be having any danger of cutting

24  anybody short at the end of the week.

25          All right.  Is there anything we need on the record

1    before we break, Mr. Steele?

2            MR. STEELE:  No, Your Honor.

3            THE COURT:  Mr. McKoon?

4            MR. MCKOON:  I don't think we need anything on the

5    record.  I just -- if he wants any of these folks that we've had

6    here by agreement to be here tomorrow, he just needs to let me

7    know so I can --

8            THE COURT:  All right.  Mr. Steele, you'll let

9    Mr. McKoon know who you need to have here tomorrow?

10            MR. STEELE:  Sure.

11            THE COURT:  All right.  We'll be in recess till nine

12   o'clock.

13            MR. MCKOON:  Thank you.

14       (Evening recess at 6:16 p.m.)

15                    * * * * * * * * * *

16

17

18

19

20

21

22

23

24

25

411

1                        COURT REPORTER'S CERTIFICATE

2              I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4              This 16th day of May, 2008.

5

6                                      /s/ Risa L. Entrekin
                                       Registered Diplomate Reporter
7                                      Certified Realtime Reporter
                                       Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RISA L. ENTREKIN, RDR, CRR, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, MIDDLE DISTRICT OF ALABAMA
ONE CHURCH STREET, MONTGOMERY, AL 36104   334-240-2405