1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  EASTERN DIVISION

4

5    DAVID DAVIS,

6          Plaintiff,

7      vs.              CASE NO.:  3:06cv544-WHA

8    PHENIX CITY, ALABAMA, et al.,

9          Defendants.

10

11                  VOLUME III

12          * * * * * * * * * *

13          JURY TRIAL PROCEEDINGS

14          * * * * * * * * * *

15      BEFORE THE HONORABLE W. HAROLD ALBRITTON, UNITED

16   STATES DISTRICT JUDGE, and a jury, at Opelika, Alabama, on

17   Wednesday, March 5, 2008, commencing at 9:04 a.m.

18   APPEARANCES:

19   FOR THE PLAINTIFF:      Mr. Douglas L. Steele
                             Attorney at Law
20                           WOODLEY & McGILLIVARY
                             1125 15th Street NW, Suite 400
21                           Washington, D.C.  20005

22                           Mr. Gary Lamar Brown
                             Attorney at Law
23                           FITZPATRICK & BROWN
                             Farley Building, Suite 600
24                           1929 Third Avenue North
                             Birmingham, Alabama  35203

25

```
 1   APPEARANCES, Continued:

 2   FOR THE DEFENDANTS:        Mr. James Robert McKoon, Jr.
                                Mr. Joshua Robert McKoon
 3                              Attorneys at Law
                                McKOON, THOMAS & McKOON
 4                              925 Broad Street
                                Phenix City, Alabama  36868
 5
                                Mr. James Paul Graham, Jr.
 6                              Attorney at Law
                                THE GRAHAM LEGAL FIRM
 7                              P.O. Box 3380
                                Phenix City, Alabama  36868-3380
 8
                   Proceedings reported stenographically;
 9                   transcript produced by computer.

10                      * * * * * * * * * *

11                          VOLUME INDEX

12   WALLACE BURNS HUNTER
           DIRECT BY MR. STEELE                    415
13         CROSS BY MR. GRAHAM                     468
           REDIRECT BY MR. STEELE                  500
14         RECROSS BY MR. GRAHAM                   514
           REDIRECT BY MR. STEELE                  517
15
     HERMAN H. ROBERTS
16         DIRECT BY MR. STEELE                    518
           CROSS BY MR. MCKOON                     550
17         REDIRECT BY MR. STEELE                  561

18   AUDREY THOMASSON
           DIRECT BY MR. BROWN                     568
19
     BRENDA DAVIS
20         DIRECT BY MR. STEELE                    573
           CROSS BY MR. MCKOON                     575
21         REDIRECT BY MR. STEELE                  576

22   PLAINTIFF RESTS                               577

23

24

25
```

1                          VOLUME INDEX, Continued

2    BARBARA GOODWIN
           DIRECT BY MR. MCKOON                           579
3          CROSS BY MR. BROWN                             580

4    ROLAND LEROY WATERS
           DIRECT BY MR. MCKOON                           581
5          CROSS BY MR. BROWN                             604

6                          * * * * * * * * * *

7        (The following proceedings were heard before the Honorable

8         W. Harold Albritton, United States District Judge, and a

9          jury, at Opelika, Alabama, on Wednesday, March 5, 2008,

10         commencing at 9:04 a.m.:)

11       (Call to Order of the Court)

12           THE COURT:  Good morning, ladies and gentlemen.  You

13   have some notebooks that have been passed out to you, and I'll

14   tell you what those are.  These are exhibits that both sides

15   have agreed are admitted in this case that may be referred --

16   will be referred to from time to time.  And so you need not be

17   concerned as to whether any of these exhibits are for you to

18   consider; they are.  Both sides agree that these are documents

19   that you should have.  And for your convenience, they've

20   distributed them so each of you will have a copy.  I'll ask you

21   not to get concerned with what's in the book and thumbing

22   through and reading it rather than listening to the witnesses.

23   They'll point to you an exhibit that you should look at.  So

24   they're there for your convenience.

25           All right.  Mr. Steele, call your next witness.

1      MR. STEELE:  Thank you, Your Honor.  We'd like to call

2  Chief Hunter to the stand.

3      (The witness is sworn)

4      THE CLERK:  Be seated.

5      **WALLACE BURNS HUNTER**, the witness, having been duly

6  sworn, testified, as follows:

7                         DIRECT EXAMINATION

8  BY MR. STEELE:

9  Q.  Good morning, Chief.

10 A.  Good morning.

11 Q.  Would you please state your name for the record.

12 A.  Wallace Burns Hunter.

13 Q.  And your current position?

14 A.  I'm the fire chief of Phenix City Fire and Rescue.

15 Q.  And Chief, how long have you been fire chief in Phenix City?

16 A.  I've been -- this is getting ready to be three years.  Three

17 years in May.

18 Q.  And were you previously at an earlier time fire chief as

19 well?

20 A.  Yes, sir.

21 Q.  And when was that?

22 A.  That was in July of 2001.

23 Q.  Okay.  Only for July?

24 A.  No, sir.  July of 2001 until December of 2001.

25 Q.  Okay.  And what happened in December 2001?

1  A.  Chief Prater became the fire chief.

2  Q.  Did you remain with the department after that?

3  A.  Yes, sir.

4  Q.  Was there a particular reason that you stopped being fire

5  chief at that point?

6  A.  Yes, sir.  I stopped being the fire chief because my family

7  couldn't stand the death threats I was receiving.

8  Q.  Okay.  And have things been better since you came back as

9  chief a second time in terms of that?

10  A.  Yes, sir.

11  Q.  Now, I believe you said that you have been fire chief since

12  May of 2005; is that correct?

13  A.  Yes, sir.

14  Q.  Were you acting chief for a period of time before that?

15  A.  Yes, sir.

16  Q.  And what was that period of time?

17  A.  I was acting chief in 2001, from 2000 -- acting chief until

18  September of 2001 from July.  And when I resigned, I was acting

19  chief under then current city manager Mr. Roberts until

20  December.  And I became interim chief again in March of 2005.

21  Q.  Okay.  So for 2005, focusing on the period that we've been

22  discussing, you were interim chief beginning in March and then

23  actually obtained the official title of chief in May?

24  A.  Yes, sir.

25  Q.  Now, Chief, if you would, please, turn to Exhibit #7 in the

1  book in front of you.

2        THE COURT:  That's the black book, isn't it, for the

3  jury's information, Mr. Steele?

4        MR. STEELE:  Yes.

5        THE COURT:  All right.  That's the black book.

6  Q.  And Chief, Plaintiff's Exhibit #7 is a newspaper article

7  from September 2005, correct?

8  A.  Yes, sir.

9  Q.  And do you recall seeing that article at the time it came

10 out?

11 A.  Yes, sir.

12 Q.  And were you interviewed for this article?

13 A.  I was asked by a reporter about this article.

14 Q.  Okay.  So you did speak with the newspaper reporter

15 concerning the issues that appear in the article?

16 A.  I spoke to -- I directed the newspaper reporter to the city

17 manager.  And I also spoke to him and told him that I didn't

18 know anything about a lot of this.  I wasn't given a chance to

19 take care of this.  That's as far as a lot of my conversation

20 went with the reporter.

21 Q.  Okay.  But you did have a conversation with the reporter.

22 A.  That's correct.

23 Q.  Okay.  I notice -- is that your picture on the first page of

24 that exhibit?

25 A.  Yes, sir.

1  Q.  Do you know how the reporter happened to have your picture?

2  A.  I'm quite sure it's from an old file with the

3  *Ledger-Enquirer*.  I had been fire chief before.

4  Q.  Okay.  So you think this is from when you were fire chief

5  earlier?

6  A.  Yes, sir.

7  Q.  Okay.  Now -- now, as I understand it, Chief, it's your

8  position that the individuals that were quoted in that article

9  should have followed the chain of command instead of going to

10  that reporter; is that correct?

11  A.  That's correct.

12  Q.  Now, I want to clarify something, just for the record, and

13  so the jury will know it.  Back in April of 2007, do you recall

14  that you gave a deposition in this case?

15  A.  Yes, sir.

16  Q.  And you were actually designated by the city to provide

17  testimony on its behalf with respect to certain issues; is that

18  correct?

19  A.  I believe so.

20  Q.  And among those issues were the facts and documents related

21  to the chain of command?

22  A.  Yes, sir.

23  Q.  And you were also designated to provide testimony on behalf

24  of the city regarding the facts and circumstances relating to

25  Mr. Davis's termination, correct?

1    A.   Yes, sir.

2    Q.   Now, Chief, is it your position, sir, that it would be a

3    violation of the merit system rules and regulations or

4    department procedures if a firefighter were to speak directly to

5    the media about inadequate staffing?   Correct?

6    A.   Yes, sir.

7    Q.   Would that also be your position with respect to health and

8    safety issues?

9         MR. MCKOON:   Judge, I object.   The first question was

10   directly to the media.   I don't know what this question is.

11        MR. STEELE:   Okay.

12        THE COURT:   Rephrase the question.

13        MR. STEELE:   Sure.

14   Q.   Is it also your position that it would be a violation of the

15   merit system rules and department policies if a firefighter

16   spoke directly to the media concerning health and safety without

17   your approval?

18   A.   If it's related to the fire service.

19   Q.   Okay.   And would it, in your opinion, be a violation of the

20   merit system and the department policies if a firefighter were

21   to speak directly to the media concerning, say, insufficient

22   financial resources or inadequate budgeting within the fire

23   department without your approval?

24   A.   You need the follow the chain of command, ASOP 12.

25   Q.   Okay.   So is the answer to that yes?

```
 1  A.   Yes, sir.

 2  Q.   So it's your position and it's the position of the city that

 3  these various items that I've mentioned -- inadequate staffing,

 4  health and safety, inadequate budgeting -- all of those issues

 5  must go through the chain of command and obtain permission

 6  before a firefighter could speak to the media on those issues?

 7  A.   Yes, sir.  They're fire-related issues.

 8  Q.   Now, Chief, I believe you said that ASOP 12 was involved in

 9  whether the firefighter could speak to the media on these

10  issues; is that correct?

11  A.   Yes, sir.  If you exhaust your chain of command, you can

12  speak to anyone you want to.  We don't hold anybody back from

13  speaking to anyone.  We just want to be given a chance to solve

14  the problem before it gets to -- out of hand.

15  Q.   Okay.  And Chief, I would ask you to try to constrain your

16  answers to the particular question that's before you.  Your

17  counsel's going to have an opportunity to ask you additional

18  questions, of course, later on.

19       If you would, Chief, turn to Exhibit #5 in the notebook in

20  front of you.

21       (Brief pause)

22  Q.   You've been able to do that?  Does that appear to be a copy

23  of the ASOP 12?

24  A.   Yes, sir.

25  Q.   Okay.  Would you point out for me, please, what part of ASOP
```

1  12 concerns firefighters' contact with the media?

2  A.  Basically, what it says, sir -- it doesn't have the media in

3  here.  But it says if a problem cannot be solved, and number

4  three, in the chain of command, then the city manager will

5  arrange a hearing with the city council.

6  Q.  Okay.  But it doesn't mention the media at all, does it?

7  This particular ASOP 12 is entitled Addressing City Council.  It

8  doesn't mention media, newspaper, television, or anything of the

9  like.  Isn't that true?

10  A.  Number two, it says if a member of the fire department finds

11  it necessary to go outside the department, the fire chief will

12  be given a reasonable time to make an appointment with the

13  public safety director, which is the city manager.

14  Q.  Okay.  So you think this is not limited to what it says

15  right at the top, addressing city council?

16  A.  No.  It's an avenue to go outside the department.

17  Q.  Well, if you look at number three, though, sir, which you

18  pointed out to us, there's this reference to the problem cannot

19  be solved by anyone in the chain of command, the city manager

20  will arrange a hearing with the city council, correct?

21  A.  That's correct.

22  Q.  It doesn't say anything about the city manager will arrange

23  a hearing with the local newspaper, does it?

24  A.  The city manager will arrange I guess what they're

25  requesting.

1  Q.  That's not what this document says, does it, sir?

2  A.  No, sir.  It --

3  Q.  This document speaks to the city council and access to the

4  city council, doesn't it?

5  A.  Yes, sir.

6  Q.  Now, sir, it is also indeed your position and the position

7  of the city, as you testified on behalf of the city, that even

8  if a firefighter were to raise issues that we previously

9  discussed, safety issues, staffing, budgeting issues and the

10 like -- even if a firefighter raised those through the chain of

11 command and were to do that, the firefighter still would not

12 have the right to go to the media with these same concerns;

13 isn't that correct?

14 A.  Repeat that.

15 Q.  Sure.  We talked about a variety of concerns that you

16 contend a firefighter is not allowed to go directly to the media

17 concerning without going through the chain of command, correct?

18 A.  That's correct.

19 Q.  All right.  And we talked about issues like health and

20 safety and protective gear, insufficient financial resources,

21 those type of topics relating to the fire department, correct?

22 A.  Correct.

23 Q.  And it's your position, sir, isn't it, and the position of

24 the city that even if a firefighter raised those issues and went

25 through the chain of command, that the firefighter still would

```
 1  not have the right to go to the media with these same concerns?
 2  A.  Yes, the firefighter would.
 3  Q.  So it's not your position that the firefighter, after
 4  exhausting the chain of command, could not go to the media?
 5  A.  You can't go directly.  If you go through your chain of
 6  command, you can go to the media.
 7  Q.  Okay.  So now, going back a moment to your testimony that
 8  you gave back in April of 2007 when you were deposed, I am
 9  correct, sir, that the testimony you gave there you gave under
10  oath?
11  A.  That's correct.
12  Q.  And you swore to tell the truth?
13  A.  That's correct.
14  Q.  And it's your belief and position that in fact you did tell
15  the truth during that deposition; isn't that correct?
16  A.  That's correct.
17          MR. MCKOON:  Could you let us know the page and where
18  you are?
19          MR. STEELE:  Yes.  I will be doing that.
20          Your Honor, permission to approach the witness?
21          THE COURT:  Yes.  This is a copy of his deposition
22  you're giving him?
23          MR. STEELE:  Yes.
24          THE COURT:  All right.
25  Q.  Now, Chief, I've just handed to you a copy of the deposition
```

1   that you gave in this case on April 4th, 2007.  And as you've

2   already testified, you recall attending that deposition and

3   providing testimony on behalf of yourself and on behalf of the

4   city, correct?

5   A.   That's correct.

6   Q.   Okay.  And if you would for me, turn to page 56 of that

7   deposition transcript.  And on page 56 of that transcript, do

8   you recall being asked and providing answers to the following

9   question?

10  A.   Yes.

11  Q.   And you were asked as a 30(b)(6) witness providing testimony

12  on behalf of the city.  Question:  Is it your position as the

13  chief of the fire department and the Rule 30(b)(6) witness in

14  this case on the following subject, if a firefighter has

15  concerns about public safety or operations in the department or

16  poor morale or understaffing and they exhaust the chain of

17  command, they route their concerns up through their first

18  officer and ultimately to you, do they then -- after you

19  consider the matter, do they then have the right to go to local

20  media and issue -- and state those same exact concerns?

21       Do you see that question, sir?

22  A.   Yes, sir.

23  Q.   And what was the answer that you gave in your deposition?

24  A.   They still don't have the right.

25  Q.   And you just testified that you were under oath when you

1  gave that, correct?

2  A.  That's correct, sir.

3  Q.  So it was at least your position back in April of 2007 that

4  even if a firefighter brought issues relating to the media -- or

5  issues relating to the department through the chain of command

6  all the way to yourself -- you're the head of the department,

7  correct?

8  A.  I'm not the end of the chain of command, sir.

9  Q.  You are the head of the department, correct, Chief?

10  A.  Yes, sir.

11  Q.  Okay.  And my question to you is if a firefighter brings

12  issues of concern relating to the department all the way through

13  the chain of command, step by step by step to your desk as chief

14  of the department and still is not satisfied, it's your

15  testimony that that firefighter still can't bring those issues

16  directly to the media?

17  A.  He hadn't exhausted the chain of command.

18  Q.  Sir, please try to answer my question.  Is your testimony --

19  did the court reporter make a mistake when she took this down?

20  A.  No, sir.

21  Q.  Okay.  So your answer to that question is that they still

22  don't have the right, even if they bring it all the way up to

23  you, correct?

24  A.  I'm not the final step.

25  Q.  Well, sir, we've already showed you ASOP 12, and we've

1  pointed out that doesn't say one word about the media, does it?

2  A.  Chain of command says the final step is city manager in ASOP

3  12.

4  Q.  ASOP 12 is entitled Addressing City Council, sir.

5  A.  We're talking about work-related issues.

6  Q.  Turn to Exhibit #5.  If you want to talk about ASOP 12,

7  we'll go back to Exhibit #5.

8  A.  Yes, sir.

9  Q.  If you follow the procedures set forth in Exhibit #5, ASOP

10  12, and you raise these work-related issues, when you get down

11  to step three, if the problem cannot be resolved in the chain of

12  command, then the city manager will arrange a hearing with the

13  city council -- now, we'll talk later about what that means or

14  doesn't mean, a hearing with the city council.  But there's not

15  one word in here that says if you go through the chain of

16  command, you can then speak to the media, is there?

17  A.  As far as the media, if their request is to talk to the

18  media, that's -- this is what we follow, ASOP 12, with

19  work-related issues.  If they come to my office, they obviously

20  come to my office with work-related issues.  And I have to

21  follow the standard operating procedure.  And at the top of that

22  chain is the city manager.

23  Q.  Okay, sir.  And according to the procedure that you have to

24  follow, according to your testimony, you have to follow ASOP 12

25  with respect to issues of public concern relating to the fire

1  department, correct?

2  A.  Correct.

3  Q.  And according to ASOP 12, if you follow this procedure that

4  you say has to be followed, it would go up the chain of command

5  to you as chief, to the city manager, and then the city manager

6  will arrange a hearing with the city council.  And again, I'm

7  not asking you what that means; we'll get to that later.

8  There's no part in this process that says an individual ever has

9  a right, without permission, to speak to the media, is there?

10  A.  Repeat that, sir.

11  Q.  There's no part in the process that's set forth in ASOP 12

12  that you keep on referring us to that ever, ever in this process

13  allows an individual access to the media.

14  A.  It doesn't say the media, but this is the avenue.

15  Q.  So the avenue, if -- and this is your position on behalf of

16  the city.  The avenue to -- if you have issues that you want to

17  raise with the media, is to go through ASOP 12.

18  A.  That's correct.

19  Q.  And we're in agreement that ASOP 12 only provides that the

20  city manager will arrange a hearing with the city council but

21  does not provide for discussion with the media.  Is that also

22  correct?

23  A.  Sir, let me explain to you.  If you meet with --

24  Q.  Sir, I have a question before you.

25  A.  Yes, sir.

428

1    Q.   And my question is -- actually, I'd like to have it read

2    back so I don't misstate what my question was.

3         (The court reporter read the pending question)

4    Q.   Sir?

5    A.   Yes, sir.

6    Q.   Matter of fact, Chief, this issue of access to the media --

7    during your deposition, you were asked about it a couple of

8    different times.  And on occasion after occasion after occasion,

9    your answer was that the individual that goes directly to the

10   media, even if they go through the chain of command, at least up

11   to your level, would still be violating policies and procedures;

12   isn't that correct?

13   A.   Yes, sir.  But you used the word "directly."

14   Q.   I did use the word "directly" after exhausting the chain of

15   command through your level.  And they still would not have a

16   right, according to -- to you, to go to the media, correct?

17   A.   That's correct.  I'm not the final link.

18   Q.   They have to use ASOP 12 and somehow hope that the media is

19   at some hearing at the city council.  Is that your testimony?

20   A.   Sir, the media is at all the meetings of the city council.

21   That is their direct link.  The media is present at the city

22   council meetings.

23   Q.   Okay.  So it's your position that the only way an employee

24   can get to the media is they go through ASOP 12, which doesn't

25   say they can ever get to the media; but then you say they can

1  have the media listen to what they say to the council as a

2  whole.

3  A.  No.

4  Q.  It doesn't provide in here, does it, sir, that they can talk

5  to a newspaper reporter outside the presence of the city

6  council.

7  A.  After they exhaust the chain of command, they can talk to

8  anyone they want.

9  Q.  Where in ASOP 12 does it say that, sir?

10 A.  It doesn't say that.  It says --

11 Q.  It doesn't say that.

12 A.  -- use your chain of command, and you can talk to anyone.

13        THE COURT:  Don't talk at the same time.

14        THE WITNESS:  Yes.

15 Q.  My question to you, sir, was where in ASOP 12 does it say

16 that.  And am I correct your answer was it doesn't say that?

17 Correct?

18 A.  Not the media.  Not the word "media."  No, sir.

19    (Brief pause)

20        MR. STEELE:  Your Honor, may I approach?

21        THE COURT:  Yes.

22 Q.  Chief.  Now, Chief, I've just handed you a second deposition

23 transcript.  And I'm correct that in this particular case, you

24 had the joy of being deposed twice, correct?

25 A.  Yes, sir.

1  Q.  And this issue of access to the media was addressed in both

2  depositions?  If you -- if you don't recall, just tell me, and

3  I'm going to point you to a spot that might help you.

4  A.  I believe so.  Just tell me.

5  Q.  Okay.  Now, there's a discussion at pages 11 to 12 of that

6  November 6th, 2007, deposition concerning access to the media.

7  And the question was asked -- and this was the question:  Okay.

8  Where I'm trying to go with this, just so you understand, is

9  that there is a preliminary requirement that before a city

10  employee can talk to the media about any city-related issue,

11  that individual has to exhaust the grievance procedures provided

12  by the city.

13      And your answer was?

14  A.  On here, it says:  No.  We have designated people to talk to

15  the media.

16  Q.  Right.

17  A.  Which we are talking about two different things here.

18  Q.  Well, stick with me, Chief.

19  A.  Yes, sir.

20  Q.  Your answer was:  No.  We have designated people to talk to

21  the media.  And then you were asked who that might be.  And your

22  answer was that it was yourself or whoever you elect, designate

23  as the person in fire prevention or whichever division that they

24  are requesting information from, correct?

25  A.  Yes, sir.

1  Q.  And then you said that you're one of the people that could

2  talk to the media, right?

3  A.  Yes, sir.  This is during day-to-day operations.

4  Q.  Sir, answer my questions --

5  A.  Yes, sir.

6  Q.  -- if you could, please.

7  A.  Okay.

8  Q.  You were asked at that deposition:  Does anyone in the fire

9  department have the discretion or opportunity to speak to the

10  media without your prior approval on any issue affecting the

11  department?

12     Do you see that question at page 12 of your deposition

13  transcript?

14  A.  That's correct.  Yes, sir.

15  Q.  And then your answer was:  As far as the media?

16     Question:  Yes.  Your answer:  No, sir.  We have designated

17  personnel for that.  And as far as I'm not here, in my absence,

18  someone would step in my place, and that person would have the

19  authority.

20     That was your answer, correct?

21  A.  That's correct.

22  Q.  So it is your testimony, sir, that a rank-and-file

23  firefighter who has an issue of public concern that's related to

24  the fire department, according to your deposition that you gave

25  under oath, that individual is not permitted to speak to the

1  media, quote, without your prior approval.

2  A.   Sir, you're talking about two different things.

3  Q.   Two different things?

4  A.   Yes, sir.

5  Q.   I'm talking about access to the media, sir.

6  A.   Access to the media during day-to-day operations, you have

7  designated personnel that talks to -- you have a chief of fire

8  prevention.  You have a chief of training.  You have a chief of

9  operations.  Those are day-to-day operations.  This is something

10  that's a concern that you're talking about that's outside of the

11  scope of those things that is totally different than people

12  that's designated to talk to the media day-to-day on fires and

13  things.  It's two totally different things.

14  Q.  All right.  Well, I'm going to repeat the question once

15  more, and then you can tell me where in the question we were

16  asking you about only day-to-day operations, okay?  The

17  question, page 12 of your deposition transcript:  Does anyone

18  else in the fire department have the discretion or opportunity

19  to speak to the media without your prior approval on any issue

20  affecting the fire department?

21       That was the question, correct?

22  A.   Yes, sir.  That was the question.

23  Q.   And your answer was:  No, sir.

24  A.   That -- that was right, except for designated personnel.

25  Q.   Except for designated people.  So unless someone is --

1  A.  On day-to-day operations.

2  Q.  Sir, you didn't say that during your deposition, did you?

3  A.  I'm sorry, I didn't.  But that's -- that's what that's all

4  about.

5  Q.  Somehow --

6  A.  That's in every fire department in the United States, sir.

7  Q.  You didn't say that, sir, during your deposition, did you?

8  A.  No, sir.  You asked me --

9  Q.  No, sir.

10  A.  -- did I have people.  And I --

11  Q.  You were asked directly whether an individual firefighter

12  ever has the opportunity to go to the media on matters of public

13  concern relating to the fire department, and your answer --

14  without your approval, and your answer was no, sir.

15  A.  Not on day-to-day operations, no.

16  Q.  You agree with me that the question that I just read to you

17  didn't say day-to-day operations?

18  A.  No, sir.  And I don't -- and I agree with you that it didn't

19  say that, also.

20  Q.  You don't agree with me --

21  A.  I wasn't asked --

22  Q.  -- that the question didn't say day-to-day operations?

23  A.  We're talking about two different things, sir.

24  Q.  All right.  Well, we've gone through it a couple of times.

25  We can go through it once again.  You have the transcript in

1  front of you, sir, correct?

2  A.  Yes, sir.

3  Q.  Question:  Does anyone else in the fire department have the

4  discretion or opportunity to speak to the media without your

5  prior approval on any issue affecting the fire department?

6     Right?  That's the question.

7  A.  Yes, sir.  That's the question.

8  Q.  I don't see in that question where it limits the scope of

9  the question to day-to-day operations.

10        MR. MCKOON:  Your Honor, I'm going to have to object.

11  May we approach for just a second?

12        THE COURT:  Well --

13        MR. STEELE:  I think this is proper examination.

14        THE COURT:  I'm going to let him question him about it.

15        MR. MCKOON:  All right.  That's fine.

16        THE COURT:  He can answer as to how he took the

17  question, but that's legitimate.  Go ahead.

18  A.  I answered -- sir, I answered:  No.  We have designated

19  people to talk to the media.  And --

20  Q.  Okay.  My question to you, sir, was the question that I just

21  read on the bottom of page 12 of your transcript does not

22  mention a word limiting that question to day-to-day operations,

23  does it?

24  A.  That's correct.

25  Q.  Let's turn for a moment, Chief, to the ability of a

1    firefighter to have contact with the city council.  We had some

2    reference to that in your testimony already.  Now, contact with

3    the city council, you've told us, is addressed and governed by

4    ASOP 12, correct?

5    A.    That's correct.

6    Q.    And that's Exhibit #5 in the notebook in front of you,

7    correct?

8    A.    Yes, sir.

9    Q.    Okay.  Now, Exhibit #5, in your view, is what controls if an

10   individual wishes -- an individual firefighter wishes to bring a

11   matter relating to the fire department to the city council; is

12   that right?

13   A.    That's correct.

14   Q.    Now, when you -- when we took your deposition, we asked you

15   not only about access to the media, we also asked you about

16   access to the city council, correct?

17   A.    That's correct.

18   Q.    And this was at your deposition when you were under oath,

19   correct?

20   A.    That's correct.

21   Q.    And sir, it was your position as head of the department and

22   testifying on behalf of yourself and the city that firefighters

23   simply can't get to the council to address concerns relating to

24   the fire department; isn't that true?

25   A.    Would you show me that?

1  Q.  Sure.

2        MR. MCKOON:  Can you tell us which deposition you're

3  in?

4        MR. STEELE:  Yeah.  As soon as I -- it will be the

5  first deposition.

6        MR. MCKOON:  Thank you.

7        MR. STEELE:  I'll give you a page number in just a

8  moment.

9  Q.  Now, Chief, you still have before you the copy from your

10  April 2000 (sic) deposition; is that correct?

11  A.  Yes, sir.

12  Q.  Okay.  And sir, we asked questions concerning access to the

13  city council during that deposition, correct?

14  A.  Yes, sir.  Let me -- let me locate it.

15  Q.  Okay.  Sure.  I'm sorry.

16  A.  That's 75?

17  Q.  Yes.

18  A.  Yes.

19  Q.  Actually, 75 on to 76 --

20  A.  Yes, sir.

21  Q.  -- but you're on the correct page.

22  A.  All right.  Go ahead.

23  Q.  At the end of 75, we asked -- or you were asked whether ASOP

24  12 that you referred to addresses the subject of the city

25  council.  And your answer was:  That's correct.

 1       Then we asked:  Does that mean addressing the city council

 2  as a body in a meeting, addressing the city council?  And you

 3  said:  Yes, as a person -- this was written in '98 -- I guess is

 4  trying to get there, the body, quote, which is a place you would

 5  never get to because it stops at the city manager.

 6       That was your answer, correct, sir?

 7  A.   Let me see.  Let me see.  You lost me.

 8  Q.   This is page 76 in the transcript that's before you.

 9  A.   Okay.

10  Q.   And we're looking at lines 3 through -- where's the end of

11  your answer?  Six.  Do you recall giving that answer during your

12  deposition, that ASOP 12, which was written in '98, according to

13  your testimony, is trying to get there, the body -- referring to

14  the city council?  And then you say, quote, which is a place you

15  would never get to because it stops at the city manager.

16       Do you see that, sir?

17  A.   Yes, sir.  I see that.

18  Q.   And that was your testimony at your deposition?

19  A.   Let me read -- let me finish reading this.

20  Q.   Certainly.

21       (Brief pause)

22  Q.   We're on page 76 of your transcript.

23  A.   I see exactly.

24  Q.   Okay.  And are you still reading or are you --

25  A.   Yes, sir.

1  Q.   Okay.

2  A.   That's correct.   That's what I said.

3  Q.   That is what you said, that the city council was a place you

4  never get because it stops at the city manager.

5  A.   No.   That -- that's -- it would stop at the city manager, as

6  far as with me.

7  Q.   Well, let's go over your answer again.   It's on the poster

8  board in front of you, and you've got a copy of the

9  deposition --

10  A.   Yes, sir.

11  Q.   -- transcript, and we're talking about ASOP 12, and we're

12  asking you whether this is the process that's used to get to the

13  council.   And your answer is:   Yes, as a person -- this was

14  written in '98 -- I guess is trying to get there.

