```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE MIDDLE DISTRICT OF ALABAMA

 3                        EASTERN DIVISION

 4

 5   DAVID DAVIS,

 6          Plaintiff,

 7      vs.                    CASE NO.:  3:06cv544-WHA

 8   PHENIX CITY, ALABAMA, et al.,

 9          Defendants.

10

11                        VOLUME IV

12              * * * * * * * * * * *

13              JURY TRIAL PROCEEDINGS

14              * * * * * * * * * * *

15         BEFORE THE HONORABLE W. HAROLD ALBRITTON, UNITED

16   STATES DISTRICT JUDGE, and a jury, at Opelika, Alabama, on

17   Thursday, March 6, 2008, commencing at 9:10 a.m.

18   APPEARANCES:

19   FOR THE PLAINTIFF:      Mr. Douglas L. Steele
                             Attorney at Law
20                           WOODLEY & McGILLIVARY
                             1125 15th Street NW, Suite 400
21                           Washington, D.C.  20005

22                           Mr. Gary Lamar Brown
                             Attorney at Law
23                           FITZPATRICK & BROWN
                             Farley Building, Suite 600
24                           1929 Third Avenue North
                             Birmingham, Alabama  35203
25
```

```
 1   APPEARANCES, Continued:

 2   FOR THE DEFENDANTS:        Mr. James Robert McKoon, Jr.
                                Mr. Joshua Robert McKoon
 3                              Attorneys at Law
                                McKOON, THOMAS & McKOON
 4                              925 Broad Street
                                Phenix City, Alabama  36868
 5
                                Mr. James Paul Graham, Jr.
 6                              Attorney at Law
                                THE GRAHAM LEGAL FIRM
 7                              P.O. Box 3380
                                Phenix City, Alabama  36868-3380
 8
                    Proceedings reported stenographically;
 9                    transcript produced by computer.

10                      * * * * * * * * * *

11                          VOLUME INDEX

12   DEFENDANT RESTS                              623

13   STIPULATION                                  623

14   PLAINTIFF RESTS (REBUTTAL)                   624

15   CLOSING ARGUMENTS
          MR. McKOON                              639
16        MR. STEELE                              659
          MR. McKOON                              680
17        MR. STEELE                              690

18   CHARGE OF THE COURT                              692

19   JURY VERDICT                                 707

20                      * * * * * * * * * *

21      (The following proceedings were heard before the Honorable

22       W. Harold Albritton, United States District Judge, and a

23        jury, at Opelika, Alabama, on Thursday, March 6, 2008,

24        commencing at 9:10 a.m.:)

25      (Call to Order of the Court)
```

```
 1              THE COURT:  Good morning, ladies and gentlemen.
 2   Welcome back.
 3              All right.  Mr. McKoon?
 4              MR. MCKOON:  Your Honor, at this time, the defendant
 5   would rest.
 6              THE COURT:  All right.  The defendant rests.  At this
 7   point, I'll call on the plaintiff for any rebuttal testimony.
 8   And I want to advise the jury -- and this is what's held us up a
 9   little bit this morning -- the plaintiff has a right to call a
10   witness to rebut specific testimony that was given in the
11   defendants' case.  There's a witness they want to call who's not
12   available, but the two sides have agreed that if she were here,
13   what she'd testify to.
14              And so Mr. Steele?
15              MR. STEELE:  Thank you, Your Honor.  The parties have
16   agreed that if the witness was present, she would testify that
17   the Captain Boatner retirement dinner that the association held
18   was held on January the 13th, 2005.
19              THE COURT:  And that witness is?
20              MR. STEELE:  That witness is Captain Anne Land, who you
21   saw previously a couple days ago.
22              THE COURT:  And the defendants have agreed that she
23   would testify to that and also do not disagree that that would
24   be correct.
25              MR. STEELE:  Thank you, Your Honor.
```

1          THE COURT:  Is that right, Mr. McKoon?

2          MR. MCKOON:  Yes, sir, Your Honor.  That's absolutely

3  correct.

4          THE COURT:  All right.  With that, does the plaintiff

5  rest?

6          MR. STEELE:  The plaintiff also rests, sir.

7          THE COURT:  This puts the case in a posture that's

8  going to be a little inconvenient for you-all, and I regret it,

9  but that's -- there's no way to avoid it.  With no other

10  witnesses having been called and that putting the -- ending the

11  testimony in the case, it's not going to be possible for us to

12  go straight into it right now and have the case argued and

13  turned over to you.  There's got to be some time for me to meet

14  with the lawyers and go over the instructions to be given you

15  based on the state of the evidence now, now knowing what all the

16  evidence is here, and also to resolve just what questions you're

17  going to be asked to answer.  So we're going to have to wait

18  until the first part of the afternoon to have you come back.

19  I'm going to -- I'm going to ask you to come back at one o'clock

20  this afternoon.  We'll have it put together by then.

21          What will happen after you come back, there will be no

22  more testimony.  The lawyers will make their closing argument to

23  you.  When they get through, I will instruct you on what the law

24  is.  I will give you copies of the forms that you're going to be

25  asked to fill out answering specific questions, and then we'll

1    let you retire to the jury room.  I'm sorry that we can't get

2    right into it this morning.  I hope you'll be able to find some

3    way to use your time between now and one o'clock; but if you'd

4    like, the jury room is available to you.  And we'll have -- I

5    guess it still has water and soft drinks in it.

6         I'll ask you to be back in the jury room in time to

7    start this trial back at one o'clock.  All the evidence is in

8    now, and so I'll remind you not to begin discussing this case

9    with each other yet.  Listen to the argument of counsel and

10   listen to my instructions on what the law is before you do

11   that.  And don't talk to anybody else or let anybody talk to you

12   or in your presence.  And I'll see you back at one o'clock this

13   afternoon.

14      (Jury out at 9:14 a.m.)

15         THE COURT:  All right.  We'll be in recess.  And

16   counsel, if you'll just hold on here, I'll get something out to

17   you shortly.

18         MR. STEELE:  Thank you.

19         MR. MCKOON:  Thank you, Your Honor.

20         THE COURT:  Oh, yes.  Let me call court back.  Elna

21   call court back to order.

22         THE CLERK:  Excuse me.  Court is back in session,

23   please.

24         THE COURT:  I neglected to take up motions at this time

25   at the conclusion of the evidence.  Mr. Steele?

1          MR. STEELE:  Your Honor, I would like to renew the

2    motion made yesterday for judgment as a matter of law.

3          THE COURT:  On the entire case?

4          MR. STEELE:  On the entire case, Your Honor.

5          THE COURT:  All right.  I deny that motion.  Do you

6    have a separate motion as to the issue?

7          MR. STEELE:  I do, Your Honor.  The separate motion is

8    a motion for judgment as a matter of law with respect to the

9    substantial and motivating factor portion of the *Pickering*

10   test.  We believe that the evidence that's come in, even though

11   witnesses have testified to multiple motivations, that the

12   documentary evidence as well as the testimony of every witness,

13   including Chief Hunter, was very clear that the straw that broke

14   the camel's back on this was indeed the phone call made to Mayor

15   Hardin.

16         THE COURT:  Mr. McKoon, do you have any response to

17   that?

18         MR. MCKOON:  Judge, just the state of the evidence as

19   it is, that the form itself says that he's fired for a group II

20   violation -- second group II violation.  That would be our

21   response to that.  We believe that while that -- the firing and

22   the reason that he was actually brought in and written up was

23   because of the phone call, that the fact that he was fired was

24   part of the progressive discipline process of the merit system

25   and that, therefore, we can agree that that's a substantial

 1    motivating factor.  That's all I would say.

 2            THE COURT:  All right.  The state of the evidence is

 3    that he would not have been fired except for that speech.  There

 4    were other reasons also.  He would have been disciplined, but he

 5    wouldn't have been fired.  I understand the argument that's made

 6    by defense counsel that the results of the termination would

 7    have been -- would have been the same, but he wouldn't have

 8    been -- he wouldn't have been disciplined at all if he hadn't

 9    made the call.  So I think it's clear that the substantial

10    motivating factor was that he made the call.  I don't see any

11    way around that.  I grant the motion.

12            MR. STEELE:  Thank you, Your Honor.

13            THE COURT:  Judgment as a matter of law on the issue

14    that the telephone call was a substantial or motivating factor

15    in termination.

16            Did you have any motions?

17            MR. MCKOON:  Judge, I do.  We have a motion for

18    judgment as a matter of law also, which we just state for the

19    record.  We have filed a written motion now, and the Court can

20    consider it at some later time or now if you want to.  You know

21    what the state of the evidence is at this current time.  So I

22    just filed a -- just say that we would move for judgment as a

23    matter of law on behalf of the defendant.

24            THE COURT:  I deny the motion.

25            MR. MCKOON:  I have a second motion, and the second

 1  motion would be that the Court find as a matter of law that ASOP

 2  12 applies whether a firefighter is on or off duty.  And the

 3  reason we say that is we agree with -- well, let me put it this

 4  way.  We think that the -- that the Court can view this as a

 5  contractual matter and that ASOP 12, in my mind -- and I think

 6  the state of the evidence would be -- would basically be

 7  meaningless if a firefighter could violate it just because he's

 8  off duty.  To say that -- in this particular kind of speech,

 9  which is speech to the city council, in the environment in which

10  we find ourselves, which we have a public safety department, a

11  paramilitary organization which has a heightened interest in

12  harmony and discipline and loyalty in the department has an

13  absolute right to restrict speech up to a point.  And to say

14  that ASOP 12 would only apply on duty would make the policy

15  meaningless.  And so we think that the Court can decide as a

16  matter of law that ASOP 12 applies both on and off duty.  And so

17  we would make that motion.

18          THE COURT:  I'm going to reserve ruling on that.

19  That's in the nature of what we've been talking about.  I'm

20  inclined to agree with the plaintiff's position at this time

21  that there's room there for a factual determination by the jury

22  with both sides arguing that in one form or another.  But let me

23  get back and look at these questions that you-all have submitted

24  and think about that, and then I'll make a ruling on it.  I

25  understand your -- is there anything other than what you've told

1    me before as to your -- well, you've cited me some cases.

2         MR. STEELE:  Right.  I've cited some cases.  We haven't

3    seen the motion.  It was probably filed this morning, his

4    renewed motion, so I don't know what is contained in that.

5         In addition to the cases cited, I would also call the

6    Court's attention to the fact that this was speech to a public

7    official on a matter that he would be voting on.  And the merit

8    system rules established and enacted by the city council clearly

9    and explicitly preserve the rights of their employees to engage

10   in political activity -- and we view this as a form of political

11   activity -- as long as they're doing it off duty.  And what that

12   means is that the city council has recognized and actually

13   incorporated into the rules that govern all employees -- and

14   City Manager Roberts said very clearly, including the fire

15   department -- they've incorporated that -- the concept that's

16   represented in one of the cases that I cited to you this morning

17   that there is a distinction between on duty and off duty for the

18   employees of the city.  And Chief Hunter, whatever his

19   intentions are, he doesn't have the authority to overrule that

20   principle that was contained in the merit system.

21         THE COURT:  Let me make sure I understand the

22   plaintiff's position on this.  My understanding of it is that

23   it's not the plaintiff's position that you think I ought to rule

24   as a matter of law the other way from what the defendant asked

25   me, but that you think this is an issue to submit to the jury;

1    is that right?

2          MR. STEELE:  Correct, Your Honor.

3          THE COURT:  Okay.  I'll take it -- yes.

4          MR. MCKOON:  May I say just one other -- I'll be very

5    brief, Judge.  In the defendants' motion for judgment as a

6    matter of law, we address this particular issue that we're

7    talking about in paragraphs 13 and 14.  Rather than just sitting

8    here and reading that to the Court, I'll just give it to you for

9    your consideration since you're going to rule on it a little

10   while later.

11         THE COURT:  When you say this, you're talking about off

12   duty?

13         MR. MCKOON:  Yes.  Yes, sir.

14         THE COURT:  After plaintiff's counsel has a chance to

15   look at this and before I rule, if you have anything to say

16   about it, I'll hear you.

17         MR. STEELE:  Thank you.  I appreciate that, Your Honor.

18         THE COURT:  All right.  We'll be in recess.

19         MR. MCKOON:  Thank you, Your Honor.

20      (Recess at 9:23 a.m. until 9:48 p.m., at which time

21       proceedings reconvened without the jury present, as

22       follows:)

23         THE CLERK:  Court is in session.  You may be seated.

24         THE COURT:  All right.  On the defendants' motion for

25   judgment as a matter of law on whether ASOP number 12 applies

1    off duty, I deny the motion.  I've read the brief.  The

2    defendant has got two bases for asking for that.  One is if the

3    evidence clearly establishes that without controversy.  I don't

4    agree with that.  And then second, that these regulations should

5    be considered together as though they were a statute, should be

6    considered under the statutory interpretation with a citation

7    for that.

8         But considering the evidence that's before me, I do not

9    find evidence to establish that the merit system rules and

10   regulations and ASOP 12 were promulgated under any legislative

11   act making them binding as if they were statutes.  I don't find

12   the statutory interpretation rule that applies to statutes to be

13   applicable in this case.  So I'm going to let this go to the

14   jury.  I'm going to -- and I do deny that motion.

15        I've got a form that I'm going to give counsel in a

16   minute to look over that's my thinking now about the

17   interrogatories after the conference that we had earlier,

18   which -- and with my ruling based on substantial and motivating

19   factor, I've left that out.  I've put in a finding as to the

20   telephone call being a violation of ASOP 12 along the lines that

21   we discussed.  I'm not holding you to it, but I understand both

22   sides felt comfortable with that.

23        I've put other -- I've put other questions in a form

24   that appears to me to be appropriate to allow the jury to

25   find -- to find damages under certain circumstances, but

1   allowing that if they find all of certain questions in a way

2   that would be favorable to the defendant, that they don't get to

3   the damages issue.  I think that it's -- I've got to either

4   charge them that way or I've got to charge them in a way that

5   tells them there's something left to be done by the Court and

6   that this damages may turn out to be just an advisory issue.