15  A.   Yes.

16  Q.   You used the word "trying" --

17  A.   Yes.

18  Q.   -- to get there, the body.   And you said, quote, which is a

19  place you would never get to because it stops at the city

20  manager, correct?

21  A.   That's correct.

22  Q.   Now, you didn't say that the city manager has discretion or

23  the city manager's policy is all you have to do is go to him,

24  then you can get to the council.   You never said that in your

25  deposition, did you?

1   A.   No, sir.  That's where --

2   Q.   Right.  You said it stops --

3   A.   As for me --

4   Q.   -- with the city council -- or the city manager.  I'm sorry.

5   A.   Yes, sir.

6   Q.   And then we asked you this question:  In other words, under

7   ASOP 12, firefighters are not permitted to go beyond the city

8   manager and are not permitted to address the city council as a

9   group in a meeting.  Is that accurate?

10       Do you see where that question is?

11           MR. MCKOON:   What line?

12  A.   Yes, sir.

13           MR. STEELE:   This is page 76, line 7 through 11.

14  Q.   Do you see that, sir?

15  A.   Yes, sir, I see that.

16  Q.   And would you read your answer that you gave at the

17  deposition?

18  A.   Okay.  The city manager informs the council of anything

19  that's going on.  He would be the one that -- if he had to

20  express something that was -- that was bad, he would be the one

21  that would meet with the city council.

22  Q.   So your testimony at your deposition in those two questions

23  is that if someone wanted to address the city council, that's a

24  place they'd never get because it, quote, stops at the city

25  manager and that if there was an issue that needed to get to the

1  council, the city manager is the one that would meet with them

2  and present it.

3  A.   That's as far as for with me.  In the line of succession

4  with me, it would stop, for me, with the city manager, and the

5  city manager would take it over from there.  And that would be

6  up to the city manager to meet with the council.

7  Q.   Well --

8  A.   That's what I meant in that statement.

9  Q.   Oh, that's what you meant in that statement.

10  A.   Yes, sir.  That's what I meant.

11  Q.   That's not what we asked you, did we?

12  A.   Well, I was telling you that's what I meant, because that's

13  the way it is.

14  Q.   And that's not what you told us when you were under oath at

15  the deposition, was it?

16  A.   Yes, sir.  That's what I meant.

17  Q.   So when we asked whether a firefighter or an employee could

18  get to the city council and your answer was that was a place

19  they would never get because it stops at the city manager, you

20  didn't mean that it stops at the city manager?

21  A.   Sir, what I meant is the firefighter wouldn't just walk into

22  the city council.  The city manager is the one that would

23  arrange that.  That's what I meant by that.  It stops at the

24  city manager, as far as for me.  Coming up through my chain, it

25  would go to the city manager.  And that's who would meet and

1    inform the council.  And beyond that, that's what they would

2    take care of between the city manager.  It only goes so far.

3    Q.   Now, Chief -- Chief --

4    A.   Yes, sir.

5    Q.   You've already told us that during your deposition you were

6    designated to provide testimony on behalf of the city, correct?

7    A.   That's correct.

8    Q.   And in this question here -- and it's before you up there --

9    A.   Yes, sir.

10   Q.   -- we did not ask you what is the limit of your authority as

11   a department head with respect to an employee getting to the

12   city council.  We asked your view on ASOP 12.  That's a policy

13   of your department, correct?

14   A.   That's correct.

15   Q.   And it's your contention that people have to follow that

16   policy; is that correct?

17   A.   That's correct.  Yes, sir.

18   Q.   And according to your testimony when you were deposed back

19   in April of 2007, an employee would never get to the city

20   council because it stops at the city manager.

21   A.   Yes, sir.  Sir, what I was answering to is most of the time,

22   I had been asked whether an employee could go directly to the

23   city council.  And I always answered in what my scope and my

24   authority is.  And it stops at the city manager.

25   Q.   Sir, you don't deny that you gave this answer, do you?

```
1   A.  No, sir.  I don't deny it at all.
2   Q.  And when you said the city council -- you said, quote, is a
3   place you never get.
4   A.  As far as directly walking into the city council.  That's
5   what I meant.
6   Q.  That's not what you said, though, at that point, is it,
7   sir?  You said the city council was, quote, a place you never
8   get.
9   A.  As far as directly going into -- I'm sorry if you've
10  mistaken that, but that's what I meant.
11  Q.  So it's your contention that when you gave that answer, when
12  you said it's a place you never get, you meant, well, you can
13  get there and that "never" means, I guess, never say never.  Is
14  that what you're trying to tell us today, sir?
15  A.  Yes, sir.  That's what I would be saying.
16  Q.  Okay.  And it's also now your contention today that when you
17  said -- after saying you would never get to the city council,
18  you said it would stop at the city manager, is it your testimony
19  today that by "stop" you really meant pause and then go?
20  A.  I meant as far as my authority, I stop at the city manager.
21  That makes sure that I don't do anything wrong.
22  Q.  Sir, sir, did we ask you the extent of your authority in
23  that question, or did we ask whether a member of your department
24  can get to the city council?
25  A.  Only thing I can speak on is my extent of authority.  When I
```

1    speak, that's what I speak to.

2    Q.   Sir, this ASOP 12, that's part of the standard operating

3    procedures of your department.

4    A.   That's correct.

5    Q.   And you were under oath, correct?

6    A.   Yes, sir.

7    Q.   And you provided testimony regarding ASOP 12.

8    A.   Yes, sir.

9    Q.   And your testimony in April of 2007 is that the city council

10   was a place they'd never get because it stops at the city

11   manager.

12   A.   I meant directly.

13   Q.   But you didn't say directly.

14   A.   I'm sorry.

15   Q.   If you would, sir, on the binder in front of you, turn to

16   what's been marked as Plaintiff's Exhibit #29.  Are you there

17   with me, sir?

18   A.   Yes, sir.

19   Q.   Okay.  Plaintiff's Exhibit #29 is a memo dated September 21,

20   2005, to you from Assistant Chief Hanson; is that correct?

21   A.   Yes, sir.

22   Q.   Did you receive this memo on or about September 21, 2005?

23   A.   Yes, sir.

24   Q.   And in this memo from Chief Hanson, it concerns a counseling

25   with at that point Driver Engineer Taylorson, correct?

1    A.   Yes, sir.

2    Q.   One of the gentlemen that we spoke to yesterday, correct?

3    A.   Yes, sir.

4    Q.   And Assistant Chief Hanson reported back to you on the issue

5    of contacts with the media and his counseling of Firefighter

6    Taylorson by -- this is, quote, the last sentence, okay, so

7    you'll know exactly where I'm talking about.  The memo says,

8    quote, I advised him that the city would not put up with another

9    episode of speaking to the media without prior approval.

10        Do you see where it says that?

11   A.   Yes, sir.

12   Q.   And did you agree or disagree with what Chief Hanson put in

13   the memo?

14   A.   Those were Chief Hanson's words, they wouldn't put up with.

15   I might have said it in a different way; you know, follow the

16   chain.

17   Q.   Do you agree with the substance of what is in here?

18   A.   As far as his advice to Sergeant Taylorson?

19   Q.   Right.

20   A.   Yes, I agree with it.

21   Q.   Okay.  I just wanted to make sure that you agree that you

22   can't get to the city council, at least according to this memo,

23   without prior approval, correct?

24   A.   He meant go through the chain, sir.

25            MR. STEELE:  Well, I'm going to ask that that be

1    stricken as to what Hanson meant.

2           THE COURT:  I sustain.  I'll sustain.

3           That's stricken.  Don't consider it.

4           Go ahead.

5    Q.  So Chief, as far as access to the media, before we move to

6    another -- another topic, I'm trying to figure out what's going

7    on here.  We can either go by what you said in your deposition,

8    which is you never get -- excuse me -- that you never get to the

9    council without going to the city manager and it stops at the

10   city manager, or we can believe that somehow you get there

11   anyway.  And with access to the media, we can accept or believe

12   what you just said, that you can't do it without approval, prior

13   approval, or now you're saying that somehow they can get there

14   by a matter of right.

15   A.  That's not what I'm saying.

16   Q.  Okay.  What is it you're saying, sir?

17   A.  I'm saying if they follow the chain, you can talk to anyone

18   you want to talk to.

19   Q.  Okay.  And you believe that that is what ASOP 12 provides.

20   A.  I believe -- I believe that.  Yes, sir.  I totally believe

21   that.

22   Q.  Okay.  I'd like to talk to you about Mr. Davis's termination

23   from employment.  Now, as department head, you don't have the

24   authority yourself to fire an employee; is that correct?

25   A.  I make a recommendation.

1  Q.  Okay.  And the recommendation is made to the city manager,

2  and then the city manager holds the authority to terminate an

3  employee; is that correct?

4  A.  I make a recommendation to the city manager and personnel

5  director.

6  Q.  Okay.  To your knowledge, does the personnel director have

7  the authority to fire a member of your department?

8  A.  Does -- does she have the authority?

9  Q.  Correct.

10 A.  The final decision is going to lie with the city manager.

11 Q.  Okay.  So the best of your knowledge, Mr. Roberts, the city

12 manager, has the authority to carry out terminations.

13 A.  That is correct.

14 Q.  So with respect to Mr. Davis, you were not in a position

15 yourself to terminate Mr. Davis, but it's within your discretion

16 as the department head to recommend that that occur.  Is that an

17 accurate statement?

18 A.  That's correct.

19 Q.  Okay.  If you would for me, I'd like you to turn to

20 Plaintiff's Exhibit #22 in the binder in front of you.

21         MR. STEELE:  And Your Honor, if I didn't already, I'd

22 like to move for the admission of Plaintiff's Exhibit #29, the

23 memo the chief testified to.

24         THE COURT:  It's admitted.

25 Q.  We're at #22 now.

1   A.   Yes, sir.

2   Q.   Okay.  Would you tell the jury what this document is?

3   A.   This is an end of employment form.

4   Q.   Okay.  And that's an end of employment form for Mr. Davis,

5   correct?

6   A.   That's correct.

7   Q.   Okay.  On this, there's a spot for the employee's signature,

8   and that looks like it might be a signature there.  And

9   Mr. Davis says it is his signature, correct?

10  A.   That's correct.

11  Q.   There's a place for the personnel director's signature, and

12  there's a signature that we will all assume is the personnel

13  director's signature, correct?

14  A.   That is correct.

15  Q.   There's a place for the department head's signature.  Is

16  that your signature there, sir?

17  A.   Yes, sir.

18  Q.   Okay.  And there's a place for the city manager's signature;

19  and you've just told us the city manager has the authority to

20  terminate an employee, not you, correct?

21  A.   That's correct.  I make recommendation.

22  Q.   Okay.  Why isn't the city manager's signature on this?

23  A.   I can't answer to that.  I don't -- you know, this -- this

24  is signed in the personnel office, taken care of there.  And --

25  Q.   How did you learn that the city manager accepted your

1   recommendation to terminate Mr. Davis?

2   A.   Well, they told me, sir.

3   Q.   Okay.  And that was in person in a meeting or was it the

4   telephone or in writing?  How did that happen?

5   A.   Well, when we talked about the position and the situation we

6   was in.

7   Q.   I'm not sure that I understood --

8   A.   As far as talking to the personnel director, when the final

9   papers were to come through --

10  Q.   Okay.  My --

11  A.   -- it was told to me that the city manager agreed.

12  Q.   Okay.  My question to you was when the city manager told you

13  that he accepted your recommendation, was that done in person,

14  at a meeting, by telephone, in writing, or some other means?

15  A.   It --

16  Q.   How did he communicate that to you?

17  A.   It was in person with the personnel director.

18  Q.   Now, in this particular case, Mr. Davis chose to appeal his

19  termination to the personnel review board, correct?

20  A.   Yes, sir.

21  Q.   But it's your understanding, sir, is it not, that in the

22  absence of an appeal, Mr. Roberts' decision that the employee

23  was terminated is final, correct?

24  A.   Say that again?

25  Q.   Sure.  An employee receives a notice, an end of employment

1  form, saying that he's terminated.  If that employee doesn't

2  file an appeal, he's still terminated, correct?

3  A.  That's correct.

4  Q.  All right.  Because Mr. Roberts has the authority and has

5  exercised the authority to terminate, correct?

6  A.  That's correct.

7  Q.  Now, while we're still on these exhibits, let's look at

8  Exhibit #21 for a moment.  And this is details of merit system

9  violation dated April 20, 2006, correct?

10  A.  Yes, sir.

11  Q.  And on this document, your signature appears on the second

12  page of the document?

13  A.  Yes, sir.

14  Q.  Okay.  And -- now, this document, from your perspective, had

15  the city manager approved the termination by the time this

16  document was presented to the employee?

17  A.  This was the write-up.  I --

18  Q.  Maybe I can ask the question differently.  Isn't it true

19  that this document was provided to Mr. Davis at the meeting when

20  he was informed that he was terminated?

21  A.  That's correct.

22  Q.  So the city manager had already approved it by the time this

23  document was presented to the employee?

24  A.  That is correct.  Yes, sir.

25  Q.  Okay.  So he was terminated at that point.

1  A.  Yes, sir.

2  Q.  Okay.  On the second page, right above the supervisor's

3  signature, there's some language there.  Would you read that

4  language, please, to the jury?

5  A.  On the second page?

6  Q.  Right.

7  A.  This written warning is intended to give an opportunity to

8  correct your work performance and conduct in the future.

9  Failure to do so would subject you to further corrective action,

10  as stated in the merit system rules and regulations, and could

11  result in your dismissal from employment with the City of Phenix

12  City.

13  Q.  Okay.  Now, this document is not intended to give Mr. Davis

14  an opportunity to correct his performance and conduct at the

15  department in the future, was it?  This document was to inform

16  him that he was terminated.

17  A.  It's a written warning form.

18  Q.  Okay.  So this is an actual form that just gets filled out

19  or typed in.

20  A.  Yes, sir.

21  Q.  Okay.  So the areas that need to be filled out on the form,

22  that's just a standard that the personnel department has, and

23  then it's completed and given to the employee as -- well, it

24  says a written warning --

25  A.  Yes, sir.

1  Q.  -- but in Mr. Davis's case, it was actually given to him as

2  a notice of termination?

3  A.  If it was your first time given one, it wouldn't be a

4  termination form.

5  Q.  That wasn't my question, sir.

6  A.  Okay.

7  Q.  My question is in this case with this exhibit when it was

8  given to Mr. Davis, it wasn't a written warning.  It was a

9  notice that he had been fired; is that correct?

10  A.  That's correct.

11  Q.  Now, sticking with this document for a moment, after the

12  boxes were filled in on this form, standard form -- and there's

13  language here that says discharge as per merit system rules and

14  regulations for second group II offense.  Discharge as per merit

15  system rules and regulations for first group III offense.

16      Do you see that language?

17  A.  Yes, sir.

18  Q.  Now, the way this is written, sir, it looks as if, to me,

19  you were saying that there were two independent bases upon which

20  the plaintiff was terminated, that he was discharged for a

21  second group II offense and he was also discharged for a first

22  group III offense.  Is that fair?

23  A.  That's correct.

24  Q.  Okay.  Now, sir, the action taken by Mr. Davis that was

25  determined and resulted in the second group II offense, that

1  action was contacting the mayor, correct?

2  A.  That was part of it.  Yes, sir.

3  Q.  Okay.  And the action which constituted the first group III

4  offense that Mr. Davis took that resulted in his termination was

5  his contacting of the mayor, correct?

6  A.  That's correct.

7  Q.  Just so there's no confusion on this, on April 16th of 2005,

8  Mr. Davis was employed as a driver engineer, a sergeant in your

9  department?

10  A.  Yes, sir.

11  Q.  And he was an employee in good standing, correct?  He was

12  not on probation or anything like that?  He was a full-fledged

13  employee of your department.

14  A.  That's correct.

15  Q.  And then on April 17th, 2005, he made a phone call to Mayor

16  Hardin, correct?

17  A.  That's correct.

18  Q.  And on April 21st, 2005, he was terminated.  Is that also

19  correct?

20  A.  That's correct.

21  Q.  And according to your testimony this morning and according

22  to the document here, but for his call to the mayor, Mr. Davis

23  wouldn't have been disciplined at all on the 21st of April,

24  2005, correct?

25  A.  On the 21st?

1  Q.   Right.

2  A.   State that again, sir.

3  Q.   Okay.  You'll agree with me -- and for the date -- I'll show

4  you where I'm getting the date from.  That may help you here.

5  A.   Yes.

6  Q.   If you look at Exhibit #21, the date at the top says April

7  20, 2006.  But if you turn to the second page where your

8  signature appears and the other signatures appear --

9  A.   Yes, sir.

10 Q.   -- it indicates that this was signed by those individuals on

11 April 21st, 2006.

12 A.   Yes, sir.

13 Q.   Does that refresh your memory that it was actually April

14 21st, 2006, when Mr. Davis was terminated?

15 A.   Yes.  All this shows is that Chief Waters prepared this

16 written warning on the 20th, and everybody -- the meeting was on

17 the 21st where these signatures were signed.

18 Q.   Right.  Right.

19 A.   Yes, sir.

20 Q.   And my question to you was just to confirm that according to

21 your testimony already today and according to the documents, if

22 David Davis had not called the mayor on April 17th, he would not

23 have been at the personnel office receiving a termination notice

24 on April 21st.

25 A.   That's correct.

1  Q.  Now, Chief, earlier you made reference to the grievance

2  procedure.  Do you recall that?

3  A.  I believe so.

4  Q.  Okay.  Is it your position that if Mr. Davis had a concern

5  relating to the proposed ordinance, that he should have filed a

6  grievance?

7  A.  That's a -- that's his choice.  He could have filed a

8  grievance.  He could have came to me.  He could have done -- he

9  could have followed his chain.  That's a choice that Sergeant

10  Davis had to make.  I can't say what he should have or shouldn't

11  have done.  It would have been much easier if he would have

12  given us a chance to take care of any concerns that he had,

13  because I definitely would have tried to, and I would have.

14  Q.  Okay.  So is it or is it not your view that he should have

15  filed a grievance before going to -- speaking with the mayor on

16  this issue?

17  A.  I -- I would have preferred the easier route, but it was his

18  choice.  I would have preferred that.  You know, if he would

19  have -- he didn't have to file a grievance.  All he had to do

20  was come talk to Chief Waters.  I had put a man down there,

21  Chief Waters, Deputy Chief Waters.  If they didn't want to come

22  to me, that they can go to a 33-year veteran that was the chief

23  of a former department I had just brought over there to make

24  sure that we can have good, workable solutions to everything.

25  It would have been much easier if he would have took that route.

1    Q.  So now you're saying -- before, as I understood your

2    testimony, an employee would have to go through each step of the

3    chain of command to you, as the department head, correct?

4    A.  That's what I just said.

5    Q.  Okay.  So you didn't just say that instead, they could --

6    A.  He could --

7    Q.  -- go to Chief Waters?

8    A.  I said follow the chain of command.  Chief Waters -- see,

9    the chain of command allows for a lot of problems to be solved.

10   I've been in this 22 years.  A lot of times, you can start at

11   one step, and it's taken care of there.  It never reaches any

12   type of argument.  You never know what a person can have laying

13   on their desk to solve your problem if you have something that

14   you don't like.  You can come -- you may walk in to -- make it

15   up the chain to the captain's office, and there may be a memo in

16   there that's taking care of all your concerns.  Anything that

17   you want done is there.  We've solved many problems through that

18   way.

19   Q.  Okay.  So problems can be resolved before they reach your

20   level.

21   A.  Yes, sir.  You never know what's there.  It's taken care

22   of.  You know, we try to solve problems at the lowest rank.

23   That's why we have the rank structure and the supervision that

24   we have.

25   Q.  Okay.  And Mr. Davis, on April 16th, 2006 -- actually, and

1  all of April prior to his termination -- he was a sergeant

2  within the department, correct?

3  A.  That's correct.

4  Q.  He worked 24-hour shifts, correct?

5  A.  That's correct.

6  Q.  And Captain Bennett was above Sergeant Davis in the chain of

7  command?

8  A.  That's correct.

9  Q.  And at times, Captain Bennett would have been Sergeant

10  Davis's first-line supervisor?

11  A.  That's correct.

12  Q.  So under your explanation -- and I appreciate it -- of the

13  chain of command, it's your view that if Mr. Davis had a

14  problem, he'd start up the chain of command.  And maybe it gets

15  solved by the captain.  And if not, maybe it gets solved

16  somewhere up.  But if it -- if it can be solved at the captain

17  level, that's preferable than having to keep elevating it.  Is

18  that essentially your testimony?

19  A.  If that particular supervisor at that level have the

20  authority to solve that.  Because what that supervisor would do,

21  if they couldn't take care of it, is pass it to their

22  supervisor.

23  Q.  Okay.

24  A.  With the authority at that level to solve it.

25  Q.  Okay.  And who do you contend has the responsibility to take

1   it to the next level?  Because as I understood your testimony,

2   you said that if one level of supervision is given a problem and

3   they don't have the authority to adjust it, the supervisor

4   should bring it to the next level?

5   A.   That's if that person requests of that supervisor.  The

6   person has to request of that supervisor that they want to move

7   on in the chain of command.  That is -- then that supervisor is

8   to move that to that next level.  That's their responsibility to

9   move it for that employee if that's what the employee requests

10  of them.  It's simple.

11  Q.   It's simple.  That's an interesting way of putting it,

12  Chief.  It's simple.  According to what you just told us, an

13  employee goes to their first-level supervisor with a problem.

14  The first-level supervisor gives the employee an answer that the

15  employee is satisfied with.  What you told me is nevertheless,

16  even though he's satisfied with what his first-line supervisor

17  told him, somehow the employee has to know whether or not that

18  first-line supervisor really had the authority to say what he

19  said.  And then after the employee figures out whether the

20  first-line supervisor really had the authority, then the

21  employee has to ask the first-line supervisor to move it up the

22  chain of command.  Is that what you're saying?

23  A.   That's correct.  It depends on what it's addressing.  If

24  it's addressing -- we have standard operating procedures in

25  place as a guideline for everybody to follow.  And we have very

1 intelligent people there that can follow these things if they

2 want to follow them.

3 Q.   I'm sure you do, Chief.  So the very simple process, in your

4 view, is that an employee goes to a first-line supervisor, gets

5 an answer that the employee is absolutely satisfied with, happy

6 as can be, but your testimony is that employee has to do

7 something else.  That employee has to figure out whether that

8 supervisor really had the authority to say what he said.  And

9 then if the employee figures out that that supervisor did not

10 have the authority, then the employee asks the supervisor to

11 elevate it.

12 A.   Sir, that is not what I said.  I said if that supervisor has

13 the authority at that level.  And that's why we give individual

14 standard operating procedures out.  Firefighters know whether a

15 person is giving them the right advice or not, but it has to be

16 requested to be moved up the chain.

17 Q.   So --

18 A.   That's what you -- going through the chain of command is.

19 Q.   That's what going through the chain of command is.

20 A.   Yes, sir.

21 Q.   So your testimony, going through the chain of command is

22 that an employee starts at the first-line supervisor.  And the

23 first-line supervisor can give him an answer and does so, and

24 the employee is happy with that answer.  Nevertheless, the

25 employee has to figure out if that supervisor had authority to

1  give the answer and then, if not, ask the supervisor to take it

2  to the next level?  That's the responsibility of the employee

3  and not the supervisor?

4  A.  No, sir.  That's why we give out standard operating

5  procedure books.  Employees doesn't have to figure that out.

6  Request a vacation, things that person -- they know the

7  procedures of it, and they take care of it and ask the captain

8  where they want to take a particular day off.  That captain

9  checks with the assistant chief and makes sure it's clear on the

10  board and we don't have too many people off, and it's taken care

11  of.

12  Q.  Okay.

13  A.  You know, if it's something in the matter of what we're

14  talking about addressing, it's right here in the book.  Standard

15  operating procedure would be there for a person if that person

16  know -- if that's the request that they put in to the

17  supervisor, to move on with something.  If they don't request

18  that -- and there's certain things that our employees know that

19  supervisors can't give them authority to do.

20  Q.  So it's not up to the supervisor or the supervisor's

21  responsibility to know whether or not he had the authority to

22  give the answer that he gave?

23  A.  Repeat that, sir?

24  Q.  So is it your testimony that it's not the obligation of the

25  supervisor to know whether the supervisor had authority to give

1    the answer that he gave?

2    A.   The supervisors are trained on knowing what answers to give

3    or they find out an answer.  They should tell that employee, if

4    they don't have an answer for that employee, I'll get back with

5    you with an answer.  And they go get the answer and give it to

6    them if it's a request for an answer.

7    Q.   Okay.  Let me try this one more time, Chief.

8    A.   Yes, sir.

9    Q.   And if I'm being unclear, please let me know.  An employee

10   has a problem, a concern, an issue that he needs an answer to.

11   And the employee is a rank-and-file firefighter on duty at the

12   station with a commander in charge of his particular station.

13   All right?

14   A.   That's correct.

15   Q.   All right.  The employee goes to the captain and asks the

16   captain the question that he has.  Whatever the issue is, he

17   asks his captain, because his captain is the first-line

18   supervisor, okay?

19   A.   That's correct.

20   Q.   All right.  And the captain gives the employee an answer

21   that the employee thinks, okay, that answer is fine.  Whether he

22   likes it or doesn't like it, the employee is satisfied with the

23   answer that the captain gives.  Okay?  Under that scenario, the

24   employee doesn't have any obligation to go beyond the captain or

25   request that the captain take it above his level, does he?

1  A.  If it's a request to see somebody above that captain, yes,

2  that employee does.  That employee gets an answer back from that

3  captain that they have a meeting with the person above them, and

4  now they can go that step above.  That --

5  Q.  Sir -- sir --

6  A.  -- supervisor have to come back to him.  That's what the

7  chain is, sir.

8  Q.  My question to you wasn't what happens if an employee goes

9  to their captain and says I want to speak to somebody above

10  you.  That wasn't my question.  My question is very simple, very

11  direct.  As -- and I want your answer as chief of the

12  department.  I think you gave it to me, but I want to have it

13  clear.

14      An employee of the fire department has a problem, has a

15  question.  They go to their supervisor.  The supervisor answers

16  that question.  The employee thinks the answer is just great, is

17  completely satisfied.  Does that employee have any obligation to

18  then go above that supervisor?

19  A.  It depends on what the situation is.  It depends on what the

20  request is, sir.

21  Q.  So sometimes it's your view that the lower ranking employee

22  who asks a question and gets an answer from his supervisor --

23  somehow that lower ranking employee is the one that has to know

24  that the supervisor gave an answer that he or she was not

25  entitled to give or didn't have the authority to give.  And then

1  they have to tell their supervisor, hey, Captain, I don't think

2  you have the authority to tell me what you just told me -- it

3  sounds insubordinate, but under your theory, that's what they

4  do -- and then the employee, not the captain, but the employee,

5  has to ask the captain to go higher on the chain of command.

6  A.   Sir, it depends on what the request -- there's a difference

7  in a request for a vacation day and a request to address the

8  council.  It's a different -- it's a different guideline on

9  that.

10  Q.   The difference --

11  A.   We have different guidelines.

12  Q.   The difference, sir, from your perspective is that there's

13  certain things that the captain has the authority to decide and

14  there's certain things that the captain does not have the

15  authority to decide.

16  A.   That is correct.

17  Q.   Okay.  And it's also your testimony here today that it's up

18  to the employee who asks the question to know whether or not his

19  captain has the authority to answer that question.  Is that

20  correct?

21  A.   I didn't say it was up to them.  The majority of the time,

22  with having the standard operating procedures available, the

23  employee knows their rights and they know what that supervisor

24  should be telling them and what they shouldn't.  That's why they

25  make the request.

1  Q.  So it's up -- it's up to the employee to -- when they

2  receive an answer from their supervisor to know whether or not

3  the supervisor had the authority to give that answer?  That's

4  your testimony?

5  A.  Like I say, it depends on the request.

6  Q.  So under the chain of command in the City of Phenix City

7  Fire Department, you have this important rank structure.  And

8  the employee goes to the supervisor and he gets an answer that

9  he's satisfied with.  It's not the supervisor's obligation to

10 know whether or not I have authority to give that answer or

11 whether I have to seek someone else's approval.  It's the

12 rank-and-file employee's obligation to know that.

13 A.  No, sir.  They know -- they follow standard operating

14 procedures.  99.90 percent of the time, it's followed.  So I

15 would have to stick with my answer on that, because I see it

16 followed every day.

17        THE COURT:  Mr. Steele, let's move on.

18        MR. STEELE:  Okay.

19 Q.  Now, moving back -- I guess we haven't really left it -- the

20 issue that Mr. Davis spoke to Mayor Hardin about, your

21 understanding and my understanding -- we'll see if it's the

22 same -- but he spoke to Mayor Hardin about a proposed ordinance

23 that would affect the probationary period for the police, the

24 fire, and the code enforcement departments.  Is that fair?

25 A.  That's fair.

1  Q.  At the time that Mr. Davis spoke to the mayor, that

2  procedure was not yet in place because the city council had not

3  approved it, correct?

4  A.  That's correct.

5  Q.  In fact, the city council did approve it, but they approved

6  it the very next morning.  Is that your understanding?

7  A.  It might have been.  I believe so.

8  Q.  Okay.  So at the time Mr. Davis spoke to the mayor, who's an

9  elected official and, as he so correctly pointed out, a

10  politician, he spoke to the politician who, as part of his

11  duties, had within his authority to vote yes or no on that

12  proposal, correct?

13  A.  That's correct.

14  Q.  And as far as you know -- and you can't disagree, I don't

15  believe, with this -- that call happened on a day when Mr. Davis

16  was off duty.  Is that correct?

17  A.  That's correct.

18  Q.  Now, in Phenix City, in addition to whatever department

19  rules you have, you've got merit system rules and regulations;

20  is that correct?

21  A.  That is correct, sir.

22  Q.  And the merit system rules and regulations, that's something

23  that actually the city council puts in place, correct?