7   And I'm persuaded by what plaintiff said, that that may be

8   confusing to the jury and possibly prejudicial to the

9   plaintiff.  But I think giving them a verdict form or the

10  interrogatories that require them to return a verdict with an

11  issue of damages without saying there's some way we don't do

12  that is prejudicial to the defendant.  I think this resolves it

13  both.  But I'm going to pass these out to counsel and give y'all

14  an opportunity to look at them.  We'll get together back in the

15  robing room as soon as you're ready.  We're in recess.

16       (Recess at 9:52 a.m. until 12:30 p.m., at which time

17        proceedings reconvened in chambers without the jury

18        present, as follows:)

19           THE COURT:  All right.  I wanted to go on the record on

20  this about the order of closing argument.  Then we'll talk about

21  the jury instructions, how we need it to be.  But let me say for

22  the record that the issue has come up as to the order of closing

23  in this case because the questions that are going to be answered

24  by the jury apply only to defenses by the defendant except for

25  damages.  And the defendant has requested that the order of

 1    closing argument be that the defendant, having the burden of

 2    proof on everything except damages, go first and the plaintiff

 3    come in the middle and the defendant close.  I've asked the

 4    lawyers to see what law they could find during the lunch or

 5    no-lunch period, and I've been doing the same thing.  And so

 6    since the request was made from the defendant, I'll ask them to

 7    speak first.

 8           MR. MCKOON:  Judge, it just looks like to me that

 9    the -- the law seems to be -- we found an Eleventh Circuit case,

10    which is *Martin* -- excuse me.  A Fifth Circuit case -- I

11    apologize.  *Martin versus Chesebrough-Pond's*, and it looks like

12    it's 614 F.2d 498, which seems to hold that this is in the sound

13    discretion of the Court.  It says, Normally the party with the

14    burden of proof has a right to open and close.  Where, however,

15    several defendants plead over against each other, the order of

16    their arguments as among themselves rests within the sound

17    discretion of the Court.  It's not exactly on point, but it does

18    seem to say that.

19           THE COURT:  Let me save us some time because I -- I

20    haven't seen that case, but I've seen some others to similar

21    effect.  And let me just hear from the plaintiff.

22           MR. STEELE:  From what we've been able to determine in

23    the short period of time, it does appear to be a matter that's

24    within the Court's discretion.  And I don't disagree with

25    anything Mr. McKoon said on that.  We weren't able to find

1    examples that we could give you that would give you guidance in

2    one direction or another.  If they're out there, we didn't come

3    across them.  But I have to agree with what Mr. McKoon said,

4    that it rests with your discretion.

5         THE COURT:  Okay.  Some of the cases I've looked at,

6    one is the *U.S. versus 2,353.28 Acres of Land*.  It's a Fifth

7    Circuit case in 1969, 414 F.2d 965.  It is for the general

8    proposition we're talking about.  It says -- in the context of

9    saying that it's within the discretion, it says, We merely

10   observe that traditional notions of fairness favor giving the

11   privilege of opening and closing to the party who carries the

12   burden of proof.

13        There's -- I've found a Seventh Circuit case in 1992,

14   *Moylan*, M-O-Y-L-A-N, *versus The Meadow Club*, 979 F.2d 1246, in

15   which the question of reversing the summations came up and the

16   district judge did reverse summations.  And they say, Moylan

17   argues that the district court erred in reversing the order of

18   summations.  It is customary for the party bearing the burden of

19   proof to open and close the argument.  That party is usually the

20   plaintiff, but in this case the district court allowed the

21   defendant to argue first and last, since the only remaining

22   issue at closing was the affirmative defense.  And there was no

23   error there.  That case did not involve an issue of damages

24   because they had been stipulated to.  So we've got a little

25   different situation here.

 1          An old Fifth Circuit case but not binding because it

 2   was -- it was December 2nd, '81, and was a Texas case is *Moreau*,

 3   M-O-R-E-A-U, *versus Oppenheim*, O-P-P-E-N-H-E-I-M, 663 F.2d 1300

 4   at 1311.  And there was an objection to the realignment of the

 5   parties and not allowing the plaintiff to open and close.  And

 6   they simply point out that it's not a subject of error, being

 7   discretionary.

 8          There's a recent case that was just noted from a

 9   district court case in Texas, Southern District of Texas, *Reyes*,

10   R-E-Y-E-S, *versus Texas Ezpawn,* E-Z-P-A-W-N, 2000 Westlaw

11   3143315, in which the district judge there held that the

12   burden -- the plaintiff's burden of proof was met, and so the

13   burden shifted to the defendant to prove the defense.  In this

14   case, there was also some issue of damages.  The Court realigned

15   the case for argument and held that the predominant issue

16   remaining was an affirmative defense.  And so he, citing this

17   Seventh Circuit case, reversed the order of summations totally.

18   And even though there was an issue of damages, he allowed the

19   defendant to open, defendant to close, and plaintiff to come in

20   the middle because he said it predominantly involved the issue

21   of liability.

22          So clearly, I think the thing -- the thing for me to

23   decide is what's fair, considering the burden of proof.  And the

24   suggestion that I mentioned earlier seems reasonable and fair to

25   me; that is, to let the defendant open, having the burden of

1    proof on the defense, let the plaintiff then argue in response

2    to that and argue damages for the first time, let the defendant

3    come back and respond to both the liability issue and damages,

4    and then let the plaintiff close, limited to damages.  Does

5    anybody want to get anything on the record about that?

6            MR. STEELE:  Yes, Your Honor.  A couple of things.

7    We'd like to state for the record an objection so we can

8    preserve that.

9            THE COURT:  All right.

10           MR. STEELE:  Because we believe that with the damage

11   element still out there, that that gives us an ultimate burden

12   of proof.  I just wanted a clarification on the suggestion

13   here.  And I think you said this last time, but maybe not this

14   time, that when the defendants open first, they would be opening

15   on everything except for damages; is that correct?

16           THE COURT:  Correct.

17           MR. STEELE:  Here's the concern that I have.  And maybe

18   there's a way of the Court giving an instruction to the jury so

19   that they'll understand what's going on.  The defendant has the

20   responsive argument and gets to argue not only damages, but

21   facts and the merits of the case.  And if we, then, come up in a

22   rebuttal and only talk about damages, I think that leaves a

23   question to the jury over whether we just accept what Mr. McKoon

24   said in his and why aren't we saying this or why aren't we

25   saying that.  So I think that if the Court's going to adopt this

 1  structure, it would really be necessary to inform the jury that

 2  under the structure the Court has established, that our rebuttal

 3  is limited to that item and that they should not draw any

 4  inferences from -- from that limitation.

 5       THE COURT:  I think that's reasonable.  I don't think

 6  it's necessary -- and I don't think anybody is asking for it --

 7  for me to talk to them about the -- ahead of time, before

 8  closing arguments, about who's going to go first and then what

 9  and all that.  You're not asking for that.  You're just asking

10  when you get up to respond on damages, that I tell them I've

11  limited you to speaking only about damages.  Don't take that to

12  mean that you wouldn't like to talk about the other parts, but

13  you're limited to talking about damages.

14       MR. STEELE:  That would be fine.

15       THE COURT:  Is that what you're asking for?

16       MR. STEELE:  Yes.

17       THE COURT:  Do y'all agree with that?

18       MR. MCKOON:  Yes, sir.

19       THE COURT:  That's fine.  Your objection is overruled.

20       Thank you, Risa.  We'll talk about the other things off

21  the record.

22    (Chambers conference concluded at 12:42 p.m., after which,

23     at 1:14 p.m., proceedings reconvened in open court without

24     the jury present, as follows:)

25       THE CLERK:  Court is in session.  You may be seated.

 1          THE COURT:  Okay.  We've discussed this off the record,

 2   but I want to put this on the record, that all of the exhibits,

 3   all the documents that have been given to the courtroom deputy

 4   in the black book for the plaintiff and white book for the

 5   defendant are offered by the parties and are admitted in

 6   evidence.  Is that correct, plaintiff?

 7          MR. STEELE:  Correct, Judge.

 8          THE COURT:  Both sides?

 9          MR. MCKOON:  Yes, sir.

10          THE COURT:  Also, copies of those were prepared by the

11   lawyers and have been in the jury box with the jurors.  And it's

12   by agreement of the parties and my agreement also that those

13   books can go back to the jury room with the jurors.  Is that

14   correct for both parties?

15          MR. STEELE:  Yes, sir.

16          MR. MCKOON:  Yes, Your Honor.

17          THE COURT:  All right.  Now, are both sides okay with

18   the full Court's instructions now that they've been delivered?

19          MR. STEELE:  Yes, Your Honor.

20          THE COURT:  Plaintiff and --

21          MR. MCKOON:  Defendant is satisfied.

22          THE COURT:  All right.  Let's bring in the jury.

23      (Jury in at 1:15 p.m.)

24          THE COURT:  Be seated.

25          All right.  Ladies and gentlemen, all the evidence is

1    in.   It's now time for the lawyers to speak to you in closing

2    argument.   When they finish, I'll give you the Court's

3    instructions on the law, and then the case will be put in your

4    hands and you'll retire to the jury room.   The defendant will go

5    first.

6         Mr. McKoon.

7         MR. MCKOON:  Yes, sir.  If it please the Court, ladies

8    and gentlemen of the jury, I want to start off by thanking you

9    for being so attentive in this case.   This is the time in the

10   case when I get to talk to you about what I believe the evidence

11   has shown.   But what I say the evidence has shown doesn't

12   matter; it's what you think it's shown.   Usually I'm real

13   nervous when I get up in front of people in closing argument;

14   for some reason, today I'm kind of eerily calm about this.

15        It's going to take me a few minutes to go through some

16   things with you; but I think as we go through them, you're going

17   to see what's going on in this case.   I will tell you that this

18   is a little bit different than the typical case where you go

19   back and find for the plaintiff or the defendant.   What you're

20   going to be doing in this case is you're going to be answering a

21   series of questions that the Court is going to pose to you.   And

22   the defendant bears the burden of proof on these questions.

23   That means we must prove these things to you.

24        And I like to think of myself as kind of a no-nonsense

25   person and getting to the point, so I'm going to try to get to

1    the point real quick of just what the questions are.  And I'm

2    going to go over them again with you before we get through.  But

3    questions you're going to be asked is you find by a

4    preponderance of the evidence that the defendants have proved

5    that the plaintiff's -- Mr. Davis -- telephone call to Mayor

6    Hardin was a violation of ASOP 12.  That's one of the questions

7    you'll have to answer.  Was that call -- did it violate ASOP 12.

8         The second question is that the defendants have

9    proved -- meaning the city and the defendants sitting over here,

10   Mr. Roberts and Mr. Hunter -- that -- have we proved that under

11   the policies and practices of the Phenix City, a firefighter,

12   after exhausting the chain of command in the Phenix City Fire

13   Department, could speak without obtaining prior permission to

14   the following:  the city council, Mayor Hardin and other city

15   council members individually, or the media.  And there's a place

16   to answer those questions yes or no.

17        The next question -- and we think it should be your

18   last question that you have to answer -- is that the defendants

19   have proved that the telephone conversation between the

20   plaintiff and Mayor Hardin concerning the proposed ordinance to

21   extend probationary period for new firefighters disrupted or

22   impeded the operations of the Phenix City Fire Department or had

23   a reasonable likelihood of disrupting or impeding those

24   operations.  We think you should answer yes to all of those

25   questions.  And if you do, that will end this case.

 1          Now, I want to talk for just a moment about what I

 2    believe is important in this case from the standpoint of how you

 3    should consider it, and that is this.  Everybody in the world --

 4    in the United States feels like they have a right to free

 5    speech, and we do.  We all have a right to free speech.  There's

 6    a gentleman sitting right over here that's actually put his life

 7    on the line before for that right, and I bet there's some of you

 8    that might have done that.  And so it's an important right, and

 9    I think it is important.

10          At the same time, if you're in a paramilitary

11    organization like a fire department or police department, you

12    give up just a little of that right.  And that means that the

13    person that you're working for, your employer, can put a

14    reasonable restriction on that right.  And that reasonable

15    restriction is so that there's not chaos in the operations of

16    public safety departments.

17          Imagine what could happen if every time a police

18    officer or a firefighter was disgruntled about something he

19    could call a press conference about it and start talking about

20    it before he ever took it up the chain of command.  You can't

21    run -- as my daddy used to say, that's no way to run a

22    railroad.  You just can't run a department like that.  All we

23    have asked Mr. Davis to do is comply with what we feel like is a

24    reasonable policy, a very reasonable policy.  And he was asked

25    to do it time and again, and he broke it time and again.

1              The thing you have to think about in this case, I

2    think, or any case you consider, is you have to look at the

3    truthfulness, the truthfulness, of the plaintiff's claim.  And

4    you -- the Judge is going to tell you at the end of this case

5    that you have to look at the credibility of witnesses.  You have

6    to size them up and say, were they truthful with me or were they

7    not truthful with me.

8              Now, here's what this case is really about.  It's about

9    who's going to run the fire department of Phenix City.  Is the

10   chief going to get the chance to run this department and run it

11   correctly, or is some gang of folks going to go off to the side

12   and decide what they want to do and run the department?  That's

13   what this case is really about.  And I'm fixing to show you the

14   evidence that points you in that direction.

15             I want you, if you would, to look at your white exhibit

16   book.  And I want to go to -- and I'm going to try to go through

17   this kind of chronologically.  Go to Exhibit #1 real quick,

18   March the 15th, 2005, and I'll just tell you what that is.  That

19   is a letter from Mr. Roberts to Mr. Malone seated here who's

20   been here every day all week in this case.  He's a union guy.

21   And he and Mr. Davis are union buddies, okay?  Nothing wrong

22   with that.  I'm not anti-union.

23             But what this is about is they have made a complaint

24   involving the previous fire chief, Chief Prater, about a meeting

25   they had with him, and they didn't like that meeting.  And so

1  they sent a letter to Mr. Roberts saying who -- who can we talk

2  to in your department if we want to talk to somebody?  Who can

3  we talk to over there in Phenix City?  And so Mr. Malone sent

4  the letter as the field representative of the union, and

5  Mr. Roberts responded to him and said come to me.  Any union

6  member or official can come see me if they've got a problem.