24  A.  That's correct.

25  Q.  Okay.  And the chain of authority -- let me get away from

1  the word "chain of command," because I think you're going to

2  argue with me about that on this question.  But the chain of

3  authority in Phenix City is that you have department heads; and

4  above department heads, you have the city manager; and the city

5  manager is hired and can be fired by the city council.

6  Correct?  That's -- that's the chain of authority in the

7  government in Phenix City, correct?

8  A.  That's -- that's correct.

9  Q.  So if the city council does something, that's at a level

10  above what you can do as department head.

11  A.  Yes, sir.

12  Q.  Nevertheless, the City of Phenix City merit system rules and

13  regulations apply to employees of the fire department in

14  addition to the other city employees that are part of the merit

15  system.

16  A.  That's correct.

17  Q.  So they govern the employees in your department.  Is that

18  fair?

19  A.  That's fair.

20  Q.  And if you would, please, turn to Exhibit #3, Plaintiff's

21  Exhibit #3 in the binder in front of you.  And sir, I'm going to

22  assert that Plaintiff's Exhibit #3 is a copy of a City of Phenix

23  City merit system rules and regulations.  I'm not going to ask

24  you to read through the whole thing to tell me if you agree.

25          MR. STEELE:  But Your Honor, this document has been

1    stipulated to, and I would move for its admission.

2            THE COURT:  It's admitted.

3            MR. STEELE:  Thank you.

4    Q.  Now, if you would, sir, turn for me to Section 1.09 of the

5    merit system rules.  I wish I could give you a page number; but

6    at least on my copy, there's not a page number.  But it's 1.09,

7    Responsibilities of Merit System Employees.  It's near the

8    front.

9            MR. MCKOON:  It's on page 8.

10           MR. STEELE:  Oh, okay.  On my copy the 8 is cut off.  I

11   don't know; the chief's copy may be better than the one I have.

12   A.  Yes.

13   Q.  Okay.  Now, Section 1.09 of the merit system is entitled

14   Responsibilities of Merit System Employees.  Am I correct that

15   Mr. Davis was a merit system employee?

16   A.  That's correct.

17   Q.  So this merit system rule would apply to him?

18   A.  Yes, sir.

19   Q.  Okay.  And under 1.091, there's a title, Political Activity.

20   A.  Yes.

21   Q.  And if you would, turn to 1.091 B, okay?

22   A.  Yes, sir.

23   Q.  Now, 1.091 B states that no person holding a position in the

24   city service shall take part in the management, affairs, or

25   political campaign of any candidate for any political office

1    during his/her working hours, correct?

2    A.   That's correct.

3    Q.   So -- but -- and you know this for a fact.  Employees of

4    city service are not prohibited from taking part in the

5    management, affairs, or political campaign of any candidate for

6    political office when they're on their nonworking hours, when

7    they're off duty, correct?

8    A.   That's correct.

9    Q.   And subpart C of 1.091, sir, reads that no employee, comma,

10   official, or person shall solicit during employee hours any

11   assessments, contributions, or services for any political party.

12       Do you see where it says that?

13   A.   Yes, sir.

14   Q.   Now, this rule does not prohibit an employee of the city on

15   their off-duty hours from collecting a contribution or funds in

16   support of a political party, correct?

17   A.   That's correct.

18   Q.   So this provision on political activity does draw a pretty

19   clear line between on duty, where the employee is strictly

20   limited in what they do with respect to political activity, and

21   off duty, when these restrictions are not in place, right?

22   A.   Yes, sir.

23            MR. STEELE:  Thank you.  Thank you, Chief.

24            MR. GRAHAM:  Your Honor, if it please the Court.

25            THE COURT:  Is that all, Mr. Steele?

1          MR. STEELE:  Yes, Your Honor.

2          MR. GRAHAM:  Your Honor, if it please the Court, I'm

3    going to do the direct on the chief, but I need a break for a

4    minute.

5          THE COURT:  Well, we'll do that.

6          All right.  Members of the jury, we're going to take a

7    15-minute recess.  Please go outside if you like.  Don't talk

8    about the case.

9          Excuse me, gentlemen.  I'm not through.

10          We're going to have a recess.  I'll remind you not to

11    discuss the case with anybody.  Be back in the jury room and

12    ready to start back at 15 minutes till eleven.

13      (Jury out at 10:28 a.m.)

14          THE COURT:  Court is in recess.

15      (Recess at 10:28 a.m. until 10:46 a.m., at which time

16       proceedings reconvened with the jury present, as follows:)

17          THE CLERK:  Court is in session.  You may be seated.

18          THE COURT:  All right.  Mr. Graham.

19                          CROSS-EXAMINATION

20    BY MR. GRAHAM:

21    Q.  Chief Hunter, I would draw your attention back to 1.09 of

22    the merit system rules and regulations that Mr. Steele spoke

23    with you about earlier.

24    A.  Yes, sir.

25    Q.  And I believe he went through those with you.  And it

1  explicitly says in this particular merit system rule that you're

2  not allowed to do it while you're on duty, perform these

3  particular actions, but when you're off duty, it's acceptable

4  to.

5  A.  Yes, sir.

6  Q.  Does this part of the merit system apply to ASOP 12?

7  A.  No, sir.

8  Q.  All right.  And ASOP 12 does not speak to whether you can do

9  it on duty or off duty.  What is your interpretation of ASOP 12?

10  A.  The guidelines follow you every day.  If you're a

11  firefighter or you work for the city and you work for the fire

12  department, you fall up under ASOP 12.

13  Q.  Is that on duty or off duty?

14  A.  That's on or off duty.

15  Q.  And if it was intended only to be on duty, it would speak to

16  that; is that correct?

17  A.  That's correct.

18  Q.  Now, let me move to your deposition.  Mr. Steele asked you a

19  question in your second deposition.  Do you still have a copy of

20  your second deposition up there?

21  A.  Yes.  Yes, sir.

22  Q.  Okay.  And he went to page 12.

23  A.  Okay.  Yes, sir.

24  Q.  Are you at page 12?

25  A.  Yes, sir.

 1  Q.  Now, let me ask you this.  I want you to go back to page 11,

 2  line 22, where Mr. Woodley asked you this question:  Okay.

 3  Where I'm trying to go with this, just so you understand, is

 4  that is there a preliminary requirement that before a city

 5  employee can talk to the media about any city-related issue,

 6  that individual employee has to exhaust the grievance procedure

 7  provided by the city?

 8      And what was your answer?

 9  A.  No.

10  Q.  And what was the rest of the answer?

11  A.  We have designated people to talk to the media.

12  Q.  Okay.  And question:  And who would that be?

13  A.  Myself and whoever I elect designated as the person in fire

14  prevention or whichever division that they are requesting the

15  information from.

16  Q.  Question:  So you consider yourself a spokesman for the fire

17  department to the media?

18  A.  Yes, sir.

19  Q.  Question:  Okay.

20      What was your answer?

21  A.  I am -- I am one of them.

22  Q.  Question:  You are one of them?  And you have, as you

23  understand it, the authority to designate another individual in

24  the fire department to speak with the media, correct?

25  A.  That is correct.

1  Q.  Question:  Does anyone else in the fire department have the

2  discretion or opportunity to speak to the media without your

3  prior approval on any issues affecting the fire department?

4  A.  As far as the media?

5  Q.  What was your answer?

6  A.  No, sir.  We have designated personnel for that.  As far as

7  I'm -- as far as if I'm not here, in my absence someone would

8  step in place and that person would have the authority.

9  Q.  Question:  Who would be the next person, if you are absent,

10  to speak with the media about a fire?

11  A.  Presently, that person would be Deputy Chief Hanson.

12  Q.  All right.  Now, this whole series of questions -- or the

13  questions that Mr. Steele asked you was part of a series of

14  questions.

15  A.  That's correct.

16  Q.  And it was cleared up by Mr. Woodley over here that you

17  would be talking about fire, which would be a fire that had

18  happened in the city of Phenix City; is that correct?

19  A.  That's correct.  Yes, sir.

20  Q.  That's not about going to the news media with anything.

21  A.  No, sir.

22  Q.  All right.  Now, go back to your first deposition, and go to

23  page 120.  I believe it's 120.  No, I'm sorry.  It's 102.

24     Are you there?  Okay.  And Mr. Woodley had been asking you a

25  number of questions about speaking to the media and

1   constitutional rights and that type of thing in the previous

2   pages.

3   A.   Yes, sir.

4   Q.   And then on my examination of you on line 14 -- so on line

5   14, I said:  Let me just ask you one question to clarify

6   something.  Now, you do recognize that a firefighter has the

7   right under the U.S. Constitution to free speech.

8        And what was your answer?

9   A.   That's right.

10  Q.   And that free speech is allowed if you follow the procedures

11  that are set out in the ASOPs and the merit system of the City

12  of Phenix City.

13  A.   That's correct.

14  Q.   All right.  And that was the first deposition that was ever

15  taken in this case of yours; is that correct?

16  A.   Yes, sir.

17  Q.   Now, did Mr. Woodley ask you any questions after that?

18  A.   No, sir.

19  Q.   So he had no more questions.

20  A.   He said:  I don't --

21  Q.   He didn't argue that point with you; is that correct?

22  A.   He said -- I said:  That's correct.  He said -- Mr. Woodley

23  said:  I don't have anything further.  Thanks, Chief.  I

24  appreciate your coming.

25  Q.   Okay.  Now, I know that when Mr. Steele initially called

1  you, he did a little bit of background work on you.

2        MR. GRAHAM:  And Judge, I'm going to try not to repeat

3  any of those questions, but there are a couple of other things

4  that I'd like to ask the chief about that.

5  Q.  All right.  Chief, when you were hired by the Phenix City

6  Fire Department, what was your entry-level position?

7  A.  Recruit firefighter.

8  Q.  All right.  So you didn't transfer in from another

9  department and already held a rank higher than just plain

10  firefighter.

11  A.  No, sir.  I was recruited in by the personnel director and

12  city manager.

13  Q.  All right.  And at any point in time in your career, were

14  you affiliated with the International Association of

15  Firefighters?

16  A.  Yes, sir.

17  Q.  Was that the local association here?

18  A.  Yes.  That's the local.

19        MR. STEELE:  Objection.  Relevance.

20        THE COURT:  What is the relevance to that?

21        MR. GRAHAM:  Judge, the relevance is they talked about

22  the union.  They talked about David as a union member going and

23  lobbying his legislative body, so to speak.  And I think we've

24  got the right to see if that ever occurred by anyone else.

25        THE COURT:  If what ever occurred by anyone else?

1          MR. GRAHAM:  Lobbying the legislative body of the city.

2          MR. STEELE:  Sir, if I may.

3          THE COURT:  I don't understand the relevance of that.

4  I sustain that.

5          MR. GRAHAM:  All right.  That's fine, Judge.  That's

6  fine.

7  Q.  All right.  Take us through your career, then, Chief Hunter,

8  and tell us when you came in as -- at the bottom level as a

9  firefighter and approximately when you achieved each promotion

10 up to fire chief.

11 A.  I was recruited in 1985.  I was in school trying to obtain

12 my fire science degree.  I started in 1986 as a recruit

13 firefighter.  I served as a firefighter for three years until

14 1989, which I became a driver engineer/sergeant.  I was promoted

15 to that rank in '89.  I served as a driver engineer until 1994,

16 which I was promoted to a captain.  In 1994 till 1998, in March,

17 I served as a captain, and I was promoted to assistant chief.  I

18 served as an assistant chief until 2001 and -- which I became

19 acting chief.  And I served there for two months, and I became

20 the chief of the department.

21     We had a bunch of turmoil going on in the department.  We

22 had a lot of threats going on at the time.  Some people didn't

23 want me to be the fire chief.  And it weighed heavily on my

24 family, and I was -- it was requested to me by my parents and

25 asked me would I resign.  So I didn't feel my family needed to

1    go through that, so I resigned as the fire chief.

2        And we had a turnover in government, and we had a new

3    government to come in.  And City Manager Roberts took over at

4    that time, and he told me I would stay as acting chief until he

5    found another chief.  And I served as fire chief until December

6    of 2001, which our former fire chief, Chief Prater, returned.

7        When Chief Prater returned, he didn't want me to go back

8    onto the line.  I wanted to go back as assistant chief; but he

9    put me as assistant chief over operations and I worked in the

10   office with him, basically, with him.  I had an office in

11   station one.  I served under -- me and Chief Prater worked

12   together real well for the next three years.  And in 2005, he

13   informed us, he and the city manager, that he was going to

14   leave.  And when he left, I was placed in as interim fire chief

15   in March of 2005.  And I served in that capacity until May of

16   2005, and which I was appointed the fire chief again.

17   Q.  Okay.  And when you became the fire chief for the second

18   time, what was the state of the fire department?

19           MR. STEELE:  Objection.  Beyond the scope of direct.

20           MR. GRAHAM:  Judge, they've introduced this

21   "Three-Alarm Turmoil" newspaper article and -- with their

22   witnesses yesterday.  And the chief had only been the fire chief

23   less than a year when that occurred.

24           MR. STEELE:  Your Honor --

25           MR. GRAHAM:  And I think we've got a right to get into

 1   it.

 2          MR. STEELE:  Your Honor, I also object to Mr. Graham

 3   testifying to the jury, and I think that explanation constituted

 4   that.  I did not ask this witness anything other than

 5   identifying that article, and I asked him about his photo.  I

 6   didn't ask him one word about the contents of that article.

 7          THE COURT:  Well, I'm going to give a little bit of --

 8   I think it would be relevant to you calling him as your own

 9   witness.  So I'll give a little latitude so that you won't have

10   to recall him, but this will have to be brief.

11          MR. GRAHAM:  Yes, sir.

12          THE COURT:  We're not going to go into a lot of detail.

13          MR. GRAHAM:  Yes, sir.

14   Q.  (Mr. Graham, continuing:)  What was the state of the fire

15   department when you became chief the second time?

16   A.  Well, we had some problems.  We had quite a few problems

17   when I took over as fire chief.  And I had to go -- go to work

18   right away with a plan trying to make everything -- get people

19   to work together and work with one another and create an

20   atmosphere that it wasn't a divided department, that it was a

21   whole department, that it didn't have certain individuals that

22   are cared about or we worked with, but we worked all together.

23   And --

24   Q.  All right.  Now, let me ask you this.  At what point in time

25   did you bring Roy Waters in as your deputy chief?

```
 1          MR. STEELE:  Objection, Your Honor.  Relevance.  This
 2   is completely beyond anything that I asked in direct.
 3          THE COURT:  It is beyond --
 4          MR. STEELE:  Chief Waters is on the list.
 5          THE COURT:  It is beyond the direct, but I think it's
 6   relevant.  I'll allow him to go into that.
 7          MR. GRAHAM:  Thank you, Judge.
 8   A.  Chief Waters became a part of my plan.  Chief Waters had
 9   been our fire science instructor at Chattahoochee Valley.  I had
10   to put together a plan to get people to work together.  I felt
11   like I might be too close to everyone there.  I mean I had been
12   there at the time 20 years; you know, and people have problems
13   with one another.  So I needed to place someone in between
14   myself and the operations of the day-to-day operations.
15       So Chief Waters was anticipating retiring from the Columbus
16   Fire Department.  And we had always been good friends, and we
17   had always had a great relationship because we don't agree on
18   everything.  And that's what I like about him, a person that you
19   can work with real good on that and agree to disagree.  So I
20   brought -- talked to Chief Waters, and he made plans to retire.
21   And when Chief Waters retired, he took -- retired, he took four
22   weeks off as vacation, and he joined the Phenix City Fire
23   Department.  So it was -- it was basically seven months after I
24   became the chief that I brought him on.
25   Q.  All right.  And this all --
```

1        MR. STEELE:  Objection, Your Honor.  I'd like to have

2  that answer stricken from the record on the basis of relevancy.

3        THE COURT:  Overruled.

4  Q.  The "Three-Alarm Turmoil" article that has been introduced

5  into evidence, did any of the people that were interviewed in

6  that ever come to you with that list of grievances after you

7  became fire chief?

8  A.  No, sir.

9        MR. STEELE:  Objection.

10  A.  No, sir.

11        MR. STEELE:  Beyond the scope of direct.

12        THE COURT:  I think that's within the scope.  You've

13  gone into things that happened there and what the chain of

14  command was and who should do what under what circumstances.

15  Overruled.

16  Q.  Well, let's move on to something else, Chief.

17  A.  Yes.

18  Q.  Does the Phenix City Fire Department have a chain of

19  command?

20  A.  Yes, sir.

21  Q.  And I think probably everybody knows; but for those that

22  don't know, tell us what a chain of command is.

23  A.  Chain of command is a structured rank of order.  It starts

24  from the chief to the deputy chief to the assistant battalion

25  chiefs.  Battalion chiefs run stations.  We have them out --

1  that's who run the day-to-day operations.  We have three shifts,

2  A shift, B shift, and C shift.  Battalion chiefs are there.

3  Under those battalion chiefs are captains that supervise each

4  station that we have.

5      At each station so far, we have -- we're discussing a

6  station four -- we have two drivers under those captains.  Under

7  those captains, we have station one where you have your most

8  firefighters.  Most of the days, we have four firefighters

9  there.  Station three, we have two firefighters under that

10  sergeant.  So it's a structured rank of order that's -- that

11  they follow in progression of rank and -- and as far as taking

12  out day-to-day operations and being supervisor.

13  Q.  All right.  Within the confines of the fire department

14  itself, you're the top level in the chain of command.

15  A.  Yes, sir.

16  Q.  And then if any problem that a firefighter has within the

17  department and you can't satisfy that problem or that grievance,

18  then where would it go?

19  A.  I take it up to the city manager.

20  Q.  Okay.  And ASOP 12 addresses that; is that correct?

21  A.  Yes, sir.  It has -- that's correct.

22  Q.  All right.  Now, why -- why is a chain of command important

23  in a paramilitary organization?

24  A.  It's very important because if you can't -- you don't follow

25  the chain of command or follow orders as far as on fire ground

1   operations or day-to-day operations, people can get killed.

2   People can be misinformed.

3   Q.   Okay.  And why is it important when you're at the scene of a

4   fire for the chain of command to be followed?

5   A.   Because it flows information.   Information is disseminated

6   from one rank to the next to make sure the operation runs

7   smoothly.

8   Q.   Well, let me ask you that, then.  Conversely, why is it

9   important -- a chain of command important when you're not at the

10  scene of a fire or other emergency?

11  A.   So the information is disseminated and everything is run --

12  run -- it will make everything run smoother during the day and

13  we won't have any problems.  We can handle all problems there,

14  and you're informed from the top to the bottom and from the

15  bottom to the top.

16  Q.   Okay.  And when -- all right.  I'm sorry.  And when you were

17  hired at a bottom-level firefighter, when a firefighter is off

18  duty, does that mean he doesn't have to stay in his chain of

19  command --

20        MR. STEELE:  Your Honor --

21  Q.   -- to deal with fire department issues or questions?

22        MR. STEELE:  Your Honor, objection to the time frame.

23  When the chief was hired as a firefighter was far before any of

24  the events that are relevant to this case.

25        THE COURT:  Well, restrict your question to a time.

1   When.

2          MR. GRAHAM:  That's okay, Judge.  I'll --

3   Q.  Since ASOP 12 has been in effect, is it your opinion that a

4   firefighter, if he's off duty, he doesn't have to stay within

5   the chain of command to talk about work-related problems?

6   A.  You always follow ASOP 12.

7   Q.  Whether you're on duty or off duty?

8   A.  Whether you're on duty or whether you're off duty.

9   Q.  All right.  And does the fire department have standard

10  operating procedures?  Which I think everybody knows.  And ASOP

11  12 is just one of those; is that correct?

12  A.  That's correct.  It's just one that we have to follow.

13  Q.  And when you have a person hired, are they required to be

14  familiar with the ASOPs and the merit system?

15  A.  That's correct.  We give them a merit system book and we

16  also give them a standard operating procedure book.  And that's

17  part of your probationary period.  When you're in there, you're

18  studying these guidelines.  And you have a tremendous amount of

19  time to study them and learn them.

20  Q.  All right.  And so each individual fire person is issued a

21  set of the merit system rules and regulations and administrative

22  SOPs?

23  A.  They have a brief portion of the merit system.  We have a

24  more extended version at the stations.  But SOP, everybody has

25  their own individual guideline, because those are the guidelines

1    specifically for the fire department.  So everybody has them so

2    they're accessible to you in your lockers.  They keep them in

3    their lockers.  Some people take them home and study them.  It's

4    a good guide to know those.  It helps you in your promotions,

5    also.

6    Q.  All right.  And would you explain to the Court and the

7    ladies and gentlemen of the jury what would happen if a

8    firefighter is permitted to ignore the standard operating

9    procedures of the department?

10   A.  It would disrupt --

11        MR. STEELE:  Objection.  Hypothetical.  There's no

12   factual situation asked to give comments on.  And beyond the

13   scope of direct.

14        THE COURT:  Well, that is a hypothetical, and I'll

15   sustain as to the language.  I'll let you ask why is it

16   important that they not do that.

17        MR. GRAHAM:  All right.

18   Q.  Why are standard operating procedures, such as ASOP 12,

19   important?

20   A.  They're very important for everyone to follow so we keep an

21   orderly day-to-day operation going.  And if you're allowed to

22   violate them, that should give everybody the right to do the

23   same thing.  And we wouldn't have any -- any type of guidance as

24   a guideline.

25   Q.  And would that be the same with the chain of command?

1    A.   That's correct.

2    Q.   To your knowledge, and just your knowledge, does the City of

3    Phenix City Fire Department ever prevent its employees from

4    speaking out about anything?

5    A.   No, sir.

6    Q.   Is it true that a Phenix City firefighter can speak to

7    anyone he wants to about anything he wants to speak about?

8    A.   That's correct.  He should follow ASOP 12.  He can speak to

9    anyone he wanted to.

10   Q.   Does that include the mayor?

11   A.   That includes the mayor, which is a council member.

12   Q.   Does that include the city council?

13   A.   That includes the council.  Yes, sir.

14   Q.   And as you said in your deposition that we read earlier,

15   does that include the newspaper?

16   A.   Yes, sir.

17   Q.   Now, what about work-related matters?  Can firefighters in

18   Phenix City speak about work-related matters directly to the

19   media --

20   A.   Not --

21   Q.   -- the mayor, or city council without going through the

22   chain of command?

23   A.   No.  They should follow ASOP 12.

24   Q.   But once they've done that, then they could speak to --

25   A.   They could speak to anyone they wanted to speak to.

1   Q.  Did David Davis comply with the requirements of ASOP number

2   12 before he called Mayor Hardin about the proposal to change

3   the probationary period?

4   A.  No, sir.

5   Q.  Did he come to you about that?

6   A.  No, sir.

7   Q.  You've touched on this next question, but why does it hurt

8   the fire department for David not to follow the SOP number 12?

9          MR. STEELE:  Objection.  Asked and answered.

10          THE COURT:  Well, he hasn't asked him about Mr. Davis's

11  particular actions.

12          I understand that's what you're asking?

13          MR. GRAHAM:  Yes, sir.  That's right.

14          THE COURT:  About the telephone call?

15          MR. GRAHAM:  Yes, sir.

16          THE COURT:  All right.  Go ahead.

17  A.  It hurts because he didn't follow standard operating

18  procedure and go through the chain of command.  That disrupts

19  harmony in the day-to-day operations.  If he should -- don't

20  have to do it, anybody shouldn't have to do that.

21  Q.  All right.  Well, how did that action affect you as the fire

22  chief?

23  A.  It undermined my authority and every supervisor that he had

24  over him, the deputy chief, the assistant chief.  It didn't give

25  them a chance to take care of any of the problems.

1   Q.   And all you wanted was a chance to solve his problems?

2   A.   That's all I need, if I could get a chance.

3   Q.   If Mr. Davis had followed the ASOP and exhausted the chain

4   of command, he could have called the mayor.  Is that not

5   correct?

6   A.   Say that again?

7   Q.   I said if Mr. Davis had followed the steps in the ASOP 12,

8   came all the way up, and then after he had exhausted his

9   remedies with you, he would have had a right to gone to the city

10  manager and then spoke with the mayor.

11  A.   That's correct.  Yes, sir.

12  Q.   Now, I believe you testified that you made the

13  recommendation to fire or terminate Mr. Davis; is that correct?

14  A.   Yes, sir.  After I was given the paperwork from Chief

15  Waters.

16  Q.   All right.  And do you do that in every case of violation of

17  the merit system where punitive action is taken against that

18  person other than a counseling session?

19  A.   That I do it -- repeat that, sir, so I could understand.

20  Q.   All right.  I said you make that recommendation anytime

21  someone's terminated.

22  A.   Yes, sir.  Fire department personnel, yes, sir, I would be

23  the one to make the recommendation.  Basically, I'm terminating

24  that person.  But I make -- handing the paperwork over to the

25  city manager because, you know, there may be another process to

 1  follow.

 2  Q.  Okay.  And does the fire department of the City of Phenix

 3  City keep a personnel file on all employees of the city?

 4  A.  Yes.  We have a small file on them inside our main office,

 5  but the main records are kept in the personnel director's

 6  office.

 7  Q.  All right.  And does that include the fire department,

 8  police department, and the code enforcement office?

 9  A.  Yes.  Yes, sir.

10  Q.  And I want to show you -- do you still have the merit system

11  there with you?

12  A.  Yes, sir.

13  Q.  All right.  Would you turn to merit system rule number

14  14.04?

15  A.  Yes, sir.

16       MR. GRAHAM:  Oh, I'm sorry.  It's page number 51 in the

17  merit system rules and regulations.

18  Q.  Are you there, Chief?

19  A.  Yes, sir.

20  Q.  All right.

21       MR. STEELE:  Your Honor, objection.  Beyond the scope

22  of direct.

23       THE COURT:  I don't know what the question is going to

24  be.

25       MR. GRAHAM:  Your Honor, could we -- I asked him to go

1   to Rule 14.04 of the merit system, which is guidelines and what

2   you do when you're a decision maker and you're contemplating

3   terminating someone.

4          THE COURT:  All right.  Overruled.

5   Q.  Are you there?

6   A.  Yes, sir.

7   Q.  All right.  And would you go to Section B of that where it

8   says Use of Past Record?

9   A.  Yes, sir.

10  Q.  All right.  And would you read that to the Court and ladies

11  and gentlemen of the jury?

12  A.  It says, in imposing any disciplinary measures on a current

13  charge, the department head shall take into consideration all

14  prior infractions of the city rules and regulations.

15  Q.  Okay.  And in your decision to recommend termination of

16  Mr. Davis, did you do that?

17  A.  Yes, sir.

18  Q.  And is that a true and accurate copy as best you know from

19  the Phenix City merit system?

20  A.  Yes, sir.

21  Q.  And would it apply to a Phenix City firefighter?

22  A.  Yes, sir.

23  Q.  I'm going to ask you -- well, you've already done that.

24  You've read it.  Tell me in your own words what that means.

25  A.  It means that you must go into the past record of a person

```
1   and look at their record as far as the past, their working

2   there, any prior infractions, that you have to take a look at

3   and see which -- what's the necessary steps where you could --

4   whereas just -- see, this particular thing that David done was

5   just a write-up.  If it would have been his only infraction,

6   David would not have been terminated.  David's past record

7   terminated David.  It wasn't what he did with that infraction.

8   That one infraction didn't --

9           MR. STEELE:  Objection, Your Honor.

10          THE COURT:  Yes.  Restrict yourself to answering the

11  question that's asked you.  It's a yes or no question.

12          THE WITNESS:  Yes, sir.

13          MR. GRAHAM:  All right, sir.

14  Q.  Do you still have the black exhibit book up there?

15  A.  Yes, sir.

16  Q.  Go to Exhibit #21, please.

17          THE COURT:  Did you say #24?

18          MR. GRAHAM:  No, sir.  #21.

19          THE COURT:  #21.

20          MR. GRAHAM:  Yes, sir.

21  Q.  Now, Chief, he asked you to read some stuff off of this in

22  your direct examination.  I'm going to call your attention to

23  where a paragraph starts with group II, line 4 --

24  A.  Yes.

25  Q.  -- violation which states.  And would you read that?
```

1  A.  Negligence or omission in complying with the requirements as

2  set forth in miscellaneous rules and group III line number six,

3  which states, insubordination by the refusal to perform work

4  assigned, slash, to comply with written or verbal instructions

5  of the supervisory force.

6  Q.  And back in September when the "Three-Alarm Turmoil" article

7  came out and all the fire department personnel signed off on

8  that memorandum that they understood the policy and they got

9  copies of ASOP 12 in the -- and how to apply it to the merit

10 system?

11 A.  That's correct.

12         MR. STEELE:  Objection.  Compound question and also

13 beyond the scope.

14         MR. GRAHAM:  Judge, I think I let him read it.

15         THE COURT:  Overruled.  Go ahead.

16 Q.  The insubordination that they're talking about here?

17 A.  Yes.

18 Q.  Is that after Mr. Davis said he understood the rules?

19 A.  That's correct.

20 Q.  He signed off on them, and then he violated them again?

21 A.  That's correct.  That was when we had our counseling with

22 them to inform him to follow the steps, follow ASOP 12.  That's

23 all he needed to follow.

24 Q.  Okay.  And he failed to do that?

25 A.  Yes, sir.  He wouldn't cooperate with that.

490

1   Q.   Now, then it says details of merit system violation, and it

2   does set out that he called Mayor Hardin.

3   A.   That's correct.

4   Q.   All right.  And then below that, starting at the bottom and

5   working up, are these the things that you reviewed --

6   A.   That's correct.  That's --

7   Q.   Wait a minute.  Let me --

8   A.   I'm sorry.

9   Q.   -- before you made your determination whether to recommend

10   termination or not?

11   A.   That's correct.

12   Q.   Okay.  And would you go through those, starting at the

13   bottom and working up?

14   A.   Current corrective --

15   Q.   Just what's on here, now.  Nothing else.

16   A.   Yes, sir.  Current corrective action taken.  Written

17   reprimand.  Mistakes due to carelessness.  Whatever's -- August

18   2nd, 2004, counseling form, backing the fire apparatus without

19   proper placement --

20            COURT REPORTER:  I'm sorry.  I'm sorry.

21            THE WITNESS:  Excuse me.

22   Q.   You need to slow down just a little bit --

23   A.   Okay.  I'm sorry.

24   Q.   -- where she can stay caught up.

25   A.   August 2nd, 2004, counseling form.  Backing the fire

1    apparatus without proper placement of guides resulting in a

2    vehicle accident.