7  That's what that was about.

8          Now, say, well, y'all didn't copy Mr. Davis on that.

9  And that's going to be part of the whole theme of this case.

10 Everything in this case is supposed to be the city's

11 responsibility or Chief Hunter's responsibility or Mr. Roberts'

12 responsibility.  Where is Mr. Davis's responsibility?  Where is

13 his responsibility?  Where is Mr. Malone's responsibility?

14 Isn't he supposed to pass that letter along?  He's the one

15 making the complaint.  So in addition to having a right to go up

16 the chain of command, if you would, we gave Mr. Davis over here

17 kind of a super right.  We let him go straight to the city

18 manager if he wanted to.  He never took that chance.  That's in

19 March.

20          Then what happens is in August -- and we went into this

21 in a very limited fashion, but you've seen this exhibit many

22 times.  I believe it's Exhibit #17 in your -- in that white

23 book.  But if you just start chronologically and you look here,

24 first of all, you see the reference to that letter to

25 Mr. Malone.  And the reason it's on there is because it's not a

1  violation of the merit system.  It's to show that he -- that

2  Mr. Davis knew or should have known that he could have gone to

3  Mr. Roberts with any problem that he had.

4         And, you know, it's kind of a funny thing about this

5  case, and I have to mention it now.  But we've been given the

6  burden of proving that if he had done these things -- if he had

7  done these things, he could have gotten to the city council or

8  gotten to the media.  Why do we have that burden?  Because he

9  never did them.  He never tried them, you know.  It seems like

10  to me the burden ought to be on him to at least try to follow

11  the procedure before you say people are silencing me.  Go up the

12  chain.  That's what you're supposed to do.

13         Now, let's go to the next thing.  This was the offense

14  that helped to get him terminated.  It is a group II written

15  warning, line -- for threatening, intimidating, coercing or

16  interfering with a fellow employee or supervisor, including

17  abusive language.  Now, we didn't go into all the details of

18  that episode and I can't today, but I'm going to tell you that

19  that's the first offense for which he really tied into this

20  later offense that got him dismissed.

21         The next thing is -- it's in August 3rd of 2005.  So

22  he's counseled for that, written up for it, given a group II

23  discipline for it, not fired.  And then on August the 22nd when

24  Mr. Davis is in charge of somebody, he orders a firefighter to

25  do 25 push-ups for forgetting his uniform shirt when he had no

1    authority to do that.  He said, okay, give me 25.  He didn't

2    have any authority to do that.  Not supposed to do that.  It's

3    not in the merit system.  But that's what he did.

4            So that leads us to the September incident.  And I want

5    to talk about that at some length, maybe five minutes or so.

6    When we get around to this media incident in September -- and

7    let's go back just a minute.  Chief Hunter, this man over

8    here -- to all the people that came in here, I said, is this man

9    fair with you?  Yes, he's been fair with me.

10           He is a fair man.  I'm proud to be here with Wallace

11   Hunter.  And whatever you do with this case, I'll still be proud

12   to be with him.  He is about -- he puts up with more than I

13   could ever put up with.  And I'm fixing to show you why.

14           When you -- when they went to this meeting, Mr. Davis

15   was disingenuous with you about what happened.  He got up here

16   and said I -- a reporter called me because he heard there were

17   some problems over in the fire department.  Now, isn't it

18   interesting that those problems come right on the heels of him

19   being disciplined in August?  He's disciplined on August the

20   3rd, and he doesn't like that, and again on August the 22nd.  So

21   on September the 20th or right around September the 16th, I

22   think it is, that newspaper article appears.  And he says, oh,

23   okay, you know, this reporter just called me out of thin air and

24   wanted to know if he could come over there and meet with us, and

25   I allowed him to do so.  I didn't invite him.  He just showed

1  up.  And we got to the meeting; we all talked.  And what I put

2  in the paper was I was afraid to talk.  He's talking to a

3  newspaper reporter, but he's afraid to talk.  And then he said,

4  and they took my picture for the thing, but I didn't think they

5  was going to put my picture in the paper.  Now, isn't that

6  silly?  Isn't that silly?

7         Turn to Exhibit #4, if you would, for just a moment.

8  There should be a series of statements in there.  Do you see

9  those?  Let's start with the last one, which is 10(h).  It's a

10  statement -- all of these are statements by the union people

11  that attended the meeting, okay?  It says on Tuesday, August the

12  13th -- I think it should have been September the 13th, but

13  anyway -- I, James Marcus Wells attended a Phenix City

14  Firefighter Association meeting.  I arrived around 1820 hours

15  and the meeting -- the meeting had already started.  Next line.

16  The meeting was called in reference to the association talking

17  to the representative of the *Columbus Ledger-Enquirer* about how

18  people felt about the way the fire department.  While sitting at

19  the meeting -- and he tells who all was there.  While sitting at

20  this meeting, a motion was raised to talk to the media.

21         Well, that was the reason for coming to the meeting.

22         I disagreed with this and stated -- Sergeant Davis was

23  set on everybody speaking.  I also observed other individuals in

24  this meeting stating the same thing, meaning they disagreed with

25  it.  I then felt this meeting was going to do nothing but make

1  problems worse in the department, relations between the

2  association and the city government.  I then left the meeting

3  and did not make any statement to any media personnel.  I don't

4  know who spoke to the media during the meeting.  I can only

5  speak for myself.  Too much embarrassment has been brought to

6  the department by the actions of only a few.

7          And you can read through these other statements if you

8  want to.  Lance Wagner said I got out of there because I -- I

9  didn't even want to be in the union anymore after this.  If you

10  look at 10(d) where he's talking, he says, however, I did not

11  feel this to be a productive way to deal with any of the

12  department's problems, and it has led me to withdraw from the

13  association.  And you can go through and read all of them if you

14  want to.

15          You'll also notice in that same group of documents

16  there are two things that you might want to look at.  One is

17  there's a statement in there -- let me see where that is -- by

18  Firefighter Brannon Wilkinson, and it's handwritten.  It is

19  10(f).  Do you see that?  I, Firefighter Brannon Wilkinson, feel

20  that though Sergeant David Davis -- through Sergeant David Davis

21  and my friendship, Sergeant Davis has felt comfortable enough

22  with me to say some things that have been offensive and

23  abusive.  In my judgment, I did not report this to Assistant

24  Chief Johansen because I felt that it would eventually stop.  I

25  will not be badgered and pushed into doing things I feel in my

 1   heart that are not correct -- the correct way to handle

 2   evaluations or problems.  I feel there are problems in our

 3   department that need to be corrected.  There are correct ways to

 4   fix these problems.  Management and employees can work

 5   together -- can work -- excuse me -- these out through

 6   communication for the betterment of all.

 7          And when he got his counseling form -- when Mr. Davis

 8   got his counseling form about this, on the form it says that he

 9   had been intimidating this firefighter.  So here we've got

10   threatening this lady, getting another fellow to do push-ups he

11   wasn't supposed to do, and now he's trying to intimidate a

12   firefighter.

13          Now, you know, these are not things you sit up here and

14   say, well, you're just picking on Mr. Davis.  I'm not picking on

15   him.  That's his record.  That's his record.  I didn't make

16   these statements.  I didn't know anything about these

17   statements.

18          So here we go.  And what does that tell you about this

19   situation?  Well, there are a lot of things that don't get in

20   records.  They're attitudinal things.  They're the way you act

21   around other people.  When Roy Waters was brought into this

22   situation, he did not know a soul over there in Phenix City, not

23   anybody.  Thirty-two years in the fire service -- there sits Roy

24   right there -- chief the Columbus Fire Department.  One of the

25   best firefighters you'd ever meet.  One of the best public

1    servants you'd ever meet.  He comes in and tries to straighten

2    things out in the department, and he's met with opposition.

3         The swap time that they had, you know, so you could --

4    and like I said, it's a great job.  I'm not -- I'm not

5    diminishing firefighter roles at all.  But, you know, when

6    you're at the station, you're not -- it's not constantly working

7    all the time.  There's -- you know, there's some cooking that

8    goes on.  There's some TV watching that goes on.  There's some

9    sitting around the table that goes on.  There's -- you can go

10   out and wash your own car if you want to.  I mean there's lots

11   of things you can do while you're at the fire station.  You get

12   good pay.  You work ten days out of 30, like I said.  In

13   addition to that, you can swap out with somebody if you want to

14   in the Phenix City Fire Department.  So if you don't want to

15   work four days and you've got a shift coming up, you can get

16   somebody else to come in and work for you and you can pay them

17   back.

18        Well, at some point in time we had an insurance problem

19   about that because somebody on the job didn't look like they

20   were on the job when they had a claim when they got hurt because

21   they didn't clock in because they swapped out with somebody

22   else.  So swap time was taken away for a while.  And you

23   remember what Chief Waters said.  He said, well, you know, one

24   of the things that happened when I was there, when I tried to

25   talk with Mr. Davis, was we had a situation where Chief Hunter

1   had gone to bat for the department, gone back to Mr. Roberts and

2   said we want to get swap time back.  And they gave it back to

3   them.  And Mr. Roberts -- I mean Mr. Hunter comes in, is going

4   to come in and announce it to everybody.  It's going to be a big

5   thing of celebration.  And Mr. Davis sits there looking out the

6   window the whole time.  And the excuse -- and there's a pattern

7   of excuse after excuse after excuse -- was that his mother was

8   having surgery that day.

9           Well, I don't know whether she was or not, but he was

10  at work.  I don't know how serious it was, but he was at work.

11  And in addition to that, what happens is he stands there, looks

12  out the window the whole time after Chief Waters has said now,

13  you know, y'all congratulate the chief on this; you know, let's

14  have a little camaraderie about this.  And he looks out the

15  window and doesn't shake his hand when it's over with.  So they

16  call him in and say, you know, what was that all about; and he

17  says, he's just doing his job.  He should have done that for me

18  anyway, you know.  You say to yourself, what is that -- what

19  kind of attitude does that reflect?  So there's a lot of things

20  goes on that doesn't get on a form like this, and they go on all

21  the time.

22          And the problem is how many chances -- how many chances

23  is Mr. Davis supposed to get?  You know, you just come up the

24  list here.  I didn't start with this stuff about the truck

25  backing up and all that stuff.  That's just a -- I guess that

1    could happen to anybody.  Everybody makes mistakes.  These are

2    intentional kinds of things.  This thing done in September was

3    an absolute intentional thing to try to disrupt the department

4    and try to hurt the chief's authority over there.

5            Now, here we go again when it comes around to this

6    business about what we're here about, this so-called five-minute

7    phone call to the mayor.  Remember you were told right from the

8    beginning that's all this was about?  That's just not true.  It

9    wasn't all that this was about.  Was it the reason, the

10   substantially motivating reason was -- yes.  We admit that.  Had

11   he not made the phone call to the mayor, he probably wouldn't

12   have been fired.  But if he hadn't had the record he had, he

13   wouldn't have been fired either.  If this was his first

14   violation and he made an innocent mistake about that, it would

15   have been fine.  This guy knows the rules better than anybody in

16   the department.  He's got a master's degree.  He studies them.

17   He knows exactly where he can push and push and push and push

18   and does it all the time.  And that's what's been going on in

19   this case.

20           So when this finally happens, you know, the chief says,

21   well -- I mean, you know, he was infuriated about it, and I

22   don't blame him.  It was, like, why do you want to do this?

23   First of all, it was a nothing issue.  Like Chief Waters told

24   you yesterday, it didn't -- it was a nothing issue.  And yet he

25   has not been honest with you even about that because he gets up

1    there and he testifies -- and he testified in his deposition the

2    same way, which was, listen, I was -- I knew it only applied to

3    new hires.

4         Because he's got like three different things he's

5    saying here.  A, it only applied to new hires.  And I was off

6    duty, so I was acting as union president to go around everything

7    to go up to the mayor, and so I didn't have to comply with the

8    policy because, A, I was off duty.  And, B, I was acting in a

9    representative capacity, like a lobbyist, like Mr. Malone is,

10   okay?  That's one thing.  And then the other thing he throws in

11   is, oh, and by the way, Captain Bennett said it was all right.

12        Well, I'm thinking, well, why did you have to ask him

13   if you didn't have to ask him, right?  Why did you have to ask

14   him if you didn't have to ask him?  I mean which is it, you

15   know?  Is it I asked him and I followed the chain of command?

16   Which Captain Bennett wouldn't have the authority to send

17   anybody to the mayor, okay?  That's just another way to say,

18   okay, let's -- you know, if this doesn't work, maybe this will

19   work.

20        That's just another excuse, because there's always an

21   excuse, just like, you know, it's the city's responsibility,

22   supposedly, to get up here and say, okay -- oh, we were supposed

23   to give everybody a copy of the ordinance.  That's what we're

24   supposed to do.  Well, everybody in the department knew about

25   it.  Only two people raised their hand, said is it going to

1  affect me.  No, not going to affect you.  Who -- where is the

2  responsibility on the other side?  Isn't it his job to find out

3  about that if he's got a problem or an interest with it?  He

4  didn't have a problem with it.

5        Now, here's what he said, okay?  Here's what he said.

6  He says one time I knew everything there was to know about it,

7  but he forgot about his personnel review board hearing

8  testimony.  And the only reason I brought it up was this, and

9  the reason I played you the tapes with his words on it was

10  because he said initially, you know, oh, I knew it was only for

11  new hires.  So that means now I'm off duty as a lobbyist for the

12  firefighter people and I'm going around to the mayor, right?

13  And I knew all about it.  I knew that's all it applied to.

14        So then I asked him -- I didn't ask him.  In fact, this

15  is his lawyer asking him questions at the personnel review board

16  hearing.  And it's on tape.  You heard it:  And I said, well, I

17  wasn't aware of that.

18        Let me go back up here.

19        And then I also told him -- this is his conversation

20  with the mayor.  We were against being put on probation after

21  you were promoted, that an 18-month-long probation after you

22  were promoted was a little long, that 12 months was adequate.