3         September 19th, 2002, mistakes due to carelessness.

4         October 25th, 2004, counseling form.  Group I, line 13,

5    violating a safety rule or practice.

6         March 15th, 2005, letter addressed to Mr. H. Malone, Jr., in

7    regards to handling of personnel issues.

8         August 3rd, 2005, written warning form, group II, line 2,

9    which states threatening, intimidating, coercing, or interfering

10   with fellow employees or supervisors at any time, including

11   abusive language.

12        August 22nd, 2005, counseling memorandum.  David Davis

13   ordering a firefighter to do 25 push-ups for forgetting his

14   uniform shirt when reporting for duty.

15        September the 20th, 2005, violation of directive from Chief

16   Wallace B. Hunter regarding free speech and grievance.

17   Violation of ASOP 12.  If a member of the fire department has a

18   problem with the department, another department, or city

19   operations and procedures which are work-related and finds it

20   necessary to go above his or her immediate supervisor, he or she

21   must notify the supervisor of the intention to do so.  Number

22   three, if a problem cannot be solved by anyone in the chain of

23   command, then the city manager will arrange a hearing with the

24   city council.

25   Q.  All right.  Now, let me get you, if you would, to go to --

1  have you got a white exhibit book up there?

2  A.  No, sir.  I just have -- I just have one.

3         MR. GRAHAM:  Your Honor, may I approach the witness?

4         THE COURT:  You may.

5         MR. GRAHAM:  And Judge, I believe you have one of

6  ours.  Is that --

7         THE COURT:  I do.

8  Q.  Chief, I'm going to ask you to look at that document and

9  tell me if you've ever seen it before.

10 A.  Yes, sir.

11        MR. STEELE:  Which exhibit?

12        MR. GRAHAM:  It's number -- I think it's #13 in yours.

13        MR. STEELE:  In what --

14        MR. GRAHAM:  No.  It's #5.

15 Q.  All right.  Chief, do you -- have you ever seen this before?

16 A.  Yes, sir.

17 Q.  And tell the ladies and gentlemen of the jury and the Court

18 what this is.

19 A.  It's a standard --

20        MR. STEELE:  Objection, Your Honor.  Relevancy.  It

21 goes beyond your earlier rulings with respect to the prior

22 actions.

23        THE COURT:  Was this not one of the exhibits that

24 everybody agreed to?

25        MR. GRAHAM:  Yes, sir, it was.

```
 1          THE COURT:  Admitted?  I understood everything in the

 2   books now were in by agreement.

 3          MR. GRAHAM:  That was my understanding also, Judge.

 4   And if I misunderstood, I apologize, but I think that was all of

 5   our understanding.

 6          MR. MCKOON:  They introduced it yesterday.

 7          THE COURT:  Is it already in evidence?

 8          MR. MCKOON:  Yes, sir.

 9          THE COURT:  Do you agree, Mr. Steele?

10          MR. STEELE:  Actually, I'm not in agreement that we

11   introduced it yesterday.  But I'm willing to let this go on if

12   it will move things along.

13          THE CLERK:  I've got it down.

14          THE COURT:  I'm sorry.  I didn't understand you.

15          MR. STEELE:  I said I'm not in agreement.  I'm not sure

16   if we entered it in, but I know you want to move things along,

17   so --

18          THE COURT:  Well, yes, I would.  But let's clear this

19   up now.  I --

20          MR. STEELE:  Your Honor, it was --

21          THE COURT:  Just a minute, Mr. Steele.  I understood

22   that everything in the books that the jurors have are there by

23   agreement.  If not, we need to take them up.

24          MR. STEELE:  We have no objection to this exhibit.

25          THE COURT:  All right.
```

```
 1           MR. STEELE:  And it's already introduced.

 2           THE COURT:  Go ahead.

 3           MR. GRAHAM:  Thank you, Judge.

 4   Q.  Now, Chief, you said you've seen this before?

 5   A.  Yes, sir.

 6   Q.  And would you tell the ladies and gentlemen of the jury what

 7   it is?

 8   A.  It's the administrative standard operating procedure 12.

 9   It's the way you go about addressing the city council.

10   Q.  All right.  And who is the name at the top?

11   A.  City of Phenix City Fire Department.

12   Q.  Okay.  And is this relative to David Davis?

13   A.  Yes, sir.

14   Q.  All right.  And would you -- this was a counseling session;

15   is that correct?  Are you on the one I'm on?

16   A.  You said -- which one you said, now?

17   Q.  #5.

18   A.  Okay.

19   Q.  There are two -- there are two exhibits.

20   A.  Yes.

21   Q.  One says #5 and one says #13?

22   A.  #5 and one #13.  Okay.

23   Q.  Okay.  Is that where you are?

24   A.  Yes.  I'm there now.

25   Q.  All right.  Now, this is a counseling form; is that correct?
```

1   A.   Yes, sir.

2   Q.   And this is relative to David Davis.

3   A.   Yes, sir.

4   Q.   All right.  And what was this counseling about?  Just read

5   it to the ladies and gentlemen of the jury and the Court, and

6   read it slow where the court reporter can keep up with you.

7   A.   This was -- I received this from -- it's Assistant Chief

8   Kenneth Johansen.  Sergeant Davis was counseled by Chief Hunter

9   and Assistant Chief Johansen on the 20th of September, 2005,

10  concerning his making or publishing statements to the local

11  media concerning fire department issues which has resulted in

12  impaired discipline and harmony, also speech which has

13  jeopardized close personal loyalties in the workplace.  Sergeant

14  Davis was advised of his freedom of speech and the merit system

15  rules and regulations.

16       Sergeant Davis was also counseled for continuous attempts to

17  force unwanted attention through intimidation, coercion, or

18  interfering with coworker, Firefighter Brannon Wilkinson.

19  Firefighter Wilkinson informed Sergeant Davis that the IAFF

20  derogatory statements and comments directed towards him would

21  not be tolerated.

22       The counseling session has been discussed with me, and I

23  understand this notice will be -- will become part of my

24  personnel file.  And it's signed by David Davis, Kenneth

25  Johansen.

1    Q.  All right.  Now, I'm going to ask you to go now in the white

2    book to Exhibit #16.

3    A.  Yes, sir.

4    Q.  And I'll ask you if you've ever seen this document.

5    A.  Yes, sir.

6    Q.  In fact, this is a memorandum to H. H. Roberts, City

7    Manager, from you as fire chief; is that correct?

8    A.  Yes, sir.

9    Q.  All right.  And what brought about the necessity for you to

10   write this memorandum to Mr. Roberts?

11   A.  I was having a talk with the personnel director, Barbara

12   Goodwin, when she brought up she had -- she had been talking

13   with the mayor, and the mayor told her that David Davis had

14   called her about some issues in the fire department.  And I felt

15   it was time for me to inform Mr. Roberts of what -- what

16   problems we was going to have with that, because that shouldn't

17   be transpiring.  And we had talked -- also talked to Mr. Davis

18   about that, the mayor, and informed Mr. Davis.  And he -- well,

19   he already knew the mayor wasn't part of the chain of command,

20   and he had a procedure to follow to go through that.

21   Q.  All right.  And in your mind, is this type of activity a

22   disruption to the fire department?

23   A.  Yes, it is.  It's a disruption.

24   Q.  And why is that?

25   A.  It's a disruption because it will impair relationships.  The

1   mayor is a council member.  We have ways of talking to council

2   members.  If we go outside of our chain of command and our

3   standard operating procedures to do things like this, it causes

4   the problems.  And it can make it look like the fire department

5   is not doing what they're supposed to do to handle their

6   problems or giving people a chance to come through that chain to

7   talk to people to hear their concerns.  And we have -- the door

8   is open and the avenue is open for us to do that.  And the

9   mayor, being a council member through the city charter, should

10  not be interfering with day-to-day operations.  Yes, it

11  causes -- it causes a problem.  It's caused a problem between me

12  and the mayor.

13  Q.  Okay.  And if something doesn't cause actual disruption in

14  the fire department, is it possible it could cause potential

15  disruption?

16  A.  That's correct.

17          MR. STEELE:  Objection.  Speculative.

18          THE COURT:  I sustain.

19  Q.  And I'm going to apologize if I've asked this question, but

20  I can't honestly remember if I have.  But pertaining to his call

21  to the mayor on here, did Mr. Davis follow ASOP 12?

22  A.  No, sir.

23  Q.  All right.  And Mr. Steele asked you a lot of questions

24  about does prior approval mean going through the chain of

25  command or does prior approval to speak to the media -- when --

1    you understood that to be going through the chain of command,

2    that prior approval; is that correct?

3    A.  That's correct.

4    Q.  Okay.  So when he asked you a question that way and you

5    answered the way you answered, it was your understanding that

6    that meant going through the chain of command.

7    A.  That's correct.

8    Q.  And they also asked you a number of questions in your

9    deposition and also here today that you -- if someone goes

10   directly to the news media or the mayor or the city council,

11   what do they have to do.  And your answer was, they can't go

12   directly there.

13   A.  No, they can't.

14   Q.  And why can't they go directly there?

15   A.  Because it's another link in the chain.  They have to follow

16   the chain of command or it would cause disruption.  They would

17   break ASOP 12.

18   Q.  All right.  And there were a number of questions asked,

19   well, Chief, once they get to you and they're not satisfied,

20   then can they go directly to the -- the mayor, council, or the

21   news media?

22   A.  No.

23        MR. STEELE:  Objection, Your Honor.  Misrepresenting

24   the questions that were asked.

25        MR. GRAHAM:  I believe he asked that question, Judge.

1           MR. STEELE:  Your Honor, I did not.  I read questions

2    from the deposition, and the deposition did not limit the

3    question the way Mr. Graham is limiting the question.

4           THE COURT:  Rephrase.

5           MR. STEELE:  He's misstated the question.

6           THE COURT:  Rephrase the question the best way you

7    can --

8           MR. GRAHAM:  Yes, sir.

9           THE COURT:  -- and I'll have to leave it up to the jury

10   as to what you remember was said.

11          MR. GRAHAM:  All right, sir.

12   Q.  Once a firefighter's gone up to you, as far as ASOP 12 --

13   A.  Yes.

14   Q.  -- what is the next step that they're required to take

15   before they can go to the media, the newspaper, the mayor, or

16   the council?

17   A.  The city manager.

18          MR. GRAHAM:  Excuse me just a moment.

19   Q.  As far as the issues in the "Three-Alarm Turmoil" and the

20   problems that he had with the probationary period being changed,

21   did Mr. Davis ever give you a chance to work those out?

22   A.  Never, sir.  No, sir.

23   Q.  He never -- he never came to you about those issues?

24   A.  No, sir.  Mr. Davis never come to my office or asked through

25   the chain of command to come and talk with me about anything

1  since I've been fire chief.

2  Q.  All right.  And on -- when he testified -- you've been in

3  here the whole time; is that correct?

4  A.  Yes, sir.

5  Q.  And do you remember him testifying he submitted a list of

6  possible grievances or problems with the fire department to

7  Chief Prater?

8  A.  Yes, sir.

9  Q.  When you became chief, did he ever present that list of

10  grievances or problems with the fire department to you?

11  A.  No, sir.  David -- he never done that.  Mr. Davis.

12  Q.  All right.  So again, you didn't have a chance to work on

13  those problems and try to resolve them?

14  A.  I never had an opportunity to.

15          MR. GRAHAM:  That's all I have.

16          THE COURT:  Mr. Steele?

17          MR. STEELE:  Thank you, Your Honor.

18                          REDIRECT EXAMINATION

19  BY MR. STEELE:

20  Q.  Well, Chief, in reference to your deposition, Mr. Graham

21  seemed to be a little disappointed that Mr. Woodley didn't ask

22  you more questions, so I'm going to try to remedy that.

23          MR. MCKOON:  Judge, I'm going to object to him making

24  statements.

25          THE COURT:  That's not your witness, Mr. McKoon.  Go

1    ahead.

2    Q.  Now, Chief, as I understand what you just told Mr. Graham,

3    he testified that Mr. Davis didn't go through the chain of

4    command to give you an opportunity to correct the problem

5    regarding the proposed ordinance.  Is that an accurate

6    recitation of your testimony?

7    A.  That's correct.

8    Q.  Now, I want to make sure that there's no confusion here.

9    We've talked about the chain of command.  And your spot on the

10   chain of command is below the city manager; and then above the

11   city manager, there's a city council, correct?

12   A.  That's correct.

13   Q.  City council is the legislative body of the city, correct?

14   A.  That's correct.

15   Q.  It's the city council that has the authority to amend or not

16   to amend the merit system rules; is that correct?

17   A.  That's correct.

18   Q.  And the issue that Mr. David Davis was talking about was in

19   fact a proposed amendment that was before the city council;

20   isn't that correct?

21   A.  That's correct.

22   Q.  Now, you, sir, as fire chief, you don't vote on proposals

23   that are before the city council, do you?

24   A.  No, sir.

25   Q.  And you've already acknowledged that that particular

1  proposal was passed the very next morning, correct?

2  A.  Yes, sir.

3  Q.  Now, there's something interesting -- let me get back to one

4  of the exhibits you already talked about.

5     (Brief pause)

6        MR. STEELE:  Oh, I'm sorry.  It's the first deposition,

7  page 75.

8  Q.  Now, Chief, do you recall we spoke about your deposition

9  answer and questions that were asked, page 75 through 77?  Do

10  you recall that?

11  A.  Yes, sir.

12  Q.  Okay.  And you also recall, sir, that I showed you, among

13  other things, a memorandum from Chief Hanson that said the

14  department would not tolerate firefighters speaking to the media

15  without prior approval, correct?

16  A.  That's correct.

17  Q.  And although you said part of the verbiage may not have been

18  the way you would have worded it, but you agreed with the part

19  that said you don't speak to the media without prior approval,

20  correct?

21  A.  That's correct.

22  Q.  Now, did I understand you right in response to Mr. Graham's

23  questions that your testimony now is that prior approval doesn't

24  actually mean approval, that you could disapprove and they would

25  still go to the media?

1  A.  Sir, once they exhaust, they can go anywhere they want to.

2  If you exhaust your standard -- your ASOP and you've done what

3  you're supposed to have done, there's no restrictions on them.

4  Q.  Chief, what part of "prior approval" states that there are

5  no restrictions?

6  A.  You follow the operating procedure.

7  Q.  Chief, doesn't the word "approval" mean that you have to

8  affirmatively give someone permission?

9  A.  No, sir, not in that aspect.  You follow the procedure.

10 Once you follow these procedures and exhaust them, you have done

11 what you're supposed to have done.

12 Q.  Okay.  So if "approval" doesn't mean approval anymore,

13 according to you, correct -- and this is ASOP 12, the document

14 you're talking about -- and you've already told us in regards to

15 that "never" doesn't mean never and "stop at the city manager"

16 doesn't mean stop --

17 A.  I told you --

18 Q.  Turn to ASOP 12, if you could, Chief.

19 A.  I told you before that "stop" is talking about what stops

20 with me.  But you -- the city manager is above me.

21 Q.  Well, Chief, I've got it up here --

22 A.  I understand.

23 Q.  -- as large as life.  And we're talking about access to the

24 city council.  You remember that.

25 A.  That's correct.

 1  Q.  Right?  And your answer is, as a person -- this was written

 2  in '98 -- I guess is trying to get there -- referring to trying

 3  to get to the city council, correct?

 4  A.  That's --

 5  Q.  All right.  And so the body, which is a place you would

 6  never get to because it stops at the city manager.  You would

 7  never get to the council because it stops at the city manager.

 8  That's what that says.

 9       MR. GRAHAM:  Your Honor, I'm going to object.  That's

10  been asked and answered on direct and on redirect.

11       THE COURT:  Yes.  He's answered that.

12  Q.  Chief, do you still have before you the copy of your

13  transcript of your deposition from November 6th, 2007?

14  A.  Yes, sir.

15  Q.  Okay.  And if you would turn once again to pages 11 and 12

16  that we talked about.

17  A.  Yes, sir.

18  Q.  And on page 12, there is a question that we have to review

19  again.  The question is:  Does anyone else in the fire

20  department have the discretion or opportunity to speak to the

21  media without prior approval on any issues affecting the fire

22  department?

23       Do you remember that question?

24  A.  Yes, sir.

25       MR. GRAHAM:  Your Honor, objection again.  Asked and

 1  answered a number of times.

 2          THE COURT:  Overruled.  Go ahead.

 3  Q.  Correct?

 4  A.  Yes, sir.

 5  Q.  And your answer was:  No, sir.  Correct?

 6  A.  Yes.

 7  Q.  Did -- did I hear you right when Mr. Graham was -- was

 8  questioning you that he said that this question referred to

 9  speaking about fires only?

10  A.  Basically, day-to-day operations.  Yes, sir.

11  Q.  What part of this question that says any issues affecting

12  the fire department indicated to you that Mr. Woodley was asking

13  you about fires only?

14  A.  Any issues, sir, to me, means any issues affecting the fire

15  department the same.  I guess we have two different

16  understandings of that.

17  Q.  So the definition of "any" means fire, but it's not broader

18  than that.

19  A.  It's the word "related to" which brings me to -- it's got to

20  be something that's related to the fire service.

21  Q.  According to your testimony, the proposed legislation was

22  related to the fire service.

23  A.  (Nods head)

24  Q.  That wasn't a fire, was it?

25  A.  It's related to the fire service, sir.

1   Q.   Correct.  And this question said:  Does anyone else in the

2   fire department have discretion or opportunity to speak to the

3   media without your prior approval on any issue affecting the

4   fire department.  And your answer was:  No, sir.

5        There's nothing about that question, Chief, that limits or

6   even speaks about an actual fire, is there?

7   A.   I was going off of what was based on my thinking, sir.

8   Q.   So just so we have it clear, when you were asked whether

9   people had the authority or discretion or opportunity to speak

10  to the media without your prior approval on any issues affecting

11  the fire department, you didn't understand the question of any

12  issues relating to the fire department to be referring to

13  anything but an actual fire?

14  A.   Sir, I said fire-related issues.

15  Q.   And you agree with me, correct, that the proposed ordinance,

16  this proposed piece of legislation, was a

17  fire-department-related issue.

18  A.   That's correct.

19  Q.   Okay.  So according to this, your statement, an employee is

20  not allowed to speak to the media concerning that issue, quote,

21  without your prior approval, correct?

22  A.   Sir, we have a chain that you follow when you speak.  You go

23  up that chain.  You speak to anyone you want to speak to.

24  Q.   Okay.  That's that whole approval doesn't mean approval

25  explanation?

1  A.  The chain is the approval.  That chain that you follow is

2  your approval.  Once you exhaust that chain, that's your

3  approval.

4  Q.  Okay.  I thought I had it handy, the blow-up of ASOP 12, but

5  I know you have it in front of you as Exhibit -- I believe

6  Exhibit #5 in the black notebook above you.  Are you with me,

7  Chief?

8  A.  I'm with you.

9  Q.  Since earlier this morning when we talked about ASOP 12 and

10  this point in time, you have to agree with me that the phrase

11  "media" or "access to the media" hasn't been added to ASOP 12,

12  correct?

13  A.  No, sir.

14  Q.  Okay.  And what language in ASOP 12 states that after

15  exhausting the chain of command, you can speak to whoever you

16  choose?

17  A.  Sir, I'm going to give you this answer again.  ASOP

18  number --

19       MR. GRAHAM:  Your Honor, we object.  Asked and answered

20  a number of times.

21       THE COURT:  This is repetitive.  Move on.

22       MR. STEELE:  Okay.

23  Q.  Now, you do agree that the proposed ordinance at the time

24  that Mr. Davis spoke about it still was a proposed ordinance

25  before the council, correct?

```
 1  A.  Yes, sir.
 2  Q.  And it's your belief that even on a policy, an ordinance, a
 3  law that isn't in effect that you, as chief of the department,
 4  do not control, do not enforce because it's not part of the law
 5  of the city, even on that --
 6          MR. GRAHAM:  Your Honor, object.  Compound question.
 7          MR. STEELE:  I don't think I finished the question.
 8          THE COURT:  Go ahead.
 9  Q.  Even -- Chief?
10  A.  Yes, sir.  I'm with you.
11  Q.  Okay.  That even on that, a member of your department off
12  duty can't speak to the mayor or somebody else on the council
13  without going through the chain of command?
14  A.  Sir, he should have followed the standard operating
15  procedures.  It's worked for me for a long time.
16  Q.  So the answer to my question is yes?
17  A.  You should follow ASOP 12.
18  Q.  Okay.  Even if -- to speak to a council member against --
19  about a piece of legislation that touches on the fire
20  department.
21  A.  He should have followed ASOP 12.  Because my insurance don't
22  stop when I get off work.
23  Q.  Chief, is the answer to my question yes or no?
24  A.  He should have followed ASOP 12.
25  Q.  Okay, Chief.  Apparently you're not willing to give that a
```

1  yes or no answer, so we'll move on.

2          MR. GRAHAM:  Your Honor, I move to strike that

3  statement by Mr. Steele.  He's --

4          THE COURT:  Yes.  That's stricken.  Go ahead.

5  Q.  Now, when Mr. Graham questioned you, he asked you some

6  questions about the City of Phenix merit system rules and

7  regulations.  Do you recall that?

8  A.  Yes, sir.

9  Q.  And you and I talked about a provision in there, too, that

10 you agreed when we were talking that it means that it doesn't

11 limit an employee's ability to engage in this political activity

12 off duty, correct?  And you agreed with me, sir, that the merit

13 system rules makes a clear distinction between on duty and off

14 duty, correct?

15 A.  I agree with you now, sir.  That's political activity, which

16 is different from ASOP 12.

17 Q.  Okay.  So I'm glad we're getting closer here since -- at the

18 time Mr. Davis was speaking to the mayor about the proposed

19 ordinance, it was something before the city council, the mayor,

20 as he said, you know, he handles things the way he handles them

21 because it's politics.  So we're in agreement, now, Mr. Davis

22 was engaging in political activity.

23 A.  Mr. Davis is a firefighter for the City of Phenix City,

24 which he falls under ASOP 12, just like myself.

25 Q.  Okay.  Now, Chief, we also talked about how the government

1  operates in Phenix City and the fact that the city council is

2  the legislative body, correct?

3  A.  That's right.  Yes, sir.

4  Q.  And the city council establishes and passes the merit system

5  rules and regulations, correct?

6  A.  That's correct.  They vote on them.

7  Q.  You're not above the city council, are you, sir?

8  A.  Am I above them?  No, sir.

9      MR. GRAHAM:  Your Honor, objection.  That's been asked

10  and answered.

11      THE COURT:  Are you getting at something new,

12  Mr. Steele?

13      MR. STEELE:  Well, this is directly related to

14  questions that Mr. Graham answered.

15  Q.  Mr. Graham suggested that this provision of the merit system

16  rules with respect to political activity somehow doesn't apply

17  to firefighters because your department has an SOP on the

18  issue.  And I just want to clarify that we're both in agreement

19  that when the council passes legislation, you, as the head of

20  the department, don't have the discretion to ignore that

21  legislation, correct?

22  A.  No, sir.

23  Q.  You don't have the discretion to take away rights that the

24  city council has acknowledged that employees have.

25  A.  Never tried to.

 1  Q.  And sir, in your earlier deposition you acknowledged that

 2  you're generally familiar that there's a First Amendment to the

 3  United States Constitution.  You remember saying that?

 4  A.  Yes, sir.

 5  Q.  And that you're generally aware that the First Amendment to

 6  the United States Constitution protects the right to freedom of

 7  speech, correct?

 8  A.  That's correct.

 9  Q.  Do you know any provision in the First Amendment or the

10  United States Constitution that provides for an exception for

11  the City of Phenix City?

12  A.  Not that I know of.

13  Q.  Aware of any provision in the Constitution or the First

14  Amendment of the United States that provides for an exception

15  for your fire department?

16  A.  What do you mean by that question?

17  Q.  Are you aware of any provision in the United States

18  Constitution and specifically the First Amendment right to

19  freedom of speech that provides --

20        MR. GRAHAM:  Your Honor, I'm going to object to that.

21  He's not a lawyer.  He's not a legal authority.  He wouldn't

22  have that within his knowledge.

23        THE COURT:  Yes.  I sustain.  This is getting into a

24  question of law and a matter for the Court.  I sustain.

25  Q.  It's your understanding, Chief, as head of the department,

1  that in addition to being bound by the merit system, that you're

2  also bound by the U.S. Constitution, correct?

3  A.  Yes, sir.

4  Q.  And Chief, when speaking to Mr. Graham, you went through and

5  talked about things that were on the warning form that notified

6  Mr. Davis of his termination and talked about group II offenses

7  and group III offenses.  You recall that whole conversation?

8  A.  Yes, sir.

9  Q.  Now, as you're here today, you don't disagree with what you

10 said in your deposition back in April of 2006?

11         MR. STEELE:  Page 82.

12 A.  That's in April?

13 Q.  And that's at page 82, sir.  Do you still have that

14 deposition in front of you?

15 A.  Yes.  Yes, sir.

16 Q.  Okay.

17   (Brief pause)

18         THE COURT:  Repeat the question, Mr. Steele.

19 Q.  Ready, Chief?

20 A.  Yes.

21 Q.  Now, do you recall --

22         MR. STEELE:  Strike it.

23 Q.  The question was as you sit here today, you still abide by

24 and agree with the testimony you gave under oath during your

25 deposition in April of 2007, correct?

1   A.   Yes, sir.

2   Q.   And when asked at that deposition this question, you gave

3   this answer, didn't you?  And the question is:  If you would

4   just listen to my question.  Let me rephrase it.  It's real

5   simple.  It says, quote, discharge as per merit system rules and

6   regulations for second group II offense, end quote.  And then

7   the question continues:  What specifically was the second group

8   II offense?

9        And what was your answer, sir, at line 20 on page 82?  It's

10  also up here.

11  A.   Contacting the mayor.

12  Q.   Correct.  That was your answer.

13  A.   Yes.

14  Q.   And when you were asked about the group III offense on page

15  84 of your deposition, if you would like to refer to it --

16  A.   Yes, sir.

17  Q.   -- the question was asked whether the group III offense,

18  which was his first group III offense for which he was

19  discharged, was in fact his telephone communication with Mayor

20  Hardin.  And your answer was:  That is correct.  That was the

21  violation.

22       Is that accurate?

23  A.   Let me finish reading that.

24       (Brief pause)

25            THE COURT:  Point him to the line and read the answer,

1  Mr. Steele.  Let's move on.

2          MR. STEELE:  Okay.

3  Q.  Chief, are you with me?

4  A.  I'm trying my best to follow you.  Now, which line do you

5  want me to look at?

6  Q.  We're looking at page 84 on your transcript beginning there

7  at line 9 and going through to line 14.

8  A.  Okay.

9  Q.  Do you see that?

10 A.  Yes.  I see line 9 to 14.

11 Q.  Okay.  And you were asked -- concerning the group III

12 offense that was listed as a reason for the discharge, you were

13 asked:  Was that in fact his telephone communication with Mayor

14 Hardin?  And your answer was:  That is correct.  That was the

15 violation.

16 A.  That's correct.

17 Q.  All right.  And it's still correct as you sit here today.

18 A.  That's correct.

19          MR. STEELE:  Nothing further, Your Honor.

20          THE COURT:  Mr. Graham, do you have anything further?

21          MR. GRAHAM:  Yes, sir.  Just a couple.

22                        RECROSS-EXAMINATION

23 BY MR. GRAHAM:

24 Q.  He went back over again in your second deposition with you

25 that series of questions that Mr. Woodley asked you about who

1  could talk to the media in the fire department and who could be

2  designated to talk to the media?

3  A.  Yes, sir.

4  Q.  And he got into this colloquy with you about whether it was

5  fire or not.  Go over to page 13, line 4.  And this is a

6  continuation of the questioning on the bottom of 11 and 12 of

7  your deposition.  And the question was, would you (sic) be the

8  next person if you are absent to speak to the media about fire.

9  Do you see that?

10  A.  Now, which one you said?  You said --

11  Q.  Page 13.

12  A.  -- 13 on the second one, in November.

13  Q.  Right.

14  A.  Okay.  Page 13, which line?

15  Q.  Line 4.

16  A.  Okay.

17  Q.  The question that Mr. Woodley asked you was --

18  A.  Okay.  I'm getting there.

19  Q.  Who would be the next person if you are absent to speak to

20  the media about fire.

21  A.  That's correct.

22  Q.  All right.  And what was your answer?

23  A.  I said:  Presently, that would be Deputy Chief Hanson.

24  Q.  Okay.  Thank you.  Now, on ASOP 12, the proposal that

25  Mr. Davis called the mayor about, was it work-related business?

1    A.   Yes, sir.

2    Q.   All right.  And ASOP 12 covers that, doesn't it?

3    A.   That's correct.

4    Q.   Are the mayor and council in the chain of command?  I just

5    want everybody to understand that.

6    A.   No, sir.  They have -- they are not in the chain.

7    Q.   Do firefighters have an unlimited right to free speech, or

8    is that right limited by the merit system rules and regulations

9    and the ASOP 12?

10           MR. STEELE:  Objection, Your Honor.  As Mr. Graham

11   pointed out, the witness is not an attorney.

12           THE COURT:  I sustain.

13   Q.   And he was talking about the last group II and the group III

14   in the write-up, the written warning form.

15   A.   Yes.

16   Q.   Was there a prior group II?

17   A.   There was a prior group II in the list of offenses --

18           MR. STEELE:  Objection, Your Honor.  Asked and

19   answered.

20           THE COURT:  Yes.  He has answered that question.

21           MR. GRAHAM:  Okay.  That's all I have, Your Honor.

22           MR. STEELE:  Thank you, Your Honor.

23           THE COURT:  All right.

24           MR. STEELE:  Your Honor?

25           THE COURT:  Oh, I'm sorry.  I thought you said no.  Go

1   ahead.