23  And that's when he told me that the probation didn't affect

24  people that were already employed, that it would be only -- only

25  be new hires.  And I said, well, I wasn't aware of that.  But

1  no matter what, I just want to let you know what our viewpoint

2  is.  We would be opposed to probation and so on.

3        And then his lawyer's next question was:  So the mayor

4  cleared up your confusion as to whether or not this proposal

5  applied to new employees or all employees in general.

6        This is at the personnel review board hearing which,

7  again -- you know, this is another little thing.  You notice

8  little things when you go through stuff.  At the end of that

9  white book you've got there, you'll see that when Mr. Davis

10  asked the personnel review board hearing for his hearing,

11  there's a time frame.  Let me see which exhibit that is real

12  quick.  It's #19.  There's a time frame in which the personnel

13  review board must meet, okay?  And they were to meet during that

14  time frame, and he said, look, I can't -- I can't be there

15  then.  I've got other stuff I need to do.  Would y'all please

16  put it out past March the 12th?  And we did.  Just another

17  chance for Mr. Davis.  Another chance for Mr. Davis.

18        People came in here and testified in this case.  The

19  mayor told you -- and you're going to hear a lot about this

20  stuff about, well, the mayor had an open-door policy, okay?  The

21  mayor is a politician who at the time he said that was running

22  as a candidate for election.  Then he goes to Todd Boatner's

23  party, and they say he said it again.  Well, we stipulated

24  today -- that means agreed -- that Todd Boatner's party was

25  January the 13th, 2005.  Okay?  Last contact with the mayor with

1    any of the union people, right?

2         When did he go to the newspaper?  When did all that

3    stuff happen?  It was September.  I've lost my board on it, but

4    I can show it to you real quick.  September the 20th, 2005.  So

5    on -- excuse me.  Let's see.  Go to #3, I guess.  See if that

6    helps us.  No, that's just David's statement about giving the

7    interview.  Okay.  It's #6.  I apologize.  #6 in the white book.

8         September 20th, 2005, is right after the newspaper

9    article.  So if there had been any confusion, any confusion

10   about whether he could go to the mayor or needed to follow the

11   policies, it was cleared up in September before this happened in

12   April.  And, you know, you-all have got jobs.  You've all been

13   working for people before.  You go into a place, you know; if

14   somebody called you in about something and said, now, look,

15   here's the rule, don't do this again, and had you sign off on

16   it, don't you think you would remember that?  Don't you -- and

17   wouldn't it at least raise a question in your mind if you

18   started to violate the rule?  You know, you'd say, wait a

19   minute, I believe there was a rule about that.  I was called in

20   about it and I was talked to about it.  Shouldn't I do something

21   about it?

22        And again, why is it so important?  Because if you keep

23   going around people all the time, this man cannot run his

24   department.  And I'm going to tell you something.  He did

25   something pretty gutsy, in my opinion.  When all this happened,

1    he issued -- he issued a memorandum to the city manager that

2    basically said tell the mayor to butt out of my business.

3    That's not his job.  I understand the charter, and the charter

4    is that the city manager is supposed to be running this.  And

5    I'm running this department, and nobody needs to be going around

6    me and exerting -- you know, trying to go around my authority,

7    because that's not the way the charter is written.  And it's not

8    the way it's written.  And it's not -- it shouldn't work like

9    that.

10            Mr. Davis knew all of this.  He knew about the

11   charter.  He knew about the SOP.  He knew about everything.  And

12   if you look at the SOP, it's just -- it's just real simple.

13   This procedure shall be followed by all members of the Phenix

14   City Fire Department.

15            Let me stop there just a minute.  Is this thing any

16   good if you can pick and choose whether you're off duty or on

17   duty when you do it?  Is it any good?  Does it have any meaning

18   at all if you're off duty and you say, oh, it doesn't apply when

19   I'm off duty?  I'll just wait till I'm off duty and go down and

20   talk to the council about fire-department-related business.

21   They can't do anything about me because I'm off duty now.

22            Well, if that's true, then we just need to tear it up

23   and throw it away.  And we need to get rid of the fire chief and

24   we just need to have some kind of little manager there.  And

25   every time we want to do something, we need to take a vote.

1    What do y'all think?  Let's call the 55 members of the fire

2    department in in Phenix City.  What do y'all think about this?

3    We're going to vote and see if it suits all of y'all.

4            Are you going to do that, or are you going to run the

5    department from the top down instead of the bottom up?  Now, I

6    don't know what you believe about that, and you're going to be

7    the people in this case that's going to decide that.  But I

8    don't think you can run it that way.  I don't think you can run

9    it that way.

10           I want to talk about a few other things here in regard

11   to this particular issue of fairness, I think, of fairness.  And

12   that is, think about just a minute, if you want to think about

13   Chief Hunter over here, and whether he's some Nazi-type person

14   that's trying to shut everybody up, which is what we've been

15   accused of.  Think about that.  When Anne Land got up there --

16   she's a captain now.  If you look at that Exhibit #4, she's one

17   of the people that was out there with this article.  Nobody --

18   nobody punished her other than came in and said, Ms. Land, here

19   is the -- here's the rule now; please go by the rule.  And

20   attached to this, by the way, was the grievance -- parts of the

21   grievance procedure and the ASOP.

22           THE CLERK:  Five minutes.

23           MR. MCKOON:  That's fine.

24           Same thing with Karl Taylorson.  He's been made a

25   captain since then.  Nobody's retaliated against him or tried to

 1    hold him down or do something terrible to him.

 2           And I'm going to talk about one other thing real

 3    quickly, and that's this, about changing policies or changing

 4    directions or all that kind of stuff.  This document, #17, which

 5    I showed you a minute ago, was created on April the 20th, 2006,

 6    right after all this happened with the phone call to Mayor

 7    Hardin.  And down here on this document, it cites ASOP 12.  We

 8    haven't changed our position on that since the day this

 9    happened.  Nobody's tried to change it or say it was any

10    different or anything.

11           And the ruling -- it's kind of confusing, because you

12    go up the grievance procedure -- if I have a grievance about

13    something and I take it up the chain to the city manager, his

14    decision on it is final.  I can't change his decision on it.

15    But after that, if I want to go talk to anybody about it, I can

16    go talk to them about it.

17           The ASOP is the same way in regard to the city

18    council.  If a problem can't be solved by anyone in the chain of

19    command, then the city manager will arrange a hearing with city

20    council, which is the same thing it says here.  This is the same

21    thing that was on this written warning form, was all he had to

22    do, all he had to do.

23           And he went through this stuff about, oh, it would take

24    22 days to get there.  Roy Waters was there.  Chief Hunter was

25    there on the 17th.  All he had to do was call them up, just go

1    straight up the chain.  It would have probably taken him an

2    hour, maybe, if that's what he wanted to do if it was some

3    urgent matter.

4         The truth of the matter, it was not an urgent matter.

5    The truth of the matter, he was not only calling on behalf of

6    other people.  The truth of the matter is he didn't call a bunch

7    of other people.  The truth of the matter is he decided this was

8    something he was going to do, and that's exactly what he did.

9         I'm going to get a chance to come back up and talk to

10   you again in a minute; and when I do, I'm going to talk to you a

11   little about some of the witnesses that testified in this case.

12   And at that time, I think you're going to see that this whole

13   case is not about wrapping somebody in the flag and defending

14   freedom.  It's about somebody that got chance after chance after

15   chance and then, finally, he ran out of chances.  He knew the

16   procedures and he violated the procedures.  And I think we have

17   to have those procedures, or we're not going to be able to run

18   our department.  How many people do you know that get written up

19   this many times for something and keep their job?  And these are

20   not made-up things.  There's been no contest about that.

21        I'll be back in a little while.  Thank you.

22        THE COURT:  Mr. Steele?

23        MR. STEELE:  Thank you, Your Honor.

24        Your Honor, members of the jury, first let me begin by

25   thanking you.  I started on Monday by thanking you for your

 1    service because it's the most important part of the case and

 2    it's the reason that we're here, and I wanted to thank you again

 3    for your service and the attention you've given us throughout

 4    this time.

 5          At the beginning of this case, among other things, the

 6    Judge informed you that what Mr. McKoon says and what I say,

 7    that's not facts.  That's just argument.  The facts come in

 8    through the witness -- on the witness stand or facts come in

 9    through documents that are admitted in evidence.  Now, the

10    reason that I have to tell you that and the reason there's a

11    rule on that is a closing argument like you just heard.  You

12    heard Mr. McKoon testifying about all sorts of things that

13    didn't come into the case.  He's testifying about Mr. Malone,

14    who he apparently knows quite well.  There's no testimony in the

15    case about Mr. Malone and his relationship and who he is and all

16    of that.  He provided testimony that Chief Hunter and Chief

17    Waters were at work on the 17th of April, 2006.  There's no

18    testimony about that.  That's Mr. McKoon testifying.

19          When you retire to the jury room and have to reach a

20    decision in this case, I'll ask you to do the same thing that

21    the Court's going to ask you to do, and that's to make a

22    determination based upon the facts that came in in evidence, not

23    facts that Mr. McKoon tells you that you didn't actually hear

24    from any witness.  And if I say anything to you that you think

25    you didn't hear from any witness, you shouldn't be relying on

1  that either.

2         Now, at the beginning of the case, as Mr. McKoon

3  pointed out, I asked you to keep something in mind.  And the

4  first thing I told you was that the evidence was going to show

5  that David Davis was terminated, was fired by the defendant as a

6  result of a five-minute phone call to the mayor.  And here we

7  are, four days later, and where are we?  The Court has

8  determined as a matter of law that Mr. Davis's phone call to

9  Mayor Hardin was a substantial or motivating reason for his

10 termination.  That's been determined by the Court already.  I

11 told you on Monday that that's what I would prove; on Thursday,

12 the Court has already accepted that.

13        Now, here's another credibility item I'd like to raise

14 with you.  As I just told you, the Court has determined as a

15 matter of law that the phone call was a substantial or

16 motivating factor.  Mr. McKoon just stood up there and said, you

17 know what, we admit that it was a substantial or motivating

18 factor.  It's awfully easy to admit something after the Court

19 has already ruled as a matter of law.  But I bet when you were

20 sitting there and you heard Mr. McKoon say that, you didn't

21 think for a minute that it's because the Court already decided

22 that issue.  You thought that there was some generosity going on

23 on the side of the defense.  No such thing.

24        You also probably noticed -- and language matters.

25 People can say things in certain ways to try to inflame passion,

1  right?  Language matters.  Yet you've heard Mr. McKoon refer to

2  the labor association people as a gang.  You used (sic) him

3  throw around the term "Nazi," but you never heard anybody on our

4  side say anything even close to that regarding the chief, but

5  Mr. McKoon throws that term around.  Why does he do that?  He's

6  hoping to distract you from the facts of this case and hope that

7  you're going to decide the case on some other basis.

8          One more item before I get to more of the facts of the

9  case, because I think you need to keep all this in mind.  The

10 Judge is going to instruct you as to the law of the case, and I

11 ask you to pay careful attention to that because Mr. McKoon

12 stood up here and said where is Mr. Davis's responsibility -- he

13 even wanted to know what Mr. Malone's responsibility is, and he

14 hasn't been a witness at all in the case -- and suggested to you

15 that the burden ought to be on Mr. Davis.  Well, guess what?

16 The Judge will instruct you as to the law.  And when you get to

17 those instructions and you see those questions, they're going to

18 tell you that the defendant has the burden of proof whether

19 Mr. McKoon likes it or not.

20         Now, while we're at it, I guess we'll say this on the

21 same topic.  You have exhibit notebooks in front of you, and

22 you're going to have a chance to review all the exhibits when

23 you retire to the jury room.  And Mr. McKoon entirely properly

24 read some of the exhibits to you and read statements from a

25 Mr. Wells or a Lance Wagner or Brannon Wilkinson.  Did you

1    notice something, though?  None of those people testified.  You

2    have no basis for judging the credibility of what those people

3    said.

4            MR. MCKOON:  Judge, excuse me.  I'm going to object to

5    that.  He had every right to call anybody he wanted to.

6            MR. STEELE:  Your Honor, I'm going to object to this

7    interruption.  This is fair closing argument, and Mr. McKoon is

8    aware of it.

9            THE COURT:  Yes.  It's fair closing.  Either side could

10   have called the witnesses.  But Mr. Steele is talking about the

11   fact that they were not up here is something for you to judge as

12   to whether this argument is credible.  So I overrule the

13   objection.

14           And don't take a minute off of Mr. Steele's time.

15           MR. STEELE:  One of the issues that you're going to be

16   called on to examine in this case is the issue of disruption.

17   And here again, this is the time when you're going to have to

18   follow the instructions, because what the instructions are going

19   to ask you to determine is whether the phone call to the mayor

20   on April 17th, 2006 -- whether that phone call either created

21   tremendous disruption in the department or interruption of

22   affairs or was likely to do so.  It's not about a newspaper

23   article.  It's not about anything else.  It's whether a

24   five-minute phone call to the mayor was going to bring this

25   department to its knees.  That's what they're trying to tell

1    you.  A phone call to the mayor was going to bring this

2    department to its knees.  There's no evidence to support that

3    other than bald assertions on their side, but that's what they

4    want you to believe in this case.

5         Now, who made those bald assertions about this is going

6    to ruin the department if somebody can call the mayor when

7    they're off duty?  Who were they?  Mr. Roberts, Chief Hunter,

8    and Chief Waters.  Who was responsible for the termination?

9    Mr. Roberts, Chief Hunter, and Chief Waters.  That may be why

10   they're trying to tell you that there would be all sorts of

11   chaos, to use Mr. McKoon's word, chaos, if they allowed

12   firefighters when they're off duty to have a short phone call

13   with the mayor.  One thing I can tell you when the judge

14   instructs you on the law of this case, the Judge is not going to

15   tell you to leave your common sense behind when you enter the

16   jury room.  Common sense tells you that that five-minute phone

17   call not only didn't cause disruption, it wasn't likely to cause

18   disruption.