2            MR. STEELE:  Thank you.  This will be brief.

3                          REDIRECT EXAMINATION

4   BY MR. STEELE:

5   Q.  Chief, Mr. Graham just went back to page 13 of your second

6   deposition transcript, and I want to go back to that page as

7   well.  Are you on that page, sir?

8   A.  Yes, sir.

9   Q.  All right.  And I want you to look beginning at line 15 of

10  that page.  Are we both at the same place?

11  A.  Yes, sir.

12  Q.  This was the question:  But if tomorrow a rank-and-file

13  firefighter currently employed by the City of Phenix City and

14  its fire department spoke to the media on his own about issues

15  affecting the fire department without your prior approval, that

16  would be a violation of the merit system rules and regulations

17  of the city.  And your answer was:  Yes, sir.  Correct?

18  A.  Yes.

19           MR. STEELE:  Thank you, Your Honor.

20           MR. GRAHAM:  Nothing further, Your Honor.

21           THE COURT:  All right.  Just stay there just a minute.

22           We're going to break for lunch at this time.  Members

23  of the jury, remember all my admonitions about everything I've

24  told you in the past.  They still apply now.  I'll ask you to be

25  back in the jury room in time to begin the trial at 1:15.  1:15.

```
 1        (Jury out at 11:55 a.m.)

 2            THE COURT:  Court is in recess.

 3        (Lunch recess at 11:55 a.m. until 1:11 p.m., at which time

 4         proceedings reconvened without the jury present, as

 5         follows:)

 6            THE CLERK:  Court is in session.  You may be seated.

 7            THE COURT:  Gentlemen, before we bring the jury in, I

 8    want to tell you that we're going to pick up the speed of this

 9    trial.  I don't like to interrupt lawyers in front of the jury

10    to tell you to move along and not repeat questions, but we've

11    got to move faster than we've been moving now.  And you could

12    have moved faster.  So I'm just forewarning you.  If I have to,

13    I'm going to tell you to move on to another subject.

14            Bring in the jury.

15        (Jury in at 1:11 p.m.)

16            THE COURT:  Be seated.  All right.  Mr. Steele, call

17    your next witness.

18            MR. STEELE:  Thank you, Your Honor.  We call City

19    Manager Roberts.

20            **HERMAN H. ROBERTS**, the witness, having been duly

21    sworn, testified, as follows:

22                            DIRECT EXAMINATION

23    BY MR. STEELE:

24    Q.  Mr. Roberts, would you please state your name and your

25    current position for the record.
```

1   A.   Herman H. Roberts, City Manager, City of Phenix City.

2   Q.   And Mr. Roberts, how long have you been city manager in

3   Phenix City?

4   A.   Approximately six and one-half years.

5   Q.   And were you assistant city manager and a code enforcement

6   officer prior to that?

7   A.   I was.

8   Q.   Based upon earlier testimony, would you agree that with

9   respect to decisions to terminate employees, you, as city

10  manager, have the authority to do that?

11  A.   I have the authority to terminate employees.

12  Q.   And department heads below you do not have that authority.

13  Is that also correct?

14  A.   No, sir.  That is not correct.

15  Q.   Okay.

16  A.   That delegation of duties has been delegated down to them.

17  Q.   Okay.  So you've delegated to -- let's just get specific.

18  Have you delegated to Chief Hunter the authority to terminate

19  employees?

20  A.   Yes, sir.  As I said before, all department heads have the

21  authority to terminate their employees.

22  Q.   Okay.  And you believe that the city charter allows that

23  type of responsibility to be delegated?

24  A.   The city charter will tell you that I'm responsible for the

25  termination and that I do have that authority to delegate it

520

1   down -- down the line.

2   Q.  Okay.  If you would, sir, please turn to Exhibit #22 in the

3   black notebook in front of you.  And, sir, Exhibit #22 is an end

4   of employment form involving Mr. Davis, and it's dated April 21,

5   2006.  There's a line for the city manager's signature, but

6   there's no signature on this form.

7   A.  That is correct.

8   Q.  And do you know the reason for that?

9   A.  I do.

10  Q.  And what is that reason?

11  A.  I was out of town.

12  Q.  Prior to April 21, 2006, or on April 21, 2006, did you

13  approve the termination of Mr. Davis?

14  A.  Sir, I knew the circumstances of the termination.  I did not

15  approve it, nor did I disapprove it.

16  Q.  Okay.  Not one way or the other at that point?

17  A.  No, sir.

18  Q.  Okay.  Have you ever informed Chief Hunter that he has the

19  authority to terminate employees?

20  A.  Yes, sir.  They have all been informed.

21  Q.  Were you present for his testimony earlier today when he

22  said his authority is to recommend and that the authority to

23  terminate rests with you?

24  A.  I heard his testimony earlier today.

25  Q.  Given that authority that you've delegated, when a

1  department head makes a decision to terminate an employee, is

2  that termination final unless the employee chooses to invoke the

3  appeal process through the hearing review board?

4  A.   That is correct.   If they choose not a review board hearing,

5  then after the allotted time limit that's required, then I would

6  sign the termination notice.   There is a reason why I did not

7  sign it, if you would like to hear it.

8  Q.   I'm fine with the answers you've given, sir.

9  A.   Thank you.

10 Q.   Now, employees do have an opportunity to -- to appeal to the

11 hearing review board, correct?

12 A.   Yes, sir.

13 Q.   And that occurred with respect to Mr. Davis?

14 A.   Yes, sir.

15 Q.   And you testified at that hearing, as a matter of fact,

16 right?

17 A.   Yes, sir.

18 Q.   Now, at the conclusion of the hearing, the hearing board

19 makes its determination and puts it in writing and the board

20 members sign off on that, correct?

21 A.   That's correct, sir.

22 Q.   And then they submit it to you, sir?

23 A.   Yes, sir.

24 Q.   And under the policies and procedures, do you then have the

25 authority to accept or reject the decision of the review board?

1  A.  I do.

2  Q.  And in this case, after testifying in favor of Mr. Davis's

3  termination, when the review board recommended termination, you

4  agreed with that?

5  A.  I did.

6  Q.  And ultimately, at that point in the process, the decision

7  rested with you.

8  A.  Once the review board gave it to me, then the decision

9  rested with me.  Whether I approve of the board's ruling or not,

10 it was up to me to decide.

11 Q.  Now, are you familiar with -- I may get his rank wrong, so

12 I'm apologizing in advance.  Is it Captain Karl Taylorson at

13 this point?

14 A.  Yes, sir, that is correct.  He is a captain at this time.

15 Q.  Okay.  And you know who Mr. Taylorson is, Captain Taylorson?

16 A.  Yes, I do.

17 Q.  Okay.  And it's true, sir, isn't it, that you testified at

18 your deposition that there was an occasion in which

19 Mr. Taylorson discussed with you various issues of concern

20 within the fire department?

21 A.  In my deposition?

22 Q.  Correct.

23 A.  Could I see it, please?

24 Q.  Sure.

25        MR. STEELE:  May I approach, Your Honor?

1          THE COURT:  You may.

2    Q.  Mr. Roberts, what I've handed you is a copy of the

3    transcript of your deposition for the deposition taken on April

4    4, 2007.  And if you'd take a minute to look at page 45 and 46,

5    and then my question to you is whether that refreshes your

6    recollection of the conversation you had with Mr. Taylorson

7    concerning certain issues related to the fire department.

8    A.  Yes, sir.  I have talked with Captain Taylorson.

9    Q.  Okay.  And on that occasion, among the issues that Captain

10   Taylorson raised with you was issues relating to the morale of

11   the department, staffing issues, and equipment issues; is that

12   correct?

13   A.  He talked with me about several things.  These talks, sir,

14   were at a National Guard meeting in just general terms.

15   Q.  Okay.  So I believe you testified that this came about at a

16   National Guard meeting.  And you ran into Mr. Taylorson, and he

17   proceeded to talk to you about matters of concern within the

18   fire department.  Is that fair?

19   A.  Yes, sir.  That's right.  He worked for me at the National

20   Guard.

21   Q.  Okay.  The conversation I'm referring to, though, is a

22   conversation about concerns he had about the Phenix City Fire

23   Department, not how the National Guard operates, correct?

24   A.  I understand your question, sir.  Yes.

25   Q.  Okay.  Now, did you inquire as to whether Captain Taylorson

1  had received the permission or authority or okay of Chief Hunter

2  to raise those issues directly with you?

3  A.  Sir, when I talked with Sergeant Taylorson -- excuse me --

4  Captain Taylorson in the fire department, Sergeant Taylorson in

5  the United States Army National Guard -- these were general

6  terms.  And sir, I don't believe he had to ask to come up the

7  chain of command when somebody higher than he asked him.  You

8  can go down the chain just as well, sir.

9  Q.  And as I understand your testimony in your deposition, you

10  contend that you invited the communication because you asked

11  Captain Taylorson how things were going; is that correct?

12  A.  That's pretty accurate.  Yes, sir.

13  Q.  Okay.  And from your perspective as city manager, by asking

14  him on that -- on that occasion how things are going, you, in

15  essence, invited him to speak with you in general terms about

16  concerns at the department?

17  A.  That's correct.  Anytime there's concerns within the

18  department, I think any city manager wants to know about it.

19  Q.  Okay.  And as you testified, you don't believe he went

20  through the chain of command first, but you believe that's okay

21  because you invited the communication.

22  A.  Sir, I invited the communication.  He did not come to me to

23  talk about it.

24  Q.  Okay.  And the full extent of your invitation of that

25  communication was asking him how things are going, correct?

1  A.  Of course, Sergeant Taylorson answered -- Captain Taylorson

2  answered --

3          THE WITNESS:  Excuse me, Judge.  I get my rank messed

4  up.

5  A.  He certainly did answer.

6  Q.  Okay.  I just wanted to make sure that you didn't

7  specifically say to Captain Taylorson, you know, how are things

8  going at the department with respect to equipment issues or how

9  are things going at the department with respect to staffing.  I

10  understood your testimony as a more general how are things

11  going.  Is that fair?

12  A.  That's correct.  And there again, Captain Taylorson properly

13  brought these things out or some of the things out that he felt

14  was a concern.

15  Q.  Okay.  And you still believe that Captain Taylorson did

16  nothing wrong in having that conversation with you, because you

17  effectively invited some feedback from him.  Is that accurate?

18  A.  Sir, on two -- on two different ways.  As his officer in

19  charge in the National Guard and as his city manager, I would

20  ask about work-related issues in a general conversation with any

21  of them out there, to include some of my police officers and

22  public works people that's under my command -- were under my

23  command.

24  Q.  Okay.  And I don't see anything wrong with that at all,

25  sir.  I just want to make sure that I understand on this

1    occasion, in your understanding as city manager, is if you come

2    across or happen to run into an employee of the city and you ask

3    him or her how things are going, then it's okay for that person

4    to answer your question.

5    A.  I do that daily, sir.

6    Q.  Okay.  Is that a little bit of an open-door policy?

7    A.  No, sir, that's not an open-door policy.  I would like to

8    explain.

9    Q.  Okay.

10   A.  If I go through the shop area in the public works, for

11   instance, if -- if I have a mechanic that's pulling an engine or

12   something of that nature, I may ask, how is the job going; is

13   everything going good today; are y'all working safely.  Things

14   that a normal supervisor or normal person in charge would ask

15   his employees.

16   Q.  Okay.  And when you do that, the employee is perfectly free

17   to respond.

18   A.  Yes, sir.  They respond to me pretty freely.

19   Q.  I had a hunch they didn't refuse to answer you, but I just

20   wanted to clarify that for you.  I'd like to ask you, sir, a

21   little bit about access of employees -- specifically, employees

22   of the fire department -- to the city council and some testimony

23   that you provided under oath at your deposition.  And you agree

24   with me that you were deposed in this case and you took an oath,

25   and you agreed to tell the truth, correct?

1  A.  I was -- yes, sir, I do.  I was deposed two times.

2  Q.  Okay.  And to the best of your ability during the

3  depositions, you did tell the truth.

4  A.  Yes, sir.

5  Q.  Now, at the deposition -- excuse me.  This is page 83.  Sir,

6  this is a blow-up of some questions and answers from your

7  deposition beginning on page 83 in the transcript that I've

8  provided to you.  Have you been able to locate that page?

9  A.  I'm on that page, sir.

10 Q.  Okay.  Now, during your deposition in this case, you were

11 asked some questions with respect to access to the city

12 council.  And we have here on page 83 beginning at line two a

13 question and an answer with respect to that issue.  And the

14 question was:  Are there any circumstances under which a

15 firefighter working for the city can communicate with the mayor

16 of the city about issues that involve the city fire department?

17     And what was your answer, sir?

18 A.  Let me read right in front of it.  Let me read just a little

19 bit more.  Just a second, please.

20 Q.  Okay.

21 A.  Okay, sir.

22 Q.  Okay.

23 A.  Sir, to answer your question, my answer is:  Not to my

24 knowledge.

25     That, in itself, you would probably have -- need to go back

1    to refer to page 82.  I assumed by the -- by the type of

2    question that we were talking about a firefighter who is on

3    duty, is there any way that he can get straight to the council,

4    so to speak.  And my answer, not to my knowledge.

5    Q.  Okay.  So the question -- of course, it's on the blow-up

6    there in front of you -- was simply are there any circumstances

7    under which a firefighter working for the city can communicate.

8    And you understood that to mean, then, when they were on duty?

9    A.  From the prior question -- line of questioning that I was

10   asked.  And that is my answer.  Not to my knowledge.

11   Q.  Okay.  I guess, Mr. Roberts, then, implicit in your answer

12   and your explanation would be that there are different

13   limitations on a firefighter's ability to speak to the mayor

14   whether they're on duty or off duty, correct?

15   A.  Let -- let me -- can I put it in my own words, sir?

16   Q.  Well, if you could my question first to --

17   A.  Okay.  Anybody at any time can follow -- can talk with any

18   elected person so long as he's followed the predesignated rules

19   that sets forth on how the employee would get to that specific

20   person.

21   Q.  Okay.  I just want to make sure that I've got this correct

22   for you.  When we asked the question, are there any

23   circumstances, you were thinking just on duty, correct?

24   A.  At that time, yes, sir.

25   Q.  And you drew a distinction whether the employee is on duty

1    or off duty, apparently, in your thinking of that question.  Is
2    that fair?
3    A.   That is a fair assumption.
4    Q.   Okay.  And you were then asked the question:  Would your
5    answer be the same if I referred to city council members?  Are
6    there circumstances or situations under which a firefighter can
7    speak to a city council member about issues involving the city's
8    fire department?
9        Do you see that question?
10   A.   Yes, sir, I do.  And I --
11   Q.   Okay.  And your answer to that question?
12   A.   Yes, sir.  I'll be glad to answer it to you.
13   Q.   Could you read the answer to us, please?
14   A.   Oh, yes.  Do you want me to read it?  They can come to the
15   council through the proper procedures.  And I think that proper
16   procedure goes through his chain of command.  If we cannot
17   correct it, then if we feel -- ultimately, if I feel that it
18   needs to get to the council, then I will get it to them.
19   Q.   Okay.  As far as this answer, you weren't referring just to
20   someone who's on duty.  In this answer, you were referring to on
21   duty or off duty.  Is that fair?
22   A.   I was speaking of both.  I wanted to be sure that I cleared
23   my answer up in the first question, sir.
24   Q.   Okay.  So you were speaking to both.  And your answer is
25   that if you go through the chain of command and if you -- if

 1  you -- feel that it needs to get to the council, then you will

 2  bring it to them.  Is that --

 3  A.   If I --

 4  Q.   Excuse me, sir.  Was that your answer when you gave --

 5  A.   What you see on the board is my answer, sir.

 6  Q.   Okay.  Now, you were given another question.  We wanted to

 7  make sure we had something clear on this.  And the question:

 8  You, as the city manager, will raise concerns?  And that's an

 9  immediate response to your prior answer.  And your answer is:

10  Yes.  The bottom line, even on a work session of whatever comes

11  before the council for a work session, we control, whether it be

12  civilians coming in or whomever.  It's a very structured form of

13  government.

14      Do you remember giving that answer?

15  A.   I do.

16  Q.   Okay.  And at least at that time, your testimony was that

17  you, as city manager, will bring the concern or raise the

18  concern with the council.

19  A.   Sir, we will make arrangements for the -- whoever wants to

20  see the council to get there.

21  Q.   Okay.  I was going to go on to the next one, but before I

22  do --

23  A.   Okay.

24  Q.   -- you, as city manager, will raise the concerns.  Isn't

25  raising the concerns, you as city manager raising the concerns,

1   something different than merely making arrangements for someone

2   else to raise the concerns?

3   A.   Sure it is.   Could I expand on that, please?

4   Q.   Sure.

5   A.   When you see the word "raising concerns," you know, once you

6   get to the council, we have -- and it's pointed out there again,

7   structured.   On the work agenda, we have an agenda.   And there's

8   an application, and we have to meet the laws of the -- of the

9   Open Meeting Act of the State of Alabama, number one.   And it's

10  published in the paper, and then their concerns is listed for

11  what that particular person wants to talk to the council about,

12  whether it be a firefighter, police officer, or any public

13  person that wants to address the council.

14  Q.   Okay.   But if the individual is not just any public person,

15  if that individual is a firefighter, your testimony, whether on

16  duty or off duty, when it gets to the city manager level, if you

17  as city manager believe that the concern needs to go to the

18  council, then you will raise it with the council.

19  A.   Sir, I don't dictate whether he goes to the council.   I have

20  to arrange a meeting for him.   I will try to alleviate the

21  problem as I can, at my level, if possible.   If not, then it's

22  elevated on up.   If it's on a fire-related issue, then it has to

23  come up through the chain of command.   If that firefighter wants

24  to come and talk to the council about his garbage pickup, all he

25  has to do is get on the agenda.

1   Q.  Well, when you had your deposition and you heard the

2   questions and you gave the answers -- and as you pointed out,

3   these things have to be taken in context.  You weren't under the

4   misimpression that you were being asked whether Mr. Davis could

5   speak before the council over whether his trash pickup is on

6   Tuesdays or Wednesdays.  You understood the question, didn't

7   you, sir, to be a questions relating to issues concerning the

8   fire department?

9   A.  Work-related issues.  Yes, sir, I did.

10  Q.  Work-related.  Okay.  Now, I want to make sure that we have

11  a fair understanding of what you testified to.  And we want to

12  make sure that you had every opportunity at your deposition to

13  be clear, so you're asked once again:  Is a firefighter

14  permitted to -- after exhausting the chain of command on an

15  issue affecting the fire department, is that firefighter then

16  allowed to address the city council or city council members on

17  that issue?

18      And what was your answer, sir?

19  A.  My answer says:  Not by the merit system.  I don't think so,

20  sir.

21  Q.  And then you were asked:  So if a firefighter did that after

22  exhausting the chain of command, that firefighter would be

23  violating the merit system rules and regulations?

24      And your answer?

25  A.  I think he would be violating the intent of the merit system

1  rules and regulations.  I do.

2  Q.  Okay.  And then we asked whether he would be violating the

3  language in the merit system rules and regulations.

4  A.  I said:  I feel like that would be, yes.

5  Q.  Okay.  And when you gave this testimony at your deposition

6  that even after exhausting the chain of command a firefighter

7  would not, under the merit system, be allowed to speak to the

8  city council, you were, as you told us already, under oath and

9  telling the truth.

10  A.  That is correct, sir.  There was never any mention, sir, of

11  ASOP 12.  Strictly meant the merit system.

12  Q.  Well, that's interesting, sir.  So we asked a question.

13  Now, our question wasn't limited up here.  Is a firefighter

14  permitted to -- after exhausting the chain of command in the

15  fire department, is that firefighter then allowed to address the

16  city council or city council members on the issue?  And you

17  answered:  Not by the merit system.

18    Are you testifying today that that was only a partial

19  answer, that when you took your oath to tell the truth and the

20  whole truth, on this question you decided to say, well, not by

21  the merit system, but not volunteer that you think that there's

22  a different policy that allows for it?

23  A.  Sir, there's a policy that's under the merit system that he

24  could have followed, which is called a grievance procedure which

25  handles work-related activities.

534

1    Q.   Okay.   Now, in regard to the grievance procedure, I'm glad

2    you raised that issue for us.   In the black binder in front of

3    you, sir, we have a copy at tab three of the City of Phenix City

4    merit system rules and regulations.

5    A.   What's the page, please?

6    Q.   Tab number three.   And as you just explained, under the

7    merit system, you believe that there was a procedure to follow

8    for someone who would want to -- a firefighter who would want to

9    speak to the council, as set forth in the --

10   A.   I said to present a grievance, sir.

11   Q.   Well, again, I -- referring you back to this question, the

12   question wasn't limited to a grievance.   It wasn't limited to

13   the merit system.   It was a question seemingly that you

14   understood, because you answered it without seeking any

15   clarification on whether, after exhausting the chain of command

16   on an issue affecting the fire department, is that firefighter

17   then allowed to address the city council or city council members

18   on that issue.   And your answer was -- was no.

19   A.   Was no, not by the merit system.

20   Q.   So are you trying to tell me today that when you answered

21   that question no, not by the merit system, that that was -- you

22   were not telling the whole truth, that there's some other system

23   that allows --

24   A.   No, sir.

25   Q.   -- the firefighter to get to the city council?

1  A.   I was strictly speaking of the merit system.

2  Q.   Sir, the question is right there before you and you have the

3  deposition.   Will you show me in that question where it says

4  merit system?

5  A.   The question does not, and the answer does.

6  Q.   Your answer does.

7  A.   Yes.

8  Q.   Your oath, though, Mr. Roberts, was to tell the truth and

9  the whole truth.

10  A.   Sir, I told the truth about the merit system.

11  Q.   Okay.   But your testimony today is that although you

12  answered that question, no, not by the merit system, that you

13  were aware of some other system of getting to the city council?

14  A.   Yes, sir.   I have -- there's another way of getting there,

15  yes, sir.

16  Q.   Okay.

17  A.   But not by the merit system.

18  Q.   Okay.   Well, tell me this, sir.   When you were asked this

19  question under oath, "is a firefighter permitted -- after the

20  exhaustion of the chain of command on an issue, is that

21  firefighter allowed to go to the city council or city council

22  members," why didn't you tell us that there's another system

23  that would allow you to answer that question yes instead of

24  answering that question no?

25  A.   Sir, I don't have an answer for that.

1   Q.   Okay.  You made a reference to the grievance procedure as

2   being one of the mechanisms.  Is that -- is that fair?

3   A.   That's fair.

4   Q.   Okay.  And referring you back to Exhibit #3 -- and on mine,

5   it has page 59 at the bottom, Section 15.02, concerning

6   complaints and grievances.

7   A.   I'm at that section.

8   Q.   Okay.  And as city manager, of course, you're fully familiar

9   with the grievance procedure that governs the employees in

10  Phenix City, correct?

11  A.   I am.

12  Q.   And you have a role in that process, your --

13  A.   I do.

14  Q.   Okay.  Now, I just have a couple of questions for you on

15  that.  There's a procedure under 15.023.  Do you see that, sir?

16  A.   15.023?

17  Q.   Yes.  Procedure for Presentation of a Grievance?

18  A.   I do.

19  Q.   Okay.  And to the best of your knowledge, this procedure was

20  the law of Phenix City at the time that Mr. Davis raised his

21  concern with the mayor.

22  A.   This is the law that was in effect if he chose to follow a

23  grievance procedure.  Yes, sir.

24  Q.   Okay.  Well, correct me if I'm wrong, sir, but when we were

25  talking about avenues to get to the city council, you said,

1   well, there's other ways to do it.  And you said, you could go

2   through the grievance procedure.  Did I misunderstand you?

3   A.   No, you did not.

4   Q.   All right.  And this is grievance procedure 15.023, correct?

5   A.   That is correct.

6   Q.   Now, the grievance procedure has a series of steps to it,

7   right?

8   A.   It does.

9   Q.   And at each step, the supervisor who is involved at that

10  step is given a certain amount of time to respond to the

11  grievance, correct?

12  A.   That's correct.

13  Q.   And the phrase that's used throughout this in terms of the

14  amount of time is three workdays or three working days.  Do you

15  see that, sir?  One example would be on page 59, the very last

16  sentence under 15.023 A, where it says an answer shall be given

17  to the employee within three working days.

18  A.   Sir, mine is D.  Are you speaking of the -- which supervisor

19  are you speaking of?  One of them is three, which would be in

20  B.   Is that what you said, or D?  Did you say B as in bravo?

21  Q.   I said A as an Adam.  On page 59 --

22  A.   I'm on 59.

23  Q.   And do you see Section 15.023 is entitled Procedure For

24  Presentation of a Grievance?

25  A.   I've got that, yes.

1   Q.  Are we at the same spot?  And on subsection A, if you would

2   see the last complete sentence on that page says the supervisor,

3   if not department head status, may contact the department head

4   for advice and counseling.  Then it says and an answer shall be

5   given to the employee within three working days.  Do you see

6   where that is --

7   A.  That is correct.

8   Q.  Okay.  My question to you is just what does that phrase

9   "three working days" mean under -- under these rules?

10  A.  It gives the supervisor time to review the grievance and to

11  give the answer back to the employee within three working days.

12  Q.  Okay.  And what is the definition of working days, as it

13  appears in this procedure?

14  A.  Well, within a fire department, you're going -- you've hit

15  me quite hard there.  I guess it's three shifts.  That would be

16  probably, what, 24, 48, 72 hours, something like that.

17  Q.  So --

18  A.  They're working 24-hour shifts.

19  Q.  Okay.  So I guess I was going to say I understand that, but

20  I'm not sure that I do because as I understand it, at least the

21  rank-and-file employees work shifts that are 24 hours on and 48

22  hours off.

23  A.  That is correct.

24  Q.  Okay.  Now, so three working days, does that mean, you know,

25  if I work on Monday and I have Tuesday and Wednesday off and

1  work on Thursday, Thursday is only day two under this policy?

2  A.  Sir, we have different -- it's not a normal eight-hour

3  workday within a city government.  A fire department's workday

4  starts at 7:30 one morning and ends at 7:30 the next day.

5  That's -- that's one of their working days.  It's a 24-hour

6  day.  That's legal by fair labor standards.

7  Q.  Okay.

8  A.  We have a police department that I've got two different

9  shifts that they work.  Some of them may be working -- they're

10  paying them on a 12-hour shift.  Some of them may be working

11  four hour -- four ten-hour days.  It's their normal workday is

12  what the normal workday is.

13  Q.  Okay.  Now, just to make sure we have a common understanding

14  on that, today is Wednesday, March 5th, 2008.  If an employee

15  raised a grievance under 15.023 A and an employee's on-duty

16  workday is today, Wednesday, March 5th, when would the

17  supervisor be obligated to respond?

18  A.  He would have the three working days, sir, just like it

19  says, which would not be the next shift that he was working, but

20  it would have to be given to him the following shift, which

21  would be the third shift.  The third rotational shift, sir.

22         MR. STEELE:  Okay.  Permission to approach, Your Honor.

23         THE COURT:  You may.

24  Q.  Mr. Roberts, I've handed you a calendar for March 2008,

25  because I think that that might make this all a lot easier for

1    all of us.  If a grievance within the fire department is filed

2    by a firefighter who works 24-hour shifts and it's filed on

3    Wednesday, March 8th, 2008, what is your understanding as the

4    date that the supervisor is required to respond?

5    A.   You said Wednesday, March 8th.  It's Wednesday, the March

6    the 5th.  Is that correct?

7    Q.   My apology.  It's Wednesday, March 5th, 2008.

8    A.   If I know how to work their schedule, it's going to be

9    somewhere between the 11th and the 12th.  That's going to be

10   about as close as I can get to it.

11   Q.   Okay.  Well, for the sake of argument, let's say a response

12   is given on the 11th and the employee is dissatisfied with it,

13   so the employee raises it to the next level of supervision, as

14   provided for in 15.023 B.  Okay?  And there, that supervisor is

15   also allowed three working days to respond.  When would that

16   response be due?

17   A.   These same -- same figures.  You go on farther down the

18   line.

19   Q.   So are we saying that it would be due on or around March

20   17th?

21   A.   17th.

22   Q.   Okay.  And then the step C actually is the department head

23   level, correct?

24   A.   That's correct.

25   Q.   Okay.  And with department heads, they're allowed five

1  working days to respond.  Now, within the fire department, does

2  five working days mean 24-on/48-off shifts or is it just

3  Monday through Friday?  What separates --

4  A.  Sir, when it gets to the department head status and he's on

5  an eight-hour workday, he's got five days to get that back.

6  Q.  Okay.  And by five working days, does that mean --

7  A.  If he works Monday through Friday, he's going to have five

8  working days.  If it comes to him on Friday, then he gets four

9  days into the following week, sir.

10  Q.  Okay.  So if it came to him on the 17th, even if we don't

11  count the 17th, or counting it, all right, we would have the

12  21st of March as when the department head would have for a

13  response; is that correct?

14  A.  You said if you did not count the 17th.

15  Q.  Well, let me ask you --

16  A.  It would give him until the 24th at that time.

17  Q.  Let me ask you -- let me ask you this and back up again,

18  because I'm trying to get this right.  If the employee appeals

19  to the department head under paragraph C on March 17th, when

20  would the department head's answer or response be due?

21  A.  21 March.

22  Q.  21 March.  Okay.  And then from the department head, the

23  next level up is the city manager level, correct?

24  A.  That's correct.

25  Q.  And the city manager, you, sir, are also allowed five

1    working days to respond.  So if an employee received a response

2    from the department head on March the 21st and that same day

3    raised the issue to your level, when would your response be due?

4    A.   27 March.

5    Q.   27th of March?  So if I'm following you properly, under this

6    grievance procedure, if an employee were to file a grievance on

7    Wednesday, March 5th, and at each step the supervisor took the

8    full allotted time that he or she is entitled to take to respond

9    to the grievance, your response could come as late as March

10   27th?

11   A.   That's correct, sir.

12   Q.   Okay.  Now, in D -- this is the step that's at the city

13   manager level, correct?

14   A.   Yes, sir.

15   Q.   Okay.  After the sentence that provides you with -- as the

16   city manager, with five working days from receipt of the written

17   grievance from the employee to respond, the next sentence says

18   the decision of the city manager shall be final and the employee

19   shall have no further rights of administrative appeal; is that

20   correct?