19        But since that's an element, let's talk a little bit

20   about these different things that they have alleged were proof

21   of disruption.  First they talked about this newspaper article

22   in September of 2005 and that that caused all sorts of morale

23   problems and other problems and, gee, it's the worst thing that

24   ever happened.  What are the facts?  The facts are that the

25   newspaper article that's in your binder already discussed

1    problems with morale and the other problems in the department

2    that preexisted the publication of the article.  That's why the

3    article was published.

4         Another fact.  Chief Waters testified that when he got

5    to the department in December of that year there were problems,

6    but he described them as typical problems, not out of the

7    ordinary for fire departments.  What does that tell you?  It

8    tells you that the newspaper article didn't create the

9    disruption; disruption created the newspaper article.  And after

10   it got published, things started to get better.  But is proof of

11   disruption so serious that this man should be deprived of his

12   First Amendment rights?  I don't think you're going to buy that.

13        The next issue that they offered in terms of statements

14   of the disruption that they want you to consider -- and they had

15   to come up with some concrete examples, right?  So they want you

16   to be able to say that there was disruption.  Well, let's look

17   at these concrete examples.  Chief Waters offered a couple of

18   them; Chief Hunter offered one of them.  But let's examine them.

19        Chief Waters gave as an example of the disruption that

20   they're laying to rest on Mr. Davis's shoulders that when he got

21   to the department, people referred to each other by their last

22   name.  You know, I don't know what Chief Waters' experience is

23   other than the fact that he doesn't know Alabama, and that was

24   made clear in the cross-examination.  But anybody who's been

25   around a bunch of teenage boys or a bunch of grown men acting

1  like teenage boys knows that calling one another by their last

2  name is not a big deal, certainly not something that you could

3  deprive someone of their constitutional rights for.

4          Then you got to the other horrible, horrible thing that

5  Mr. Davis did.  He's accused of looking out the window.

6  Somehow, he should not have constitutional rights because he

7  looked out the window during a meeting.  Well, let's think about

8  this meeting for a minute.  Chief Waters told you and Mr. Davis

9  told you that they had a swap-time policy, they had it taken

10 away from them, and then they had it given back.  And for some

11 reason, Chief Waters decided that when they got it back, they

12 should have this meeting and everybody should go and you all

13 should -- and he told the people this.  You should all then go

14 up and shake the chief's hand and thank him for it.

15         Now, I have no idea why Chief Waters thought that Chief

16 Hunter needed to have his ego stroked in that way.  I didn't get

17 that impression from the chief when he testified.  But these

18 people have nothing better to do than to go around and create a

19 ceremony and ask the people to have this spontaneous action of

20 shaking hands and saying thank you?  It's something they had

21 taken away from them and got back.  It's almost -- it's almost

22 like you steal your neighbor's car and a year later you decide

23 to give it back to him, and you're expecting to be congratulated

24 for it.  And yet they want you to believe that, you know, this

25 department can't survive if David Davis is allowed to look out

1   the window.

2          And then they told you that after this meeting was

3   over, the management, they all got together.  And what did they

4   say?  Did you see that?  David was looking out the window.  I

5   saw that.  David was looking at the window.  And they all had

6   this big conflict about David looking out the window.  Maybe

7   there would be fewer problems in the department if they worried

8   about real things and not whether Mr. Davis looked out the

9   window or not.  That's not disruption that's going to interfere

10  with the department.

11         Then move on to that, they had another theory.  They've

12  got to have theories on what the disruption is, and this is an

13  interesting one.  It's really kind of a doozy.  Here's the

14  theory.  Chief Hunter writes a memo to the city manager.  For

15  some reason, Chief Hunter -- now, remember, the chief, city

16  manager, city council.  Chief Hunter takes it upon himself to

17  chastise the mayor and claim that he knows better than the mayor

18  what the charter reads.

19         I'm not going to try to tell you who knows better what

20  the charter reads, but the chief was chastising the mayor about

21  it.  And when the mayor found out about it, he took offense to

22  that.  And then the two of them acted like mature adults and

23  stopped talking to one another for a while.  And that's David

24  Davis's fault?  And he should not have free speech rights

25  because the mayor and the chief decided they weren't going to

1    talk to each other for a while?  That doesn't make sense either.

2         So then, you know, we get to a point where you're going

3    to have questions about access to the media and access to the

4    city council, and there's going to be a lot of interesting

5    things that you need to keep in mind when you do that.  Now,

6    there's an exhibit in your notebooks that is the

7    much-talked-about ASOP 12.  You've seen it plenty of times, and

8    I'm sure you're going to be talking about it later.

9         Well, according to the city's witnesses, ASOP 12

10   prevents an employee from talking to the media without

11   permission.  When you retire to the jury room, take the time and

12   read ASOP 12.  It doesn't say one word about the media, not TV,

13   not radio, not newspapers, nothing.  It doesn't say anything

14   about the media.  And if you want a little more evidence that it

15   doesn't apply to speaking to the media, what's the process

16   here?  According to ASOP 12, the process is you go through the

17   steps and then what happens?  The city manager will arrange a

18   hearing with the city council.  Now, I'll talk in a few minutes

19   what I think that means.  But wait a minute.  I want to talk to

20   the media, and the end result is I follow a policy and the city

21   manager will arrange a hearing before the city council.  That

22   doesn't make sense.  ASOP 12 has nothing to do with contacts to

23   the media.  It simply was an excuse to put some discipline on

24   Mr. Davis.  It's really utterly illogical for so many witnesses

25   to stand up here and tell you that ASOP 12 regulated contact

1   with the media.  It just didn't.

2          Now, what do you do with that?  We know that ASOP 12

3   doesn't address contact with the media, so what do we look at?

4   We look at what people say when they were deposed in this case.

5   And Chief Hunter was repeatedly asked questions about contact

6   with the media.  And we've got an example up here, and we talked

7   about it some already, where we asked Chief Hunter some

8   questions about access to the media.  And what does he say?

9   They still don't have the right.  Said, if there's a problem, I

10  can guarantee anyone that I try to do my best to resolve it.

11         Well, I appreciate the chief would try to do his best

12  to resolve it, but he was pretty clear on that.  They don't have

13  a right to go to the media.  And he was asked again.  He had a

14  chance to clarify it, whether they could go to the media, and he

15  said they would violate that, but we've never had it happened.

16  Given what you've learned about the operation of this fire

17  department, are you surprised that they've never had it happen?

18  There's no evidence in this case that any policy or procedure of

19  the city allows individuals access to the media.

20         But we have another piece of evidence that deals with

21  access to the media, and that was admitted as Exhibit #29 in the

22  binder in front of you.  And Exhibit #29 was a memorandum

23  from -- to Chief Hunter from Chief Hanson talking about a verbal

24  counseling with now-Sergeant Taylorson, who you met this week.

25  And the last sentence of that -- that counseling says, I advised

1  him that the city would not put up with another episode of

2  speaking to the media without prior approval.  Chief Hunter, on

3  the stand, agreed with me that -- he may not have worded it the

4  same in terms of "put up with," but he agreed with me that the

5  rest of the sentence was true, that the policy was that they

6  weren't going to have people speaking to the media without prior

7  approval.

8         But then the chief said -- he backed up a little bit

9  and he said, well, "approval" doesn't really mean approval.

10 "Approval" means you get to do it anyway even if I disapprove.

11 That was the first really interesting definition that was

12 presented to you this week but not the only interesting

13 definition.  But "approval" somehow -- and "prior approval" --

14 they were clear on that.  "Prior approval" somehow doesn't mean

15 approval at all.  You can't get that from the documents or the

16 evidence that's before you.  You just have to assume that

17 somehow "approval," in the world that the officials are

18 operating in this week, doesn't mean approval.

19        Then there's reference about this grievance process.  I

20 mean why was there discussions of the grievance process?  This

21 is why there's discussions of the grievance process, and I think

22 you may have noticed this.  When I pushed the witnesses with

23 respect to ASOP 12, which doesn't say a word about the media and

24 doesn't guarantee access to council members, I suddenly get an

25 answer he should have take -- gone and taken a grievance.

1            And then I get the grievance policy out -- and that's

2    in your notebook as well -- and I point out how it's this

3    four-step complicated process, it could take up to 20-some days

4    to be resolved.  And the final step, you only get to the city

5    manager.  So what do they do with that?  The city manager,

6    according to the grievance policy, gets a final nonappealable

7    decision.  Guess what?  They've told you "final nonappealable,"

8    that doesn't mean what it sounds like either.  Because once

9    you're through this final nonappealable stage, you can do

10   whatever you want, according to the testimony this week.  That's

11   not what the document says.

12           And then when you talk about that, they shift you back

13   again and they would start talking about ASOP 12.  And then

14   in -- this is kind of a fun one.  If it wasn't confused enough

15   with them pointing at the grievance process, pointing at ASOP

16   12, suddenly they start talking about a letter that was sent to

17   Mr. Malone.  According to that letter, chain of command doesn't

18   matter a bit.  You can go directly to the city manager.  So

19   we've got chain of command is very important.  Chain of command

20   is extremely important.  You can't make a phone call to the

21   mayor; that would ruin the chain of command.  Then suddenly

22   chain of command isn't all that important because if you have a

23   concern, take it directly to Mr. Roberts.

24           There's not a piece of evidence before you that says

25   David Davis ever received that memo.  Any -- you know,

1   Mr. McKoon interrupted my closing to say, well, we could have

2   called any witness we want.  Fair enough.  They could have

3   called any witness they want, and they've got the burden of

4   proof on this.  The city manager's letter, he sent copies to the

5   city council, to the city attorney, to personnel, to file.  He

6   didn't send one copy to any firefighter in Phenix City, and yet

7   somehow that also is an excuse to deprive this man of his

8   freedom of speech.

9           Now, in addition to access to the media -- and they've

10  provided you no evidence that that's permissible; they wrote up

11  people, said they wouldn't tolerate it.  And the policy that

12  they say, you know, provides for it doesn't say anything about

13  the media.  There's going to be a question before you about

14  access to the city council.  Would there be access to the city

15  council or city council members had Mr. Davis gone through the

16  chain of command?

17          And you've got, you know, good old ASOP 12.  And ASOP

18  12, you know, says you have to go through this step and then you

19  go through this step.  Then it has this phrase, then the city

20  manager will arrange a hearing with the council.  Now, that's a

21  pretty vague phrase.  What does that mean?  The city manager

22  will arrange a hearing with the council.  Well, we don't have to

23  guess what that means because Chief Hunter along with

24  Mr. Roberts explained what that meant.  Remember I had a long

25  conversation with the chief about --

1          That's Mr. Roberts.  I'm sorry.  Let's get the right

2    one in front of you.

3          We had this conversation with Chief Roberts about

4    contact with the city council.  And this is, you know, an

5    excerpt of his deposition transcript that he said was the truth

6    when he gave it under oath.  And here he was very clear about

7    whether firefighters have a right to get to the council without

8    prior approval.  It's -- he said ASOP 12 concerns getting to the

9    council as a body.  This was written in '98 -- I'm not sure why

10   he said that -- but I guess is trying to get there, the body,

11   which is a place you would never get because it stops at the

12   city manager.  A place you would never get because it stops at

13   the city manager.

14         Chief Hunter told you, in essence -- you know, I asked

15   him; I didn't expect he'd agree with me.  I said, is this one of

16   those never-say-never situations that "never" doesn't really

17   mean what you say?  When I asked him if it was a never-say-never

18   situation, he kind of agreed with me on that.  And then we find

19   out that "stop" doesn't necessarily mean stop.  "Stop"

20   apparently means slow down.  But there's no way of reconciling

21   that answer if you use your common sense.  There's no way of

22   rationalizing or connecting that answer to what they're telling

23   you now, that there's a right to get to the council.

24         And, you know, what about Mr. Roberts?  Mr. Roberts is

25   the one that's supposed to arrange this hearing, this vague --

1    arrange this hearing.  This is what Mr. Roberts says that

2    means.  They can come through the -- to the council through

3    proper procedures.  And I think that proper procedure goes

4    through the chain of command.  Then he says:  If we cannot

5    correct it, then we -- ultimately, if I feel that it needs to

6    get to the council, then I will get it to them.

7              And then:  So you, as city manager, will raise the

8    concerns.  Interesting question.  It doesn't say you, as city

9    manager, will arrange for David Davis to get to the council.  It

10   says so you, as city manager, will raise the concerns.  He

11   says:  Yes.  The bottom line, even on a work session or whatever

12   comes before the council or whomever.  It's a very structured

13   form of government.

14             The defendant has the burden of proof of establishing

15   that under their policies and procedures, Mr. Davis could have

16   gotten to the city council or individual council members by

17   going through the chain of command.  The document, ASOP 12, is

18   vague, at best.  Chief Hunter, Mr. Roberts, when they were

19   deposed back in April of '07, they both said that's a place you

20   don't get to because it stops at the city manager.  Suddenly now

21   "stop" doesn't mean stop.

22             Now, there's a reference that I guess we need to

23   discuss because it was brought up, and it's kind of been an

24   important issue in the case.  And that's the issue of the

25   mayor's open-door policy.  Now, the mayor admitted that he had

1    an open-door policy, so that's not an issue in dispute anymore.

2        Yesterday -- did you notice?  This was something really

3    interesting.  Yesterday the defense put a witness on the stand

4    to tell you that the gentleman who had his retirement party that

5    the mayor spoke at, that he retired back in 2004.  And they just

6    left it at that.  Now, why did they do that?  They wanted to

7    leave in your mind the impression that this couldn't have

8    happened for -- after the mayor was elected and that everybody

9    who stood up here and talked about it wasn't telling you the

10   truth.  That's why they left that fact out there.

11       But what did you learn today?  It's been stipulated by

12   the parties that that retirement dinner or meeting occurred in

13   January 2005, back when the mayor was in office.  They were

14   trying to get one over on you on that, make you believe that it

15   couldn't have happened when the witnesses said it happened.  But

16   now you know and have to accept as a stipulated fact that it did

17   happen after the mayor got into office, just like the witnesses

18   that we put on told you.