21   A.   That is correct, sir.

22   Q.   So if an employee were to follow the grievance procedure as

23   set forth in this provision because the employee wished to speak

24   to the council and the city manager says no, according to this,

25   that's the final step.  It's not appealable.

1  A.   The final decision is final.   They can talk with whomever

2  they want to after that -- that point.

3  Q.   So if the issue that's coming up through the chain of

4  command is an employee is asking to speak to the city council

5  and your final decision is no, final and unappealable decision

6  is no, I don't think you should speak to the council on that

7  issue, that's your final decision, the employee is free to

8  disregard that and speak to whoever they wish?

9  A.   Let me try to straighten that out.   If he's coming up

10 through the chain of command on a fire-related issue, he's going

11 to use his ASOP 12.   If he's got a grievance, it's a totally

12 different procedure, sir.

13 Q.   Okay.   So you don't think the grievance procedure was really

14 applicable in the situation of Mr. Davis wishing to speak to the

15 mayor concerning the ordinance that -- or proposed ordinance

16 pending at the city council?

17 A.   That is a work-related issue.   It could have been viewed as

18 a grievance.   Yes, sir.

19 Q.   All right.   And had Mr. Davis gone through the grievance

20 process, it would have taken perhaps 22 days to get to the end

21 of that grievance process, give or take?

22 A.   That's possible, sir.

23 Q.   Okay.   And had he chosen that route and was dissatisfied

24 with the answer that you gave, you know, I don't think this is a

25 matter that should go to the city council -- for whatever

1    reason, that was your conclusion as city manager -- under this

2    policy, if he chose that procedure, it's over, right?

3    A.  Sir, the -- the grievance is over.  The decision is over.

4    He can carry it to whomever he wants after that.  It's perfectly

5    legal.

6    Q.  So it's your testimony, then -- I just want to make sure we

7    have this clear -- that if you, as city manager, issue a

8    decision to an employee that says, you know, Mr. Davis or

9    Mr. Smith, I am denying your request to speak to the city

10   council about such-and-such issue within the fire department --

11   if you issue that decision and specifically deny him that right

12   in your decision, then he's free to disregard your decision?

13   A.  Sir, if his specific request is to speak to the council or

14   if he's speaking about a particular item, if his specific

15   request is to speak to the council, sir, he's going to speak to

16   the council.

17   Q.  Even if -- even if you instruct him not to?

18   A.  Sir, I just told you my standpoint.  If I'm there and he

19   asked to speak to the council, that's my decision that he speaks

20   to the council right by the grievance procedure, sir.

21   Q.  So the employee gets up to your level and asks to speak to

22   the council, and you say that he'll get to speak to the council

23   because it's your decision.  Is that correct?

24   A.  Sir, if he specifically asked to speak to the council, then

25   he's going to speak to the council.  If he's speaking on a

1  grievance such as -- let's just say that he's not satisfied with

2  the turnout gear, for instance.  And if I make a decision that

3  that piece of turnout gear that we've got is what we're going to

4  use, then that decision is final.  But he can still talk with

5  anybody he wants to about it.

6  Q.  Okay.  Different scenario.  The question isn't turnout gear,

7  but the question is -- and the person starts with their

8  first-line supervisor and says, you know, Captain, I'd really

9  like to speak to the council about some issues relating to the

10 fire department.  And the captain says no.  And then it goes up

11 to the next level, and the employee is told no.  And it goes to

12 the fire department; and for some reason, Chief Hunter reviews

13 the situation and determines no, this isn't something that

14 should be aired before the council.  And then it's appealed to

15 you and we're at day 22, and you issue a decision that says, no,

16 this isn't something that should be aired before the council.

17 Is the employee completely free to disregard your -- your

18 decision?

19 A.  Sir, let me try to clarify that, if I may.  If he has gone

20 through his chain of command, he is following ASOP 12.  And if

21 he is specifically wanting to talk to the council, ASOP 12

22 states that I will get him there and he will be allowed to talk

23 to the council.

24 Q.  Now, ASOP 12 is part of, from your testimony, a

25 firefighter's chain of command, correct?

1    A.   Yes, sir.   ASOP 12 is a specific set of rules and guidelines

2    for a particular department.

3    Q.   Right.

4    A.   Each department has them.   Each of them are quite different.

5    Q.   And it requires an employee, if I understand your

6    interpretation of it, to exhaust the chain of command.   Is

7    that -- before talking.   Is that correct?

8    A.   Yes, sir.   Bring it up through the chain.

9    Q.   Okay.   So here I bring you back, sir, to your answers that

10   you provided during your deposition, whether a firefighter is

11   permitted -- after exhausting the chain of command on an issue

12   affecting the fire department, is he then allowed to address the

13   city council or city council members on that issue.

14       Not by the merit system.   I don't think so.   No, sir.

15   A.   That's exactly what I said.   I did not mention anything

16   about ASOP 12.   I mentioned about the merit system.   And that is

17   my answer.

18   Q.   Okay.   Does the question mention ASOP 12?

19   A.   No, sir.   Your question does not mention ASOP 12.

20   Q.   Was it your practice during the deposition when you were

21   given questions to only answer in part and not let the person

22   know?

23   A.   Sir, I answered the question the way I understood it from

24   the attorney presenting it.

25   Q.   You heard this question, and you thought it only applied to

1    the merit system?

2    A.   Sir --

3    Q.   Is that your testimony today?

4    A.   Excuse me.   I'll let you finish talking.

5    Q.   Right.   The question is, you heard that question during your

6    deposition.   And are you telling us today that you thought that

7    referred to only the merit system?

8    A.   Sir, that's exactly what my answer said.

9    Q.   Your answer says what it says.   My question is what you

10   understood the question to be.   Let me repeat so you know

11   exactly what I'm asking.   When you heard this question at your

12   deposition when you were under oath to tell the truth and the

13   whole truth, you thought that question was only asking you

14   whether the merit system allowed the employee --

15   A.   In my opinion, it was talking about the merit system.   Yes,

16   sir.

17   Q.   Did you ever tell Mr. Woodley during the deposition that you

18   were only talking about the merit system?

19   A.   I believe, sir, if you'll -- let me get -- get my full

20   deposition out, sir.

21   Q.   We could actually move on to another question if you want,

22   but I'll certainly give you the opportunity --

23          THE COURT:   Go ahead.

24   A.   Oh, go ahead.

25   Q.   Okay.   And this may clarify it for you.   This is from your

1  transcript again at page 85.  Well, just so the record is clear,

2  the firefighter pursues the chain of command on an issue

3  affecting the fire department and addresses the city council on

4  that same issue, then he would be subject to discipline,

5  including firing?  And your answer was:  He could be.  Yes.

6  A.  That is exactly what I answered, especially if it's going to

7  cause dissension amongst the fire department.

8  Q.  So you still retain the authority, if a firefighter goes

9  through the chain of command, to discipline him for speaking to

10 the city council.

11 A.  Sir, even a firefighter or anyone in city government has a

12 section of the merit system that applies, which is 2.054.  And

13 it fully tells them so they are fully aware of the free speech

14 and the -- what's spelled out, I think, within the

15 Constitution.  However, there is four items under there -- and I

16 do not remember them all by heart -- that can cause disharmony

17 or distrust within the workplace or loyalty, some of that thing

18 that can cause disruption or alarm, so to speak, within the

19 department that -- no, sir, that's -- that's not something that

20 we want to try to handle ourself.

21 Q.  Okay.  So this answer -- let me make sure I understand

22 this.  When you gave the answer "not by the merit system," you

23 really, you know, were suggesting, according to you, that

24 there's some other system of getting there.  Now, on this

25 answer, when you said he could be disciplined, you were only

1  referring to somebody who creates a big ruckus if they speak to

2  the council.

3  A.   Something that is not true or something that is -- brings

4  disharmony or disloyalty.  It's spelled in 2.054, sir.

5  Q.   So your testimony is even after exhausting the chain of

6  command, if you feel that the firefighter's opinion is something

7  that might cause disharmony or something that you think is not

8  true, he can still be disciplined for going to the city

9  council.  Is that --

10  A.   If we feel like it violates one of the four items, which

11  could result in insubordination, for instance.  Yes, sir.

12  Q.   Okay.  So the firefighter goes through the chain of command

13  and wants to get to the council, exhausted every step up through

14  and including you, follows ASOP 12, they go to the council on

15  their own risk of being disciplined.

16  A.   Sir, if they go up there and tell a lie, for instance,

17  certainly they can be disciplined for it.

18  Q.   What if they go to the council and say, you know, Mr. Mayor

19  and city councilors, you've got a proposal before you, and I've

20  got some concerns about it?

21  A.   That would be entirely legal, and there would be nothing

22  done to the employee.

23  Q.   Okay.  And for some reason, sir, you just didn't think

24  that -- when we asked you about these questions during your

25  deposition, you just didn't think that was important enough to

1  tell us?

2  A.  Sir, the question is vague.  And my answer says it could

3  be.  And I believe that's just what I tried to explain, I hope.

4      MR. STEELE:  It could be.  Yes, it could be.  Thank

5  you.

6      THE COURT:  Is that all, Mr. Steele?

7      MR. STEELE:  Yes, Your Honor.

8      THE COURT:  All right.  Mr. McKoon?

9                    CROSS-EXAMINATION

10 BY MR. MCKOON:

11 Q.  Since we're at that spot, Mr. Roberts, let me get a couple

12 things over here.  And I'm not going to spend a lot of time on

13 this.  I'm going to try to cover it just as quickly as

14 possible.  Go back up to page 81 of your deposition.  Let's take

15 this, put it back up there.  Page 81 is what preceded page 83,

16 and then they've skipped down here to 84 and 85 and so on.  And

17 what I want to do is I want to start right up there with

18 question number nine that Mr. Woodley asked you at the time.

19 I'm starting up above where this is.

20    It says:  You'll notice Chief Hunter in your memo to you is

21 expressing concerns or actually criticizing Mayor Hardin.

22 You'll see that at the bottom of the first page of the memo

23 where he said, quote, Mayor Hardin should refer any employee

24 violating the chain of command as indicated in our merit system

25 back to the department head, personnel department, or city

1  manager.  Failing to do so is a violation of our city charter,

2  end quote.  See where it says that?

3      Now, Mr. Woodley is reading from a document prepared by

4  Mr. Hunter; is that correct?

5  A.  That's correct.

6          THE COURT:  State your objection.

7          MR. STEELE:  Objection.  Beyond the scope of direct.

8          THE COURT:  I think it's leading up to what he was

9  questioned about.  I'll overrule.

10 Q.  And what was your answer?

11 A.  My answer was:  I do.

12 Q.  And do you agree with the -- with that assessment by Chief

13 Hunter concerning the activities and position of the mayor?

14     And what was your answer?

15         MR. STEELE:  Objection.  Relevancy.

16         THE COURT:  Overruled.

17 A.  I feel like the mayor should instruct the firefighter or

18 union president, if it is concerning something to do with any

19 business, to contact me since I was the designated

20 representative for the International Association of Firefighters

21 to contact on city business, which would have -- to me, would

22 have violated the merit system anyway, if he was a firefighter

23 calling.  So yes, there was a definite merit system violation.

24 Q.  And his next question was:  Do you think the mayor violated

25 the merit system rules and regulations?

1      And what was your answer?

2   A.   No.  I'm saying Mr. Davis did.  The mayor is not covered by

3   the merit system.

4   Q.   All right.  So all of those questions that preceded these

5   questions in regard to what you-all were talking about was the

6   merit system; is that correct?

7   A.   Mr. McKoon, that's what I tried to say.

8   Q.   All right.

9   A.   Yes, sir.

10  Q.   And so when -- when you got to this -- this answer about

11  merit system rules and regulations, you said I felt like they

12  would be, yes.  Is that correct?

13  A.   That's correct.

14  Q.   Now, going to page 85 -- and again, he just asked you about

15  this question:  Well, just so the record is clear, the

16  firefighter pursues the chain of command on an issue affecting

17  the fire department and addresses the city council on that same

18  issue, then would he be subject to discipline, including

19  firing?  And you said:  He could be, yes.

20      Is that right?

21  A.   That's correct.

22  Q.   For instance, if a firefighter, after pursuing the chain of

23  command, went before the city council and said something that

24  was untrue and inflammatory, that caused problems or was meant

25  to cause problems within the department, could he be disciplined

 1  for that?

 2  A.  Yes, sir, he could.

 3  Q.  Okay.  And is -- I mean there's no -- well, that's fine.

 4  You've answered it.

 5     Now, what I'd like for you to do now -- is there a white

 6  exhibit book up there, Mr. --

 7  A.  Yes, sir.

 8  Q.  Thank you.  If you would, just go to Exhibit #1.  Mr. Steele

 9  had asked you a series of questions about how long it might take

10  Mr. Davis, in particular, to follow a grievance procedure if he

11  had chosen the grievance route as opposed to ASOP 12.  Do you

12  remember that series of questions just a minute ago?

13  A.  I do.

14  Q.  All right.  Would you identify for the jury what this

15  Exhibit #1 is?

16  A.  This is a letter from Mr. Thomas Malone, Field

17  Representative, International Association of Firefighters.  It's

18  a letter that I sent to Mr. Malone.

19  Q.  How did that letter come about?

20  A.  I had received a letter from the union concerning the --

21  what they felt was their concerns in a meeting they had had with

22  Chief Prater.  And then I talked with the council, and we

23  decided that this was -- that any future -- any future

24  International Association of Firefighters Association business

25  would come through the city manager.

1  Q.  All right.  And so did you send this letter to Mr. Malone to

2  let him know that if there was a union member or an official of

3  the union that wanted to talk about any -- any union business,

4  they -- the person -- the contact person was you?

5  A.  That's exactly what the city council saw fit for us to do,

6  and that's exactly what we did.

7  Q.  And so if Mr. Davis wanted to come to somebody about union

8  business and he was the president of the union, you were the

9  person.

10  A.  That's correct.

11  Q.  And unlike any other firefighter, he could have actually --

12  instead of following either the grievance procedure or ASOP 12,

13  he could have come directly to you; is that correct?

14  A.  Yes, sir.

15  Q.  All right.  Did he do that?

16  A.  No, sir.

17  Q.  Did he follow ASOP 12?

18  A.  No, sir.

19  Q.  And did he file a grievance procedure?

20  A.  No, sir.

21  Q.  All right.  Let's talk a little bit about the ordinance

22  process.  When a department head makes a proposal or a series of

23  department heads get together and make a proposal that they want

24  passed to amend the merit system or any other thing affecting

25  their particular department at the city of Phenix City, what

1  happens as far as -- how does that come about?  Can you explain

2  that process to the jury?

3  A.  For an ordinance to come before the council, the usual

4  procedure is the department heads, whether it be one or a series

5  of department heads or if there may be a change in a zoning

6  ordinance as well with the board of zoning, adjustments, and

7  appeals, the ordinance would be drawn up, given to the city

8  clerk.  The city clerk will then put it on the agenda, which is

9  published in the paper, and will put it on the work session for

10  explanations and -- or input from the department that edited or

11  put the ordinance together or questions that the council may

12  have.

13      Then the following Tuesday or the next day it is put on

14  first reading.  Then it's published again in the paper.  Two

15  weeks, we'll have another meeting.  The work session -- again,

16  by agenda that's listed in the paper, it will be discussed at

17  the work session.  It will be told to the council, this will be

18  the second reading.  The ordinance itself will not be read in

19  its entirety at the second meeting like it is the first

20  meeting.  And then the council will vote on it and put a date on

21  when that particular ordinance would become a city ordinance.

22  Q.  An ordinance of this particular kind, the one that we're

23  talking about here and they've been talking about for three days

24  where we're going to make a change in the merit system rules in

25  regard to a probationary period, is this something that's

1  formulated by the department heads?

2  A.  This -- this particular ordinance was formulated by three

3  department heads.  The reason for its drafting was the extended

4  time not only as it related to firefighters.  Our code

5  enforcement officers go through the Alabama Law Enforcement

6  Training Act and are sworn officers as well, plus they have an

7  extended time to -- where they have to have some technical

8  certifications as well in order for them to maintain their job.

9  With a police officer, the basic training again, along with the

10 code enforcement; that was extended by APOST, Alabama standards

11 that, you know, qualifies your police officers.

12      In order to put a firefighter, a police officer, or a code

13 enforcement officer on the street and have him working and know

14 that he's going to produce, then one year is not a length of

15 time.  And once they're put on the street, for instance, you

16 really don't get to be a -- a -- what I would call a journeyman

17 police officer, firefighter, code enforcement officer.  You've

18 still got another three to four years of good OJT that you're

19 going to get on the job.

20 Q.  Let me stop you for a minute about that and just ask you

21 this.  If those people, the police chief, the head of code

22 enforcement, and the fire chief, Chief Hunter, brought that

23 ordinance to the council, does the council pretty much rely on

24 your input and their input in determining whether or not to pass

25 an ordinance of that kind?

1        MR. STEELE:  Objection.  Relevancy.

2        THE COURT:  Yes.  I sustain.

3        MR. MCKOON:  Okay.

4   Q.  At any time when an ordinance comes before the council, can

5   it be tabled?

6   A.  Certainly.  We have them tabled all the time, sir.

7   Q.  All right.  And this business about the grievance procedure

8   taking so long, that's the maximum amount of time the procedure

9   can take.  Am I right?

10  A.  Yes, sir.  There again, those time frames are within the

11  time that shift is working.  Usually when there's a grievance,

12  it's going to be expedited.  They're not going to -- they're

13  going to get the paper in and get it back out and get due

14  process.

15  Q.  All right.  Did this particular episode with Mr. Davis cause

16  any -- any problems?  And specifically, in regard to the mayor

17  and the fire chief.

18  A.  Yes, sir, it did.

19  Q.  Would you look in your book there and turn to Exhibit #16?

20  Your -- the white exhibit book.  Is this a memo that you

21  received from Chief Hunter?

22  A.  It is.

23  Q.  And just reading through the memo, I'm going to go down to

24  the last part of it.  Let's just go to the next -- the last

25  sentence there on the first page where it says, this continued

1  disrespect of the city's policies and procedures from Sergeant

2  Davis has made it very difficult for me to expect other members

3  of the fire department or the city to adhere to any policies and

4  procedures if he's allowed to continue any further with this

5  type of behavior.

6      And then he goes on to say, I also feel very strongly that

7  someone should speak with Mayor Hardin about this sensitive

8  issue of interfering with the job that department heads are

9  trying to do to keep their departments running smoothly and

10 effectively.

11     Did you talk with the mayor about this?

12 A.  The mayor and I had some conversations about this, yes.

13 Q.  And was that a happy conversation?

14 A.  No, sir.

15 Q.  What was the result of that conversation?

16 A.  Basically, the mayor and the fire chief went for a number

17 of -- number of weeks without speaking.

18 Q.  What about -- what about you and the mayor?

19 A.  It caused some turmoil with us as well.

20 Q.  The city government of Phenix City, as I understand it, is

21 structured so that you run the day-to-day operation; is that

22 correct?

23 A.  That's -- that's correct.

24 Q.  And from time to time -- and let me ask you this.  Why is

25 that?  Why have -- if you know, why is the charter structured in

```
 1  such a way that there's a strong city manager and a
 2  mayor/council off to the side?
 3          MR. STEELE:  Objection.  Relevancy, and beyond the
 4  scope of direct.
 5          THE COURT:  Yes.  I sustain.
 6          MR. MCKOON:  Okay.
 7  Q.  Oh, I almost forgot.  You -- going back to Mr. Taylorson
 8  just very briefly, turn to page 47 of your deposition.  By the
 9  way, how long have you been in the National Guard?
10  A.  I'm retired.  I was in 41 years and eight months.
11  Q.  When did you get out?
12  A.  This coming June I'll be -- will be two years.
13  Q.  When this conversation took place with Mr. Taylorson, was he
14  still -- was he a captain then or a sergeant then, or do you
15  know?
16  A.  With the fire department?
17  Q.  Yeah.  With the fire department.
18  A.  I would assume to have been a -- he was a sergeant then.  He
19  was a driver engineer.
20  Q.  All right.  If you would, just go to page 47, line ten, and
21  we want to get your full answer there.  My question was:  When
22  you say not in the manner, why?  What do you mean by that?
23      And what was your answer?
24  A.  I investigate his concerns (sic).  I asked him how things
25  were going in the fire department.  I think when you do that,
```

1  you open the door.

2  Q.  All right.  So what you were being asked is whether or not

3  he had violated the merit system by talking to you; is that

4  right?

5  A.  That's exactly right.

6  Q.  And what you said was I instigated the conversation.  I

7  asked him not just how things were going, but you asked him how

8  things were going at the fire department; isn't that right?

9  A.  That's correct.

10  Q.  All right.  And like you said, that's not unusual for you to

11  do, is it?

12  A.  No, sir.  It's done on a daily basis.

13  Q.  I believe you've also served as a deputy sheriff previously.

14  A.  I have.

15  Q.  And are you still certified as a law enforcement officer?

16  A.  I am.

17  Q.  Are you familiar, then, with the chain of command?

18  A.  Yes, sir.

19  Q.  And why -- why is that important in a paramilitary

20  organization, such as a fire department or a police department?

21        MR. STEELE:  Your Honor, I would object to the question

22  from the standpoint of trying to equate the chain of command

23  within the fire department to the city manager's experience with

24  the National Guard.

25        THE COURT:  Yes.  I sustain.  Limit it to the activity

1  on the fire department.

2        MR. MCKOON:  Okay.

3  Q.  Do you know why it's important -- the chain of command is

4  important in a fire department?

5  A.  A chain of command is important to instill discipline.  It

6  will also provide you a smooth flow of information, whether it

7  be from the bottom up or from the top down.  It will ensure that

8  the individual, whether it be a -- the lowest ranking member or

9  the highest ranking member, has a -- a knowledge of what's going

10 on, whether it be mission-oriented or training-oriented or just

11 general procedures of what you have to do within a given

12 environment.

13 Q.  Just one last question, I guess, for now.  And that is how

14 long have you worked for the City of Phenix City?

15 A.  Thirty-five years.

16 Q.  And you started out as what?

17 A.  An electrical inspector.

18        MR. MCKOON:  That's all.

19        THE COURT:  Any redirect?

20        MR. STEELE:  Yes, Your Honor.

21                   REDIRECT EXAMINATION

22 BY MR. STEELE:

23 Q.  Mr. Roberts, I'm going to promise this is the last time I'm

24 going to hold up this page 83 and 84 to you; but I think that

25 when we read it last time, that I skipped over one of your

1   answers.  And I want to make sure that we've got that complete.

2   In reference to the question of whether a firefighter, after

3   exhausting the chain of command, would be violating the merit

4   system rules and regulations, your answer here is that it would

5   be violating both the language and the spirit of the rules and

6   regulations; is that correct?  And this is on page 83.  I know

7   you have it in front of you.  I don't mean to make you answer

8   until you look at it.

9   A.   Okay.

10  Q.   And if you could see your answer at page 84, line 11.

11  A.   Yes, sir.  I see my answer.  It's just as it says there.

12  Not by the merit system.  I do not think so.  I don't think so.

13  No, sir.

14  Q.   Asking, actually, here to look at these questions and

15  answers where you were asked if a firefighter, after exhausting

16  the chain, would be violating the merit system rules and

17  regulations.  And you said:  I think it would be violating the

18  intent of the merit system rules and regulations.  And then to

19  narrow -- to make sure we covered the bases so we didn't leave

20  anything out for you, it said:  Would he be violating the

21  language of the merit system rules and regulations?  And your

22  answer is:  I feel like they would be, yes.

23       Do you see that?

24  A.   Yes, sir, I do.

25  Q.   In answering either of these questions, did you really --

1    did you ever say it could be, but maybe not?

2    A.  I never said that in that deposition, no.

3    Q.  Now, with respect to the ordinance proposal process, you,

4    sir, as you sit here today, have no personal knowledge that

5    Mr. Davis ever saw the actual proposed ordinance that we've been

6    talking about these past several days on the probationary

7    period.  You, sir, have no personal knowledge that Mr. Davis

8    ever saw that ordinance prior to the 16th of April in 2006; is

9    that correct?

10   A.  Sir, I don't have any personal knowledge of what he saw and

11   what he didn't see.  I know the ordinance was published.

12   Q.  Your answer is you don't have personal knowledge of what he

13   saw and when he saw it?

14   A.  I do not.

15   Q.  It's not the practice of the city if there's an ordinance

16   that affects, say, the fire department and the police department

17   to send copies of the proposed ordinance to all of the

18   firefighters and police officers, correct?

19   A.  No, sir.  That's not a policy.

20   Q.  Okay.  Now, you indicated in response to one of Mr. McKoon's

21   questions on, you know, whether it was possible that a proposed

22   ordinance before the city council could get tabled.  Do you

23   remember that question?

24   A.  I do.

25   Q.  And you said yes, things get tabled all the time, correct?

1  A.   Yes.

2  Q.   As city manager of the City of Phenix City, you, sir, have

3  no authority to table a measure before the city council; isn't

4  that correct?

5  A.   No, sir.   But I've asked for measures to be tabled before,

6  and they have been.

7  Q.   Because the city council chose to, correct?

8  A.   It's entirely their option, sir.

9  Q.   It's entirely their option.   Thank you.

10     Now, you know, Mr. Davis has been accused of a lot of

11  things, but I have to say this is pretty interesting what you

12  said in response to Mr. McKoon's questions.   Chief Hunter felt

13  to take it upon himself in a letter to chastise the mayor

14  because the chief felt that he had a better understanding of the

15  merit system rules than the mayor does.   And somehow you're

16  sitting up here today and saying that's Mr. Davis's fault.

17  Mr. Davis didn't chastise the mayor as violating the merit

18  system rules.

19          MR. MCKOON:   Judge, objection.

20          THE COURT:   Is that a question?

21          MR. MCKOON:   I don't understand that question or

22  whatever it was, statement.

23          THE COURT:   Yes.   I sustain.

24  Q.   All right.   Well, turn, if you would, to Exhibit #16 that

25  you testified about.   Are you with me, sir?

1   A.   I'm with you.

2   Q.   Okay.  And Exhibit #16 was a memo to you as city manager

3   from Chief Hunter on April 20th, 2006.  Do you see that?

4   A.   I do.

5   Q.   And in response to questions by Mr. McKoon as to whether

6   Mr. Davis's phone call created harm somehow, you explained as an

7   example that, gee, you know, the chief and the mayor didn't

8   speak for how long?

9   A.   Several weeks.

10  Q.   For several weeks, the chief and the mayor didn't speak.

11  And what I'm suggesting to you, sir, is you may be able to

12  accuse Mr. Davis of some things.  Mr. Davis didn't draft this

13  document, did he, sir?

14  A.   No, sir, but --

15  Q.   Mr. Davis did not take it upon himself to chastise the

16  mayor, did he, sir?

17  A.   No, sir.

18  Q.   And the conflict between the mayor and the chief is because

19  they had -- the mayor did not appreciate the chief's

20  chastisement in his letter to you.  Is that fair, sir?

21  A.   No, sir, that's not fair.

22  Q.   Well, what was the problem between --

23  A.   The item that came that caused this was failure to follow

24  the chain of command that broke discipline within that fire

25  department.

1  Q.  So your testimony wasn't that there was a problem between

2  the two of them because Chief Hunter pointed out that he thought

3  the mayor had violated the merit system rules?

4  A.  Sir, the foundation of that problem is what I have just

5  stated, where someone failed to follow the proper procedure.

6  Q.  I see.  So if Mr. Davis chose -- if Mr. Davis violated a

7  proper procedure but never once chastised the mayor or the fire

8  chief, for that matter, and for some reason the fire chief

9  thinks that the mayor did something wrong and the fire chief

10 chastises the mayor, even though he's above even you, somehow

11 that's still Mr. Davis's fault?

12 A.  Sir, as I said, the foundation was set.  And that's the

13 reason for the letter.

14 Q.  Now, one more question for you.  This is, again, in the

15 white notebook.  You were asked about Exhibit #1.  And Exhibit

16 #1 is this letter from you to Mr. Malone concerning contacts

17 between union officials and the city, correct?

18 A.  That's correct.

19 Q.  Now, you didn't send this letter to Mr. Davis, did you?

20 A.  No, sir.

21 Q.  And you addressed it to Mr. Malone.  And if you look at the

22 bottom of the letter, there's a bunch of names or indications

23 after the cc, which I take it means copy was sent to, correct?

24 A.  That's exactly what it means, sir.

25 Q.  So you sent a copy to the city council, a copy to the city

 1  attorney, a copy to the fire chief at the time, to personnel,

 2  and to file; is that correct?

 3  A.  Yes, sir.

 4  Q.  You didn't send a copy to Mr. Davis, did you?

 5  A.  No, sir, I didn't send a copy to Mr. Davis.

 6  Q.  And in fact, as you sit here today, you have no personal

 7  knowledge of whether Mr. Davis ever saw or knew of this letter

 8  prior to his termination, do you?

 9  A.  No, sir.  I don't have any personal knowledge.  But I know

10  if a good representative is there, he's going to put that

11  back -- write that down to the union member.

12  Q.  You have no personal knowledge, correct?

13  A.  No personal knowledge.

14          MR. STEELE:  Thank you.

15          MR. MCKOON:  Judge, I don't have anything else.

16          THE COURT:  Is that all?

17          MR. MCKOON:  Thank you.

18          THE COURT:  You can come down, Mr. Roberts.

19          THE WITNESS:  Thank you.

20          THE COURT:  Next witness?

21          MR. BROWN:  Your Honor, we would like to call

22  Ms. Audrey Thomasson.  She is visually impaired and will need

23  someone to sort of help her navigate.