19       Now, in a -- there's this issue that we need to address

20   concerning prior discipline, if we want to call it discipline.

21   And Mr. McKoon and Chief Hunter went through the lists on that

22   document and section.  You know, they even included the "give me

23   25 push-ups."  That doesn't sound like such a horrible thing to

24   me; but apparently, the department can't run if somebody, in

25   jest, says give me 25.  But they talk about all of these things,

1    and yet they're trying to paint a picture that they didn't do
2    this because of the phone call.
3            The Court is going to instruct you otherwise.  The
4    Court is going to instruct you that the phone call was a
5    substantial or motivating factor.  It doesn't have to be the
6    only factor, but it was a substantial or motivating factor.  And
7    it's not just the Court that's telling you that.  Chief Hunter
8    testified -- Chief Hunter testified that the second group II
9    offense that Mr. Davis was charged with was the phone call to
10   the mayor.  Chief Hunter testified that the first group III
11   offense that Mr. Davis was charged with was the phone call to
12   the mayor.  And yesterday, the last witness that they put on,
13   Chief Waters, very candidly admitted that if David had not --
14   excuse me -- Mr. Davis had not phoned the mayor on April 17th,
15   2006, he wouldn't have been fired.  And that's just a basic fact
16   of this case.  They may not like it, they may not be comfortable
17   with it, but that's a basic fact of the case.
18           Now, in looking for the reasons for the termination, I
19   think here's something that you should also keep in mind when
20   judging the credibility of the various witnesses and deciding
21   for yourself what really happened.  I'm sure you picked up on
22   this, but it's kind of an interesting thing I've never seen in
23   one of these cases.
24           Chief Hunter got up there and told you -- and it makes
25   perfect sense -- he recommends termination.  He doesn't approve

1    termination.  And he told you with respect to Mr. Davis that he

2    recommended Mr. Davis's termination, but chief -- City Manager

3    Roberts was the one who approved it prior to Mr. Davis being

4    terminated.  So he pointed the finger at the city manager, which

5    kind of made sense to me.  But then the city manager gets on the

6    stand; and he said, I didn't approve the termination until after

7    the appeal board hearing.  I delegated that discretion to my

8    department heads.

9         So what are you left with as a jury trying to figure

10   out what really happened here?  Chief Hunter told you he didn't

11   terminate David Davis.  City Manager Roberts told you that he

12   didn't terminate David Davis.  Who did?  We don't know.  But we

13   know he was terminated, and nobody on that side seems to want to

14   take the blame for it anymore.

15        When they talk about taking responsibility, let's talk

16   about responsibility for their actions.  Responsibility for

17   their actions in the scope of this lawsuit brings us to the

18   issue of damages.  And the damages in this case, as was

19   mentioned during the trial, have been stipulated with respect to

20   actual out-of-pocket damages, and it's $3756.88.  And as

21   Mr. Davis told you, this case wasn't about $3700.  That's not

22   what the case is about.  The case is about for calling the mayor

23   on his own free time, this man lost not just his job, he lost

24   his career for calling the mayor and he suffered greatly for it.

25        You've heard him testify how much his career meant to

1   him in this department, that this was the department that he

2   always wanted to work in.  This is the area where he grew up.

3   These are the people that he wanted to serve and did serve for

4   over eight years.  This man was crushed when he lost that, when

5   it was taken away from him for doing something that he thought

6   he had the right to do.  Responsibility for that action is

7   something that should lay squarely at the feet of the city on

8   this.

9           Now, $3700?  Why was that the case?  Because Mr. Davis

10  went out and got not just one, but got two full-time jobs to try

11  to make up financially what he lost and support his family.  And

12  it required him to work these two jobs, 106 hours, an average of

13  106 hours in a week.  Now, I don't know about any of you, but

14  106 hours a week, that's a lot hours.  And I don't care if

15  there's, you know, an ability to sleep once in a while at night

16  when you're not on a run for a call.  That's 106 hours away from

17  home.  It's impacted him.  It's worn him out.  And both his

18  grandmother and his wife testified it's impacted the family.

19  How could it not?  They see him suffer.  You have loved ones.

20  Is it any surprise that Brenda Davis said it hurts her to watch

21  him hurt?  Should anyone be surprised by that?

22          So we get to the point that's probably the least

23  comfortable part of the whole thing; and that's where, you know,

24  I have to suggest to you what damages amount would be

25  appropriate for Mr. Davis.  Now, the Judge will instruct you on

1    the law on this.  And that's where your instructions will come

2    from, and those are the instructions you'll need to follow.  And

3    the Judge will instruct you that in addition to out-of-pocket

4    expenses for lost income and such, that if you find it

5    appropriate, you as the jury can compensate Mr. Davis for the

6    emotional pain and suffering and anguish that he suffered

7    because they took his career away from him.

8         Now, the amount of money that you would award him for

9    that, how do you figure that out?  You know, there's no formula

10   for it.  I can't stand up here with a chart and tell you what's

11   compensation for pain and anguish.  All I can do is this.  What

12   we ask is that you consider awarding Mr. Davis $500,000 for pain

13   and suffering and the anguish he went through and that you've

14   heard on the stand.  But ultimately, that judgment is left up to

15   you.  And it's going to be in your discretion to determine the

16   amount that you would think is appropriate if you find that

17   Mr. Davis is entitled to damages.

18        And we trust that when you get to that stage and it's

19   time to consider, that you're going to follow the Judge's

20   rules.  You're going to remember what Mr. Davis said as well as

21   his wife and his grandmother, and you'll come up with a number

22   that you believe is right.  And that's what the Court is going

23   to ask you to do, and that's what we ask you to do.

24        Thank you very much for your time.

25        THE COURT:  Let's take a brief recess before we

1    conclude closing arguments and I instruct you on the law.  We'll

2    take ten minutes.  Don't begin discussing the case yet.  We'll

3    take a ten-minute recess and we'll start back at 25 minutes till

4    three.

5        (Jury out at 2:24 p.m.)

6            THE COURT:  Court is in recess.

7        (Recess at 2:24 p.m. until 2:36 p.m.)

8        (Chambers conference held off the record, after which

9          proceedings reconvened in open court with the jury present,

10         as follows:)

11           THE CLERK:  Court is in session.  You may be seated.

12           THE COURT:  Mr. McKoon.

13           MR. MCKOON:  Thank you, Your Honor.  Ladies and

14    gentlemen, I promise I won't be too long this time.  This is my

15    time to respond to some of the things that were said by

16    Mr. Steele, and I intend to do that.

17           I thought that when the plaintiff took the witness

18    stand in this case, there were two things that I remember very

19    clearly.  One was the only reason I was fired was because I made

20    a phone call to the mayor.  I believe that's what his testimony

21    was.  I believe that's what you were told in opening statement.

22    Now, if you remember that different, then that's fine.  But I

23    believe that's what the testimony was.

24           That was not the only reason, and we've gone over those

25    reasons with you.  Substantial motivating factor, that's fine.

1    That was not the only reason.  And had it been the only thing he

2    had done, like I told you earlier, it wouldn't have resulted in

3    a termination.  It's kind of like your driver's license, you

4    know?  Once you get over 12 points, you lose it.  You get chance

5    and chance and chance and then, boom, that's it.  Now, how many

6    more chances is he supposed to get?

7           I also thought the plaintiff said, all I want is my job

8    back.  Do y'all remember that?  All I want is my job back.

9    Apparently he wants a half a million dollars.  That's what he

10   says he wants now.  For what?  Where is his damages?  He took a

11   job at Care Ambulance making more per hour than he was making at

12   the fire department.  He claims he works all these hours every

13   week.  And like I told you, I'm not denigrating the job, but a

14   lot of this job on both counts is sleeping and eating and

15   hanging around.  It really is.  And I hate to say that, but it's

16   a fact.  And so, you know, that's just the way it is.

17          And, you know, like I said, I'm kind of a bottom-line

18   person.  When he said, oh, Mr. McKoon used these buzz words like

19   "Nazi" and all, what's the implication here?  What's the

20   implication here?  Don't imply stuff; just tell me the facts,

21   you know?

22          Just like you're going to bring in three witnesses and

23   call me like I'm doing something unfair to people.  Just call me

24   a crook.  And so I -- that's the reason I asked that question.

25   Mr. Pitts, do you think I'm a crook?  Object.  No.  No.  No,

1  sir, I don't think that.  You've been fair with me.  You've been

2  fair with everybody in here.

3        Wallace Hunter has been fair with all of these folks

4  every time.  They came in here with three witnesses from the

5  fire department to testify, supposedly, about one thing.  And

6  the one thing was to say that the mayor had an open-door

7  policy.  We spent about an hour and a half, two hours, listening

8  to those people.  The mayor had just left the witness stand

9  saying the same thing.  What did they add to that?  What was the

10  real purpose of calling those folks?

11        I've got two young lawyers sitting over here.  One of

12  them is my son and the other one is a boy I've known since he

13  was five years old.  And I hope they'll learn something from me

14  and the way I conduct myself, and I don't like being slammed by

15  people.  I don't think it's fair, and I don't think it's right.

16        And he can say, oh, the whole fire department will just

17  fall apart because poor Mr. Davis is looking out the window.

18  Well, you know what?  My daddy always taught me to look people

19  in the eye when they talked to me, you know?  The one thing he

20  did teach me was how to work.  I worked in a grocery store when

21  I came up.  We were open seven to nine Monday through Sunday --

22  through Saturday and seven to seven on Sunday, and he took off

23  Christmas.  There is many a day when I look back and think about

24  how hard that was and I think, you know, those were the happiest

25  days of my life.  Because he left me with one thing, and that

1   was work and to respect the people who give you a job.  Because

2   the best thing you can do for a person is give them meaningful

3   work.  That is the very best thing you can do for them.  And if

4   you do that for a person, then the least thing they can do to

5   you is give you some modicum of loyalty, you know, and respect.

6         That's all Wallace Hunter was looking for.  That's all

7   this policy is about.  And we can get lawyers from Washington,

8   D.C., to come down here and ask about merit system and ask about

9   this and take things out of context and put it out and do all

10   that.  You shouldn't have to have a law degree to fire

11   somebody.  It shouldn't be like that, but that's what we've come

12   to in America now.  Want to wrap up in the First Amendment when

13   basically you're going around being a bully to people and

14   threatening them and undermining them every chance you get?

15         He wants to talk about disruption.  Look at -- look at

16   that -- look at that newspaper article.  Read the whole thing

17   from beginning to end.  Chief Hunter had no -- no opportunity to

18   do anything except respond to a newspaper article; reporters

19   calling up, oh, we met with some of your firefighters.  And let

20   me tell you what.  There's a newspaper reporter sitting out here

21   today taking all this down.  He's probably hoping we're going to

22   lose because he can sell more newspapers.  That's just a fact.

23   So you want to talk about using terms like "Nazi" and "crook"

24   and that kind of stuff?  Let's just -- let's just lay it out

25   there.  Don't slide around and imply stuff.

1         Mr. Woodley was the guy who asked all these questions.

2    I didn't know these lawyers till this week, but I know them now.

3         Now, I'm fixing to get back to this just a minute.  And

4    I apologize if I got a little emotional about that, but -- but,

5    you know, I'm going to tell you something.  There's a word

6    that's -- you know, there's this movie out -- and I didn't go

7    see it, but I did read the book -- called *No Country For Old*

8    *Men*.  I don't like to watch violent stuff.  And sometimes I look

9    around in the country and I think, this ain't no country for me

10   anymore because people are not doing like they're supposed to be

11   doing anymore.  You know, people don't think about, you know,

12   you've got to work hard.  I try to hire some people sometimes,

13   and they don't have enough sense to answer the telephone.

14   Nobody's taught them anything.  They don't know how to respect

15   people, how to dress, how to do anything.

16        You know, you say, well, what's that got to do with all

17   this?  What it has to do with is this real simple fact.  If

18   somebody's going to give you a job and give you a task and

19   you're going to do it, then do it with this word, honor.

20   Remember that word?  H-O-N-O-R.  Be an honorable person.  Be an

21   up-front person.  You know, if Mr. Davis doesn't like something,

22   come to the person he's got the problem with and talk to them

23   about it.  Don't go over and whisper it to somebody else and

24   whisper it to somebody else.

25        And let me tell you something.  If you go through that

1   Exhibit #4 and you look at that stuff, you will see that some of

2   his own members of the union are misled about that meeting.

3   They went out there expecting a union meeting, and some of them

4   didn't even know a reporter was going to be there.  And the

5   other ones, the purpose of a meeting was told to them, so we can

6   talk to the newspaper.  Now, that's just being dishonest, in my

7   opinion.  That's all that is, all that is.  And I don't think

8   people ought to be rewarded for bad behavior and dishonesty.  I

9   don't think so.

10          This stuff about he's lost his career.  He's a

11  firefighter for the Opelika Fire Department.  Is that not a

12  career?  Is there something wrong with that career?  It's the

13  same career he had.  Say, well, oh, now I'm not as far up in

14  rank and all that.  Well, whose fault is that, you know?

15          The question that you're going to have is have the

16  defendants -- that the defendants have proved that the

17  plaintiff's telephone call to Mayor Hardin was a violation of

18  ASOP 12.  Okay.  Well, it's just real, real simple.  If you go

19  up ASOP 12 and just look at it -- and you've looked at it ad

20  nauseam now till you're probably sick of it.  But if you look at

21  this, it just says if it finds -- a member of the fire

22  department finds it necessary to go outside the fire

23  department -- that means to anybody; that means to the media, to

24  the Legislature, to anybody outside the fire department -- he's

25  got to come up the chain of command.  It's just that simple.

1          Mr. Davis never did any of this.  He never did any of

2    this.  He never complied with this.  And he's got excuse after

3    excuse as to why he didn't do it, but the truth of the matter is

4    it's just excuses.  When people do the kind of things he does on

5    a systematic basis, what it is, it's -- oh, the 25 push-ups;

6    that's not a big deal.  That's telling somebody to do

7    something.  Bullying around Brannon Wilkinson, trying to get him

8    to come in with him; that -- that's not a big deal.  Showing

9    disrespect to a superior officer and threatening them and

10   abusing them; that's not a big deal.  That's not going to ruin

11   the fire department.  Not following the chain of command; that's

12   not a big deal.  That's not going to ruin the fire department.