24     (Brief pause)

25          THE CLERK:  Would you raise your right hand, please.

```
 1      (The witness is sworn)

 2           THE CLERK:  You may be seated.

 3           AUDREY THOMASSON, the witness, having been duly sworn,

 4  testified, as follows:

 5                         DIRECT EXAMINATION

 6  BY MR. BROWN:

 7  Q.  Good afternoon, Ms. Thomasson.  Would you please state your

 8  legal name for the record, please?

 9  A.  Audrey Thomasson.

10  Q.  And where do you reside, Ms. Thomasson?

11  A.  4404 Linda Drive, Phenix City, Alabama.

12  Q.  How long have you lived there, Ms. Thomasson?

13  A.  Thirty-one years this month.

14  Q.  And what's your occupation, please, ma'am?

15  A.  I retired from Members Alliance Federal Credit Union with 35

16  years in April 21st of 2006.

17  Q.  And do you have children?

18  A.  I have two children, one boy and one girl.

19  Q.  And do you have any grandchildren?

20  A.  I have four grandchildren.

21  Q.  Okay.  And is one of those grandchildren here in the

22  courtroom today?

23  A.  Yes, sir.  David Davis.

24  Q.  Okay.  Just wanted to establish for the jury who you were,

25  please, ma'am.  Would you please describe for me, Ms. Davis
```

1  (sic), how you would characterize your relationship with your

2  grandson?

3  A.  We have always been extremely close.  In fact, I brought him

4  home from the hospital with his mother, as his dad was on duty

5  at Fort Benning, and he's always lived close by.  And we've

6  always had an extremely close relationship, not only as my

7  grandson and I'm his grandmother, but we're just good friends.

8  Q.  How often do you normally talk with him?

9  A.  We talk on the phone two to three times a week.  We often

10  get to see each other weekly and sometimes every two weeks or

11  so, due to his schedule.

12  Q.  And for how long have you enjoyed a relationship of that

13  nature with your grandson?

14  A.  All his life.

15  Q.  How would you have described his way of approaching life and

16  activities prior to his being terminated at the fire department?

17  A.  David was so excited.  His whole dream was to be a fireman

18  in Phenix City where he had grew up.  And that was his

19  hometown.  And he has such a zest for life, for his job.  His

20  dream was to be a fireman; and he worked very, very hard to

21  educate himself to become a fireman.

22      Once he became a fireman, he further went on to work very,

23  very hard to further his education.  At 21 years old, his dad

24  walked out and left him.  He worked very, very hard from there

25  on as he wanted to not only get an education to be a fireman, he

1  wanted to further his education.  Because he knew that in order

2  to be the very best fireman that he could be and do the very

3  best that he could be on his job, he knew that education was

4  very, very important.

5       And he -- when he got to work at the fire department, David

6  had a very deep dedication and such pride in his job, because he

7  was raised by his mom to -- to stand on his own two feet, to be

8  independent, do his very best at anything that he did and stand

9  for what he believed in.  And he -- I always felt to be such a

10  young man, he did very, very well.

11  Q.  And how did you learn of the plaintiff's termination from

12  the fire department?

13  A.  He was fired on the same day of April the 21st, 2006, the

14  same day I retired from my job.  And I had gone out of town to

15  be with my sister and brother in Dothan, Alabama, and to

16  celebrate my retirement, because I was pretty excited about it.

17  And I come home on a Sunday afternoon, and I called David, as I

18  always did, all the family, to let them know that I was home

19  safely.  And in talking with David, I told him granny was home

20  safe.  And then I said, how are you, darling?  And he said,

21  Granny, I'm not so good.  He said they called me in today, and

22  they have fired me.  And we didn't talk much further, because I

23  could tell that David was emotionally -- very emotionally upset

24  at that time.  So we didn't discuss a lot at that time.

25  Q.  And have you observed any changes in his behavior, his way

1  of living, since his termination?

2  A.  Yes, sir.  The glow, the joy, and the light of him was

3  just -- had just gone out.  He was very depressed.  He was

4  emotionally distressed, and to the point that when the family

5  got together, David just wasn't the joyous person.  He was very,

6  very quiet.  Sometimes he would just be so irritable, depressed

7  that not only did he suffer of what he had gone through, but the

8  whole family, we were just really disturbed and depressed also.

9  But I saw such a change in him.

10     And in discussing and talking with David on occasions, he

11  would often say, well, Granny, it doesn't matter anymore.

12  Nothing matters.  They have took away my dream, the dream that I

13  dreamed of being a fireman in Phenix City where I grew up, and

14  that I wanted to be the very best fireman I could be.  And in me

15  knowing and watching over the years how he had worked so hard, I

16  could really relate to him being so discouraged and so

17  disappointed.  And we would be riding around in Phenix City, and

18  he would see the fire trucks or maybe the fire hydrants that

19  many times he had had to paint, and he would make a comment that

20  how sad it made him feel.

21     When he began working with the Care Ambulance Service -- and

22  we were thankful that he found a job, because he needed a job to

23  pay his bills, as we all do.  And each time that he would go on

24  a call when they have a 911 call and he would go out on a call,

25  the ambulance would be there as well as the fire department.

1   And he'd often tell me, Granny, it just hurts me so bad to see

2   the fire truck there and I can't be with them and can't be on

3   the fire truck.  All I have ever wanted was just to be a fireman

4   here in Phenix City.  He's always said that, and he says that

5   till this very day that that's all he really wants to do is be

6   the best fireman Phenix City has ever had, that the citizens

7   could be proud of him because he would give them his very best.

8       And I believe in my heart that David does his very best on

9   the job that he's on now because he's that type of a person.

10  Every job that David's ever had, other than the problem he's had

11  with Phenix City Fire Department, he has always had people that

12  said high -- good comments about him.  They did not want him to

13  leave.  And I feel like that, as I say, he's done his best, but

14  he's lost the pride that he once had.  There's just -- there's

15  something missing there.  He's just not the same.  And it's

16  really brought him down, and it's brought the family down in

17  general.  It really has.

18          MR. BROWN:  Thank you.  I have no further questions.

19          THE COURT:  Mr. McKoon?

20          MR. MCKOON:  I don't have anything for this witness,

21  Your Honor.  Thank you.

22          THE COURT:  All right.  Ms. Thomasson, you may come

23  down.

24          THE WITNESS:  Thank you, sir.

25          THE COURT:  Let's take a short recess at this time

1   before we go.  We're going to take ten minutes.  And members of

2   the jury, be ready to come back in and start the trial back at

3   ten minutes till three.

4          Let me see lead counsel up here just a minute.

5      (Bench conference held off the record)

6      (Recess at 2:41 p.m. until 2:52 p.m., at which time

7       proceedings reconvened with the jury present, as follows:)

8          THE CLERK:  Court is in session.  You may be seated.

9          THE COURT:  Mr. Steele, call your next witness.

10         MR. STEELE:  We call Brenda Davis, Your Honor.

11         THE CLERK:  Would you raise your right hand.

12     (The witness is sworn)

13         THE CLERK:  Be seated.

14         **BRENDA DAVIS**, the witness, having been duly sworn,

15   testified, as follows:

16                        DIRECT EXAMINATION

17   BY MR. STEELE:

18   Q.  Good afternoon.

19   A.  Good afternoon.

20   Q.  Will you please state your name for the record.

21   A.  I'm Brenda Davis.

22   Q.  And you are Mr. Davis's wife, correct?

23   A.  Correct.

24   Q.  Would you just tell the jury how long you've known

25   Mr. Davis?

1  A.  Almost eight years.

2  Q.  And how long have you been married?

3  A.  About four and a half years.

4  Q.  I understand you have dogs.  We heard that earlier.

5  A.  Yeah.  Those are our children.

6  Q.  You got points from me for that one.  I'm going to ask you a

7  couple of questions about your observations of your husband

8  relating to his employment and loss of employment with Phenix

9  City.  And from your perspective as Mr. Davis's wife, can you

10  tell us your observations of what his job with Phenix City meant

11  to him?

12  A.  His job with Phenix City Fire Department as a firefighter

13  meant everything to him.  He was very dedicated.  He never

14  missed work.  He loved going to work.  He would go to work early

15  because he liked it so much.  He never called out sick.  He was

16  never late.  He went to every class.  Any opportunity he had to

17  improve hisself with the fire department, any class, anything,

18  he always went.  It just meant the world to him.

19  Q.  And please tell the jury your observations as to how the

20  loss of that job and the circumstances affected your husband.

21  A.  Well, for one thing, it was a surprise to him.  It took him

22  by a very big surprise.  He wasn't expecting it at all because,

23  you know, he was such a good employee.  He -- since he was

24  fired, from that time forward, I've noticed him decline.  His --

25  he's been depressed.  Can't sleep.  He doesn't get any enjoyment

 1   out of life anymore.  And our marriage has suffered.

 2          MR. STEELE:  I know this is difficult.  Actually, no

 3   further questions.

 4          THE COURT:  Any cross-examination?

 5          MR. MCKOON:  Just a few.

 6                        CROSS-EXAMINATION

 7   BY MR. MCKOON:

 8   Q.  Ms. Davis, just during the time that your husband was with

 9   the fire department, particularly calling your attention to the

10   year 2005 and early 2006, were you aware that he had some other

11   disciplinary actions taken against him prior to the time he was

12   terminated?

13          MR. STEELE:  Objection.  Beyond the scope, Your Honor.

14          THE COURT:  I think it's in response to one of her

15   answers.  Overruled.

16   A.  Was I aware of him being --

17   Q.  Disciplined for any other thing before he was fired from the

18   police -- I mean from the fire department.

19   A.  I remember a couple of times that he was -- he had said that

20   he had been written up.

21   Q.  Do you know what those involved?

22   A.  No, sir.  I don't recall.

23   Q.  Do you know how long ago that was before he was actually

24   terminated?

25   A.  No, sir.  I don't recall.

1  Q.  When he -- well, did he discuss those with you in any

2  detail?

3  A.  No, he did not.

4  Q.  So he just said I've been written up, and that was it?

5  A.  To that fact that he was written up and he -- you know, of

6  course, he didn't --

7  Q.  He didn't think it was justified, did he?

8  A.  Exactly.

9  Q.  And what do you do?

10  A.  I'm a registered nurse.

11  Q.  And where do you work?

12  A.  I'm at East Alabama Medical Center.

13  Q.  What -- what type of nursing do you do?

14  A.  I work in ICU.

15  Q.  Is all you know about David's life on the job what he would

16  have told you?

17  A.  Yes, sir.

18          MR. MCKOON:  That's all I have.

19          THE COURT:  Mr. Steele?

20                      REDIRECT EXAMINATION

21  BY MR. STEELE:

22  Q.  Ms. Davis, in addition to anything that your husband may

23  have told you about his life on the job, as his wife, weren't

24  you in a position to observe personally how his job and his loss

25  of that job affected him?

1           MR. MCKOON:  That's been -- that's been asked and

2  answered.

3           MR. STEELE:  It's in response to your --

4           THE COURT:  I'll allow the question in response to the

5  examination.

6           Go ahead.  You can answer.

7  A.  Yes.

8  Q.  So the testimony that you gave isn't just based upon what

9  David has told you, but it's based upon your --

10 A.  What I've seen him go through.  Yes.

11          MR. STEELE:  Thank you.

12          THE COURT:  You can come down, Ms. Davis.

13          THE WITNESS:  Okay.

14          THE COURT:  Call your next witness, Mr. Steele.

15          MR. STEELE:  Your Honor, at this point, we would rest

16 our case in chief and would like to state a motion for the

17 record that has to be done outside of the presence of the jury.

18          THE COURT:  All right.  The plaintiff rests.

19          Members of the jury, I'm going to have to ask you to

20 step out again.  This won't take long.  Just step out and be

21 ready to come back in in a few minutes.

22     (Jury out at 2:59 p.m.)

23          THE COURT:  All right.  Mr. Steele?

24          MR. STEELE:  First of all, I apologize.  We could have

25 actually handled that at sidebar.  I didn't intend to make the

1  jury leave the room.  We want to preserve for the record and

2  make a motion for judgment as a matter of law in this case.  I

3  anticipate that you may not be ruling on that now, but we want

4  to get that on the record and have that reflected.

5          THE COURT:  All right.  Fine.  The record will show

6  your motion, and I'll defer it.

7          MR. STEELE:  Thank you, Your Honor.

8          MR. MCKOON:  Judge, we would have the same motion.

9          THE COURT:  All right.

10          MR. MCKOON:  Judgment as a matter of law.  And what we

11  would like to do, if it's all right with the Court, is just

12  bring something on that in the morning.

13          THE COURT:  Well, you can bring it in the morning, and

14  I'll hear it when I can.  But I'll defer.

15          All right.  Bring the jury back in.

16          Are you ready to proceed?

17          MR. MCKOON:  Yes, sir, Judge.  I will tell you, I have

18  one witness here that I believe will take about 30 minutes.  The

19  only other witness I have is not available right now.

20          THE COURT:  Well, get somebody else here then.

21          MR. MCKOON:  All right.

22      (Jury in at 3:00 p.m.)

23          THE COURT:  Be seated.

24          All right.  The defendants have rested and it's now --

25  I mean the plaintiff.  And it's now time for the defendants to

 1  go forward.

 2          Mr. McKoon, call your first witness.

 3          MR. MCKOON:  Yes.  Judge, at this time, I would call

 4  Barbara Goodwin.

 5          THE CLERK:  Would you raise your right hand, please.

 6      (The witness is sworn)

 7          THE CLERK:  Be seated.

 8          **BARBARA GOODWIN**, the witness, having been duly sworn,

 9  testified, as follows:

10                          DIRECT EXAMINATION

11  BY MR. MCKOON:

12  Q.  State your name for the record, please, ma'am.

13  A.  Barbara Goodwin.

14  Q.  And are you employed somewhere, Ms. Goodwin?

15  A.  With the City of Phenix City.

16  Q.  How long have you been with the city?

17  A.  Eighteen years.

18  Q.  And what is your position there?

19  A.  Personnel director.

20  Q.  As personnel director, do you keep custody of the personnel

21  files of employees of the City of Phenix City?

22  A.  I do.

23  Q.  And as part of your job, did I ask you to look in a -- in a

24  particular personnel file to get some information for this

25  Court?

1  A.  You did.

2  Q.  All right.  And do you have the personnel file here today of

3  Todd Boatner?

4  A.  I do.

5  Q.  Would you just tell the Court and the jury the date that

6  Todd Boatner retired?

7  A.  December 3rd, 2004.

8          MR. MCKOON:  That's all the questions I have.

9          THE COURT:  Mr. Steele?

10         MR. BROWN:  Excuse me.  What was your answer?

11         THE COURT:  Mr. Brown.

12         THE WITNESS:  I'm sorry?

13         MR. BROWN:  Might you please state your answer to the

14  last question that Mr. --

15         THE WITNESS:  The date?

16         MR. BROWN:  Yes.

17         THE WITNESS:  December 3rd, 2004.

18                   CROSS-EXAMINATION

19  BY MR. BROWN:

20  Q.  Okay.  Ms. Goodwin, do you happen to know whether a

21  retirement party for Mr. Boatner was held?

22  A.  I do not know.

23  Q.  Did you say you wouldn't have any idea of whether or not --

24  what date it was on?

25  A.  No, sir.

1    Q.  Would you happen to have any personal knowledge whether the

2    mayor of the city of Phenix City might have gone to -- or

3    mayor-elect -- gone to such a retirement party?

4    A.  I do not.

5            MR. BROWN:  Thank you.  I have no further questions.

6            MR. MCKOON:  May she be excused, Your Honor?

7            THE COURT:  All right.  Yes.  You may be excused.

8    You're free to go.

9            THE WITNESS:  Thank you.

10           THE COURT:  Next witness?

11           MR. MCKOON:  We call Roy Waters.

12           THE CLERK:  Would you raise your right hand.

13       (The witness is sworn)

14           THE CLERK:  Be seated.

15           **ROLAND LEROY WATERS**, the witness, having been duly

16   sworn, testified, as follows:

17                              DIRECT EXAMINATION

18   BY MR. MCKOON:

19   Q.  State your name for the record, please, sir.

20   A.  Roland Leroy Waters.

21   Q.  Where do you reside currently?

22   A.  In Phenix City.

23   Q.  And prior to 2005, I guess, where were you employed?

24   A.  The Columbus Department of Fire and Emergency Medical

25   Services, Columbus, Georgia.

1  Q.  And Mr. Waters, if you would, speak up just a little bit.

2  And what was your employment over there?

3  A.  I was employed from 1973 until November 30th, 2005.

4  Q.  And in what capacity?

5  A.  I retired as the chief of the department, but I started out

6  as a firefighter and was promoted to sergeant, to lieutenant, to

7  captain, to deputy chief, interim chief, and then chief.

8  Q.  How long did you serve as fire chief?

9  A.  About eight years.

10 Q.  What size department is Columbus, Georgia's department?

11 A.  When I retired, 394 personnel.

12 Q.  At some point in time prior to or right after -- or right

13 around the time of your retirement, did you get any contact from

14 Chief Wallace Hunter of the Phenix City Fire Department?

15 A.  Yes, sir.  Chief Hunter and I talked about my retirement and

16 the possibility of coming to work for Phenix City.

17 Q.  And what was the nature of the conversation, if you recall?

18 A.  Basically, he just thought that the department needed a

19 different perspective, maybe, a new set of eyes.  He was aware

20 of what I had accomplished in Columbus.  And I taught at

21 Chattahoochee Valley Community College for a number of years;

22 and he thought I could bring some new ideas, I guess, to

23 training and maybe enhance the training in Phenix City and, you

24 know, take care of some problems that they had in the

25 department.

1  Q.  And did you agree to come on to the Phenix City Fire

2  Department?

3  A.  Yes, sir, I did.

4  Q.  And in what capacity did you join the department?

5  A.  As deputy chief.

6  Q.  And what were you in charge of?

7  A.  Operations.

8  Q.  Now, what does that mean?

9  A.  The emergency response part of the fire department.

10 Q.  I'm sorry?

11 A.  The emergency response part of the fire department.

12 Day-to-day operations.

13 Q.  Okay.  How many fire stations does Phenix City have?

14 A.  Three.

15 Q.  And approximately how many personnel?

16 A.  In operations, I believe at that time it was approximately

17 50, probably.

18 Q.  When you came to Phenix City, did you know when you were

19 coming that you were coming to a department that, for lack of a

20 better term, was troubled?

21 A.  I knew there was going to be some challenges.  Yes, sir.

22 Q.  And what did you find when you got there?

23 A.  The -- the tension was pretty thick for the people in the

24 field.  There was -- they were pretty suspicious of everything.

25 There appeared to be, from their standpoint -- because I had

584

1    several meetings with all the personnel -- a lack of

2    communication and a lack of training or maybe not as much

3    training as they should have had, but issues with morale,

4    typical issues that, I'll be honest with you, you're going to

5    find in any fire department you go to, in my opinion.

6    Q.  And I don't know if I asked this or not, but when did you

7    join the department?

8    A.  In Phenix City?

9    Q.  Yes, sir.

10   A.  I believe the date was December the 19th, 2005.

11   Q.  When you got there and assessed the situation, what -- what

12   action did you take in regard to your activities as deputy

13   chief?

14   A.  I had --

15        MR. BROWN:  Objection, Your Honor.  Relevance to the

16   plaintiff's claims in this case, please, sir.

17        THE COURT:  All right.  And the relevance?

18        MR. MCKOON:  I expect him to testify that he instituted

19   some changes, which included communications with the plaintiff.

20        THE COURT:  All right.  Overruled.

21   Q.  Go right ahead.

22   A.  Would you repeat that question again, please, sir?

23   Q.  What thing -- what did you do when you came to the

24   department in regard to like the problems you were just talking

25   about with communication?

1    A.  The first thing, we had meetings during the week.  And I

2    asked all of the personnel to give me their side, what they

3    thought the problems were in the department and what it would

4    take to correct it and to open up the lines of communication,

5    which basically they said were somewhat restricted.  And the

6    changes that -- or the problems that they brought to my

7    attention, a lot of them could be taken care of at my level.

8    Some of them were taken to the chief to -- to get corrected.

9    But everybody -- we -- we really tried to get everybody's

10   inclusion into what was going on at the department and gave them

11   an opportunity to communicate with -- with everybody.  And the

12   lines of communication were definitely opened up.  I can tell

13   you.

14   Q.  Did you conduct training meetings?

15   A.  Yes, sir.  I clearly communicated to everybody what I

16   thought was important to get the department back on track.  I

17   also communicated that -- what my expectations were to everybody

18   on a daily basis.  I also opened up every meeting with do you

19   have any problems, do you have any suggestions or

20   recommendations or criticisms or problems or anything, every

21   day.  And --

22   Q.  All right.  Let me stop you there just a minute.  Would

23   Mr. Davis have been at these meetings?

24   A.  Yes, sir.

25   Q.  And when you say there were three -- I'm having a problem

1  understanding.  There's three fire stations.

2  A.  Yes, sir.

3  Q.  Where -- how would you meet on kind of a daily basis with

4  everybody?

5  A.  Chief Hunter allowed me to bring everyone together.  We --

6  we met consistently in the afternoon around one o'clock each

7  day.  And he allowed me to bring all of them together at the

8  same time.

9  Q.  Where would that be?

10  A.  At -- initially, it was at station one.  And then he was

11  able to get a training center opened up, and then the classes

12  were relocated to the training center.

13  Q.  And so you -- you told about how you would open the

14  meetings, about communicating with people and all that.  Did you

15  even invite people to come to your house if they had a problem?

16  A.  Yes.

17          MR. BROWN:  Objection.  Relevance, Your Honor.

18          THE COURT:  I think it's relevant to show the general

19  condition there when the actions took place to put everything in

20  context.  Overruled.

21  A.  Yes, sir.

22  Q.  Go ahead.

23  A.  What I did was when I'd ask if they -- if anybody had any

24  problems or suggestions or criticisms or anything, because there

25  was -- as I told you earlier, there was a lot of people that

1  were very suspicious, reluctant to speak -- speak out or

2  whatever.  So I told them, I said, if you have any problems, if

3  you don't want to talk to me here, I said, you can come to my

4  house.  I only live like a couple miles from my office and, I

5  said, I'll be glad to talk to you there.  Because my whole

6  objective was to get people talking to each other and getting

7  some of these issues resolved.  So they had -- they had every

8  opportunity to come and talk to me and meet with me.  And I

9  first got the chief's permission to do this so everybody would

10  know that I was -- you know, the chain of command was not going

11  to be compromised at any time.

12  Q.  Did Mr. Davis take you up on your offer?

13  A.  To come to my house?

14  Q.  No.  To come to your office.

15  A.  Oh, yes, sir.  On two different occasions.  The first

16  occasion when I first got there, he let me know he had gone

17  through the chain of command and wanted to let me know he was

18  the president of the union.  And basically, he hoped we could

19  work together.  It was a very short meeting.  And I think my

20  comment was that, you know, as long as everybody does their job,

21  we won't have a problem.

22      And then there was one other occasion when his assistant

23  chief came to me and said that there was a problem on his

24  shift.  And he had met with Mr. Davis and that he wanted to meet

25  with me and that he -- this is what his chief said.  His chief

 1  told me that he had gone through the chain of command.  We met

 2  in my office for a few minutes.  I don't even remember what it

 3  was about.  I don't think it was anything of any significance,

 4  but it was resolved before the day was out, in my opinion.

 5  Q.  As far as you know, as far as his daily skills as a

 6  firefighter, was he good at that?

 7  A.  Yes, sir.

 8  Q.  At some point in time, did this issue come up regarding the

 9  extension of the probationary period?

10  A.  Yes, sir.  Chief Hunter had talked to me about it and said

11  that more than likely, the city was going to go for I believe

12  the firefighters and the police officers and code enforcement

13  and change it from 12 months to 18 months, which is pretty

14  consistent throughout the United States.  And I started to -- in

15  the daily meetings we had, I brought it up that it would change

16  from 12 to 18 months.  And everybody was told that it would not

17  impact anybody that was currently working.  It would only be for

18  new employees.  And it had nothing to do with promotions.

19      And after I did, then Chief Hunter even came in and told

20  them.  And only two people, to my knowledge, brought up a

21  question.  And it was two of the firefighters currently employed

22  that I believe their probation was going to end like at the end

23  of June or something.  And they wanted to know from the chief,

24  well, does this impact us.  He said no.  It's only for new

25  employees.  And there was no other discussion.

1  Q.  Did Mr. Davis ever raise that issue with you?

2  A.  No, sir, not to my recollection.  He did not.

3  Q.  Was there any uproar or objection about it among the people

4  that were veteran firefighters?

5  A.  No, sir.  If they did, they did not talk to me about it.

6  And the reason, I think, is because it was a nonissue.  It was

7  not important.  It didn't have any impact on anybody in a

8  negative way.  In fact, in my opinion, it was like an insurance

9  policy.  And I clearly used that same phrase when I was talking

10  to the people in the department because firefighters today are

11  required to know so much more.  Their certifications, their

12  training is longer than it ever has been.  And to increase it by

13  six months gives them a lot of breathing room, because they're

14  trying to push so much into a small amount of time.  So they're

15  not up under nearly as much pressure with it going from 12 to 18

16  months as having just a 12-month probationary period.  It's the

17  best thing that a department could do anywhere.

18  Q.  As the time got closer, I guess, for the policy to be

19  implemented, did you have anything to do with -- with that in

20  any way?

21  A.  No, sir.  I think that when the final draft was -- I guess

22  when it was prepared, that's when Chief Hunter came out and went

23  over it with the people in the field.  And like I said, only two

24  people had -- two firefighters had a concern, because they

25  thought that it may impact them, but it did not.  And that was

1  clearly communicated earlier on by myself.

2  Q.  All right.  Now, you had come in, I believe, in December;

3  and this happened, this issue that we've been here about three

4  days, happened around April, wasn't it?

5  A.  Yes, sir.  I believe that's correct.

6  Q.  In that period of time, were things gradually getting better

7  in the department?

8  A.  In my opinion, yes, sir.  I think that by that time, people

9  were talking to each other.  When I first came there, I mean

10  they weren't hardly talking to each other.  And when they did,

11  everybody would talk -- calling people by their last names and

12  stuff like -- it was very impersonal.  And when I left -- and no

13  one came to work with a smile on their face hardly at all.

14      When I left, people were coming to work with a smile on

15  their face.  I mean it was just completely changed.  The

16  department had been transformed; and I think that it was a

17  top-performing department, to be honest with you.  I mean I'm

18  not going to say it was problem-free; but I can tell you from

19  what I first started till then, a lot of things were

20  accomplished.  And it wasn't because of me, necessarily.  I

21  think it was because of what the chief was allowing me to do

22  through the personnel that was working.

23  Q.  When you would have these talks with people on a daily basis

24  and invite them to share their problems with you and stuff like

25  that, did you ever have any talks about the chain of command?

1    A.  Absolutely.  That's one of the first things I communicated

2    when I started to work, because I wanted to let them know the

3    importance of the chain of command and some of the things that

4    we would do.  I mean I clearly talked about -- one of the things

5    I said was, okay, if we're going to get things turned around,

6    here's a couple things I want us to do.  We're not going to talk

7    about anybody.  We're not going to talk about the mayor, the

8    city manager, council, the fire chief.  We're going to keep

9    problems in house.  We're going to try to resolve problems

10   here.  If we can't, after everything goes through the chain of

11   command, you can take it anywhere you want to.  Go as high as

12   you want to.  I mean no one -- there were never restrictions put

13   on anybody.  And I have to believe it worked because nobody

14   else, you know, violated it.

15   Q.  Did there come a time when you had learned that Mr. Davis

16   had made some sort of phone call to the mayor about this

17   probationary policy?

18   A.  Yes, sir.  Chief Hunter called me in my office -- my office

19   was at station one -- and told me that -- a conversation that he

20   had heard about and asked me to have Mr. Davis come down -- he

21   was on duty -- to station one and find out what happened, which

22   I did.  I asked the assistant chief to get Davis to come down

23   with his crew, and I asked them to come into the assistant

24   chief's office with myself and then the assistant chief -- or

25   acting assistant chief at that time was Bobby Brooks and his

1  captain, George Bennett.

2      And I told them, I said, the reason you're here is because

3  of what the chief has been told.  And I just need to know, did

4  you do this.  And he said he did talk to the mayor.  I said, did

5  you go through the chain of command?  He said no, he did not.  I

6  looked at his captain and I said, did he go through the chain of

7  command?  He says, no, he did not.

8      So I was very -- the whole time I was very polite and

9  professional.  I said, okay.  David, what I need you to do is

10  this.  I need you to go next door into the office -- there's no

11  one in there -- and type up a letter to the chief stating

12  exactly what happened.  And he did.  And he said what he did he

13  did because he was the president of the union.

14      And then when he finished the letter and gave it to me, then

15  we walked down to my office.  And I told him, I said, I'm going

16  to take the letter now and take it to Chief Hunter.  And I did.

17  This whole thing took place over -- from the time that he was

18  contacted until the time he got back to the station that

19  afternoon, you're talking about a total of 90 minutes.  That's

20  it.

21  Q.  How do you know that?

22  A.  Because the information was taken from the computer-aided

23  dispatch system in 911.

24  Q.  So if Mr. Davis -- well, it wasn't four or five hours, was

25  it?

1   A.   Absolutely not, sir.  Because when the fire truck leaves for

2   anything, emergency or nonemergency, the time is reported to 911

3   in any department.

4   Q.   All right.  Did you have anything to do with writing this

5   up?

6   A.   Yes, sir.  I prepared the disciplinary report form.

7   Q.   And let me get that form real quickly.

8        (Brief pause)

9            MR. MCKOON:  Here it is.  All right.  Let me go get

10  this.

11  Q.   All right.  Chief Waters, I'm going to put this up here.

12  It's this document here.  Do you recognize that document?

13  A.   Yes, sir, I do.

14  Q.   Let me look and see whether I can find it in this exhibit

15  book so the jury can refer to it.  Well, I'll find it in a

16  minute.  In the meantime, as part of your consideration of this

17  offense -- first of all, did you consider this to be a serious

18  matter?

19  A.   Yes, sir.  I definitely do.  The chain of command is

20  critical to the morale in the department, for a harmonious work

21  environment, and for the safety and survival of personnel, both,

22  you know, in emergency/nonemergency situations.  You cannot

23  afford to compromise the chain of command at any level at any

24  time for any reason.

25  Q.   And why is that?

1  A.  Because people's life depend on it.  And, you know, you

2  cannot undermine the authority of your supervisors.  That's why

3  they're in place.  Rules are in place to be enforced, and the

4  chain of command is one way of seeing that that's done.  Just

5  like on -- in an emergency situation, you could cause somebody

6  their life if you compromise the chain of command.