13   Well, I don't need a lawyer from Washington, D.C., to come down

14   here and tell the Phenix City people how to run the fire

15   department, you know?  You can't work with people like that.

16   You just can't do it.

17          And I don't know -- you know, let me just tell you

18   something.  This is an important case.  This case has worried

19   me.  And the reason it's worried me is this, is because if you

20   find a verdict in his favor in this case, it's going to be like

21   injecting a cancer cell back into that department.  All three of

22   those people who came in here and said what they had to say

23   about the department, every one of them said, well, the

24   department is doing good now.  Do you think that's a

25   coincidence?  Do you think that's a coincidence?  Of course it

1   isn't.

2         This is an important case.  And you're important

3   people, because not everybody you could put on a jury would be

4   smart enough to go through these questions and answer them.  Not

5   everybody you put on a jury would be smart enough to understand

6   this situation.  I don't know how much -- you know, I look

7   around here and look at the ages of people and look at your

8   particular experiences and all you've done.  And I've got to say

9   to myself, there's probably, what, 300 years of experience

10  between you of some kind.  Most of you have had a work life

11  somewhere.  You've had to answer to superiors.  You've had

12  people working under you.  You know how it is when you've got

13  somebody that's an irritant all the time, that's trying to

14  disrupt things.  You can't always put your finger right on it,

15  you know, but they're doing it.  And they're not going to be

16  happy until they keep everybody else miserable.

17         Look at what his own people had to say.  Read that --

18  read through that #4 there.  And he wants to talk about them not

19  coming up here?  They could have subpoenaed anybody they wanted

20  to to come in here.  But you know what?  I was very happy with

21  what they said.  All they did was tell the truth.  They wrote it

22  out.  What more do you want them to do?

23         So I want you to look at these questions.  And here's

24  what I'm going to urge you to do.  I'm going to urge you to do

25  this.  If you want to, take that newspaper article and read

1    every bit of it.  You decide whether that newspaper article was

2    disruptive or not.  You decide that, okay?  Look at those things

3    in Exhibit #4.  See if that helped the fire department doing

4    what he did.  If you don't think that was disruptive, then I --

5    I need to go somewhere else.  It's no country for me.

6         The second question, that the defendants have proved

7    that under the policies and practices of Phenix City, a

8    firefighter, after exhausting the internal chain of command of

9    the Phenix City Fire Department could speak without obtaining

10   prior permission to the following.

11        Let me tell you one other thing that I forgot and

12   Mr. Graham reminded me of just a minute ago.  And it was

13   testified to; and that is, the media is at every council

14   meeting.  They have a cable TV station broadcast the whole thing

15   every week.  In addition to that, people from the newspaper are

16   there.  Every council meeting.  If you go to the council, you're

17   going to get to the media.  And if you go outside the

18   department, you're going to get to the media.  That's what this

19   is about.

20        Finally -- so your answer to both of the first two

21   questions should be yes.  And the last question is that the

22   defendants have proved the telephone conversation between the

23   plaintiff and Mayor Hardin concerning the proposed ordinance to

24   extend probationary period for new firefighters disrupted or

25   impeded the operations of the Phenix City Fire Department or had

1    a reasonable likelihood of disrupting it.  We don't have to

2    prove that it disrupted it, but that it would have or had a

3    likelihood to do it.

4         Now, what happened here was the fire chief comes in and

5    finds out this is happening.  And it's like, here we go again.

6    Here we go again.  Here we go again with Mr. Davis, going around

7    me again, not giving me a chance.  David has had chance after

8    chance after chance, Mr. Davis has.  He's not had one chance

9    (indicating Mr. Hunter).  He was asked, what kind of

10   relationship did he have with the fire chief?  None.  And yet

11   the folks that came in here said he's a fair guy.  He's a fair

12   guy.

13        So the bottom line on all of it is this.  I honestly

14   and truly believe this is one of the most important cases I've

15   ever handled in my life.  And I -- and I earnestly implore you

16   to go back and answer these first three questions all yes and

17   let us go home.  Let him go back to what he's doing now and let

18   us go back to keep -- having a good fire department, because

19   we're not trying to keep anybody from speaking.  All we want

20   them to do is talk to the people in charge first.

21        And we said that, like I said, on April the 20th,

22   2006.  It's been in the policy.  I don't know what else to do.

23   We're not perfect.  You know, we're not perfect.  I mean we've

24   got -- we've probably got forms we could fill out better, things

25   we could do different, all that kind of stuff, you know.  I

 1    don't know what else we could do, but there's nothing ever

 2    perfect.  If you find a perfect organization, I hope you'll join

 3    it.

 4            That's all I've really got to say.  This stuff about

 5    damages, I mean I don't get it.  You know, you come in here and

 6    say, well, I want my job back.  I want my $3800.  Oh, and in

 7    addition, throw me in a half million dollars, you know.  The

 8    lottery.  Thank y'all.

 9            THE COURT:  All right.  Members of the jury, under our

10    procedure, the plaintiff's lawyer has an opportunity to speak to

11    you one last time, but it's limited to nothing more than the

12    issue of damages.  He's not going to be allowed -- he knows

13    this -- the procedures won't allow him to respond to any of the

14    things that the defendants' lawyer just argued to you about

15    answering the questions or anything.  So don't take the fact

16    that he doesn't answer to those -- respond to those things to

17    mean he agrees with it.  He's restricted to speaking only on the

18    issue of damages, and he'll now have that opportunity to do so.

19            Mr. Steele.

20            MR. STEELE:  Thank you, Your Honor.

21            On this issue of damages, there's an important thing

22    for you to consider when you enter that jury room.  You should

23    remember what Mr. McKoon stood up here and said.  He only said

24    he wanted his job back; now he's looking for money.  That

25    probably left a question in your mind.

1          But when you go into that jury room and you see the

2     instructions the Judge is going to give you and you look at the

3     questions the Judge will ask you to answer, you'll learn that

4     you don't have the power, unfortunately, as a jury -- you don't

5     have the power to give him his job back.  That's not within your

6     authority.  Mr. McKoon didn't tell you that.  He wanted you to

7     believe that somehow we weren't interested in his job.  Of

8     course we're interested in his job.  You, as a jury, are not in

9     a position to give that to us.

10         Now, in addition to that, somehow -- I'm not sure how

11    this works out, but somehow the damages that Mr. Davis is

12    entitled to are supposed to be reduced because I work in

13    Washington, D.C.  Now, I don't think for a minute that any of

14    you are going to be fooled by that; but in case any of you want

15    to know, I grew up in a small town called Baldwinsville, New

16    York, a suburb of Syracuse.  Is that relevant to the case?  It's

17    not.  It's not any more relevant to the case than the movie that

18    Mr. McKoon knows about or the fine associates that he has

19    working for him.  What's relevant here is that you now have in

20    your hands a chance to do justice by awarding damages to

21    Mr. Davis in an amount that you feel is appropriate.

22         You know, there's a phrase that probably you should

23    keep in mind when you're thinking about how Mr. Davis was

24    harmed.  You heard this phrase come from Mr. McKoon several

25    times this week.  And it was, lawsuits come and go; lawsuits

1    come and go, but careers matter.  Well, Mr. Davis's career

2    mattered to him in Phenix City, and he told you how hurt he was

3    to lose it when he didn't think he did anything wrong.

4          Now, I'm not going to talk about -- any more about the

5    amount of damages.  We talked about that already.  And the

6    instructions are going to tell you as a group to consider all

7    the facts, to consider your common knowledge, and to award an

8    amount that you feel is right.  And that's all we can ask of

9    anybody.  We trust in you to do the right thing.  Thank you very

10   much.

11         THE COURT:  All right.  Ladies and gentlemen, I'm going

12   to instruct you on the law at this time.  And it's in writing so

13   that you'll have something to take back to the jury room with

14   you, and I'll send this back with you.  But I'll ask you to

15   listen carefully as I instruct you on the matters of law.

16         Now that you've heard all the evidence and argument on

17   behalf of the parties, it becomes my duty to give you the

18   instructions of the Court concerning the law applicable to this

19   case.  It is your duty to follow the law whether or not you

20   agree with it.  It is then your duty to determine the facts and

21   apply the law to those facts.

22         In deciding the facts of this case, you must not be

23   swayed by prejudice or favor as to any party.  Our system of law

24   does not permit jurors to be governed by prejudice or sympathy

25   or public opinion.

1            The fact that a governmental entity is involved as a

2   party must not affect your decision in any way.  A governmental

3   entity and all other persons stand equal before the law and must

4   be dealt with as equals in a court of justice.  When a

5   governmental entity is involved, of course, it may act only

6   through people as its employees or officials.  And in general, a

7   governmental agency is responsible under the law for any of the

8   acts and statements of its employees or officials that are made

9   within the scope of their duties as employees or officials of

10  that governmental agency.

11          All the parties and the public expect that you will

12  carefully and impartially consider all the evidence in this

13  case, follow the law as stated by the Court, and reach a just

14  verdict, according to the evidence and the law.  This was the

15  oath you took and the promise you gave when you were selected as

16  jurors.  When you are true to this oath, you move us closer to

17  our ideal of equal justice under law, closer to our aim to make

18  the courthouse a temple of justice.

19          As stated earlier, it is your duty to determine the

20  facts.  And in so doing, you must consider only the evidence

21  that has been admitted in the case.  The term "evidence"

22  includes the sworn testimony of the witnesses, stipulations of

23  the parties, and the exhibits admitted in the record.  As you

24  consider the evidence, both direct and circumstantial, you may

25  make deductions and reach conclusions which reason and common

1  sense lead you to make.

2          Direct evidence is the testimony of one who asserts

3  actual knowledge of a fact, such as an eyewitness.

4  Circumstantial evidence is proof of a chain of facts and

5  circumstances tending to prove or disprove any fact in dispute.

6  The law makes no distinction between the weight you may give to

7  either direct or circumstantial evidence.

8          Remember that any statements, objections, or arguments

9  made by the lawyers or by any party while not under oath are not

10  evidence in the case.  It is your own recollection and

11  interpretation of the evidence that controls in the case.  What

12  the lawyers say is not binding upon you.  And except for my

13  instructions to you on the law, you should disregard anything

14  that I may have said during the trial in arriving at your

15  decision as to the facts.

16          Now, in saying that you must consider all the evidence,

17  I do not mean that you must accept all the evidence as true or

18  accurate.  You should decide whether you believe what each

19  witness had to say and how important that testimony was.  In

20  making that decision, you may believe or disbelieve any witness

21  in whole or in part.  Also, the number of witnesses testifying

22  concerning any particular dispute is not controlling.

23          In deciding whether you believe any witness, I suggest

24  that you ask yourself a few questions.  Did the witness impress

25  you as one who was telling the truth?  Did the witness have any

1    reason not to tell the truth?  Did the witness have any personal

2    interest in the outcome of the case?  Did the witness seem to

3    have a good memory?  Did the witness have the opportunity and

4    ability to observe accurately the things he or she testified

5    about?  Did the witness appear to understand the questions

6    clearly and answer them directly?  Did the witness's testimony

7    differ from other testimony or evidence?  You may accept or

8    reject the testimony of any witness in whole or in part.

9         You should ask yourself whether there was evidence

10   tending to prove that the witness testified falsely concerning

11   some important fact or whether there was evidence that at some

12   other time the witness said or did something or failed to say or

13   do something which was different from the testimony the witness

14   gave before you during the trial.

15        You should keep in mind, of course, that a simple

16   mistake by a witness does not necessarily mean that the witness

17   was not telling the truth as he or she remembered it because

18   people naturally tend to forget some things and remember other

19   things inaccurately.  So if a witness has made a misstatement,

20   you need to consider whether that misstatement was simply an

21   innocent lapse of memory or an intentional falsehood.  And the

22   significance of that may depend on whether it has to do with an

23   important fact or only an unimportant detail.

24        In a civil action such as this, the plaintiff has the

25   burden of proving every essential element of his claim by a

1    preponderance of the evidence; and the defendants have the

2    burden of proving every essential element of their affirmative

3    defenses by a preponderance of the evidence.  This is sometimes

4    called the burden of proof or the burden of persuasion.

5         A preponderance of the evidence simply means an amount

6    of evidence that is enough to persuade you that the claim or

7    defense is more likely true than not true.  In deciding whether

8    any fact has been proved by a preponderance of the evidence, you

9    may consider the testimony of all the witnesses regardless of

10   who may have called them and all the exhibits received in

11   evidence regardless of who may have produced them.

12        Up until this point, I've been stating general

13   principles of law which apply to any civil jury trial.  I'll now

14   instruct you on the law that is particularly applicable to this

15   case.  This involves a claim of a constitutional violation.

16   This is the constitutional violation asserted by the plaintiff.

17   In this case, the plaintiff, David Davis, claims that the

18   defendants, Phenix City, Alabama, and H. H. Roberts and Wallace

19   Hunter in their official capacities as city manager and fire

20   chief, respectively, intentionally deprived the plaintiff of his

21   rights of free speech under the Constitution of the United

22   States.  The law provides that a person may sue in this court

23   for an award of money damages against anyone who, under color of

24   any state law or custom, intentionally violates the plaintiff's

25   rights under the Constitution of the United States.  In this

1   case, the parties have stipulated or agreed that the defendants

2   acted under color of state law, and you should, therefore,

3   accept that fact as proved.

4        The plaintiff claims that the defendants intentionally

5   violated the plaintiff's constitutional right to freedom of

6   speech by terminating him when he directly contacted Mayor

7   Hardin about a proposed city ordinance which would extend the

8   probationary period for new hires in the fire department.  The

9   plaintiff contends that this violated his right of free speech

10  under the First Amendment to the Constitution of the United

11  States.  The defendants deny that they violated the plaintiff's

12  rights in any way and assert that the plaintiff could have used

13  less disruptive channels through the chain of command in

14  accordance with city and departmental policy.