7  Q.  Well, of course, now, if -- you know, just sitting here

8  today and you think, well, him calling the mayor, I mean how --

9  that doesn't compromise anybody's life, does it?

10 A.  Well, you know, when people know that you have violated, you

11 know, a standard operating procedure, it does.  And furthermore,

12 the mayor had -- in the form of government that Phenix City has,

13 the mayor has no legal authority.

14 Q.  Okay.  It's -- in the white book, it's Exhibit #17.  Is this

15 your signature on the second page of the document?

16 A.  Yes, sir.

17 Q.  When you signed this document, was all of this stuff that's

18 on the first page on it?

19 A.  Yes, sir.

20 Q.  All right.  Where did this -- where did this stuff come

21 from?

22 A.  From Mr. Davis's personnel file.

23 Q.  All right.  Did you have anything to do with reviewing his

24 file before recommending the type of offense that would be

25 imposed here?

1    A.   Yes, sir.  Before any offense is going to be rendered, you

2    look at the personnel file for previous discipline.

3    Q.   And does that play into what type of discipline is going to

4    be imposed in any particular situation?

5    A.   Yes, sir.

6    Q.   And is that in accordance with the merit system?

7    A.   Yes, sir.

8    Q.   So this was not a first offense.

9    A.   No, sir.

10   Q.   And Chief, maybe you could help me.  Let's look at Section

11   14 of the -- of the merit system, which I believe starts on page

12   50.  Do you see that?  It's in that white book.  And -- I'm

13   sorry.  The exhibit is Exhibit #13.  So go to tab 13, page 50.

14      (Brief pause)

15   Q.   All right.  Now, let's look over to page 51 where it says

16   14.05 there.  The heading is Three Groups of Offenses.

17   A.   Uh-huh.

18   Q.   Would you just read that first sentence into the record?

19   A.   Under 14.05?

20   Q.   Yes, sir.

21   A.   The progressive discipline procedures of the city are based

22   on three groups of offense.

23   Q.   Okay.  What does progressive discipline mean?

24   A.   Progressive discipline is something that's used probably in

25   most agencies today where the -- the discipline is based on what

```
 1  a person does.  So it will start off, and everything that
 2  happens over his or her career is going to be listed so that it
 3  starts off with the lesser offenses and moves up to the more
 4  serious so that you won't go in there, if someone committed an
 5  offense that's viewed as not being that serious, and try to
 6  terminate them.  It's going to be based on a progression
 7  throughout his or her career.
 8  Q.  And then if you turn over to page 52, you see a -- kind of a
 9  list of group I offenses; is that correct?
10  A.  Yes, sir.
11  Q.  And it shows the progressive punishments for it right at the
12  top.
13  A.  Yes, sir.  Yes, sir, it does.
14  Q.  And then on the next page is group II offenses.  Do you see
15  that?
16  A.  Yes, sir.
17  Q.  And what is the -- what is the punishment, I guess, for a
18  group II offense on the second occasion?
19  A.  Discharge.
20  Q.  And on a group III offense, what's the punishment?
21  A.  First offense, discharge.
22  Q.  Looking at the -- going back for just a moment to the
23  Exhibit #17, Defendants' Exhibit #17, would you tell the jury
24  what you took into consideration -- well, let me -- let me back
25  up just a minute.  Are you the one that decided what -- how the
```

1  offense would be classified here?

2  A.  I'm not sure I understand the question.

3  Q.  In other words, whether it would be group II, group III,

4  what it was going to be?

5  A.  No, sir.  That's -- to me, the information for the group I,

6  II, and III is clearly indicated in the merit system.

7  Q.  All right.  So you take the facts and just apply it to the

8  merit system --

9  A.  Yes, sir.

10  Q.  -- and that's what gives you the classification.

11  A.  Yes, sir.

12  Q.  And did you do that?

13  A.  Yes, I did, sir.

14  Q.  All right.  And in considering all of that, did you also

15  look at the record that Mr. Davis previously had?

16  A.  Yes, sir.

17  Q.  In looking at that record, did it come to your attention

18  that he had previously violated this ASOP 12?

19  A.  Yes, sir.

20  Q.  And when was that?

21  A.  The -- that happened, I think, prior to me coming on board,

22  as far as the -- in that particular paragraph right there where

23  he was written up for that.

24  Q.  Right.

25  A.  But I think it was back in September, if I'm not mistaken.

1    And then, of course, the same thing would apply this time, as

2    far as the chain of command goes here, too.

3    Q.  Once you wrote this up, what was the next step that you

4    took -- oh, let me go back to something just a minute.  I

5    forgot.  Who all did you say was present when he was brought

6    into the station to talk about this?

7    A.  Captain Bennett, which is his captain and immediate

8    supervisor, and at that time, it was Captain Brooks.  He was

9    his -- he was the acting assistant chief.

10   Q.  All right.  And that was Captain George Bennett?

11   A.  Yes, sir.

12   Q.  Did -- was anything ever said to you or any information ever

13   given to you about whether or not Mr. Davis had spoken to

14   Captain Bennett about talking to the mayor before he did it?

15   A.  No, sir.  I just -- the question I asked was did -- you

16   know, did you talk to the mayor.  And he said yes.  And I said,

17   did you go through the chain of command.  And he said no.  And I

18   looked at his captain and asked him the same thing, and he said

19   that he did not go through the chain of command.

20   Q.  Okay.  So both Mr. Davis denied going through the chain of

21   command and Captain Bennett, who was standing there, denied he

22   had done it also.

23   A.  Yes, sir.

24   Q.  After that happened and you wrote this up, what happened

25   next?

1  A.   Gave it to the chief.

2  Q.   Was Mr. Davis then sent on back to his station?

3  A.   Yes, sir.  That day.  Yes, sir.

4  Q.   And I believe you said all that took about 90 minutes?

5  A.   Now, the day that this was written, when -- let me clarify

6  that.  When I met with Mr. Davis and Captain Bennett and Captain

7  Brooks that day and I asked David to write the letter up and

8  then I looked at the letter and told him what I -- I was taking

9  it to the chief.  I went back and gave it to Chief Hunter.  It

10 was, I believe, the next day when Chief Hunter, you know, had

11 reviewed it and said to go ahead and have his assistant chief

12 call him in or assistant chief get him to report to personnel.

13 So the first time that Mr. Davis would have seen that would have

14 been in personnel.

15 Q.   All right.  If you would, turn over to tab 12.  Is that the

16 letter that you asked Mr. Davis to write up?

17 A.   Yes, sir.

18 Q.   In that letter, did he ever mention that he had followed the

19 chain of command?

20 A.   No, sir.

21 Q.   Did he ever say he had talked to anybody in his chain of

22 command that had approved him calling the mayor?

23 A.   No, sir.

24 Q.   All right.  What was your next participation in this?

25 A.   Chief Hunter, when he told me to have the on-duty assistant

1  chief at that time to call Mr. Davis in and tell him to report

2  to personnel.  Then a meeting was set up to bring Mr. Davis in

3  to personnel.  And I was there, the chief was there, and

4  Ms. Goodwin was there.

5  Q.  In taking this action -- or let me ask you this.  Did you

6  recommend this to the chief, or how did this -- how did the

7  decision come together, I guess is what I'm trying to ask.

8  A.  The decision comes from the merit system.  It's not

9  optional.  The merit system says the second group II is

10  discharge.  The first group III is discharge.  So it's not like

11  a decision has to be made.  It's clearly, you know, outlined in

12  the merit system.

13  Q.  Did you notice whether or not Mr. Davis had any issues with

14  Chief Hunter while he was there?

15  A.  I don't know if he had any issue with him.  I -- I don't

16  think that they had any kind of relationship.

17  Q.  Okay.  And what makes you say that?

18  A.  Perception.  I think that -- you know, I have talked to

19  Mr. Davis on a couple of occasions, and I think that he -- he

20  may have had some issues with Chief Hunter; I don't know.  I

21  mean he -- I know that on one particular meeting when -- one of

22  the most important things that happened while I was there, they

23  had taken swap time away originally and Chief Hunter was able to

24  go and have the swap time put back in the department.  And the

25  people in the department, everybody was extremely pleased about

 1  that.  And when Chief Hunter came down to meet with all the

 2  personnel and explain to them how the policy was going to work,

 3  David, during the whole meeting, would just sit there and look

 4  out -- stared out the window.  And I had even told everybody

 5  when the chief gets through explaining this, I wanted them to

 6  all get up and shake his hand.

 7          MR. BROWN:  Objection, Your Honor.  I'm sorry.  Out of

 8  courtesy to the witness, I withheld my objection.  But the

 9  witness started out speaking about his perceptions rather than

10  his firsthand knowledge.  We object on the grounds of not

11  speaking within his personal knowledge of this incident.

12          THE COURT:  I think he got into speaking of his

13  personal knowledge with what he observed there.

14          MR. BROWN:  Might we have the portion of the transcript

15  that reflects his perceptions rather than firsthand knowledge

16  stricken, please?

17          THE COURT:  All right.  Members of the jury, don't

18  consider anything that might have been just his perception of

19  the workings of the mind of the plaintiff.

20  Q.  (Mr. McKoon, continuing:)  Let me ask you -- well, first of

21  all, let me ask you for a minute about swap time.  What was

22  that?

23          MR. BROWN:  Objection, Your Honor.  Relevance.

24          THE COURT:  Well, that's what he just testified about

25  was the subject of this conversation without objection.

1  Overruled.  Go ahead.

2  A.  One of the things that the firefighters were dissatisfied

3  about in Phenix City was the fact that they had had swap time

4  privileges originally, and they were suspended for a period of

5  time.  What swap time is, it allows -- because firefighters work

6  24 hours at the station and then they're off for 48, it allows

7  them to have someone work for them in their place, and then they

8  pay them that time back.  And it is a major deal, I can tell

9  you, in the fire service because of the work schedule.  And I

10  can tell you that everybody was extremely pleased when -- when

11  Chief Hunter was able to get the swap time put back in.

12  Q.  And what was Mr. Davis's reaction to that?

13  A.  During the meeting, he stared out the window the whole

14  time.  And his captain, George Bennett, and his assistant chief,

15  Mickeal Hanson at the time -- when the meeting was over, I

16  called them into my office.  And before I said anything, they

17  said, I know what you're going to say; and they said, we noticed

18  it too.  He was just staring out the window.  And when they said

19  something to Mr. Davis, he just said the chief was just doing

20  his job.

21  Q.  So you had specifically asked him to show some respect to

22  the chief and shake his hand.  And his opinion about that was,

23  he was just doing his job.  He's not to be congratulated.

24  A.  That's what -- well, that's what he told me.  Yes, sir.

25  Q.  This ASOP number 12, in your mind, does it relate to any

1  work-related business of the fire department?

2  A.  Yes, sir.

3  Q.  And I'm going to show you -- I guess I'll go to the exhibit

4  book once again and I'll refer to it one last time.  Let me find

5  it.  Go to tab 14 in the white exhibit book.  It says here --

6  under scope, it says this procedure shall be followed by all

7  members of the Phenix City Fire Department.  And I guess my

8  question to you is there's been some talk about if a firefighter

9  is off duty, that he -- he's not bound by the SOPs.  You've been

10 a fire chief for 32 years and a deputy chief for a year at some

11 point in time.  Is that -- what is your experience in regard to

12 SOPs and firefighters?

13 A.  That they apply.  I think if you asked any fire chief,

14 they'll tell you we're on duty 24-7.  We are held to a higher

15 standard, and that's why it's so important.  Whatever you do on

16 duty is -- the same thing is going to apply off duty.

17 Q.  Are you currently with the Phenix City Fire Department?

18 A.  No, sir.

19 Q.  How long have you been away from the department or

20 unemployed, however you want to put it?

21 A.  A little over a year.

22 Q.  Okay.  The offenses that you looked at when you were writing

23 up this written warning form, did you pretty much go through all

24 of them and look at them?

25 A.  Yes, sir.  It had to be attached to it.  Yes, sir.

1          MR. MCKOON:  I believe Chief Hunter has gone over them,

2  so I don't think I'm going to go over them with you again.  I

3  believe that's all I have at this time.

4          THE COURT:  Mr. Brown?

5          MR. MCKOON:  Judge, may I ask one more?

6          THE COURT:  All right.

7          MR. MCKOON:  I apologize.

8  Q.  Was this particular proposal about probation -- about the

9  probationary period, was it, in your judgment, related to

10  operations or procedures which are work-related within the fire

11  department?

12  A.  Yes, sir.

13          MR. MCKOON:  That's all.

14          THE COURT:  Mr. Brown?

15                    CROSS-EXAMINATION

16  BY MR. BROWN:

17  Q.  Good afternoon, Chief Waters.

18  A.  Good afternoon, sir.

19  Q.  My name is Gary Brown.  It's my privilege to represent the

20  plaintiff in this matter.  You spoke of the probation period in

21  your direct examination.  Do you remember that testimony, sir?

22  A.  Yes, sir.

23  Q.  And I believe you termed that 18 months a great thing; is

24  that correct?

25  A.  Yes, sir.

1   Q.  Do you consider that other great fire departments may have a

2   probation period of 12 months?

3   A.  They may have.

4   Q.  Are you familiar with the largest fire department in the

5   state?

6   A.  No, sir.

7   Q.  You've been in fire service for 34 years?

8   A.  Yes, sir.

9   Q.  And you don't know what's the largest fire department in the

10  state of Alabama?

11  A.  No, sir.  I've been in fire service 32 years and ten months

12  in Columbus, Georgia.  I was a deputy chief over here for 13

13  months.  And believe me, my focus of attention was trying to get

14  the things that Chief Hunter wanted accomplished taken care of.

15  So my concern was the department at Phenix City.

16  Q.  You testified that 18 months' probation was a great thing,

17  but you wouldn't know whether or not the Birmingham Fire

18  Department has a 12-month probationary period, would you, sir?

19  A.  No, sir, I would not know that.

20  Q.  And you characterized the atmosphere at the Phenix City Fire

21  Department when you came as rather typical things that were

22  going on, didn't you, sir?

23  A.  A lot of the comments they brought to me were comments that

24  you're going to hear in a lot of departments, honestly.

25  Q.  And "typical" is just ordinary, everyday things, isn't it,

1    Chief Waters?

2    A.  Yes, sir.

3    Q.  And so when you got here to the Phenix City Fire Department,

4    did you testify it was in December of '05?

5    A.  Yes, sir.  I believe I started work December the 19th, if

6    I'm not mistaken.

7    Q.  Matters were rather ordinary and everyday and typical.  Is

8    that what you testified?

9    A.  They had some challenges, like I said earlier on.  But I

10   don't think it was -- you know, the conditions were terrible by

11   any means.  They had some challenges.

12   Q.  And so any -- there was no disruption going on in the fire

13   department during that time that was really out of the ordinary

14   and typical.  It was just challenges, wasn't it, Chief Waters?

15   A.  Disruption meaning what?

16   Q.  Excuse me?

17   A.  Disruption meaning what?

18   Q.  You said the atmosphere of the fire department was typical

19   and ordinary and everyday life, did you not, sir?

20   A.  Yes, sir.  And the only thing I -- and I clarified it by

21   saying the only thing that was different was that when I got

22   there, the people were not talking to each other, I mean not

23   like you would normally find.  And if someone was talking to

24   someone else, they referred to them by their last names, which

25   is something that was not real common to me, what I was used

1   to.  But there -- and I told you that there were some suspicions

2   about some things.  And the communication process, they had

3   concerns about that.  But that is typical, I can tell you, in my

4   experience.

5   Q.  And so being typical, just a few months after an article had

6   appeared in the newspaper, things had become typical.  And I

7   accept your testimony on that.

8       Now, you spoke of the proposed ordinance to change the

9   probation period from 12 to 18 months.  Do you recall that, sir?

10  A.  Yes, sir.

11  Q.  And did you not state that you discussed that in numerous

12  meetings?

13  A.  Yes, sir.

14  Q.  And we agree that there was a communication problem going on

15  in the fire department at the time; is that correct?

16  A.  Yes, sir.

17  Q.  Isn't it true that the issue of the probation period had

18  come up at a time prior to the time when the plaintiff had

19  contacted the mayor?

20  A.  I'm not real sure I understand your question, sir.

21  Q.  Okay.  Was the change -- the proposed probation period --

22  A.  Yes, sir.

23  Q.  -- that was being considered by the city council --

24  A.  Yes, sir.

25  Q.  -- in April of 2006, was that the first time that the

608

1   probation period had been addressed by the city council in
2   recent months?
3   A.   It was -- since I had been there.   Now, I don't know about
4   prior to that.
5   Q.   So you don't have any common knowledge whether or not
6   another rendition or version of the probation period had come
7   before the city council before, do you?
8   A.   Before I started work?   No, sir.
9   Q.   Okay.   It was only one time; is that correct?
10  A.   When I started work and when Chief Hunter brought it to my
11  attention is when I started communicating it to the people in
12  the field.   And the questions and concerns they had were
13  addressed.   And they were, does it apply to, you know, currently
14  employed personnel and does it apply to promotions when you get
15  promoted.
16  Q.   And so all of those meetings that you went and held and
17  spoke about the probation period, not one time did any of the
18  firefighters say, Chief Waters, this has come up before and it
19  was a bad thing?
20  A.   If they did, I don't recall it, sir.   Because when I started
21  explaining it, one of the things I said was, you know, we had
22  this in Columbus where I was -- just retired from.   And I said,
23  it's not a bad thing.   I said, I can't think of anything that's
24  bad about it, because it really does relieve a lot of pressure
25  on someone coming to the fire service where he or she has got to

1  learn and get certified in and accomplish in a very short period

2  of time.  And so once again, sir, the only two people that I

3  recall saying anything at all about it were two firefighters

4  that had asked Chief Hunter about specifically is this going to

5  apply to us on our probation, because I think they were fixing

6  to come off of probation.

7  Q.  But you didn't tell the firefighters with particularity when

8  that ordinance was going to be coming up on the city council

9  docket, did you, sir?

10  A.  No, sir, I did not.  Because what happened was when Chief

11  Hunter first brought that to my attention and told me to go out

12  and let the personnel in the field know, I did.  And then I

13  guess when everything was -- I guess the final draft was

14  approved and everything and they were going to take it to the

15  council was when Chief Hunter came out to the stations and

16  actually talked to the people in the field on all three shifts.

17  Q.  And you were trying to improve communications; is that

18  correct?

19  A.  Yes, sir.

20  Q.  But you didn't think to make a copy of the ordinance and

21  pass it out to all the firefighters, did you?

22  A.  No, sir.

23  Q.  Okay.  And, you know, you didn't post a copy of that

24  proposed ordinance in any of the fire stations, did you, sir?

25  A.  No, sir.

610

1    Q.  And you don't know for a fact, do you, sir, when this

2    gentleman or any other firefighter for the Phenix City Fire

3    Department first found out about when that ordinance, with

4    particularity, was going to be on the city council docket, do

5    you?

6    A.  No, sir, I don't know that one --

7    Q.  That's correct.  Thank you.  The ordinance originated, did

8    it not, sir, from the management of the department?

9    A.  The chief is the one that brought it to me.  Yes, sir.

10   Q.  Okay.  So we know that the upper management of the city had

11   the information, correct?

12   A.  Yes, sir.

13   Q.  But what we don't know and what has not been established --

14   and in fact, we -- we understand that the rank-and-file members

15   who were concerned about it didn't have a copy.

16   A.  They didn't have a copy, sir, but no one expressed any

17   concern or questions other than the two firefighters.

18       If -- and the thing about it, I think if you asked the

19   firefighters in the department specifically about me, could

20   they -- do they feel free they could come to me and talk to me

21   about anything if they had a problem or whatever, I believe that

22   the vast majority of them would have told you absolutely.  And

23   when they didn't bring up any questions and concerns -- I mean

24   can you understand -- I'm not asking you to agree, but can you

25   understand why, to me, and I think -- and I'm not speaking for

 1  the chief, but it's not -- it was a nonissue, because no one had

 2  any concerns about.  When it was explained that -- you know,

 3  what the objective would be and -- and the fact that it would

 4  not impact anybody that's currently working, I don't understand

 5  how that --

 6  Q.  But, sir, you would agree with me, wouldn't you, that the --

 7  that a better way of communicating what was going to be on a

 8  one-page ordinance would have been to say, here, folks, have the

 9  ordinance.  Correct?

10  A.  Yes, sir.  You could have done it.  But the fact of the

11  matter is nothing changed from what they were told to what come

12  out on the ordinance.  It was the same thing.

13  Q.  And verbal communications can be miscommunicated when

14  they're passed from one person to the other, can't they?

15  A.  Yes, sir.

16  Q.  Thank you.  So if there is some fault to be assigned that

17  the rank and file did not have a copy of this ordinance, which

18  we know after the fact many did have concerns with, it wasn't

19  the fault of the rank and file.  It was the fault of the folks

20  who had the document, wasn't it?

21  A.  I guess you can say that, sir.  But get -- if they had these

22  concerns, why didn't they communicate from their part?  Because

23  communication is a two-way process, not just from the top down,

24  but from the bottom up.  So if they had these concerns after,

25  why did they not bring it up when they were bringing up other

1    problems in the department and we were resolving them pretty

2    much as quick as they brought them up, if we possibly could?

3    Q.  And at the time that Mr. Davis was alleged to -- and we have

4    established he did in fact phone the mayor -- it had already

5    gone beyond the department level to do anything about, hadn't

6    it?

7    A.  No, sir.  I think that had the chain of command been

8    utilized, I'm -- I can't speak for the chief, but I feel

9    reasonably sure had Mr. Davis brought it up through the chain of

10   command, at least it would have gotten to me.  I would have

11   called the chief and said, look, we've got a problem.  I don't

12   think it was imperative that it went to council on any

13   particular day.  I think they would have stopped it.  They would

14   have tabled it and let whatever concerns and issues be

15   addressed.

16   Q.  You think that, but you don't know, sir?

17   A.  Well, I told you, I cannot speak for the chief.

18   Q.  Thank you, sir.  And you don't know for a fact that you

19   actually invited the plaintiff to come to your house.

20   A.  I don't know that for a fact?

21   Q.  Thank you, sir.

22   A.  No, sir.  I was -- I was stating what you said.

23   Q.  Thank you, sir.

24   A.  He had been, as all 50-something people in operations.

25   Q.  And you don't know for a fact, as you testified, do you,

1   sir, that he and the chief had had any issues?

2   A.   Not specifically.  No, sir.

3   Q.   Thank you.  Now, you, a 30-some-odd-year veteran of the fire

4   department, would you agree it's a rather unique working

5   environment?

6   A.   Yes, sir.

7   Q.   And would you agree that even today or even at the time that

8   the plaintiff had his incident with the city, largely male

9   dominated in firemen?

10  A.   Yes, sir.

11  Q.   And I think we probably agree that there have been times in

12  male dominated, competitive environments that people -- men are

13  reluctant to, shall we say, tell on the other men when issues

14  happen in the fire department?

15  A.   What specifically are you talking about?

16  Q.   You were asked a series of questions about whether or not

17  the plaintiff and Captain Bennett -- or whether it was told to

18  you that -- whether or not Captain Bennett had in fact given him

19  some sort of a permission up through his chain of command.  And

20  you did answer you didn't know that, right?

21  A.   I asked Captain Bennett -- I asked Mr. Davis first, did you

22  go through the chain of command.  And he said no.  And that's

23  when he told me, he said, I did this acting in my capacity as

24  president.  And I asked his captain, who was sitting right next

25  to him, did he go through the chain of command.  He said no.

1  Q.  And my question to you, sir, though, is that you would agree

2  that sometimes men in that close working environment are

3  reluctant to get their coworkers in a spot of trouble?

4  A.  That can happen.  Yes, sir.

5  Q.  Have you ever seen that happen?

6  A.  Yes, sir.

7  Q.  I thought so.  And you also spoke of an incident where the

8  plaintiff was given some sort of counseling or spoken with about

9  looking out the window during a meeting.  Is that -- do you

10  recall that testimony?

11  A.  Yes, sir.

12  Q.  And do you recall whether or not the plaintiff explained to

13  you that his mother was having surgery?

14  A.  He did not say anything about that.

15  Q.  On that very day?

16  A.  No, sir, he did not.  At least not to me.

17  Q.  Let me direct your attention again to Plaintiff's Exhibit

18  #21.  That would be in your black book.  And you recall

19  Mr. McKoon asking you a series of questions about that document,

20  don't you, sir?

21  A.  Just a minute, now.  This is what exhibit, sir?

22  Q.  Plaintiff's Exhibit #21 in the black book.  And do you

23  recall the line of questioning that you received on direct

24  examination about that document?

25  A.  Yes.  Yes, sir.

1  Q.   Okay.  Now, can you explain for me, going down to the bottom

2  of the first page, Plaintiff's Exhibit #21, starting with the

3  sentence, "Discharge as per merit system rules and regulations

4  for second group II offense.  Discharge as per merit system

5  rules and regulations for first group III offense."  Is that a

6  correct reading of that sentence?

7  A.   Yes, sir.

8  Q.   Okay.  And we can agree that that sentence contains the

9  reason that the plaintiff was discharged, correct?

10  A.   Yes, sir.

11  Q.   Okay.  Do you know, sir, what the second group II offense

12  was that this document references?

13  A.   I -- I believe it was -- now, I don't have those documents

14  in front of me.  Do you -- are they listed as an exhibit in here

15  so I could refer back to them?

16  Q.   I'm just asking if you can tell from that document what it

17  was.

18  A.   I mean can I read it real quick?

19  Q.   Sure.

20  A.   Okay.  The first group II, according to this, would have

21  been August the 3rd, written warning form, group II, line two.

22  And then the second would -- would have been the -- I guess the

23  violation of him going to the media.  It's got September 30th

24  (sic), 2005, violation of directive --

25  Q.   Excuse me.  I want you to tell me what the -- if you can --

```
 1   I'll tell you --

 2         MR. BROWN:  We'll strike that.

 3   Q.  Let me give you something that might help refresh your

 4   memory.  Do you recall having your deposition taken in this

 5   case, Chief?

 6   A.  Yes, sir.

 7         MR. BROWN:  Okay.  Your Honor, permission to approach

 8   the witness and show him his deposition.

 9         THE COURT:  You may.

10   Q.  And would you please, sir, open your deposition to page 31?

11   A.  Yes, sir.

12   Q.  And the question that was posed to you on the bottom of page

13   31 at line 20 states:  So just -- just so the record is clear,

14   the discharge concerning the first group III offense would have

15   been focused on the telephone call and the conversation that

16   Davis had with the mayor; is that correct?

17   A.  That's what the question is.

18   Q.  Yes, sir.  And your answer was what?

19   A.  Do you want me to just read it to you?

20   Q.  That would be fine.

21   A.  Okay.  My interpretation would be the insubordination where

22   the city manager had written a letter stating that the city does

23   not recognize a union and that any business, as such, something

24   along those lines, has to go through the city manager.  And that

25   was the point of the conversation that we had in the office with
```

1   David and Captain Bennett and Chief Brooks to ask you -- to ask

2   did you, in fact, go through the chain of command with

3   supervisors and whatever, and it was not.  So my understanding

4   is that the city manager, when he wrote that memo stating that

5   the city does not recognize a union and that any dealings were

6   to go through him, something along those lines, specifically --

7   so that, in effect, was my interpretation of the

8   insubordination, because you had a directive stating you could

9   not do it.

10  Q.  Okay.  Chief Waters, and if you'll follow me, the next

11  question that was asked to you on that same page, page 32,

12  states:  Okay.  And Mr. Woodley in your deposition said:  Let me

13  state it the opposite way.  If Mr. Davis had not placed the

14  telephone call to the mayor in April of 2006 and had not that

15  telephone conversation, he would not have been charged with a

16  second group II offense; is that correct?

17  A.  That's right.  There would have been no violation.

18  Q.  Right.  Next question:  Right.  Same question.

19      Turning to page 33.

20      If he had not placed the telephone call and had the

21  telephone conversation with the mayor in April of 2006, he would

22  not have been charged with the first group III offense; is that

23  correct?

24  A.  Yes, sir.

25  Q.  And your answer that day was what?

1  A.  That's my understanding.  Yes, sir.

2  Q.  And if he had not placed that telephone call, he would not

3  have been discharged; is that correct?

4  A.  Yes, sir.

5            MR. BROWN:  Thank you, sir.

6            THE COURT:  Mr. McKoon?

7            MR. MCKOON:  Judge, I have no further questions of

8  Mr. Waters.

9            THE COURT:  All right.  You can come down, Mr. Waters.

10           MR. MCKOON:  May I approach for just one moment?  Just

11 one moment.

12           THE COURT:  All right.  Just a minute.

13           MR. MCKOON:  I don't need the court reporter.

14           THE COURT:  Pardon?

15           MR. MCKOON:  I don't need the court reporter.

16    (Bench conference held off the record)

17           THE COURT:  Ladies and gentlemen, I think you'll be

18 pleased to hear this.  There's a witness who has been available

19 but has gotten unavailable but will be tomorrow morning, and

20 he's not supposed to take too long.  But the point is that the

21 lawyers and I will be able to do some things that have to be

22 done outside of your presence this afternoon instead of taking

23 up your time tomorrow.  So in the long run, it may save us some

24 time.  It won't cost us any time.  So we're going to recess

25 until tomorrow morning at nine o'clock and take up these other

619

1   matters.

2        So I'll remind you, you're still under instructions not

3   to discuss the case with anybody or let anybody discuss it with

4   you or in your presence or among yourselves, and you're not to

5   listen to anything or read anything about the case.  I ask you

6   to be back in the jury room in time to come in and resume the

7   trial tomorrow morning at nine o'clock.  Nine o'clock.

8        (Jury out at 4:00 p.m.)

9        THE COURT:  All right.  We're in recess until nine

10  o'clock.  And I'll see counsel in chambers.

11       (Chambers discussion held off the record)

12       (Evening recess at 4:28 p.m.)

13                    * * * * * * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

```
1                   COURT REPORTER'S CERTIFICATE

2          I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4          This 16th day of May, 2008.

5

6                              /s/ Risa L. Entrekin
                               Registered Diplomate Reporter
7                              Certified Realtime Reporter
                               Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```