15       This is the -- what the plaintiff claims in his First

16  Amendment free speech claim.  Under the First Amendment to the

17  Constitution of the United States, every public employee has the

18  right to freedom of speech addressing issues of public concern.

19  In this case, the plaintiff contacted Mayor Hardin concerning a

20  proposal to extend the probationary period for new firefighters

21  from one year to 18 months.  You are instructed that this speech

22  activity by the plaintiff was on a matter of public concern.

23       Also, the evidence establishes that the fact that the

24  plaintiff made contact with Mayor Hardin was a substantial or

25  motivating factor in his being terminated.  So you need not --

 1   those two things are not an issue in the case for you to decide.

 2   Generally, a public employee cannot legally be terminated from

 3   employment if his exercise of First Amendment rights in

 4   discussing the subject of public concern was a substantial or

 5   motivating factor, even if there were other reasons that played

 6   a part in his being terminated.

 7        But now, the defendants have defenses to that.  And as

 8   a defense to this claim, they say that because the plaintiff was

 9   a firefighter, the Phenix City merit system rules and the fire

10   department administrative standard operating procedures properly

11   placed a restriction on his speech that does not apply to

12   average public employees; that is, a requirement that the

13   plaintiff first go through an internal chain of command before

14   speaking outside the fire department.  What I'm telling you now

15   are in the nature of affirmative defenses, claims that the

16   defendants make that they have the burden of proof on.

17        It's the defendants' further contention, however, that

18   under the Phenix City merit system rules and Phenix City Fire

19   Department's administrative standard operating procedures, the

20   plaintiff could speak to the city council, to the mayor and

21   council members individually, and to the media without obtaining

22   the defendants' permission about the proposal to extend the

23   probationary period for new firefighters if he had first

24   exhausted the internal chain of command, but that the plaintiff

25   failed to do so.  And the defendants say that the plaintiff's

1    speaking to Mayor Hardin about this when he did was a violation

2    of what's been referred to as ASOP 12.

3         Therefore, you're going to be asked to answer several

4    questions when you retire to the jury room on these issues.

5    This will be called special interrogatories to the jury; but in

6    effect, this will be your verdict.  I'm going to ask the clerk

7    to pass out to you, each of you, copies of this form that you'll

8    have, and then I'm going to talk to you about how this operates

9    on what you're to decide.

10    (Brief pause)

11         THE COURT:  Now, these questions on the first page have

12    to do with the defendants' affirmative defenses, which they have

13    the burden of proving by a preponderance of the evidence.  So

14    each of these questions -- and I'm going through each one of

15    them with you.  Each one of them is prefaced by the question, Do

16    you find by a preponderance of the evidence.  And I explained to

17    you what that meant.

18         All right.  First, do you find by a preponderance of

19    the evidence that the defendants have proved that the

20    plaintiff's telephone call to Mayor Hardin was a violation of

21    ASOP 12?  You answer that question yes or no.

22         Then you go to question two.  And question two would

23    be:  Do you find by a preponderance of the evidence that the

24    defendants have proved that under the policies and practices of

25    Phenix City, a firefighter, after exhausting the internal chain

1  of command in the Phenix City Fire Department, could speak

2  without obtaining prior permission to the following?  And you

3  answer that as to each of three different things.  First, to the

4  city council, yes or no; second, to Mayor Hardin or other city

5  council members individually, you answer yes or no; and third,

6  to the media, you answer yes or no.

7         Then you go to question three.  And that is:  Do you

8  find by a preponderance of the evidence that the defendants have

9  proved that the telephone conversation between the plaintiff and

10 Mayor Hardin concerning the proposed ordinance to extend the

11 probationary period for new firefighters disrupted or impeded

12 the operation of the Phenix City Fire Department or had a

13 reasonable likelihood of disrupting or impeding the operations

14 of the Phenix City Fire Department?  And you answer that yes or

15 no.

16         Now, at the top of the second page, this has another

17 one.  It says if you answered yes to all of those questions on

18 the first page, then you need not go to question four.  If

19 everything on the first page has been answered yes, you go on --

20 you're through.  You go down and have your foreperson sign it

21 and date it, and we'll have you return to the courtroom.

22         However, if you did not answer all questions on the

23 first page yes, then you go to question four.  And that is, that

24 the plaintiff has proven by a preponderance of the evidence that

25 he suffered damages as a result of the defendants' actions in

1  discharging the plaintiff from his employment with the Phenix

2  City Fire Department.  Yes or no.  If you answer that yes, then

3  you go to question number three, which says in what amount.  And

4  I'll talk to you about that in just a moment.

5       Before getting to that, I want to explain to you the

6  law on damages.  And if you answer the questions in the manner I

7  just discussed with you so that you're called on to address the

8  plaintiff's damages, then you must decide the issue of

9  plaintiff's damages.  And I'll now instruct you on the law of

10 damages.

11      For damages to be the proximate or legal result of

12 wrongful conduct, it must be shown that except for such conduct,

13 the damages would not have occurred.  In considering the issue

14 of the plaintiff's damages, you are instructed that you should

15 assess the amount you find to be justified by a preponderance of

16 the evidence as full, just, and reasonable compensation for all

17 of the plaintiff's damages, no more, no less.

18      Compensatory damages are not allowed as a punishment

19 and must not be imposed or increased to penalize a defendant.

20 Also, compensatory damages must not be based on speculation or

21 guesswork, because it is only actual damages that are

22 recoverable.

23      On the other hand, compensatory damages are not

24 restricted to actual loss of time or money.  They cover both the

25 mental and physical aspects of the injury, tangible and

1    intangible.  Thus, no evidence of the value of such intangible

2    things as emotional pain and mental anguish has been or need to

3    be introduced.  In that respect, it is not value we're trying to

4    determine, but an amount that will fairly compensate the

5    plaintiff for all those claims of damages.  There's no exact

6    standard for fixing the compensation to be awarded on account of

7    such elements of damages.  Any such award should be fair and

8    just in the light of the evidence.

9         So if you determine that there were damages and damages

10   are to be awarded, you should consider the following elements of

11   damage to the extent you find them proved by a preponderance of

12   the evidence and no others.  There are two elements of damage

13   that you may then consider, net loss of wages and benefits and

14   emotional pain and mental anguish.

15        Now, as to net lost wages and benefits to the date of

16   trial, the parties have agreed that if the plaintiff is entitled

17   to damages, that this amount of net lost wages and benefits

18   would amount to $3,756.88.  And there's a stipulation before

19   you.  So you would put that amount in the blank if you find that

20   damages should be awarded.  The next blank is emotional pain and

21   mental anguish.  You should fill in the blank with an amount

22   that you all agree to if you find that such damages should be

23   awarded.

24        Of course, the fact that I've given you instructions

25   concerning the issue of plaintiff's damages should not be

1    interpreted in any way as an indication of how I believe you

2    should answer the questions in the special interrogatories to

3    the jury.

4         Now, in conclusion, any verdict you reach in the jury

5    room must be unanimous.  In other words, to return a verdict,

6    you must all agree.  Your deliberations will be secret.  You

7    will never have to explain your verdict to anyone.

8         It is your duty as jurors to discuss the case with one

9    another in an effort to reach agreement, if you can do so.  Each

10   of you must decide the case for yourself, but only after a full

11   consideration of the evidence with the other members of the

12   jury.  While you're discussing the case, do not hesitate to

13   reexamine your own opinion and change your mind if you become

14   convinced that you were wrong.  But do not give up your honest

15   beliefs solely because the others think differently or merely to

16   get the case over with.  Remember that in a very real way, you

17   are judges, judges of the facts.  Your only interest is to seek

18   the truth from the evidence in this case.

19        Upon retiring to the jury room, you first select one of

20   your number to act as your foreperson, and that person will

21   preside over your deliberations in the jury room and speak for

22   you here in court.  You will take the special interrogatories to

23   the jury room with you.  And when you've reached a unanimous

24   agreement as to each interrogatory or question that you're

25   called upon to answer, you will have your foreperson fill in the

1  answer.  When you've unanimously agreed on each answer you are

2  called upon to give, you will then have your foreperson date and

3  sign the form, knock on the door, and the clerk -- the marshal

4  will return you to the courtroom.

5       So when you first get back there, you elect a

6  foreperson.  That foreperson will take charge of your

7  deliberations.  Let the foreperson have the verdict form that

8  will be the official verdict form, and the foreperson will have

9  the jury charge that I send back with you.  Also, you can take

10 your notes back with you, and you can also take back your books

11 with the forms of both the plaintiff's and the defendants'

12 exhibits.

13      Now, if during the deliberations you should find it

14 necessary to communicate with the Court -- that is, with me --

15 put your message or question in writing signed by the foreperson

16 and pass the note to the marshal, who will bring it to my

17 attention.  I will respond as promptly as possible, either in

18 writing or by having you return to the courtroom so I can

19 address you orally.  This will have to be done in the presence

20 of the parties and their attorneys.  If you desire to

21 communicate with me, do not indicate any numerical division of

22 the jury.

23      Now, it's proper, I think, for me to add a final

24 caution.  Nothing that I've said in these instructions and

25 nothing that I've said or done during the trial of this case has

1  been done to suggest to you what I think your verdict in the

2  form of your answers to these special interrogatories should

3  be.  What your answers are will be your sole duty and your sole

4  responsibility.

5        Now, at this time, it's necessary for me to talk to the

6  lawyers for just a minute outside of your presence.  Just be at

7  ease there, and we'll be right back.

8     (Bench conference, as follows:)

9        THE COURT:  What says the plaintiff?  What says the

10 plaintiff?  Any objections?

11       MR. STEELE:  No objections, Your Honor.

12       THE COURT:  Defendants?

13       MR. MCKOON:  Satisfied.

14       THE COURT:  Thank you.  All right.

15    (Bench conference concluded)

16       THE COURT:  All right.  Ladies and gentlemen, at this

17 time, you'll be escorted into the jury room to begin your

18 deliberations.

19    (Jury out at 3:17 p.m. to commence deliberations)

20       THE COURT:  Court will be in recess.

21    (Recess at 3:18 p.m. until 4:39 p.m., at which time

22     proceedings reconvened without the jury present, as

23     follows:)

24       THE CLERK:  Court is in session.  You may be seated.

25       THE COURT:  The jury knocked on the door and told the

1  marshal that they needed another jury verdict form because they

2  messed up what they had.  So I'm going to give the -- I'm going

3  to give the courtroom deputy, the clerk, another copy of the

4  special interrogatories and have her deliver that to the jury.

5  Any comment from either side?

6         MR. STEELE:  No objection, Your Honor.

7         MR. MCKOON:  No, sir.

8         THE COURT:  All right.  Ms. Behrman, will you take that

9  to them.

10         We'll be back in recess.  I don't know what that means.

11     (Recess at 4:39 p.m. until 4:43 p.m., at which time

12       proceedings reconvened without the jury present, as

13       follows:)

14         THE CLERK:  Court is in session.  You may be seated.

15         THE COURT:  All right.  The jury has announced that it

16  has a verdict.  Bring the jury in.

17     (Jury in at 4:43 p.m.)

18         THE COURT:  Be seated.  Has the jury reached a verdict?

19         THE FOREPERSON:  We have, Your Honor.

20         THE COURT:  Hand it to the clerk, please.

21         Before I receive the verdict, I want to thank all of

22  you for being here all this week.  We've had some funny weather

23  situations and we've had some delays, and I want to thank you on

24  behalf of our Court and the citizens of the Middle District for

25  serving on the jury this week.

1          Special interrogatories to the jury.  Do you find by a

2  preponderance of the evidence:

3          One, that the defendants have proved that the

4  plaintiff's telephone call to Mayor Hardin was a violation of

5  ASOP 12?  Yes.

6          Two, that the defendants have proved that under the

7  policies and practices of Phenix City, a firefighter, after

8  exhausting the internal chain of command in the Phenix City Fire

9  Department, could speak without obtaining prior permission to

10 the following:  The city council?  Yes.  Mayor Hardin and other

11 city council members individually?  Yes.  The media?  Yes.

12         Three, that the defendants have proved that the

13 telephone conversation between the plaintiff and Mayor Hardin

14 concerning the proposed ordinance to extend the probationary

15 period for new firefighters disrupted or impeded the operations

16 of the Phenix City Fire Department or had a reasonable

17 likelihood of disrupting or impeding the operations of the

18 Phenix City Fire Department?  Yes.

19         Signed by Nadean -- and I'm sorry.  I can't read the

20 last -- Dalton?

21         THE FOREPERSON:  Dalton.  Yes, sir.

22         THE COURT:  -- Dalton, Foreperson, March 6th, 2008.

23         Members of the jury, my question to you is are each of

24 these answers your individual answer?  And I'll go down the

25 line, and answer yes or no.

1          THE FOREPERSON:  Yes, sir.

2          JUROR:  Yes, sir.

3          JUROR:  Yes, sir.

4          JUROR:  Yes, sir.

5          JUROR:  Yes.

6          JUROR:  Yes, sir.

7          JUROR:  Yes.

8          JUROR:  Yes, sir.

9          THE COURT:  I'll enter a judgment in accordance with

10   the factual findings.  And at this time, with our thanks, you're

11   excused.

12      (Jury out at 4:46 p.m.)

13          THE COURT:  Be seated.  Anything for the record before

14   court is adjourned from the plaintiff?

15          MR. STEELE:  No, Your Honor.

16          THE COURT:  Defendants?

17          MR. MCKOON:  No.  No, sir.

18          THE COURT:  I'll enter final judgment in accordance --

19   or consistent with the factual findings determined by the jury.

20   Court is adjourned.

21          MR. MCKOON:  Thank you, Your Honor.

22      (Proceedings concluded at 4:47 p.m.)

23                  * * * * * * * * * *

24

25

1                    COURT REPORTER'S CERTIFICATE

2          I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4          This 16th day of May, 2008.

5

6                                    /s/ Risa L. Entrekin
                                     Registered Diplomate Reporter
7                                    Certified Realtime Reporter
                                     Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25